ROSEN ✧ SABA, LLP

RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
FRANCESCA N. DIOGUARDI, ESQ. (State Bar No. 210212)
fdioguardi@rosensaba.com
LAURA KELLY ST. MARTIN, ESQ. (State Bar No. 260966)
lsmartin@rosensaba.com
9350 Wilshire Boulevard, Suite 250
Beverly Hills, California 90212
Telephone:   (310) 285-1727
Facsimile:   (310) 285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company, <br><br> *Plaintiff*, <br><br> v. <br><br> CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; and DOES 1 through 10, inclusive, <br><br> *Defendants*. | Case No.: <br><br> **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF:** <br> **(1)   RICO (18 U.S.C. §1962(c))** <br> **(2)   Conspiracy to Violate RICO (18 U.S.C. §1962(d))** <br> **(3)   Violation of the Federal Defend Trade Secrets Act (18 U.S.C. §1836 *et seq.*)** <br> **(4)   Breach of Contract – HRT** <br> **(5)   Breach of Contract – SKYE** <br> **(6)   Conversion – against CTM and Banman** <br> **(7)   Conversion – against Stumpe** <br> **(8)   Accounting/Unjust Enrichment** <br> **(9)   Tortious Interference with Contract** <br> **(10)   Tortious Interference with Prospective Economic Advantage** <br><br> **<u>JURY TRIAL DEMANDED</u>** |

ROSEN ✧ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

**TO THIS HONORABLE COURT AND ALL INTERESTED PARTIES:**

Plaintiffs Skye Orthobiologics, LLC ("SKYE") and Human Regenerative Technologies, LLC ("HRT") prosecute the following claims against all Defendants.

## INTRODUCTION

1. This Action arises out of Defendant Bryan Banman's formation of a medical supply company, CTM BioMedical, LLC, through the misappropriation of Plaintiffs' confidential, proprietary, and trade secret information and tortious interference with Plaintiffs' agreements with its customers, vendors, and employees and profiting therefrom to the immediate and ongoing detriment of Plaintiffs. The other Defendants participated in this scheme as conspirators to harm Plaintiffs.

2. Plaintiffs seek injunctive relief, actual damages, punitive damages, and recovery of their costs and reasonable attorneys' fees incurred in connection with this action.

## THE PARTIES

3. Plaintiff SKYE is a Delaware limited liability corporation, legally qualified to do business and lawfully doing business in the County of Los Angeles and the State of California. SKYE's principal place of business is located at 2255 Campus Drive, El Segundo, California 90245. At all times pertinent to this litigation, SKYE's principal and chief officer is and was Christopher Sharp ("Sharp"), an individual who resides in California.

4. Plaintiff HRT is a Delaware limited liability corporation, legally qualified to do business and lawfully doing business in the County of Los Angeles and the State of California. HRT's principal place of business is located at 2255 Campus Drive, El Segundo, California 90245. At all times pertinent to this litigation, HRT's principal and chief officer is and was Sharp.

2

COMPLAINT

ROSEN ✧ SABA, LLP

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

5. Plaintiffs SKYE and HRT are collectively referred to herein as "Plaintiffs".

6. Defendant CTM BioMedical, LLC ("CTM") is a Delaware limited liability corporation. CTM's principal place of business is located at 3474 S. Ocean Boulevard, Unit 4, Palm Beach, Florida 33480.

7. Defendant Bryan Banman ("Banman") is an individual who was formerly employed by SKYE and performed services for HRT. Plaintiffs are informed and believe, and based thereon allege, Banman is a citizen of Canada who resides in Toronto, Ontario, Canada. Plaintiffs are informed and believe, and based thereon allege, that Banman is the current President and Manager of CTM.

8. Defendant Gardner Rogers ("Rogers") is an individual who resides in Palm Beach County, Florida. Rogers performed services for SKYE.

9. Defendant Mike Stumpe ("Stumpe") is an individual who resides in Hancock County, Indiana. Stumpe performed services for SKYE.

10. The true names and capacities, whether individual, plural, corporate, partnership, associate or otherwise, of DOES 1 through 10, inclusive, are unknown to Plaintiffs who therefore sue said Defendants by such fictitious names. The full extent of the facts linking such fictitiously sued Defendants is unknown to Plaintiffs. Plaintiffs are informed and believe and based thereon allege that each of the Defendants designated herein as a DOE was, and is, negligently, recklessly, and/or intentionally responsible for the events and happenings hereinafter referred to, and thereby negligently, recklessly, and/or intentionally legally and proximately caused the hereinafter described injuries and damages to Plaintiffs will hereafter seek leave of the Court to amend this Complaint to show the fictitiously sued Defendants' true names and capacities, after the same have been ascertained.

11. Defendants CTM, Banman, Rogers, Stumpe and DOES 1 through 10 are collectively referred to herein as "Defendants".

COMPLAINT

ROSEN ✧ SABA, LLP

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

ROSEN ✧ SABA, LLP

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

12. Plaintiffs are informed and believe, and based thereon allege, that the business affairs of Defendants Banman and CTM are, and at all times relevant were, so mixed and intermingled that they cannot reasonably be segregated, and are in inextricable confusion such that a unity of interest and ownership existed, including the comingling of assets and the use of Banman's personal telephone, cellular phone, computers, Quickbooks, portable electronic devices, email accounts, bank accounts, and other personal devices and/or accounts in carrying out the actions alleged herein as and/or on behalf of CTM. CTM is, and at all times relevant hereto was, used by Defendant Banman as a shell and conduit for the conduct of certain of Banman's affairs and is, and was, the alter ego of Defendant Banman. The recognition of the separate existence of CTM would be unfair and would not promote justice, in that it would permit Banman to wrongfully insulate himself from liability to Plaintiffs. Accordingly, Defendant CTM, constitutes the alter ego of Defendant Banman and the fiction of its separate corporate existence should be disregarded.

13. At all times mentioned herein, each of the Defendants was the agent, principal, partner, alter-ego, joint venturer, employee, and/or authorized representative of every other Defendant and, in doing the things hereinafter alleged, was acting within the course and scope of such agency, service, and representation and directed, aided and abetted, authorized, and/or ratified each and every act and conduct hereinafter alleged.

## JURISDICTION AND VENUE

14. The Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338 in that this action arises under the laws of the United States, specifically 18 U.S.C. §1962(c) (RICO); 18 U.S.C. §1962(d) (Conspiracy to Violate RICO); and 18 U.S.C. §1836 *et seq.* (the Defend Trade Secrets Act of 2016). The Court also has supplemental jurisdiction over Plaintiffs' state and

4

COMPLAINT

common law claims pursuant to 28 U.S.C. § 1367, which form part of the same case or controversy.

15.    This Court has personal jurisdiction over Banman pursuant to his express consent as set forth in the relevant contract between SKYE and Banman, which provides in pertinent part that:

> "In case of any dispute hereunder, the parties will submit to the exclusive jurisdiction and venue of any court of competent jurisdiction sitting in Los Angeles County, California, and will comply with all requirements necessary to give such court jurisdiction over the parties and the controversy."

16.    The exercise of personal jurisdiction over Defendants is reasonable and proper because, at the time pertinent to these allegations, Defendants regularly transacted business and derived substantial revenue from services rendered in the State of California, including as to Defendants Rogers, Stumpe and CTM entering into agreements at issue in this lawsuit in the State of California.  Defendants participated in the transactions, negotiations, communications, and other activities within and/or targeted at California that give rise to the claims in this Complaint. Moreover, Defendants have committed tortious acts causing injury to Plaintiffs and others in California.

17.    Venue is also proper in this District because the contract creating the obligations on which the majority of this action is based included a choice of venue provision designating the County of Los Angeles as the appropriate place for trial.

### ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### HRT and SKYE

18.    HRT manufactures  tissue biologic products under various trade names including, but not limited to HydraTek® and BioECM®.  These tissue products are used in both surgical and non-surgical contexts and are applied in Wound Care,

COMPLAINT

Foot & Ankle, Urology, Podiatry, OB/GYN, ENT, Orthopedics, Spine, Plastics and Cosmetics.

