Paul T. Martin (SBN 155367)
   pmartin@hgla.com
Thomas H. Case (SBN 116660)
   tcase@hgla.com
HENNELLY & GROSSFELD LLP
4640 Admiralty Way, Suite 850
Marina del Rey, CA  90292
Telephone:  (310) 305-2100
Facsimile:   (210) 305-2116

Robert J. Fluskey, Jr. *(pro hac vice)*
   rfluskey@hodgsonruss.com
Ryan K. Cummings *(pro hac vice)*
   rcumming@hodgsonruss.com
Matthew K. Parker *(pro hac vice)*
   mparker@hodgsonruss.com
HODGSON RUSS LLP
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
Telephone:  (716) 856-4000
Facsimile:   (716) 849-0349

Attorneys for Defendants
CTM Biomedical, LLC, Bryan Banman,
CTM Medical, Inc., and Pablo Seoane

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company,<br><br>        Plaintiffs,<br><br>vs.<br><br>CTM BIOMEDICAL, LLC, a Delaware Limited Corporation; BRYAN BANMAN, an individual; CTM MEDICAL INC., a Delaware Corporation; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; NATHAN BOULAIS, an individual; and DOES 3 through 10, inclusive,<br>        Defendants. | Case No.: 2:20-cv-03444-MEMF (PCVx)<br>Hon. Maame Ewusi-Mensah Frimpong<br><br>**JOINT BRIEF ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>**REQUEST FOR ORAL ARGUMENT**<br><br>Date:         February 9, 2023<br>Time:         10:00 a.m.<br>Courtroom:  8B |

Case No.: 2:20-cv-03444-MEMF-PVC

JOINT BRIEF ON DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

**Additional Counsel:**

Arash Beral, Esq.
Saam Takaloo, Esq.
Blank Rome LLP
2029 Century Park East, 6th Floor
Los Angeles, CA 90067

Attorneys for Defendant Mike Stumpe


Michael R. Williams, Esq.
Carlos A. Nevarez, Esq.
Bienert Katzman Littrell Williams, LLP
903 Calle Amanecer, Suite 350
San Clemente, CA 02673

Attorneys for Defendant Nathan Boulais


Ryan D. Saba, Esq.
Laura St. Martin, Esq.
Rosen Saba, LLP
2301 Rosecrans Ave., Suite 3180
El Segundo, CA 90245

Attorneys for Plaintiffs

Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ viii

DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ........................................... 1

PRELIMINARY STATEMENTS ........................................................................................ 1

      THE CTM DEFENDANTS' PRELIMINARY STATEMENT ................................... 1

      STUMPE'S PRELIMINARY STATEMENT ............................................................ 2

      PLAINTIFFS' PRELIMINARY STATEMENT ...................................................... 3

      DEFENDANTS' REPLY PRELIMINARY STATEMENT ..................................... 4

FACTUAL BACKGROUND .............................................................................................. 5

THE CTM DEFENDANTS' FACTUAL SUMMARY ....................................................... 5

I.     The Parties and their Products .................................................................................. 5

II.    Banman's Prior Work with HRT/Skye ..................................................................... 5

III.   The Business of CTM ............................................................................................... 6

IV.   This Action ............................................................................................................... 7

STUMPE'S FACTUAL SUMMARY ................................................................................. 7

I.     Stumpe's Background .............................................................................................. 7

II.    Stumpe's Entities (Novus and Silenda) Begin Work With Skye ............................. 7

III.   Silenda Begins Working With CTM ........................................................................ 7

IV.   Plaintiffs' Claims Against Stumpe in His Individual Capacity ................................ 8

V.    Plaintiffs' Allegations of Conversion ...................................................................... 10

PLAINTIFFS' FACTUAL SUMMARY ............................................................................ 11

I.     BRYAN BANMAN HAD NO KNOWLEDGE OR EMPLOYMENT HISTORY IN
      THE HUMAN PLACENTAL BUSINESS BEFORE HE MET CHRIS SHARP ... 11

II.    BANMAN AND SHARP BEGIN TO WORK TOGETHER .................................. 12

III.   HRT'S PRODUCTS REDUCES HEALING TIME FOR PATIENTS ................... 13

IV.   THE HRT PRODUCTS ARE PLAINLY PROTECTIBLE TRADE SECRETS ... 13

V.    SKYE/HRT OPT FOR TRADE SECRET RATHER THAN PATENT
      PROTECTION ......................................................................................................... 14

VI.    CONTRACTS SIGNED BETWEEN PLAINTIFFS AND DEFENDANTS.........................16

    A.    Banman Signed Multiple Confidentiality Agreements.................................16

    B.    Boulais, Stumpe and Seoane Likewise Agree to Confidentiality.................17

VII.   BANMAN SECRETLY STARTS A COMPETING COMPANY USING PLAINTIFFS' TRADE SECRETS, PRODUCTS AND SALES REPRESENTATIVES...............................................................................................17

    A.    The Conspiracy Is Created in March 2018 .................................................17

    B.    Banman Uses Fake Aliases to Find a Manufacturer....................................19

    C.    Skye's Customers Are Secretly Targeted ...................................................20

    D.    In Summer 2018, the Conspiracy Expands to Steal Skye Accounts by Deception ...................................................................................................22

    E.    Banman Uses Skye's Confidential Login Credential to Access Broward Health ........................................................................................................24

    F.    Banman Searches for a Company to Manufacture Skye's Products with CTM Name ..........................................................................................................24

    G.    CTM and Alamo sign the Agreement for Biomedical Materials.................25

    H.    The Defendants Reveal the Purpose of the Conspiracy, And Recruit Another Member ......................................................................................................27

VIII.  PLAINTIFFS HAVE BEEN SIGNIFICANTLY DAMAGED................................29

SUMMARY JUDGMENT STANDARD ........................................................................29

ALL DEFENDANTS........................................................................................................29

PLAINTIFFS ...................................................................................................................30

ARGUMENT...................................................................................................................31

DEFENDANTS' PORTION:............................................................................................31

I.     The Court should dismiss Plaintiffs' RICO claims (Counts I & II) under Rule 56 and Rule 12(c) because there is no "predicate act" or "pattern of racketeering activity." ............31

    A.    There is no predicate act as a matter of law...............................................31

PLAINTIFFS' PORTION:................................................................................................33

A.    Defendants Do Not Meet Their Summary Judgment Burden on This Issue ...............33

B.    A Violation of 18 U.S.C. § 1832 is a Predicate Act for RICO ...................................33

C.    This Court Previously Ruled on this Pleading Issue in Favor of Plaintiffs. ...............37

D.    A Violation of the DTSA is also a Predicate Act for RICO .......................................38

DEFENDANTS' REPLY: ...................................................................................................40

    1.    Plaintiffs' procedural argument is wrong as a matter of law ..........................40

    2.    Defendants did not engage in any act in violation of Section 1832................40

    3.    The Court did not previously rule on this issue ..............................................41

    4.    Plaintiffs misstate Defendants' argument and the case law............................42

DEFENDANTS' PORTION:.................................................................................................43

B.    There is no threat of continued criminal activity (no "pattern")................................43

PLAINTIFFS' PORTION:....................................................................................................44

DEFENDANTS' REPLY: ....................................................................................................45

DEFENDANTS' PORTION:.................................................................................................46

C.    There is no actionable RICO "scheme." ....................................................................46

PLAINTIFFS' PORTION:....................................................................................................46

DEFENDANTS' PORTION:.................................................................................................47

D.    Plaintiffs' conspiracy to violate RICO claim (Count II) must also be

    dismissed.....................................................................................................................47

PLAINTIFFS' PORTION:....................................................................................................47

DEFENDANTS' REPLY: ....................................................................................................48

DEFENDANTS' PORTION:.................................................................................................48

II.    The Court should grant summary judgment to Defendants on Plaintiffs' DTSA Claim

    (Count III). .................................................................................................................48

A.    Plaintiffs have failed to identify the allegedly misappropriated trade secrets. ...........49

    1.    The applicable law ..........................................................................................49

    2.    Plaintiffs' failure to identify as to the CTM Defendants. ...............................50

B.    Certain items are indisputably not trade secrets (all DTSA Defendants). ..................55

iii                Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

1.   "Connective tissue matrix" ................................................55

2.   The Identities of Employees and Sales Representatives.................55

3.   The Identities of Research Physicians .................................56

4.   Skye's Pricing .......................................................56

5.   Product Appearance/Product Ideas......................................56

6.   Relationships are Not Trade Secrets ..................................56

PLAINTIFFS' PORTION:........................................................59

A.   The Relevant Law.....................................................59

B.   The Case Law Cited by Defendants is Inapplicable ....................60

C.   Plaintiffs Have Identified Trade Secrets ............................61

1.   HRT's Manufacturing Process is a Trade Secret........................61

2.   Skye's Customer Lists and Information are Trade Secrets..............62

3.   Plaintiffs' Research Physicians are Trade Secret....................64

4.   Skye's Employee and Sales Representative Information is Trade Secret.................................................................65

5.   Skye and HRT's Business Operations are Trade Secret.................65

6.   Skye's Customer Pricing Information is Trade Secret .................66

7.   Skye's Marketing and Sales Strategies are Trade Secrets ............66

8.   Skye and HRT have shown Reasonable Efforts to Keep these Secret ....67

D.   Defendants' Argument that "Certain" Items are Not Trade Secrets is Misguided ............................................................67

DEFENDANTS' REPLY:.........................................................68

1.   Plaintiffs fail to address Defendants' principal argument...........68

2.   Defendants' may seek summary judgment on an element or portion of a claim..............................................................71

3.   Plaintiffs finally concede that Stumpe's relationships are not trade secrets.............................................................72

DEFENDANTS' PORTION:.......................................................73

C.    The undisputed evidence conclusively disproves use and disclosure..........................73

   1.    The applicable law ........................................................................73

   2.    The evidence of non-use and non-disclosure as to the CTM Defendants........74

   3.    Stumpe did not misappropriate any alleged "trade secret."............................75

   4.    HRT admits it has no viable claims against Stumpe......................................77

PLAINTIFFS' PORTION:....................................................................................77

DEFENDANTS' REPLY: .....................................................................................78

   A.    Plaintiffs fail to submit evidence of use or disclosure ................................78

   B.    Plaintiffs seemingly concede that Stumpe  did not misappropriate an alleged

          trade secret ......................................................................................78

DEFENDANTS' PORTION:..................................................................................80

III.   Plaintiffs' breach of contract claims against Banman (Counts IV & V) fail because

       the undisputed, material facts disprove use and disclosure. ...................................80

PLAINTIFFS' PORTION:....................................................................................80

DEFENDANTS' REPLY: .....................................................................................81

DEFENDANTS' PORTION:..................................................................................81

IV.   The Court should dismiss Plaintiffs' conversion claim against CTM, CTM Med, and

       Banman (Count VI).........................................................................................81

PLAINTIFFS' PORTION:....................................................................................82

DEFENDANTS' PORTION:..................................................................................82

V.    Plaintiffs' conversion claim against Stumpe (Count VII) is misplaced...................82

PLAINTIFFS' PORTION:....................................................................................84

DEFENDANTS' REPLY: .....................................................................................85

   A.    The Conversion Claim Against Stumpe Lacks Merit. .................................85

DEFENDANTS' PORTION:..................................................................................86

VI.   The Court should grant partial summary judgment to the  CTM Defendants on

       Plaintiffs' tortious interference with contract claim (Count VIII). ..........................86

   A.    The court should dismiss the customer interference claims. ......................87

v            Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

B.      The court should dismiss the research physician interference claims. ........................88

C.      The Court should limit the independent sales representatives claim. .........................88

D.      Other allegations of interference in Plaintiffs' Complaint...........................................90

PLAINTIFFS' PORTION:.............................................................................................................91

DEFENDANTS' REPLY: ..............................................................................................................93

A.      Rule 56 permits partial summary judgment on portions of a claim.............................93

B.      Plaintiffs do not oppose many of Defendants' arguments............................................93

C.      There is no evidence of breach or disruption of any customer contract ......................93

D.      Plaintiffs' arguments concerning Seoane, Carey, and Stumpe should be
        rejected ...........................................................................................................................94

DEFENDANTS' PORTION:..........................................................................................................94

VII.    Plaintiffs' claim for tortious interference with  prospective economic advantage
        (Count IX) fails. ............................................................................................................94

A.      The undisputed facts disprove "independently wrongful" acts. ...................................94

PLAINTIFFS' PORTION:.............................................................................................................95

DEFENDANTS' REPLY: ..............................................................................................................96

DEFENDANTS' PORTION:..........................................................................................................96

B.      Trade secret law preempts the interference claim.........................................................96

PLAINTIFF'S PORTION:.............................................................................................................97

DEFENDANTS' REPLY: ..............................................................................................................98

1.      Preemption Defense Need Not Be Raised  by Answer, and Plaintiffs
        Misread the DTSA ...........................................................................................98

DEFENDANTS' PORTION:........................................................................................................100

C.      HRT admits it has no viable claim for intentional interference  with
        prospective economic advantage against Stumpe........................................................100

PLAINTIFFS' PORTION:...........................................................................................................100

DEFENDANTS' REPLY: ............................................................................................................100

DEFENDANTS' PORTION:........................................................................................................100

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

VIII.    Plaintiffs are foreclosed from seeking certain remedies against Stumpe. ............................100

PLAINTIFFS' PORTION:..................................................................................................................103

DEFENDANTS' REPLY: ..................................................................................................................104

      A.    Plaintiffs' Damage Allegations Against Stumpe Lack Merit. ...................................104

DEFENDANTS' PORTION:...............................................................................................................106

IX.    Plaintiffs' claims against Stumpe are misplaced ................................................................106

PLAINTIFFS' PORTION:..................................................................................................................106

DEFENDANTS' REPLY: ..................................................................................................................107

      A.    Claims Against Stumpe are Misguided...................................................................107

DEFENDANTS' CONCLUSION ......................................................................................................107

PLAINTIFFS' CONCLUSION .........................................................................................................107

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

## TABLE OF AUTHORITIES

**Federal Cases**

*1-800 Remodel, Inc. v. Bodor*,

2018 WL 6340759 (C.D.Cal. Oct. 17, 2018)................................................................77

*Adickes v. S.H. Kress & Co.*,

398 U.S. 144 (1970)................................................................................................30

*AdvantaCare Health Partners, LP v. Access IV, Inc.*,

2003 WL 23883596 (N.D. Cal. Oct. 24, 2003) (unpublished) .........................................57, 71

*Agile Sourcing v. Dempsey*,

No. EDCV 21-773, 2021 U.S. Dist. LEXIS 204631 (C.D. Cal. July 15, 2021) ....................97

*Al–Kazemi v. General Acceptance & Investment Corp.*,

633 F.Supp. 540 (D.C 1986)......................................................................................103

*Al-Abood ex rel. Al-Abood v. El-Shamari*,

217 F.3d 225 (4th Cir. 2000) ....................................................................................46

*Albert's Organics, Inc. v. Holzman*,

445 F. Supp. 3d 463 (N.D.Cal. 2020).............................................................................62

*Alexander v. Wessell*,

742 Fed.Appx. 216 (9th Cir. 2018)...............................................................................103

*Allstate Inc. Co. v. Madan*,

889 F. Supp. 374 (C.D. Cal. 1995) ................................................................................72

*Allstate Ins. Co. v. Countrywide Fin. Corp.*,

824 F. Supp. 2d 1164 (C.D. Cal. 2011) ........................................................................98

*Allwaste, Inc. v. Hecht*,

65 F.3d 1523 (9th Cir. 1995) ......................................................................................44

*Argo Grp. US, Inc. v. Prof'l Governmental Underwriters, Inc.*,

2013 WL 11327772 (C.D.Cal. 2013).............................................................................66

*Ashcroft v. Iqbal*

556 US 662 (2009)....................................................................................................33

*Attia v. Google LLC*,

2018 WL 2971049 (N.D. Cal. June 13, 2018)................................................................43, 44, 45

*Bartlett v. Bartlett*,

2017 WL 5499403 (S.D.Ill.2017)...........................................................................................45

*Baumer v. Pachl*,

8 F.3d 1341 (9th Cir. 1993) .....................................................................................................47

*Beaulieu Group, LLC v. Bates*,

2016 WL 7626471 (C.D. Cal. Oct. 18, 2016)................................................................. *passim*

*Bell Atlantic Corp. v. Twombly*

550 US 544 (2007)...................................................................................................................33

*Binary Semantics Ltd. v. Minitab, Inc.*,

2008 WL 763575 (M.D. Pa. Mar. 20, 2008)......................................................................44, 45

*Bondit, LLC v. Hallows Movie, Inc.*,

2020 WL 7777992 (C.D. Cal. Apr. 1, 2020) ...........................................................................48

*Brand Energy & Infrastructure Servs. v. Irex Contr. Grp.*,

2017 WL 1105648 (E.D.Penn.2017) ....................................................................38, 39, 42, 45

*Brocade Commc'n Sys. Inc. v. A10 Networks, Inc.*,

873 F.Supp.2d 1192 (N.D.Cal. 2012) ................................................................................63, 66

*C-Ville Fabricating, Inc. v. Tarter*,

2019 WL 1368621 (E.D.Ky.2019) ..........................................................................................45

*Cablecom Tax Services, Inc. v. Shenandoah Telecommunications Co.*,

2013 WL 2382969 (W.D. Va. May 30, 2013) .........................................................................57

*Calendar Rsch. LLC v. StubHub, Inc.*,

2020 WL 4390391 (C.D. Cal. May 13, 2020) ................................................................ *passim*

*Celotex Corp. v. Catrett*,

477 U.S. 317 (1986).....................................................................................................29, 30, 33

*In re Centerstone Diamonds, Inc.*,

2014 WL 1330186 (Bankr. C.D. Cal. Apr. 2, 2014)................................................................93

*CMI Roadbuilding, Inc. v. Specsys, Inc.*,

2021 WL 2189222 (D. Okla. May 28, 2021)................................................................74

*Coble v. United States*,

335 F. Supp. 49 (C.D. Cal. 1971) ...............................................................106, 107

*CollegeSource, Inc. v. AcademyOne, Inc.*,

No. 08CV1987-GPC (MDD), 2015 WL 5638104 (S.D. Cal. Sept. 24, 2015), aff'd,

709 F. App'x 440 (9th Cir. 2017)................................................................99

*Collins v. Cottrell Contracting Corp.*,

733 F.Supp.2d 690 (E.D.N.C. 2010)................................................................103

*Com-Tech Associates v. Competer Associates Intern., Inc.*,

753 F. Supp. 1078 (E.D. NY 1990) .................................................................104

*Corelogic Sols., LLC v. Credifi Corp.*,

2021 WL 1156860 (C.D.Cal. 2021)................................................................59

*Cosmos Forms Ltd. V. Guardian Life Ins. Co. of Am.*,

113 F.3d 308 (2d Cir. 1997)................................................................46

*CrossBorder Sols., Inc. v. Macias, Gini, & O'Connell, LLP*,

2022 WL 562934 (S.D.N.Y. Feb. 23, 2022)................................................. *passim*

*Cutera, Inc. v. Lutronic Aesthetics, Inc.*,

444 F. Supp. 3d 1198 (E.D. Cal. 2020)................................................62, 66, 67

*Deerpoint Grp., Inc. v. Agrigenix, LLC*,

345 F.Supp.3d 1207 (E.D.Cal. 2018)................................................................59

*DHI Group, Inc. v. Kent*,

397 F.Supp.3d 904 (S.D.Tex. 2019)................................................................45

*DropzoneMS, LLC v. Cokayne*,

2019 WL 7630788 (D. Or. Sept. 12, 2019) ................................49, 50, 53, 60, 68

*Earthbound Corp. v. MiTek USA, Inc.*,

2017 WL 2919101 (C.D.Cal. 2017)................................................................59

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

*ELT Sight Inc. v. EyeLight Inc.*,

2020 WL 7862134 (C.D. Cal. Aug. 28, 2020)...................................................74, 78

*ESPOT, Inc. v. MyVue Media, LLC*,

492 F. Supp. 3d 672 (E.D. Tex. 2020) .............................................. *passim*

*Fast Access Specialty Therapeutics, LLC v. UnitedHealth Grp., Inc.*,

532 F. Supp. 3d 956 (S.D. Cal. 2021)...................................................................98

*First Advantage Background Serv. Corp. v. Private Eyes, Inc.*,

2007 WL 2572191 (N.D.Cal. Sep. 5, 2007) .........................................87, 88, 96, 104

*Fleischhauer v. Feltner*,

879 F.2d 1290 (6th Cir. 1989) ...........................................................................46

*Fontana v. Haskin*,

262 F.3d 871 (9th Cir. 2001) ..............................................................................30

*Franklin-Mason v. Penn*,

259 F.R.D. 9 (D.D.C. 2009).....................................................................67, 91, 103

*Goldsmith v. CVS Pharmacy, Inc.*,

No. CV 20-00750-AB (JCX), 2020 WL 1650750 (C.D. Cal. Apr. 3, 2020).................106, 107

*Grimmet v. Brown*,

75 F.3d 506 (9th Cir. 1996) ................................................................................31

*H.Q. Milton, Inc. v. Webster*,

2017 WL 5625929 (N.D.Cal. 2017) ..............................................................62, 66

*Hardwire, LLC v. Ebaugh*,

2021 WL 3809078 (D. Md. Aug. 26, 2021) .........................................31, 32, 42, 43

*Henry Schein, Inc. v. Cook*,

2016 WL 3418537 (N.D. Cal. 2016) .....................................................................63

*Honey Bum, LLC v. Fashion Nova, Inc.*,

2022 WL 385185 (C.D. Cal. Jan. 6, 2022) ......................................................94, 95

*Howard v. Am. Online Inc.*,

208 F.3d 741 (9th Cir 2000) ..........................................................................47, 48

xi          Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

*Hunter Consulting, Inc. v. Beas*,

2013 WL 12131581 (C.D. Cal. 2013)................................................................38, 39, 42

*IDX Sys. Corp. v. Epic Sys. Corp.*,

285 F.3d 581 (7th Cir. 2002) ...........................................................................................49

*Ikuno v. Yip*,

912 F.2d 306 (9th Cir. 1990) ...........................................................................................44

*Imax Corp. v. Cinema Techs., Inc.*,

152 F.3d 1161 (9th Cir. 1998) ...........................................................30, 49, 50, 60

*Int'l Med. Devices, Inc. v. Cornell*,

2021 WL 686441 (C.D. Cal. 2021)............................................................................59, 61

*Integral Dev. Corp. v. Tolat*,

675 Fed. Appx. 700 (9th Cir. 2017)..........................................................................30, 48

*Integrated Cash Mgmt. Serv. v. Digital Transactions*

920 F.2d 171 (2d Cir.1990)..............................................................................................61

*International Data Bank, Ltd. v. Zepkin*,

812 F.2d 149 (4th Cir. 1987) .................................................................................102, 105

*Jerome M. Sobel & Co. v. Fleck*,

2003 WL 22839799 (S.D.N.Y. Dec. 1, 2003) ................................................................46

*Jurisearch Holdings, LLC v. Lawriter*,

LLC, 2009 WL 10670588 (C.D. Cal. Apr. 13, 2009).....................................................81

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,

497 F.Supp.3d 552 (N.D.Cal. 2020) .....................................................................84, 106

*Kellwood Apparel, LLC v. Protrend Ltd.*,

2020 WL 3302669 (C.D. Cal. Mar. 5, 2020)..................................................................70

*Kennan v. Dow Chem. Co.*,

717 F.Supp. 799 (M.D. Fla. 1989)...................................................................................97

*Kittrich Corp. v. Chilewich Sultan, LLC*,

2013 WL 12131376 (C.D.Cal. 2013)...............................................................................59

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,

234 F. Supp. 3d 180 (D.D.C. 2017) .................................................................71, 104

*Lefkowitz v. Bank of N.Y.*,

2003 WL 22480049 (S.D.N.Y. Oct. 31, 2003) ..........................................................46

*LiiON LLC v. Vertiv Group Corp.*,

2021 WL 4963610 (N.D. Ill. Oct. 26, 2021).............................................................74

*Liquid Air Corp. v. Rogers*,

834 F.2d 1297 (7th Cir. 1987) ..................................................................................46

*Loop Al Labs, Inc. v. Gatti*,

195 F. Supp. 3d 1107 (N.D. Cal. 2016) ...............................................................49, 60

*Magnesita Refractories Co. v. Tianjin New Century Refractories Co., Ltd*,

2019 WL 1003623 (M.D.Pa. 2019) ..........................................................................34

*MAI Sys. Corp. v. Peak Comp., Inc.*,

991 F.2d 511 (9th Cir. 1993) ...............................................................30, 60, 62, 67

*Martin v. Lennox Int'l Inc.*,

342 Fed. Appx. 15 (5th Cir. 2009)............................................................................40

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574 (1986)...................................................................................................30

*Mattel, Inc. v. MGA Ent., Inc.*,

782 F.Supp.2d 911 (C.D. Cal. 2011) ........................................................................66

*McCandless Grp., LLC v. Coy Collective, Inc.*,

No. 221CV02069DOCKES, 2022 WL 2167686 (C.D. Cal. Feb. 14, 2022) .....................97, 99

*Medallion Television Enters., Inc. v. SelecTV of Cal., Inc.*,

833 F.2d 1360 (9th Cir. 1987) ..................................................................................46

*Medicrea USA, Inc. v. K2M Spine, Inc.*,

2018 WL 3407702 (S.D.N.Y. Feb. 7, 2018)..............................................................70

*Medinol Ltd. V. Boston Scientific Corp.*,

346 F. Supp. 2d 575 (S.D.N.Y. 2004).......................................................................46

*Mgt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*,
883 F.2d 48 (7th Cir. 1989) ....................................................................31, 44, 45

*Mohebbi v. Khazen*,
50 F. Supp. 3d 1234 (N.D. Cal. 2014) ..........................................................102, 105

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
319 F. Supp. 2d 1040 (C.D. Cal. 2003) ................................................................100

*Neibel v. Trans World Assur. Co.*,
108 F.3d 1123 (9th Cir. 1997) ............................................................................103

*Ochoa v. McDonald's Corp.*,
133 F. Supp. 3d 1228 (N.D. Cal. 2015) ...........................................................71, 104

*Office Outfitters, Inc. v. A.B. Dick Co., Inc.*,
83 F. Supp. 2d 772 (E.D. Tex. 2000)....................................................................46

*Oki Semiconductor Co. v. Wells Fargo Bank*,
298 F.3d 768 (9th Cir. 2002) ........................................................................47, 48

*PartyLite Gifts, Inc. v. Swiss Colony Occasions*,
246 F. App'x 969 (6th Cir. 2007) ...................................................................58, 65

*PartyLite Gifts, Inc. v. Swiss Colony Occasions*,
246 Fed. Appx. 969 (6th Cir. 2007)......................................................................55

*Quintara Biosciences, Inc. v. Ruifeng Biztech Inc.*,
No. C 20-04808 WHA, 2020 WL 7260510 (N.D. Cal. Dec. 10, 2020) ...............................101

*Religious Tech. Ctr. v. Wollersheim*,
796 F.2d 1076 (9th Cir. 1986) ...........................................................................38

*RRX Indus., Inc. v. Lab-Con, Inc.*,
772 F.2d 543 (9th Cir. 1985) ...........................................................................100

*Salinas v. United States*,
522 U.S. 52 (1997)......................................................................................47

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985)..................................................................................33, 38

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

*Shapiro v. Hasbro, Inc.*,

No. CV 16-5750-BRO, 2016 WL 9024810 (C.D. Cal. Aug. 15, 2016) ................................56

*Shaw v. Nissan N. Am., Inc.*,

220 F. Supp. 3d 1046 (C.D. Cal. 2016) ......................................................................31, 43, 47

*SolarCity Corp. v. Pure Solar Co.*,

2016 WL 11019989 (C.D.Cal.2016)......................................................................................45

*Source Prod. & Equip. Co., Inc. v. Schehr*,

2019 WL 4752058 (E.D. La. Sept. 30, 2019)........................................................................74

*SPS Techs., LLC v. Briles Aerospace, Inc.*,

2019 WL 1974902 (C.D. Cal. Mar. 11, 2019)......................................................................74

*Structural Preservation Systems, LLC v. Andrews*,

931 F.Supp.2d 667 (D. Md. 2013).........................................................................................58

*Sullivan v. Dollar Tree Stores, Inc.*,

623 F.3d 770 (9th Cir. 2010) ................................................................................................30

*Sun Sav. & Loan Ass'n v. Dierdorff*,

825 F.2d 187 (9th Cir. 1987) ................................................................................................44

*Sutrisno v. WebMD Practice Servs., Inc.*,

2005 WL 8154571 (C.D. Cal. June 30, 2005) ......................................................................87

*Teledyne Risi, Inc. v. Martin-Baker Aircraft Co. Ltd.*,

2016 WL 8857029 (C.D.Cal. 2016)......................................................................................61

*Ticor v. Title Ins. Co. v. Florida*,

937 F.2d 447 (9th Cir. 1991) ................................................................................................45

*Trandes Corp. v. Guy F. Atkinson Co.*,

996 F.2d 655 (4th Cir.1993) .................................................................................................60

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,

768 F.2d 1001 (9th Cir.1985) ...............................................................................................85

*UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*,

117 F. Supp. 3d 1092 (C.D. Cal. 2015) ...........................................................................86, 93

*United States v. Chung*,

659 F.3d 815 (9th Cir. 2011) ...............................................................................60, 61

*United States v. Fernandez*,

388 F.3d 1199 (9th Cir. 2004) ...................................................................................47

*United States v. Nosal*,

844 F.3d 1024 (9th Cir. 2016) ...................................................................................59

*Uptegrove v. U.S.*,

600 F.2d. 1248 (9th Cir. 1979) ..................................................................................40

*VBS Distrib., Inc. v. Nutrivita Labs., Inc.*,

2018 WL 5274172 (C.D. Cal. Sept. 10, 2018) ..........................................................30

*VCL Comm. GmbH v. Crystal Sky, LLC*,

2009 WL 10671634 (C.D. Cal. Sep. 22, 2009)..........................................................96

*Waymo LLC v. Uber Techs., Inc.*,

No. C 17-939 WHA, 2017 WL 2123560 (N.D. Cal. May 15, 2017).........................56

*WeRide Corp. v. Kun Huang*,

379 F. Supp. 3d 834 (N.D. Cal. 2019) .......................................................................67

*X6D Ltd. v. Li-Tek Corps. Co.*,

2012 WL 12952726 (C.D. Cal. Aug. 27, 2012)....................................................49, 50

*Yumul v. Smart Balance, Inc.*,

No. CV 10-00927 MMM, 2011 WL 1045555 (C.D. Cal. Mar. 14, 2011) ..............99

**State Cases**

*Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*,

226 Cal.App.4th 26 (2014) ........................................................................................61

*AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*,

28 Cal.App.5th 923 (Cal. Ct. App. 4th 2018).....................................................81, 91

*Anschutz Entertainment Group, Inc. v. Snepp*,

171 Cal. App. 4th 598 (2009) ..................................................................................104

*Beard Research, Inc. v. Kates*,

8 A.3d 573 (Del.Ch.2010).................................................................................................61

*Burlesci v. Petersen*,

68 Cal. App. 4th 1062 (1998) ...........................................................................................83

*Coll. Hosp. Inc. v. Superior Ct.*,

8 Cal. 4th 704, 882 P.2d 894 (1994) ...............................................................................103

*Dowell v. Biosense Webster, Inc.*,

179 Cal. App. 4th 564 (2009) ...........................................................................................57

*Edwards v. Arthur Andersen LLP*,

44 Cal. 4th 937 (2008) .....................................................................................................57

*Farmers Ins. Exchange v. Zerin*

53 Cal.App.4th 445 (1997) ..................................................................................84, 85, 86

*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.*,

171 Cal. App. 4th 939 (2009) ................................................................................96, 97, 102

*Metro Traffic Control, Inc. v. Shadow Traffic Network*,

22 Cal. App. 4th 853 (1994) .............................................................................................57

*Morlife, Inc. v. Perry*,

56 Cal.App.4th 1514 (1997) .............................................................................................63

*Nuvasive, Inc. v. Miles*,

2019 WL 4010814 (Del. Ch. Aug. 26, 2019) ...................................................................91

*Oakdale Village Group v. Fong*,

43 Cal. App. 4th 539 (1996) .............................................................................................82

*Pac. Gas & Electric Co. v. Bear Stearns & Co.*,

50 Cal. 3d 1118 (CA 1990)...............................................................................................87

*Ret. Group v. Galante*,

176 Cal. App. 4th 1226 (2009) .........................................................................................57

*Sethscot Collection, Inc. v. Drbul*,

669 So.2d 1076 (Fla. Dist. Ct. App. 1996) ................................................................58, 71

*Silvaco Data Systems v. Intel Corp.*,

    184 Cal. App. 4th 210 (2010) ...........................................................................97

*Simonian v. Patterson*,

    27 Cal. App. 4th 773 (1994) ......................................................................83, 84

*Smith v. Sup.Ct. (Bucher)*,

    10 Cal. App. 4th 1033 (1992) .........................................................................104

*Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-6930-RS,

    2018 WL 1456697 (N.D. Cal. Mar. 23, 2018).................................................57

*Whyte v. Schlage Lock Co.*,

    101 Cal. App. 4th 1443 (2002) ........................................................................74

*Zaslow v. Kroenert*,

    29 Cal. 2d 541 549 (1946) ........................................................................82, 83

**Federal Statutes**

18 U.S.C. § 1832............................................................................................ *passim*

18 U.S.C. § 1833.............................................................................48, 101, 103

18 U.S.C. § 1836............................................................................................ *passim*

18 U.S.C. § 1838...................................................................................................98, 99

18 U.S.C. § 1839.............................................................32, 49, 54, 56, 59, 73, 77, 78

18 U.S.C. § 1961..................................................................................31, 37, 42, 43

18 U.S.C. § 1962...........................................................................................31, 47

**State Statutes**

Cal. Bus. & Prof. Code § 16600 ................................................................57, 81, 91

Cal. Bus. & Prof. Code § 17200 et. seq. ...........................................................97

Cal. Civil Code § 3294(a) ..................................................................................103

Cal. Civ. Code § 3426.1(d) .................................................................................56

Cal. Civ. Code § 3426.3.......................................................................................98

Cal. Civ. Code § 3426.7(b) ..................................................................................96

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Cal. Uniform Trade Secrets Act.................................................................................59, 102

**Rules**

Fed. R. Civ. P. 8(c) .................................................................................................97

Fed. R. Civ. P. 8(e) .................................................................................................33

Fed. R. Civ. P. 12(c) .................................................................................31, 40, 98

Fed. R. Civ. P. 12(h) .....................................................................................40, 98

Fed. R. Civ. P. 56(a) ......................................................................29, 71, 96, 104

Local Rules 56-2 and 56-3 .................................................................................30

**Constitutional Provisions**

Fourth Amendment ..................................................................................................1

**Other Authorities**

Restatement (3rd) of Employment Law, § 8.02.................................................................58

**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

**PRELIMINARY STATEMENTS**

**THE CTM DEFENDANTS' PRELIMINARY STATEMENT**

This action is a brazen attempt to restrict the lawful competition of former consultants, employees, and independent sales representatives. Defendant Bryan Banman worked as a consultant and employee of Plaintiff Skye Orthobiologics, LLC ("Skye") and as a consultant for Plaintiff Human Regenerative Technologies, LLC ("HRT"). In 2018, he formed his own business, defendant CTM Biomedical, LLC ("CTM"). This angered Chris Sharp, the owner of HRT and Skye, so he filed this lawsuit and baselessly accused Banman of masterminding a RICO conspiracy. Sharp's goal was to shut down CTM's business. He joined CTM employee Pablo Seoane and independent sales representatives Mike Stumpe and Nathan Boulais. As part of their effort to make litigation as destructive as possible, Plaintiffs even named Gardner Rogers, who merely checked CTM's mail and deposited checks for the company, and issued more than 150 non-party subpoenas to any company or person who might conceivably have a relationship with CTM or Banman.

