# EXHIBIT B

Paul T. Martin (SBN 155367)
    *pmartin@hgla.com*
Thomas H. Case (SBN 116660)
    *tcase@hgla.com*
HENNELLY & GROSSFELD LLP
4640 Admiralty Way, Suite 850
Marina del Rey, CA  90292
Telephone:  (310) 305-2100
Facsimile:   (210) 305-2116

Robert J. Fluskey, Jr. *(pro hac vice)*
    *rfluskey@hodgsonruss.com*
Ryan K. Cummings *(pro hac vice)*
    *rcumming@hodgsonruss.com*
Matthew K. Parker *(pro hac vice)*
    *mparker@hodgsonruss.com*
HODGSON RUSS LLP
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
Telephone:  (716) 856-4000
Facsimile:   (716) 849-0349

Attorneys for Defendants
CTM Biomedical, LLC, Bryan Banman,
CTM Medical, Inc., and Pablo Seoane

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company, <br><br>                                Plaintiffs,<br><br>vs.<br><br>CTM BIOMEDICAL, LLC, a Delaware Limited Corporation; BRYAN BANMAN, an individual; CTM MEDICAL INC., a Delaware Corporation; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; NATHAN BOULAIS, an individual; and DOES 3 through 10, inclusive,<br>                                Defendants. | Civil Case No.  2:20-cv-03444-MEMF (PVCx)<br><br><br>**JOINT APPENDIX OF UNDISPUTED AND DISPUTED FACTS AND CONCLUSIONS OF LAW ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**<br><br>Date:            February 9, 2023<br><br>Time:            10:00 a.m.<br><br>Courtroom:    8B |

1

**Additional Counsel:**

Arash Beral, Esq.
Saam Takaloo, Esq.
Blank Rome LLP
2029 Century Park East, 6th Floor
Los Angeles, CA 90067

Attorneys for Defendant Mike Stumpe

Michael R. Williams, Esq.
Carlos A. Nevarez, Esq.
Bienert Katzman Littrell Williams, LLP
903 Calle Amanecer, Suite 350
San Clemente, CA 02673

Attorneys for Defendant Nathan Boulais

Ryan D. Saba, Esq.
Laura St. Martin, Esq.
Rosen Saba, LLP
2301 Rosecrans Ave., Suite 3180
El Segundo, CA 90245

Attorneys for Plaintiffs

2

Pursuant to Local Rule of Civil Procedure 56-1 and this Court's Civil Standing Order, Section VIII(E), Defendants CTM Biomedical, LLC ("CTM"), Bryan Banman ("Banman"), CTM Medical, Inc. ("CTM Med"), and Pablo Seoane ("Seoane") (collectively, the "CTM Defendants"), Mike Stumpe ("Stumpe"), and Nathan Boulais ("Boulais"), and Plaintiffs' Skye Orthobiologics, LLC ("Skye") and Human Regenerative Technologies, LLC (HRT) (together, ("Plaintiffs")), hereby provide the following Joint Appendix of Undisputed and Disputed Facts and Conclusions of Law on Defendants' motions for summary judgment.

**I.      Defendants' Statements of Uncontroverted Facts**

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | **CTM Defendants' Statement of Uncontroverted Facts[1]** | | |
| **II.** | **The Parties and their Products** | | |
| 1. | Human Regenerative Technologies, LLC ("HRT") is in the business of processing and manufacturing medical products derived from human placental tissue.<br><br>Banman Decl. ¶ 10; Compl. ¶¶ 32-33; Fluskey Decl. Ex. 14 (Sharp Depo.) at 697:5-6 | Disputed to the effect that the products are categorized as "medical products."  HRT processes and manufactures membrane and particulate flowable products that are derived from human placental tissue.  Banman Decl. ¶ 10. | N/A[2] |

---

[1]   This Rule 56 Statement includes undisputed facts for all Defendants. The main headings of the document identify the defendant or defendant group that is proffering the facts.

[2]   Defendants only provide reply statements where necessary. Where not necessary, they indicate "N/A".

3

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| 2. | Skye Orthobiologics, LLC ("Skye") sells medical products derived from human placental tissue.<br><br>Banman Decl. ¶ 10; Compl. ¶ 33; Fluskey Decl. Ex. 15 (Chormann Depo.) 21:11-13 | Disputed to the effect that the products are categorized as "medical products."  Among other products, Skye sells various human tissue products, including membranes and flowable particulate products derived from human placental tissue.  Banman Decl. ¶ 10. | N/A |
| 3. | The placental products that Skye sells are processed and manufactured by HRT.<br><br>Banman Decl. ¶ 10; Compl. ¶ 32-33; Fluskey Decl. Ex. 14 (Sharp Depo.) at 197:14-20 | Undisputed. | N/A |
| 4. | Christopher Sharp is the Chief Executive Officer of HRT and Skye.<br><br>Banman Decl. ¶ 10; Fluskey Decl. Ex. 14 (Sharp Depo.) at 10:17-11:12 | Undisputed. | N/A |
| 5. | CTM sells, but does not manufacture, medical products derived from human placental tissue.<br><br>Banman Decl. ¶¶ 44, 45 | Objection.  The evidence cited in response to the evidence do not support the statement of evidence.  Banman's declaration does not say that "CTM does not manufacture medical products derived from human placental tissue." | There is no basis for Plaintiffs' objection. The paragraph cited in the Banman declaration states that CTM is a seller of medical products. It does not manufacture such products. Banman Decl. ¶¶ 44-45, 48-52; *see also* Banman Reply Decl. ¶ 52. |

4

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Disputed.  CTM products are manufactured through specific instructions to Alamo/Precision Allografts so that the products are made to CTM's specifications. [PF 622.] | |
| 6. | Bryan Banman is the President and CEO of CTM.

Banman Decl. ¶ 10 | Undisputed. However, this fact is not located at Banman Decl. ¶ 10, but rather at Banman Decl. ¶ 1. | N/A |
| 7. | Pablo Seoane is the National Director of Business Development for CTM.

Seoane Decl. ¶ 1 | Undisputed. | N/A |
| 8. | CTM Medical Inc. is the single member of CTM Biomedical LLC, and it is not an operating company.

Banman Decl. ¶ 44, n.1 | Undisputed. | N/A |
| 9. | Human placental tissue products can be manufactured and sold in multiple forms.

Banman Decl. ¶ 4 | Undisputed. | N/A |
| 10. | Three common forms of placental products are: (1) "membranes"; (2) flowable particulates (sometimes called "injectables"); and (3) particulates. | Undisputed. | N/A |

5

Case 2:20-cv-03444-MEMF-PVC     Document 211-2     Filed 12/19/22     Page 7 of 272
Page ID #:14893

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Banman Decl. ¶ 4 | | |
| 11. | Membrane products look similar to patches. They are used by physicians during medical procedures, including surgical and non-surgical treatments.<br><br>Banman Decl. ¶ 5 | Undisputed. | N/A |
| 12. | Flowable particulate products are particulated (*i.e.*, ground up or "morselized") placental tissue stored in liquid. They are administered by physicians through a syringe.<br><br>Banman Decl. ¶ 5 | Objection. Overbroad.<br><br>Generally undisputed.<br><br>However, the particulate does not have to be stored in liquid. The liquid can be added later before injection.<br><br>Report of John Lee (Declaration of John Lee Ex. 1) at p. 4 (Opinion #1) ("Prior to CTM's emergence in the marketplace, there was no other company in the United States that was manufacturing a connective tissue matrix flowable product using HRT's formula of premixed placental particulate matter with saline."); p. 16 (Opinion #9) ("Both CTM's and HRT's flowable products are non-dehydrated, sterile, ambient temperature shelf-stable, ready-to-use products. Other manufacturers were selling products that take valuable operating room time as they (1) needed to be mixed on-site; (2) are | There is no basis for any objection, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant quotations from an expert report are non-responsive and should be disregarded.<br><br>The comments quoted from that expert report are also wrong. *See* Declaration of Rouzbeh R. Taghizadeh, Ph.D.; Declaration of James H. Forsell, Ph.D. But the parties' expert reports are immaterial to the legal issues presented by Defendants on this motion. Defendants have only added their reports to the record out of an abundance of caution that any of the irrelevant, incorrect facts submitted by Plaintiffs might be deemed admitted. |

6

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | | frozen products that needed to be thawed before use; and (3) are expensive to ship on dry ice and cumbersome to store on site of the surgery center or hospital.") | |
| 13. | Particulate products are particulated placental tissue that are not stored in liquid.<br><br>Banman Decl. ¶ 5 | Undisputed. | N/A |
| 14. | The human placenta is typically described as consisting of three non-maternal components: amnion membrane; chorion membrane; and umbilical cord.<br><br>Banman Decl. ¶ 6 | Undisputed. | N/A |
| 15. | Membrane products, flowable particulates, and particulates can be comprised of amnion, chorion, or umbilical cord tissue, or some combination of all three components.<br><br>Banman Decl. ¶ 6 | Undisputed in theory. However, CTM and Skye/HRT do not manufacture or sell membrane products that are a "combination of all three components". | Plaintiffs should have simply stated "undisputed." Their additional commentary is non-responsive.  It is also false. HRT/Skye claim to sell a flowable particulate that includes a "formula of premixed placental particulate" that consists of all three placental components. *See* Opposition to SOF 16 below. |
| 16. | Numerous companies sell placental membrane and/or | Undisputed. | Plaintiffs' irrelevant commentary is non-responsive and should be |

7

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | flowable particulate products.<br><br>Banman Decl. ¶ 7, Ex. 1; Fluskey Decl. Ex. 18 (Andrews Depo.) at 344:10-13; Fluskey Decl. Ex. 15 (Chormann Depo.) at 116:16-24, 122:6-7; Fluskey Decl. Ex. 14 (Sharp Depo.) at 757:22-758:18 | However, those products differ from those manufactured by HRT.<br><br>[PF 372, 702]; Lee Rpt. (J. Lee Decl. Ex. 1) at p. 4 (Opinion #1) ("Prior to CTM's emergence in the marketplace, there was no other company in the United States that was manufacturing a connective tissue matrix flowable product using HRT's formula of premixed placental particulate matter with saline. "); p. 13 (Opinion #6) ("No other company in the United States has a suite of products of amnion only, chorion only, and cord only membranes"). | disregarded. Plaintiffs should have simply stated "undisputed."<br><br>The quotes of Plaintiffs' expert are immaterial because the outward facing features of products available in the marketplace are not trade secrets. Further, the so-called "formula of premixed placental particulate matter" was not disclosed by HRT/Skye in its trade secret interrogatory response. Fluskey Decl. Exs. 1 & 2. It has not even been disclosed in this motion. |
| 17. | Placental membrane, flowable particulate, and particulate products are sold to hospitals, surgery centers, and medical facilities.<br><br>Banman Decl. ¶ 8 | Generally, undisputed. | N/A |
| 18. | Placental products are sold in boxes that contain package inserts, typically called "Instructions for Use" or "IFUs," which provide a summary of the product and its intended use. | Undisputed that CTM and HRT products contain package inserts. | N/A |

8

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
|  | Banman Decl. ¶ 8; Fluskey Decl. Ex. 14 (Sharp Depo.) at 155:17-19, 156:17-22 | | |
| 19. | When a user opens a box containing a placental product and looks at the product, the user knows whether the product is a membrane product, a flowable particulate product, or a particulate product. Facilities order product based on these characteristics.<br><br>Banman Decl. ¶ 8 | Objection. Speculation, lack of foundation. FRE 602.<br><br>Generally, undisputed. | There is no basis for the objection. Plaintiffs should have simply stated "undisputed." Banman is a percipient witness who has worked in the placental industry for multiple years. Banman Decl. ¶ 3. *See also* Fluskey Decl. Ex. 18 (Andrews Depo.) at 346:15-347:5. He, like any other witness, can testify to what he sees when he opens a box containing a placental product. |
| 20. | If it is a membrane product, the user can see its dimensions—length, width, and thickness.<br><br>Banman Decl. ¶ 8; Fluskey Decl. Ex. 18 (Andrews Depo.) at 345:18-347:5 | Objection. Speculation, lack of foundation. FRE 602.<br><br>Generally, undisputed. The dimensions are actually identified on the outside of the boxes sold by CTM and Skye/HRT. | There is no basis for any objection. Plaintiffs should have simply stated "undisputed." Percipient witnesses can testify to what they see when they look at a membrane product. |
| III. | **Banman's Work with HRT/Skye** | | |
| A. | **Relevant Contracts** | | |
| 21. | Banman began providing formal consulting services to Skye in or around April 2012. | Disputed. Banman began providing consulting services as early as 2009. Banman ¶ 11. On November 1, 2010, Banman signed a "Mutual Non-Disclosure and | N/A |

9

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
|     | Banman ¶ 11; Fluskey Decl. Ex. 14 (Sharp Depo.) at 434:6-9 | Confidentiality Agreement" with Chris Sharp and "any of Chris Sharp's companies".  [PF 419.] |  |
| 22. | On April 23, 2012, Banman signed a Mutual Non-Disclosure, Confidentiality & Non-Circumvent Agreement (the "2012 Mutual NDA") with Skye.<br><br>Banman ¶ 11, Ex. 2 | Undisputed. | N/A |
| 23. | The 2012 Mutual NDA required each party to mark any document with a "Confidential" legend in order for the document's contents to be deemed "Confidential" under the agreement.<br><br>Banman Decl. Ex. 2 at § 1 | Undisputed. | N/A |
| 24. | The 2012 Mutual NDA also required each party to identify in writing any information that it sought to protect as a trade secret.<br><br>Banman Decl. Ex. 2 at § 1 | Undisputed. | N/A |
| 25. | The term of the 2012 Mutual NDA was one year, so it expired on April 23, 2013.<br><br>Banman Decl. Ex. 2 at § 9 | Disputed and misstates the document. The one-year term only applies to "Confidential Information" other than trade secrets. The 2012 Mutual NDA requires that all trade | There is no basis for any dispute. Section 9 of the 2012 Mutual NDA provides for a one year term. Certain confidentiality obligations with respect to trade secret |

10

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | secret information shall remain confidential "for a term at least as long as the information is a trade secret according to the laws of the state of Delaware, United States of America."<br><br>[PF 424]; Banman Decl. Ex. 2 at § 3 | information survive that term. |
| 26. | The parties' confidentiality obligations, except for items identified in writing as trade secrets, lasted five years (up to April 23, 2017).<br><br>Banman Decl. Ex. 2 at § 5 | Objection. Misstates the document.  The document says: "The Parties agree go hold in confidence for five (5) years from the Effective Date all Confidential Information, other than trade secrets, disclosed by the other party. Trade secret information will survive the obligations of the receiving party respecting disclosures and use of the Confidential Information acquired from the disclosing party for a term at least as long as the information is a trade secret according to the laws of the state of Delaware."<br><br>[PF 424]; Declaration of Ryan D. Saba, Exhibit 12; Banman Decl. Ex. 2 at § 5 | There is no basis for any objection. Plaintiffs should have simply stated "undisputed." |
| 27. | In June 2014, Banman signed a consulting agreement with HRT (the | Undisputed. | N/A |

11

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | "HRT Consulting Agreement"). <br><br> Banman Decl. ¶ 13, Ex. 3 | | |
| 28. | Section 5 of the HRT Consulting Agreement states that HRT's information does not include "non-public, confidential and proprietary information and trade secret belonging to Consultant [Bryan Banman]." <br><br> Banman Decl. Ex. 3 at § 5 | Objection. Incomplete statement of fact. <br><br> In June 2014, Mr. Banman signed a "Consulting Agreement/Consultation Contract" with Human Regenerative Technologies. In this agreement, among other things, Mr. Banman was granted the option to acquire Membership Units in the amount of 10% ownership in HRT. <br><br> In exchange, Mr. Banman agreed to keep certain information confidential, including but not limited to processing protocols, product formulations and the business affairs of HRT. <br><br> Section 5 provides that any creations in connection with his employment with Skye/HRT are the sole property of Skye/HRT. <br><br> In this agreement, Mr. Banman also agreed that HRT owns all of the proprietary information and trade secrets related to HRT's business. <br><br> Exhibit A to the agreement identifies "Services" in | Plaintiffs' objection and commentary is non-responsive.  Plaintiffs should have simply stated "undisputed." This fact quotes verbatim from Section 5 of the HRT Consulting Agreement. |

12

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | | which Mr. Banman had agreed to provide to HRT. Those Services include, but not limited to:<br><br>A.    Assist in establishing protocols, equipment sourcing, and SOPs in a timely manner<br><br>B.    Assist in all validations and initial product build out<br><br>C.    Document a design file for each product family from scientific papers and prototypes<br><br>. . .<br><br>G.    Research scientific papers and advise (HRT) regarding new developments applicable to (HRT's) products<br><br>H.    Coordinate evidence-based studies for all (HRT) specialties<br><br>I.    Assist with new product formulations and delivery systems<br><br>The confidentiality provisions of this agreement were to last in perpetuity.<br><br>[PF 440-445]; Banman Decl. Ex. 3 at § 5. | |
| 29. | On or about April 18, 2018, Banman began | Disputed to the extent that Banman's employment | Banman never worked as an employee for Skye until |

13

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | working for Skye as an employee with the title of Senior Vice President of Business Development.<br><br>Banman Decl. ¶ 15, Ex. 4 | began on April 18, 2018. Banman's employment with Skye began on March 25, 2013, when Mr. Banman signed a Business/Marketing Development Agreement" with Skye. [PF 432.]<br><br>Undisputed that on April 18, 2018, Mr. Banman signed an "Employment Letter" with Skye for the position of Senior VP Business Development in which that title role started on April 1, 2018. | April 18, 2018. Banman Decl. ¶ 15. Prior to that time, Banman only provided consulting services, not as a W-2 employee. Banman Decl. ¶¶ 11-15. |
| 30. | On or about April 18, 2018, Banman signed an Employee Confidentiality Agreement with Skye (the "Skye Employee Confidentiality Agreement"). The Skye Employee Confidentiality Agreement does not include any whistleblower notice provision.<br><br>Banman Decl. ¶ 16, Ex. 5 | Undisputed. | N/A |
| B. | **Banman's Role in HRT/Skye Sales and Product Development** | | |
| 31. | Banman's initial work for Skye was focused upon developing sales and marketing.<br><br>Banman Decl. ¶ 17 | Objection. Vague as to the phrase "initial work" and the time frame of this "initial work".<br><br>Disputed. Banman performed product | There is no basis for any objection or dispute. When Banman first started working with Skye, his work focused on developing sales and marketing initiatives. Banman Decl. ¶ 17. The statements included in the |

14

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | development and research for placental products.<br><br>[PF 359-363]; Banman Decl. ¶ 19. | Plaintiffs' Statement of Facts at paragraphs 359-363 are disputed and immaterial. *See* responses to such paragraphs below. |
| 32. | Beginning at least as early as 2012, Skye was re-selling a membrane product and a flowable particulate product manufactured by a company called BioDlogics, LLC ("BioD").<br><br>Banman Decl. ¶ 18; Fluskey Decl. Ex. 14 (Sharp Depo.) at 419:25-420:4 | Objection. Misstates the testimony.<br><br>Disputed. Skye began selling products manufactured by BioD in the "first quarter of 2011." Fluskey Decl. Ex. 14 (Sharp Depo.) at 419:25-420:4 | The "dispute" cited by Plaintiffs is immaterial. |
| 33. | In or around the first of quarter of 2013, Banman began working on product development initiatives.<br><br>Banman Decl. ¶ 19 | Undisputed. | N/A |
| 34. | Mr. Sharp sought to replace the BioD products with a product line of his own.<br><br>Banman Decl. ¶ 19 | Undisputed. | N/A |
| 35. | When working on product development initiatives, Banman researched publicly available information, such as articles, marketing materials distributed by | Generally, undisputed. Banman also performed other tasks as part of the product development initiatives which included non-publicly available information and testing of | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 362-376, 378-386, |

15

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | other companies, and patents.<br><br>Banman Decl. ¶ 20 | raw placenta material.  [PF 362-376, 378-386, 388-391.] | 388-391 are disputed and non-responsive to this fact. *See* below. |
| 36. | During this 2012-2013 period, there was a substantial amount of publicly available information describing placental products for use in medical applications.<br><br>Banman Decl. ¶ 21, Ex. 6 | Generally, undisputed that there was public information describing placental products for use in medical applications. | There is no basis for any dispute. Plaintiffs should have simply stated "undisputed." |
| 37. | Mimedx Group, Inc. ("Mimedx") filed a patent application on August 7, 2012 that discloses a manufacturing process for placental membrane products. The application was published on November 22, 2012, and the patent was issued on December 3, 2013.<br><br>Banman Decl. ¶ 21, Ex. 6 | Objection. Irrelevant.  FRE 401-403. Lack of foundation. FRE 602.<br><br>Disputed. There is no evidence that Banman knew of this patent when Skye/HRT were developing products. Further, this patent does not identify or disclose the methods used by HRT to manufacture its products.<br><br>Report of Daniel M. Cislo (Declaration of Daniel M. Cislo Ex. 1) at § 5.10-5.13. | There is no basis for any objection, and Plaintiffs' non-responsive commentary should be disregarded. Courts can take judicial notice of publicly-available patents. The date of the patent application is available on the face of the document. Banman Decl. ¶ 21, Ex. 6. |
| 38. | The Mimedx patent discloses the steps of obtaining placental tissue, cleaning the placental tissue, separating the amnion and chorion layers, dehydrating the separated placental tissue using a drying fixture, and cutting | Objection. Irrelevant.  FRE 401-403. Lack of foundation. FRE 602.<br><br>Disputed. There is no evidence that Banman knew of this patent when Skye/HRT were developing products. Further, this patent does | There is no basis for Plaintiffs' objection, and their non-responsive commentary should be disregarded. The patent discloses precisely what is set forth in SOF ¶ 38. A review of the plain |

16

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | the tissue to create membrane tissue grafts.<br><br>Banman Decl. ¶ 21, Ex. 6 at col. 2, lines 45-61 & cols. 5-10 | not identify or disclose the methods used by HRT to manufacture its products.<br><br>Neither this patent, nor any other patent, discloses the unique processes and unique combination of processes developed by HRT, "and taken together, one skilled in the art would not arrive at the Skye/HRT processes". Cislo Rpt. (Cislo Decl. Ex. 1) at § 5.10-5.13.<br><br>Cislo Rpt. (Cislo Decl. Ex. 1) at § 5.10-5.13. | language of the documents proves this fact.<br><br>Plaintiffs' citation to the Cislo Report is immaterial because the specific "unique processes and unique combination of processes" have never been disclosed by HRT/Skye in this litigation—not in their trade secret interrogatories, and not on this motion. *See* Fluskey Decl., Exs. 1 & 2.<br><br>Defendants also assert objections to the Cislo Report, as he is a lawyer, and clearly not one skilled in the art of tissue processing.<br><br>He is also wrong. *See* Taghizadeh Decl.; Forsell Decl. But these expert issues are immaterial to the motion before the Court. |
| 39. | When working to develop replacement products, Sharp and Banman toured the tissue processing facility of BioD.<br><br>Banman Decl. ¶ 22; Fluskey Decl. Ex. (Sharp Depo.) at 421:9-11 | Objection. Misleading. FRE 403.<br><br>Undisputed that Sharp and Banman toured the tissue processing facility of BioD and had a "meet and greet" with the CEO of BioD. Sharp Depo. (Saba Decl. Ex. 7) at 421:9-11; 19-25.<br><br>However, Sharp and Banman were not provided access to, nor did they observe, how the BioD products were actually manufactured. [PF 381.] | Plaintiffs' non-responsive commentary should be disregarded, and there is no basis for any objection. Plaintiffs should have simply written "undisputed." In addition, Plaintiffs' comment that they were only provided a "meet-and-greet" and did not see processing facilities is untrue. Banman and Sharp were shown processing equipment and facilities while at BioD, including observing the |

17

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
|     |                          | Even Mr. Banman's own declaration says that they only observed the "equipment and systems used by BioD."  Banman does not state that he observed the manufacturing process of BioD products. Banman Decl. ¶ 22

Sharp testified that they were never given access to how the BioD products were made and "still to this day" it is "speculation of what is actually in that product."  Sharp Depo. (Saba Decl. Ex. 7) at 422:1-423:17 | cryo-mill that BioD used to particulate placental tissue. Banman Reply Decl. ¶ 11. |
| 40. | BioD owns a patent that discloses a process for manufacturing a product that includes particulated (or "morselized"/"ground up") placental tissue suspended in liquid. The application for the patent was filed on October 31, 2012, and the patent was issued on January 13, 2015.

Banman Decl. ¶ 23, Ex. 7 | Objection. Lack of foundation. FRE 602. Calls for a legal conclusion whether BioD owns a patent.  Misstates the terms of the patent. Irrelevant. FRE 401-403. Misleading. FRE 403.  Irrelevant. FRE 401-403. Misleading. FRE 403.

Disputed. There is no evidence that Banman knew of this patent when Skye/HRT were developing products.

Neither this patent, nor any other patent, discloses the unique processes and unique combination of processes developed by HRT, "and taken together, | There is no basis for any objection or non-responsive commentary. Plaintiffs should have simply stated "undisputed." The Court can take judicial notice of the fact that BioD owns the patent attached as Exhibit 7 to the Banman declaration, when the patent was filed, and the plain language of the document. |

18

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | one skilled in the art would not arrive at the Skye/HRT processes". Cislo Rpt. (Cislo Decl. Ex. 1) at § 5.10-5.13. | |
| 41. | The step of grinding up placental tissue in a milling device and suspending the particulate in solution is discussed at column 8, lines 6-56 of the BioD Patent.<br><br>Banman Decl. ¶ 23, Ex. 7 | Objection. Misstates the document.<br><br>Objection. Lack of foundation. FRE 602. Calls for a legal conclusion whether BioD owns a patent. Misstates the terms of the patent. Irrelevant. FRE 401-403. Misleading. FRE 403. Irrelevant. FRE 401-403. Misleading. FRE 403.<br><br>Disputed. There is no evidence that Banman knew of this patent when Skye/HRT were developing products.<br><br>Neither this patent, nor any other patent, discloses the unique processes and unique combination of processes developed by HRT, "and taken together, one skilled in the art would not arrive at the Skye/HRT processes". Cislo Rpt. (Cislo Decl. Ex. 1) at § 5.10-5.13. | There is no basis for any objection or non-responsive commentary. Plaintiffs should have simply stated "undisputed." The Court can take judicial notice of the fact that BioD owns the patent attached as Exhibit 7 to the Banman declaration, when the patent was filed, and the plain language of the document. |
| 42. | HRT/Skye began selling its own placental tissue membrane and flowable particulate products no later than February 2014. | Generally, undisputed. Sharp testified it as "early in 2014." | N/A |

19

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Banman Decl. ¶ 24; Fluskey Decl. Ex. 14 (Sharp Depo.) at 424:1-4 | Fluskey Decl. Ex. 14 (Sharp Depo.) at 424:1-4 | |
| 43. | The development work for Skye/HRT products took place in 2013 and early 2014.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) 424:5-8; Banman Decl. ¶¶ 19, 24 | Undisputed. | N/A |
| 44. | When working on product development for Skye/HRT, Banman played a role in drafting certain sections of what are typically referred to as Standard Operating Procedures ("SOPs"), which set forth the steps for manufacturing a placental product.<br><br>Banman Decl. ¶ 25 | Undisputed. | N/A |
| 45. | Banman did not provide final sign-off on any Skye/HRT SOPs.<br><br>Banman Decl. ¶ 25 | Objection. Irrelevant.  FRE 401-403.  Misleading. FRE 403<br><br>The "final sign-off" of the SOPs is done by HRT's medical director. | There is no basis for any objection or non-responsive commentary. Plaintiffs should have simply stated "undisputed." |
| 46. | Banman did not receive or review Skye/HRT's final, complete SOPs.<br><br>Banman Decl. ¶ 25; Fluskey Decl. Ex. 14 | Objection. Irrelevant.  FRE 401-403.  Misleading. FRE 403.<br><br>Disputed.  Banman drafted the essential processing steps of the SOPs for the | Plaintiffs should have simply stated "undisputed." The evidence cited by Plaintiffs, including the declaration of Sharp, support the statement. The non-responsive comments set forth at PF 390-391, |

20

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | (Sharp Depo.) at 107:17-108:9; 109:4-18 | HRT products. [PF 390.] The SOPs created by Banman on how to manufacture HRT products have not materially changed since they were drafted by him. [PF 391.] As such, Banman reviewed at least the material parts of HRT's final SOPs.<br><br>Banman has been in possession of HRT's "Design File" documents, even after this litigation commenced, as evidence by his production of those documents in discovery. [PF 377.]  These documents contain all of the information Banman would need to replicate HRT's process. [PF 362-376, 378-386, 388-391.]<br><br>Whether or not Banman received or reviewed a "final" copy of HRT's SOPs is immaterial.  The research had already been completed.  Banman would not have needed those specific documents  to replicate HRT's trade secret processes.  [PF 362-376, 378-386, 388-391.] | 377, 362-376, 378-386, and 388-391 are all disputed. *See* below.<br><br>Plaintiffs' comment that the so-called "Design File" contains "all of the information Banman would need to replicate HRT's process" is false. The HRT Design File is a seven-page document that includes bullet-point summaries of publicly-available information. It does not include any SOPs or process steps.  Saba Decl. Ex. 6; Banman Reply Decl. ¶ 47. |
| 47. | Banman was not responsible for ensuring that HRT's/Skye's products were made according to SOPs.<br><br>Banman Decl. ¶ 25 | Objection. Irrelevant.  FRE 401-403.<br><br>Undisputed. | N/A |

21

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| 48. | Banman was not responsible for processing or manufacturing HRT/Skye finished products.<br><br>Banman Decl. ¶ 25 | Objection. Irrelevant.  FRE 401-403.<br><br>Undisputed. | N/A |
| 49. | HRT/Skye employed a lab director and quality assurance director who were responsible for manufacturing and for ensuring that products were made according to SOPs.<br><br>Banman Decl. ¶ 25; Fluskey Decl. Ex. 16 (Shoen Depo.) at 17:4-11; Fluskey Decl. Ex. 17 (Chin-Sang Depo.) at 50:6-51:11, 54:6-25 | Generally, undisputed. However, there are others who are also responsible for manufacturing and ensuring HRT's products are made according to SOPs, including Chris Sharp. | N/A |
| 50. | When working as a consultant on product development initiatives for Skye/HRT, Banman worked out of Toronto, Ontario, Canada.<br><br>Banman Decl. ¶ 26 | Objection. Irrelevant. FRE 401-403. Vague as to time and the phrase "worked out of."  Undisputed that Banman resided in Canada, but he also regularly travelled to the United States, including Skye/HRT's headquarters, to perform his job functions.  [PF 700.] | There is no basis for any objection or Plaintiffs' non-responsive commentary. Plaintiffs should have simply stated "undisputed." |
| 51. | Banman did not work out of HRT's lab located in California. | Objection. Vague as to time and the phrase "worked out of." Undisputed that Banman | N/A |

22

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
|  | Banman Decl. ¶ 26 | resided in Canada, but he also regularly travelled to the United States, including Skye/HRT's headquarters, to perform his job functions.  [PF 700.] | |
| 52. | Banman never manufactured finished product with Chris Sharp (or any other HRT/Skye representative) in HRT's lab.<br><br>Banman Decl. ¶ 26; Fluskey Decl. Ex. 17 (Chin-Sang Depo.) at 115:3-5.; Fluskey Decl. Ex. 16 (Shoen Depo.) at 37:24-38:23 | Undisputed. | N/A |
| 53. | Banman's work on product development for Skye/HRT ended in 2014-2015.<br><br>Banman ¶ 27; Fluskey Decl. Ex. 14 (Sharp Depo.) at 118:10-24 | Disputed. Banman's work on product development ended in 2015.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 118:10-24 | N/A |
| 54. | Banman did not examine HRT/Skye SOPs or any other documents that detail the manufacturing process after the 2014-2105 timeframe.<br><br>Banman Decl. ¶ 27 | Objection.  Irrelevant. FRE 401-403.  Vague and ambiguous as to the term "examine". Argumentative. FRE 403.<br><br>Undisputed. | N/A |

23

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 55. | Banman did not need to have access to Skye/HRT SOPs to do his day-to-day job from 2015 forward.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 118:25-119:17 | Objection. Incomplete statement.  The direct testimony is as follows:<br><br>Q. Okay. So from 2015 forward, Mr. Banman did not need to have access to SOPs to do his day-to-day job; is that correct?<br><br>A. That is correct. He fulfilled his obligation to assist in the development of all SOPs with HRT, and hence, that triggered his earn-in of 10 percent of HRT.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 118:25-119:17 | N/A |
| 56. | When working with HRT/Skye, Banman did not have access to all of the HRT/Skye SOPs.<br><br>Banman Decl. ¶ 28; Fluskey Decl. Ex. 14 (Sharp Depo.) at 107:17-108:9, 109:4-18 | Objection. Irrelevant. FRE 401-403. Misstates the testimony.<br><br>Disputed.<br><br>Banman jointly participated in the creation of how to manufacture HRT's placental products. Banman had access to the important aspects of the SOPs, including the manufacturing process.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 107:17-108:9, 109:4-18<br><br>Banman has been in possession of HRT's "Design File" documents, | There is no basis for any objections or dispute. The testimony cited supports the statement. Plaintiffs' commentary is non-responsive and should be rejected. Plaintiffs' statement that the "Design File" contains "all of the information Banman would need to replicate HRT's process" is false. The Design File is a seven-page document that includes bullet-point summaries of information that Banman researched, much of which was available on the internet. It does not include any SOPs or manufacturing process |

24

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
|  |  | even after this litigation commenced, as evidence by his production of those documents in discovery. [PF 377.]  These documents contain all of the information Banman would need to replicate HRT's process. [PF 362-376, 378-386, 388-391.] | steps. Saba Decl. Ex. 6. Banman Reply Decl. ¶ 47.\n\nThe Design File is not disclosed as containing trade secrets in Plaintiffs' trade secret interrogatory responses. Fluskey Decl. Exs. 1 & 2.\n\nThe false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
| 57. | After Banman's work in product development ended, he continued to work on managing the marketing and sales of HRT/Skye products.\n\nBanman ¶ 29 | Undisputed. | N/A |
| 58. | In April 2018, when he became an employee of Skye with the title of Senior Vice President of Business Development, Banman managed marketing and sales.\n\nBanman Decl. ¶ 30 | Disputed to the extent that Banman's employment began on April 18, 2018. Banman's employment with Skye began on March 25, 2013, when Mr. Banman signed a Business/Marketing Development Agreement" with Skye. [PF 432.] | There is no basis for any dispute. Banman first began working for Skye as a W-2 employee on April 18, 2018. He did not work in that capacity for Skye before that date. Banman Decl. ¶¶ 11-16. |
| 59. | As Senior Vice President of Business Development at Skye, Banman did not create or review SOPs—or other documents that would detail manufacturing processes. | Undisputed that after April 2018, Banman did not *create* SOPs for HRT's manufacturing process.\n\nDisputed to the extent that Banman retained documents in the HRT | There is no basis for any dispute. Plaintiffs' commentary is non-responsive and should be disregarded. Plaintiffs' statement that the "Design File" contains "all of the information Banman |

25

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Banman Decl. ¶ 30 | design file from the time of their creation to the present, which detail steps of HRT's manufacturing process.<br><br>Banman has been in possession of HRT's "Design File" documents, even after this litigation commenced, as evidence by his production of those documents in discovery. [PF 377.]  These documents contain all of the information Banman would need to replicate HRT's process. [PF 362-376, 378-386, 388-391.]<br><br>Banman drafted the essential processing steps of the SOPs for the HRT products. [PF 390.]   The SOPs created by Banman on how to manufacture HRT products have not materially changed since they were drafted by him. [PF 392.]  As such, Banman reviewed at least the material parts of HRT's final SOPs. | would need to replicate HRT's process" is false. The Design File is a seven-page document that includes bullet-point summaries of information that Banman researched, much of which was available on the Internet. It does not include any SOPs or manufacturing process steps. Saba Decl., Ex. 6. Banman Reply Decl. ¶ 7.<br><br>The Design File is not disclosed as containing trade secrets in Plaintiffs' trade secret interrogatory responses. Fluskey Decl. Exs. 1 & 2.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
| **C.** | **Features of the HRT/Skye Business Model** | | |
| 60. | Skye's customers are primarily medical facilities and hospitals.<br><br>Banman Decl. ¶ 32; Seoane Decl. ¶ 11; Fluskey | Undisputed | N/A |

26

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|--------------------|
| | Decl. Ex. 14 (Sharp Depo.) at 456:7-19 | | |
| 61. | Skye sells its products primarily through independent contractor sales representatives who are not employees of Skye or HRT.<br><br>Banman Decl. ¶ 32; Seoane Decl. ¶ 11; Fluskey Decl. Ex. 14 (Sharp Depo.) at 414:24-415:5; Fluskey Decl. Ex. 15 (Chormann Depo.) at 15:1-11 | Undisputed | N/A |
| 62. | Skye independent sales representatives make sales calls and visits to physicians and medical facility representatives.<br><br>Banman Decl. ¶ 32; Seoane Decl. ¶ 11; Fluskey Decl. Ex. 15 (Chormann Depo.) at 50:4-52:4 | Undisputed | N/A |
| 63. | In recruiting sales representatives, Skye often searched the Internet and LinkedIn accounts to identify individuals with expertise in sales in the medical products industry.<br><br>Banman Decl. ¶ 33; Seoane Decl. ¶ 12; Fluskey Decl. Ex. 15 (Chormann Depo.) at 18:12-19:17 | Objection. Misstates the testimony of Chormann. Skye uses LinkedIn to reach out to prospective sales representatives, not the general "internet."<br><br>Fluskey Decl. Ex. 15 (Chormann Depo.) at 18:12-19:17 | N/A |

27

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| 64. | Skye purposefully searched for sales representatives who had prior experience selling tissue products, including products that competed with Skye.<br><br>Banman Decl. ¶ 33; Seoane Decl. ¶¶ 12-13 | Objection. Misstates the declaration of Seoane. He states, he would "search LinkedIn accounts to identify individuals with expertise in medical sales."<br><br>Otherwise, undisputed.<br><br>Seoane Decl. ¶¶ 12-13 | N/A |
| 65. | In multiple instances, Skye worked with independent sales representatives who also sold competitive products for other companies.<br><br>Banman Decl. ¶ 38; Seoane Decl. ¶¶ 13, 17; Fluskey Decl. Ex. 14 (Sharp Depo.) at 304:15-305:10, 320:4-6 | Objection. Sharp's deposition at 304:15-305:10 and 320:4-6 is not attached to Exhibit 14 of Fluskey Decl. Even if those pages were attached, the testimony does not states that "In multiple instances, Skye worked with independent sales representatives who also sold competitive products for other companies." Further, this is a conclusory allegation.<br><br>Disputed. Skye provided permission to BJ Benik to sell products for Skye and other companies. However, BJ Benik had to sign a document that has not and will not disclose Skye's trade secrets to CTM. [PF 701.]<br><br>Banman's declaration at ¶ 38 says Skye permitted Stumpe and Trengove to sell products for Skye and competitors. Disputed. | Pages 304-305 and 320 of the Sharp deposition transcript was inadvertently omitted from the Fluskey Declaration. Those pages are attached as Exhibit 1 to the Fluskey Reply Declaration and they support the statement provided by Defendants. At 304:15–305:10, Sharp admitted that Erin Barnes sold products for both CTM and Skye. At 320:4–6, Sharp admitted that BJ Benik sold products for both CTM and Skye and that he had access to both CTM's and Skye's pricing. BJ Benik did not sign a special agreement regarding confidentiality until September 22, 2022 Fluskey Reply Decl. 8. He was working for both CTM and Skye as of August 2018. Banman Reply Decl. ¶ 57. |

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Skye did not permit Stumpe or Trengove to sell products for Skye and Skye's competitors simultaneously. [PF 702.] Banman's declaration is speculative and conclusory without any foundational facts to support the statement.  FRE 403, 602.<br><br>Seoane's declaration at ¶¶ 13 and 17 is speculative and conclusory without any foundational facts to support the statement. FRE 403, 602. | |
| 66. | When an independent sales representative contracted with Skye, in almost all cases, the individual already maintained relationships with customers and physicians based on his or her prior work.<br><br>Banman Decl. ¶ 34; Seoane Decl. ¶ 13; Fluskey Decl. Ex. 15 (Chormann Depo.) at 19:13-17 | Objection. Overbroad, speculative and conclusory. FRE 401-403, 602, 701.<br><br>Generally, undisputed that sales representatives had relationships with customers and physicians. However, disputed that those relationships were in the placental product marketplace. | There is no basis for any objections. Plaintiffs should have simply stated "undisputed." |
| 67. | Skye's independent sales representatives did not treat their affiliation with Skye as a secret.<br><br>Banman Decl. ¶ 35; Seoane Decl. ¶ 14; Fluskey Decl. Ex. 14 (Sharp Depo.) at 248:8-17 | Objection.  Overbroad, speculative and conclusory.<br><br>Disputed.  Skye required independent sales representatives to sign confidentiality agreements that require them to keep certain information | N/A |

29

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
|  |  | confidential. [PF 473, 478, 683-684, 698.]<br><br>Undisputed that independent sales representatives did tell physicians and medical facilities that they sold Skye products. Fluskey Decl. Ex. 14 (Sharp Depo.) at 248:8-17 |  |
| 68. | Skye's independent sales representatives sold Skye products in the marketplace and would inform physicians and customers that they were affiliated with Skye.<br><br>Banman Decl. ¶ 35; Seoane Decl. ¶ 14; Fluskey Decl. Ex. 14 (Sharp Depo.) at 248:8-17 | Generally undisputed. | N/A |
| 69. | Skye's independent sales representatives who worked with Skye used their own personal computers, personal phones, and personal iCloud accounts to store information about Skye and its products.<br><br>Banman Decl. ¶ 36; Seoane Decl. ¶ 15; Fluskey Decl. Ex. 14 (Sharp Depo.) at 239:20-241:14; Fluskey Decl. Ex. 15 (Chormann Depo.) at 36:23-37:3, 43:2-44:22, 45:4-11 | Objection.  Overbroad, lacks foundation.  FRE 602.  Irrelevant.  FRE 401-403. However, generally undisputed. | N/A |

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| 70. | Skye did not know the personal passwords used by these independent sales representatives on their personal phones, personal computers, or personal iCloud accounts.<br><br>Banman Decl. ¶ 39; Seoane Decl. ¶ 15; Fluskey Decl. Ex. 14 (Sharp Depo.) at 242:15-17; Fluskey Decl. Ex. 15 (Chormann Depo.) at 44:14-16 | Undisputed. | N/A |
| 71. | In working with independent sales representatives, Skye would communicate by email with the sales representatives by sending information to their personal email accounts.<br><br>Banman Decl. ¶ 37; Seoane Decl. ¶ 16; Fluskey Decl. Ex. 15 (Chormann Depo.) at 38:4-14, 39:2-7 | Objection.  Irrelevant. FRE 401-403.  Skye required all of its sales representatives to sign confidentiality agreements. [PF 698.]<br><br>However, generally undisputed. | N/A |
| 72. | In marketing and selling its products, Skye and its independent sales representatives would disclose the company's pricing information for its products to potential customers (medical facilities and doctors).<br><br>Banman Decl. ¶ 39; Seoane Decl. ¶ 18; Fluskey | Objection. Misstates the evidence.  Misleading. FRE 403.<br><br>Disputed. The Deposition of Chorman at 52:5-11 (Fluskey Decl. Ex. 15) states:<br><br>Q Does Skye disclose pricing data to the doctors that it attempts to sell products to? | There is no basis for any objections or dispute. The evidence cited supports the statement that Skye discloses its pricing. Further, Sharp himself testified that Skye discloses its price to customers without any confidentiality restrictions. Fluskey Decl., Ex. 14 (Sharp Depo.) at 209:13-201:10. There is no evidentiary basis for |

31

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
|     | Decl. Ex. 15 (Chormann Depo.) at 52:5-18 | A In a hospital setting, we do not. The physician typically does not know what the pricing is at all, and the pricing information for hospitals are typically only known within the hospital system and – <br><br> Also, pricing for each facility is unique. There is no set price that Skye universally sells its products to all locations. [PF 703.] | Sharp's testimony that it is "industry standard that facilities do not disclose the price they pay for medical products." He has not been disclosed as an expert. He cannot competently testify to what every facility would or would not do with pricing information. <br><br> The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
| 73. | Skye did not maintain confidentiality agreements with customer facilities or doctors that would prevent the facilities or doctors from disclosing Skye's pricing information. <br><br> Banman Decl. ¶ 39; Seoane Decl. ¶ 18; Fluskey Decl. Ex. 14 (Sharp Depo.) at 210:4-10; Fluskey Decl. Ex. 36 (Schlifka Depo.) at 20:22-24 | Undisputed that there is no written "confidentiality agreements" with customer facilities. <br><br> Disputed that "all" the doctors know the pricing of Skye products. <br><br> Disputed that the medical facilities disclose Skye's pricing information. <br><br> It is industry standard that the facilities do not disclose the price they pay for medical products because they do not want competitive medical facilities to know how much they pay for products. [PF 699.] | N/A |

32

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| **IV.** | **The Formation and Business of CTM** | | |
| 74. | On July 2, 2018, Banman provided Skye with written notice of his resignation from the company.<br><br>Banman Decl. ¶ 43 | Undisputed. | N/A |
| 75. | Banman named his new company "CTM Biomedical," which stands for "connective tissue matrix."<br><br>Banman Decl. ¶ 44 | Undisputed. | N/A |
| 76. | "Connective tissue matrix" is a generic term that describes certain characteristics of human connective tissue.<br><br>Banman Decl. ¶ 44, Ex. 8; Fluskey Decl. Ex. 21 (Hiatt Depo.) at 215:13-20 | Disputed. "Connective tissue" is a medical term of art. However, "Connective tissue matrix" was a term brought to the placental industry by Sharp and used by HRT/Skye. [PF 412.] | There is no basis for any dispute, and Plaintiffs' denial of this fact is frivolous. The evidence attached to the Banman Declaration includes use of the term "connective tissue matrix" before HRT/Skye was operating. A Google search for the term returns about 17,800,000 results. Banman Reply Decl. ¶ 36. |
| 77. | The term "connective tissue matrix" has been used for many years by scientists and physicians to describe tissue in the human body.<br><br>Banman Decl. ¶ 44, Ex. 8 | Objection. lack of foundation. FRE 602. Conclusory.<br><br>Disputed. "Connective tissue" is a medical term of art. However, "Connective tissue matrix" was a term brought to the placental | *See* response to 76 above. |

33

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | industry by Sharp and used by HRT/Skye. [PF 412.]<br><br>Exhibit 8 attached to the declaration of Banman only presents articles using "connective tissue matrix" after Skye/HRT started utilizing this term and brought this term to the industry. | |
| 78. | The phrase "connective tissue matrix" was not created by HRT or Skye and was not used exclusively by HRT or Skye.<br><br>Banman Decl. ¶ 44, Ex. 8 | Disputed. "Connective tissue" is a medical term of art.  However, "Connective tissue matrix" was a term brought to the placental industry by Sharp and used by HRT/Skye. [PF 412.]<br><br>Exhibit 8 attached to the declaration of Banman only presents articles using "connective tissue matrix" after Skye/HRT started utilizing this term and brought this term to the industry. | *See* response to 76 above. |
| 79. | The phrases "connective tissue matrix" ("CTM") and extracellular matrix ("ECM") are not HRT/Skye trade secrets.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 230:11-21 | Objection. Misstates the testimony and disputed.<br><br>Q But Skye's use of the phrase is not a secret. Can we agree on that?<br><br>A No, but it gives you a competitive advantage knowing that it makes a lot of sense to use that terminology, that doctors can relate to that and what it means, and also, that there's specific | Plaintiffs' attempt to dispute this fact is frivolous. Sharp testified that Plaintiffs' use of the term is not a secret. Fluskey Decl., Ex. 14 (Sharp Depo.) at 203:11-21. It is also undisputed that Plaintiffs use this term in publicaly-available marketing materials. Saba Decl. Ex. 75 at Skye/HRT 000430. Multiple other |

34

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
|     |                          | reimbursement tied to using a connective tissue product.

Q A lot of your competitors use the phrase "connective tissue" to describe their products; right?

A Not to my knowledge, no.

Fluskey Decl. Ex. 14 (Sharp Depo.) at 231:6-18 | companies also use the term. Banman Decl. Ex. 8. |
| **A.** | **CTM's Re-Seller Business** | | |
| 80. | CTM began selling products in the summer of 2018.

Banman Decl. ¶ 45 | Undisputed. | N/A |
| 81. | CTM sells its products primarily through independent contractor sales representatives.

Banman Decl. ¶ 45 | Undisputed. | N/A |
| 82. | When CTM first began operating, it purchased and re-sold products manufactured by other companies.

Banman Decl. ¶¶ 45-46 | Undisputed. | N/A |
| 83. | From summer 2018 to September 2019, CTM was | Undisputed. | N/A |

35

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | only a product re-seller/distributor.<br><br>Banman Decl. ¶ 47 | | |
| **B.** | **The Independent Development of CTM's Product Line** | | |
| 84. | In late 2018 and early 2019, Banman began exploring the possibility of creating a CTM product line.<br><br>Banman Decl. ¶ 48 | Objection. Vague and ambiguous as to the phrase "exploring the possibility".<br><br>Undisputed that Banman began *meeting with* potential CTM manufacturers in late 2018 and early 2019 to manufacture Skye products using the CTM name. [PF 599.]<br><br>Disputed that this is when "Banman began exploring" the possibility of creating CTM products.<br><br>From the outset, Banman planned to make his own products as "phase 2" of CTM. In his August 3, 2018 email to his "core CTM team", he stated that he was: "quickly advancing the Phase 2 product planning, as it's already clear these companies think much to (sic) small for an alpha team like us."  [PF 577.]<br><br>Banman informed Stumpe that he had a "proprietary product" or "access to a | Plaintiffs' commentary is non-responsive and should be disregarded. The fact should be deemed admitted.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

36

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
| | | proprietary" when Stumpe joined CTM. [PF 574.] | |
| 85. | CTM was not a processor of placental tissue products, so it began researching third-party tissue banks.<br><br>Banman Decl. ¶ 48 | Objection. Vague and ambiguous as to time and substance.<br><br>Disputed that CTM "began researching third-party tissue banks" in late 2018-early 2019.<br><br>From the outset, Banman planned to make his own products as "phase 2" of CTM. In his August 3, 2018 email to his "core CTM team", he stated that he was: "quickly advancing the Phase 2 product planning, as it's already clear these companies think much to (sic) small for an alpha team like us."  [PF 577.] | Plaintiffs have no basis to dispute this statement. They should have simply stated "undisputed." CTM was not (and is not) a processor/manufacturer of placental tissue products. Banman Decl. ¶ 48; Banman Reply Decl. ¶ 52.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
| 86. | In February 2019, Banman began communicating with Lee Andrews, the principal of Alamo Biologics, LLC and Precision Allograft Solutions, LLC (together, "Alamo").<br><br>Banman Decl. ¶ 49; Fluskey Decl. Ex. 18 (Andrews Depo.) at 42:8-10, 320:24-321:1 | Undisputed. | N/A |
| 87. | Alamo is a tissue bank company with experience processing human tissue. | Objection. The citation to evidence does not state that "Alamo is a tissue bank company with experience | There is no basis for a dispute. The evidence supports the statement. |

37

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Fluskey Decl. Ex. 18 (Andrews Depo.) at 26:17-23 | processing human tissue." Andrews deposition states:<br><br>Q. Did you do any research on Skye Orthobiologics or HRT at any time?<br><br>A. No.<br><br>Q. Even after you received a subpoena or deposition notice.<br><br>A. No.<br><br>Q. And prior to working with CTM, was Alamo making for any other customer a ground up particulate with or without saline that derives from the placenta?<br><br>A. No, sir.<br><br>Andrews depo. (Saba Decl. Ex. 81) 50:9-12.<br><br>Disputed.  Alamo had no experience processing a flowable particulate product that Banman wanted Alamo to produce. [PF 628.]<br><br>Alamo had never manufactured chorion only membranes.  [PF 628.] Banman had to tell Alamo how to manufacture the product. [PF 628.]  Even after a prototype was provided to Banman, he had to send Alamo a picture of Skye/HRT's product and sent Alamo a | Plaintiffs' commentary is non-responsive.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

38

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | sample of Skye/HRT's product and instructed Alamo to make it the CTM product exactly like Skye/HRT's product. [PF 635-637.] | |
| 88. | Before meeting Banman, Alamo had substantial experience manufacturing products derived from human placental tissue.<br><br>Fluskey Decl. Ex. 18 (Andrews Depo.) at 322:12-19 | Objection. Irrelevant. FRE 401-403.<br><br>Disputed. Alamo had no experience processing a flowable particulate product that Banman wanted Alamo to produce. [PF 628]<br><br>Q. And prior to working with CTM, was Alamo making for any other customer a ground up particulate with or without saline that derives from the placenta?<br><br>A. No, sir.<br><br>Andrews depo. (Saba Decl. Ex. 81) 50:9-12<br><br>Alamo had never manufactured chorion only membranes. [PF 628.] Banman had to tell Alamo how to manufacture the product. [PF 628.] Even after a prototype was provided to Banman, he had to send Alamo a picture of Skye/HRT's product and sent Alamo a sample of Skye/HRT's product and instructed Alamo to make it the CTM product exactly like | There is no basis for a dispute. The evidence supports the statement. Plaintiffs' commentary is non-responsive.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

39

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Skye/HRT's product. [PF 635-637.] | |
| 89. | Before meeting Banman, Alamo had experience processing and manufacturing placental tissue, including amnion, chorion, and fluid.<br><br>Fluskey Decl. Ex. 18 (Andrews Depo.) at 47:14-48:23 | Objection. Misstates the deposition testimony.<br><br>Disputed. Alamo had no experience processing a flowable particulate product that Banman wanted Alamo to produce. [PF 628]<br><br>Q. And prior to working with CTM, was Alamo making for any other customer a ground up particulate with or without saline that derives from the placenta?<br><br>A. No, sir.<br><br>Andrews depo. (Saba Decl. Ex. 81)  50:9-12<br><br>Alamo had never manufactured chorion only membranes.  [PF 628.] Banman had to tell Alamo how to manufacture the product. [PF 628.]  Even after a prototype was provided to Banman, he had to send Alamo a picture of Skye/HRT's product and sent Alamo a sample of Skye/HRT's product and instructed Alamo to make it the CTM product exactly like Skye/HRT's product. [PF 635-637.] | There is no basis for a dispute. The evidence supports the statement. Plaintiffs' commentary is non-responsive.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

40

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Alamo was not processing and manufacturing single layer amnion or chorion membranes.  Rather, Alamo was manufacturing dual-layer products. Fluskey Decl. Ex. 18 (Andrews Depo.) at 48:8-15<br><br>Q. And prior to working with CTM, did Alamo make a cord dehydrated membrane?<br><br>A. I don't think so.<br><br>Andrews depo. (Saba Decl. Ex. 81) 68:3-69:3:<br><br>Q before Alamo met Bryan Banman, Alamo is manufacturing the AmnioBioGraft; is that correct?<br><br>A. Correct.<br><br>Q. Okay. Now, tell me if I'm right, because I looked at the literature that your company puts out regarding the AmnioBioGraft. Tell me if this is accurate, okay?<br><br>A. Yes, sir.<br><br>Q. That the AmnioBioGraft is a single layer patch-like tissue derived from the amniotic membrane of the placenta.<br><br>A. Correct. | |

41

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Q. Okay. So I asked you earlier about chorion only patches, right? If the AmnioBioGraft is -- or -- is made up of amniotic membrane, are you sure that Alamo was making chorion only patches prior to meeting Bryan Banman?<br><br>A. No, sir.<br><br>Q. No, sir, what?<br><br>A. I am not sure.<br><br>Q. Okay. So you just don't recall or you just don't know one way or another?<br><br>A. I don't recall. | |
| 90. | Before meeting Banman, Alamo had experience manufacturing placental membrane products that included chorion-only membrane.<br><br>Fluskey Decl. Ex. 18 (Andrews Depo.) at 49:2-6, 57:7-9 | Objection. Misstates the testimony. The witness later corrected his testimony.<br><br>Disputed.<br><br>Andrews deposition 68:3-69:3:<br><br>Q before Alamo met Bryan Banman, Alamo is manufacturing the AmnioBioGraft; is that correct?<br><br>A. Correct.<br><br>Q. Okay. Now, tell me if I'm right, because I looked at the literature that your company puts out regarding the | There is no basis for a dispute. The evidence supports the statement. Plaintiffs' commentary is non-responsive.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

42

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | AmnioBioGraft. Tell me if this is accurate, okay? | |

AmnioBioGraft. Tell me if this is accurate, okay?

A. Yes, sir.

Q. That the AmnioBioGraft is a single layer patch-like tissue derived from the amniotic membrane of the placenta.

A. Correct.

Q. Okay. So I asked you earlier about chorion only patches, right? If the AmnioBioGraft is -- or -- is made up of amniotic membrane, are you sure that Alamo was making chorion only patches prior to meeting Bryan Banman?

A. No, sir.

Q. No, sir, what?

A. I am not sure.

Q. Okay. So you just don't recall or you just don't know one way or another?

A. I don't recall.

Alamo had never manufactured chorion only membranes.  [PF 628.] Banman had to tell Alamo how to manufacture the product. [PF 628.]  Even after a prototype was provided to Banman, he had to send Alamo a picture of Skye/HRT's product and sent Alamo a

43

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | | sample of Skye/HRT's product and instructed Alamo to make it the CTM product exactly like Skye/HRT's product. [PF 635-637.] | |
| 91. | Before working with Banman, Alamo had experience processing and manufacturing dehydrated amnion-only membrane products and dehydrated chorion-only dehydrated membrane products.<br><br>Fluskey Decl. Ex. 18 (Andrews Depo.) at 57:4-9, 56:20-23 | Objection. Misstates the testimony. The witness later corrected his testimony.<br><br>Disputed.<br><br>Andrews deposition 68:3-69:3:<br><br>Q before Alamo met Bryan Banman, Alamo is manufacturing the AmnioBioGraft; is that correct?<br><br>A. Correct.<br><br>Q. Okay. Now, tell me if I'm right, because I looked at the literature that your company puts out regarding the AmnioBioGraft. Tell me if this is accurate, okay?<br><br>A. Yes, sir.<br><br>Q. That the AmnioBioGraft is a single layer patch-like tissue derived from the amniotic membrane of the placenta.<br><br>A. Correct.<br><br>Q. Okay. So I asked you earlier about chorion only | There is no basis for a dispute. The evidence supports the statement. Plaintiffs' commentary is non-responsive.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

44

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
|  |  | patches, right? If the AmnioBioGraft is -- or -- is made up of amniotic membrane, are you sure that Alamo was making chorion only patches prior to meeting Bryan Banman? A. No, sir. Q. No, sir, what? A. I am not sure. Q. Okay. So you just don't recall or you just don't know one way or another? A. I don't recall. Alamo had never manufactured chorion only membranes. [PF 628.] Banman had to tell Alamo how to manufacture the product. [PF 628.] Even after a prototype was provided to Banman, he had to send Alamo a picture of Skye/HRT's product and sent Alamo a sample of Skye/HRT's product and instructed Alamo to make it the CTM product exactly like Skye/HRT's product. [PF 635-637.] |  |
| 92. | Before meeting Banman, Alamo had processes and procedures in place for manufacturing placental products. | Objection. Vague. Overbroad. Irrelevant. FRE 401-403. Undisputed. | N/A |

45

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Fluskey Decl. Ex. 18 (Andrews Depo.) at 322:20 24 | | |
| 93. | Before meeting Banman, Alamo had experimented with using a shaker mill device to particulate human placental tissue.<br><br>Fluskey Decl. Ex. 18 (Andrews Depo.) at 164:21-165:11 | Disputed. Prior to meeting Banman, Alamo never put placenta particulates into a cryo shaker to make particulates.<br><br>Fluskey Decl. Ex. 18 (Andrews Depo.) at 162:25-163:4 (Q: "Prior to meeting Mr. Banman . . . your company never put placenta into a cryo shaker to make particulates. A: I believe that's correct."). | There is no basis for a dispute. The evidence supports the statement. Plaintiffs' commentary is non-responsive.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
| 94. | In February 2019, Banman emailed PowerPoint slides to Alamo that identified the types of products that he wanted manufactured.<br><br>Banman Decl. ¶ 50, Ex. 9 | Undisputed. | N/A |
| 95. | The PowerPoint presentation Banman sent to Alamo included black and white drawings of shapes and empty jars indicating the three different types of products.<br><br>Banman Decl. ¶ 50, Ex. 9 | Objection. Vague and ambiguous as to the words "shapes" and "Empty jars". Also misleading as to the term "drawings'. Banman is a skilled graphic designer and his drawings convey exactly what is intended. FRE 403.<br><br>Disputed. The PowerPoint lists a suite of potential products with graphics of membranes and flowable matrix product containers that are nearly identical to | There is no basis for a dispute. The evidence supports the statement. Plaintiffs' commentary is non-responsive. The additional, immaterial facts that they add to the record are disputed below in response to "Plaintiffs' Facts."<br><br>Plaintiffs' contention that Banman's PowerPoint contains products that are purportedly "nearly identical to the images |

46

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | the images contained in HRT's 2017 Active Barrier and Active Matrix product brochure (the brochure being used at the time Banman left Skye/HRT).<br><br>[*See*, PF 609]; Expert Rpt. of John Lee (Lee Decl. Ex. 1) at p. 12 (has a visual comparison of the images in Banman's presentation to HRT's 2017 brochures.)<br><br>The presentation contains graphics depicting three thicknesses of membranes, with proposed membrane sizes listed below. Saba Decl. Ex. 69.<br><br>The presentation also contains graphics depicting vials of flowable product in various sizes, with the various proposed doses listed below. Saba Decl. Ex. 69. | contained in HRT's 2017 Active Barrier and Active Matrix product brochure" are immaterial. The images in that brochure were publicly-available and not a trade secret.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
| 96. | When Banman sent Alamo his PowerPoint slides in February 2019, there were multiple other companies in the marketplace selling placental membrane products, flowable particulate products, and particulate paste products.<br><br>Banman Decl. ¶ 51, Ex. 1 & Exs. 6-7 | Objection. Misstates Evidence. Misleading. FRE 403. Exhibits 6 and 7 are **patents** and do not support the conclusory statement that "multiple other companies in the marketplace selling placental membrane products, flowable particulate products, and particulate paste products."<br><br>Disputed. No company other than Skye/HRT was | N/A |

47

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
|     |                          | selling the same suite of products.  [PF 609.]  Further, Skye/HRT were the only companies manufacturing and selling an ambient temperature, shelf stable premixed flowable.  [PF 702]; Lee. Rpt. (Lee Decl. Ex. 1) at p. 3; p. 15 (Opinion #9) ("In my experience, I have not seen a wet tissue (non-dehydrated), frozen and then particulated to make a flowable product.")  Additionally, Skye/HRT were the only companies manufacturing and selling a chorion only membrane.  [PF 372, 609]; Lee Rpt. (Lee Decl. Ex. 1) at p. 4 ("Based upon my review of the marketplace, I was unable to locate any other company in the United States that sells connective tissue flowable products or chorion only membranes other than Skye/HRT and CTM Biomedical."); p. 4 (Opinion #1) ("While some companies do manufacture a dual layer membrane, none were manufacturing a chorion only product.")  Finally, no company was selling a "paste" product.  Lee Rpt. (Lee Decl. Ex. 1) at p. 4 (Opinion #1) | |

48

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
| | | ("Finally, no other company was manufacturing a placental paste product.") | |
| 97. | On August 29, 2019, CTM contracted with Alamo for Alamo to process and manufacture placental products that CTM would sell under its own brand names.<br><br>Banman Decl. ¶ 52 | Undisputed. | N/A |
| 98. | Under Section 1.2(g)-(h) of the CTM/Alamo contract, Alamo was required to provide CTM with descriptions of processing procedures for review by CTM.<br><br>Banman Decl. ¶ 53 | Objection. Best evidence rule. Banman does not attach the actual contract. It also misstates the contract. FRE 403.<br><br>Section 1.2(g) says that Alamo will provide CTM with examples of instructions-for-use package inserts. Section 1.2(h) says Alamo will provide CTM with descriptions of the processing procedures for CTM's review and approval.<br><br>Saba Decl. Ex. 16.<br><br>Disputed.<br><br>On June 10, 2019, Banman sent Lee Andrews at Alamo a "draft term sheet" stating: "CTM will provide all product designs for CTM liquid matrix product and CTM particulate paste | There is no basis for a dispute. The evidence cited supports the statement. In addition, the plain language of Section 1.2(g)–(h) of the CTM/Alamo contract supports the statement, which has been added to the record at Exhibit 80 (not Exhibit 16) of the Saba Declaration.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

49

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
|  |  | product, and processing specs for CTM amnion, chorion, and umbilical cord membrane products." [PF 615.]<br><br>The Agreement with Alamo states that CTM will purchase from Alamo the following products made to CTM's specifics: "(a) placental tissue allograft liquid matrix product, as specified by CTM on Exhibit B; (b) placental membrane allografts (amnion, chorion, umbilical cord versions) as specified by CTM on Exhibit B; and (c) particulate placental tissue allograft paste, as specified by CTM on Exhibit B." [PF 622.]<br><br>Banman drafted and sent Alamo Exhibit B to the manufacturing agreement. [PF 627.]<br><br>Exhibit B identifies two pages of step-by-step instructions on how to make the products. [PF 622-623.] |  |
| 99. | Banman relied on Alamo to develop the specific manufacturing process (and the corresponding SOPs) used to make the products that would be sold under the CTM brand name. | Disputed.<br><br>On June 10, 2019, Banman sent Lee Andrews at Alamo a "draft term sheet" stating: "CTM will provide all product designs for CTM liquid matrix product and CTM particulate paste | There is no basis for any dispute, and Plaintiffs' non-responsive commentary should be disregarded. Banman's personal-knowledge testimony supports this statement. In addition, Lee |

50

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
|     | Banman Decl. ¶ 53 | product, and processing specs for CTM amnion, chorion, and umbilical cord membrane products." [PF 615.]<br><br>The Agreement with Alamo states that CTM will purchase from Alamo the following products made to CTM's specifics: "(a) placental tissue allograft liquid matrix product, as specified by CTM on Exhibit B; (b) placental membrane allografts (amnion, chorion, umbilical cord versions) as specified by CTM on Exhibit B; and (c) particulate placental tissue allograft paste, as specified by CTM on Exhibit B." [PF 622.]<br><br>Banman drafted and sent Alamo Exhibit B to the manufacturing agreement. [PF 627.]<br><br>Exhibit B identifies two pages of step-by-step instructions on how to make the products. [PF 622-623.]<br><br>Exhibit B, and ultimately the SOPs that were drafted for the CTM products, set forth steps for processing the placental tissue that would result in the creation of the identical products made by HRT. [PF 630.] | Andrews of Alamo testified that Alamo was the author of the substantive provisions of the SOPs for CTM products. Fluskey Decl., Ex. 18 (Andrews Depo.) at 325–330.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

51

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
| | | Banman had to Banman had to explain to Alamo how to make a chorion only membrane because Alamo had never manufactured one. [PF 628, 632.] Banman had to explain how to make the flowable matrix product because Alamo had never made a flowable product. [PF 632.]<br><br>Even after Banman provided Alamo with step-by-step instructions on how to make HRT's chorion only membrane, Alamo did not make it correctly. [PF 632-638.]<br><br>[PF 632-638.]<br><br>Banman had to tell Alamo how to manufacture the product. [PF 628.] Even after a prototype was provided to Banman, he had to send Alamo a picture of Skye/HRT's product and sent Alamo a sample of Skye/HRT's product and instructed Alamo to make it the CTM product exactly like Skye/HRT's product. [PF 635-637.] | |

52

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 100. | Alamo utilizes primarily three SOPs in connection with its manufacturing of products for CTM: (1) SOP BT-8005 entitled "Birth Tissue Debridement and Rinse"; (2) BT-8006 entitled "Birth Tissue Sizing"; and (3) BT-8015 entitled "Particulated Birth Tissue."<br><br>Banman Decl. ¶ 54; Fluskey Decl. Ex. 18 (Andrews Depo.) at 325:19-326:8 | Disputed.<br><br>Banman told Alamo how to manufacture the products which lead to the creation of the SOPs.<br><br>BT-8005 restates the precise steps in Banman's Exhibit B, which he provided to Alamo before the SOPs were created.<br><br>Saba Decl. Exs. 80, 115.<br><br>Neither Banman nor Alamo has produced any proof that BT-8005 contained these terms prior to Banman's involvement.<br><br>███████████████<br>███████████████<br>███████████████<br>███████████████ | There is no basis for any dispute. The evidence cited supports this factual statement. Plaintiffs' non-responsive commentary should be disregarded.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

53

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | BT-8005 restates the precise steps in Banman's Exhibit B, which he provided to Alamo before the SOPs were created.<br><br>███████████████ | |
| 101. | Alamo was the sole author of the first SOP BT-8005, and Banman contributed no content.<br><br>Banman Decl. ¶ 55; Fluskey Decl. Ex. 18 (Andrews Depo.) at 326:12-21 | Objection. Irrelevant who the author was of this SOP.<br><br>Disputed.  Lee Andrews testified that Banman specifically instructed Alamo to ███████████████<br><br>Banman told Alamo how to manufacture the products which lead to the creation of the SOPs. [PF 262.] | There is no basis for any dispute. The evidence cited supports this factual statement. Plaintiffs' non-responsive commentary should be disregarded.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

54

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
|  |  | BT-8005 restates the precise steps in Banman's Exhibit B, which he provided to Alamo before the SOPs were created.<br><br>Saba Decl. Exs. 80, 115.<br><br>Neither Banman nor Alamo has produced any evidence that BT-8005 contained these terms prior to Banman's involvement.<br><br>Saba Decl. ¶ 120.<br><br>Alamo had never manufactured a chorion only membrane.  [PF 628, 632.]<br><br>It is evident that Alamo did not ███████ Banman had to instruct them to correct. [PF 632-638.] |  |
| 102. | Alamo was the sole author of the second SOP BT-8006, and Banman contributed no content.<br><br>Banman Decl. ¶ 56; Fluskey Decl. Ex. 18 (Andrews Depo.) at 327:1-9 | Objection. Irrelevant.  FRE 401. This SOP is not at issue in this litigation.<br><br>Otherwise, generally undisputed. | There is no basis for any dispute. The evidence supports this factual statement. Plaintiffs' non-responsive commentary should be disregarded.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
| 103. | With respect to SOP BT-8015, entitled "Particulated Birth Tissue," Banman added only non-technical sections and revisions to this document. Alamo was the author of the process steps.<br><br>Banman Decl. ¶ 57, Exs. 11-14; Fluskey Decl. Ex. 18 (Andrews Depo.) at 327:10- 329:12 | Disputed.<br><br>Banman participated in the drafting of this SOP by providing Alamo with the processing steps to include in Exhibit B, which was given to Alamo before the SOPs were drafted.<br><br>*See*, Saba Decl. Ex. 20. Banman sent first draft of the SOP BT-8015.<br><br>Banman drafted the following sections: Purpose, Scope, Forms and References, and definitions section.<br><br>Andrews depo. (Saba Decl. Ex. 81) 328:16-329:5.<br><br>The rest of the SOP came straight from Exhibit B, which was prepared by Banman and given to Alamo before CTM's SOPs were drafted.  [PF 627.]<br><br>Alamo never made particulate flowable or paste or chorion or cord only membrane – though the steps to make those products are detailed in Exhibit B and BT-8015. [PF 628.]<br><br>There is no evidence that Alamo engaged in any product development or research with CTM to create product SOPs, | There is no basis for any dispute. The evidence cited supports this factual statement. Plaintiffs' non-responsive commentary should be disregarded.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

56

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | despite Alamo's never having manufactured flowable or chorion only membranes before CTM. Saba Decl. ¶ 123.<br><br>Exhibit B, and ultimately the SOPs that were drafted for the CTM products, set forth steps for processing the placental tissue that would result in the creation of the identical products made by HRT. [PF 623-627, 630.]<br><br>Banman signed off an approved the final version of this SOP BT-8015.<br><br>Andrews depo. (Saba Decl. Ex. 81) at 329:19-24.; Saba Decl. Exs. 116-117. | |
| 104. | The process steps added by Alamo to SOP BT-8015 were based on procedures already in place at Alamo.<br><br>Fluskey Decl. Ex. 18 (Andrews Depo.) at 330:13 16 | Disputed.<br><br>On June 10, 2019, Banman sent Lee Andrews at Alamo a "draft term sheet" stating: "CTM will provide all product designs for CTM liquid matrix product and CTM particulate paste product, and processing specs for CTM amnion, chorion, and umbilical cord membrane products." [PF 615.]<br><br>The Agreement with Alamo states that CTM will purchase from Alamo the following products made to CTM's specifics: "(a) placental tissue | There is no basis for any dispute. The evidence cited supports this factual statement. Plaintiffs' non-responsive commentary should be disregarded.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

57

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | allograft liquid matrix product, as specified by CTM on Exhibit B; (b) placental membrane allografts (amnion, chorion, umbilical cord versions) as specified by CTM on Exhibit B; and (c) particulate placental tissue allograft paste, as specified by CTM on Exhibit B." [PF 622.] <br><br> Banman drafted and sent Alamo Exhibit B to the manufacturing agreement. [PF 627.] <br><br> Exhibit B identifies two pages of step-by-step instructions on how to make the products. [PF 622-623.] <br><br> Exhibit B is then incorporated into SOP BT-8015. <br><br> [PF 630]; Lee Rpt. (Lee Decl. Ex. 1) at p. 11 (Opinion #5) ("Whether by retaining documents or merely remembering and recreating the information, the material aspects of these processes were set forth as SOPs for PAS/CTM, with the only known common link being Bryan Banman.") <br><br> Alamo never made particulate flowable or paste or chorion or cord only membrane – though the steps to make those | |

58

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
|     |                          | products are detailed in Exhibit B and BT-8015. [PF 628.] <br><br> When Banman sent Alamo his PowerPoint presentation, Alamo, they did not know if they could even make the particulate product he requested. <br><br> Andrews depo. (Saba Decl. Ex. 81) 59:8-61:21 <br><br> Andrews depo. (Saba Decl. Ex. 81) 60:18-19. <br><br> He testified that he originally thought Alamo could not make <br><br> Andrews depo. (Saba Decl. Ex. 81) 60:18-19. |                   |

59

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Banman also had to tell Alamo how to manufacture the chorion only membrane product. [PF 628.]  Even after a prototype was provided to Banman, he had to send Alamo a picture of Skye/HRT's product and sent Alamo a sample of Skye/HRT's product and instructed Alamo to make it the CTM product exactly like Skye/HRT's product. [PF 635-637.] | |
| 105. | Alamo did not purchase any new equipment in connection with manufacturing products for CTM.<br><br>Fluskey Decl. Ex. 18 (Andrews Depo.) at 333:20-23 | Undisputed. | N/A |
| 106. | Banman never transmitted to Alamo any SOPs of HRT or Skye.<br><br>Banman Decl. ¶ 58; Fluskey Decl. Ex. 18 (Andrews Depo.) at 321:23-25 | Disputed.<br><br>Banman drafted and sent Alamo Exhibit B to the manufacturing agreement. [PF 627.]  Exhibit B lists HRT's manufacturing steps. PF 623-627, 630.]<br><br>Exhibit B identifies two pages of step-by-step instructions on how to make the products.  [PF 622-623.]  Exhibit B is then incorporated into SOP BT-8015. [PF 630]. | There is no basis for any dispute. The evidence supports the statement.<br><br>Exhibit B to the CTM/Alamo contract does not include any process steps or manufacturing steps. Plaintiffs' statement that the exhibit includes "step-by-step instructions on how to make the products" is false. Saba Decl. Ex.80; It is the SOPs that set forth the steps to process CTM's products. Banman Reply Decl. ¶ 47; Fluskey Reply Decl. Ex. 7 |

60

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Alamo never made particulate flowable or paste or chorion or cord only membrane –though the steps to make those products are detailed in Exhibit B and BT-8015. [PF 628.]<br><br>When Banman sent Alamo his PowerPoint presentation, Alamo, they did not know if they could even make the particulate product he requested.<br><br>Andrews depo. (Saba Decl. Ex. 81) 69:8-61:21<br><br><br><br>Andrews depo. (Saba Decl. Ex. 81) 60:18-19.<br><br>He testified that he originally<br><br><br><br>Andrews depo. (Saba Decl. Ex. 81) 60:18-19. | (Andrews Depo.) at 323:16-19, 325:19-23.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

61

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | | Saba Decl. Ex. 80.<br><br>Banman also had to tell Alamo how to manufacture the chorion only membrane product. [PF 628.]  Even after a prototype was provided to Banman, he had to send Alamo a picture of Skye/HRT's product and sent Alamo a sample of Skye/HRT's product and instructed Alamo to make it the CTM product exactly like Skye/HRT's product. [PF 635-637.] | |
| 107. | Banman never transmitted to Alamo any documents that summarized or referenced any of the manufacturing process steps for HRT or Skye.<br><br>Banman Decl. ¶ 58; Fluskey Decl. Ex. 18 (Andrews Depo.) at 321:9-22 | Disputed.<br><br>Banman transcribed HRT's trade secret processes into Exhibit B and, ultimately, into CTM's SOPs.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 11 (Opinion #5) ("Whether by retaining documents or merely remembering and recreating the information, the material aspects of [HRT's] processes were set forth as SOPs for PAS/CTM, with the only known common link being Bryan Banman").<br><br>Banman drafted and sent Alamo Exhibit B to the | There is no basis for any dispute. The evidence supports the statement.<br><br>Exhibit B to the CTM/Alamo contract does not include any process steps or manufacturing steps. Plaintiffs' statement that that exhibit includes "step-by-step instructions on how to make the products" is false. Saba Decl. Ex.80. It is the SOPs that set forth the steps to process CTM's products. Banman Reply Decl. ¶ 47; Fluskey Reply Decl. Ex. 7 (Andrews Depo.) at 323:16-19, 325:19-23. |

62

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
|  |  | manufacturing agreement. [PF 627.] Exhibit B lists HRT's manufacturing steps. [PF 623-627, 630.]<br><br>Exhibit B identifies two pages of step-by-step instructions on how to make the products. [PF 622-623.] Exhibit B is then incorporated into SOP BT-8015. [PF 630].<br><br>Alamo never made particulate flowable or paste or chorion or cord only membrane –though the steps to make those products are detailed in Exhibit B and BT-8015. [PF 628.]<br><br>When Banman sent Alamo his PowerPoint presentation, Alamo, they did not know if they could even make the particulate product he requested.<br><br>Andrews depo. (Saba Decl. Ex. 81) 69:8-61:21<br><br>Andrews never even fathomed making<br><br>Andrews depo. (Saba Decl. Ex. 81) 60:18-19.<br><br>He testified that he originally thought Alamo | Neither Plaintiffs nor their expert, Mr. Lee, have identified the "material aspects of HRT's process." Accordingly, that opinion lacks foundation.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

63

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | could not make Banman's requested ██████████ ██████████ ██████████ ██████████<br><br>Andrews depo. (Saba Decl. Ex. 81) 60:18-19.<br><br>Banman had to explain, in Exhibit B, that he wanted ██████████ ██████████ ██████████<br><br>Saba Decl. Ex. 80.<br><br>Banman also had to tell Alamo how to manufacture the chorion only membrane product. [PF 628.] Even after a prototype was provided to Banman, he had to send Alamo a picture of Skye/HRT's product and sent Alamo a sample of Skye/HRT's product and instructed Alamo to make it the CTM product exactly like Skye/HRT's product. [PF 635-637.] | |
| 108. | Banman never communicated orally to Alamo any of the manufacturing/processing steps for any of HRT's or Skye's products.<br><br>Banman Decl. ¶ 58 | Disputed. Banman transcribed HRT's trade secret processes into Exhibit B and, ultimately, into CTM's SOPs.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 11 (Opinion #5) ("Whether by retaining | There is no basis for any dispute. The evidence supports the statement.<br><br>Exhibit B to the CTM/Alamo contract does not include any process steps or manufacturing steps. Plaintiffs' statement |

64

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
|     |                          | documents or merely remembering and recreating the information, the material aspects of [HRT's] processes were set forth as SOPs for PAS/CTM, with the only known common link being Bryan Banman"). | that that exhibit includes "step-by-step instructions on how to make the products" is false. Saba Decl. Ex. 80. It is the SOPs that set forth the steps to process CTM's products. Banman Reply Decl. ¶ 47; Fluskey Reply Decl. Ex. 7 (Andrews Depo.) at 323:16-19, 325:19-23. |
|     |                          | Banman drafted and sent Alamo Exhibit B to the manufacturing agreement. [PF 627.]  Exhibit B lists HRT's manufacturing steps. PF 623-627, 630.] | Neither Plaintiffs nor their expert, Mr. Lee, have identified the "material aspects of HRT's process." Accordingly, that opinion lacks foundation. |
|     |                          | Exhibit B identifies two pages of step-by-step instructions on how to make the products.  [PF 622-623.]  Exhibit B is then incorporated into SOP BT-8015. [PF 630]. | The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
|     |                          | Alamo never made particulate flowable or paste or chorion or cord only membrane –though the steps to make those products are detailed in Exhibit B and BT-8015. [PF 628.] | |
|     |                          | When Banman sent Alamo his PowerPoint presentation, Alamo, they did not know if they could even make the particulate product he requested. | |
|     |                          | Andrews depo. (Saba Decl. Ex. 81) 69:8-61:21 | |

65

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
|     |                          | Andrews depo. (Saba Decl. Ex. 81) 60:18-19.<br><br>He testified that he originally thought Alamo<br><br>Andrews depo. (Saba Decl. Ex. 81) 60:18-19.<br><br>Banman had to explain, in Exhibit B, that he wanted<br><br>Saba Decl. Ex. 80.<br><br>Banman also had to tell Alamo how to manufacture the chorion only membrane product. [PF 628.] Even after a prototype was provided to Banman, he had to send Alamo a picture of Skye/HRT's product and sent Alamo a sample of Skye/HRT's product and instructed Alamo to make it the CTM product exactly like | |

66

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
| | | Skye/HRT's product. [PF 635-637.] | |
| 109. | In developing the manufacturing processes used by Alamo to make CTM products, Alamo did not reference the content of any HRT SOPs.<br><br>Fluskey Decl. Ex. 18 (Andrews Depo.) at 322:4-7 | Disputed.<br><br>Alamo may not have known it was referencing HRT's SOPs, but it was referencing the trade secret processing steps in HRT's SOPs, transcribed by Banman into Exhibit B.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 11 (Opinion #5) ("Whether by retaining documents or merely remembering and recreating the information, the material aspects of [HRT's] processes were set forth as SOPs for PAS/CTM, with the only known common link being Bryan Banman").<br><br>Banman drafted and sent Alamo Exhibit B to the manufacturing agreement. [PF 627.] Exhibit B lists HRT's manufacturing steps. PF 623-627, 630.]<br><br>Exhibit B identifies two pages of step-by-step instructions on how to make the products. [PF 622-623.] Exhibit B is then incorporated into SOP BT-8015. [PF 630].<br><br>Alamo never made particulate flowable or paste or chorion or cord only membrane –though | There is no basis for any dispute. The evidence supports the statement.<br><br>Exhibit B to the CTM/Alamo contract does not include any process steps or manufacturing steps. Plaintiffs' statement that that exhibit includes "step-by-step instructions on how to make the products" is false. Saba Decl. Ex. 80. It is the SOPs that set forth the steps to process CTM's products. Banman Reply Decl. ¶ 47; Fluskey Reply Decl. Ex. 7 (Andrews Depo.) at 323:16-19, 325:19-23.<br><br>Neither Plaintiffs nor their expert, Mr. Lee, have identified the "material aspects of HRT's process." Accordingly, that opinion lacks foundation.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

67

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
|     |                          | the steps to make those products are detailed in Exhibit B and BT-8015. [PF 628.]<br><br>When Banman sent Alamo his PowerPoint presentation, Alamo, they did not know if they could even make the particulate product he requested.<br><br>Andrews depo. (Saba Decl. Ex. 81) 59:8-61:21<br><br>Andrews depo. (Saba Decl. Ex. 81) 60:18-19.<br><br>He testified that he originally thought Alamo could not make Banman's requested<br><br>Andrews depo. (Saba Decl. Ex. 81) 60:18-19.<br><br>Banman had to explain, in Exhibit B, that he wanted Alamo to freeze the tissue instead of dehydrate the |  |

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | tissue before putting it in the mill.<br><br>Saba Decl. Ex. 80.<br><br>Banman also had to tell Alamo how to manufacture the chorion only membrane product. [PF 628.]  Even after a prototype was provided to Banman, he had to send Alamo a picture of Skye/HRT's product and sent Alamo a sample of Skye/HRT's product and instructed Alamo to make it the CTM product exactly like Skye/HRT's product. [PF 635-637.] | |
| 110. | Seoane was not involved in the development, formulation, or manufacturing of any CTM products.<br><br>Seoane Decl. ¶¶ 38, 40 | Undisputed. | N/A |
| C. | **Differences between the Parties' Processes** | | |
| 111. | There are multiple differences between the processes used by HRT/Skye to manufacture products and the processes used by Alamo on behalf of CTM.<br><br>Banman Decl. ¶ 64; Fluskey Decl. Ex. 18 | Objection.  Misstates testimony.  Misleading. FRE 403.<br><br>Andrews merely testified as to certain steps in CTM's SOPs, he did not state that these were materially different from HRT's. | There is no basis for any dispute. The evidence cites supports the statement.<br><br>Plaintiffs' comment that "any differences in the manufacturing processes are immaterial and the processes still result in the same products" is incorrect. The outward facing, publicly-available |

69

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | (Andrews Depo.) at 339:17-341:13. | Fluskey Decl. Ex. 18 (Andrews Depo.) at 339:17-341:13<br><br>Objection. Lacks foundation. FRE. 602. Improper lay opinion. FRE 701.<br><br>Disputed. Any "differences" in the manufacturing processes are immaterial and the processes still result in the same products. [PF 630, 361.]<br><br>Banman created the SOPs for the CTM products, which are substantially similar to HRT's SOPs, and yield an identical product. [PF 631.]<br><br>"CTM sells the identical membrane products as HRT. CTM's Thin product is the same as HRT's amnion membranes, CTM's Thick product is the same as HRT's chorion membranes, and finally, CTM's X-Thick is the same as HRT's cord-based membrane. These are the same products."<br><br>[PF 709]; Lee Rpt. (Lee Decl. Ex. 1) at p. 13 (Opinion #6).<br><br>"Further, CTM's 'Flow' product is identical to HRT's flowable connective tissue membrane product."<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 13 (Opinion #6); | features of products cannot be trade secrets. It is the **processes**, not the **products**, which are at issue.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

70

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Declaration of Chris Sharp ¶ 29.<br><br>"Both CTM's and HRT's flowable products are non-dehydrated, sterile, ambient temperature shelf-stable, ready-to-use products", unlike other product on the market.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 16 (Opinion #9).<br><br>Competitors' products consist of floating, non-integrated, flakes of particulate that is mixed at the time of use making only the limited amount of flakes effective vs. the entire solution like HRT/Skye's product. CTM copied this process from HRT.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 16 (Opinion #9.)<br><br>"CTM's overall steps [for flowable product] go through the same formulation with similar processes that produce an outcome that is identical, with the same ratio and percentage of tissue to solution as one of HRT's products."<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 16 (Opinion #10); Sharp Decl. ¶ 29. | |
| 112. | With respect to the parties' amnion membrane and chorion membrane products, the parties use a different dehydration method: ▮▮▮▮▮ | Objection. Irrelevant. FRE 401-403. The step in the process is dehydration. How the product is dehydrated is Irrelevant. | There is no basis for any dispute. The evidence cited supports the statement.<br><br>Plaintiffs' comment that "any differences in the manufacturing processes |

71

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | ▮▮▮▮▮<br><br>Banman Decl. ¶ 64; Fluskey Decl. Ex. 18 (Andrews Depo.) at 340:16-22; Fluskey Decl. Ex. 14 (Sharp Depo.) at 64:12-65:4 | Disputed. "CTM sells the identical membrane products as HRT. CTM's Thin product is the same as HRT's amnion membranes, CTM's Thick product is the same as HRT's chorion membranes, and finally, CTM's X-Thick is the same as HRT's cord-based membrane.  These are the same products."<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 13 (Opinion #6); Sharp Decl. ¶ 75. | are immaterial and the processes still result in the same products" is incorrect. The outward facing, publicly-available features of products cannot be trade secrets. It is the **processes**, not the **products**, which are at issue.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
| 113. | The parties use a different cleansing method. ▮▮▮<br>▮▮▮ Alamo washes the products with a detergent known as "Triton-X."<br><br>Banman Decl. ¶ 64; Fluskey Decl. Ex. 18 (Andrews Depo.) at 339:11-20; Fluskey Decl. Ex. 14 (Sharp Depo.) at 178:22-25 | Objection. Irrelevant, misleading. FRE 401-403. The method of cleaning the membrane does not make a material difference.<br><br>The steps in Exhibit B for cleaning and separating tissue would result in the same raw materials from which to process tissue as HRT, and the steps in Exhibit B for processing that tissue would result in the same ultimate products made by HRT.<br><br>[PF 575]; Expert report of J. Lee (Lee Decl. Ex. 1) at p. 11 (Opinion #5); p. 13 (Opinion #7) ("HRT's SOPs at 3.6 to 8.1 to 8.21.4 are essentially identical to BT-8005 rev. 0, Birth tissue debridement and rinse. [Saba Decl. Exs. 114, 115.]  There are no | There is no basis for any dispute. The evidence cited supports the statement.<br><br>Plaintiffs' comment that "any differences in the manufacturing processes are immaterial and the processes still result in the same products" is incorrect. The outward facing, publicly-available features of products cannot be trade secrets. It is the processes, not the products, which are at issue.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

72

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | objective criteria differences in the tissue cleaning process to indicate differences in the final raw tissue produced."); Sharp Decl. ¶¶ 29, 75, 76. | |
| 114. | With respect to umbilical cord products, HRT and Skye sell a non-dehydrated product. Alamo manufactures a dehydrated umbilical cord product for CTM.

Banman Decl. ¶ 64; Fluskey Decl. Ex. 18 (Andrews Depo.) at 341:6-13 | Objection.  Irrelevant, misleading.  FRE 401-403.

Both membranes are cord derived.  It is still the same tissue source and product material.

Sharp Decl. ¶ 77; [PF 709]; Lee Rpt. (Lee Decl. Ex. 1) at p. 13 (Opinion #6) ("CTM's X-Thick is the same as HRT's cord-based membrane.  These are the same products.") | There is no basis for any objection or dispute. The evidence cited supports the statement.

The fact that both membranes use umbilical cord is immaterial. The raw materials used to make placental products (*i.e.*, components of the placenta) are not secret. Fluskey Decl. Ex. 14 (Sharp Depo.) at 31:9-13, 32:11-18; Banman Decl. ¶ 72. |

**V.      Certain Facts Regarding the HRT/Skye "Trade Secrets"**

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 115. | At least some steps in HRT's manufacturing process are public information and not secret.

Fluskey Decl. ¶ 25, Ex. 5 at 4-5 | Objection.  Misstates the document. Misleading. FRE 403. Irrelevant.  FRE 401-403.

It is "well recognized" in the Ninth Circuit that "a trade secret may consist of a compilation of data, public sources or a combination of proprietary and public sources" because "a compilation that affords a competitive advantage and is not readily ascertainable falls | There is no basis for any dispute, and Plaintiffs' legal argument in this statement of facts is improper. The evidence clearly supports the statement provided. In interrogatory responses, Plaintiffs admitted that "some steps [of their process] may be public information." Fluskey Decl. ¶ 25 Ex. 5 at 4-5. Sharp also admitted this fact. Fluskey Decl. Ex. 14 |

73

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | within the definition of a trade secret." *Earthbound Corp. v. MiTek USA, Inc.*, 2017 WL 2919101, at *12 (C.D.Cal. 2017).<br><br>Disputed. The response says in full: "entire manufacturing process taken as a whole is a trade secret of HRT. Bryan Banman was aware of these steps to manufacture placental membranes and connective tissue matrix products (flowable and paste). He misappropriated the entire manufacturing process for all products. While some steps may by public information, some steps are secret information. The unified process of all of the steps provides HRT (and Skye) with a competitive advantage." Fluskey Decl. ¶ 25, Ex. 5 at 4-5 | at 20-21, 23-24, 31-32, 33-35. |
| 116. | The fact that HRT's/Skye's placental membrane products are dehydrated is not a secret. HRT/Skye advertised that fact.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 20:11-24, 20:18-24, 21:22-25 | Undisputed. | N/A |
| 117. | The billing codes used for placental products are in the public domain. | Undisputed that billing codes in general are in the public domain. | There is no basis for any dispute. The evidence supports the statement provided. |

74

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
| | Banman Decl. ¶ 68, Exs. 15-17; Seoane Decl. ¶ 89 | Disputed. The use of billing code by Skye/HRT are part of the training of the sales representatives which is proprietary information. [PF 685.] | |
| 118. | The billing codes used for HRT/Skye placental products are in the public domain.<br><br>Banman Decl. ¶ 68, Exs. 15-17; Fluskey Decl. Ex. 14 (Sharp Depo.) at 237:9-11; Seoane Decl. ¶ 89 | Disputed. The use of billing code by Skye/HRT are part of the training of the sales representatives which is proprietary information. [PF 685.] | There is no basis for any dispute. The evidence supports the statement provided. |
| 119. | The doctors who utilized HRT's/Skye's products know that the products are subject to insurance code reimbursement, and those doctors are not bound by any agreement to keep that information secret.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 23:24-24:6 | Undisputed. | N/A |
| 120. | HRT's/Skye's research and understanding of FDA regulations is based on publicly available articles, FDA regulations, and published material on how other competitors delivered their products.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 27:19-28:13; Banman Decl. ¶ 69 | Disputed. One role for Banman was that he was tasked with researching various products in the market that already existed; looked up FDA regulations; and reviewed pending regulations. Banman then analyzed that information to reach conclusions about where the FDA was heading so that HRT could come up | There is no basis for any dispute, and Plaintiffs' non-responsive commentary should be disregarded. The evidence supports the statement provided.<br><br>The false, immaterial statements that Plaintiffs add to the record are |

75

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | with a lineup of products that were on indication with the FDA that others in the industry did not possess.  [PF 361]; Sharp Depo. (Saba Decl. Ex. 7) at 26:20-27:11.<br><br>Banman then created design files which contained his work product analysis of the publicly available information and then combined that with the trial-and-error analysis of the products that HRT/Skye were creating in the lab. [PF 361-362]; Sharp Depo. (Saba Decl. Ex. 7) at 27:19-28:3 | disputed below in response to "Plaintiffs' Facts." |
| 121. | The raw materials used for HRT/Skye products are not secret.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 31:9-13, 32:11-18; Banman Decl. ¶ 72 | Undisputed that HRT's products are made from placenta.<br><br>Disputed that the source of where HRT obtains its raw placental tissue is a identified as confidential in Skye's confidentiality agreements. [PF 450, 465, 683.]<br><br>Further it is a trade secret as to which portions of the placenta are used in each of HRT's products. [PF 706.] | There is no basis for any dispute, and Plaintiffs' non-responsive commentary should be disregarded. The evidence supports the statement provided.<br><br>Plaintiffs have not alleged that Banman misappropriated the "source" of where HRT obtains its raw materials. Plaintiffs have not identified the specific portions of placenta that they claim are trade secrets and how CTM has used those specific portions in its products. Fluskey Decl. Exs. 4-5. |

76

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 122. | The fact that some of HRT's products include chorion is not a secret.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 33:8-35:11 | Undisputed to the effect that Skye tells customers that certain products are "chorion based."<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 33:8-35:11 | N/A |
| 123. | HRT does not keep the identity of its employees confidential.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 201:8-12 | Undisputed.  Sharp's testimony: "we don't promote who works for us. We try to keep that information to ourselves, but we don't make that confidential." | N/A |
| 124. | Skye's independent sales representatives did not treat their affiliation with Skye as a secret.<br><br>Banman Decl. ¶ 35; Seoane Decl. ¶ 14 | Undisputed. | N/A |
| 125. | Skye's independent sales representatives sold Skye products in the marketplace and would inform physicians and customers that they were affiliated with Skye.<br><br>Banman Decl. ¶ 35; Seoane Decl. ¶ 14; Fluskey Decl. Ex. 14 (Sharp Depo.) at 248:8-17 | Undisputed<br><br>However, information about Skye's sales reps including agreement terms, training, sales records, and customers are trade secret.<br><br>Sharp Depo. (Saba Decl. Ex. 7) at 248:22-249:15 ("when you have this information, when you know the names of independent  contractors, you know what specialty they sell to, you know how successful they are, that | There is no basis for any dispute. Plaintiffs should have simply stated "undisputed." The evidence supports the statement provided. |

77

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | they've got immediate and current sales, you know the level of those sales that can finance your business right out of the gate to what commissions they're being paid so you can offer them something more attractive, potentially, that gives you a leg up and that is one component of what we're saying here is our proprietary information.") | | |
| 126. | Skye has no contracts with independent sales representatives that prohibit them from disclosing that they work for Skye.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 248:8-17 | Undisputed. | N/A |
| 127. | Skye's pricing is disclosed to customers with no confidentiality agreements.<br><br>Banman Decl. ¶ 39; Seoane Decl. ¶ 18; Fluskey Decl. Ex. 14 (Sharp Depo.) at 210:4-10; Fluskey Decl. Ex. 12 | Undisputed. | N/A |
| 128. | The doctors who work with HRT/Skye are not prohibited from disclosing their identities or the fact that they were conducting research or studies for Skye or HRT. | Undisputed. | N/A |

78

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Banman ¶ 79; Fluskey Decl. Ex. 23 | | |
| **VI.** | **The CTM Defendants' Non-Use of Trade Secrets** | | |
| 129. | CTM and Banman did not use or disclose any of the "trade secret" information referred to in HRT's and Skye's Amended Responses to Banman's First Sets of Interrogatories, Interrogatory No. 1 (Fluskey Decl. Exs. 1 & 2).<br><br>Banman Decl. ¶¶ 65-92 | Objection vague, ambiguous, overbroad, and misleading. FRE 401-403. The cite to this alleged undisputed fact includes 27 paragraphs in Banman's declaration.<br><br>Disputed by the very nature of the question and evidence. The evidence cited by Banman is the identification of trade secrets by Skye and HRT in response to verified interrogatory responses. Banman simply states the Skye's responses are not accurate. That is a triable issue of fact.<br><br>Additionally, some of the paragraphs in Banman's declaration simply state that certain claimed trade secrets are not trade secrets. That is also a question of fact. (See, Banman Decl. ¶ 72 ("I do not believe that this could possibly be secret to HRT and Skye.")<br><br>There is abundant evidence of that Banman did wrongfully use and/or disclose Skye and HRT's trade secrets. | Plaintiffs' objections and non-responsive legal commentary should be disregarded.<br><br>In response, Plaintiffs do not identify the trade secrets that they contend CTM or Banman misappropriated.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." As indicated in those responses, Plaintiffs have still failed to proffer any evidence of the specific trade secrets that they allege Defendants have misappropriated. There is no identification of a price list, a customer list, the specific steps of HRT's process that purportedly constitute trade secrets and which were used by CTM. They do not identify confidential marketing material that was utilized by CTM. |

79

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | As examples, regarding HRT's product manufacturing, Banman's transcribed HRT's trade secret processing steps onto "Exhibit B", which he provided to Alamo, specifically to manufacture copies of HRT's products. [PF 615, 623-628, 629, 630-632.]<br><br>CTM, Banman, Seoane, and Stumpe all disclosed and used Skye's trade secret customer information and sales history, potential customers, research physicians, employees and independent contractors, business operations, Skye's pricing, and marketing and sales information, to jump start a competing business with a built-in structure, customer base, and sales force. [PF 519-521, 532, 535-540, 554-565, 569-573, 576, 578-580, 583, 588-590, 595-597, 680.] | |
| 130. | Seoane did not use or disclose any of the "trade secret" information referred to in HRT's and Skye's Amended Responses to Seoane's First Sets of Interrogatories, Interrogatory No. 1 (Fluskey Decl. Exs. 3 & 4). | Objection vague, ambiguous, overbroad, and misleading.  FRE 401-403. The cite to this alleged undisputed fact includes 16 paragraphs in Seoane's declaration.<br><br>Disputed by the very nature of the question and evidence.  The evidence cited by Seoane is the | Plaintiffs do not identify any trade secrets that Seoane misappropriated.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

80

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Seoane Decl. ¶¶ 39-55 | identification of trade secrets by Skye and HRT in response to verified interrogatory responses. Seoane simply states the Skye's responses are not accurate.  That is a triable issue of fact.<br><br>There is evidence that Seoane did acquire, use and/or disclose Skye's trade secrets including sales representative information that he transferred from Skye's database to CTM's database.   [PF 672-674, 686]. | |
| 131. | CTM and Banman did not use or disclose any of the information identified under the "Product Development and Manufacturing" heading in HRT's and Skye's Amended Responses to Banman's First Sets of Interrogatories, Interrogatory No. 1.<br><br>Banman Decl. ¶¶ 67-73 | Disputed by the very nature of the question and evidence.  The evidence is the identification of trade secrets by Skye and HRT in interrogatory responses. Banman simply states the responses are not accurate. That is a triable issue of fact.<br><br>There is evidence that CTM and Banman did acquire, use and/or disclose HRT's manufacturing  trade secrets. [PF 362, 376-378, 641.] | Plaintiffs have not identified the specific "Product Development and Manufacturing" steps that CTM and Banman have allegedly misappropriated. Plaintiffs' interrogatory responses do not identify those specific steps, and Plaintiffs have still not identified those steps in this summary judgment record.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
| 132. | CTM and Banman have not used or disclosed any HRT/Skye "physician | Objection. Incomplete statement of fact. Defendants cherry pick two phases from one | Plaintiffs have not identified any evidence in response to this statement that either identifies the |

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | studies" or "feedback from physicians."<br><br>Banman Decl. ¶ 71 | sentence in an entire section of trade secret misappropriation.<br><br>Disputed by the very nature of the question and evidence.  The evidence is the identification of trade secrets by Skye and HRT in interrogatory responses. Banman simply states the responses are not accurate. That is a triable issue of fact.<br><br>There is evidence that Banman and CTM used and disclosed physician information. [PF 584-587.] | "physician studies" or "feedback from physicians" that CTM and Banman allegedly misappropriated.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
| 133. | CTM and Banman have not used or disclosed any HRT/Skye customer list.<br><br>Banman Decl. ¶ 75 | Disputed.  CTM and Banman specifically targeted Plaintiffs' top sales representatives and top customers. [PF 481, 491, 493-494, 537, 573, 575, 576, 580,  588, 667-668, 672-674, 285.]<br><br>[PF 519-521, 522-523, 594-596, 530-533, 536, 643-645, 534-535, 558-567, 565-567, 539, 557, 575-576, 591, 646, 647, 649, 554-556, 581-583, 651-653,  578-579, 558-567, 575-576, 680.] | There is no basis for any dispute. Plaintiffs have not responded to the specific factual statement presented. Plaintiffs have not identified any customer list allegedly misappropriated by CTM and Banman.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
| 134. | CTM and Banman have not used or disclosed any HRT/Skye potential customer list. | Disputed. CTM and Banman specifically targeted Plaintiffs' top sales representatives and top customers. | There is no basis for any dispute. Plaintiffs have not responded to the specific factual statement presented. Plaintiffs have not identified any customer |

82

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Banman Decl. ¶ 75 | [PF 481, 491, 493-494, 537, 573, 575, 576, 580, 588, 667-668, 672-674, 285.]<br><br>[PF 519-521, 522-523, 594-596, 530-533, 536, 643-645, 534-535, 558-567, 565-567, 539, 557, 575-576, 591, 646, 647, 649, 554-556, 581-583, 651-653, 578-579, 558-567, 575-576, 680.] | list allegedly misappropriated by CTM and Banman.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
| 135. | HRT/Skye have no evidence that CTM or Banman used any customer or potential customer list.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 224:3-21 | Objection. Misleading. FRE 403. CTM's customer list and documents relating to customer lists were marked as "highly confidential" in this litigation which means Mr. Sharp was prohibited from seeing the list. When he was asked whether he had seen the documents, his answer is truthful when he said "no." Defendants are seeking to penalize Plaintiffs for following the Protective Order.<br><br>Disputed. There is ample evidence that CTM/Banman used Plaintiffs' customer lists to target customers for CTM.<br><br>[PF 519-521, 522-523, 594-596, 530-533, 536, 643-645, 534-535, 558-567, 565-567, 539, 557, 575-576, 591, 646, 647, 649, 554-556, 581-583, | Plaintiffs have not identified or disclosed, in discovery or on this motion, any HRT/Skye customer list. In the "PF" citations provided, there is no customer list disclosed or identified.<br><br>The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |

83

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | 651-653, 578-579, 558-567, 575-576, 680.] | |
| 136. | CTM and Banman have not used or disclosed any HRT/Skye "customer preferences." <br><br> Banman Decl. ¶ 75 | Disputed. There is ample evidence that CTM/Banman targeted Skye's customers to "switch", "swap", or "replace" the exact products (types and sizes) that they had purchased from Skye with comparable CTM products. <br><br> [PF 519-521, 522-523, 594-596, 530-533, 536, 643-645, 534-535, 558-567, 565-567, 539, 557, 575-576, 591, 646, 647, 649, 554-556, 581-583, 651-653, 578-579, 558-567, 575-576, 680.] | Plaintiffs have not identified or disclosed, in discovery or on this motion, any HRT/Skye "customer preferences." In the "PF" citations provided, there are no "customer preferences" disclosed or identified. <br><br> The false, immaterial statements that Plaintiffs add to the record are disputed below in response to "Plaintiffs' Facts." |
| 137. | CTM and Banman have not used or disclosed any patient registry of HRT/Skye. <br><br> Banman Decl. ¶ 78 | Disputed. CTM sent Skye's research to facilities and potential sales representatives but falsely indicating that it was performed using CTM's products. [PF 707-709.] | There is no basis for any dispute. The evidence supports the statement presented. In response, Plaintiffs do not even identify the "patient registry" at issue. *See* PF 707–709 and Defendants' responses below. Plaintiffs have never disclosed the contents of this purported "patient registry" in discovery. *See* Fluskey Decl. Exs. 1 & 2. |
| 138. | HRT/Skye have no evidence that CTM or Banman used or disclosed | Objection. Misstates the testimony. <br><br> Q You don't have knowledge of him | There is no basis for any dispute. During his deposition, Sharp was unable to identify this purported "patient |

84

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | any patient registry of Skye/HRT.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 198:4-199:1 | disclosing the information to a third party, is that correct, after he left your companies?<br><br>A I believe we've seen some documents where some of Skye's information was leveraged in marketing materials used by CTM.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 198:16-21<br><br>Disputed. CTM sent Skye's research to facilities and potential sales representatives but falsely indicating that it was performed using CTM's products.  [PF 707-709.] | registry," let alone explain how Banman utilized it. Fluskey Decl. Ex. 14 (Sharp Depo.) at 198:4–199:1. |
| 139. | CTM and Banman have not used or disclosed HRT's/Skye's "compilation of information" regarding the companies' employees, independent contractors, sales representative, and/or distributors.<br><br>Banman Decl. ¶¶ 81-82 | Disputed. CTM has used information about Skye's employees, independent contractors, sales representatives, and/or distributors.<br><br>[PF 481, 491, 493-494, 537, 573, 575, 576, 580, 588, 667-668, 672-674, 285.] | Plaintiffs have failed to identify this purported "compilation of information" in response to this fact or in discovery. There is no basis for any dispute. The evidence supports the statement provided.<br><br>Plaintiffs have not identified or disclosed, in discovery or on this motion, any HRT/Skye customer list. In the "PF" citations provided, there is no customer list disclosed or identified.<br><br>The false, immaterial statements that Plaintiffs add to the record are |

85

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | | disputed below in response to "Plaintiffs' Facts." |
| 140. | CTM and Banman did not use or disclose any "commission structure" of HRT/Skye.<br><br>Banman Decl. ¶ 83 | Disputed.  Banman specifically targets Skye sales representatives and offered them better commissions than what Skye was paying them.<br><br>[PF 481, 491, 493-494, 537, 573, 575, 576, 580, 588, 667-668, 672-674, 285.] | The statement set forth in the "PF" citations do not include any evidence that CTM and Banman utilized a "commission structure" of HRT/Skye. *See* Defendants' responses to those "PF" paragraphs below. |
| 141. | CTM and Banman did not use or disclose any of the "business operations" information that is referred to in HRT's and Skye's Amended Responses to Banman's First Sets of Interrogatories, Interrogatory No. 1.<br><br>Banman Decl. ¶ 84 | Objection. This is a vague fact by just referring to the title of a section.  The full response reads:<br><br>"Plaintiff's confidential business operations strategies including marketing research, profit margins relating to different markets (i.e., surgical implants), profitability of manufacture vs. outsourcing, providing options in the company as incentive, resource allocation, the responsibilities of the Business Development Department and internal financials including profit margins, revenue numbers, profitability forecasts and costs are not publicly known and have provided Plaintiff with a significant business advantage. Plaintiff has used | Plaintiffs have not identified "business operations" at issue, let alone proffered any evidence that these "business operations" are trade secrets that were misappropriated by Defendants. In response, Plaintiffs simply quote from their vague interrogatory response that does not disclose any trade secrets. At PF 609–263, 661, 573, 570, 671–674, Plaintiffs do not proffer any evidence of the contents of these alleged "business operations.' *See* Response to those "PF" statements below. |

86

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiffs offices and information centers." Disputed.  Evidence supporting the above statement is as follows. [PF 609-263, 661, 573, 570, 671-674.] | |
| 142. | CTM and Banman did not use or disclose any confidential costs or pricing of HRT/Skye. Banman Decl. ¶¶ 85-86 | Disputed.  CTM and Banman used and/or disclosed Skye and HRT"s confidential costs and pricing. [PF 450, 465, 478, 558-567, 565-567, 570-572, 578-579, 610-612, 643-645, 661, 683, 684.] | There is no basis for any dispute. *See* Defendants' responses to "Plaintiffs' Facts" below. |
| 143. | CTM and Banman did not use or disclose any confidential marketing and sales information of HRT/Skye. Banman Decl. ¶¶ 88-90 | Disputed. CTM and Banman did use and/or disclose confidential marketing and sales information of HRT/Skye. [PF 450, 465, 478, 519-521, 522-523, 530-533, 534-535, 536, 557, 554-556, 558-567, 565-567, 570-572, 575-576, 578-579, 581-583, 593, 591, 594-595, 610-612, 643- | There is no basis for any dispute. *See* Defendants' responses to "Plaintiffs' Facts" below. |

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
| | | 645, 646, 647, 649, 651-653, 661, 680, 683, 684.] | |
| 144. | CTM and Banman did not use or disclose any training materials or methods of HRT/Skye.<br><br>Banman Decl. ¶ 91 | Disputed. CTM and Banman used and disclosed Skye's trade secret training materials and methods. [PF 686, 713.] | There is no basis for any dispute. *See* Defendants' responses to "Plaintiffs' Facts" below. |
| 145. | Banman never "wrongfully copied" or "wrongfully obtained" any documents containing or reflecting Skye's or HRT's confidential information.<br><br>Banman Decl. ¶ 128 | Disputed. Banman wrongfully copied or wrongfully obtained HRT's and Skye's trade secret information.<br><br>As examples:<br><br>HRT processing information: PF 376-378, 614, 616, 622-628, 630-640, 641.<br><br>Skye's data regarding revenue, profit margins, and sales of products: PF 564-601, 616.<br><br>Skye's employee and sales representative information: PF 481, 491, 493-494, 537, 575, 576, 588, 667-668.<br><br>Skye's customer information:  PF 450, 465, 478, 519-521, 522-523, 530-533, 534-535, 536, 557, 554-556, 558-567, 565-567, 570-572, 575-576, 578-579, 581-583, 593, 591, 594-595, 610-612, 643-645, 646, 647, | There is no basis for any dispute, and Plaintiffs have fabricated allegations on this motion of purported "wrongful copying" and "wrongfully obtaining" information. All information relating to Banman's work with HRT/Skye was lawfully acquired by Banman while working with HRT/Skye. Banman never accessed any HRT/Skye systems after he ceased working with those companies. Banman Decl. ¶ 128; Banman Reply Decl. ¶¶ 15-18. *See* Defendants' responses to "Plaintiffs' Facts" below. |

88

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | 649, 651-653, 661, 680, 683, 684.<br><br>Dr. research information: PF 584-587, 707-709.<br><br>Skye's sample products: PF 635-637. | |
| 146. | Banman created, obtained, and had access to documents concerning Plaintiffs' businesses while working with Plaintiffs and never obtained any such information without Plaintiffs' consent.<br><br>Banman Decl. ¶ 128 | Objection. Vague and ambiguous as to timing. Misleading. FRE 403.<br><br>Undisputed as to Plaintiffs' consent while Banman was working at Skye. | N/A |
| 147. | Banman never downloaded or copied information from Plaintiffs' computers or offices without Plaintiffs' consent.<br><br>Banman Decl. ¶ 128 | Objection. Vague and ambiguous as to timing. Misleading. FRE 403.<br><br>Undisputed while Banman was working for Skye.<br><br>Disputed if this fact is intended to be after his employment.<br><br>Banman wrongfully copied or wrongfully obtained HRT's and Skye's trade secret information.<br><br>As examples:<br><br>HRT processing information: PF 376-378, 614, 616, 622-628, 630-640, 641.<br><br>Skye's data regarding revenue, profit margins, | There is no basis for any dispute. Plaintiffs' implication that Banman downloaded or copied information from Plaintiffs' systems after he ceased working with the Plaintiff is a fabrication. After he ceased working with HRT/Skye, Banman never accessed any of Plaintiffs' systems. Banman Decl. ¶ 128; Banman Reply Decl. ¶¶ 15-18. *See* Defendants' responses to "Plaintiffs' Facts" below. |

89

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
| | | and sales of products: PF 564-601, 616.<br><br>Skye's employee and sales representative information: PF 481, 491, 493-494, 537, 575, 576, 588, 667-668.<br><br>Skye's customer information:  PF 450, 465, 478, 519-521, 522-523, 530-533, 534-535, 536, 557, 554-556, 558-567, 565-567, 570-572, 575-576, 578-579, 581-583, 593, 591, 594-595, 610-612, 643-645, 646, 647, 649, 651-653, 661, 680, 683, 684.<br><br>Dr. research information: PF 584-587, 707-709.<br><br>Skye's sample products: PF 635-637. | |
| 148. | CTM and Banman have not used or disclosed any "Confidential Information" that HRT may have disclosed to Banman under the HRT Consulting Agreement.<br><br>Banman Decl. ¶ 133 | Disputed.  Banman wrongfully copied or wrongfully obtained HRT's and Skye's trade secret information.<br><br>As examples:<br><br>HRT processing information: PF 376-378, 614, 616, 622-628, 630-640, 641.<br><br>Skye's data regarding revenue, profit margins, and sales of products: PF 564-601, 616. | *See* Defendants' responses to "Plaintiffs' Facts" below. |

90

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Skye's employee and sales representative information: PF 481, 491, 493-494, 537, 575, 576, 588, 667-668.<br><br>Skye's customer information:  PF 450, 465, 478, 519-521, 522-523, 530-533, 534-535, 536, 557, 554-556, 558-567, 565-567, 570-572, 575-576, 578-579, 581-583, 593, 591, 594-595, 610-612, 643-645, 646, 647, 649, 651-653, 661, 680, 683, 684.<br><br>Dr. research information: PF 584-587, 707-709.<br><br>Skye's sample products: PF 635-637. | |
| 149. | CTM and Banman have not used or disclosed any Skye "Proprietary Information" that Skye may have disclosed to Banman under the Skye Employee Confidentiality Agreement.<br><br>Banman Decl. ¶ 134 | Disputed. Banman wrongfully copied or wrongfully obtained HRT's and Skye's trade secret information.<br><br>As examples:<br><br>HRT processing information: PF 376-378, 614, 616, 622-628, 630-640, 641.<br><br>Skye's data regarding revenue, profit margins, and sales of products: PF 564-601, 616.<br><br>Skye's employee and sales representative information: | *See* Defendants' responses to "Plaintiffs' Facts" below. |

91

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | PF 481, 491, 493-494, 537, 575, 576, 588, 667-668.<br><br>Skye's customer information:  PF 450, 465, 478, 519-521, 522-523, 530-533, 534-535, 536, 557, 554-556, 558-567, 565-567, 570-572, 575-576, 578-579, 581-583, 593, 591, 594-595, 610-612, 643-645, 646, 647, 649, 651-653, 661, 680, 683, 684.<br><br>Dr. research information: PF 584-587, 707-709.<br><br>Skye's sample products: PF 635-637. | |
| 150. | During the period of April 23, 2012 through April 23, 2013, Skye did not disclose to Banman any information that it identified in writing as a "trade secret" belonging to Skye.<br><br>Banman Decl. ¶ 132 | Disputed. Banman was selling private label products manufactured by BioD and had access to Skye's trade secret information relating to, at least, business operations, customers, pricing. [PF 712.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed."  Plaintiffs' commentary is non-responsive.  The additional fact they attempt to add to the record at PF 712 is disputed and non-responsive to this fact. *See* below. |
| 151. | Banman has returned to HRT/Skye or his counsel the materials that he possessed in connection with his work for HRT/Skye.<br><br>Banman Decl. ¶ 128 | Disputed. Banman continues to possess the HRT Design File and the Skye Biz Dev Compendium, and various other Skye documents that he has produced in this litigation.  [PF 376, 377, 688.]  Banman also failed | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 376-377, 637, and 688 are disputed and non- |

92

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | to return the Skye chorion membrane that he sent to Alamo for them to copy. [PF 637.] | responsive to this fact. *See* below. CTM has asserted evidentiary objections to Plaintiffs' statements. |
| 152. | Seoane never used or disclosed any HRT/Skye customer list when working with CTM. Seoane Decl. ¶ 36 | Disputed. Seoane conspired with Stumpe, Boulais and Banman to share and use Skye's trade secret customer lists for the benefit of CTM. [PF 450, 465, 478, 519-521, 522-523, 530-533, 534-535, 536, 557, 554-556, 558-567, 565-567, 570-572, 575-576, 578-579, 581-583, 593, 591, 594-595, 610-612, 643-645, 646, 647, 649, 651-653, 661, 672-674, 680, 683, 684.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record are disputed and non-responsive to this fact. *See* below. CTM has asserted evidentiary objections to Plaintiffs' statements. |
| 153. | Seoane did not use any confidential or proprietary Skye information to help develop CTM's onboarding or training programs for independent sales representatives. Seoane Decl. ¶ 37 | Disputed. Seoane prepared an email with attachments distributed to CTM sales representatives that mirrors Skye's sales materials and coding guides he had previously distributed to Skye's sales representatives. [PF 713-714.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 713-714 are disputed and non-responsive to this fact. *See* below. CTM has asserted evidentiary objections to Plaintiffs' statements. |
| 154. | Seoane did not use or disclose any of the information identified under the "Product Development and Manufacturing" heading in | Undisputed but immaterial. | N/A |

93

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | HRT's and Skye's Amended Responses to Seoane's First Sets of Interrogatories, Interrogatory No. 1.<br><br>Seoane Decl. ¶¶ 10, 39-41 | | |
| 155. | Seoane was not involved in the development, processing, or manufacturing of HRT/Skye products.<br><br>Seoane Decl. ¶¶ 10, 39 | Undisputed but immaterial. | N/A |
| 156. | Seoane did not have access to any documents concerning the development, processing, or manufacturing of HRT/Skye products.<br><br>Seoane Decl. ¶¶ 10, 39 | Undisputed but immaterial. | N/A |
| 157. | Seoane did not review any documents concerning the development, processing, or manufacturing of HRT/Skye products.<br><br>Seoane Decl. ¶¶ 10, 39 | Undisputed but immaterial | N/A |
| 158. | Seoane never discussed or conspired with Bryan Banman, Mike Stumpe, Nate Boulais, or Gardner Rodgers to use or disclose any HRT/Skye processes for manufacturing any products. | Undisputed but immaterial. | N/A |

94

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
| | Seoane Decl. ¶ 41 | | |
| 159. | Seoane has not used or disclosed any customer lists of HRT or Skye.<br><br>Seoane Decl. ¶ 43 | Disputed. Seoane conspired with Stumpe, Boulais and Banman to share and use Skye's trade secret customer lists for the benefit of CTM. [PF 450, 465, 478, 519-521, 522-523, 530-533, 534-535, 536, 557, 554-556, 558-567, 565-567, 570-572, 575-576, 578-579, 581-583, 593, 591, 594-595, 610-612, 643-645, 646, 647, 649, 651-653, 661, 672-674, 680, 683, 684.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record are disputed and non-responsive to this fact. *See* below. |
| 160. | Seoane has not used or disclosed any potential customer lists of HRT or Skye.<br><br>Seoane Decl. ¶ 43 | Disputed. Seoane conspired with Stumpe, Boulais and Banman to share and use Skye's trade secret customer lists for the benefit of CTM. [PF 450, 465, 478, 519-521, 522-523, 530-533, 534-535, 536, 557, 554-556, 558-567, 565-567, 570-572, 575-576, 578-579, 581-583, 593, 591, 594-595, 610-612, 643-645, 646, 647, 649, 651-653, 661, 672-674, 680, 683, 684.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objections to Plaintiffs' statements. |
| 161. | Seoane has not used or disclosed any "preferences for customers" developed or compiled by HRT or Skye.<br><br>Seoane Decl. ¶ 43 | Disputed. Seoane conspired with Stumpe, Boulais and Banman to share and use Skye's trade secret customer lists for the benefit of CTM. [PF 450, 465, 478, 519-521, 522-523, 530-533, 534-535, 536, 557, 554-556, 558- | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record are disputed and |

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | 567, 565-567, 570-572, 575-576, 578-579, 581-583, 593, 591, 594-595, 610-612, 643-645, 646, 647, 649, 651-653, 661, 672-674, 680, 683, 684.] | non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objections to Plaintiffs' statements. |
| 162. | Seoane has not used or disclosed a HRT/Skye "patient registry" in connection with his work for CTM.<br><br>Seoane Decl. ¶ 46 | Generally undisputed. | N/A |
| 163. | Seoane has not used or disclosed Skye's or HRT's "compilation of information" regarding Skye's or HRT's employees, independent contractors, sales representative, and/or distributors.<br><br>Seoane Decl. ¶ 47 | Disputed.  Seoane wrongfully stole and disclosed to Banman Skye's trade secret sales rep and lead information. [PF 672-674, 682.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 672-674, 682, are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objections to Plaintiffs' statements. |
| 164. | Seoane has not used or disclosed any of Skye's cost information.<br><br>Seoane Decl. ¶ 48 | Generally undisputed. | N/A |
| 165. | Seoane has not used or disclosed any "analyses" prepared by Skye regarding its pricing or cost information. | Generally undisputed. | N/A |

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Seoane Decl. ¶ 48 | | |
| 166. | Seoane did not utilize or refer to any marketing materials or strategies of Skye in his work for CTM.<br><br>Seoane Decl. ¶ 51 | Disputed. Seoane prepared an email with attachments distributed to CTM sales representatives that mirrors Skye's sales materials and coding guides distributed to Skye's sales representatives.  [PF 713-714.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 713-714 are disputed and non-responsive to this fact. *See* below. |
| 167. | Seoane did not utilize any research or analyses of Skye or HRT regarding medical reimbursement coding in his work for CTM.<br><br>Seoane Decl. ¶ 53 | Disputed. Seoane prepared an email with attachments distributed to CTM sales representatives that mirrors Skye's sales materials and coding guides distributed to Skye's sales representatives.  [PF 713-714.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 713-714 are disputed and non-responsive to this fact. *See* below. |
| 168. | Seoane did not reference, utilize, or rely upon any training materials of Skye in his work for CTM.<br><br>Seoane Decl. ¶ 54 | Disputed. Seoane prepared an email with attachments distributed to CTM sales representatives that mirrors Skye's sales materials and coding guides distributed to Skye's sales representatives.  [PF 713-714.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 713-714 are disputed and non-responsive to this fact.  *See* below. |
| 169. | Seoane did not use or disclose any of the Apple "Notes" files referred to in the Complaint in connection with his work for CTM.<br><br>Seoane Decl. ¶ 28 | Disputed. Seoane prepared an email with attachments distributed to CTM sales representatives that mirrors Skye's sales materials and coding guides distributed to Skye's sales representatives.  [PF 713-714.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 713-714 are disputed and non-responsive to this fact. *See* below. |

97

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 170. | HRT/Skye have no evidence that Banman, CTM, or Seoane used or disclosed any of the Apple "Notes" files referred to in the Complaint.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 238:2-17 | Objection.  Misstates cited testimony. Argumentative. Misleading. FRE 403.<br><br>Documents containing CTM's sales and marketing information were marked as "highly confidential" in this litigation which means Mr. Sharp was prohibited from seeing them. When asked if he had seen evidence that CTM used the Notes files, Chris Sharp testified: "I haven't been privy to all the discovery documents to be able to accurately answer that; but of the ones I have seen, I don't believe so."<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 238:2-17.<br><br>Defendants are seeking to penalize Plaintiffs for following the Protective Order.<br><br>Disputed.  Seoane prepared an email with attachments distributed to CTM sales representatives that mirrors Skye's sales materials and coding guides distributed to Skye's sales representatives, to be used to CTM's benefit and Skye's detriment.  [PF 713-714.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The cited testimony establishes CTM's stated fact. Plaintiffs have failed to offer evidence to rebut the fact. The additional facts they attempt to add to the record at PF 713-714 are disputed and non-responsive to this fact. *See* below. |

98

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| **VII.** | **The CTM Defendants' Lack of Interference** | | |
| **A.** | **Customers** | | |
| 171. | Skye has not produced in this case a written agreement with Carmel Ambulatory Surgery Center.<br><br>Fluskey Decl. Ex. 12 (RFA 3) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement Carmel Ambulatory Surgery Center. | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 172. | Skye has not produced in this case a written agreement with Columbus Specialty Surgery Center.<br><br>Fluskey Decl. Ex. 12 (RFA 8) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Columbus Specialty Surgery Center. | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 173. | Skye has not produced in this case a written agreement with Skyway Surgery Center. | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not |

99

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Fluskey Decl. Ex. 12 (RFA 62) | Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Skyway Surgery Center. | argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 174. | Skye has not produced in this case a written agreement with Southern New Mexico Surgery Center.<br><br>Fluskey Decl. Ex. 12 (RFA 65) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Southern New Mexico Surgery Center. | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 175. | Skye has not produced in this case a written agreement with Veterans Administration.<br><br>Fluskey Decl. Ex. 12 (RFA 74) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Veterans Administration | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 176. | Skye has not produced in this case a written agreement with Veterans | Objection. Irrelevant. FRE 401. Argumentative. FRE 403. | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered |

100

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Administration National Acquisition Center.<br><br>Fluskey Decl. Ex. 12 (RFA 77) | Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Veterans Administration National Acquisition Center | with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 177. | Skye has not produced in this case a written agreement with Veterans Medical Distributor: Central Texas VA.<br><br>Fluskey Decl. Ex. 12 (RFA 83) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Veterans Medical Distributor: Central Texas VA | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 178. | Skye has not produced in this case a written agreement with Veterans Medical Distributor: Long Beach VA.<br><br>Fluskey Decl. Ex. 12 (RFA 86) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Veterans Medical Distributor: Long Beach VA | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |

101

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|--------------------|
| 179. | Skye has not produced in this case a written agreement with Veterans Medical Distributor: Martinsburg VAMC.<br><br>Fluskey Decl. Ex. 12 (RFA 89) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Veterans Medical Distributor: Martinsburg VAMC | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 180. | Skye has not produced in this case a written agreement with Veterans Medical Distributor: SFC – System Perform.<br><br>Fluskey Decl. Ex. 12 (RFA 92) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Veterans Medical Distributor: SFC – System Perform | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 181. | Skye has not produced in this case a written agreement with Veterans Medical Distributor: VMAC Washington DC.<br><br>Fluskey Decl. Ex. 12 (RFA 95) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622. | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have |

102

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Undisputed that Skye has not produced a written agreement with Veterans Medical Distributor: VMAC Washington DC | simply stated "undisputed." |
| 182. | Skye has not produced in this case a written agreement with Wabash Valley Surgery Center.<br><br>Fluskey Decl. Ex. 12 (RFA 98) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Wabash Valley Surgery Center | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 183. | Skye has not produced in this case a written agreement with Witham Hospital.<br><br>Fluskey Decl. Ex. 12 (RFA 107) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Witham Hospital | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 184. | Skye has not produced in this case a written agreement with Janos Ertl.<br><br>Fluskey Decl. Ex. 12 (RFA 110) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not |

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Janos Ertl | argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 185. | Skye has not produced in this case a written agreement with Michael Baker.<br><br>Fluskey Decl. Ex. 12 (RFA 116) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Michael Baker | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 186. | Skye has not produced in this case a written agreement with Scott Taylor.<br><br>Fluskey Decl. Ex. 12 (RFA 119) | Objection. Irrelevant. FRE 401. Argumentative. FRE 403.<br><br>Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye has not produced a written agreement with Scott Taylor | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 187. | Skye does not possess a written agreement signed by Robert Bibb. | Objection. Objection. Irrelevant. FRE 401. Argumentative. FRE 403. Misstates the cited evidence. | Plaintiffs' evidentiary objections are without basis, the contract at issue was allegedly interfered with by CTM and the existence of a contract is |

104

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Fluskey Decl. Ex. 12 (RFA 152) | Under California's Civil Code, contracts may be written, oral or implied. Cal. Civ. Code §§ 1619-1622.<br><br>Undisputed that Skye does not have an agreement "signed by" Robert Bibb, but Skye has an agreement with his company, BMP Bracing, signed by Tommy Miller on behalf of BMP Bracing and Robert Bibb.<br><br>Fluskey Decl. Ex. 12 (RFA 152) | fact, it is not argumentative. There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." |
| 188. | CTM, Banman, and Seoane did not disrupt any contractual relationship between Skye and its customers.<br><br>Banman Decl. ¶ 93; Seoane Decl. ¶ 56 | Objection. Improper lay opinion. FRE 701. This is a legal conclusion, not a "fact".<br><br>Disputed.  CTM, Banman, and Seoane,  conspired with Stumpe and Boulais to share and use Skye's trade secret employee and sales representative information to induce Skye sales representatives to breach their agreements. [PF 481, 491, 493-494, 537, 575, 576, 588, 667-668, 672-674, 686.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objections to Plaintiffs' statements. |
| 189. | CTM, Banman, and Seoane did not induce any customer or potential customer to breach any contract with Skye. | Objection. Improper lay opinion. FRE 701. This is a legal conclusion, not a "fact".<br><br>Disputed. CTM, Banman, and Seoane,  conspired with Stumpe and Boulais | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record are disputed and |

105

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | Banman Decl. ¶ 93; Seoane Decl. ¶ 56 | to share and use Skye's trade secret customer information to target Skye's customers and induce them to breach their agreements with Skye.  [PF 450, 465, 478, 519-521, 522-523, 530-533, 534-535, 536, 557, 554-556, 558-567, 565-567, 570-572, 575-576, 578-579, 581-583, 593, 591, 594-595, 610-612, 643-645, 646, 647, 649, 651-653, 661, 680, 683, 684.] | non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objections to Plaintiffs' statements. |
| 190. | No customer of CTM has informed CTM, Banman, or Seoane that it has a contract with Skye.<br><br>Banman Decl. ¶ 94; Seoane Decl. ¶ 57 | Objection. Misleading and irrelevant. FRE 401-403. Whether or not any customers informed CTM or Banman of their contractual relationship with Skye has no bearing on whether or not Banman knew about Skye's contracts with customers.<br><br>Undisputed that Banman and Seoane claim they were not told by a customer that the customer had an agreement with Skye. | Plaintiffs' commentary is legal argument and it is wrong; Plaintiffs should have simply stated "undisputed." |
| 191. | Skye sells products to its customers based on individual customer orders, and generally does not have written contracts with its customers.<br><br>Banman Decl. ¶ 95; Seoane Decl. ¶ 58 | Undisputed. | N/A |

106

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 192. | Skye does not have contracts with doctors for the purchase or use of Skye products.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 588:21-25; 590:11-21 | Disputed. Skye had valid oral agreements with doctors for research using Skye's products. [PF 716.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional fact they attempt to add to the record at PF 716, is disputed and non-responsive to this fact. *See* below. |
| 193. | Skye does not have any contracts with customers that require the customers to purchase products from Skye.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 586:13-588:2; 591:21-592:10 | Undisputed. | N/A |
| 194. | Skye does not have contracts with customers that prohibit customers from purchasing products from other suppliers, including CTM.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 673:20-674:13, 675:8-676:12, 677:7-11; Banman Decl. ¶ 96; Seoane Decl. ¶ 59; Fluskey Decl. Ex. 36 (Schlifka Depo.) at 21:8-21 | Undisputed. | N/A |
| 195. | CTM has no contracts with its customers that prevents the customers from purchasing products from other suppliers. | Undisputed. | N/A |

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Banman Decl. ¶ 97; Seoane Decl. ¶ 60 | | |
| 196. | None of the customers with whom Skye alleges interference have breached any contract with Skye.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 673:9-677:3 | Objection. Misleading. Misstates deposition. FRE 401-403.<br><br>Sharp did not testify that none of Skye's customers have breached contracts, Sharp testified that Skye has not filed lawsuits against any of its customers.  [PF 689.] Skye had valid oral and implied contracts with twenty-six customers at issue in this lawsuit.  [PF 693.]<br><br>Disputed. CTM, Banman, and Seoane,  conspired with Stumpe and Boulais to share and use Skye's trade secret customer information to target Skye's customers and induce them to breach their agreements with Skye.  [PF 450, 465, 478, 519-521, 522-523, 530-533, 534-535, 536, 557, 554-556, 558-567, 565-567, 570-572, 575-576, 578-579, 581-583, 593, 591, 594-595, 610-612, 643-645, 646, 647, 649, 651-653, 661, 680, 683, 684.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' opposition intentionally misstates and mischaracterizes Chris Sharp's deposition testimony by stating that "Sharp did not testify that the entities and individuals with whom Skye is claiming interference, did not breach any contract with Skye." Chris Sharp testified as follows:<br><br>Q. Look at 450 - - - actually, before we go there.  Sorry. Has Skye or HRT filed any lawsuits against any of the individuals or entities listed on pages 8 through 9 for breaching any contracts?<br><br>A. No. I don't believe so, no.<br><br>Q. Does Skye allege that any entity or individual on that list has breached a contract Skye?<br><br>A. No.<br><br>Saba Decl., Ex. 109, 674:24-675:7.<br><br>Plaintiffs' statement about alleged oral contracts is not |

108

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
|     |                          |                      | support by any competent evidence, they are just conclusory statements by Sharp.  Sharp Decl. ¶ 67. Sharp does not identify any of the terms of the alleged oral agreements, who entered into the oral agreements on behalf of Plaintiffs, who entered into the alleged oral agreements on behalf the entities, what the terms of the alleged oral agreements were, or that anyone breached any alleged oral agreement with Plaintiffs.<br><br>Moreover, CTM has never sold product to a number of the entities. Banman Decl. ¶ 98.<br><br>The additional facts they attempt to add to the record are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objections to Plaintiffs' statements. |
| 197. | CTM has never sold products to JFK Medical Center of Florida; St. Luke's Springwoods Village Hospital; St. Luke's Woodlands; Wabash Valley Surgery Center; Witham Hospital; Veterans Medical Distributors; Central Texas Veterans Administration | Objection. Irrelevant. FRE 401. CTM used Skye trade secrets to interfere with Skye's customers.<br><br>Disputed. CTM interfered with Skye's relationships with these facilities. [PF 450, 465, 478, 519-521, 522-523, 530-533, 534-535, 536, 557, 554-556, 558-567, 565-567, 570- | Plaintiffs' evidentiary objection is without merit as they have asserted tortious interference claims against CTM for the entities and individuals identified in the statement, so the fact that CTM has never sold to them is relevant. |

109

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | ("VA"); Long Beach VA; Martinsburg VA; SFC-System Perform; VAMC of Washington DC; Travis Clegg; Layton Elliot; Keith Flak; Todd Midla; and Scott Taylor.<br><br>Banman Decl. ¶ 98 | 572, 575-576, 578-579, 581-583, 593, 591, 594-595, 610-612, 643-645, 646, 647, 649, 651-653, 661, 680, 683, 684.] | The additional facts they attempt to add to the record are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| **B.** | **Research Physicians** | | |
| 198. | Of the doctors with whom Skye alleges interference, only Dr. Badman, Dr. Hiatt, and Dr. Ciaglia have conducted research for CTM.<br><br>Banman Decl. ¶ 100; Seoane Decl. ¶ 62 | Objection. Irrelevant. FRE 401.<br><br>CTM used Skye's trade secret information to target and interfere with Skye's research physicians. [PF 584-587.]<br><br>Whether or not those physicians ultimately performed research for CTM is irrelevant.<br><br>Otherwise, undisputed. | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' evidentiary objection is without merit as they have asserted tortious interference claims against CTM for the individuals identified in the statement, so the fact that CTM has only worked with three of the physicians Plaintiffs identified in their discovery responses is relevant. The additional facts they attempt to add to the record at PF 584-587, are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 199. | Skye's agreements with Dr. Badman, Dr. Hiatt, and Dr. Ciaglia are not exclusive and do not prohibit them from | Undisputed. | N/A |

110

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | working with other companies.<br><br>Fluskey Decl. Ex. 23; Fluskey Decl. Ex. 14 (Sharp Depo.) at 385:3-386:13, 395:21-396:14, 674:13-23, 676:8-12; Banman Decl. ¶ 101 | | |
| 200. | CTM, Banman, and Seoane did not ask or direct Dr. Badman, Dr. Hiatt, and Dr. Ciaglia to breach any contracts with Skye.<br><br>Banman Decl. ¶ 101; Seoane Decl. ¶ 64 | Disputed. CTM, Banman, and Seoane conspired with Stumpe and Boulais to interfere with Dr. Kelly Hiatt's contract with Skye. [PF 584-587.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 584-587, are disputed and non-responsive to this fact.  *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 201. | Skye's research agreements with research physicians do not require those physicians to conduct research.<br><br>Fluskey Decl. Ex. 23; Fluskey Decl. Ex. 21 (Hiatt Depo.) at 64:4-67:4 | Objection. Misstates the supporting testimony. Dr. Hiatt's testimony goes against a plain reading of her contract terms which creates a question of fact.<br><br>Disputed.<br><br>Fluskey Decl. Ex. 23. | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The cited testimony literally says, discussing the research agreement: "But this does not, I didn't see this as a document that said I had to complete forty ENT procedures per report. I've not done forty tympanoplasties in my life. Let alone – this is not an achievable thing. I thought this was an opportunity to participate and that my report could include that. But this didn't, this didn't strike me as a contract that |

111

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | | said that I was legally obligated to do this." Fluskey Decl., Ex. 21 (Hiatt Depo.) at 66:13-22.<br><br>Plaintiffs' counsel agreed with Dr. Hiatt's testimony: "Q. [Mr. Saba] No, you were not legally obligated. They were going to pay you in exchange for performing services if you performed them. You understand that, correct?" Fluskey Decl., Ex. 21 (Hiatt Depo.) at 66:23-67:1. |
| 202. | Skye research physicians were to be compensated by Skye in a lump sum if they completed and submitted a clinical report with supporting data.<br><br>Fluskey Decl. Ex. 23 | Objection. Speculative. FRE 602.<br><br>Disputed. Research physicians were paid per study.<br><br>Fluskey Decl. Ex. 23. | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' evidentiary objection is without merit, the research agreements provide for how the physician would be paid. Fluskey Decl., Ex. 23. |
| 203. | No doctor with whom Skye alleges interference has breached any contract with Skye.<br><br>Fluskey Decl. Ex. (Sharp Depo.) at 673:9-677:3, 376:16-377:16, 386:15-24 | Disputed. Dr. Hiatt breached her agreement with Skye. [PF 584-587.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 584-587, are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |

112

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 204. | Dr. Anderson did not have any agreement with Skye or with CTM.

Fluskey Decl. Ex. 22 (Anderson Depo.) at 21:5-22:9, 31:24-32:15, 77:2-15, 83:5-84:1; Banman Decl. ¶ 100 | Objection.  Misstates testimony.  Misleading. FRE 401-403.

Dr. Anderson testified that he "[didn't] think we had any formal agreement, written agreement." Anderson Depo. (Fluskey Decl. Ex. 22) at 21:11-12. | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. |
| 205. | Skye is not claiming contract interference with Dr. Walt Lowe.

Fluskey Decl. Ex. 13 at 3 | Undisputed. | N/A |
| C. | **Independent Sales Representatives** | | |
| 206. | CTM executes non-exclusive agreements with its independent sales representatives that include express representations by the representative that (1) the representative is not bound by a restrictive covenant that would prohibit his work for CTM, and (2) no other contract prohibits the representative from working with CTM.

Banman Decl. ¶ 102; Seoane Decl. ¶ 65; Fluskey Decl. Ex. 35 | Objection. Irrelevant. Misstates the evidence. FRE 401-403.

Sales representatives do not sign these agreements under oath.  Whether or not any sales representatives informed CTM or Banman of their contractual relationship with Skye has no bearing on whether or not Banman knew about Skye's contracts with its sales representatives.

Disputed. CTM's representative agreement askes the signor to affirm that they are not subject to restrictive covenants "involving Company's | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. |

113

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Business or Customers" and that their work for CTM will not cause them "to breach or violate any agreement with any other person, business, or entity." See, Fluskey Decl. Ex. 35 at V(F). | |
| 207. | Alex Wrinkles, Chad Galloway, Daniel Mirenda, Jake Bergey, James Boone, Kyle Clark, Lisa Robinson, Matt Dripps, Scott Tanabe, William Trengove, Wally Karam, and Matt Locus have never contracted with, or sold products for, CTM.<br><br>Banman Decl. ¶ 104; Seoane Decl. ¶ 71 | Objection. Irrelevant. FRE 401.<br><br>Undisputed that Defendants did not interfere with Matt Locus.<br><br>Otherwise disputed.<br><br>CTM, Banman, Seoane, Boulais, and Stumpe used Skye trade secrets to interfere with Skye's sales representatives. [PF 573, 717.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. The additional facts they attempt to add to the record at PF 573, 717, are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 208. | Maria Carey, Andrew Hubbard, Bill Morgan, Tommy Miller, Robert Bibb, Katey Deariso, and Garrett Amadon contracted with CTM for the ability to sell CTM products, but never sold any CTM products.<br><br>Banman Decl. ¶ 106; Seoane Decl. ¶ 73 | Objection. Irrelevant. FRE 401.<br><br>Disputed. CTM, Banman, Seoane, Boulais, and Stumpe used Skye trade secrets to interfere with Skye's sales representatives. [PF 493, 494, 588, 717.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' evidentiary objection is without merit as they have asserted tortious interference claims against CTM for the individuals identified in the statement, so the fact that the individuals Plaintiffs identified in their discovery responses have not sold CTM product is relevant. Plaintiffs' |

114

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | | irrelevant commentary is non-responsive and should be disregarded. The additional facts they attempt to add to the record at PF 493, 494, 588, and 717, are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 209. | Andrew Hubbard, Bill Morgan, Tommy Miller, Robert Bibb, Katey Deariso, and Garret Amadon did not inform Banman or Seoane that they had a contract with Skye that prevented them from working with CTM.<br><br>Banman Decl. ¶ 107; Seoane Decl. ¶ 74 | Objection. Irrelevant and misleading.  FRE 401.<br><br>Banman was in charge of the sales representatives and knew the terms of the standard sales representative agreement. [PF 398-400.]<br><br>Disputed. CTM, Banman, Seoane, Boulais, and Stumpe used Skye trade secrets to interfere with Skye's sales representatives. [PF 493, 494, 588, 717.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 398-400, 493, 494, 588, and 717, are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 210. | Maria Carey expressly represented in writing to Banman that she was free to contract with CTM.<br><br>Banman Decl. ¶ 107; Fluskey Decl. Ex. 33; Fluskey Decl. Ex. 20 (Carey Depo.) at 52:5-9, 52:15-54:8 | Objection. Irrelevant. Misleading. FRE 401-403.<br><br>Disputed. Page 52 of Maria Carey's Deposition is not attached to the Declaration of Robert Fluskey. Maria Carey testified that Banman instructed her to write that email and told her what to write.   Carey | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' statement that "Maria Carey testified that Banman instructed her to write that email and told her what to write" is false. The deposition testimony |

115

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
|     |                          | Depo. (Saba Decl. Ex. 31) 52:24-53:2.

Banman was in charge of the sales representatives and knew the terms of the standard sales representative agreement. [PF 398-400.] | from Maria Carey was as follows:

Q.  Okay. Now, before IMS and CTM signed a contract did you tell Mr. Banman that you were free to do business with him?

A. Yes.  Free to do whatever the hell I want, yes, I did.

Q. Okay.

A. I did.

Fluskey Reply Dec., Ex. 3 (Carey Depo.) at 52:5-11.

With regard to the email referenced in Plaintiffs' response, she testified that she wrote the email:

Q. Okay. Let's first start by looking at it, and then I want to talk to you about the e-mail, all right. So this is an e-mail from you to Bryan Banman dated September 18, 2018, correct?

A. Yes, sir.

Q. Okay.  And you wrote this e-mail?

A. Yes, sir.

Fluskey Reply Decl., Ex. 3 (Carey Depo.) at 53:3-11.

The additional facts they attempt to add to the record |

116

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | | at PF 398-400, are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 211. | CTM, Banman, and Seoane did not instruct, direct, or suggest that any independent sales representative should breach contracts with Skye.<br><br>Banman Decl. ¶ 102; Seoane Decl. ¶ 65 | Disputed. CTM, Banman, and Seoane induced and encouraged Skye sales representatives to breach the terms of their agreements with Skye. [PF 481, 491, 493-494, 537, 575, 576, 588, 667-668, 672-673, 682-684.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 481, 491, 493-394, 537, 575, 576, 588, 667-668, 672-673, and 682-684, are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 212. | There is no exclusivity provision in the contract that B.J. Benik signed with Skye. The provision was crossed-out.<br><br>Fluskey Decl. Ex. 26; Fluskey Ex. 14 (Sharp Depo.) at 317:1-318:21 | Objection. Irrelevant. FRE 401.<br><br>Undisputed. However, BJ Benik had to sign a document that has not and will not disclose Skye's trade secrets to CTM. [PF 701.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. The additional fact they attempt to add to the record at PF 701 is disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |

117

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 213. | B.J. Benik has not breached any contract with Skye.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 319:23-25 | Objection. Misstates testimony. FRE 401-403.<br><br>Chris Sharp testified that he has not alleged BJ Benik breached any agreement with Skye.  Not that he did not breach any agreement with Skye.<br><br>Fluskey Decl. Ex. 14 (Sharp Depo.) at 319:23-25.<br><br>Otherwise | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. |
| 214. | Jeremy Smith signed a contract with Skye effective March 20, 2017.<br><br>Fluskey Decl. Ex. 27 | Undisputed. | N/A |
| 215. | There is no exclusivity provision in the contract that Jeremy Smith signed with Skye. The provision was crossed-out.<br><br>Fluskey Decl. Ex. 27 | Objection. Irrelevant and misleading.  401-403.<br><br>Jeremy Smith's representative agreement contains a confidentiality provision that lasts for five years, to March 20, 2022 that Plaintiffs allege the Defendants' interfered with.<br><br>[PF 717], Fluskey Decl. Ex. 27.<br><br>Otherwise, undisputed. | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. |
| 216. | Jeremy Smith signed a contract with CTM effective June 17, 2021. | Undisputed. | N/A |

118

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Banman Decl. ¶ 110; Seoane Decl. ¶ 78 | | |
| 217. | Mike Stumpe, on behalf of Novus Ortho Corp., signed a contract with Skye effective January 26, 2015. Fluskey Decl. Ex. 28 | Undisputed. | N/A |
| 218. | Mike Stumpe, on behalf of Silenda Medical, signed a contract with CTM effective July 25, 2018. Banman Decl. ¶ 109 | Undisputed. | N/A |
| 219. | Dean Conway signed a contract with Skye effective January 17, 2018. Fluskey Decl. Ex. 29 | Undisputed. | N/A |
| 220. | Dean Conway signed a contract with CTM effective August 1, 2020. Banman Decl. ¶ 108; Seoane Decl. ¶ 75 | Undisputed. | N/A |
| 221. | Skye is not claiming contract interference with Dave McGrew, Jason Belohlavek, Stephen Wood, and Matt Locus. Fluskey Decl. Ex. 13 at 2-3 | Undisputed. | N/A |

119

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| D. | Other Allegations in Plaintiffs' Complaint | | |
| 222. | Banman never told anyone at Integrative Medical Solutions to stop distributing Skye products and to only distribute CTM products.<br><br>Banman Decl. ¶ 111 | Disputed. Banman intentionally targeted Maria Carey, of Integrative Medical Solutions, and induced the breach of Carey's agreement with Skye. [PF 493, 494, 588.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. The additional facts they attempt to add to the record at PF 493, 494, 588, are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 223. | Banman did not target or attempt to recruit/poach Integrative Medical Solutions to breach their contracts with Plaintiffs and work with CTM instead.<br><br>Banman Decl. ¶ 112; Fluskey Decl. Ex. 20 (Carey Depo.) at 58:1-12 | Disputed. Banman intentionally targeted Maria Carey, of integrative Medical Solutions, and induced the breach of Carey's agreement with Skye. [PF 493, 494, 588.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. The additional facts they attempt to add to the record at PF 493, 494, 588, are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 224. | After Banman resigned from Skye and formed CTM in 2018, Maria Carey contacted Banman and told | Disputed. Banman attempted to recruit Maria Carey in March 2018, | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' |

120

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | him she was interested in adding CTM products to the portfolio of products sold by Integrative Medical Solutions.<br><br>Banman Decl. ¶ 113; Fluskey Decl. Ex. 20 (Carey Depo.) at 51:16-22 | before Banman had left Skye. [PF 493, 494.] | irrelevant commentary is non-responsive and should be disregarded. The additional facts they attempt to add to the record at PF 493, 494, are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 225. | On September 18, 2018, Maria Carey sent an email to Banman and represented in writing that she was free to work with CTM and had no contractual restrictions.<br><br>Banman Decl. ¶ 115; Fluskey Decl. Ex. 33; Fluskey Decl. Ex. 20 (Carey Depo.) at 53:6-54:8. | Objection. Irrelevant. Misleading. FRE 401-403.<br><br>Disputed. Banman instructed Carey to send the email after telling her what to say.  Carey Depo. (Saba Decl. Ex. 31) at 147:3-148:5.<br><br>Banman was in charge of the sales representatives and knew the terms of the standard sales representative agreement. [PF 398-400.]<br><br>Undisputed that Maria Carey sent Banman an email stating she was "free to carry other amniotic lines". | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' statement that "Maria Carey testified that Banman instructed her to write that email and told her what to write" is false. The deposition testimony from Maria Carey was as follows:<br><br>Q. Okay. Now, before IMS and CTM signed a contract did you tell Mr. Banman that you were free to do business with him?<br><br>A. Yes.  Free to do whatever the hell I want, yes, I did.<br><br>Q. Okay.<br><br>A. I did.<br><br>Fluskey Reply Decl., Ex. 3 (Carey Depo.) at 52:5-11. |

121

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
|  |  |  | With regard to the email referenced in Plaintiffs' response, she testified that she wrote the email:

Q. Okay. Let's first start by looking at it, and then I want to talk to you about the e-mail, all right. So this is an e-mail from you to Bryan Banman dated September 18, 2018, correct?

A. Yes, sir.

Q. Okay.  And you wrote this e-mail?

A. Yes, sir.

Fluskey Decl., Ex. 20 (Carey Depo.) at 53:3-11.

The additional facts they attempt to add to the record at PF 398-400, are disputed and non-responsive to this fact. *See* below.

CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 226. | Maria Carey and Integrative Medical Solutions entered into a contract with CTM, but have never sold a CTM product. | Objection. Irrelevant. FRE 401.

Disputed. Banman intentionally targeted Maria Carey, of Integrative Medical Solutions, and induced the breach of | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. The additional facts they attempt to add to the record at PF 493, 494, 588, are |

122

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Banman Decl. ¶ 116; Fluskey Decl. Ex. 20 (Carey Depo.) at 59:3-7. | Carey's agreement with Skye. [PF 493, 494, 588.] | disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 227. | Banman never told Dr. Anderson or Gerald Champion Regional Medical Center to stop buying Plaintiffs' products.<br><br>Banman Decl. ¶ 118 | Disputed. In June 2018, Banman contacted physician John Anderson, who worked at Gerald Champion Regional Medical Center ("GCRMC") and Southern New Mexico Surgery Center and asked that he start using CTM products instead of Skye products. [PF 539-540, 569.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. The additional facts they attempt to add to the record at PF 539-540, and 569 are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 228. | Banman did not interfere with VMD's contract with Skye or demand that VMD sell CTM products.<br><br>Banman Decl. ¶ 120; Fluskey Decl. Ex. 19 (Rogers Depo.) at 71:3-5; Declaration of Gardner Rogers, dated November 3, 2022 ("Rogers Decl.") ¶¶ 12-15 | Disputed. VMD signed an exclusive distribution agreement with Skye.<br><br>[Saba Decl. ¶ 130, Ex. 124.]<br><br>After Banman left CTM, he instructed Gardner Rogers to send an email to Chris Sharp, to avoid the exclusivity obligations with Skye, falsely stating that the applications to sell Skye products to the Veteran's Administration as part of a schedule with the Veterans | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs have discontinued their claims against Gardner Rogers because they were without merit. The "evidence" Plaintiffs' cite, Saba Decl., Exs. 124 and 125, do not support Plaintiffs' commentary. |

123

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | Administration Nation Acquisition Center, had been denied.  It had not been reviewed at that time.<br><br>[Saba Decl. ¶ 131, Ex. 125.] | |
| 229. | Banman never directed Rogers to terminate VMD's contract with Skye or to stop selling Skye products.<br><br>Banman Decl. ¶ 120; Rogers Decl. ¶¶ 12-15 | Disputed. After Banman left CTM, he instructed Gardner Rogers to send an email to Chris Sharp, to avoid the exclusivity obligations with Skye, falsely stating that the applications to sell Skye products to the Veteran's Administration as part of a schedule with the Veterans Administration Nation Acquisition Center, had been denied.  It had not been reviewed at that time.<br><br>[Saba Decl. ¶ 131, Ex. 125.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs have discontinued their claims against Gardner Rogers because they were without merit. The "evidence" Plaintiffs' cite, Saba Decl., Ex. 125, does not support Plaintiffs' commentary. |
| 230. | VMD and Rogers have never sold or distributed a CTM product.<br><br>Banman Decl. ¶ 121; Fluskey Decl. Ex. 19 (Rogers Depo.) at 70:25-71:8; Rogers Decl. ¶¶ 17-19 | Disputed. Banman emailed a price quote for  CTM products for Rogers to sell to a Texas VA.<br><br>[Saba Decl. ¶ 132, Ex. 126.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs have discontinued their claims against Gardner Rogers because they were without merit. The "evidence" Plaintiffs' cite, Saba Decl., Ex. 126, does not support Plaintiffs' commentary. |

124

CASE NO: 2:20-cv-03444-MEMF-PVC

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 231. | VMD and Rogers never entered into a contractual relationship with CTM.<br><br>Banman Decl. ¶ 121; Fluskey Decl. Ex. 19 (Rogers Depo.) at 72:17-73:11; Rogers Decl. ¶¶ 17-19 | Disputed. Rogers had three 1099s from CTM for 2018, 2019, and 2020.<br><br>[Saba Decl. ¶ 133, Ex. 127.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs have discontinued their claims against Gardner Rogers because they were without merit. The "evidence" Plaintiffs' cite, Saba Decl., Ex. 127, does not support Plaintiffs' commentary.<br><br>Gardner Rogers has stated, unequivocally, that "[He] never entered into any agreements or transactions with Mr. Banman or CTM Biomedical ("CTM"), including never being an employee, agent, or distributor for Mr. Banman (after he left Skye) or CTM, besides checking mail for Mr. Banman, described more fully below." Rogers Decl., ¶ 17. |
| 232. | Rogers lives in Palm Beach, Florida and is a personal acquaintance of Banman's.<br><br>Banman Decl. ¶ 122; Fluskey Decl. Ex. 19 (Rogers Depo.) at 33:22-34:2, 34:21-35:5 | Undisputed. | N/A |
| 233. | Rogers has periodically checked the mail in CTM's P.O. Box located in Palm Beach, Florida, informed | Undisputed. | N/A |

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Banman of the contents, and deposited checks into CTM's bank account.<br><br>Banman Decl. ¶ 122; Fluskey Decl. Ex. 19 (Rogers Depo.) at 34:21-35:5, 78:3-79:12; Rogers Decl. ¶¶ 18-19 | | |
| 234. | Banman never told Rogers to inform the Veterans Administration Nation Acquisition Center ("NAC") that Skye was not a viable candidate.<br><br>Banman Decl. ¶ 123; Rogers Decl. ¶¶ 11-13 | Undisputed. | N/A |
| 235. | Ben Reinwald at the NAC told Rogers that VMD's application for a FSS schedule would not be accepted and asked Rogers to withdraw the application.<br><br>Fluskey Decl. Ex. 19 (Rogers Depo.) at 55:14-59:5; Rogers Decl. ¶ 12; Declaration of Bernard C. Reinwald, dated November 2, 2022 ("Reinwald Decl.") ¶¶ 6-7 | Disputed. Gardner Rogers never informed Chris Sharp that anyone asked him to withdraw the application when he told Sharp the application had been denied.<br><br>[Sharp Decl. ¶¶ 83-85.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs have discontinued their claims against Gardner Rogers because they were without merit. The "evidence" Plaintiffs' cite, Sharp Decl., ¶¶ 83-85, is not responsive to the statement of fact and immaterial. |
| 236. | Rogers withdrew VMD's application to the NAC.<br><br>Fluskey Decl. Ex. 19 (Rogers Depo.) at 58:15- | Undisputed. | N/A |

126

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | 59:5; Rogers Decl. ¶¶ 12-13; Reinwald Decl. ¶¶ 5-8 | | |
| 237. | Banman never tried to "recruit" Dr. Schlifka for CTM.<br><br>Banman Decl. ¶ 130 | Disputed. Banman wanted to flip Dr. Schlifka through Skye sales representative, Maria Carey. [PF 589.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. The additional fact they attempt to add to the record at PF 589 is disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 238. | Banman never asked Dr. Schlifka to stop doing business with Skye.<br><br>Banman Decl. ¶ 130 | Undisputed. | N/A |
| 239. | Dr. Schlifka has never performed research or consulting services for CTM.<br><br>Banman Decl. ¶ 131 | Undisputed. | N/A |
| 240. | Dr. Schlifka is not a current customer of CTM.<br><br>Banman Decl. ¶ 131; Fluskey Decl. Ex. 36 (Schlifka Depo.) at 16:10-24 | Undisputed. | N/A |

127

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 241. | Seoane did not "act as a spy" for Banman after Banman resigned from Skye.<br><br>Banman Decl. ¶ 124; Seoane Decl. ¶¶ 81-87 | Objection. Overbroad.<br><br>Disputed. Over a year after Banman left Skye, Seoane stole his Skye database of sales representatives and other contacts, and informed Banman he would "start to go through and transferring contacts and opportunities into [CTM's database]."  [PF 672.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. The additional fact they attempt to add to the record at PF 672 is disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 242. | After Banman resigned from Skye, Seoane reached out to Banman expressing a potential interest in working for CTM.<br><br>Banman Decl. ¶ 125 | Objection. Irrelevant. FRE 401. Regardless, Banman flew Seoane to Canada to convince him to work for CTM while Seoane was working for Skye.<br><br>Saba Decl. ¶ 129, Ex. 123. | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. |
| 243. | Seoane began working for CTM in February 2020.<br><br>Banman Decl. ¶ 125; Seoane Decl. ¶ 30 | Undisputed. | N/A |
| 244. | Upon hiring Seoane, Banman instructed Seoane not to use any Skye/HRT information in working with CTM.<br><br>Banman Decl. ¶ 126; Seoane Decl. ¶ 30 | Disputed. Over a year after Banman left Skye, Seoane stole his Skye database of sales representatives and other contacts, and informed Banman he would "start to go through and transferring contacts and opportunities into [CTM's database]." | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. The additional facts they attempt to add to the record at PF 672-674, and 682, |

128

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
|  |  | Banman encouraged him to do this.  [PF 672-674.]

Seoane was responsible for flipping at least two Skye sales representatives. [PF 682.] | are disputed and non-responsive to this fact. *See* below.

CTM has asserted evidentiary objection to Plaintiffs' statements. |
| 245. | When Seoane resigned from HRT he returned his company computer.

Seoane Decl. ¶ 25 | Undisputed. | N/A |
| 246. | On Seoane's last day of employment with HRT, Seoane and Chris Sharp reviewed the Apple "Notes" App on Seoane's personal iPhone, which is what Skye's independent sales representatives and internal Skye sales personnel used to share information about sales pitches to customers, Skye's products, and similar information.

Seoane Decl. ¶ 26 | Disputed. On his last day of employment, Sharp requested, in person, that Seoane delete the training notes that were on his iPhone.  [PF 671.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. At his deposition, Mr. Seoane testified that the Notes were prepared when he worked for Skye, that Mr. Sharp watched him delete a number of Notes and then said "That's—that's fine" before all of them had been deleted, that he was asked not to delete certain Notes because other Skye employees wanted/needed access to it, and he specifically testified that he did not represent to Mr. Sharp that he had deleted them all: "A. Okay, You told him you deleted all the ios notes, didn't you? A. No, I did not." Fluskey Reply Decl., Ex. 4 |

129

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | | (Seoane Depo.) at 21:2-24:7. |
| 247. | On Seoane's last day of employment with HRT, Chris Sharp asked Seoane to delete certain Notes, as Sharp watched.<br><br>Seoane Decl. ¶ 26 | Disputed. On his last day of employment, Sharp requested, in person, that Seoane delete the training notes that were on his iPhone. [PF 671.]<br><br>Seoane did not delete the Notes. [PF 671.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. At his deposition, Mr. Seoane testified that the Notes were prepared when he worked for Skye, that Mr. Sharp watched him delete a number of Notes and then said "That's—that's fine" before all of them had been deleted, that he was asked not to delete certain Notes because other Skye employees wanted/needed access to it, and he specifically testified that he did not represent to Mr. Sharp that he had deleted them all: "A. Okay, You told him you deleted all the ios notes, didn't you? A. No, I did not." Fluskey Reply Decl., Ex. 4 (Seoane Depo) at 21:2-24:7. |
| 248. | On Seoane's last day of employment with HRT, Chris Sharp directed Seoane not to delete certain Notes because he wanted those Notes accessible to Skye's independent sales | Disputed. On his last day of employment, Sharp requested, in person, that Seoane delete the training notes that were on his iPhone. [PF 671.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. At his deposition, Mr. Seoane testified that the Notes |

130

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
| | representatives and internal sales personnel.

Seoane Decl. ¶ 26 | | were prepared when he worked for Skye, that Mr. Sharp watched him delete a number of Notes and then said "That's—that's fine" before all of them had been deleted, that he was asked not to delete certain Notes because other Skye employees wanted/needed access to it, and he specifically testified that he did not represent to Mr. Sharp that he had deleted them all: "A. Okay, You told him you deleted all the ios notes, didn't you? A. No, I did not." Fluskey Reply Decl., Ex. 4 (Seoane Depo.) at 21:2-24:7. |
| 249. | Because Seoane was the author of the Notes, if he deleted a Note that Note would no longer be accessible to the independent sales representatives or internal Skye sales personnel with whom Seoane had previously shared the note.

Seoane Decl. ¶ 26 | Disputed. Seoane returned the stolen 17 Notes files after Skye sent three cease and desist letters.  [PF 686-687.]  Seoane could have deleted or returned these Notes to Skye at any time. | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. At his deposition, Mr. Seoane testified that the Note was prepared when he worked for Skye, that he was asked not to delete the Note by Chris Sharp because other Skye employees wanted/needed access to it, and upon receipt of a letter from Plaintiffs' counsel in June 2020, after Mr. Seoane's counsel preserved the evidence, he deleted the Note. When he deleted the Note, it sent an |

131

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | | email to Mr. Chormann and Mr. Banman's Skye email accounts (an account that Mr. Banman no longer had access to). Fluskey Reply Decl., Ex. 4 (Seoane Depo.) at 21:2-24:7; 270:16-275:1. |
| 250. | Matt Chormann and Dave Grossman, both Skye employees, advised Chris Sharp not to have Seoane delete the Notes until they could copy them for their internal use.<br><br>Seoane Decl. ¶ 27 | Objection. Hearsay. FRE 802.<br><br>Disputed. Matt Chormann never told Chris Sharp to prevent Seoane from deleting Skye Notes from his phone so that he could still have access to them.<br><br>Declaration of Matt Chormann ¶ 5. | N/A |
| 251. | After he resigned from HRT, no one from Skye or HRT contacted Seoane to direct him to delete those Notes until this litigation.<br><br>Seoane Decl. ¶ 27 | Undisputed. | N/A |
| 252. | Seoane never shared any "Notes" files of HRT/Skye with Banman or CTM.<br><br>Banman Decl. ¶ 126; Seoane Decl. ¶ 28 | Disputed. On June 23, 2020, Seoane emailed one of the 17 Skye Notes that he kept from Skye to Banman and Matt Chormann.  [PF 686.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. At his deposition, Mr. Seoane testified that the Note was prepared when he worked for Skye, that he was asked not to delete the Note by Chris Sharp because other |

132

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | | Skye employees wanted/needed access to it, and upon receipt of a letter from Plaintiffs' counsel in June 2020, after Mr. Seoane's counsel preserved the evidence, he deleted the Note. When he deleted the Note, it sent an email to Mr. Chormann and Mr. Banman's Skye email accounts (an account that Mr. Banman no longer had access to).  Fluskey Reply Dec., Ex. 4 (Seoane Depo.) at 21:2-24:7; 270:16-275:1. |
| 253. | Seoane never used any "Notes" files of HRT/Skye in connection with his work for CTM.<br><br>Seoane Decl. ¶ 28 | Disputed. Seoane prepared an email with attachments distributed to CTM sales representatives that mirrors Skye's sales materials and coding guides he had previously distributed to Skye's sales representatives.  [PF 713-714.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 713-714 are disputed and non-responsive to this fact. *See* below.<br><br>CTM has asserted evidentiary objections to Plaintiffs' statements. |
| 254. | After this lawsuit was filed, at the request of Plaintiffs' counsel, Seoane deleted the Notes from his phone.<br><br>Seoane Decl. ¶ 29 | Disputed. Only after Skye sent three cease and desist letters did Seoane delete the "Notes". [PF 686-687.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." The additional facts they attempt to add to the record at PF 686-687 are disputed and non-responsive to this fact. *See* below. |

133

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | | CTM has asserted evidentiary objections to Plaintiffs' statements. |
| 255. | Seoane never interfered with Skye's contract with Jason Belohlavek or Sea Glass Orthopedic Distributors.<br><br>Seoane Decl. ¶ 68 | Undisputed that Plaintiff is not claiming that the Defendants interfered with Jason Belohlavek or Sea Glass Orthopedic Distributors. | N/A |
| 256. | Banman never instructed Seoane to interfere with Skye's contract with Jason Belohlavek or Sea Glass Orthopedic Distributors.<br><br>Seoane Decl. ¶ 68 | Undisputed that Plaintiff is not claiming that the Defendants interfered with Jason Belohlavek or Sea Glass Orthopedic Distributors. | N/A |
| 257. | Seoane did not reach out to Jason Belohlavek to solicit him to work for CTM. After Seoane left HRT, Jason Belohlavek reached out to Seoane about potentially selling for CTM.<br><br>Seoane Decl. ¶ 69 | Undisputed that Plaintiff is not claiming that the Defendants interfered with Jason Belohlavek or Sea Glass Orthopedic Distributors. | N/A |
| 258. | Skye is not claiming contract interference with Jason Belohlavek.<br><br>Fluskey Decl. Ex. 13 at 3 | Undisputed that Plaintiff is not claiming that the Defendants interfered with Jason Belohlavek or Sea Glass Orthopedic Distributors. | N/A |
| 259. | Banman has personal log-in credentials for Broward Health. | Objection. Irrelevant. FRE 401. The evidence does not support the fact. Exhibit 13 | There is no basis for any dispute, and Plaintiffs should have simply stated |

134

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Banman Decl. ¶ 129 | to Fluskey's declaration is a meet and confer letter that counsel for Skye sent to counsel for Banman. Broward Health is not mentioned.<br><br>Undisputed if Banman currently has his own log-in credentials for Broward Health.  However, on September 10, 2018, Banman used Skye's log-in and password to access Broward Health's website and uploaded two documents on behalf of CTM. [PF 597-598.] | "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. |
| 260. | Banman did not use Skye's log-in information for Broward Health. Banman has his own personal log-in information.<br><br>Banman Decl. ¶ 129 | Disputed.<br><br>On September 10, 2018, Banman used Skye's log-in and password to access Broward Health's website and uploaded two documents on behalf of CTM. [PF 597-598.] | There is no basis for any dispute, and Plaintiffs should have simply stated "undisputed." Plaintiffs' irrelevant commentary is non-responsive and should be disregarded. The additional facts they attempt to add to the record at PF 597-598 are disputed and non-responsive to this fact. *See* below. |

135

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | **Stumpe's Statement of Uncontroverted Facts** | | |
| 294.[3] | Stumpe graduated from Ball State University in 2004 with a degree in Organizational Communication, and he currently lives in and at all relevant times has lived in the State of Indiana.<br><br>Declaration of Mike Stumpe ("Stumpe Decl.") ¶ 3 | Undisputed. | N/A |
| 295. | Following college, Stumpe followed in his father's footsteps (who was also in sales) and became involved in medical product distribution and sales as an independent sales representative.  In fact, he has been involved in this industry well before the key players in this lawsuit, Plaintiffs Skye Orthobiologics, LLC ("Skye") and Human Regenerative Technologies, LLC ("HRT"), and Defendants CTM Biomedical, LLC ("CTM") and CTM Medical, Inc. were ever in existence.  Indeed, Stumpe was the first person in Indiana to distribute a | Objection. Lack of foundation, speculation. FRE 602 to: "Stumpe was the first person in Indiana to distribute a medical product derived from human birth tissue".<br><br>Otherwise, undisputed. | There is no basis for any objection. Stumpe is established enough in the medical sales industry in Indiana in order to have the foundation, knowledge and expertise to make this statement. |

---

[3]   Statement of Facts No. 261 through 293 were submitted by Defendants Gardner Rogers and Veterans Medical Distributors, Inc. ("VMD"). After Defendants served Plaintiffs with Defendants' portion of the summary judgment motions, Plaintiffs voluntarily dismissed Rogers and VMD from this action. Dkt. 206. Rogers' and VMD's facts were removed at Plaintiffs' request.

CASE NO: 2:20-cv-03444-MEMF-PVC

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | medical product derived from human birth tissue ("Amniox") for orthopedic use.<br><br>Stumpe Decl. ¶ 4 | | |
| 296. | In 2009, Stumpe began working with Biomet Trauma (which later became Zimmer Biomet [together, "Zimmer"]) through a distributor that was the representative for Amniox in the Ohio and Indiana markets. This team was the first to market amniotic/placental tissue on behalf of Amniox. Through that process, he built long-lasting relationships with surgeons and medical centers, who and which came to trust and rely on Stumpe to timely deliver Amniox and other medical products for their surgical use. Some of these relationships have blossomed into close friendships, including with Dr. Janos Ertl. Stumpe also built relationships with colleagues at Zimmer, which he continued working with until approximately 3 years ago.<br><br>Stumpe Decl. ¶ 5; Declaration of Janos Ertl ("Ertl Decl.") ¶¶ 9-14 | Undisputed. | N/A |

137

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
| 297. | In this industry, decisions to purchase and use a specific medical product for surgical applications is one made by the surgeon and medical center. Decisions to "go through" a certain sales representative to purchase those products is entirely relationship-based and results-based.  It is very common in Stumpe's industry for sales representatives to work with multiple medical product manufacturers and distributors at the same time.  Stumpe himself was working with multiple manufacturers, distributors, and various medical products including Zimmer, NuCell, RTI, Extremity Medical and Bone Support, Heartland Medical, Artelon, Flower, Organogenesis and others. The trust that is developed between a sales representative, and a surgeon or medical center customer means that the customer may even approach the sales representative that they have the relationship with for a product that competes with what the representative is selling.  It is extremely common for a successful sales representative to supply a surgeon or medical center | Objection. Lack of foundation, overbroad, speculation, and calls for expert testify to which this witness is not qualified. FRE 602 and 703 to: "In this industry, decisions to purchase and use a specific medical product for surgical applications is one made by the surgeon and medical center."

Objection. Lack of foundation, overbroad. FRE 602 to: "Decisions to 'go through' a certain sales representative to purchase those products is entirely relationship-based and results-based.

Objection. Lack of foundation, overbroad, conclusory. FRE 602 to: "Any customer in this industry would say that they would much rather have their own representative source the competitive product, rather than let a competitive representative into the situation."

Otherwise, undisputed. | There is no basis for any objection. Stumpe has been designated as a non-retained expert on issues involving the medical sales industry. He is therefore qualified to make such statements, and they are well-grounded in foundation and expertise. |

138

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | with a directly competitive product, especially if the product is better than the product the sales representative carries.  Any customer in this industry would say that they would much rather have their own representative source the competitive product, rather than let a competitive representative into the situation.<br><br>Stumpe Decl. ¶ 6 | | |
| 298. | In the end, the customer knows what it wants and relies on the sales representative to deliver the product as well as great customer service.  Stumpe learned quickly in this industry that in order to become a successful sales representative, he had to help make his surgeons' lives easier.  For instance, Stumpe helps facilitate surgical appointments, ensures the products are ready and available for use, attends the surgeries and addresses any emergency issues, and essentially acts as a quasi-assistant to his surgeons.  He *over-delivers* in order to build those long-lasting relationships so that the surgeons and medical centers think of him when it is time to put in another order.  He owes his success in this industry | Objection. Overbroad, speculation, lack of foundation. FRE 602 to: "In the end, the customer knows what it wants and relies on the sales representative to deliver the product as well as great customer service."<br><br>Otherwise, undisputed. | There is no basis for any objection. Stumpe is established enough in the medical sales industry in order to have the foundation, knowledge and expertise to make this statement. |

139

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
|     | to the special service he provides to his surgeons, medical centers, and staff employed by the surgeons and medical centers.

Stumpe Decl. ¶ 7 |  |  |
| 299. | By way of example, when the Zimmer distributor Stumpe was working with lost its distributorship rights to distribute Amniox, the surgeons and medical centers *approached Stumpe* to work with *another* company (NuCell) to distribute their placental products through, as they would only work with that company if Stumpe was involved.  And he did so.  While he continued selling other Zimmer products, he was also working with NuCell to distribute its products to his surgeons and medical centers because that is what they wanted.  Over time, however, his relationship with NuCell deteriorated – he was not being paid his commissions – and he decided not to work with NuCell any further.

Stumpe Decl. ¶ 8 | Undisputed. | N/A |

140

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|--------------------|
| **STUMPE'S RELATIONSHIP WITH PLAINTIFF SKYE ORTHOBIOLOGICS, LLC** | | | |
| 300. | At Zimmer, Stumpe met a colleague named Jason Ewers.  At some point, Jason had begun working with Skye selling Skye's products.  In light of the breakdown of Stumpe's relationship with NuCell, in or about 2013 or 2014, Jason and Stumpe connected regarding Skye and its products, and Jason indicated that Stumpe could start selling Skye products through him, which Stumpe did.  Neither Jason nor Skye asked Stumpe to execute any documents or maintain any "confidential information" or "trade secrets."  Stumpe did not use any alleged "trade secrets" when he began selling Skye products.  The surgeons and medical centers simply wanted Skye products and they ordered through Stumpe.  At some point later, however, when Jason (like NuCell) decided not to pay Stumpe his rightful commissions, Stumpe approached Defendant Bryan Banman ("Banman") then with Skye to put in place a direct commission structure through Skye so that Stumpe did not have to | Disputed. Skye and Stumpe signed a Representative Agreement which contained confidentiality and exclusivity clauses.

Exhibit 1 to Stumpe declaration. | There is no basis for any dispute. The facts outlined here pre-date any agreement that the entities that Stumpe worked for—Novus and Silenda—signed any agreement with Skye. There was never a signed, written agreement between Stumpe (in his individual capacity) and Skye. Therefore, the statement "Skye and Stumpe signed a Representative Agreement …" is a mischaracterization of the evidence. |

141

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | rely on people like Jason to pay him.<br><br>Stumpe Decl. ¶ 9 | | |
| 301. | Banman and Stumpe hit it off right away.  Banman knew of Stumpe's sales history and work ethic and was very enthusiastic about getting Stumpe onboarded as a direct sales representative with Skye. By then, Stumpe had established himself within the Indiana market and Banman knew that this would be a lucrative arrangement for Skye. And while Stumpe was growing as a sales representative, he had formed Novus Ortho Corp. ("Novus") through which he was doing business with Zimmer.<br><br>Stumpe Decl. ¶ 10 | Undisputed. | N/A |
| 302. | In or about late 2014 or early 2015, Banman asked Novus to sign a commission agreement. Stumpe was always very clear and definite in expressing to Banman that Novus was selling products for other manufacturers/distributors (i.e., Zimmer) while at the same time selling for Skye. Banman told Stumpe in no uncertain terms that Novus may continue to do so, and | Disputed. Skye and Stumpe signed a Representative Agreement which contained confidentiality and exclusivity clauses. He was not permitted to sell competitive products in his territory.<br><br>Exhibit 1 to Stumpe declaration. | There is no basis for any dispute. Nowhere in the agreement between Novus and Skye does it state that he was not permitted to sell other products in his territories. This is the exact purpose of the "carve-outs" awarded to him. Also, there was never a signed, written agreement between Stumpe (in his individual capacity) and Skye. Therefore, the statement "Skye and Stumpe signed a |

142

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Skye always knew this was the case. In the end, Banman told Stumpe that Skye was interested in Stumpe's relationships with surgeons and medical centers and Skye would pay Novus commissions to sell Skye products to these contacts. Stumpe received "carve-outs" for territory in Indiana and Florida (where the contacts were based) for precisely this reason: to sell Skye products to them. <br><br> Stumpe Decl. ¶ 11, Ex. 1; Declaration of Arash Beral ("Beral Decl.") Ex. 3, 52:3-11; 309:8-16 | | Representative Agreement …" is a mischaracterization of the evidence |
| 303. | Over the next year, Stumpe decided to separate Novus for Zimmer-related work and formed Silenda Medical, Inc. ("Silenda") for Skye-related work. Stumpe asked Skye to begin sending his commissions to Silenda and Banman sent him an identical commission agreement (same as the one Novus executed) for Silenda to execute. Again, Skye and Banman knew that Stumpe was selling other products and working with other parties, and consented to it. | Objection. Exhibit 2 is an unsigned agreement and is not properly authenticated. FRE 901, 1001. | There is no basis for any objection. Exhibit 2 may be unsigned, but it is undisputed that Skye worked with Silenda since the effective date of the agreement between these parties. It was Skye's general practice not to sign agreements. Beral Reply Decl., Ex. 1 (Stumpe Deposition Transcript p. 313:19-314:4.) Skye did not execute the Novus representative agreement either. Stumpe Decl., Ex. 1. Skye did business with Silenda throughout their relationship since the date of the Skye representative agreement with Silenda. Beral Reply Decl., Ex. 1 |

143

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Stumpe Decl. ¶ 12, Ex. 2; Beral Decl. Ex. 3, 52:3-11; 309:8-16 | | (Stumpe Deposition Transcript p. 56:24-57:2.). |
| 304. | It is normal and common for sales representatives in this industry to work with multiple manufacturers at the same time.<br><br>Beral Decl. Ex. 4, 200:8-11 | Objection. Lack of foundation. FRE 602.<br><br>Otherwise, undisputed. | There is no basis for any objection. Stumpe is established enough in the medical sales industry in order to have the foundation, knowledge and expertise to make this statement. |
| 305. | Even throughout Stumpe's relationship with Zimmer, Zimmer was aware that Stumpe was selling Skye products.<br><br>Beral Decl. Ex. 3, 212:7-213:2 | Undisputed. | N/A |
| 306. | From the start, Stumpe, in his individual capacity, was never an employee or independent contractor of Skye.  Novus began selling for Skye as a sub-representative for Jason Ewers, then Stumpe worked with Skye through Novus, and then through Silenda.<br><br>Stumpe Decl. ¶ 13 | Objection. Calls for a legal conclusion., lack of foundation. FRE 602, 702<br><br>Disputed.Stumpe was an independent sales representative for Skye. [PF 476.] | There is no basis for any objection. Stumpe was never an employee or independent contractor of Skye. This is not a legal conclusion, but is evidenced by the agreements between Skye and Novus, and Skye and Silenda showing no direct relationship between Skye and Stumpe. PF 476 is addressed by Defendants in response to Plaintiffs' facts. |
| 307. | Stumpe never had a Skye e-mail address.  He has used either his own personal computers, | Undisputed, but misleading. FRE 403. Stumpe signed an | There is no basis for any objection. This is not misleading.  Stumpe's obligation to keep certain |

144

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
|  | phones, and e-mail and cloud accounts, or those belonging to Novus and Silenda to conduct any business with Skye.  Skye did not have access to any of these aforementioned devices or accounts.  Skye did not employ any protective or security measures on Stumpe's personal devices or those owned by Novus or Silenda.  Stumpe Decl. ¶ 14 | agreement to keep all Skye information confidential.  Exhibit 1 to Stumpe declaration; PF 478. | information confidential is not mutually exclusive with the facts expressed here. PF 476 is addressed by Defendants in response to Plaintiffs' facts. Plus, Stumpe (in his individual capacity) did not have any written agreements with Skye. |
| 308. | Skye did not provide Novus or Silenda with any information regarding potential or actual customers, customer lists, sales training, product training, sales tips, or any other resources to help Stumpe make sales of its products.  Stumpe used his personal experience, relationships, and knowledge he acquired himself in the medical sales industry to sell Skye's products.  Stumpe Decl. ¶ 15; Beral Decl. Ex. 3, 305:8-10; 307:18-24 | Disputed. Banman educated Stumpe on how to sell products. Stumpe participated in Skye training. Banman sent Boulais Skye training materials, pitch scripts, recent Skye studies, Skye coding guidelines, and literature to use when pitching Skye to his customers.  [PF 718.] | There is no basis for any dispute. Banman's introduction to Stumpe on Skye products or training specific to Skye has nothing to do with the general skills and experience that sales representatives utilize in their work. PF 718 is addressed by Defendants in response to Plaintiffs' facts. |
| 309. | When selling Skye products, Stumpe disclosed their pricing information to his actual and potential customers, while comparing the prices with | Objection. This is not a material fact in violation of Local Rule 56-2.  This is argument. | There is no basis for any objection or dispute. Stumpe is established enough in the medical sales industry in order to have the foundation, |

145

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | that of other manufacturers.  This open and non-confidential disclosure of company pricing data is customary in the industry and is what Stumpe has experienced during his career.  Pricing data is not "secret;" one may simply call a surgeon or medical center and ask how much they are paying for a certain product and attempt to "beat that price" with a product the representative is selling.  This is a common practice among sales representatives.  Customers even sometimes ask vendors to "reverse auction" their products for specific procedures or surgeries, which further highlights the openness of manufacturer pricing.<br><br>Stumpe Decl. ¶ 16; Beral Decl. Ex. 4, 115:1-18; 200:8-202:3; Ertl Decl. ¶ 15 | Overbroad.<br><br>Generally disputed, see the opposition to the motion for summary judgment.<br><br>Pricing is unique per facilities. [PF 703.]  It is industry standard that the facilities do not disclose the price they pay for medical products because they do not want competitive medical facilities to know how much they pay for products. [PF 699.] | knowledge and expertise to make this statement.  Plaintiffs have not put forward any exact basis for why these facts are disputed.  Pricing being "unique per facility" has nothing to do with the fact that prices of different manufacturers are comparatively presented to one facility that a sales representative is working with. These prices cannot also be "secret" as it pertains to the facility in question.  Stumpe is not expressing, for example, that a representative compares the prices of a single product across multiple facilities. PF 699 and 703 are addressed by Defendants in response to Plaintiffs' facts. |
| 310. | Skye would freely provide its pricing information and its marketing materials and strategies to representatives that it would not even have agreements with.<br><br>Beral Decl. Ex. 4, 117:5-118:11 | Objection. This is not a material fact in violation of Local Rule 56-2.  This is argument.<br><br>Generally disputed, see the opposition to the motion for summary judgment. | There is no basis for any objection or dispute.  Stumpe is established enough in the medical sales industry (and especially with Skye) in order to have the foundation, knowledge and expertise to make this statement. Plaintiffs have not put forward any exact |

146

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | | | basis for why this fact is disputed. |
| 311. | Stumpe also focused sales on the surgeons and facilities that he had the best personal relationships with – relationships that he built while working with other manufacturers before Novus or Silenda began working with Skye. Stumpe did not create or build these relationships through Skye, nor did he use any of Skye's information or resources to cultivate or develop these relationships. These were his own personal relationships that he sold Skye products through. Just as he would with any other product, he would disclose the details of the product he was selling to these contacts (details that anybody could acquire), and the pricing of the products as compared to those of other manufacturers. Nothing that he shared with these established connections was "secret," or deemed the same by anyone at Skye, either expressly or impliedly.<br><br>Stumpe Decl. ¶ 17; Beral Decl. Ex. 3, 305:17-307:4 | Disputed. Skye's pricing for each facility was unique and thus a trade secret. [PF 703.] | There is no basis for any dispute. Pricing being "unique per facility" has nothing to do with the fact that prices of different manufacturers are comparatively presented to one facility that a sales representative is working with. These prices cannot also be "secret" as it pertains to the facility in question. Stumpe is not expressing, for example, that a representative compares the prices of a single product across multiple facilities. PF 703 is addressed by Defendants in response to Plaintiffs' facts. |

147

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 312. | In this industry, a representative's relationships built with various doctors and hospitals are his own, and do not belong to anyone else.  These relationships are built over time and upon a foundation.

Beral Decl. Ex. 4, 199:22-200:7; 202:19-204:9 | Undisputed. | N/A |
| 313. | Skye's own criteria for recruiting sales representatives is based on how well established they are in terms of their relationships with customers.  These relationships are not Skye's trade secrets.

Beral Decl. Ex. 5, 462:13-23; 463:20-464:5 | Undisputed. | N/A |
| 314. | Stumpe has never received any money from Skye in his individual capacity. Skye has paid sales commissions to Novus, and later Silenda, per their respective representative agreements, and Stumpe has in turn received a salary from Novus and Silenda as their employee. Novus and Silenda also employ or have independent sub-representative relationships with others who help them | Disputed and misstates the testimony.

Stumpe testified that he and his wife are the only two "employees" of Silenda and that Novus is not operational. Beral Decl. Ex. 3, pp. 25:25-26:3. | There is no basis for any dispute. The testimony Plaintiffs cite supports the factual statement, and is not inconsistent. Plus, Plaintiffs' conveniently ignore the fact that Novus and Silenda *had* other employees in the past. |

148

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | facilitate sales for monetary compensation.<br><br>Stumpe Decl. ¶ 18; Beral Decl. Ex. 3, pp. 25:25-26:3; 30:11-25 | | |
| 315. | Novus, Silenda or Stumpe have never been employees or independent contractors of Plaintiff Human Regenerative Technologies, LLC ("HRT," and collectively with Skye, "Plaintiffs"), nor have they conducted any business with HRT.<br><br>Stumpe Decl. ¶ 19 | Undisputed. | N/A |
| 316. | Because Novus and Silenda were independent contractors of Skye, Stumpe did not have much involvement or communication with Skye's employees. Stumpe's main point of contact at Skye was Banman.  Stumpe had very minimal contact with the CEO, Chris Sharp ("Sharp"), only meeting with or speaking with him on two to three occasions.<br><br>Stumpe Decl. ¶ 20 | Undisputed. | N/A |
| **STUMPE'S RELATIONSHIP WITH DEFENDANT CTM BIOMEDICAL, LLC** | | | |
| 317. | In or around July 2018, Stumpe found out that | Generally, undisputed. | N/A |

149

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | Banman left Skye. Stumpe did not know where Banman was going or what his future plans were going to be. At some point, Stumpe learned that Banman founded CTM. Stumpe Decl. ¶ 21 | | |
| 318. | Banman reached out to Stumpe to see if Silenda was interested in adding CTM products to its sales portfolio, along with Skye and others. Given that Stumpe enjoyed working with Banman and liked him, Silenda agreed to add CTM to its portfolio as well. At this point, Novus and Silenda's agreements with Skye had expired as well. Stumpe Decl. ¶ 22 | Objection. Calls for a legal conclusion as to: "At this point, Novus and Silenda's agreements with Skye had expired as well." Disputed. The agreement between Stumpe and Skye had not expired. Exhibit 1 to Stumpe declaration. Otherwise, undisputed. | There is no basis for any objection or dispute. Stumpe refers to a specific time period following the expiry of agreements for set terms. There is no agreement between Stumpe and Skye. Skye is referring to the agreement between Novus and Skye that expired in February 2017—two years after it was entered into. Stumpe Decl., Ex. 1. |
| 319. | Banman *never* approached Stumpe about starting CTM with him, and Stumpe only learned of its existence after it was already formed. Stumpe made no investment of money, skills or time in the founding of CTM, and is not considered a founder of the company. Stumpe Decl. ¶ 23; Beral Decl. Ex. 3, 79:19-80:21 | Disputed. Stumpe is part of the "Core team" and/or the "A-Team". Stumpe was provided ownership in CTM. Stumpe invested his skill and time in the formation and evolution of CTM. [PF 479, 480, 573-583, ] 576 ("core team"), 667, 680, 681, 713.]; Saba Decl. ¶ 135, Ex. 129. | There is no basis for any dispute. Stumpe being asked to later work with CTM (through Silenda) has nothing to do with any involvement in CTM's founding. PF 479, 480, 573-583, 576, 667, 680, 681 and 713 are addressed by Defendants in response to Plaintiffs' facts. |

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 320. | Sometime later in 2018, Silenda began offering and selling CTM's products. At this time, Silenda was still selling products from Skye and others.<br><br>Stumpe Decl. ¶ 24; Beral Decl. Ex. 3, 24:13-25:18 | Undisputed. | N/A |
| 321. | Silenda would not promote CTM over any other product, including that of Skye.  Any decision to use CTM over others was by customers themselves.<br><br>Ertl Decl. ¶¶ 16-17 | Objection. The evidence does not support this statement of fact.<br><br>Disputed. Stumpe specifically "flipped" Skye accounts to become CTM accounts and instructed physicians and facilities that were buying Skye products to buy CTM products instead. [PF 554-556, 573, 558-567, 572-576, 578-579, 580, 581-583, 651-653, 672-674, 680.] | There is no basis for any objection or dispute. Paragraphs 15 and 17 of the Ertl declaration say exactly what has been presented in this undisputed fact. Any "flipping" of Skye accounts were based solely upon Stumpe's customer relationships preferring the pricing and products of CTM, as Ertl did. PF 554-556, 573, 558-567, 572-576, 578-579, 580, 581-583, 651-653, 672-674, and 680 are addressed by Defendants in response to Plaintiffs' facts. |
| 322. | On August 10, 2018, Silenda entered into a commission agreement with CTM, where CTM agreed to pay Silenda higher commissions than Skye.<br><br>Stumpe Decl. ¶ 25, Ex. 3 | Undisputed. | N/A |
| 323. | Stumpe or Novus have never been employees or | Disputed.  Skye and CTM have a relationship with | There is no basis for any dispute. Any relationship |

151

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | independent contractors of CTM, nor have they conducted any business with CTM.  CTM has a relationship with Silenda, as does Skye since March 20, 2016.<br><br>Stumpe Decl. ¶ 26 | Stumpe.  [PF 476-478] Stumpe used to sell Skye products. [PF 479-480, 546-547.]  Stumpe now sells CTM products.  [PF 553-556.] | that Stumpe has had with Skye, CTM or any other manufacturer has been as an employee of Novus or Silenda. PF 476-480, 546-547, and 553-556 are addressed by Defendants in response to Plaintiffs' facts. |
| 324. | Stumpe does not have a CTM e-mail address.<br><br>Stumpe Decl. ¶ 27 | Undisputed. | N/A |
| 325. | Stumpe does not have any ownership interest in CTM, but executed a share agreement that may entitled him to shares in CTM in the future should those interests ever vest.<br><br>Stumpe Decl. ¶ 28 | Objection to the interpretation of the agreement.  He does have an "ownership interest." Undisputed that the ownership interest needs to vest. Saba Decl. ¶ 135, Ex. 129. | There is no basis for any objection. Stumpe has no interest in CTM unless and until certain conditions cause an interest to vest. |
| **PLAINTIFFS SKYE AND HRT'S ALLEGATIONS AGAINST STUMPE** | | | |
| 326. | In addition to the allegations that Plaintiffs have made against the other Defendants in this action and Stumpe, both Plaintiffs have made certain allegations solely against Stumpe in his individual capacity.  This is curious as, first, Stumpe never had any relationship HRT and, second, the relationship with Skye was formed through Novus and Silenda, but Novus and Silenda were not sued in | Objection. This is not a material fact in violation of Local Rule 56-2.  This is argument.<br><br>Generally disputed, see the opposition to the motion for summary judgment. | There is no basis for any objection or dispute. Stumpe not having any relationship with HRT, any relationship with Skye being through his employment by Novus and Silenda, Novus and Silenda not being sued in this action, and Novus and Silenda's agreements with Skye containing limitation of liability provisions are all undisputed facts. Plaintiffs have not put forward any exact basis for |

152

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | this action. Stumpe believes that Plaintiffs strategically and intentionally avoided suing Novus and Silenda because the agreements with those entities contain limitations of liability provisions, which Plaintiffs should not be able to circumvent.<br><br>Stumpe Decl. ¶ 29 | | why these facts are disputed. |
| 327. | Plaintiffs allege that Stumpe conspired with all other defendants to interfere with Plaintiffs' relationships with sixty-two of their customers and sales representatives.<br><br>Stumpe Decl. ¶ 31; Beral Decl. Ex. 1, pp. 13-26. | Undisputed. | N/A |
| 328. | With respect to alleged trade secret misappropriation, Skye vaguely claims that Stumpe used its trade secrets relating to Skye's alleged customers, Dr. Janos Ertl, Eskenazi Hospital, Dr. Brian Badman, and IU Health.<br><br>Stumpe Decl. ¶ 32; Beral Decl. Ex. 1, pp. 30-32 | Undisputed, except to the word "vaguely." Disputed. Skye vehemently claims Stumpe misappropriated its trade secrets. [PF 554-556, 573, 558-567, 572-576, 578-579, 580, 581-583, 651-653, 672-674, 680.] | There is no basis for any dispute. When given the opportunity to put forward the basis for its trade secret misappropriation claims against Stumpe, Skye made only those contentions outlined in this undisputed fact based on Skye's written and verified discovery responses. PF 554-556, 573, 558-567, 572-576, 578-583, 651-653, 672-674 and 680 are addressed by Defendants in response to Plaintiffs' facts. |

153

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| 329. | Stumpe's relationship with Dr. Janos Ertl predates his work with Skye through Novus and Silenda, and he brought Dr. Ertl to Skye after selling to him through other manufacturers for several years.  Moreover, Stumpe cannot misappropriate a relationship that already belonged to him.  Dr. Ertl works primarily at Eskenazi Hospital and IU Health, and all of Stumpe's business with them has been done through Dr. Ertl. Stumpe cannot misappropriate any customers that have always belonged to him, and to whom he has sold multiple manufacturers' products. Dr. Ertl is a very close friend of Stumpe's, with whom he began working approximately eleven years ago.  They have traveled together extensively with their respective families, and he has been there for Dr. Ertl when his wife had cancer.  Stumpe Decl. ¶ 32 | Undisputed that Stumpe is friends with Dr. Ertl.  Disputed that Stumpe misappropriated Skye's trade secrets. [PF 554-556, 581-583, 680.] | There is no basis for any dispute. Stumpe has established that Dr. Ertl is *his* relationship, and Dr. Ertl's decision to purchase CTM products through Silenda is not a misappropriation of Skye's trade secrets. PF 554-556, 581-583 and 680 are addressed by Defendants in response to Plaintiffs' facts. |
| 330. | Novus and/or Silenda serviced Dr. Brian Badman at Skye through another representative, Matt Dripps, who had an existing relationship with him.  Dr. Badman left Skye | Undisputed. | N/A |

154

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| | when Matt Dripps did. Stumpe has never sold any CTM products to Dr. Badman.  Stumpe Decl. ¶ 32; Beral Decl. Ex. 3, 69:25-70:7 | | |
| 331. | Skye also vaguely claims that Stumpe used its trade secrets to target and convince Skye's sales representatives to breach their agreements with Skye and work for CTM instead. Skye has not identified a single sales representative that Stumpe allegedly poached to work with CTM.  Stumpe Decl. ¶ 33 | Disputed.  Stumpe misappropriated Skye's trade secrets. [PF 554-556, 573, 558-567, 572-576, 578-579, 580, 581-583, 651-653, 672-674, 680.] | There is no basis for any dispute. Skye cannot make a blanket statement with no support in response to something that Stumpe did not do. It is undisputed that Plaintiffs cannot identify a *single* sales representative that Stumpe allegedly poached to start working with CTM. PF 554-556, 573, 558-567, 572-576, 578-583, 651-653, 672-674 and 680 are addressed by Defendants in response to Plaintiffs' facts. |
| 332. | Skye's allegations for intentional interference with prospective economic advantage are identical to those underlying its misappropriation of trade secret claims.  Beral Decl. Ex. 1, pp. 37-39 | Objection. This is not a material fact in violation of Local Rule 56-2.  This is argument.  Disputed. The allegations are different. | There is no basis for any objection or dispute. Stumpe is referring to Skye's own discovery responses provided with verifications. Plaintiffs have also not put forward any exact basis for why or how the allegations "are different." |
| 333. | To the extent that Skye contends that Stumpe used or misappropriated other alleged "trade secrets" allegedly belonging to it, Stumpe disputes those contentions.  Every piece | Disputed. Stumpe used confidential Skye information to sell products, including information regarding which physicians were purchasing Skye products, | There is no basis for any dispute. Plaintiffs' response does not even address the fact presented. For example, Stumpe "used confidential Skye information…including |

155

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | of information Silenda and/or Novus used to successfully sell Skye products was available publicly and simply through phone calls or emails with surgeons and facilities.  Insurance billing codes, for example, were well-known in the industry by sales representatives, insurance companies, and billing staff at surgical centers and facilities.<br><br>Stumpe Decl. ¶ 34 | how much they were purchasing, and the price the medical facility was paying for the products. [PF 554-556, 573, 558-567, 572-576, 578-579, 580, 581-583, 651-653, 672-674, 680.] | information regarding which physicians were purchasing Skye products" is information regarding *his own customer relationships*. These are Stumpe's own relationships. PF 554-556, 573, 558-567, 572-576, 578-583, 651-653, 672-674, and 680 are addressed by Defendants in response to Plaintiffs' facts. |
| 334. | HRT admits that Stumpe did not interfere with any of its valid and/or prospective contractual relationships.<br><br>Stumpe Decl. ¶ 35; Beral Decl. Ex. 2, p. 10 | Undisputed. | N/A |
| 335. | HRT admits that Stumpe did not interfere with its prospective economic advantages.<br><br>Stumpe Decl. ¶ 36; Beral Decl. Ex. 2, p. 13 | Undisputed. | N/A |
| 336. | HRT admits that Stumpe did not interfere with its economic relationships.<br><br>Stumpe Decl. ¶ 37; Beral Decl. Ex. 2, pp. 15-16 | Undisputed. | N/A |

156

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 337. | HRT admits that Stumpe did not misappropriate any confidential information.<br><br>Stumpe Decl. ¶ 38; Beral Decl. Ex. 2, pp. 10-11 | Undisputed. | N/A |
| 338. | HRT admits that Stumpe did not misappropriate any of its trade secrets.<br><br>Stumpe Decl. ¶ 39; Beral Decl. Ex. 2, p. 11 | Undisputed. | N/A |
| | **CONVERSION CLAIM AGAINST STUMPE** | | |
| 339. | Skye very rarely sent products or inventory directly to Novus or Silenda upon special requests.  Other Skye representatives in Stumpe's territory that he did not know existed would consign inventory to Stumpe's accounts without his knowledge or consent. Notwithstanding these rare and exceptional circumstances, in general, and according to the agreements Novus and Silenda had with Skye, any inventory either ordered directly or for consignment purposes by *Silenda or Novus* was delivered to the customer facilities.<br><br>Stumpe Decl. ¶ 40, Exs. 1-2 | Undisputed. | N/A |

157

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| 340. | Skye's own policy is to ship consignment inventory straight to facilities and they maintain tracking information.<br><br>Beral Decl. Ex. 5, 512:18-513:25 | Objection. Vague as to time.  However, undisputed. | There is no basis for any objection. Stumpe is referring to a general policy of Skye, that does not require a specific time period. |
| 341. | When this lawsuit was filed, Silenda was in possession of four of Skye's products that Silenda returned to Skye's lawyers.<br><br>Stumpe Decl. ¶ 41; Beral Decl. Ex. 3, 43:8-44:12 | Disputed.  Stumpe was in possession of 45 unused and unreturned products. Stumpe only returned four products after they were expired and became worthless.<br><br>Beral Decl. Ex. 7. | There is no basis for any dispute.  Skye does not provide any evidence for the allegation that Stumpe was in possession of "45 unused and unreturned products" or that the products "were expired and became worthless." |
| 342. | Plaintiffs have brought a claim of conversion against Stumpe in his individual capacity for certain other inventory.  In support, Skye provides no evidence besides a spreadsheet it created listing certain inventory that is allegedly in consignment with multiple customer facilities and assigned to *Silenda*.<br><br>Stumpe Decl. ¶ 42; Beral Decl. Ex. 7 | Disputed. Plaintiff requested that Stumpe return his outstanding inventory several times including on January 22, 2019, but Stumpe failed to return the inventory.<br><br>Saba Decl. ¶ 114, Ex. 110. | There is no basis for any dispute. The only purported evidence presented is an e-mail from January 22, 2019, where a Skye representative, Harsh Gupta, asks Silenda to verify the Skye consignment inventory count at Silenda's various customer locations. (PF 694.) Not only does this in no way constitute any request to "return" inventory, but it also admits exactly what Stumpe states—that Skye's inventory is with customers, and not in Silenda's (or Stumpe's) possession or under his control. |

CASE NO: 2:20-cv-03444-MEMF-PVC

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|----------------------|-------------------|
| 343. | Silenda has never had any such inventory in its possession, besides the four sample items described above, which have since been returned to Skye.<br><br>Stumpe Decl. ¶ 43 | Disputed. The responsibility for the product belonged to Stumpe per his contract.<br><br>Exhibit 1 to Stumpe declaration.<br><br>Saba Decl. ¶ 32, Ex. 29 at § 3. | There is no basis for any dispute. There is no Stumpe contract. The "contract" was with Novus or Silenda, but even as to Silenda, Plaintiffs have seemingly taken the position above that the Silenda contract is invalid since it was not signed. |
| 344. | Per the representative agreements between Skye, and Novus and Silenda, Skye would send consignment inventory to customer hospitals/facilities.  These were requested by the customers.  It was then Skye's responsibility to audit these facilities to determine what unsold consigned products may be missing from any facility, which would be the responsibility of the representative who requested or facilitated the consignment.<br><br>Stumpe Decl. ¶ 44, Ex. 1-2 | Disputed. The responsibility for the product belonged to Stumpe per his contract.<br><br>Exhibit 1 to Stumpe declaration.<br><br>Saba Decl. ¶ 32, Ex. 29 at § 3. | There is no basis for any dispute. There is no Stumpe contract. The "contract" was with Novus or Silenda, but even as to Silenda, Plaintiffs have seemingly taken the position above that the Silenda contract is invalid since it was not signed. |
| 345. | Skye failed on many occasions to reconcile any consigned inventory, and then did not carry out the requisite audits as required by the representative agreements to clear up any discrepancies. | Disputed. Plaintiff requested that Stumpe return his outstanding inventory several times including on January 22, 2019, but Stumpe failed to return the inventory.<br><br>Saba Decl. ¶ 114, Ex. 110. | There is no basis for any dispute. There is no Stumpe contract. The contract was with Novus or Silenda, but even as to Silenda, Plaintiffs have seemingly taken the position above that the |

159

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|-----|--------------------------|---------------------|-------------------|
| | Stumpe Decl. ¶ 45 | | Silenda contract is invalid since it was not signed.<br><br>Stumpe refers to Skye's failure to keep track of what inventory is at various facilities. The January 22, 2019 email from Harsh Gupta asks Silenda to verify the Skye consignment inventory count at Silenda's various customer locations. (PF 694.) Not only does this in no way constitute any request to "return" inventory, but it also admits exactly what Stumpe states—that Skye's inventory is with customers, and not in Silenda's (or Stumpe's) possession or under his control. |
| 346. | As of June 13, 2019, Skye was still asking Stumpe for the return of consigned inventory at Westview Hospital, *a facility that had been closed for two years at that time*. According to Skye, such inventory was on consignment for *1,045 days* as of that date, and Skye made no effort to either reconcile any such inventory that had been sold, or to arrange for its return. It is telling that Skye waited until Westview Hospital did not exist anymore to request the return of consignment | Disputed. The responsibility for the product belonged to Stumpe per his contract.<br><br>Exhibit 1 to Stumpe declaration.<br><br>Saba Decl. ¶ 32, Ex. 29 at § 3. | There is no basis for any dispute. There is no Stumpe contract. The "contract" was with Novus or Silenda, but even as to Silenda, Plaintiffs have seemingly taken the position above that the Silenda contract is invalid since it was not signed. |

160

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | inventory.  This inventory allegedly still with Westview Hospital is part of the inventory that Plaintiffs allege that *Stumpe* has somehow converted.<br><br>Stumpe Decl. ¶ 45; Ex. 4 | | |
| 347. | Skye does not even have a set policy regarding consigned inventory.  At some point, Skye changed its product strategy and attempted to secure the return of all consigned inventory.  It did not, however, have a consistent method for doing so, sometimes charging the sales representatives who requested the consigned inventory in question, and at other times charging the customers themselves.  This was despite Skye claiming that it would charge the customers for any unreturned consignment inventory, and only hold representatives responsible if the customers declined or otherwise failed to pay Skye.<br><br>Stumpe Decl. ¶ 46; Beral Decl., Ex. 6, 41:4-42:11 | Disputed. Skye does have a policy regarding consigned inventory.  Additionally, Stumpe's representation agreement contains requirements regarding consigned inventory.<br><br>Exhibit 1 to Stumpe declaration. See, section 3.<br><br>Saba Decl. ¶ 32, Ex. 29 at § 3. | There is no basis for any dispute. There is no Stumpe contract. The "contract" was with Novus or Silenda, but even as to Silenda, Plaintiffs have seemingly taken the position above that the Silenda contract is invalid since it was not signed.<br><br>Furthermore, Skye presents no evidence regarding its alleged "policy regarding consigned inventory" or that Stumpe, Silenda, or Novus even knew about it |
| 348. | Given Skye's inconsistent practices, it could very well be that the inventory that Plaintiffs allege | Objection. Lack of foundation, speculation. FRE 602. This is not a material fact in violation of | There is no basis for any objection. Stumpe points to Skye's lack of protocol or policy concerning |

161

| No. | Undisputed Fact/Evidence | Plaintiffs' Response | Defendants' Reply |
|---|---|---|---|
| | *Stumpe* converted were either sold and not reconciled internally, or returned and not resolved with an audit that Skye was required to do.<br><br>Stumpe Decl. ¶ 47 | Local Rule 56-2. This is argument.<br><br>Disputed. | consigned inventory that is supported by Stumpe's evidence and conceded by Plaintiffs |
| 349. | At all times that Stumpe worked with Skye through Novus and Silenda, neither Novus, Silenda nor himself were ever provided with any whistleblower notice by Skye or HRT under the Defend Trade Secrets Act ("DTSA").<br><br>Stumpe Decl. ¶ 48 | Objection. Irrelevant and immaterial. FRE 401, 402.<br><br>Otherwise, undisputed. | There is no basis for any objection. This is relevant to Plaintiffs' claims. |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | **PLAINTIFFS' FACTS** | |
| 350. | Chris Sharp has worked in the human tissue medical industry since 1996.<br><br>Sharp Decl. ¶ 3. | Disputed. Sharp testified that Skye was formed in 2009. Before that, he worked in venture capital and business development roles involving orthopedic applications, dental implants, sterilization equipment, and spinal implants. Fluskey Reply Decl. Ex. 1 (Sharp Depo.) at 408-413. |
| 351. | Chris Sharp started his first company in 2005.<br><br>Sharp Decl. ¶ 4. | Undisputed and immaterial. |

162

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 352. | Bryan Banman's wife was close friends with Sharp's wife since they were in grade school in Canada.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 86:17-87:5; Sharp Decl. ¶ 5. | Undisputed and immaterial. |
| 353. | It was during the wedding of Banman's sister-in-law Audrey Lupke in 2009 that Sharp and Banman began discussing working together.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 87:12-88:7; Sharp Decl. ¶ 6. | Undisputed and immaterial. |
| 354. | Banman was a graphic designer who was not making a lot of money and was between careers.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 77:22-25, 78:4-12, and 85:21-86:4. | Disputed and immaterial. The testimony cited does not support Plaintiffs' statement. Saba Decl. Ex. 1 at 77-78, 85-86. |
| 355. | During Banman's sister-in-law's wedding, Banman suggested he could design marketing materials, brochures, and a website for Sharp's company.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 88:8-13; Sharp Decl. ¶ 7. | Disputed and immaterial. The testimony cited does not support Plaintiffs' statement. Banman did not suggest to Sharp that Banman could design marketing materials. Sharp asked Banman if he would provide marketing assistance. Saba Decl. Ex. 1 at 87:24 - 88:14. |
| 356. | Sharp was trying to help Banman since he was struggling financially.<br><br>Sharp Decl. ¶ 8. | Disputed and immaterial. Sharp asked Banman for Banman's assistance. Banman did not seek out Sharp. Banman Reply Decl. ¶ 2; Saba Decl. Ex. 1 at 87-88. |
| 357. | Banman had never worked with human placental biologics prior to working for Skye. | Undisputed and immaterial. |

163

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Banman Depo. Vol. I (Saba Decl. Ex. 1) at 92:8-12. | |
| 358. | In the early years, HRT and Skye were not actively making their own products. Skye was purchasing products from contract manufacturers and was selling those private label products under the Skye trade name.<br><br>Sharp Decl. ¶ 9. | Disputed. Beginning at least as early as 2012, Skye was re-selling a membrane product and a flowable particulate product manufactured by BioD. Banman Decl. ¶ 18. HRT was not founded until 2013. Banman Reply Decl. ¶ 14; Fluskey Reply Decl. Ex. 1 (Sharp Depo.) at 413:9-10. |
| 359. | Banman showed interest in learning the HRT/Skye business, so Sharp agreed to mentor Banman.<br><br>Sharp Decl. ¶ 10. | Disputed and immaterial. HRT did not exist when Banman first began working with Skye. Sharp never agreed to mentor Banman, nor did Banman ask for such mentorship. Banman performed certain services for Skye pursuant to agreements/contracts. Banman Reply Decl. ¶ 4; Banman Decl. ¶¶ 11-20. Sharp told Banman that Sharp did not know what to do with the flowable particulate BioD product line that Skye was distributing, so he asked for Banman's assistance. Fluskey Reply Decl. Ex. 2 (Banman Depo.) at 90:18-91:25. |
| 360. | After a period of time, Sharp decided that he wanted to create a more diverse and unique product offering than the private label products Skye was selling under Skye's trade name.<br><br>Sharp Decl. ¶ 11 | Disputed. Sharp did not seek to create a "more diverse and unique product offering." He sought to create his own processing facility to replace the BioD product line that Skye was already re-distributing. Banman Decl. ¶ 19. |
| 361. | Together, Sharp and Banman reviewed the various products in the marketplace; studied the direction FDA regulations were heading; analyzed the market and trends so that they could create a unique product line that would be like nothing else in the marketplace, long lasting and | Disputed. Banman researched publicly-available information when working on product development initiatives. Banman and Sharp did not conduct "countless hours of trial-and-error experimentation in a lab later to become HRT." Banman did not work out of any lab owned or |

164

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | competitive; and conducted countless hours of trial-and-error experimentation in a lab later to become HRT that Chris Sharp and Skye set up and funded.<br><br>Sharp Decl. ¶ 12. | managed by Skye or HRT. He worked out of Toronto, Canada. Sharp owned no lab prior to HRT. Banman Decl. ¶¶ 20, 26-27; Banman Reply Decl. ¶ 6. |
| 362. | As Sharp and Banman collaborated, they created a "HRT Design File." The HRT Design File is a collection of documents, notes and photographs that describe the progress of the design and development activities of the HRT products. The purpose of the HRT Design File is to demonstrate the various trial and error steps that were utilized during the research and development phase of the products. This is essentially a historical record book of all of the steps and discovery Sharp and Banman took and found in the development of the products.<br><br>Sharp Decl. ¶ 13. | Disputed. Banman, not Sharp, created the so-called "Design File". This is not a "historical record book of all of the steps and discovery Sharp and Banman took." It is a seven-page document that summarizes some of the publicly-available information Banman researched when working on product development initiatives. Banman Reply Decl. ¶ 7; Banman Decl. ¶¶ 19-20; Saba Decl. Ex. 6. |
| 363. | During this research and development phase, Sharp was the lead and he asked Banman to perform certain aspects of the research and development as they created five unique products to make the company competitive in the marketplace.<br><br>Sharp Decl. ¶ 14. | Disputed. Sharp was not the "lead" on research initiatives. Banman conducted much of this publicly-available research on his own. "Five unique products" were not created. Prior to HRT making any products, other companies were selling membrane products and flowable particulate products. Banman Reply Decl. ¶ 9; Banman Decl. ¶¶ 20-23. |
| 364. | The products created by HRT were brand new creations that were not sold by any company.<br><br>Sharp Decl. ¶ 16; Declaration of John Lee, Exhibit. 1, at p. 4. | Disputed. Other companies were selling membrane and particulate products before HRT/Skye brought any of their products to market. Banman Decl. ¶¶ 20-23; Banman Reply Decl. ¶ 9; All HRT/Skye products were derivative of BioD products Skye distributed, existing products and methods from other processors, and/or |

165

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|---------------------|
| | | other publicly available information. Banman Reply Decl. ¶ 9.<br><br>*See also* Taghizadeh Decl.; Forsell Decl.<br><br>This statement is also immaterial because it is the ***processes***, not the ***products***, which are at issue in Plaintiffs' trade secret claim. |
| 365. | Banman wrote, "Btw, isn't it incredible when you sit back and look at what we've done, that we're the only guys in the world who've created a room temp product from placenta and figured out that it would work?"<br><br>Saba Decl. ¶ 4, Ex. 2, at p. 2. | Undisputed. |
| 366. | The products that were created were as follows: (1) a connective tissue matrix flowable product mixed with saline; (2) a connective tissue matrix paste; (3) an amnion only membrane; (4) a single layer chorion only membrane; and (5) an umbilical cord only membrane.<br><br>Sharp Decl. ¶ 15. | Disputed, in part. HRT/Skye did not create, and they have never sold, a paste product. Banman Decl. ¶ 73; Fluskey Reply Decl. Ex. 1 (Sharp Depo.) at 90:6-19 |
| 367. | The HRT Design File identifies that Sharp and Banman spent significant time creating the connective tissue matrix saline product and the paste product.<br><br>Saba Decl. ¶ 5 Ex. 3; Saba Decl. ¶ 6 Ex. 4; Saba Decl. ¶ 7 Ex. 5 at p. 16 [paste]; Sharp Decl. ¶ 17. | Disputed. Skye/HRT did not create a paste product. Banman Decl. ¶ 73. The design file does not include any mention of "paste" or a "paste product." The design file only shows that Banman spent some time researching publicly-available information on other products in the marketplace. Saba Decl. Ex. 6; Banman Reply Decl. ¶¶ 6-7.<br><br>Defendants have also asserted objections to Saba Decl., ¶ 5, Ex. 3. |

166

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 368. | The "HRT Design file" also includes an analysis of marketing by competitors.  For example, one internal note states that the human biologic industry would advertise products as "chorion free" as if that was something the consumer wanted.  However, Banman's notes then state: ███████ and then states the reasons why, based on their research, chorion would be safe to use.<br><br>Saba Decl. ¶ 8, Ex. 6, pp. 2-3. | Undisputed. |
| 369. | Because of the research conducted by Sharp and Banman, they developed the first and only chorion-only membrane product that was sold in the marketplace.<br><br>Sharp Decl. ¶ 18; Lee Rpt. (Lee Decl. Ex. 1) at p. 4 (Opinion #1). | Disputed. Use of chorion-only membrane products was publicly-available before HRT/Skye sold any such products. Banman Decl. ¶ 21, Ex. 6; Banman Reply Decl. ¶ 13; *see also* Taghizadeh Decl.; Forsell Decl.<br><br>This statement is also immaterial because the fact that HRT/Skye sold a chorion membrane product was not a secret. SOF ¶ 122; Fluskey Decl. Ex. 14 at 33:8-35:11.<br><br>Defendants have also asserted objections to Sharp's declaration testimony. |
| 370. | Banman writes: "The knock against Chorion is that it contains more maternal tissue and may cause more of an immune response in the patient.  We feel that this is not an issue, based on the following…".<br><br>Saba Decl. ¶ 8, Ex. 6, p. 3. | Undisputed that the statement accurately quotes one small section of the document, but the quote is incomplete and out of context. |

167

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
| 371. | In the HRT Design File, Banman lists five reasons based on his and Sharp's research and testing including "All Skye chorion products will be sterilized after processing, thus mitigating most remaining potential hazards." <br><br> Saba Decl. ¶ 8, Ex. 6, at p. 3. | Undisputed that the statement accurately quotes one small section of the document, but the quote is incomplete and out of context. |
| 372. | Still to this day, HRT is the only manufacturer of a single layer chorion only membrane until CTM began selling the identical product. <br><br> Sharp Decl. ¶ 19; Lee Rpt. (Lee Decl. Ex. 1) at p. 4 (Opinion #1). | Disputed. HRT is not the only manufacturer of a single layer chorion product. Banman Decl. ¶ 21, Ex. 6; Banman Reply Decl. ¶ 13; Taghizadeh Decl.; Forsell Decl. <br><br> This statement is also immaterial because the fact that HRT/Skye sold a chorion membrane product was not a secret. SOF ¶ 122; Fluskey Decl. Ex. 14 at 33:8-35:11. <br><br> Defendants have also asserted objections to Sharp's declaration testimony. |
| 373. | The development of the HRT products took long, countless hours of research and testing.  For example, Banman and Sharp spent significant time ███████████ <br><br> Sharp Decl. ¶ 20; Lee Rpt. (Lee Decl. Ex. 1) at p. 10 (Opinion #4). | Disputed. The development of HRT products did not take "long, countless hours of research and testing." HRT was formed in 2013. Banman Reply Decl. ¶ 14; Fluskey Reply Decl. Ex. 1 (Sharp Depo.) at 413:9-10. HRT products were first distributed to customers no later than February 2013, and probably earlier. Banman Decl. ¶ 24. Banman's research and development initiatives were based on Internet research of publicly-available information. He did not work out of HRT's lab. He worked out of an office in Toronto, Canada. Banman Decl. ¶¶ 20-23, 26-27; Banman Reply Decl. ¶ 14. |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 374. | Banman and Sharp maintained a shared, password-protected Dropbox account that they were the only two people who had access.<br><br>Sharp Decl. ¶ 21. | Disputed, and misleading to timeframe. Banman maintained his own personal Dropbox account, and in 2012, Banman invited Sharp to join a "Skye" folder contained within it while Banman was providing services to HRT/Skye. Banman Reply Decl. ¶ 6; Saba Decl. Ex. 7 at 108-111. |
| 375. | The Dropbox account shared by only Banman and Sharp, contained all of the keys to the future success of Skye/HRT including their research notes used in the development of the products.<br><br>Sharp Depo. Vol. I (Saba Decl. Ex. 7) at 109:19-110:3, 110:11-19. | Disputed. The DropBox account included some information regarding some of the projects that Banman and/or Sharp were working on. It did not include "all of the keys to the future success of Skye/HRT." This Dropbox account contained information which was shared with numerous Skye independent sales representatives. Banman Reply Decl. ¶ 19. |
| 376. | After Banman left Skye/HRT, he copied the HRT Design File to his personal computer and kept all of the information. In discovery of this litigation, Banman produced documents that were part of the Skye/HRT shared Dropbox, including documents titled "HRT Design File", "Skye RM Processing Methods", various research memos, photos of testing, and research results.<br><br>Sharp Depo. Vol. I (Saba Decl. Ex. 7) at 110:22-111:5. | Disputed. Banman did not copy the Design File or any DropBox information to his personal computer after ceasing his work with HRT/Skye. Banman utilized his personal computer and personal I-Cloud account while working with HRT/Skye because the companies did not provide him with a computer. He saved information relating to his work *while employed by Skye*, with Sharp's knowledge and consent. Banman Reply Decl. ¶¶ 15-18.<br><br>The Sharp testimony cited *does not support this statement.* Sharp testified that the DropBox was made available to Banman while he was working with HRT/Skye. Saba Decl. Ex. 7 at 108-111. Sharp also testified that he received confirmation that Banman removed himself from that DropBox. Fluskey Decl. Ex. 14 at 112 ("Q. Ok. So did you received confirmation that Mr. Banman |

169

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
|     |                          | removed himself from that Drop Box? A. Yes."). Plaintiffs omitted page 112 of Sharp's deposition transcript from their portion of the record. |
| 377. | Banman has been in possession of these documents since they were created and is still in possession of them since he produced them in discovery in this case.<br><br>Saba Decl. ¶ 10; Sharp Depo. Vol. I (Saba Decl. Ex. 7) at 110:22-111:5. | Disputed. Banman returned to Plaintiffs or to his counsel the materials that he possessed in connection with his work for Plaintiffs. Banman's counsel produced that information in this case. Banman Decl. ¶ 128.<br><br>The foundationless testimony of Sharp and Sharp's counsel does not support Plaintiffs' false statement that Banman currently possesses any of Plaintiffs' information.<br><br>Banman has also asserted evidentiary objections to Plaintiffs' cited evidence. |
| 378. | The "HRT Design File" contains trade secret information gained from "hundreds of hours" of research and testing that Banman and Sharp performed in creating the HRT products.  For example, Banman wrote "Based on our research, from hundreds of papers and articles, we believe that these are not 'stem cell products', but that they're reliant on the Extracellular Matrix…"<br><br>Sharp Decl. ¶ 22; Saba Decl. ¶ 8, Ex. 6; Lee Rpt. (Lee Decl. Ex. 1) at p. 10 (Opinion #4). | Disputed and immaterial. The Design File does not contain "trade secret information," nor was it the result of "hundreds of hours of" testing. The Design File is a seven-page document that reflects Banman's examination of publicly-available information.<br><br>Banman Reply Decl. ¶ 7; Banman Decl. ¶¶ 20-23; Saba Decl. Ex. 6.<br><br>This statement is also immaterial because Plaintiffs have not identified the HRT "Design File" as containing trade secrets in their interrogatory responses. Fluskey Decl. Exs. 1 & 2.<br><br>The CTM Defendants have asserted a foundation objection to the Lee expert report. |
| 379. | At the time of this research and development, Skye was selling private | Undisputed. |

170

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
|     | label products manufactured by a company called BioD.<br><br>Sharp Decl. ¶ 23. | |
| 380. | Sharp and Banman tried but could not reverse engineer the BioD products and obviously BioD was not going to tell them how the products were made.<br><br>Banman Depo. Vol. II (Saba Decl. Ex. 8) at 671:12-672:8; Saba Decl. ¶ 12, Ex. 9; Saba Decl. ¶ 13, Ex. 10. | Disputed. The testimony and documents cited by Plaintiffs do not support this statement. Banman never testified that he and Sharp were unable to reverse engineer BioD products. He testified that they toured BioD's lab and tried to deconstruct their products. Saba Decl. Ex. 8 at 671-72. HRT/Skye did create multiple products that were substantially similar to BioD's membrane products that Skye distributed under the brand names ResetMatrix™ and ResetBarrier™ and flowable particulate products that Skye distributed under the brand name LiquidGen™. Banman Reply Decl. ¶ 21. BioD published a patent that described the processes used to make these products. Banman Decl. ¶ 23, Ex. 7. |
| 381. | One note from Banman states: "Skye has never been trained on what the specific makeup of these tissues are and how they function or where to apply and why. BioD has been extremely closed about telling us what's in LiquidGen." Banman then outlines remaining questions they had including "How is it cleaned?", "How is it dried – air drying, desiccation, oven baking, freeze drying?", "What's in it?", "Is it amnion only, or amnion and chorion?".<br><br>Saba Decl. ¶ 8, Ex. 6, at p. 2. | Disputed, in part. Banman did write the words quoted in the Design File, which was drafted in 2013. But Banman and Sharp learned that specific processing information on the BioD products was publicly-available, including in a patent. Banman Decl. ¶ 23, Ex. 7. |
| 382. | RESERVED. | |
| 383. | Together Banman and Sharp also tested various Retch and Specs equipment and | Disputed. Plaintiffs quote accurately from part of the Design File, which was drafted |

171

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | learned which equipment works best for their process. For example, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Sharp Decl. ¶ 24; Saba Decl. ¶ 8, Ex. 6, at p. 5; Lee Rpt. at p. 15 (Opinion #9) | in 2013. Plaintiffs are incorrect when they state that no other company was using a cryo-mill to grind placental tissue. BioD was doing exactly that, and BioD explained the process in a patent. That patent application was filed in 2012. Banman Decl. ¶¶ 22-23, Ex. 7. Sharp and Banman toured the BioD processing facility in 2013. During this tour, Banman and Sharp saw BioD's cryo-mill, and learned that BioD used that mill to particulate the placental tissue. *Id.*; Banman Reply Decl. ¶ 11. |
| 384. | During the research and development phase, HRT had doctors use various versions of their products and then return patient data about the efficacy of the products. Sharp Decl. ¶ 25. | Disputed. HRT/Skye did not have doctors use products on patients before the products were validated and brought to market. Doctors did not return data to HRT/Skye on products that were not yet marketed or validated. Banman Reply Decl. ¶ 22. |
| 385. | During the research and development phase, Patients would score their pain levels and how quickly they recovered with the use of the product versus non-use. Sharp Decl. ¶ 26 | Disputed. *See* response to 384. Patients did not report pain scores or how quickly they recovered with the use of the product during the design and development phase. Packaged finished products are utilized on a patient. Banman Reply Decl. ¶ 22. |
| 386. | For the flowable product, Sharp and Banman tested various levels of saline to connective tissue and then gathered the results.  From those results they were able to determine an effective range of the most efficient formula ratios to maximize efficacy without extra waste of product. These results are in the HRT Design File. Sharp Decl. ¶ 27; Saba Decl. ¶ 8, Ex. 6, at p. 2. | Disputed. The Design File does not include any ratios of saline to connective tissue. There is merely a reference to the publicly-available fact that the native salt content of the body is approximately .9%. There are no results showing how Skye products maximize efficacy. There are no results related to efficacy or waste of product in the HRT Design File. Saba Decl. Ex. 6 at 2; Banman Reply Decl. ¶ 23. |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 387. | CTM flow products have the identical sources of non-dehydrated material and uses an identical formula ratio of connective tissue matrix to saline as HRT developed, tested and is in more than one HRT product.<br><br>Sharp Decl. ¶ 28; Lee Rpt. (Lee Decl. Ex. 1) at pp. 15-16 (Opinion #9); pp. 16-17 (Opinion #10) ("CTM's overall steps go through the same formulation with similar processes that produce an outcome that is identical, with the same ratio and percentage of tissue to solution as one of HRT's products.") ("In CTM's BT 8015 rev 0001 SOP, Section 6.3 through 6.3.1.3, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ "); Saba Decl. Ex. 33-34. | Disputed. CTM products do not use the same ratio of sources of non-dehydrated material or the same formula ratio of connective tissue to liquid. Banman Decl. ¶¶ 63-64. The Sharp Declaration, at paragraph 28, does not even disclose the ratio used by HRT/Skye for its flowable particulate products. Exhibits 33-34 to the Saba Declaration do not address any type of ratio. *See* Taghizadeh Decl.; Forsell Decl. |
| 388. | Once the final formulations of the various products were completed – and agreed upon by Banman and Sharp – the next step was to create a specific step-by-step guide of how to manufacture the products. These guides are called Standard Operating Procedures ("SOPs").<br><br>Sharp Decl. ¶ 29. | Disputed. "Final formulations" cannot be created before the creation of SOPs. It is the SOPs, approved by a medical director or a quality assurance director, which set forth the steps of how products are formulated and manufactured. Banman never reviewed final, complete SOPs, he did not provide sign-off on such SOPs, and he never had access to complete SOPs. He did not develop any "final formulations" for HRT/Skye products. Sharp controlled the final approval of all product formulations. Banman Decl. ¶¶ 25-28; Banman Reply Decl ¶ 24. |

173

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 389. | The purpose of the SOPs is to ensure manufacturing operations are carried out correctly and the products are made consistently.<br><br>Sharp Decl. ¶ 30. | Disputed, in part. SOPs also set forth the detailed steps for manufacturing or processing a placental product. Banman Decl. ¶ 25; Fluskey Decl. Ex. 14 at 38:23-39:5, 101:20-24; Fluskey Decl. Ex. 16 at 17:4-11; Fluskey Reply Decl. Ex. 5 (Chin-Sang Depo.) at 53:24-54:5. |
| 390. | Banman drafted the essential processing steps of the SOPs for the HRT products.<br><br>Sharp Decl. ¶ 31. | Disputed. Banman did not draft the "essential processing steps" of HRT SOPs. Sharp maintained control of all SOPs. Sharp directed the creation of all SOPs. Banman did not receive or review final, complete SOPs. He did not provide sign-off on SOPs. Banman had no responsibility for processing or manufacturing products. That was the job of a lab director and quality assurance director. Banman Decl. ¶¶ 25-28; Fluskey Decl. Ex. 14 at 79:23-80:1, 108:1-9; Fluskey Reply Decl. Ex. 5 (Chin-Sang Depo.) at 30:16-25, 109:8-14; Fluskey Reply Decl. Ex. 6 (Shoen Depo.) at 13:25-14:16, 17:13-17, 27:3-21.<br><br>Banman had never seen the document setting forth the specific ratio of placental tissue used for HRT's flowable product, which is not part of HRT's integrated SOPs. Only Sharp knows that formula, and the separate document showing that formula was locked in Sharp's office. Banman Reply Decl. ¶ 27; Fluskey Reply Decl. Ex. 5 (Chin-Sang Depo.) at 107:13-108:2, Ex. 6 (Shoen Depo.) at 34:3-35:5, 37:13-20. |
| 391. | To this day, the SOPs created by Banman on how to manufacture HRT products have not materially changed since they were drafted by him. | Disputed. *See* response to 390. In this litigation, Plaintiffs have produced multiple versions of SOPs. Some of them bear revision dates after 2014-2015, when Banman ceased working on product |

174

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Sharp Decl. ¶ 32; Lee Rpt. at p. 10 (Opinion #4). | development initiatives. Fluskey Decl. Ex. 30 (Depo Exs. 46 and 47); Banman Decl. ¶ 27. |
| 392. | The products that were created by Skye/HRT are revolutionary as they discovered how to preserve and reintroduce that placental material into the human body.<br><br>Sharp Decl. ¶ 33. | Disputed. HRT/Skye products were not "revolutionary." Multiple companies developed, marketed, and sold placental products (including membrane products and flowable particulates) before HRT/Skye. Banman Decl. ¶¶ 20-24, Exs. 6-7. |
| 393. | To create the product, HRT obtains raw human placenta, performs numerous steps to manipulate the tissue, which leads to the creation of an ambient temperature, shelf stable, final implantable product.<br><br>Sharp Decl. ¶ 34. | Undisputed. |
| 394. | The product itself is used in either wound care (cuts, lacerations, gashes, tears to the skin) or in surgical applications (when closing an incision).<br><br>Sharp Decl. ¶ 35. | Disputed, in part. CTM does not sell placental products for use in wound care. CTM sells such products for multiple surgical applications. Banman Reply Decl. ¶ 28. |
| 395. | When properly used, the product reduces the amount of scar tissue; lessons infection rates; decreases pain; and diminishes the healing time for the skin.   Essentially, the product boosts recovery of incisions and wounds to the skin.<br><br>Sharp Decl. ¶ 36. | HRT and Skye have not produced or published data supporting these statements. |
| 396. | Sharp was so pleased with Banman's hard work in the development of the products for HRT, that he rewarded Banman with 10% equity in HRT. | Disputed. Banman was entitled to 10% equity in HRT pursuant to a Membership Unit Grant Agreement. Banman was not "rewarded" with 10% equity in HRT because Sharp was "pleased with |

175

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|---------------------|
| | Sharp Decl. ¶ 37. | Banman's hard work." Banman had a contractual right to the equity. Banman Decl. ¶ 14. |
| 397. | Banman still owns 10% of HRT to this day – and even though this lawsuit is pending, Banman has been paid his 10% profit share every year.<br><br>Sharp Decl. ¶ 38; Banman Depo. Vol. I (Saba Decl. Ex. 1) at 17:7-12. | Disputed, in part. Banman does own 10% of HRT, but Banman has not been paid his proper 10% equity distribution in HRT each year. Banman was forced to pursue a Books and Records trial in Delaware Chancery Court against HRT, where Banman prevailed on all points. The court referred to HRT's conduct in the litigation as "unprincipled," and HRT paid a portion of Banman's legal fees. Fluskey Decl. Ex. 34 at p. 14; Banman Reply Decl. ¶ 32. |
| 398. | Once HRT finalized the products, Banman's new role as Sharp's trusted employee (and essentially the #2 person in the company), pivoted to become the head of sales.<br><br>Sharp Decl. ¶ 39. | Disputed. Banman never worked for HRT as the "head of sales." After Banman's consulting agreement with HRT expired, and he ceased working on product development initiatives, Banman continued working on business development matters for Skye. Banman Decl. ¶¶ 13, 15, 27-30. |
| 399. | As the head of sales, Banman's role was to recruit independent sales representatives to sell the products to medical facilities.<br><br>Sharp Decl. ¶ 40. | Disputed, in part. Banman was never the "head of sales" for HRT. Banman served as the Senior Vice President of Business Development for Skye. Banman Decl. ¶¶ 29-30. |
| 400. | Banman's job function became the recruitment, management, and development of all sales for the products.<br><br>Sharp Decl. ¶ 41. | Disputed, in part. Banman performed these services for Skye during a certain period of time, not for HRT. Banman Decl. ¶¶ 27-30. |
| 401. | Since the human placental industry was newly emerging, there were not many sales representatives that had experience in selling human placental products. | Disputed. Skye recruited sales representatives with substantial experience selling medical products, including tissue products. Skye did not provide "extensive |

176

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Nonetheless, Banman had to recruit sales individuals and then provide them with extensive training.<br><br>Sharp Decl. ¶ 42. | training." The training consisted of a 60 minute webinar. For the most part, these sales representatives brought pre-existing relationships with them to Skye. Banman Decl. ¶¶ 33-35; Banman Reply Decl. ¶ 33; Fluskey Reply Decl. Ex. 9 (Stumpe Depo.) at 307:18-24. |
| 402. | To train new sales representatives, Banman created sales modules or "notes" so that the sales representatives could be educated about the products and have "talking points" on how best to sell the products to facilities.<br><br>Sharp Decl. ¶ 43. | Undisputed. |
| 403. | Many times, sales representatives would speak to physicians to explain the benefits of the products. The physicians would then typically instruct the medical facilities to order the products so they would be available in either a surgical or in-office wound care setting.<br><br>Sharp Decl. ¶ 44. | Undisputed. |
| 404. | It takes significant time and energy to train a sales representative so that the individual is armed with the knowledge about the benefits of the product. However, it took considerably more time for the sales representative to meet with doctors and educate them on the benefits of the product.<br><br>Sharp Decl. ¶ 45. | Disputed. It did not take "significant time and energy to train a sales representative." Skye targeted sales representatives with substantial prior experience selling medical products, including products that competed with Skye. The independent sales representatives relied on their prior experience and relationships to sell Skye products. Banman Decl. ¶¶ 33-34. Substantial training was not required. Banman Reply Decl. ¶ 33; Fluskey Reply Decl. Ex. 9 (Stumpe Depo.) at 307:18-24. |
| 405. | Many doctors are skeptical of new products and want empirical data or | Disputed. Other companies were selling placental products before HRT/Skye. The |

177

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | historical information about the benefits of the products. Doctors also need training and education as to how and why the products work.<br><br>Sharp Decl. ¶ 46. | products were not "new." Banman Decl. ¶¶ 7, 20-24 & Ex. 1.<br><br>Defendants also object based on lack of foundation and hearsay. |
| 406. | Since this was an emerging industry, the benefits of the products were not well known, and it took substantial time to sell the product to a physician.<br><br>Sharp Decl. ¶ 47. | Disputed. *See* response to 405. |
| 407. | Once a doctor started using the products, and personally observed the benefits to the patients, the doctors would reorder regularly.<br><br>Sharp Decl. ¶ 48. | Disputed. A physician's ordering habits vary according to the physician's needs and the patient's needs. One cannot state with certainty that a doctor would "reorder regularly" after the doctor personally observed the benefits. Banman Reply Decl. ¶ 34.<br><br>Banman has also asserted evidentiary objections. |
| 408. | That was the key to the sales – once you could get a doctor to become a believer in the product, they would continue to buy with regularity and become a valuable asset to the company.<br><br>Sharp Decl. ¶ 49. | Disputed. *See* response to 407.<br><br>Defendants also object on lack of foundation and hearsay. |
| 409. | To gather product efficacy information, Skye partnered with doctors to use the product and provide data results. This data was important for Skye to assess the efficacy of their product, which in turn it could then publicize to potentially new users. | Disputed. Skye did not "partner" with doctors. Skye entered into contracts with certain doctors to conduct research. Skye has not published any surgical data on its products. Banman Reply Decl. ¶ 34. |

178

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|---------------------|
|  | Sharp Decl. ¶ 50. |  |
| 410. | Costs are also a major factor. There are realistic cost barriers when a physician adds a new product to already established surgical protocol.<br><br>Sharp Decl. ¶ 51. | Disputed. There are no "major" "cost factors" that prevent medical facilities or physicians from using a placental product. Banman Reply Decl. ¶ 35. |
| 411. | If a doctor wanted to start using the connective tissue matrix flowable as part of a shoulder surgery, someone had to pay for the product.<br><br>Sharp Decl. ¶ 52. | Undisputed. |
| 412. | Skye brought the term connective tissue matrix into the placental marketplace.<br><br>Sharp Decl. ¶ 53. | Disputed. The term "connective tissue matrix" is a generic term used to describe tissue that exists in the human body. It has been used by physicians and scientists for many years. Skye did not bring this term to the placental marketplace. Banman Decl. ¶ 44, Ex. 8; Banman Reply Decl. ¶ 36.<br><br>This statement is also immaterial because Plaintiffs publicly used the term "connective tissue matrix." It is not a trade secret. SOF ¶ 77; Fluskey Decl. Ex. 14 at 230:16-231:5' Fluskey Reply Decl. Ex. 1 (Sharp Depo.) at 437:13-438:1; Saba Decl. Ex. 75. |
| 413. | Skye discovered that connective tissue matrix products qualified as a reimbursable product by insurance companies.<br><br>Sharp Decl. ¶ 54. | Disputed. Skye did not "discover" that placental products qualified for insurance reimbursement. The codes utilized for reimbursement of such products are publicly-available. SOF ¶ 117; Banman Decl. ¶ 68, Exs. 15-17; Fluskey Decl. Ex. 14 at 237:4-11. CMS Medicare created a code for the billing and reimbursement of human connective tissue prior to 2013. |

179

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | | CMS Medicare created a code for the billing and reimbursement of human connective tissue prior to 2013. The FDA published information about "particulate human placental connective tissue matrix" in 2004. Skye/HRT referenced this FDA information in its product development, and used it in creating its products' intended use statement. Banman Reply Decl. ¶ 37. |
| 414. | By having insurance companies pay for the product, then a patient would not bear the expense, which makes it easier for a physician and medical facility to use the product.<br><br>Sharp Decl. ¶ 55. | Disputed, in part. No private insurance payer has added Skye products to its list of reimbursable "connective tissue" contracts. The only reimbursement contracts Skye is listed on are for Medicare for certain Skye wound care products when used in outpatient wound care. Banman Reply Decl. ¶ 38. |
| 415. | As the head of sales, Banman communicated with the sales force daily to make sure that they had the proper tools and resources to sell the products.<br><br>Sharp Decl. ¶ 56. | Undisputed, as to Banman's role with Skye. |
| 416. | Once a sale was made, Banman ensured that the product was shipped to the medical facility and the customers were satisfied.<br><br>Sharp Decl. ¶ 57. | Disputed. Banman did not ensure product was shipped. Skye Customer Service and Shipping departments ensured product was shipped. Baman had no access to the shipping system or FedEx system. Banman Reply Decl. ¶ 39. |
| 417. | Skye kept detailed records of which sales representatives made the most sales; which medical facilities were buying products; and which doctors were using the products.<br><br>Sharp Decl. ¶ 58. | Disputed, in part. Skye did not keep records regarding which doctors were using products. Skye did not track revenue by utilizing physician. Banman Reply Decl. ¶ 39. Fluskey Reply Decl. Ex. 11 (Lee Depo.) at 116:9-117:3. |

180

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 418. | Banman led the customization of the software system called Netsuite to capture all this information, so he was intimately aware of who the top sales representatives were; which facilities bought the most product and how much they paid; and which doctors had been educated on the products, used the products, and were re-ordering the products. This collected data is a trade secret of Skye and HRT.<br><br>Sharp Decl. ¶ 59. | Disputed. Banman did not lead this customization. Priscilla Lee, an employee of HRT/Skye, implemented Netsuite with Sharp. Consultants worked in-person in California with Sharp and Lee. Banman Reply Decl. ¶ 41. Skye's sales representatives and customer identities were not a secret of Skye. Sales representatives' identities and customer identities were not kept secret within the company. SOF ¶¶ 123-128. |
| 419. | On November 1, 2010, Banman signed a "Mutual Non-Disclosure and Confidentiality Agreement" with Sharp and "any of Chris Sharp's companies".<br><br>Saba Decl. ¶ 14, Ex. 11. | Undisputed, but immaterial. Plaintiffs do not pursue a claim under this contract. |
| 420. | The November 1, 2010 Mutual Non-Disclosure and Confidentiality Agreement states in pertinent part that Banman was required to keep certain information confidential, including "business, scientific or technical information" related to the "business interests, research, product plans, products, developments, inventions, clinical and test data, trade secrets, know-how".<br><br>Saba Decl. ¶ 14, Ex. 11, at p. 1 ¶ 1. | Undisputed, but immaterial. Plaintiffs do not pursue a claim under this contract. |
| 421. | The November 1, 2010 Mutual Non-Disclosure and Confidentiality Agreement requires that all trade secret information shall remain confidential "for a term at least as long as the information is a trade secret according to the laws of the state of Delaware." | Undisputed, but immaterial. Plaintiffs do not pursue a claim under this contract. |

181

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Saba Decl. ¶ 14, Ex. 11, at p. 1 ¶ 5. | |
| 422. | On April 23, 2012, Banman signed a "Mutual Non-Disclosure, Confidentiality & Non-Circumvent Agreement" with Skye.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 76:16-20; Saba Decl. ¶ 15, Ex. 12. | Undisputed |
| 423. | The April 23, 2012 Skye Mutual Non-Disclosure, Confidentiality & Non-Circumvent Agreement states in pertinent part that Banman was required to keep certain information confidential, including but not limited to the "know-how" of how to make Skye's products.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 76:21-77:7; Saba Decl. ¶ 15, Ex. 12, at p. 1. | Disputed, in part. Banman admits that he signed the April 23, 2012 Mutual Non-Disclosure, Confidentiality & Non-Circumvent Agreement with Skye. He denies that only the provision cited by Plaintiffs is the "pertinent" provision. |
| 424. | The April 23, 2012 Skye Mutual Non-Disclosure, Confidentiality & Non-Circumvent Agreement requires that all trade secret information shall remain confidential "for a term at least as long as the information is a trade secret according to the laws of the state of Delaware."<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 76:21-77:7; Saba Decl. ¶ 15, Ex. 12, at p. 1, § 5; | Undisputed that Plaintiff has accurately quoted the agreement. |
| 425. | Banman understood he was going to be provided confidential and proprietary information after he signed the April 23, 2012 Skye Mutual Non-Disclosure, Confidentiality & Non-Circumvent Agreement. | Disputed. Banman testified that he might "potentially" be provided with information that is confidential or proprietary. Saba Decl., Ex. 1 at 90:3-9. |

182

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
| | Banman Depo. Vol. I (Saba Decl. Ex. 1) at 89:17-90:9; Saba Decl. ¶ 15, Ex. 12. | |
| 426. | On May 21, 2012, Banman signed a "Market Development Agreement" with Skye.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 90:10-17; Saba Decl. ¶ 16, Ex. 13. | Undisputed and immaterial, and Sharp did not sign the agreement. Saba Decl., Ex. 13. |
| 427. | The May 21, 2012 Skye Market Development Agreement identifies the April 23, 2012 Non-Disclosure Agreement and affirms that Banman is bound by such an agreement.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 92:24-93:7; Saba Decl. ¶ 16, Ex. 13 at p. 2. | Undisputed and immaterial. |
| 428. | The May 21, 2012 Skye Market Development Agreement states in pertinent part that Banman is required to keep certain information confidential, including but not limited to names of business contacts.<br><br>Saba Decl. ¶ 16, Ex. 13 at p. 2. | Disputed and immaterial. The Skye Market Development Agreement required Banman and Skye to each hold certain information in confidence for the duration of the agreement. Saba Decl., Ex. 13.<br><br>Plaintiffs do not pursue a claim under this contract. |
| 429. | In the May 21, 2012 Skye Market Development Agreement, Banman agreed that he would not circumvent or attempt to circumvent Skye's business relationships.<br><br>Saba Decl. ¶ 16, Ex. 13 at p. 2. | Disputed and immaterial. The Skye Market Development Agreement does not include the language paraphrased by Plaintiffs. Saba Decl., Ex. 13.<br><br>Plaintiffs do not pursue a claim under this contract. |
| 430. | Section 7 of the May 21, 2012 Skye Market Development Agreement recognizes that any work product created | Disputed and immaterial. The Skye Market Development Agreement does not state that "any work product created in connection with Skye" will be the |

183

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | in connection with Skye would be exclusive property of Skye.<br><br>Saba Decl. ¶ 16, Ex. 13 at p. 3. | exclusive property of Skye. The agreement states that "[a]ll written materials and other works solely and only related to this Agreement and the Field . . . that relate only to this Agreement in the course of providing such services to Skye . . . shall become Skye's property." Saba Decl., Ex. 13 at 2-3.<br><br>Plaintiffs do not pursue a claim under this contract. |
| 431. | In the May 21, 2012 Skye Market Development Agreement, the duty of confidentiality and non-circumvention was to remain in place until at least May 21, 2019.<br><br>Saba Decl. ¶ 16, Ex. 13 at p. 2. | Disputed and immaterial. The Confidentiality & Non-Circumvention Clause of the Skye Market Development Agreement (Section 4) states that the confidentiality and non-circumvention obligations would last for a period of five years after termination, and Section 5 sets forth termination rights. Saba Decl., Ex. 13 at 3.<br><br>Plaintiffs do not pursue a claim under this contract. |
| 432. | On March 25, 2013, Banman signed a "Business/Market development Agreement" with Skye.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 93:19-22; Saba Decl. ¶ 17, Ex. 14. | Disputed and immaterial. Banman signed the "Business/Market Development Agreement" with Skye Biologics, Inc., not Skye Orthobiologics, LLC (which has been defined as "Skye"). Saba Decl., Ex. 14.<br><br>Plaintiffs do not pursue a claim under this contract. |
| 433. | The March 25, 2013 Business/Market Development Agreement identifies the April 23, 2012 Non-Disclosure Agreement and affirms that Banman is bound by such an agreement. | Undisputed, but immaterial. Plaintiffs do not pursue a claim under this contract. |

184

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|---------------------|
| | Banman Depo. Vol. I (Saba Decl. Ex. 1) at 95:10-14; Saba Decl. ¶ 17, Ex. 14. | |
| 434. | Banman agreed that "the identities of contacts and manufacturing know-how is recognized as exclusively Skye's confidential information."<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 96:7-11. | Disputed and immaterial. Banman testified that he agreed to the terms set forth in Section 4a. of the Business/Market Development Agreement. Saba Decl., Ex. 1 at 95-96. Banman does not admit that this provision is enforceable.<br><br>Plaintiffs do not pursue a claim under this contract. |
| 435. | Banman agreed to "keep confidential how to process birth tissue and the names of any contacts introduced or revealed by Skye."<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 96:12-18. | Disputed and immaterial. Banman testified that he agreed to the terms set forth in Section 4a. of the Business/Market Development Agreement. Saba Decl., Ex. 1 at 95-96. Banman does not admit that this provision is enforceable.<br><br>Plaintiffs do not pursue a claim under this contract. |
| 436. | Banman agreed that "confidentiality will include how to process tissues, any names, address, telephone, telex, facsimile numbers, and other pertinent information disclosed, revealed or learned by" Banman.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 96:19-97:1. | Disputed and immaterial. Banman testified that he agreed to the terms set forth in Section 4a. of the Business/Market Development Agreement. Saba Decl., Ex. 1 at 95-96. Banman does not admit that this provision is enforceable.<br><br>Plaintiffs do not pursue a claim under this contract. |
| 437. | Banman agreed that he "would not directly or indirectly interfere with, circumvent, or attempt to circumvent, avoid, bypass or obviate any of Skye's business interests including manufacturing, manufacturing know-how, or interest or relationship between the parties." | Disputed and immaterial. Banman testified that he agreed to the terms set forth in Section 4a. of the Business/Market Development Agreement. Saba Decl., Ex. 1 at 95-96. Banman does not admit that this provision is enforceable. |

185

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Banman Depo. Vol. I (Saba Decl. Ex. 1) at 97:2-10. | Plaintiffs do not pursue a claim under this contract. |
| 438. | The duty of confidentiality and non-circumvention in the March 25, 2013 Skye Business/Market Development Agreement was to remain in place until at least March 25, 2020.<br><br>Saba Decl. ¶ 17, Ex. 14. | Disputed and immaterial. The confidentiality and non-circumvention provision of Business/Market Development Agreement was to remain in effect for five years following termination of the Agreement. The Agreement provides several bases for termination. Saba Decl., Ex. 14 §§ 4, 9.<br><br>Plaintiffs do not pursue a claim under this contract. |
| 439. | In June 2014, Banman signed a "Consulting Agreement/Compensation Contract" with HRT.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 97:15-19; 87:12-88:7 Decl. ¶ 18, Ex. 15. | Undisputed |
| 440. | In the HRT Consulting Agreement/Compensation Contract, Banman was granted the option to acquire Membership Units in the amount of 10% ownership in HRT.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 98:9-99:2; Saba Decl. ¶ 18, Ex. 15, at p. 1. | Undisputed |
| 441. | In exchange, Banman agreed to keep certain information confidential, including but not limited to processing protocols, product formulations, and the business affairs of HRT in the HRT Consulting Agreement/Compensation Contract.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 100:17-101:18; Saba Decl. ¶ 18, Ex. 15, at p. 2. | Disputed. In the HRT Consulting Agreement/Compensation Contract, Banman did not agree to keep certain information confidential "in exchange" for receiving equity. The agreement contains separate equity provisions, compensation provisions, and confidentiality provisions. Saba Decl. Ex. 15. |

186

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
| 442. | Banman understood HRT's confidential information including how HRT processes and manufacturers human tissue.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 101:13-18. | Disputed. Banman testified only that he agreed to the text of the contract. Saba Decl. Ex. 1 at 100-102. |
| 443. | Section 5 of the HRT Consulting Agreement/Compensation Contract provides that any creations in connection with Banman's employment with HRT are the sole property of HRT.<br><br>Saba Decl. ¶ 18, Ex. 15, at p. 3, § 5. | Disputed. Plaintiffs have misstated the full provision of the contract. The contract states that certain deliverables created by Banman in connection with his work for HRT would become the property of HRT, except for the non-public, confidential and proprietary information and trade secrets belonging to Banman. Saba Decl. Ex. 15 § 5. |
| 444. | In the HRT Consulting Agreement/Compensation Contract, Banman agreed that HRT owns all of the proprietary information and trade secrets related to HRT's business.<br><br>Saba Decl. ¶ 18, Ex. 15, at p. 3. | Disputed. Plaintiffs have misstated the full provision of the contract. The contract states that certain deliverables created by Banman in connection with his work for HRT would become the property of HRT, except for the non-public, confidential and proprietary information and trade secrets belonging to Banman. Saba Decl. Ex. 15 § 5. |
| 445. | Exhibit A to the HRT Consulting Agreement/Compensation Contract identifies "Services" in which Banman had agreed to provide to HRT. Those Services include, but not limited to:<br><br>A. Assist in establishing protocols, equipment sourcing, and SOPs in a timely manner<br><br>B. Assist in all validations and initial product build out | Undisputed |

187

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | C. Document a design file for each product family from scientific papers and prototypes<br><br>. . .<br><br>G. Research scientific papers and advise (HRT) regarding new developments applicable to (HRT's) products<br><br>H. Coordinate evidence-based studies for all (HRT) specialties<br><br>I. Assist with new product formulations and delivery systems<br><br>Saba Decl. ¶ 18, Ex. 15, at p. 7. | |
| 446. | The confidentiality aspects of the HRT Consulting Agreement/Compensation Contract were to last in perpetuity.<br><br>Saba Decl. ¶ 18, Ex. 15, at p. 2 § 3(c). | Disputed. Section 3 of the HRT Consulting Agreement/Compensation Contract states that the confidentiality provision survived termination of the agreement. Nothing in the agreement states that there are any obligations that were to last in "perpetuity." |
| 447. | On June 20, 2014, Banman signed a "Membership Unit Grant Agreement" with HRT where he was granted up to 10% ownership of HRT.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 102:3-8; Saba Decl. ¶ 19, Ex. 16. | Undisputed |
| 448. | On June 26, 2014, Banman signed a "HRT Services/Consultant Confidentiality Agreement".<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 103:8-21; Saba Decl. ¶ 20, Ex. 17. | Undisputed |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 449. | The HRT Services/Consultant Confidentiality Agreement shall be effective "as of January 1, 2013 when development of HRT products and processes were first discussed."<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 103:22-104:3; Saba Decl. ¶ 20, Ex. 17. | Disputed, in part. The agreement contains the language quoted in the statement, but Banman does not admit that this language/provision is enforceable under California law. |
| 450. | Banman promised to hold in the "strictest confidence and will not disclose to anyone" any proprietary information in the HRT Services/Consultant Confidentiality Agreement which means product formulations, product ingredients, revenue numbers, financials, representation agreements, representation commissions, employment/service agreements, pricing, sources of supply, employee compensation, HRT structure, HRT ownership structure, margins, product designs, packaging, inserts, future products and marketing materials.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 104:12-106:5; Saba Decl. ¶ 20, Ex. 17. | Disputed, in part. The statement quotes accurately from a portion of the agreement. Banman does not admit that the provision quoted is enforceable as a matter of law. |
| 451. | In the HRT Services/Consultant Confidentiality Agreement Banman agreed that "during the period of my services by HRT I will not, without HRT prior written consent, engage in any services or business activity other than for HRT."<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 107:25-108:7 Saba Decl. ¶ 20, Ex. 17. | Disputed, in part. The statement quotes accurately from a portion of the agreement. Banman does not admit that the provision quoted is enforceable as a matter of law. |
| 452. | In the HRT Services/Consultant Confidentiality Agreement, Banman agreed that during the term of his service with HRT and for a period of five years | Disputed. The statement accurately paraphrases this section of the agreement. |

189

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | thereafter, Banman would not solicit or arrange to have any other person or entity solicit or any person or entity engaged by HRT as an employee, customer, supplier, consultant or advisor of HRT to terminate such party's relationship with HRT.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 108:8-17; Saba Decl. ¶ 20, Ex. 17. | But the section paraphrased is unenforceable. |
| 453. | In the HRT Services/Consultant Confidentiality Agreement, Banman agreed that he would not improperly use or disclose any confidential information or trade secrets.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 108:18-22; Saba Decl. ¶ 20, Ex. 17. | Undisputed |
| 454. | In the HRT Services/Consultant Confidentiality Agreement, Banman agreed to return to HRT all drawings, notes, memoranda, financials, specifications, devices, formulas to HRT.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 109:4-9; Saba Decl. ¶ 20, Ex. 17. | Undisputed |
| 455. | On December 9, 2015, Banman signed an acknowledgment that he agreed to the terms of the company handbook.<br><br>The company handbook includes provisions relating to the return of company property:<br><br>Employees will not, except as required in the conduct of THE COMPANY'S business or as authorized in writing by THE COMPANY, disclose or use during their term of employment or subsequent thereto any Trade Secrets/Confidential lnformation. Furthermore, all records, | Undisputed |

190

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | files, plans, documents and the like relating to the business of THE COMPANY which employees prepare, use or come in contact with shall be and shall remain the sole property of THE COMPANY and shall not be copied without written permission of THE COMPANY and shall be returned to THE COMPANY on termination or cessation of employment, or at THE COMPANY'S request at any time.<br><br>Upon termination of employment, an employee shall not remove any software or data from Company computer systems and shall completely remove all data collected, downloaded and/or created on non-Company computers used for Company business that relate in any manner to THE COMPANY'S business.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 113:11-24; Saba Decl. ¶ 21, Ex. 18. | |
| 456. | One of the key components of the handbook was the section called "Protection of THE COMPANY'S Trade Secrets and Confidential Information".<br><br>Saba Decl. ¶ 21, Ex. 18. | Disputed. The Handbook contains a section regarding protection of the company's alleged trade secrets and confidential information. The agreement does not indicate that this is a "key component" of the document. |
| 457. | In the Protection of THE COMPANY'S Trade Secrets and Confidential Information section of the company handbook, the term "trade secret" is defined to include a formula, pattern, compilation, program, device, method, technique or process.<br><br>Saba Decl. ¶ 21, Ex. 18; Saba Decl. ¶ 22, Ex. 19; Saba Decl. ¶ 23, Ex. 20. | Disputed. The statement does not quote the full definition of trade secret as used in the Handbook. Saba Decl. Ex. 18 at 7. |

191

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 458. | On March 31, 2016, Skye and Banman extended the March 25, 2013 "Business/Market Development Agreement" to December 31, 2016.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 118:5-22; Saba Decl. ¶ 24, Ex. 21. | Disputed and immaterial. This document was not signed by Bryan Banman. Saba Decl. Ex. 21. The Banman testimony cited does not support the statement. On page 118 of the transcript, Banman stated only that he saw the words on the document presented to him at deposition. Saba Decl. Ex. 1, at 118. When asked on the following page (119) if he recalled entering into this agreement, Banman testified that he did *not* recall. Fluskey Reply Decl. Ex. 2 (Banman Depo.) at 119. Banman later testified that he did not recall ever receiving the document or negotiating it. Fluskey Reply Decl. Fluskey Reply Decl. Ex. 2 (Banman Depo.) at 704. Plaintiffs omitted pages 119 and 704 from their portion of the record.<br><br>Plaintiffs are not pursuing any claim under this agreement. |
| 459. | The extension to the March 25, 2013 Business/Market Development Agreement required Mr. Banman to keep certain trade secrets and information confidential until December 31, 2021 (five years after the expiration of the agreement per original agreement). | Disputed and immaterial. Banman did not sign the referenced extension agreement. *See* Response to 458.<br><br>Plaintiffs are not pursuing any claim under this agreement. |
| 460. | On January 1, 2017, Skye and Banman again extended the Business/Market Development agreement.<br><br>Saba Decl. ¶ 25, Ex. 22. | Disputed and immaterial. Banman did not sign the referenced extension agreement. Banman was asked at deposition if he recognized this document, and he testified that he was not sure if he did. Fluskey Reply Decl. Ex. 2 (Banman Depo.) at 119. Banman also testified that he did not recall ever receiving or negotiating the document attached as Ex. 22 to the Saba Decl. (Deposition Ex. 134). Fluskey Reply Decl. |

192

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | | Ex. 2 (Banman Depo.) at 705. Plaintiffs omitted these pages of the transcript from their portion of the record.<br><br>Plaintiffs are not pursuing any claim under this agreement. |
| 461. | The extension to the March 25, 2013 Business/Market Development Agreement, required Mr. Banman to keep certain trade secrets and information confidential until December 31, 2022 (five years after the expiration of the agreement per original agreement).<br><br>Saba Decl. ¶ 14, Ex. 11, at p. 2; Saba Decl. ¶ 25, Ex. 22. | Disputed and immaterial. *See* Response to 460. |
| 462. | On April 18, 2018, Banman signed a Confidentiality Agreement in connection with his employment with Skye.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 120:15-24; Saba Decl. ¶ 26, Ex. 23. | Undisputed. |
| 463. | Banman signed this employment agreement with the understanding that he intended to keep working for the company.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 134:5-135:1. | Undisputed. |
| 464. | In the April 18, 2018 Agreement, Banman agreed "to hold in the strictest of confidence Skye's proprietary information."<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 121:4-122:13; Saba Decl. ¶ 26, Ex. 23. | Disputed. Plaintiffs have failed to quote all relevant portions of the confidentiality provisions of the agreement; most notably, the provision that carves out from the definition of "Proprietary Information" information that Banman knew or disclosed to Skye under the previous April |

193

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | | 23, 2012 Mutual Non-Disclosure Agreement. Saba Decl. Ex. 23 § 1. |
| 465. | In the April 18, 2018 Agreement, the proprietary information includes product formulations, product ingredients, revenue numbers, financials, representation agreements, representation commissions, employment agreements, pricing, sources of supply, employee compensation, product designs, future products, etc. The agreement also requires Banman to keep confidential the know-how of manufacturing products.<br><br>Saba Decl. ¶ 26, Ex. 23, at p. 1. | Disputed. *See* Response to 464. |
| 466. | In the April 18, 2018 Agreement, Banman confirmed that he assigned all trade secrets to Skye.<br><br>Saba Decl. ¶ 26, Ex. 23, p. 2, § 3. | Disputed. *See* Response to 464. |
| 467. | In the April 18, 2018 Agreement, Banman agreed to, when leaving Skye's employ, "deliver to Skye all drawings, notes, memoranda, financials, product designs, etcetera."<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 122:14-18; Saba Decl. ¶ 26, Ex. 23. | Undisputed. |
| 468. | On April 18, 2018, Banman signed an "Employment Letter" with Skye for the position of Senior VP Business Development.<br><br>Saba Decl. ¶ 27, Ex. 24. | Undisputed. |
| 469. | Banman agreed that (i) Skye will be his sole job and focus during his time of | Undisputed. |

194

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
| | employment; (ii) the execution of the confidentiality and non-solicit agreement was a condition of employment; and (iii) Skye's Company Handbook is signed as a condition of employment.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 123:12-23; Saba Decl. ¶ 27, Ex. 24, at p. 2. | |
| 470. | On June 13, 2016, Nate Boulais signed a Representative Agreement.<br><br>Saba Decl. ¶ 28, Ex. 25. | Disputed in part. Boulais signed the agreement on behalf of Medical-Assist LLC. Saba Decl., Ex. 25 at 1. |
| 471. | Boulais understood that the June 13, 2016 Representative Agreement required Boulais, individually, to perform certain duties.<br><br>Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 34:17-23; Saba Decl. ¶ 28, Ex. 25. | Disputed as vague and ambiguous, and immaterial. |
| 472. | Boulais agreed that for the term of the June 13, 2016 Representative Agreement, and six months after, he would "not receive compensation or represent any other Company that sells Amniotic membrane, flowable, Cell Product(s) or Placental Tissue."<br><br>Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 37:10-25; Saba Decl. ¶ 28, Ex. 25. | Disputed in part and immaterial. The agreement's term was for two years from date of commencement (June 13, 2016) and automatically terminated on June 13, 2018. Saba Decl., Ex. 25 ¶ 6.1. The agreement applied to Medical-Assist LLC, not Boulais individually. Saba Decl., Ex. 25 at 1. Neither Medical-Assist LLC nor Boulais have been sued for breaching the agreement. |
| 473. | In the June 13, 2016 Representative Agreement, Boulais agreed to keep confidential any "Skye's business, plans, pricing information, manufacturers' names, processing information, presentations, marketing materials, end-users, technology, and products that are confidential and of substantial value to | Disputed in part and immaterial.  The agreement applied to Medical-Assist LLC, not Boulais individually. Saba Decl., Ex. 25. Neither Medical Assist LLC nor Boulais have been sued for breaching the agreement. |

195

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Skye, which value would be impaired if such information were disclosed to third parties." Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 38:1-18; Saba Decl. ¶ 28, Ex. 25 at § 8.2. | |
| 474. | Boulais never gave Skye notice that he was terminating any representative agreements with Skye. Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 39:9-13. | Undisputed and immaterial. |
| 475. | On July 1, 2018, Boulais signed a Unit Appreciation Rights Agreement with Skye; Stumpe also signed his own. Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 161:11-25; Saba Decl. ¶ 30, Ex. 27; Saba Decl. ¶ 33, Ex. 30 at p. 35. | Disputed in part and immaterial. It is undisputed Boulais signed an agreement, but Boulais has not been sued for breaching the agreement. The cited evidence does not indicate Stumpe signed an agreement, and there is no evidence that Stumpe ever did, but nonetheless Stumpe has not been sued for breach of the agreement. |
| 476. | On February 9, 2015, Stumpe signs a Representative Agreement with Skye Orthobiologics, LLC, effective as of January 26, 2015. Stumpe Depo. (Saba Decl. Ex. 28) at 55:22-24; Saba Decl. ¶ 32, Ex. 29. | Disputed in part and immaterial. Stumpe never had any signed, written agreements with Skye. The agreement was with Novus Ortho Corp. Saba Decl., Ex. 29 at 1. Stumpe is not a party to this agreement. |
| 477. | In signing the agreement, Stumpe agreed to be responsible for consignment inventory and "any unaccounted-for tissues will be invoiced by Skye directly to the Representative." Saba Decl. ¶ 32, Ex. 29 at § 3. | Disputed as to everything except the quoted portion: "any unaccounted-for tissues will be invoiced by Skye directly to the Representative [Novus Ortho Corp]." Otherwise misstates and misrepresents the content of the document. Skye is responsible for keeping track of consigned inventory through audits, per the |

196

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|---------------------------|---------------------|
| | | agreement. Saba Decl. ¶ 32, Ex. 29 at § 3.5.<br><br>Moreover, Stumpe never had any signed, written agreements with Skye. The agreement was with Novus Ortho Corp. *See* Saba Dec., Ex. 29, p. 1. Stumpe is not a party to this agreement |
| 478. | Stumpe also agreed not to disclose Skye's confidential information which includes: "Skye's business, plans, pricing information, manufacturer's names, processing information, presentations, marketing materials, end-users, technology, and products that are confidential and of substantial value to Skye, which value would be impaired if such information were disclosed to third parties."<br><br>Saba Decl. ¶ 32, Ex. 29. | Disputed in part and immaterial. The agreement applied to Novus Ortho Corp., not Stumpe individually. Saba Decl., Ex. 29 at 1. Neither Novus Ortho Corp. nor Stumpe have been sued for breaching the agreement. *See* Dkt. No. 130 (Complaint). The agreement also fails to state exactly what Skye claims is a "trade secret." |
| 479. | Banman recruited Stumpe and Boulais to work with CTM because they were top sales representatives for Skye.<br><br>Banman Depo. Vol. 1 (Saba Decl. Ex. 1) at 227:8-18. | Disputed. The cited deposition testimony does not discuss Stumpe at all. Saba Decl., Ex. 1 at 227:8-18. In addition, the cited deposition testimony does not discuss recruiting or on boarding Stumpe or Boulais. *Id.* Moreover, the evidence shows that neither Stumpe nor Boulais ever had any direct relationship with CTM in their individual capacities. |
| 480. | Stumpe and Boulais knew physicians and medical facilities that were reordering Skye's products.<br><br>Sharp Decl. ¶ 60. | Disputed. The cited evidence, Chris Sharp's Declaration ¶ 60, is simply Mr. Sharp's speculation. He cannot testify as to what Stumpe and Boulais did, or did not, know. |
| 481. | The secret company started in March 2018 when Banman met with Boulais and | Disputed. The cited deposition testimony does not discuss the recruiting of Boulais, the creation of a new company, or |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | recruited him to be part of CTM as a co-founder of the company. | anything else to support Plaintiffs' "statement of undisputed fact." Saba Decl., Ex. 26 at 78:10-21. |
| 482. | To communicate with each other, Banman instructed Boulais to download and utilize a mobile application called WhatsApp.

Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 78:10-21. | Disputed. The cited document does not advise anyone to download WhatsApp. Saba Decl., Ex. 30. |
| 483. | Banman and Boulais did not use the WhatsApp application to communicate about Skye business.

Saba Decl. ¶ 33, Ex 30. | Disputed. The cited document does not discuss the use of WhatsApp for Skye's business. Saba Decl., Ex. 30. |
| 484. | On March 30, 2018, Boulais sent Banman a WhatsApp message, confirming that he had downloaded the application at Banman's request.

Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 78:10-21; Saba Decl. ¶ 33, Ex 30, at p.1. | Undisputed and immaterial. |
| 485. | Boulais stated: "I'll text on this from now on. Ready to rip and excited for the next evolution."

Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 79:10-13; Saba Decl. ¶ 33, Ex 30, at p.1. | Undisputed and immaterial. |
| 486. | Boulais testified the "next evolution" would be "starting a company".

Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 79:10-17; Saba Decl. ¶ 33, Ex 30, at p.1. | Disputed in part and immaterial. The cited testimony says "potentially starting a new company", Plaintiff deleted "potentially" from its quote. Saba Decl., Ex. 26 at 79:17. |

CASE NO: 2:20-cv-03444-MEMF-PVC

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 487. | On April 4, 2018, Boulais wrote to Banman advising that he was ready to convert physicians to CTM.<br><br>Saba Decl. ¶ 33, Ex 30 at p.1. | Disputed, mischaracterizes the cited evidence. The cited messages discuss a potential untapped market, colorectal. Saba Decl., Ex. 30 at 1. There is no indication from the messages that anyone is "ready to convert physicians to CTM." *Id.* |
| 488. | On April 4, 2018, Boulais then wrote to Banman stating: "We're gonna kill it!"<br><br>Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 92:5-8; Saba Decl. ¶ 33, Ex 30, at p.1. | Undisputed and immaterial. |
| 489. | Banman responded to Boulais' April 4, 2018 text with "thumbs up" emojis.<br><br>Saba Decl. ¶ 33, Ex 30, at p.1. | Undisputed and immaterial. |
| 490. | As of March 30, 2018, Banman and Boulais were still under contract to work exclusively for Skye.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 90:10-17; Saba Decl. ¶ 16, Ex 13.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 93:19-22; Saba Decl. ¶ 17, Ex 14.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 97:15-19; Saba Decl. ¶ 18, Ex 15.<br><br>Banman Depo. Vol. 1 (Saba Decl. Ex. 1) at 102:3-8; Saba Decl. ¶ 19, Ex 16.<br><br>Banman Depo. Vol. 1 (Saba Decl. Ex. 1) at 103:8-21; Saba Decl. ¶ 20, Ex 17.<br><br>Banman Depo. Vol. 1 (Saba Decl. Ex. 1) at 113:11-24; Saba Decl. ¶ 21, Ex 18. | Disputed, and immaterial. The cited evidence references multiple agreements between Plaintiffs and Banman with differing terms, many of which had expired by their own terms, and some make no mention of Banman working for Plaintiffs.<br><br>For example, Saba Decl., Ex. 1 at 90:10-17 addresses a Market Development Agreement. The Market Development Agreement (Saba Decl., Ex. 13), was effective May 21, 2012 and terminated, by its terms on May 21, 2014. Saba Decl., Ex. 13, p. 3 of 7, § 9(a).<br><br>Saba Decl., Ex. 1 at 93:19-22 addresses a Business/Market Development Agreement. The Business/Market Development Agreement is dated March 25, 2013 and it expired by its terms on March 25, 2016. Saba Decl., Ex. 14, p. 4 of 7, § 9(a). The Business/Marketing Development Agreement was subsequently extended by way of a March |

199

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|---------------------|
|  | Banman Depo. Vol. 1 (Saba Decl. Ex. 1) at 118:5-22; Saba Decl. ¶ 24, Ex 21.<br><br>Saba Decl. ¶ 25, Ex. 22.<br><br>Banman Depo. Vol. 1 (Saba Decl. Ex. 1) at 120:15-24; Saba Decl. ¶ 26, Ex 23.<br><br>Saba Decl. ¶ 27, Ex. 24.<br><br>Saba Decl. ¶ 28, Ex. 25.<br><br>Boulais Depo. Vol. 1 (Saba Decl. Ex. 26) at 161:11-25; Saba Decl. ¶ 30, Ex 27. | 16, 2016 letter agreement and January 1, 2017 letter agreement, to December 31, 2017. Saba Decl., Exs. 21 & 22.<br><br>Saba Decl., Ex. 1 at 102:3-8 addresses a Membership Unit Grant Agreement. The Agreement provides vesting dates and rights to Mr. Banman on July 1, 2014, July 1, 2015, July 1, 2016, and July 1, 2017 provided he is still providing consulting services on those dates. Saba Decl., Ex. 16, § 1.<br><br>Saba Decl., Ex. 1 at 103:8-21 addresses a HRT Services/Consultant Confidentiality Agreement. The agreement is not contract to work exclusively for Skye and by its terms it does not confer on Banman any right to continuation of his services to HRT. Saba Decl., Ex. 17, § 14.6. Indeed, it is not even between Skye and Banman. *Id.*<br><br>Saba Decl., Ex. 1at 113:11-24 addresses the Employee Handbook for HRT, Skye, and Osprey Biomedical, Inc. The handbook is not a contract to work for HRT or Skye and, in fact, it states that "nothing in the Employee Handbook creates or is intended to create a promise or representation of continued employment…." Saba Decl., Ex. 18 at 17 (Employee Acknowledgment and Agreement).<br><br>Saba Decl., Ex. 1, 120:15-24 addresses a Skye Employee Confidentiality Agreement. The agreement, by its own terms, does not confer any right to employment by Mr. Banman. Saba Decl., Ex. 23, § 14.7.<br><br>Saba Decl., Ex. 24 is an Employment Letter dated April 18, 2018 with a start date of April 1, 2018—it does not apply to March 30, 2018.<br><br>Saba Decl., Ex. 25 is a Representative Agreement between Skye and Medical-Assist LLC, not Boulais. |

200

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|---------------------|
|  |  | Saba Decl., Ex. 27 is a Skye Biologics Holdings LLC Unit Appreciation Rights Agreement. It specifically says that it does not confer any "right to continue in the service or employ of the Company or any Subsidiary…" *Id.* at § 9(a). |
| 491. | Banman told Boulais that "There was going to be an ownership opportunity and multiple ways to get paid."<br><br>Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 79:18-21; Saba Decl. ¶ 33, Ex 30. | Undisputed and immaterial. |
| 492. | Boulais knew that CTM was created to compete with Skye.<br><br>Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 79:22-24. | Disputed in part, mischaracterizes the testimony. The cited testimony was that the new company would "[e]ventually" compete with Skye. Saba Decl., Ex. 26 at 79:22-24. Plaintiffs omit "eventually" from the statement. |
| 493. | Banman's next recruitment effort was sales representative Maria Carey in Florida.  At the time she was one of Skye's top three sales representative.<br><br>Sharp Decl. ¶ 61; Carey Depo. (Saba Decl. Ex. 31) at 148:6-13. | Disputed, mischaracterizes the referenced testimony, and immaterial. The cited deposition testimony does not mention any "recruitment effort" of Maria Carey. Saba Decl., Ex. 31 at 148:6-13. Maria Carey has never sold a single CTM product. Banman Decl., ¶¶ 106, 116. |
| 494. | In March 2018, Banman had a secret meeting with Maria Carey advising her that he was starting a competing business and asked her to distribute products for CTM instead of Skye.<br><br>Carey Depo. (Saba Decl. Ex. 31) at 148:6-13. | Disputed, mischaracterizes the referenced testimony, and immaterial. The cited deposition testimony does not state that Mr. Banman asked Ms. Carey "to distribute products for CTM instead of Skye." Saba Decl., Ex. 31 at 148:6-13. Maria Carey has never sold a single CTM product. Banman Decl., ¶¶ 106, 116. |
| 495. | On April 20, 2018, Boulais writes to Banman: "Can we talk live today or is it best to wait til Monday. Ready to rip. I've | Undisputed and immaterial. |

201

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | got 4 reps I've been waiting to get rolling until we get our ducks in a row." <br><br> Saba Decl. ¶ 33, Ex. 30 at p. 4. | |
| 496. | Banman assures him "We can talk this aft." Boulais responds "Lets GOOOOOO!" "Dude I wake up at 2am thinking about it. We're going to dominate." <br><br> Saba Decl. ¶ 33, Ex. 30 at p. 4. | Undisputed and immaterial. |
| 497. | On May 2, 2018, Banman texted to Boulais: "Text is dangerous." Nate responded: "Fuuuuck me. We are building something special now :) thx for the reminder." <br><br> Saba Decl. ¶ 33, Ex. 30 at p. 7. | Undisputed and immaterial. |
| 498. | On May 22, 2018, Banman emailed Amnio Technologies, a manufacturer of placental products, to ask about becoming a "distributor". <br><br> Saba Decl. ¶ 35, Ex. 32 at p. 16. | Undisputed and immaterial. |
| 499. | He signed the email using the name "Carl" and using the email address: ctmbiomedical@gmail.com. <br><br> Saba Decl. ¶ 35, Ex. 32 at p. 16. | Undisputed and immaterial. |
| 500. | Banman created the email address in May 2018. <br><br> Banman Depo. Vol. I (Saba Decl. Ex. 1) at 303:13-21. | Undisputed and immaterial. |

202

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 501. | In his email, Banman lies to Amnio that he already has an existing team of sales representatives and an existing customer base:<br><br>"We're a team of execs and reps with significant experience in this space for the last seven years, selling nationally into ortho, spine/neuro, GYN, DPM, ENT, plastics markets, and are looking for a new product supply.<br><br>We'd be starting up with new products in a controlled manner at select accounts, but we currently do $10M+ annually in gross amniotic sales. As our business runs into HCA and other large networks, with the right partner and purchase price structure, we could drive a good amount of revenue.<br><br>We understand the market well, and can work with you to avoid pricing issues with any existing network pricing contracts. No expectations of exclusive territories on our end."<br><br>Saba Decl. ¶ 35, Ex. 32 at p. 15. | Disputed in part and immaterial. Undisputed Plaintiffs properly quoted the email.  Certain comments in the email were not correct and were negotiation puffery.  Banman Depo. Vol. I (Saba Decl. Ex. 1) at 306:11-307:3. |
| 502. | All the above was a lie.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 306:11-307:3. | Disputed in part and immaterial. Certain comments in the email were not correct and were negotiation puffery.  Banman Depo. Vol. I (Saba Decl. Ex. 1) at 306:11-307:3. |
| 503. | Banman testified that he "made that up" to appear more credible.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 306:11-307:3. | Disputed in part and immaterial. Undisputed Plaintiffs properly quoted the testimony.  Certain comments in the email were not correct and were negotiation puffery.  Banman Depo. Vol. I (Saba Decl. Ex. 1) at 306:11-307:3. |

203

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 504. | Banman stated: "I assumed if I represented in an email where it sounded like an established company with a good deal of business that it would afford a better purchasing rate on a stocking distributor deal."<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 309:22-310:5. | Undisputed and immaterial. |
| 505. | On May 25, 2018, Banman signed a Non-Disclosure Agreement with a human tissue product manufacturer company called Vivex.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 237:1-18, 238:4-13 [Agreement dated 2017 but Banman believes it was dated wrong and should be dated 2018]; Saba Decl. ¶ 36, Ex 33. | Undisputed and immaterial. |
| 506. | This time, he didn't only use a fake name in an email, but he also falsely signed the legal binding document using the false name "Nathan Tierney".<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 237:1-18, 238:4-13 [Agreement dated 2017 but Banman believes it was dated wrong and should be dated 2018]; Saba Decl. ¶ 36, Ex 33. | Disputed in part and immaterial.  Admit that the document was signed in the name of Nathan Tierney. |
| 507. | Banman admitted: "It's a signature of Nathan Tierney, but he did not sign that paper."<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 237:7-14. | Undisputed and immaterial. |

204

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
| 508. | Banman also "created" a digital initials "NT" to initial four pages of the Agreement. <br><br> Banman Depo. Vol. I (Saba Decl. Ex. 1) at 237:25-238:2. | Undisputed and immaterial. |
| 509. | Nathan Tierney is Banman's nephew. <br><br> Banman Depo. Vol. I (Saba Decl. Ex. 1) at 29:12-19. | Undisputed and immaterial. |
| 510. | Banman did not get Nathan Tierney's permission before signing his name to these documents, and Nathan Tierney was not working for CTM in any capacity at the time these documents were signed. <br><br> Tierney Depo. (Saba Decl. Ex. 34) at 20:15-25; Banman Depo. Vol. I (Saba Decl. Ex. 1) at 332:10-19. | Undisputed and immaterial. |
| 511. | Tierney testified in his deposition that he never knew about this, nor did he authorize it. <br><br> Tierney Depo. (Saba Decl. Ex. 34) at 54:11-22, 59:11-13. | Undisputed and immaterial. |
| 512. | Vivex required a signed Non-Disclosure Agreement before they would provide "Carl" with confidential "pricing, etc." <br><br> Saba Decl. ¶ 38, Ex. 35 at p. 1. | Undisputed and immaterial. |
| 513. | Banman also informed Vivex that he is "looking to **convert business** in a controlled roll out" and he has "an experienced team of top reps and execs who solely focus on the amniotic space, | Undisputed, immaterial, and mischaracterizes the document. In context "convert business" means to sell Vivex's products to new Vivex customers, not, as |

205

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | with a significant amount of business ($10M+ annually)…" <br><br> Saba Decl. ¶ 38, Ex. 35 at p. 2. (Bold emphasis added). | Plaintiffs imply, to convert business from Skye to Vivex. Banman Reply Decl. ¶ 46. |
| 514. | Banman also spoke with another manufacturer named Bone Bank Allografts, and wrote an email, again purporting to be from Nathan Tierney. <br><br> Banman Depo. Vol. I (Saba Decl. Ex. 1) at 325:1-9. | Disputed. The cited deposition testimony does not mention Bone Bank Allografts and the evidence does not include the document being referenced. Saba Decl., Ex. 1 at 325:1-9. |
| 515. | This time, Banman requested that the required non-disclosure agreement be with CTM Biomedical, LLC, even though CTM had not yet been formed as a company.  Ultimately, the document was again falsely signed "Nathan Tierney". <br><br> Banman Depo. Vol. I (Saba Decl. Ex. 1) at 326:15-25. | Undisputed and immaterial. |
| 516. | On May 24, 2018, Banman messaged Boulais confirming that he intended to sell contract manufactured products in the interim until he could manufacture his own CTM products. Boulais responded: "We're going to build something special!!! Keep believing brother!" and Banman replied: "You know it. I'm frustrated by how slow setup is going, but we're almost there on interim products." <br><br> Saba Decl. ¶ 33, Ex. 30 at p. 17. | Disputed. The evidence cited by Plaintiffs makes no mention of selling contract manufactured products. Saba Decl., Ex. 30 at 17. |
| 517. | On May 30, 2018, Banman falsely signed another Non-Disclosure Agreement with Amnio, using the name Nathan Tierney. | Undisputed and immaterial. |

206

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Saba Decl. ¶ 39, Ex. 36; Banman Depo. Vol. I (Saba Decl. Ex. 1) 331:12-19. | |
| 518. | On June 1, 2018, Banman registered CTM Biomedical, LLC and filed a Certificate of Incorporation of CTM Medical, Inc. with the Delaware Secretary of State<br><br>Saba Decl. ¶ 40, Ex. 37; Saba Decl. ¶ 41, Ex. 38. | Undisputed and immaterial. |
| 519. | On May 31, 2018, Boulais texted Banman sharing his intent to convert business from Skye to CTM stating: "surgery CTR of Carmel scares me… I might have to be cautious converting existing business which sucks."<br><br>Saba Decl. ¶ 33, Ex. 30 at p. 19. | Disputed in part, mischaracterizes the document. It is undisputed Boulais sent the quoted text, but Plaintiffs omit the following sentence in the same message which says: "But all new markets I open can be ours." Saba Decl., Ex. 30 at 19. |
| 520. | On June 8, 2018, Boulais and Banman text about "switch[ing]" Carmel Ambulatory's business from Skye to CTM, with Banman proposing: "Maybe we switch them on July 1."<br><br>Saba Decl. ¶ 33, Ex. 30 at p. 20; Banman Depo. Vol. II (Saba Decl. Ex. 8) at 452:6-16. | Disputed in part, mischaracterizes the document. It is undisputed the quoted language was used, but Plaintiffs omit that the messages also say that Carmel Ambulatory is pissed at Skye because it was sending purchase orders in June 2018 for Medicaid patients in 2017. Saba Decl., Ex. 30 at 20. Plaintiffs also omit the very next message where Boulais reiterates that "Paula Ferraro [at Carmel Ambulatory] is PISSED." *Id.* |
| 521. | By June 12, 2018, Boulais convinced the product purchaser at Carmel Ambulatory to switch from buying Skye to buying a CTM products.<br><br>Saba Decl. ¶ 33, Ex. 30 at p. 20; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 132:17-25. | Disputed. The cited evidence does not support the purported statement of fact. Saba Decl., Ex. 30 at 20 does not include any messages after June 8, 2018 and makes no mention of Carmel Ambulatory switching from Skye to CTM products. The deposition testimony cited, Saba Decl., Ex. 26 at 132:17-25, does not indicate Boulais convinced Carmel Ambulatory to switch from Skye to CTM |

207

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | | products, but rather notes that Carmel Ambulatory is "pissed" at Skye for its billing practices. |
| 522. | On the same day, Boulais asked Banman if they could get membrane products "next week" and "need 2-4ccs at Surgery CTR Carmel." Saba Decl. ¶ 33, Ex. 30 at p. 23; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 133:20-134:22. | Undisputed and immaterial. |
| 523. | Banman responds: "Yes. We will bill through CTM." Saba Decl. ¶ 33, Ex. 30 at p. 24. | Undisputed and immaterial. |
| 524. | On June 13, 2018, Banman signed Nathan Tierney's name on a Distribution Agreement with Vivex. Saba Decl. ¶ 42, Ex. 39. | Undisputed and immaterial. |
| 525. | "Carl" also sent an email to Vivex asking if he could rush order products. Saba Decl. ¶ 43, Ex. 40. | Undisputed and immaterial. |
| 526. | Banman is using both names to create the illusion that there are multiple people working for CTM and is using the fake names because he is still working for Skye. Banman Depo. Vol. I (Saba Decl. Ex. 1) at 306:11-307:9, 320:8-15. | Disputed. The cited deposition testimony, Saba Decl., Ex. 1 at 306:11-307:9, 320:8-15, is discussing emails from May 2018, not the June 2018 agreement and email referenced in statements 524 and 525. |
| 527. | After Banman advised Boulais of his deceptive emails, Boulais sends Banman | Disputed. The cited document does not support Plaintiffs' statement that "After Banman advised Boulais of his deceptive |

208

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
| | the text that says: "Smile!! We're off and running baby." Saba Decl. ¶ 33, Ex. 30 at p. 24. | emails…" Saba Decl., Ex. 30 at 24. The cited messages make no mention of any emails. |
| 528. | On June 13, 2018, Banman created and registered the domain "ctmbiomedical.com". Banman Depo. Vol. I (Saba Decl. Ex. 1) at 350:10-13. | Undisputed and immaterial. |
| 529. | Banman also created the email address "Customer Service" cs@ctmbiomedical.com and controlled the ingoing and outgoing mail from that account. Banman Depo. Vol. II (Saba Decl. Ex. 8) at 382:23-383:2. | Undisputed and immaterial. |
| 530. | On June 14, 2018, Boulais forwarded an email to cs@ctmbiomedical.com from the materials manager at Riverview Health requesting a "new vendor form" and a "copy of the W-9." Saba Decl. ¶ 44, Ex. 41; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 130:17-131:1. | Undisputed and immaterial. |
| 531. | Riverview Health was a Skye facility and Boulais was the sales representative that worked with this facility. Saba Decl. ¶ 45, Ex. 42 at p. 34. | Disputed in part. The cited exhibit, Saba Decl., Ex. 45 at 34, notes that Medical-Assist LLC was the sales representative selling Skye products to Riverview and it notes that more Skye product was sold to Riverview in 2018 then the two preceding years combined. |
| 532. | Boulais forwarded the message to Banman and stated: "If we want to flip Riverview | Disputed in part. It is undisputed that Boulais wrote the quoted language. It is |

209

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
|  | [a Skye customer], here's the info we need." <br><br> Saba Decl. ¶ 44, Ex. 41; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 131:7-15. | disputed because Plaintiffs offer the statement out of context, the cited deposition testimony explains that "Riverview had had reimbursement issues with Skye and performance issues with Active Matrix and were looking for a solution." Saba Decl., Ex. 26 at 131:12-15. |
| 533. | Boulais admitted in deposition that he had already communicated with Riverview about purchasing CTM products while Banman was still working at Skye and while Boulais was still contracted to exclusively sell Skye products. <br><br> Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 131:2-25. | Undisputed and immaterial. |
| 534. | Also on June 14, 2018, Boulais forwarded an email to Banman from a medical facility that was asking follow-up questions regarding Skye's Active Matrix and Active Barrier products. <br><br> Saba Decl. ¶ 46, Ex. 43. | Disputed in part, mischaracterizes the document. The cited document, Saba Decl., Ex. 43, references the steps Skye would need to go through, including approval from a third-party company called The Resource Group, in order to get any products into St. Vincent Hospital in Indianapolis, Indiana. |
| 535. | With the email, Boulais writes: "Here's the pathway for St. Vincent 86th Street, St. Vincent Carmel" and five other facilities. <br><br> Saba Decl. ¶ 46, Ex. 43. | Undisputed and immaterial. |
| 536. | On June 18, 2018, Boulais emailed the materials manager at Riverview Hospital and states: "I'm in the process of converting you guys to a new injectable that I'll own called Allogen." | Undisputed and immaterial. |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Saba Decl. ¶ 47, Ex. 44; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 145:13-16. | |
| 537. | When asked if Boulais believed he would own Allogen, a Vivex product, he stated in deposition: "It was my understanding at the time that I was going to be a part owner of CTM. That was the product that we would be selling initially."<br><br>Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 145:17-20. | Undisputed and immaterial. |
| 538. | Boulais successfully switched Riverview Hospital from buying Skye products to buying CTM products.<br><br>Saba Decl. ¶ 45, Ex. 42 at p. 34; Saba Decl. ¶ 48, Ex. 45 at p. 15. | Disputed in part. The cited exhibit, Saba Decl., Ex. 45 at 34, notes that Medical-Assist LLC was the sales representative selling Skye products to Riverview and it notes that more Skye product was sold to Riverview in 2018 then the two preceding years combined. The other cited exhibit, Saba Decl., Ex. 46, are communications between Banman and Stumpe after Banman left Plaintiffs and do not mention selling to Riverview. |
| 539. | In June 2018, Banman contacted physician John Anderson, who worked at Gerald Champion Regional Medical Center ("GCRMC") and Southern New Mexico Surgery Center and asked that he start using CTM products instead of Skye products.<br><br>Anderson Depo. (Saba Decl. Ex. 46) at 44:17-24. | Disputed and immaterial.  The cited deposition testimony was objected to and the witness' answer acknowledges only that there was a communication prior to June 26, 2018, he did not testify about where he worked or the content of the prior communication. |
| 540. | Dr. Anderson requested his facilities move away from Skye to use CTM.<br><br>Saba Decl. ¶ 50, Ex. 47; Saba Decl. ¶ 51, Ex. 48. | Disputed. The cited documents, Saba Decl., Exs. 47 and 48, indicate that Dr. Anderson is looking "to see if we [the facility] could look at changing products on the amniotic human allograft" and |

211

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | | indicate that as of July 13, 2018 that had not happened. |
| 541. | On June 27, 2018, Stumpe created a WhatsApp group titled "Weee." Banman and Boulais were participants in the group chat. In this chat, Banman, Boulais and Stumpe discussed CTM and undercutting Skye.<br><br>Saba Decl. ¶ 52, Ex. 49 at p. 1. | Undisputed and immaterial. |
| 542. | The same day, Banman messaged Stumpe from a new phone and asked him to delete his "other" WhatsApp chat history.<br><br>Saba Decl. ¶ 53, Ex. 50; Stumpe Depo. (Saba Decl. Ex. 28) at 76:3-14. | Undisputed and immaterial. |
| 543. | Stumpe confirmed that he did delete that chat history.<br><br>Stumpe Depo. (Saba Decl. Ex. 28) at 76:13-14. | Undisputed and immaterial. |
| 544. | This chat history was never produced in this litigation.<br><br>Saba Decl. ¶ 53. | Disputed. Defendants have produced all WhatsApp messages as evidenced by Saba Decl., Ex. 30, which includes WhatsApp messages from before June 27, 2018, the date of the alleged switch and deletion. |
| 545. | Sharp was oblivious to this new secret company and thought his employee Banman and sales representatives Boulais and Stumpe were loyal and exclusive.<br><br>Sharp Decl. ¶ 62. | Disputed in part and immaterial. Disputed as to Stumpe being Skye's "exclusive" sales representative, or Skye's representative at all in his individual capacity. Skye had sales representative agreements with Novus and Silenda. Stumpe Decl., Exs. 1 and 2. (SUF 297-298, 302-304.) |

212

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
| 546. | To that end, on July 1, 2018, Skye rewarded Boulais and Stumpe with an opportunity to obtain ownership in Skye.<br><br>Saba Decl. ¶ 30, Ex. 27; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 161:16-25. | Disputed in part and immaterial. The cited evidence does not reference Stumpe at all. Saba Decl., Ex. 27; Ex. 26 at 161:16-25. Undisputed that Boulais signed an agreement with an effective date of July 1, 2018. |
| 547. | Boulais and Stumpe agreed and signed an Appreciation Rights Agreement with Skye.<br><br>Saba Decl. ¶ 30, Ex. 27; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 161:16-25. | Disputed in part and immaterial. The cited evidence does not reference Stumpe at all. Saba Decl., Ex. 27; Ex. 26 at 161:16-25. Undisputed that Boulais signed an agreement with an effective date of July 1, 2018. |
| 548. | Boulais admitted that he did not notify anyone at Skye that he was working with CTM and selling CTM products before he signed the Agreement.<br><br>Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 163:2-6. | Disputed in part, mischaracterizes the testimony, and immaterial. The deposition testimony was that Boulais "was going to be working with CTM", not that he "was working with CTM" as stated in Plaintiffs' statement. Saba Decl., Ex. 26 at 163:2-6. |
| 549. | Boulais testified that he signed this Agreement knowing he was going to work for Banman and CTM, and that he had no intention of "adhering to its binding stipulations for shares".<br><br>Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 164:11-13. | Disputed, mischaracterizes the testimony, and immaterial. The cited testimony, Saba Decl., Ex. 26 at 164:11-13, makes no mention of Boulais going to work for CTM or Banman, and it takes the comment out of context as Boulais testified that: "But had I sold a million dollars I would have wanted the opportunity to earn the compensation." *Id.* at 164:18-20. |
| 550. | Boulais and Stumpe then discussed the Unit Agreement on their group WhatsApp chat with Banman.  After Boulais told them that he signed the agreement, Stumpe responded: "Then I'll prob sign just to make sure we stay off the radar a bit, good idea wouldn't you say?" | Undisputed and immaterial. |

213

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Saba Decl. ¶ 33, Ex. 30 at p. 35. | |
| 551. | Boulais then says: "That's why i did so there are no alarm bells."<br><br>Saba Decl. ¶ 33, Ex. 30 at p. 35; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 167:9-14. | Undisputed and immaterial. |
| 552. | On July 2, 2018, Banman delivered a letter to Sharp resigning from his position as a Senior Vice President of Skye. When asked why he did not tell Sharp he was starting a competing business, he responded "I don't think I need Chris Sharp's advice on that."<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 135:2-15. | Disputed in part, calls for speculation, immaterial. The cited deposition testimony, Saba Decl., Ex. 1 at 135:2-15, does not mention delivery of a letter to Sharp. The cited deposition testimony also includes an objection to the question asked. |
| 553. | Even though Banman resigned, Boulais and Stumpe continued to conceal that they were working with CTM.<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 135:2-15. | Disputed. The cited evidence does support Plaintiffs' statement. The cited testimony, Saba Decl., Ex. 1 at 135:2-15 makes no mention of Boulais or Stumpe or "concealment" by them. Neither Stumpe, Novus Ortho Corp., nor Silenda ever kept it a secret that Novus and Silenda worked with multiple distributors and manufacturers. (SUF, 297-298, 303-304.) |
| 554. | On July 5, 2018, Stumpe texted Banman that he was with a physician who had regularly purchased Skye products as part of Eskenazi Health, stating: "I'm with ertl right now and since he won't have any Skye sales for the next month, might be a perfect time to switch Eskenazi. Ertl called the head nurse and told her to get it done quickly and quietly for us and she is a part of the program big time. One of us". | Undisputed and immaterial. |

214

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Saba Decl. ¶ 33, Ex. 30 at p. 34. | |
| 555. | Banman responded: "Mike, sounds good. I'll have product details and vendor setup docs shortly." Saba Decl. ¶ 33, Ex. 30 at p. 34. | Undisputed and immaterial. |
| 556. | On July 6, 2018, Stumpe texted Banman that he has worked out a deal switching Skye's product for a CTM injectable product, charging less than he charged for Skye: "Eskenazi is done deal. . . . We have green light to switch this month while ertl is gone and spoke to the Ortho coordinator and she said it would help if we could save her some money" Saba Decl. ¶ 33, Ex. 30 at p. 35. | Undisputed and immaterial. |
| 557. | On July 3, 2018, Boulais emailed Banman with "Initial Launch Projects," outlining the status of flipping various Skye facilities. Saba Decl. ¶ 54, Ex. 51; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 172:21-173:4. | Disputed. The cited documents and testimony do not reference "flipping" Skye facilities. Saba Decl., Ex. 51; Ex. 26 at 172:21-173:4. |
| 558. | On July 12, 2018, Boulais shared an email from Sharp in the WhatsApp chat saying "Here's a perfect opportunity to reach out to Ethan Chappell at Community and undercut Skye." Saba Decl. ¶ 52, Ex. 49 at p. 2; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 154:14-21. | Undisputed and immaterial. |

215

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 559. | Boulais testified that "undercut" means to "sell a product to the facility for less price than Skye was selling the product for". Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 154:22-25. | Undisputed and immaterial. |
| 560. | Stumpe then responds: "I have a copy of the agreement we sent her. Bryan, this converts Community without making it look like Nate and I are apart (sic) of it. Like 6 months ahead of schedule. This is an opening from the gods." Saba Decl. ¶ 33, Ex. 30 at p. 38; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 155:1-6; Saba Decl. ¶ 52, Ex. 49, p. 2-3. | Undisputed and immaterial. |
| 561. | Stumpe continues, "In response to [Sharp], I offered him a copy of the agreement, obviously I'm not going to give that to him." Saba Decl. ¶ 52, Ex. 49 p. 3; Stumpe Depo. (Saba Decl. Ex. 28) at 92:5-13. | Undisputed and immaterial. |
| 562. | Stumpe explained that the "Jan" referenced is Jan Nellinger "[a]nd basically if you were going to go into Community Hospital Network she was the one that approves the products." Stumpe Depo. (Saba Decl. Ex. 28) at 93:24-94:6. | Undisputed and immaterial. The referenced document, Saba Decl., Ex. 49, makes clear that "Jan Nellinger retired…." |
| 563. | Banman then responds: "Guys, I can't rightfully act on this CHN inside information. I shouldn't be privy to this, as it's from after I quit, and violates my proprietary information clause." | Undisputed and immaterial. |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Saba Decl. ¶ 33, Ex. 30 at p. 39. | |
| 564. | Stumpe asks Banman if he and Boulais can act on the information and Banman responds: "That's your call."<br><br>Saba Decl. ¶ 33, Ex. 30 at p. 40. | Undisputed and immaterial. |
| 565. | Stumpe responds that he deceived Sharp to "hold the line and don't give any more discounts" to Community Health Network.<br><br>Saba Decl. ¶ 33, Ex. 30 at p. 41. | Disputed and immaterial. The cited document does not state that Sharp was "deceived." The document is also misleading as the same message referenced in Saba Decl., Ex. 30 at 41 also references Matt Dripps. Matt Dripps has never had a contract with, or worked for, CTM.  Banman Decl., ¶ 104. |
| 566. | Banman then says: "Phone calls only for CHN."<br><br>Saba Decl. ¶ 33, Ex. 30 at p. 41. | Undisputed and immaterial. |
| 567. | Not surprisingly, shortly thereafter, Community Health Network purchases dropped off dramatically  as it started buying CTM products instead.<br><br>Saba Decl. ¶ 45, Ex. 42 at p. 7; Saba Decl. ¶ 48, Ex. 45 at p. 5. | Disputed. The cited documents do not support Plaintiffs' statement that "shortly thereafter, Community Health Network purchases dropped off dramatically as it started buying CTM products instead." Saba Decl., Ex. 42 references five "Community Hospital" entities being serviced by Silenda Medical and/or Medical-Assist LLC. The documents indicate that three of the five had sales in 2018 that exceeded the 2016 and 2017 sales for those same entities. |
| 568. | On July 12, 2018, Stumpe communicates to Banman that they "Need a scientific game plan to present to flak to move away from Skye. So do what you do best for us!!." | Undisputed and immaterial. |

217

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Saba Decl. ¶ 55, Ex. 52 at p. 1. | |
| 569. | On July 13, 2018, Banman successfully switches over GCRMC from Skye products to CTM products.<br><br>Saba Decl. ¶ 45, Ex. 42 at p. 8; Saba Decl. ¶ 48, Ex. 45 at p. 13. | Disputed. The cited documents do not support Plaintiffs' statement. Saba Decl., Ex. 42, p. 8 makes no reference to GCRMC as every customer is redacted. Saba Decl., Ex. 45 does not contain a p. 13 and the page that makes up Ex. 45 does not reference GCRMC. |
| 570. | On July 30, 2018, Boulais sent an email to a potential customer by completely fabricating a story that Skye has "production issues", that "most of his customers prefer CTM", and attaching a discounted CTM price list directly next to a Skye pricelist. Boulais' email states: "Attached you'll see an option from Skye Biologics. There have been some production issues lately with their injectable, so most of my hospitals and surgery centers prefer the options from CTM BioMedical."<br><br>Saba Decl. ¶ 56, Ex. 53; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 203:1-7. | Disputed in part and immaterial. The quoted language from Saba Decl., Ex. 53 is undisputed, but Plaintiffs' statement that it was "completely fabricated" is false. As set forth in Saba Decl., Ex. 26 at 203:12-16, Boulais said: "Yes, I experienced product performance issues [referencing Skye's products and Ex. 53]." |
| 571. | Boulais statements were not truthful.<br><br>Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 203:8-11,18-22. | Disputed and immaterial. Plaintiffs' statement that it was "completely fabricated" is false. As set forth in Saba Decl., Ex. 26 at 203:12-16, Boulais said: "Yes, I experienced product performance issues [referencing Skye's products and Ex. 53]." |
| 572. | Boulais attached Skye's confidential pricing and CTM's pricing to the email, with CTM's pricing being lower than Skye's with the title "20% Discount Price List". | Disputed in part and immaterial. It is undisputed that Boulais attached pricing information to his email. But the cited documents do not support Plaintiffs' statement that Skye's pricing was |

218

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|---------------------|
| | Saba Decl. ¶ 56, Ex. 53; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 203:24-204:8. | confidential. Saba Decl., Ex. 53; Ex. 26 at 203:24-204:8. |
| 573. | On August 1, 2018, Stumpe was convincing another sales representative named Matt Dripps to switch from Skye to sell CTM products. He sent him a text saying: "I still have a flawless relationship with Skye and always have it in our back pocket of (sic) something may come up."<br><br>Saba Decl. ¶ 57, Ex. 54; Stumpe Depo. (Saba Decl. Ex. 28) at 120: 4-6, 25-121:25; Saba Decl. ¶ 58, Ex. 55. | Disputed in part and immaterial. Disputed as this is a complete mischaracterization of the evidence. Matt Dripps had already left Skye (see Undisputed Fact No. 330), plus there is no evidence that Stumpe asked Matt Dripps to stop selling Skye. Matt Dripps has never had a contract with, or worked for, CTM. Banman Decl. ¶ 104. |
| 574. | Stumpe testified that Banman had informed him that "we had a proprietary product. Or that he had access to proprietary, you know, product."<br><br>Stumpe Depo. (Saba Decl. Ex. 28) at 121:17-122:5. | Undisputed but immaterial. |
| 575. | On August 3, 2018, Banman sent an email to Stumpe and Boulais as "the core CTM team", with the intention of sending weekly updates of "notable progress".<br><br>Saba Decl. ¶ 59, Ex. 56. | Undisputed and immaterial. |
| 576. | The first paragraph "Off with a Bang!" thanking Boulais for his "early sales" and that "CTM will be paying out $55k in commissions for sales to July 31st!".<br><br>Saba Decl. ¶ 59, Ex. 56. | Undisputed and immaterial. |
| 577. | He also notes that they are "quickly advancing the Phase 2 product planning, as it's already clear these companies think | Undisputed and immaterial. |

219

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | much to (sic) small for an alpha team like us."<br><br>Saba Decl. ¶ 59, Ex. 56. | |
| 578. | On August 9, 2018, Stumpe worked to "flip" Dr. Baker and informed Banman of his plan to undercut Skye's pricing: "[Baker] is telling them tonight that it's time to turn on the gas, then we will come in at a better price than Skye and make them look good to purchasing :)."<br><br>Saba Decl. ¶ 60, Ex. 57. | Disputed. The cited evidence does not support Plaintiffs' statement. Saba Decl., Ex. 57 is a CTM Sales by Customer document, it does not make any reference to Stumpe "flipping" anyone; it does not contain any communication between Stumpe and Banman about a plan to undercut Skye's pricing and it does not contain the quote referenced in the statement. |
| 579. | Banman then asks what the Skye pricing is at that facility, Stumpe tells him, and Banman plans to keep the pricing "close to that so we could start almost right away."<br><br>Saba Decl. ¶ 60, Ex. 57. | Disputed. The cited evidence does not support Plaintiffs' statement. Saba Decl., Ex. 57 is a CTM Sales by Customer document, it does not make any reference to Stumpe "flipping" anyone; it does not contain any communication between Stumpe and Banman and it does not contain the quote referenced in the statement. |
| 580. | On August 10, 2018, Stumpe texts a Skye sales representative and attempts to convince him to work for CTM instead, saying: "Make sure you keep all of this super hush to Skye. It would blow us all up."<br><br>Saba Decl. ¶ 61, Ex. 58; Stumpe Depo. (Saba Decl. Ex. 28) at 136:9-11. | Disputed in part and immaterial. Disputed, as there is no evidence that Stumpe asked this representative to stop working with Skye. The independent sales representative being discussed in the documents, Bill Bingham, did not work for CTM. *See* Saba Decl., Ex. 28 at 136:12-18. |
| 581. | On August 22, 2018, the purchasing agent at Eskenazi emails Stumpe requesting a new agreement since he understands Eskenazi is "shifting" from Skye to CTM. | Disputed in part, mischaracterizes the document and immaterial. It is undisputed that Deipan Shah emailed Stumpe about a new agreement. It is disputed that the document indicates Eskenazi will be shifting from Skye to CTM as the |

220

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Saba Decl. ¶ 62, Ex. 59. | document says: "It's our understanding that we will be shifting our consignment agreement from Skye to Vivex?. Saba Decl., Ex. 59. Moreover, the document makes clear that Skye would still be providing products to Eskenazi: "I am still your Skye representative as well. We are just working with the surgeons [*sic*] needs, as well as the hospitals [*sic*] needs. If you need anything regarding Skye, just let me know and I can take care of that for you as well." *Id.* |
| 582. | Stumpe responds by introducing Banman and states "We will also be able to provide a new agreement, that will look very similar to the current Skye agreement you have."<br><br>Saba Decl. ¶ 62, Ex. 59. | Undisputed and immaterial. |
| 583. | Stumpe helped facilitate Eskenazi's switch from Skye to CTM in 2019.<br><br>Stumpe Depo. (Saba Decl. Ex. 28) at 193:19-194:6. | Disputed, as Stumpe refers solely to the "surgical side," referring to his long-time surgeon contact, Dr. Janos Ertl. |
| 584. | In August 2018, Banman and Boulais approached Dr. Kelly Hiatt, a research physician who was under contract with Skye to conduct studies and provide data.<br><br>Saba Decl. ¶ 63, Ex. 60; Saba Decl. ¶ 64, Ex. 61. | Disputed in part and immaterial. It is undisputed that Boulais and Banman communicated with Dr. Kelly Hiatt in August 2018. It is disputed that she was "under contract with Skye to conduct studies and provide data." The Research Agreement referenced, Saba Decl., Ex. 61, does not require Dr. Hiatt to do anything. By its terms it was a "proposed study." As Dr. Hiatt testified, she understood the agreement did not require her to conduct a study or provide data to Skye, but if she did, this would outline her compensation. Fluskey Decl. Ex. 21, 66:13-67:1. |

221

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 585. | Banman and Boulais asked Hiatt to join the CTM "physician advisor team". <br><br> Saba Decl. ¶ 63, Ex. 60. | Undisputed and immaterial. |
| 586. | Boulais attaches the Vivex product information and states "this will be our primary line until we develop our line in 12-18 months" and stresses that they would like to get data of patients treated with the products vs. untreated. <br><br> Saba Decl. ¶ 63, Ex. 60. | Undisputed and immaterial. |
| 587. | It was not public information that Hiatt was under contract with Skye. <br><br> Sharp Decl. ¶ 63. | Disputed and immaterial. Mr. Sharp has no foundation for claiming that Skye's potential Research Agreement with Dr. Hiatt was public knowledge or not. Dr. Hiatt's Research Agreement is publicly available. Fluskey Decl. Ex. 24. |
| 588. | On October 26, 2018, Banman convinced Maria Carey, a Skye representative, to start selling CTM products. <br><br> Saba Decl. ¶ 65, Ex. 62. | Disputed. The cited document does not establish Maria Carey agreed to start selling CTM products. It says Banman will send her an agreement. Saba Decl., Ex. 62. Maria Carey has never sold CTM products. Banman Decl., ¶ 106. |
| 589. | Banman also asks her about flipping Dr. Schlifka and to "get different products into PBG [Palm Beach Gardens facility]". <br><br> Saba Decl. ¶ 65, Ex. 62. | Disputed in part. It is undisputed the document references Brett [Dr. Schlifka]. But Plaintiffs' statement is disputed as the cited document does not discuss "flipping Dr. Schlifka." Saba Decl., Ex. 62. The document cites Banman's aspiration of seeing Dr. Schlifka "on our team at some point." *Id.* |
| 590. | On the same day, Banman emailed David Kennedy at Amnio, and writes "We have some accounts using a competitor that I | Undisputed and immaterial. |

222

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | believe we can switch, in the West Palm Beach Area…"<br><br>Saba Decl. ¶ 66, Ex. 63. | |
| 591. | On December 31, 2018, Boulais tells Dr. Elliott to use CTM instead of Skye. At his deposition, Boulais admits to convincing Dr. Elliott to "switch" to using CTM products.<br><br>Saba Decl. ¶ 67, Ex. 64; Boulais Depo. Vol. I (Saba Decl. Ex. 26) at 247:5-8. | Disputed. The cited document, Saba Decl., Ex. 64, is not a communication between Boulais and Dr. Elliott. The document does not, in any way, state that "Boulais tells Dr. Elliott to use CTM instead of Skye." In fact, the document says Boulais will "get you [Carmel Ambulatory Surgery Center] restocked w[ith] 2-3 more from Skye and then schedule a lunch when he returns to see if he wants to switch." *Id.* The cited deposition testimony, Saba Decl., Ex. 26 at 247:5-8, also does not support Plaintiffs' statement. |
| 592. | On January 25, 2019, Banman emails Boulais the CTM Medical Phantom Equity Plan and stated, "Let the fun begin!!"<br><br>Saba Decl. ¶ 68, Ex. 65. | Undisputed and immaterial. |
| 593. | On January 25, 2019, Boulais sent a pitch to Community Health Network stating "we can bill and replace like we discussed." Boulais was referring to replacing Skye products.<br><br>Saba Decl. ¶ 69, Ex. 66. | Disputed in part and immaterial. It is undisputed that Boulais sent an email on January 25, 2019 to Community Health Network. Plaintiffs have not provided any evidence to support their assumption that Boulais was discussing replacing Skye products. |
| 594. | On January 26, 2019, Boulais sent CTM a Skye purchase order for the Surgery Center of Carmel replacing the Skye logo with "CTM."<br><br>Saba Decl. ¶ 70, Ex. 67. | Disputed in part and immaterial. It is undisputed that Boulais sent the referenced email. It is disputed that Boulais is the one who replaced the Skye logo with CTM; Plaintiffs have provided no evidence to support their statement. |

223

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 595. | On January 31, 2019, Boulais emailed Carmel Ambulatory, copying Banman, offering to switch out their "current option" [Skye products] for CTM at no charge.  Boulais also tells them:  "Paula, meet Bryan Banman. Bryan and I started CTM BioMedical over the last year . . ." Saba Decl. ¶ 71, Ex. 68. | Disputed. The cited document, Saba Decl., Ex. 68, does not indicate anyone is offering to "switch out" Skye's products for CTM products "at no charge." The document says: "Bryan would be willing to donate a comparable graft for Dr. Elliott to try. I can assure you it'll handle exactly like his current option . . . so think same product/better partner." *Id.* And the "CTM products" being discussed are Cygnus and Allogen, products manufactured by Vivex (also referred to as "UMTB" or the University of Miami Tissue Bank). |
| 596. | On September 10, 2018, Banman used Skye's confidential login credentials to access Broward Health's Vendor Registration site. Chormann Decl. ¶¶ 3-4, Ex. 1. | Disputed. Banman did not use Skye's log-in credentials to access Broward Health's Vendor Registration site. Banman maintains his own log-in credentials for that site. Banman Decl. ¶ 129; Banman Reply Decl. ¶ 42. |
| 597. | Banman downloads two documents, signs them on behalf of CTM, and then uploads the two documents back into the Broward Health system in order to register CTM products into the Broward Health System. Chormann Decl. ¶¶ 3-4, Ex. 1. | Disputed, in part. Banman did sign and upload Broward Health forms to the Brown Health website. However, these were forms prepared and maintained by Broward Health. These were not forms that belonged to HRT/Skye. Banman Reply Decl. ¶ 42 |
| 598. | Broward Health is a health system operating over thirty facilities in Florida. Chormann Decl. ¶ 3, Ex. 1. | Disputed. Broward Health is a local network that has four hospital locations. Broward Health is not one customer or medical facility. Banman Reply Decl. ¶ 42. |
| 599. | Throughout late 2018 and 2019, Banman met with various companies about manufacturing "CTM products." Banman was trying to find a company who would | Disputed. Banman met with a few tissue banks about manufacturing products for CTM under CTM brand names. Banman was not trying to find a company to manufacture Skye's products. Banman Decl. ¶ 48; Banman Reply Decl. ¶ 43. The |

224

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
| | manufacture Skye's products using the CTM name.<br><br>Banman Depo. Vol. II (Saba Decl. Ex. 8) at 554:7-14. | testimony cited by Plaintiff does not support this false statement. |
| 600. | Banman created a "slide deck" to present to potential manufacturers.<br><br>Banman Depo. Vol. II (Saba Decl. Ex. 8) at 553:24-554:6. | Undisputed. |
| 601. | The slide deck describes Skye's products without mentioning Skye's name.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at pp. 11-12 (Opinion #5); Saba Decl. ¶ 72, Ex. 69. | Disputed. The slide deck identified generically the types of products that Banman wanted to have manufactured. It included black-and-white drawings of shapes and empty jars. These generic descriptions were not of "Skye's products." When Banman sent this slide deck to Alamo, there were multiple other companies in the marketplace selling placental membrane products, including flowable particulate products and particulate paste products. Banman Decl. ¶¶ 50-51, Exs. 1, 6-7; Banman Reply Decl. ¶ 43. |
| 602. | Banman met with Vivex in Miami; Amnio Technology in Arizona; Biostem in Florida; and Alamo (Precision Allograft Solutions) in San Antonio.<br><br>Banman Depo. Vol. II (Saba Decl. Ex. 8) at 554:7-14. | Undisputed. |
| 603. | On December 11, 2018, Banman met with the Biostem team, with a PowerPoint presentation.<br><br>Saba Decl. ¶ 73, Ex. 70; Saba Decl. ¶ 74, Ex. 71. | Undisputed. |

225

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 604. | After the meeting, Banman sent a follow up email discussing the practical steps needed for product manufacturing and assured Biostem: "**I have a lot of detail on the processing steps that would help to create the SOPs… On the flowable product recipe, you won't need to create the recipe as I have the entire formulation, process, volumes, etc. designed already**." <br><br> Saba Decl. ¶ 75, Ex. 72. | Disputed, as Plaintiffs misleadingly cite "only a portion of the email." Banman indicated in the email that Biostem would need to "create from scratch" and that all validations would need to be performed "from scratch." The email back from Biostem also indicates that the "gentleman who runs our lab" is "very familiar with what you want" and had already created samples. Saba Decl., Ex. 72. |
| 605. | CTM/Banman did not produce this email in discovery despite representing they would do so in response to eight specifically targeted Requests for Production of Documents. (RFPS 194-197 to Banman and RFPS 257-259 to CTM.). It was obtained via subpoena to Biostem. <br><br> Saba Decl. ¶ 75, Ex. 72. | Disputed. The CTM Defendants produced over 135,050 pages of documents in response to thirty (30) sets of Requests for Production. The CTM Defendants did not possess this specific email when gathering information as part of their productions. |
| 606. | On February 12, 2019, Banman met with Lee Andrews in person at Alamo in San Antonio. <br><br> Saba Decl. ¶ 76 Ex. 73. | Undisputed. |
| 607. | During this meeting, Banman described and showed pictures of the products he wanted to make (the Skye products) and told Alamo "I want this product manufactured." <br><br> Saba Decl. ¶ 76, Ex. 73; Banman Depo. Vol. II (Saba Decl. Ex. 8) at 561: 9-13. | Disputed. The testimony cited does not support this statement. Banman never testified that he showed pictures and described products during this interaction. Saba Decl., Ex. 8 at 561. Exhibit 73 to the Saba declaration does not support this statement either. Banman never asked Alamo to make "Skye products." Banman inquired with Alamo to see if Alamo could manufacture products for CTM — types of products that were already available in the marketplace. Decl. ¶¶ 50-51; Fluskey |

226

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | | Decl. Ex. 18 (Andrews Depo.) at 47:10-49:20, 322:10-24, 343:18-344:3. |
| 608. | On February 15, 2019, Banman sent Andrews his 2-year product forecast with slides of his desired products.<br><br>Saba Decl. ¶ 72, Ex. 69; Saba Decl. ¶ 77, Ex. 74. | Undisputed. |
| 609. | Banman concealed from Alamo where he got the idea for the products he was pitching.<br><br>Banman Depo. Vol. II (Saba Decl. Ex. 8) at 564:12-19. | Disputed. Banman's product ideas were based on his own knowledge and publicly-available information in the marketplace. Banman Decl. ¶¶ 50-51. The testimony cited by Plaintiffs does not support the statement. Counsel vaguely asked Banman (over objections) if Banman ever made a "representation" about where Banman came up with the idea to manufacture the CTM products. Banman said that he did not recall whether he made any such representation. Saba Decl., Ex. 8 at 564. |
| 610. | Banman's introductory proposal to Alamo lists a suite of potential products which are identical to those in HRT's 2017 Active Barrier and Active Matrix product brochure (the brochure being used at the time Banman left Skye/HRT).<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 12 (showing images of Banman's PowerPoint compared to Skye's brochure images); p. 13 (Opinion #6) ("No other company in the United States has a suite of products of amnion only, chorion only, and cord only membranes"), p. 12 (Opinion #5), p. 15-16 (Opinion #9);<br><br>Saba Decl. ¶ 72, Ex. 69; Saba Decl. ¶ 78, Ex. 75, at pp. 424, 426. | Disputed. Banman's Powerpoint does not include products that are "identical" to HRT products. The generic product ideas set forth in Banman's Powerpoint contain black-and-white drawings of generic products from different sections of the placenta. Multiple companies were already producing, and making publicly-available, these types of products. Banman Decl. ¶ 50, Ex. 9. One of the generic product ideas Banman included was a non-dehydrated sterile particulate (a paste). HRT/Skye has never made or sold a paste product. Banman Decl. ¶ 73.<br><br>Banman has also asserted objections to the Lee report.<br><br>This statement is also immaterial because the brochure referenced by Plaintiffs was |

227

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|---------------------|
|  |  | publicly-available, and therefore, cannot include trade secrets. Saba Decl., Ex. 75. |
| 611. | Specifically, a complete product lineup of membrane and flowable particulate connective tissue products.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 11 (Opinion #5). | Disputed. *See* Response to 610.  Banman has also asserted objections to the Lee report. |
| 612. | Banman had inside knowledge on which products and sizes are the most desirable in the market and adapted this information from Skye's internal data.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 11 (Opinion #5). | Disputed. The information included in Banman's Powerpoint was not "inside knowledge" of Skye. Banman Decl. ¶ 50, Ex. 9. Skye indicates that the "inside information" was available in a publicly distributed brochure. *See* response to 610. Also, CTM product sizes, volumes and dimensions were materially different than Skye's. Banman Decl. ¶ 64(e).<br><br>Banman has also asserted objections to the Lee report. |
| 613. | Banman then sent Andrews an email listing out "next steps" which included a confidential agreement to keep CTM's information secret.<br><br>Saba Decl. ¶ 79, Ex. 76. | Disputed. The document cited by Plaintiffs does not support the statement. Nothing in the document indicates or attaches "a confidential agreement to keep CTM's information secret." The document simply references that CTM would prepare a "draft IP [Intellectual Property] agreement." |
| 614. | Banman asks Alamo to make the exact products that he developed with Sharp at Skye.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at . 11 (Opinion #5); Saba Decl. ¶ 72, Ex. 69; Saba Decl. ¶ 78, Ex. 75, at pp. 424, 426. | Disputed. Banman asked Alamo to manufacture generic products that were publicly-available in the marketplace. Banman asked Alamo if it could manufacture a particulate paste product, which HRT/Skye had never made or sold. Banman Decl. ¶ 50, Ex. 9.<br><br>This statement is also immaterial because the types of products Plaintiffs are |

228

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | | referring to were publicly-available in Plaintiffs' own brochures. *See* response to 610; Saba Decl., Ex. 75.<br><br>Banman has also asserted objections to the Lee report. |
| 615. | On June 4, 2019, Sharp received a notification at Banman's old Skye email address, that Banman had attempted to access the Skye Drop Box, containing all of Skye and HRT's initial research and design documents including the HRT Design File.<br><br>Saba Decl. ¶ 80, Ex. 77. | Disputed. Banman did not attempt to access any DropBox link in June 2019. Banman Reply Decl. ¶ 20.<br><br>Banman has also asserted foundation objections to this document, as it is attached only to an attorney declaration with no supporting or authenticating testimony. |
| 616. | Banman and Andrews continued to exchange emails and, on June 10, 2019, Banman sent him a "draft term sheet" which included details regarding order size, shipping, packaging, and also advising that "**CTM will provide all product designs for CTM liquid matrix product and CTM particulate paste product, and processing specs for CTM amnion, chorion, and umbilical cord membrane products**."<br><br>Saba Decl. ¶ 81, Ex. 78. | Disputed, as Plaintiffs misleadingly quote only a portion of the document. The document indicates that Banman would provide "designs" and that Alamo would supply instructions for use and Standard Operating Procedures (SOPs) for the manufacturing steps to create the products. Saba Decl., Ex. 78 at 4. |
| 617. | The term sheet acknowledges that "Alamo does not currently produce or distribute 'connective tissue matrix' or 'extracellular matrix' 361 product and is not allowed to do so during the term of this agreement, or following the termination of this agreement, without the written consent of CTM Biomedical."<br><br>Saba Decl. ¶ 81, Ex. 78. | Undisputed. |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 618. | On August 7, 2019, Banman texted Andrews stressing the importance of keeping "his" product indication language restricted stating "As long as we have security on the indications in section 11.6, I'm sure you and I can sort any other details."<br><br>Saba Decl. ¶ 82, Ex. 79, at p. 1. | Disputed, in part. The full-sentence quote from the statement accurately quotes from a portion of a text message. There is no reference to "his product" in this text message. Saba Decl., Ex. 79. |
| 619. | Banman then sent Andrews "Indications for Use" language and some packaging information before entering an "Agreement for Biomedical Materials."<br><br>Saba Decl. ¶ 81, Ex. 78. | Disputed. The document cited by Plaintiffs does not support the statement. Exhibit 78 to the Saba Declaration is a May-June 2019 email exchange, which precedes the text messages (from August 2019) cited above. The document does not include "indications for use" language.<br><br>The statement is also immaterial as "indications for use" and package inserts are included in the boxes with placental tissue products that are sold to consumers. The language and an indication for use document is not a secret. Fluskey Decl. Ex. 14 (Sharp Depo.) at 156:17-22. |
| 620. | This language was stolen from Skye/HRT.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 20 (Opinion #16) | Disputed. *See* Response to 619; Banman Reply Decl. ¶ 45. |
| 621. | Alamo and CTM ultimately entered a written contract called "Agreement for Biomedical Materials" dated August 29, 2019.<br><br>Saba Decl. ¶ 83, Ex. 80. | Undisputed, except that the agreement was signed by Precision Allograph Solutions (an affiliate of Alamo). |
| 622. | One of the most important terms of the Agreement is contained in Paragraph 1 in which Alamo agrees to make certain | Disputed. The agreement for Biomedical Materials does not support Plaintiffs' false statement. The agreement does not |

230

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | products that CTM tells them how to make, and that CTM will provide the specific formula for (a) placental tissue allograft liquid matrix product; (b) placental membrane allografts (amnion, chorion, umbilical cord versions); and (c) particulate placental tissue allograft paste.<br><br>Saba Decl. ¶ 83, Ex. 80. | indicate that CTM would tell Alamo "how to make" products or that CTM would provide the "specific formula." Section 1.2(g)-(h) indicates that PAS (Alamo, *not* CTM) would provide "complete and accurate descriptions of processing procedures" and "instructions-for-use" of the products. |
| 623. | The contract then attaches Exhibit B which are the instructions for Alamo on how to make these three products.<br><br>Saba Decl. ¶ 83, Ex. 80. | Disputed. Exhibit B does not include the "instructions for Alamo on how to make these three products." Exhibit B is a two-page outline that sets forth the generic types of products Alamo would manufacture for CTM. Saba Decl., Ex. 80, at Ex. B. The manufacturing steps and processes used by Alamo to make CTM products are contained in Alamo's SOPs, which were prepared by Alamo. Banman Decl. ¶ 57, Exs. 11-14; Fluskey Decl. Ex. 18 (Andrews Depo.) at 325:19-330:16, 284:6-14. |
| 624. | "Exhibit B" is a series of instructions for Alamo on how to make the membrane products, the flowable liquid products, and the paste products.<br><br>Saba Decl. ¶ 83, Ex. 80. | Disputed. *See* Response to 623. |
| 625. | Banman did not ask Alamo to make any products except the exact suite of products that Skye sells.<br><br>Saba Decl. ¶ 83, Ex. 80. | Disputed. Banman did not ask Alamo to make any Skye products. Banman Decl. ¶¶ 50-51, Ex. 9. Further, Skye never made or sold a particulate (paste) product. Banman Decl. 73.<br><br>This statement is also immaterial because the "suite of products" that Skye sold was publicly-available information and was marketed in brochures by HRT/Skye. *See* responses to 610. |

231

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 626. | The steps in Exhibit B for cleaning and separating tissue would result in the same raw materials from which to process tissue as HRT, and the steps in Exhibit B for processing that tissue would result in the same ultimate products made by HRT.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 11 (Opinion #5); p. 13 (Opinion #7) ("HRT's SOPs at 3.6 to 8.1 to 8.21.4 are essentially identical to BT-8005 rev. 0, Birth tissue debridement and rinse. [Saba Decl. Exs. 114 and 115.] There are no objective criteria differences in the tissue cleaning process to indicate differences in the final raw tissue produced."); Sharp Decl. ¶ 75. | Disputed and immaterial. All placental products are made from the same raw materials—amnion, chorion, and/or cord. Banman Decl. ¶¶ 6-8. The raw materials used for these products is not a HRT/Skye trade secret. Fluskey Decl. Ex. 14 (Sharp Depo.) at 31:9-15. The "ultimate products" are not secrets; their general characteristics and makeup are visible to the naked eye. Fluskey Decl. Ex. 18 (Andrews Depo.) at 346:15-347:5; Banman Reply Decl. ¶ 12, Ex. 1. |
| 627. | CTM is instructing Alamo how to make products using HRT's trade secret processing methods.<br><br>Saba Decl. ¶ 83, Ex. 80. | Disputed. Nothing that Banman ever transmitted to Alamo includes "HRT's trade secret processing methods." Banman Decl. ¶¶ 58-60. HRT's processing methods are set forth in SOPs, and Banman never transmitted any content of any HRT SOPs to Alamo. Banman Decl. ¶¶ 54-60; Fluskey Decl. Ex. 18 (Andrews Depo.) at 321:9-15, 321:19-25, 322:4-7, 330:17-19. The document cited by Plaintiffs does not support its statement. The only citation is to the Processing Agreement between PAS/Alamo and CTM. |
| 628. | Andrews confirmed that Exhibit B was written by Banman and sent to Andrews.<br><br>Andrews Depo. (Saba Decl. Ex. 81) at 144:6-16. | Undisputed. |
| 629. | Andrews also confirmed that he had never manufactured flowable material before, and Banman testified that that he had to explain how to manufacture chorion | Disputed, in part. Alamo had not sold a flowable particulate before working with Banman. It had made and sold placental-based products. Fluskey Decl. Ex. 18 |

232

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | membranes as Alamo had not processed chorion only membranes before.<br><br>Andrews Depo. (Saba Decl. Ex. 81) at 88:13-23; Banman Depo. Vol. II (Saba Decl. Ex. 8) at 627:3-628:7. | (Andrews Depo.) at 47:10-49:20, 224:18-23; SOF 87-92. Alamo possessed the equipment necessary to particulate tissue, and had previously experimented with particulating placental tissue. Fluskey Decl. Ex. 18 (Andrews Depo.) at 162:25-163:4, 164:21-165:11, 333:24-334:11, 334:21-335:5; SOF 93. Banman did not testify that he had to "explain how to manufacture chorion membranes" for Alamo. At the section of testimony cited, Banman stated that he asked Alamo to create a thicker version of the chorion product. Banman Decl., Ex. 8 at 627. |
| 630. | There is no evidence that CTM participated in any product development or research and there is no "CTM Design File" charting the evolution or creation of CTM products.<br><br>Saba Decl. ¶ 85. | Disputed. CTM and Alamo participated in a months-long discussion of the products that Alamo would manufacture for CTM and the processes to be utilized. Alamo created SOPs for the different process steps utilized to make CTM products. Banman Decl. ¶¶ 49-57, Exs. 11-14. Alamo is a tissue bank with substantial experience manufacturing products derived from human placental tissue. Fluskey Decl. Ex. 18 (Andrews Depo.) at 322:12-19. Before meeting Banman, Alamo had experience processing and manufacturing placental tissue, including amnion, chorion, and fluid. *Id.* at 47:14-48:23.<br><br>Banman also objects on evidentiary grounds. The only citation provided by Plaintiffs is a comment made by Plaintiffs' outside counsel in a declaration. There is no foundation for that testimony. Plaintiffs' counsel is not a witness with personal knowledge. |
| 631. | Exhibit B, and ultimately the SOPs that were drafted for the CTM products, set forth steps for processing the placental | Disputed. The SOPs, which were prepared by Alamo, set forth the process steps used to manufacture CTM products. Banman |

233

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | tissue that would result in the creation of the identical products made by HRT.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at pp. 15-16 (Opinion #9); pp. 16-17 (Opinion #10) ("CTM's overall steps go through the same formulation with similar processes that produce an outcome that is identical, with the same ratio and percentage of tissue to solution as one of HRT's products.") ("In CTM's BT 8015 rev 0001 SOP, Section 6.3 through 6.3.1.3, ██ ████████████████ ;<br><br>Saba Decl. ¶¶ 121-122, Exs. 116-117. | Decl. ¶¶ 54-57, Exs. 11-14. Exhibit B to the CTM/Alamo contract does not provide process steps for manufacturing placental tissue products. Banman Reply Decl. ¶ 47.<br><br>The different processes used by CTM/Alamo and HRT/Skye do not result in "identical products." There are material differences in the parties' processes. Banman Decl. ¶ 64.<br><br>The ████████████ refrenced by Plaintiffs' expert is immaterial, as HRT/Skye did not disclose this as a trade secret in their interrogatory responses. Fluskey Decl. Exs. 1-4. |
| 632. | Banman created the SOPs for the CTM products, which are substantially similar to HRT's SOPs, and yield an identical product.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 11 (Opinion #5). | Disputed. Alamo prepared the processing steps in the SOPs for CTM products. Banman Decl. ¶¶ 54-57; Fluskey Decl. Ex. 18 (Andrews Depo.) at 325-330.<br><br>Banman also asserts evidentiary objections. The statement is factual; it is not expert opinion. Plaintiff's purported liability expert lacks personal knowledge to testify to this factual question, and it is not appropriate for expert testimony. |
| 633. | At the outset, Banman told Alamo how to make the products. For example, Banman had to explain to Alamo how to make a chorion only membrane because Alamo had never manufactured one. | Disputed. Banman relied on Alamo, a tissue bank processing company, to develop the manufacturing steps for CTM's products. Banman Decl. ¶¶ 54-57; Fluskey Decl. Ex. 18 (Andrews Depo.) at 325-330. Banman did not tell Alamo how to make products. Fluskey Decl. Ex. 18 |

234

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
| | Banman Depo. Vol. II (Saba Decl. Ex. 8) at 627:3-628:7. | (Andrews Depo.) at 159:7-22, 329:22-330:16, 335:2-5, 340:19-22. The testimony cited by Plaintiffs does not support the statement. Banman testified that he asked Alamo to make a thicker version of a chorion membrane product. He did not teach Alamo how to make it. |
| 634. | Banman asked Alamo to create a prototype sample of a chorion only membrane, which it shipped to Banman in Canada.  On October 21, 2019, Banman responded that the initial batch was too thin, and the membrane had been "scraped down, and almost as thin as amnion." <br><br> Saba Decl. ¶ 86, Ex. 82. | Undisputed. |
| 635. | Banman then attaches a **photo of an HRT sample chorion membrane** to ensure Alamo had "a comparison of the thickness we're aiming for." <br><br> Saba Decl. ¶ 86, Ex. 82; Banman Depo. Vol. II (Saba Decl. Ex. 8) at 624:7-17, 626:20-25. | Undisputed and immaterial. The photo of an HRT sample is not a secret. Anyone who purchases or uses an HRT product has access to the overall thickness, dimensions, and appearance of the product. Banman Reply Decl. ¶¶ 12 (& Ex. 1), 48. Banman Decl. ¶ 61. Fluskey Decl. Ex. 18 (Andrews Depo.) at 246:11-20, 346:15-347:5. Fluskey Decl. Ex. 14 (Sharp Depo.) at 88:11-21, 36:18-25. |
| 636. | <br><br><br><br><br><br><br> Banman Depo. Vol. II (Saba Decl. Ex. 8) at 627:3-628-7. | Undisputed, to the extent that Banman asked Alamo to maintain ▮▮▮▮▮▮ of the membrane. |
| 637. | Banman also mailed the HRT's sample chorion membrane to Alamo and told | Disputed, in part. Banman sent an un-marked reference of HRT |

235

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Alamo to copy the HRT sample: "Here's a couple of pics of the tissue we're sending you, for chorion reference. The initial batch Will did, the membrane was scraped down, and almost as thin as the amnion. Then we stopped scrapping it and are processing it intact, but I haven't seen a picture of that version yet." <br><br> Saba Decl. ¶ 86, Ex. 82; Banman Depo. Vol. II (Saba Decl. Ex. 8) at 624:7-17, 626:20-25. | publicly-available tissue that appears to be the approximate thickness of chorion membrane. It was shared as reference for a rough approximation of thickness visible to the naked eye. The actual thickness of the graft was never measured or discussed. And no direction was given by Banman to "copy the HRT sample." Banman Reply Decl. ¶ 48; Banman Decl. ¶ 61. |
| 638. | The photograph attached shows HRT's product which Bryan Banman had in his possession after he left HRT. Banman sent the picture and the actual sample to Alamo to copy in making CTM product. <br><br> Saba Decl. ¶ 86, Ex. 82; Banman Depo. Vol. II (Saba Decl. Ex. 8) at 627:3-628:7. | Disputed, in part. The photograph shows an unbranded, packaged HRT membrane tissue which Banman had in his possession at the time. Alamo was already processing finished CTM product at this time. And prior to this time, Alamo had not been instructed to remove any ▮▮▮▮▮ or any other tissue from the chorion membrane. Banman Reply Decl. ¶ 49. |
| 639. | Without Banman's instruction of how to manufacture the chorion only membrane, Alamo was unable to reverse engineer how to make the product. Indeed, when Alamo was given directions that ▮▮▮ ▮▮▮▮▮▮▮▮▮▮ from the membranes in Exhibit B, Alamo still prepared the chorion membrane incorrectly. <br><br> Saba Decl. ¶ 86, Ex. 82. | Disputed. CTM and Alamo were not "reverse engineering" HRT/Skye products. Alamo manufactured products according to SOPs that it drafted. Banman Decl. ¶¶ 54-57. The one document that Plaintiffs cite does not support the statement. It is an email which shows that Banman looked at a product sample's thickness (which was not secret and which could be observed by anybody who uses or purchases the product) in communicating with Alamo. Banman asked Alamo to process the CTM chorion membrane the same way that Alamo processed Alamo's amnion membrane, just with chorion. This included ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Banman Reply Decl. ¶ 49. |

236

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 640. | Later, in 2020, Banman again corrects Alamo after receiving a batch of thin membranes asking "Can you please confirm if your lab is processing our CTM Thick to our proper natural thickness on all current orders?  We have items from May 2020 orders that are thin, like this one. And we had corrected this to produce only the unscraped, full-thickness chorion membranes for CTM Thick."<br><br>Saba Decl. ¶ 87, Ex. 83. | Undisputed. |
| 641. | CTM's flowable products and HRT's flowable connective tissue matrix products are identical. Both CTM's and HRT's flowable products are non-dehydrated, sterile, ambient temperature shelf-stable, ready-to-use products.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 15 (Opinion #9). | Disputed. CTM's flowable particulate products and HRT's flow particulate products are not identical, and the parties' do not employ all the same process steps in making these products. Banman Decl. ¶ 64. Skye contends that Sharp is the only individual who knows the specific proportion of amnion, chorion, and cord used for the flowable products, and that the SOP with that proportion is locked in his office. Skye's lab director and quality assurance directors do not know this proportion. Fluskey Decl. Ex. 16 (Shoen Depo.) at 37:16-23; Fluskey Reply Decl. Ex. 6 (Shoen Depo.) at 32:17-33:24, 37:13-23; Fluskey Reply Decl. Ex. 5 (Chin-Sang Depo.) at 61:25-64:8, 121:17-122:16.<br><br>This statement is also immaterial because the publicly-available nature of the product is not at issue in this case; rather, it is the processes that are at issue, which are materially different. The fact that HRT's flowable products are non-dehydrated, sterile, ambient temperature shelf-stable, and ready-to-use are all publicized in the brochure that Plaintiffs |

237

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | | have added to this record. Saba Decl. Ex. 75 at SKYE/HRT000425-31. |
| 642. | Banman knew the benefits of offering a line of premixed, ambient temperature flowable products, and handed HRT's trade secret methods to Alamo to make an identical product.<br><br>Lee Rpt. (Lee Decl. Ex. 1) at p. 16 (Opinion #9). | Disputed. Banman did not transmit any confidential trade secret information, or any information regarding HRT processing steps, to Alamo. Banman Decl. ¶¶ 54-60; Fluskey Decl. Ex. 18 (Andrews Depo.) at 321:9-15, 321:19-25, 322:4-7, 330:17-19.<br><br>Futher, the fact that HRT made and sold premixed, ambient temperature flowable products was not secret. HRT/Skye advertised these features, and they were readily observable by anyone who purchased or used the products. Saba Decl. Ex. 75 at SKYE/HRT000426-27; Banman Decl. ¶ 8; Banman Reply Decl. ¶ 12, Ex. 1. |
| 643. | On March 15, 2019, Boulais informed James Ehrick at Riverview Health that Dr. Agostino would "be fine switching" from Skye to CTM.<br><br>Saba Decl. ¶ 88, Ex. 84. | Undisputed. |
| 644. | Boulais then sends Skye's price sheet to Dr. Ehrick to show a Skye-CTM price comparison and undercut Skye's prices.<br><br>Saba Decl. ¶ 88, Ex. 84; Saba Decl. ¶ 89, Ex. 85. | Undisputed that Boulais transmitted a Skye price sheet, which was not confidential, to Dr. Ehrick. |
| 645. | Boulais sent Skye's full pricing, not discount pricing, so that James would think CTM was cheaper than Skye: "to influence James' bosses that this was a potential cost savings for the facility." | Disputed. The testimony does not support the statement presented. Boulais testified that he sent Skye's pricing to provide a comparison in response to the potential customer's request. He did not testify that he sent Skye's full pricing as opposed to |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Boulais Depo. Vol. II (Saba Decl. Ex. 86) at 275:9-22. | discount pricing in order to make the customer think that CTM was cheaper. |
| 646. | On May 22, 2019, Boulais sends an email to Barbara Foland-Shutovich at Indiana University Beltway hospital stating: "As we discussed, Skye continues to be difficult to work with and rude to customers. Please ignore any and all emails from them . . . In lieu of their track-record of poor behavior, I founded CTM BioMedical last July . . . My partner, Bryan Banman, is the preeminent thought-leader worldwide in biologic extracellular matrices." <br><br> Saba Decl. ¶ 91, Ex. 87. | Disputed, as Plaintiffs have misleadingly omitted critical portions of the quote. The full quote indicates that Boulais wrote this email in response to accusations by Skye that the facility possessed Skye's "missing allografts." |
| 647. | On May 30, 2019, Boulais emails Franciscan Alliance medical facility stating: "I'm also your Skye rep but the CTM lines are 200% more potent and should offer a discount to the network. . . . I can offer consignment as well, where Skye wants all their consigned inventory back and has had some production/quality issues over the last 2 years." <br><br> Saba Decl. ¶ 92, Ex. 88, at p. 1. | Undisputed and immaterial. |
| 648. | Skye never had production or quality issues and CTM's products were identical to Skye products. <br><br> Sharp Decl. ¶ 80. | Disputed and immaterial. CTM's products were not identical to Skye's products. Banman Decl. ¶ 64. |
| 649. | On July 8, 2019, Boulais emails Witham Hospital stating: "If you wanted to switch out your Skye inventory, CTM would replace it 1 for 1 with our comparable | Undisputed. |

239

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | room temp grafts. Our tissue content is 200-300% more potent." Saba Decl. ¶ 93, Ex. 89 at p. 1. | |
| 650. | Boulais testified that he was not telling the truth and what he was referring to was "the injectable we had in development" when stating that the product would potentially be "200% more potent" if it was developed. Saba Decl. ¶ 92, Ex. 88, at p. 1; Boulais Depo. Vol. II (Saba Decl. Ex. 86) at 327:6-8. | Disputed. Plaintiff has misstated this testimony. Boulais did not testify that he was not telling the truth. He explained that his email was referring to CTM's injectable product. |
| 651. | On January 7, 2020, Stumpe accidentally sent a CTM email to Banman's old Skye email address about a Skye client Eskenazi Health. Saba Decl. ¶ 94, Ex. 90; Saba Decl. ¶ 95, Ex. 91; Stumpe Depo. (Saba Decl. Ex. 28) at 213:17-24. | Objection. Immaterial. The e-mail lacks any relevance to Skye's alleged relationship with Eskenazi Health. |
| 652. | Stumpe was still concealing from Skye that he was working with CTM and part of the conspiracy. Stumpe Depo. (Saba Decl. Ex. 28) at 214:21-23. | Objection. Speculation, lack of foundation. FRE 602. Misstates the evidence. Misleading. FRE 403. Improper legal contention. First, Stumpe's testimony is clear that he attached images of *Vivex* products at Eskenazi to the e-mail in question, asking that these *Vivex* products be replaced with *CTM* products (*not that Skye's products be replaced with CTM, as Skye attempts to insinuate*). Stumpe Depo. (Saba Decl. Ex. 28) at 214:5-17. Second, Stumpe never had a direct relationship with Skye or CTM. Those |

240

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | | relationships were legally defined by contracts with Novus and/or Silenda.<br><br>Third, Skye knew that Novus and Silenda were selling non-Skye products at all times.<br><br>Fourth, Stumpe was never a part of any "conspiracy." |
| 653. | Stumpe wrote "bill for all missing and replace with CTM."<br><br>Saba Decl. ¶ 94, Ex. 90. | Objection. Speculation, lack of foundation. FRE 602. Misstates the evidence. Misleading. FRE 403. Improper legal contention.<br><br>First, Stumpe's testimony is clear that he attached images of *Vivex* products at Eskenazi to the e-mail in question, asking that these *Vivex* products be replaced with *CTM* products (*not that Skye's products be replaced with CTM, as Skye attempts to insinuate*). Stumpe Depo. (Saba Decl. Ex. 28) at 214:5-17.<br><br>Second, Stumpe never had a direct relationship with Skye or CTM. Those relationships were legally defined by contracts with Novus and/or Silenda.<br><br>Third, Skye knew that Novus and Silenda were selling non-Skye products at all times. |
| 654. | Sharp received the email and responded: "Why would we replace with CTM?"<br><br>Saba Decl. ¶ 95, Ex. 91. | Undisputed and immaterial. |
| 655. | Stumpe immediately sent Banman a text message and a screenshot saying "[h]aha. Welp, cat might be out of the bag on this now." | Objection. Speculation, lack of foundation. FRE 602. Misstates the evidence.  Misleading. FRE 403. Improper legal contention. |

241

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Saba Decl. ¶ 96, Ex. 92 at p. 2. | First, Stumpe's testimony is clear that he attached images of *Vivex* products at Eskenazi to the e-mail in question, asking that these *Vivex* products be replaced with *CTM* products (*not that Skye's products be replaced with CTM, as Skye attempts to insinuate*). Stumpe Depo. (Saba Decl. Ex. 28) at 214:5-17.<br><br>Second, Skye knew that Novus and Silenda were selling non-Skye products at all times. |
| 656. | Banman responded that Sharp might call Eskenazi and Stumpe responded: "Fuck em. I'm done with them. . . .Letting it ride out. I'm done"… "I want to respond to him but it won't do any good. Guilty pleasure fantasy".<br><br>Saba Decl. ¶ 96, Ex. 92 at p. 2. | Undisputed and immaterial. |
| 657. | Banman responded: "What's he gonna do. Befriend Ertl and scoop the biz?"<br><br>Saba Decl. ¶ 96, Ex. 92 at p. 2. | Undisputed. |
| 658. | On August 29, 2019, Boulais sent a WhatsApp message to Banman and Stumpe complaining that Skye "withheld 6k from my commissions…".<br><br>Saba Decl. ¶ 33, Ex. 30 at p. 115. | Undisputed and immaterial. |
| 659. | Banman responds: "Well, in about 18 months we'll withhold $26 million from them."<br><br>Saba Decl. ¶ 33, Ex. 30 at p. 115. | Undisputed and immaterial. |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 660. | [redacted]<br><br>Saba Decl. ¶ 97, Ex. 93. | Disputed. Banman did not have knowledge of Skye's 2018 revenue. Banman ceased working for the company in July 2018, and he did not have access to the company's income statements. Skye has maintained "Attorneys' Eyes Only" protection over all of its financial statements, including for 2018. In the text message referenced in 659 above, Banman was not referring to Skye's 2018 revenue. Banman Reply Decl. ¶ 51. |
| 661. | Banman had inside knowledge of Skye's revenue and intended to take all of it. This is the conspiracy's stated purpose: Take all of Skye's revenue and shift it to CTM.<br><br>Stumpe Depo. (Saba Decl. Ex. 28) at 189:24-190:9. | Disputed. *See* response to 660. Plaintiffs have grossly misrepresented Stumpe's testimony. He simply did not say this. |
| 662. | Boulais testified about this text: "I think it was very personal for Bryan to be more successful than Chris" and "I think it was important to Bryan to create a company bigger and better and more successful…Than Skye."<br><br> Boulais Depo. Vol. II (Saba Decl. Ex. 86) at 339:4-9, 340:25-341:7. | Disputed, as Plaintiffs have omitted significant portions of the testimony provided by Boulais. Most notably, Boulais testified that he did not know what Bryan meant by the text. Saba Decl. Ex. 86, at 339:10-20. |
| 663. | Stumpe testified that Banman wanted to "convert" $26 million of sales from Skye to CTM within 18 months.<br><br>Stumpe Depo. (Saba Decl. Ex. 28) at 189:24-190:9. | Disputed. The statement mischaracterizes the testimony. Stumpe was asked by counsel to speculate about what Banman meant in a text message. Defense counsel objected. Stumpe speculated that Banman may have wanted to earn $26 million of sales in competition with Skye. Plus, Stumpe's use of the word "convert" carries a non-legal meaning. Stumpe is not a lawyer and has no legal training. |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 664. | Boulais continued to conceal his activities from Skye when on September 11, 2019, Boulais signed the Skye Sales Representative Training and Compliance Certification which indicates that he participated in Skye training and is selling Skye products.<br><br>Boulais Depo. Vol. II (Saba Decl. Ex. 86) at 348:14-349:20. | Disputed, as statement lacks foundation and mischaracterizes Mr. Boulais's testimony. *See* Vol. II (Saba Decl. Ex. 86) at 348:21-22 ("I knew that my original representative agreement expired in June of 2018.").  Moreover, nowhere in the cited testimony does Mr. Boulais confirm that he executed the alleged "Skye Sales Representative Training and Compliance Certification" on September 11, 2019.  In any case, this fact is immaterial to the claims against Mr. Boulais. |
| 665. | When asked why he signed this, he testified that he was still operating under the original terms of his representative agreement.<br><br>Boulais Depo. Vol. II (Saba Decl. Ex. 86) at 348:14-349:20. | Disputed, as statement lacks foundation and mischaracterizes Mr. Boulais's testimony. *See* Boulais Depo. Vol. II (Saba Decl. Ex. 86) at 348:16-18 ("So you were operating with Skye as if there was an agreement in place with them to sell products and they would pay you commissions for those sales? Yes.").  The cited testimony does not support Plaintiffs' alleged fact.   In any case, this fact is immaterial to the claims against Mr. Boulais. |
| 666. | The acts of the Defendants are malicious. For example, on February 13, 2020, Seoane wrote to Banman about another Skye sales representative that CTM flipped: "Word got back to Skye that Erin is going around opening up accounts for ctm fyi" and Banman responded: "Haha. Good. Skye can suck my dick."<br><br>Saba Decl. ¶ 98, Ex. 94, at p. 111. | Disputed and immaterial. There is no evidence presented by Plaintiffs that any conduct of Defendants was "malicious." |
| 667. | Banman continuously refers to Stumpe, Boulais and Seoane as the "CTM A-Team" in numerous emails, and including an email on March 10, 2020.<br><br>Saba Decl. ¶ 99, Ex. 95. | Disputed and immaterial. Plaintiffs have cited one email in which these individuals were referred to the "A-Team." They cite no evidence that Banman "continuously" referred to these individuals as the A-Team. |

244

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 668. | On January 31, 2020, Pablo Seoane resigned from Skye and relocated to Jacksonville, Florida, to work for CTM.<br><br>Sharp Decl. ¶ 64. | Disputed, in part. Seoane did not move to Florida in order to work for CTM. Seoane resigned from Skye, and relocated to Jacksonville, Florida. After he finalized plans to move to Jacksonville with his family, Soeane contacted Banman to inquire about working for CTM. Banman Reply Decl. ¶ 53. |
| 669. | However, before he left Skye, he informed Skye that he was leaving to work for a "tech" company. Seoane also flashed his iPhone to Sharp and Matt Chormann showing them an "offer letter" from the tech company.<br><br>Sharp Decl. ¶ 65. | Undisputed and immaterial. |
| 670. | During his deposition, he admitted that he lied to Sharp.<br><br>Seoane Depo. (Saba Decl. Ex. 96) at 11:17-12:2. | Undisputed and immaterial. |
| 671. | On his last day of employment, Sharp requested, in person, that Seoane delete the training notes that were on his iPhone. However, Seoane intentionally did not delete seventeen of the "notes" even though he told Sharp that he did do so.<br><br>Seoane Depo. (Saba Decl. Ex. 96) at 22:25-23:20. | Disputed in part, mischaracterizes Seoane's deposition testimony. At his deposition, Seoane testified that the Notes were prepared when he worked for Skye, that Sharp watched him delete a number of Notes and then said "That's—that's fine" before all of them had been deleted, that he was asked not to delete certain Notes because other Skye employees wanted/needed access to it, and he specifically testified that he did not represent to Sharp that he had deleted them all: "A. Okay, You told him you deleted all the ios notes, didn't you? A. No, I did not." Fluskey Reply Decl., Ex. 4 (Seoane Depo.) at 21:2-24:7. |

245

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 672. | On February 24, 2020, Seoane texted Banman: "Hey B…I'll then start to go through and transferring contacts and opportunities into SF to try to get some traction going this week with my roladeck... Hopefully it won't be too long before I have a good feel for CTM process on onboarding and training, SF and doc sharing. Just so you know what im up to."<br><br>Saba Decl. ¶ 98, Ex. 94 at p. 114. | Undisputed. |
| 673. | Seoane then attaches a photo showing a laptop computer and a large desktop monitor.  The desktop monitor shows CTM's contacts database open, and the laptop shows Excel tabs containing Skye sales representative contact trade secret information ("Pablo Leads"; "Pablo Reps"; HARSH; "Matt Reps") that Seoane should no longer have.<br><br>Saba Decl. ¶ 101, Ex. 97; Saba Decl. ¶ 102, Ex. 98; Sharp Decl, ¶ 67. | Disputed in part. It is undisputed Seoane sent a picture to Banman. It is disputed that any of the information is a trade secret and Plaintiffs have not identified the information (i.e. the names) as a trade secret that was allegedly misappropriated by Defendants in any discovery responses. Fluskey Decl., Exs. 1-4. Moreover, despite Plaintiffs' contention, none of those names were ever entered into CTM's Salesforce (SF) program. CTM produced in discovery documents showing that those names are not in its Saleforce program. Banman Reply Decl., ¶ 55, Ex. 4. |
| 674. | Seoane downloaded, copied and/or transferred this information to his personal computer after returning his Skye issued computer.<br><br>Seoane Decl. ¶ 25. | Disputed. Plaintiffs' statement is not supported by any competent evidence. The cited evidence, Seoane Decl., ¶ 25, makes no mention of downloading, copying, or transferring information to Seoane's personal computer. |
| 675. | CTM projects it will earn almost $50,000,000 in revenue in 2023 – all from the sales of placental products which were stolen trade secrets belonging to Plaintiffs.<br><br>Seoane Depo. (Saba Decl. Ex. 96) at 299:19-22. | Disputed in part. Plaintiffs' statement is not supported by any competent evidence. The cited evidence, Saba Decl., Ex. 96, 299:19-22, asks for Seoane's projection of CTM sales of 2023 and he responded "It could be close to $45- $48 million in sales." There was no discussion as to the basis for the projection, the accuracy of |

246

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
|  |  | the projection, and certainly no discussion of trade secrets belonging to Plaintiffs. Seoane is not involved in any CTM sales forecasting or projections. |
| 676. | RESERVED. | No statement of fact was made so no response is necessary. |
| 677. | On August 2, 2018, Boulais signed an Independent Contractor Agreement – Sales Representative with CTM in which he agreed to keep CTM's "trade secrets" and "confidential information" "strictly confidential".<br><br>Saba Decl. ¶ 103, Ex. 99 at p. 8. | Undisputed and immaterial. |
| 678. | In his CTM Representative Agreements, Banman defines "trade secrets" as:<br><br>For purposes of this Agreement, **a "Trade Secret" is any information, including technical or non-technical data, formulas, product designs, storage methods, formulations, indications, preservation methods, dehydration methods, patterns, compilations, programs, devices, other methods, techniques, drawings, processes, financial data, financial plans, product plans, marketing plans, sales strategies, or a list of actual or potential customers or suppliers** which qualifies as a trade secret under applicable law. A "Trade Secret" generally (i) derives economic value, actual or potential, from not being generally known, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use; and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. | Undisputed and immaterial, but Plaintiffs misleadingly left unbolded a critical qualifier in the quote: "which qualifies as a trade secret under applicable law." |

247

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
|  | Saba Decl. ¶ 103, Ex. 99 at p. 8. (Bold emphasis added). |  |
| 679. | In his CTM Representative Agreements, Banman defines "confidential information" as:<br><br>For purposes of this Agreement, "Confidential Information" includes any information related to the **development, creation, processing, formulation or marketing of amniotic or placental tissue products, and the methods of sourcing, reimbursement methods, processing, formulation, indications for use, storage, preservation and application thereof, all data or infom1ation, whether or not marked "confidential"** (other than Trade Secrets), **that is valuable to Company** (or, if owned by someone else, is valuable to that third party) and not generally known to the public or to competitors in the industry, whether (i) disclosed by Company or developed by Representative as part of Representative's duties hereunder, or (ii) disclosed to Company, or to Representative as part of Representative's duties hereunder, by third parties subject to obligations of confidentiality. **"Confidential Information" includes Representative's compensation from Company pursuant to this Agreement, Company's business, markets, strategic plans, or any information pertaining to the technologies and proprietary products, services, and processes of Company (including technology under current development or improvement, including but not limited to human amnion, chorion, umbilical cord, placental, or connective tissue products and formulations in flowable, fluid, sheet, membrane, wrap, filler, matrix,** | Undisputed and immaterial, but Plaintiffs misleadingly left unbolded a critical qualifier in the quote: "and not generally known to the public or to competitors in the industry." |

248

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
| | or other forms; **their indications for use; processing, storage and preservation methods; marketing strategies; reimbursement methods and strategies;** and any other related information), or any confidential information received from a customer or business partner of Company, unless Representative has obtained express approval to use or disclose such information from Company in advance. **Any and all material data, information, know-how, and documentation related to Company's Business, its market, its customers, its technology, its research and development, and its anticipated business** which is communicated to, supplied to, or observed by Representative that is not public information constitutes Confidential Information. Nothing in this Section Vlll(D) is intended to limit the definition of a "Trade Secret." <br><br> Saba Decl. ¶ 103, Ex. 99 at pp. 8-9. (Bold emphasis added). | |
| 680. | On December 3, 2019, Stumpe texted Banman that he had "completely removed Skye from sax [Saxony Surgery Center], we have used all allogen, and stocked with CTM.  Ertl with 2 cases tomorrow : ). Hoffman at eagle highlands is on board after my lunch yesterday, he will get started soon." <br><br> Stumpe Depo. (Saba Decl. Ex. 28) at 301:9-17; Saba Decl. ¶ 104, Ex. 100 at p. 4. | Objection. Mischaracterizes the evidence. Stumpe was referring to his relationship, Dr. Ertl's decision to use CTM at Saxony Surgery Center. |
| 681. | When Banman texted Stumpe in March of 2020 that he had hired Seoane to work for CTM, Banman told him "[Chris Sharp] doesn't know. It's kept quiet just to avoid | Undisputed and immaterial. |

249

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|---------------------|
| | harassment."  Stumpe responded: "I can't wait until he finds out. Wish I could watch."  He clarified he wished he could watch Chris "go nuts."<br><br>Stumpe Depo. (Saba Decl. Ex. 28) at 302:7-303:5; Saba Decl. ¶ 104, Ex. 100, at p. 7. | |
| 682. | Seoane was responsible for flipping Brian Houghton and Dean Conway, two Skye sales representatives, to work for CTM.<br><br>Seoane Depo. (Saba Decl. Ex. 96) at 110:5-7, 111:2-6, 115:11-25. | Disputed. The cited deposition testimony makes clear Brian Houghton contacted Seoane to see if he could sell CTM products; he did not reach out to them. *See* Saba Decl., Ex. 96 at 115:19-22 ("I was the person responsible for receiving his call, yes."). And Seoane has said "Mr. Conway reached out to me, I did not solicit him, asking to sell CTM products." Seoane Decl., ¶ 76. |
| 683. | On August 21, 2017, Pablo Seoane signed an Employee Confidentiality Agreement with HRT and signed the Skye/HRT employee handbook.  Seoane agreed to keep in the "strictest  confidence": trade confidential knowledge, product formulations, product ingredients, revenue numbers, financials, representation agreements, representation commissions, employment agreements, pricing, sources of supply, employee compensation, HRT structure, HRT ownership structure, margins, product designs, packaging, inserts, FUTURE PRODUCTS, marketing materials, etc, data or any other information of HRT or HRT affiliates."<br><br>Saba Decl. ¶ 22, Ex. 19; Saba Decl. ¶ 105, Ex. 101, at p. 1. | Undisputed and immaterial. |

250

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 684. | On December 19, 2018, Seoane signed a Skye/HRT Employee Confidentiality Agreement.<br><br>Saba Decl. ¶ 106, Ex. 102. | Undisputed and immaterial. |
| 685. | On November 9, 2017, Banman emailed Matt Chormann and Pablo Seoane regarding Skye's insurance reimbursement coding.<br><br>"**Great example this morning of our excellent Skye proprietary advantage**." He then details how a doctor was not going to use Skye's products because competitor's products were not reimbursed.  Banman sent "our standard coding reference email" and the facility confirmed reimbursement.  Banman then reiterates the value of these codes and their secrecy by stating:  "**These give us a massive advantage** over Palingen, BioD, Applied  Biologics, MiMedx, Amniox and others, as **none of those companies understand the reimbursement, nor do they have C1762 available to them**. Please keep in mind however, that **we only provide this** for engaged reps working on an account or on a case, requesting further coding support.<br><br>Saba Decl. ¶ 107, Ex. 103. | Disputed in part and immaterial. The document has not been authenticated by anyone with personal knowledge. The document also does not include the highlighting in Plaintiffs' statement. |
| 686. | On June 23, 2020, Seoane emailed one of the 17 Skye Notes that he kept from Skye to Banman and Matt Chormann.<br><br>Saba Decl. ¶ 108, Ex. 104. | Disputed in part. The cited evidence, Saba Decl., Ex. 104, does not support Plaintiffs' statement that Seoane kept any Notes from Skye. At his deposition, Seoane testified that the Note was prepared when he worked for Skye, that he was asked not to delete the Note by Chris Sharp because other Skye employees wanted/needed access to it, and upon receipt of a letter from Plaintiffs' counsel in June 2020, after |

251

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | | Seoane's counsel preserved the evidence, he deleted the Note. When he deleted the Note, it sent an email to Chormann and Banman's Skye email accounts (an account that Banman no longer had access to). Fluskey Reply Decl., Ex. 4 (Seoane Depo.) at 21:2-24:7; 270:16-275:1. |
| 687. | On June 3, 2020, counsel for Skye sent a Cease-and-Desist letter to Seoane requesting he return Skye materials.  After receiving a letter of refusal, Skye sent two additional letters requesting the return of Skye's 17 "Notes" files.<br><br>Saba Decl. ¶ 109, Ex. 105; Saba Decl. ¶ 110, Ex. 106; Saba Decl. ¶ 111, Ex. 107. | Disputed in part and immaterial. It is undisputed that the referenced documents were sent. Plaintiffs fail to include Seoane's response. Fluskey Reply Decl., Ex. 10. It is disputed that Plaintiffs' self-serving legal letters are admissible as they misstate the law and facts. Fluskey Reply Decl., Ex. 4 (Seoane Depo.) at 21:2-24:7; 270:16-275:1. Plaintiffs have not identified any of the information in the Notes as being a trade secret. |
| 688. | On January 29, 2020, Banman sent a text to Andrew MacDonald, a CTM employee in business development, a link to Banman's iCloud account with documents titled "CTM Biz Dev Compendium" and "Skye Biz Dev Compendium".<br><br>Banman Depo. Vol. I (Saba Decl. Ex. 1) at 28:20-22; Saba Decl. ¶ 112, Ex. 108. | Disputed in part and immaterial. Plaintiffs' citations do not authenticate Saba Decl., Ex. 108. Plaintiffs have not identified any of the information in the Biz Dev Compendium as being a trade secret. |
| 689. | Sharp testified that that Skye has not filed lawsuits against these individuals for breach of contract, and that Skye does not allege breach of contract against these individuals/entities in this action.  Sharp did not testify that the entities and individuals with whom Skye is claiming interference, did not breach any contract with Skye.<br><br>Sharp Depo. Vol. III (Saba Decl. Ex. 109) at 674:25-675:7, 676:13-19. | Disputed. Plaintiffs' statement intentionally misstates and mischaracterizes Chris Sharp's deposition testimony by stating that "Sharp did not testify that the entities and individuals with whom Skye is claiming interference, did not breach any contract with Skye."<br><br>Chris Sharp testified as follows:<br><br>Q. Look at 450 - - - actually, before we go there.  Sorry. Has Skye or HRT filed any lawsuits against any of the individuals or |

252

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | | entities listed on pages 8 through 9 for breaching any contracts?<br><br>A. No. I don't believe so, no.<br><br>Q. Does Skye allege that any entity or individual on that list has breached a contract Skye?<br><br>A. No.<br><br>Saba Decl., Ex. 109, 674:24-675:7. |
| 690. | Pursuant to CTM's Sales by Customer list produced by CTM, up until at least 2021, CTM continued to sell products to Skye customers including, but not limited to, Carmel Ambulatory Surgery Center, Community Anderson Hospital, Community Hospital East, Community Hospital North, Community Hospital South, Community Surgery Center-Hamilton, Gerald Champion Medical Center, Good Samaritan Medical Center, IU Methodist Hospital, Memorial Herman SC Pinecroft, Saxony Surgery Center, and Southern New Mexico Surgery Center.<br><br>Saba Decl. ¶ 48, Ex. 45. | Disputed and immaterial. The cited document, Saba Decl., Ex. 45, is not CTM's Sales by Customer list and the attached document does not support Plaintiffs' statement. |
| 691. | As a direct result of Defendants' unlawful acts, Skye's surgical sales revenue decreased from 2018 to present.<br><br>Saba Decl. ¶ 45, Ex. 42. | Disputed. Plaintiffs' statement is not supported by evidence in admissible form. No one with personal knowledge authenticated Saba Decl., Ex. 42, nor has anyone with personal knowledge identified or testified in the manner set forth in Plaintiffs' statement. Plaintiffs' statement that "As a direct result…." is conclusory, argumentative, and a misstatement of the law, which permits companies to compete with them. |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 692. | Sharp considered patenting HRT's SOP processes but made the business decision that the value in the marketplace of keeping the processing steps secret outweighed the 20-year exclusivity he would have with a patent.<br><br>Sharp Decl. ¶ 66. | Disputed and immaterial. Sharp did not pursue patent protection for HRT's processes because they were almost certainly not patentable. Banman Reply Decl., ¶ 54; Banman Decl. ¶ 20; Banman Decl. Exs. 1, 6, & 7. |
| 693. | Skye had valid oral agreements with the following facilities:<br><br> | Disputed and immaterial. Plaintiffs' statement is not support by any competent evidence, it is just a conclusory statement by Sharp. Sharp Decl., ¶ 67. Sharp does not identify any of the terms of the alleged oral agreements, who entered into the oral agreement on behalf of Skye, who entered into the alleged oral agreements on behalf the entities, what the term of the alleged oral agreements were, or that any entity breached any alleged oral agreement with Skye. Moreover, CTM has never sold product to a number of the entities, including: Beltway Surgery Center; Broward Health Hospital; St. Luke's Springwoods Village Hospital; St. Luke's Woodlands; Wabash Valley Surgery Center; Witham Hospital; Veterans Medical Distributors; Central Texas Veterans Administration ("VA"); Long Beach VA; Martinsburg VA; SFC-System Perform; VAMC of Washington DC. Banman Decl., ¶ 98. |

254

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Sharp Decl. ¶ 67. | |
| 694. | Plaintiff requested that Stumpe return his outstanding inventory several times including on January 22, 2019, but Stumpe failed to return the inventory.<br><br>Saba Decl. ¶ 114, Ex. 110. | Objection. Misleading and mischaracterizes the evidence. Further, the cited document is not authenticated by anyone with personal knowledge and, therefore is not evidence in admissible form. The cited document also does not support Plaintiffs' statement that any request was made "several times" as the document is a single communication regarding product that was allegedly on consignment (i.e. at a facility), not that it was in Stumpe's possession. There is also no request to "return" any inventory, but to confirm the status of product on consignment at other facilities. Moreover, any product on "consignment," at best, concerns a contractual term involving Novus Ortho Corp's or Silenda's agreements with Skye (not Stumpe). |
| 695. | Stumpe continued communicating with Chris Sharp after Banman started CTM because he "was still selling Skye."<br><br>Stumpe Depo. (Saba Decl. Ex. 28) at 54:9-13. | Undisputed and immaterial. |
| 696. | Stumpe is the sole owner of Silenda Medical, Inc. | Undisputed and immaterial. |

255

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
|      | Stumpe Depo. (Saba Decl. Ex. 28) at 23:10-18. | |
| 697. | Stumpe did not raise preemption as an affirmative defense in his Answer or in any of the 12(b)(6) Motions to Dismiss. Saba Decl. ¶ 115, Ex. 111. | Disputed in part and immaterial. Objection. This is not a material fact in violation of Local Rule 56-2. It is a legal argument that is not properly included in a Statement of Facts. Moreover, "preemption" is a legal issue that Plaintiffs cannot overcome as a matter of law; it need not be an affirmative defense (even though it is already subsumed within the other defenses) and is not waiveable. |
| 698. | Sharp requires all Skye and HRT employees and sales representatives to sign confidentiality agreements. Sharp Decl. ¶ 68. | Defendants cannot respond in full because Plaintffs have failed to produce all confidentiality agreements in discovery. They have objected to such production. What Sharp "requires" is irrelevant; the issue is whether there are any signed confidentiality agreements. |
| 699. | It is industry standard that the facilities do not disclose the price they pay for medical products because they do not want competitive medical facilities to know how much they pay for products. Sharp Decl. ¶ 82. | Disputed. Plaintiffs' statement is not supported by evidence in admissible form. Plaintiffs' statement is based on a conclusory statement by Sharp. Sharp Decl., ¶ 82. Sharp has not been disclosed as an industry expert and he certainly is not an expert on what is industry standard for medical facilities. Sharp's statement lacks foundation and is purely speculative. Sharp's statement is also false. *See* Stumpe Decl. ¶¶ 16-17 (stating that "[o]ne may simply call a surgeon or medical center and ask how much they are paying for a certain product and attempt to 'beat that price' with a product the representative is selling," and that doing such is "common practice among sales representatives."). |

256

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 700. | In 2012 to 2015, when Banman worked on product development with HRT, he resided in Canada but regularly travelled to the United States, including Skye/HRT's headquarters, to perform his job functions.<br><br>Sharp Decl. ¶ 69. | Disputed in part. It is undisputed that from 2012 to 2015 Banman resided in Canada. It is disputed that Banman worked on product development with HRT from 2012 to 2015 (Banman Decl. ¶¶ 17-27) and that Banman regularly traveled to the United States to perform his work functions. Banman Reply Decl. ¶ 56. |
| 701. | Skye provided permission to BJ Benik to sell products for Skye and other companies. However, BJ Benik had to sign a document that has not and will not disclose Skye's trade secrets to CTM.<br><br>Sharp Decl. ¶ 70. | Disputed in part and intentionally misleading. It is undisputed that Benik serves as an independent sales representative for both Skye and CTM.<br><br>But Benik did not sign a special agreement regarding non-disclosure of confidential information until September 22, 2022. Fluskey Reply Decl. Ex. 8; Ex. 1 (Sharp Depo.) at 661-662, 682-683. He has worked for Skye and CTM, at the same time, since August 2018. Banman Reply Decl. ¶ 57. Plaintiffs had Benik sign this new confidentiality agreement long after this litigation was commenced and in response to contentions presented by Defendants. Plaintiffs did not require Benik to sign this agreement as a condition to simultaneously work for both companies. |
| 702. | Skye did not permit Stumpe or Trengove to sell products for Skye and Skye's competitors simultaneously<br><br>Sharp Decl. ¶ 71. | Disputed in part and immaterial. William (Billy) Trengove never contracted with or worked for CTM. Banman Decl., ¶ 104. Stumpe testified that Novus and Silenda sold products for Skye's competitors when he was first approached about selling for Skye, and during the time Novus and Silenda sold Skye's products.  Fluskey Reply Decl., Ex. 9 (Stumpe Depo.) at 44:17-45:6, 52:3-12. |

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
| 703. | Skye's pricing for each facility is unique. There is no set price that Skye universally sells its products to all locations<br><br>Sharp Decl. ¶ 72. | Disputed and immaterial. Skye has a standard price list for product sales to the Veteran's Administration. Skye also has a standard price list from which it may deviate for customers. An individual independent sales representative may deviate from that standard price list. |
| 704. | Before CTM, HRT was the only company manufacturing and selling an ambient temperature, shelf stable flowable product using HRT's formula of premixed placental particulate matter with saline.<br><br>Lee Rpt. (Decl. of J. Lee Ex. 1) at p. 4 (Opinion #1) (Prior to CTM's emergence in the marketplace, there was no other company in the United States that was manufacturing a connective tissue matrix flowable product using HRT's formula of premixed placental particulate matter with saline); p. 16 (Opinion #9) ("Other manufacturers were selling products that take valuable operating room time as they (1) needed to be mixed on-site; (2) are frozen products that needed to be thawed before use; and (3) are expensive to ship on dry ice and cumbersome to store on site of the surgery center or hospital.") | Disputed.  The quotes of Plaintiffs' expert are immaterial because the outward facing features of products available in the marketplace are not trade secrets. Further, the so-called "formula of premixed placental particulate matter" was not disclosed by HRT/Skye in its trade secret interrogatory response. Fluskey Decl. Exs. 1 & 2. It has not even been disclosed in this motion. |
| 705. | There is no evidence that Alamo engaged in any product development or research with CTM to create product SOPs, despite Alamo's never having manufactured flowable or chorion only membranes before CTM.<br><br>Saba Decl. ¶ 123. | Disputed. Plaintiffs' statement is not support by any evidence in admissible form, it is just a statement of counsel. *See* Saba Decl., ¶ 123. The statement is also false. Banman Decl., ¶¶ 48-56, Exs. 9-14; Fluskey Decl., Ex. 18 (Andrews Depo.) at 57:7-9. |

258

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
| 706. | It is a trade secret as to which portions of the placenta are used in each of HRT's products<br><br>Sharp Decl. ¶ 81. | Disputed. Plaintiffs' conclusory statement is a legal conclusion unsupported by any evidence. Plaintiffs' statement is also false. The boxes containing Skye's products and the instructions for use inside those boxes identify the portions of the placenta used in each of HRT's products. Banman Reply Decl., Ex. 2. Indeed, Skye's website identifies the portions of the placenta used for each product. *See skyebiologics.com/woundcare* [last visited Decl. 15, 2022] ("Woundex® is a FastActing® dehydrated amniotic membrane, available in thin amnion-only WoundEx 45® and thick chorion-based WoundEx 200®."); *skyebiologics.com/oculomatrix-visidisc* [last visited Decl. 15, 2022] ("OculoMatrix® and VisiDisc® are FastActing® amniotic membrane allografts available in a thin, amnion-only, and a thick, chorion-based configuration for **improved handling and optimal coverage.") (emphasis in original);** *humantissue.com/products* **[last visited Decl. 15, 2022]** ("Thin Amniotic Membrane. A dehydrated membrane created for maximum ease and versatility. It adheres naturally without suturing" and "Thick Amniotic Membrane. A thicker dehydrated membrane, which can be easier to handle and apply."). |
| 707. | On August 16, 2018, Boulais sent an email to Riverview pitching CTM products stating: "We recently completed a case series of 300 interventional spine procedures where amniotic allografts lowered their infection rate by 85%, saving the facility over 3 Million Dollars in associated costs." | Undisputed and immaterial. |

259

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | Saba Decl. ¶ 125, Ex. 119. | |
| 708. | This 300-patient study was done by Skye and was not published. Boulais would have only known about this study through his work at Skye.<br><br>Sharp Decl. ¶ 73. | Disputed and immaterial. Plaintiffs' conclusory statement is not supported by any evidence in admissible form. Sharp cannot speculate as to what Boulais was referring to; the referenced document includes attachments from Vivex, a large biologics manufacturer and Skye competitor. |
| 709. | On July 17, 2018, Nate Boulais sent an email to a potential sales representative he was targeting, attaching a Skye research study but implying the research was done using CTM products.<br><br>Saba Decl. ¶ 126, Ex. 118. | Disputed. Plaintiffs' statement that Timsteeletim@aol.com is a sales representative Boulais was targeting is not supported by any evidence in admissible form, is conclusory, and speculative. In addition, the referenced article was published and is readily available online.<br><br>*See https://pubmed.ncbi.nlm.nih.gov/29437272/* [last visited Decl. 15, 2022] and https://www.researchgate.net/publication/323156224_Bioactivity_and_composition_of_a_preserved_connective_tissue_matrix_derived_from_human_placental_tissue_COMPONENTS_AND_BIOACTIVITY_OF_A_PLACENTA_TISSUE_DERIVED_MATRIX [last visited Decl. 15, 2022]. Finally, the article itself makes clear that the "Contract grant sponsor" was "Human Regenerative Technologies, LLC" and the products used were Skye Biologics, Inc. products. |
| 710. | CTM's process results in identical membrane products as HRT. CTM's Thin product is the same as HRT's amnion membranes, CTM's Thick product is the same as HRT's chorion membranes, and | Disputed and immaterial. Plaintiffs' statement is not supported by evidence in admissible form, but rather are conclusory statements. Further, HRT's products are not "identical" to CTM's products, as there are material differences in the |

260

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | finally, CTM's X-Thick is the same as HRT's cord-based membrane.<br><br>Sharp Decl. ¶ 75; Lee Rpt. (Lee Decl. Ex. 1) at p. 13 (Opinion #6). | manufacturing processes. Banman Decl. ¶ 64.<br><br>The statement is also immaterial because HRT's products are not secret. The names, general characteristics, and make-up of the products are publicly-disclosed and adverstised. Banman Decl. ¶8; Banman Reply Decl. 12; Saba Decl, Ex. 75 (product brochure). Skye's website identifies the basic material and make-up of the products. *See, e.g., skyebiologics.com/woundcare* [last visited Decl. 15, 2022] ("Woundex® is a FastActing® dehydrated amniotic membrane, available in thin amnion-only WoundEx 45® and thick chorion-based WoundEx 200®."); *skyebiologics.com/oculomatrix-visidisc* [last visited Decl. 15, 2022] ("OculoMatrix® and VisiDisc® are FastActing® amniotic membrane allografts available in a thin, amnion-only, and a thick, chorion-based configuration for **improved handling and optimal coverage.") (emphasis in original);** *humantissue.com/products* **[last visited Decl. 15, 2022] ("**Thin Amniotic Membrane. A dehydrated membrane created for maximum ease and versatility. It adheres naturally without suturing" and "Thick Amniotic Membrane. A thicker dehydrated membrane, which can be easier to handle and apply."). Product identification is not a secret. |
| 711. | HRT and CTM's extra thick membranes are both cord derived.  They have the same tissue source and product material.<br><br>Sharp Decl. ¶ 76 | Undisputed and immaterial. The sources of raw material used (*i.e.*, sections of placenta) is not a secret. Fluskey Decl. Ex. 14 (Sharp Depo.) at 32:11-18 |

261

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| 712. | In 2012-2013, before Skye and HRT began researching and developing HRT's products, Skye was selling private label products manufactured by BioD and Banman had access to Skye's trade secret information relating to, at least, business operations, sales representatives, customers, and pricing.<br><br>Sharp Decl. ¶ 77. | Disputed in part. Undisputed that in 2012-2013 Skye was selling private label products manufactured by BioD. Banman Decl., ¶¶ 19-20. Disputed that "Banman had access to Skye's trade secret information relating to, at least, business operations, sales representatives, customers, and pricing." Plaintiffs' statement fails to identify what the purported trade secrets are and, rather, are unsupported conclusory statements. For example, what business operations does Skye contend were trade secrets? What information relating to the independent sales representatives does Skye contend were trade secrets? Their identities were publicly available, Banman identified potential sales representatives to recruit on LinkedIn. Banman Decl., ¶ 31. |
| 713. | Seoane prepared a canned email for the CTM sales representatives to use that includes Skye's coding reimbursement guide, Skye's FDA language and Skye's indication language, in the same format used by Skye to educate its doctors and facilities.<br><br>Saba Decl. ¶ 126, Ex. 120. | Disputed. Seoane prepared an email for CTM's independent sales representatives, but that email does *not* include "Skye's code reimbursement guide, Skye's FDA language and Skye's indication language. The HCPCS Codes "are developed and maintained by CMS [Center for Medicaid and Medicaid Services]. . . ." Saba Decl. Ex. 120. All of the insurance codes referenced here by Skye are in the public domain. They do not belong to Skye. Banman Decl. ¶ 68, Exs. 15-17; Fluskey Decl. Ex. 14 (Sharp Depo.) at 237:4-11. |
| 714. | CTM's coding guide mirrors Skye's coding guide.<br><br>Saba Decl. ¶ 127, Ex. 121. | Disputed. Plaintiffs' statement is not supported by any competent testimony, but rather is statement by their counsel. Saba Decl. ¶ 127. In addition, a simple comparison of the documents shows that CTM's coding guide is not a copy, or mirror, of the Skye's coding guide. *Compare* Saba Decl., Ex. 120 *with* Ex. |

262

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|----------------------|
|  |  | 121. Finally, HCPCS and CPT codes are published by the federal government, they are not proprietary or secret to Skye. All of the insurance codes referenced here by Skye are in the public domain. They do not belong to Skye. Banman Decl. ¶ 68, Exs. 15-17; Fluskey Decl. Ex. 14 (Sharp Depo.) at 237:4-11. |
| 715. | Seoane and Banman prepared a Product Comparison Chart for Broward Health which includes false information about Skye, to make CTM appear to be the only reimbursable product.  Seoane and Banman knew that the implant billing codes were discovered and used by Skye but, in the comparison chart, they falsely represent that Skye products are "transplants" that are not reimbursed. Skye's billing codes are used for CTM only.

Saba Decl. ¶ 128, Ex. 122. | Disputed. Plaintiffs' statement is not supported by any competent testimony, but rather is statement by their counsel. Saba Decl., ¶ 128. Finally, HCPCS and CPT codes are published by the federal government, they are not proprietary or secret to Skye, they were not "discovered" by Skye, and they certainly are not "Skye's billing codes." All of the insurance codes referenced here by Skye are in the public domain. They do not belong to Skye. Banman Decl. ¶ 68, Exs. 15-17; Fluskey Decl. Ex. 14 (Sharp Depo.) at 237:4-11. |
| 716. | Skye had valid oral agreements with the following doctors for research using Skye's products:

| Disputed. Plaintiffs' statement is not supported by any competent evidence, it is just a conclusory statement by Sharp. Sharp Decl., ¶ 78. Sharp does not identify any of the terms of the alleged oral agreements, who entered into the oral agreement on behalf of Plaintiffs, what the term of the alleged oral agreements were, or that anyone breached any alleged oral agreement with Plaintiffs. To the extent the alleged oral contract was for research, CTM has only worked with Dr. Kelly Hiatt, Dr. Brian Badman, and Dr. Mark Ciaglia to perform research/analysis. Banman Decl., ¶ 100. CTM was not aware, and still is not aware, of any contracts between Plaintiffs and Dr. Hiatt, Dr. Badman, and/or Dr. Ciaglia that would |

263

| No. | Undisputed Fact/Evidence | Defendants' Response |
|-----|--------------------------|---------------------|
|  | ██  ████████ <br><br> Sharp Decl. ¶ 78. | prevent them from working with CTM. Banman Decl., ¶ 101. |
| 717. | The defendants in this case have interfered with the following Skye sales representatives: <br><br> • Garrett Amadon <br> • Erin Barnes <br> • BJ Benik <br> • Jake Bergey <br> • Robert Bibb <br> • James Boone <br> • Nate Boulais <br> • Maria Carey <br> • Kyle Clark <br> • Dean Conway <br> • Katey Deariso <br> • James Demo <br> • Gregg Dimery <br> • Matt Dripps <br> • Brian Floros <br> • Chad Galloway <br> • Brian Houghton <br> • Andrew Hubbard <br> • Wally Karam <br> • Tommy Miller <br> • Daniel Mirenda <br> • Bill Morgan <br> • Lisa Robinson <br> • Pablo Seoane <br> • Jeremy Smith <br> • Mike Stumpe <br> • Billy Trengrove <br> • Scott Tanabe <br> • Alex Wrinkles <br><br> Sharp Decl. ¶ 79. | Disputed. Plaintiffs' statement is not supported by any competent evidence, it is just a conclusory statement by Sharp. Sharp Decl., ¶ 79. Sharp does not identify how CTM allegedly interfered with independent sales representatives.  Alex Wrinkles; Billy Trengove; Chad Galloway; Daniel Mirenda; Jake Bergy; James Boone; Kyle Clark; Scott Tanabe; Lisa Robinson; Matt Dripps; Matt Locus; and Wally Karam never contracted with or worked for CTM. Banman Decl., ¶ 104. Andrew Hubbard; Bill Morgan; Dave McGrew; Garrett Amadon; Katey Deariso; Maria Carey; Robert Bibb; and Tommy Miller never sold a single CTM product. Banman Decl., ¶ 106. B.J. Benik's and Jeremy Smith's contracts with Skye did not have an exclusivity clause and they were free to sell products on behalf of other companies, including CTM. Fluskey Decl. Exs. 26 & 27. Dean Conway signed a contract with CTM on August 2, 2020, after his contract with Skye, including the exclusivity clause, had expired. Fluskey Decl., Ex. 29; Banman Decl., ¶ 108. Silenda Medical (a company in which Mike Stumpe is a principal) signed a contract with CTM on August 10, 2018 (with an effective date of July 25, 2018), after Skye's contract with Stumpe's former company, including the exclusivity clause, had expired. Fluskey Decl., Ex. 28; Banman Decl., ¶ 109. |
| 718. | Banman educated Stumpe on how to sell products. Stumpe participated in Skye training. Banman sent Boulais Skye | Undisputed and immaterial. The cited document, Saba Decl., Ex. 128, is from |

264

| No. | Undisputed Fact/Evidence | Defendants' Response |
|---|---|---|
| | training materials, pitch scripts, recent Skye studies, Skye coding guidelines, and literature to use when pitching Skye to his customers.<br><br>Saba Decl. ¶ 134, Ex. 128. | September 1, 2016 while Banman and Stumpe were both working for Skye. |

265

## II.    Conclusions of Law

### A.    CTM Defendants

1.    Plaintiffs have failed to allege and establish that the Defendants committed a predicate act of racketeering activity under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962) ("RICO"). On that basis alone, summary judgment in Defendants' favor is warranted on Counts 1-2.

2.    Plaintiffs have failed to allege and establish that the Defendants engaged in a pattern of racketeering activity under RICO. On that basis alone, summary judgment in Defendants' favor is warranted on Counts 1-2.

3.    Plaintiffs have failed to allege and establish that the Defendants engaged in a conspiracy to violate RICO. On that basis alone, summary judgment in Defendants' favor is warranted on Counts 1-2.

4.    Plaintiffs have failed to identify the trade secrets allegedly misappropriated by the CTM Defendants. Summary judgment in the CTM Defendants' favor on Plaintiffs' Defend Trade Secrets Act ("DTSA") (Count 3) claim is warranted on this basis alone.

5.    The evidence proves that the CTM Defendants did not "misappropriate" (use or disclose) Plaintiffs' trade secrets, and Plaintiffs failed to establish a genuine dispute of material fact on this issue. Summary judgment in the CTM Defendants' favor on Plaintiffs' DTSA claim (Count 3) is warranted on this basis alone.

6.    The term "connective tissue matrix" is not subject to trade secret protection as a matter of law.

7.    The identities of Plaintiffs' employees, independent sales representatives, and research physicians are not subject to trade secret protection as a matter of law.

8.    Plaintiffs' pricing is not subject to trade secret protection as a matter of law.

9.    The evidence proves that Banman did not breach the HRT Consulting Agreement, and Plaintiffs failed to establish a genuine dispute of material fact on this issue. Summary judgment in Banman's favor on Count 4 is warranted.

10.     The evidence proves that Banman did not breach the Skye Employment Agreement, and Plaintiffs failed to establish a genuine dispute of material fact on this issue. Summary judgment in Banman's favor on Count 5 is warranted.

11.     The evidence proves that Banman did not breach the Skye Confidentiality Agreement, and Plaintiffs failed to establish a genuine dispute of material fact on this issue. Summary judgment in Banman's favor on Count 5 is warranted.

12.     The evidence proves that Banman, CTM, and CTM Med did not copy or wrongfully obtain Plaintiffs' confidential information or trade secrets, and Plaintiffs failed to establish a genuine dispute of material fact on this issue. Summary judgment is warranted on Count 6.

13.     The evidence proves that Plaintiffs have not been deprived of the use of their property, and Plaintiffs failed to establish a genuine dispute of material fact on this issue.  Summary judgment is warranted on Count 6.

14.     The evidence proves that the CTM Defendants did not engage in intentional acts that induced a breach or disruption of Plaintiffs' contractual relationships with customers, and Plaintiffs failed to establish a genuine dispute of material fact on this issue. To the extent that Plaintiffs allege contractual interference with their customers (Count 8), summary judgment is warranted on Count 8.

15.     The evidence proves that the CTM Defendants did not engage in intentional acts that induced a breach or disruption of Plaintiffs' contractual relationships with research physicians, and Plaintiffs failed to establish a genuine dispute of material fact on this issue. To the extent that Plaintiffs allege contractual interference with research physicians (Count 8), summary judgment is warranted on Count 8.

16.     The evidence proves that the CTM Defendants did not engage in intentional acts that induced a breach or disruption of Plaintiffs' contractual relationships with independent sales representatives Alex Wrinkles, Chad Galloway, Daniel Mirenda, Jake Bergey, James Boone, Kyle Clark, Lisa Robinson, Matt Dripps, Scott Tanabe, William Trengove, Wally Karam, B.J. Benik, Jeremy Smith, Mike Stumpe, Dean Conway, Maria Carey; Andrew Hubbard, Bill Morgan, Tommy

Miller, Robert Bibb, Katey Deariso, Garrett Amadon, Dave McGrew, Matt Locus, Stephen Wood, and Jason Belohlavek.  Plaintiffs failed to establish a genuine dispute of material fact on this issue. To the extent that Plaintiffs allege contractual interference with these independent sales representatives (Count 8), summary judgment is warranted on Count 8.

17.     The evidence proves that the CTM Defendants did not interfere in any contractual relationships between Plaintiffs and Maria Carey/Integrative Medical Solutions, Dr. Anderson/Gerald Champion Regional Medical Center, Rogers/VMD, and Seoane. To the extent that Plaintiffs allege contractual interference with these individuals or entities (Count 8), summary judgment is warranted on Count 8.

18.     The evidence proves that the CTM Defendants did not engage in intentional, independently wrongful acts to support a tortious interference with prospective economic advantage claim. Plaintiffs failed to establish a genuine dispute of material fact on this issue. Summary judgment is warranted on Plaintiffs' claim for tortious interference with prospective economic advantage (Count 9).

**B.     STUMPE**

Defendant Mike Stumpe joins in the CTM Defendants' Conclusions of Law.

**C.     PLAINTIFFS**

1.     Defendants Banman, Stumpe, Boulais, and Seoane committed predicate acts of racketeering activity under RICO.  At a minimum, genuine issues of material fact exist concerning this issue.  On that basis, summary judgment should be denied as to Counts 1-2.

2.     Defendants Banman, Stumpe, Boulais, and Seoane engaged in a pattern of racketeering activity under RICO.  At a minimum, genuine issues of material fact exist concerning this issue.  On that basis, summary judgement should be denied as to Counts 1-2.

3.     Defendants Banman, Stumpe, Boulais, and Seoane engaged in a conspiracy to violate RICO.  At a minimum, genuine issues of material fact exist concerning this issue.  On that basis, summary judgement should be denied as to Counts 1-2.

268

CASE NO: 2:20-cv-03444-MEMF-PVC

4.	Plaintiffs have identified trade secrets that were misappropriated by CTM, CTM Med, Banman, Stumpe and Seoane. At a minimum, genuine issues of material fact exist concerning this issue. Summary judgment should be denied as to Count 3 (violations of the Defend Trade Secrets Act ("DTSA")).

5.	CTM, CTM Med, Banman, Stumpe and Seoane misappropriated (wrongfully acquired, used, and/or disclosed) Plaintiffs' trade secrets. At a minimum, genuine issues of material fact exist concerning this issue. Summary judgment should be denied as to Count 3.

6.	Plaintiffs have shown through admissible evidence that genuine issues of material fact exist as to whether or not the use of "connective tissue matrix" in coding guidelines and marketing strategies by Skye is a trade secret.

7.	Plaintiffs have shown through admissible evidence that genuine issues of material fact exist as to whether or not the identities and information relating to Plaintiffs' employees, independent sales representatives, and research physicians including information about specific training, agreement terms, specific pricing, customer preferences, contacts, physician research, and commission structures are subject to trade secret protection.

8.	Plaintiffs have shown through admissible evidence that genuine issues of material fact exist as to whether or not Plaintiffs' pricing models, guidelines, and customer specific unique pricing is a trade secret.

9.	Plaintiffs have shown through admissible evidence that genuine issues of material fact exist as to whether or not Banman breached the HRT Consulting Agreement.  Summary judgment should be denied as to Count 4.

10.	Plaintiffs have shown through admissible evidence that genuine issues of material fact exist as to whether or not Banman breached the Skye Employment Agreement. Summary judgment should be denied as to Count 5.

11.	Plaintiffs have shown through admissible evidence that genuine issues of material fact exist as to whether or not Banman breached the Skye Confidentiality Agreement. Summary judgment should be denied as to Count 5.

12. Plaintiffs are voluntarily dismissing Count 6 for Conversion against Banman, CTM, and CTM Med.

13. CTM, CTM Med, Banman, Stumpe and Seoane engaged in intentional acts that induced a breach or disruption of Plaintiffs' contractual relationships with customers. At a minimum, genuine issues of material fact exist concerning this issue. Summary judgment should be denied as to Count 8.

14. CTM, CTM Med, Banman, Stumpe and Seoane engaged in intentional acts that induced a breach or disruption of Plaintiffs' contractual relationships with research physicians. At a minimum, genuine issues of material fact exist concerning this issue. Summary judgment should be denied as to Count 8.

15. CTM, CTM Med, Banman, Stumpe and Seoane engaged in intentional acts that induced a breach or disruption of Plaintiffs' contractual relationships with sales representatives. At a minimum, genuine issues of material fact exist concerning this issue. Summary judgment should be denied as to Count 8.

16. CTM, CTM Med, Banman, Stumpe and Seoane engaged in wrongful acts, independent of the interference itself, to support a tortious interference with prospective economic advantage claim. At a minimum, genuine issues of material fact exist concerning this issue. Summary judgment should be denied as to Count 9.

270

DATED:  December 19, 2022          **HODGSON RUSS LLP**


By:     *s/ Robert J. Fluskey, Jr.*
        Robert J. Fluskey, Jr., Esq.
        Ryan K. Cummings, Esq.
        Matthew K. Parker, Esq.
        Attorneys for Defendants
        CTM Biomedical, LLC,
        Bryan Banman, CTM Medical, Inc.,
        and Pablo Seoane


DATED:  December 19, 2022          **BLANK ROME LLP**


By:     *s/ Arash Beral*
        Arash Beral, Esq.
        Saam Takaloo, Esq.
        Attorneys for Defendant
        Mike Stumpe


DATED:  December 19, 2022          **BIENERT KATZMAN LITTRELL
                                   WILLIAMS, LLP**


By:     *s/ Michael R. Williams*
        Michael R. Williams, Esq.
        Carlos A. Nevarez, Esq.
        Attorneys for Defendant
        Nathan Boulais


DATED:  December 19, 2022          ROSEN ✧ SABA, LLP


By:     */s Ryan D. Saba*
        Ryan D. Saba, Esq.
        Laura Kelly St. Martin, Esq.
        Attorneys for Plaintiffs

271