19.    HRT distributes its products in two ways:  (a) HRT manufactures the BioECM® line exclusively for SKYE and SKYE in turn sells this line through independent contractor salespeople who are under contract directly with SKYE; and (b) HRT distributes its products through private label agreements with other companies.  SKYE is the only corporate entity that is authorized to distribute and sell the BioECM® products.  SKYE and HRT's products are distributed nationwide and internationally.

20.    Plaintiffs invested substantial time, money and resources identifying and maintaining key customer relationships, designing customer initiatives, determining strategic new developments, allotting resources for new product marketing initiatives and materials and creating business plans. The information Plaintiffs compile about the unique needs and preferences of its customers and its business leads comprises some of its most valuable corporate assets, particularly because the compilation of this information, including the identity of specific contacts, business leads, sales and profit data, value of individual contracts, and pricing data, is not generally known.

21.    Plaintiffs also invested significant resources to HRT product development, formulations and ingredients, product design, unique product preservation and stabilization delivery method of the product, packaging inserts, sources of supply, pricing, marketing and marketing methods and processes relating to HRT products which also comprises some of its most valuable corporate assets, particularly because the compilation of this information, including the processes and methodologies, is not generally known.

22.    Furthermore, Plaintiffs have invested substantial time, money and resources to maintain the confidentiality of the unique needs and preferences of its customers and business leads as well as product information, marketing strategy

6

COMPLAINT

and medical billing practices, and all of their confidential information and trade secrets as these are not generally known.

23. Among other safeguards, Plaintiffs require each of its employees, including consultants, to execute confidentiality agreements and/or non-disclosure agreements as a condition of their employment relationship, with such agreements explicitly informing the employees that they face the possibility of termination and civil penalties should they violate the terms of the confidentiality agreements. Plaintiffs also control physical access to Plaintiffs' offices and information and use network firewalls, password protection, and security credentials to prevent unauthorized access to Plaintiffs' servers and revoke authorization at the end of any relationship with Plaintiffs.

24. Plaintiffs have developed and maintained valuable relationships and substantial goodwill with its customers and consultants.

25. Plaintiffs' business information, customer relationships, and goodwill are of paramount significance to its business and its success.

**Banman's Role and Relationship with Plaintiffs**

26. Beginning in 2012, Banman began working for SKYE as an independent contractor to direct sales.

27. Because of Banman's skill and expertise with respect to HRT's products, on or around June 20, 2014, Banman and HRT entered into a "Consulting Agreement/Compensation Contract" ("the HRT Consulting Agreement"). The HRT Consulting Agreement contained strict confidentiality provisions. The HRT Consulting Agreement was signed by Sharp on behalf of HRT which is attached as **Exhibit A** to this Complaint, and the terms and conditions of which are hereby incorporated in full by this reference.

28. The purpose of the HRT Consulting Agreement was to formalize Banman's services to HRT as an independent contractor to work with management

ROSEN ✧ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

in developing products, manufacturing set-up, marketing, sales strategies and other services, which, in turn, afforded Banman the opportunity to acquire an interest in HRT. To that end, Banman was granted an "earn in" of ten percent (10%) capital interest in HRT which he still owns today.

29.     By signing the HRT Consulting Agreement to receive the ten percent capital interest in HRT and other benefits, Banman agreed, among other promises, to keep in confidence Plaintiffs' proprietary information. The HRT confidentiality provisions of the Consulting Agreement provide:

### SECTION 3. CONFIDENTIAL INFORMATION

(a) In the course of conducting the activities hereunder, it is anticipated that Consultant will have access to the Company's proprietary or confidential information, including, without limitation, data, processing protocols, product formulations, information, or documents concerning the finances, business and affairs of the Company which it acquires or produces in the performance of its obligations under this Agreement and data regarding medical, financial and other personal data and information of the Company's participants (collectively, "Confidential Information"). **During the term of this Agreement and thereafter, Consultant shall keep such Confidential Information strictly confidential, and shall not disclose the Company's Confidential Information to any third party.** Consultant shall be permitted to disclose Confidential Information to those employees and agents who (i) have a reasonable need for access in connection with Consultants duties, (ii) have been advised of the confidentiality requirements of this Agreement, and (iii) agree to be bound by the provisions hereof. Confidential Information may be disclosed pursuant to a legal, judicial or governmental proceeding or subpoena; provided that the Company is given prompt notice by Consultant so that the Company can seek a protective order or other protection for the Confidential Information.

(b) Consultant hereby acknowledges and agrees that, in the event that Consultant shall violate any provisions of this **Section 3**, the Company will be without an adequate remedy at law and, accordingly, will be entitled to enforce such restrictions by temporary or permanent injunctive or other equitable relief obtained in any action or proceeding, without the necessity of proving damages or posting bond, and without prejudice to any other remedies which it may have at law or in equity.

(c) If any action or proceeding shall be commenced to enforce this **Section 3**, the prevailing party in such action or proceeding shall be entitled to recover from the other party all reasonable attorneys' fees, costs and expenses incurred by such prevailing party in connection with such action or proceeding. The provisions of **Section 3** shall

8

COMPLAINT

survive the termination of this Agreement.

**SECTION 5. OWNERSHIP OF MATERIALS; RETURN OF INFORMATION**

Except for the non-public, confidential and proprietary information and trade secrets belonging to Consultant or to a third party entrusting such information and/or trade secrets to Consultant (including Consultant's proprietary format and methodology), the content of all Deliverables (whether in tangible or electronic, digital, magnetic or other form), shall be the sole and absolute property of the Company for any and all purposes; provided that the Company has rendered payment to Consultant for services rendered as set forth in this Agreement. For purposes of this Agreement, "Deliverables" shall mean all documents, and other information, including but not limited to, memoranda, reports, projections, analyses and other materials whether or not confidential, provided or created by Consultant to the Company in connection with Consultant's services hereunder. Consultant agrees that Consultant does not have and will not claim to have any right, title or interest in such or to such Deliverables. The confidential and proprietary information and trade secrets belonging to Consultant shall not include any information and/or materials that is Confidential Information under **Section 3** above or which Consultant obtained or created expressly for the Company's use in the course of Consultant's engagement by the Company, or any information and materials provided to Consultant by or on behalf of the Company. Promptly upon the Company's request, Consultant shall return to the Company  or its designee (or destroy at the Company's sole option) all data, documents, and other information, in all media, in Consultant's possession or control whether provided to Consultant by the Company, or by others, or prepared by Consultant. Consultant may retain archival copies of such material and information. In addition, Consultant agrees to provide reasonable cooperation with any successor consultant, including explaining and decoding such data, in order to assure a smooth and uninterrupted transition of services.

30.    In addition to executing the HRT Consulting Agreement, on June 20, 2014, Banman executed a Membership Unit Grant Agreement (the "MUG Agreement") with HRT, which is attached hereto as **Exhibit B**, the full terms and conditions of which are incorporated by this reference.

31.    On or about April 1, 2018, Banman's role at Plaintiffs' organization grew and he became an employee salesman with SKYE with the title of Senior Vice President of Business Development.  Banman's role was to maintain existing sales and the sales growth of SKYE.

COMPLAINT

32.   As part of his employment with SKYE, on April 18, 2018, Banman signed an Employment Agreement (the "SKYE Employment Agreement"), which is attached hereto as **Exhibit C**, and the terms and conditions of which are hereby incorporated in full by this reference. The SKYE Employment Agreement was signed by Sharp on behalf of SKYE.

33.   As part of the SKYE Employment Agreement, SKYE agreed to pay Banman an annualized base salary of $350,000 plus a bonus commission, retirement benefits and healthcare.  Additionally, because Banman is a Canadian citizen who, at the time in which he was employed by SKYE, required authorizations to work in the United States, SKYE also agreed to provide Banman with work authorizations, visas, or permits that Banman required to perform the duties of his position at SKYE's sole cost and expense.

34.   As part of the SKYE Employment Agreement, Banman agreed that SKYE would be his "sole job and focus" during his time of employment with SKYE, and agreed to "commit to offering the level [of] service and dedication" he did while he was a consultant for HRT from 2012-2017.

35.   In connection with his employment with SKYE, on April 18, 2018, Banman signed a Confidentiality Agreement (the "SKYE Confidentiality Agreement"), which is attached hereto as **Exhibit D**, and the terms and conditions of which are hereby incorporated in full by this reference.   The SKYE Confidentiality Agreement was signed by Sharp on behalf of SKYE.