Plaintiffs claim that trade secret misappropriation under the Defend Trade Secrets Act ("DTSA") (18 U.S.C. § 1836) is the "predicate act" of the RICO conspiracy. But they are unable to identify the trade secrets that the defendants allegedly used or disclosed. When asked for that information in discovery, they provided vague references to broad categories of information that encompassed their entire business. Plaintiffs' case is driven by a flagrantly anti-competitive theme: everything that we do is "secret" and "proprietary," and if you compete against us, you must be using our information. But the law is clear that DTSA cannot be weaponized in this fashion. Prior access to confidential information does not prove misappropriation, and "inevitable disclosure" is not misappropriation under the DTSA or in California. To proceed to trial, Plaintiffs must identify their specific trade secrets and proffer evidence that those trade secrets were used or disclosed. They cannot do either.

This Court should put an end to Plaintiffs' overreach. To that end, the CTM Defendants (Banman, Seoane, CTM, and CTM Medical, Inc. ("CTM Med")) seek summary judgment on Counts 1-6, and 8-9 of the Fourth Amendment Complaint. Plaintiffs' RICO claims (Counts 1-2) fail because

Plaintiffs have not identified or established a predicate act or pattern of racketeering activity. The DTSA claim (Count 3) fails for multiple reasons, including that Plaintiffs failure to identify their trade secrets, and to the extent that they have referenced broad categories of information, they are either not protectable as a matter of law or have not been misappropriated. Plaintiffs' breach-of-contract claims (Counts 4-5) and tortious interference with prospective economic advantage claim (Count 9) fail for essentially the same reasons as the DTSA claim. There is no basis for Plaintiffs' conversion claim (Count 6) because the CTM Defendants did not wrongfully acquire any of Plaintiffs' information. Finally, partial summary judgment on Plaintiffs' tortious interference with contract claim (Count 8) is warranted because Plaintiffs do not have any contracts with customers or research physicians that preclude those entities/individuals from doing business with CTM. There simply are no contracts that were breached or disrupted. Further, Plaintiffs have baselessly included in this claim multiple individuals and entities with whom CTM has never even done business.

## STUMPE'S PRELIMINARY STATEMENT

For longer than Skye Orthobiologics, LLC ("Skye") and Human Regenerative Technologies, LLC ("HRT," and with Skye, "Plaintiffs") have been in existence, Mike Stumpe ("Stumpe") has made a living selling and distributing medical products (including amniotic-derived products). Stumpe sells these products in the relatively small Indiana market, most of which sales are earmarked for his best friend, Dr. Janos Ertl, and a few others with whom he maintains very close relationships. Stripped to its core, this case is all about who gets to own those relationships but:

1. *Nobody owns Stumpe's relationships.*

2. *Relationships are not trade secrets.*

Despite these incontrovertible truths, Skye (and, oddly, also HRT with which Stumpe never had any direct or indirect dealings) enter this courthouse with a flurry of claims designed to cloak Stumpe into some conspiracy theory and other alleged wrongs that are not supported by the law or material evidence. The reality is that Stumpe sold products for Skye from 2013 to 2020 first through non-party Novus Ortho Corp. ("Novus") and later through non-party Silenda Medical, Inc. ("Silenda"). As Plaintiffs very well know, independent medical sales representatives work with multiple manufacturers and distributors at the same time (sometimes as direct representatives, and

2

Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

other times as sub-representatives), and have free mobility within the marketplace. In fact, Skye and Skye's Bryan Banman ("Banman"), in particular, was always aware that Novus and Silenda sold other products. In the end, what Skye and Banman were after was Stumpe's relationships.

In or about 2018, Banman left Plaintiffs and founded CTM Biomedical, LLC ("CTM"). After Banman approached Silenda to sell, and Silenda agreed to sell, CTM products (in addition to Skye products), Plaintiffs sought retribution against *Stumpe*. Indeed, Plaintiffs elected not to sue Novus or Silenda, the only entities with which Skye had a contract, but targeted Stumpe instead (with whom there was never an agreement or direct relationship). They did so in order to avoid those contracts altogether, which they cannot, an issue addressed further herein.

As the lead defendants (Banman, CTM, CTM Medical, Inc. and Pablo Seoane) have demonstrated, Plaintiffs' claims suffer from a variety of defects. Stumpe joins the Banman-CTM parties' arguments as they relate to the claims asserted against Stumpe, and also addresses herein additional issues with those claims. For instance, HRT has no legitimate claim against Stumpe (as HRT itself admits). As discussed below, relationships are not trade secrets and could never form a basis for a trade secret claim. Next, much of Plaintiffs' secondary theories (i.e., interference) are also invalid (Stumpe cannot interfere with his own relationships) and are also preempted by trade secret law. Plaintiffs' conversion claim is belied by the fact that Silenda (and certainly, Stumpe, who is one step removed from Silenda) never controlled or possessed any alleged converted inventory it (er, he) is being accused of converting. Further, Plaintiffs' failure to comply with the DTSA's notice requirement is also fatal to their prayer for fees and punitive damages.

These are just a sampling of issues that lay waste to Plaintiffs' claims against Stumpe. For these and those reasons that follow, Stumpe respectfully requests summary judgment.

## PLAINTIFF'S PRELIMINARY STATEMENT

When enacting the DTSA, Senator Chris Coons (D-Del) said "American businesses continue losing significant revenue and American jobs to trade secret theft, a national problem the Defend Trade Secrets Act intends to fix."

Here, the undisputed evidence establishes that Defendants embarked on an elaborate conspiracy to steal Plaintiffs' trade secreted technology – to which they had access as prior officers

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

and sales representatives of Plaintiffs – and then exploit that stolen intellectual property by selling products to Plaintiffs' own customers, but under the Defendants' newly formed and competitive company, all while using Plaintiffs' proprietary pricing data to undersell those products. And yet these Defendants now move for summary judgment, based on synthetic contentions that cannot survive an encounter with the evidence of their own actions.

The sheer scope of what the Defendants have done seems impossible and beyond the imagination of even a talented novelist. But it's happened, and the Plaintiffs have been excessively damaged in the process. The instant motion must be denied because, as explained below, the objective and undisputed evidence demonstrates that Defendants had access to the Plaintiffs protected technology and related proprietary information through their work with the Plaintiffs, and then set out deliberately and secretly to appropriate that information for themselves, form a company to compete with the Plaintiffs, and then proceed surreptitiously to use the Plaintiffs' technology, knowhow, and data to compete directly with Plaintiffs' in the marketplace. The result is a compelling claim under RICO, DTSA, and various state claims, and nothing Defendants argue, or present, can change that unavoidable conclusion.

### DEFENDANTS' REPLY PRELIMINARY STATEMENT

Defendants moved on specific claims and issues. They presented Statements of Facts, with supporting evidence, directed to those claims and issues. In response, Plaintiffs purposefully overloaded the record with 369 additional "facts" (more than all Defendants combined) and numerous exhibits. The vast majority of Plaintiffs' statements and documents are patently immaterial to the issues presented. Plaintiffs' tactic is clear: bury the parties and the Court with irrelevant material to create the false impression that "there must be an issue of fact somewhere." The Court should reject that tactic and grant Defendants' summary judgment motions.

**FACTUAL BACKGROUND**

**THE CTM DEFENDANTS' FACTUAL SUMMARY[1]**

**I.      The Parties and their Products**

HRT processes and manufactures medical products derived from human placental tissue. Skye purchases such products from HRT, and sells them to medical facilities through independent contractor sales representatives. Chris Sharp is the CEO of HRT and Skye. SOF 1-4.

CTM sells (but does not manufacture) medical products derived from human placental tissue. Banman is the President and CEO of the company. SOF 5-6. Stumpe and Boulais are independent sales representatives who sell CTM products. They previously sold Skye products. Seoane is a current employee of CTM. He joined CTM in February 2020 after resigning from HRT. SOF 7, 243. Veterans Medical Distributors ("VMD") is a medical distribution company with which CTM does no business. Gardner Rogers is the principal of VMD who retrieved and deposited checks for CTM for a short period of time. SOF 230-233.

The placental products at issue are made and sold in multiple forms. Three common forms are: (1) "membranes"; (2) flowable particulates (sometimes called "injectables"); and (3) particulates. Membranes look similar to patches. Flowable particulates include ground up or "morselized" placental tissue stored in liquid. They are administered by physicians through a syringe. Particulates are particulated placental tissue that are not stored in liquid. Numerous companies sell placental membrane and/or flowable particulate products. HRT/Skye and CTM are not the only companies in this space. SOF 9-16. HRT/Skye manufacture and sell membranes and particulates; CTM sells all three.

**II.      Banman's Prior Work with HRT/Skye**

Banman worked in various consulting roles for Skye and HRT during the period of 2012 up to April 2018. His primary job included business development, marketing, and sales development. SOF 21, 31. For a limited period—from in or around the spring of 2012 up to the 2014-2015 timeframe—he worked on product development. To that end, he helped HRT/Skye bring certain placental products

---

[1]      The CTM Defendants provide a brief overview of the facts here. The complete facts are set forth in the CTM Defendants' Statement of Uncontroverted Facts ("SOF").

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

to market. In working on those initiatives, he researched publicly-available information, including literature, patents, and FDA materials. There was a substantial amount of publicly available information at that time that described the use of placental products for medical procedures. SOF 35-38. Banman worked for HRT/Skye out of Ontario, Canada. SOF 50-51. While he helped draft certain sections of Standard Operating Procedures ("SOPs") that summarized some steps of HRT's manufacturing process, he was not responsible for manufacturing (which took place in HRT's California lab) or quality assurance. He did not produce finished product, and he did not have access to HRT's final, complete SOPs. SOF 42-48.

Banman's product development role ended in 2014-2015, and he continued working as a consultant in the areas of business and sales development. Part of his job was recruiting and managing Skye's independent sales representatives. In April 2018, Banman became an employee of Skye, holding the title of Senior Vice President of Business Development. In that role, he continued to work on sales development and the management of Skye's independent sales representatives. Banman resigned his position with Skye on July 2, 2018. SOF 30, 53, 57-59, 74.

## III.    The Business of CTM

Banman formed CTM as a company that would sell placental products. CTM has never manufactured such products. SOF 80-82. From the summer of 2018 up to September 2019, CTM was a product reseller/distributor. It did not sell its own products under its own brand name. SOF 83.

In late 2018 and early 2019, Banman began exploring the possibility of creating a CTM product line. SOF 84-85. In August 2019, he contracted with a third-party tissue processor named Alamo Biologics, LLC ("Alamo") to make products under CTM brand names. SOF 86. Alamo has substantial experience manufacturing products derived from human placental tissue. SOF 87-93.

While Banman presented Alamo with general product ideas and quality standards, he relied on Alamo to develop the manufacturing steps for CTM's products. SOF 99-104. Banman did not transmit any confidential information of HRT/Skye to Alamo as part of the development process. SOF 106-108. CTM did not sell its own products (made by Alamo) until September 2019, more than one year after Banman resigned from Skye and more than three years after Banman ceased working in product development for HRT/Skye. SOF 53, 74, 97.

Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

**IV.    This Action**

On April 14, 2020, almost two years after CTM began operating, Plaintiffs filed this lawsuit. Plaintiffs amended their pleading multiple times, and had essentially unfettered access to the functioning of CTM's business through expansive discovery. A detailed summary of the procedural history is set forth in the Fluskey Declaration.

**STUMPE'S FACTUAL SUMMARY**

**I.    Stumpe's Background**

The Declaration of Mike Stumpe filed concurrently herewith details the pertinent facts as it relates to this action.  In short, Stumpe has been in medical product distribution and sales long before Plaintiffs and was the first in Indiana to distribute Amniox, a medical product derived from human birth tissue for orthopedic use.  (SUF, 295.)  Providing superior service, Stumpe has built and developed key relationships and close friendships in the medical industry.  (SUF, 296.)  In this industry, decisions to use a medical product for surgical applications is generally one made by the surgeon and medical center.  (SUF, 297.)  And decisions to "go through" a certain sales representative to purchase those products is entirely relationship-based and results-based.  (*Id*.)  It is very common in Stumpe's industry for sales representatives to work with multiple medical product manufacturers and distributors at the same time and it is also common for surgeons and medical centers *to direct the sales representatives* to the companies they want to buy from.  (*Id*.)

**II.    Stumpe's Entities (Novus and Silenda) Begin Work With Skye**

Stumpe began selling Skye products in or about 2013 as a sub-representative to Jason Ewers and, later, as a direct independent contractor to Skye through non-party Novus Ortho Corp. ("Novus") and, in 2015, through non-party Silenda Medical, Inc. ("Silenda").  (SUF, 300.)  Stumpe used his relationships to sell Skye products, and Novus and Silenda received commissions for those sales. Stumpe and Banman also developed a relationship.  (SUF, 301.)  Stumpe had very limited dealings with Chris Sharp ("Sharp").  (SUF, 316.)

**III.    Silenda Begins Working With CTM**

In or around July 2018, Banman left Skye.  (SUF, 317.)  Banman reached out to Stumpe to determine if Silenda would be interested in adding CTM products to its offerings.  (SUF, 318.)

7          Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Banman never approached Stumpe about starting CTM with him, and Stumpe only learned of its existence after it was already formed. (SUF, 319.)  Stumpe made no investment of money, skills or time in the founding of CTM, and is not a founder of the company. (*Id*.)

Sometime later in 2018, Silenda began offering and selling CTM's products. (SUF, 320.)  At this time, Silenda was still selling products from Skye and others. (*Id*.)  On August 10, 2018, Silenda entered into a commission agreement with CTM, where CTM agreed to pay Silenda higher commissions than Skye. (SUF, 322.)

## IV.    Plaintiffs' Claims Against Stumpe in His Individual Capacity

Plaintiffs' accusations rest solely against Stumpe in his individual capacity.[2] (SUF, 326.)  This is curious as, first, Stumpe never had any relationship with HRT and, second, the relationship with Skye was formed through Novus and Silenda. (*Id*.)  Plaintiffs strategically and intentionally avoided suing Novus and Silenda because the agreements with those entities (which are fully integrated) contain limitations of liability provisions, which Plaintiffs cannot circumvent. (*Id*.)  Those provisions (Paragraph 7.2) state:

> NEITHER PARTY WILL BE LIABLE FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR INCIDENTAL DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY (INCLUDING NEGLIGENCE), EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

It is exactly "special, indirect, consequential, exemplary or incidental damages" that Skye is improperly after here.

Moreover, Plaintiffs allege that Stumpe *conspired* with all other defendants (even some parties he did not even know or had ever met) to interfere with Plaintiffs' relationships with customers and sales representatives. (SUF, 327.)  With respect to alleged trade secret misappropriation, Skye vaguely claims that Stumpe used Skye's alleged "trade secrets" relating to Skye's alleged customers, Dr. Janos Ertl, Eskenazi Hospital, Dr. Brian Badman, and IU Health. (SUF, 328.)  Stumpe's relationship with Dr. Janos Ertl predates Skye, and he sold Skye products to Dr. Ertl fter selling to him through other

---

[2]    Indeed, towards the end of this brief, Stumpe argues that no claims should have been brought against him in his individual capacity and that those claims are misplaced.

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

manufacturers for several years.  (SUF, 329.)  Moreover, Stumpe cannot misappropriate a relationship that already belonged to him.  (*Id*.)  And a relationship is not a trade secret anyway.

Dr. Ertl works primarily at Eskenazi Hospital and IU Health, and all of Stumpe's business with them has been done through Dr. Ertl.  (SUF, 329.)  Stumpe cannot misappropriate any customers that have always belonged to him, and to whom he has sold multiple manufacturers' products.  (*Id*.)  Dr. Ertl is a very close friend of Stumpe's, with whom he began working approximately eleven years ago.  (*Id*.)  They have traveled together extensively with their respective families, and he has been there for Dr. Ertl when his wife had cancer.  (*Id*.)

Novus and/or Silenda serviced Dr. Brian Badman at Skye through another representative, Matt Dripps, who had an existing relationship with him.  (SUF, 330.)  Dr. Badman left Skye when Matt Dripps did.  (*Id*.)  Stumpe has never sold any CTM products to Dr. Badman.  (*Id*.)

Skye also vaguely claims that Stumpe used its alleged "trade secrets" to target and convince Skye's sales representatives to breach their agreements with Skye and work for CTM instead.  (SUF, 331.)  Skye has not identified a single sales representative that Stumpe allegedly poached to work with CTM, let alone a trade secret that he allegedly misappropriated.  (*Id*.)

Skye's allegations for intentional interference with prospective economic advantage are identical to those underlying its misappropriation of trade secret claims. (SUF, 332.)  To the extent that Skye contends that Stumpe used or misappropriated other alleged "trade secrets" allegedly belonging to it, every piece of information Silenda and/or Novus used to successfully sell Skye products was available publicly and simply through phone calls or emails with surgeons and facilities.  (*Id*.)  Insurance billing codes, for example, were well-known in the industry by sales representatives, insurance companies, and billing staff at surgical centers and facilities.  (*Id*.)  None of these are "trade secrets."

As it pertains to HRT, HRT admits that Stumpe did not interfere with any of its valid and/or prospective contractual relationships; that Stumpe did not interfere with its prospective economic advantages; that Stumpe did not interfere with its economic relationships; that Stumpe did not misappropriate any confidential information; and that Stumpe did not misappropriate any of its trade secrets.  (SUF, 334-338.)

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

## V.    **Plaintiffs' Allegations of Conversion**

Skye very rarely sent products or inventory directly to Novus or Silenda.  In fact, other Skye representatives in Indiana (whom Stumpe was not even aware of at the time) would consign inventory to Silenda's accounts without Stumpe's knowledge or consent.  (SUF, 339.)  Notwithstanding these rare and exceptional circumstances, in general, and according to the agreements Novus and Silenda had with Skye, any inventory either ordered directly or for consignment purposes by Silenda or Novus was delivered to the customer facilities.  (*Id*.)

When this lawsuit was filed, Silenda was in possession of four of Skye's products that Silenda returned to Skye's lawyers.  (SUF, 341.)  Plaintiffs have brought a claim of conversion against Stumpe in his individual capacity for certain other inventory.  (SUF, 342.)  In support, Skye provides no evidence besides a spreadsheet it created listing certain inventory that is allegedly in consignment with multiple customer facilities *and assigned to Silenda*.  (*Id*.)  Silenda has never had any such inventory in its possession, besides the four sample items described above, which have since been returned to Skye.  (SUF, 343.)  Nor is Silenda a party to this lawsuit.

Per the Novus-Skye and Silenda-Skye agreements, Skye would send consignment inventory directly to hospitals/facilities.  (SUF, 344.)  It was then Skye's responsibility to audit these facilities to determine what unsold consigned products may be missing from any facility, which would be the responsibility of the representative who requested or facilitated the consignment.  (*Id*.)  Skye failed on many occasions to reconcile any consigned inventory, and then did not carry out the requisite audits as required by the representative agreements to clear up any discrepancies.  (SUF, 345.)  As of June 13, 2019, for example, Skye was still asking for the return of consigned inventory at Westview Hospital, a facility that had been closed for *two years* at that time.  (SUF, 346.)  According to Skye, such inventory was on consignment for 1,045 days as of that date, and Skye made no effort to either reconcile any such inventory that had been sold, or to arrange for its return.  (*Id*.)  It is telling that Skye waited until Westview Hospital did not exist anymore to request the return of consignment inventory. (*Id*.)  This inventory – allegedly still with Westview Hospital – is part of the inventory that Plaintiffs allege that Stumpe (not Silenda) has somehow converted.  (*Id*.)

Skye does not even have a set policy regarding consigned inventory.  (SUF, 347.)  At some

10                    Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

point, Skye changed its product strategy and attempted to secure the return of all consigned inventory. (*Id*.)  It did not, however, have a consistent method for doing so, sometimes charging the sales representatives who requested the consigned inventory in question, and at other times charging the customers themselves.  (*Id*.)  This was despite Skye claiming that it would charge the customers for any unreturned consignment inventory, and only hold representatives responsible if the customers declined or otherwise failed to pay Skye.  (*Id*.)

**PLAINTIFFS' FACTUAL SUMMARY**

Defendants labor to sanitize their brazen theft and misappropriation of Plaintiffs' trade secrets and deliberate and surreptitious sabotage of Plaintiffs' hard earned competitive advantages in the marketplace. But the ***objective*** written and electronic evidence – including documents, texts, WhatsApp messages, and testimony – lay waste to the entirety of their factual assertions. That evidence – representing the Defendants own words and deed – demonstrates without ambiguity a fully formed conspiracy with the criminal intent to destroy Plaintiffs by lying, theft, and cheating. That the truth was discovered only after secret WhatsApp messages were finally obtained in discovery and third-party witnesses began to expose the Defendants' expansive cover-up, serves only to emphasizes the depths of this misconduct.[3] And that truth, as explained below, is shocking in the sheer scope and nefariousness of what has transpired, all to the Plaintiffs' prejudice.

**I.    BRYAN BANMAN HAD NO KNOWLEDGE OR EMPLOYMENT HISTORY IN THE HUMAN PLACENTAL BUSINESS BEFORE HE MET CHRIS SHARP**

Chris Sharp has worked in the human tissue medical industry since 1996, starting his first company in 2005. [Plaintiffs' Additional Facts ("PF") 350, 351] Sharp's wife was close friends with Banman's wife and, through that friendship, Sharp and Banman became acquainted and began discussing working together. [PF 352, 353] Banman was a graphic designer earning modest income and, despite no experience in the industry, suggested he could design marketing materials, brochures, and a website for Sharp's company. [PF 354, 355, 357] Sharp, in an effort to assist, obliged. [PF 356]

---

[3]/ CTM Defendants submit 260 facts in the "Joint Appendix of Undisputed and Disputed Facts." Most of these facts are not mentioned in this motion.  Their inclusion of additional facts is their way of circumventing the 25-page limit.

11          Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

## II.    BANMAN AND SHARP BEGIN TO WORK TOGETHER

Banman was an industry novice when he arrived at Skye, but Sharp was not. Sharp had a strategic vision for the companies. In the early years, Skye did not actively manufacture their own products, but was instead purchasing products from contract manufacturers and was selling those private label products under the Skye trade name.[4] [PF 358] But Sharp was determined to develop and distribute indigenously created and superior product, and he set about doing just that. [PF 360]

Sharp specifically wanted to develop Skye products that would prove durable and unique, and which would in turn afford Skye with natural advantages in the marketplace. [PF 361] Banman, for his part, expressed an interest in learning and Sharp agreed to mentor him through the process. [PF 359] Sharp proceeded, with Banman in tow, to conduct widespread market research, including reviewing myriad products, understanding the direction of FDA regulations, and assessing market trends as part of his initial research and development efforts. [PF 361]

What followed was a painstaking process of trial and error building on that research, but one that ultimately led to the development of technology that was unique in the industry and exceedingly valuable in its very existence. The two conducted countless experiments in the HRT lab and created in the process a "HRT Design File." [PF 361, 362] That file is itself definitive evidence of the time and effort devoted to developing Skye's trade secret products, and it includes voluminous documents, notes and photographs evidencing the developmental process that forged this technology. [PF 367.] Sharp wanted the file to serve as record of the steps during the research and development phase of the products, and thus a recordation of HRT's authorship. [PF 362]

That record, as reflected in the HRT Design File, leaves no ambiguity concerning the extensive technological and financial commitment made to develop these products. [PF 382] Sharp and Banman tested various Retsch and Spex equipment and learned which equipment works best for their process. [PF 383.] The notes memorialize that testing: "████████████████████████████████████████████████████████████

---

[4]/ This is known as private label manufacturing. A private label product is manufactured by a contract or third-party manufacturer and sold under a retailer's brand name. An example of this practice is the "Kirkland" brand products sold at Costco. General Mills may manufacture the product, but the product is packaged with a Kirkland brand name.

Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

███████████████████████" [PF 383] The two also had doctors test their pending creation by using versions of the products and then providing patient data concerning their efficacy based on how quickly those patients recovered through use of the product when compared to non-use. [PF 387] Beyond that, they tested various ratios of saline to connective tissue and, from the results, determined the ratio necessary to maximize efficacy without undue use of the product. [PF 386] Sharp and Banman finally took the settled formulations for the products and created a detailed guide for manufacturing the products. [PF 388] These Standard Operating Procedures ("SOPs") ensure manufacturing operations are carried out correctly and the products are made consistently, and the SOPs remain unchanged today. [PF 388, 389]

### III.    HRT'S PRODUCTS REDUCES HEALING TIME FOR PATIENTS

There is no dispute as to the innovation of the Plaintiffs' creation.  Sharp, with some assistance from Banman, now had five unique products entailing: (1) a connective tissue matrix flowable product mixed with saline; (2) a connective tissue matrix paste; (3) an amnion only membrane; (4) a chorion only membrane; and (5) an umbilical cord only membrane. [PF 366] Their  significance cannot be understated – no competitor was selling products bearing this combination of characteristics. [PF 364]

Nor is there any question concerning the revolutionary medicinal effect of the products, which preserves and reintroduces placental material into the human body – a process involving obtaining raw human placenta and performing numerous steps to manipulate the tissue, which leads to the creation of an ambient temperature, shelf stable, final implantable product. [PF 392, 393.] The HRT products are used in either surgical incisions or repair o in wound care (cuts, lacerations, gashes, tears to the skin) and, when properly applied, reduce scar tissue and infection rates, decrease pain; and diminish the healing time for the skin. [PF 394, 395.] In essence, they boost recovery of wounds to the skin, and are becoming industry standard for surgical applications. [PF 395]

### IV.    THE HRT PRODUCTS ARE PLAINLY PROTECTIBLE TRADE SECRETS

The revolutionary therapeutic implications of these products not surprisingly reflect the economic value of their formulaic foundations. No competitor had managed to develop similar technology, and the economic value presented to Skye/HRT was not lost on either Sharp or Banman. [PF 364] Banman, in fact, remarked at one point "Btw, isn't it incredible when you sit back and look

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

at what we've done, that we're the only guys in the world who've created a room temp product from placenta and figured out that it would work?" [PF 365] He was right, and the "HRT Design file" – which includes an analysis of marketing by competitors – demonstrates that fact. [PF 368] The internal notes observed that the human biologic industry would advertise products as "chorion free" as if that was something the consumer wanted. [PF 368] But Banman writes: "In our research, however, we have learned of the very beneficial properties of chorion. Handling benefits include a thicker, stronger tissue….It is our belief that the chorion has traditionally been discarded, out of habit from following prior studies that just use amnion…" He then explains why, based on their research, chorion would be safe to use. [PF 368] And the same research produced the first and only chorion-only membrane product that was sold in the marketplace. [PF 369] Banman specifically wrote – again, describing Skye's and HRT's products – that: "The knock against Chorion is that it contains more maternal tissue and may cause more of an immune response in the patient. We feel that this is not an issue, based on" five reasons including that "all Skye chorion products will be sterilized after processing, thus mitigating most remaining potential hazards." [PF 371] And HRT remained the only manufacturer of a chorion only membrane until CTM began selling the identical product. [PF 372]

Skye and HRT, realizing the inherent value of this technology, took immediate steps to maintain its secrecy. Sharp and Banman maintained a shared, password-protected Dropbox account which their research notes and to which only they had access. [PF 374, 375] That Banman later surreptitiously copied the HRT Design File to his personal computer and kept all the information only emphasizes the value Skye/HRT protected by maintaining its secrecy. [PF 376][5]

**V.      SKYE/HRT OPT FOR TRADE SECRET RATHER THAN PATENT PROTECTION**

Skye and HRT, having forged the new technology and realizing its economic value, were consequently confronted with an important strategic decision.  The processes and formulas comprising the HRT products were indisputably protectable as utility patents, and thus filing and ultimately having a patent issued provided one obvious form of intellectual property protection. But that would necessitate the disclosure of the technology they had diligently worked to keep secret, and afford them

---

[5]/ Lest there be any doubt, Banman produced in litigation a wide array of materials that were held in the HRT Design File Dropbox. [PF 376-378] Banman should not have access to these documents after he left Skye/HRT [PF 455, 467]

in return a patent exclusivity period of only 20 years – that is, utility patent protection expires at the conclusion of that period and would then become a part of the public domain. Given the nature of the marketplace in which they found themselves, and the anticipated durability of the products, Plaintiffs opted instead to protect these products as trade secrets. [PF 692] That decision entailed the continued and rigorous efforts to maintain the secrecy of the products and, more specifically, the technology, processes and formulas comprising them.

Banman, for his part, was intimately aware of the decision to pursue trade secret rather than patent protection, and the myriad layers of protection HRT imposed to preserve the confidentiality of those trade secrets. Sharp, in fact, increased Banman's role and position with HRT/Skye in the wake of the development of the products, rewarding him 10% of HRT – which he holds today and for which he is paid his *pro rata* profit despite the ongoing litigation – and elevated him to the position of head of sales for Skye. [PF 397, 398] Banman was, in that position, essentially the #2 person in the company responsible for the recruitment, management, and development of all sales for the products. [PF 400]

The human placental industry was, at the time, an emerging business with few experienced sales representatives and Banman consequently and necessarily provided new representatives with extensive training. [PF 401] That training was essential to the representatives' knowledge of the products themselves, which itself was critical in the esoteric world of medical technology. More particularly, these products are sold to doctors and medical facilities, many of whom are skeptical of new products and insist on empirical data or historical information verifying the benefits of what they are proposing to purchase. [PF 405.] And those same doctors and facilities need training and education concerning the use of the products, a process that in this case consumed additional resources because of the emerging nature of the industry – the benefits of the products were not widely understood due to the nascency of the market, and thus it took substantial time to sell the product to a physician. [PF 405, 406] The benefits of that time and effort were undeniable because typically once a doctor began using the products, they would observe the benefits to the patients like no other product, and the doctors would reorder the product regularly. [PF 407] That earned loyalty was critical to the success of any product and, in this case, required that sales representatives were conversant with the technology and its benefits before pitching it to prospective doctors/customers. [PF 408]

Accordingly, Skye invested in extensive training and education of the sales force, and Banman specifically created sales modules or "notes" to educate the sales representatives concerning the products and providing "talking points" on how best to sell to facilities. [PF 402] But the initial sales process was only one component of the company's marketing efforts. Physicians, as a practical matter, would commonly instruct their associated medical facility to order the products so they would be available in either a surgical or in-office wound care setting. [PF 403] And Skye, to gather information, partnered with doctors to provide scientific data concerning results. [PF 409] That data was essential for Skye to assess the efficacy of their products and was instrumental in constructing a more comprehensive empirical model that would be used in marketing to potential customers. [PF 409]

As the head of sales, Banman was integral to these efforts, and communicated daily with the sales force to ensure that they had the proper tools and resources to sell the products. [PF 415-416] Banman also developed a software system called Netsuite that captured all relevant sales information, and he was therefore keenly aware of who the top sales representatives were, which facilities bought the most product and how much they paid, and which doctors had been educated on the products, used the products, and were re-ordering the products. [PF 418] That collected data, in addition to the underlying technology, is a clear trade secret of Skye and HRT. [PF 418] And Banman eventually, in his haste and greed, weaponized it against HRT and Skye.

## VI. CONTRACTS SIGNED BETWEEN PLAINTIFFS AND DEFENDANTS

### A. Banman Signed Multiple Confidentiality Agreements

The undisputed facts show that Banman, before embarking on his perfidious campaign of misappropriation and sabotage of the business, was indisputably aware of the confidential and legally protected nature of the products HRT was making and Skye was selling, and the technology underlying those products. Banman executed no less than *eleven* agreements with HRT and/or Skye containing express confidentiality provisions. Those agreements dated November 1, 2010; April 23, 2012; May 21, 2012; March 25, 2013; June 2014; June 20, 2014; June 26, 2014; December 9, 2015; March 31, 2016; January 1, 2017; and April 18, 2018, collectively compel Banman to keep confidential all of Plaintiffs' trade secrets and proprietary information. [PF 419-469] Nor was there any ambiguity as to the import of those terms. The first of those Agreements, a "Mutual Non-Disclosure and

16      Case No.: 2:20-cv-03444-MEMF-PVC

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Confidentiality Agreement" expressly required Banman to maintain the confidentiality of any "business, scientific or technical information" related to the "business interests, research, product plans, products, developments, inventions, clinical and test data, trade secrets, know-how". [PF 420] And the final Confidentiality Agreement concerning his employment with Skye, likewise provided that Banman "hold in the strictest of confidence Skye's proprietary information." [PF 462-464] The proprietary information encompassed by the agreement includes product formulations, product ingredients, revenue numbers, financials, representation agreements, representation commissions, employment agreements, pricing, sources of supply, employee compensation, product designs, future products, etc. [PF 465.] The *nine* intervening agreements include similar restrictions. [PF 426, 432, 439, 447, 448, 455, 458, 460, 462]

## B.    Boulais, Stumpe and Seoane Likewise Agree to Confidentiality

Banman was not alone among the Defendants required to maintain Plaintiffs' trade secrets. Both Boulais and Stumpe signed Exclusive Sales Representative Agreements with Skye including strict confidentiality provisions. The two agreements – Stumpe executed his on February 9, 2015 and Boulais followed on June 13, 2016 – each prohibited the disclosure of Skye's "business, plans, pricing information, manufacturer's names, processing information, presentations, marketing materials, end-users, technology, and products that are confidential and of substantial value to Skye, which value would be impaired if such information were disclosed to third parties." [PF 470, 473, 476, 478] Boulais' agreement precluded him, for six months after the expiration of the term of the agreement, to "not receive compensation or represent any other Company that sells Amniotic membrane, flowable, Cell Product(s) or Placental Tissue." [PF 472.] Seoane also signed confidentiality agreement and employment handbooks requiring secrecy. [PF 683-684] All three systematically obliterated, by their conduct, the protections of these agreements. [PF 478]

## VII.    BANMAN SECRETLY STARTS A COMPETING COMPANY USING PLAINTIFFS' TRADE SECRETS, PRODUCTS AND SALES REPRESENTATIVES

### A.    The Conspiracy Is Created in March 2018

That Banman and his conspiratorial partners serially stole and exploited Skye's most sensitive information to sell Skye's trade secreted technology and products under the CTM name, is beyond

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

any reasonable dispute. And despite yeoman's efforts to keep this scheme secret, discovery has revealed the full scope of the Defendants' web of deceit.