36.   By signing the SKYE Confidentiality Agreement, Banman agreed, to keep in confidence SKYE's proprietary information.  The SKYE Confidentiality Agreement provides, in pertinent part:

> 1.   RECOGNITION   OF   COMPANIES'   RIGHTS; NONDISCLOSURE
> At all times during the term of my employment and thereafter, I will hold in strictest confidence and will not disclose to anyone or organization, use, lecture upon or publish any of SKYE Proprietary Information (defined below), except as such disclosure, use or

ROSEN ✧ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

publication may be required in connection with my work for SKYE, or unless CEO expressly authorizes such in writing. The term "Proprietary Information" shall mean trade confidential knowledge, product formulations, product ingredients, revenue numbers, financials, representation agreements, representation commissions, employment agreements, pricing, sources of supply, employee compensation, SKYE structure, SKYE ownership structure, margins, product designs, packaging inserts, FUTURE PRODUCTS, marketing materials, etc., data or any other information of SKYE or SKYE affiliate.

9. NO IMPROPER USE OF MATERIALS.
During my employment by SKYE, I will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of SKYE any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person.

11. RETURN OF SKYE DOCUMENTS.
When I leave the employ of SKYE, I will deliver to SKYE any and all drawings, notes, memoranda, financials, specifications, devices, formulas, product designs, storage media, including software, documents and computer printouts, together with all copies thereof, and any other material containing or disclosing any Inventions, Third Party Information or Proprietary Information of SKYE. I further agree that any property situated on SKYE premises and owned by SKYE, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by SKYE personnel at any time with or without notice.

37. By signing the SKYE Confidentiality Agreement, Banman also agreed to a Covenant Not to Solicit or Compete, which provides, in pertinent part:

8. COVENANT NOT TO SOLICIT OR COMPETE.
8.1 RESTRICTIVE COVENANTS.
I agree that during the period of my employment by SKYE I will not, without SKYE['s] prior written consent, engage in any employment or business activity other than for SKYE. I further agree that during the term of my employment with SKYE and for a period of one (1) year thereafter, I also shall not solicit, or arrange to have any other person or entity solicit, any person or entity engaged by SKYE as an employee, customer, supplier, or consultant or advisor to SKYE to terminate such party's relationship with SKYE. The time periods provided for in this Section 8.1(a) shall be extended for a period of time equal to any period of time in which I shall be in violation of any provision of this Section 8.

COMPLAINT

ROSEN ✧ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

38.    Throughout his relationship with HRT and SKYE, Banman was trusted with and had access to HRT and SKYE's confidential and proprietary information and trade secrets including, but not limited to, data processing protocols, product development, formulations and ingredients, product design, packaging inserts, sources of supply, pricing, marketing materials, marketing methods and processes, customer lists and information, prospective customer lists and information,  information concerning the finances, business and affairs of the Plaintiffs, revenue numbers, and company structure.  Banman was also intimately familiar with confidential information regarding various employees of Plaintiffs, including employees' special skills, experience, salaries, commission structures, agreement terms and performance histories.

39.    As a result of his respective positions with Plaintiffs, Banman was provided access to Plaintiff's trade secrets and confidential information, subject to confidentiality and/or nondisclosure restrictions such as those found in the HRT Consulting Agreement and SKYE Confidentiality Agreement.  Banman had direct access to product formulations, operating procedures on how the entire manufacturing division functioned step by step, servers, databases, customer contact lists, pricing plans, profitability forecasts, research and development, marketing plans, strategic outlines and information about competitors.

40.    As an employee and/or consultant of Plaintiffs', Banman had a duty to give Plaintiffs' business preference relating to any similar business Banman may have had.

41.    Banman resigned from SKYE on July 2, 2018, approximately three months after he signed the SKYE Employment Agreement.

**Banman's Role and Relationship with CTM**

42.    Plaintiffs are informed and believe, and based thereon allege, that while Banman was employed by Plaintiffs, he started a competing business using

12

COMPLAINT

both Plaintiffs' resources and equipment and Banman's personal equipment including telephone, cellular phone, computers, Quickbooks, portable electronic devices, email accounts and other personal devices and/or accounts.

43.    About one month before he resigned from SKYE, on or about June 1, 2018, while he was still employed by SKYE, Banman formed CTM as a Delaware corporation.

44.    Approximately two weeks later, on or about June 13, 2018, again, while he was still employed by SKYE, Banman registered the domain name <www.ctmbiomedical.com>.  SKYE only became aware of Banman's formation of CTM after Banman's resignation from SKYE.

45.    Plaintiffs are informed and believe, and based thereon allege, CTM and Banman (through CTM) are distributing tissue products that are comparable and competitive to those offered for sale by HRT and SKYE.  Plaintiffs are informed and believe, and based thereon allege, CTM and Banman (through CTM) are selling various tissue products that are sold under CTM trade names and the trade names BioD® and Cygnus,  manufactured by direct competitors of HRT.

46.    In their marketing and promotional materials, Plaintiffs describe HRT's tissue and graft products with the phrase "connective tissue matrix," which is abbreviated as "CTM" or "CTMs."  When selling HRT's products, HRT and SKYE salespersons refer to the corporate tissue and graft products as "CTMs." The term CTM is known in the tissue and graft product industry to be associated with Plaintiffs' products.

47.    Banman chose the name CTM for his new endeavor as a direct reference to the phrase "connective tissue matrix," abbreviated as "CTM" or "CTMs", used exclusively by HRT and SKYE salespersons to describe HRT's products.

48.    Plaintiffs are informed and believe, and based thereon allege, by selecting the name CTM as his new company, Banman purposefully sought to trade

ROSEN ✧ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

13

off the goodwill and recognition that HRT and SKYE had made in the marketplace with respect to products identified as "CTMs."

49. Plaintiffs are informed and believe, and based thereon allege, by selecting the name CTM as his new company, Banman purposefully sought to confuse HRT and SKYE's customers into thinking that the products Banman was selling through CTM were "CTMs," were similar to "CTMs," or were otherwise affiliated with "CTMs."

50. Moreover, Banman and CTM's website, advertising materials, product description and packaging designs resemble Plaintiffs' such that Banman further sought to trade off the goodwill and recognition that HRT and SKYE had made in the marketplace and further sought to confuse HRT and SKYE's customers into thinking that the products Banman was selling through CTM were "CTMs," were similar to Plaintiffs' "CTMs," or were otherwise affiliated with Plaintiffs.

51. Furthermore, among Plaintiffs' variety of tissue and graft products, are "ambient temperature flow" products and a "paste" product which were researched and developed by Plaintiffs. Many of the products that were developed and sold by Plaintiffs are in an ambient / room temperature flowable form which allows medical professionals to use the product faster with less handling time and reduced shipping and storage needs. Starting in approximately 2013 and throughout Banman's contractual employment relationship with Plaintiffs, Plaintiffs conceptualized, researched, developed, produced and marketed both a connected tissue matrix in a room temperature form and were the only ones on the market with such a product. Plaintiffs also conceptualized with Banman a paste product that is not in flowable form, but, rather is in a "paste" form.

52. The products marketed by CTM are "Boost"; "Paste"; "Flow"; "Thin"; "Thick" and "X-Thick" which are substantially similar, if not identical to the SKYE products.

COMPLAINT

53. As an example, throughout Banman's contractual employment relationship with Plaintiffs, based on his role at HRT and SKYE, Banman had access to the protected confidential information and trade secrets relating to the flowable product and the paste product.

54. CTM is also using Plaintiffs' marketing description language and is marketing its product in a similar fashion as having the "richest concentration" for a flowable product.

55. Plaintiffs are informed and believe, and based thereon allege, that Defendants acquired, disclosed, and/or used certain of Plaintiffs' confidential trade secrets, and are using Plaintiffs' confidential trade secrets to develop, manufacture and/or market a room temperature "flowable" product and a "paste" product to capitalize on Plaintiffs' investment of time, resources and goodwill.

56. Furthermore, in 2014, Plaintiffs developed a product knows as "human connective tissue matrix" to be on indication with the FDA and meet insurance reimbursement requirements.