The instrument through which this conspiracy trafficked stolen technology was CTM, which was formed in deception and constructed through the betrayal of Skye. Banman recruited Stumpe and Boulais to start the company with him, because they were top Skye sales representatives and had connections with the physicians and medical facilities who were reordering Skye's products. [PF 480] Stumpe and Boulais thus knew precisely how to sell Skye's trade secreted products, which CTM would now pass off as its own – with the benefit of perceived continuity in light of Stumpe and Boulais pitching to doctors with whom they already had a relationship due to their time with Skye.

The depths to which these Defendants sunk in concealing their conduct demonstrates an obvious consciousness of guilt. For example, Banman after initially recruiting Boulais to join CTM, instructed Boulais to download and utilize a mobile application called WhatsApp. [PF 482] But they did not use WhatsApp to communicate about Skye business, notwithstanding that both retained their contractual roles with Skye while hatching their competing business. [PF 483] They instead used this end user encrypted application to avoid (or at least they thought) a digital footprint so they would not be discovered in the future.[6]

On March 30, 2018, Boulais confirmed in a WhatsApp message to Banman that he had downloaded the application at Banman's request and that: "I'll text on this from now on. Ready to rip and excited for the next evolution." [PF 484, 485] And Boulais, to leave no uncertainty, testified the "next evolution" would be "starting a company". [PF 486] The two moved quickly and secretly. Boulais wrote Banman on April 4, 2018 and made clear he was ready to convert physicians who exclusively buy Skye products to CTM and stated: "We're gonna kill it!" [PF 487-488] Banman responded with "thumbs up" emojis. [PF 489] That both were, as of March 30, 2018, still under contract to work exclusively for Skye, did not temper their conspiratorial instincts. [PF 490] This, despite Boulais knowing that CTM was created to compete with Skye. [PF 492]

---

[6] In discovery, on April 7, 2021, Plaintiffs requested Banman produce all communications with Defendants. The WhatsApp messages were not produced until August 2022 after multiple "meet and confer" sessions and Court orders.

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

**B.    Banman Uses Fake Aliases to Find a Manufacturer**

Banman moved steadily in building his illicit business, meeting in March 2018 with another sales representative, Maria Carey. [PF 494] The meeting was, of course, in secret. [PF 494] By April 20, 2018, the conspirators were apparently nearing launch, because Boulais wrote Banman that day and remarked: "Can we talk live today or is it best to wait til Monday. Ready to rip. I've got 4 reps I've been waiting to get rolling until we get our ducks in a row." [PF 495] Banman assured him "We can talk this aft," to which Boulais responded "Lets GOOOOOO!" "Dude I wake up at 2am thinking about it. We're going to dominate." [PF 496] Banman was nevertheless nervous about secrecy, and warned Boulais by text on May 2, 2018 that: "Text is dangerous." Boulais' response: "Fuuuuck me. We are building something special now :) thx for the reminder." [PF 497]

Having surreptitiously lined up Skye sales representatives for the competing business, Banman also approached manufacturers to make products for his new company. There was no less deception to this effort – Banman used fake names and lied to prospective manufacturers about having an established team. On May 22, 2018, for example, Banman emailed Amnio Technologies, a manufacturer of placental products, to inquire about becoming a "distributor". [PF 498] He signed the email using the name "Carl" and using the email address: ctmbiomedical@gmail.com. [PF 499-500] The text of the email then proceeded to misrepresent that Banman already had an existing team of sales representatives and an existing customer base. [PF 501]

Banman does not dispute that all this was untrue – he admitted in deposition that he "made that up" to appear more credible. [PF 502-503] His specific testimony is revealing: "I assumed if I represented in an email where it sounded like an established company with a good deal of business that it would afford a better purchasing rate on a stocking distributor deal." [PF 504] That wasn't all he made up. He lied repeatedly to manufacturers in the weeks leading to CTM's formation, going so far as to sign legally binding documents with a manufacturer under the name Nathan Tierney. The manufacturer, Vivex, required a signed Non-Disclosure Agreement before they would provide "Carl" – the alias Banman was using – with confidential "pricing." [PF 512] Banman signed an initial NDA with Vivex as Nathan Tierney and asked that a second NDA be issued to CTM Biomedical, LLC – a company which was not yet formed – and then again signed as Nathan Tierney. [PF 505-515] On May

19                Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

30, 2018, Banman falsely signed another Non-Disclosure Agreement with Amnio, again using the name Nathan Tierney. [PF 517][7]

### C.   Skye's Customers Are Secretly Targeted

On June 1, 2018, Banman registered CTM Biomedical, LLC and filed a Certificate of Incorporation of CTM Medical, Inc. in Delaware – later, on June 13, he created and registered the domain "ctmbiomedical.com". [PF 518, 528] The day before, May 31, 2018, Boulais texted Banman and confirmed their shared intent to convert business from Skye to CTM: "surgery CTR of Carmel scares me… I might have to be cautious converting existing business which sucks."[8] [PF 519] Then, on June 8, 2018, they texted concerning "switch[ing]" Carmel Ambulatory's business from Skye to CTM, with Banman proposing: "Maybe we switch them on July 1." [PF 520] By June 12, 2018, Boulais convinced Carmel Ambulatory to switch from buying Skye to CTM products. [PF 521.]

The next day, Banman – still using his alias "Carl" and having signed Nathan Tierney on the NDA – emailed Vivex and asked if he could rush product orders. [PF 525] Banman employed these false names both to concoct the illusion that CTM had multiple employees and, of course, to conceal his true identity because he was still working for Skye. [PF 526] Banman informed Boulais of his deceptive emails, to which Banman texted: "Smile!! We're off and running baby." [PF 527]

The artifice was indeed off and running. Banman created the email address "Customer Service" cs@ctmbiomedical.com and controlled the ingoing and outgoing mail from that account. [PF 529] On June 14, 2018, Boulais forwarded an email to cs@ctmbiomedical.com from the materials manager at Riverview Health requesting a "new vendor form" and a "copy of the W-9."[9] [PF 530] Boulais messaged Banman and noted: "If we want to flip Riverview [a Skye customer], here's the info we need." [PF 531-532] Boulais admitted in deposition that he had already communicated with Riverview about purchasing CTM products while Banman was still working at Skye and while Boulais was still

---

[7]/ Nathan Tierney is Banman's nephew. [PF 509] Tierney did not know Banman used his name and affirmatively testified he did not give Banman permission to do so. [PF 510, 511]

[8]/ Carmel Ambulatory Surgery Center and Surgery Center of Carmel are both based in Indiana and were both purchasers of Skye products and Boulais was Skye's sales representative. Carmel Ambulatory Surgery Center was the 81st largest customer of Skye and its sister facility, Surgery Center of Carmel, was the 9th largest customer out of 499 customers.

[9]/ Riverview Health is located in Indiana and has four locations. Boulais was the Skye sales representative that worked with this facility. At the time, Riverview Health was the 57th largest customer of Skye out of 499 customers.

Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

contracted to exclusively sell Skye products. [PF 533] But that did not temper the efforts to convert this customer through deception. To the contrary, Boulais emailed Riverview Health and claimed: "I'm in the process of converting you guys to a new injectable that I'll own called Allogen." [PF 536] When asked if Boulais believed he would own Allogen, Boulais testified: "It was my understanding at the time that I was going to be a part owner of CTM. That was the product that we would be selling initially." [PF 537] Boulais successfully switched Riverview from buying Skye products to buying CTM products, by using Skye's trade secreted pricing and other confidential data. [PF 538]

The campaign, though secret, was nevertheless relentless. Banman contacted physician John Anderson, of Gerald Champion Regional Medical Center ("GCRMC"), in June 2018 and asked that he start using CTM products instead of Skye products. [PF 539] Dr. Anderson obliged, requested his facilities move away from Skye to use CTM. [PF 540]

The shamelessness of this conspiracy suffices to make even the hardened cynic whistle in amazement. On June 27, 2018, for example, Stumpe created a WhatApp group titled "Weee" with Banman and Boulais and, in the resulting chat, the three *openly discuss* CTM and *undercutting Skye pricing*. [PF 541] This was Stumpe's entry to the conspiracy. The evidence shows he learned fast, and proved a willing participant in short order. The same day, Banman messaged Stumpe from a new phone and asked him to delete his "other" WhatsApp chat history. [PF 542] Stumpe promptly confirmed the deletion, and this chat history was not produced in this litigation. [PF 544]

Sharp were entirely unaware of CTM and the serious peril his companies were facing. But that was because Banman, Boulais and Stumpe continued to perpetuate the conceit that they were loyal and exclusive. [PF 545] Defendants went to extraordinary lengths to maintain the deception. On July 1, 2018, Skye rewarded Boulais and Stumpe with an opportunity to obtain ownership in Skye, and Boulais and Stumpe – after jointly forming CTM with Banman – both signed an Appreciation Rights Agreement with Skye. [PF 547] That is, the two signed agreements with Skye at the very moment they were misappropriating Skye's trade secrets and actively working to undermine Skye in the marketplace. Boulais admits that he did not notify anyone at Skye that he was working with CTM and selling CTM products – using Skye trade secrets – before he signed the Agreement. [PF 548] But he also testified that he signed this Agreement knowing he was working CTM, and that he had no

21    Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

intention of "adhering to its binding stipulations for shares". [PF 549] It gets worse, however, because Boulais, Stumpe and Banman then discussed the Agreement on their group WhatsApp chat and decided to use the agreements to further their deception. Stumpe, after Boulais remarked that he signed the Agreement, responded: "Then I'll prob sign just to make sure we stay off the radar a bit, good idea wouldn't you say?" [PF 550] Boulais agreed: "That's why i did so there are no alarm bells." [PF 551]

### D.    In Summer 2018, the Conspiracy Expands to Steal Skye Accounts by Deception

On July 2, 2018, Banman delivered a letter to Sharp resigning his position as a Senior Vice President of Skye. [PF 552] When asked why he did not tell Sharp he was starting a competing business, he responded "I don't think I need Chris Sharp's advice on that." [PF 552] Boulais and Stumpe, despite Banman's resignation, continued to conceal they were working with CTM. [PF 553]

The three then picked up the pace of the conspiracy. On July 3, 2018, Boulais emailed Banman with "Initial Launch Projects," outlining the strategy to "flip" various Skye facilities. [PF 557] On July 6, 2018, Stumpe texted Banman that he had worked out a deal switching Skye's product for a CTM product. And while duplicative of countless other exchanges exist, this one stands out because Stumpe makes clear that CTM is promising to charge less than he charged for Skye: "Eskenazi is done deal. . . . We have green light to switch this month while ertl is gone and spoke to the Ortho coordinator and she said it would help if we could save her some money." [PF 556] Stumpe, in other words, was using Skye's confidential pricing structure to undersell Skye to an existing Skye customer.

The commercial predation continued. On July 12, 2018, Boulais shared an email from Sharp in the WhatsApp chat saying: "Here's a perfect opportunity to reach out to Ethan Chappell at Community and undercut Skye." [PF 558] Boulais admitted in deposition "undercut" meant to "sell a product to the facility for less price than Skye was selling the product for". [PF 559] Stumpe responded in kind: "I have a copy of the agreement we sent her. Bryan, this converts Community without making it look like Nate and I are apart (sic) of it. Like 6 months ahead of schedule. This is an opening from the gods." [PF 560] He continued, "In response to [Sharp], I offered him a copy of the agreement, obviously I'm not going to give that to him." [PF 561]

Skye's pricing for each customer is unique and privately negotiated, and it apparently dawned on Banman at this point that the express use of Skye's obviously proprietary information might pose

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

a problem for him, because he responded to this chain and remarked: "Guys, I can't rightfully act on this CHN inside information. I shouldn't be privy to this, as it's from after I quit, and violates my proprietary information clause." [PF 563, 633] When Stumpe asked if he and Boulais can act on the information, Banman responded: "That's your call." [PF 564] Stumpe's solution, though typical of the conspiratorial pathology prevailing among the three, is nonetheless chilling – he informed his compatriots that told Sharp to "hold the line and don't give any more discounts" to Community Health Network. [PF 565] The implications of that acknowledgement require a moment to sink in – Stumpe, acting under his agreements with Skye, encouraged Sharp not to reduce pricing for a customer while simultaneously attempting to convince the same customer to convert its allegiance from Skye to CTM by, among other things, using Skye's confidential pricing information to undersell Skye concerning the identical product. Banman apparently understood those implications, because be quickly issued instructions: "Phone calls only for CHN." [PF 566] Shortly thereafter, Community Health Network dramatically reduced its Skye purchases and started buying CTM products instead. [PF 567]

The conspirators eventually decided that a more disciplined effort to undermine Skye was necessary. Stumpe contacted Banman on June 12, 2018 and claimed they needed "a scientific game plan to present to flak to move away from Skye. So do what you do best for us!!." [PF 568] That strategy soon took form, and not surprisingly was rooted in deception. Specifically, Boulais emailed a potential customer on July 30, 2018 and fabricated a story that Skye had "production issues", that "most of his customers prefer CTM".  Boulais' misrepresentations in this email are explicit: "Attached you'll see an option from Skye Biologics. There have been some production issues lately with their injectable, so most of my hospitals and surgery centers prefer the options from CTM BioMedical." [PF 570] Those statements were patently false. [PF 571] There were no production issues at Skye, nor did "most of his customers prefer CTM."  Beyond that, the email attached Skye's ***confidential pricing*** side-by-side with CTM's pricing, with the latter titled "20% Discount Price List". [PF 572]

The conspirators' use of Skye's trade secreted technology is likewise beyond reasonable dispute. Stumpe, for example, convinced a sales representative named Matt Dripps to switch from Skye to sell CTM products, on the basis that Banman had informed him that "we had a proprietary product. Or that he had access to proprietary, you know, product." [PF 574.] The undercutting of

Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

pricing also continued unabated.  On August 9, 2018, Stumpe worked to "flip" Dr. Baker and informed Banman of his plan to undercut Skye's pricing: "[Baker] is telling them tonight that it's time to turn on the gas, then we will come in at a better price than Skye and make them look good to purchasing :)." [PF 578.] The three were ever conscious of keeping their efforts concealed from Skye. On August 10, 2018, for example, Stumpe texted a Skye sales representative and attempts to convince him to work for CTM instead saying: "Make sure you keep all of this super hush to Skye. It would blow us all up." [PF 580] They did in fact keep it "super hush" to Skye, as they continued recruiting efforts *for months* using Skye's customer lists and confidential pricing. [PF 581-595.]

### E.  <u>Banman Uses Skye's Confidential Login Credential to Access Broward Health</u>

The scale of the Defendants' conduct knew no limits. On September 10, 2018, Banman used *Skye's confidential login credentials* to access Broward Health's Vendor Registration site. [PF 596] He then downloaded two documents, signed them on behalf of CTM, and then uploaded the two documents back into the Broward Health system to register CTM products in the Broward Health System's thirty facilities in Florida. [PF 597, 598.]

### F.  <u>Banman Searches for a Company to Manufacture Skye's Products with CTM Name</u>

By late 2018, Banman began meeting with various companies about manufacturing "CTM products." [PF 599] The purpose was simple, and illegal – he was trying to find a company who would manufacture Skye's products under the CTM name. Banman in fact created a "slide deck" to present to potential manufacturers, and that slide deck describes with almost surgical precision Skye's trade secreted products, but without mentioning Skye's name. Banman used this slide deck in meetings with Vivex in Miami; Amnio Technology in Arizona; Biostem in Florida; and Alamo in San Antonio. [PF 601-602] He did not, of course, disclose the source of the products.

At the Biostem meeting on December 11, 2018, Banman conducted a PowerPoint presentation. [PF 603] And after the meeting, Banman sent a follow up email discussing the practical steps needed for product manufacturing and assured Biostem: "**I have a lot of detail on the processing steps that would help to create the SOPs… On the flowable product recipe, you won't need to create the**

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

recipe as I have the entire formulation, process, volumes, etc. designed already.”[10] [PF 604]

Banman's meeting with Alamo, on February 12, 2019, included him presenting a list of products that are *identical* to those in HRT's 2017 Active Barrier and Active Matrix product brochure (the brochure being used at the time Banman left Skye/HRT), and specifically comprised a complete product lineup of membrane and flowable connective tissue matrix products. [PF 611] Banman then sent a follow-up email to Lee Andrews – the Alamo representative with whom he met – setting out the "next steps" and included an agreement to keep CTM's information secret. [PF 613] And while he was stealing Skye's technology, Banman didn't want anyone else seizing that same technology from him. On June 10, 2019, he emailed Andrews a "draft term sheet" detailing the order size, shipping, packaging. That term sheet provides that "**CTM will provide all product designs for CTM liquid matrix product and CTM particulate paste product, and processing specs for CTM amnion, chorion, and umbilical cord membrane products**." [PF 616] The term sheet acknowledges that "Alamo does not currently produce or distribute 'connective tissue matrix' or 'extracellular matrix' 361 product and is not allowed to do so during the term of this agreement, or following the termination of this agreement, without the written consent of CTM Biomedical." [PF 617] Banman apparently believed there was no honor among thieves, an irony emphasized in an August 7, 2019 text Banman sent Andrews stressing the importance of keeping "his" product indication language restricted: "As long as we have security on the indications in section 11.6, I'm sure you and I can sort any other details." [PF 618] Banman then sent Andrews "Indications for Use" language which was stolen from Skye/HRT. [PF 619-620]

### G.    CTM and Alamo sign the Agreement for Biomedical Materials

Alamo and CTM ultimately entered a written contract entitled "Agreement for Biomedical Materials" dated August 29, 2019. [PF 621] That agreement was unambiguously intended to manufacture products bearing Skye's trade secreted technology, but under the CTM name. As if to confirm that unlawful intent, Paragraph 1 prescribes that Alamo will manufacture certain products to CTM's technical specifications, and that **CTM will provide the specific formula** for (a) placental

---

[10]/ CTM/Banman did not produce this email in discovery despite representing they would do so in response to eight specifically targeted Requests for Production of Documents. It was obtained via third party subpoena to Biostem.

tissue allograft liquid matrix product; (b) placental membrane allografts (amnion, chorion, umbilical cord versions); and (c) particulate placental tissue allograft paste. [PF 622] Exhibit B to the Agreement constitutes a series of instructions for Alamo concerning the particulars of producing the membrane products, the flowable liquid products, and the paste products. [PF 624] Banman did not ask Alamo to make any products except the exact suite of products that Skye sells, and indeed Exhibit B is a processing blueprint for manufacturing HRT's birth tissue products. [PF 626] It sets out, as do the SOPs that were drafted for the CTM products, the steps for processing the placental tissue that would result in the creation of the identical products HRT made. [PF 631]

Andrews, for his part, confirmed in deposition that Alamo had never manufactured flowable material before, and that Banman prepared Exhibit B and provided it to Andrews. Banman also created the SOPs for the CTM products – which were provided to Alamo – that are essentially duplicative of HRT's SOPs, and yield an identical product. [PF 628, 632.] Leaving no doubt, Banman testified that that he had to explain how to manufacture chorion membranes because Alamo had not processed chorion only membranes before, and otherwise had to instruct Alamo in detail concerning the manufacture of the products. [PF 629, 634-636] The degree to which he tutored Alamo, and did so using HRT proprietary technology, is emphasized by an email dated October 21, 2019. Alamo's initial prototype of chorion only membrane was too thin, and Banman remarked that they membrane had been "scraped down, and almost as thin as amnion." [PF 634] He then attached a ***photo of an HRT chorion membrane*** to ensure Alamo had "a comparison of the thickness we're aiming for." [PF 635] Banman explained "here's a couple of pics of tissue we're sending you, for chorion reference":



26            Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

This photo is **HRT's product,** and Banman should not have had it in his possession after he left HRT – though he plainly did. [PF 638] To state the obvious, Banman was providing an exemplar of an **HRT product** for Alamo to copy as a CTM product. [PF 638] There is brazen. There is shameless. And then there is this.

In light of Banman's October 21, 2019 email, it should go without saying that there is no evidence that CTM independently researched and developed any of the products it had manufactured or sold. There is no "CTM Design File" charting the evolution or creation of CTM products, nor any evidence that CTM did anything other than misappropriate Plaintiffs' trade secreted technology and use it to manufacture competing goods. [PF 630] And a simple review of the company's product line confirms that unavoidable conclusion. CTM's flowable products and HRT's flowable products are identical. [PF 641] Both CTM's and HRT's flowable products are non-dehydrated, sterile, ambient temperature shelf-stable, ready-to-use products. [PF 641] Banman, knowing the benefits of offering a line of premixed, and ambient temperature flowable products, simply copied HRT's trade secret methods and provided them to Alamo to make an identical product. [PF 642]

### H. The Defendants Reveal the Purpose of the Conspiracy, And Recruit Another Member

Defendants continued converting Skye customers to CTM, and did so through the use of Skye's trade secrets. [PF 644-657] But like all conspiracies, this one could not stay under wraps forever. On August 29, 2019, Boulais messaged Banman via WhatsApp and complained that Skye withheld money from him. [PF 658] Banman responded that: "Well, in about 18 months we'll withhold $26 million from them." [PF 659] This number was no mere coincidence – Skye's revenue for 2018 was approximately $███████. [PF 660] Banman, in short, had inside knowledge of Skye's revenue and intended to take all of it for himself. [PF 661] And his co-conspirators appreciate the craven nature of his motives. Boulais testified, about this text, that: "I think it was very personal for Bryan to be more successful than Chris" and "I think it was important to Bryan to create a company bigger and better and more successful…than Skye." [PF 662] Stumpe, for his part, agreed in deposition that Banman wanted to "**convert**" $26 million of sales from Skye to CTM within 18 months. [PF 663]

The malice at the root of Banman's motives had no limit, nor apparently did his desire to

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

destroy Skye. Pablo Seoane became the head of sales for Skye after Banman's departure and Banman naturally could not resist attempting to lure him away from the company. He succeeded, and Seoane resigned on January 31, 2020, telling Skye he was leaving to work for a "tech" company – he flashed his iPhone to Sharp and Matt Chorman revealing an "offer letter" from the tech company. [PF 669] The truth was he was relocating to Florida to work for CTM. When confronted in his deposition, Seoane readily admitted that he lied to Sharp. [PF 668, 670]

On his last day of employment, Sharp requested, in person, that Seoane delete the training notes that were on his iPhone, and Seoane agreed. [PF 671] Seoane told Sharp he would, and then -- despite that assurance – intentionally retained seventeen of the "notes." [PF 671] But he did more than keep training notes. He also maintained all of Skye's contact information for sales representatives, doctors, and facilities. And he had no apparent hesitation of exploiting this plainly proprietary information, texting Banman on February 24, 2020 and assuring his new conspirator that: "Hey B…I'll then start to go through and transferring contacts and opportunities into SF to try to get some traction going this week with my roladeck... Hopefully it won't be too long before I have a good feel for CTM process on onboarding and training, SF and doc sharing. Just so you know what im up to." [PF 672] He then proceeded to attach a photo depicting a laptop computer and a large desktop monitor. [PF 673.] The desktop monitor shows CTM's contacts database open, and the laptop shows Excel tabs containing Skye sales representative contact trade secret information that Seoane no longer had the right to possess and which he promised Sharp he would delete. [PF 673.] Having downloaded, copied, and/or transferred this trade secret information to his personal computer after returning his Skye issued computer, Seoane was quickly transferring trade secreted information to CTM.



JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Seoane, the last member of the conspiracy, nonetheless took little time ingratiating himself in the predatory culture of the CTM artifice. On February 13, 2020, he wrote Banman about another Skye sales representative that CTM flipped and that the information found its way back to Skye: "Word got back to Skye that Erin is going around opening up accounts for ctm fyi." Banman responded: "Haha. Good. Skye can suck my dick." [PF 666.] A fitting epithet to this entire sordid mess.

## VIII.    PLAINTIFFS HAVE BEEN SIGNIFICANTLY DAMAGED.

CTM has interfered with 29 sales representatives that had exclusive and confidential contracts with Skye by offering better commission rates. CTM has also interfered with 29 medical facilities and hospitals to stop using Skye/HRT products and instead buy CTM products by offering better pricing.

CTM projects it will earn almost $50,000,000 in revenue in 2023 – all from the sales of placental products which were stolen trade secrets belonging to Plaintiffs. [PF 675] At the time of trial, Plaintiffs' expert will testify that the amount of lost profits had Defendants not stolen and used Plaintiffs' trade secrets is $276,836,614.[11]

**SUMMARY JUDGMENT STANDARD**

**ALL DEFENDANTS**

A court should grant summary judgment when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of . . . [the record that] demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. Instead, the moving party's burden is met by pointing out an absence of evidence supporting the non-moving party's case." *Beaulieu Group, LLC v. Bates*, 2016 WL 7626471, at *5 (C.D. Cal. Oct. 18, 2016).

---

[11]/ Plaintiffs advise this Court of this information so that this Court is aware of the serious and extraordinary damage that Defendants have caused to Plaintiffs' business. Plaintiffs' expert economist report is 113 pages long and is not attached as evidence to this motion but is available for the Court's consideration if necessary.

29                Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Once the movant meets this initial burden, the burden shifts to the nonmovant to demonstrate with admissible evidence that genuine issues of material fact remain. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "[C]onclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment." *VBS Distrib., Inc. v. Nutrivita Labs., Inc.*, 2018 WL 5274172, at *2 (C.D. Cal. Sept. 10, 2018).

Under Local Rules 56-2 and 56-3, material issues of fact must be identified in the non-moving party's "Statement of Genuine Issues" and supported by "declaration or other written evidence." *See also Sullivan v. Dollar Tree Stores, Inc.*, 623 F.3d 770, 779 (9th Cir. 2010). The importance of Plaintiff's opposition briefing and accompanying "Statement of Genuine Issues" is especially pronounced in trade secret cases, where "[a] plaintiff seeking relief for misappropriation of trade secrets 'must identify the trade secrets and carry the burden of showing that they exist.'" *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998) (quoting *MAI Sys. Corp. v. Peak Comp., Inc.*, 991 F.2d 511, 522 (9th Cir. 1993)). It is Plaintiff's burden to "clearly identify the information" that allegedly constitutes a trade secret in its briefing and supporting evidence. *Integral Dev. Corp. v. Tolat*, 675 Fed. Appx. 700, 702 (9th Cir. 2017).

**PLAINTIFFS**

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex, 477 U.S. at 323. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970). When evaluating a motion for summary judgment, the court must "view[ ] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001). The court may not, however, engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts as those functions are for the trier of fact. Anderson, 477 U.S. at 255. Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. *Id.* at 250–51.

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

**ARGUMENT**

**DEFENDANTS' PORTION:**

**I.   The Court should dismiss Plaintiffs' RICO claims (Counts I & II) under Rule 56 and Rule 12(c) because there is no "predicate act" or "pattern of racketeering activity."[12]**

To succeed on a RICO claim under 18 U.S.C. Section 1962(c), a plaintiff must allege and prove: (1) conduct; (2) of an enterprise; (3) through a **pattern**; (4) of **racketeering activity (known as predicate acts)**; (5) causing injury to plaintiff's business or property. *Grimmet v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996); *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1052 (C.D. Cal. 2016).

Plaintiffs' RICO claim fails for at least three independent reasons: (1) Plaintiffs have not identified, let alone established, a RICO predicate act because they have only alleged civil trade secret misappropriation under 18 U.S.C. Section 1836, not "indictable" trade secret theft under 18 U.S.C. Section 1832; (2) even if Plaintiffs could allege trade secret theft, they cannot establish a threat of continued trade secret theft (a "pattern"); and (3) the "scheme" alleged by Plaintiffs is not actionable under RICO. This commercial dispute is "simply not a case that involves long-term criminal conduct or activity that could, in commonsense, be called a pattern of racketeering" under RICO. *Mgt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 883 F.2d 48, 51 (7th Cir. 1989).

**A.   There is no predicate act as a matter of law.**

"Racketeering activity"—often referred to as a "predicate act"—is a necessary element of a RICO claim. Only certain wrongs can constitute predicate acts, and the RICO statute specifically identifies them. *See* 18 U.S.C. § 1961(1); *Shaw*, 220 F. Supp. 3d at 1052. Indictable trade secret "theft" under 18 U.S.C. Section 1832 can constitute a predicate act. But civil trade secret misappropriation under 18 U.S.C. Section 1836 is ***not*** a RICO predicate. *See* 18 U.S.C. § 1961(1) (listing Section 1832 as a predicate act, but not Section 1836); *see also ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 694-95 (E.D. Tex. 2020) (trade secret misappropriation under Section 1836 is not a RICO predicate); *CrossBorder Sols., Inc. v. Macias, Gini, & O'Connell, LLP*, 2022 WL 562934, at *9-10 (S.D.N.Y. Feb. 23, 2022) (same); *Hardwire, LLC v. Ebaugh*, 2021 WL 3809078, at *7 (D. Md. Aug.

---

[12]   Plaintiffs assert Counts I and II against Banman, Stumpe, Boulais, and Seoane (the "RICO Defendants"). All RICO Defendants join Point I. To the extent that certain arguments within Point I are raised only on behalf of a specific defendant(s), the sub-headings so indicate.

26, 2021) ("§ 1836 . . . is not a RICO predicate").

The Court should grant summary judgment to all Defendants on Plaintiffs' RICO claim because Plaintiffs allege civil trade secret misappropriation under Section 1836, not indictable trade secret theft under Section 1832. There is no reference to Section 1832 in the entire Complaint. And the absence of that statutory reference makes sense. Plaintiffs do not allege that Defendants broke-in to Plaintiffs' facilities or hacked computers in acts of trade secret espionage (potentially indictable acts under Section 1832). Plaintiffs instead contend Defendants misappropriated purported trade secrets under Section 1836 by using and disclosing those trade secrets after receiving them from Plaintiffs under confidentiality restrictions. Dkt. 130 ("Compl.") ¶¶ 43-53, 68, 135, 147. According to Plaintiffs, Defendants lawfully acquired these "secrets" while working with Plaintiffs (*id.* ¶¶ 43-53, 68, 125, 143) and then later used them with CTM's competing business. *Id.* ¶¶ 70, 82, 135, 192-194. Plaintiffs specifically claim that civil misappropriation under Section 1836 constitutes a RICO predicate. *Id.* ¶¶ 172-176. But they are wrong as a matter of law.

*ESPOT, Inc. v. MyVue Media* is on point. There, on substantively identical facts, the court rejected the plaintiff's argument that civil trade secret misappropriation under Section 1836 could serve as a RICO predicate. 492 F. Supp. 3d at 694. The Court held that Section 1836 violations cannot be RICO predicates because Section 1836 is not included in the RICO statute's definition of "racketeering activity." *Id.* at 695. Other courts have reached the exact same conclusion. *See CrossBorder Sols., Inc.*, 2022 WL 562934, at *10 ("while a plaintiff may bring a civil claim for the 'use' of a stolen trade secret under § 1836, such 'use' cannot constitute a predicate act under RICO"); *Hardwire, LLC*, 2021 WL 3809078, at *7 ("Although that alleged misappropriation of trade secrets may entitle [plaintiff] to civil remedies under § 1836, it falls outside the scope of conduct prohibited under § 1832. As such, [plaintiff] fails to allege any predicate acts of racketeering activity.").

Plaintiffs have only alleged trade secret misappropriation under Section 1836. Compl. at 1 (DTSA claim under Section 1836), ¶¶ 188-202. They repeatedly allege that the Defendants "acquired, disclosed, and/or used" Plaintiffs' purported trade secrets (Compl. ¶¶ 193-194), which is the definition of civil "misappropriation" in the DTSA. 18 U.S.C. § 1839(5). Plaintiffs do not allege trade secret theft under Section 1832 and have therefore not identified a predicate act. In addition, the evidence

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

proves that Defendants did not engage in acts of trade secret "theft" under Section 1832. They did not "steal" Plaintiffs' information or obtain it without Plaintiffs' consent. They lawfully obtained information in connection with their work with Plaintiffs. SOF 21-30, 146.

**PLAINTIFFS' PORTION:**

A.    **Defendants Do Not Meet Their Summary Judgment Burden on This Issue**

The party seeking summary judgment bears the initial responsibility to demonstrate the absence of a genuine issue of material fact. *Celotex Corp., supra*, 477 U.S. at 323. But Defendants argue that Plaintiffs have not *alleged* a predicate act and, setting aside that the Defendants' contention lacks substantive merit, this argument is entirely misplaced in this procedural context.[13] Specifically, a Rule 56 summary judgment motion does not test the soundness of the pleading, but the disputation of material evidence and fact. Challenges to the pleadings are the province of a Rule 12 motion, which the Defendants plainly know because they mounted the identical argument in a Rule 12 motion that this Court already denied twice. [Docket #104.] But Defendants, in rehashing the same contention, cite the Court to no ***fact*** demonstrating a lack of predicate acts, retreating instead to the purported but erroneous assertion that the Plaintiffs failed to *allege* such an act. The burden has, as a consequence, not shifted to Plaintiffs and the Defendants' contention concerning this issue must necessarily fail. That said, Plaintiffs have amassed a wide array of evidence demonstrating a full complement of predicate acts establishing a compelling RICO claim.  The statute, as the Supreme Court has directed, must be "read broadly." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985) ("*Sedima*").