57. While Banman was employed with SKYE, Plaintiffs researched and developed a marketing plan to sell the connective tissue matrix to its customers so that it could be reimbursed by insurance companies. Plaintiffs invested a significant amount of time and resources to develop this new formula, strategy and methodology for marketing its product which is a highly valuable trade secret that none of its competitors can access, allowing it to have a competitive advantage in the marketplace.

58. Plaintiffs are informed and believe, and based thereon allege, that Banman is using Plaintiffs' confidential information and trade secret marketing formula, strategy and methodology to market products through CTM.

59. Plaintiffs are informed and believe, and based thereon allege, that Defendants Banman and CTM acquired, used and/or disclosed Plaintiffs' time, resources, trade secrets, and confidential information to form a competing business

COMPLAINT

ROSEN ✧ SABA, LLP

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

in violation of the provisions of the HRT Consulting Agreement and the SKYE Confidentiality Agreement. Defendants continue to use Plaintiffs' trade secrets and confidential information for financial gain.

60. Additionally, while employed at SKYE, Banman solicited Rogers as an agent to sell SKYE's products to the Veteran's Administration medical facilities. Plaintiffs are informed and believe and based thereon allege that Banman wrongfully disclosed Plaintiffs' confidential information and trade secrets to Rogers, and then CTM and Rogers acquired, used and/or disclosed Plaintiffs' confidential information and trade secrets to assist Banman and CTM in the wrongful acts described herein and to interfere with Plaintiffs' legitimate business interests, valid contracts and prospective economic advantages.

61. Plaintiffs' trade secrets and confidential information are not generally known in the industry and are valuable because Plaintiffs derive economic value from the information not being publicly available. Plaintiffs' trade secrets and confidential information is of great value to Plaintiffs and such information would give any competitor, who improperly acquired such information, an unfair competitive advantage by inter alia, not expending the time and resources to develop the trade secret information as Plaintiffs have done.

62. In addition to requiring employees and consultants to keep their proprietary information confidential as a condition of employment, Plaintiffs protect their information by password protecting computers, limiting access to information to necessary parties, and requiring employees and consultants to sign confidentiality agreements.

63. Plaintiffs' customer relationships and goodwill are of paramount importance to Plaintiffs. Many customers entrust Plaintiffs with their confidential information and require Plaintiffs to enter into confidentiality agreements as well.

64. Further, pursuant to the HRT Consulting Agreement and SKYE Confidentiality Agreement, any and all intellectual property developed by

COMPLAINT

Defendants, including any inventions and proprietary rights with respect thereto, which, by definition, did not fall within the scope of California *Labor Code* §2870, were and are the sole property of Plaintiffs. Accordingly, Defendants assigned all of his respective right, title and interest in any and all inventions and related proprietary rights to Plaintiffs.

65. Defendants' actions are a serious threat to Plaintiffs' businesses, are in violation of Defendants' contractual obligations, and applicable law, and unjustly enriched Defendants.

66. Furthermore, even though Banman has resigned from HRT/SKYE, and actively and illegally competes with HRT/SKYE, he continues to claim that he is entitled to receive his membership interest in HRT. As a result of Banman's intentional actions to harm HRT/SKYE, Plaintiffs will seek an order to disqualify his membership units in HRT or expel Banman as a member of HRT.

**Defendants' Actions and Interference with Plaintiffs' Business Relationships**

67. Plaintiffs are informed and believe, and based thereon allege, that Defendants Banman and CTM used Plaintiffs' time, resources, trade secrets, and confidential information to form his competing business, continue to use Plaintiffs' trade secrets and confidential information to intentionally interfere with Plaintiffs' current and future economic opportunities.

68. After Banman's resignation from SKYE, SKYE became aware that Banman, through his new venture, CTM, had been in contact with several of Plaintiffs' customers. Plaintiffs are informed and believe, and based thereon allege, Banman used Plaintiffs' protected trade secrets and confidential information including, but not limited to Plaintiffs' proprietary pricing models, customer lists and billing processes, to identify Plaintiffs' customers, who had already purchased or shown an interest in purchasing the unique products and services provided by

17
COMPLAINT

Plaintiffs, and solicit those customers to conduct business with CTM instead of Plaintiffs.

69.    HRT's and SKYE's sales with long term, key customers have dropped significantly since Banman's departure from SKYE in July 2018.    Plaintiffs are informed and believe, and based thereon allege, numerous customers that previously purchased tissue products from HRT or SKYE are now purchasing competitively similar tissue products from CTM.

### Integrative Medical Solutions in Florida

70.    In March 2018, while Banman was still employed with SKYE, he had a secret, private breakfast meeting with the principals of Integrative Medical Solutions ("IMS"), which is a distributor of SKYE products in Palm Beach, Florida.    Banman advised IMS that he was going to start a competing business and was speaking to various SKYE representatives to switch and wanted IMS to stop distributing SKYE products and only distribute CTM products for Banman.    SKYE was paying Banman during this time period while he was preparing to compete with SKYE.

71.    On June 11, 2018, while Banman was still an employee of SKYE, Banman and Sharp attended a dinner with Dr. S.[1], who is a SKYE advisor and large volume customer of Plaintiffs. An IMS principal was also at this dinner.    Banman concealed from Sharp that he had already met with IMS principals and that he had no intention of following through with his employment with SKYE.    Upon information and belief, after CTM was formed, Banman attempted to recruit Dr. S. as a customer of Banman and/or CTM and recently tried to block SKYE from continuing to be a sponsor / exhibitor at regional research meeting.

---

[1]/ The full name of the physician is not used in the Complaint to protect the physician's privacy rights

COMPLAINT

72. Plaintiffs are informed and believe and based thereon allege that Banman knew of IMS' contractual relationship with Plaintiffs and used/disclosed Plaintiffs' confidential information/trade secrets to target and attempt to recruit/poach IMS to breach the terms of their agreements with Plaintiffs and work for Defendants Banman and CTM, all to Plaintiff's detriment. Banman also informed IMS that he was speaking with other SKYE sales personnel to do the same thing, including a "large rep" in Indiana and others across the country.

73. Plaintiffs are informed and believe and based thereon allege that Banman continue to unlawfully contact IMS with the intention of instructing them to breach their agreements with SKYE and work for CTM, offering higher commissions.

74. Plaintiffs are aware of at least one salesperson that, under Banman's direction, (a) has been using Plaintiffs' confidential information and trade secrets to sell CTM products instead of HRT products to SKYE's customers in violation of his respective agreement with Plaintiffs; and (b) has wrongfully attempted to persuade and/or did persuade them to stop performing under their respective agreements with Plaintiffs, resign when Banman's competing company was fully operational, and work for Banman for more favorable commissions and employment terms to Plaintiffs' detriment.

**Interference With Gerald Champion Regional Medical Center in New Mexico**

75. As another example, after Banman resigned from SKYE, in or around August 2018, Banman contacted a Dr. Anderson at the Gerald Champion Regional Medical Center ("GCRMC") in Alamogordo, New Mexico. The GCRMC was a customer of Plaintiffs' and Banman sold HRT products to Dr. Anderson when Banman was employed by SKYE and for two years prior to Banman's resignation from SKYE. Dr. Anderson was collecting valuable data for SKYE about the clinical outcome data of SKYE's products that were used in surgeries.

ROSEN ✧ SABA, LLP

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

76. Plaintiffs are informed and believe, and based thereon allege, the purpose of Banman's August 2018 contact with Dr. Anderson was to tell Dr. Anderson and GCRMC to stop buying Plaintiffs' products and instead to buy BioD® products through CTM.

77. After Banman convinced Dr. Anderson to stop using Plaintiffs' products and instead use BioD's® products, Dr. Anderson asked John Hudson ("Hudson"), the Director of Materials Management for GCRMC (who is ultimately responsible for making purchase orders for GCRMC), to purchase BioD® products only through CTM. Banman had also worked with Hudson when he was employed by SKYE.

78. On or about August 23, 2018, Hudson unintentionally e-mailed Banman at his old SKYE-affiliated e-mail address, asking Banman "to discuss your CTM pricing" and to "cross reference these SKYE [] items to their closes CTM equivalent items" and then listed three types of tissues that needed to be cross-referenced.