B.    **A Violation of 18 U.S.C. § 1832 is a Predicate Act for RICO**

Section 1832 identifies numerous crimes qualifying as predicate RICO acts. And when the Defend Trade Secrets Act ("DTSA") was codified in 2016, Congress also expanded the definition of "racketeering activity" to include not only the "theft" of a trade secret but a series of additional conduct impairing the trade secret of another:

---

[13]/ Pleadings in federal courts "must be construed so as to do justice." FRCP 8(e). The Federal Rules are designed to minimize disputes over pleading technicalities. *Ashcroft v. Iqbal* (2009) 556 US 662, 678 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era"). A complaint is sufficient if it gives the defendant "fair notice of what the … claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly* (2007) 550 US 544, 555. Applying that standard, this Court already properly found that paragraphs 162-181 of the Complaint did allege predicate acts.  [*See* Docket #130.]

- Steals – 18 USCA §1832(a)(1)
- Carries away – 18 USCA §1832(a)(1)
- Misappropriates ("without authorization approp`riates") – 18 USCA §1832(a)(1)
- Conceals – 18 USCA §1832(a)(1)
- Copies, duplicates, photographs, photocopies, replicates – 18 USCA §1832(a)(2)
- Downloads, uploads – 18 USCA §1832(a)(2)
- Transmits, delivers, sends, communicates or conveys – 18 USCA §1832(a)(2)
- Possession of the stolen information – 18 USCA §1832(a)(3)
- An attempt to commit any of the above offenses – 18 USCA §1832(a)(4)
- Conspires to commit the above offenses – 18 USCA §1832(a)(5)

RICO requires only two predicate acts, and each separate violation of Section 1832 is considered an independent "predicate act" under the statute. In our case, Defendants' misconduct violates the expanded definition of Section 1832 in myriad respects and by way of countless independent predicate acts. *Magnesita Refractories Co. v. Tianjin New Century Refractories Co., Ltd*, 2019 WL 1003623, at *8 (M.D.Pa. 2019) (noting that not treating violations of the different subsections of Section 1832 as separate acts for RICO purposes would undermine the DTSA). A summary of the violations of Section 1832 reveal the full breadth of their conspiracy:

| Defendant/ Violation | Summary of Evidence |
|---|---|
| **Banman**: Stole §1832(a)(1) | 1. HRT's processing formula for HRT's products. [PF 362, 376-378, 641] |
| **Banman**: Carried away without authorization §1832(a)(1) | 2. HRT's processing formula for HRT's products. [PF 362, 376-378, 641]<br>3. Skye's product sales and marketing information. [PF 564-601, 616]<br>4. Skye's customer information for GCRMC and Dr. John Anderson [PF 539, 540, 569], Palm Beach Gardens [PF 589-590]<br>5. Skye's sales representative information for Boulais, Stumpe, Carey, and Seoane. [PF 481, 491, 493-494, 537, 575, 576, 588, 667-668]<br>6. Skye's login information and password for Broward Health's vendor registration. [PF 596-598]<br>7. Skye's Business Development Compendium. [PF 688] |
| **Banman**: Attempted to steal §1832(a)(4) | 8. HRT's Dropbox containing HRT's processing information for its products. [PF 615] |
| **Banman**: Appropriated without authorization §1832(a)(1) | 9. HRT's processing formula for HRT's products. [PF 372, 376-378, 641, 596-632]<br>10. Skye's data regarding sales of product sales. [PF 564-601, 616]<br>11. Skye's employee and sales representative information for Boulais, Stumpe, Carey, and Seoane. [PF 481, 491, 493-494, 537, 575, 576, 588, 667-668]<br>12. Skye's customer information for GCRMC and Dr. John Anderson [PF 539, 540, 569], Palm Beach Gardens [PF 589-590] |

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| | 13. Dr. Hiatt research information. [PF 584-587] |
| **Banman**: Copied/ Duplicated without authorization §1832(a)(2) | 14. HRT's processing formula for HRT's products. [PF 376-378, 614, 616, 619, 596-632]<br>15. Forms from Broward Health's vendor registration using Skye's login information. [PF 596-598]<br>16. Skye's HRT product sales and marketing information. [PF 599-604; 607-608, 610-612.] |
| **Banman**: Uploaded without authorization §1832(a)(2) | 17. Forms to Broward Health's vendor registration using Skye's login information. [PF 596-598] |
| **Banman**: Transmitted without authorization §1832(a)(2) | 18. HRT's processing formula for HRT's products to Lee Andrews. [PF 376-378, 614, 616, 622-628, 631-640, 641]<br>19. Skye's Business Development Compendium to Andrew MacDonald. [PF 688] |
| **Banman**: Delivered without authorization §1832(a)(2) | 20. Skye's sample of chorion only membrane to Alamo. [PF 634-637] |
| **Banman**: Received information knowing the information was appropriated without authorization §1832(a)(3) | 21. Skye's customer pricing and price lists. [PF 558-567, 570-572, 578-579, 643-645.]<br>22. Skye's employee and sales representative information. [PF 573, 580, 672-674, 682]<br>23. Skye's customer information for Carmel Ambulatory [PF 519-521]; Surgery Center of Carmel [PF 522-523; 594-595]; Riverview [PF 530-533, 536, 643-645]; St. Vincent [PF 534-535]; Community Health Network [PF 558-567, ; 593]; [PF 557, 575-576]; Dr. Elliot [PF 591]; Indiana Univ. [PF 646], Franciscan Alliance [PF 647]; Witham Hospital [PF 649]; Eskenazi [PF 554-556, 581-583, 651-653]; Dr. Baker [PF 578-579]; Community Health Network [PF 558-567]; [PF 575-576]; Saxony Surgery Center [PF 680]<br>24. Skye's trade secret 17 training "Notes". [PF 686]<br>25. Skye's trade secret sales rep and lead information into CTM's database. [672-674.]<br>26. Dr. Hiatt research information. [PF 584-587] |
| **Banman**: Conspired with **Boulais** who then acted to "effect the object of the conspiracy" §1832(a)(5) | 27. To appropriate without authorization Skye's for Carmel Ambulatory [PF 519-521]; Surgery Center of Carmel [PF 522-523; 594-595]; Riverview [PF 530-533, 536, 643-645]; St. Vincent [PF 534-535]; Community Health Network [PF 558-567, ; 593]; [PF 557, 575-576]; Dr. Elliot [PF 591]; Indiana University [PF 646], Franciscan Alliance [PF 647]; Witham Hospital [PF 649]<br>28. Skye's customer pricing. [PF 558-567; 570-572; 643-645]<br>29. Dr. Hiatt research information. [PF 584-587] |
| **Banman**: Conspired with **Stumpe** who then acted to "effect the object of the conspiracy" §1832(a)(5) | 30. To appropriate without authorization Skye's customer information for Dr. Flak [PF 568]<br>31. Skye's customer pricing and price lists. [PF 558-567, 572, 578-579, ]<br>32. Skye's customer information for Eskenazi [PF 554-556, 581-583, 651-653]; Dr. Baker [PF 578-579]; Community Health Network [PF 558-567]; [PF 575-576]; Saxony Surgery Center [PF 680] |

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| | 33. Skye's employee and sales representative information. [PF 573, 580, 672-674] |
| **Banman**: Conspired with **Seoane** who then acted to "effect the object of the conspiracy" §1832(a)(5) | 34. To appropriate without authorization Skye's employee and sales representative information. [PF 672-674, 682] |
| **Seoane**: Stole §1832(a)(1) | 35. Skye's trade secret 17 training "Notes". [PF 671]<br>36. Skye's employee and sales representative information. [PF 672-674, 682] |
| **Seoane**: Carried away without authorization §1832(a)(1) | 37. Skye's trade secret 17 training "Notes". [PF 671]<br>38. Skye's employee and sales representative information. [PF 672-674] |
| **Seoane**: Appropriated without authorization §1832(a)(1) | 39. Skye's employee and sales representative information. [PF 672-674, 682] |
| **Seoane**: Downloaded without authorization §1832(a)(2) | 40. Skye's trade secret sales rep and lead information. [PF 672-674, 682.] |
| **Seoane**: Uploaded without authorization §1832(a)(2) | 41. Skye's trade secret sales rep and lead information into CTM's database. [PF 672-674]<br>42. |
| **Seoane**: Transmitted without authorization §1832(a)(2) | 43. Skye's trade secret 17 training "Notes". [PF 686]<br>44. Skye's trade secret sales rep and lead information into CTM's database. [PF 672-674] |
| **Seoane**: Communicated without authorization §1832(a)(2) | 45. Skye's trade secret 17 training "Notes". [PF 686] |
| **Boulais**: Appropriated without authorization §1832(a)(1) | 46. Skye's customer pricing and price lists. [PF 558-567; 570-572; 643-645.]<br>47. Skye's customer information for Carmel Ambulatory [PF 519-521]; Surgery Center of Carmel [PF 522-523; 594-595]; Riverview [PF 530-533, 536, 643-645]; St. Vincent [PF 534-535]; Community Health Network [PF 558-567, ; 593]; [PF 557, 575-576]; Dr. Elliot [PF 591]; Indiana University [PF 646], Franciscan Alliance [PF 647]; Witham Hospital [PF 649].<br>48. Dr. Hiatt research information. [PF 584-587] |
| **Boulais**: Communicated without authorization §1832(a)(2) | 49. Skye's customer pricing and price lists. [PF 558-567; 570-572; 643-645.] |
| **Stumpe**: Appropriated without authorization §1832(a)(1) | 50. Skye's customer pricing and price lists. [PF 558-567, 572, 578-579, .]<br>51. Skye's customer information for Eskenazi [PF 554-556, 581-583, 651-653]; Dr. Baker [PF 578-579]; Community Health Network [PF 558-567]; [PF 575-576]; Saxony Surgery Center [PF 680].<br>52. Skye's employee and sales representative information. [PF 573, 580, 672-674.] |
| **Stumpe**: Communicated | 53. Skye's customer pricing and price lists. [PF 558-567, 572, 578-579.] |

36    Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

| without authorization §1832(a)(2) | |
|---|---|
| **Banman, Stumpe,** and **Boulais:** Conspired and then acted to "effect the object of the conspiracy" §1832(a)(5) | 54. Skye's customer information for Eskenazi [PF 554-556, 581-583, 651-653]; Dr. Baker [PF 578-579]; Community Health Network [PF 558-567]; [PF 575-576]; Saxony Surgery Center [PF 680]; for Carmel Ambulatory [PF 519-521]; Surgery Center of Carmel [PF 522-523; 594-595]; Riverview [PF 530-533, 536, 643-645]; St. Vincent [PF 534-535]; Community Health Network [PF 558-567, ; 593]; [PF 557, 575-576]; Dr. Elliot [PF 591]; Indiana University [PF 646], Franciscan Alliance [PF 647]; Witham Hospital [PF 649.]<br>55. Skye's customer pricing and price lists. [PF 558-567, 570-572, 578-579, 643-645.]<br>56. Skye's employee and sales representative information. [PF 573, 580, 672-674.] |
| **Banman, Stumpe, Boulais, and Seoane:** Conspired and then acted to "effect the object of the conspiracy" §1832(a)(5) | 57. Skye's trade secret sales rep and lead information. [PF 573, 580, 672-674]<br>58. Skye's customer information for Eskenazi [PF 554-556, 581-583, 651-653]; Dr. Baker [PF 578-579]; Community Health Network [PF 558-567]; [PF 575-576]; Saxony Surgery Center [PF 680]; for Carmel Ambulatory [PF 519-521]; Surgery Center of Carmel [PF 522-523; 594-595]; Riverview [PF 530-533, 536, 643-645]; St. Vincent [PF 534-535]; Community Health Network [PF 558-567, ; 593]; [PF 557, 575-576]; Dr. Elliot [PF 591]; Indiana University [PF 646], Franciscan Alliance [PF 647]; Witham Hospital [PF 649.] |

These *facts* are the determinative factor on this issue, not the pleadings.

**C.     This Court Previously Ruled on this Pleading Issue in Favor of Plaintiffs.**

In any event, the Court has long since considered and resolved any questions concerning the pleadings. Specifically, the Court denied the initial Rule 12 motion on February 9, 2021, finding that "Plaintiffs identify the DTSA violations discussed above as the predicate acts for racketeering activity. FAC at ¶ 158. They allege that to 'accomplish the overall aims of the criminal enterprise,' Defendants 'acquir[ed], us[ed] and/or disclos[ed] Plaintiffs' confidential information and trade secrets to form and run a competing business' and 'acquir[ed], us[ed] and/or disclos[ed] Plaintiffs' confidential information and trade secrets to wrongfully interfere with and hinder Plaintiffs' legitimate business interests, valid contracts and prospective economic advantages to the detriment of Plaintiffs.' Id. at ¶147. Violations of the DTSA are enumerated as 'racketeering activity'" under RICO. See 18 U.S.C. § 1961(1)." [Docket #60, p.15-16] The Court made the same finding in denying a later Rule 12 motion. [Docket #104, p. 3.]

### D. A Violation of the DTSA is also a Predicate Act for RICO

Defendants, citing the Eastern District of Texas *ESPOT* case, argue that DTSA violations may not serve as RICO predicate acts. But Defendants disregard, and do not advise the Court, of the split among the District Courts on this issue, nor ***that this Court already rejected this contention in denying Defendants' Rule 12(b) Motion***.[14] And the Court was right in doing so because the Ninth Circuit has embraced precisely the type of claim Plaintiffs have brought: "Despite repeated efforts by courts to limit the reach of civil RICO private damages actions, it is clear that suits alleging the requisite predicate acts are entitled to federal court jurisdiction, even if the acts are of a common-garden variety far removed from what is normally regarded as 'organized crime' activity." *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1080 (9th Cir. 1986) (citing *Sedima* at 495) (indicating civil RICO suit may rest on a commercial contract dispute with no criminal convictions for predicate acts).

Beyond that, the Central District has found the stealing ***and using*** of trade secrets fall within RICO. Thus, in *Hunter Consulting, Inc. v. Beas*, 2013 WL 12131581, at *5-7 (C.D. Cal. 2013), the Court concluded that the theft of of the plaintiffs' proprietary information – including "use of [plaintiffs'] proprietary information to undercut prices", a practice with which HRT and Skye are now unfortunately all too familiar – constituted racketeering activity. The bulk of District Courts nationwide have reached similar conclusions. *See, e.g., Brand Energy & Infrastructure Servs. v. Irex Contr. Grp.,* 2017 WL 1105648 at *12-13 (E.D.Penn.2017) ("Brand alleges that the defendants stole Brand's trade secrets in violation of the DTSA * * * These allegations alone are sufficient to constitute a 'pattern of racketeering activity' under RICO.").

Furthermore, Defendants distort the *ESPOT* holding in material respects and, on basic scrutiny, the decision supports Plaintiffs' position. The case involved allegations by ESPOT (plaintiff) that the defendants worked together to obtain ESPOT's intellectual property – namely, source code for a tablet-based digital-media product that would streamline communication between the coaches and the families of student athletes – and distribute products bearing that intellectual property. The defendants specifically retained a hacker who attempted, but failed, to extract source code from ESPOT's tablets.

---

[14]/ This is a violation ABA Rule of Professional Conduct, Rule 3.3 (Candor Toward the Tribunal).

ESPOT contended this posed the threat of an indefinite pattern of criminal activity. *ESPOT* at 692. The Court, in granting the defendants' Rule 12 motion, found ESPOT had not alleged a predicate act for RICO, ***but not because the theft of trade secrets or the DTSA were not or could not serve as predicate acts.*** To the contrary, the Court specifically delineated Section 1832 in the list of such acts, and commented that the statute was amended to include trade secrets theft after Congress' passage of the DTSA. But the Court drew a distinction between the act of stealing a trade secret – which is specifically delineated in Section 1832 – and the broader conduct of misappropriating one, which the DTSA encompasses. Section 1832, the Court concluded, "does not use the term 'misappropriate'" but "appears to invoke the ways in which a person or entity can take receive a trade secret, not use it once taken." *Id.* at 695. And because ESPOT had not alleged *theft* of its trade secrets – the hacking attempt was unsuccessful – there were no predicate acts.

*ESPOT,* in its parsimonious reading of RICO, ***is inconsistent with the Ninth Circuit's direction*** that the statute be construed broadly, and is likewise contrary to the Central District's conclusion in *Hunter Consulting* that the ***use*** of trade secrets is an actionable predicate acts. Nor is the restrictive construction of Section 1832 in conformity with the plain language of the statute. Section 1832(a)(1) explicitly identifies a violator as one who "without authorization appropriates" a trade secret, and the standard dictionary definition of misappropriate means "to appropriate wrongly." See, Merriam-Webster dictionary. And Section 1832(a)(2) defines a violator as one who "without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, ***transmits, delivers, sends, mails, communicates, or conveys such information***." (Emphasis added.) The statute, in short, plainly embodies both the theft and use of trade secrets, and the *Hunter Consulting* and *Brand* interpretations are in fidelity to that plain meaning.

The *ESPOT* decision consequently, and for multiple reasons, has no currency here. But even if applied (and it cannot be), it would nevertheless demand the denial of the Defendants' motion because HRT and Skye have accumulated a veritable mountain of evidence demonstrating that the Defendants each stole trade secrets and did so intentionally. Under any interpretation of the law and evidence, in other words, the Plaintiffs have established an array of predicate acts.

39          Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

**DEFENDANTS' REPLY:**

Plaintiffs concede, as they must, that trade secret misappropriation under 18 U.S.C. § 1836 is not a RICO predicate act. Plaintiffs do not dispute that their Complaint alleges only 18 U.S.C. § 1836 violations, and not trade secret theft under 18 U.S.C. § 1832. Plaintiffs now claim—for the first time—that Defendants engaged in trade secret theft under § 1832. Their theory fails.

### 1.      Plaintiffs' procedural argument is wrong as a matter of law

Plaintiffs' contention that Defendants have failed to meet their summary judgment burden because their arguments are purportedly directed only to pleading deficiencies is clearly wrong for several reasons. First, "failure to state a claim . . . may also serve as a basis for summary judgment." *Martin v. Lennox Int'l Inc.*, 342 Fed. Appx. 15, 17 (5th Cir. 2009); *see also Uptegrove v. U.S.*, 600 F.2d. 1248, 1249 (9th Cir. 1979) (affirming district court's grant of summary judgment for failure to state a claim). Second, failure to state a claim is not waived and can be raised even at trial. FRCP 12(h)(2)(C). Third, Defendants have moved on the RICO claim under **both** Rule 56 and 12(c). Rule 12(c) provides an independent basis for dismissal. *See* FRCP 12(c); FRCP 12(h)(2)(B). Fourth, as discussed below, Defendants' argument is not only directed to pleading deficiencies. Defendants have presented evidence that negates any purported § 1832 wrongs.

### 2.      Defendants did not engage in any act in violation of Section 1832

Defendants have presented evidence that conclusively refutes any contention now raised by Plaintiffs (not pleaded in their Complaint) that Defendants somehow engaged in trade secret theft under 18 U.S.C. § 1832. Thus, even if the Court treats Plaintiffs' contentions in their brief as pleaded allegations, the claim still fails.

Defendants did not "steal" Plaintiffs' information or obtain it without Plaintiffs' consent; rather, they lawfully obtained the information in connection with their work with Plaintiffs. SOF 21-30, 146; Banman Reply Decl. ¶¶ 15-18. This is not a case where Plaintiffs alleged, let alone proved on summary judgment, that Defendants hacked computers, broke into company headquarters, or engaged in the type of trade secret theft set out in 18 U.S.C. § 1832. The evidence conclusively proves that Defendants did not engage in such acts. SOF 21-30, 146; Banman Reply Decl. ¶¶ 15-18. Plaintiffs' lengthy chart of purported trade secret "theft" proves Defendants' point. In each instance, Plaintiffs

actually claim that a Defendant legally obtained access to purported trade secret information *while working with Plaintiffs* and then later used that information to compete.

Knowing that they cannot establish a RICO predicate, Plaintiffs falsely claim, for the first time, that Banman "copied" the HRT Design File and materials from a DropBox to his personal computer after he left Skye. SOF 376 (citing Sharp Depo. at 110:22-111:5). Sharp's own testimony disproves this assertion. Sharp testified that he and Banman used a shared folder in a DropBox *while Banman worked for Skye/HRT*. Banman lawfully had access to the Design File as part of his work. Fluskey Decl. Ex. 14 (Sharp Depo.) at 109-112; Banman Reply Decl. ¶¶ 15-18. Sharp even confirmed that Banman removed himself from the shared folder when he left Skye/HRT. Fluskey Decl. Ex. 14 at 112:5-14. Banman copied documents, including the Design File, to his personal computer and iCloud account while working with Skye/HRT and with Sharp's consent because the companies did not provide Banman with a work computer. Banman removed himself from the shared drive when he ceased working, and he documented that removal. Banman Reply Decl. ¶ 17, Ex. 3. He never accessed Skye/HRT information from the DropBox after he ceased working. The information produced in this case had been downloaded to his computer while he was working with Skye/HRT. *Id.* at 18. Plaintiffs have even dropped their conversion claim (Count VI), implicitly conceding that they have no basis to accuse Defendants of engaging in trade secret theft covered by 18 U.S.C. § 1832. *See* Point IV.

### 3. <u>The Court did not previously rule on this issue</u>

Plaintiffs' assertion that this Court already decided the question presented on this motion is irresponsibly false. The CTM Defendants filed two 12(b)(6) motions that challenged Plaintiffs' RICO pleading. They argued that Plaintiffs failed to allege a RICO "enterprise" with a "common purpose," failed to allege how each Defendant directed the enterprise's affairs, and failed to satisfy Rule 9(b). *See* Dkt. 41-1 at 11-19; Dkt. 68-1 at 10-20. The CTM Defendants did not present, and the Court did not rule upon, the argument now before this Court—namely, that Plaintiffs failed to identify a predicate act under 18 U.S.C. § 1832. Even if the Court had addressed the question (it did not), nothing prevents Defendants from raising the issue again on summary judgment. The case law on this issue has developed substantially since the CTM Defendants filed their first motion in July 2020, and it makes clear that civil trade secret misappropriation under 18 U.S.C. § 1836 is not a RICO predicate.

*See ESPOT*, 492 F. Supp. 3d at 694-95 (E.D. Tex. Oct. 2, 2020); *CrossBorder Sols.*, 2022 WL 562934, at *9-10 (S.D.N.Y. Feb. 23, 2022); *Hardwire*, 2021 WL 3809078, at *7 (D. Md. Aug. 26, 2021). Plaintiffs' accusation in footnote 14 that Defendants somehow violated an ethical rule by not informing this Court of a previous ruling turns the world upside down. It is Plaintiffs who have misrepresented the issues presented in the CTM Defendants' 12(b)(6) motions and the scope of the Court's prior rulings.

### 4.    Plaintiffs misstate Defendants' argument and the case law

Defendants do not argue that "DTSA violations may not serve as RICO predicate acts." Rather, Defendants argue that only indictable trade secret theft under 18 U.S.C. § 1832 is a predicate act. That is what the statute says. *See* 18 U.S.C. § 1961(1).

Plaintiffs contend that this District has found that "use" of trade secrets constitutes a RICO predicate act, citing *Hunter Consulting, Inc. v. Beas*, 2013 WL 12131581 (C.D. Cal. 2013), but they misrepresent the court's holding. *Hunter Consulting* did not concern whether civil trade secret misappropriation under 18 U.S.C. § 1836 or "use" of trade secrets constitutes a RICO predicate act. The predicate acts alleged there were mail fraud, wire fraud, and interstate transportation of stolen property. 2013 WL 12131581, at *4. Further, the *Hunter Consulting* decision is from 2013—three years ***prior to the enactment of the DTSA*** in 2016. No DTSA violation, including 18 U.S.C. § 1832, was a RICO predicate act at that time.

Plaintiffs are clearly incorrect when they assert that "the bulk of District Courts nationwide have reached similar conclusions" to *Hunter Consulting*. First, as discussed above, *Hunter Consulting* did not reach the conclusion Plaintiffs claim. Second, Plaintiffs only cite a single, unreported decision from the Eastern District of Pennsylvania in 2017, shortly after the DTSA was enacted, to support their incorrect contention that "use" of trade secrets constitutes a predicate act. *Brand Energy & Infrastructure Servs. v. Irex Contr. Grp.,* 2017 WL 1105648 at *12-13 (E.D. Pa. Mar. 24, 2017). The overwhelming majority of courts have held that use of trade secrets is ***not*** a RICO predicate as a matter of law. *See ESPOT*, 492 F. Supp. 3d at 695; *CrossBorder Sols.*, 2022 WL 562934, at *10; *Hardwire*, 2021 WL 3809078, at *6-7. Plaintiffs have no answer for these cases. The plaintiffs in *ESPOT* and *Hardwire* also attempted to rely on *Brand Energy* and were rejected by the court. *ESPOT*, 492 F. Supp.

3d at 696-97; *Hardwire*, 2021 WL 3809078, at *7.

Plaintiffs' attempt to distinguish *ESPOT* fails. They contend that there were no predicate acts in *ESPOT* because plaintiff had not alleged theft of trade secrets. But that is not true. The plaintiff specifically alleged violations of 18 U.S.C. § 1832 in its Complaint, *see* 2019 WL 7423564 (*ESPOT* Complaint) ¶¶ 154-160, which the court recognized. *See ESPOT*, 492 F. Supp. 3d at 692 ("ESPOT asserts that the . . . Defendants have worked together to engage in . . . theft of trade secrets").

**DEFENDANTS' PORTION:**

**B.     There is no threat of continued criminal activity (no "pattern").**

Even if Plaintiffs alleged that Defendants engaged in theft of trade secret under Section 1832, as opposed to misappropriation under Section 1836, their claim would still fail because they cannot prove a pattern of racketeering activity—a threat of continued trade secret theft, as opposed to continued misappropriation. *See ESPOT, Inc.*, 492 F. Supp. 3d at 694.

The "pattern" element of RICO "requires the commission of at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). A plaintiff must show that the racketeering predicates are related and that they amount to a threat of continued criminal activity. *Shaw*, 220 F. Supp. 3d at 1053; *Attia v. Google LLC*, 2018 WL 2971049, at *14 (N.D. Cal. June 13, 2018); *ESPOT, Inc.*, 492 F. Supp. 3d at 693; *CrossBorder Sols., Inc.*, 2022 WL 562934, at *8-9. The continuity requirement can be established by closed-ended continuity or open-ended continuity. *ESPOT, Inc.*, 492 F. Supp. 3d at 693; *CrossBorder Sols., Inc.*, 2022 WL 562934, at *8-9. Closed-ended continuity involves a series of related predicate acts extending over a substantial period of time, while open-ended continuity involves a pattern of racketeering activity that poses a threat of continuing criminal conduct into the future. *ESPOT, Inc.*, 492 F. Supp. 3d at 693; *CrossBorder Sols., Inc.*, 2022 WL 562934, at *8-9.

Plaintiffs cannot establish closed-ended or open-ended continuity. With respect to close-ended continuity, Plaintiffs have not alleged trade secret theft, let alone a series of related instances of trade secret theft over a substantial period. Plaintiffs may try to argue that certain Defendants engaged in trade secret theft when they ceased working with Plaintiffs and purportedly failed to return Plaintiffs' information. But that would have occurred at a specific point in time (when Defendants ceased

working), not over a substantial period. As to open-ended continuity, Plaintiffs have only alleged a threat of continued *use* of their purported trade secrets, not continued *theft*. Compl. ¶¶ 82, 199. As multiple courts have held, allegations of continued use or disclosure of trade secrets, even those allegedly stolen, are insufficient as a matter of law to establish an open-ended pattern of racketeering activity. *ESPOT, Inc.*, 492 F. Supp. 3d at 695 ("[plaintiff] cannot rely on allegations that the [defendants] are using its trade secrets, and will continue to do so, to establish an open-ended pattern of racketeering activity."); *CrossBorder Sols., Inc.*, 2022 WL 562934, at \*10 ("[S]ince the criminal statute is limited to the point in time that a trade secret falls into unauthorized hands, then the ongoing use of the trade secrets once obtained cannot be a predicate act to establish a threat of continued criminal activity."); *Mgt. Comput. Servs., Inc.*, 883 F.2d at 51 ("[defendant's] subsequent use of the allegedly stolen software cannot be characterized as subsequent thefts"); *Attia*, 2018 WL 2971049, at \*18, n.15 ("Plaintiffs' theory that 'ongoing use' of trade secrets can somehow constitute *two* predicate acts under RICO is entirely unsupported and illogical") (emphasis in original); *Binary Semantics Ltd. v. Minitab, Inc.*, 2008 WL 763575, at \*4 (M.D. Pa. Mar. 20, 2008) (same).

**PLAINTIFFS' PORTION:**

Defendants continue their attempt to summarily shift the burden, by simply arguing that there is "no ongoing use". The Court, as a starting point, has already dispensed with this argument in the Rule 12 motion order. [Docket #104 at p. 5-6: "Plaintiffs have sufficiently demonstrated the 'threat of continuity' of racketeering. H.J. Inc., 492 U.S. at 230, 242 (emphasis omitted)."] Beyond that, Plaintiffs have set forth facts establishing the ongoing use of the trade secrets, and thus both an on-going and closed ended continuity. Under the open-ended definition, "liability depends on whether the threat of continuity is demonstrated." *H.J., Inc.,* 492 U.S. at 242. In other words, "[p]redicate acts that specifically threaten repetition or that become a 'regular way of doing business' satisfy the open-ended continuity requirement." *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995). The time frame over which these acts occurred is not dispositive. The Ninth Circuit, for instance, has found open-ended continuity based on (1) four predicate acts spanning two months (*Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 194 (9th Cir. 1987)); (2) two predicate acts over a 12 month period (*Ikuno v. Yip*, 912 F.2d 306, 308 (9th Cir. 1990)); and (3) three predicate acts within a thirteenth-month time

frame (*Ticor v. Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir. 1991)). The chart above delineates 58 predicate spanning the past four years, and on-going.

The facts also support close ended continuity, which RICO defines as a series of related predicates extending over a substantial period of time. *H.J. Inc.,* 492 U.S. at 230. Here, even if Defendants somehow terminated their unlawful acts, that leaves predicate acts extending 2018 to the present, and five years surely satisfies the close ended continuity standard.

Finally, Federal Courts have routinely found the element of continuity satisfied under facts analogous to those here. *See e.g. DHI Group, Inc. v. Kent*, 397 F.Supp.3d 904, 926 (S.D.Tex. 2019) (continuity requirement met when "there [was] no evidence [defendant] would have ceased his illicit [trade secret theft] had he not been caught"); *SolarCity Corp. v. Pure Solar Co.*, 2016 WL 11019989, at *7 (C.D.Cal.2016) ("From Plaintiff's allegations, it appears that [using Plaintiff's trade secrets] was [defendants'] 'regular way of doing business.'"); *Brand Energy & Infrastructure Services, Inc., supra,* 2017 WL 1105648, at *12 ("There is also a threat that the DTSA violations will continue because, allegedly, the defendants continue to use Brand's trade secrets in their business affairs at Irex."); *Bartlett v. Bartlett*, 2017 WL 5499403, at *6 (S.D.Ill.2017) (plaintiff properly "pled an open-ended scheme predicated on theft of trade secrets" when defendant used protected customer lists and financial data); *C-Ville Fabricating, Inc. v. Tarter*, 2019 WL 1368621, at *19 (E.D.Ky.2019) (continuity requirement met where plaintiff alleged theft of confidential pricing and customer information that threatened to continue).

**DEFENDANTS' REPLY:**

Plaintiffs once again misstate Defendants' arguments. Defendants did not "simply argu[e] that there is no ongoing use." Defendants explained that Plaintiffs' allegations of ongoing *use* of trade secrets, even if proven, are insufficient to establish a threat of continued criminal activity (*i.e.,* trade secret *theft*). Plaintiffs have no answer for the many decisions where courts held that the threat of continued *use* of trade secrets fails to establish RICO's continuity requirement. *See ESPOT*, 492 F. Supp. 3d at 695; *CrossBorder Sols.*, 2022 WL 562934, at *10; *Mgt. Comput. Servs.*, 883 F.2d at 51; *Attia*, 2018 WL 2971049, at *18, n.15; *Binary Semantics*, 2008 WL 763575, at *4. In their last paragraph, Plaintiffs copied the cases cited in footnote 7 of *ESPOT*. *See ESPOT*, 492 F. Supp. 3d at

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

697 n.7. But the *ESPOT* court distinguished those cases, holding that a threat of continuing **use** of trade secrets is not a threat of continuing **theft**. *Id.* Finally, Plaintiffs' argument that they have established the continuity requirement by claiming that Defendants' purported ongoing **use** of trade secrets is their regular way of doing business was specifically rejected by the *ESPOT* court. *ESPOT*, 492 F. Supp. 3d at 694-97. This Court should reject Plaintiffs' argument for the same reasons.

## DEFENDANTS' PORTION:

### C.    There is no actionable RICO "scheme."

Plaintiffs allege only a few participants in the purported "scheme" (Banman, Seoane, Stumpe, Boulais, and Rogers) with a single, narrow purpose—directing Plaintiffs' business to CTM. Compl. ¶¶ 165, 167. "Courts have uniformly and consistently held that schemes involving a single, narrow purpose and one or few participants directed towards a single victim do not satisfy the RICO requirement of a closed or open pattern of continuity." *Medinol Ltd. V. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 616 (S.D.N.Y. 2004) (citing *Lefkowitz v. Bank of N.Y.*, 2003 WL 22480049, at *8-9 (S.D.N.Y. Oct. 31, 2003)); *see also CrossBorder Sols., Inc.*, 2022 WL 562934, at *9; *Jerome M. Sobel & Co. v. Fleck*, 2003 WL 22839799, at * 12 (S.D.N.Y. Dec. 1, 2003).