79. Sharp received this e-mail sent to SKYE, and, in response, asked Hudson "Are you asking if these RX products are similar to our other products?" In response to Sharp's e-mail, Hudson said "Yes. I am."

80. In 2017, GCRMC sales were approximately $371,000.00; in 2018, after Defendants' interference, GCRMC sales were approximately $103,000.00; and GCRMC did not purchase any product from Plaintiffs in 2019 or up to the present.

81. GCRMC is no longer a customer of SKYE's or HRT's and no longer uses HRT's products. Plaintiffs are informed and believe, and based thereon allege, GCRMC continues to purchase products from CTM.

82. SKYE and HRT lost hundreds-of-thousands-of-dollars of business from GCRMC from 2017 to the present because of Defendants' actions.

///

20

COMPLAINT

ROSEN ✧ SABA, LLP

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

## Broward Health Hospital in Florida

83.    As another example, in September 2019, Sharp was alerted that Banman used SKYE's confidential login to access the Broward Health Hospital Vendor Registration System as SKYE, and that he signed and/or uploaded at least two documents on behalf of CTM.  While accessing the system with SKYE's confidential login, Banman accessed: (1) Broward Health Disclosure Form for Physician Ownership & Financial Arrangements; and (2) North Broward Hospital District Conflict of Interest Questionnaire form for vendors/ contractors/ subcontractor/ agent. By accessing this information, Banman used SKYE's confidential information and trade secrets to access and target SKYE's known customers to interfere with Plaintiffs' business.

## Veterans Affairs Medical Facilities and Gardner Rodgers

84.    Additionally, Banman interfered with SKYE's contract with Veterans Medical Distributors ("VMD") and Plaintiffs' prospective large-scale sales to the Veteran's Affairs medical facilities.  In order to sell tissue products to Veteran's Affairs ("VA") medical facilities and hospitals, a company needs to use a broker that has a Federal Supply Schedule ("FSS") license.  The FSS license allows the broker to sell to the VA's National Acquisition Center ("NAC") which handles the purchasing for the VA.

85.    During the course of his employment with SKYE, Banman solicited Rogers, an FSS licensee that SKYE could use to sell to the VA vis-à-vis the NAC who had a company, VMD, located in Florida.  Rogers entered into a contract with SKYE whereby Rogers would exclusively sell HRT products to the NAC and SKYE would exclusively use Rogers to sell HRT's products to the NAC.

86.    Shortly after Banman resigned from SKYE, Rogers demanded that SKYE modify the exclusivity contract he signed with Plaintiffs so that Rogers would be able to sell other products to the NAC.  Plaintiffs are informed and

believe, and based thereon allege, Banman interfered with SKYE's contract with Rogers and demanded that Rogers also sell CTM products to the NAC, in violation of Rogers' contract with SKYE, and agreed to compensate Rogers more favorably than SKYE, such that Rogers was motivated to change the terms of his agreement with SKYE to no longer exclusively sell HRT products.

87.    When SKYE refused to modify the exclusivity provisions of the contract between SKYE and Rogers, Rogers informed SKYE that HRT's products were not approved for sale to the NAC, so that Rogers could terminate the contract with SKYE without breaching any provisions of the contract.

88.    Plaintiffs are informed and believe, and based thereon allege, Rogers knowingly misrepresented to the NAC that SKYE was not a viable candidate.

89.    Plaintiffs are informed and believe, and based thereon allege, Rogers misrepresented that the HRT products were not approved by the NAC to SKYE, and that HRT's application for approval had not yet been reviewed by the NAC for sale by the VA or HRT's products had been approved for sale by the VA.  Plaintiffs are informed and believe, and based thereon allege, Rogers lied to get out of the contract with SKYE based on Banman's representation that such that he could enter into a more financially lucrative agreement with Banman.

90.    Plaintiffs are informed and believe, and based thereon allege, Banman manipulated, failed to act with due care and/or otherwise wrongfully interfered with the application process to the FSS in order to disrupt Plaintiffs' contractual relationship and future business with Rogers.

91.    Plaintiffs are informed and believe, and based thereon allege, Rogers eventually entered a relationship with Banman and CTM.  On or about April 12, 2019, Rogers unintentionally emailed Banman at his SKYE-affiliated email address with a check stub dated March 29, 2019 showing that Columbus Specialty Surgery Center in Indiana issued payment to CTM in the amount of $3,950.00.  There was also other checks including one from Allias Health Systems in Minnesota for

ROSEN ✧ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

$39,000.  There was also a deposit form indicating that Rogers paid to Banman and/or CTM over $147,300.

92.    Plaintiffs are informed and believe and based thereon allege that Defendants Banman, CTM and Rodgers conspired and cooperated to acquire, disclose and/or use Plaintiffs' confidential information and trade secrets to interfere with Plaintiffs' legitimate business interests, valid contracts and prospective economic advantages.

### Interference with Sales Personnel

93.    Further, in January 2019, Sharp became aware that Banman had approached several of SKYE's sales personnel and wrongfully attempted to persuade and/or did persuade them to stop performing under their respective agreements with Plaintiffs, resign when Banman's competing company was fully operational, and work for Banman for more favorable commissions and employment terms to Plaintiffs' detriment.

94.    In April 2019, Banman and/or CTM approached at least two of SKYE's sales agents who have executed Employment Agreements and/or Consulting Agreements with Plaintiffs.  Those individuals reside in Palm Beach County, Florida and Harris County, Texas.

### Mike Stumpe in Indiana

95.    Mike Stumpe had been a sales agent for SKYE for years and has executed an Employment Agreement and/or Consulting Agreement with SKYE. Stumpe is based out of Indiana.

96.    Plaintiffs are informed and believed and based thereon allege that, under Banman's instruction and interference, Stumpe stopped performing under his agreement with SKYE, stopped selling SKYE's products and, instead, used

23

COMPLAINT

ROSEN ✧ SABA, LLP

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

Plaintiff's confidential information and trade secrets to sell CTM's products to SKYE's customers.

97.    In 2018, Stumpe had over $822,000 of SKYE/HRT products, but in 2019, his sales dropped to $195,000, and in 2020, his sales are non-existent.

98.    This information became known to Plaintiffs when on January 7, 2020, Stumpe accidently emailed Sharp with his "current eski inventory".  He states: "Bill for all missing and replace with CTM.  Could you send me a copy of what we Bill for this order?"  Sharp responded: "Why would we bill and replace with CTM?" Stumpe did not respond to the email by Sharp.

99.    Plaintiffs have also learned that Stumpe had contacted at least one other SKYE salespersons, Matt Dripps, who is also a sub-rep/associate of Stumpe's.  Sharp was informed that Stumpe, working with Banman, instructed Dripps to breach the terms of his agreement with SKYE, to slowly stop selling SKYE products even though remaining under contract with Plaintiffs, and to "wait" until CTM was up and running and then, ultimately, to leave SKYE to go work for CTM resulting in a notable decrease in sales.

100.    Plaintiffs are informed and believe and based thereon allege that Defendants Banman, CTM and Stumpe conspired and cooperated to acquire, disclose and/or use Plaintiffs' confidential information and trade secrets to interfere with Plaintiffs' legitimate business interests, valid contracts and prospective economic advantages.

**Recruitment of Doctors**

101.    Upon information and belief, Banman has met with multiple doctors in various states in order to solicit the doctors to become "advisors" for CTM.  These doctors are customers of SKYE.

102.    Banman had actual knowledge of the doctor's contractual and/or business relationship with Plaintiffs and used and/or disclosed Plaintiffs'

24

COMPLAINT

confidential information and trade secrets to target these doctors in order to interfere with her relationship with Plaintiffs by attempting to and/or succeeding in (1) instructing the doctors to stop purchasing Plaintiffs' products and purchase from Defendants instead, and (2) create a conflict whereby the doctors would be required to cease her relationship with Plaintiffs and cease providing valuable clinical data which would cause immeasurable harm to Plaintiffs to benefit Defendants.

## FIRST CAUSE OF ACTION
## RICO (18 U.S.C. §1962(c))
### (On behalf of all Plaintiffs against all Defendants)

103.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 102 and incorporate them herein by reference.