## PLAINTIFFS' PORTION:

A RICO claim does not, as Defendants suggest, need to involve more than one victim and more than one scheme. *See Medallion Television Enters., Inc. v. SelecTV of Cal., Inc.,* 833 F.2d 1360, 1363 (9th Cir. 1987) (RICO does not "require a showing that the defendants engaged in more than one 'scheme' or 'criminal episode.' "); *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) ("There is no per se rule against a RICO claim involving only one victim"); *Cosmos Forms Ltd. V. Guardian Life Ins. Co. of Am.*, 113 F.3d 308, 310 (2d Cir. 1997) ("There is only one victim, but that does not, by itself, preclude a RICO pattern."); *Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1305 (7th Cir. 1987) ("repeated infliction of economic injury upon a single victim of a single scheme is sufficient to establish a pattern of racketeering activity for purposes of civil RICO"); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1298 (6th Cir. 1989) ("We . . . reject any contention that a 'pattern' requires 'multiple schemes.'"); *Office Outfitters, Inc. v. A.B. Dick Co., Inc.,* 83 F. Supp. 2d 772, 778 (E.D. Tex. 2000) ("Plaintiffs allege Defendants implemented a [single] scheme that would facilitate a future

transaction of a yet-unknown character . . . Defendants' single-transaction argument is of the kind the Supreme Court sought to avoid.").

**DEFENDANTS' PORTION:**

**D.    Plaintiffs' conspiracy to violate RICO claim (Count II) must also be dismissed.**

Because a claim for conspiracy to violate RICO requires a substantive RICO violation (which Plaintiffs have failed to establish, as set forth above), Plaintiffs' RICO conspiracy claim under 18 U.S.C. § 1962(d) must be dismissed. *See Shaw*, 220 F. Supp. 3d at 1058.

**PLAINTIFFS' PORTION:**

Defendants' argument is wrong as a matter of law. A RICO conspiracy under §1962(d) may be established by proof of an agreement to commit a substantive violation of RICO. *See Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 774-75 (9th Cir. 2002) ("It is the mere agreement to violate RICO that §1962(d) forbids; it is not necessary to prove any substantive RICO violations ever occurred as a result of the conspiracy"). And the conspirator need not have agreed to commit or facilitate each and every part of the substantive offense, but must merely have been "aware of the essential nature and scope of the enterprise and intended to participate in it." *Howard*, 208 F.3d 741, 751 (9th Cir. 2000) (citing *Salinas v. United States*, 522 U.S. 52, 65 (1997) and *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993)). *Id.* (citing). The agreement itself "need not be express as long as its existence can be inferred from words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co.*, 298 F.3d at 775. If a RICO conspiracy is demonstrated, "[a]ll conspirators are liable for the acts of their co-conspirators." *Id.; see also United States v. Fernandez*, 388 F.3d 1199, 1229-30 (9th Cir. 2004) (There is no requirement that the defendant have actually conspired to operate or manage the enterprise himself).

The case cited by Defendants does not support their own conclusion of law. In *Shaw v. Nissan North America,* 220 F.Supp.3d 1046 (C.D.Cal. 2016), the Court did not specifically hold that there must be an actual RICO violation to have a conspiracy to violate RICO, but rather that there were no allegations of a conspiracy. *Id.* at 1058. That stands in stark contrast to this case, where there are a slew of facts supporting the RICO conspiracy.

**DEFENDANTS' REPLY:**

Plaintiffs' argument that a RICO conspiracy claim does not require a substantive RICO violation is incorrect. *See Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir 2000) ("The district court held that the failure to adequately plead a substantive violation of RICO precludes a claim for conspiracy. We agree."); *ESPOT*, 492 F. Supp. 3d at 698; *Bondit, LLC v. Hallows Movie, Inc.*, 2020 WL 7777992, at *9 (C.D. Cal. Apr. 1, 2020). Plaintiffs' reliance on *Oki Semiconductor Co. v. Wells Fargo Bank* is misplaced. There, the Court considered whether a co-conspirator who did not commit a substantive RICO violation could be held liable for the conduct of her co-conspirators who ***did*** commit a substantive RICO violation. 298 F.3d 768, 774-75 (9th Cir. 2002). Here, no defendant committed a substantive RICO violation.

**DEFENDANTS' PORTION:**

**II.   The Court should grant summary judgment to Defendants on Plaintiffs' DTSA Claim (Count III).**[15]

A DTSA claim consists of three primary elements. A plaintiff must plead and prove that: "(1) it possessed **a trade secret**; (2) [d]efendants **misappropriated** the trade secret; and (3) [d]efendants' misappropriation caused or threatened **damage** to [p]laintiff." *Calendar Rsch. LLC v. StubHub, Inc.*, 2020 WL 4390391, at *3 (C.D. Cal. May 13, 2020) (citing *Integral Dev. Corp. v. Tolat*, 675 Fed. Appx. 700, 703 (9th Cir. 2017)). Plaintiffs' DTSA claim fails because: (1) Plaintiffs have not identified their alleged trade secrets as required by the DTSA and decisional law; (2) to the extent that Plaintiffs have identified "categories" of purported trade secret information, the information is not subject to trade secret protection as a matter of law; and (3) the undisputed evidence disproves Plaintiffs' allegations of use and disclosure, and therefore, Plaintiffs cannot establish misappropriation.[16]

---

[15]   Plaintiffs assert Counts III against CTM, CTM Med, Banman, Stumpe, and Seoane (the "DTSA Defendants"). All DTSA Defendants join in this Section of the brief. To the extent that certain arguments within this Section are raised only on behalf of a specific defendant(s), the sub-headings so indicate.

[16]   Plaintiffs' request for exemplary damages against Banman, CTM, and Seoane under the DTSA also fails because employers who do not provide the statutorily required whistleblower notice in any contract or agreement with an employee are not entitled to exemplary damages or attorneys' fees under the DTSA. 18 U.S.C. § 1833(a)(b)(3)(C). Neither Banman's Skye Employee Confidentiality Agreement nor Seoane's employee confidentiality agreements with HRT and Skye included this required whistleblower notice. Fluskey Decl., Ex. 37; Banman Decl., Ex. 5.

Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

**A. <u>Plaintiffs have failed to identify the allegedly misappropriated trade secrets</u>.**

**1. <u>The applicable law</u>**

A "trade secret" can include financial, scientific, technical, or engineering information that "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839. Trade secrets do not encompass publicly-available information. *See Calendar Rsch.*, 2020 WL 4390391, at *10. Trade secret law does not protect every aspect of a company's business (*see, e.g., IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002)), nor can it be employed so broadly as to prevent a former employee from competing. *Calendar Rsch.*, 2020 WL 4390391, at *5. Further, trade secret law does not protect general product ideas. *Id.* at *6, *14.

For these reasons, a plaintiff "must **<u>identify the trade secrets</u> and carry the burden of showing that they exist**." *Id.* at *4 (emphasis added); *see also Beaulieu Group, LLC*, 2016 WL 7626471, at *11. Because there is potential tension between lawful competition and the ownership of intellectual property, a plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Calendar Rsch.*, 2020 WL 4390391, at * 4; *Beaulieu Group, LLC*, 2016 WL 7626471, at *11 (both quoting *Imax Corp.*, 152 F.3d at 1164-65).

This identification requirement is not simply a discovery issue. It is required on summary judgment. If a plaintiff fails to specifically identify the trade secrets at issue, summary judgment for the defendant is the proper result. *See Calendar Rsch.*, 2020 WL 4390391, at *5 (granting summary judgment for failure to identify trade secrets); *DropzoneMS, LLC v. Cokayne*, 2019 WL 7630788, at *10 (D. Or. Sept. 12, 2019) (granting summary judgment for failure to identify trade secret and noting "at the summary judgment stage, the 'strong practical and policy reasons' for requiring sufficient or reasonable particularity are even more pronounced than during discovery"); *X6D Ltd. v. Li-Tek Corps. Co.*, 2012 WL 12952726, at *1 (C.D. Cal. Aug. 27, 2012) (same). The identification requirement is especially critical in cases that involve potentially complex subject matter. *Calendar Rsch.*, 2020 WL 4390391, at *5; *Loop Al Labs, Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1115 (N.D. Cal. 2016) ("Where

49      Case No.: 2:20-cv-03444-MEMF-PVC

JOINT BRIEF ON DEFENDANTS'<br>MOTION FOR SUMMARY JUDGMENT

alleged trade secrets consist of incremental variations on, or advances in the state of the art in a highly specialized technical field, a more exacting level of particularity may be required . . . .").

To satisfy its identification requirement, a plaintiff must do more than reference a kind of technology and then invite the court to hunt through the details. *See Calendar Rsch.*, 2020 WL 4390391, at *4 (citing *X6D Ltd.*, 2012 WL 12952726, at *1). Broad categories such as "know-how" and "learnings" and similar catch-all phrases do not meet the required particularity. *Calendar Rsch.*, 2020 WL 4390391, at *5; *DropzoneMS*, 2019 WL 7630788, at *11; *see also Imax Corp.*, 152 F.3d at 1164-67. The identification requirement also implicates important policy considerations in the employer-employee context. "To prevent employers from using trade secret law as a weapon against employee mobility . . . a party seeking to protect trade secrets must describe the subject matter with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit defendant to ascertain at least the boundaries within which the secret lies." *Calendar Rsch.*, 2020 WL 4390391, at *5.

**2.      Plaintiffs' failure to identify as to the CTM Defendants.**

In each of their responses to Banman's and Seoane's Interrogatory No. 1, which asked HRT and Skye to identify the trade secrets purportedly misused, the companies provided vague references to broad categories of information concerning every aspect of their businesses. Plaintiffs' responses did not identify any specific trade secrets—there is no explanation of any specific steps of a manufacturing process, and no identification of specific customer lists, pricing analyses, purported "physician research," or confidential "marketing strategies." *See* Fluskey Decl. Exs. 1-4.

Despite broad-ranging discovery—hundreds of thousands of pages of document production, over 150 non-party subpoenas, and 10 depositions (Fluskey Decl. ¶¶ 22-23)—Plaintiffs never supplemented these responses. Plaintiffs' Rule 30(b)(6) representative, Christopher Sharp, was unable to identify the alleged trade secrets in detail. In many instances, he admitted that the information vaguely referred to in the interrogatory responses was not secret. Fluskey Decl. Ex. 14 (Sharp Depo) (discussed *infra.*). On this record, the DTSA claim simply cannot go to a jury. There are no identified trade secrets to present to the trier of fact.

HRT's and Skye's trade secret interrogatory responses to Banman/CTM and Seoane are

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

substantively identical, except that Skye's response included two categories not in HRT's response: "cost and pricing" and "marketing and sales." *See* Fluskey Decl. Ex. 1, Ex. 2, Ex. 3, & Ex. 4. Below, we address each of these broad categories.

**Product Manufacturing**. Plaintiffs refer to "Product Development and Manufacturing" as a trade secret category. Fluskey Decl. Ex. 1 at 7-11 & Ex. 2 at 5-8. But they do not identify the specific trade secret steps of their manufacturing process and which of those steps were allegedly misappropriated. Nowhere in the response is there a description of how HRT actually makes its products. *Id.* The response generally incorporates many of HRT's SOPs, which purportedly summarize HRT's manufacturing processes. But incorporating voluminous documents into a response is not a sufficient trade secret identification. *See Calendar Rsch.*, 2020 WL 4390391, at *4 (citation omitted). Further, Sharp admitted during deposition that not every step of the manufacturing process is included in HRT's SOPs and that the "additional details" are not memorialized in any other document. Fluskey Decl. Ex. 14 at 101:20-102:14. When asked to define the "compilation of information about Plaintiff's product development and manufacturing," as referenced in the interrogatory response, Sharp responded: "That's quite a bit of information, Rob. It's everything to with how—from start to finish making our products." *Id.* at 17:12-24.

The problems caused by Plaintiffs' failure to identify are exacerbated by Sharp's admissions that many of the concepts referenced by Plaintiffs are not secret at all. The examples of this are numerous. Sharp initially testified that the dehydrated state of its membrane products was a trade secret. *Id.* at 20:11-17. But then he admitted that HRT publicized this information. *Id.* at 20:18-24 ("Q. And the fact that HRT's products used dehydration in the manufacturing process is something you kept secret? A. No. We advertise that it is dehydrated."); *see also id.* at 21:22-25. Plaintiffs' interrogatory response vaguely refers to "surgical implant reimbursement" as a trade secret. But Sharp admitted that the doctors who utilized HRT's products knew that they were subject to insurance code reimbursement, and those doctors were not bound by any confidentiality obligations. *Id.* at 23:24-24:6. The insurance codes themselves are also in the public domain. *Id.* at 237:9-11; Banman Decl. ¶ 68, Exs. 15-17.

The interrogatory response suggests that "research and understanding of new FDA regulations"

51                    Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

was a trade secret. But Sharp admitted that this "research" was publicly available articles, FDA regulations, and other published material on how other competitors delivered their products. Fluskey Decl. Ex. 14 at 27:19-28:8. The interrogatory response states that "sources of raw materials" and the different "properties of the various regions of the placenta" are HRT trade secrets. But Sharp admitted that "sources of raw materials" is simply a reference to the placenta (*id.* at 31:9-13), and he agreed that the different regions of the placenta is publicly available information. *Id.* at 32:11-18. The interrogatory response appears to claim trade secret protection over the notion that some of Plaintiffs' products include chorion membrane. But Sharp admitted that HRT disclosed this fact on its website (*id.* at 33:8-35:4) and that its sales representatives would inform doctors that the product was chorion-based. *Id.* at 34:12-25; *see also id.* at 35:1-4 ("Q. So it was not a secret that some of HRT's products included chorion as a base? Can we agree on that? A. Correct.").

In a follow-up interrogatory, CTM Med asked HRT to identify which specific steps of its manufacturing process are subject to trade secret protection. Fluskey Decl. ¶ 24, Ex. 5. HRT claimed that the *entire* process was a trade secret, while simultaneously acknowledging that certain steps of the process are not secret. *Id.* ¶ 25, Ex. 5 at 4-5. This acknowledgement is consistent with the undisputed fact that there are many companies that manufacture placental membrane and particulate flowable products, and there are numerous articles and patents that discuss the process steps. Banman Decl. ¶¶ 7, 20-21, 23, Exs. 1, 6, and 7.

The trade secret identification requirement for the so-called "product development and manufacturing" information is uniquely important in light of the parties' contracts and the timing of disclosures. Much of the development work for HRT/Skye new products took place before the first quarter of 2014. Banman Decl. ¶¶ 19, 24; Fluskey Decl., Ex. 14 (Sharp Depo.) at 424:5-8. The confidentiality agreement in place between Banman and Skye during this period was a mutual non-disclosure agreement, effective April 23, 2012 (the "2012 Mutual NDA"), which required each party to identify in writing any information that it believed was a "trade secret. Banman Decl. Ex. 2 at § 1. The agreement expired on April 23, 2013, and confidentiality obligations for any information other than identified "trade secrets" ended five years after execution (April 23, 2017). During the period of the 2012 Mutual NDA, Skye did not identify in writing any information that it deemed to be a "trade

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

secret." Banman Decl. ¶ 132. Information not tagged with a "trade secret" legend lost confidentiality protection in 2017, long before Banman founded CTM.

A detailed identification of the trade secret elements of HRT's process is thus particularly important for at least four reasons: (1) it is undisputed that certain elements of the process cannot be a trade secret (Fluskey Decl. Ex. 5 at 4-5, Ex. 14 (Sharp Depo.) at 20-35); (2) the process is complex, so a clear trade secret identification is required for the Court and the jury (*see, e.g., Calendar Rsch.*, 2020 WL 4390391, at *5); (3) the confidentiality agreement in place during the development period contained a trade secret marking requirement; and (4) there are material differences between the HRT process and the process used by the tissue lab that manufactures CTM's products (Alamo). Banman Decl. ¶ 64; Fluskey Decl. Ex. 18 (Andrews Depo.) at 339:17-341:13. To proceed to trial, HRT was required to distinguish between the non-trade secret elements of its process and the trade secret elements and identify what the CTM Defendants misappropriated. *DropzoneMS*, 2019 WL 7630788, at *9-10. Defendants are entitled to know which parts of the process are at issue, and Plaintiffs have refused or failed to identify that information.

By choosing to pursue a "cat and mouse" strategy with respect to their trade secret disclosure obligations, Plaintiffs have painted themselves into a corner. If they contend that CTM misappropriated certain steps of their manufacturing process, they were required to define those steps, and they failed to do so. If they truly contend that the *entire* process is *the* trade secret at issue, and CTM misappropriated it, their claim fails because it is undisputed that there are material differences in the parties' processes. Banman Decl. ¶ 64; Fluskey Decl. Ex. 18 (Andrews Depo.) at 339:17-341:13.

**Customer Lists**. Plaintiffs refer to "Customer Lists and Potential Customers" as an alleged trade secret category. But they do not identify any actual lists. Fluskey Decl. Ex. 1 at 6-7 & Ex. 2 at 8-10; Ex. 14 (Sharp Depo.) at 182:25-184:9, 220:5-7. The interrogatory responses vaguely refer to "customer preferences," but does not identify the preferences.

**Research Physicians and Patient Registry**. Plaintiffs list "Research Physicians and Patient Registry" as an alleged trade secret category.  Fluskey Decl. Ex. 1 at 11-12 & Ex. 2 at 10-11. But they do not identify the contents of any "patient registry." *Id.*; Fluskey Decl. Ex. 14 (Sharp Depo.) at 190:15-195:13. The mere identities of research physicians does not fall within the statutory definition

of a trade secret. 18 U.S.C. § 1839. And Plaintiffs admit that they did not require doctors performing research for Plaintiffs to keep their association with Plaintiffs a secret. Fluskey Decl. Ex. 14 (Sharp Depo.) at 200:6-11.

**Employees/Independent Contractors/Sales Representatives**. Plaintiffs list "Employees, Independent Contractors, Sales Representatives, and Distributors" as an alleged trade secret category and state that they possess a "compilation of information" on these groups. Fluskey Decl. Ex. 1 at 15 & Ex. 2 at 11. But Plaintiffs do to identify the "compilation of information." *Id.* Sharp was unable to provide any clarity. Fluskey Decl. Ex. 14 at 247:17-251:12. Plaintiffs seemingly argue that because Banman learned the identities of Skye employees and sales representatives during his employment, the identities of those employees and independent sales representatives are trade secrets. *Id.* at 248:1-251:12. However, these individuals were not required to keep the fact of their employment confidential. *Id*. at 201:8-12. When asked to itemize the other information on sales representatives (besides identity) that Skye alleges constitutes a trade secret, Sharp was unable to do so with any level of specificity. *Id*. at 248:18-249:15.

**Business Operations**.  Plaintiffs are similarly unable to identify with any level of specificity the alleged trade secrets under their "Business Operations" category. Fluskey Decl. Ex. 1 at 15-16 & Ex. 2 at 12. Plaintiffs vaguely reference the company's "confidential business operations strategies," with no explanation of what that means. *Id.* This is clearly not a trade secret disclosure. *See Calendar Rsch.*, 2020 WL 4390391, at *5. Sharp could not clarify the alleged "Business Operations" category during deposition. Fluskey Decl. Ex. 14 at 203:2-204:19, 206:16-207:20.

**Cost and Pricing.**  Skye lists "cost and pricing" as a trade secret category.  But it does not identify any specific pricing, pricing analyses, or "costs." Fluskey Decl. Ex. 1 at 5-6. Skye states that it has developed a "pricing scheme to maximize the profit while remaining competitive in the market," but it does tell us what that pricing scheme consists of. *Id.* Skye only makes vague references to abstract concepts.

**Marketing and Sales Strategies.** Skye vaguely states that its "marketing initiatives," the "regions, physicians, facilities, surgery centers, and hospitals to target," its "marketing language," "marketing initiatives" with regard to "reimbursement coding," and "specific training methods for

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

employees and sales representatives" were all trade secrets. Fluskey Decl. Ex. 1 at 12-14. But it never tells us exactly what these things are or how the CTM Defendants have used them. These amorphous references to broad marketing-related concepts do not constitute trade secret disclosure. *See Calendar Rsch.*, 2020 WL 4390391, at *5. Plaintiffs failed to identify any concrete strategies, methods, or processes beyond certain "Notes" files. Fluskey Decl. Ex. 1 at 12-14. As set forth below in Section II(C), those "Notes" were never used or disclosed.

**B.  Certain items are indisputably not trade secrets (all DTSA Defendants).**

There are certain categories of information that cannot be trade secrets as a matter of law and/or as a matter of undisputed fact.

**1.  "Connective tissue matrix"**

In its Complaint, Plaintiffs imply that this term was used "exclusively" by them and that Banman somehow behaved improperly by calling his company CTM. Dkt. 130 ¶ 61-62. This contention is frivolous. This is a generic term that has been used by scientists and physicians for many years to describe human tissue. Fluskey Decl. Ex. 21 (Hiatt Depo.) at 215:13-20. It was never used exclusively by Plaintiffs. Banman ¶ 44, Ex. 8. Sharp admitted that this is not a trade secret. Fluskey Decl. Ex. 14 at 230:16-18.

**2.  The Identities of Employees and Sales Representatives**

The identities of employees and independent sales representatives are not trade secrets as matter of law. *See PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 Fed. Appx. 969, 973-975 (6th Cir. 2007) (affirming the district court's conclusion that the names of plaintiff's sales consultants were not trade secrets). In addition, HRT/Skye did not keep this information secret. Banman Decl. ¶ 35; Seoane ¶ 14. The companies did not have contracts with sales representatives that prohibited them from disclosing their affiliation, and the sales representatives regularly call on doctors and indicate that they are affiliated with Skye. Fluskey Decl. Ex. 14 (Sharp Depo.) at 248:8-17. HRT does not keep the identity of its employees confidential. Fluskey Decl. Ex. 14 (Sharp Depo.) at 201:8-12. Plaintiffs have also filed on public dockets several of their independent sales representative agreements. Fluskey Decl. Ex. 25.

### 3.    The Identities of Research Physicians

The physicians who work with HRT/Skye are not required to keep their affiliation a secret. Banman Decl. ¶¶ 79-80; Fluskey Decl. Ex. 14 (Sharp Depo.) at 199:18-200:11. The names of physicians receiving research payments from HRT/Skye is publicly available on a website related to the Centers for Medicare & Medicaid Services ("CMS"). Banman Decl. ¶ 79. Further, Plaintiffs have filed on public dockets several of their research agreements. Fluskey Decl. Ex. 24.

### 4.    Skye's Pricing

To the extent Skye alleges that the "prices" at which it sells its products to customers constitute trade secrets, Sharp admitted that those prices are not kept secret. Fluskey Decl. Ex. 14 at 210:4-10 (Q: So the customer that pays that price know the price; correct? A: Yes. Q: And are Skye's customers bound by any confidentiality agreement with Skye to protect the confidentiality of Skye's pricing? A: I don't believe so.); Banman Decl. ¶ 39; Seoane Decl. ¶ 49. Skye's pricing is not protected as confidential and is not an actionable trade secret.

### 5.    Product Appearance/Product Ideas

The appearance of the placental products—whether they are a membrane, a flowable particulate, or a particulate, the size shape, and thickness—cannot be a trade secret. The features are visible to those who purchase and use them. Banman Decl. ¶ 8; Fluskey Decl. Ex. 18 (Andrews Depo.) at 346:15-347:5. The general idea of producing such a product is also not protectable. *See Calendar Rsch.*, 2020 WL 4390391, at *6, 14.

### 6.    Relationships are Not Trade Secrets

When asked to substantiate its trade secret misappropriation claim in written discovery, Skye verified under oath that Stumpe misappropriated its alleged trade secrets relating to four of Skye's alleged customers—Dr. Janos Ertl, Eskenazi Hospital, Dr. Brian Badman and IU Health.  (SUF, 328) First, these are relationships, which is not "information."  Under both state and federal trade secret law, only information can constitute a trade secret.  18 U.S.C. § 1839; Cal. Civ. Code § 3426.1(d) (a "trade secret" is defined as "information, including a formula, pattern, compilation, program, device, method, technique, or process, that ...."); *see Waymo LLC v. Uber Techs., Inc.*, No. C 17-939 WHA, 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017); *Shapiro v. Hasbro, Inc.*, No. CV 16-5750-BRO

(AJWx), 2016 WL 9024810, at *7 (C.D. Cal. Aug. 15, 2016). Because of their similarities, federal district courts in California have applied *California's* state trade secret case law to causes of action brought under the federal DTSA. *See Vendavo, Inc. v. Price f(x) AG*, No. 17-CV-6930-RS, 2018 WL 1456697, at *3 (N.D. Cal. Mar. 23, 2018).

As a matter of law, "relationships" cannot be safeguarded from competition under California law. *Ret. Group v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009) (soliciting customers is not actionable, but the use of information that is itself a trade secret in the solicitation would be actionable); *Metro Traffic Control, Inc. v. Shadow Traffic Network*, 22 Cal. App. 4th 853, 862 (1994) (mere fact that at-will employee is trained to meet and/or possesses requirements specified by a customer does not convert employee into a "trade secret" or permit employer to enjoin his subsequent competition); *AdvantaCare Health Partners, LP v. Access IV, Inc.*, 2003 WL 23883596 *2 (N.D. Cal. Oct. 24, 2003) (unpublished) (relationships employee developed with referral sources fall within employee's general knowledge and experience gained while working at defendant company and are not trade secret).

To protect "relationships" as a trade secret, or to conclude that contact information is a trade secret simply because an independent contractor has a relationship with those contacts, would effectively create a blanket non-solicitation between all former independent contractors and their former principals, something that would be patently inconsistent with public policy. *See* Bus. & Prof. Code § 16600; *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 945 (2008) (covenants not to compete generally void); s*ee also Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564 (2009) (questioning continued survival of the so-called trade secret exception to covenants not to compete following *Edwards*). Other courts and authorities interpreting the same definition of "trade secrets" as found in the CUTSA uniformly agree that "relationships" do not meet the definition of a trade secret. *See, e.g., Cablecom Tax Services, Inc. v. Shenandoah Telecommunications Co.*, 2013 WL 2382969, *5 (W.D. Va.). As stated in *Cablecom:*

> The court cannot fathom how Cablecom's alleged "valuable relationships" with taxing authorities could conceivably fall under the definition of trade secret. Simply put, such a relationship is not information that derives independent economic value from not being generally known and which could be the subject of reasonable efforts to maintain secrecy.

57                         Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Likewise, the Court in *Structural Preservation Systems, LLC v. Andrews*, 931 F.Supp.2d 667, 678 (D. Md. 2013) dismissed a misappropriation of trade secret claim pursuant to the Maryland Uniform Trade Secret Act where plaintiff claimed "established customer relationships" had been misappropriated as trade secret, reasoning that it is unclear "how such 'relationships' are plausibly construed as a trade secret" and distinguishing "relationships" from "customer lists."  A similar conclusion was reached in *PartyLite Gifts, Inc. v. Swiss Colony Occasion*s, 246 F. App'x 969, 973 (6th Cir. 2007) (under Tennessee Uniform Trade Secret Act, "relationships with customers are not trade secrets").  *See also, e.g.*, *Sethscot Collection, Inc. v. Drbul*, 669 So.2d 1076, 1078 (Fla. Dist. Ct. App. 1996) (former employee may be enjoined from utilizing former employer's active customer list, which constituted trade secret under Florida's Uniform Trade Secret Act, but could not be enjoined from contacting and soliciting customers with whom former employer conducted business).

This position also has roots in the common law and is also the same one taken in the Restatement (3rd) of Employment Law, § 8.02 "Definition of Employer's Confidential Information," Tentative Draft No. 4, comment a, where it is explained that the definition within the Restatement section is consistent with definition of trade secret used in the Uniform Trade Secrets Act and that, consistent with the common law duty not to use or disclose an employer's confidential information, it does not protect customer relationships.  *See id.* (common-law duty not to use or disclose an employer's confidential information "*does not protect customer relationships, investment in an employee's reputation in the market, or investment in the purchase of an employee's business.  An employer seeking to protect these interests must do so contractually,* in accordance with §§ 8.06 and 8.07.  (Emphasis added.)

Customer relationships are *not* protectable trade secrets.  Only certain customer *information* that is secret and carries independent economic *may* be protected from misappropriation (and that is only if the plaintiff meets certain requirements).  The proposition that *relationships* are protectable trade secrets is invalid as a matter of law and cannot stand.  For this reason, Skye's trade secret misappropriation claim against Stumpe fails.

Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

**PLAINTIFFS' PORTION:**

**A.     The Relevant Law**

The DTSA defines "trade secrets" as "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being relatively ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3). And misappropriation under the statute is duplicative of that under the California Uniform Trade Secrets Act ("CUTSA"). *Deerpoint Grp., Inc. v. Agrigenix, LLC*, 345 F.Supp.3d 1207, 1227 (E.D.Cal. 2018). Federal Courts in this state have consequently "applied California's trade secret case law to causes of action brought under the federal DTSA." *Corelogic Sols., LLC v. Credifi Corp.*, 2021 WL 1156860, at *8 (C.D.Cal. 2021).

The Central District has, in turn, found that "a trade secret may consist of a compilation of data, public sources or a combination of proprietary and public sources" because "a compilation that affords a competitive advantage and is not readily ascertainable falls within the definition of a trade secret." *Earthbound Corp. v. MiTek USA, Inc.*, 2017 WL 2919101, at *12 (C.D.Cal. 2017). The Ninth Circuit concluded the same in *United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016). The Court there held specifically that "source lists" were "classic examples of a trade secret that derives from an amalgam of public and proprietary source data. To be sure, some of the data came from public sources and other data came from internal, confidential sources. But cumulatively, the Searcher database contained a massive confidential compilation of data, the product of years of effort and expense." *Id.*

Under California law "absolute secrecy is not required to protect a trade secret." *Int'l Med. Devices, Inc. v. Cornell,* 2021 WL 686441, at *8 (CD Cal. 2021); *Kittrich Corp. v. Chilewich Sultan, LLC*, 2013 WL 12131376, at *4 (C.D.Cal. 2013) (holding that whether "the webpage identifying the relationship between Plaintiff and [a] Supplier means that the information is 'generally known to the

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

relevant people' [] depends on the target audience and the popularity of the website.").

As to whether the information derives independent economic value from being kept secret, the most telling inquiry is whether the trade secrets conferred a competitive advantage on their owner. *See e.g., United States v. Chung,* 659 F.3d 815, 826 (9th Cir. 2011); *see also MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (holding that the plaintiff, which serviced computers running MAI software, derived economic value from the secrecy of its customer database because the defendant, which offered the same technical services, would be able to direct their sales efforts to customers using MAI software); *and see Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 663 (4th Cir.1993) (finding that, "[a]rmed with a copy of the [plaintiff's proprietary] object code, an individual would have the means to offer much the same engineering services as [the plaintiff].").

### B.    The Case Law Cited by Defendants is Inapplicable

A plaintiff must describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit a defendant to ascertain at least the boundaries within which the secret lies. *See Imax Corp. v. Cinema Technologies, Inc.,* 152 F.3d 1161, 1164-65 (9th Cir. 1998). Defendants summarily argue that Plaintiffs have not sufficiently identified their trade secrets, and in support cite wholly inapposite decisional authority where ***no*** trade secret information was provided or where the plaintiffs could not "offer any non-speculative evidence that the[] alleged trade secrets ever existed." *Calendar Rsch. LLC v. StubHub, Inc.*, 2020 WL 4390391, at *5 (C.D.Cal. 2020). In *Calendar Rsch.,* for example, the District Court had already held that the plaintiff's source code was not a trade secret, and the plaintiffs offered no additional information demonstrating otherwise. *Id.* Similarly, in *DropzoneMS, LLC v. Cockayne*, 2019 WL 7630788, at *10 (D.Or. 2019), the plaintiff alleged trade secrets (also source code) but "[did] not take the crucial next step of describing the trade secrets to separate them from matters of general knowledge." The *Loop AI Labs Inc. v. Gatti*, 195 F.Supp.3d 1107, 1112 (N.D.Cal. 2016) decision is no more apposite – the Court there analyzed a trade secret disclosure standard under CUTSA, found that the "Plaintiff's trade secret disclosure consists of a publicly-filed document listing 55 paragraphs of purported trade secrets" and, thus, failed to "reasonably particularize" plaintiff's trade secrets.

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

**C.**    **Plaintiffs Have Identified Trade Secrets**

**1.**    **HRT's Manufacturing Process is a Trade Secret**

The facts before this Court are entirely different. We start with the undeniable fact that product designs are trade secrets. *Teledyne Risi, Inc. v. Martin-Baker Aircraft Co. Ltd.,* 2016 WL 8857029, at *7 (C.D.Cal. 2016) (finding that "various designs, techniques, processes, materials, and methods of fabrication" are adequately pled trade secrets). Novelty and invention are not, however, a requisite for a trade secret. *Altavion, Inc. v. Konica Minolta Sys. Lab., Inc.*, 226 Cal.App.4th 26, 56 (2014). A product is a protectible trade secret even if the concept "might be evident to a [product's] end user." *Id..*; *Integrated Cash Mgmt. Serv. v. Digital Transactions* (2d Cir.1990) 920 F.2d 171, 171 ("the manner in which several non-secret utility programs are arranged to create" the plaintiff's "computer software product" qualified as trade secret).

Investment of "substantial time, effort, and money in developing and testing design concepts is evidence of a design concept's independent value." *Int'l Med. Devices, Inc. v. Cornell*, 2021 WL 686441, at *8 (C.D.Cal. 2021) (holding Plaintiffs invested substantial time, effort and resources developing and testing the design concepts for its products); *see also*, *Beard Research, Inc. v. Kates*, 8 A.3d 573, 594 (Del.Ch.2010) (cited by *United States v. Chung*, 659 F.3d 815, 826 (9th Cir. 2011)).

Defendants stumble over themselves in attempting to oversimplify Plaintiffs trade secret manufacturing process, and blithely suggest there can be no trade secret protection because competitors are selling medical products for the same purpose as Skye. But that ignores the deeply embedded principle that product design conferring an economic benefit on the plaintiff – because it's unknown to competitors – is the linchpin of trade secrets law. Cola is ubiquitous in the marketplace, but there is only one Coca-Cola. The same is true of fried chicken and KFC.

With that backdrop, the "know-how" necessary to manufacture HRT's products is plainly a trade secret. And the inordinate time Sharp and Banman spent researching, developing, and testing the new products and the methods for processing those products – set forth in the HRT Design File – is evidence of that fact. [PF 361-373.] And even if certain elements of HRT's process were in patents or were otherwise publicly known, the "unified process design" and operation "in unique combination" confers HRT the specific competitive advantage that is the heart of a protectable trade secret. The

additional fact that HRT's are patentable technology further confirms their status as trade secrets, notwithstanding Sharp's decision to opt for trade secret rather than patent protection. [PF 692.]