104.   At all relevant times, HRT and SKYE are each a person within the meaning of 18 U.S.C. §§1961(3) and 1962(c).

105.   At all relevant times, Defendants are each a person within the meaning of 18 U.S.C. §§1961(3) and 1962(c).

106.   At all relevant times, each of the RICO Defendants was, and is, a person that exists separate and distinct from the RICO Enterprise, as described below.

107.   Defendants constitute an association-in-fact enterprise (the "RICO Enterprise") within the meaning of 18 U.S.C. §§1961(4) and 1962(c).

108.   Defendants Banman, CTM, Stumpe, and Rogers are a group of persons associated together in fact for the common purpose of carrying on an ongoing criminal enterprise.  In particular, the RICO Enterprise has a common goal of defrauding Plaintiffs through a coordinated, sustained, and well-orchestrated scheme of deceptive conduct including the theft and misuse of confidential and proprietary information, interfering with interstate commerce, and funneling these ill-gotten gains to the RICO Defendants, and thereby promoting and conducting

their criminal activities, rewarding and incentivizing participation in the scheme, and frustrating efforts to recover the RICO Defendants' illicit profits by making it difficult or impossible for Plaintiffs to trace and collect the funds. In order to effectuate this common goal, the members of the RICO Enterprise engaged in a pattern of racketeering activity.

109. The members of the RICO Enterprise have long-standing and ongoing relationships rooted in ongoing business dealings, and a mutual interest and participation in common criminal activities.

110. The RICO Enterprise has longevity sufficient enough to permit the RICO Defendants to pursue the RICO Enterprise's goal of defrauding Plaintiffs to the RICO Defendants' profit. Plaintiffs are informed and believe the overall scheme has been in operation since at least April 2018.

111. The RICO Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure, operating in, and directed from, the United States and Canada. While the organization of the RICO Enterprise may have changed over time, and its members may have held different roles at different times, the RICO Enterprise has been structured to operate as a unit in order to accomplish the common goals and purposes of their criminal scheme.

112. Plaintiffs are informed and believe Banman, as the President and Manager of CTM, and prior thereto, maintains command and control of the RICO Enterprise on a strategic level, is the principal authority figure with final say on decisions, and directed other members of the RICO Enterprise to take actions, necessary to accomplish the overall aims of the criminal enterprise, including, but not limited to: Defendants' acquiring, using and/or disclosing Plaintiffs' confidential information and trade secrets to form and run a competing business; Defendants' acquiring, using and/or disclosing Plaintiffs' confidential information and trade secrets to wrongfully interfere with and hinder Plaintiffs' legitimate

ROSEN ✧ SABA, LLP

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

26

COMPLAINT

business interests, valid contracts and prospective economic advantages to the detriment of Plaintiffs.

113. From and through his positions at HRT and SKYE wherein he became aware of HRT and SKYE's confidential information, Banman was in a position to conduct and participate in the operation and management of the RICO Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to defraud Plaintiffs and misappropriate Plaintiffs' trade secrets and confidential information.

114. CTM and Banman, directly and through their agents and employees, have been an active participants and central figures in the operation and management of the RICO Enterprise and its affairs, and in orchestration, planning, perpetration, and execution of the scheme to defraud Plaintiffs.

115. Stumpe has been involved in, and held positions of responsibility with respect to the planning and execution of the scheme to defraud Plaintiffs, and has taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the criminal Enterprise, including misappropriating Plaintiffs' confidential and trade secret information to the detriment of Plaintiffs and interfering and harming Plaintiffs' contractual and prospective contractual relationships with United States Government entities and otherwise. From and through his business relationships, including his prior business and contractual relationships with Plaintiffs, he has conducted and participated in the operation and management of the RICO Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to defraud Plaintiffs and misappropriate Plaintiffs' trade secrets and confidential information

116. Rogers has been involved in, and held positions of responsibility with respect to the planning and execution of the scheme to defraud Plaintiffs, and has taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the criminal Enterprise, including misappropriating

27

COMPLAINT

Plaintiffs' confidential and trade secret information to the detriment of Plaintiffs and interfering and harming Plaintiffs' contractual and prospective contractual relationships with United States Government entities and otherwise. From and through his business relationships, including his prior business and contractual relationships with Plaintiffs, he has conducted and participated in the operation and management of the RICO Enterprise and its affairs, and has been a central participant in the orchestration, planning, and execution of the scheme to defraud Plaintiffs and misappropriate Plaintiffs' trade secrets and confidential information.

117.   Each of the RICO Defendants knew of the existence of and conducted or participated in the operation or management of, the RICO Enterprise and its affairs.

118.   Plaintiffs are informed and believe and based thereon allege that at all relevant times, Defendants obtained income, either directly or indirectly, from the above-described pattern of racketeering activity.

119.   Plaintiffs are informed and believe, and on that basis allege, that the RICO Defendants, and each of them, received income, either directly or indirectly, in an amount that exceeds $5,000, from the above-described pattern of racketeering activity.

120.   Plaintiffs are informed and believe and based thereon allege that, at all relevant times, the RICO Defendants used income derived, either directly or indirectly, from the above-described pattern of racketeering activity in the establishment and/or operation of an enterprise, which engaged in and/or whose activities affected interstate commerce, in violation of 18 U.S.C. §1962(d).

121.   Plaintiffs are informed and believe and based thereon allege that, at all relevant times, in undertaking the actions described herein, the RICO Defendants, through a pattern of racketeering activity, directly or indirectly acquired and maintained an interest in and control over an enterprise which engaged in and/or whose activities affected interstate commerce, in violation of 18 U.S.C. §1962(d).

28

COMPLAINT

ROSEN ✦ SABA, LLP

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

122. The RICO Defendants accomplished their scheme by misappropriating Plaintiffs' trade secrets and confidential information in violation of 18 U.S.C. §1832. The RICO Defendants accomplished their scheme over the course of the last year, including, misappropriating Plaintiffs' trade secrets and confidential information as early as April 2018.

123. Each of the RICO Defendants, through their control of the RICO Enterprise, knew of, and participated in, numerous misappropriations of Plaintiffs' trade secrets and confidential information.

124. Plaintiffs have been and will continue to be injured in their business and property by reason of the RICO Defendants' violations of 18 U.S.C. §1962(c), in an amount to be determined at trial. The injuries to Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations include, but are not limited to, lost profits, diminution in value of Plaintiffs' trade secrets, harm to reputation, competitive harm, attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting the RICO Defendants' fraudulent activities.

125. Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to recover treble damages, plus costs and attorneys' fees from the RICO Defendants.

## SECOND CAUSE OF ACTION
### Conspiracy to Violate RICO (18 U.S.C. §1962(d))
### (On behalf of all Plaintiffs against all Defendants)

126. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 125 and incorporate them herein by reference.

127. The RICO Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. §1962(c) as described above, in violation of 18 U.S.C. §1962(d).

COMPLAINT

128. By and through each of the RICO Defendants' close business relationships, and their close coordination with one another in the affairs of the RICO Enterprise, each RICO Defendant knew the nature of the RICO Enterprise and each RICO Defendant knew that the RICO Enterprise extended beyond the RICO Defendant's individual role. Moreover, through the same connections and coordination, each RICO Defendant knew that the RICO Defendants were engaged in a conspiracy to commit predicate acts, including those set forth above, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

129. Each RICO Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c). In particular, each RICO Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the RICO Defendants shared a common purpose, namely, the stealing and misappropriation of Plaintiffs' trade secrets, and other confidential information. In the absence of agreement, the Enterprise could not have operated as it did. Further evidence of an agreement among the RICO Defendants is particularly within the control of the RICO Defendants.

130. The participation and agreement of each of the RICO Defendants was necessary to allow the commission of this pattern of activity.

131. Plaintiffs' have been and will continue to be injured in their business and property by reason of the RICO Defendants' violations of 18 U.S.C. §1962(c), in an amount to be determined at trial. The injuries to Plaintiffs directly, proximately, and reasonably foreseeably resulting from or caused by these violations include, but are not limited to, lost profits, diminution in value of Plaintiffs' trade secrets, harm to reputation, competitive harm, attorneys' fees and costs, including the attorneys' fees and costs associated with exposing and prosecuting the RICO Defendants' fraudulent activities.