The HRT Design File, which Banman stole and kept after his departure from Skye/HRT, was a treasure trove of confidential information and all Banman needed to create identical products. [PF 362. 363, 365, 366-378, 386, 390] Banman, in a rare moment of candor, in fact commented to Sharp concerning the unique nature of their creation, admitting they were "the only guys in the world who've created a room temp product from placenta and figured out that it would work?" [PF 365.]

Confirming that, Banman contractually agreed that such information constitutes trade secrets and that HRT owns the products, and CTM now requires its own employees <u>sign similar agreements providing that CTM's manufacturing process (which, of course, was stolen from HRT and Skye) is a trade secret</u>. [PF 419-469, 678-679.]

CTM, in contrast, has no design file and no research and development. [PF 281.] Rather, Banman went to various manufacturers and told them that "**I have a lot of detail on the processing steps that would help to create the SOPs… On the flowable product recipe, you won't need to create the recipe as I have the entire formulation, process, volumes, etc. designed already**." [PF 574.] And what we know is that when Banman met with manufacturers – notably Alamo – that he provided drawings of Skye's product line, and provided an actual HRT product, and directed and instructed Alamo to make products using HRT's protected trade secrets. [PF 607-11, 635]

### 2. <u>Skye's Customer Lists and Information are Trade Secrets</u>

This Court, in denying Defendants' Rule 12 motion, held that "[c]ourts have frequently held that customer-related information qualifies as a trade secret, especially if a plaintiff has spent 'considerable time, effort, and resources,' in developing some of that information." [Docket #60] See also, *Albert's Organics, Inc. v. Holzman*, 445 F. Supp. 3d 463, 472 (N.D.Cal. 2020) (quoting *MAI Sys. Corp.*, 991 F.2d at 521 (holding that a customer database constituted a trade secret because the database "allow[ed] a competitor ... to direct its sales efforts to those potential customers already using the [plaintiff's] computer system.")); *H.Q. Milton, Inc. v. Webster*, 2017 WL 5625929, at *3 (N.D.Cal. 2017) (finding "customer list and contact information, sales leads, customer interests, and [plaintiff's] proprietary pricing" constituted trade secrets); *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp.

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

3d 1198, 1206 (E.D. Cal. 2020) (concluding that customer information including indicating customers' preferences and purchase histories qualifies as a trade secret); *Brocade Commc'n Sys. Inc. v. A10 Networks, Inc*., 873 F.Supp.2d 1192, 1214 (N.D.Cal. 2012) ("[C]ustomer-related information including ... pricing guidelines ... and customers' business needs/preferences ... is routinely given trade secret protection."); *Henry Schein, Inc. v. Cook*, 2016 WL 3418537, at *4 (N.D. Cal. 2016) (holding customer information, margins, and profit percentages used to gain an advantage over competitors were protectable as trade secrets.)

Thus, in *Morlife, Inc. v. Perry*, 56 Cal.App.4th 1514, 1521–22 (1997), the California Court held "where the employer has expended time and effort identifying customers with particular needs or characteristics[,] ... Such lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers," and can constitute trade secrets.

Skye's customer information includes historical purchasing information necessary to develop a list of customers throughout the country who were willing to purchase, and/or who did in fact purchase Skye's tissue biologic products; customer specific needs and preferences; customer order history; customer specific pricing guidelines; and customer information. [PF 418.] Skye gathered that sensitive data over the entire history of its operations, and its accumulation represents thousands of hours of research, travel and individual customer interaction. All of which gave Skye a competitive advantage from it not being known – as illustrated by the ease with which CTM was able to come in and pay out large commissions in the first month of operations. [PF 576] Banman, Stumpe, Boulais and Seoane knew that, and thus specifically targeted customers **already using** Skye's specific membrane and injectable products and offered to "switch" them out for the **exact** same types of products, at the same volumes. [PF 519, 520, 521, 532, 537, 535, 538, 539, 540. 554-565, 569, 578, 579, 583, 588-590, 595-597, 680.] Stumpe even bragged that he had "completely removed Skye" from Saxony Surgery Center, a repeat Skye customer, and that he was flipping a doctor at another facility. [PF 680] This is not open competition, as Defendants suggest. It is the exploitation of confidential and proprietary information is obvious violation of the DTSA. [PF 428-469, 470-473, 476-478, 683-685.]

Indeed, Defendants had exclusive, inside information of customer contacts, order histories, and specific pricing per customer to target those exact customers and offer them replacements of

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

"comparable" products at lower prices. [PF 570, 578.] Defendants' contention that "relationships are not trade secrets" is a red herring. Defendants could have sold independently developed CTM products to non-Skye customers. What they couldn't do under the law, but did, was steal Skye's technology and sell *Skye products to Skye's customers, under the CTM name*. And they did it knowingly and deliberately. [PF 519, 520, 521, 532, 537, 535, 538, 539, 540. 554-565, 569, 576, 578, 579, 583, 588-590, 595-597, 680.]

All of which is to reiterate that Skye has identified the specific customers, customer contacts, and customer preferences with offers to switch out exact products (showing knowledge of the customers' order histories), emails comparing Skye pricing to CTM's lower pricing, and conspiracies to "undercut" Skye's pricing based on information that Banman acknowledged were trade secrets. That the Defendants went to such lengths to conceal that they were secretly replacing Skye products with CTM products, while all but Banman were still working with Skye, leaves no legitimate dispute concerning the protectable nature of the information.

### 3.    Plaintiffs' Research Physicians are Trade Secret

As with Skye's customers, Skye has spent significant time and resources hand-selecting and developing business relationships with specific physicians who Skye has vetted and chosen because of their skill and experience in the field. These physicians agree to conduct research studies wherein they are educated on Plaintiffs' products, use Plaintiffs' products on select patients, and then provide the results of those applications results. Plaintiff uses this study data in marketing its products. The terms of their research agreements, and the research studies performed specifically for Skye, in turn provides Skye a significant competitive advantage by not being known. Knowing that he was creating copies of Skye products, Banman also knew he could avoid physician courtship and training all together and enlist doctors who had already done the studies he was asking them to do. Banman immediately sought Dr. Hiatt, who was under agreement with Skye, to become an advisor for CTM and perform the same research she had previously performed for Skye. [PF 584-587] What he did not do was seek research physicians who did not have a previous relationship with Skye. Thus, Defendants used Skye's trade secret information regarding the specialized qualifications of its research physicians.

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

**4.    Skye's Employee and Sales Representative Information is Trade Secret**

Skye's sales representatives, whom Skye took the time to recruit and train in Skye's specific products and human placental tissue products, also provided Skye with a competitive advantage and are also trade secret. The case to which Defendants cite for the principal that employees are not a trade secret is inapposite and analyzes the Tennessee trade secrets act.  The court there held that the names of consultants was not trade secret where the company widely published a magazine containing "list after list of consultant names, rank in the company, and their sales figures. Lists of top sellers in various categories (e.g., team, unit, district and regional leaders) as well as the names of newly qualified consultants are published." *PartyLite Gifts, Inc. v. Swiss Colony Occasions*, 246 F. App'x 969, 974 (6th Cir. 2007). No such publication exists here.

Banman *only* recruited sales representatives that were top sellers for Skye to be his "A Team" or "Core Team": Boulais, Stumpe, Maria Carey, and Seoane. [PF 479, 480, 493, 494, 541-542, 575, 667.] Skye sales representatives would not require any additional training or instruction, because their training, territories, performance histories, and commission structures were not generally known and provided Skye with a competitive advantage. If this information were known, a competitor could target these "turn-key" sales representatives, taking advantage of all of Skye's efforts. Banman, Boulais, Stumpe, and Seoane did exactly that.

**5.    Skye and HRT's Business Operations are Trade Secret**

Banman and Seoane agreed with Skye/HRT to keep "in the strictest confidence" "revenue numbers, financials, representation agreements, representation commissions, employment/service agreements, pricing, sources of supply, employee compensation, HRT structure, HRT ownership structure, margins, product designs, packaging, inserts, future products and marketing materials." [PF 450, 465, 683, 684] Stumpe agreed not to disclose: "Skye's business, plans, pricing information, manufacturers' names, processing information, presentations, marketing materials, end-users, technology, and products that are confidential and of substantial value to Skye". [PF 478]

Banman disclosed and misused business operation trade secrets through all the acts described above. [PF 610-312, 661.] Stumpe, Boulais, and Seoane also stole and misappropriated Skye's marketing Notes, research, and sales representative agreement terms. [PF 573, 570, 671-674.]

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

### 6.  Skye's Customer Pricing Information is Trade Secret

Pricing information has also been held to be a protectable trade secret. *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F.Supp.3d 1198, 1207–08 (E.D. Cal. 2020) (concluding that customer information including indicating customers' preferences and purchase histories qualifies as an adequately plead trade secret); *Argo Grp. US, Inc. v. Prof'l Governmental Underwriters, Inc.*, 2013 WL 11327772, at *2 (C.D.Cal. 2013) ("[I]nformation regarding profit margins, costs, and market research can be protected trade secrets."; *H.Q. Milton, Inc. v. Webster*, 2017 WL 5625929, at *3 (N.D.Cal. 2017) (finding plaintiff's "proprietary pricing" constituted trade secrets); *Brocade Commc'n Sys. Inc. v. A10 Networks, Inc.*, 873 F.Supp.2d 1192, 1214 (N.D.Cal. 2012) ("[C]ustomer-related information including … pricing guidelines ... and customers' business needs/preferences ... is routinely given trade secret protection."); *Mattel, Inc. v. MGA Ent., Inc.*, 782 F.Supp.2d 911, 982 (C.D. Cal. 2011) ("actual and projected pricing schemes, calibrated to retailers' space constraints and tailored to maximize profits" are "categories of information commonly understood to hold value within an industry.")

Skye's product cost and pricing information including detailed analysis of data relating to the individual cost of production per item (research and development, materials, labor, overhead, specific costs Plaintiff has negotiated with its vendors, etc.), which information was intentionally kept secret from third parties. Defendants knew the value of that exclusive inside information – including specific pricing per customer – and used it to target those exact customers and offer them replacements of "comparable" products at lower prices. [PF 578] Confirming its protectable nature, Banman requested pricing information from Stumpe, who was still acting as though he was working for Skye, and then used that secret pricing information, instructing Stumpe to "keep the pricing "close to that so we could start almost right away." [PF 578-579] CTM used that pricing information to "undercut" Skye with Skye's customers. [PF 570-572, 644-645]

### 7.  Skye's Marketing and Sales Strategies are Trade Secrets

California courts have also held that market research and internal marketing strategies can be trade secrets. *Mattel, Inc. v. MGA Ent., Inc.,* 782 F.Supp.2d 911, 982 (C.D. Cal. 2011) ("a reasonable fact-finder could conclude that a particular marketing strategy not generally known to the public [gives] a competitive advantage over other retailers who, for example, may not have known of the

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

relative profitability of a marketing campaign that tied product sales to charitable efforts.") Plaintiff's marketing strategies reflects an investment of significant time and expense to research and develop marketing strategies and initiatives, and research medical reimbursement coding and understand the application of certain codes to apply (including "AM" and "C" codes) to its unique tissue implants for insurance reimbursement. The compilation of that research is contained in "coding notes" that were distributed only to engaged sales representatives working on specific accounts or on a specific case who have requested further coding support. [PF 685] Banman stressed the proprietary value of these codes and the advantage they gave Skye in an email in 2017: "Great example this morning of <u>our excellent Skye proprietary advantage</u>." [PF 685] He then detailed how a doctor was not going to use Skye's products because competitor's products were not reimbursed. Banman sent "our standard coding reference email" and the facility confirmed reimbursement. Banman then reiterated the value of these codes and their secrecy: "These give us a massive advantage over Palingen, BioD, Applied Biologics, MiMedx, Amniox and others, as none of those companies understand the reimbursement, nor do they have ▆▆▆▆ available to them. Please keep in mind however, that we only provide this for engaged reps working on an account or on a case, requesting further coding support." [PF 685]

**8.      Skye and HRT have shown Reasonable Efforts to Keep these Secret**

In denying the Defendants' Rule 12 motion, this Court found that "Plaintiffs took adequate steps to protect the product information and customer information by requiring confidentiality agreements and controlling physical and digital access to information with network firewalls, password protection, and security credentials." [Docket #60 p. 13, citing *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1206 (E.D. Cal. 2020); *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 846. 847 (N.D. Cal. 2019); *see also MAI Systems*, 991 F.2d at 521 (holding that a requirement that "employees ... sign confidentiality agreements" can satisfy a party's burden to take reasonable measures to "insure the secrecy" of the relevant information).]

**D.      Defendants' Argument that "Certain" Items are Not Trade Secrets is Misguided**

Defendants argue that certain items are not trade secrets. First, this is improper because "[a] party may not file a motion for partial summary judgment on a fact or an element of a claim." *Franklin-Mason v. Penn,* 259 F.R.D. 9, at *11 (D.D.C. 2009). Second, items 2-4 – Skye's employees and sales

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

representative information, Skye's research physicians, and Skye's pricing – *are in fact trade secrets*, as discussed above. Defendants attempt to oversimplify Plaintiffs' allegations, by contending that because individual advertise themselves as Skye representatives somehow shows his/her is not a trade secret. But that is not what Plaintiffs are claiming. They assert instead that the Defendants took internal knowledge, that they agreed was trade secret, and that they knew gave the Plaintiffs a competitive advantage, and disclosed/used that information to jump-start their competing business by stealing Skye's already established sales representatives, customers, and research physicians.

As for the name "Connective Tissue Matrix", it is undisputed that Sharp brought that to the placental tissue industry and that has allowed Skye significant advantages with regard to insurance reimbursement for products. [PF 685] Banman's use of the term as his company's name illustrates his intention to easily "switch" out or steal Skye's established business by advertising the similarities in the products. Concerning the "appearance" of placental products, Plaintiffs understand that the products themselves are released to the medical facilities, but the manufacturing process and how the products are made is a trade secret, the specific performance history of Skye's specific product types and sizes is a trade secret, and specific customer preferences for specific products is a trade secret.

### DEFENDANTS' REPLY:

#### 1.    Plaintiffs fail to address Defendants' principal argument

Defendants' lead argument is that Plaintiffs have failed to identify their allegedly misappropriated trade secrets, which is required to survive summary judgment. *See DropzoneMS,* 2019 WL 7630788, at *10; *Calendar Rsch.*, 2020 WL 4390391, at *5. In response, Plaintiffs had the opportunity to show exactly what trade secrets are at issue. Instead, they sidestepped the question. Like their Complaint and interrogatory responses (Fluskey Decl. Exs. 1-5), they vaguely refer to only categories of information. They cite cases holding (often at the pleadings stage) that certain broad categories *can* constitute trade secrets, but they do not take the "crucial next step of describing [their] trade secrets to separate them from matters of general knowledge." *DropzoneMS,* 2019 WL 7630788, at *10.

#### The Manufacturing Process

Plaintiffs contend, in conclusory fashion, that Banman and CTM are using elements of HRT's

manufacturing process to make CTM products. But what specific elements of Plaintiffs' process are the trade secrets at issue here, and how is CTM using them? Despite adding more than 350 immaterial "facts" to the record, Plaintiffs never answer this question. It cannot be the use of dehydration, the fact that some of HRT's products are chorion-based, or the source of raw materials. That information is indisputably not secret. Fluskey Decl. Ex. 14 (Sharp Depo.) at 20:18-24, 31-32, 34-35. And Plaintiffs have admitted that "some steps [of their process] may be public information." Fluskey Decl. Ex. 5 (response to Rog. 2 at pp. 4-5). As such, Plaintiffs had an obligation to separate that public information from what they claim is their secrets. *Calendar Rsch*., 2020 WL 4390391, at * 4; *Beaulieu Group, LLC*, 2016 WL 7626471, at *11. They have not done so.

Plaintiffs now claim that Banman misappropriated trade secrets from a "Design File." But this Design File is not even mentioned in their trade secret interrogatory responses. *See* Fluskey Decl. Ex. 1 at 7-11 & Ex. 2 at 5-8. That is not surprising, as it is a seven-page document that contains no processing steps, and presents only Banman's early summary of research on publicly-available information. *See* Saba Decl. Ex. 6; Banman Reply Decl. ¶ 7. In their interrogatory response, Plaintiffs stated that their SOPs outlined the manufacturing process, not any "Design File." Fluskey Decl. Ex. 2 at 7-11. And Plaintiffs do not tell us what specifically in that Design File is a trade secret and how Banman used it. Plaintiffs summarily conclude that Exhibit B to the agreement between CTM and Alamo includes HRT's trade secrets. But they do not identify what on Exhibit B constitutes their trade secrets. Sharp admitted at deposition that much of Exhibit B is not secret at all. Fluskey Decl. Ex. 14 at 142-156. Plaintiffs jam reports of unqualified experts into the record to create the false impression that that there might be a "battle of the experts." That is a red herring. The question here is *identification* of trade secrets, and those experts, like Plaintiffs, do not identify the specific process steps that are purportedly Plaintiffs' trade secrets. *See* Cislo and Lee Declarations.

In their opening papers, Banman and CTM established that there are several material differences between the manufacturing processes used by CTM/Alamo and HRT. SOF 111-114; Banman Decl. ¶ 64; Fluskey Decl. Ex. 18 (Andrews Depo.) at 339:17-341:13. In response, Plaintiffs revealed that their trade secret case is based on a fundamental misapprehension of trade secret law. They contend that CTM and Banman engaged in misappropriation, even though the parties' processes

69                    Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

differ, because the processes result in the same or similar products. *See* Plaintiffs' responses to SOF 111-114 (and "evidence" cited therein). They also contend that Banman somehow violated the DTSA because he purportedly presented Alamo with a "suite of products" that were "identical" to those in HRT's ***publicly-distributed*** 2017 ***brochure*** (Saba Decl. Ex. 75 (HRT brochure), SOF 95 (Plaintiffs' Response), PF 610) and because he sent Alamo a picture of a sample HRT product that was being sold in the marketplace. PF 635-637.

While trade secret law can in theory protect a ***process***, it does not protect a ***product*** that is sold to the consuming public. "[A]s a matter of law, outward-facing features that every user of [the product] can see and experience are not trade secrets." *Calendar Rsch.,* at \*10; *see Kellwood Apparel, LLC v. Protrend Ltd.*, 2020 WL 3302669, at \*8 (C.D. Cal. Mar. 5, 2020) (denying preliminary injunction to jeans manufacturer where some of its alleged trade secrets, such as apparel design and style, likely would have been evident from the jeans themselves and thus publicly available and readily ascertainable); *Medicrea USA, Inc. v. K2M Spine, Inc.*, 2018 WL 3407702, at \*13 (S.D.N.Y. Feb. 7, 2018).

The nature and basic makeup of a placental product—*e.g.*, whether it is a membrane, a flowable particulate, its dimensions, and storage temperature—is publicly available information. When a user opens a box containing the product, he or she can observe those basic attributes. SOF 19-20; Banman Reply Decl. ¶ 12, Ex. 1; Fluskey Decl. Ex. 14 at 33:8-35:11; Banman Decl. ¶ 8; Fluskey Decl. Ex. 18 (Andrews Depo.) at 345:18-347:5; Saba Decl. Ex. 75 (HRT brochure). Under trade secret law, Plaintiffs cannot prohibit competitors from creating similar, or even identical, products. Plaintiffs' misapplication of the Coca-Cola analogy proves Defendants' point. Coca-Cola cannot prevent Pepsi or a former employee from making carbonated sugar water that looks and tastes like Coke in the same size cans and bottles. The Coca-Cola trade secret is in ***the exact formula and process*** used to create the product, not the product itself. This is why—as part of their manufacturing trade secret claim—Plaintiffs were required to identify the steps of the process that constitute their trade secrets. They refused to do so and instead chose to intentionally obscure the target—to vaguely contend that the entire process is the trade secret at issue, while acknowledging that some of the process is not secret. Fluskey Decl. Ex. 5; Ex. 14 at 20-21, 43-45. The evidence shows that the entire processes are ***not*** the

70                    Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

same. By choosing to identify only the entire process as the trade secret, they have doomed their claim.

**The Business "Trade Secrets"**

Plaintiffs have not identified, even in their opposition, an actual "customer list" or any document containing "historical purchasing information," "customer specific needs and preferences," "customer-specific pricing guidelines," and "customer information." Plaintiffs seem to claim that Defendants can never sell to any customer that Defendants know once purchased products from Plaintiffs because Defendants' knowledge of that customer relationship is a trade secret. This is not what trade secret law protects. *AdvantaCare*, 2003 WL 23883596, at*2; *Sethscot*, 669 So.2d at 1078.

The identities of the research physicians who contracted with Plaintiffs cannot be Plaintiffs' trade secrets. It is undisputed that the research physicians were (a) not prohibited from conducting research for other companies (and were not even required to *actually perform any* research for Plaintiffs (SOF 199-200)) and (b) had no obligation to keep their relationships with Plaintiffs secret. Fluskey Decl. Ex. 14 (Sharp Depo.) at 200:6-11. Further, some of these research agreements are publicly available. Fluskey Decl. Ex. 24; Banman Decl. ¶ 79. Plaintiffs' independent sales representatives were similarly under no obligation to keep their relationships with Plaintiffs secretive. SOF 67. Some of Plaintiffs' independent sales representative agreements are publicly available. Fluskey Decl. Ex. 25.

2.    **Defendants' may seek summary judgment on an element or portion of a claim**

Plaintiffs' argument that Defendants may not seek summary judgment on a portion of a claim is clearly wrong. It is based on outdated case law decided before the 2010 amendments to Rule 56. Summary judgment is unquestionably permissible on parts of a claim, as the plain language of Rule 56 states: "A party may move for summary judgment, identifying each claim or defense—*or the part of each claim or defense*—on which summary judgment is sought." FRCP 56(a) (emphasis added). *See U.S. ex rel. Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 191 (D.D.C. 2017) ("[Th]e 2010 amendment to Rule 56 . . . *clarifies that summary judgment is permissible on portions of a claim*") (emphasis added); *Ochoa v. McDonald's Corp.*, 133 F. Supp. 3d 1228, 1232 (N.D. Cal. 2015) ("The current version of Rule 56 changed the federal summary judgment process by authorizing the

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Court to grant what is sometimes called partial summary judgment to dispose of less than the entire case *and even just portions of a claim or defense*.") (emphasis added); *Allstate Inc. Co. v. Madan*, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995) (allowing a Rule 56 motion on part of plaintiff's claim).

### 3. Plaintiffs finally concede that Stumpe's relationships are not trade secrets

When confronted with indisputable authority that relationships are not trade secrets, Plaintiffs finally conceded the point. But to distract the Court from this admission, they label this argument as a "red herring" and that what they *really* meant to claim was that defendants "[stole] Skye's technology and [sold] *Skye products to Skye's customers, under the CTM name*. And they did it knowingly and deliberately." (*See* Plaintiffs' Opposition Section II(C)(2).) In other words, when faced with a doomsday motion, they now resort to trickery and deceit; they know full well that their claims and alleged damages center around Skye's lost sales to Stumpe's own contacts made based solely on his relationships.

Indeed, first, there is *no* allegation against Stumpe that he stole any of Skye's alleged technology. The only trade secret misappropriation allegations are that Stumpe flipped customers from Skye to CTM—specifically that Stumpe did so using Skye's "customer information," including information on the specific needs and preferences, order history, customer specific pricing guidelines, and offered to "switch" them out for the *exact* same types of products, at the same volumes. The fatal flaw in this argument is that it implies that these customers belonged to Skye but, in reality, Dr. Ertl is *Stumpe's* and not Skye's customer, as Stumpe's relationship with Dr. Ertl predates his work with Skye through Novus and Silenda, and he brought Dr. Ertl to Skye after selling to him through other manufacturers for several years. (SUF, 296, 329.) Dr. Ertl works primarily at Eskenazi Hospital and IU Health, and all of Stumpe's business with them across multiple manufacturers' products has been done through Dr. Ertl. (*Id*.) Stumpe did not have any dealings with Eskenazi Hospital or IU Health that were not through Dr. Ertl. (*Id*.) Plaintiffs do not dispute these facts. Skye even admits (undisputedly) that it looks for sales representatives with relationships like the one that Stumpe has

with Ertl.  (SUF, 313.)[17]

Given the above, Stumpe cannot conceivably harm Skye through purported trade secret misappropriation by "flipping" customers that *he himself* brought to Skye.  These customers did not belong to Skye in the first place.  Portable business is a cornerstone of this industry, as decisions on what products to use and purchase are those of the *customer*, and representatives work with multiple manufacturers.  (SUF, 297-298, 304.)  Plaintiffs do not dispute these facts regarding the market.  Moreover, these customers already know what Skye's prices are, as well as all of the details of their products, so nothing "secret" that they are not already privy to is being relayed to them to cause them to switch to CTM.

Finally, addressing Plaintiffs' evidence that pertains to Stumpe on this topic establishes the same.  PF 554, 555, 556, 560-562, 564-565, 583, and 680 all pertain to Stumpe's relationship with Dr. Ertl, as they either mention Ertl by name, or facilities that Stumpe worked with Ertl through.

Plaintiffs are well aware that their claims against Stumpe solely relate to his established relationships with his own customers as a sales representative.  These customers worked with Skye at certain points and knew about Skye's products and pricing.  For Stumpe to provide them with the details of a new product that they switched to does not in any way violate an alleged "trade secret" (if it could even be called that).  Most importantly, these customers never belonged to Skye, such that moving their business to a different manufacturer would cause Skye harm.

**DEFENDANTS' PORTION:**

C.    **The undisputed evidence conclusively disproves use and disclosure.**

1.    **The applicable law**

Even if Plaintiffs had identified protectable trade secrets (they have not), to proceed to trial, they must proffer evidence of misappropriation (*i.e.*, use or disclosure of the trade secrets). 18 U.S.C. § 1839(5); *Calendar Rsch. LLC*, 2020 WL 4390391, at *3; *Beaulieu Group, LLC*, 2016 WL 7626471, at *12. Defendants' access to some of Plaintiffs' purportedly confidential information does not

---

[17]    Stumpe has no relationship with Dr. Badman, nor has he ever sold any CTM products to Badman or worked with him in any other capacity since Matt Dripps (Badman's salesman relationship) stopped working with Stumpe. (SUF, 330.)

establish misappropriation. *Calendar Rsch. LLC*, 2020 WL 4390391, at \*14 (dismissing DTSA claims where Plaintiff presented evidence of retention of confidential information, but failed to present evidence of use or disclosure); *see also Beaulieu Group, LLC*, 2016 WL 7626471, at \*12 ("Plaintiff has presented *no* evidence that Defendant *ever used these secrets*.") (emphasis in original); *CMI Roadbuilding, Inc. v. Specsys, Inc.*, 2021 WL 2189222, at \*12 (D. Okla. May 28, 2021) (dismissing Plaintiffs' DTSA claim as predicated solely on "retention"); *Source Prod. & Equip. Co., Inc. v. Schehr*, 2019 WL 4752058, at \*11 (E.D. La. Sept. 30, 2019) (same); *LiiON LLC v. Vertiv Group Corp.*, 2021 WL 4963610, at \*7 (N.D. Ill. Oct. 26, 2021) (same).

Further, California does not recognize the "inevitable disclosure doctrine," which means Plaintiffs cannot prove trade secret misappropriation by claiming that Defendants' work for a competing company (CTM) will inevitably lead to use or disclosure of Plaintiffs' trade secrets. *See Whyte v. Schlage Lock Co.*, 101 Cal. App. 4th 1443, 1463 (2002); *SPS Techs., LLC v. Briles Aerospace, Inc.*, 2019 WL 1974902, at \*13 (C.D. Cal. Mar. 11, 2019) (applying the *Whyte* holding to DTSA claims); *ELT Sight Inc. v. EyeLight Inc.*, 2020 WL 7862134, at \*25 (C.D. Cal. Aug. 28, 2020).

As summarized below and as set forth in greater detail in the accompanying Rule 56 statement, the evidence proves that the CTM Defendants have not used or disclosed Plaintiffs' "trade secrets." In several instances, Plaintiffs have openly admitted that the lack evidence on this element.

### 2. <u>The evidence of non-use and non-disclosure as to the CTM Defendants</u>

The evidence proves that CTM and Banman did not use any of the information identified by Plaintiffs under the "Product Development and Manufacturing" heading of their interrogatory responses. Banman retained a third-party tissue bank (Alamo) to manufacture products under CTM brand names. Alamo had substantial experience manufacturing products derived from human placental tissue. Banman did not transmit to Alamo any HRT/Skye SOPs or other documents that summarized those companies' manufacturing processes. SOF 106-109. The evidence also conclusively proves that there are material differences between the manufacturing processes used by HRT/Skye and the processes used by Alamo. SOF 111-114.

CTM and Banman did not use or disclose the other categories of information vaguely referenced by Plaintiffs in their interrogatory responses—namely, "Customer Lists and Potential

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Customers," "Research Physicians and Patient Registry," "Employees, Independent Contractors, Sales Representatives, and Distributors," "Business Operations," "Cost and Pricing," and "Marketing and Sales." SOF 129-144.

Seoane never even had access to the manufacturing process for HRT/Skye products. SOF 156. He clearly did not use any of the information identified by Plaintiffs under the "Product Development and Manufacturing" heading of their interrogatory responses. SOF 154. He did not use or disclose the other categories of information vaguely referenced by Plaintiffs in their interrogatory responses— namely, "Customer Lists and Potential Customers," "Research Physicians and Patient Registry," "Employees, Independent Contractors, Sales Representatives, and Distributors," "Business Operations," "Cost and Pricing," and "Marketing and Sales." SOF 152-169.

After leaving HRT/Skye, Seoane had continued electronic access to certain Apple "Notes" files because Skye failed to disable his access and told him not to delete them. Seoane never disclosed those "Notes" files to Banman or CTM, and he never used them in connection with CTM. When Skye complained about Seoane's access to those "Notes" in connection with this litigation, Seoane deleted them at Plaintiffs' counsel's request. All such "Notes" information has been deleted/returned. SOF 246-254.

Testifying as a 30(b)(6) representative for HRT and Skye, Sharp admitted that the companies possess no evidence that the CTM Defendants used or disclosed any of Plaintiffs' "Customer Lists" (Fluskey Decl. Ex. 14 at 184:7-186:4, 224:3-21), "Customer Preferences" (*id*. at 187:10-188:13), "Patient Registry" (*id.* at 198:4-199:1), "Financial Data" (*id.* 207:9-23), "Pricing" (*id.* at 213:4-215:22, 218:18-25), or the Apple "Notes" files (*id.* at 238:2-17).

### 3. Stumpe did not misappropriate any alleged "trade secret."

Any of Skye's claims that Stumpe misappropriated its relationships with Dr. Ertl, Dr. Badman, Eskenazi Hospital and IU Health, are also misguided. As the evidence clearly shows, Stumpe's relationship with Dr. Janos Ertl predates his work with Skye through Novus and Silenda, and he brought Dr. Ertl to Skye after selling to him through other manufacturers for several years. (SUF, 296, 329.) Moreover, Stumpe cannot misappropriate a relationship that already belonged to him. Dr. Ertl works primarily at Eskenazi Hospital and IU Health, and all of Stumpe's business with them across

multiple manufacturers' products has been done through Dr. Ertl. (*Id*.) Stumpe did not have any dealings with Eskenazi Hospital or IU Health that were not through Dr. Ertl. (*Id*.) In fact, Skye itself admits that it looks for sales representatives with relationships like the one that Stumpe has with Ertl. (SUF, 313.)

For Dr. Badman, Novus and/or Silenda serviced him at Skye through another representative, Matt Dripps, who had an existing relationship with him. (SUF, 330.) Dr. Badman left Skye when Matt Dripps did, and Stumpe has never sold any CTM products to him or worked with him in any other capacity since, which means that he could not have misappropriated his business. (*Id*.)

Finally, Skye vaguely claims that Stumpe used its "trade secrets" to target and convince Skye's sales representatives to breach their agreements with Skye and work for CTM instead. (SUF, 331.) Skye has not, however, identified any evidence of Stumpe poaching a single sales representative from Skye to work with CTM, let alone any alleged "trade secret" he allegedly used to do so. (*Id*.) In the absence of such evidence, there can be no claim.

Nor can Skye claim that Stumpe (er, really, Silenda or Novus) used any "trade secrets" in selling products other than Skye to any customers. Decisions on what products to use and purchase are those of the *customer*. (SUF, 297-298.) The representatives are only the vehicle through which the sales happen, and they work with multiple manufacturers. (*Id*.; SUF, 304.) If a customer approaches Stumpe regarding a specific product (which is very common in the industry and has happened with Stumpe with Zimmer and NuCell (SUF, 299)), then the sales representative is solely doing his job for his client. At the same time, it is customary practice to disclose comparative pricing information to customers regarding manufacturers—pricing data is not "secret." (SUF, 309.) Skye was fully aware of all of this, as it was aware of Silenda and Novus' work with multiple manufacturers, and freely provided its pricing information and its marketing materials and strategies to representatives that it would not even have agreements with. (SUF, 302-303, 310.)

Skye has undoubtedly failed to present any evidence of trade secret misappropriation on Stumpe's part through any viable legal theory, and summary judgment on this claim should be granted in Stumpe's favor.

**4.**      **HRT admits it has no viable claims against Stumpe**

Count III of the FAC is asserted by both Plaintiffs against Stumpe. (FAC, ¶¶ 188-202.) In verified discovery responses, however, HRT expressly admitted that Stumpe did not interfere with any of its alleged contracts or alleged economic advantages and did not misappropriate any alleged trade secrets belonging to HRT. (SUF, 334-338.) These admissions are dispositive of HRT's claim for misappropriation of trade secrets, and such claim must be adjudicated in Stumpe's favor as a result. Finally, because trade secret misappropriation is the predicate act for HRT's RICO claims against Stumpe (Counts I and II), those claims also fail for the same reason.

**PLAINTIFFS' PORTION:**

Misappropriation is defined in pertinent part as the "**acquisition** of a trade secret ... by a person who knows or has reason to know that the trade secret was acquired by improper means[,]" **or** the "**disclosure or use** of a trade secret ... by a person who ... used improper means to acquire knowledge of the trade secret or ... knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret[.]" *1-800 Remodel, Inc,* 2018 WL 6340759, at *4 (citing 18 U.S.C. §1839(5)(A)–(B), bold emphasis added). Although the DTSA "do[es] not define the term "acquire," the plain meaning of the term is "[t]o gain possession or control of; to get or obtain[.]" *1-800 Remodel, Inc. v. Bodor*, 2018 WL 6340759, at *5.