ROSEN ✧ SABA, LLP

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

132.  Pursuant to 18 U.S.C. §1964(c), Plaintiffs are entitled to recover treble damages, plus costs and attorneys' fees from the RICO Defendants.

## THIRD CAUSE OF ACTION

**Misappropriation of Trade Secrets - The Defend Trade Secrets Act of 2016**

**(on behalf of all Plaintiffs against all Defendants)**

133.  Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 102 and incorporate them herein by reference.

134.  Plaintiffs' business plan, pricing information, data processing protocols, product development, formulations and ingredients, product design, packaging inserts, sources of supply, pricing, marketing materials, marketing methods and processes, customer information, information concerning the finances, business and affairs of the Plaintiffs, revenue numbers, company structure and employment terms and agreements constitute trade secrets under 18 U.S.C. §1839(3).

135.  Plaintiffs have taken various steps to protect their confidential, proprietary, and trade secret information, including: (1) using network firewalls, password protection, and security credentials to prevent unauthorized access to Plaintiffs' servers, (2) limiting employees' access to information to that which is necessary for employees, consultants, and contractors to fulfill their functions, (3) revoking authorization at the end of the relationship with Plaintiffs, (4) controlling physical access to Plaintiffs' offices and information, and (5) requiring all employees, consultants and contractors with access to such information to execute confidentiality, non-disclosure, non-solicitation, and/or non-competition agreements.

136.  Plaintiffs are informed and believe, and based thereon allege, Defendants have acquired, disclosed, and/or used certain of Plaintiffs' trade secrets, and are using Plaintiffs' trade secrets to develop and manufacture competing human

COMPLAINT

allograft tissue products and capitalize on Plaintiffs' investment of time, resources and goodwill. More specifically, Plaintiffs are informed and believe Defendants acquired, disclosed, and/or used Plaintiffs' product design and formulations to manufacture its products, Plaintiffs' product cost information, and product specifications.

137. Plaintiffs are informed and believe, and based thereon allege, Defendants have acquired, disclosed, and/or used certain of Plaintiffs' trade secrets, and are using Plaintiffs' trade secrets including proprietary pricing models, customer lists and billing processes, to identify Plaintiffs' customers, who had already purchased or shown an interest in purchasing the unique products and services provided by Plaintiffs, and solicit those customers to conduct business with CTM instead of Plaintiffs and to interfere with Plaintiffs' legitimate business interests, valid contracts and prospective economic advantages to the detriment of Plaintiffs.

138. The information and/or documents Defendants misappropriated constitute trade secrets under the Defend Trade Secrets Act of 2016 ("DTSA") because they derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and because Plaintiffs took reasonable and practical measures to maintain the secrecy and confidentiality of their trade secrets and confidential information.

139. Plaintiffs are informed and believe, and based thereon allege, Defendants have misappropriated Plaintiffs' trade secrets.

140. Plaintiffs are informed and believe, and based thereon allege, Defendants knew or should have known that the trade secrets were acquired by improper means.

141. Plaintiffs did not expressly or impliedly consent to Defendants' acquisition, disclosure, or use of their trade secrets.

COMPLAINT

ROSEN ✧ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

142. Plaintiffs are informed and believe, and based thereon allege, Defendants' misappropriation of Plaintiffs' trade secrets was willful and malicious.

143. Defendants' misappropriation of Plaintiffs' trade secrets has caused Plaintiffs to suffer and will cause Plaintiffs to continue to suffer damage and irreparable harm, absent immediate injunctive relief. Because Plaintiffs' remedy at law is inadequate, Plaintiffs seeks preliminary and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and the competitive and other benefits that information confers.

144. Unless and until enjoined, Defendants will continue to receive the benefit of the Plaintiffs' trade secrets misappropriated by Defendants, which have aided and will continue to aid Defendants to compete unfairly against Plaintiffs. Moreover, Defendants will continue to expand their business, solicit customers of Plaintiffs and disclose trade secrets to third parties.

145. Defendants' misappropriation has proximately caused damages to Plaintiffs, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities.

146. Plaintiffs are informed and believe, and based thereon allege, Defendants have been unjustly enriched as a further proximate result of his misappropriation of Plaintiffs' trade secret and confidential information.

147. Defendants' actions in misappropriating Plaintiffs' trade secrets were willful, fraudulent, malicious, and were done with the intent to injure and oppress Plaintiffs and improve Defendants own economic opportunities, thereby justifying an award of punitive damages against Defendants pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. §1836(b)(3)(D).

///

COMPLAINT

ROSEN ✧ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

## FOURTH CAUSE OF ACTION

### Breach of Contract - HRT

### (On behalf of HRT against Banman and DOES 1-10)

148. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 102 and incorporate them herein by reference.

149. HRT and Banman entered into the HRT Consulting Agreement on or about on or around June 20, 2014.

150. At all relevant times, HRT fully performed all terms and conditions of the SKYE Employment Agreement and the HRT Consulting Agreement.

151. Banman breached the parties' agreements, by using and disclosing confidential information and trade secrets, including but not limited to Plaintiffs' proprietary pricing models and customer lists, to third parties. Defendants have also used Plaintiffs' confidential information and trade secrets to breach and end the business relationship that Plaintiffs had with their customers.

152. Additionally, Banman breached the HRT Consulting Agreement by using Plaintiffs' property including their confidential information and trade secrets, for purposes other than his employment with HRT.

153. As a direct and proximate result of these breaches of contract, HRT has been damaged in an amount according to proof which includes the loss of all gross revenue from all customers that Banman solicited.

154. As a direct and proximate result of these breaches of contract, HRT has suffered other economic and contractual damages, including but not limited to, past and future expenses and lost profits, in an amount to be proven at trial.

///

COMPLAINT

# FIFTH CAUSE OF ACTION

## Breach of Contract - SKYE

### (On behalf of SKYE against Banman and DOES 1-10)

155. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 102 incorporate them herein by reference.

156. SKYE and Banman entered into the SKYE Employment Agreement and the SKYE Confidentiality Agreement on or about April 18, 2018.

157. At all relevant times, SKYE fully performed all terms and conditions of the SKYE Employment Agreement and the SKYE Confidentiality Agreement.

158. Banman breached the SKYE Employment Agreement and the SKYE Confidentiality Agreement by using and disclosing confidential information and trade secrets, including but not limited to Plaintiffs' proprietary pricing models, (1) to third parties; (2) for purposes other than his employment with SKYE; (3) to breach and end the business relationship that HRT and SKYE had with their customers; and (4) to form, create and then work for CTM during his employment with SKYE, which he was prohibited from doing pursuant to the terms of the SKYE Employment Agreement and the SKYE Confidentiality Agreement.

159. Banman also breached the SKYE Employment Agreement and the SKYE Confidentiality Agreement by using SKYE's customer lists, which are protectable as trade secret, to solicit customers of SKYE's within one year of his resignation from his employment with SKYE.

160. As a direct and proximate result of these breaches of contract, SKYE has been damaged in an amount according to proof which includes the loss of all gross revenue from all customers that Banman solicited.

161. As a direct and proximate result of these breaches of contract, SKYE has suffered other economic and contractual damages, including but not limited to, past and future expenses and lost profits, in an amount to be proven at trial.

COMPLAINT

## SIXTH CAUSE OF ACTION

### Conversion

### (on behalf of all Plaintiffs against CTM and Banman)

162. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 102 and incorporate them herein by reference.

163. Plaintiffs have an ownership interest in and are entitled to possession of all documents and materials, in whatever form, related to HRT and SKYE businesses and HRT products, and have an ownership interest in their trade secrets and confidential information as described hereinabove.

164. Plaintiffs are informed and believe, and based thereon allege, Defendants copied and/or wrongfully obtained electronic files, data and documents without the authorization of Plaintiffs, including without limitation, documents containing or reflecting Plaintiffs' confidential information and Defendants have been unjustly enriched by virtue of their use of same.

165. The above acts of Defendants constitute a conversion of these electronic files, data, documents, and tangible materials.

166. As a proximate result of Defendants' conduct, Plaintiffs have suffered actual damages as a direct and proximate result of this conversion.