Defendants argue there is no evidence showing use of Plaintiffs' trade secrets. This is patently untrue and contrary to the overwhelming weight of the evidence. And that is without mentioning that "misappropriation" includes "acquisition" and "disclosure" of trade secrets – as well as use.

The trade secrets protection afforded HRT's product manufacturing is addressed in exhaustive detail above, but we note specifically here that Banman's transcribed HRT's trade secret processing steps onto "Exhibit B", which he provided to Alamo, specifically to manufacture copies of HRT's products. [PF 616, 623-628, 629, 631-632] Defendants cannot claim, as a consequence, Alamo knew how to manufacture Skye's exact products – Andrews testified it did not and Banman had to provide the specifications, which he did. [PF 610-612, 629]

Defendants also disclosed – again as already set out above – Skye's trade secret customer information and sales history, potential customers, research physicians, employees and independent

contractors, business operations, Skye's pricing, and marketing and sales information. And they did so to jump start a competing business with a built-in structure, customer base, and sales force. [PF 519-521, 532, 535-540, 554-565, 569-573, 576, 578-580, 583, 588-590, 595-597, 680] For his part, Seoane disclosed to Banman at least one of the 17 notes he took prior to deleting them, after receiving two cease and desist letters from Plaintiffs. [PF 686]

Skye is not claiming that relationships with doctors are a trade secret. It is Stumpe's inside knowledge of which doctors were purchasing Skye products, and the exact purchase history, as trade secrets. Indeed, Stumpe used that confidential information to convince doctors and facilities to "switch out" Skye products for CTM products – seamlessly providing the exact same products, sizes and quantities they had ordered from Skye with zero wait time. [PF 541, 550, 554-555, 556, 568, 578-579, 581, 583, 659-663.] Defendants even went so far as to send a purchase order to Skye's customer with Skye's logo scratched out and replaced with the handwritten letters "CTM". [PF 594]

**DEFENDANTS' REPLY:**

**A.    Plaintiffs fail to submit evidence of use or disclosure**

Banman did not acquire any alleged trade secrets from Plaintiffs by improper means—Plaintiffs admitted he had lawful access. SOF 146; Dkt. 130 ¶¶ 43-53. Plaintiffs were required, but failed, to put forth evidence of use or disclosure. 18 U.S.C. § 1839(5). Plaintiffs repeatedly state in their opposition that because Banman gained certain knowledge while employed by Skye, and went on to do certain things at CTM, he *must have* used Plaintiffs' trade secrets. But these types of assumptions are simply not evidence. Plaintiffs are missing essential links in this use or disclosure chain, because California does not recognize the inevitable disclosure doctrine, as discussed above. Plaintiffs have failed to create a genuine dispute of material fact as to use or disclosure by Defendants. *See ELT Sight Inc. v. EyeLight Inc.*, 2020 WL 7862134, at *25 (C.D. Cal. Aug. 28, 2020).

**B.    Plaintiffs seemingly concede that Stumpe
         did not misappropriate an alleged trade secret**

Plaintiffs wholly ignored the fact that HRT admitted that Stumpe did not interfere with any of its alleged contracts or alleged economic advantages and did not misappropriate any alleged trade secrets belonging to HRT. (SUF, 334-338.) This is once again dispositive of both HRT's claim for

misappropriation of trade secrets, as well as its RICO claims against Stumpe (Counts I and II), which are based on the predicate act of trade secret misappropriation.

Additionally, Skye's shifting the focus upon Stumpe's "inside knowledge of which doctors were purchasing Skye products and the exact purchase history" is misplaced. Skye ignored (and effectively admits) that purchasing decisions are made by the customers. The customers contact Stumpe and an order is made. Stumpe's "inside knowledge," therefore, is no factor in a sale. Moreover, there is no "inside knowledge" that Stumpe possesses that is a protectible trade secret. Are Plaintiffs claiming that Stumpe can never do business in this industry because he possesses certain information in his head? Surely, they are not. Finally, and again, Stumpe's relationships with Dr. Ertl, Eskenazi Hospital and IU Health are his own and predate Skye. These relationships were also the main reason *why Skye sought out Stumpe.* (SUF, 296, 313 329.) If Stumpe took away business with his relationships that ***he himself*** brought to Skye, then he is not damaging Skye in any way, as this business did not belong to Skye in the first place, and it is therefore not being harmed. Portable business is a cornerstone of this industry, as decisions on what products to use and purchase are those of the ***customer***, and representatives work with multiple manufacturers. (SUF, 297-298, 304.) Moreover, this alleged "inside knowledge" is something that the customers are already aware of, because, per custom, comparative pricing information is freely relayed to customers regarding manufacturers. (SUF, 309.) Stumpe's customers already know what Skye's prices are, so nothing "secret" is being relayed to them for them to switch to CTM. The record is clear that Stumpe has and does only work with his long-time customers (through Novus or Silenda), such that nothing of Skye's is being disclosed or misappropriated.

Finally, Plaintiffs fail to even address the evidence that Dr. Badman was never Stumpe's relationship and Stumpe has never sold any CTM products to him or worked with him in any other capacity (SUF 330), and that Stumpe did not "poach" any sales representatives from Skye to CTM or use any alleged "trade secrets" in such a situation. (SUF, 331.) This failure suggests that Plaintiffs are conceding such points.

**DEFENDANTS' PORTION:**

III.    **Plaintiffs' breach of contract claims against Banman (Counts IV & V)**
       **fail because the undisputed, material facts disprove use and disclosure.**[18]

Plaintiffs' breach of contract claims against Banman are based solely on Banman's alleged use and disclosure of Plaintiffs' confidential information and trade secrets. Compl. ¶¶ 204-207, 211-214. Plaintiffs have failed to establish that Banman used or disclosed any of Plaintiffs' confidential information or trade secrets. *See* Point II(C), *supra*. Thus, Plaintiffs' breach of contract claims based on alleged use and disclosure should be dismissed. *See Beaulieu Group, LLC*, 2016 WL 7626471, at *18-19 (granting summary judgment to defendant and dismissing breach of contract claim due to lack of evidence of use or disclosure of plaintiff's confidential information).

HRT alleges that Banman breached the confidentiality provisions of a Consulting Agreement, which became effective in June 2014 (the "HRT Consulting Agreement"). Dkt. 130 at ¶¶ 203-209. The claim fails because Banman has not used or disclosed any "Confidential Information" provided under the HRT Consulting Agreement. Banman Decl. Ex. 3 at § 3; Banman Decl. ¶¶ 65-92. Skye alleges that Banman breached the confidentiality obligations of his April 18, 2018 Skye Employment Agreement and Employee Confidentiality Agreement. Dkt. 130 at ¶¶ 210-216. That claim also fails because Banman has not used or disclosed any "Proprietary Information" provided by Skye under that agreement. Banman Decl. Ex. 4 at § 1 (confidentiality provision); Banman Decl. ¶¶ 65-92.

**PLAINTIFFS' PORTION:**

Defendants only argue that they did not breach any contract because they did not use or disclose any of Plaintiffs' confidential information or trade secrets. Plaintiff's allegations in the complaint go beyond this argument because Plaintiffs also allege Banman breached the non-solicitation provision of the agreements. Accordingly, the argument set forth above by Defendants do not completely dispose of this cause of action. This Court addressed this issue in the February 9, 2021 ruling on the motion to dismiss. [Docket #60 at p. 17.] ("Moreover, the CTM MTD does not address Plaintiffs' allegations that Banman violated the non-solicitation provisions of the Skye Confidentiality Agreement, which prohibited him from soliciting "employee, customer, supplier, or consultant or advisor to Skye to

---

[18]    Plaintiffs assert Counts IV and V only against Banman.

terminate such party's relationship with Skye," for the duration of Banman's employment and for a period of one year thereafter. Id. at ¶ 45. Plaintiffs have adequately alleged that Banman violated the non-solicitation provisions by soliciting various doctors, customers, and Plaintiffs' employees.")

Regardless, there are countless triable facts on the issue of whether Banman used and disclosed Plaintiffs' confidential information and/or trade secrets, which the evidence plainly demonstrates he did. [PF 479, 481, 493-494, 516, 520-526, 539-540, 554-555, 557, 565-567, 569, 574-577, 579, 581-582, 584-585, 588, 589, 590, 592, 595-597, 599-601, 603-604, 606-612, 614-616, 619-642, 659, 661, 675-676, 681] This issue should be denied.

### DEFENDANTS' REPLY:

Plaintiffs do not allege that Banman breached the non-solicitation provisions in their Complaint. Plaintiffs' breach claims relate only to alleged breach of confidentiality provisions. Dkt. 130 ¶¶ 206-207, 213-214. Paragraph 51 of the Complaint refers to a non-solicitation provision in the Skye Confidentiality Agreement. Dkt. 130 ¶ 51. But Skye does not allege that Banman breached that provision. That is likely because Plaintiffs know that this non-solicitation provision is unenforceable under California law. Cal Bus. & Prof. Code § 16600; *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.*, 28 Cal.App.5th 923, 935 (Cal. Ct. App. 4th 2018) (holding that employee non-solicitation covenants are generally void under Section 16600).

### DEFENDANTS' PORTION:

**IV. The Court should dismiss Plaintiffs' conversion claim against CTM, CTM Med, and Banman (Count VI).[19]**

"A claim for conversion requires proof that the plaintiff owns or has a right to possess property, that there has been a wrongful disposition of the property, and that damages resulted." *Jurisearch Holdings, LLC v. Lawriter*, LLC, 2009 WL 10670588, at *4 (C.D. Cal. Apr. 13, 2009). Further, "[w]here property is capable of being copied, wrongfully possession of copies does not typically give rise to a conversion if the rightful owner retains possession of the original or retains access to other copies." *Id.* at *7 (reasoning that if the owner still possesses the property itself the owner is in no way being deprived of the use of that property). There is no evidence that Plaintiffs have been deprived of

---

[19]   Plaintiffs assert Count VI against CTM, CTM Med, and Banman.

the use of any property. Moreover, the evidence proves that CTM, CTM Med, Banman, and Seoane did not "copy" or "wrongfully obtain" Plaintiffs' confidential information. Banman Decl. ¶¶ 127-28. Further, Banman and Seoane have deleted/returned any information relating to HRT/Skye. Banman Decl. ¶ 128; Seoane Decl. ¶¶ 25-26, 29.

**PLAINTIFFS' PORTION:**

Plaintiffs voluntarily dismiss Count VI for conversion against CTM, CTM Med and Banman.

**DEFENDANTS' PORTION:**

V.    **Plaintiffs' conversion claim against Stumpe (Count VII) is misplaced.**[20]

Plaintiffs' claim of conversion against Stumpe fails due to a lack of both factual and legal bases. The claim is based upon the allegation that Stumpe has "intentionally interfered with Plaintiffs' possession of…inventory by retaining possession of that inventory without any intention to return the profits from the sale of that inventory to Plaintiffs, and refusing to return the inventory to Plaintiffs." (FAC, ¶ 227.) This inventory is allegedly in the amount of $171,528. (SUF, 342.) These allegations are not only unfounded, however, but Plaintiffs also fail to establish Stumpe's liability under California law.

Conversion is defined as "the wrongful exercise of dominion over the property of another." *Oakdale Village Group v. Fong*, 43 Cal. App. 4th 539, 543 (1996). The required elements for this claim are "the plaintiff's ownership or right to possession of the property at the time of the conversion; the defendant's conversion by a wrongful act or disposition of property rights; and damages." *Id*. at 543-544. A Plaintiff must "show *an assumption of control or ownership over the property*, or that the alleged converter has applied the property to his own use." *Id*. at 544. (Emphasis added.) "Conversion is any act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Zaslow v. Kroenert*, 29 Cal. 2d 541 549 (1946). (Citations omitted.)

Moreover, Plaintiffs cannot maintain a claim for conversion against Stumpe because they cannot establish that Stumpe has exercised dominion, control or ownership over the property in

---

[20]    Plaintiffs assert Count VII only against Stumpe.

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

question.  For one, Plaintiffs claim that the inventory was requested by *Silenda*, not Stumpe.  (SUF, 342.)  For another, Plaintiffs' policy is to send consignment inventory directly to customers, and not to sales representatives.  (SUF, 344.)  This is also memorialized in Skye's agreements with its sales representatives.  (SUF, 339.)  As a matter of law, the foundation for a conversion claim "rests upon the unwarranted interference by defendant with the dominion over the property of the plaintiff from which injury to the latter results...." *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1065 (1998).  "It is incumbent upon the plaintiff to show an intention or purpose to convert the goods and to exercise ownership over them, or to prevent the owner from taking possession of the property." *Zaslow*, 29 Cal. 2d at 550.

Here, Plaintiffs expressly admit through their own evidence that they, not Stumpe, were the ones who sent the allegedly-converted inventory to various facilities, and it is currently with those facilities and not in Stumpe's (or Silenda's) possession.  (SUF, 339-340, 342.)  At no time has this inventory in question been in Stumpe's possession or under his control.  If Stumpe did not take or does not possess this inventory, as shown by Plaintiffs' own evidence, then it is difficult to see how he has intended to or actually exercised any dominion, control or ownership over it.  The analysis does not change even if Stumpe (or Silenda) requested or directed that Plaintiffs send this inventory to the facilities in question.  Even a defendant's act of personally moving items that belong to a plaintiff is not a conversion of the plaintiff's property, because there is no exercise of dominion over those items and no intent to prevent the rightful owner from taking possession. *Simonian v. Patterson*, 27 Cal. App. 4th 773, 781–782 (1994).  Silenda simply requested that inventory be stocked in various facilities … to Plaintiffs' benefit.

Likewise, Plaintiffs cannot assert that Stumpe converted the inventory in question because he failed to ensure that it was returned from the facilities to them.  Plaintiffs have failed on many occasions to reconcile any consigned inventory that representatives sold, and to carry out the requisite audits as required by their representative agreements to clear up any discrepancies.  (SUF, 345.)  For example, as of June 13, 2019, Skye was asking Stumpe for the return of inventory that was consigned for 1045 days at Westview Hospital, a facility that had been closed for two years at that time, without carrying out a single audit or reconciliation attempt in those 1045 days.  (SUF,

346.) It is telling that Skye waited until the hospital did not exist anymore to request the return of consignment inventory. (*Id*.)

Further, Skye changed its product strategy at some point and attempted to secure the return of all consigned inventory, charging customers and facilities that failed to return it. (SUF, 347.) Additionally, Skye always claimed that it would charge customers first for any unreturned consignment inventory, and only hold representatives responsible if the customers declined or otherwise failed to pay Skye. (*Id*.) This means that securing the return of inventory is something that is fully within Plaintiffs' control, and has nothing to do with a representative like Stumpe. Plaintiffs should be suing the facilities that possess their inventory instead. The fact is that Silenda was in possession of four Skye items that it returned to Skye. (SUF, 341.) Neither Silenda nor Stumpe are in possession of any other Skye products.

Based on the above, Plaintiffs have not established that Stumpe had any wrongful control, dominion, possession or ownership over their inventory. Plaintiffs sent the inventory to the facilities, not to Stumpe, and they are evidently able to secure its return. There is therefore no conversion claim against Stumpe. If anything, per Plaintiffs' own documentation, the inventory was consigned on behalf of Silenda, not Stumpe. Plaintiffs did not sue Silenda.

**PLAINTIFFS' PORTION:**

Neither legal title nor absolute ownership of the property is necessary for conversion; a party need only allege it is entitled to immediate possession at the time of conversion. *Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 45. On January 26, 2015, Stumpe signed a Representative Agreement with Skye. [PF 476] In signing the agreement, Stumpe agreed to be responsible for consignment inventory and "any unaccounted for tissues will be invoiced by Skye directly to the Representative." [PF 477]

Plaintiffs requested that Stumpe return its outstanding inventory several times including on January 22, 2019. Stumpe refused to do so, even though he admits he was in possession of Skye's inventory. [PF 694, 696; SUF 341]

Even if "Silenda" had the inventory, which Plaintiffs do not concede, Stumpe is nonetheless personally liable to Plaintiffs for converting Skye's inventory. See, *In re JUUL Labs, Inc., Mktg., Sales*

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

*Pracs., & Prod. Liab. Litig.*, 497 F.Supp.3d 552, 670 (N.D.Cal. 2020) (A corporate officer who participates in the commission of a tort may be held individually liable, regardless of whether the officer acted on behalf of the corporation in the course of official duties and regardless of whether the corporate veil is pierced.) Stumpe is also liable under an agency theory of liability. *See*, *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir.1985) ("A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf.").

**DEFENDANTS' REPLY:**

**A.      The Conversion Claim Against Stumpe Lacks Merit.**

Plaintiffs begin by misstating the evidence. *Stumpe* has *never* had a Representative Agreement with Skye. Novus and/or Silenda were named in the agreements. And Plaintiffs strategically refused to sue either or any of them so as to avoid the limitations of liability provisions the parties agreed to in the contract(s). Moreover, Plaintiffs' "several" requests that Stumpe return its "outstanding inventory" that were purportedly met with a refusal is also gross mischaracterization of the facts. Plaintiffs provide no evidence that they requested that Stumpe return Skye's outstanding inventory *even once*, let alone "several times." The only purported evidence presented is an e-mail from January 22, 2019, where a Skye representative, Harsh Gupta, asks Stumpe to verify the Skye consignment inventory count at Stumpe's various customer locations. (PF 694.) Not only does this in no way constitute any request to "return" inventory, but it also admits exactly what Stumpe argues—that Skye's inventory is with these customers, and not in Stumpe's possession or under his control, and that Plaintiffs failed on many occasions to reconcile any consigned inventory that representatives sold. This e-mail also confirms Stumpe's demonstration that Plaintiffs were seeking clarity on inventory at facilities that were not even in operation, such as Westview Hospital, following a failure to carry out any audits or reconciliations before. (PF 694.) In fact, the e-mail shows that inventory was on consignment at Westview for 904 days at the time. (*Id*.) Plaintiffs have thus still not demonstrated any basis for a conversion claim.

Looking to Plaintiffs' own presented legal authority, a plaintiff must "show an assumption of control or ownership over the property, or that the alleged converter has applied the property to his or

her own use." *Farmers Ins. Exchange v. Zerin*, 53 Cal. App. 4th 445, 446 (1997). As discussed above, Plaintiffs have failed to demonstrate any of this. Plaintiffs themselves sent the allegedly converted inventory to various facilities, and it has never been in Stumpe's (or Silenda's) possession or under their control. (SUF, 339-340, 342.) This is an essential element of the conversion claim that has not been established.

Moreover, according to *Farmers Ins. Exchange v. Zerin*, cited by Plaintiffs, "a mere contractual right of payment, without more, will not suffice" for a conversion claim. 53 Cal.App.4th at 446. Plaintiffs have still not shown that Stumpe, or any entity he worked for, converted the inventory in question, such that they were exercising wrongful dominion over it. Simply making a party contractually responsible for payment for such inventory cannot create a conversion claim as a matter of law.

Finally, Plaintiffs also fail to address Section 3.5 of the Novus Agreement, which places the burden on Skye to audit any customers where it has placed consignment tissue on behalf of a sales representative. (PF 477.) Simply put, Skye's failure to keep track of its own inventory has resulted in its own alleged harm. Plaintiffs bringing a claim of conversion against Stumpe for items that Stumpe does not have in his possession or control reeks of bad faith. Indeed, Plaintiffs have not provided even an iota of evidence that these items are with the facilities that they claim they are with. All Plaintiffs have shown is that they failed to adequately keep track of their own inventory.

**DEFENDANTS' PORTION:**

**VI.    The Court should grant partial summary judgment to the
CTM Defendants on Plaintiffs' tortious interference with contract claim (Count VIII).[21]**

A claim for tortious interference with contract requires a plaintiff to plead and prove: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *UMG Recordings, Inc. v. Glob. Eagle Entm't, Inc.*, 117 F. Supp. 3d 1092, 1115 (C.D. Cal. 2015).

Plaintiffs allege that the CTM Defendants have interfered with Plaintiffs' contracts with certain

---

[21]    Plaintiffs assert Count VIII against CTM, CTM Med, and Banman.

customers, research physicians, and independent sales representatives. Dkt. 130 ¶¶ 233-239. HRT's interrogatory responses clarified that only Skye, not HRT, is claiming interference with contracts. Fluskey Decl. Exs. 10 & 11. The parties with which the CTM Defendants have purportedly "interfered" has changed multiple times throughout the case. Skye has amended its responses to Banman's Second Set of Interrogatories, Interrogatory Nos. 6 & 8 and its responses to Seoane's Second Set of Interrogatories, Interrogatory 3 several times, each time removing and adding names to the "interference" list. Fluskey Decl. Exs. 7-9. Below, we address the individuals and entities identified in Skye's most recent amended responses to those interrogatories. *Id.*

### A. The court should dismiss the customer interference claims.

To the extent that Skye alleges tortious interference with customer contracts, the claim should be dismissed in its entirety.

First, Skye cannot establish any breach of a customer contract. Skye either does not have, or has not produced, written contracts with most of the customers identified. Fluskey Decl. Ex. 12. Skye does not even execute contracts with doctors. Fluskey Decl. Ex. 14 (Sharp Depo.) at 588:21-25, 590:11-21. Perhaps more important, Skye does not have any contracts with customers that prohibit customers from purchasing products from other suppliers, including CTM. *Id.* at 673:20-674:13, 675:8-676:12, 677:7-11. Sharp admitted that none of the customers with whom Skye alleges interference have breached any contract. *Id.* at 673:9-677:3.

Second, Skye cannot establish disruption of any customer contract. To prove disruption, Skye must show that the CTM Defendants' intentional acts made Skye's contractual obligations more expensive or burdensome. *See Sutrisno v. WebMD Practice Servs., Inc.*, 2005 WL 8154571, at *4 (C.D. Cal. June 30, 2005); *Pac. Gas & Electric Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1129 (CA 1990). Skye's only obligations to customers are to supply products for a specified price if and when purchased. Fluskey Decl. Ex. 14 (Sharp Depo.) at 586:13-588:2. CTM has no contracts with any of its customers that prevents the customer from purchasing products from other suppliers, including Skye. Banman Decl. ¶ 97. Thus, there is nothing preventing these customers from purchasing products from Skye. Under Skye's theory, any competitor that offers to sell products to a customer that has purchased Skye products would be liable for actionable contract disruption. That is clearly not the law. *See*

87  Case No.: 2:20-cv-03444-MEMF-PVC

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

*Sutrisno*, 2005 WL 8154571, at *16.

In the alternative, if the Court does not dismiss the customer portion of the interference claim in its entirety (it should), it must limit the claim. Skye has baselessly included on its customer interference list several entities with which the CTM Defendants have never done business. *See* Banman Decl. ¶ 98. Those customer claims cannot be part of the case.

**B.    The court should dismiss the research physician interference claims.**

Skye alleges contractual interference with certain physicians who were conducting research. The Court should dismiss this claim in its entirety because Skye cannot establish any breach or disruption of its research agreements.

Of the physicians identified by Skye, only three—Badman, Hiatt, and Ciaglia—have ever conducted research for CTM. Banman Decl. ¶ 100. Skye's agreements with these physicians are not exclusive and do not prohibit them from working with other companies. Fluskey Decl. Ex. 23; *Id.*, Ex. 14 (Sharp Depo.) at 385:3-386:13, 395:21-396:14, 674:13-23, 676:8-12. Skye's research agreements do not even require those physicians to conduct research. Fluskey Decl. Ex. 23. They only provide those physicians with the opportunity to conduct research. *Id.* The physicians were to be compensated in a lump sum *if* they completed and submitted a clinical report with supporting data. Fluskey Decl. Ex. 23; *Id.*, Ex. 21 (Hiatt Depo.) at 64:4-67:4. Sharp even admitted that no doctor with whom Skye alleges interference has breached any contract. Fluskey Decl. Ex. 14 at 673:9-677:3; *see also id.* at 376:16-377:16, 386:15-24.

To the extent Skye is claiming interference with a research agreement with Dr. John Anderson (Fluskey Decl. Ex. 14 (Sharp Depo.) at 384:1-10, 392:5-8), the claim must also be dismissed. Dr. Anderson did not have any agreement with Skye or with CTM. Fluskey Decl. Ex. 22 (Anderson Depo.) at 21:5-22:9, 31:24-32:15, 77:2-15, 83:5-84:1; Banman Decl. ¶ 100.

**C.    The Court should limit the independent sales representatives claim.**

Skye has claimed contract interference with approximately 30 independent sales representatives. This claim must be dismissed, in part, for several reasons.

<u>First,</u> nearly half of the allegedly interfered-with sales representatives have never even contracted with, or sold products for, CTM. Banman Decl. ¶ 104. The CTM Defendants clearly did

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

not interfere with these independent sales representatives.

Second, two independent sales representatives with whom Skye alleges interference—B.J. Benik and Jeremy Smith—owed no exclusivity obligations to Skye and were free to work with and sell products for other companies, including CTM. The exclusivity provisions in Benik's and Smith's contracts with Skye were crossed-out. Fluskey Decl. Exs. 26 & 27; Ex. 14 (Sharp Depo.) at 317:1-318:21. Skye has also admitted that Benik has not breached any contract with Skye. Fluskey Decl. Ex. 14 (Sharp Depo.) at 319:23-25. Further, the effective date of Smith's contract with Skye was March 20, 2017, and it expired two years later. Fluskey Decl. Ex. 27. Smith did not enter into a contract with CTM until June 17, 2021, over two years after his Skye contract expired. Banman Decl. ¶ 110.

Third, two other independent sales representatives—defendant Mike Stumpe and Dean Conway—did not contract with CTM until after their contracts with Skye, including the exclusivity clause, had expired. Skye entered into a contract with Stumpe's former company, Novus Ortho Corp., effective January 26, 2015. Fluskey Decl. Ex. 28. The agreement expired two years later, and the exclusivity clause expired six months after that on July 26, 2017. *Id.* §§ 6.1, 1.9. CTM's contract with Stumpe's new company, Silenda Medical, was effective as of July 25, 2018. Banman Decl. ¶ 109. Skye entered into a contract with Conway's company effective January 17, 2018. Fluskey Decl. Ex. 29. The agreement expired two years later, and the exclusivity clause expired six months after that on July 17, 2020. *Id.* §§ 6.1, 1.9. CTM did not enter into a contract with Conway's company until August 2, 2020. Banman Decl. ¶ 108.

Fourth, several of the independent sales representatives identified by Skye signed a contract with CTM for the ability to sell CTM products, but never sold any products. Banman Decl. ¶ 106. Merely signing a contract with CTM does not constitute a disruption of Skye's contracts. CTM's contracts with its independent sales representatives are not exclusive, and those sales representatives were free to sell products for other companies. Banman Decl. ¶ 102. Further, signing a contract with CTM did not breach the exclusivity clause in the Skye contract. That clause only prohibits the sales representative from "receiv[ing] compensation or represent[ing] any other Company" that sells certain products. *See, e.g.*, Fluskey Decl. Ex. 28 § 1.9. The sales representatives who signed with CTM, but never sold CTM products, were never compensated by CTM and never represented CTM. Sharp even

89                    Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

confirmed that Skye is not alleging that any of the individuals breached a contract with Skye. Fluskey Decl. Ex. 14 at 675:8-677:3.

Fifth, Skye has confirmed in writing that it is not claiming contract interference with Dave McGrew, Stephen Wood, Matt Locus, and Jason Behlohlavek. Fluskey Decl. Ex. 13 at 2-3. Skye has also admitted it does not possess a written contract with Robert Bibb. Fluskey Decl. Ex. 12 at 73-74.

### D.      Other allegations of interference in Plaintiffs' Complaint

In their Complaint, Plaintiffs allege that Banman interfered with Plaintiffs' contractual or business relationships with Maria Carey/Integrative Medical Solutions, Dr. Brett Schlifka, Dr. John Anderson/Gerald Champion Regional Medical Center, Rogers/VMD, and Seoane. Dkt. 130 ¶¶ 86, 93-94, 101, 105, 107. The indisputable evidence disproves these baseless allegations. Banman did not interfere with any of those individuals or entities. Banman Decl. ¶¶ 111-126.

**IMS/Maria Carey**. Contrary to the allegations in Plaintiffs' Complaint (Dkt. 130 ¶¶ 86-91), Banman did not recruit/poach Integrative Medical Solutions ("IMS") and Maria Carey, nor did Banman encourage IMS and Carey to cease doing business with Skye in favor of CTM. After Banman resigned from Skye and formed CTM, Carey told him that she was interested in adding CTM products to her portfolio. Banman specifically asked Carey if she had any contractual restrictions that prevented her from working with CTM. She represented in writing that she did not. While Carey signed a contract with CTM, she has never sold a single product for the company. SOF 222-226.

**Dr. Schlifka**. Contrary to the allegations in Plaintiffs' Complaint (Dkt. 130 ¶¶ 87-88), Banman never asked Dr. Schlifka to stop doing business with Skye. Dr. Schlifka has never performed research for CTM, and is not even a current customer of CTM. SOF 238-240.

**Dr. Anderson**. Banman never told Dr. Anderson or Gerald Champion Regional Medical Center to stop buying Plaintiffs' products, as alleged in paragraphs 92-99 of the Complaint. SOF 227.

**Gardner Rogers/VMD**. Contrary to the allegations in Plaintiffs' Complaint (Dkt. 130 ¶¶ 92-99) CTM and Banman did not instruct VMD to cease working with Skye. Banman never directed Rogers to inform the Veterans Administration Nation Acquisition Center that Skye was not a viable candidate to sell products to VA facilities. VMD/Rogers never entered into a business relationship with CTM or Banman and never distributed or sold a CTM product. Rogers is a personal acquaintance

of Banman, and the sum total of his work with CTM involved checking CTM's P.O. Box in Florida and depositing checks. SOF 228-236; Declaration of Gardner Rogers, dated November 3, 2022, ¶¶ 11-19; Declaration of Bernard C. Reinwald, dated November 2, 2022, ¶¶ 5-8. Plaintiffs' inclusion of Gardner Rogers and VMD is frivolous.

**Pablo Seoane**. Plaintiffs' contention that Seoane acted as a "spy" for Banman (Dkt. 130 ¶ 127) is demonstrably false. Banman resigned from Skye in July 2018, and Seoane did not start working for CTM until February 2020. Seoane contacted Banman expressing an interest in CTM. Banman did not instruct Seoane to breach any contract with HRT/Skye upon hiring Seoane, Banman instructed Seoane not use any HRT/Skye information. SOF 241-244. To the extent that Plaintiffs' contend that Banman or CTM is liable for inducing a breach of the three-year non-compete clause contained in Seoane's contract with HRT/Skye (Dkt. 130-5), the claim fails because that clause is unenforceable. Cal Bus.& Prof. Code § 16600; *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc*., 28 Cal. App. 5th 923, 935 (Cal. Ct. App. 4th 2018) (California's "strong public policy" of protecting the right of citizens to pursue lawful employment voids covenants not to compete); *Nuvasive, Inc. v. Miles*, 2019 WL 4010814, at *6-7 (Del. Ch. Aug. 26, 2019) (holding that a Delaware choice of law provision does not trump California public policy against non-compete clauses).

### PLAINTIFFS' PORTION:

Defendants are improperly seeking summary judgment on "on a fact or element of a claim." See, *Franklin-Mason v. Penn*, *supra,* 259 F.R.D. at *11. A Rule 56 motion must dispose of an entire cause of action, and Defendants cannot ask this Court to make factual determinations on the existence or sufficiency of *some* specific agreements. Defendants also deliberately include irrelevant information as a presumed intent to confuse the Court on the issue of the Defendants' interference.

As an example of Banman's red herrings, Sharp did ***not*** testify that none of Skye's customers have breached contracts – he testified that Skye has not filed lawsuits against any of its customers. [PF 689] Skye had valid oral and implied contracts with twenty-six customers at issue in this lawsuit. [PF 693.] In addition, there is clear evidence that the Defendants intentionally interfered with Plaintiffs' valid agreements. [PF 450, 465, 478, 479, 493, 494, 519-523, 530-537, 554-562, 570-573, 575-576, 578-588, 593, 591, 594-595, 610-612, 643-647, 649, 651-653, 661, 680, 682-684, 717]

There are in a myriad of examples of Defendants interference, including that Maria Carey was under an exclusivity agreement with Skye, as well as a confidentiality agreement with Skye to keep confidential "pricing information", "marketing materials", and "end-users" and would "not use in any way for [her] own account" or "the account of a third party", when she signed an agreement with CTM and conspired with Banman to "switch" Dr. Schlifka. [PF 493, 494, 588.] Banman intentionally induced the breach of Carey's agreement with Skye.

Seoane was also under a confidentiality agreement with Plaintiffs when he joined CTM. [PF 683-684.] But Seoane downloaded Skye's sales representative database information and uploaded it into CTM's database for CTM to use to the detriment of Skye. [PF 672-674] Banman never instructed Seoane *not* to do this, and induced Seoane to breach his agreement with Skye. [PF 673]

Stumpe's contractual obligations to Skye had not expired when his misconduct transpired. The confidentiality clause in his agreement extends five years after the alleged "termination" of the agreement, which, according to Stumpe's argument, would place expiration in January 2022. The evidence is also clear that Stumpe continued operating under an implied agreement with Skye for years after his original agreement allegedly expired. Stumpe testified that he was still selling for Skye after Banman had started CTM, that he signed a Unit Appreciation Agreement with Skye in July 2018, and that he intentionally concealed his relationship with CTM from Skye to maintain the appearance that he was still working under his Skye Agreement – all showing that an implied agreement continued to exist between the parties. [PF 476, 547, 550-551, 553, 573, 580, 652, 680, 681, 694] At Banman's direction, Stumpe then disclosed Skye's trade secret customer information and pricing and sales representative information to Banman, Boulais and Seoane, and misappropriated Skye's trade secrets in furtherance of the conspiracy to divert Skye's business to CTM. [PF 556, 558-565, 579, 581-583] Banman intentionally induced Stumpe to breach his agreement with Skye.

The Defendants are improperly asking this Court to make factual determinations on the existence of a handful of agreements or on the issue of breach. Defendants' arguments regarding Plaintiffs' interference with contract cause of action must be denied.

92                    Case No.: 2:20-cv-03444-MEMF-PVC
JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

**DEFENDANTS' REPLY:**

**A.    Rule 56 permits partial summary judgment on portions of a claim**

Plaintiffs' argument that Defendants are improperly seeking summary judgment on an element or portion of a claim is incorrect. *See supra* Defendants' Reply to Point II, Subsection 2.