167. Plaintiffs are entitled to judgment against Defendants for the amount of their actual, general, compensatory, incidental, special, and consequential damages relating to such conversion.

168. As a further proximate result of Defendant's conduct, Plaintiffs have incurred expense in pursuit of their property. Therefore, Plaintiffs are entitled to compensation for their time and costs expended in pursuit of their property pursuant to *California Civil Code* § 3336.

169. Defendants' actions were reckless, willful, and wanton and Plaintiffs are further entitled to judgment against Defendants for punitive damages

ROSEN ✦ SABA, LLP

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

36

COMPLAINT

ROSEN ✧ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

## SEVENTH CAUSE OF ACTION

### Conversion

### (on behalf of all Plaintiffs against Stumpe)

170.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 102 and incorporate them herein by reference.

171.   Plaintiffs have an ownership and possessory interest in and are entitled to possession of all of Plaintiffs' product inventory, and the profits from the sale of that inventory, given to sales personnel on a consignment basis meaning that sales personnel must either sell the inventory within a certain time parameter, returning the profit to Plaintiffs, or return the inventory to Plaintiffs.

172.   Stumpe has intentionally interfered with Plaintiffs' possession of certain inventory by retaining possession of that inventory without any intention to return the profits from the sale of that inventory to Plaintiffs, and refusing to return the inventory to Plaintiffs.

173.   Plaintiffs are informed and believe, and based thereon allege that Stumpe has been unjustly enriched by virtue of his use/possession of same.

174.   The inventory unlawfully in Stumpe's possession has a value to be proven at trial but which Plaintiffs are informed and believe exceeds $200,000.00.

175.   The above acts of Stumpe constitute a conversion of this product inventory.

176.   As a proximate result of Stumpe's conduct, Plaintiffs have suffered actual damages as a direct and proximate result of this conversion.

177.   Plaintiffs are entitled to judgment against Stumpe for the amount of their actual, general, compensatory, incidental, special, punitive, and consequential damages relating to such conversion.

///

COMPLAINT

## EIGHTH CAUSE OF ACTION

### Accounting/Unjust Enrichment

### (on behalf of all Plaintiffs against all Defendants)

178.  Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 102 and incorporate them herein by reference.

179.  Defendants received a benefit as described herein, including but not limited to using Plaintiffs' business accounts and property to establish their competing business, using Plaintiffs' confidential information and trade secrets, without Plaintiffs' authorization, to improperly target Plaintiffs' existing and prospective customers, to produce and market products, to interfere with business agreements to their advantage and to Plaintiffs' detriment, all to capitalize on Plaintiffs' investment of time, resources and the goodwill and recognition that HRT and SKYE had made in the marketplace.

180.  Accordingly, Plaintiffs demand an accounting from Defendants.

181.  Additionally, Defendants retained the benefit unjustly as described herein, which Plaintiffs demand payment.

## NINTH CAUSE OF ACTION

### Tortious Interference with Contract

### (on behalf of all Plaintiffs against CTM and Banman)

182.  Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 102 and incorporate them herein by reference

183.  Plaintiffs HRT and/or SKYE and numerous contracts with sales agents, vendors, distributors, hospitals and doctors.

184.  Plaintiffs are informed and believe, and based thereon allege, that Banman interfered with Plaintiffs' contract with Rogers, GCRMC, and many others.

ROSEN ✧ SABA, LLP

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

38

185. Plaintiffs are informed and believe, and based thereon allege that Banman also interfered with Plaintiffs' contract with Stumpe to cease performance under their respective agreements with Plaintiffs.

186. Defendants knowingly, intentionally, unjustifiably, and in bad faith induced Rogers, Stumpe, and GCRMC to breach their agreement by requesting, encouraging, or otherwise inducing them to cease performance under their agreements and to disclose or use Plaintiffs' confidential, proprietary, or trade secret information to harm Plaintiffs.

187. As a direct and proximate result of Defendants' misconduct, Plaintiffs' have been damaged in an amount to be proven at trial, but in any event in excess of $75,000.

188. Upon information and belief, as a result of Defendants' conduct, Plaintiffs have suffered, and continue to suffer substantial and irreparable injury for which there is no adequate remedy at law.

189. By reason of the foregoing, Plaintiffs are entitled to recover compensatory and punitive damages against Defendants

## TENTH CAUSE OF ACTION

### Tortious interference with Prospective Economic Advantage
### (on behalf of all Plaintiffs against all Defendants)

190. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 102 and incorporate them herein by reference

191. Defendants are aware of Plaintiffs' valid contractual and business relationships with customers, employees, consultants, including salespersons, as stated herein, that are maintained in order to make and sell Plaintiffs' products.

192. Defendants are aware of the economic benefits that flow to Plaintiffs as a result of these contractual relationships. Defendants are further aware of the

COMPLAINT

probability that economic benefits would continue to flow to Plaintiffs in the future as a result of these contractual relationships

193.   As an example, Defendants CTM, Banman and Rodgers manipulated Plaintiffs' application to the FSS, which interfered with Plaintiffs' relationships with Rogers and VMD.

194.   Additionally, Defendants CTM, Banman and Stumpe wrongfully solicited, recruited and convinced Plaintiffs' employees and consultants to stop performing under their respective agreements with Plaintiffs.

195.   Moreover, Defendants CTM, Banman and Stumpe used Plaintiffs' trade secrets to target and solicit Plaintiffs' customers with the purpose of interfering with actual or prosective contractual relationships.

196.   The conduct of Defendants' described above is intended to disrupt the economic relationships between Plaintiffs and their customers.

197.   Upon information and belief, Plaintiffs' customers have limited their purchase of Plaintiffs' products in anticipation of Defendants' products or have ceased performing under the terms of their agreements with Plaintiffs.

198.   As a proximate result of Defendants' intentional misconduct, Plaintiffs have suffered damages in an amount to be proven at trial.

199.   The conduct of Defendants in interfering with Plaintiffs' economic relationships was intentional, willful and calculated to cause damages to Plaintiffs' lawful business. The conduct of Defendants was perpetrated with actual malice and ill will toward Plaintiffs, and with the intentional and improper purpose of causing damage. There was no justifiable cause for Defendants' action other than to divert revenue, and as a result, an award of punitive damages is warranted.

///

COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that:

A.     For general damages in an amount within the jurisdictional limits of this court;

B.     For special damages against all Defendants, and each of them, in an amount to be determined at trial;

C.     For compensatory damages against Defendants in an amount to be determined at trial, but in any event, more than $75,000;

D.      For exemplary and/or punitive damages for Defendants' willful, malicious, wanton, or reckless conduct;

E.     Preliminary and permanent injunctive relief enjoining and restraining Defendants, along with their respective agents, employers, attorneys, servants, representatives, successors, assigns, and all persons acting under, in concert, in participation with, or for them from (i) directly or indirectly disclosing Plaintiffs' trade secrets and confidential information; and (ii) committing any other unfair business practice directed towards obtaining for the Defendant the business and customers of Plaintiffs;

F.     An Order requiring Defendants to take immediate steps to protect and preserve Plaintiffs' trade secrets;

G.     An Order requiring Defendants to return to Plaintiffs all Plaintiffs' property, including all Confidential Information of Plaintiffs;

H.     An accounting from Defendants of their unjust profits and misuse of Plaintiffs' trade secrets and confidential information;

I.     An Order disgorging Defendants' profits from its unlawful acts and accounting of such profit;

J.     A constructive trust for the benefit of Plaintiffs to be imposed upon all funds, assets, revenues, and profits and Defendants have or will derive from their unlawful acts and misappropriation of Plaintiffs' information and property;

ROSEN ◆ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

41

COMPLAINT

K.     Reasonable attorneys' fees incurred in bringing this action to the full extent permitted by law or contract;

L.     For statutory civil penalties against all Defendants, and each of them, in a sum to be established according to proof;

M.     For interest at the legal rate permitted by law; and

N.     For such other and further relief as the court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED:  April 13, 2020                    ROSEN ✧ SABA, LLP


By:     s/ Ryan D. Saba
         Ryan D. Saba, Esq.
         Francesca N. Dioguardi, Esq.
         Laura Kelly St. Martin, Esq.
         Attorneys for Plaintiffs



42

COMPLAINT