**B.    Plaintiffs do not oppose many of Defendants' arguments**

Plaintiffs do not oppose dismissal of the research physician interference claims. They do not oppose dismissal of the interference claims concerning Dr. Schlifka, Dr. Anderson, and Rogers/VMD. Plaintiffs do not oppose dismissal of their interference claims concerning B.J. Benik, Jeremy Smith, and Dean Conway. They do not dispute that CTM has never done business with many of the customers, doctors, and independent sales representatives with whom Plaintiffs allege interference and do not oppose dismissal of those claims. Thus, these claims must be dismissed.

**C.    There is no evidence of breach or disruption of any customer contract**

The customer interference claims must also be dismissed for at least three reasons.

First, Plaintiffs misrepresent Sharp's testimony. He testified that Skye is not alleging that any customer breached a contract with Skye. Fluskey Decl. Ex. 14 at 675:4-7 ("Q. Does Skye allege that any entity or individual on that list [Skye's customer interference list] has breached a contract with Skye? A. No."). The question and answer were not limited to written contracts. *Id.* Second, Plaintiffs concede that there has been no interference with any written customer contract. Instead, they claim, in conclusory fashion, that Plaintiffs had "valid oral and implied contracts" with customers. But Plaintiffs do not identify the purported ***terms*** of any oral or implied customer contract, which requires dismissal of this claim. *See UMG Recordings*, 117 F. Supp. 3d at 1115; *In re Centerstone Diamonds, Inc.*, 2014 WL 1330186, at *6 (Bankr. C.D. Cal. Apr. 2, 2014). Third, there is no evidence, and Plaintiffs point to none, that Banman and CTM were aware of the purported "oral and implied" contracts. *UMG Recordings*, 117 F. Supp. 3d at 1115. Plaintiffs also do not even attempt to establish that there has been an actual breach or disruption of any oral or implied contract. *Id.* Nor could they. It is undisputed that no Skye customer was required to purchase products from Skye or prohibited from purchasing products from CTM. SOF 193-194. There could be no breach or disruption.

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

**D.**    **Plaintiffs' arguments concerning Seoane, Carey, and Stumpe should be rejected**

Plaintiffs' argument concerning Seoane is illogical. They claim that Banman induced Seoane into breaching his confidentiality agreement because Banman did not instruct Seoane not to breach that agreement. Not instructing someone not to breach a contract is not an intentional act designed to induce a breach of that contract. In any event, the evidence proves that Banman did instruct Seoane not to use any Skye/HRT information in working with CTM. SOF 244.

Plaintiffs misrepresent Carey's testimony. Banman did not ask Carey to distribute products for CTM instead of Skye (SOF 222-224), as Plaintiffs claim. SOF 494. Carey testified that Banman told her he was considering moving on from Skye. She did not testify that Banman asked her to distribute CTM products instead of Skye products. Saba Decl. Ex. 31 at 148:14-24. That is not intentional interference with Carey's contract with Skye. As Carey put it, "That's called free enterprise." *Id.* at 148:21-22. Plaintiffs identify no evidence that Banman induced Carey to disclose any of Skye's confidential information. Further, it is undisputed that neither Carey nor her company, IMS, ever sold a single CTM product. SOF 226. So Plaintiffs have no damages. Plaintiffs' argument that Banman directed Stumpe to disclose Skye's trade secret information is contrary to the evidence. Plaintiffs cite SOF 556, 558-565, 579, 581-583. But none of the evidence cited in those paragraphs concerns Banman directing Stumpe to do anything, let alone disclose trade secret information.

**DEFENDANTS' PORTION:**

**VII.    Plaintiffs' claim for tortious interference with prospective economic advantage (Count IX) fails.[22]**

**A.    The undisputed facts disprove "independently wrongful" acts.**

A claim for tortious interference with prospective economic advantage requires a plaintiff to plead and prove: (1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional, wrongful acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff

---

[22]    Plaintiffs assert Count IX against CTM, CTM Med, Banman, Stumpe, and Seoane (the "Count IX Defendants"). All Count IX Defendants join this Section. To the extent that certain arguments within this Section are raised only on behalf of a specific defendant(s), the sub-headings so indicate.

proximately caused by the acts of the defendant. *See Honey Bum, LLC v. Fashion Nova, Inc.*, 2022 WL 385185, at *4 (C.D. Cal. Jan. 6, 2022). A plaintiff must establish that that the defendant's interference was independently wrongful "by some measure beyond the fact of the interference itself." *Beaulieu Group, LLC*, 2016 WL 7626471, at *16. An act is independently wrongful if it is prohibited by some constitutional, statutory, regulatory, common law, or other determinable legal standard. *Honey Bum, LLC*, 2022 WL 385185, at *4.

The only independently wrongful conduct alleged by Plaintiffs is trade secret misappropriation, which they have failed to establish as a matter of law, as set forth above. Accordingly, Plaintiffs have failed to prove any independently wrongful acts by the CTM Defendants, and their claim for tortious interference with prospective economic advantage should be dismissed. *See Honey Bum, LLC*, 2022 WL 385185, at *4.

To the extent the Court does not dismiss this claim entirely (it should), this claim must be dismissed to the same extent and for the same reasons as Plaintiffs' tortious interference with contract claim. Specifically, there has been no actual disruption of Plaintiffs' relationships with their customers and research physicians, and no actual disruption of Plaintiffs' relationships with a majority of the independent sales representatives with which Plaintiffs allege interference. *See supra.*

## PLAINTIFFS' PORTION:

Defendants yet again improperly attempt to dispose an element of Plaintiffs' claim. Nevertheless, Plaintiffs sufficiently establish Defendants' wrongful acts independent of the interference itself as follows: Defendants stole, misappropriated, took, carried away, concealed, copied, duplicated, downloaded, uploaded, replicated, transmitted delivered, sent, communicated, and possessed Skye/HRT's trade secret information in violation of 18 U.S.C.A. §1832(a)(1)-(3) as stated in Plaintiffs' predicate acts above, and further conspired to commit the foregoing offenses in violation of 18 U.S.C.A. 1832(1)(5). [PF 362, 372, 376-378, 481, 491, 493-494, 537, 539-540, 558-567, 564-604, 607-608, 610-612, 614-616, 619, 622-641, 643-645, 667-668, 672-674, 682, 686, 688] Defendants misappropriated Plaintiffs' trade secret in violation of the DTSA. [PF 479-482, 493-494, 519-521, 532, 535, 537-538, 539-542, 554-565, 569-573, 578-579, 583-590, 595-597, 610-612, 616, 623-629, 631-632, 644-655, 672-674, 680, 682, 685] Further, Banman breached his contracts with

Skye/HRT by stealing and misappropriating Skye/HRT's trade secrets. [PF 479, 481, 493-494, 516, 520-526, 539-540, 554-555, 557, 565-567, 569, 574-577, 579, 581-582, 584-585, 588, 589, 590, 592, 595-597, 599-601, 603-604, 606-612, 614-616, 619-642, 659, 661, 675-676, 681] Banman also breached his fiduciary duty and duty of loyalty to Skye.[23] [PF 479-481, 493-494, 520-521, 539-542, 554-555, 563-567, 569, 578-579, 584-590, 595-597, 610-612, 616, 623-628, 631-632, 685]

All the foregoing acts were committed intentionally by the Defendants to divert sales from Skye to CTM and disrupt Plaintiffs' relationships causing economic loss to Plaintiffs' business.

**DEFENDANTS' REPLY:**

Again, Plaintiffs' procedural argument is incorrect based on the plain language of Rule 56(a). *See supra* Defendants' Reply to Point II, Subsection 2. Aside from that, Plaintiffs confirm the only independently wrongful conduct they claim is trade secret misappropriation. Because Plaintiffs have failed to establish that Defendants engaged in trade secret misappropriation as a matter of law, there is no evidence of any independently wrongful conduct.[24] This claim should be dismissed.

**DEFENDANTS' PORTION:**

**B.      Trade secret law preempts the interference claim.**

In response to written discovery regarding any of Skye's prospective economic advantages that Stumpe allegedly interfered with, Skye resorted to parroting its allegations of trade secret misappropriation, which means that both claims are based upon the same factual nexus.  (SUF, 332.) Skye claims that Stumpe used Skye's "trade secrets" to direct Skye's business to CTM, and to convince Skye's sales representatives to leave Skye for CTM.  (*Id.*)  These are the identical grounds upon which Skye's trade secret claim is based.

Trade secret law preempts non-contractual civil claims that are "based on the same nucleus of facts" as the misappropriation claim.  *K.C. Multimedia, Inc. v. Bank of America Technology &*

---

[23]/ Although not at issue in this motion, Breach of Fiduciary Duty and Breach of Duty of Loyalty are alleged by Skye against Banman in the Fourth Amended Complaint.

[24]   A breach of contract cannot be an "independently wrongful" act to support a tortious interference with prospective economic advantage claim. *See First Advantage Background Serv. Corp. v. Private Eyes, Inc.*, 2007 WL 2572191, *2 (N.D.Cal. Sep. 5, 2007); *VCL Comm. GmbH v. Crystal Sky, LLC*, 2009 WL 10671634, * 9 (C.D. Cal. Sep. 22, 2009).

*Operations, Inc.*, 171 Cal. App. 4th 939, 956-62 (2009). The allegations of the operative complaint are used to make such a preemption analysis. *Id*. In *K.C. Multimedia*, the Court found that the legislature intended that state trade secret law would occupy the field with regard to common law trade secret misappropriation claims. *Id*. at 954; *see also* Civ. Code ¶ 3426.7(b). State trade secret law therefore "provides the exclusive civil remedy for conduct falling within its terms..." *Silvaco Data Systems v. Intel Corp.*, 184 Cal. App. 4th 210, 236 (2010) (overruled on other grounds in *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011).)

To determine whether causes of action share a common nucleus of facts, a court must focus on the "factual predicate for the claim" and look to the "conduct at the heart" of the claim." *K.C. Multimedia*, 171 Cal. App. 4th at 960. If the "gravamen of the wrongful conduct asserted... is the misappropriation of trade secrets," then the claimed conduct derives from "the same nucleus of facts" as the trade secret claim, and the claim is preempted. *Id*. at 961. In *K.C. Multimedia*, the Court specifically held that the UTSA preempted claims for intentional interference with contract and violation of Bus. & Prof. Code Section 17200 et. seq. *Id*. at 958-962.

***These preemption principles remain in effect even if a plaintiff elects to solely bring a DTSA claim because "DTSA shall not preempt any state law remedy and CUTSA serves as the sole remedy for the misappropriation of trade secrets under California state law."*** *McCandless Grp., LLC v. Coy Collective, Inc.*, No. 221CV02069DOCKES, 2022 WL 2167686, at *5 (C.D. Cal. Feb. 14, 2022) (emphasis added). ***Accordingly, a plaintiff "cannot circumvent CUTSA preemption by asserting a claim under DTSA."*** *Id*. (emphasis added); s*ee also Agile Sourcing v. Dempsey*, No. EDCV 21-773, 2021 U.S. Dist. LEXIS 204631, at *22 (C.D. Cal. July 15, 2021) (***Although filing under DTSA, "[t]he fact that Plaintiff has chosen not to plead a violation of CUTSA does not change the law's preemptive effect on its tort claims."***)

For these reasons, Skye's interference with prospective economic advantage claim must be examined as a claim for the misappropriation of trade secrets and fails for the reasons explained above. (*See* Sections IV(C)(2-3).)

**PLAINTIFF'S PORTION:**

Stumpe's preemption argument fails for two reasons. First, and most importantly, preemption

is a "matter constituting an avoidance" and thus must be raised as an affirmative defense or is waived. *Kennan v. Dow Chem. Co.*, 717 F.Supp. 799, 807-809 (MD FL 1989); FRCP 8(c). Stumpe did not raise preemption as an affirmative defense in his Answer. [PF 697] Thus, Stumpe has waived any preemption argument.

Second, the plain and unambiguous reading of the DTSA preemption clause provides that the DTSA will not act to bar available remedies to a plaintiff: "this chapter shall not be construed to preempt or displace **any other remedies**, whether civil or criminal, **provided by United States Federal**, **State**, … law for the misappropriation of a trade secret". 18 U.S.C.A. §1838 (bold emphasis added). The plain, unambiguous reading of the statute, in other words, is that the DTSA is ***not intended to preempt*** "any other remedies" for trade secret misappropriation, and Stumpe relies on non-precedential opinions in support of his preemption argument, and those opinions contravene the plain reading of the DTSA statute and intent and should not be followed. The CUTSA is not a "remedy", but a mechanism for providing a remedy (i.e., damages). *See*, Cal. Civ. Code § 3426.3 (damages under the CUTSA). The DTSA was created to protect American businesses against the misappropriation of trade secrets in the context of "interstate or foreign commerce", like Skye and HRT. 18 U.S.C.A. §1836(b)(1). Thus, all available ***remedies*** under Federal and State law are available to these Plaintiffs.

**<u>DEFENDANTS' REPLY:</u>**

> **1.    Preemption Defense Need Not Be Raised <u>by Answer, and Plaintiffs Misread the DTSA</u>**

As an initial matter, Plaintiffs' presented authority regarding the waiver of a preemption defense is not from this circuit, and thus is not binding.  In fact, as discussed below, a preemption defense in our circuit is *not* subject to waiver.. *Fast Access Specialty Therapeutics, LLC v. UnitedHealth Grp., Inc.*, 532 F. Supp. 3d 956, 962 (S.D. Cal. 2021).  Moreover, Rule 12(h)(1) expressly states that the only defenses subject to waiver under Rule 12(h)(1)(B), which concerns the failure to raise a defense in a responsive pleading, are those listed in Rule 12(b)(2)-(5), i.e. lack of personal jurisdiction, improper venue, insufficient process, and insufficient service of process.  Any other defense, especially one regarding "the failure to state a claim," which is the situation here, may be raised:  "(A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c)

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

[for judgment on the pleadings]; or (C) at trial." Rule 12(h)(2).

Indeed, a preemption defense may properly be raised in a motion for judgment on the pleadings, or at trial, so there is no doubt it can be raised here. *Fast Access Specialty Therapeutics, LLC v. UnitedHealth Grp., Inc.*, 532 F. Supp. 3d at 962; *see Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1175 (C.D. Cal. 2011) (invoking the "substantial amount" of caselaw allowing successive Rule 12(b)(6) motions where the motions have not been filed for the purpose of delay, where entertaining the motion would expedite the case, and where the motion would narrow the issues involved); *Yumul v. Smart Balance, Inc.*, No. CV 10-00927 MMM, 2011 WL 1045555, at *5 (C.D. Cal. Mar. 14, 2011) (finding that a preemption defense can be raised anytime); *see also CollegeSource, Inc. v. AcademyOne, Inc.*, No. 08CV1987-GPC (MDD), 2015 WL 5638104, at *20 (S.D. Cal. Sept. 24, 2015) ("[T]he legal standard to allow an affirmative defense of preemption is liberal."), aff'd, 709 F. App'x 440 (9th Cir. 2017). Therefore, Stumpe has not waived such argument.

Moreover, Plaintiff has misconstrued both Stumpe's argument and the applicable law. Stumpe is not arguing that the DTSA is preempting any other law, such that the DTSA's language where it "shall not be construed to preempt or displace any other remedies, whether civil or criminal, provided by United States Federal, State, … law for the misappropriation of a trade secret" (18 U.S.C.A. §1838) becomes relevant. Stumpe's argument is that it is the ***CUTSA*** that preempts the DTSA—a principle that is not inconsistent with the language of the DTSA, which solely states that the DTSA cannot preempt or displace any other law, but not that other law cannot preempt it. In fact, the authority that Stumpe presented is clear that the DTSA's non-preemption language allows the CUTSA's preemption principles to remain in effect if a plaintiff decides to only assert a DTSA claim, which is the case here. *McCandless Grp., LLC v. Coy Collective, Inc.*, No. 221CV02069DOCKES, 2022 WL 2167686, at *5 (C.D. Cal. Feb. 14, 2022). The fact is that Plaintiffs cannot avoid the CUTSA preempting all of their claims based on trade secret misappropriation by solely bringing a DTSA claim, and they have presented no authority to the contrary besides the very language of the DTSA that enables such CUTSA preemption.

**DEFENDANTS' PORTION:**

**C.     HRT admits it has no viable claim for intentional interference
with prospective economic advantage against Stumpe**

Count IX of the FAC has been brought by both Plaintiffs against Stumpe.  (FAC, ¶¶ 240-249.) As with its trade secret claims, however, HRT expressly admitted in verified discovery responses that Stumpe did not interfere with any of its alleged contracts or alleged economic advantages.  (SUF, 334-336.)  These admissions are dispositive of HRT's claim for intentional interference against Stumpe. Moreover, because trade secret law preempts the interference claim, as explained above, the admitted failure of HRT's trade secret misappropriation claim against Stumpe (*See* Section II(D)(6), above) is fatal to the subject claim as well.

**PLAINTIFFS' PORTION:**

Plaintiff HRT voluntarily dismisses Count IX against Stumpe only.

**DEFENDANTS' REPLY:**

Plaintiff's voluntary dismissal of Count IX against Stumpe disposes of this claim.  It must also be noted that all other claims against Stumpe by HRT should be dismissed as well, given that HRT has admitted in its verified discovery responses that Stumpe did not engage in any of the conduct that HRT alleged he did, including trade secret misappropriation.  (SUF, 334-338.)  Stumpe respectfully requests that the Court enter an Order dismissing these claims against Stumpe.

**DEFENDANTS' PORTION:**

**VIII.  Plaintiffs are foreclosed from seeking certain remedies against Stumpe.**

Plaintiffs are foreclosed from seeking certain remedies against Stumpe from both a contractual standpoint and a legal standpoint.  First, "[u]nder California law, parties may agree by their contract to the limitation of their liability in the event of a breach."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 319 F. Supp. 2d 1040, 1048 (C.D. Cal. 2003).  "[W]here parties agree to a limitation of damages provision, courts should not alter the bargained-for risk allocation unless a breach of contract is so fundamental that it causes a loss which is not part of that allocation."  *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 547 (9th Cir. 1985).  As mentioned above, the parties bargained away their right to seek "special, indirect, consequential, exemplary or incidental damages" from one another.  (SUF,

302-303.) This includes, for example, Skye's alleged lost profits as a consequence of customers no longer doing business with Skye. This includes any other special or incidental damage (costs to replace Banman or others, for instance). And this includes exemplary damages. Skye is bound by the terms of the agreements it entered into.

Second, Plaintiffs also seek punitive damages and attorney's fees through their claims for violation of RICO, conspiracy to violate RICO, trade secret misappropriation, conversion and intentional interference with prospective economic advantage against Stumpe. (FAC, ¶¶ 181, 187, 202, 224, 249.) Even assuming for the sake of argument that such claims are supported by material evidence (which they are not), Plaintiffs have failed to comply with the whistleblower notice requirements of the DTSA,[25] and did not properly plead entitlement to punitive damages in their operative complaint for the conversion claim.

Under the DTSA, an employer must have provided written notice to its "employees" of the DTSA's whistleblower protections before it may recover exemplary damages and attorney's fees for trade secret misappropriation. 18 U.S.C. § 1833(b). *Quintara Biosciences, Inc. v. Ruifeng Biztech Inc.*, No. C 20-04808 WHA, 2020 WL 7260510, at *1 (N.D. Cal. Dec. 10, 2020). The term "employee" includes any individual performing work as a contractor or consultant for an employer. 18 U.S.C.A. § 1833(b)(4). If an employer does not comply with the notice requirement in subparagraph (A), the employer may not be awarded exemplary damages or attorney fees under subparagraph (C) or (D) of section 1836(b)(3) in an action against an "employee" to whom notice was not provided. 18 U.S.C.A. § 1833(b)(3)(C).

Here, Stumpe, as an employee of Novus and Silenda, worked to sell Skye products through the operative representative agreements that Novus and Silenda had with Skye. (SUF, 302-303.) At no time during these entities' relationship with Skye did Skye provide anyone at Novus or Silenda with whistleblower notice as required under the DTSA. (SUF, 349.) Plaintiffs may argue that because Skye's agreements with Novus and Silenda pre-date the May 12, 2016 enactment of the DTSA, the

---

[25] This applies to both of Plaintiffs' claims for trade secret misappropriation and intentional interference with prospective economic advantage claim because the latter is based upon the same nucleus of operative facts as the former.

whistleblower rule does not apply.  However, both agreements had a term of two years, meaning that new agreements should have been created on or after January 26, 2017 and March 20, 2018, respectively, but were not.  (SUF, 302-303.)  There is no evidence that Plaintiffs provided either Novus or Silenda with any whistleblower notice on or after these dates either.  (SUF, 349.)

Worse for Plaintiffs, they claim that Stumpe is *individually* responsible under the DTSA (FAC, ¶¶ 188-202).  Therefore, taking Novus and Silenda out of the equation, Plaintiffs never provided Stumpe *individually* with any such DTSA notice.  (SUF, 349.)  This means that Plaintiffs waived their right to punitive damages and/or attorney fees on any claim relating to the DTSA.  Indeed, this failure also forecloses Plaintiffs' entitlement to exemplary damages and attorney's fees under their RICO claims because the DTSA is the predicate act to the alleged RICO violation.  A plaintiff cannot circumvent a clear *statutory* requirement that Congress implemented in the DTSA by asserting a RICO claim instead.  If this were permitted, then all employers who failed to provide written notice to employees or independent contractors of the DTSA's whistleblower protections could bring claims in the form of a RICO cause of action to "fix their mistake" and circumvent the statutory requirements. This was not what Congress intended when making the notice requirement part of the DTSA statute. The law is clear that parties must abide by the requirements of the underlying predicate act when bringing a RICO claim.  For example, in the Ninth Circuit, a plaintiff seeking to plead a RICO claim based on a predicate act of fraud must comply with the pleading requirements for fraud under Rule 9(b).  *Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1253 (N.D. Cal. 2014); *International Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 152-154 (4th Cir. 1987) (plaintiff could not circumvent the standing requirements of the federal securities laws by bringing a RICO action based on predicate acts of securities fraud that it could not assert on its own behalf.)

Finally, the lack of DTSA whistleblower notice also affects Plaintiffs' common law tort claim for intentional interference with prospective economic advantage, which is premised on trade secret theft, given that all those claims arise out of the same nucleus of operative facts as the DTSA claims, and are therefore preempted by the DTSA claims, making punitive damages unavailable through this avenue as well.  *K.C. Multimedia,* 171 Cal. App. 4th at 958 (The California Uniform Trade Secrets Act ("CUTSA") serves as the sole remedy for the misappropriation of trade secrets under California

state law, preempting common law claims that are "based on the same nucleus of facts as the misappropriation of trade secrets claim for relief.")

Finally, with respect to their allegations of conversion against Stumpe (even if it is not contractually barred [which it is]), Plaintiffs are required by statute to plead alleged "oppression, fraud, or malice" in order to properly claim punitive damages. *Coll. Hosp. Inc. v. Superior Ct.*, 8 Cal. 4th 704, 712, 882 P.2d 894, 898 (1994); California Civil Code § 3294(a). (FAC, ¶¶ 225-232.) Plaintiffs failed to do so in the conversion claim. This is presumably not an oversight, as the preceding cause of action for conversion against defendants CTM, CTM Medical and Banman includes such allegations. (FAC, ¶ 224.)

**PLAINTIFFS' PORTION:**

Stumpe is again improperly trying to obtain partial summary judgment on a part of an element of a claim. *Franklin-Mason v. Penn, supra,* 259 F.R.D. at 11 (D.D.C. 2009) ("a party may not file a motion for partial summary judgment on a fact or an element of a claim"); *Collins v. Cottrell Contracting Corp.,* 733 F.Supp.2d 690, 697–98, (E.D.N.C. 2010) ("a number of courts have concluded that a motion for summary judgment may not properly seek to dispose of only a factual allegation or element of a single indivisible claim for relief"). Partial summary judgment must dispose of an entire count in the complaint.

Notwithstanding the above, Stumpe's reading of the law is incorrect. The notice requirement under 18 USCA §1833 does not apply to any employees or independent contractors that signed a contract prior to May 11, 2016, the date the statute was enacted and became effective. 18 USCA §1833(b)(3)(D) ("This paragraph shall apply to contracts and agreements that are entered into or updated after the date of enactment of this subsection"). Stumpe entered his representative agreement, containing confidentiality provisions, before May 11, 2016. [PF 476-477] This agreement was never updated. Therefore, the whistleblower notice requirements do not apply.

Moreover, there is no authority supporting Stumpe's argument that Plaintiffs are not entitled to punitive damages for counts other than DTSA, because punitive damages are permitted under RICO. *Alexander v. Wessell*, 742 Fed.Appx. 216, 217-218 (9th Cir. 2018).; *Neibel v. Trans World Assur. Co.*, 108 F.3d 1123, 1131 (9th Cir. 1997) ("a plaintiff may receive both treble damages under

RICO and state law punitive damages for the same course of conduct"); *Al–Kazemi v. General Acceptance & Investment Corp., supra,* 633 F.Supp. at 543–44 (permitting a punitive damage award in addition to a RICO treble damage award); *Com-Tech Associates v. Competer Associates Intern., Inc.,* 753 F. Supp. 1078, 1093 (E.D. NY 1990) (motion to strike punitive damage remedy from RICO count denied, stating "a claim for punitive damages should be permitted to stand, especially since the Supreme Court has held that civil RICO is primarily remedial in nature and only secondarily punitive," citing to *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987)).

Finally, as stated above, Plaintiffs' state law claims for interference are not preempted. Plaintiffs have set forth sufficient facts to show malice on Stumpe's part in that he was part of a conspiracy to steal and use Plaintiffs' trade secrets - all while telling Banman, about Skye: "Fuck em. I'm done with them."  [PF 656]

**DEFENDANTS' REPLY:**

### A.    Plaintiffs' Damage Allegations Against Stumpe Lack Merit.

First, as discussed above, summary judgment is unquestionably permissible on parts of a claim. *See, e.g.*, *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d at 191; *Ochoa v. McDonald's Corp.*, 133 F. Supp. 3d at 1232; Fed. R. Civ. P. 56(a).

Second, Plaintiffs fail to address the fact that they omitted allegations of oppression, fraud, or malice against Stumpe in their conversion claim; therefore, they concede that they have failed to establish any claim for punitive damages with respect to such claim.  The law is clear that a plaintiff must allege specific facts showing that the defendant's conduct was oppressive, fraudulent or malicious, for example that defendant acted with the intent to inflict great bodily harm on a plaintiff or to destroy a plaintiff's property or reputation.  *Smith v. Sup.Ct. (Bucher)*, 10 Cal. App. 4th 1033, 1041-1042 (1992); *Anschutz Entertainment Group, Inc. v. Snepp*, 171 Cal. App. 4th 598, 643 (2009) (allegations that defendant's conduct was intentional, willful, malicious, performed with ill will toward plaintiffs and in conscious disregard of plaintiffs' rights did not satisfy specific pleading requirement).  Plaintiffs point to no specific allegations in their operative complaint establishing any such requisite conduct by Stumpe, and once again, the fact that the preceding cause of action for conversion against defendants CTM, CTM Medical and Banman includes allegations of oppression, fraud and malice

(FAC, ¶ 224) shows that Plaintiffs are aware of the lack of merit of their punitive damages claims against Stumpe. Plaintiffs' isolated and ambiguous quote attributed to Stumpe that includes no context has no bearing upon whether or not they properly pled entitlement to punitive damages in their conversion claim, and must be ignored.

Third, Plaintiffs have made an argument in opposition that Stumpe already addressed and rendered moot. Skye's representative agreement with Novus does pre-date the May 12, 2016 enactment of the DTSA, but this agreement only had a term of two years, meaning that it expired on January 26, 2017. (SUF, 302.) Plaintiffs expressly admit in their own opposition to this motion that "The evidence is also clear that **Stumpe** continued operating under an implied agreement with Skye for years after his original agreement allegedly expired." (*See* Plaintiffs' opposition to Section IV of this Motion.) (Emphasis added.) This suggests that a new agreement with a different party—Stumpe, not Novus—was created by implication. The relevant time period underlying Plaintiffs' allegations also solely falls after the expiry of the agreement with Novus and during the alleged implied agreement with Stumpe. (Fourth Amended Complaint, (ECF 130) ¶ 116.) However, Plaintiffs do not have any evidence that they provided Stumpe, Novus or Silenda with any whistleblower notice on or after this date. (SUF, 349.) In fact, Plaintiffs admit that their failure to provide Stumpe, Novus or Silenda with any whistleblower notice is undisputed. There can thus be no doubt that Plaintiffs waived their right to punitive damages and/or attorney fees on any claim relating to the DTSA.

Fourth, once again, Plaintiffs are not entitled to exemplary damages and attorney's fees under their RICO claims because the DTSA is the predicate act to the alleged RICO violation. All of the authority Plaintiffs present above only shows that such damages are permitted **in general**, but does not address a situation where a DTSA claim is involved. In this situation, clear statutory requirements cannot be circumvented through RICO. *See Mohebbi v. Khazen*, 50 F. Supp. 3d 1234, 1253 (N.D. Cal. 2014); *International Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 152-154 (4th Cir. 1987) (Both cases examined in Stumpe's moving portion.)

Fifth, Plaintiffs' state law claims are preempted by CUTSA, as explained above.

**DEFENDANTS' PORTION:**

**IX.    Plaintiffs' claims against Stumpe are misplaced**

Finally, there is no basis for Plaintiffs to sue Stumpe at all.  Plaintiffs brought all of their causes of action against *Stumpe* in his individual capacity, despite Skye's only relationship with Stumpe arising out of its contractual relationship with Novus and Silenda (through fully integrated agreements), entities which Stumpe was an employee of during all times that he sold Skye's products. Under the doctrine of *respondeat superior,* the *employer* is liable for the alleged torts committed by its employee in the course and scope of the employment.  *Goldsmith v. CVS Pharmacy, Inc.*, No. CV 20-00750-AB (JCX), 2020 WL 1650750, at *5 (C.D. Cal. Apr. 3, 2020).  The employer shall be held liable under this doctrine regardless of whether or not the employer was an active participant.  *Coble v. United States*, 335 F. Supp. 49, 51 (C.D. Cal. 1971).  Stumpe has only dealt with Skye as an employee of Novus and Silenda.  (SUF, 306-307, 314, 326.)  Stumpe never had any dealings whatsoever with HRT.  (SUF, 315.)

Despite this, Plaintiffs' filed violation of RICO and conspiracy claims against *Stumpe* on the basis of the alleged "directing SKYE/HRT's business to CTM,"  (FAC, ¶¶ 165-167); their misappropriation of trade secrets claim is based upon *Stumpe's* alleged acquisition of such trade secrets (FAC, ¶ 193); their conversion claim stems from inventory sent to customers that *Stumpe* worked with; and the tortious interference with prospective economic advantage claim originates from *Stumpe's* alleged awareness of Plaintiffs' business relationships.  (FAC, ¶¶ 241-242.)

All of these allegations speak to a relationship that Plaintiffs (actually, Skye alone) had with Novus and Silenda—and not Stumpe.  Likewise, the inventory that was allegedly converted by *Stumpe* was product sent to facilities allegedly on behalf of *Silenda*, pursuant to the terms of the agreement that Skye had with Silenda.  (SUF, 339.)

**PLAINTIFFS' PORTION:**

Stumpe's argument that Plaintiffs' causes of action against Stumpe arise out of his contractual relationship is misguided. Plaintiffs brought suit against Stumpe for RICO, DTSA, tortious interference with contract, tortious interference with prospective economic advantage, and conversion, none of which require the existence of a contractual relationship between Stumpe and Plaintiffs.

JOINT BRIEF ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

Further, a corporate officer who participates in the commission of a tort may be held individually liable. *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F.Supp.3d 552, 670 (N.D.Cal. 2020).

**DEFENDANTS' REPLY:**

### A.    Claims Against Stumpe are Misguided

Stumpe is not arguing that any of Plaintiffs' claims against Stumpe **require** pleading a contractual relationship. The contractual relationships between Novus and Skye, and Silenda and Skye, are relevant to illustrate how Skye and Stumpe became associated for the purposes of the claims that have been brought against Stumpe as an employee and representative of Novus and Silenda. Such claims fail as a matter of law because all of Stumpe's conduct that is allegedly tortious was carried out while he was ***acting solely within his capacity as an employee and representative of Novus or Silenda***. (SUF, 306-307, 314, 326.) For this reason, only Novus or Silenda would be held liable if Plaintiffs' claims are in fact viable (they are not) subject to the terms of the parties' contractual relationships. *Coble v. United States*, 335 F. Supp. 49, 51 (C.D. Cal. 1971).

That Stumpe is a corporate officer of either Novus or Silenda is of no consequence. Even if this were a valid argument, Plaintiffs should have still brought these claims against the entities through which the relationship was created, per *Coble* and *Goldsmith*. Stumpe was at all relevant times a representative of Novus and Silenda, and cannot be held responsible for actions taken in that capacity.

### DEFENDANTS' CONCLUSION

For the reasons set forth above, this Court should grant Defendants' motions for summary judgment.

### PLAINTIFFS' CONCLUSION

Plaintiff requests the motion be denied except as stated as unopposed herein.

DATED:  December 19, 2022                **HODGSON RUSS LLP**


By:    s/ Robert J. Fluskey, Jr.
       Robert J. Fluskey, Jr., Esq.
       Ryan K. Cummings, Esq.
       Matthew K. Parker, Esq.
       Attorneys for Defendants
       CTM Biomedical, LLC,
       Bryan Banman, CTM Medical, Inc.,
       and Pablo Seoane


DATED:  December 19, 2022                **BLANK ROME LLP**


By:    s/ Arash Beral
       Arash Beral, Esq.
       Saam Takaloo, Esq.
       Attorneys for Defendant
       Mike Stumpe


DATED:  December 19, 2022                **BIENERT KATZMAN LITTRELL
                                         WILLIAMS, LLP**


By:    s/ Michael R. William
       Michael R. Williams, Esq.
       Carlos A. Nevarez, Esq.
       Attorneys for Defendant
       Nathan Boulais


DATED:  December 19, 2022                ROSEN ◇ SABA, LLP


By:    /s Ryan D. Saba
       Ryan D. Saba, Esq.
       Laura Kelly St. Martin, Esq.
       Attorneys for Plaintiffs