Paul T. Martin (SBN 155367)
  *pmartin@hgla.com*
Thomas H. Case (SBN 116660)
  *tcase@hgla.com*
HENNELLY & GROSSFELD LLP
4640 Admiralty Way, Suite 850
Marina del Rey, CA 90292
Telephone: (310) 305-2100
Facsimile: (210) 305-2116

Robert J. Fluskey, Jr. *(pro hac vice)*
  *rfluskey@hodgsonruss.com*
Ryan K. Cummings *(pro hac vice)*
  *rcumming@hodgsonruss.com*
Matthew K. Parker *(pro hac vice)*
  *mparker@hodgsonruss.com*
HODGSON RUSS LLP
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
Telephone: (716) 856-4000
Facsimile: (716) 849-0349

Attorneys for Defendants
CTM Biomedical, LLC, Bryan Banman,
CTM Medical, Inc., and Pablo Seoane

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company, <br><br> Plaintiffs, <br><br> vs. <br><br> CTM BIOMEDICAL, LLC, a Delaware Limited Corporation; BRYAN BANMAN, an individual; CTM MEDICAL INC., a Delaware Corporation; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; NATHAN BOULAIS, an individual; and DOES 3 through 10, inclusive, <br><br> Defendants. | Civil Case No. 2:20-cv-03444-MEMF (PVCx) <br><br><br> **DECLARATION OF ROBERT FLUSKEY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Date: January 5, 2023 or February 9, 2023 <br><br> Time: 10:00 a.m. <br><br> Courtroom: 8B |

1

Robert Fluskey, under penalty of perjury and pursuant to 28 U.S.C. Section 1746, declares the following to be true and correct:

1.      I am an attorney with Hodgson Russ LLP, counsel to defendants CTM Biomedical, LLC ("CTM"), Bryan Banman ("Banman"), CTM Medical, Inc. ("CTM Med"), and Pablo Seoane ("Seoane") (collectively, the "CTM Defendants").

2.      I submit this declaration in support of the CTM Defendants' motion for partial summary judgment seeking dismissal of Plaintiffs' First through Sixth, Eighth, and Ninth causes of action.

## I.      Procedural History

### A.      Pleadings and Motions to Dismiss

3.      Plaintiffs Skye Orthobiologics, LLC ("Skye") and Human Regenerative Technologies, LLC ("HRT") (together, "Plaintiffs") commenced this action against CTM, Banman, Gardner Rogers ("Rogers"), and Mike Stumpe ("Stumpe") on April 14, 2020. Dkt. 1.

4.      Plaintiffs filed their First Amended Complaint on June 22, 2022. Dkt. 30. The First Amended Complaint asserted causes of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Defend Trade Secrets Act ("DTSA"), breach of contract, conversion, accounting/unjust enrichment, tortious interference with contract, and tortious interference with prospective economic advantage. *Id.* The First Amended Complaint also added Seoane and Veterans Medical Distributors, Inc. ("VMD") as defendants. *Id.*

5.      On July 13, 2020, CTM, Banman, and Seoane moved to dismiss Counts 1-5 and 8 of the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 41.

6.      On February 9, 2021, the Court issued an Order granting CTM's, Banman's, and Seoane's motion to dismiss the First Amended Complaint

in part. Dkt. 60. The Court dismissed, with leave to amend, Plaintiffs' DTSA claim "based on generally-alleged employee information, Seoane's 'Notes,' and Skye's log-in information to access the Broward Health Hospital Vendor Registration System." *Id.* at 15. The Court dismissed, with leave to amend, Plaintiffs' RICO claims for failure to identify a RICO enterprise. *Id.* at 15-16. The Court also dismissed Plaintiffs' cause of action for an accounting/unjust enrichment, without prejudice. *Id.* at 17-18.

7. Plaintiffs' filed their Second Amended Complaint on February 26, 2021. Dkt. 62. In their Second Amended Complaint, Plaintiffs abandoned their cause of action for an accounting/unjust enrichment and added claims against Banman for breach of fiduciary duty and breach of duty of loyalty. *Id.*

8. On March 19, 2021, CTM, Banman, and Seoane moved to dismiss Counts 1 and 2 (RICO claims) and Banman moved to dismiss Counts 10 and 11 (breach of fiduciary duty and duty of loyalty claims) of the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. 68.

9. On August 30, 2021, the Court issued an Order granting, in part, Banman's motion and dismissing Plaintiffs breach of fiduciary duty claim, with leave to amend. Dkt. 104.

10. Plaintiffs filed their Third Amended Complaint on September 15, 2021. Dkt. 109.

11. Plaintiffs filed their **Fourth Amended Complaint (the operative pleading)** on February 3, 2022. Dkt. 130. Plaintiffs' Fourth Amended Complaint added CTM Med and Nathan Boulais ("Boulais") as defendants. *Id.*

12. The CTM Defendants filed Answers to Plaintiffs' Fourth Amended Complaint on March 10, 2022.  Dkt. 143-146.

3

**B.    Trade Secret Discovery**

13.    Counsel for the parties participated in a Rule 26(f) conference on April 2, 2021, and discovery commenced thereafter.

14.    On April 2, 2021, Banman and Seoane propounded their First Sets of Interrogatories to Skye and HRT. Banman's and Seoane's Interrogatory 1 to Skye and HRT asked each company to identify and describe in detail each trade secret that Banman and Seoane allegedly misappropriated.

15.    The parties submitted a joint Rule 26(f) report and proposed scheduling order on April 9, 2021. Dkt. 81.

16.    In their portion of the Rule 26(f) report, the CTM Defendants argued that Plaintiffs should be required to identify under oath and with particularity each trade secret allegedly misappropriated by the CTM Defendants before receiving any confidential business information from the CTM Defendants. Dkt. 81 at 9-11.

17.    On May 13, 2021, Skye and HRT served their responses to Banman's and Seoane's First Sets of Interrogatories. Plaintiffs refused to answer Banman's and Seoane's First Sets of Interrogatories that sought the identity of trade secrets, citing the absence of a protective order.

18.    On July 27, 2021, the CTM Defendants filed a motion seeking to compel Plaintiffs to answer Banman's and Seoane's First Sets of Interrogatories and to identify their trade secrets with reasonable particularity before the CTM Defendants were required to disclose their own trade secrets and confidential information to Plaintiffs in discovery. Dkt. 93 at 8-10.

19.    On August 27, 2021, Magistrate Judge Castillo issued an Order denying the CTM Defendants' motion to compel Plaintiffs to answer Banman's and Seoane's First Sets of Interrogatories and to identify their trade secrets with reasonable particularity before the CTM Defendants were required to disclose their

CASE NO: 2:20-cv-03444-MEMF-PVC

own trade secrets and confidential information to Plaintiffs in discovery. Dkt 102 at 13-20.

20.    On October 8, 2021—more than six months after Banman and Seoane served interrogatories asking Plaintiffs to identify their trade secrets—Skye and HRT served Amended Responses to Banman's and Seoane's First Sets of Interrogatories. Skye's Amended Responses to Banman's First Set of Interrogatories is attached as **Exhibit 1**. HRT's Amended Responses to Banman's First Set of Interrogatories is attached as **Exhibit 2**. Skye's Amended Responses to Seoane's First Set of Interrogatories is attached as **Exhibit 3**. HRT's Amended Responses to Seoane's First Set of Interrogatories is attached as **Exhibit 4**.

21.    Plaintiffs' Amended Responses to Interrogatory 1 from Banman's and Seoane's First Sets of Interrogatories vaguely referenced broad categories of information that encompass Plaintiffs' entire business. The responses do not identify the specific trade secrets allegedly misappropriated by the defendants. *See* Exs. 1-4.

22.    Without identifying the trade secrets at issue, Plaintiffs embarked on extraordinarily broad and far-reaching discovery. Plaintiffs issued over 150 non-party document subpoenas—pursuing any customer, medical facility, doctor, and independent sales representative who could conceivably have a business relationship with CTM, regardless of whether they also had a business relationship with Plaintiffs. Plaintiffs conducted ten fact depositions, including the non-party deposition of the third-party that manufactures CTM's tissue products. The CTM Defendants produced 133,953 pages of documents encompassing essentially every aspect of CTM's business.

23.    Despite this broad discovery, Plaintiffs never supplemented or amended their responses to Interrogatory 1 from Banman's and Seoane's First Sets of Interrogatories, which asked Plaintiffs to identify and describe in detail the

CASE NO: 2:20-cv-03444-MEMF-PVC

allegedly misappropriated trade secrets.

24.    On September 12, 2022, CTM Med propounded its First Set of Interrogatories to HRT. CTM Med's interrogatories asked HRT to identify each step of its manufacturing process that it contends is a trade secret, and to identify each step of the manufacturing process that HRT contends CTM, CTM Med, or Banman misappropriated.

25.    HRT served its Responses to CTM Med's First Set of Interrogatories on October 10, 2022, a copy of which is attached as **Exhibit 5**. HRT claimed that its entire manufacturing process is a trade secret and that Banman misappropriated it. At the same time, HRT admitted that certain steps in its manufacturing process are not secret. *See* Ex. 5 at 4-5.

26.    On September 12, 2022, CTM Med propounded its Second Set of Interrogatories to Skye. CTM Med asked Skye to identify by Bates number each price list and customer list that Banman, CTM, or CTM Med misappropriated.

27.    Skye served its responses to CTM Med's Second Set of Interrogatories on October 14, 2022, a copy of which is attached as **Exhibit 6**. Skye did not identify any customer list and price list that it alleges Banman, CTM, or CTM Med misappropriated. *See* Ex. 6 at 4.

## II.    <u>Additional Exhibits</u>

28.    Attached as **Exhibit 7** is Skye's Second Amended Responses to Banman's Second Set of Interrogatories, dated June 28, 2022.

29.    Attached as **Exhibit 8** is Skye's Fourth Amended Responses to Banman's Second Set of Interrogatories, dated August 18, 2022, which was marked at depositions as exhibit 454.

30.    Attached as **Exhibit 9** is Skye's Fourth Amended Responses to Seoane's Second Set of Interrogatories, dated August 18, 2022, which was marked at depositions as exhibit 455.

CASE NO: 2:20-cv-03444-MEMF-PVC

31.    Attached as **Exhibit 10** is HRT's Amended Responses to CTM's Second Set of Interrogatories, dated November 5, 2021.

32.    Attached as **Exhibit 11** is HRT's Amended Responses to Seoane's Second Set of Interrogatories, dated November 5, 2021.

33.    Attached as **Exhibit 12** is Skye's Amended Responses to CTM's First Set of Requests for Admission, dated September 26, 2022.

34.    Attached as **Exhibit 13** is a letter from Plaintiffs' counsel dated April 29, 2022.

35.    Attached as **Exhibit 14** are the relevant pages of the deposition transcripts of Christopher Sharp, dated March 29, March 30, and September 7, 2022.

36.    Attached as **Exhibit 15** are the relevant pages of the deposition transcript of Matt Chormann, dated September 8, 2022.

37.    Attached as **Exhibit 16** are the relevant pages of the deposition transcript of Kim Shoen, dated September 21, 2022.

38.    Attached as **Exhibit 17** are the relevant pages of the deposition transcript of Cristina Chin-Sang, dated September 22, 2022.

39.    Attached as **Exhibit 18** are the relevant pages of the deposition transcript of Arnold Lee Andrews, dated March 17, 2022.

40.    Attached as **Exhibit 19** are the relevant pages of the deposition transcript of Gardner Rogers, dated April 15, 2022.

41.    Attached as **Exhibit 20** are the relevant pages of the deposition transcript of Maria Carey, dated April 7, 2022.

42.    Attached as **Exhibit 21** are the relevant pages of the deposition transcript of Kelly Hiatt, dated May 26, 2022.

43.    Attached as **Exhibit 22** are the relevant pages of the deposition transcript of Dr. John Anderson, dated April 11, 2022.

CASE NO: 2:20-cv-03444-MEMF-PVC

44.    Attached as **Exhibit 23** are Skye's Research Agreements with Dr. Brian Badman (marked as deposition exhibit 76), Dr. Kelly Hiatt (marked as deposition exhibit 74), and Dr. Mark Ciaglia.

45.    Attached as **Exhibit 24** are copies of Skye's Research Agreements with Dr. Brian Badman and Dr. Kelly Hiatt that Skye filed on a public docket in the United States District Court for the Southern District of Indiana, Case No. 1:21-mc-00042-SEB-MJD (Dkt. 20-6 & 20-12).

46.    Attached as **Exhibit 25** are copies of Skye's Independent Sales Representative Agreements with Novus Ortho Corp., signed by Mike Stumpe, and Medical-Assist LLC, signed by Nate Boulais, that Skye filed on a public docket in the United States District Court for the Southern District of Indiana, Case No. 1:21-mc-00036-SEB-MJD (Dkt. 15-10 & 15-11), which was marked as deposition exhibit 93.

47.    Attached as **Exhibit 26** is Skye's Independent Sales Representative Agreement with JJBM Medical, LLC, signed by B.J. Benik on July 10, 2017, with an effective date of June 29, 2017, which was marked at deposition as exhibit 58.

48.    Attached as **Exhibit 27** is Skye's Independent Sales Representative Agreement with Health Connect Life Sciences, LLC, signed by Jeremy Smith on March 22, 2017, with an effective date of March 20, 2017, which was marked as deposition exhibit 72.

49.    Attached as **Exhibit 28** is Skye's Independent Sales Representative Agreement with Novus Ortho Corp., signed by Mike Stumpe on February 9, 2015, with an effective date of January 26, 2015, which was marked as deposition exhibit 73.

50.    Attached as **Exhibit 29** is Skye's Independent Sales Representative Agreement with Conway Medical Company LLC, signed by Dean

8

Conway on January 28, 2018, with an effective date of January 17, 2018, which was marked as deposition exhibit 63.

51.     Attached as **Exhibit 30** are HRT's Standard Operating Procedures ("SOPs") that were produced in this action, which includes marked deposition exhibits 41-52 and 487-488.

52.     Attached as **Exhibit 31** is the CTM Defendants' Amended Rule 30(b)(6) Notice of Deposition Skye, which was marked as deposition exhibit 44.

53.     Attached as **Exhibit 32** is the CTM Defendants' Amended Rule 30(b)(6) Notice of Deposition to HRT, which was marked as deposition exhibit 43.

54.     Attached as **Exhibit 33** is an email from Maria Carey to Bryan Banman, dated September 18, 2018, which was marked as deposition exhibit 248.

55.     Attached as **Exhibit 34** is the transcript of the post-trial rulings by the Hon. Paul V. Fioravanti, Vice Chancellor of the Court of Chancery of the State of Delaware, in an action captioned *Bryan Banman v. Human Regenerative Technologies, LLC*, C.A. No. 2020-0490-PAF.

56.     Attached as **Exhibit 35** is a copy of CTM's Independent Contractor Agreement – Sales Representative with Silenda Medical, LLC, signed by Mike Stumpe on August 10, 2018 with an effective date of July 25, 2018, which was marked as deposition exhibit 302.

57.     Attached as **Exhibit 36** are the relevant pages of the deposition transcript of Brett Schlifka, dated August 10, 2022.

58.     Attached as **Exhibit 37** are HRT's Employee Confidentiality Agreement and Skye/HRT's Employee Confidentiality Agreement signed by Pablo Seoane, which were marked as deposition exhibits 494 and 495.

CASE NO: 2:20-cv-03444-MEMF-PVC

Dated:  November 3, 2022

s/*Robert J. Fluskey, Jr.*
Robert J. Fluskey, Jr.

10

16346529v4

# Exhibit 1

ROSEN ✧ SABA, LLP
RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY St. MARTIN (State Bar No. 260966)
lstmartin@rosensaba.com
JOHN J. AUMER (State Bar No. 130585)
jaumer@rosensaba.com
JUSTIN L. WILSON (State Bar No. 263076)
jwilson@rosensaba.com
9350 Wilshire Boulevard, Suite 250
Beverly Hills, California 90212
Telephone:   (310) 285-1727
Facsimile:   (310) 285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company,<br><br>*Plaintiffs,*<br><br>v.<br><br>CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; and DOES 1 through 10, inclusive,<br><br>*Defendants.* | Case No.: 2:20-cv-03444-DMG-PVC<br>*Honorable Dolly M. Gee*<br><br>**PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S AMENDED RESPONSES TO BRYAN BANMAN'S FIRST SET OF INTERROGATORIES**<br><br>Complaint Filed:   April 23, 2020<br>Trial Date:   None Set<br><br>**HIGHLY CONFIDENTIAL** |

EXHIBIT 53  PENGAD 800-631-6989

1

PROPOUNDING PARTY:        Defendant, Brian Banman

RESPONDING PARTY:        Plaintiff, Skye Orthobiologics, LLC

SET NUMBER:        One

**TO DEFENDANT BRYAN BANMAN AND HIS ATTORNEYS OF RECORD:**

Plaintiff Skye Orthobiologics, LLC ("Plaintiff"), hereby provides its amended responses to the Interrogatories, Set No. One, propounded by Defendant Brian Banman ("Defendant") as follows:

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose of this action. Each answer is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and any and all other objections and grounds which would require the exclusion of any statement herein if the Interrogatories were asked of, or any statements contained herein were made by, a witness present and testifying in Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Plaintiff and its counsel have not yet completed their discovery or preparation for trial, nor have they completed their analysis, review or investigation of all evidence, applicable defenses, information, witness accounts or other trial preparation matters and subjects obtained or discovered to date. The within responses are, therefore, complete as to all presently known facts and information acquired or possessed by Plaintiff up to this time. These responses should, therefore, not be construed as prejudicing or waiving Plaintiff's right to provide additional facts, evidence, contentions or theories at trial or any subsequent hearing based upon information, evidence or analysis hereafter obtained or evaluated. Nothing in these responses should be construed as waiving any privileges or objections which may be applicable to information or evidence hereafter obtained.

Plaintiff further reserves the right to update and/or supplement these responses if and when information which is responsive to these interrogatories is discovered.

2

SKYE'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that Plaintiff has answered any Interrogatory should not be taken as an admission that Plaintiff accepts or admits the existence of any facts set forth or assumed by such Interrogatory, or that such response constitutes admissible evidence. The fact that Plaintiff has answered part or all of any interrogatory is not intended and shall not be construed to be a waiver by Plaintiff of all or any part of any objection to any Interrogatory.

## GENERAL OBJECTIONS

1.    Plaintiff objects to the Interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, attorney work product doctrine or any other applicable privilege or protection under statutory or common law.

2.    Plaintiff objects to the Interrogatories to the extent that they call for the disclosure of information protected by any of the parties' or third parties' constitutional right to privacy under the United States or California Constitutions, or protected as proprietary, commercially sensitive, trade secret or falling under the rubric of any other such confidentiality protection or privilege.

3.    Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4.    Plaintiff objects to the Interrogatories to the extent that they are unlimited as to time or scope, and as a result, are overly broad and unduly burdensome.

5.    Highly Confidential: Pursuant to the Court Order (DKT 108), this entire document is designated as "Highly Confidential".

///

3



## INTERROGATORIES

### INTERROGATORY NO. 1:

Identify and describe in detail each trade secret of Skye that Banman allegedly misappropriated.

### RESPONSE TO INTERROGATORY NO. 1:

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a description of the trade secret or something else. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

### AMENDED RESPONSE TO INTERROGATORY NO. 1:

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a description of the trade secret or something else.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows:   Discovery has only just commenced and the full scope of the trade secrets that Banman has misappropriated are not yet fully known to Plaintiff.  Plaintiff reserves the right

4

to supplement these responses as new information is obtained.

Plaintiff's trade secrets at issue in this case include, but are not limited to, the following:

### A.    Cost and Pricing

Plaintiff's costs and pricing information, which includes the detailed analysis relating to the individual cost of production per item (research and development, materials, labor, overhead, specific prices Plaintiff has negotiated with its vendors, etc.), together with profit margin and market analysis, has been intentionally kept secret from third parties and provides Plaintiff with a substantial business advantage. Skye has spent considerable time and resources developing a pricing scheme to maximize the profit while remaining competitive in the market.

In addition, as discussed below regarding Plaintiff's marketing strategies, potential reimbursement for Plaintiff's products is also considered in Plaintiff's pricing analysis. Plaintiff has spent significant time and expense to extensively research medical reimbursement and understand the application of certain medical codes to its unique tissue implants for insurance reimbursement. Skye and HRT developed the industry's first surgical implant that is a "connective tissue" on indication as a tissue product (derived from amniotic or any placental tissue), and the only one in the industry that could be reimbursed at cost plus profit. This is a substantial advantage as medical facilities typically lose money when using the competition's products.

Plaintiff's pricing scheme was developed to target the needs of a diverse group of clinics, surgery centers, hospitals and physicians around the country to give competitively attractive pricing in line with each customer's different pricing goals, with pricing being individually tailored to each customer. Plaintiff's pricing information is not publicly known and provides Plaintiff with a substantial business advantage. The pricing of similar products in the industry is not published to competitors, so any competitor having Plaintiff's pricing information would have the advantage of foregoing all of Plaintiff's time and effort in analyzing the various factors at play to develop a pricing scheme that was competitive,

5

would be accepted by facilities and physicians, and was still profitable.

### B.    Customer Lists and Potential Customers

Plaintiff's confidential customer lists and information, and potential customer lists and information, including key contacts and specific preferences for customers and potential customers throughout the country are not publicly known   and provide Plaintiff with a substantial business advantage.

Human Placental and Amniotic based biologic products are a new class of product and are not ubiquitous to hospitals, surgery centers and medical offices.  Finding doctors and facilities who are willing to use the product, let alone repeatedly, requires specialized marketing and recruitment efforts.  Plaintiff has spent significant time and money seeking out potential purchasers, fostering those relationships, educating those individuals, and assessing individual needs.  Once Plaintiff has identified a potential customer, Plaintiff then takes the time and resources to educate that customer on the patient benefits, specific applications, positioning of its products and insurance reimbursement for Plaintiff's products.  Plaintiff has invested substantial time, research, money and resources identifying and maintaining key customer relationships, designing customer initiatives and compiling information about the unique needs and preferences of its customers including historical purchasing information in order to develop a list of customers throughout the country who were willing to purchase, and/or who did in fact purchase, Plaintiff's tissue biologic products.  Plaintiff's customer information also includes customer satisfaction and interest in specific products; customer specific needs and preferences; customer order history; historical customer specific pricing, discount and payment term information; sales lead and call/meeting information and records; customer networks and associated facilities; and customer name, address, telephone number, specific points of contact and private email addresses.  Plaintiff's customer information also includes customer feedback and patient data relating to the performance of Plaintiff's products.

Plaintiff's collection of customer information contains information that Plaintiff has

gathered over the entire history of its operations, which span not only many years but thousands of hours of research, travel and individual customer interaction. The information on the lists would allow a competitor to direct its sales efforts to those customers that have already been educated about or are already purchasing Plaintiff's products and/or potential customers who had shown an interest in using Plaintiff's products.

In addition, Plaintiff's existing customer relationships include approvals by customers to access credential-protected customer internet portals. To obtain confidential log-in access, Plaintiff spends time and resources to go through an approval process which takes time, energy, and capital. Defendant Banman unlawfully used Plaintiff's trade secret log-in and password credentials and used those credentials to access Plaintiff's account with Broward Health, in order to obtain (1) Broward Health Disclosure Form for Physician Ownership & Financial Arrangements; and (2) North Broward Hospital District Conflict of Interest Questionnaire form for vendors/ contractors/ subcontractor/ agent. Plaintiff gains an advantage in the market in having access to these customers' internet portals. A competitor could short-cut the approval process and benefit from Plaintiff's spent time and expense.

Plaintiff's compiled information regarding its customer lists and prospective customers has given Plaintiff a competitive advantage in the industry because it is not publicly known . Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

## C.    **Product Development and Manufacturing**

The compilation of information about Plaintiff's product development and manufacturing is not publicly known  and provides Plaintiff with a substantial business advantage.

Plaintiff's product information includes surgical implant reimbursement; research

7

and understanding of (then pending) new FDA regulations that affect placental / amniotic derived biologic products; the sources of raw materials and the different properties of the various regions of the placenta, including the surrounding tissues and fluids; research and development to create standard operating procedures for manufacturing which include: separating, cleaning and disinfecting tissue; storing hydrated alone and/or at ambient temperature in a flowable form, researching and utilizing drying methods that maintain higher moisture levels during the drying process for certain products that those otherwise used in the industry which yields less damage to the tissue; preserving natural biologic content and processing the tissue into unique individual and combination product forms, including tissue ratio calculations and various combinations of raw placental tissue, sterilizing, packaging and preserving; the machinery used and the know-how used to create different forms of products (*ex*. membrane vs. ambient flowable) including product sizing and specifications. As an example, through Plaintiff's extensive investment of time and resources, Plaintiff and HRT developed the first ambient temperature, shelf stable, flowable connective tissue that remained the only ambient temperature flowable connective tissue prior to Defendant Banman's departure. Plaintiff's collected product information including research and development and manufacturing protocols for products is not publicly known and provides Plaintiff with a significant business advantage.

Plaintiff and HRT developed a line of novel products that take raw human placental tissue and run it through an HRT proprietary process that cleans, disinfects, preserves, and hydrates the final tissue implant to be either stored at a frozen temperature or at an ambient temperature. This preservation and storage of a connective tissue at ambient temperature was an industry first developed by HRT. This process enabled placental tissue implants to be effectively placed it in the body of a patient for surgical, non-surgical, wound, incision and trauma repair. Plaintiff's products preserve and provide a complete connective tissue biologic matrix, with the necessary scaffolding, growth factors and BioActive molecules to augment the patient's biology at the surgical/trauma/implant site, assisting in proper remodeling and repair of damaged tissue, avoiding excess inflammation and reducing

8

complications, leading to proper tissue formation and minimizing scar tissue.

Plaintiff and HRT dedicated numerous hours and resources to the development, creation and preservation of its manufacturing process including which tissue types to process as well as how to dissect, remove, extract, dry, size, preserve, and package tissues. Plaintiff alleges that Defendant Banman, and/or the other named Defendants, stole, disseminated and then used these proprietary processing methods to instruct a third-party manufacturer on how to produce Plaintiff's connective tissue matrix products.

Plaintiff's unique processes applied to native placental connective tissue result in products that: maintain the integrity of the native placental/amniotic tissue; ensure the stability of those tissues which allows them to exist with minimal damage to the natural tissues in different application forms; allow for easier to use products; and have an increased shelf life and unique product stabilization and delivery methods. Plaintiff's and HRT's data compilations include detailed information on the material form and function of the placental/amniotic tissue cells and how those cell molecules react to different methods of processing.

Plaintiff and HRT developed a best-in-class membrane lineup consisting of three thicknesses, "Thin", "Thick", and "X-Thick", and a range of connective tissue matrix products. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Plaintiff's one-of-a-kind ambient temperature stable product has significant competitive advantages over competitors' products that are either freeze dried, requiring reconstitution prior to use, or frozen, requiring thawing prior to use. Plaintiff's products have a reduced handling time, reduced shipping costs, flexible storage, increased shelf life, as well as shorter operating room time due to the lack of thaw-down-time or reconstituting required. In addition,

9

SKYE'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

Plaintiff and HRT developed an omnidirectional membrane implant product meaning that it does not have a specific "right-side-up" or specific direction when implanting. This provides a significant advantage for use in procedures.

Through significant research and development, Plaintiff and HRT have developed product lines and unique processing methods which Plaintiff and HRT have had trademarked including: HydraTek® and the BioAware® Membrane Preservation System, referring to the series of scientific methods providing a distinct advantage in handling, safety, quality and performance of its implants. HydraTek® BioAware® Technology is designed to protect the biomechanical structure of its membrane tissues. FastActing® membrane products provide an immediate covering at the site, then resorb quickly to incorporate into the patient's tissues sooner than other products on the market. BioECM® ActiveMatrix® line is an advanced line up of biologics that provides a complete connective tissue matrix -- Complete Connective Tissue Matrix®, harvested from the human placenta and processed with HydraTek® technology to preserve its natural fluid state – the Original Fluid Connective Tissue Matrix® and Original Ambient Flowable Tissue Matrix®.

These products were not being offered by competitors, but Defendant CTM is currently offering membrane and other products referred to as "Thin", "Thick", and "Flow" which uses Plaintiff's marketing language.

Plaintiff and HRT's product development also involved physician studies and feedback by physicians, specifically chosen by Plaintiff because of their skill and expertise in their fields, in order to better meet physicians' needs. Plaintiff has also spent significant time and money in researching its sources of supply of materials and pricing so as to obtain the best materials at a price to advance sales and profitability.

Plaintiff and HRT also discovered how to make and apply a "paste" product and researched the marketability of such a product while Banman was still at Skye/HRT. CTM is now marketing a "Paste" product.

Plaintiff's trade secret unique manufacturing and processing protocols are outlined in HRT's Standard Operating Procedures documents which include: Separation of

10

Placental Tissue; Dying of Tissue; Cleaning of Placental Connective Tissue; Processing of Frozen Placental Tissue – Surgical HRT – Private Label; Processing of Frozen Placental Tissue – Non-Surgical– Umbilical Cord Only – Skye; and Placental Tissue Processing.

The compilation of Plaintiff's unique product formulas, sources of supply, research and development, and manufacturing processes has given Plaintiff a competitive advantage in the industry because it is not publicly known  . Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

### D.    <u>Research Physicians and Patient Registry</u>

Information on Plaintiff's physicians used for research and data collection is not publicly known  and provides Plaintiff with a substantial business advantage.  Plaintiff has spent significant time and resources researching, hand-selecting and developing business relationships with specific physicians who Plaintiff has vetted and chosen because of their skill and experience in the field.  These physicians agree to collect valuable data on Plaintiff's products to demonstrate safety and efficacy and provide valuable feedback.  Some also conduct research studies wherein they are educated on Plaintiff's products, use Plaintiff's products on select patients, and then provide the results of those applications.  Plaintiff created an extensive patient registry containing this information which includes a patient's medical information and product application information to track product performance.  This information is invaluable in product development and optimization.

The doctors conducting the studies, the products used in the studies, the methods of the studies and the types of data sought from these studies is all trade secret, confidential information until the results of the studies are final and published.  Revealing the physicians involved, the products being used and the methods of these research studies before the results are published would give a competitor an advantage in knowing the products Plaintiff is in the process of analyzing.  The identity of the specific physicians being used

11

would also give competitors the advantage of targeting physicians that Plaintiff has spent the time and resources identifying as having specialized qualifications and have been educated about the products.

In addition to the names of the physicians participating in these studies, the amount of money that Plaintiff compensates these physicians for their participation is also confidential. The compilation of details relating to the physicians performing research studies and the data from those research studies, as well as the physicians performing data collection and the data collected, including the patient registry, have given Plaintiff a competitive advantage in the industry because they are not publicly known . Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

### E.    Marketing and Sales

Plaintiff's marketing strategies, methods and processes are not publicly known  and provide Plaintiff with a significant business advantage.

Plaintiff's analysis, strategy and recommendations regarding its marketing initiatives and the regions, physicians, facilities, surgery centers, and hospitals to target; marketing language; campaigns based on research in the market and Plaintiff's internal records on the profitability of certain marketing campaigns, including, for example, a newsletter campaign and the profitability vs. expense of attending certain trade shows; research and analysis of competitive pricing and compensation models in the market are the result of significant time and resource investments and gave Plaintiff a substantial advantage in the market because they were not publicly known .

Plaintiff has spent significant time and expense to research marketing strategy and develop marketing initiatives, research medical reimbursement coding and understand the application of certain codes to apply to its unique tissue implants for insurance reimbursement. This gives Plaintiff a significant advantage as no other company has

12

Plaintiff's level of understanding as to reimbursement, nor do they have certain codes available to them, as their products are **not** human connective tissue allograft implants for surgical use (biologic implant). Plaintiff's research and analysis of reimbursement coding and product requirements allowed them to determine product classifications that would apply to its products while also allowing for reimbursement. Through extensive analysis, Plaintiff determined that its products qualify as connective tissue. Prior to Banman resigning, Plaintiff was also the only company that had a tissue implant with the indication: "Intended to supplement or replace damage or inadequate connective tissue." This marketing strategy has provided Plaintiff with the significant advantage of offering products with greater indications and allowing for insurance reimbursement. Defendant CTM is now using the same indication. In addition, Plaintiff developed the marketing strategy of using specific language to quickly educate doctors in a way that they could easily digest, using the terms "ECM" or Extracellular Matrix, BioECM®, and "connective tissue matrix".

Plaintiff's compilation of its medical reimbursement research is reflected in its "coding notes" that were distributed only to engaged sales representatives working on specific accounts or on a specific case who have requested further coding support. This gave Plaintiff a significant advantage in the market as facilities are far more likely to use products that could be reimbursed.

In addition, Plaintiff devised specific training methods for employees and sales representatives to educate them on the intricate details of Plaintiff's marketing and sales strategies as well as each product's manufacture and application so that they could then educate customers and physicians on the benefits of Plaintiff's products and how to use the products. These training methods are detailed in the seventeen "Notes" files that Plaintiff alleges were stolen by Defendant Seoane:

1.    Skye WoundEx® Insurance Verification Hotline

2.    Novitas Patient Selection Criteria for DFU and VLU

3.    GYN Canned Doc Email

4.    New Rep Training Email

13

5.    Skye Vs. Tides Medical

6.    Plastics Indications for Skye BioECM®

7.    Call Script for Rep Consultation

8.    Call Script for Sales Strategy Calls

9.    Vascular Indications for Skye BioECM®

10.    General Product Training Follow-up

11.    New Rep - Sales Strategy Call Complete Email

12.    Territory Email

13.    Colorectal Indications for Skye BioECM®

14.    UroGyn Indications for Skye BioECM®

15.    Oncology Indications for Skye BioECM®

16.    Nerves Indications for Skye BioECM®/ Spine/Neuro Applications for Skye BioECM®

17.    Ocular Direct Sales/Ocular Leads

The "Notes" files contained the playbook for Plaintiff on how to be successful in selling Plaintiff's products, information that was created by Plaintiff to train its salesforce on how the products work, how to sell the products, and internal corporate strategy against competitors.

Plaintiff's confidential marketing strategies, marketing initiatives, marketing methods and processes and sales strategies give Plaintiff a competitive advantage in the industry because they are not publicly known . An individual with knowledge of Plaintiff's confidential marketing information could simply transfer that information to their own business and forego the years and significant expense Plaintiff has invested in market research. Also, if known to a competitor it would allow the competitor to predict and counter Plaintiff's marketing strategies. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

14

**F.    Plaintiff's Employees, Independent Contractors, Sales Representatives, and Distributors**

Plaintiff's compilation of information regarding employees, independent contractors, sales representatives, and/or distributors of Plaintiff, including their special skills, experience, territories, customers, compensation (including commissions structure, salary, and/or bonuses, referral fees, recruitment strategies, and compensation considerations), agreement terms and performance histories is not publicly known  and provides a significant business advantage.

Plaintiff has spent significant time and resources recruiting and training its employees and sales representatives in Plaintiff's confidential trade secret product information and marketing strategies outlined above.  Plaintiff has also invested significant time and resources in determining compensation structures for these employees that consider various factors including performance, profit margins, training, and experience. In addition, Plaintiff has invested significant time in recruiting qualified sales representatives who have relationships with physicians and facilities.   Keeping its employee and sales representative information confidential has given Plaintiff a significant advantage in the industry in knowing which sales personnel are the highest performing with specific products and customers.   A competitor with this information would benefit from Plaintiff's significant investment of time and expense and would be able to target key employees who have already been vetted, trained and given Plaintiff's confidential and trade secret information.

**G.    Business Operations**

Plaintiff's confidential business operations strategies including marketing research, profit margins relating to different markets (i.e., surgical implants), profitability of manufacture vs. outsourcing, providing options in the company as incentive, resource allocation, the responsibilities of the Business Development Department and internal financials including profit margins, revenue numbers, profitability forecasts and costs are

15

not publicly known   and have provided Plaintiff with a significant business advantage. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

**INTERROGATORY NO. 2:**

Identify and describe in detail each trade secret of Skye that is referred to in paragraph 164 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a description of the trade secret or something else. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a Stipulation signed by the Court. However, the parties have not executed a protective order which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a

16

description of the trade secret or something else.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows:   Discovery has only just commenced and the full scope of the trade secrets that Banman has misappropriated are not yet fully known to Plaintiff.  Plaintiff reserves the right to supplement these responses as new information is obtained.

Plaintiff's trade secrets at issue in this case include, but are not limited to, the following:

A.    **Cost and Pricing**

Plaintiff's costs and pricing information, which includes the detailed analysis relating to the individual cost of production per item (research and development, materials, labor, overhead, specific prices Plaintiff has negotiated with its vendors, etc.), together with profit margin and market analysis, has been intentionally kept secret from third parties and provides Plaintiff with a substantial business advantage.  Skye has spent considerable time and resources developing a pricing scheme to maximize the profit while remaining competitive in the market.

In addition, as discussed below regarding Plaintiff's marketing strategies, potential reimbursement for Plaintiff's products is also considered in Plaintiff's pricing analysis. Plaintiff has spent significant time and expense to extensively research medical reimbursement and understand the application of certain medical codes to its unique tissue implants for insurance reimbursement.  Skye and HRT developed the industry's first surgical implant that is a "connective tissue" on indication as a tissue product (derived from amniotic or any placental tissue), and the only one in the industry that could be reimbursed at cost plus profit.  This is a substantial advantage as medical facilities typically lose money when using the competition's products.

Plaintiff's pricing scheme was developed to target the needs of a diverse group of clinics, surgery centers, hospitals and physicians around the country to give competitively attractive pricing in line with each customer's different pricing goals, with pricing being individually tailored to each customer.  Plaintiff's pricing information is not publicly known

17

and provides Plaintiff with a substantial business advantage. The pricing of similar products in the industry is not published to competitors, so any competitor having Plaintiff's pricing information would have the advantage of foregoing all of Plaintiff's time and effort in analyzing the various factors at play to develop a pricing scheme that was competitive, would be accepted by facilities and physicians, and was still profitable.

### B.    Customer Lists and Potential Customers

Plaintiff's confidential customer lists and information, and potential customer lists and information, including key contacts and specific preferences for customers and potential customers throughout the country are not publicly known   and provide Plaintiff with a substantial business advantage.

Human Placental and Amniotic based biologic products are a new class of product and are not ubiquitous to hospitals, surgery centers and medical offices. Finding doctors and facilities who are willing to use the product, let alone repeatedly, requires specialized marketing and recruitment efforts. Plaintiff has spent significant time and money seeking out potential purchasers, fostering those relationships, educating those individuals, and assessing individual needs. Once Plaintiff has identified a potential customer, Plaintiff then takes the time and resources to educate that customer on the patient benefits, specific applications, positioning of its products and insurance reimbursement for Plaintiff's products. Plaintiff has invested substantial time, research, money and resources identifying and maintaining key customer relationships, designing customer initiatives and compiling information about the unique needs and preferences of its customers including historical purchasing information in order to develop a list of customers throughout the country who were willing to purchase, and/or who did in fact purchase, Plaintiff's tissue biologic products. Plaintiff's customer information also includes customer satisfaction and interest in specific products; customer specific needs and preferences; customer order history; historical customer specific pricing, discount and payment term information; sales lead and call/meeting information and records; customer networks and associated facilities; and

18

customer name, address, telephone number, specific points of contact and private email addresses. Plaintiff's customer information also includes customer feedback and patient data relating to the performance of Plaintiff's products.

Plaintiff's collection of customer information contains information that Plaintiff has gathered over the entire history of its operations, which span not only many years but thousands of hours of research, travel and individual customer interaction. The information on the lists would allow a competitor to direct its sales efforts to those customers that have already been educated about or are already purchasing Plaintiff's products and/or potential customers who had shown an interest in using Plaintiff's products.

In addition, Plaintiff's existing customer relationships include approvals by customers to access credential-protected customer internet portals. To obtain confidential log-in access, Plaintiff spends time and resources to go through an approval process which takes time, energy, and capital. Defendant Banman unlawfully used Plaintiff's trade secret log-in and password credentials and used those credentials to access Plaintiff's account with Broward Health, in order to obtain (1) Broward Health Disclosure Form for Physician Ownership & Financial Arrangements; and (2) North Broward Hospital District Conflict of Interest Questionnaire form for vendors/ contractors/ subcontractor/ agent. Plaintiff gains an advantage in the market in having access to these customers' internet portals. A competitor could short-cut the approval process and benefit from Plaintiff's spent time and expense.

Plaintiff's compiled information regarding its customer lists and prospective customers has given Plaintiff a competitive advantage in the industry because it is not publicly known . Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

19

## C.    Product Development and Manufacturing

The compilation of information about Plaintiff's product development and manufacturing is not publicly known   and provides Plaintiff with a substantial business advantage.

Plaintiff's product information includes surgical implant reimbursement; research and understanding of (then pending) new FDA regulations that affect placental / amniotic derived biologic products; the sources of raw materials and the different properties of the various regions of the placenta, including the surrounding tissues and fluids; research and development to create standard operating procedures for manufacturing which include: separating, cleaning and disinfecting tissue; storing hydrated alone and/or at ambient temperature in a flowable form, researching and utilizing drying methods that maintain higher moisture levels during the drying process for certain products that those otherwise used in the industry which yields less damage to the tissue; preserving natural biologic content and processing the tissue into unique individual and combination product forms, including tissue ratio calculations and various combinations of raw placental tissue, sterilizing, packaging and preserving; the machinery used and the know-how used to create different forms of products (*ex.* membrane vs. ambient flowable) including product sizing and specifications.  As an example, through Plaintiff's extensive investment of time and resources, Plaintiff and HRT developed the first ambient temperature, shelf stable, flowable connective tissue that remained the only ambient temperature flowable connective tissue prior to Defendant Banman's departure.   Plaintiff's collected product information including research and development and manufacturing protocols for products is not publicly known   and provides Plaintiff with a significant business advantage.

Plaintiff and HRT developed a line of novel products that take raw human placental tissue and run it through an HRT proprietary process that cleans, disinfects, preserves, and hydrates the final tissue implant to be either stored at a frozen temperature or at an ambient temperature.   This preservation and storage of a connective tissue at ambient temperature was an industry first developed by HRT.   This process enabled placental tissue implants to

20

be effectively placed it in the body of a patient for surgical, non-surgical, wound, incision and trauma repair. Plaintiff's products preserve and provide a complete connective tissue biologic matrix, with the necessary scaffolding, growth factors and BioActive molecules to augment the patient's biology at the surgical/trauma/implant site, assisting in proper remodeling and repair of damaged tissue, avoiding excess inflammation and reducing complications, leading to proper tissue formation and minimizing scar tissue.

Plaintiff and HRT dedicated numerous hours and resources to the development, creation and preservation of its manufacturing process including which tissue types to process as well as how to dissect, remove, extract, dry, size, preserve, and package tissues. Plaintiff alleges that Defendant Banman, and/or the other named Defendants, stole, disseminated and then used these proprietary processing methods to instruct a third-party manufacturer on how to produce Plaintiff's connective tissue matrix products.

Plaintiff's unique processes applied to native placental connective tissue result in products that: maintain the integrity of the native placental/amniotic tissue; ensure the stability of those tissues which allows them to exist with minimal damage to the natural tissues in different application forms; allow for easier to use products; and have an increased shelf life and unique product stabilization and delivery methods. Plaintiff's and HRT's data compilations include detailed information on the material form and function of the placental/amniotic tissue cells and how those cell molecules react to different methods of processing.

Plaintiff and HRT developed a best-in-class membrane lineup consisting of three thicknesses, "Thin", "Thick", and "X-Thick", and a range of connective tissue matrix products. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Plaintiff's one-of-a-kind

21

ambient temperature stable product has significant competitive advantages over competitors' products that are either freeze dried, requiring reconstitution prior to use, or frozen, requiring thawing prior to use. Plaintiff's products have a reduced handling time, reduced shipping costs, flexible storage, increased shelf life, as well as shorter operating room time due to the lack of thaw-down-time or reconstituting required. In addition, Plaintiff and HRT developed an omnidirectional membrane implant product meaning that it does not have a specific "right-side-up" or specific direction when implanting. This provides a significant advantage for use in procedures.

Through significant research and development, Plaintiff and HRT have developed product lines and unique processing methods which Plaintiff and HRT have had trademarked including: HydraTek® and the BioAware® Membrane Preservation System, referring to the series of scientific methods providing a distinct advantage in handling, safety, quality and performance of its implants. HydraTek® BioAware® Technology is designed to protect the biomechanical structure of its membrane tissues. FastActing® membrane products provide an immediate covering at the site, then resorb quickly to incorporate into the patient's tissues sooner than other products on the market. BioECM® ActiveMatrix® line is an advanced line up of biologics that provides a complete connective tissue matrix – Complete Connective Tissue Matrix®, harvested from the human placenta and processed with HydraTek® technology to preserve its natural fluid state – the Original Fluid Connective Tissue Matrix® and Original Ambient Flowable Tissue Matrix®.

These products were not being offered by competitors, but Defendant CTM is currently offering membrane and other products referred to as "Thin", "Thick", and "Flow" which uses Plaintiff's marketing language.

Plaintiff and HRT's product development also involved physician studies and feedback by physicians, specifically chosen by Plaintiff because of their skill and expertise in their fields, in order to better meet physicians' needs. Plaintiff has also spent significant time and money in researching its sources of supply of materials and pricing so as to obtain the best materials at a price to advance sales and profitability.

22

Plaintiff and HRT also discovered how to make and apply a "paste" product and researched the marketability of such a product while Banman was still at Skye/HRT. CTM is now marketing a "Paste" product.

Plaintiff's trade secret unique manufacturing and processing protocols are outlined in HRT's Standard Operating Procedures documents which include: Separation of Placental Tissue; Dying of Tissue; Cleaning of Placental Connective Tissue; Processing of Frozen Placental Tissue – Surgical HRT – Private Label; Processing of Frozen Placental Tissue – Non-Surgical– Umbilical Cord Only – Skye; and Placental Tissue Processing.

The compilation of Plaintiff's unique product formulas, sources of supply, research and development, and manufacturing processes has given Plaintiff a competitive advantage in the industry because it is not publicly known . Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

### D.    Research Physicians and Patient Registry

Information on Plaintiff's physicians used for research and data collection is not publicly known  and provides Plaintiff with a substantial business advantage. Plaintiff has spent significant time and resources researching, hand-selecting and developing business relationships with specific physicians who Plaintiff has vetted and chosen because of their skill and experience in the field. These physicians agree to collect valuable data on Plaintiff's products to demonstrate safety and efficacy and provide valuable feedback. Some also conduct research studies wherein they are educated on Plaintiff's products, use Plaintiff's products on select patients, and then provide the results of those applications. Plaintiff created an extensive patient registry containing this information which includes a patient's medical information and product application information to track product performance. This information is invaluable in product development and optimization.

The doctors conducting the studies, the products used in the studies, the methods of

23

the studies and the types of data sought from these studies is all trade secret, confidential information until the results of the studies are final and published. Revealing the physicians involved, the products being used and the methods of these research studies before the results are published would give a competitor an advantage in knowing the products Plaintiff is in the process of analyzing. The identity of the specific physicians being used would also give competitors the advantage of targeting physicians that Plaintiff has spent the time and resources identifying as having specialized qualifications and have been educated about the products.

In addition to the names of the physicians participating in these studies, the amount of money that Plaintiff compensates these physicians for their participation is also confidential. The compilation of details relating to the physicians performing research studies and the data from those research studies, as well as the physicians performing data collection and the data collected, including the patient registry, have given Plaintiff a competitive advantage in the industry because they are not publicly known . Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

### E.    Marketing and Sales

Plaintiff's marketing strategies, methods and processes are not publicly known  and provide Plaintiff with a significant business advantage.

Plaintiff's analysis, strategy and recommendations regarding its marketing initiatives and the regions, physicians, facilities, surgery centers, and hospitals to target; marketing language; campaigns based on research in the market and Plaintiff's internal records on the profitability of certain marketing campaigns, including, for example, a newsletter campaign and the profitability vs. expense of attending certain trade shows; research and analysis of competitive pricing and compensation models in the market are the result of significant time and resource investments and gave Plaintiff a substantial advantage in the market because

24

they were not publicly known .

Plaintiff has spent significant time and expense to research marketing strategy and develop marketing initiatives, research medical reimbursement coding and understand the application of certain codes to apply to its unique tissue implants for insurance reimbursement. This gives Plaintiff a significant advantage as no other company has Plaintiff's level of understanding as to reimbursement, nor do they have certain codes available to them, as their products are **not** human connective tissue allograft implants for surgical use (biologic implant). Plaintiff's research and analysis of reimbursement coding and product requirements allowed them to determine product classifications that would apply to its products while also allowing for reimbursement. Through extensive analysis, Plaintiff determined that its products qualify as connective tissue. Prior to Banman resigning, Plaintiff was also the only company that had a tissue implant with the indication: "Intended to supplement or replace damage or inadequate connective tissue." This marketing strategy has provided Plaintiff with the significant advantage of offering products with greater indications and allowing for insurance reimbursement. Defendant CTM is now using the same indication. In addition, Plaintiff developed the marketing strategy of using specific language to quickly educate doctors in a way that they could easily digest, using the terms "ECM" or Extracellular Matrix, BioECM®, and "connective tissue matrix".

Plaintiff's compilation of its medical reimbursement research is reflected in its "coding notes" that were distributed only to engaged sales representatives working on specific accounts or on a specific case who have requested further coding support. This gave Plaintiff a significant advantage in the market as facilities are far more likely to use products that could be reimbursed.

In addition, Plaintiff devised specific training methods for employees and sales representatives to educate them on the intricate details of Plaintiff's marketing and sales strategies as well as each product's manufacture and application so that they could then educate customers and physicians on the benefits of Plaintiff's products and how to use the products. These training methods are detailed in the seventeen "Notes" files that Plaintiff

25

alleges were stolen by Defendant Seoane:

1. Skye WoundEx® Insurance Verification Hotline

2. Novitas Patient Selection Criteria for DFU and VLU

3. GYN Canned Doc Email

4. New Rep Training Email

5. Skye Vs. Tides Medical

6. Plastics Indications for Skye BioECM®

7. Call Script for Rep Consultation

8. Call Script for Sales Strategy Calls

9. Vascular Indications for Skye BioECM®

10. General Product Training Follow-up

11. New Rep - Sales Strategy Call Complete Email

12. Territory Email

13. Colorectal Indications for Skye BioECM®

14. UroGyn Indications for Skye BioECM®

15. Oncology Indications for Skye BioECM®

16. Nerves Indications for Skye BioECM®/ Spine/Neuro Applications for Skye BioECM®

17. Ocular Direct Sales/Ocular Leads

The "Notes" files contained the playbook for Plaintiff on how to be successful in selling Plaintiff's products, information that was created by Plaintiff to train its salesforce on how the products work, how to sell the products, and internal corporate strategy against competitors.

Plaintiff's confidential marketing strategies, marketing initiatives, marketing methods and processes and sales strategies give Plaintiff a competitive advantage in the industry because they are not publicly known . An individual with knowledge of Plaintiff's confidential marketing information could simply transfer that information to their own business and forego the years and significant expense Plaintiff has invested in market

26

research. Also, if known to a competitor it would allow the competitor to predict and counter Plaintiff's marketing strategies. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

**F.      Plaintiff's Employees, Independent Contractors, Sales Representatives, and Distributors**

Plaintiff's compilation of information regarding employees, independent contractors, sales representatives, and/or distributors of Plaintiff, including their special skills, experience, territories, customers, compensation (including commissions structure, salary, and/or bonuses, referral fees, recruitment strategies, and compensation considerations), agreement terms and performance histories is not publicly known  and provides a significant business advantage.

Plaintiff has spent significant time and resources recruiting and training its employees and sales representatives in Plaintiff's confidential trade secret product information and marketing strategies outlined above. Plaintiff has also invested significant time and resources in determining compensation structures for these employees that consider various factors including performance, profit margins, training, and experience. In addition, Plaintiff has invested significant time in recruiting qualified sales representatives who have relationships with physicians and facilities.  Keeping its employee and sales representative information confidential has given Plaintiff a significant advantage in the industry in knowing which sales personnel are the highest performing with specific products and customers.  A competitor with this information would benefit from Plaintiff's significant investment of time and expense and would be able to target key employees who have already been vetted, trained and given Plaintiff's confidential and trade secret information.

27

SKYE'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

### G.    Business Operations

Plaintiff's confidential business operations strategies including marketing research, profit margins relating to different markets (i.e., surgical implants), profitability of manufacture vs. outsourcing, providing options in the company as incentive, resource allocation, the responsibilities of the Business Development Department and internal financials including profit margins, revenue numbers, profitability forecasts and costs are not publicly known   and have provided Plaintiff with a significant business advantage. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

### INTERROGATORY NO. 3:

For each trade secret identified in response to Interrogatories 1-2, describe with particularity how Banman misappropriated the trade secret.

### RESPONSE TO INTERROGATORY NO. 3:

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a stipulation which will keep the information confidential, nor has the Court entered any such order. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

### AMENDED RESPONSE TO INTERROGATORY NO. 3:

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and

unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff reserves the right to supplement these responses as new information is obtained.

Banman misappropriated each of the trade secrets identified in response to Interrogatories Nos. 1-2 because, at the time of the trade secret's acquisition, and/or at the time of Banman's disclosure and/or use of Plaintiff's trade secrets, Banman knew or had reason to know that the trade secret was acquired through improper means, and/or knew or had reason to know that he was acting without consent, and/or breaching a duty to maintain the secrecy of Plaintiff's trade secrets, and/or breaching a duty to maintain limited use of Plaintiff's trade secrets.

Such misappropriation included breaching confidentiality provisions of the agreements that he signed while working for Skye and HRT and disclosing and/or using Plaintiff's trade secrets in forming and/or operating CTM, which includes all aspects of CTM (*ex.*, the manufacture and marketing of products), as well as disclosing and/or using Plaintiff's trade secrets in interfering with Plaintiff's legitimate business interests.

Such agreements include:

1.   April 23, 2012 Mutual Non-Disclosure, Confidentiality & Non-Circumvent Agreement [signed May 3, 2012] (between Banman and Skye);

2.   May 21, 2012 Market Development Agreement [signed May 22, 2012] (between Banman and Skye);

3.   March 25, 2013 Business/Market Development Agreement [signed April 4, 2013] (between Banman and Skye);

4.   June 2014 Consulting Agreement/Compensation Contract (between Banman and HRT);

5.   June 26, 2014 HRT Services/Consultant Confidentiality Agreement (between Banman and HRT);

29



6.    December 9, 2015 HRT/Skye Employee Handbook (acknowledged by Banman);

7.    March 31, 2016 Extension of 3/25/2013 Business/Market Development Agreement thru December 31, 2016 (between Banman and Skye);

8.    January 1, 2017 Extension of 3/25/2013 Business/Market Development Agreement thru December 31, 2017 (between Banman and Skye);

9.    April 18, 2018 Employment Agreement [acknowledging the Skye Employee Confidentiality Agreement & Non-Solicit is signed as a condition of the agreement] (between Banman and Skye);

10.    Skye Orthobiologics LLC Employee Confidentiality Agreement.

As an example, Banman also breached the provisions of the April 18, 2018 Skye Confidentiality Agreement by disclosing and/or using Plaintiffs' trade secrets in forming and/or operating CTM:

1.    RECOGNITION OF COMPANIES' RIGHTS; NONDISCLOSURE
At all times during the term of my employment and thereafter, I will hold in strictest confidence and will not disclose to anyone or organization, use, lecture upon or publish any of SKYE Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for SKYE, or unless CEO expressly authorizes such in writing. The term "Proprietary Information" shall mean trade confidential knowledge, product formulations, product ingredients, revenue numbers, financials, representation agreements, representation commissions, employment agreements, pricing, sources of supply, employee compensation, SKYE structure, SKYE ownership structure, margins, product designs, packaging inserts, FUTURE PRODUCTS, marketing materials, etc., data or any other information of SKYE or SKYE affiliate.

As another example, Banman breached the provisions of the Employee Handbook acknowledged by Banman in December 2015 by disclosing and/or using Plaintiff's trade secrets in forming and/or operating CTM. The Employee Handbook provided:

As part of their employment with THE COMPANY [which included Plaintiff], employees may be exposed to and/or provided with trade secrets ("Trade Secrets") and other confidential and proprietary information ("Confidential Information") of THE COMPANY relating to the operation of THE COMPANY'S business and its customers (collectively referred to as

30

"Trade Secrets/Confidential Information").

*Employees are not allowed to discuss information about their job, contract, finances, processes, or technological knowledge with anyone outside their department or anyone within their department unless they have been granted written access to that information.*

"Trade Secrets" mean information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons or entities who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain it secrecy. THE COMPANY'S Trade Secrets are (1) not publicly known  to the public or to THE COMPANY'S competitors; (2) were developed or compiled at significant expense by THE COMPANY over an extended period of time; and (3) are the subject of THE COMPANY'S reasonable efforts to maintain their secrecy.

"Confidential Information" means information belonging to THE COMPANY, whether reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, that has been provided to employees during their employment THE COMPANY and/or employees have gained access to while employed by THE COMPANY and/or were developed by employees in the course of their employment with THE COMPANY, that is proprietary and confidential in nature.

As part of the consideration employees provide to THE COMPANY in exchange for their employment and continued employment with THE COMPANY is their agreement and acknowledgement that all Trade Secrets/Confidential Information developed, created or maintained by them shall remain at all times the sole property of THE COMPANY, and that if THE COMPANY'S Trade Secrets/Confidential Information were disclosed to a competing business or otherwise used in an unauthorized manner, such disclosure or use would cause immediate and irreparable harm to THE COMPANY and would give a competing business an unfair business advantage against THE COMPANY.

Employees will not, except as required in the conduct of THE COMPANY'S business or as authorized in writing by THE COMPANY, disclose or use during their term of employment or subsequent thereto any Trade Secrets/Confidential Information. Furthermore, all records, files, plans, documents and the like relating to the business of THE COMPANY which employees prepare, use or come in contact with shall be and shall remain the sole property of THE COMPANY and shall not be copied without written

31

SKYE'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

permission of THE COMPANY and shall be returned to THE COMPANY on termination or cessation of employment, or at THE COMPANY'S request at any time.

In addition, Banman knew or had reason to know that Defendants Seoane and Stumpe also signed multiple confidentiality agreements and were breaching the same in their acquisition, disclosure and use of Plaintiff's trade secrets.

Banman's misappropriation also included, but was not limited to the following:

Banman acquired, used and/or disseminated cost and pricing information including detailed analysis of data relating to the individual cost of production per item (research and development, materials, labor, overhead, specific costs Plaintiff has negotiated with its vendors, etc.), which information is only known to Plaintiff in the formation and operation of CTM and to interfere with Plaintiff's legitimate business interests.

Banman acquired, used and/or disseminated Plaintiff's trade secret customer information and potential customer information including a compilation of customers throughout the country who were willing to purchase, and/or who did in fact purchase, Plaintiff's tissue biologic products; customer satisfaction and interest in specific products; customer specific needs and preferences; customer specific pricing guidelines; customer order history; log-in credentials for customer portals; and customer information including name, address, telephone number, specific points of contact and private email addresses in order to target those specific customers and essentially offer them the exact same products, (including offering Plaintiff's pricing in a side-by-side comparison) in order to interfere with Plaintiff's legitimate business interests.

Plaintiff's customers who Banman used and disseminated Plaintiff's trade secret customer information to unlawfully target and instruct others to target include but are not limited to: Riverview Hospital, Carmel Ambulatory and Gerald Champion Regional Medical Center. Plaintiff has sent subpoenas to other entities believed to have been targeted by Banman and the other named Defendants through the dissemination and use of Plaintiff's trade secret customer information. Plaintiff is discovering additional individuals.

32

Banman acquired, used and/or disseminated the compilation of information about Plaintiff's product research and development, performance data, product formulations, sources of supply, manufacturing process, and design, including specific technology, that are not publicly known   and provide Plaintiff with its significant competitive advantage. Plaintiff alleges that Defendant Banman used and disseminated Plaintiff's proprietary information to external manufacturers to create and market products, including a room temperature "flowable" connective tissue matrix product and membrane products, to capitalize on Plaintiff's significant investment of time, resources and goodwill.  Banman used and disseminated this trade secret information in the formation and operation of CTM and to interfere with Plaintiff's legitimate business interests.

Banman acquired, used and/or disseminated Plaintiff's compilation of information on specific physicians who Plaintiff vetted and chose because of their skill and experience in the field, the compilation of details relating to the physicians performing research studies and the data from those research studies, the amount physicians are being compensated, and the compilation of data on specific procedures using Plaintiff's products in order to target these physicians, regardless of whether or not they were in the midst of performing research for Plaintiff, in the formation and/or operations of CTM and with the purpose of interfering with Plaintiff's legitimate business interests. Banman targeted these physicians in order to interfere with their relationship with Plaintiffs by attempting to and/or succeeding in (1) instructing the doctors to stop purchasing Plaintiff's products and purchase from CTM instead, and (2) create a conflict whereby the doctors would be required to cease their relationship with Plaintiffs and cease providing valuable clinical data which would cause immeasurable harm to Plaintiffs to benefit Banman.  These include Dr. Anderson, Dr. Badman, and Dr. Shifka.  Additionally, Banman targeted Dr. Hiatt, who was performing an ENT study for Plaintiff but did not produce the results of that study to Plaintiff, and instead gave those results to Banman at Banman's instruction, and now is the Chief Scientific Officer of CTM.

Banman acquired, used and/or disseminated Plaintiff's trade secret compilation of

33

information regarding employees and/or sales representatives of Plaintiff, including their special skills, experience, territories, customers, compensation (including commissions structure, salary, and/or bonuses and compensation considerations), agreement terms and performance histories to target certain sales associates and then used and disseminated that information to other individuals who, in turn, used and disseminated that information to attempt to convince Plaintiff's sales associates to interfere with Plaintiff's legitimate business interests, valid contracts and prospective economic advantages; to sell CTM's products to Plaintiff's customers; and to encourage Plaintiff's customers, sales personnel and distributors to breach the terms of their respective agreements with Plaintiff. Banman also used and disseminated this trade secret information in the formation and/or operations of CTM. These associates include: Nate Boulais; ████████████████████: Mike Stumpe, who then targeted Matt Dripps; Pablo Seoane, who was instructed to keep and did keep the seventeen "Notes" files outlined above following his separation from Skye in violation of his own confidentiality agreement with Plaintiff; Integrative Medical Solutions ("IMS"); VMD and Gardner Rogers, who Plaintiff alleges assisted Banman in the sabotage of Plaintiff's application for its products to be approved by VA National Acquisition Center. Plaintiff is discovering additional individuals and will amend these responses as appropriate.

Banman acquired, used and/or disseminated Plaintiff's marketing strategies, marketing methods and processes, coding notes, sales strategy notes and the seventeen Notes Files identified above, in the formation and/or operations of CTM and also in order to interfere with Plaintiff's legitimate business interests. When working for Plaintiff and HRT, Banman was in charge of Plaintiff's marketing department and was involved in Plaintiff's marketing strategies including market research and analysis, sales representative training, and business development strategy. By conspiring with Defendant Pablo Seoane, Banman misappropriated the iOS Notes Files stored or captured on the iOS Notes Application utilized by Seoane exclusively for Plaintiff by instructing Seoane to share the contents of the files with Banman and other Defendants. The "Notes" files contained the

34

playbook for Plaintiff on how to be successful in selling Plaintiff's products, information which was created by Plaintiff to assist its salesforce on how the products work, how to sell the products, and internal corporate strategy against competitors. Banman both improperly acquired the iOS Notes Files and thereafter improperly used and/or disclosed the information contained therein in training CTM personnel to sell CTM products. Banman also misappropriated Plaintiff's trade secret marketing strategies and initiatives and is improperly using and/or disclosing that information to sell CTM products.

Banman acquired, used and/or disseminated Plaintiff's business plan, financials including Plaintiff's profit margins, revenue numbers, profitability forecasts, costs and market research, company structure, ownership structure and business affairs in the formation and operation of CTM to create a copy-cat of Plaintiff's entire business and interfere with Plaintiff's legitimate business interests.

**INTERROGATORY NO. 4:**

For each trade secret identified in Interrogatories 1-2, describe with particularity all of Skye's efforts to maintain the secrecy of the trade secret.

**RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

SKYE'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

**AMENDED RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff reserves the right to supplement these responses as new information is obtained.

Plaintiff requires each of its employees, independent contractors, consultants, sales representatives, and distributors with access to trade secret information, to execute confidentiality agreements and/or non-disclosure agreements which explicitly inform the individuals of the consequences that they face should they violate the terms of the confidentiality agreements. Plaintiff also has employees execute and acknowledge the nature and extent of trade secret information in an Employee Handbook.

Plaintiff also advises employees and consultants that any information belonging to Plaintiff, whether reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, that has been provided to the employees and consultants during their tenure with Plaintiff, that the employees and consultants have gained access to while working with Plaintiff and/or were developed by the employee or consultant in the course of their work with Plaintiff, is proprietary and confidential in nature and would be the exclusive property of Plaintiff.

Plaintiff also controls physical access to Plaintiff's offices and information and use network firewalls, password protection, and security credentials to prevent unauthorized access to Plaintiff's servers and internally shared documents, and revoke authorization at the end of any relationship with Plaintiff.

**INTERROGATORY NO. 5:**

For each trade secret identified in Interrogatories 1-2, identify all Documents that

36

memorialize, embody, or reference the trade secret.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to the instant interrogatory because it calls for the identification of a list of documents which may be confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Further, Plaintiff will produce all responsive documents in lieu of listing the documents in this response because of sheer volume of documents will be extensive. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to the instant interrogatory on the grounds that it is vague, ambiguous and unintelligible as to the terms "memorialize," "embody" and "reference". None of the terms are defined rendering it impossible to know what is intended by the question. To the extent the interrogatory can even be understood, Plaintiff further objects to the instant interrogatory on the grounds that it is overbroad as to timeframe and scope and by such overbreadth is burdensome and oppressive.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff will produce all responsive documents in lieu of listing the documents in this response because of sheer volume of documents will be extensive. Plaintiff exercises its option under Rule 33(d) to respond to this interrogatory by referring the propounding party to Plaintiff's document production.

///

///

///



37

SKYE'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

DATED: October 8, 2021

ROSEN ✦ SABA, LLP

By:    /s Ryan D. Saba
Ryan D. Saba, Esq.
Laura Kelly St. Martin, Esq.
Attorneys for Plaintiffs
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE
TECHNOLOGIES, LLC

SKYE'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

**VERIFICATION**

I, Chris Sharp, am an officer or agent of the party providing this Verification, and am authorized to make this Verification for and on its behalf, and I make this Verification for that reason; I have read the attached document(s): **PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S AMENDED RESPONSES TO BRYAN BANMAN'S FIRST SET OF INTERROGATORIES,** and know the contents; I am informed and believe and upon that ground allege that the matters stated in said document(s) are true and correct under the penalty of perjury under the laws of the United States of America.

Executed on October 7th, 2021, at Los Angeles, California.

_____
Chris Sharp

ROSEN ✧ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

1

VERIFICATION

## PROOF OF SERVICE

**STATE OF CALIFORNIA** )
)    **ss**
**COUNTY OF LOS ANGELES** )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 9350 Wilshire Boulevard, Suite 250, Beverly Hills, California 90212.

On **October 8, 2021**, I served the foregoing document described as: **PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S AMENDED RESPONSES TO BRYAN BANMAN'S FIRST SET OF INTERROGATORIES,** on the interested parties as follows:

| | |
|---|---|
| **YUKEVICH \| CAVANAUGH**<br>TODD CAVANAUGH, Esq.<br>355 S Grand Ave 15th Floor<br>Los Angeles, CA 90071 | Attorneys for Defendants GARDNER ROGERS and VETERANS MEDICAL DISTRIBUTORS, INC.<br><br>Tel: (213) 362-7777<br>Fax: (213) 362-7788<br><br>Email: tcavanaugh@yukelaw.com |
| **HODGSON RUSS LLP**<br>ROBERT J. FLUSKEY, JR.<br>MATTHEW K. PARKER<br>The Guaranty Building<br>140 Pearl Street, Suite 100<br>Buffalo, New York 14202 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel:  (716) 856-4000<br>Fax: (716) 849-0349<br><br>Email: rfluskey@hodgsonruss.com<br>Email: mparker@hodgsonruss.com |
| **HENNELLY & GROSSFELD LLP**<br>Thomas H. Case, Esq.<br>Paul T. Martin, Esq.<br>Marina Towers North<br>4640 Admiralty Way #850<br>Marina Del Rey, CA 90292 | Attorneys for: Defendants, Bryan Banman, CTM Biomedical, LLC, and Pablo Seoane aka Paul Seoane<br><br>Tel: (310) 305-2100<br>Fax: (310) 305-2116<br><br>Email: tcase@hgla.com<br>Email: pmartin@hgla.com |

39

| **BLANK ROME LLP**<br>Arash Beral, Esq.<br>Saam Takaloo ., Esq.<br>2029 Century Park East, 6th Floor<br>Los Angeles, CA 90067 | Attorneys for: Defendant<br>Mike Stumpe<br><br>Tel: 424.239.3400<br>Fax: 424.239.3434<br><br>Email: aberal@blankrome.com<br>Email: saam.takaloo@blankrome.com |
|---|---|

BY E-MAIL OR ELECTRONIC TRANSMISSION - I caused the document(s) described above to be sent from e-mail address dsanchez@rosensaba.com to the persons at the e-mail address listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I also declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **October 8, 2021**, at Beverly Hills, California.

Danielle Sanchez

SKYE'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

# Exhibit 2

ROSEN ✧ SABA, LLP
RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY St. MARTIN (State Bar No. 260966)
lstmartin@rosensaba.com
JOHN J. AUMER (State Bar No. 130585)
jaumer@rosensaba.com
JUSTIN L. WILSON (State Bar No. 263076)
jwilson@rosensaba.com
9350 Wilshire Boulevard, Suite 250
Beverly Hills, California 90212
Telephone:    (310) 285-1727
Facsimile:    (310) 285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company, <br><br> *Plaintiffs,* <br><br> v. <br><br> CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; and DOES 1 through 10, inclusive, <br><br> *Defendants.* | Case No.: 2:20-cv-03444-DMG-PVC <br> *Honorable Dolly M. Gee* <br><br> **PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC'S AMENDED RESPONSES TO BRYAN BANMAN'S FIRST SET OF INTERROGATORIES** <br><br> Complaint Filed:    April 23, 2020 <br><br> Trial Date:    None Set <br><br> **HIGHLY CONFIDENTIAL** |

**EXHIBIT**
tabbies®
45

1

PROPOUNDING PARTY:          Defendant, Brian Banman

RESPONDING PARTY:          Plaintiff, Human Regenerative Technologies, LLC

SET NUMBER:          One

**TO DEFENDANT BRYAN BANMAN AND HIS ATTORNEYS OF RECORD:**

Plaintiff Human Regenerative Technologies, LLC ("Plaintiff"), hereby submits its amended responses to the Interrogatories, Set No. One, propounded by Defendant Brian Banman ("Defendant") Set of Interrogatories under oath, pursuant to the provisions of California *Code of Civil Procedure* §2030.210, et seq., as follows:

## PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action. Each answer is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and any and all other objections and grounds which would require the exclusion of any statement herein if the Interrogatories were asked of, or any statements contained herein were made by, a witness present and testifying in Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Plaintiff and its counsel have not yet completed their discovery or preparation for trial, nor have they completed their analysis, review or investigation of all evidence, applicable defenses, information, witness accounts or other trial preparation matters and subjects obtained or discovered to date. The within responses are, therefore, complete as to all presently known facts and information acquired or possessed by Plaintiff up to this time. These responses should, therefore, not be construed as prejudicing or waiving Plaintiff's right to provide additional facts, evidence, contentions or theories at trial or any subsequent hearing based upon information, evidence or analysis hereafter obtained or evaluated. Nothing in these responses should be construed as waiving any privileges or objections which may be applicable to information or evidence hereafter obtained.

2

Plaintiff further reserves the right to update and/or supplement these responses if and when information which is responsive to these interrogatories is discovered.

Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that Plaintiff has answered any Interrogatory should not be taken as an admission that Plaintiff accepts or admits the existence of any facts set forth or assumed by such Interrogatory, or that such response constitutes admissible evidence. The fact that Plaintiff has answered part or all of any interrogatory is not intended and shall not be construed to be a waiver by Plaintiff of all or any part of any objection to any Interrogatory.

## GENERAL OBJECTIONS

1. Plaintiff objects to the Interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, attorney work product doctrine or any other applicable privilege or protection under statutory or common law.

2. Plaintiff objects to the Interrogatories to the extent that they call for the disclosure of information protected by any of the parties' or third parties' constitutional right to privacy under the United States or California Constitutions, or protected as proprietary, commercially sensitive, trade secret or falling under the rubric of any other such confidentiality protection or privilege.

3. Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4. Plaintiff objects to the Interrogatories to the extent that they are unlimited as to time or scope, and as a result, are overly broad and unduly burdensome.

5. Highly Confidential: Pursuant to the Court Order (DKT 108), this entire document is designated as "Highly Confidential".

3

<div align="center">INTERROGATORIES</div>

**INTERROGATORY NO. 1:**

Identify and describe in detail each trade secret of HRT that Banman allegedly misappropriated.

**RESPONSE TO INTERROGATORY NO.1:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a description of the trade secret or something else. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a description of the trade secret or something else.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced and the full scope of the trade secrets that Banman has misappropriated are not yet fully known to Plaintiff. Plaintiff reserves the

<div align="center">4</div>

right to supplement these responses as new information is obtained.

Plaintiff's trade secrets at issue in this case include, but are not limited to, the following:

### A.    Product Development and Manufacturing

The compilation of information about Plaintiff's product development and manufacturing is not publicly known and provides Plaintiff with a substantial business advantage.

Plaintiff's product information includes surgical implant reimbursement; research and understanding of (then pending) new FDA regulations that affect placental / amniotic derived biologic products; the sources of raw materials and the different properties of the various regions of the placenta, including the surrounding tissues and fluids; research and development to create standard operating procedures for manufacturing which include: separating, cleaning and disinfecting tissue; storing hydrated alone and/or at ambient temperature in a flowable form, researching and utilizing drying methods that maintain higher moisture levels during the drying process for certain products that those otherwise used in the industry which yields less damage to the tissue; preserving natural biologic content and processing the tissue into unique individual and combination product forms, including tissue ratio calculations and various combinations of raw placental tissue, sterilizing, packaging and preserving; the machinery used and the know-how used to create different forms of products (*ex.* membrane vs. ambient flowable) including product sizing and specifications.  As an example, through Plaintiff's extensive investment of time and resources, Plaintiff and Skye developed the first ambient temperature, shelf stable, flowable connective tissue that remained the only ambient temperature flowable connective tissue prior to Defendant Banman's departure. Plaintiff's collected product information including research and development and manufacturing protocols for products is not publicly known and provides Plaintiff with a significant business advantage.

Plaintiff and Skye developed a line of novel products that take raw human

HRT'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

placental tissue and run it through an HRT proprietary process that cleans, disinfects, preserves, and hydrates the final tissue implant to be either stored at a frozen temperature or at an ambient temperature. This preservation and storage of a connective tissue at ambient temperature was an industry first developed by HRT. This process enabled placental tissue implants to be effectively placed it in the body of a patient for surgical, non-surgical, wound, incision and trauma repair. Plaintiff's products preserve and provide a complete connective tissue biologic matrix, with the necessary scaffolding, growth factors and BioActive molecules to augment the patient's biology at the surgical/trauma/implant site, assisting in proper remodeling and repair of damaged tissue, avoiding excess inflammation and reducing complications, leading to proper tissue formation and minimizing scar tissue.

Plaintiff and Skye dedicated numerous hours and resources to the development, creation and preservation of its manufacturing process including which tissue types to process as well as how to dissect, remove, extract, dry, size, preserve, and package tissues. Plaintiff alleges that Defendant Banman, and/or the other named Defendants, stole, disseminated and then used these proprietary processing methods to instruct a third-party manufacturer on how to produce Plaintiff's connective tissue matrix products.

Plaintiff's unique processes applied to native placental connective tissue result in products that: maintain the integrity of the native placental/amniotic tissue; ensure the stability of those tissues which allows them to exist with minimal damage to the natural tissues in different application forms; allow for easier to use products; and have an increased shelf life and unique product stabilization and delivery methods. Plaintiff's and Skye's data compilations include detailed information on the material form and function of the placental/amniotic tissue cells and how those cell molecules react to different methods of processing.

Plaintiff and Skye developed a best-in-class membrane lineup consisting of three thicknesses, "Thin", "Thick", and "X-Thick", and a range of connective tissue matrix products. Plaintiff's standard operating procedures including dehydrating versus freeze-

6

drying (lyophilization), using e-beam irradiation, avoiding high heat or harsh chemicals which can damage tissue, and using a low bioburden environment when processing. Only Plaintiff and Skye extract raw connective tissue components from the placenta, as opposed to using freeze dried amniotic membrane, harvesting stem cells or amniotic fluid, giving Plaintiff's products the most tissue biologic content per vial. Plaintiff's one-of-a-kind ambient temperature stable product has significant competitive advantages over competitors' products that are either freeze dried, requiring reconstitution prior to use, or frozen, requiring thawing prior to use. Plaintiff's products have a reduced handling time, reduced shipping costs, flexible storage, increased shelf life, as well as shorter operating room time due to the lack of thaw-down-time or reconstituting required. In addition, Plaintiff and Skye developed an omnidirectional membrane implant product meaning that it does not have a specific "right-side-up" or specific direction when implanting. This provides a significant advantage for use in procedures.

Through significant research and development, Plaintiff and Skye have developed product lines and unique processing methods which Plaintiff and Skye have had trademarked including: HydraTek® and the BioAware® Membrane Preservation System, referring to the series of scientific methods providing a distinct advantage in handling, safety, quality and performance of its implants. HydraTek® BioAware® Technology is designed to protect the biomechanical structure of its membrane tissues. FastActing® membrane products provide an immediate covering at the site, then resorb quickly to incorporate into the patient's tissues sooner than other products on the market. BioECM® ActiveMatrix® line is an advanced line up of biologics that provides a complete connective tissue matrix – Complete Connective Tissue Matrix®, harvested from the human placenta and processed with HydraTek® technology to preserve its natural fluid state – the Original Fluid Connective Tissue Matrix® and Original Ambient Flowable Tissue Matrix®.

These products were not being offered by competitors, but Defendant CTM is currently offering membrane and other products referred to as "Thin", "Thick", and

<div align="center">7</div>

HRT'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

"Flow" which uses Plaintiff's marketing language.

Plaintiff and Skye's product development also involved physician studies and feedback by physicians, specifically chosen by Plaintiff because of their skill and expertise in their fields, in order to better meet physicians' needs. Plaintiff has also spent significant time and money in researching its sources of supply of materials and pricing so as to obtain the best materials at a price to advance sales and profitability.

Plaintiff and Skye also discovered how to make and apply a "paste" product and researched the marketability of such a product while Banman was still at Skye/HRT. CTM is now marketing a "Paste" product.

Plaintiff's trade secret unique manufacturing and processing protocols are outlined in HRT's Standard Operating Procedures documents which include: Separation of Placental Tissue; Dying of Tissue; Cleaning of Placental Connective Tissue; Processing of Frozen Placental Tissue – Surgical HRT – Private Label; Processing of Frozen Placental Tissue – Non-Surgical– Umbilical Cord Only – Skye; and Placental Tissue Processing.

The compilation of Plaintiff's unique product formulas, sources of supply, research and development, and manufacturing processes has given Plaintiff a competitive advantage in the industry because it is not publicly known. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

**B.    Customer Lists and Potential Customers**

Plaintiff's confidential customer lists and information, and potential customer lists and information, including key contacts and specific preferences for customers and potential customers throughout the country are not publicly known  and provide Plaintiff with a substantial business advantage.

Human Placental and Amniotic based biologic products are a new class of product and are not ubiquitous to hospitals, surgery centers and medical offices. Finding doctors

8

and facilities who are willing to use the product, let alone repeatedly, requires specialized marketing and recruitment efforts. Plaintiff has spent significant time and money seeking out potential purchasers, fostering those relationships, educating those individuals, and assessing individual needs. Once Plaintiff has identified a potential customer, Plaintiff then takes the time and resources to educate that customer on the patient benefits, specific applications, positioning of its products and insurance reimbursement for Plaintiff's products. Plaintiff has invested substantial time, research, money and resources identifying and maintaining key customer relationships, designing customer initiatives and compiling information about the unique needs and preferences of its customers including historical purchasing information in order to develop a list of customers throughout the country who were willing to purchase, and/or who did in fact purchase, Plaintiff's tissue biologic products. Plaintiff's customer information also includes customer satisfaction and interest in specific products; customer specific needs and preferences; customer order history; historical customer specific pricing, discount and payment term information; sales lead and call/meeting information and records; customer networks and associated facilities; and customer name, address, telephone number, specific points of contact and private email addresses. Plaintiff's customer information also includes customer feedback and patient data relating to the performance of Plaintiff's products.

Plaintiff's collection of customer information contains information that Plaintiff has gathered over the entire history of its operations, which span not only many years but thousands of hours of research, travel and individual customer interaction. The information on the lists would allow a competitor to direct its sales efforts to those customers that have already been educated about or are already purchasing Plaintiff's products and/or potential customers who had shown an interest in using Plaintiff's products.

Plaintiff's compiled information regarding its customer lists and prospective customers has given Plaintiff a competitive advantage in the industry because it is not publicly known . Plaintiff has used reasonable methods to keep this information secret

9

including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

### C.    Research Physicians and Patient Registry

Information on Plaintiff's physicians used for research and data collection is not publicly known and provides Plaintiff with a substantial business advantage. Skye has spent significant time and resources researching, hand-selecting and developing business relationships with specific physicians who it has vetted and chosen because of their skill and experience in the field. These physicians agree to collect valuable data on Plaintiff's products to demonstrate safety and efficacy and provide valuable feedback. Some also conduct research studies wherein they are educated on Plaintiff's products, use the products on select patients, and then provide the results of those applications. Skye created an extensive patient registry containing this information which includes a patient's medical information and product application information to track product performance. This information is invaluable in product development and optimization.

The doctors conducting the studies, the products used in the studies, the methods of the studies and the types of data sought from these studies is all trade secret, confidential information until the results of the studies are final and published. Revealing the physicians involved, the products being used and the methods of these research studies before the results are published would give a competitor an advantage in knowing the products Plaintiff is in the process of analyzing. The identity of the specific physicians being used would also give competitors the advantage of targeting physicians that Skye has spent the time and resources identifying as having specialized qualifications and have been educated about the products.

The compilation of details relating to the physicians performing research studies and the data from those research studies, as well as the physicians performing data collection and the data collected, including the patient registry, have given Plaintiff a

10

competitive advantage in the industry because they are not publicly known.  Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

**D.**    **Plaintiff's Employees, Independent Contractors, Sales Representatives, and Distributors**

Plaintiff's compilation of information regarding employees, independent contractors, sales representatives,  and/or distributors of Plaintiff, including their special skills, experience, territories, customers, compensation (including commissions structure, salary, and/or bonuses, referral fees, recruitment strategies, and compensation considerations), agreement terms and performance histories is not publicly known and provides a significant business advantage.

Plaintiff has spent significant time and resources recruiting and training its employees and sales representatives in Plaintiff's confidential trade secret product information and marketing strategies outlined above.  Plaintiff has also invested significant time and resources in determining compensation structures for these employees that consider various factors including performance, profit margins, training, and experience. In addition, Plaintiff has invested significant time in recruiting qualified sales representatives who have relationships with physicians and facilities.  Keeping its employee and sales representative information confidential has given Plaintiff a significant advantage in the industry in knowing which sales personnel are the highest performing with specific products and customers.  A competitor with this information would benefit from Plaintiff's significant investment of time and expense and would be able to target key employees who have already been vetted, trained and given Plaintiff's confidential and trade secret information.

HRT'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

### E.   Business Operations

Plaintiff's confidential business operations strategies including marketing research, profit margins relating to different markets (i.e., surgical implants), profitability of manufacture vs. outsourcing, providing options in the company as incentive, resource allocation, the responsibilities of the Business Development Department and internal financials including profit margins, revenue numbers, profitability forecasts and costs are not publicly known and have provided Plaintiff with a significant business advantage. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

**INTERROGATORY NO. 2:**

Identify and describe in detail each trade secret of HRT that is referred to in paragraph 164 of the Complaint.

**RESPONSE TO INTERROGATORY NO.2:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a description of the trade secret or something else. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a Stipulation signed by the Court. However, the parties have not executed a protective order which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

12

**AMENDED RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a description of the trade secret or something else.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced and the full scope of the trade secrets that Banman has misappropriated are not yet fully known to Plaintiff. Plaintiff reserves the right to supplement these responses as new information is obtained.

Plaintiff's trade secrets at issue in this case include, but are not limited to, the following:

A.    **Product Development and Manufacturing**

The compilation of information about Plaintiff's product development and manufacturing is not publicly known and provides Plaintiff with a substantial business advantage.

Plaintiff's product information includes surgical implant reimbursement; research and understanding of (then pending) new FDA regulations that affect placental / amniotic derived biologic products; the sources of raw materials and the different properties of the various regions of the placenta, including the surrounding tissues and fluids; research and development to create standard operating procedures for manufacturing which include: separating, cleaning and disinfecting tissue; storing hydrated alone and/or at ambient temperature in a flowable form, researching and utilizing drying methods that maintain higher moisture levels during the drying process for certain products that those otherwise used in the industry which yields less damage to the tissue; preserving natural biologic content and processing the tissue into unique individual and combination product forms, including tissue ratio calculations and various combinations of raw placental

tissue, sterilizing, packaging and preserving; the machinery used and the know-how used to create different forms of products (*ex.* membrane vs. ambient flowable) including product sizing and specifications. As an example, through Plaintiff's extensive investment of time and resources, Plaintiff and Skye developed the first ambient temperature, shelf stable, flowable connective tissue that remained the only ambient temperature flowable connective tissue prior to Defendant Banman's departure. Plaintiff's collected product information including research and development and manufacturing protocols for products is not publicly known and provides Plaintiff with a significant business advantage.

Plaintiff and Skye developed a line of novel products that take raw human placental tissue and run it through an HRT proprietary process that cleans, disinfects, preserves, and hydrates the final tissue implant to be either stored at a frozen temperature or at an ambient temperature. This preservation and storage of a connective tissue at ambient temperature was an industry first developed by HRT. This process enabled placental tissue implants to be effectively placed it in the body of a patient for surgical, non-surgical, wound, incision and trauma repair. Plaintiff's products preserve and provide a complete connective tissue biologic matrix, with the necessary scaffolding, growth factors and BioActive molecules to augment the patient's biology at the surgical/trauma/implant site, assisting in proper remodeling and repair of damaged tissue, avoiding excess inflammation and reducing complications, leading to proper tissue formation and minimizing scar tissue.

Plaintiff and Skye dedicated numerous hours and resources to the development, creation and preservation of its manufacturing process including which tissue types to process as well as how to dissect, remove, extract, dry, size, preserve, and package tissues. Plaintiff alleges that Defendant Banman, and/or the other named Defendants, stole, disseminated and then used these proprietary processing methods to instruct a third-party manufacturer on how to produce Plaintiff's connective tissue matrix products.

Plaintiff's unique processes applied to native placental connective tissue result in

14

products that: maintain the integrity of the native placental/amniotic tissue; ensure the stability of those tissues which allows them to exist with minimal damage to the natural tissues in different application forms; allow for easier to use products; and have an increased shelf life and unique product stabilization and delivery methods. Plaintiff's and Skye's data compilations include detailed information on the material form and function of the placental/amniotic tissue cells and how those cell molecules react to different methods of processing.

Plaintiff and Skye developed a best-in-class membrane lineup consisting of three thicknesses, "Thin", "Thick", and "X-Thick", and a range of connective tissue matrix products. Plaintiff's standard operating procedures including dehydrating versus freeze-drying (lyophilization), using e-beam irradiation, avoiding high heat or harsh chemicals which can damage tissue, and using a low bioburden environment when processing. Only Plaintiff and Skye extract raw connective tissue components from the placenta, as opposed to using freeze dried amniotic membrane, harvesting stem cells or amniotic fluid, giving Plaintiff's products the most tissue biologic content per vial. Plaintiff's one-of-a-kind ambient temperature stable product has significant competitive advantages over competitors' products that are either freeze dried, requiring reconstitution prior to use, or frozen, requiring thawing prior to use. Plaintiff's products have a reduced handling time, reduced shipping costs, flexible storage, increased shelf life, as well as shorter operating room time due to the lack of thaw-down-time or reconstituting required. In addition, Plaintiff and Skye developed an omnidirectional membrane implant product meaning that it does not have a specific "right-side-up" or specific direction when implanting. This provides a significant advantage for use in procedures.

Through significant research and development, Plaintiff and Skye have developed product lines and unique processing methods which Plaintiff and Skye have had trademarked including: HydraTek® and the BioAware® Membrane Preservation System, referring to the series of scientific methods providing a distinct advantage in handling, safety, quality and performance of its implants. HydraTek® BioAware® Technology is

15

designed to protect the biomechanical structure of its membrane tissues. FastActing® membrane products provide an immediate covering at the site, then resorb quickly to incorporate into the patient's tissues sooner than other products on the market. BioECM® ActiveMatrix® line is an advanced line up of biologics that provides a complete connective tissue matrix – Complete Connective Tissue Matrix®, harvested from the human placenta and processed with HydraTek® technology to preserve its natural fluid state – the Original Fluid Connective Tissue Matrix® and Original Ambient Flowable Tissue Matrix®.

These products were not being offered by competitors, but Defendant CTM is currently offering membrane and other products referred to as "Thin", "Thick", and "Flow" which uses Plaintiff's marketing language.

Plaintiff and Skye's product development also involved physician studies and feedback by physicians, specifically chosen by Plaintiff because of their skill and expertise in their fields, in order to better meet physicians' needs. Plaintiff has also spent significant time and money in researching its sources of supply of materials and pricing so as to obtain the best materials at a price to advance sales and profitability.

Plaintiff and Skye also discovered how to make and apply a "paste" product and researched the marketability of such a product while Banman was still at Skye/HRT. CTM is now marketing a "Paste" product.

Plaintiff's trade secret unique manufacturing and processing protocols are outlined in HRT's Standard Operating Procedures documents which include: Separation of Placental Tissue; Dying of Tissue; Cleaning of Placental Connective Tissue; Processing of Frozen Placental Tissue – Surgical HRT – Private Label; Processing of Frozen Placental Tissue – Non-Surgical– Umbilical Cord Only – Skye; and Placental Tissue Processing.

The compilation of Plaintiff's unique product formulas, sources of supply, research and development, and manufacturing processes has given Plaintiff a competitive advantage in the industry because it is not publicly known. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements,

using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

**B.    Customer Lists and Potential Customers**

Plaintiff's confidential customer lists and information, and potential customer lists and information, including key contacts and specific preferences for customers and potential customers throughout the country are not publicly known   and provide Plaintiff with a substantial business advantage.

Human Placental and Amniotic based biologic products are a new class of product and are not ubiquitous to hospitals, surgery centers and medical offices.  Finding doctors and facilities who are willing to use the product, let alone repeatedly, requires specialized marketing and recruitment efforts.  Plaintiff has spent significant time and money seeking out potential purchasers, fostering those relationships, educating those individuals, and assessing individual needs.  Once Plaintiff has identified a potential customer, Plaintiff then takes the time and resources to educate that customer on the patient benefits, specific applications, positioning of its products and insurance reimbursement for Plaintiff's products.   Plaintiff has invested substantial time, research, money and resources identifying and maintaining key customer relationships, designing customer initiatives and compiling information about the unique needs and preferences of its customers including historical purchasing information in order to develop a list of customers throughout the country who were willing to purchase, and/or who did in fact purchase, Plaintiff's tissue biologic products.  Plaintiff's customer information also includes customer satisfaction and interest in specific products; customer specific needs and preferences; customer order history; historical customer specific pricing, discount and payment term information; sales lead and call/meeting information and records; customer networks and associated facilities; and customer name, address, telephone number, specific points of contact and private email addresses. Plaintiff's customer information also includes customer feedback and patient data relating to the performance of Plaintiff's products.

17

Plaintiff's collection of customer information contains information that Plaintiff has gathered over the entire history of its operations, which span not only many years but thousands of hours of research, travel and individual customer interaction. The information on the lists would allow a competitor to direct its sales efforts to those customers that have already been educated about or are already purchasing Plaintiff's products and/or potential customers who had shown an interest in using Plaintiff's products.

In addition, Plaintiff's existing customer relationships include approvals by customers to access credential-protected customer internet portals. To obtain confidential log-in access, Plaintiff spends time and resources to go through an approval process which takes time, energy, and capital. Defendant Banman unlawfully used Plaintiff's trade secret log-in and password credentials and used those credentials to access Plaintiff's account with Broward Health, in order to obtain (1) Broward Health Disclosure Form for Physician Ownership & Financial Arrangements; and (2) North Broward Hospital District Conflict of Interest Questionnaire form for vendors/ contractors/ subcontractor/ agent. Plaintiff gains an advantage in the market in having access to these customers' internet portals. A competitor could short-cut the approval process and benefit from Plaintiff's spent time and expense.

Plaintiff's compiled information regarding its customer lists and prospective customers has given Plaintiff a competitive advantage in the industry because it is not publicly known . Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

C.    **Research Physicians and Patient Registry**

Information on Plaintiff's physicians used for research and data collection is not publicly known and provides Plaintiff with a substantial business advantage. Skye has

18

spent significant time and resources researching, hand-selecting and developing business relationships with specific physicians who it has vetted and chosen because of their skill and experience in the field. These physicians agree to collect valuable data on Plaintiff's products to demonstrate safety and efficacy and provide valuable feedback. Some also conduct research studies wherein they are educated on Plaintiff's products, use the products on select patients, and then provide the results of those applications. Skye created an extensive patient registry containing this information which includes a patient's medical information and product application information to track product performance. This information is invaluable in product development and optimization.

The doctors conducting the studies, the products used in the studies, the methods of the studies and the types of data sought from these studies is all trade secret, confidential information until the results of the studies are final and published. Revealing the physicians involved, the products being used and the methods of these research studies before the results are published would give a competitor an advantage in knowing the products Plaintiff is in the process of analyzing. The identity of the specific physicians being used would also give competitors the advantage of targeting physicians that Skye has spent the time and resources identifying as having specialized qualifications and have been educated about the products.

The compilation of details relating to the physicians performing research studies and the data from those research studies, as well as the physicians performing data collection and the data collected, including the patient registry, have given Plaintiff a competitive advantage in the industry because they are not publicly known. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

///

HRT'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

**D.    Plaintiff's Employees, Independent Contractors, Sales Representatives, and Distributors**

Plaintiff's compilation of information regarding employees, independent contractors, sales representatives, and/or distributors of Plaintiff, including their special skills, experience, territories, customers, compensation (including commissions structure, salary, and/or bonuses, referral fees, recruitment strategies, and compensation considerations), agreement terms and performance histories is not publicly known and provides a significant business advantage.

Plaintiff has spent significant time and resources recruiting and training its employees and sales representatives in Plaintiff's confidential trade secret product information and marketing strategies outlined above. Plaintiff has also invested significant time and resources in determining compensation structures for these employees that consider various factors including performance, profit margins, training, and experience. In addition, Plaintiff has invested significant time in recruiting qualified sales representatives who have relationships with physicians and facilities. Keeping its employee and sales representative information confidential has given Plaintiff a significant advantage in the industry in knowing which sales personnel are the highest performing with specific products and customers. A competitor with this information would benefit from Plaintiff's significant investment of time and expense and would be able to target key employees who have already been vetted, trained and given Plaintiff's confidential and trade secret information.

**E.    Business Operations**

Plaintiff's confidential business operations strategies including marketing research, profit margins relating to different markets (i.e., surgical implants), profitability of manufacture vs. outsourcing, providing options in the company as incentive, resource allocation, the responsibilities of the Business Development Department and internal financials including profit margins, revenue numbers, profitability forecasts and costs are

20

not publicly known and have provided Plaintiff with a significant business advantage. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

**INTERROGATORY NO. 3:**

For each trade secret identified in response to Interrogatories 1-2, describe with particularity how Banman misappropriated the trade secret.

**RESPONSE TO INTERROGATORY NO.3:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a stipulation which will keep the information confidential, nor has the Court entered any such order. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO.3:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff reserves the right to supplement these responses as new information is obtained.

21

Banman misappropriated each of the trade secrets identified in response to Interrogatories Nos. 1-2 because, at the time of the trade secret's acquisition, and/or at the time of Banman's disclosure and/or use of Plaintiff's trade secrets, Banman knew or had reason to know that the trade secret was acquired through improper means, and/or knew or had reason to know that he was acting without consent, and/or breaching a duty to maintain the secrecy of Plaintiff's trade secrets, and/or breaching a duty to maintain limited use of Plaintiff's trade secrets.

Such misappropriation included breaching confidentiality provisions of the agreements that he signed while working for Skye and HRT and disclosing and/or using Plaintiff's trade secrets in forming and/or operating CTM, which includes all aspects of CTM (*ex.*, the manufacture and marketing of products), as well as disclosing and/or using Plaintiff's trade secrets in interfering with Plaintiff's legitimate business interests. Such agreements include:

1. April 23, 2012 Mutual Non-Disclosure, Confidentiality & Non-Circumvent Agreement [signed May 3, 2012] (between Banman and Skye);

2. May 21, 2012 Market Development Agreement [signed May 22, 2012] (between Banman and Skye);

3. March 25, 2013 Business/Market Development Agreement [signed April 4, 2013] (between Banman and Skye);

4. June 2014 Consulting Agreement/Compensation Contract (between Banman and HRT);

5. June 26, 2014 HRT Services/Consultant Confidentiality Agreement (between Banman and HRT);

6. December 9, 2015 HRT/Skye Employee Handbook (acknowledged by Banman).

7. March 31, 2016 Extension of 3/25/2013 Business/Market Development Agreement thru December 31, 2016 (between Banman and Skye);

8. January 1, 2017 Extension of 3/25/2013 Business/Market Development Agreement thru December 31, 2017 (between Banman and Skye);

9. April 18, 2018 Employment Agreement [acknowledging the Skye Employee

22

Confidentiality Agreement & Non-Solicit is signed as a condition of the agreement] (between Banman and Skye);

10.    Skye Orthobiologics LLC Employee Confidentiality Agreement.

As an example, Banman breached the provisions of the June 2014  Consulting Agreement/Compensation Contract with HRT by disclosing and/or using Plaintiffs' trade secrets in forming and/or operating CTM:

**SECTION 3. CONFIDENTIAL INFORMATION**

(a) In the course of conducting the activities hereunder, it is anticipated that Consultant will have access to the Company's proprietary or confidential information, including, without limitation, data, processing protocols, product formulations, information, or documents concerning the finances, business and affairs of the Company which it acquires or produces in the performance of its obligations under this Agreement and data regarding medical, financial and other personal data and information of the Company's participants (collectively, "Confidential Information"). **During the term of this Agreement and thereafter, Consultant shall keep such Confidential Information strictly confidential, and shall not disclose the Company's Confidential Information to any third        party.**
Consultant shall be permitted to disclose Confidential Information to those employees and agents who (i) have a reasonable need for access in connection with Consultants duties, (ii) have been advised of the confidentiality requirements of this Agreement, and (iii) agree to be bound by the provisions hereof. Confidential Information may be disclosed pursuant to a legal, judicial or governmental proceeding or subpoena; provided that the Company is given prompt notice by Consultant so that the Company can seek a protective order or other protection for the Confidential Information.

(b) Consultant hereby acknowledges and agrees that, in the event that Consultant shall violate any provisions of this **Section 3**, the Company will be without an adequate remedy at law and, accordingly, will be entitled to enforce such restrictions by temporary or permanent injunctive or other equitable relief obtained in any action or proceeding, without the necessity of proving damages or posting bond, and without prejudice to any other remedies which it may have at law or in equity.

(c) If any action or proceeding shall be commenced to enforce this **Section 3**, the prevailing party in such action or proceeding shall be entitled to recover from the other party all reasonable attorneys' fees, costs and

23

expenses incurred by such prevailing party in connection with such action or proceeding. The provisions of **Section 3** shall survive the termination of this Agreement.

**SECTION 5. OWNERSHIP OF MATERIALS; RETURN OF INFORMATION**

Except for the non-public, confidential and proprietary information and trade secrets belonging to Consultant or to a third party entrusting such information and/or trade secrets to Consultant (including Consultant's proprietary format and methodology), the content of all Deliverables (whether in tangible or electronic, digital, magnetic or other form), shall be the sole and absolute property of the Company for any and all purposes; provided that the Company has rendered payment to Consultant for services rendered as set forth in this Agreement. For purposes of this Agreement, "Deliverables" shall mean all documents, and other information, including but not limited to, memoranda, reports, projections, analyses and other materials whether or not confidential, provided or created by Consultant to the Company in connection with Consultant's services hereunder. Consultant agrees that Consultant does not have and will not claim to have any right, title or interest in such or to such Deliverables. The confidential and proprietary information and trade secrets belonging to Consultant shall not include any information and/or materials that is Confidential Information under **Section 3** above or which Consultant obtained or created expressly for the Company's use in the course of Consultant's engagement by the Company, or any information and materials provided to Consultant by or on behalf of the Company. Promptly upon the Company's request, Consultant shall return to the Company or its designee (or destroy at the Company's sole option) all data, documents, and other information, in all media, in Consultant's possession or control whether provided to Consultant by the Company, or by others, or prepared by Consultant. Consultant may retain archival copies of such material and information. In addition, Consultant agrees to provide reasonable cooperation with any successor consultant, including explaining and decoding such data, in order to assure a smooth and uninterrupted transition of services.

As another example, Banman breached the provisions of the Employee Handbook acknowledged by Banman in December 2015 by disclosing and/or using Plaintiff's trade secrets in forming and/or operating CTM. The Employee Handbook provided:

As part of their employment with THE COMPANY [which included Plaintiff], employees may be exposed to and/or provided with trade secrets ("Trade Secrets") and other confidential and proprietary information

24

HRT'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

("Confidential Information") of THE COMPANY relating to the operation of THE COMPANY'S business and its customers (collectively referred to as "Trade Secrets/Confidential Information").

*Employees are not allowed to discuss information about their job, contract, finances, processes, or technological knowledge with anyone outside their department or anyone within their department unless they have been granted written access to that information.*

"Trade Secrets" mean information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) derives independent economic value, actual or potential, from not being publicly known to the public or to other persons or entities who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain it secrecy. THE COMPANY'S Trade Secrets are (1) not publicly known to the public or to THE COMPANY'S competitors; (2) were developed or compiled at significant expense by THE COMPANY over an extended period of time; and (3) are the subject of THE COMPANY'S reasonable efforts to maintain their secrecy.

"Confidential Information" means information belonging to THE COMPANY, whether reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, that has been provided to employees during their employment THE COMPANY and/or employees have gained access to while employed by THE COMPANY and/or were developed by employees in the course of their employment with THE COMPANY, that is proprietary and confidential in nature.

As part of the consideration employees provide to THE COMPANY in exchange for their employment and continued employment with THE COMPANY is their agreement and acknowledgement that all Trade Secrets/Confidential Information developed, created or maintained by them shall remain at all times the sole property of THE COMPANY, and that if THE COMPANY'S Trade Secrets/Confidential Information were disclosed to a competing business or otherwise used in an unauthorized manner, such disclosure or use would cause immediate and irreparable harm to THE COMPANY and would give a competing business an unfair business advantage against THE COMPANY.

Employees will not, except as required in the conduct of THE COMPANY'S business or as authorized in writing by THE COMPANY, disclose or use during their term of employment or subsequent thereto any Trade Secrets/Confidential Information. Furthermore, all records, files,

25

plans, documents and the like relating to the business of THE COMPANY which employees prepare, use or come in contact with shall be and shall remain the sole property of THE COMPANY and shall not be copied without written permission of THE COMPANY and shall be returned to THE COMPANY on termination or cessation of employment, or at THE COMPANY'S request at any time.

Additionally, Banman knew or had reason to know that Defendants Seoane and Stumpe also signed multiple confidentiality agreements and were breaching the same in their acquisition, disclosure and use of Plaintiff's trade secrets.

Banman's misappropriation also included, but was not limited to the following:

Banman acquired, used and/or disseminated the compilation of information about product research and development, performance data, product formulations, sources of supply, manufacturing process, and design, including specific technology, that are not publicly known and provide Plaintiff with its significant competitive advantage. Plaintiff alleges that Defendant Banman used and disseminated Plaintiff's proprietary information to external manufacturers to create and market products, including a room temperature "flowable" connective tissue matrix product and membrane products, to capitalize on Plaintiff's significant investment of time, resources and goodwill. Banman used and disseminated this trade secret information in the formation and operation of Banman and to interfere with Plaintiff's legitimate business interests.

Banman acquired, used and/or disseminated Plaintiff's compilation of information on specific physicians who Plaintiff vetted and chose because of their skill and experience in the field, the compilation of details relating to the physicians performing research studies and the data from those research studies, the amount physicians are being compensated, and the compilation of data on specific procedures using Plaintiff's products in order to target these physicians, regardless of whether or not they were in the midst of performing research for Plaintiff, in the formation and/or operations of CTM and with the purpose of interfering with Plaintiff's legitimate business interests. Banman targeted these physicians in order to interfere with their relationship with Plaintiffs by attempting to and/or succeeding in (1) instructing the doctors to stop purchasing Plaintiff's products and

26

purchase from CTM instead, and (2) create a conflict whereby the doctors would be required to cease their relationship with Plaintiffs and cease providing valuable clinical data which would cause immeasurable harm to Plaintiffs to benefit Banman. These include Dr. Anderson, Dr. Badman, and Dr. Shifka. Additionally, Banman targeted Dr. Hiatt, who was performing an ENT study for Plaintiff but did not produce the results of that study to Plaintiff, and instead gave those results to Banman at Banman's instruction, and now is the Chief Scientific Officer of CTM.

Banman acquired, used and/or disseminated Plaintiff's trade secret compilation of information regarding employees and/or sales representatives of Plaintiff, including their special skills, experience, territories, customers, compensation (including commissions structure, salary, and/or bonuses and compensation considerations), agreement terms and performance histories to target certain sales associates and then used and disseminated that information to other individuals who, in turn, used and disseminated that information to attempt to convince Plaintiff's sales associates to interfere with Plaintiff's legitimate business interests, valid contracts and prospective economic advantages; to sell CTM's products to Plaintiff's customers; and to encourage Plaintiff's customers, sales personnel and distributors to breach the terms of their respective agreements with Plaintiff. Banman also used and disseminated this trade secret information in the formation and/or operations of CTM. These associates include: Nate Boulais; ██████████████████ Mike Stumpe, who then targeted Matt Dripps; Pablo Seoane, who was instructed to keep and did keep the seventeen "Notes" files outlined above following his separation from Skye in violation of his own confidentiality agreement with Plaintiff; Integrative Medical Solutions ("IMS"); VMD and Gardner Rogers, who Plaintiff alleges assisted Banman in the sabotage of Plaintiff's application for its products to be approved by VA National Acquisition Center. Plaintiff is discovering additional individuals and will amend these responses as appropriate.

Seoane acquired, used and/or disseminated Plaintiff's trade secret customer information and potential customer information including a compilation of customers

27

throughout the country who were willing to purchase, and/or who did in fact purchase, Plaintiff's tissue biologic products; customer satisfaction and interest in specific products; customer specific needs and preferences; customer specific pricing guidelines; customer order history; log-in credentials for customer portals; and customer information including name, address, telephone number, specific points of contact and private email addresses in order to target those specific customers and essentially offer them the exact same products, (including offering Plaintiff's pricing in a side-by-side comparison) in order to interfere with Plaintiff's legitimate business interests.

Banman acquired, used and/or disseminated Plaintiff's business plan, financials including Plaintiff's profit margins, revenue numbers, profitability forecasts, costs and market research, company structure, ownership structure and business affairs in the formation and operation of CTM to create a copy-cat of Plaintiff's entire business and interfere with Plaintiff's legitimate business interests.

**INTERROGATORY NO. 4:**

For each trade secret identified in Interrogatories 1-2, describe with particularity all of HRT's efforts to maintain the secrecy of the trade secret.

**RESPONSE TO INTERROGATORY NO.4:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

28

HRT'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

**AMENDED RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff reserves the right to supplement these responses as new information is obtained.

Plaintiff requires each of its employees, independent contractors, consultants, sales representatives, and distributors with access to trade secret information, to execute confidentiality agreements and/or non-disclosure agreements which explicitly inform the individuals of the consequences that they face should they violate the terms of the confidentiality agreements. Plaintiff also has employees execute and acknowledge the nature and extent of trade secret information in an Employee Handbook.

Plaintiff also advises employees and consultants that any information belonging to Plaintiff, whether reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, that has been provided to the employees and consultants during their tenure with Plaintiff, that the employees and consultants have gained access to while working with Plaintiff and/or were developed by the employee or consultant in the course of their work with Plaintiff, is proprietary and confidential in nature and would be the exclusive property of Plaintiff.

Plaintiff also controls physical access to Plaintiff's offices and information and use network firewalls, password protection, and security credentials to prevent unauthorized access to Plaintiff's servers and internally shared documents, and revoke authorization at the end of any relationship with Plaintiff.

HRT'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

**INTERROGATORY NO. 5:**

For each trade secret identified in Interrogatories 1-2, identify all Documents that memorialize, embody, or reference the trade secret.

**RESPONSE TO INTERROGATORY NO.5:**

Plaintiff objects to the instant interrogatory because it calls for the identification of a list of documents which may be confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Further, Plaintiff will produce all responsive documents in lieu of listing the documents in this response because of sheer volume of documents will be extensive. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to the instant interrogatory on the grounds that it is vague, ambiguous and unintelligible as to the terms "memorialize," "embody" and "reference". None of the terms are defined rendering it impossible to know what is intended by the question. To the extent the interrogatory can even be understood, Plaintiff further objects to the instant interrogatory on the grounds that it is overbroad as to timeframe and scope and by such overbreadth is burdensome and oppressive.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff will produce all responsive documents in lieu of listing the documents in this response because of sheer volume of documents will be extensive. Plaintiff exercises its option under Rule 33(d) to respond to this interrogatory by referring the propounding party to Plaintiff's document production.

HRT'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

DATED:  October 8, 2021                              ROSEN ✧ SABA, LLP

                                          By:    /s Ryan D. Saba
                                                 Ryan D. Saba, Esq.
                                                 Laura Kelly St. Martin, Esq.
                                                 Attorneys for Plaintiffs
                                                 SKYE ORTHOBIOLOGICS, LLC and
                                                 HUMAN REGENERATIVE
                                                 TECHNOLOGIES, LLC

HRT'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

**VERIFICATION**

I, Chris Sharp, am an officer or agent of the party providing this Verification, and am authorized to make this Verification for and on its behalf, and I make this Verification for that reason; I have read the attached document(s): **PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC'S AMENDED RESPONSES TO BRYAN BANMAN'S FIRST SET OF INTERROGATORIES**, and know the contents; I am informed and believe and upon that ground allege that the matters stated in said document(s) are true and correct under the penalty of perjury under the laws of the United States of America.

Executed on October 7th, 2021, at Los Angeles, California.

_____
Chris Sharp

1

VERIFICATION

## PROOF OF SERVICE

**STATE OF CALIFORNIA**    )
                            )    ss
**COUNTY OF LOS ANGELES**   )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 9350 Wilshire Boulevard, Suite 250, Beverly Hills, California 90212.

On **October 8, 2021**, I served the foregoing document described as: **PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC'S AMENDED RESPONSES TO BRYAN BANMAN'S FIRST SET OF INTERROGATORIES,** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

| | |
|---|---|
| **YUKEVICH \| CAVANAUGH**<br>TODD CAVANAUGH, Esq.<br>NATHAN GUEST, Esq.<br>355 S Grand Ave 15th Floor<br>Los Angeles, CA 90071 | Attorneys for Defendants GARDNER ROGERS and VETERANS MEDICAL DISTRIBUTORS, INC.<br><br>Tel: (213) 362-7777<br>Fax: (213) 362-7788<br><br>Email: tcavanaugh@yukelaw.com |
| **HODGSON RUSS LLP**<br>ROBERT J. FLUSKEY, JR.<br>MATTHEW K. PARKER<br>The Guaranty Building<br>140 Pearl Street, Suite 100<br>Buffalo, New York 14202 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel: (716) 856-4000<br>Fax: (716) 849-0349<br><br>Email: rfluskey@hodgsonruss.com<br>Email: mparker@hodgsonruss.com |
| **HENNELLY & GROSSFELD LLP**<br>Thomas H. Case, Esq.<br>Paul T. Martin, Esq.<br>Marina Towers North<br>4640 Admiralty Way #850<br>Marina Del Rey, CA 90292 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel: (310) 305-2100<br>Fax: (310) 305-2116<br><br>Email: tcase@hgla.com<br>Email: pmartin@hgla.com |

32

HRT'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

| **BLANK ROME, LLP**<br>Arash Beral, Esq.<br>2029 Century Park E Ste, 6th Floor<br>Los Angeles, CA 90067 | Attorneys for Defendant Mike Stumpe<br><br>Tel: (424) 239-3453<br>Fax: (424) 389-7519<br><br>Email: aberal@blankrome.com |
|---|---|

BY E-MAIL OR ELECTRONIC TRANSMISSION - I caused the document(s) described above to be sent from e-mail address dsanchez@rosensaba.com to the persons at the e-mail address listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X]    FEDERAL    I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I also declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **October 8, 2021**, at Beverly Hills, California.

Danielle Sanchez

HRT'S AMENDED RESPONSES TO BRYAN BANMAN'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

# Exhibit 3

# ROSEN ✧ SABA, LLP

RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY St. MARTIN (State Bar No. 260966)
lstmartin@rosensaba.com
JOHN J. AUMER (State Bar No. 130585)
jaumer@rosensaba.com
JUSTIN L. WILSON (State Bar No. 263076)
jwilson@rosensaba.com
9350 Wilshire Boulevard, Suite 250
Beverly Hills, California 90212
Telephone:    (310) 285-1727
Facsimile:    (310) 285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company, <br><br> *Plaintiffs,* <br><br> v. <br><br> CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PABLO SEOANE, an individual; and DOES 1 through 10, inclusive, <br><br> *Defendants.* | Case No.: 2:20-cv-03444-DMG-PVC <br> *Honorable Dolly M. Gee* <br><br> **PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S AMENDED RESPONSES TO PABLO SEOANE'S FIRST SET OF INTERROGATORIES** <br><br> Complaint Filed:    April 23, 2020 <br> Trial Date:    None Set <br><br> **HIGHLY CONFIDENTIAL** |

1

SKYE'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

PROPOUNDING PARTY:      Defendant, Pablo Seoane

RESPONDING PARTY:      Plaintiff, Skye Orthobiologics, LLC

SET NUMBER:      One

**TO DEFENDANT PABLO SEOANE AND HIS ATTORNEYS OF RECORD:**

Plaintiff Skye Orthobiologics, LLC ("Plaintiff"), hereby submits these amended responses to the Interrogatories, Set No. One, propounded by Defendant Pablo Seoane ("Defendant") Set of Interrogatories under oath, pursuant to the provisions of California *Code of Civil Procedure* §2030.210, et seq., as follows:

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose of this action. Each answer is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and any and all other objections and grounds which would require the exclusion of any statement herein if the Interrogatories were asked of, or any statements contained herein were made by, a witness present and testifying in Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Plaintiff and its counsel have not yet completed their discovery or preparation for trial, nor have they completed their analysis, review or investigation of all evidence, applicable defenses, information, witness accounts or other trial preparation matters and subjects obtained or discovered to date. The within responses are, therefore, complete as to all presently known facts and information acquired or possessed by Plaintiff up to this time. These responses should, therefore, not be construed as prejudicing or waiving Plaintiff's right to provide additional facts, evidence, contentions or theories at trial or any subsequent hearing based upon information, evidence or analysis hereafter obtained or evaluated. Nothing in these responses should be construed as waiving any privileges or objections which may be applicable to information or evidence hereafter obtained.

Plaintiff further reserves the right to update and/or supplement these responses if and

2

SKYE'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

when information which is responsive to these interrogatories is discovered.

Except for explici t fac ts admitted herei n, no incidental or imp lied a dmissions are intended hereby. The fact that Plaintiff has answered any Interrogatory should not be taken as an admiss ion that Plaintiff acce pts or ad mits the exi stence of any facts set f orth o r assumed by such Interrogatory, or that such response constitutes admissible evidence. The fact that Plaintiff has answered part or all of any interrogatory is not intended and shall not be const rued to b e a waiver by P laintiff of all or a ny p art o f any objection to any Interrogatory.

## GENERAL OBJECTIONS

1.      Plaintiff objects t o the Interrogat ories to the extent the y seek info rmation protected from disclosure by the attorney-client privilege, a ttorney work product doctrine or any other applicable privilege or protection under statutory or common law.

2.      Plaintiff objects to t he Interroga tories to the extent that t hey cal l for the disclosure of info rmation protected by any of the parties' or third p arties' constitu tional right to priva cy u nder the United S tates o r Califor nia Constitutions, or protec ted a s proprietary, comm ercially sensit ive, tra de se cret or fall ing un der th e rubric o f any other such confidentiality protection or privilege.

3.      Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4.      Plaintiff objects to the Interrogatories to the extent that they are unlimited as to time or scope, and as a result, are overly broad and unduly burdensome.

5.      Highly C onfidential: Pursuant t o the Court Order (DK T 108), this entire document is designated as "Highly Confidential".

///

3

SKYE'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

## INTERROGATORIES

### INTERROGATORY NO. 1:

Identify and describe in detail each trade secret of Skye that Seoane allegedly misappropriated.

### RESPONSE TO INTERROGATORY NO. 1:

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a description of the trade secret or something else. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

### AMENDED RESPONSE TO INTERROGATORY NO. 1:

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a description of the trade secret or something else.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced and the full scope of the trade secrets that Seoane has misappropriated are not yet fully known to Plaintiff. Plaintiff reserves the right

4

to supplement these responses as new information is obtained.

Plaintiff's trade secrets at issue in this case include, but are not limited to, the following:

**A.    Cost and Pricing**

Plaintiff's costs and pricing information, which includes the detailed analysis relating to the individual cost of production per item (research and development, materials, labor, overhead, specific prices Plaintiff has negotiated with its vendors, etc.), together with profit margin and market analysis, has been intentionally kept secret from third parties and provides Plaintiff with a substantial business advantage. Skye has spent considerable time and resources developing a pricing scheme to maximize the profit while remaining competitive in the market.

In addition, as discussed below regarding Plaintiff's marketing strategies, potential reimbursement for Plaintiff's products is also considered in Plaintiff's pricing analysis. Plaintiff has spent significant time and expense to extensively research medical reimbursement and understand the application of certain medical codes to its unique tissue implants for insurance reimbursement. Skye and HRT developed the industry's first surgical implant that is a "connective tissue" on indication as a tissue product (derived from amniotic or any placental tissue), and the only one in the industry that could be reimbursed at cost plus profit. This is a substantial advantage as medical facilities typically lose money when using the competition's products.

Plaintiff's pricing scheme was developed to target the needs of a diverse group of clinics, surgery centers, hospitals and physicians around the country to give competitively attractive pricing in line with each customer's different pricing goals, with pricing being individually tailored to each customer. Plaintiff's pricing information is not publicly known and provides Plaintiff with a substantial business advantage. The pricing of similar products in the industry is not published to competitors, so any competitor having Plaintiff's pricing information would have the advantage of foregoing all of Plaintiff's time and effort in analyzing the various factors at play to develop a pricing scheme that was competitive,

5

would be accepted by facilities and physicians, and was still profitable.

### B.    Customer Lists and Potential Customers

Plaintiff's confidential customer lists and information, and potential customer lists and information, including key contacts and specific preferences for customers and potential customers throughout the country are not publicly known and provide Plaintiff with a substantial business advantage.

Human Placental and Amniotic based biologic products are a new class of product and are not ubiquitous to hospitals, surgery centers and medical offices. Finding doctors and facilities who are willing to use the product, let alone repeatedly, requires specialized marketing and recruitment efforts. Plaintiff has spent significant time and money seeking out potential purchasers, fostering those relationships, educating those individuals, and assessing individual needs. Once Plaintiff has identified a potential customer, Plaintiff then takes the time and resources to educate that customer on the patient benefits, specific applications, positioning of its products and insurance reimbursement for Plaintiff's products. Plaintiff has invested substantial time, research, money and resources identifying and maintaining key customer relationships, designing customer initiatives and compiling information about the unique needs and preferences of its customers including historical purchasing information in order to develop a list of customers throughout the country who were willing to purchase, and/or who did in fact purchase, Plaintiff's tissue biologic products. Plaintiff's customer information also includes customer satisfaction and interest in specific products; customer specific needs and preferences; customer order history; historical customer specific pricing, discount and payment term information; sales lead and call/meeting information and records; customer networks and associated facilities; and customer name, address, telephone number, specific points of contact and private email addresses. Plaintiff's customer information also includes customer feedback and patient data relating to the performance of Plaintiff's products.

Plaintiff's collection of customer information contains information that Plaintiff has

6



gathered over the enti re history of its operat ions, which span no t only many years but thousands of hours of research, travel and individual customer interaction. The information on the lists would allow a competitor to direct its sales efforts to those customers that have already been educated about or are already purchasing Plaintiff's products and/or potential customers who had shown an interest in using Plaintiff's products.

Plaintiff's compiled i nformation regardi ng its custo mer list s a nd prospec tive customers has give n Plaintiff a competitiv e advantage in the indus try because it is not publicly kn own. Plai ntiff has used r easonable methods t o keep t his informat ion secret including re quiring c onfidentiality agreeme nts, using net work fire walls, pass words an d security cr edentials, a s well as con trolling physical access to Plaintiff's offices and information centers.

## C. **Product Development and Manufacturing**

The compilatio n of informatio n about Pl aintiff's produ ct dev elopment and manufacturing is not publicly kno wn and p rovides P laintiff with a substantial b usiness advantage.

Plaintiff's pr oduct info rmation inclu des surgi cal implant reim bursement; researc h and understanding of (then pending) new FDA regulations that affect placental / amni otic derived biologic pr oducts; the sources of raw materials and the different properties of the various regions of the placenta, including the surrounding tissues and fluids; research and development to create standard oper ating pr ocedures for manufacturing which i nclude: separating, cleaning and disinfecting tis sue; storing hydrated alo ne and/or at ambient temperature in a flo wable form, resear ching and utili zing drying m ethods t hat m aintain higher moisture levels during the drying process for certain product s that those otherwise used in the indust ry w hich yields less da mage to the tissue; preser ving natural bio logic content and processing the tissue into un ique individua l and combinatio n product forms, including tissue ratio calculation s and various combinati ons of raw placental tissue, sterilizing, pack aging and preserving; the machinery used a nd the know -how used

7

to create different forms of products (*ex*. membrane vs. ambient flowable) including product sizing and specifications. As an example, through Plaintiff's extensive investment of time and resources, Plaintiff and HRT developed the first ambient temperature, shelf stable, flowable connective tissue that remained the only ambient temperature flowable connective tissue prior to Defendant Banman's and Seoane's departure. Plaintiff's collected product information including research and development and manufacturing protocols for products is not publicly known and provides Plaintiff with a significant business advantage.

Plaintiff and HRT developed a line of novel products that take raw human placental tissue and run it through an HRT proprietary process that cleans, disinfects, preserves, and hydrates the final tissue implant to be either stored at a frozen temperature or at an ambient temperature. This preservation and storage of a connective tissue at ambient temperature was an industry first developed by HRT. This process enabled placental tissue implants to be effectively placed it in the body of a patient for surgical, non-surgical, wound, incision and trauma repair. Plaintiff's products preserve and provide a complete connective tissue biologic matrix, with the necessary scaffolding, growth factors and BioActive molecules to augment the patient's biology at the surgical/trauma/implant site, assisting in proper remodeling and repair of damaged tissue, avoiding excess inflammation and reducing complications, leading to proper tissue formation and minimizing scar tissue.

Plaintiff and HRT dedicated numerous hours and resources to the development, creation and preservation of its manufacturing process including which tissue types to process as well as how to dissect, remove, extract, dry, size, preserve, and package tissues. Plaintiff alleges that Defendant Seoane, and/or the other named Defendants, stole, disseminated and then used these proprietary processing methods to instruct a third-party manufacturer on how to produce Plaintiff's connective tissue matrix products.

Plaintiff's unique processes applied to native placental connective tissue result in products that: maintain the integrity of the native placental/amniotic tissue; ensure the stability of those tissues which allows them to exist with minimal damage to the natural tissues in different application forms; allow for easier to use products; and have an increased



8

shelf life and unique product stabilization and delivery methods. Plaintiff's and HRT's data compilations include detailed information on the material form and function of the placental/amniotic tissue cells and how those cell molecules react to different methods of processing.

Plaintiff and HRT developed a best-in-class membrane lineup consisting of three thicknesses, "Thin", "Thick", and "X-Thick", and a range of connective tissue matrix products. Plaintiff's standard operating procedures including dehydrating versus freeze-drying (lyophilization), using e-beam irradiation, avoiding high heat or harsh chemicals which can damage tissue, and using a low bioburden environment when processing. Only Plaintiff and HRT extract raw connective tissue components from the placenta, as opposed to using freeze dried amniotic membrane, harvesting stem cells or amniotic fluid, giving Plaintiff's products the most tissue biologic content per vial. Plaintiff's one-of-a-kind ambient temperature stable product has significant competitive advantages over competitors' products that are either freeze dried, requiring reconstitution prior to use, or frozen, requiring thawing prior to use. Plaintiff's products have a reduced handling time, reduced shipping costs, flexible storage, increased shelf life, as well as shorter operating room time due to the lack of thaw-down-time or reconstituting required. In addition, Plaintiff and HRT developed an omnidirectional membrane implant product meaning that it does not have a specific "right-side-up" or specific direction when implanting. This provides a significant advantage for use in procedures.

Through significant research and development, Plaintiff and HRT have developed product lines and unique processing methods which Plaintiff and HRT have had trademarked including: HydraTek® and the BioAware® Membrane Preservation System, referring to the series of scientific methods providing a distinct advantage in handling, safety, quality and performance of its implants. HydraTek® BioAware® Technology is designed to protect the biomechanical structure of its membrane tissues. FastActing® membrane products provide an immediate covering at the site, then resorb quickly to incorporate into the patient's tissues sooner than other products on the market. BioECM®

9

ActiveMatrix® line is an advanced line up of biologics that provides a complete connective tissue matrix – Complete Connective Tissue Matrix®, harvested from the human placenta and processed with HydraTek® technology to preserve its natural fluid state – the Original Fluid Connective Tissue Matrix® and Original Ambient Flowable Tissue Matrix®.

These products were not being offered by competitors, but Defendant CTM is currently offering membrane and other products referred to as "Thin", "Thick", and "Flow" which uses Plaintiff's marketing language.

Plaintiff and HRT's product development also involved physician studies and feedback by physicians, specifically chosen by Plaintiff because of their skill and expertise in their fields, in order to better meet physicians' needs. Plaintiff has also spent significant time and money in researching its sources of supply of materials and pricing so as to obtain the best materials at a price to advance sales and profitability.

Plaintiff and HRT also discovered how to make and apply a "paste" product and researched the marketability of such a product while Banman was still at Skye/HRT. CTM is now marketing a "Paste" product.

Plaintiff's trade secret unique manufacturing and processing protocols are outlined in HRT's Standard Operating Procedures documents which include: Separation of Placental Tissue; Dying of Tissue; Cleaning of Placental Connective Tissue; Processing of Frozen Placental Tissue – Surgical HRT – Private Label; Processing of Frozen Placental Tissue – Non-Surgical– Umbilical Cord Only – Skye; and Placental Tissue Processing.

The compilation of Plaintiff's unique product formulas, sources of supply, research and development, and manufacturing processes has given Plaintiff a competitive advantage in the industry because it is not publicly known. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.



10

### D.    Research Physicians and Patient Registry

Information on Plaintiff's physicians used for research and data collection is not publicly known and provides Plaintiff with a substantial business advantage. Plaintiff has spent significant time and resources researching, hand-selecting and developing business relationships with specific physicians who Plaintiff has vetted and chosen because of their skill and experience in the field. These physicians agree to collect valuable data on Plaintiff's products to demonstrate safety and efficacy and provide valuable feedback. Some also conduct research studies wherein they are educated on Plaintiff's products, use Plaintiff's products on select patients, and then provide the results of those applications. Plaintiff created an extensive patient registry containing this information which includes a patient's medical information and product application information to track product performance. This information is invaluable in product development and optimization.

The doctors conducting the studies, the products used in the studies, the methods of the studies and the types of data sought from these studies is all trade secret, confidential information until the results of the studies are final and published. Revealing the physicians involved, the products being used and the methods of these research studies before the results are published would give a competitor an advantage in knowing the products Plaintiff is in the process of analyzing. The identity of the specific physicians being used would also give competitors the advantage of targeting physicians that Plaintiff has spent the time and resources identifying as having specialized qualifications and have been educated about the products.

In addition to the names of the physicians participating in these studies, the amount of money that Plaintiff compensates these physicians for their participation is also confidential. The compilation of details relating to the physicians performing research studies and the data from those research studies, as well as the physicians performing data collection and the data collected, including the patient registry, have given Plaintiff a competitive advantage in the industry because they are not publicly known. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality

11

SKYE'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

agreements, using net work firewal ls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

### E.    Marketing and Sales

Plaintiff's marketing strategies, methods and processes are not publicly known and provide Plaintiff with a significant business advantage.

Plaintiff's analysis, strategy and recommendations regarding its marketing initiatives and the regions, physicians, facilities, surgery centers, and hospitals to target; marketing language; campaigns based on research in the market and Plaintiff's internal records on the profitability of certain marketing campaigns, including, for example, a newsletter campaign and the profitability vs. expense of attending certain trade shows; research and analysis of competitive pricing and compensation models in the market are the result of significant time and resource investments and gave Plaintiff a substantial advantage in the market because they were not publicly known.

Plaintiff has spent significant time and expense to research marketing strategy and develop marketing initiatives, research medical reimbursement coding and understand the application of certain codes to apply to its unique tissue implants for insurance reimbursement. This gives Plaintiff a significant advantage as no other company has Plaintiff's level of understanding as to reimbursement, nor do they have certain codes available to them, as their products are **not** human connective tissue allograft implants for surgical use (biologic implant). Plaintiff's research and analysis of reimbursement coding and product requirements allowed them to determine product classifications that would apply to its products while also allowing for reimbursement. Through extensive analysis, Plaintiff determined that its products qualify as connective tissue. Prior to Banman resigning, Plaintiff was also the only company that had a tissue implant with the indication: "Intended to supplement or replace damage or inadequate connective tissue." This marketing strategy has provided Plaintiff with the significant advantage of offering products with greater indications and allowing for insurance reimbursement. Defendant CTM is now

12

using this same indication. In addition, Plaintiff developed the marketing strategy of using specific language to quickly educate doctors in a way that they could easily digest, using the terms "ECM" or Extracellular Matrix, BioECM®, and "connective tissue matrix".

Plaintiff's compilation of its medical reimbursement research is reflected in its "coding notes" that were distributed only to engaged sales representatives working on specific accounts or on a specific case who have requested further coding support. This gave Plaintiff a significant advantage in the market as facilities are far more likely to use products that could be reimbursed.

In addition, Plaintiff devised specific training methods for employees and sales representatives to educate them on the intricate details of Plaintiff's marketing and sales strategies as well as each product's manufacture and application so that they could then educate customers and physicians on the benefits of Plaintiff's products and how to use the products. These training methods are detailed in the seventeen "Notes" files that Plaintiff alleges were stolen by Defendant Seoane:

1.    Skye WoundEx® Insurance Verification Hotline

2.    Novitas Patient Selection Criteria for DFU and VLU

3.    GYN Canned Doc Email

4.    New Rep Training Email

5.    Skye Vs. Tides Medical

6.    Plastics Indications for Skye BioECM®

7.    Call Script for Rep Consultation

8.    Call Script for Sales Strategy Calls

9.    Vascular Indications for Skye BioECM®

10.    General Product Training Follow-up

11.    New Rep - Sales Strategy Call Complete Email

12.    Territory Email

13.    Colorectal Indications for Skye BioECM®

14.    UroGyn Indications for Skye BioECM®

13



15. Oncology Indications for Skye BioECM®

16. Nerves Indications for Skye BioECM®/ Spine/Neuro Applications for Skye BioECM®

17. Ocular Direct Sales/Ocular Leads

The "Notes" files contained the playbook for Plaintiff on how to be successful in selling Plaintiff's products, information that was created by Plaintiff to train its sales force on how the products work, how to sell the products, and internal corporate strategy against competitors.

Plaintiff's confidential marketing strategies, marketing initiatives, marketing methods and processes and sales strategies give Plaintiff a competitive advantage in the industry because they are not publicly known. An individual with knowledge of Plaintiff's confidential marketing information could simply transfer that information to their own business and forego the years and significant expense Plaintiff has invested in market research. Also, if known to a competitor it would allow the competitor to predict and counter Plaintiff's marketing strategies. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

F. **Plaintiff's Employees, Independent Contractors, Sales Representatives, and Distributors**

Plaintiff's compilation of information regarding employees, independent contractors, sales representatives, and/or distributors of Plaintiff, including their special skills, experience, territories, customers, compensation (including commissions structure, salary, and /or bonuses, referral fees, recruitment strategies, and compensation considerations), agreement terms and performance histories is not publicly known and provides a significant business advantage.

Plaintiff has spent significant time and resources recruiting and training its

14



employees and sales representatives in Plaintiff's confidential trade secret product information and marketing strategies outlined above. Plaintiff has also invested significant time and resources in determining compensation structures for these employees that consider various factors including performance, profit margins, training, and experience. In addition, Plaintiff has invested significant time in recruiting qualified sales representatives who have relationships with physicians and facilities. Keeping its employee and sales representative information confidential has given Plaintiff a significant advantage in the industry in knowing which sales personnel are the highest performing with specific products and customers. A competitor with this information would benefit from Plaintiff's significant investment of time and expense and would be able to target key employees who have already been vetted, trained and given Plaintiff's confidential and trade secret information.

### G.    Business Operations

Plaintiff's confidential business operations strategies including marketing research, profit margins relating to different markets (i.e., surgical implants), profitability of manufacture vs. outsourcing, providing options in the company as incentive, resource allocation, the responsibilities of the Business Development Department and internal financials including profit margins, revenue numbers, profitability forecasts and costs are not publicly known and have provided Plaintiff with a significant business advantage. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

### INTERROGATORY NO. 2:

Identify and describe in detail each trade secret of Skye that is referred to in paragraph 164 of the Complaint.



SKYE'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

**RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a description of the trade secret or something else. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a Stipulation signed by the Court. However, the parties have not executed a protective order which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a description of the trade secret or something else.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced and the full scope of the trade secrets that Banman has misappropriated are not yet fully known to Plaintiff. Plaintiff reserves the right to supplement these responses as new information is obtained.

**INTERROGATORY NO. 3:**

For each trade secret identified in response to Interrogatories 1-2, describe with particularity how Seoane misappropriated the trade secret.

16

**RESPONSE TO INTERROGATORY NO. 3:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a stipulation which will keep the information confidential, nor has the Court entered any such order. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO.3:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff reserves the right to supplement these responses as new information is obtained.

Seoane misappropriated each of the trade secrets identified in response to Interrogatories Nos. 1-2 because, at the time of the trade secret's acquisition, and/or at the time of Seoane's disclosure and/or use of Plaintiff's trade secrets, Seoane knew or had reason to know that the trade secret was acquired through improper means, and/or knew or had reason to know that he was acting without consent, and/or breaching a duty to maintain the secrecy of Plaintiff's trade secrets, and/or breaching a duty to maintain limited use of Plaintiff's trade secrets.

Such misappropriation included breaching confidentiality provisions of the agreements that he signed while working for Skye and HRT and disclosing and/or using

17

Plaintiff's trade secrets in forming and/or operating CTM, which includes all aspects of CTM (*ex.*, the manufacture and marketing of products), as well as disclosing and/or using Plaintiff's trade secrets in interfering with Plaintiff's legitimate business interests. These agreements include:

1. August 14, 2017 Employment Offer (between HRT/Skye and Seoane) [acknowledging the Skye/HRT standard confidentiality agreement and non-compete is signed as a condition of the agreement]

2. August 21, 2017 HRT Employee Confidentiality Agreement;

3. August 21, 2017 HRT/Skye Employee Handbook (acknowledged by Seoane);

4. November 2, 2018 HRT/Skye Employee Handbook (acknowledged by Seoane);

5. December 19, 2018 Skye Biologics holdings & Skye/HRT Employee Confidentiality Agreement (between HRT/Skye and Seoane).

As an example, Seoane breached the provisions of the December 19, 2018 Skye/HRT Employee Confidentiality Agreement by disclosing and/or using Plaintiffs' trade secrets in forming and/or operating CTM:

1. PROPRIETARY INFORMATION.

I understand that my employment by the Company creates a relationship of confidence and trust with respect to any information of a confidential or secret nature that may be disclosed to me by the Company or a third party that relates to the operation of SKYE/HRT or to the business of any parent, subsidiary, affiliate, customer or supplier of the Company or any other party with whom the Company agrees to hold information of such party in confidence (the "Proprietary Information"), and that the Company has taken reasonable measures under the circumstances to protect from unauthorized use or disclosure. Such Proprietary Information includes, but is not limited to, trade secrets as well as other proprietary knowledge, information, know-how, nonpublic intellectual property rights including unpublished or pending patent applications and all related patent rights, manufacturing techniques, allografts, biological products, inventions and formulae, processes, discoveries, improvements, ideas, conceptions, compilations of data, and developments, whether or not patentable and whether or not copyrightable.

18

For example and without limitation, Proprietary Information may include information I learn about or develop in connection with my employment with the Company, such as: (i) placental tissues and/or other allografts; (ii) supplier, customer, vendor or other business partner lists and data, (ii) monetization information and data, (iv) non-public financial information, which may include revenues, profits, margins, forecasts, budgets and other financial data, (v) marketing and advertising plans, strategies, tactics, budgets and studies; (vi) business and operations strategies, (vii) the identities of the key decision makers at the Company's vendors, suppliers customers or other business partners, (viii) the particular needs and preferences of the Company's customers, independent contractors and other business partners, and the Company's approaches and strategies for satisfying those needs and preferences, (ix) contracts, credit procedures and terms, (x) employment and personnel information (including, without limitation, the names, addresses, compensation, specific capabilities, job assignments and performance evaluations of Company personnel), (xi) information regarding, or used, in employee training, (xii) information relating to employee compensation, (xiii) information relating proposed or ongoing acquisitions or takeovers by or on behalf of the Company, (xiv) information relating to the structure and ownership of the Company, and (xv) other information about how to operate the Company's business that is not public information. The foregoing are only examples of Confidential Information. If I am uncertain as to whether any particular information or material constitutes Confidential Information, I shall seek written clarification from the Company.

As another example, Seoane breached the provisions of the HRT/Skye Employee Handbook acknowledged by Seoane on November 2, 2018 by disclosing and/or using Plaintiff's trade secrets in operating CTM. The Employee Handbook provided:

As part of their employment with THE COMPANY [which included Plaintiff], employees may be exposed to and/or provided with trade secrets ("Trade Secrets") and other confidential and proprietary information ("Confidential Information") of THE COMPANY relating to the operation of THE COMPANY'S business and its customers (collectively referred to as "Trade Secrets/Confidential Information").

***Employees are not allowed to discuss information about their job, contract, finances, processes, or technological knowledge with anyone outside their department or anyone within their department unless they have been granted written access to that information.***

"Trade Secrets" mean information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) derives independent

19



economic value, actual or potential, from not being generally known to the public or to other persons or entities who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain it secrecy. THE COMPANY'S Trade Secrets are (1) not publicly known to the public or to THE COMPANY'S competitors; (2) were developed or compiled at significant expense by THE COMPANY over an extended period of time; and (3) are the subject of THE COMPANY'S reasonable efforts to maintain their secrecy.

"Confidential Information" means information belonging to THE COMPANY, whether reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, that has been provided to employees during their employment THE COMPANY and/or employees have gained access to while employed by THE COMPANY and/or were developed by employees in the course of their employment with THE COMPANY, that is proprietary and confidential in nature.

As part of the consideration employees provide to THE COMPANY in exchange for their employment and continued employment with THE COMPANY is their agreement and acknowledgement that all Trade Secrets/Confidential Information developed, created or maintained by them shall remain at all times the sole property of THE COMPANY, and that if THE COMPANY'S Trade Secrets/Confidential Information were disclosed to a competing business or otherwise used in an unauthorized manner, such disclosure or use would cause immediate and irreparable harm to THE COMPANY and would give a competing business an unfair business advantage against THE COMPANY.

Employees will not, except as required in the conduct of THE COMPANY'S business or as authorized in writing by THE COMPANY, disclose or use during their term of employment or subsequent thereto any Trade Secrets/Confidential Information. Furthermore, all records, files, plans, documents and the like relating to the business of THE COMPANY which employees prepare, use or come in contact with shall be and shall remain the sole property of THE COMPANY and shall not be copied without written permission of THE COMPANY and shall be returned to THE COMPANY on termination or cessation of employment, or at THE COMPANY'S request at any time.

In addition, Seoane knew or had reason to know that Defendants Banman and Stumpe also signed multiple confidentiality agreements and was breaching the same in their acquisition, disclosure and use of Plaintiff's trade secrets.

20



SKYE'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

Seoane's misappropriation also included, but was not limited to the following:

Prior to Seoane's resignation, Seoane essentially acted as the Defendants' eyes and ears within Skye/HRT as a spy for Banman and other Defendants to wrongfully acquire confidential information and trade secrets including those relating to product formulations, physician, customer lists and prospective customer lists with the intention of disclosing this information to Defendants. At the time of his resignation, Seoane intentionally deceived Chris Sharp by specifically telling him that he was not going to work for Banman and CTM.

Seoane acquired, used and/or disseminated cost and pricing information including detailed analysis of data relating to the individual cost of production per item (research and development, materials, labor, overhead, specific costs Plaintiff has negotiated with its vendors, etc.), which information is only known to Plaintiff in the operation of CTM and to interfere with Plaintiff's legitimate business interests.

Seoane acquired, used and/or disseminated Plaintiff's trade secret customer information and potential customer information including a compilation of customers throughout the country who were willing to purchase, and/or who did in fact purchase, Plaintiff's tissue biologic products; customer satisfaction and interest in specific products; customer specific needs and preferences; customer specific pricing guidelines; customer order history; log-in credentials for customer portals; and customer information including name, address, telephone number, specific points of contact and private email addresses in order to target those specific customers and essentially offer them the exact same products, (including offering Plaintiff's pricing in a side-by-side comparison) in order to interfere with Plaintiff's legitimate business interests.

Seoane acquired, used and/or disseminated the compilation of information about Plaintiff's product research and development, performance data, product formulations, sources of supply, manufacturing process, and design, including specific technology, that are not publicly known and provide Plaintiff with its significant competitive advantage. Plaintiff alleges that Seoane used and disseminated Plaintiff's proprietary information to external manufacturers to create and market products, including a room temperature

21

"flowable" connect ive tissue matrix prod uct and m embrane prod ucts, to capitalize on Plaintiff's si gnificant investment o f time, r esources, and g oodwill. Seoane used an d disseminated this trade secret informati on in t he formation an d oper ation of CTM and t o interfere with Plaintiff's legitimate business interests.

Seoane acquired, used and/or disseminated Plaintiff's compilation of information on specific physicians who Plaintiff vetted and c hose because of their s kill and experience in the field, the co mpilation of details rel ating to the physicians performing research studies and the data from those research studies, the amount physicians are being compensated, and the compilation of data on specific procedures using Pla intiff's products in order to target these physicians, regardless of whether or not they were in the midst of performing research for Plaintiff, in the o perations of CTM a nd with the purpose of int erfering with Plaintiff's legitimate busine ss int erests. Seoane targeted these p hysicians in or der to i nterfere with their relationship with Plaintiffs by attempting to and/o r succee ding in (1) in structing the doctors t o st op pu rchasing Pla intiff's prod ucts and purchase from C TM inst ead, a nd (2 ) create a conflict wher eby the doctor s wo uld be require d to cease their relationship with Plaintiffs and cease providing valuable clinical data which would cause immeasurable harm to Plaintiffs to b enefit CTM. Thes e inc lude Dr. Anderson, Dr. Badman, and Dr. Sh ifka. Additionally, Seoane targeted Dr. Hiatt, who was performing an ENT study for Plaintiff but did not produce th e results of that stud y to Plaintiff, and in stead gave those result s to Banman at Banman's instruction, and now is the Chief Scientific Officer of CTM.

Seoane acquired, used and/or dissemina ted Plaintiff's trad e secret compilation of information regardin g employees an d/or sales representative s of Plai ntiff, including their special skill s, experie nce, territorie s, custo mers, compe nsation ( including co mmissions structure, salary, a nd/or bonuses and c ompensation con siderations), agreement terms and performance histories to target certain sales associates and then used and disseminated that information to other in dividuals who , in turn, used and disseminat ed that information to attempt to convi nce P laintiff's s ales as sociates to in terfere with Plaintiff's legiti mate business i nterests, vali d contracts and pro spective econo mic adva ntages; to sel l CTM 's

22

products to Plaintiff's customers; and to encourage Plaintiff's customers, sales personnel and distributors to breach the terms of their respective agreements with Plaintiff. CTM also used and disseminated this trade secret information in the operations of CTM. These associates include: Nate Boulais; ███████████████; Mike Stumpe, who then targeted Matt Dripps; Integrative Medical Solutions ("IMS"); VMD and Gardner Rogers, who Plaintiff alleges assisted Banman in the sabotage of Plaintiff's application for its products to be approved by VA National Acquisition Center.

On March 6, 2019, Jason Belohlavek at Sea Glass Orthopedic Distributors ("Sea Glass") entered a 2-year written exclusive agreement. Before June 2020, Seoane induced Belohlavek to breach his exclusive agreement and promote CTM products instead of Plaintiff's.

Plaintiff's customers who Seoane used and disseminated Plaintiff's trade secret customer information to unlawfully target and instruct others to target include but are not limited to: Riverview Hospital, Carmel Ambulatory and Gerald Champion Regional Medical Center. Plaintiff has sent subpoenas to other entities believed to have been targeted by Seoane and the other named Defendants through the dissemination and use of Plaintiff's trade secret customer information. Plaintiff is discovering additional individuals.

Seoane acquired, used and/or disseminated Plaintiff's marketing strategies, marketing methods and processes, coding notes, sales strategy notes and the seventeen Notes Files identified above, in the formation and/or operations of CTM and also in order to interfere with Plaintiff's legitimate business interests. When working for Plaintiff and HRT, Seoane worked with Banman in Plaintiff's marketing department and was involved in Plaintiff's marketing strategies including market research and analysis, sales representative training, and business development strategy. By conspiring with Defendant Banman, Seoane misappropriated the iOS Notes Files stored or captured on the iOS Notes Application utilized by Seoane exclusively for Plaintiff by instructing Seoane to share the contents of the files with Banman, CTM and other Defendants. The "Notes" files contained the playbook for Plaintiff on how to be successful in selling Plaintiff's products, information

23

which was created by Plaintiff to assist its salesforce on how the products work, how to sell the products, and internal corporate strategy against competitors. Seoane both improperly acquired the iOS Notes Files and thereafter improperly used and/or disclosed the information contained therein in training CTM personnel to sell CTM products. Seoane also misappropriated Plaintiff's trade secret marketing strategies and initiatives and is improperly using and/or disclosing that information to sell CTM products.

Seoane acquired, used and/or disseminated Plaintiff's business plan, financials including Plaintiff's profit margins, revenue numbers, profitability forecasts, costs and market research, company structure, ownership structure and business affairs in the formation and operation of CTM to create a copy-cat of Plaintiff's entire business and interfere with Plaintiff's legitimate business interests.

## INTERROGATORY NO. 4:

For each trade secret identified in Interrogatories 1-2, describe with particularity all of Skye's efforts to maintain the secrecy of the trade secret.

## RESPONSE TO INTERROGATORY NO. 4:

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

///

///



24
SKYE'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

**AMENDED RESPONSE TO INTERROGATORY NO. 4:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff reserves the right to supplement these responses as new information is obtained.

Plaintiff requires <u>each of its</u> employees, independent contractors, consultants, sales representatives, and distributors with access to trade secret information, to execute confidentiality agreements and/or non-disclosure agreements which explicitly inform the individuals of the consequences that they face should they violate the terms of the confidentiality agreements. Plaintiff also has employees execute and acknowledge the nature and extent of trade secret information in an Employee Handbook.

Plaintiff also advises employees and consultants that any information belonging to Plaintiff, whether reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, that has been provided to the employees and consultants during their tenure with Plaintiff, that the employees and consultants have gained access to while working with Plaintiff and/or were developed by the employee or consultant in the course of their work with Plaintiff, is proprietary and confidential in nature and would be the exclusive property of Plaintiff.

Plaintiff also controls physical access to Plaintiff's offices and information and use network firewalls, password protection, and security credentials to prevent unauthorized access to Plaintiff's servers and internally shared documents, and revoke authorization at the end of any relationship with Plaintiff.

**INTERROGATORY NO. 5:**

For each trade secret identified in Interrogatories 1-2, identify all Documents that

25



memorialize, embody, or reference the trade secret.

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to the instant interrogatory because it calls for the identification of a list of documents which may be confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Further, Plaintiff will produce all responsive documents in lieu of listing the documents in this response because of sheer volume of documents will be extensive. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to the instant interrogatory on the grounds that it is vague, ambiguous and unintelligible as to the terms "memorialize," "embody" and "reference". None of the terms are defined rendering it impossible to know what is intended by the question. To the extent the interrogatory can even be understood, Plaintiff further objects to the instant interrogatory on the grounds that it is overbroad as to timeframe and scope and by such overbreadth is burdensome and oppressive.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff will produce all responsive documents in lieu of listing the documents in this response because of sheer volume of documents will be extensive. Plaintiff exercises its option under Rule 33(d) to respond to this interrogatory by referring the propounding party to Plaintiff's document production.

///



26

DATED:  October 8, 2021

ROSEN ✧ SABA, LLP

By:    /s Ryan D. Saba
      Ryan D. Saba, Esq.
      Laura Kelly St. Martin, Esq.
      Attorneys for Plaintiffs
      SKYE ORTHOBIOLOGICS, LLC and
      HUMAN REGENERATIVE
      TECHNOLOGIES, LLC



SKYE'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

**VERIFICATION**

I, Chris Sharp, am an officer or agent of the party providing this Verification, and am authorized to make this Verification for and on its behalf, and I make this Verification for that reason; I have read the attached document(s): **PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S AMENDED RESPONSES TO PABLO SEOANE'S FIRST SET OF INTERROGATORIES,** and know the contents; I am informed and believe and upon that ground allege that the matters stated in said document(s) are true and correct under the penalty of perjury under the laws of the United States of America.

Executed on October 7th, 2021, at Los Angeles, California.

_____
Chris Sharp

9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

ROSEN ✦ SABA, LLP



1
VERIFICATION

## PROOF OF SERVICE

STATE OF CALIFORNIA        )
                               )    ss

COUNTY OF LOS ANGELES    )

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is: 9350 Wilshire Boulevard, Suite 250, Beverly Hills, California 90212.

On **October 8, 2021**, I served the foregoing document described as: **PLAINTIFF SKYE ORT HOBIOLOGICS, LLC'S AMENDED RESPONSES TO PABLO SEOANE'S FIRST SET OF INTERROGATORIES,** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

| | |
|---|---|
| **YUKEVICH \| CAVANAUGH** <br> TODD CAVANAUGH, Esq. <br> 355 S Grand Ave 15th Floor <br> Los Angeles, CA 90071 | Attorneys for Defendants GARDNER ROGERS and VETERANS MEDICAL DISTRIBUTORS, INC. <br><br> Tel: (213) 362-7777 <br> Fax: (213) 362-7788 <br><br> Email: tcavanaugh@yukelaw.com |
| **HODGSON RUSS LLP** <br> ROBERT J. FLUSKEY, JR. <br> MATTHEW K. PARKER <br> The Guaranty Building <br> 140 Pearl Street, Suite 100 <br> Buffalo, New York 14202 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PABLO SEOANE <br><br> Tel:  (716) 856-4000 <br> Fax: (716) 849-0349 <br><br> Email: rfluskey@hodgsonruss.com <br> Email: mparker@hodgsonruss.com |
| **HENNELLY & GROSSFELD LLP** <br> Thomas H. Case, Esq. <br> Paul T. Martin, Esq. <br> Marina Towers North <br> 4640 Admiralty Way #850 <br> Marina Del Rey, CA 90292 | Attorneys for: Defendants, Bryan Banman, CTM Biomedical, LLC, and Pablo Seoane aka Pablo Seoane <br><br> Tel: (310) 305-2100 <br> Fax: (310) 305-2116 <br><br> Email: tcase@hgla.com <br> Email: pmartin@hgla.com |

SKYE'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

| **BLANK ROME LLP**<br>Arash Beral, Esq.<br>Saam Takaloo ., Esq.<br>2029 Century Park East, 6th Floor<br>Los Angeles, CA 90067 | Attorneys for: Defendant<br>Mike Stumpe<br><br>Tel: 424.239.3400<br>Fax: 424.239.3434<br><br>Email: aberal@blankrome.com<br>Email: saam.takaloo@blankrome.com |
|---|---|

BY E-MAIL OR ELECTRONIC TRANSMISSION - I caused the document(s) described above to be sent from e-mail address dsanchez@rosensaba.com to the persons at the e-mail address listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X]    FEDERAL    I declare that I a m employed in the  office of a member of th e bar o f this Court at whose direction the service was made.  I also declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **October 8, 2021**, at Beverly Hills, California.

_____
Danielle Sanchez



29

# Exhibit 4

ROSEN ✧ SABA, LLP

RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY St. MARTIN (State Bar No. 260966)
lstmartin@rosensaba.com
JOHN J. AUMER (State Bar No. 130585)
jaumer@rosensaba.com
JUSTIN L. WILSON (State Bar No. 263076)
jwilson@rosensaba.com
9350 Wilshire Boulevard, Suite 250
Beverly Hills, California 90212
Telephone:    (310) 285-1727
Facsimile:    (310) 285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company,<br><br>*Plaintiffs*,<br><br>v.<br><br>CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; and DOES 1 through 10, inclusive,<br><br>*Defendants*. | Case No.: 2:20-cv-03444-DMG-PVC<br>*Honorable Dolly M. Gee*<br><br>**PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC'S AMENDED RESPONSES TO PABLO SEOANE'S FIRST SET OF INTERROGATORIES**<br><br>Complaint Filed:    April 23, 2020<br>Trial Date:          None Set<br><br>**HIGHLY CONFIDENTIAL** |

1

PROPOUNDING PARTY:      Defendant, Pablo Seoane

RESPONDING PARTY:       Plaintiff, Human Regenerative Technologies, LLC

SET NUMBER:             One

**TO D EFENDANT PABLO SEOANE AND HIS ATTORNEYS OF RECORD:**

Plaintiff Human Regenerative Technologies, LLC ("Plaintiff") hereby submits these a mended responses to t he Interrogatories, Set No. One, p ropounded by Defendant Pblo Seoane ("Defendant") Set of Interrogatories under oath, pursuant to the provisions of California *Code of Civil Procedure* §2030.210, et seq., as follows:

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose of this action. Each answer is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and any and all other objections and grounds which would require the exclusion of a ny s tatement h erein if the I nterrogatories w ere a sked of, o r a ny statements contained herein were made by, a witness present and testifying in Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Plaintiff and its counsel have not yet completed their discovery or preparation for tr ial, no r ha ve t hey c ompleted t heir a nalysis, r eview or in vestigation of a ll evidence, a pplicable de fenses, i nformation, w itness a ccounts or other tr ial preparation m atters and s ubjects obtained or discovered to date. The w ithin responses are, therefore, complete as to all presently known facts and information acquired or possessed by Plaintiff up to this time. These responses should, therefore, not be construed as prejudicing or waiving Plaintiff's right to provide additional facts, evidence, c ontentions or t heories a t trial or a ny subsequent hearing b ased u pon information, evidence or analysis hereafter obtained or evaluated. Nothing in these

responses should be construed as waiving any privileges or objections which may be applicable to information or evidence hereafter obtained.

Plaintiff further reserves the right to update and/or supplement these responses if and when information which is responsive to these interrogatories is discovered.

Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that Plaintiff has answered any Interrogatory should not be taken as an admission that Plaintiff accepts or admits the existence of any facts set forth or assumed by such Interrogatory, or that such response constitutes admissible evidence. The fact that Plaintiff has answered part or all of any interrogatory is not intended and shall not be construed to be a waiver by Plaintiff of all or any part of any objection to any Interrogatory.

## **GENERAL OBJECTIONS**

1.      Plaintiff objects to the Interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, attorney work product doctrine or any other applicable privilege or protection under statutory or common law.

2.      Plaintiff objects to the Interrogatories to the extent that they call for the disclosure of information protected by any of the parties' or third parties' constitutional right to privacy under the United States or California Constitutions, or protected as proprietary, commercially sensitive, trade secret or falling under the rubric of any other such confidentiality protection or privilege.

3.      Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4.      Plaintiff objects to the Interrogatories to the extent that they are unlimited as to time or scope, and as a result, are overly broad and unduly burdensome.

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

5.    Highly Confidential:  Pursuant to the  Court  Order (DKT 108),  this  entire document is designated as "Highly Confidential".

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify and describe in detail each trade secret of HRT that Seoane allegedly misappropriated.

**RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a description of the trade secret or something else. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 1:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of trade secrets or a

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

description of the trade secret or something else.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced and the full scope of the trade secrets that Seoane has misappropriated are not yet fully known to Plaintiff. Plaintiff reserves the right to supplement these responses as new information is obtained.

Plaintiff's trade secrets at issue in this case include, but are not limited to, the following:

### A. Product Development and Manufacturing

The compilation of information about Plaintiff's product development and manufacturing is not publicly known and provides Plaintiff with a substantial business advantage.

Plaintiff's product information includes surgical implant reimbursement; research and understanding of (then pending) new FDA regulations that affect placental / amniotic derived biologic products; the sources of raw materials and the different properties of the various regions of the placenta, including the surrounding tissues and fluids; research and development to create standard operating procedures for manufacturing which include: separating, cleaning and disinfecting tissue; storing hydrated alone and/or at ambient temperature in a flowable form, researching and utilizing drying methods that maintain higher moisture levels during the drying process for certain products that those otherwise used in the industry which yields less damage to the tissue; preserving natural biologic content and processing the tissue into unique individual and combination product forms, including tissue ratio calculations and various combinations of raw placental tissue, sterilizing, packaging and preserving; the machinery used and the know-how used to create different forms of products (*ex.* membrane vs. ambient flowable) including product sizing and specifications. As an example, through Plaintiff's extensive investment of time and resources, Plaintiff and Skye developed the first ambient temperature, shelf stable, flowable connective tissue that remained the only ambient temperature flowable connective tissue prior to Defendant Banman's and Seoane's departure. Plaintiff's collected product

5

information including research and development and manufacturing protocols for products is not publicly known and provides Plaintiff with a significant business advantage.

Plaintiff and Skye developed a line of novel products that take raw human placental tissue and run it through an HRT proprietary process that cleans, disinfects, preserves, and hydrates the final tissue implant to be either stored at a frozen temperature or at an ambient temperature. This preservation and storage of a connective tissue at ambient temperature was an industry first developed by HRT. This process enabled placental tissue implants to be effectively placed it in the body of a patient for surgical, non-surgical, wound, incision and trauma repair. Plaintiff's products preserve and provide a complete connective tissue biologic matrix, with the necessary scaffolding, growth factors and BioActive molecules to augment the patient's biology at the surgical/trauma/implant site, assisting in proper remodeling and repair of damaged tissue, avoiding excess inflammation and reducing complications, leading to proper tissue formation and minimizing scar tissue.

Plaintiff and Skye dedicated numerous hours and resources to the development, creation and preservation of its manufacturing process including which tissue types to process as well as how to dissect, remove, extract, dry, size, preserve, and package tissues. Plaintiff alleges that Defendant Seoane, and/or the other named Defendants, stole, disseminated and then used these proprietary processing methods to instruct a third-party manufacturer on how to produce Plaintiff's connective tissue matrix products.

Plaintiff's unique processes applied to native placental connective tissue result in products that: maintain the integrity of the native placental/amniotic tissue; ensure the stability of those tissues which allows them to exist with minimal damage to the natural tissues in different application forms; allow for easier to use products; and have an increased shelf life and unique product stabilization and delivery methods. Plaintiff's and Skye's data compilations include detailed information on the material form and function of the placental/amniotic tissue cells and how those cell molecules react to different methods of processing.

Plaintiff and Skye developed a best-in-class membrane lineup consisting of three

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

thicknesses, "Thin", " Thick", and "X -Thick", and a range of con nective tissue ma trix products. Pla intiff's s tandard operati ng proce dures includi ng dehydrati ng versus fr eeze-drying (l yophilization), using e -beam irrad iation, avoi ding high hea t or ha rsh c hemicals which can damage tissue, and using a low bioburden environment when processing. Only Plaintiff and Skye extract raw connective tissue components from the placenta, as opposed to using freeze dried a mniotic mem brane, ha rvesting stem cell s or amniotic fluid, gi ving Plaintiff's pro ducts th e most tissue biol ogic content per vial. Pla intiff's one -of-a-kind ambient temper ature stable product has significant compe titive advantages over competitors' products t hat are either freeze dr ied, requiring reco nstitution prior to use, or frozen, requiring thawing prior to use. P laintiff's products ha ve a reduced handlin g time, reduced shipping cos ts, flexible stor age, incre ased shelf life, as well as shorter oper ating room ti me due to the lack of thaw -down-time or r econstituting required. In a ddition, Plaintiff and Skye developed an omnidirectional membrane implant product meaning that it does not have a spe cific "rig ht-side-up" or specific directi on when impla nting. Th is provides a significant advantage for use in procedures.

Through significant re search and development, Plaintiff and Skye have devel oped product line s and un ique process ing met hods which Plaintiff and S kye ha ve had trademarked including: HydraTek® and the BioAware® Membrane Preservation System, referring to the series of scientific methods providing a d istinct a dvantage in ha ndling, safety, qual ity and performance of its imp lants. HydraT ek® B ioAware® Tech nology is designed to pr otect th e biomechanic al struct ure of its membra ne t issues. FastA cting® membrane pr oducts p rovide an im mediate c overing at the site, th en resorb qui ckly to incorporate into the patient's tissues sooner than other products on the market. BioECM® ActiveMatrix® line is an advanced line up of biologics that provides a complete connective tissue matrix – Complete Connective Tissue Matrix®, harvested from the human placenta and processed with HydraTek® technology to preserve its natural fluid state – the Original Fluid Connective Tissue Matrix® and Original Ambient Flowable Tissue Matrix®.

These pro ducts w ere not being offered by competitors, but Defendant CT M is

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

currently offering membrane and other products referred to as "Thin", "Thick", and "Flow" which uses Plaintiff's marketing language.

Plaintiff and Skye's product development also involved physician studies and feedback by physicians, specifically chosen by Plaintiff because of their skill and expertise in their fields, in order to better meet physicians' needs. Plaintiff has also spent significant time and money in researching its sources of supply of materials and pricing so as to obtain the best materials at a price to advance sales and profitability.

Plaintiff and Skye also discovered how to make and apply a "paste" product and researched the marketability of such a product while Banman was still at Skye/HRT. CTM is now marketing a "Paste" product.

Plaintiff's trade secret unique manufacturing and processing protocols are outlined in HRT's Standard Operating Procedures documents which include: Separation of Placental Tissue; Dying of Tissue; Cleaning of Placental Connective Tissue; Processing of Frozen Placental Tissue – Surgical HRT – Private Label; Processing of Frozen Placental Tissue – Non-Surgical– Umbilical Cord Only – Skye; and Placental Tissue Processing.

The compilation of Plaintiff's unique product formulas, sources of supply, research and development, and manufacturing processes has given Plaintiff a competitive advantage in the industry because it is not publicly known. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

### B.    Customer Lists and Potential Customers

Plaintiff's confidential customer lists and information, and potential customer lists and information, including key contacts and specific preferences for customers and potential customers throughout the country are not publicly known and provide Plaintiff with a substantial business advantage.

Human Placental and Amniotic based biologic products are a new class of product

and are not ubiquitous to hospitals, surgery centers and medical offices. Finding doctors and facilities who are willing to use the product, let alone repeatedly, requires specialized marketing and recruitment efforts. Plaintiff has spent significant time and money seeking out potential purchasers, fostering those relationships, educating those individuals, and assessing individual needs. Once Plaintiff has identified a potential customer, Plaintiff then takes the time and resources to educate that customer on the patient benefits, specific applications, positioning of its products and insurance reimbursement for Plaintiff's products. Plaintiff has invested substantial time, research, money and resources identifying and maintaining key customer relationships, designing customer initiatives and compiling information about the unique needs and preferences of its customers including historical purchasing information in order to develop a list of customers throughout the country who were willing to purchase, and/or who did in fact purchase, Plaintiff's tissue biologic products. Plaintiff's customer information also includes customer satisfaction and interest in specific products; customer specific needs and preferences; customer order history; historical customer specific pricing, discount and payment term information; sales lead and call/meeting information and records; customer networks and associated facilities; and customer name, address, telephone number, specific points of contact and private email addresses. Plaintiff's customer information also includes customer feedback and patient data relating to the performance of Plaintiff's products.

Plaintiff's collection of customer information contains information that Plaintiff has gathered over the entire history of its operations, which span not only many years but thousands of hours of research, travel and individual customer interaction. The information on the lists would allow a competitor to direct its sales efforts to those customers that have already been educated about or are already purchasing Plaintiff's products and/or potential customers who had shown an interest in using Plaintiff's products.

Plaintiff's compiled information regarding its customer lists and prospective customers has given Plaintiff a competitive advantage in the industry because it is not publicly known. Plaintiff has used reasonable methods to keep this information secret

<div align="center">9</div>

including re quiring c onfidentiality agreeme nts, using net work fire walls, pass words an d security cr edentials, a s well  as con trolling physical  access  to  Plaintiff's  offices and information centers.

### C.      Research Physicians and Patient Registry

Information on  Plaintiff's physic ians u sed fo r research a nd data  co llection is  not publicly known and provides Plaintiff with a substantial business advantage.  Skye has spent significant t ime and   resources rese arching, hand -selecting  and developing busines  s relationships with spec ific physic ians who it  has vetted and c hosen because of their  skill and experience in th e field.  These physicians agree to co llect valuable data on  Plaintiff's products to  demonstrate safety  and  efficacy  a nd prov ide v aluable fe edback.  S ome al so conduct research studies wherein they are educated on Plaintiff's products, use the products on select  patient s, an d then pr ovide the re sults of t hose a pplications.  S kye cre ated an extensive pa tient regi stry containin g this in formation wh ich inclu des a  patient's medical information and prod  uct applicati on infor mation to track    product performance.    This information is invaluable in product development and optimization.

The doctors conducting the studies, the products used in the studies, the methods of the studies and the ty pes of data sought fro m these studies is all  trade secret,  confidential information until the results of the studies are final and published.  Revealing the physicians involved, the produc ts being  used  and  the m ethods  of th ese re search studi es b efore  the results are publis hed  would give a compe  titor an advantage in k   nowing the prod ucts Plaintiff is in the process of analyzing.  The identity of the specific physicians being used would also give comp etitors the advantage of  targeting physicians that Skye has spent the time and resources identifying as having specialized qualifications and have been educated about the products.

The compilation of details relating to the physicians performing research studies and the data from those res earch studies, as well a s the physicians perfo rming data collectio n and the data collected,  including the patien t registry, have giv en P laintiff a competiti ve

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

advantage i n the   industry becau se they  are  not pub  licly k nown.  Plaintif  f has   used reasonable me thods to  keep thi s infor mation secret inc  luding requ iring confi dentiality agreements,  using net work firewal ls,  passwords  and  security  credentials, as   well as controlling physical access to Plaintiff's offices and information centers.

### D.    Plaintiff's Employees, Independent Contractors, Sales  Representatives, and Distributors

Plaintiff's compil  ation of infor    mation   regarding e  mployees, independen  t contractors, sales  repre sentatives,  and/ or dis tributors of Plai ntiff, i ncluding t heir sp ecial skills, exper ience, terri tories, custo mers, co mpensation (i ncluding  commissions struct ure, salary, and  /or bon  uses, referral    fees, re  cruitment   strategies, and com    pensation considerations), agr eement terms  and pe rformance hist ories is  not  publicly known  and provides a significant business advantage.

Plaintiff has   spent si gnificant ti me and re   sources recru iting an d training its employees and    sales representa tives  in P laintiff's c onfidential trade se   cret pr oduct information and marketing strategies outlined above.  Plaintiff has also invested significant time and resources in    determining com  pensation structure s for these employees that consider various factors including performance, profit margins, training, and experience. In addition, Plaintiff has invested significant time in recruiting qualified sales representatives who have re lationships with ph ysicians and  facilities.   Keeping it s employee  and sal es representative infor mation confid ential  has gi ven Plaint iff a s ignificant advanta ge in  the industry in knowing which sales personnel are the highest performing with specific products and custo mers.   A c ompetitor  with th is i nformation would  be nefit from   Plaintiff's significant investment of time and expense and would be able to target key employees who have already bee  n ve tted, trained and    given P laintiff's co nfidential and trade secret information.

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

### E.    Business Operations

Plaintiff's confidential business operations strategies including marketing research, profit margins rela ting to different market s (i.e., surgical impla nts), profitabil ity of manufacture vs. ou tsourcing, pro viding options in the compa ny a s incentive, resourc e allocation, the res ponsibilities of the Busin ess Devel opment Dep artment an d inter nal financials including profit margins, revenue numbers, profitability forecasts and costs are not publicly kn own and have provided P laintiff with a si gnificant business advan tage. Plaintiff has used r easonable methods to keep this info rmation secr et including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

## INTERROGATORY NO. 2:

Identify and describe in detail each trade secret of HRT that is referred to in paragraph 164 of the Complaint.

## RESPONSE TO INTERROGATORY NO. 2:

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms a re d efined rendering i t d ifficult t o k now w hat i s in tended b y t he question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a list of tr ade se crets or a de scription of the tr ade se cret or something else. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a Stipulation signed by the C ourt. However, the pa rties h ave no t executed a protective or der w hich w ill k eep the i nformation c onfidential, no r ha s t he C ourt entered a ny s uch order. Plaintiff proposed a S tipulation a nd Protective Or der to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective or der a nd c larification of the m eaning of th is i nterrogatory,

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 2:**

Plaintiff obje cts to the  instant interro gatory  because it is vagu  e, a mbiguous an d unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined render ing it di fficult to know  what is intended by the q uestion. Specifically, it is unclear if the call of t  he question is fo r Plai ntiff to identif y a list  of trade secrets or a description of the trade secret or something else.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows:   Discovery has only just commenced and the  full scope of the trade  secrets that Banman has misappropriated are not yet fully known to Plaintiff.  Plaintiff reserves the right to supplement these responses as new information is obtained.

Plaintiff's tr ade secret s at issue in t  his case  include, but a re not l imited to, th e following:

A.      **Product Development and Manufacturing**

The compilatio n of informatio  n about Pl   aintiff's produ  ct dev elopment and manufacturing is not  publicly kno wn and p rovides P laintiff with  a substantial bu siness advantage.

Plaintiff's pr oduct info rmation inclu des surgi cal implant reim bursement; researc h and understanding of (then pending) new FDA regulations that affect placental / amni otic derived biologic products; the sources of raw  materials and the  different properties of the various regions of the placenta, including the surrounding tissues and fluids; research an d development to create  standard oper ating pr ocedures for  manufacturing which i nclude: separating, cleaning  and  disinfecting tis sue;  storing  hydrated alo ne  and/or  at  ambient temperature in  a flo wable form,  resear ching and utili zing  drying m ethods t hat m aintain higher moisture levels during the drying process for certain product s that those  otherwise used in the indust ry w hich yields less da mage to the tissue; preser ving natural bio logic content and  processing the tissue into un      ique individua l and combinatio  n product

forms, including tissue ratio calculations and various combinations of raw placental tissue, sterilizing, packaging and preserving; the machinery used and the know-how used to create different forms of products (*ex.* membrane vs. ambient flowable) including product sizing and specifications. As an example, through Plaintiff's extensive investment of time and resources, Plaintiff and Skye developed the first ambient temperature, shelf stable, flowable connective tissue that remained the only ambient temperature flowable connective tissue prior to Defendant Banman's and Seoane's departure. Plaintiff's collected product information including research and development and manufacturing protocols for products is not publicly known and provides Plaintiff with a significant business advantage.

Plaintiff and Skye developed a line of novel products that take raw human placental tissue and run it through an HRT proprietary process that cleans, disinfects, preserves, and hydrates the final tissue implant to be either stored at a frozen temperature or at an ambient temperature. This preservation and storage of a connective tissue at ambient temperature was an industry first developed by HRT. This process enabled placental tissue implants to be effectively placed it in the body of a patient for surgical, non-surgical, wound, incision and trauma repair. Plaintiff's products preserve and provide a complete connective tissue biologic matrix, with the necessary scaffolding, growth factors and BioActive molecules to augment the patient's biology at the surgical/trauma/implant site, assisting in proper remodeling and repair of damaged tissue, avoiding excess inflammation and reducing complications, leading to proper tissue formation and minimizing scar tissue.

Plaintiff and Skye dedicated numerous hours and resources to the development, creation and preservation of its manufacturing process including which tissue types to process as well as how to dissect, remove, extract, dry, size, preserve, and package tissues. Plaintiff alleges that Defendant Seoane, and/or the other named Defendants, stole, disseminated and then used these proprietary processing methods to instruct a third-party manufacturer on how to produce Plaintiff's connective tissue matrix products.

Plaintiff's unique processes applied to native placental connective tissue result in products that: maintain the integrity of the native placental/amniotic tissue; ensure the

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

stability of those tissues which allows them to exist with minimal damage to the natural tissues in different application forms; allow for easier to use products; and have an increased shelf life and unique product stabilization and delivery methods. Plaintiff's and Skye's data compilations include detailed information on the material form and function of the placental/amniotic tissue cells and how those cell molecules react to different methods of processing.

Plaintiff and Skye developed a best-in-class membrane lineup consisting of three thicknesses, "Thin", "Thick", and "X-Thick", and a range of connective tissue matrix products. Plaintiff's standard operating procedures including dehydrating versus freeze-drying (lyophilization), using e-beam irradiation, avoiding high heat or harsh chemicals which can damage tissue, and using a low bioburden environment when processing. Only Plaintiff and Skye extract raw connective tissue components from the placenta, as opposed to using freeze dried amniotic membrane, harvesting stem cells or amniotic fluid, giving Plaintiff's products the most tissue biologic content per vial. Plaintiff's one-of-a-kind ambient temperature stable product has significant competitive advantages over competitors' products that are either freeze dried, requiring reconstitution prior to use, or frozen, requiring thawing prior to use. Plaintiff's products have a reduced handling time, reduced shipping costs, flexible storage, increased shelf life, as well as shorter operating room time due to the lack of thaw-down-time or reconstituting required. In addition, Plaintiff and Skye developed an omnidirectional membrane implant product meaning that it does not have a specific "right-side-up" or specific direction when implanting. This provides a significant advantage for use in procedures.

Through significant research and development, Plaintiff and Skye have developed product lines and unique processing methods which Plaintiff and Skye have had trademarked including: HydraTek® and the BioAware® Membrane Preservation System, referring to the series of scientific methods providing a distinct advantage in handling, safety, quality and performance of its implants. HydraTek® BioAware® Technology is designed to protect the biomechanical structure of its membrane tissues. FastActing®

15

membrane pr oducts p rovide an im mediate c overing at the   site, th en resorb qui ckly to incorporate into the patient's tissues sooner than other products on the market.  BioECM® ActiveMatrix® line is an advanced line up of biologics that provides a complete connective tissue matrix – Complete Connective Tissue Matrix®, harvested from the human placenta and processed with HydraTek® technology to preserve its natural fluid state – the Original Fluid Connective Tissue Matrix® and Original Ambient Flowable Tissue Matrix®.

These pro ducts w ere  not being  offered  by  competitors, but  Defendant CT M is currently offering membrane and other products referred to as "Thin", "Thick", and "Flow" which uses Plaintiff's marketing language.

Plaintiff  and  Skye's  product d evelopment  also invo lved  physician  studies an d feedback by physicians, specifically chosen by Plaintiff because of their skill and expertise in their fields, in order to better meet physicians' needs.  Plaintiff has also spent significant time and money in researching its sources of supply of materials and pricing so as to obtain the best materials at a price to advance sales and profitability.

Plaintiff and  Skye also discov ered how to  make and appl y a "past e" produ ct an d researched the marketability of such a product while Banman was still at Skye/HRT.  CTM is now marketing a "Paste" product.

Plaintiff's trade secret unique manufacturing and processing protocols are o utlined in HRT 's S tandard  Operating Proce dures docume nts  which in clude:  Separa tion  of Placental Tissue; Dying of Tissue; Cleaning of Placental Connective Tissue; Processing of Frozen Pl acental Tissue – Surgical HR T – Private Label; Proces sing of F rozen P lacental Tissue – Non-Surgical– Umbilical Cord Only – Skye; and Placental Tissue Processing.

The compilation of Plaintiff's unique product formulas, sources of supply, research and development, and manufacturing processes has given Plaintiff a competitive advantage in the industry because it is not publicly known.  Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, pass words a nd security credentia ls, as well as controllin g physical access to Plaintiff's offices and information centers.

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

## B.    Customer Lists and Potential Customers

Plaintiff's confidential customer lists and information, and potential customer lists and information, including key contacts and specific preferences for customers and potential customers throughout the country are not publicly known and provide Plaintiff with a substantial business advantage.

Human Placental and Amniotic based biologic products are a new class of product and are not ubiquitous to hospitals, surgery centers and medical offices. Finding doctors and facilities who are willing to use the product, let alone repeatedly, requires specialized marketing and recruitment efforts. Plaintiff has spent significant time and money seeking out potential purchasers, fostering those relationships, educating those individuals, and assessing individual needs. Once Plaintiff has identified a potential customer, Plaintiff then takes the time and resources to educate that customer on the patient benefits, specific applications, positioning of its products and insurance reimbursement for Plaintiff's products. Plaintiff has invested substantial time, research, money and resources identifying and maintaining key customer relationships, designing customer initiatives and compiling information about the unique needs and preferences of its customers including historical purchasing information in order to develop a list of customers throughout the country who were willing to purchase, and/or who did in fact purchase, Plaintiff's tissue biologic products. Plaintiff's customer information also includes customer satisfaction and interest in specific products; customer specific needs and preferences; customer order history; historical customer specific pricing, discount and payment term information; sales lead and call/meeting information and records; customer networks and associated facilities; and customer name, address, telephone number, specific points of contact and private email addresses. Plaintiff's customer information also includes customer feedback and patient data relating to the performance of Plaintiff's products.

Plaintiff's collection of customer information contains information that Plaintiff has gathered over the entire history of its operations, which span not only many years but thousands of hours of research, travel and individual customer interaction. The information

on the lists would allow a competitor to direct its sales efforts to those customers that have already been educated about or are already purchasing Plaintiff's products and/or potential customers who had shown an interest in using Plaintiff's products.

Plaintiff's compiled information regarding its customer lists and prospective customers has given Plaintiff a competitive advantage in the industry because it is not publicly known. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

### C.   Research Physicians and Patient Registry

Information on Plaintiff's physicians used for research and data collection is not publicly known and provides Plaintiff with a substantial business advantage. Skye has spent significant time and resources researching, hand-selecting and developing business relationships with specific physicians who it has vetted and chosen because of their skill and experience in the field. These physicians agree to collect valuable data on Plaintiff's products to demonstrate safety and efficacy and provide valuable feedback. Some also conduct research studies wherein they are educated on Plaintiff's products, use the products on select patients, and then provide the results of those applications. Skye created an extensive patient registry containing this information which includes a patient's medical information and product application information to track product performance. This information is invaluable in product development and optimization.

The doctors conducting the studies, the products used in the studies, the methods of the studies and the types of data sought from these studies is all trade secret, confidential information until the results of the studies are final and published. Revealing the physicians involved, the products being used and the methods of these research studies before the results are published would give a competitor an advantage in knowing the products Plaintiff is in the process of analyzing. The identity of the specific physicians being used

18

would also give competitors the advantage of targeting physicians that Skye has spent the time and resources identifying as having specialized qualifications and have been educated about the products.

The compilation of details relating to the physicians performing research studies and the data from those research studies, as well as the physicians performing data collection and the data collected, including the patient registry, have given Plaintiff a competitive advantage in the industry because they are not publicly known. Plaintiff has used reasonable methods to keep this information secret including requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

### D.   Plaintiff's Employees, Independent Contractors, Sales Representatives, and Distributors

Plaintiff's compilation of information regarding employees, independent contractors, sales representatives, and/or distributors of Plaintiff, including their special skills, experience, territories, customers, compensation (including commissions structure, salary, and/or bonuses, referral fees, recruitment strategies, and compensation considerations), agreement terms and performance histories is not publicly known and provides a significant business advantage.

Plaintiff has spent significant time and resources recruiting and training its employees and sales representatives in Plaintiff's confidential trade secret product information and marketing strategies outlined above. Plaintiff has also invested significant time and resources in determining compensation structures for these employees that consider various factors including performance, profit margins, training, and experience. In addition, Plaintiff has invested significant time in recruiting qualified sales representatives who have relationships with physicians and facilities. Keeping its employee and sales representative information confidential has given Plaintiff a significant advantage in the industry in knowing which sales personnel are the highest performing with specific products

and custo mers.   A c ompetitor  with th is i nformation would  be nefit from   Plaintiff's significant investment of time and expense and would be able to target key employees who have already bee n ve tted, trained and    given P laintiff's co nfidential and trade secret information.

### E.        Business Operations

Plaintiff's confidential business oper ations strategies including marketing research, profit margins rela  ting to different market    s (i.e.,    surgical impla nts), profitabil ity of manufacture vs. ou tsourcing, pro viding  options in the   compa ny a s incentive,  resourc e allocation, the res  ponsibilities  of the  Busin ess Devel opment Dep artment an d inter nal financials including profit margins, revenue numbers, profitability forecasts and costs are not  publicly kn own  and have  provided P laintiff with  a si gnificant business  advan tage. Plaintiff ha s used r easonable methods to  keep this info rmation secr et includin g requiring confidentiality agreements, using network firewalls, passwords and security credentials, as well as controlling physical access to Plaintiff's offices and information centers.

## INTERROGATORY NO. 3:

For each trade secret identified in response to Interrogatories 1-2, describe with particularity how Seoane misappropriated the trade secret.

## RESPONSE TO INTERROGATORY NO. 3:

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity."  The terms in this phrase are no t de fined r endering it d   ifficult to k   now w hat is  int ended b y th e question.  Additionally, th is interrogatory c alls for information that is  confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a p rotective or der s igned b y t he C ourt.  However, the  parties ha ve n ot executed a stipulation which will keep the information confidential, nor has the Court

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

entered any such order.  Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO.3:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not defined rendering it difficult to know what is intended by the question.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows:  Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff reserves the right to supplement these responses as new information is obtained.

Seoane misappropriated each of the trade secrets identified in response to Interrogatories Nos. 1-2 because, at the time of the trade secret's acquisition, and/or at the time of Seoane's disclosure and/or use of Plaintiff's trade secrets, Seoane knew or had reason to know that the trade secret was acquired through improper means, and/or knew or had reason to know that he was acting without consent, and/or breaching a duty to maintain the secrecy of Plaintiff's trade secrets, and/or breaching a duty to maintain limited use of Plaintiff's trade secrets.

Such misappropriation included breaching confidentiality provisions of the agreements that he signed while working for Skye and HRT and disclosing and/or using Plaintiff's trade secrets in forming and/or operating CTM, which includes all aspects of CTM (*ex.*, the manufacture and marketing of products), as well as disclosing and/or using Plaintiff's trade secrets in interfering with Plaintiff's legitimate business interests.  These agreements include:

1.    August 14, 2017 Employment Offer (between HRT/Skye and Seoane) [acknowledging the Skye/HRT standard confidentiality agreement and non-compete is signed as a condition of the agreement]

2.    August 21, 2017 HRT Employee Confidentiality Agreement;

**HIGHLY CONFIDENTIAL**

3.    August 2 1, 20 17 H RT/Skye Emplo yee  Handbook (ackno wledged by Seoane);

4.    November 2,   2018  HRT/Skye Emp loyee Handbo ok (ac knowledged by Seoane);

5.    December 19, 2018    Skye Biologic s holdi ngs & Skye/HRT E   mployee Confidentiality Agreement (between HRT/Skye and Seoane).

As an exa  mple,  Seoane breached  the pr  ovisions of  the Dec  ember  19, 20 18 Skye/HRT E mployee  Confidentiality Agree ment by disclosi ng an d/or using P  laintiffs' trade secrets in forming and/or operating CTM:

1. PROPRIETARY INFORMATION.

I understand that my employment by the Company creates a relationship of confidence and  trust  with  respect  to an y  information  of  a con fidential or secret nature that  may be  disclosed to  me by  the Company or a  third party that relates to the operation of SKYE/HRT or to the business of any parent, subsidiary, affiliate, customer or supplier of the Company or any other party with  whom  the  Com pany  agrees  to  hold i nformation  of  such  party in confidence (the "Proprietary Information"), and that the Company has taken reasonable measures under the circumstances to protect  from unauthorized use or disclosure. Such Proprietary Information includes, but is not limited to, trade secrets as well as other proprietary knowledge, information, know-how, nonpublic intellectual property rights including unpublished or pending patent applications an d all  related pat ent ri ghts, manufacturing tech niques, allografts,  biological  products,  inventions  and formula e,  processes, discoveries, improvements, ideas, conceptions, compilations of  data, and developments, whether or no t patentable and  whether or not copyrightable. For exampl e and wi thout  limitation,  Proprietary  Information ma y i nclude information I learn about or develop in connection with my employment with the Compa ny,  such  as: (i)  placental ti ssues  and/or other allograf ts; (ii) supplier,  customer, ve ndor or ot  her  business  partner  lists a nd  data, (ii) monetization infor mation and  data, (iv) non-public fina ncial  information, which may inclu de revenues, profits, margins, forecasts, budgets and other financial  data, (v)  marketing  and adv ertising  plans,  strategies,  tactics, budgets  and studies; (vi)   business  and op erations strategie s,  (vii)  the identities  of the  key d ecision makers  at the  Company's vendor s,  suppliers customers or o   ther b usiness partn ers, (viii )  the particular    needs and preferences of the Company's customers, independent contractors and other business partners, and the Company's approaches and strategies for satisfying

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

those needs and preferences, (ix) contracts, credit procedures and terms, (x) employment and perso nnel information (including, without limitation, the names, addresses, compensation, specific capabilities, job assignments and performance evaluations of Company personnel), (xi) information regarding, or used, in employee training , (xi i) information relating to employee compensation, (xiii) in formation relating proposed or on going ac quisitions or takeovers by or on behalf of the Company, (xiv) infor mation relating to the structure and own ership of the C ompany, and (xv) othe r info rmation about how to operate the Company's business that is not public information. The foregoing are only examples of Confidential Information. If I am uncertain as to whether any particular information or material co nstitutes Confidential Information, I shall seek written clarificat ion fro m the Company.

As another exam ple, S eoane breached th e pr ovisions of the H RT/Skye Employee Handbook ackno wledged by S eoane o n No vember 2, 2018 by di sclosing a nd/or u sing Plaintiff's trade secrets in operating CTM. The Employee Handbook provided:

As part of their employment with THE C OMPANY [wh ich i ncluded Plaintiff], employees may be exposed to and/or provided with trade secrets ("Trade S ecrets") an d other confide ntial and propr ietary infor mation ("Confidential Information") of THE COMPANY relating to the operation of THE COMPANY'S business and its customers (collectively referred to as "Trade Secrets/Confidential Information").

***Employees are not allowed to discuss information about their job, contract, finances, processes, or technological knowledge with anyone outside their department or anyon e within th eir dep artment un less th ey hav e been granted written access to that information.***

"Trade Secrets" mean information, including a formula, pattern, compilation, program, device, method, technique or process, that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons or entities who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain it secrecy. THE COMPANY'S Trade Secrets are (1) not publicl y known to th e pu blic or t o TH E C OMPANY'S competitors; (2) were developed or compiled at significant expense by THE COMPANY over an extended period of time; and (3) are the subject of THE COMPANY'S reasonable efforts to maintain their secrecy.

"Confidential Inform ation" means inf ormation belon ging t o THE COMPANY, whether reduced to writing or in a form from which such information can be ob tained, translat ed or d erived into reaso nably usable

23



form, that has been provided to employees during their employment THE COMPANY and/or employees have gained access to while employed by THE COMPANY and/or were developed by employees in the course of their employment with THE COMPANY, that is proprietary and confidential in nature.

As part of the consideration employees provide to THE COMPANY in exchange for their employment and continued employment with THE COMPANY is their agreement and acknowledgement that all Trade Secrets/Confidential Information developed, created or maintained by them shall remain at all times the sole property of THE COMPANY, and that if THE COMPANY'S Trade Secrets/Confidential Information were disclosed to a competing business or otherwise used in an unauthorized manner, such disclosure or use would cause immediate and irreparable harm to THE COMPANY and would give a competing business an unfair business advantage against THE COMPANY.

Employees will not, except as required in the conduct of THE COMPANY'S business or as authorized in writing by THE COMPANY, disclose or use during their term of employment or subsequent thereto any Trade Secrets/Confidential Information. Furthermore, all records, files, plans, documents and the like relating to the business of THE COMPANY which employees prepare, use or come in contact with shall be and shall remain the sole property of THE COMPANY and shall not be copied without written permission of THE COMPANY and shall be returned to THE COMPANY on termination or cessation of employment, or at THE COMPANY'S request at any time.

In addition, Seoane knew or had reason to know that Defendants Banman and Stumpe also signed multiple confidentiality agreements and were breaching the same in their acquisition, disclosure and use of Plaintiff's trade secrets.

Seoane's misappropriation also included, but was not limited to the following:

Prior to Seoane's resignation, Seoane essentially acted as the Defendants' eyes and ears within Skye/HRT as a spy for Banman and other Defendants to wrongfully acquire confidential information and trade secrets including those relating to product formulations, physician, customer lists and prospective customer lists with the intention of disclosing this information to Defendants. At the time of his resignation, Seoane intentionally deceived Chris Sharp by specifically telling him that he was not going to work for Banman and CTM.

Seoane acquired, used and/or disseminated the compilation of information about

24

Plaintiff's product research and development, performance data, product formulations, sources of supply, manufacturing process, and design, including specific technology, that are not publicly known and provide Plaintiff with its significant competitive advantage. Plaintiff alleges that Seoane used and disseminated Plaintiff's proprietary information to external manufacturers to create and market products, including a room temperature "flowable" connective tissue matrix product and membrane products, to capitalize on Plaintiff's significant investment of time, resources, and goodwill. Seoane used and disseminated this trade secret information in the formation and operation of CTM and to interfere with Plaintiff's legitimate business interests.

Seoane acquired, used and/or disseminated Plaintiff's trade secret customer information and potential customer information including a compilation of customers throughout the country who were willing to purchase, and/or who did in fact purchase, Plaintiff's tissue biologic products; customer satisfaction and interest in specific products; customer specific needs and preferences; customer specific pricing guidelines; customer order history; log-in credentials for customer portals; and customer information including name, address, telephone number, specific points of contact and private email addresses in order to target those specific customers and essentially offer them the exact same products, (including offering Plaintiff's pricing in a side-by-side comparison) in order to interfere with Plaintiff's legitimate business interests.

Seoane acquired, used and/or disseminated Plaintiff's compilation of information on specific physicians who Plaintiff vetted and chose because of their skill and experience in the field, the compilation of details relating to the physicians performing research studies and the data from those research studies, the amount physicians are being compensated, and the compilation of data on specific procedures using Plaintiff's products in order to target these physicians, regardless of whether or not they were in the midst of performing research for Plaintiff, in the operations of CTM and with the purpose of interfering with Plaintiff's legitimate business interests. Seoane targeted these physicians in order to interfere with their relationship with Plaintiffs by attempting to and/or succeeding in (1) instructing the

doctors to stop purchasing Plaintiff's products and purchase from CTM instead, and (2) create a conflict whereby the doctors would be required to cease their relationship with Plaintiffs and cease providing valuable clinical data which would cause immeasurable harm to Plaintiffs to benefit CTM. These include Dr. Anderson, Dr. Badman, and Dr. Shifka. Additionally, Seoane targeted Dr. Hiatt, who was performing an ENT study for Plaintiff but did not produce the results of that study to Plaintiff, and instead gave those results to Banman at Banman's instruction, and now is the Chief Scientific Officer of CTM.

Seoane acquired, used and/or disseminated Plaintiff's trade secret compilation of information regarding employees and/or sales representatives of Plaintiff, including their special skills, experience, territories, customers, compensation (including commissions structure, salary, and/or bonuses and compensation considerations), agreement terms and performance histories to target certain sales associates and then used and disseminated that information to other individuals who, in turn, used and disseminated that information to attempt to convince Plaintiff's sales associates to interfere with Plaintiff's legitimate business interests, valid contracts and prospective economic advantages; to sell CTM's products to Plaintiff's customers; and to encourage Plaintiff's customers, sales personnel and distributors to breach the terms of their respective agreements with Plaintiff. CTM also used and disseminated this trade secret information in the operations of CTM. These associates include: Nate Boulais; ████████████████████ Mike Stumpe, who then targeted Matt Dripps; Integrative Medical Solutions ("IMS"); VMD and Gardner Rogers, who Plaintiff alleges assisted Banman in the sabotage of Plaintiff's application for its products to be approved by VA National Acquisition Center.

On March 6, 2019, Jason Belohlavek at Sea Glass Orthopedic Distributors ("Sea Glass") entered a 2-year written exclusive agreement. Before June 2020, Seoane induced Belohlavek to breach his exclusive agreement and promote CTM products instead of Plaintiff's.

Plaintiff's customers who Seoane used and disseminated Plaintiff's trade secret customer information to unlawfully target and instruct others to target include but are not

26

limited to:  Riverview Hospital, Carmel Ambulatory and Gerald Champion Regional Medical Center.  Plaintiff has sent subpoenas to other entities believed to have been targeted by Seoane and the other named Defendants through the dissemination and use of Plaintiff's trade secret customer information.   Plaintiff is discovering additional individuals.

Seoane acquired, used and/or disseminated Plaintiff's business plan, financial including Plaintiff's profit margins, revenue numbers, profitability forecasts, costs and market research, company structure, ownership structure and business affairs in the formation and operation of CTM to create a copy-cat of Plaintiff's entire business and interfere with Plaintiff's legitimate business interests.

## INTERROGATORY NO. 4:

For each trade secret identified in Interrogatories 1-2, describe with particularity all of HRT's efforts to maintain the secrecy of the trade secret.

## RESPONSE TO INTERROGATORY NO. 4:

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity."  The terms in this phrase are not defined rendering it difficult to know what is intended by the question.  Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court.  However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order.  Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

## AMENDED RESPONSE TO INTERROGATORY NO. 4:

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe with particularity." The terms in this phrase are not

27

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

defined rendering it difficult to know what is intended by the question.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff reserves the right to supplement these responses as new information is obtained.

Plaintiff requires each of its employees, independent contractors, consultants, sales representatives, and distributors with access to trade secret information, to execute confidentiality agreements and/or non-disclosure agreements which explicitly inform the individuals of the consequences that they face should they violate the terms of the confidentiality agreements. Plaintiff also has employees execute and acknowledge the nature and extent of trade secret information in an Employee Handbook.

Plaintiff also advises employees and consultants that any information belonging to Plaintiff, whether reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, that has been provided to the employees and consultants during their tenure with Plaintiff, that the employees and consultants have gained access to while working with Plaintiff and/or were developed by the employee or consultant in the course of their work with Plaintiff, is proprietary and confidential in nature and would be the exclusive property of Plaintiff.

Plaintiff also controls physical access to Plaintiff's offices and information and use network firewalls, password protection, and security credentials to prevent unauthorized access to Plaintiff's servers and internally shared documents, and revoke authorization at the end of any relationship with Plaintiff.

## INTERROGATORY NO. 5:

For each trade secret identified in Interrogatories 1-2, identify all Documents that memorialize, embody, or reference the trade secret.

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

**RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to the instant interrogatory because it calls for the identification of a list of documents which may be confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Further, Plaintiff will produce all responsive documents in lieu of listing the documents in this response because of sheer volume of documents will be extensive. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 5:**

Plaintiff objects to the instant interrogatory on the grounds that it is vague, ambiguous and unintelligible as to the terms "memorialize," "embody" and "reference". None of the terms are defined rendering it impossible to know what is intended by the question. To the extent the interrogatory can even be understood, Plaintiff further objects to the instant interrogatory on the grounds that it is overbroad as to timeframe and scope and by such overbreadth is burdensome and oppressive.

Without waiving the foregoing objections, and subject to each, Plaintiff responds as follows: Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff will produce all responsive documents in lieu of listing the documents in this response because of sheer volume of documents will be extensive. Plaintiff exercises its option under Rule 33(d) to respond to this interrogatory by referring the propounding party to Plaintiff's document production.

///

29

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

DATED:  October 8, 2021                          ROSEN ◆ SABA, LLP

By:     /s Ryan D. Saba
        Ryan D. Saba, Esq.
        Laura Kelly St. Martin, Esq.
        Attorneys for Plaintiffs
        SKYE ORTHOBIOLOGICS, LLC and
        HUMAN REGENERATIVE
        TECHNOLOGIES, LLC

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

## <u>VERIFICATION</u>

I, Chris Sharp, am an officer or agent of the party providing this Verification, and am authorized to make this Verification for and on its behalf, and I make this Verification for that reason; I have read the attached document(s): **PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC'S AMENDED RESPONSES TO PABLO SEOANE'S FIRST SET OF INTERROGATORIES,** and know the contents; I am informed and believe and upon that ground allege that the matters stated in said document(s) are true and correct under the penalty of perjury under the laws of the United States of America.

Executed on October 7th, 2021, at Los Angeles, California.



_____
Chris Sharp

1
VERIFICATION

## PROOF OF SERVICE

**STATE OF CALIFORNIA**                                )
                                                       )        **ss**
**COUNTY OF LOS ANGELES**                              )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 9350 Wilshire Boulevard, Suite 250, Beverly Hills, California 90212.

On **October 8, 2021**, I served the foregoing document described as: **PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC 'S AMENDED RESPONSES TO PABLO SEOANE'S FIRST SET OF INTERROGATORIES,** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

| | |
|---|---|
| **YUKEVICH \| CAVANAUGH**<br>TODD CAVANAUGH, Esq.<br>355 S Grand Ave 15th Floor<br>Los Angeles, CA 90071 | Attorneys for Defendants GARDNER ROGERS and VET ERANS MED ICAL DISTRIBUTORS, INC.<br><br>Tel: (213) 362-7777<br>Fax: (213) 362-7788<br><br>Email: tcavanaugh@yukelaw.com |
| **HODGSON RUSS LLP**<br>ROBERT J. FLUSKEY, JR.<br>MATTHEW K. PARKER<br>The Guaranty Building<br>140 Pearl Street, Suite 100<br>Buffalo, New York 14202 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PABLO SEOANE<br><br>Tel: (716) 856-4000<br>Fax: (716) 849-0349<br><br>Email: rfluskey@hodgsonruss.com<br>Email: mparker@hodgsonruss.com |
| **HENNELLY & GROSSFELD LLP**<br>Thomas H. Case, Esq.<br>Paul T. Martin, Esq.<br>Marina Towers North<br>4640 Admiralty Way #850<br>Marina Del Rey, CA 90292 | Attorneys for: Defendants, Bryan Banman, CTM Biomedical, LLC, and Pablo Seoan e aka Pablo Seoane<br><br>Tel: (310) 305-2100<br>Fax: (310) 305-2116<br><br>Email: tcase@hgla.com<br>Email: pmartin@hgla.com |

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**

| **BLANK ROME LLP**<br>Arash Beral, Esq.<br>Saam Takaloo ., Esq.<br>2029 Century Park East, 6th Floor<br>Los Angeles, CA 90067 | Attorneys for: Defendant<br>Mike Stumpe<br><br>Tel: 424.239.3400<br>Fax: 424.239.3434<br><br>Email: aberal@blankrome.com<br>Email: saam.takaloo@blankrome.com |
|---|---|

BY E-MAIL OR ELECTRONIC TRANSMISSION - I caused the document(s) described above to be sent from e-mail address dsanchez@rosensaba.com to the persons at the e-mail address listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X]    FEDERAL  I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I also declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **October 8, 2021**, at Beverly Hills, California.

_____
Danielle Sanchez

32
HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET ONE
**HIGHLY CONFIDENTIAL**



# Exhibit 5

# ROSEN ✧ SABA, LLP

RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY St. MARTIN (State Bar No. 260966)
lstmartin@rosensaba.com
2301 Rosecrans Avenue, Suite 3180
El Segundo, California 90245
Telephone:    (310) 285-1727
Facsimile:    (310) 285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company,<br><br>*Plaintiffs*,<br><br>v.<br><br>CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; CTM MEDICAL, INC., a Delaware Corporation; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; NATHAN BOULAIS, an individual, and DOES 3 through 10, inclusive,<br><br>*Defendants*. | Case No.: 2:20-cv-03444-MEMF-PVC<br>*Honorable Maame Ewusi-Mensah Frimpong*<br>*Magistrate Pedro V. Castillo*<br><br>**PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC'S RESPONSES TO CTM MEDICAL, INC'S INTERROGATORIES (SET ONE)**<br><br>Complaint Filed:    April 23, 2020<br>Trial Date:            April 17, 2023 |

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

1

PROPOUNDING PARTY:        Defendant, CTM Medical, Inc.

RESPONDING PARTY:         Plaintiff, Human Regenerative Technologies, LLC

SET NUMBER:               One

**TO DEFENDANT CTM MEDICAL, INC. AND ITS ATTORNEYS OF RECORD:**

Plaintiff Human Rege nerative Te chnologies, LLC (" Plaintiff"), he reby submits these Responses to th e Interrogat ories, S et No. One, propounded by Defend ant CTM Medical, Inc. ("Defendant") under oath, as follows:

**PRELIMINARY STATEMENT**

These respo nses are made solely f or the pur pose of this action. Each answer i s subject t o all objec tions as to compete nce, releva nce, materiality, pr opriety and admissibility, a nd a ny and a ll ot her o bjections and grou nds which would requ ire th e exclusion of any state ment herein if the Inte rrogatories were asked of, or any state ments contained herei n were made by, a witness p resent and testify ing i n Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Plaintiff and its co unsel have not yet comple ted their discover y or p reparation for trial, nor hav e they c ompleted th eir analys is, review or i nvestigation of all evi dence, applicable defen ses, in formation, wit ness acc ounts or other trial pre paration matter s and subjects obtained or discovered to date. The within responses are, therefore, complete as to all presently known facts and information acquired or possessed by Plaintiff up to this time. These re sponses should, th erefore, n ot be constru ed as pr ejudicing or waiving Plaintiff's right to provide additional facts, evidence, contentions or theories at trial or any subsequent hearing b ased upon inf ormation, evidence or ana lysis hereafter obtai ned or evaluated. Not hing in these response s should be construed as waiving any privi leges or objections which may be applicable to information or evidence hereafter obtained.

Plaintiff fur ther reser ves the right t o update and/or supp lement t hese response s if

2

ROSEN ✦ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

and when information which is responsive to these interrogatories is discovered.

Except for explici t fac ts admitted herei n, no incidental or imp lied a dmissions are intended hereby. The fact that Plain tiff ha s answered any Interrogatory sh ould not be taken as an admission that Plaintiff accepts or admits the existence of any facts set forth or assumed by suc h Inte rrogatory, or that suc h response const itutes admissib le evid ence. The fact th at Plai ntiff has answer ed part or a ll of any Interrogatory is not i ntended and shall not be cons trued to be a waiver by Plain tiff of all or any part of any objection to any Interrogatory.

## GENERAL OBJECTIONS

1. Plaintiff objects t o the Interrogat ories to the extent the y seek info rmation protected from disclosure by the attorney-client privilege, a ttorney work product doctrine or any other applicable privilege or protection under statutory or common law.

2. Plaintiff objects to t he Interroga tories to the extent that t hey cal l for the disclosure of info rmation protected by any of the parties' or third p arties' constitu tional right to priva cy u nder the United S tates o r Califor nia Constitutions, or protec ted a s proprietary, comm ercially sensit ive, tra de se cret or fall ing un der th e rubric o f any other such confidentiality protection or privilege.

3. Plaintiff objects to the Interrogatories to the extent that they seek information that is nei ther relevant to the s ubject matter of thi s ac tion nor reasona bly calculated to lead to the discovery of admissible evidence.

4. Plaintiff objects to the Interrogatories to the extent that they are unlimited as to time or scope, and as a result, are overly broad and unduly burdensome.

5. Highly C onfidential: Pursuant t o the Court Order (DK T 108), this entire document is designated as "Highly Confidential".

HRT'S RESPONSES TO CTM MEDICAL INC.'S INTERROGATORIES, SET ONE

# INTERROGATORIES

## INTERROGATORY NO. 1:

Identify each step or element of HRT's process for manufacturing placental tissue products that HRT contends is a trade secret.

## RESPONSES TO INTERROGATORY NO. 1:

HRT objects that this request seeks information that is beyond the scope of this litigation, seeks information that is not relevant to subject matter of the action, seeks information that is not admissible, and is not reasonably calculated to lead to discovery of admissible evidence. HRT objects to this request as seeking information that has been produced by other parties in this case and/or third parties in this case and are, therefore, equally available to the requesting party. Additionally, HRT objects on the grounds that this request is overbroad and unlimited in its scope. HRT further objects to this Interrogatory in that a response would require the preparation of a compilation and summary of the documents produced by the HRT/HRT (as well as the Defendants and third parties in this action), rendering the request unduly burdensome. (FRCP Rule 33(d).)

Without waiving these objections, HRT responds as follows: The entire manufacturing process taken as a whole is a trade secret of HRT. For the specific steps, please see, HRT's SOPs produced in this action.

## INTERROGATORY NO. 2:

Identify each step or element of HRT's process for manufacturing placental tissue products that HRT contends CTM, CTM Med, or Banman misappropriated.

## RESPONSES TO INTERROGATORY NO. 2:

HRT objects that this request seeks information that is beyond the scope of this litigation, seeks information that is not relevant to subject matter of the action, seeks

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

HRT'S RESPONSES TO CTM MEDICAL INC.'S INTERROGATORIES, SET ONE

information that is not admissible, and is not reasonably calculated to lead to discovery of admissible evidence. HRT objects to this request as seeking information that has been produced by other parties in this case and/or third parties in this case and are, therefore, equally available to the requesting party. Additionally, HRT objects on the grounds that this request is overbroad and unlimited in its scope. HRT further objects to this Interrogatory in that a response would require the preparation of a compilation and summary of the documents produced by the HRT/HRT (as well as the Defendants and third parties in this action), rendering the request unduly burdensome. (FRCP Rule 33(d).)

Without waiving these objections, HRT responds as follows: The entire manufacturing process taken as a whole is a trade secret of HRT. Bryan Banman was aware of these steps to manufacture placental membranes and connective tissue matrix products (flowable and paste). He misappropriated the entire manufacturing process for all products. While some steps may by public information, some steps are secret information. The unified process of all of the steps provides HRT (and Skye) with a competitive advantage.

## INTERROGATORY NO. 3:

Identify all facts and evidence supporting HRT's response to Interrogatory No. 2, above.

## RESPONSES TO INTERROGATORY NO. 3:

HRT objects that this request seeks information that is beyond the scope of this litigation, seeks information that is not relevant to subject matter of the action, seeks information that is not admissible, and is not reasonably calculated to lead to discovery of admissible evidence. HRT objects to this request as seeking information that has been produced by other parties in this case and/or third parties in this case and are, therefore, equally available to the requesting party. Additionally, HRT objects on the grounds that this request is overbroad and unlimited in its scope. HRT further objects to this

5

Interrogatory in that a response would require the preparation of a compilation and summary of the documents produced by the HRT/HRT (as well as the Defendants and third parties in this action), rendering the request unduly burdensome. (FRCP Rule 33(d).)

Without waiving these objections, HRT responds as follows: Please see the depositions in this matter, including Bryan Banman, Lee Andrews, Chris Sharp, and others. Further, see HRT's SOPs, HRT Set Up File, documents produced by Alamo/Precision Allografts, documents produced by CTM, Banman and Seoane, documents produced by all parties in this action. Bryan Banman instructed Alamo/Precision Allograft how to create CTM products using the trade secret unified formula and manufacturing process created by HRT.

DATED: October 10, 2022          ROSEN ✧ SABA, LLP

By:  /s/ Ryan D. Saba
     Ryan D. Saba, Esq.
     Laura Kelly St. Martin, Esq.
     Attorneys for Plaintiffs
     SKYE ORTHOBIOLOGICS, LLC and
     HUMAN REGENERATIVE
     TECHNOLOGIES, LLC



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

## PROOF OF SERVICE

STATE OF CALIFORNIA              )
                                 )    ss
COUNTY OF LOS ANGELES            )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 2301 Rosecrans Avenue, Suite 3180, El Segundo, California 90245.

On **October 10, 2022**, I served the foregoing document described as: **PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC'S RESPONSES TO CTM MEDICAL, INC'S INTERROGATORIES (SET ONE),** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

| | |
|---|---|
| **YUKEVICH \| CAVANAUGH**<br>TODD CAVANAUGH, Esq.<br>355 S Grand Ave 15th Floor<br>Los Angeles, CA 90071 | Attorneys for Defendants GARDNER ROGERS and VETERANS MEDICAL DISTRIBUTORS, INC.<br><br>Tel: (213) 362-7777<br>Fax: (213) 362-7788<br><br>Email: tcavanaugh@yukelaw.com<br>Email: helrakabawy@yukelaw.com |
| **HODGSON RUSS LLP**<br>ROBERT J. FLUSKEY, JR.<br>MATTHEW K. PARKER<br>The Guaranty Building<br>140 Pearl Street, Suite 100<br>Buffalo, New York 14202 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel: (716) 856-4000<br>Fax: (716) 849-0349<br><br>Email: rfluskey@hodgsonruss.com<br>Email: mparker@hodgsonruss.com |
| **HENNELLY & GROSSFELD LLP**<br>THOMAS H. CASE, ESQ.<br>PAUL T. MARTIN, ESQ.<br>Marina Towers North<br>4640 Admiralty Way #850<br>Marina Del Rey, CA 90292 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel: (310) 305-2100<br>Fax: (310) 305-2116<br>Email: tcase@hgla.com<br>Email: pmartin@hgla.com |

7

HRT'S RESPONSES TO CTM MEDICAL INC.'S INTERROGATORIES, SET ONE

ROSEN ❖ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

| ARASH BERAL, ESQ.<br>SAAM TAKALOO, ESQ.<br>**BLANK ROME LLP**<br>2029 Century Park East, 6th Floor<br>Los Angeles, CA 90067 | Attorneys for: Defendant<br>Mike Stumpe<br><br>Tel: 424.239.3400<br>Fax: 424.239.3434<br><br>aberal@blankrome.com<br>saam.takaloo@blankrome.com |
|---|---|
| Michael R. Williams, Esq.<br>Carlos A. Nevarez, Esq.<br>**BIENERT KATZMAN LITTRELL**<br>**WILLIAMS, LLP**<br>903 Calle Amanecer, Suite 350<br>San Clemente, CA  92673 | Attorneys for Defendant,<br>Nathan Boulais<br><br>Tel: (949) 369-3700<br><br>mwilliams@bklwlaw.com<br>cnevarez@bklwlaw.com<br>lthompson@bklwlaw.com |

BY E-MAIL OR ELECTRONIC TRANSMISSION - I caused the document(s) described above to be sent from e-mail address dsanchez@rosensaba.com to the persons at the e-mail address listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X]   FEDERAL   I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.  I also declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **October 10, 2022**, at El Segundo, California.

        /s/ Danielle Sanchez
        Danielle Sanchez

HRT'S RESPONSES TO CTM MEDICAL INC.'S INTERROGATORIES,
SET ONE

ROSEN ◆ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



# Exhibit 6

ROSEN ✧ SABA, LLP

RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY St. MARTIN (State Bar No. 260966)
lstmartin@rosensaba.com
2301 Rosecrans Avenue, Suite 3180
El Segundo, California 90245
Telephone: (310)    285-1727
Facsimile: (310)    285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company, <br><br> *Plaintiffs*, <br><br> v. <br><br> CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; CTM MEDICAL, INC., a Delaware Corporation; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; NATHAN BOULAIS, an individual, and DOES 3 through 10, inclusive, <br><br> *Defendants*. | Case No.: 2:20-cv-03444-MEMF-PVC <br> *Honorable Maame Ewusi-Mensah Frimpong* <br> *Magistrate Pedro V. Castillo* <br><br> **PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S RESPONSES TO CTM MEDICAL, INC'S INTERROGATORIES (SET TWO)** <br><br> Complaint Filed:    April 23, 2020 <br> Trial Date:         April 17, 2023 |

1

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

PROPOUNDING PARTY:         Defendant, CTM Medical, Inc.

RESPONDING PARTY:          Plaintiff, Skye Orthobiologics, LLC

SET NUMBER:                Two

**TO DEFENDANT CTM MEDICAL, INC. AND ITS ATTORNEYS OF RECORD:**

Plaintiff Skye Orthobiologics, LLC ("Pla intiff"), hereby submits these Responses to the Interrogatories, Set No. Tw o, pr opounded by D efendant CTM Me dical, Inc. ("Defendant") under oath, as follows:

## PRELIMINARY STATEMENT

These responses are made sole ly for the purpose of this action. Each ans wer is subject to all objections as to competen ce, relevance, materiality, propriety and admissibility, and any and all other objec tions and grounds wh ich would require the exclusion of any statement herei n if the Interrogatories were asked of, or any statements contained herein were ma de by, a witness present and test ifying in Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Plaintiff and its counsel have not yet co mpleted their discovery or preparation for trial, nor have they completed their analys is, review or investigation of all evidence, applicable defenses, informati on, witness accounts or oth er trial preparation matters and subjects obtained or discovered to date. Th e within responses are, therefore, complete as to all presently known facts a nd information acquired or posse ssed by Plaintiff up to this time. The se respons es shoul d, therefore, not be construed as prej udicing or waivi ng Plaintiff's right to provide additional facts, evidence, contentions or theories at trial or any subsequent hearing based upon information, evidence or analysis hereafter obtained or evaluated. Nothing in these responses should be c onstrued as waiving any privileges or objections which may be applicable to information or evidence hereafter obtained.

Plaintiff further reserves the right to upda te and/ or supplement these responses if

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



2

and when information which is responsive to these interrogatories is discovered.

Except for explicit facts admitted herein, no incidental or im plied admissions are intended hereby. The fact that Plaintiff has answered any Interrogatory should not be taken as an admission that Plaintiff accepts or admits the existence of any facts set forth or assumed by such Int errogatory, or that su ch respons e constitutes admissible evidence. The fact that Plaintiff has answered part or a ll of any Interrogatory is not intended an d shall not be construed to be a waiver by Plainti ff of all or any part of any objection to any Interrogatory.

## GENERAL OBJECTIONS

1. Plaintiff objects to the Interrogatories to the extent they seek information protected from disclosure by th e attorney-client privilege, a ttorney work pr oduct doctrine or any other applicable privilege or protection under statutory or common law.

2. Plaintiff objects to the Interrogatories to the extent that they call for the disclosure of information protect ed by any of the parties' or third parties' constitutional right to privacy unde r the United States or Californi a Constitutions, or protected as proprietary, commercially sensiti ve, trade secret or falling u nder the rubric of any other such confidentiality protection or privilege.

3. Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the s ubject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4. Plaintiff objects to the Interrogatories to the extent that they are unlimited as to time or scope, and as a result, are overly broad and unduly burdensome.

5. Highly Confidential: Purs uant to the C ourt Order (DKT 108), this entire document is designated as "Highly Confidential".

<div style="margin-left:0">
ROSEN ✧ SABA, LLP<br>
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245
</div>



SKYE'S RESPONSES TO CTM MEDICAL INC.'S INTERROGATORIES, SET TWO

## INTERROGATORIES

### INTERROGATORY NO. 1 (SIC) 5:

Identify by Bates number each price list that Banman, CTM, or CTM Med misappropriated.

### RESPONSES TO INTERROGATORY NO. 1 (SIC) 5:

Skye objects to this request as seeking in formation that has been produced by other parties in this case an d/or third parties in this case and are, therefore, equally available to the requesting party. Additionally, Skye objects on the groun ds that this request is overbroad, unlimited in its scope, and compound. Skye further obj ects to this Interrogatory in that a response woul d re quire the preparation of a compilation and summary of the documents pr oduced by the Skye/HRT (as well as the Defenda nts and third parties in this action), rendering the request unduly burdensome. (FRCP Rule 33(d).)

### INTERROGATORY NO. 2(SIC) 6:

Identify by Bat es n umber each custom er list that Banman, CTM, or CTM Med misappropriated.

### RESPONSES TO INTERROGATORY NO. 2 (SIC) 6:

Skye objects to this request as seeking information that has been produced by other parties in this case an d/or third parties in this case and are, therefore, equally available to the requesting party. Additionally, Skye objects on the groun ds that this request is overbroad, unlimited in its scope, and compound. Skye further obj ects to this Interrogatory in that a response woul d re quire the preparation of a compilation and summary of the documents pr oduced by the Skye/HRT (as well as the Defenda nts and third parties in this action), rendering the request unduly burdensome. (FRCP Rule 33(d).)

4

DATED:  October 14, 2022                    ROSEN ✧ SABA, LLP

                                By:     /s Ryan D. Saba
                                        Ryan D. Saba, Esq.
                                        Laura Kelly St. Martin, Esq.
                Attorneys                       for Plaintiffs
                                        SKYE ORTHOBIOLOGICS, LLC and
                                        HUMAN REGENERATIVE
                                        TECHNOLOGIES, LLC

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



5

**PROOF OF SERVICE**

| STATE OF CALIFORNIA | ) | |
| | ) | **ss** |
| COUNTY OF LOS ANGELES | ) | |

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 2301 Rosecrans Avenue, Suite 3180, El Segundo, California 90245.

On **October 14, 2022**, I served the foregoing document described as: **PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S RESPONSES TO CTM MEDICAL, INC'S INTERROGATORIES (SET two),** on the interested parties in this action as follows:

| | |
|---|---|
| **YUKEVICH \| CAVANAUGH**<br>TODD CAVANAUGH, Esq.<br>355 S Grand Ave 15th Floor<br>Los Angeles, CA 90071 | Attorneys for Defendants GARDNER ROGERS and VETERANS MEDICAL DISTRIBUTORS, INC.<br><br>Tel: (213) 362-7777<br>Fax: (213) 362-7788<br><br>Email: tcavanaugh@yukelaw.com<br>Email: helrakabawy@yukelaw.com |
| **HODGSON RUSS LLP**<br>ROBERT J. FLUSKEY, JR.<br>MATTHEW K. PARKER<br>The Guaranty Building<br>140 Pearl Street, Suite 100<br>Buffalo, New York 14202 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel:  (716) 856-4000<br>Fax: (716) 849-0349<br><br>Email: rfluskey@hodgsonruss.com<br>Email: mparker@hodgsonruss.com |
| **HENNELLY & GROSSFELD LLP**<br>THOMAS H. CASE, ESQ.<br>PAUL T. MARTIN, ESQ.<br>Marina Towers North<br>4640 Admiralty Way #850<br>Marina Del Rey, CA 90292 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel: (310) 305-2100<br>Fax: (310) 305-2116<br>Email: tcase@hgla.com<br>Email: pmartin@hgla.com |

ROSEN ◇ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



| ARASH BERAL, ESQ.<br>SAAM TAKALOO, ESQ.<br>**BLANK ROME LLP**<br>2029 Century Park East, 6th Floor<br>Los Angeles, CA 90067 | Attorneys for: Defendant<br>Mike Stumpe<br><br>Tel: 424.239.3400<br>Fax: 424.239.3434<br><br>aberal@blankrome.com<br>saam.takaloo@blankrome.com |
| --- | --- |
| Michael R. Williams, Esq.<br>Carlos A. Nevarez, Esq.<br>**BIENERT KATZMAN LITTRELL**<br>**WILLIAMS, LLP**<br>903 Calle Amanecer, Suite 350<br>San Clemente, CA  92673 | Attorneys for Defendant,<br>Nathan Boulais<br><br>Tel: (949) 369-3700<br><br>mwilliams@bklwlaw.com<br>cnevarez@bklwlaw.com<br>lthompson@bklwlaw.com |

BY E-MAIL OR ELECTRONIC TRANSMISSION - I caused the document(s) described above to be sent from e-mail address    lstmartin@rosensaba.com to the persons at the e-mail address listed above.  I did not         receive, within a reasona    ble time after the transmission, any electronic message or ot       her indication that the transmission was unsuccessful.

I declare that I am employed  in the office of a member of   the bar of this Court at whose direction the service was made.  I also   declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **October 14, 2022**, at El Segundo, California.

_/s/ Laura St. Martin__
Laura St. Martin

SKYE'S RESPONSES TO CTM MEDICAL INC.'S INTERROGATORIES,
SET TWO



# Exhibit 7

ROSEN ✧ SABA, LLP

RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY St. MARTIN (State Bar No. 260966)
lstmartin@rosensaba.com
9350 Wilshire Boulevard, Suite 250
Beverly Hills, California 90212
Telephone: (310) 285-1727
Facsimile: (310) 285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company, <br><br> *Plaintiffs*, <br><br> v. <br><br> CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; and DOES 1 through 10, inclusive, <br><br> *Defendants*. | Case No.: 2:20-cv-03444-DMG-PJW <br> *Honorable Dolly M. Gee* <br><br> **PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S SECOND AMENDED RESPONSES TO BRYAN BANMAN'S SECOND SET OF INTERROGATORIES** <br><br> Complaint Filed: April 23, 2020 <br> Trial Date: None Set <br><br> **HIGHLY CONFIDENTIAL** |

<div align="center">1</div>



SKYE'S SECOND AMENDED RESPONSES TO BANMAN'S INTERROGATORIES, SET TWO
**<u>HIGHLY CONFIDENTIAL</u>**

PROPOUNDING PARTY:     Defendant, Bryan Banman

RESPONDING PARTY:     Plaintiff, Skye Orthobiologics, LLC

SET NUMBER:     Two

**TO DEFENDANT BRYAN BANMAN AND HIS ATTORNEYS OF RECORD:**

Plaintiff Skye Orthobiol ogics, LLC ("Plaintiff"), here by s ubmits these second amended responses to the In terrogatories, Set No. Tw o, propounded by Defe ndant Bryan Banman ("Defendant") under oath, as follows:

**PRELIMINARY STATEMENT**

These responses are made sole ly for the purpose of this action. Each ans wer is subject to all objections as to competen ce, relevance, materiality, propriety and admissibility, and any and all other objec tions and grounds wh ich would require the exclusion of any statement herei n if the Interrogatories were asked of, or any statements contained herein were ma de by, a witness present and test ifying in Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Plaintiff and its counsel have not yet co mpleted their discovery or preparation for trial, nor have they completed their analys is, review or investigation of all evidence, applicable defenses, informati on, witness accounts or oth er trial preparation matters and subjects obtained or discovered to date. The within responses are, therefore, complete as to all presently known facts and information acquired or possessed by Plaintiff up to this time. These responses shoul d, therefore, not be constr ued as prejudicing or waiving Plaintiff's right to provide additional facts, evidence, contentions or theories at trial or any subsequent hearing based upon informati on, evidence or analysis hereaft er obtained or evaluated. Nothing in these resp onses sh ould be const rued as waiving any privileges or objections which may be applicable to information or evidence hereafter obtained.

Plaintiff further reserves the right to updae and/or supplement these responses if and when information which is responsive to these interrogatories is discovered.

2

Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that Plaintiff has answered any Interrogatory should not be taken as an admission that Plaintiff accepts or admits the existence of any facts set forth or assumed by such Interrogatory, or that such response constitutes admissible evidence. The fact that Plaintiff has answered part or all of any interrogatory is not intended and shall not be construed to be a waiver by Plaintiff of all or any part of any objection to any Interrogatory.

## GENERAL OBJECTIONS

1.      Plaintiff objects to the Interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, attorney work product doctrine or any other applicable privilege or protection under statutory or common law.

2.      Plaintiff objects to the Interrogatories to the extent that they call for the disclosure of information protected by any of the parties' or third parties' constitutional right to privacy under the United States or California Constitutions, or protected as proprietary, commercially sensitive, trade secret or falling under the rubric of any other such confidentiality protection or privilege.

3.      Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4.      Plaintiff objects to the Interrogatories to the extent that they are unlimited as to time or scope, and as a result, are overly broad and unduly burdensome.

5.      Highly Confidential: Pursuant to the Court Order (DKT 108), this entire document is designated as "Highly Confidential".

///

3



## INTERROGATORIES

**INTERROGATORY NO. 6 (sic) 11:**

Identify each of the Skye "sales personnel" that Banman allegedly "approached," as referred to in paragraph 105 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 6 (sic) 11:**

This interrogatory calls for speculation b ecause Plaintiff does not know each Skye "sales personnel" contacted by CTM and/or Banman. Additionally, this interrogatory calls for information that is confidential and se cret and therefor Plaintiff contends that the information shoul d not be disclosed w ithout a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor ha s the Court entered an y such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective or der and clarification of t he meaning of this Interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 6 (sic) 11:**

This interrogatory calls for speculation b ecause Plaintiff does not know each Skye "sales personnel" contacted by CTM and/or Banman. Additionally, it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections, and subject to each of them, Plaintiff responds as follows:

Discovery has only just commenced, and t he full scope of the Def endants' actions are not yet fully known to Plaintiff. Plain tiff reserves the right to supplement these responses as new information is obtained.



---
4

[REDACTED]

**SECOND AMENDED RESPONSE TO INTERROGATORY NO. 6 (SIC) 11:**

This interrogatory calls for speculation because Plaintiff does not know each Skye "sales personnel" contacted by CTM and/or Banman. Additionally, it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections, and subject to each of them, Plaintiff responds as follows: Plaintiff alleges that the Skye sales personnel that Banman "approached" include, but are not limited to, the following individuals:

[REDACTED]

**INTERROGATORY NO. 8 (sic) 13:**

Identify each Skye customer that Banman or CTM contacted after Banman's resignation from Skye, as referred to in paragraph 76 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 8 (sic) 13:**

This interrogatory calls for speculation because Plaintiff does not know each Skye "customer" contacted by CTM and/or Banman. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the

5

information confidential, nor ha s the Court entered an y such order.  Plaintiff proposed a Stipulation and Protective Order to Defendant    on May 4, 2021, but    Defendant did not respond to the proposal.    Upon the entry of    a protective or der and clarification of t  he meaning of this Interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 8 (sic) 13:**

This interrogatory calls for speculation b ecause Plaintiff does  not know each Skye "customer" contacted by CTM   and/or Banman. Additionally,   it is misnumbered and is therefore not compliant with Fed  eral Rules  of Civil Procedu  re, Rule 33(a)(1). Without waiving these objections, and subject to each of them, Plaintiff responds as follows:

Customers that Banman and/or CTM contacted include, but are not limited to:

6

**HIGHLY CONFIDENTIAL**



[REDACTED]

**SECOND AMENDED RESPONSE TO INTERROGATORY NO. 8 (sic) 13:**

This interrogatory calls for speculation b ecause Plaintiff does not know each Skye "customer" contacted by CTM and/or Banman. Additionally, it is misnumbered and is therefore not compliant with Fed eral Rules of Civil Procedu re, Rule 33(a)(1). Without

7

waiving these objections, and subject to each of them, Plaintiff responds as follows:

Customers that Banman and/or CTM contacted include, but are not limited to:

1.    John Anderson, MD

2.    Brian Badman, MD

8

██  ████████████████

██  ████████████████

██  ██████████████

██  ████████████████████

██  ██████████████████

██  ██████████████████████████

██  ████████████████████████████

██  ██████████████████

██  ████████████████

██  ██████████████████

██  ████████████████████

██  ████████████████████████

DATED:  June 28, 2022                    ROSEN ✧ SABA, LLP

By:    /s Ryan D. Saba
Ryan D. Saba, Esq.
Laura Kelly St. Martin, Esq.
for Plaintiffs
Attorneys               SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE
TECHNOLOGIES, LLC

9

SKYE'S SECOND AMENDED RESPONSES TO BANMAN'S INTERROGATORIES, SET TWO

**HIGHLY CONFIDENTIAL**



## PROOF OF SERVICE

STATE OF CALIFORNIA            )

                                          )    ss

COUNTY OF LOS ANGELES        )

       I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 9350 Wilshire Boulevard, Suite 250, Beverly Hills, California 90212.

   On        **June 28, 2022** , I served the foregoing document described a s: **PLAINTIFF SKYE ORTHOBI OLOGICS, LLC'S SE COND AMENDED RESPONSES TO BRYAN BANMAN'S SECOND SET OF INTERROGATORIES,** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

| | |
|---|---|
| **YUKEVICH \| CAVANAUGH**<br>TODD CAVANAUGH, Esq.<br>355 S Grand Ave 15th Floor<br>Los Angeles, CA 90071 | Attorneys for Defendants GARDNER ROGERS and VETERANS MEDICAL DISTRIBUTORS, INC.<br><br>Tel: (213) 362-7777<br>Fax: (213) 362-7788<br><br>Email: tcavanaugh@yukelaw.com |
| **HODGSON RUSS LLP**<br>ROBERT J. FLUSKEY, JR.<br>MATTHEW K. PARKER<br>The Guaranty Building<br>140 Pearl Street, Suite 100<br>Buffalo, New York 14202 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel: (716) 856-4000<br>Fax: (716) 849-0349<br><br>Email: rfluskey@hodgsonruss.com<br>Email: mparker@hodgsonruss.com |
| **HENNELLY & GROSSFELD LLP**<br>Thomas H. Case, Esq.<br>Paul T. Martin, Esq.<br>Marina Towers North<br>4640 Admiralty Way #850<br>Marina Del Rey, CA 90292 | Attorneys for: Defenda nts, Bryan Banman, CTM Biomedical, LLC, and Pa blo Seoane aka Paul Seoane<br><br>Tel: (310) 305-2100<br>Fax: (310) 305-2116<br><br>Email: tcase@hgla.com<br>Email: pmartin@hgla.com |
| **BLANK ROME LLP** | Attorneys for: Defendant |

10

SKYE'S SECOND AMENDED RESPONSES TO BANMAN'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**



| Arash Beral, Esq. | Mike Stumpe |
| Saam Takaloo ., Esq. | |
| 2029 Century Park East, 6th Floor | Tel: 424.239.3400 |
| Los Angeles, CA 90067 | Fax: 424.239.3434 |
| | Email: aberal@blankrome.com |
| | Email: saam.takaloo@blankrome.com |

BY E-MAIL OR ELECTRONIC TRANSMISSION - I caused the document(s) described above to be sent from e-mail address lstmartin@rosensaba.com to the persons at the e-mail address listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X]    FEDERAL    I declare that I am employed  in the office of a me mber of the bar of this Court at whose direction the service was made.  I also declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **June 28, 2022**, at Beverly Hills, California.

_____
Laura St. Martin

11

SKYE'S SECOND AMENDED RESPONSES TO BANMAN'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

# Exhibit 8

## ROSEN ✧ SABA, LLP

RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY St. MARTIN (State Bar No. 260966)
lstmartin@rosensaba.com
2301 Rosecrans Avenue, Suite 3180
El Segundo, California 90245
Telephone:    (310) 285-1727
Facsimile:    (310) 285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company, <br><br> *Plaintiffs,* <br><br> v. <br><br> CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; and DOES 1 through 10, inclusive, <br><br> *Defendants.* | Case No.: 2:20-cv-03444-DMG-PJW <br> *Honorable Dolly M. Gee* <br><br> **PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S FOURTH AMENDED RESPONSES TO BRYAN BANMAN'S SECOND SET OF INTERROGATORIES** <br><br> Complaint Filed:    April 23, 2020 <br> Trial Date:    None Set <br><br> **HIGHLY CONFIDENTIAL** |



EXHIBIT

454

1

PROPOUNDING PARTY:     Defendant, Bryan Banman

RESPONDING PARTY:     Plaintiff, Skye Orthobiologics, LLC

SET NUMBER:     Two

**TO DEFENDANT BRYAN BANMAN AND HIS ATTORNEYS OF RECORD:**

Plaintiff Skye Orthobiologics, LLC ("Plaintiff"), hereby submits these fourth amended responses to the Interrogatories, Set No. Two, propounded by Defendant Bryan Banman ("Defendant") under oath, as follows:

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose of this action. Each answer is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and any and all other objections and grounds which would require the exclusion of any statement herein if the Interrogatories were asked of, or any statements contained herein were made by, a witness present and testifying in Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Plaintiff and its counsel have not yet completed their discovery or preparation for trial, nor have they completed their analysis, review or investigation of all evidence, applicable defenses, information, witness accounts or other trial preparation matters and subjects obtained or discovered to date. The within responses are, therefore, complete as to all presently known facts and information acquired or possessed by Plaintiff up to this time. These responses should, therefore, not be construed as prejudicing or waiving Plaintiff's right to provide additional facts, evidence, contentions or theories at trial or any subsequent hearing based upon information, evidence or analysis hereafter obtained or evaluated. Nothing in these responses should be construed as waiving any privileges or objections which may be applicable to information or evidence hereafter obtained.

Plaintiff further reserves the right to update and/or supplement these responses if and when information which is responsive to these interrogatories is discovered.

2

SKYE'S FOURTH AMENDED RESPONSES TO BANMAN'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that Plaintiff has answered any Interrogatory should not be taken as an admission that Plaintiff accepts or admits the existence of any facts set forth or assumed by such Interrogatory, or that such response constitutes admissible evidence. The fact that Plaintiff has answered part or all of any interrogatory is not intended and shall not be construed to be a waiver by Plaintiff of all or any part of any objection to any Interrogatory.

## **GENERAL OBJECTIONS**

1.     Plaintiff objects to the Interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, attorney work product doctrine or any other applicable privilege or protection under statutory or common law.

2.     Plaintiff objects to the Interrogatories to the extent that they call for the disclosure of information protected by any of the parties' or third parties' constitutional right to privacy under the United States or California Constitutions, or protected as proprietary, commercially sensitive, trade secret or falling under the rubric of any other such confidentiality protection or privilege.

3.     Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4.     Plaintiff objects to the Interrogatories to the extent that they are unlimited as to time or scope, and as a result, are overly broad and unduly burdensome.

5.     Highly Confidential: Pursuant to the Court Order (DKT 108), this entire document is designated as "Highly Confidential".

///

3

## INTERROGATORIES

### INTERROGATORY NO. 8 (sic) 13:

Identify each Skye customer that Banman or CTM contacted after Banman's resignation from Skye, as referred to in paragraph 76 of the Complaint.

### RESPONSE TO INTERROGATORY NO. 8 (sic) 13:

This interrogatory calls for speculation because Plaintiff does not know each Skye "customer" contacted by CTM and/or Banman. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this Interrogatory, Plaintiff will amend this response.

### AMENDED RESPONSE TO INTERROGATORY NO. 8 (sic) 13:

This interrogatory calls for speculation because Plaintiff does not know each Skye "customer" contacted by CTM and/or Banman. Additionally, it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections, and subject to each of them, Plaintiff responds as follows:

Customers that Banman and/or CTM contacted include, but are not limited to:



4

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

## SECOND AMENDED RESPONSE TO INTERROGATORY NO. 8 (sic) 13:

This interrogatory calls for speculation because Plaintiff does not know each Skye "customer" contacted by CTM and/or Banman. Additionally, it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections, and subject to each of them, Plaintiff responds as follows:

Customers that Banman and/or CTM contacted include, but are not limited to:

5

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

## THIRD AMENDED RESPONSE TO INTERROGATORY NO. 8 (sic) 13:

This interrogatory calls for speculation because Plaintiff does not know each Skye "customer" contacted by CTM and/or Banman. Additionally, it is misnumbered and is

6



therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections, and subject to each of them, Plaintiff responds as follows:

Customers that Banman and/or CTM contacted include, but are not limited to:



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

7



## FOURTH AMENDED RESPONSE TO INTERROGATORY NO. 8 (sic) 13:

This interrogatory calls for speculation because Plaintiff does not know each Skye "customer" contacted by CTM and/or Banman. Additionally, it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections, and subject to each of them, Plaintiff responds as follows:

Customers that Banman and/or CTM contacted include, but are not limited to:

SKYE'S FOURTH AMENDED RESPONSES TO BANMAN'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**



DATED: August 18, 2022                    ROSEN ✧ SABA, LLP

By:    /s Ryan D. Saba
       Ryan D. Saba, Esq.
       Laura Kelly St. Martin, Esq.
       Attorneys for Plaintiffs
       SKYE ORTHOBIOLOGICS, LLC and
       HUMAN REGENERATIVE
       TECHNOLOGIES, LLC

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue. Suite 3180, El Segundo, CA 90245

9

**HIGHLY CONFIDENTIAL**

## PROOF OF SERVICE

**STATE OF CALIFORNIA**                )
                                       )    ss
**COUNTY OF LOS ANGELES**              )

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is: 2301 Rosecrans Ave, Suite 3180, El Segundo, California 90212.

On **August 18, 2022**, I served the foregoing document described as: **PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S FOURTH AMENDED RESPONSES TO BRYAN BANMAN'S SECOND SET OF INTERROGATORIES,** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

| | |
|---|---|
| **YUKEVICH \| CAVANAUGH**<br>Todd Cavanaugh, Esq.<br>Hassan Elrakabawy, Esq.<br>355 S Grand Ave 15th Floor<br>Los Angeles, CA 90071 | Attorneys for Defendants GARDNER ROGERS and VETERANS MEDICAL DISTRIBUTORS, INC.<br><br>Tel: (213) 362-7777<br>Fax: (213) 362-7788<br><br>Email: tcavanaugh@yukelaw.com<br>Email: HElrakabawy@yukelaw.com |
| **HODGSON RUSS LLP**<br>Robert J. Fluskey, Jr., Esq.<br>Matthew K. Parker, Esq.<br>The Guaranty Building<br>140 Pearl Street, Suite 100<br>Buffalo, New York 14202 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel:  (716) 856-4000<br>Fax: (716) 849-0349<br><br>Email: rfluskey@hodgsonruss.com<br>Email: mparker@hodgsonruss.com |

10

SKYE'S FOURTH AMENDED RESPONSES TO BANMAN'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

| **HENNELLY & GROSSFELD LLP**<br>Thomas H. Case, Esq.<br>Paul T. Martin, Esq.<br>Marina Towers North<br>4640 Admiralty Way #850<br>Marina Del Rey, CA 90292 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel: (310) 305-2100<br>Fax: (310) 305-2116<br>Email: tcase@hgla.com<br>Email: pmartin@hgla.com |
|---|---|
| Arash Beral, Esq.<br>Saam Takaloo, Esq.<br>**BLANK ROME LLP**<br>2029 Century Park East, 6th Floor<br>Los Angeles, CA 90067 | Attorneys for: Defendant<br>Mike Stumpe<br><br>Tel: 424.239.3400<br>Fax: 424.239.3434<br><br>aberal@blankrome.com<br>saam.takaloo@blankrome.com |
| Michael R. Williams, Esq.<br>Carlos A. Nevarez, Esq.<br>BIENERT KATZMAN LITTRELL WILLIAMS, LLP<br>903 Calle Amanecer, Suite 350<br>San Clemente, CA 92673 | Attorneys for Defendant,<br>Nathan Boulais<br><br>Tel: (949) 369-3700<br><br>mwilliams@bklwlaw.com<br>cnevarez@bklwlaw.com<br>lthompson@bklwlaw.com |

BY E-MAIL OR ELECTRONIC TRANSMISSION - I caused the document(s) described above to be sent from e-mail address dsanchez@rosensaba.com to the persons at the e-mail address listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X]    FEDERAL    I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I also declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **August 18, 2022**, at El Segundo, California.

Danielle Sanchez

11

SKYE'S FOURTH AMENDED RESPONSES TO BANMAN'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

# Exhibit 9

# ROSEN ✧ SABA, LLP

RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY St. MARTIN (State Bar No. 260966)
lstmartin@rosensaba.com
2301 Rosecrans Avenue, Suite 3180
El Segundo, California 90245
Telephone:    (310) 285-1727
Facsimile:    (310) 285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company,<br><br>*Plaintiffs,*<br><br>v.<br><br>CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; and DOES 1 through 10, inclusive,<br><br>*Defendants.* | Case No.: 2:20-cv-03444-DMG-PJW<br>*Honorable Dolly M. Gee*<br><br>**PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S FOURTH AMENDED RESPONSES TO PABLO SEOANE'S SECOND SET OF INTERROGATORIES**<br><br>Complaint Filed:    April 23, 2020<br>Trial Date:    None Set<br><br>**HIGHLY CONFIDENTIAL** |



EXHIBIT

455

1

SKYE'S FOURTH AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES,
SET TWO
**HIGHLY CONFIDENTIAL**

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

PROPOUNDING PARTY:        Defendant, Pablo Seoane

RESPONDING PARTY:         Plaintiff, Skye Orthobiologics, LLC

SET NUMBER:               Two

**TO DEFENDANT PABLO SEOANE AND HIS ATTORNEYS OF RECORD:**

Plaintiff Skye Orthobiologics, LLC ("Plaintiff"), hereby submits these fourth Amended Responses to the Interrogatories, Set No. Two, propounded by Defendant Pablo Seoane ("Defendant") under oath, as follows:

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose of this action. Each answer is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and any and all other objections and grounds which would require the exclusion of any statement herein if the Interrogatories were asked of, or any statements contained herein were made by, a witness present and testifying in Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Plaintiff and its counsel have not yet completed their discovery or preparation for trial, nor have they completed their analysis, review or investigation of all evidence, applicable defenses, information, witness accounts or other trial preparation matters and subjects obtained or discovered to date. The within responses are, therefore, complete as to all presently known facts and information acquired or possessed by Plaintiff up to this time. These responses should, therefore, not be construed as prejudicing or waiving Plaintiff's right to provide additional facts, evidence, contentions or theories at trial or any subsequent hearing based upon information, evidence or analysis hereafter obtained or evaluated. Nothing in these responses should be construed as waiving any privileges or objections which may be applicable to information or evidence hereafter obtained.

Plaintiff further reserves the right to update and/or supplement these responses if and when information which is responsive to these interrogatories is discovered.

2

SKYE'S FOURTH AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES,
SET TWO
**HIGHLY CONFIDENTIAL**

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that Plaintiff has answered any Interrogatory should not be taken as an admission that Plaintiff accepts or admits the existence of any facts set forth or assumed by such Interrogatory, or that such response constitutes admissible evidence. The fact that Plaintiff has answered part or all of any Interrogatory is not intended and shall not be construed to be a waiver by Plaintiff of all or any part of any objection to any Interrogatory.

## GENERAL OBJECTIONS

1.     Plaintiff objects to the Interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, attorney work product doctrine or any other applicable privilege or protection under statutory or common law.

2.     Plaintiff objects to the Interrogatories to the extent that they call for the disclosure of information protected by any of the parties' or third parties' constitutional right to privacy under the United States or California Constitutions, or protected as proprietary, commercially sensitive, trade secret or falling under the rubric of any other such confidentiality protection or privilege.

3.     Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4.     Plaintiff objects to the Interrogatories to the extent that they are unlimited as to time or scope, and as a result, are overly broad and unduly burdensome.

5.     Highly Confidential:  Pursuant to the Court Order (DKT 108), this entire document is designated as "Highly Confidential".

///

3

## INTERROGATORIES

### INTERROGATORY NO. 3 (sic) 23:

Identify each Skye contract with which Seoane allegedly interfered.

### RESPONSE TO INTERROGATORY NO. 3 (sic) 23:

This interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this Interrogatory, Plaintiff will amend this response.

### AMENDED RESPONSE TO INTERROGATORY NO. 3 (sic) 23:

This is an improper interrogatory because it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections and subject to them, Plaintiff Responds as follows: Discovery has only just commenced, and the full scope of the Defendants' actions are not yet fully known to Plaintiff. Plaintiff reserves the right to supplement these responses as new information is obtained. The contracts, whether written, verbal or implied, with which Seoane and/or CTM tortiously interfered include, but are not limited to those between Plaintiff and:



4
SKYE'S FOURTH AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES,
SET TWO
**HIGHLY CONFIDENTIAL**

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ◇ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**HIGHLY CONFIDENTIAL**



## SECOND AMENDED RESPONSE TO INTERROGATORY NO. 3 (sic) 23:

This is an improper interrogatory because it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections and subject to them, Plaintiff Responds as follows: The contracts, whether written, verbal or implied, with which Seoane and/or CTM tortiously interfered include, but are not limited to those between Plaintiff and:



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



6

**HIGHLY CONFIDENTIAL**



SKYE'S FOURTH AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES,
SET TWO

**HIGHLY CONFIDENTIAL**

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo. CA 90245

**THIRD AMENDED RESPONSE TO INTERROGATORY NO. 3 (sic) 23:**

This is an improper interrogatory because it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections and subject to them, Plaintiff Responds as follows: The contracts, whether written, verbal or implied, with which Seoane and/or CTM tortiously interfered include, but are not limited to those between Plaintiff and:

8

**HIGHLY CONFIDENTIAL**







**FOURTH AMENDED RESPONSE TO INTERROGATORY NO. 3 (sic) 23:**

This is an improper interrogatory because it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections and subject to them, Plaintiff Responds as follows: The contracts, whether written, verbal or implied, with which Seoane and/or CTM tortiously interfered include, but are not limited to those between Plaintiff and:



9

ROSEN ◇ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

10

SKYE'S FOURTH AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES,
SET TWO

**HIGHLY CONFIDENTIAL**



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

DATED: August 18, 2022

ROSEN ✧ SABA, LLP

By:     /s Ryan D. Saba
        Ryan D. Saba, Esq.
        Laura Kelly St. Martin, Esq.
        Attorneys for Plaintiffs
        SKYE ORTHOBIOLOGICS, LLC and
        HUMAN REGENERATIVE
        TECHNOLOGIES, LLC

11

SKYE'S FOURTH AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES,
SET TWO

**HIGHLY CONFIDENTIAL**

## PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )    ss
COUNTY OF LOS ANGELES        )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 2301 Rosecrans Avenue, Suite 3180, El Segundo, California 90245.

On **August 18, 2022**, I served the foregoing document described as: **PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S FOURTH AMENDED RESPONSES TO PABLO SEOANE'S SECOND SET OF INTERROGATORIES,** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

| | |
|---|---|
| **YUKEVICH \| CAVANAUGH**<br>TODD CAVANAUGH, Esq.<br>355 S Grand Ave 15th Floor<br>Los Angeles, CA 90071 | Attorneys for Defendants GARDNER ROGERS and VETERANS MEDICAL DISTRIBUTORS, INC.<br><br>Tel: (213) 362-7777<br>Fax: (213) 362-7788<br><br>Email: tcavanaugh@yukelaw.com |
| **HODGSON RUSS LLP**<br>ROBERT J. FLUSKEY, JR.<br>MATTHEW K. PARKER<br>The Guaranty Building<br>140 Pearl Street, Suite 100<br>Buffalo, New York 14202 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel: (716) 856-4000<br>Fax: (716) 849-0349<br><br>Email: rfluskey@hodgsonruss.com<br>Email: mparker@hodgsonruss.com |
| **HENNELLY & GROSSFELD LLP**<br>Thomas H. Case, Esq.<br>Paul T. Martin, Esq.<br>Marina Towers North<br>4640 Admiralty Way #850<br>Marina Del Rey, CA 90292 | Attorneys for: Defendants, Bryan Banman, CTM Biomedical, LLC, and Pablo Seoane aka Paul Seoane<br><br>Tel: (310) 305-2100<br>Fax: (310) 305-2116<br><br>Email: tcase@hgla.com<br>Email: pmartin@hgla.com |

SKYE'S FOURTH AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET TWO

**HIGHLY CONFIDENTIAL**

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

| **BLANK ROME LLP** | Attorneys for: Defendant |
| Arash Beral, Esq. | Mike Stumpe |
| Saam Takaloo ., Esq. | |
| 2029 Century Park East, 6th Floor | Tel: 424.239.3400 |
| Los Angeles, CA 90067 | Fax: 424.239.3434 |
| | |
| | Email: aberal@blankrome.com |
| | Email: saam.takaloo@blankrome.com |

<u>BY E-MAIL OR ELECTRONIC TRANSMISSION</u> - I caused the document(s) described above to be sent from e-mail address <u>dsanchez@rosensaba.com</u> to the persons at the e-mail address listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X]    FEDERAL    I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I also declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **August 18, 2022**, at El Segundo, California.

_____
Danielle Sanchez

<div align="center">13</div>

SKYE'S FOURTH AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES,
SET TWO
**HIGHLY CONFIDENTIAL**



# Exhibit 10

ROSEN ✧ SABA, LLP

RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY St. MARTIN (State Bar No. 260966)
lstmartin@rosensaba.com
9350 Wilshire Boulevard, Suite 250
Beverly Hills, California 90212
Telephone:    (310) 285-1727
Facsimile:    (310) 285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company,<br><br>*Plaintiffs*,<br><br>v.<br><br>CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; and DOES 1 through 10, inclusive,<br><br>*Defendants*. | Case No.: 2:20-cv-03444-DMG-PJW<br>*Honorable Dolly M. Gee*<br><br>**PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC'S AMENDED RESPONSES TO CTM BIOMEDICAL, LLC'S SECOND SET OF INTERROGATORIES**<br><br>Complaint Filed:    April 23, 2020<br><br>Trial Date:    None Set<br><br>**HIGHLY CONFIDENTIAL** |

1

PROPOUNDING PARTY:     Defendant, CTM Biomedical, LLC

RESPONDING PARTY:     Plaintiff, Human Regenerative Technologies, LLC

SET NUMBER:     Two

**TO DEFENDANT CTM BIOMEDICAL, LLC AND ITS ATTORNEYS OF RECORD:**

Plaintiff Human Regenerative Technologies, LLC ("Plaintiff"), hereby submits these amended responses to the Interrogatories, Set No. Two, propounded by Defendant CTM Biomedical, LLC ("Defendant") under oath, as follows:

## PRELIMINARY STATEMENT

These responses are made solely for the purpose of this action. Each answer is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and any and all other objections and grounds which would require the exclusion of any statement herein if the Interrogatories were asked of, or any statements contained herein were made by, a witness present and testifying in Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Plaintiff and its counsel have not yet completed their discovery or preparation for trial, nor have they completed their analysis, review or investigation of all evidence, applicable defenses, information, witness accounts or other trial preparation matters and subjects obtained or discovered to date. The within responses are, therefore, complete as to all presently known facts and information acquired or possessed by Plaintiff up to this time. These responses should, therefore, not be construed as prejudicing or waiving Plaintiff's right to provide additional facts, evidence, contentions or theories at trial or any subsequent hearing based upon information, evidence or analysis hereafter obtained or evaluated. Nothing in these responses should be construed as waiving any privileges or objections which may be applicable to information or evidence hereafter obtained.

Plaintiff further reserves the right to update and/or supplement these responses if and

2

HRT'S AMENDED RESPONSES TO CTM'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

when information which is responsive to these interrogatories is discovered.

Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. The fact that Plaintiff has answered any Interrogatory should not be taken as an admission that Plaintiff accepts or admits the existence of any facts set forth or assumed by such Interrogatory, or that such response constitutes admissible evidence. The fact that Plaintiff has answered part or all of any Interrogatory is not intended and shall not be construed to be a waiver by Plaintiff of all or any part of any objection to any Interrogatory.

## GENERAL OBJECTIONS

1.      Plaintiff objects to the Interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege, attorney work product doctrine or any other applicable privilege or protection under statutory or common law.

2.      Plaintiff objects to the Interrogatories to the extent that they call for the disclosure of information protected by any of the parties' or third parties' constitutional right to privacy under the United States or California Constitutions, or protected as proprietary, commercially sensitive, trade secret or falling under the rubric of any other such confidentiality protection or privilege.

3.      Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4.      Plaintiff objects to the Interrogatories to the extent that they are unlimited as to time or scope, and as a result, are overly broad and unduly burdensome.

5.      Highly Confidential:  Pursuant to the Court Order (DKT 108), this entire document is designated as "Highly Confidential".

///

are defined rendering it difficult to know what is intended by the question. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 5 (sic) 10:**

Plaintiff objects to the instant Interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Additionally, it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections, and subject to each of them, Plaintiff responds as follows: Skye is responsible for trade secret marketing formulas, strategy and methodology for all of Skye's and HRT's products.

**INTERROGATORY NO. 6 (sic) 11:**

Identify each HRT customer that Banman or CTM contacted after Banman's resignation from Skye, as referred to in paragraph 76 of the Complaint.

**RESPONSE TO INTERROGATORY NO. 6 (sic) 11:**

This interrogatory calls for speculation because Plaintiff does not know each HRT customer that Banman or CTM contacted. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the

HRT'S AMENDED RESPONSES TO CTM'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4 , 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 6 (sic) 11:**

This interrogatory calls for speculation because Plaintiff does not know each HRT "customer" contacted by CTM and/or Banman. Additionally, it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections, and subject to each of them, Plaintiff responds as follows:

Customers purchasing Skye products are considered customers of Skye.

**INTERROGATORY NO. 7 (sic) 12:**

For each customer identified in response to Interrogatory 6, describe in detail the nature and content of Banman's and CTM's communications with the customer.

**RESPONSE TO INTERROGATORY NO. 7 (sic) 12:**

This interrogatory calls for speculation because Plaintiff does not know each HRT customer that Banman or CTM contacted. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4 , 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 7 (sic) 12:**

11



This interrogatory calls for speculati on because Plaintiff does not know each Skye "customer" contracted by CTM and/or Banman. Further, this is an improper interrogatory because it does not c ontain discrete s ubparts and is therefore act ually several sepa rate interrogatories which now exceeds the limit of interrogatories allowed pursuant to Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections, and subject to each of them, Plaintiff responds as follows:  Not applicable.

**INTERROGATORY NO. 8 (sic) 13:**

Identify each HRT customer for which HRT has experienced a reduction in business as a result of any alleged misconduct of Banman or CTM.

**RESPONSE TO INTERROGATORY NO. 8 (sic) 13:**

Plaintiff objects to the instant interrogatory because it is vague, ambiguous and unintelligible as to the phrase "reduction in business." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a reduction in revenue or a decrease in sales or s omething else. Additionally, this interrogatory calls for information that is c onfidential and se cret and therefor Plaintiff contends that the information s hould no t be d isclosed w ithout a pr otective order s igned by the Court. However, the parties have not executed a Stipulation which will keep the information c onfidential, n or h as the C ourt e ntered a ny such or der. Plaintiff proposed a S tipulation a nd P rotective O rder t o De fendant o n M ay 4, 2 021, b ut Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 8 (sic) 13:**

Plaintiff o bjects t o t he i nstant in terrogatory  because i t i s va gue, a mbiguous a nd unintelligible as to the phrase "reduction in business." The phrase nor the terms are

12

defined rendering it difficult to know what is intended by the question. Specifically, it is unclear if the call of the question is for Plaintiff to identify a reduction in revenue or a decrease in sales or something else. This is also an improper interrogatory because it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving these objections, and subject to each of them, Plaintiff responds as follows: Skye.

**INTERROGATORY NO. 9 (sic) 14:**

Identify each HRT contract with which Banman or CTM has tortiously interfered.

**RESPONSE TO INTERROGATORY NO. 9 (sic) 14:**

This interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 9 (sic) 14:**

This is an improper interrogatory because it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving and subject to the above objections, Plaintiff responds as follows: Contracts entered for the purchase, sale, distribution, marketing, research, and/or data collection relating to Skye products are considered contracts with Skye. HRT does not allege that Seoane interfered with any HRT contracts for the purposes of this action.

**INTERROGATORY NO. 10 (sic) 15:**

For each contract identified in response to Interrogatory 9, describe in detail all facts supporting or Concerning Banman's and CTM's tortious interference.

**RESPONSE TO INTERROGATORY NO. 10 (sic) 15:**

This interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 10 (sic) 15:**

Plaintiff objects to the instant Interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Further, this request is an improper interrogatory because it does not contain discrete subparts and is therefore actually several separate interrogatories which now exceeds the limit of interrogatories allowed pursuant to Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving the foregoing objections, and subject to each one, Plaintiff responds as follows: Not applicable.



HRT'S AMENDED RESPONSES TO CTM'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

DATED:  November 5, 2021                    ROSEN ✦ SABA, LLP

                                    By:    /s Ryan D. Saba
                                           Ryan D. Saba, Esq.
                                           Laura Kelly St. Martin, Esq.
                                           Attorneys for Plaintiffs
                                           SKYE ORTHOBIOLOGICS, LLC and
                                           HUMAN REGENERATIVE
                                           TECHNOLOGIES, LLC

---

15

## **VERIFICATION**

I, Chris Sharp, am an officer or agent of the party providing this Verification, and am authorized to make this Verification for and on its behalf, and I make this Verification for that reason; I have read the attached document(s): **PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC'S AMENDED RESPONSES TO CTM BIOLOGICS, LLC'S SECOND SET OF INTERROGATORIES,** and know the contents; I am informed and believe and upon that ground allege that the matters stated in said document(s) are true and correct under the penalty of perjury under the laws of the United States of America.

Executed on November 5, 2021, at Los Angeles, California.



_____
Chris Sharp

1
VERIFICATION

ROSEN ✦ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212



## PROOF OF SERVICE

STATE OF CALIFORNIA               )

                                         )      ss

COUNTY OF LOS ANGELES      )

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is: 9350 Wilshire Boulevard, Suite 250, Beverly Hills, California 90212.

On **November 5, 2021**, I served the foregoing document described as: **PLAINTIFF HUMAN RE GENERATIVE TE CHNOLOGIES, LLC' S  AMENDED  RESPONSES TO CTM  BIOMEDICAL, LLC'S SECOND SET O F INTERROGATORIES,** on the interested parties in this action by placing a true copy thereof enclos ed in sealed envelopes addressed as follows:

| | |
|---|---|
| **YUKEVICH \| CAVANAUGH**<br>TODD CAVANAUGH, Esq.<br>355 S Grand Ave 15th Floor<br>Los Angeles, CA 90071 | Attorneys for Defendants GARDNER ROGERS and  VET ERANS MED ICAL DISTRIBUTORS, INC.<br><br>Tel: (213) 362-7777<br>Fax: (213) 362-7788<br><br>Email: tcavanaugh@yukelaw.com |
| **HODGSON RUSS LLP**<br>ROBERT J. FLUSKEY, JR.<br>MATTHEW K. PARKER<br>The Guaranty Building<br>140 Pearl Street, Suite 100<br>Buffalo, New York 14202 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PABLO SEOANE<br><br>Tel:  (716) 856-4000<br>Fax: (716) 849-0349<br><br>Email: rfluskey@hodgsonruss.com<br>Email: mparker@hodgsonruss.com |
| **HENNELLY & GROSSFELD LLP**<br>Thomas H. Case, Esq.<br>Paul T. Martin, Esq.<br>Marina Towers North<br>4640 Admiralty Way #850<br>Marina Del Rey, CA 90292 | Attorneys for: Defe ndants, Bryan Banman, CTM Biome dical, LL C, and Pablo Seoan e aka Pablo Seoane<br><br>Tel: (310) 305-2100<br>Fax: (310) 305-2116<br><br>Email: tcase@hgla.com<br>Email: pmartin@hgla.com |
| **BLANK ROME LLP** | Attorneys for: Defendant |

16

HRT'S AMENDED RESPONSES TO CTM'S INTERROGATORIES, SET TWO

**HIGHLY CONFIDENTIAL**



| Arash Beral, Esq. | Mike Stumpe |
|---|---|
| Saam Takaloo ., Esq. 2029 Century Park East, 6th Floor Los Angeles, CA 90067 | Tel: 424.239.3400 Fax: 424.239.3434 Email: aberal@blankrome.com Email: saam.takaloo@blankrome.com |

BY E-MAIL OR ELECTRONIC TRANSMISSION - I caused the document(s) described above to be sent from e-mail address dsanchez@rosensaba.com to the persons at the e-mail address listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X]    FEDERAL    I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. I also declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **November 5, 2021**, at Beverly Hills, California.

_____
Danielle Sanchez

HRT'S AMENDED RESPONSES TO CTM'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

# Exhibit 11

# ROSEN ✧ SABA, LLP

RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY St. MARTIN (State Bar No. 260966)
lstmartin@rosensaba.com
9350 Wilshire Boulevard, Suite 250
Beverly Hills, California 90212
Telephone:    (310) 285-1727
Facsimile:    (310) 285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company, <br><br> *Plaintiffs*, <br><br> v. <br><br> CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; and DOES 1 through 10, inclusive, <br><br> *Defendants*. | Case No.: 2:20-cv-03444-DMG-PJW <br> *Honorable Dolly M. Gee* <br><br> **PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC'S AMENDED RESPONSES TO PABLO SEOANE'S SECOND SET OF INTERROGATORIES** <br><br> Complaint Filed:    April 23, 2020 <br> Trial Date:    None Set <br><br> **HIGHLY CONFIDENTIAL** |



1

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

PROPOUNDING PARTY:  Defendant, Pablo Seoane

RESPONDING PARTY:   Plaintiff, Human Regenerative Technologies, LLC

SET NUMBER:    Two

**TO DEFENDANT PABLO SEOANE AND HIS ATTORNEYS OF RECORD:**

Plaintiff Human Regenerative Technologies, LLC ("Plaintiff") hereby submits these amended responses to the Interrogatories, Set No. Two, propounded by Defendant Pablo Seoane ("Defendant") under oath, as follows:

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose of this action. Each answer is subject to all objections as to competence, relevance, materiality, propriety and admissibility, and any and all other objections and grounds which would require the exclusion of any statement herein if the Interrogatories were asked of, or any statements contained herein were made by, a witness present and testifying in Court, all of which objections and grounds are reserved and may be interposed at the time of trial.

Plaintiff and its counsel have not yet completed their discovery or preparation for trial, nor have they completed their analysis, review or investigation of all evidence, applicable defenses, information, witness accounts or other trial preparation matters and subjects obtained or discovered to date. The within responses are, therefore, complete as to all presently known facts and information acquired or possessed by Plaintiff up to this time. These responses should, therefore, not be construed as prejudicing or waiving Plaintiff's right to provide additional facts, evidence, contentions or theories at trial or any subsequent hearing based upon information, evidence or analysis hereafter obtained or evaluated. Nothing in these responses should be construed as waiving any privileges or objections which may be applicable to information or evidence hereafter obtained.

Plaintiff further reserves the right to update and/or supplement these responses if and when information which is responsive to these interrogatories is discovered.

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

Except for explici t fac ts admitted herei n, no incidental or imp lied a dmissions are intended hereby.  The fact that Plaintiff has answered any Interrogatory should not be taken as an admiss ion that  Plaintiff acce pts or ad mits the exi stence of  any facts set f orth o r assumed by such Interrogatory, or that such response constitutes admissible evidence.  The fact that Plaintiff has answered part or all of any Interrogatory is not intended and shall not be const rued  to b e a  waiver  by P laintiff of all  or a ny p art o f any  objection to  any Interrogatory.

## GENERAL OBJECTIONS

1.      Plaintiff objects t o the Interrogat ories to the  extent the y seek info rmation protected from disclosure by the attorney-client privilege, a ttorney work product doctrine or any other applicable privilege or protection under statutory or common law.

2.      Plaintiff objects  to t he Interroga tories  to the  extent  that t hey cal l for the disclosure of info rmation protected by any of  the parties' or third p arties' constitu tional right to  priva cy u nder the   United S tates o r Califor nia  Constitutions, or  protec ted a s proprietary, comm ercially sensit ive, tra de se cret or fall ing un der th e rubric o f any  other such confidentiality protection or privilege.

3.      Plaintiff objects to the Interrogatories to the extent that they seek information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

4.      Plaintiff objects to the Interrogatories to the extent that they are unlimited as to time or scope, and as a result, are overly broad and unduly burdensome.

5.      Highly C onfidential:  Pursuant t o the  Court  Order (DK T 108), this  entire document is designated as "Highly Confidential".

///

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

## INTERROGATORIES

**INTERROGATORY NO. 1 (sic) 5:**

Does HRT contend that any of the "Notes" files identified in paragraph 124 of the Complaint contain HRT trade secrets? If so, identify each "Notes" file that contains at least one HRT trade secret.

**RESPONSE TO INTERROGATORY NO. 1 (sic) 5:**

Objection. This Interrogatory asks two separate questions that are not appropriate subparts and therefore this interrogatory is not in conformity with FRCP, Rule 33(a). Accordingly, Plaintiff will respond to the first question only. Subject to the above objection, Plaintiff responds as follows:

Yes, HRT contends that some or all of "Notes" identified in paragraph 124 of the Complaint contain Skye trade secrets.

**AMENDED RESPONSE TO INTERROGATORY NO. 1 (sic) 5:**

Objection. This Interrogatory asks two separate questions that are not appropriate subparts and therefore this interrogatory is not in conformity with FRCP, Rule 33(a). Subject to the above objection, Plaintiff responds as follows: The "Notes" do not contain "HRT trade secrets".

**INTERROGATORY NO. 2 (sic) 6:**

For each "Notes" file identified in response to Interrogatory 1, identify and describe with particularity the HRT trade secrets contained in the "Notes" file.

**RESPONSE TO INTERROGATORY NO. 2 (sic) 6:**

Plaintiff objects to the instant Interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe with particularity." The phrase nor the terms are defined rendering it difficult to know what is intended by the

4



question. Specifically, it is unclear because there are no "Notes" identified in response to Interrogatory No. 1. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this Interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 2 (sic) 6:**

Plaintiff objects to the instant Interrogatory because it is vague, ambiguous and unintelligible as to the phrase "Identify and describe with particularity." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Specifically, it is unclear because there are no "Notes" identified in response to Interrogatory No. 1. Further, this is an improper interrogatory because it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Subject to the above objection, Plaintiff responds as follows: The "Notes" do not contain "HRT trade secrets".

**INTERROGATORY NO. 3 (sic) 7:**

Identify each HRT contract with which Seoane allegedly interfered.

**RESPONSE TO INTERROGATORY NO. 3 (sic) 7:**

This interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this Interrogatory, Plaintiff will amend this response.

**AMENDED RESPONSE TO INTERROGATORY NO. 3 (sic) 7:**

This is an improper interrogatory because it is misnumbered and is therefore not compliant with Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving and subject to the above objections, Plaintiff responds as follows: Contracts entered for the purchase, sale, distribution, marketing, research, and/or data collection relating to Skye products are considered contracts with Skye. HRT does not allege that Seoane interfered with any HRT contracts for the purposes of this action.

**INTERROGATORY NO. 4 (sic) 8:**

For each contract identified in response to Interrogatory 3, describe in detail all facts supporting or Concerning Seoane's tortious interference.

**RESPONSE TO INTERROGATORY NO. 4 (sic) 8:**

Plaintiff objects to the instant Interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Additionally, this interrogatory calls for information that is confidential and secret and therefor Plaintiff contends that the information should not be disclosed without a protective order signed by the Court. However, the parties have not executed a Stipulation which will keep the information confidential, nor has the Court entered any such order. Plaintiff proposed a Stipulation and Protective Order to Defendant on May 4, 2021, but Defendant did not respond to the proposal. Upon the entry of a protective order and clarification of the meaning of this Interrogatory, Plaintiff will amend this response.

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

**AMENDED RESPONSE TO INTERROGATORY NO. 4 (sic) 8:**

Plaintiff objects to the instant Interrogatory because it is vague, ambiguous and unintelligible as to the phrase "describe in detail." The phrase nor the terms are defined rendering it difficult to know what is intended by the question. Further, this request is an improper interrogatory because it does not contain discrete subparts and is therefore actually several separate interrogatories which now exceeds the limit of interrogatories allowed pursuant to Federal Rules of Civil Procedure, Rule 33(a)(1). Without waiving the foregoing objections, and subject to each one, Plaintiff responds as follows: Not applicable.

DATED: November 5, 2021                    ROSEN ✦ SABA, LLP

By:    /s Ryan D. Saba
        Ryan D. Saba, Esq.
        Laura Kelly St. Martin, Esq.
        Attorneys for Plaintiffs
        SKYE ORTHOBIOLOGICS, LLC and
        HUMAN REGENERATIVE
        TECHNOLOGIES, LLC

7

## **VERIFICATION**

I, Chris Sharp, am an officer or agent of the party providing this Verification, and am authorized to make this Verification for and on its behalf, and I make this Verification for that reason; I have read the attached document(s): **PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC'S AMENDED RESPONSES TO PABLO SEOANE'S SECOND SET OF INTERROGATORIES,** and know the contents; I am informed and believe and upon that ground allege that the matters stated in said document(s) are true and correct under the penalty of perjury under the laws of the United States of America.

Executed on November 5, 2021, at Los Angeles, California.



_____
Chris Sharp



ROSEN ✦ SABA, LLP
9350 Wilshire Boulevard, Suite 250, Beverly Hills, CA 90212

1
VERIFICATION

## PROOF OF SERVICE

**STATE OF CALIFORNIA**         )
                                   )     **ss**

**COUNTY OF LOS ANGELES**     )

     I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is: 9350 Wilshire Boulevard, Suite 250, Beverly Hills, California 90212.

     On **November 5, 2021**, I served the foregoing document described as: **PLAINTIFF HUMAN REGENERATIVE TECHNOLOGIES, LLC'S AMENDED RESPONSES TO PABLO SEOANE'S, SECOND SET OF INTERROGATORIES,** on the interested parties in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

| | |
|---|---|
| **YUKEVICH \| CAVANAUGH**<br>TODD CAVANAUGH, Esq.<br>355 S Grand Ave 15th Floor<br>Los Angeles, CA 90071 | Attorneys for Defendants GARDNER ROGERS and VETERANS MEDICAL DISTRIBUTORS, INC.<br><br>Tel: (213) 362-7777<br>Fax: (213) 362-7788<br><br>Email: tcavanaugh@yukelaw.com |
| **HODGSON RUSS LLP**<br>ROBERT J. FLUSKEY, JR.<br>MATTHEW K. PARKER<br>The Guaranty Building<br>140 Pearl Street, Suite 100<br>Buffalo, New York 14202 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PABLO SEOANE<br><br>Tel:  (716) 856-4000<br>Fax: (716) 849-0349<br><br>Email: rfluskey@hodgsonruss.com<br>Email: mparker@hodgsonruss.com |
| **HENNELLY & GROSSFELD LLP**<br>Thomas H. Case, Esq.<br>Paul T. Martin, Esq.<br>Marina Towers North<br>4640 Admiralty Way #850<br>Marina Del Rey, CA 90292 | Attorneys for: Defendants, Bryan Banman, CTM Biomedical, LLC, and Pablo Seoane aka Pablo Seoane<br><br>Tel: (310) 305-2100<br>Fax: (310) 305-2116<br><br>Email: tcase@hgla.com<br>Email: pmartin@hgla.com |

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

| **BLANK ROME LLP** <br> Arash Beral, Esq. <br> Saam Takaloo ., Esq. <br> 2029 Century Park East, 6th Floor <br> Los Angeles, CA 90067 | Attorneys for: Defendant <br> Mike Stumpe <br><br> Tel: 424.239.3400 <br> Fax: 424.239.3434 <br><br> Email: aberal@blankrome.com <br> Email: saam.takaloo@blankrome.com |
|---|---|

<u>BY E-MAIL OR ELECTRONIC TRANSMISSION</u> - I caused the document(s) described above to be sent from e-mail address <u>dsanchez@rosensaba.com</u> to the persons at the e-mail address listed above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

[X]    FEDERAL    I declare that I a m employed in the  office of a member of th e bar o f this Court at whose direction the service was made. I also declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **November 5, 2021**, at Beverly Hills, California.

_____
Danielle Sanchez

HRT'S AMENDED RESPONSES TO PABLO SEOANE'S INTERROGATORIES, SET TWO
**HIGHLY CONFIDENTIAL**

# Exhibit 12

**ROSEN ✧ SABA, LLP**

RYAN D. SABA, ESQ. (State Bar No. 192370)
rsaba@rosensaba.com
LAURA KELLY St. MARTIN (State Bar No. 260966)
lstmartin@rosensaba.com
2301 Rosecrans Avenue, Suite 3180
El Segundo, California 90245
Telephone:    (310) 285-1727
Facsimile:    (310) 285-1728

Attorneys for Plaintiffs,
SKYE ORTHOBIOLOGICS, LLC and
HUMAN REGENERATIVE TECHNOLOGIES, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company,<br><br>*Plaintiffs*,<br><br>v.<br><br>CTM BIOMEDICAL, LLC, a Delaware Limited Liability Corporation; BRYAN BANMAN, an individual; CTM MEDICAL, INC., a Delaware Corporation; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; NATHAN BOULAIS, an individual, and DOES 3 through 10, inclusive,<br><br>*Defendants* | Case No.: 2:20-cv-03444-MEMF-PVC<br>*Honorable Maame Ewusi-Mensah Frimpong*<br><br>**PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S AMENDED RESPONSES TO CTM BIOMEDICAL LLC'S REQUEST FOR ADMISSIONS (SET ONE)**<br><br>Complaint Filed: April 23, 2020<br><br>Trial: April 17, 2023 |

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP

1
SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)



**PROPOUNDING PARTY:**      Defendant, CTM BIOMEDICAL LLC

**RESPONDING PARTY:**      Plaintiff, SKYE ORTHOBIOLOGICS, LLC

**SET NUMBER:**      One

**TO DEFENDANT CTM BIOMEDICAL LLC AND ITS ATTORNEYS OF RECORD:**

Plaintiff Skye Orthobiologics, LLC ("Plaintiff" or "Skye") hereby responds to Defendant CTM Biomedical LLC'S ("Defendant") First Set of Requests for Admission under oath, pursuant to the provisions of *Federal Rules of Civil Procedure*, Rule 36, as follows:

Plaintiff and its counsel have not yet completed their investigation relating to this action, have not completed discovery in this action, and have not completed preparation for trial. The following responses are based on Plaintiff's knowledge, information, and beliefs at this time. Plaintiff reserves all rights to refer to, to conduct discovery with reference to, or to offer at the time of trial, facts, evidence, documents and things developed during the course of discovery and trial preparation, notwithstanding the reference to facts, evidence, documents and things in these responses. These responses are given without prejudice to subsequent revision or supplementation based on any information, evidence, and documentation which may hereinafter be discovered. Nothing in these responses should be construed as waiving any privileges or objections which may be applicable to information or evidence hereafter obtained, whether or not asserted herein and which is specifically reserved.

## GENERAL OBJECTIONS

Plaintiff objects generally to all of CTM's Requests for Admissions on the following grounds:

1.    Plaintiff objects to each Request, and the definitions of terms used therein, on the ground and to the extent that they seek to impose upon Plaintiff discovery obligations beyond those contained in the *Federal Rules of Civil Procedure* or the Local Rules of this

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



Court.

2.      Plaintiff objects to each Request on the ground and to the extent it seeks information protected from disclosure by the attorney-client privilege or the attorney work product doctrine.

3.      Plaintiff objects to each Request to the extent it seeks admissions beyond the scope of this litigation and/or class certification.

4.      Plaintiff objects to each Request on the ground and to the extent it seeks information that is not relevant to any party's claim or defense.

5.      Plaintiff objects to each Request on the ground and to the extent that it seeks admissions based on information that are confidential to, proprietary to, or constitute trade secrets of Plaintiff.

6.      Plaintiff objects to each Request on the ground that it attempts to impose a burden or expense that outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in this action, and/or the importance of the discovery in resolving the issues.  *See* Fed. R. Civ. P. 26(b)(2)(C)(iii).

Plaintiff incorporates by reference each and every General Objection set forth above into each specific response set forth below.  A specific response may repeat a General Objection, but the failure to include any General Objection into any specific response does not waive any General Objection to that Request or Plaintiff's right to amend or supplement the response in the future.

## RESPONSES TO REQUESTS FOR ADMISSION

## REQUEST FOR ADMISSION NO. 1:

Admit that Skye has not executed a written agreement with Beltway Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 3:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam‑Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows:  Admit.

**REQUEST FOR ADMISSION NO. 4:**

Admit that Skye has not executed a written agreement with Carmel Ambulatory Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 4:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam‑Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows:  Deny.  Skye does have and has performed on an agreement with Carmel Ambulatory Surgery Center.

**REQUEST FOR ADMISSION NO. 5:**

Admit that Skye has not produced in this case a written agreement between Skye and Carmel Ambulatory Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 5:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is also outside the scope of permissible requests under Rule 36(a)(1).  This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows:  Admit that Skye has not produced in this case a written agreement with Carmel Ambulatory Surgery Center.

**REQUEST FOR ADMISSION NO. 6:**

Admit that Skye has not executed a written confidentiality agreement with Carmel Ambulatory Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 6:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam‑Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows:  Admit.

**REQUEST FOR ADMISSION NO. 7:**

Admit that Skye has not executed a written agreement with Columbus Specialty Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 7:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows:  Deny.  Skye does have and has performed on an agreement with Columbus Specialty Surgery Center.

**REQUEST FOR ADMISSION NO. 8:**

Admit that Skye has not produced in this case a written agreement between Skye and Columbus Specialty Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 8:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is also outside the scope of permissible requests under Rule 36(a)(1).  This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows:  Admit that Skye has not produced in this case a written agreement with Columbus Specialty Surgery Center.

**REQUEST FOR ADMISSION NO. 9:**

Admit that Skye has not executed a written confidentiality agreement with Columbus Specialty Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 65:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is also outside the scope of permissible requests under Rule 36(a)(1). This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit that Skye has not produced in this case a written agreement with Southern New Mexico Surgery Center.

**REQUEST FOR ADMISSION NO. 66:**

Admit that Skye has not executed a written confidentiality agreement with Southern New Mexico Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 66:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 67:**

Admit that Skye has not executed a written agreement with St. Luke's Springwoods Village Hospital (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 61:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows:  Deny.  Skye does have and has performed on an agreement with Skyway Surgery Center

**REQUEST FOR ADMISSION NO. 62:**

Admit that Skye has not produced in this case a written agreement between Skye and Skyway Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 62:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is also outside the scope of permissible requests under Rule 36(a)(1).  This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.
Without waiving these objections and subject to each of them, Skye responds as follows:  Admit that Skye has not produced in this case a written agreement with Skyway Surgery Center.

**REQUEST FOR ADMISSION NO. 63:**

Admit that Skye has not executed a written confidentiality agreement with Skyway Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

32



**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 63:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam‑Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 64:**

Admit that Skye RT has not executed a written agreement with Southern New Mexico Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 64:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "signed". The issue of whether there is a signed agreement versus any agreement including but not limited to a digital, implied or oral agreement is a legal conclusion.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny. Skye has a written agreement with Southern New Mexico Surgery Center.

**REQUEST FOR ADMISSION NO. 65:**

Admit that Skye has not produced in this case a written agreement between Skye and Southern New Mexico Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).



2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP

33

**REQUEST FOR ADMISSION NO. 72:**

Admit that Skye has not executed a written confidentiality agreement with St. Luke's Woodlands (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 72:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 73:**

Admit that Skye has not executed a written agreement with Veterans Administration (the entity referred to in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 73:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny. Skye does have and has performed on an agreement with Veterans Administration.

**REQUEST FOR ADMISSION NO. 74:**

Admit that Skye has not produced in this case a written agreement between Skye and

37

ROSEN ✦ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



Veterans Administration (the entity referred to in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 74:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is also outside the scope of permissible requests under Rule 36(a)(1).  This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows:  Admit that Skye has not produced in this case a written agreement with Veterans Administration.

**REQUEST FOR ADMISSION NO. 75:**

Admit that Skye has not executed a written confidentiality agreement with Veterans Administration (the entity referred to in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 75:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows:  Admit.

**REQUEST FOR ADMISSION NO. 76:**

Admit that Skye has not executed a written agreement with Veterans Administration National Acquisition Center.

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 76:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny. Skye does have and has performed on an agreement with Veterans Administration National Acquisition Center.

**REQUEST FOR ADMISSION NO. 77:**

Admit that Skye has not produced in this case a written agreement between Skye and Veterans Administration National Acquisition Center.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 77:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is also outside the scope of permissible requests under Rule 36(a)(1). This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit that Skye has not produced in this case a written agreement with Veterans Administration National Acquisition Center.

**REQUEST FOR ADMISSION NO. 78:**

Admit that Skye has not executed a written confidentiality agreement with Veterans Administration National Acquisition Center.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 78:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead

39

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



Distributor: Central Texas VA.

**REQUEST FOR ADMISSION NO. 83:**

Admit that Skye has not produced in this case a written agreement between Skye and Veterans Medical Distributor: Central Texas VA (the entity referred to on Bates No. SKYE/HRT 625508-625551).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 83:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is also outside the scope of permissible requests under Rule 36(a)(1). This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit that Skye has not produced in this case a written agreement with Central Texas VA but Skye has produced a written agreement with Veterans medical distributors.

**REQUEST FOR ADMISSION NO. 84:**

Admit that Skye has not executed a written confidentiality agreement with Veterans Medical Distributor: Central Texas VA (the entity referred to on Bates No. SKYE/HRT 625508-625551).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 84:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit.



SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**REQUEST FOR ADMISSION NO. 85:**

Admit that Skye has not executed a written agreement with Veterans Medical Distributor: Long Beach VA (the entity referred to on Bates No. SKYE/HRT 625508-625551).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 85:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny. Skye does have and has performed on an agreement with Veterans Medical Distributor: Long Beach VA.

**REQUEST FOR ADMISSION NO. 86:**

Admit that Skye has not produced in this case a written agreement between Skye and Veterans Medical Distributor: Long Beach VA (the entity referred to on Bates No. SKYE/HRT 625508-625551).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 86:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is also outside the scope of permissible requests under Rule 36(a)(1). This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit that Skye has not produced in this case a written agreement with Long Beach VA but Skye has produced a written agreement with Veterans medical distributors

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



**REQUEST FOR ADMISSION NO. 89:**

Admit that Skye has not produced in this case a written agreement between Skye and Veterans Medical Distributor: Martinsburg VAMC (the entity referred to on Bates No. SKYE/HRT 625508-625551).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 89:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is also outside the scope of permissible requests under Rule 36(a)(1).  This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows:  Admit that Skye has not produced in this case a written agreement with Martinsburg VAMC.

**REQUEST FOR ADMISSION NO. 90:**

Admit that Skye has not executed a written confidentiality agreement with Veterans Medical Distributor: Martinsburg VAMC (the entity referred to on Bates No. SKYE/HRT 625508-625551).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 90:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows:  Admit.



ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

45
SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

**REQUEST FOR ADMISSION NO. 91:**

Admit that Skye has not executed a written agreement with Veterans Medical Distributor: SFC – System Perform (the entity referred to on Bates No. SKYE/HRT 625508-625551).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 91:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny. Skye does have and has performed on an agreement with Veterans Medical Distributor: SFC – System Perform.

**REQUEST FOR ADMISSION NO. 92:**

Admit that Skye has not produced in this case a written agreement between Skye and Veterans Medical Distributor: SFC – System Perform (the entity referred to on Bates No. SKYE/HRT 625508-625551).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 92:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is also outside the scope of permissible requests under Rule 36(a)(1). This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit that Skye has not produced in this case a written agreement with SFC – System Perform.

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

ROSEN ✧ SABA, LLP

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)



**REQUEST FOR ADMISSION NO. 95:**

Admit that Skye has not produced in this case a written agreement between Skye and Veterans Medical Distributor: VAMC Washington DC (the entity referred to on Bates No. SKYE/HRT 625508-625551).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 95:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is also outside the scope of permissible requests under Rule 36(a)(1).  This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows:  Admit that Skye has not produced in this case a written agreement with VAMC Washington DC but Skye has produced a written agreement with Veterans Medical Distributors.

**REQUEST FOR ADMISSION NO. 96:**

Admit that Skye has not executed a written confidentiality agreement with Veterans Medical Distributor: VAMC Washington DC (the entity referred to on Bates No. SKYE/HRT 625508-625551).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 96:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows:  Admit.

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



**REQUEST FOR ADMISSION NO. 97:**

Admit that Skye has not executed a written agreement with Wabash Valley Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 97:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny. Skye does have and has performed on an agreement with Wabash Valley Surgery Center.

**REQUEST FOR ADMISSION NO. 98:**

Admit that Skye has not produced in this case a written agreement between Skye and Wabash Valley Surgery Center (the entity referred to on Bates No. SKYE/HRT 625508-625551).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 98:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is also outside the scope of permissible requests under Rule 36(a)(1). This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit that Skye has not produced in this case a written agreement with Wabash Valley Surgery Center.

49

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**REQUEST FOR ADMISSION NO. 106:**

Admit that Skye has not executed a written agreement with Witham Hospital (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 106:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny. Skye does have and has performed on an agreement with Witham Hospital.

**REQUEST FOR ADMISSION NO. 107:**

Admit that Skye has not produced in this case a written agreement between Skye and Witham Hospital (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 107:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is also outside the scope of permissible requests under Rule 36(a)(1). This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit that Skye has not produced in this case a written agreement with Witham Hospital.

**REQUEST FOR ADMISSION NO. 108:**

Admit that Skye has not executed a written confidentiality agreement with Witham

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

Hospital (the entity referred to on Bates No. SKYE/HRT 625508-625551 and in Response No. 8).

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 108:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 109:**

Admit that Skye has not executed a written agreement with Janos Ertl, MD.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 109:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny. Skye does have and has performed on an agreement with Janos Ertl, MD.

**REQUEST FOR ADMISSION NO. 110:**

Admit that Skye has not produced in this case a written agreement between Skye and Janos Ertl, MD.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 110:**

Skye objects to this request on the grounds that it is not reasonably calculated to

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



**REQUEST FOR ADMISSION NO. 115:**

Admit that Skye has not executed a written agreement with Michael Baker, MD.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 115:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny. Skye does have and has performed on an agreement with Michael Baker, MD.

**REQUEST FOR ADMISSION NO. 116:**

Admit that Skye has not produced in this case a written agreement between Skye and Michael Baker, MD.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 116:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is also outside the scope of permissible requests under Rule 36(a)(1). This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit that Skye has not produced in this case a written agreement with Michael Baker, MD.

**REQUEST FOR ADMISSION NO. 117:**

Admit that Skye has not executed a written confidentiality agreement with Michael Baker, MD.

<div align="center">57</div>

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)



ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 117:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam‑Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit.

**REQUEST FOR ADMISSION NO. 118:**

Admit that Skye has not executed a written agreement with Scott Taylor, MD.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 118:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam‑Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny. Skye does have and has performed on an agreement with Scott Taylor, MD.

**REQUEST FOR ADMISSION NO. 119:**

Admit that Skye has not produced in this case a written agreement between Skye and Scott Taylor, MD.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 119:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is also outside the scope of permissible requests under Rule 36(a)(1). This request also seeks information protected

58

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows:  Admit that Skye has not produced in this case a written agreement with Scott Taylor, MD.

**REQUEST FOR ADMISSION NO. 120:**

Admit that Skye has not executed a written confidentiality agreement with Scott Taylor, MD.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 120:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows:  Admit.

**REQUEST FOR ADMISSION NO. 121:**

Admit that Skye does not possess a fully-executed written agreement between Skye and James Kerpsack, MD.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 121:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence.  This request is vague, ambiguous, and unintelligible as to the term "fully-executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as

59

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 150:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny. Skye does have and has performed on an agreement with Robert Bibb/BMPR Orthopedic, LLC.

**REQUEST FOR ADMISSION NO. 151:**

Admit that Skye has not produced in this case a written agreement between Skye and Robert Bibb or BMPR Orthopedic LLC.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 151:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is also outside the scope of permissible requests under Rule 36(a)(1). This request also seeks information protected by the attorney-client privilege or the attorney work-product doctrine.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny.

**REQUEST FOR ADMISSION NO. 152:**

Admit that Skye does not possess a written agreement signed by Robert Bibb.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 155:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. The issue of whether there is a written agreement versus any agreement including but not limited to a digital, implied or oral

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)



agreement is a legal conclusion.

Without waiving these objections and subject to each of them, Skye responds as follows: Admit that Skye does not have an agreement "signed by" Robert Bibb, but Skye has an agreement with his company, BMP Bracing, signed by Tommy Miller on behalf of BMP Bracing and Robert Bibb.

**REQUEST FOR ADMISSION NO. 153:**

Admit that Skye does not possess a fully-executed written agreement between Skye and Bill Morgan or Sequensant, Inc.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 153:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "fully-executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny. Skye does have and has performed on an agreement with Bill Morgan/Sequensant, Inc.

**REQUEST FOR ADMISSION NO. 154:**

Admit that Skye has not produced in this case a fully-executed written agreement between Skye and Bill Morgan or Sequensant, Inc.

**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 154:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "fully-executed"; however, Skye presumes Defendant means

ROSEN ✧ SABA, LLP

2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)



**AMENDED RESPONSE TO REQUEST FOR ADMISSION NO. 186:**

Skye objects to this request on the grounds that it is not reasonably calculated to lead Skye objects to this request on the grounds that it is not reasonably calculated to lead to the discovery of relevant, admissible evidence. This request is vague, ambiguous, and unintelligible as to the term "fully-executed"; however, Skye presumes Defendant means "to carry out" or "perform" according to Merriam-Webster and Black's Law Dictionary.

Without waiving these objections and subject to each of them, Skye responds as follows: Deny.

DATED: September 26, 2022

ROSEN ✧ SABA, LLP

By: _____

RYAN D. SABA, ESQ.
LAURA KELLY ST. MARTIN, ESQ.
Attorneys for Plaintiffs
SKYE ORTHOBIOLOGICS, LLC and
HUMAN                REGENERATIVE
TECHNOLOGIES, LLC

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245

90
SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)



## PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )    ss
COUNTY OF LOS ANGELES        )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 2301 Rosecrans Avenue, Suite 3180, El Segundo, California 90245.

On **September 26, 2022,** I served the foregoing document described as: **PLAINTIFF SKYE ORTHOBIOLOGICS, LLC'S AMENDED RESPONSES TO CTM BIOMEDICAL LLC'S REQUEST FOR ADMISSIONS (SET ONE),** on the interested parties as follows:

| | |
|---|---|
| **YUKEVICH \| CAVANAUGH**<br>Todd Cavanaugh, Esq.<br>Hassan Elrakabawy, Esq.<br>355 S Grand Ave 15th Floor<br>Los Angeles, CA 90071 | Attorneys for Defendants GARDNER ROGERS and VETERANS MEDICAL DISTRIBUTORS, INC.<br><br>Tel: (213) 362-7777<br>Fax: (213) 362-7788<br><br>Email: tcavanaugh@yukelaw.com<br>Email: HElrakabawy@yukelaw.com |
| **HODGSON RUSS LLP**<br>Robert J. Fluskey, Jr., Esq.<br>Matthew K. Parker, Esq.<br>The Guaranty Building<br>140 Pearl Street, Suite 100<br>Buffalo, New York 14202 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel:  (716) 856-4000<br>Fax: (716) 849-0349<br><br>Email: rfluskey@hodgsonruss.com<br>Email: mparker@hodgsonruss.com |
| **HENNELLY & GROSSFELD LLP**<br>Thomas H. Case, Esq.<br>Paul T. Martin, Esq.<br>Marina Towers North<br>4640 Admiralty Way #850<br>Marina Del Rey, CA 90292 | Attorneys for Defendants BRYAN BANMAN, CTM BIOMEDICAL, LLC, and PABLO SEOANE aka PAUL SEOANE<br><br>Tel: (310) 305-2100<br>Fax: (310) 305-2116<br>Email: tcase@hgla.com<br>Email: pmartin@hgla.com |

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



| Arash Beral, Esq.<br>Saam Takaloo, Esq.<br>**BLANK ROME LLP**<br>2029 Century Park East, 6th Floor<br>Los Angeles, CA 90067 | Attorneys for: Defendant<br>Mike Stumpe<br><br>Tel: 424.239.3400<br>Fax: 424.239.3434<br><br>aberal@blankrome.com<br>saam.takaloo@blankrome.com |
| Michael R. Williams, Esq.<br>Carlos A. Nevarez, Esq.<br>**BIENERT KATZMAN LITTRELL**<br>**WILLIAMS, LLP**<br>903 Calle Amanecer, Suite 350<br>San Clemente, CA  92673 | Attorneys for Defendant,<br>Nathan Boulais<br><br>Tel: (949) 369-3700<br><br>mwilliams@bklwlaw.com<br>cnevarez@bklwlaw.com<br>lthompson@bklwlaw.com |

BY E-MAIL OR ELECTRONIC TRANSMISSION - I caused the document(s) described above to be sent from e-mail address lstmartin@rosensaba.com to the persons at the e-mail address listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.  I also declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on **September 26, 2022**, at El Segundo, California.

_/s/ Laura St. Martin__
Laura Kelly St. Martin

SKYE'S AMENDED RESPONSES TO CTM'S REQUEST FOR ADMISSIONS (SET ONE)

ROSEN ✧ SABA, LLP
2301 Rosecrans Avenue, Suite 3180, El Segundo, CA 90245



# Exhibit 13

ROSEN ◆ SABA, LLP

TRIAL LAWYERS

April 29, 2022

**VIA ELECTRONIC MAIL ONLY**

Robert J. Fluskey, Jr., Esq.
HODGSON RUSS
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
rfluskey@hodgsonruss.com

>    Re:    *Skye Orthobiologics, LLC, et al. v. CTM Biomedical, LLC, et al.*
>            United States District Court, Central District of California
>            Case No. 2:20-cv-03444-DMG-PVC

Dear Rob:

This correspondence acknowledges receipt of and responds to your April 21, 2022 letter. We will respond to each category below. We have also included our continued meet and confer efforts regarding outstanding discovery issues relating to Banman, CTM and Seoane.

## I.    RESPONSE TO YOUR APRIL 21, 2022 MEET AND CONFER LETTER

### 1. Text messages and WhatsApp messages

We have resolved the technical issues regarding Chris Sharp's text messages and will produce them by May 12, 2022. We will produce these in an Excel spreadsheet format. Please confirm that you will produce the remainder of Banman's and Seoane's requested text messages in the same format also by May 12, 2022.

### 2. Complete versions of all of HRT's Standard Operating Procedures

We have produced all of HRT's complete SOPs provided by HRT. Today, we are producing a 2014 document of handwritten notes that correspond with HRT's SOPs, Bates no. Skye/HRT 625482 to 625485.

### 3. All relevant financial information for Skye and HRT for 2014 and 2015.

We will produce 2014 and 2015 financial reports.

Robert J. Fluskey, Jr., Esq.
April 29, 2022
Page 2

4. **Sales/revenue *by product* for Skye and HRT for 2014 through 2021.**

   Skye will produce the revenue by product type from 2017 to 2021. Please provide us with a date that CTM will produce the same information so we can have a simultaneous exchange. Plaintiffs agree to go back to 2017, rather than 2018, to give a baseline before Banman left.

5. **Sales/revenue *by physician contact* for 2014 through 2021.**

   We would like to discuss this issue further with you by telephone.

6. **Sales/revenue for any Veterans Administration facilities for 2014 through 2021.**

   We will agree to produce this information upon a mutual exchange with CTM. Please suggest a date for a simultaneous exchange.

7. **Sales/revenue information for the following customers identified in Plaintiffs' interrogatory responses for 2014 through 2021:**



   f) Veterans Administration National Acquisition Center: All sales to the VA NAC are listed through Veterans Medical Distributors, which is listed in the Sales by Customer spreadsheet.

8. **Sales/revenue information for the following sales representatives identified in Plaintiffs' interrogatory responses for 2014 through 2021:**

Robert J. Fluskey, Jr., Esq.
April 29, 2022
Page 3



9. **All contracts/agreements with the following physicians identified in Plaintiffs' interrogatory responses:**

    **a)** Mark Ciaglia: This agreement is produced as Skye/HRT 625487 to 625488.

    **b)** Janos Ertl: Skye does not have a formal written agreement with Dr. Ertl.

    **c)** Walt Lowe: Skye is not claiming contract interference with Dr. Lowe.

10. **All contracts/agreements with the following sales representatives (or their respective companies) identified in Plaintiffs' interrogatory responses:**



Robert J. Fluskey, Jr., Esq.
April 29, 2022
Page 4



11. **Communications with non-parties.**

If these have not already been produced, any responsive documents will be produced with Chris Sharp's text messages.

## II. OUTSTANDING DISCOVERY ISSUES WITH DEFENDANTS BANMAN, CTM, AND SEOANE

### 1. Banman's US and Canada Tax Returns

Banman has objected to and refused to produce documents in response to Skye's request for Banman's United States Federal Tax Returns for the years 2016 through 2021 (RFP 232) and Banman's Canadian tax returns for the years 2016 through 2021 (RFP 233). As we have set forth in detail in our March 27, 2022 meet and confer letter, Banman's personal tax returns are relevant to Plaintiffs' RICO cause of action and Plaintiffs' punitive damages claims. Please produce these documents.

### 2. Banman's Text and WhatsApp Messages

As stated above, please produce the remainder of Banman's text messages, WhatsApp messages, and other messages by May 12, 2022.

### 3. Seoane's text messages

To date, we have not received any text messages or WhatsApp messages from Pablo Seoane. Please produce these by May 12, 2022.

### 4. Phone records

We have only seen Seoane's Phone Records from 2020-2021. Please provide Banman, CTM's and Seoane's phone records from 2018 to the present.

Very Truly Yours,

RYAN D. SABA

# Exhibit 14

HIGHLY CONFIDENTIAL

**Page 1**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

SKYE ORTHOBIOLOGICS, LLC, A DELAWARE LIMITED LIABILITY COMPANY, HUMAN REGENERATIVE TECHNOLOGIES, LLC, A DELAWARE LIMITED LIABILITY COMPANY,    No. 2:20-CV-03444-MEMF (PVCX)

             Plaintiffs,

         vs.

CTM BIOMEDICAL, LLC, A DELAWARE LIMITED CORPORATION; BRYAN BANMAN, AN INDIVIDUAL; CTM MEDICAL, INC., A DELAWARE CORPORATION; VETERANS MEDICAL DISTRIBUTORS, INC., A FLORIDA CORPORATION; GARDNER ROGERS, AN INDIVIDUAL; MIKE STUMPE, AN INDIVIDUAL; PABLO SEOANE AKA PAUL SEOANE, AN INDIVIDUAL; NATHAN BOULAIS, AN INDIVIDUAL; AND DOES 3 THROUGH 10, INCLUSIVE,

             Defendants.

_____

** HIGHLY CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF CHRISTOPHER SHARP

El Segundo, California

Tuesday, March 29, 2022

Volume I

Reported by:

MARIA ELLERSICK

CSR No. 10531

Job No. 5154374

PAGES 1 - 267

HIGHLY CONFIDENTIAL

Page 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

SKYE ORTHOBIOLOGICS, LLC, A DELAWARE LIMITED LIABILITY COMPANY, HUMAN REGENERATIVE TECHNOLOGIES, LLC, A DELAWARE LIMITED LIABILITY COMPANY,    No. 2:20-CV-03444-MEMF (PVCX)

          Plaintiffs,

     vs.

CTM BIOMEDICAL, LLC, A DELAWARE LIMITED CORPORATION; BRYAN BANMAN, AN INDIVIDUAL; CTM MEDICAL, INC., A DELAWARE CORPORATION; VETERANS MEDICAL DISTRIBUTORS, INC., A FLORIDA CORPORATION; GARDNER ROGERS, AN INDIVIDUAL; MIKE STUMPE, AN INDIVIDUAL; PABLO SEOANE AKA PAUL SEOANE, AN INDIVIDUAL; NATHAN BOULAIS, AN INDIVIDUAL; AND DOES 3 THROUGH 10, INCLUSIVE,

          Defendants.

_____

          Videotaped Deposition of CHRISTOPHER SHARP, Volume I, taken on behalf of Defendants CTM Biomedical, LLC, at 2301 Rosecrans Avenue, Suite 3180, El Segundo, California, beginning at 9:14 a.m. and ending at 5:37 p.m. on Tuesday, March 29, 2022, before MARIA ELLERSICK, Certified Shorthand Reporter No. 10531.

HIGHLY CONFIDENTIAL

Page 3

APPEARANCES:


For Plaintiffs:

ROSEN, SABA, LLP

BY:  RYAN D. SABA

BY:  LAURA K. ST. MARTIN (Via videoconference)

Attorneys at Law

2301 Rosecrans Avenue, Suite 3180

El Segundo, California 90245

(310) 285-1727

Email:  rsaba@rosensaba.com


For Defendants CTM Biomedical, LLC, Bryan Banman,

CTM Medical, Inc., and Pablo Seoane:

HODGSON, RUSS, LLP

BY:  ROBERT J. FLUSKEY

BY:  MATTHEW K. PARKER (Via videoconference)

Attorneys at Law

The Guaranty Building

140 Pearl Street, Suite 100

Buffalo, New York 14202

(716) 856-4000

Email:  rfluskey@hodgsonruss.com

HIGHLY CONFIDENTIAL

Page 4

APPEARANCES (Continued):


For Defendants Gardner Rogers and Veterans

Medical Distributors, Inc.:

     YUKEVICH, CAVANAUGH

     BY:  TODD A. CAVANAUGH

     BY:  HASSAN ELLRAKABAWY (Via videoconference)

     Attorneys at Law

     355 South Grand Avenue, 15th Floor

     Los Angeles, California 90071

     (213) 362-7777

     Email:  tcavanaugh@yukelaw.com


For Defendant Mike Stumpe:

     BLANK ROME, LLP

     BY:  ARASH BERAL

     Attorney at Law

     (Via Videoconference)

     2029 Century Park East, 6th Floor

     Los Angeles, California 90067

     (424) 239-3453

     Email:  arash.beral@blankrome.com

HIGHLY CONFIDENTIAL

Page 5

APPEARANCES (Continued):


For Defendant Nathan Boulais:

BIENERT, KATZMAN, LITTRELL, WILLIAMS, LLP

BY:  MICHAEL R. WILLIAMS

Attorney at Law

(Via Videoconference)

903 Calle Amanecer, Suite 350

San Clemente, California 92673

(949) 369-3700

Email:  mwilliams@bklwlaw.com






Also  Present:

Bryan Banman

Gardner Rogers (Via videoconference)

Mike Stumpe (Via videoconference)

Pablo Seoane (Via videoconference)






Videographer:

JOSHUA OSHIMA

HIGHLY CONFIDENTIAL

Page 6

INDEX

WITNESS                                      EXAMINATION

CHRISTOPHER SHARP

VOLUME I

                 BY MR. FLUSKEY                    10

                          EXHIBITS

EXHIBIT                                       PAGE

Exhibit 43   Amended Notice of Deposition
             of Human Regenerative
             Technologies, LLC               11

Exhibit 44   Amended Notice of Deposition
             of Skye Orthobiologics, LLC     12

Exhibit 45   Plaintiff Human Regenerative
             Technologies, LLC's, Amended
             Responses to Bryan Banman's
             First Set of Interrogatories    14

Exhibit 46   Standard Operating Procedure,
             Separation of Placental Tissue,
             Effective date 12/19/17         104

Exhibit 47   Standard Operating
             Procedure, Drying of
             Tissues,
             Effective date 12/09/15         114

Exhibit 48   Cleaning of Placental
             Connective Tissue checklist     121

HIGHLY CONFIDENTIAL

Page 7

EXHIBITS (Continued):

EXHIBIT                                                        PAGE

Exhibit 49     Processing of Frozen
               Placental Tissues-Surgical
               HRT-Private Label                              124

Exhibit 50     Processing of Frozen
               Placental Tissues-
               Non-Surgical Umbilical
               Cord Only-Skye                                130

Exhibit 51     Standard Operating
               Procedure, Placental Tissue
               Processing Protocol,
               Effective date 10/01/13                       135

Exhibit 52     Standard Operating
               Procedure, Placental Tissue
               Processing,
               Effective date 8/04/14                        137

Exhibit 53     Plaintiff Skye
               Orthobiologics, LLC's,
               Amended Responses to
               Bryan Banman's First
               Set of Interrogatories                        208


               PREVIOUSLY MARKED EXHIBITS

EXHIBIT                                                        PAGE

Exhibit 16     Agreement for Biomedical
               Materials                                     141

Exhibit 20     E-mail from Bryan Banman
               to Lee Andrews,
               dated 9/20/19; SOP Template   179

HIGHLY CONFIDENTIAL

Page 8

El Segundo, California; Tuesday, March 29, 2022

9:14 a.m.

THE VIDEOGRAPHER:  Good morning.  We are now going on the record.  The time is 9:14 a.m. on Tuesday, March 29th, 2022.

Please note that microphones are sensitive and may pick up whispering, private conversations, and cellular interference.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This begins the video recorded deposition of Christopher Sharp taken in the matter Skye Orthobiologics, LLC, et al., versus CTM Biomedical, LLC, et al., filed in the U.S. District Court, Central District of California.  Case number of which is 2:20-CV-03444DMG.

This deposition is being held at 2301 Rosecrans Avenue, El Segundo, California 90245 and with Zoom videoconference.  My name is Joshua Oshima from the firm Veritext.  I'm the videographer.  The court reporter is Maria Ellersick.  I am not related to any party in this action, nor am I financially interested in the outcome.

HIGHLY CONFIDENTIAL

Page 9

Counsel and all parties present will now state their appearances and affiliations for the record.  If there are any objections to proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

MR. FLUSKEY:  Rob Fluskey of Hodgson, Russ, LLP, for CTM Biomedical, LLC, Bryan Banman, CTM Medical, and Pablo Seoane.

MR. SABA:  My name is Ryan Saba of Rosen, Saba on behalf of the Plaintiffs Skye Orthobiologics and HRT.

MR. CAVANAUGH:  Todd Cavanaugh for Defendants Gardner Rogers and Veterans Medical Distributors.

THE REPORTER:  And on Zoom, please.

MR. BERAL:  Arash Beral on behalf of Defendant Mike Stumpe.

MR. PARKER:  And Matt Parker on behalf of Defendants CTM Biomedical, LLC, Ryan Banman, CTM Medical, Inc., and Pablo Seoane.

MR. SABA:  And just for the record, can we identify the parties that are also here?  I think Mr. Banman is here, and is there somebody on Zoom?

MR. FLUSKEY:  Mr. Seoane is on Zoom as well.

MR. PARKER:  He was.  I think he may have dropped off.

MR. SABA:  Okay.  Thanks folks.


CHRISTOPHER SHARP,

having been administered an oath, was examined and testified as follows:


EXAMINATION

BY MR. FLUSKEY:

Q   Good morning, Mr. Sharp.

A   Good morning, Rob.

Q   You are testifying here today as a representative of Human Regenerative Technologies, LLC?

A   Correct.

Q   You're also testifying here today as a representative of Skye Orthobiologics, LLC.  Do you understand that?

A   Yes, I do.

Q   Okay.  What is your current position with Human Regenerative Technologies, LLC?

A   I'm the CEO.

Q   And I'm going to refer to that company as "HRT."  Okay?

HIGHLY CONFIDENTIAL

Page 11

        A    Okay.

        Q    Are you also the founder of HRT?

        A    Yes.

        Q    Fair to say you're the highest ranking
executive of HRT?

        A    I am.

        Q    And what is your position with Skye
Orthobiologics?

        A    The exact same, founder, CEO.

        Q    Highest ranking executive for that company
as well?

        A    Yes, yes.

            MR. SABA:  Let him finish his question.
She can only take down one of your voices at a time.

            THE WITNESS:  Got it.

            MR. SABA:  So wait for him to finish.  Then
you'll answer, and you'll finish.

            MR. FLUSKEY:  Took the words out of my
mouth.

            (Exhibit 43 was marked for
        identification by the court reporter.)
BY MR. FLUSKEY:

        Q    Let me hand you what we've marked as
Exhibit 43.  This is an amended notice of
deposition.  Have you seen this before, Mr. Sharp?

HIGHLY CONFIDENTIAL

Page 12

A   I believe so.

Q   If you would turn to the fourth page for me.  You see there's a heading "Topics," and beneath that heading there are 26 topics listed?

A   Yes.

Q   Are you prepared to testify on behalf of HRT with respect to those topics?

A   Yes.

MR. SABA:  Let me just interject quickly here.  There was some meet and confer discussion on these topics on the scope of them and the vagueness of some of them, but generally, he can answer the questions.

Go ahead.

(Exhibit 44 was marked for identification by the court reporter.)

BY MR. FLUSKEY:

Q   Okay.  Let me hand you what's been marked as Exhibit 44.  Have you seen this before?

A   Yes.

Q   This is an amended notice of deposition to Skye Orthobiologics; correct?

A   Yes.

Q   And if you would turn to the fourth page for me, you see there are topics listed beginning on

HIGHLY CONFIDENTIAL

Page 13

page 4?

A    That's correct.

Q    26 topics in total?

A    That's correct.

Q    And are you prepared to testify as to those topics today on behalf of Skye?

MR. SABA:  Same issues as with HRT.  There was prior meet and confer in terms of scope and vagueness, but the witness is here as the designated representative for the company to testify.

BY MR. FLUSKEY:

Q    So are you prepared to testify today on behalf of Skye with respect to Topics 1 through 26 in Exhibit 44?

A    Yes, I am.

Q    How did you prepare for your deposition today?

A    I reviewed some of the files that have been exchanged.  I reviewed the complaint.

Q    When you say "files that have been exchanged," you mean documents produced by the parties in this case?

A    That is correct.

Q    Do you know if you reviewed any documents not produced by any parties in this case in

Page 14

preparing for your deposition?

A    No.

Q    Other than reviewing documents, did you do anything else to prepare for your deposition?

A    I spoke with my counsel.

Q    Okay.  About how many hours did you spend preparing for your deposition?

A    Probably three hours, four hours.

Q    Did you speak to anyone other than counsel in connection with preparing for your deposition today?

A    No.

(Exhibit 45 was marked for identification by the court reporter.)

BY MR. FLUSKEY:

Q    Okay.  Let me hand you what has been marked as Exhibit 45.

Actually, before we go to 45, Mr. Sharp, could you go back to Exhibit 43 for a moment, please.

Do you see that Topic 5 in that notice is "Each HRT trade secret allegedly misappropriated by CTM, Banman, CTM Med, or Seoane"?

A    Which one are you looking at?

Q    Exhibit 43, the deposition notice to HRT.

A   Can you repeat it?

Q   Topic 5 reads "Each HRT trade secret allegedly misappropriated by CTM, Banman, CTM, or Seoane."

A   Yes.

Q   Okay.  And you're prepared to testify on that topic; correct?

A   Correct.

Q   Are you prepared today to explain to those who are in attendance the trade secrets that each Defendant misappropriated in this case?

A   Yes.

Q   Okay.  Now let's look at Exhibit 45, which I previously handed to you.  This is Plaintiff Human Regenerative Technologies, LLC's, Amended Responses to Bryan Banman's First Set of Interrogatories.  Do you have that in front of me?

A   Yes, I do.

Q   Now, if you would turn to three pages before the last page, you'll see there's a Verification.  That's your signature on the Verification; correct?

A   Yes, it is.

Q   You verified the truth of these responses under oath?

HIGHLY CONFIDENTIAL

Page 16

A    Yes.

Q    And you read them before you signed this Verification?

A    Correct.

Q    If you turn to page 4 for me of Exhibit 45. Do you see Interrogatory 1 on that page?

A    Yes.

Q    Interrogatory 1 asked "Identify and describe in detail each trade secret of HRT that Banman allegedly misappropriated."  Do you see where I'm reading?

A    Yes, I do.

Q    And then on pages 4 through 12, HRT provided a response; is that right?

A    Yes, we did.

Q    Okay.  Did you draft that response?

A    I did with counsel.

Q    You understood you were verifying the content of this specific response under oath?

A    That is correct.

Q    Okay.  And you did your best to identify in detail each trade secret of HRT that Mr. Banman misappropriated in answering this interrogatory; is that right?

A    Correct.

HIGHLY CONFIDENTIAL

Page 17

Q   Okay.  Let's look at the interrogatory answer beginning on page 5.  So the first heading that HRT listed in its answer is "Product Development and Manufacturing."  Do you see that?

A   Yes.

Q   So am I right that HRT alleges that Mr. Banman misappropriated trade secrets of HRT relating to product development and manufacturing?

A   100 percent.

Q   Okay.  You're sure of that?

A   100 percent.

Q   Okay.  Let's look through the response starting in the first paragraph.  The first paragraph reads "The compilation of information about Plaintiff's product development and manufacturing is not publically known and provides Plaintiff with a substantial business advantage."  Do you see that?

A   Yes.

Q   What is the compilation of information that you're referring to there?

A   That's quite a bit of information, Rob.  It's everything to do with how -- from start to finish making our products.

Q   Okay.  And you contend that Mr. Banman

HIGHLY CONFIDENTIAL

Page 18

misappropriated start to finish everything associated with the development of your products?

A   I would say the most important parts, yes.

Q   What are the most important parts?

Q   Okay.

MR. SABA:   First we're going to have to mark this section "highly confidential" as we're talking about the manufacturing process of HRT, which means we're going to have that last question and answer start in a separate booklet that is going to be considered highly confidential.  The remainder of the deposition will be confidential until we remove the section of "highly confidential."  We then also have a problem with Mr. Seoane's on the line now.

MR. FLUSKEY:   Well, he's alleged to have misappropriated these trade secrets.

MR. SABA:   But we have not released him

HIGHLY CONFIDENTIAL

Page 19

from the "highly confidential" designation at this time.

MR. FLUSKEY:  Well, obviously --

MR. SABA:  And the allegation is that he conspired to do so, not actually did so.  So I think at this time we have to politely ask him to drop off.

MR. PARKER:  This is Matt Parker. Mr. Seoane is not currently on the line.  I will note that two other counsel have joined since we began who have not identified themselves yet.

MR. SABA:  Okay.  Who joined?  We can't see the lineup.  So we don't know who's on the call.

MR. WILLIAMS:  This is Mike Williams on behalf of Nate Boulais.

MR. SABA:  Thank you.

MR. FLUSKEY:  Anybody else?

MR. WILLIAMS:  Yes.  Laura?

MR. SABA:  Oh, it could be Laura St. Martin from my office.  She may not have a microphone in her computer.

Okay.  So go ahead.  This will be in the "highly confidential" designation section at this point.

MR. FLUSKEY:  So Mr. Seoane is not on.  So

HIGHLY CONFIDENTIAL

Page 20

the issue is currently moot, but we would object to excluding him from this questioning.  If he's alleged to have misappropriated trade secrets, he's entitled to know what he allegedly stole.  And if he allegedly stole these trade secrets, he's seen them already anyway.  So right now, I guess, the issue is moot, but we would extraneously object to excluding him from this questioning.

          MR. SABA:  We can deal with it later.

BY MR. FLUSKEY:

     Q    You mentioned in your last answer, Mr. Sharp, that dehydration was an important part of HRT's manufacturing process.  Do I have that right?

     A    It's one of them, yes.

     Q    Okay.  And you considered that to be a trade secret of HRT?

     A    One of them, yes.

     Q    Okay.  And the fact that HRT's products used dehydration in the manufacturing process is something you keep secret?

     A    No.  We advertise that it is dehydrated.

     Q    Okay.  So it's publicly known that some of HRT's products are dehydrated; correct?

     A    Yes, it is.

     Q    All right.  Now, how did Mr. Banman

HIGHLY CONFIDENTIAL

Page 21

misappropriate this publicly known dehydration feature of HRT's products?

A    We have to look at everything in combination and in totality because when we looked at originally setting up HRT, Banman was tasked, along with working with myself, to looking at every product that existed on the market.  Okay.  And what we did is we found where our products would potentially be extremely unique.  Okay.  Came up with new classes of products.  How we could properly preserve products to make sure that they had the most efficacious nature as possible.

And so when you look at things like dehydration, dehydration is very important with membranes in order to maintain the biologic characteristics of those, and not every person or every manufacturer in the space was doing so.  Okay.

Q    Okay.  But the fact that HRT was doing that, dehydrating, was not secret; correct?

A    No.  We advertised that we used dehydration, yes.

HIGHLY CONFIDENTIAL

Page 22

Q   Okay.  Let's go back to Exhibit 45, page 5, and let's look at the second paragraph.

A   Can you repeat the page, please?

Q   Sure.  Page 5.

A   I see.

Q   We're still reading the HRT's response to Interrogatory No. 1.  So the first sentence in the second paragraph reads "Plaintiff's product information includes surgical implant reimbursement."  Do you see that?

A   Yes.

Q   Do you allege that Banman misappropriated a trade secret relating to surgical implant reimbursement?

A   What Banman did is while he was employed with Skye, he learned while being compensated by Skye that if you have a connective issue implant, there is a connective tissue reimbursement code. This was not known in the industry.  There was no other competitors at the time using that reimbursement information.

Q   When you say "reimbursement code," you're speaking about insurance reimbursement?

A   That is correct.

Q   Okay.  And the fact that some of these

HIGHLY CONFIDENTIAL

Page 23

products were subject to insurance reimbursement, you considered that a trade secret of HRT?

A    The knowledge that was developed while being employed at Skye was confidential and a trade secret, yes.

Q    What is that knowledge?

A    The knowledge, again, that connective tissue as an implant can be reimbursed as a connective implant.

Q    Okay.  Now, other companies today obtain insurance reimbursement for these tissue products; correct?

MR. SABA:  Speculation.  Lack of foundation.

BY MR. FLUSKEY:

Q    You know that; right?

A    Not connective tissue, not a flowable product the same as this.

Q    Okay.  But they do for other types of products in this space, like, for example, membrane products?

A    You can apply for a specific code through CMS for wound coverings, yes.

Q    Okay.  Now, did the doctors who you sold your products to, including flowable products, know

HIGHLY CONFIDENTIAL

Page 24

that they were subject to reimbursement?

A    Yes.

Q    And were those doctors bound by any
agreement to keep that information secret?

MR. SABA:  Overbroad.

THE WITNESS:  No, they were not.

BY MR. FLUSKEY:

Q    Okay.  And how is Mr. Banman using surgical
implant reimbursement information in his current
company that you consider to be wrongful?

A    Well, this, like many other things, were
learned while employed at Skye, and it's a
competitive advantage.  It's not known to the
industry.  Otherwise, every other company would be
using that reimbursement code, and therefore, he
took that information.  He was using information
that was developed while working at Skye and using
it in order to benefit his company.

Q    How do you know he used it?

A    Because in the documents disclosed, we know
that that's how they've been positioning it.

Q    Positioning what?

A    A connective tissue matrix.

Q    What do you mean by "positioning"?

A    That's how they've been selling it.

HIGHLY CONFIDENTIAL

Page 25

Q   Okay.  To make sure I'm following -- I want to make sure I'm following you.  You've seen documents in which CTM informs customers that some of its products are subject to reimbursement.  Is that what you're referring to?

A   Yes.

Q   Okay.  And you believe that is an example of trade secret theft?

A   I believe it is theft of confidential information and trade secrets, yes.  It's a violation.

Q   Okay.  Are there any other companies, to your knowledge, that market their flowable products as subject to reimbursement?

A   Not that I can recall.

Q   Okay.  How about Alliqua?  Do you know that company Alliqua?

A   I don't believe they exist anymore.

Q   They were bought by someone else?

A   Cellularity.

Q   Right.  And they market a product called Interfyl?

A   Correct.

Q   And is that product flowable?

A   When you reconstitute it at the site, it

HIGHLY CONFIDENTIAL

Page 26

can become into a flowable form, but it's not a ready-mixed solution like ours.

Q   Okay.  So by that you mean Interfyl sells a particulated product which then must be mixed with saline on site?

A   That's correct.

Q   And do they market their product subject to reimbursement?

A   I am not sure.  I believe -- I believe they do not, though.

Q   Okay.  Back to Interrogatory 1, Exhibit 45, second paragraph, first sentence still.  See the reference to "research and understanding of then pending new FDA regulations"?

A   Uh-huh, yes.

Q   Okay.  Do you allege that HRT's research and understanding regarding FDA regulations is an HRT trade secret?

A   Yes, it is.

Q   Okay.  And what is this research?

MR. SABA:  It's overbroad, but go ahead.

THE WITNESS:  Again, when Banman was employed at Skye, he was tasked with researching various products that were on the market that were already existing, okay, before we set up HRT.  We

HIGHLY CONFIDENTIAL

Page 27

also looked at the current FDA regulations, okay, that existed pre 2014, okay, and potentially draft pending regulations on how they would regulate both amniotic membranes and any 361A allograft, for that matter.

So having that foresight and knowledge of where the FDA was headed and some of the rulings that had taken place previously, we came up with a complete lineup of products that were on indication with the FDA that others in the industry did not possess.

BY MR. FLUSKEY:

Q    Okay.  The research, was that committed to writing?

MR. SABA:  Overbroad.

THE WITNESS:  Yes.  We have design files, E-mails, yes.

BY MR. FLUSKEY:

Q    And this research was based on, I think you mentioned, FDA regulations?

A    No.  It was multi-facetted.  This took, you know, many, many, many months.  It was everything from, yes, the regulations in the space, but it was also numerous publications on placental tissues, both in the U.S. and internationally.  Looking at

HIGHLY CONFIDENTIAL

Page 28

other competitors' forms, tissues used, how they process, how they preserve, how they deliver, to name a few.

Q   Okay.  Now, the information you just itemized -- FDA regulations, publications, information from other competitors -- that was all publicly available; right?

A   FDA, yes.

Q   And the publications were public, I assume?

A   Publications as well, yes.

Q   And the information on competitors was publically available; correct?

A   Yes, it was.

Q   Now, do you allege that Mr. Banman took any written document that included this research information referred to in this interrogatory with him when he ceased working with you?

A   He -- Banman had access to all of our files that we developed and all the research we developed in setting up HRT and the success in the placental space with Skye.  And he said he deleted them all, but from files that we've received, he clearly kept those or portions of them.  So to answer your question, yes, I do.

Q   So he had access to these materials while

HIGHLY CONFIDENTIAL

Page 29

working for HRT; correct?

A   Yes.

Q   And you believe based on information you've seen in discovery that he still possessed them after he left?

A   Yes.

Q   Okay.  Have you seen any information which indicates that he has used those materials in running CTM?

A   I mean, he uses extensive things that we use at Skye and HRT, yes.

Q   Okay.  What evidence do you have to support that belief?

A   Well, when you look at their website, you look at any of their materials -- when he left, Skye/HRT had five products.  Okay.  It's fascinating that CTM launched with extremely similar, if not the exact same, five products.  Whereas no other competitor had anything similar to that number of products.

Q   And the number of products --

A   Well, number and forms, Rob.

Q   Okay.  Number and forms of products that HRT had on its website was publically available; correct?

HIGHLY CONFIDENTIAL

Page 30

A    That is correct.

Q    Okay.  Do you contend in this case that the number of products HRT makes is a trade secret?

A    No.

Q    Okay.  Let's go back to the interrogatory response.  A little bit further down, there's a reference to "the sources of raw materials."  Do you see that?

MR. SABA:  What line are you looking at?

MR. FLUSKEY:  Third line.

MR. SABA:  At line 10?

MR. FLUSKEY:  Line 10.

MR. SABA:  Thank you.

BY MR. FLUSKEY:

Q    I'll read the full sentence.  "Plaintiff's products information includes surgical implant reimbursement, research and understanding of then pending new FDA regulations that affect placental/amniotic derived biologic products; the sources of raw materials," and that's what I want to focus on now is the reference to "the sources of raw materials."

MR. SABA:  Well, do you want to read the whole part just so we have a complete record of that semicolon section?

Page 31

MR. FLUSKEY:  Well, I want to go through each thing one by one.

MR. SABA:  Okay.

BY MR. FLUSKEY:

Q   So the sources of raw materials, what are we referring -- what are you referring to there?

A   We're -- placental -- placental tissues or tissues derived from placental -- from the placenta.

Q   Now, it was no secret that HRT manufactured products derived from human placental tissue; right?

A   No.

Q   That was known?

A   Yes.

Q   Correct?

A   Yes, yes.

Q   Now, the next thing referenced in this response is "and the difference properties of the various regions of the placenta."

A   Yes.

Q   "Including the surrounding tissues and fluids."  You see that?

A   Correct.

Q   Okay.  Now, that information, "the different properties of the various regions of the placenta," is not a secret of HRT; correct?

HIGHLY CONFIDENTIAL

Page 32

A    Can you repeat the question?

Q    The different properties of the various regions of the placenta, okay, do you allege that's a trade secret of HRT?

A    Yes.

Q    You do.  Okay.

MR. SABA:  And I just want to belatedly -- I'm not so sure I understand what you mean by "properties," that word, but go ahead.

MR. FLUSKEY:  It's not my word.

Q    So the placenta includes different regions; right?

A    Yes.

Q    Okay.  And that's not a secret; correct?

A    No.

Q    I can open a textbook and see there's amnion, chorion, and cord; right?

A    Yes.

Q    Okay.  So what properties of the various regions of the placenta are a trade secret of HRT?

A    Well, the trade secret is it was never disclosed in our connective tissue forms exactly which tissues of placenta were in each product. That's a trade secret.

Q    Okay.  By "which tissues," do you mean

HIGHLY CONFIDENTIAL

Page 33

amnion versus chorion?

A   And cord and ratios and milligram content.

[REDACTED]

Q   Okay.  Didn't HRT disclose that on its website?

A   Not for every product, no.

Q   But it disclosed it for some?

A   Can you repeat the question?

Q   Sure.  Didn't HRT disclose on its website that some of its products were chorion based?

A   Yes.

Q   Okay.  And didn't it disclose in some marketing materials that some of its products were chorion based?

A   Yes.

Q   And when your sales representatives would go out and call on customers, they would tell the customer that certain products were chorion based; right?

A   Yes.

MR. SABA:  Speculation what they would say.

HIGHLY CONFIDENTIAL

Page 34

BY MR. FLUSKEY:

Q   You know what your own sales reps would say, don't you?

A   Yes.

Q   You train them; right?

A   Banman did, yes.

Q   Okay.  And you consider that training a trade secret; right?

A   Yes.

Q   Okay.  So you know --

A   Some of it, yes.

Q   So you know that your sales reps told doctors what was in the product they were going to use; right?

A   Not all of it, but in some cases.

Q   Right.  And in some cases, they told the doctors the product included chorion; correct?

A   They said it was chorion based for one membrane.

Q   Okay.  Which would mean it included chorion?

A   One of five.

Q   "Chorion based" would mean it includes chorion; right?

A   The base was chorion.

HIGHLY CONFIDENTIAL

Page 35

Q   Right.  So it was not a secret that some of HRT's products included chorion as a base?  Can we agree on that?

A   Correct.

Q   Okay.  Now, let's talk about amnion.  Some of HRT's products include amnion as a base; correct?

A   Yes.

Q   And it was not a secret that some of HRT's products included amnion as a base.  Can we agree on that?

A   Yes.

HIGHLY CONFIDENTIAL

Page 36

Q   Okay.  Do you know if that's how CTM processes its membrane products?

A   Yes, I believe so, yes.

Q   How do you know that?

A   Information that was shared with us through E-mail communication from Banman to a gentleman by the name of Will.  A sample from Alamo was sent to Banman.  Banman said it was too thin.  ████████ ██████████████████████████  Can you do it more like this one.  The sample he sent back and the photo of it was an HRT product sample.

HIGHLY CONFIDENTIAL

Page 37

Q   Okay.  And Alamo -- I just want to make sure the record's clear.  You referred to Alamo.  That's the company that currently processes tissue for CTM; correct?

A   That is correct.

███ ███████████  ██████████████████████████

█ ██████████████████████████████████████████

█ ████████████████████████████████████████

A   That is incorrect.

Q   That's not correct?

A   That is not correct.

Q   Okay.  So if your sales reps were to testify that they did tell doctors that, they'd be wrong?

A   To my knowledge, our sales reps did not even know this.

Q   Okay.  So your sales reps didn't know everything about HRT's processes; correct?

A   That is correct.

Q   They only had access to certain information?

A   That is correct.

███ ████████████████████████████

█ ████████████████████████████████████████████

█ █████████████████████████████████

Page 38

A    No.

Q    It did not?  They did not?

A    That is correct.

Q    Okay.  Did HRT disclose that information at meetings of CMS that you attended with Mr. Banman?

A    I don't believe so.

Q    You don't believe so?

A    That's what I said, yes.

Q    Okay.  You say you don't believe so.  Does that mean you're not sure?

A    To my knowledge, it was not disclosed.

Q    Okay.  Just so the record's clear, by "SOP," do you mean standard operating procedure?

A    That is correct.

HIGHLY CONFIDENTIAL

Page 39

Q    What is that?

A    Those are procedures that are our guide to the manufacturing individuals in our lab to follow when making our products, but don't include absolutely every step of the way.

Q    Okay.  Looking back at Exhibit 45, line 19, there's a reference to the machinery used to create different forms of products.  Do you see that?

A    Yes.

Q    All right.  Do you believe the machinery that HRT used to create different products is a trade secret of HRT?

A    Only the knowledge to use a specific type of mill is a trade secret to HRT.

Q    So the knowledge to use a certain piece of equipment?

A    Yes.

Q    What do you mean by "mill"?

A    It's a piece of machinery.  There's many different ones that are on the market that are used to grind up, to pulverize, to reduce in size tissue.

Q    So you're referring to a mill that's used to particulate tissue?

A    Yes.

Q    Okay.  Other than knowledge regarding use

HIGHLY CONFIDENTIAL

Page 40

of that particulating machine, do you consider any other equipment used by HRT to be an HRT trade secret?

A   I -- when thinking of our process, no specific piece of equipment comes to mind, but it's -- again, it's how we go through the entire process that gives us unique forms and preservation of our products that has given us a competitive advantage.

Q   I want to make sure I'm following you there.  Are you saying that the process used by HRT in its entirety gives the company a competitive advantage?

A   No.

Q   Okay.  Well, what do you mean by the different steps together then?

A   When we looked to develop these products, we wanted to create a system using different techniques that would do the best to preserve the natural biologic content of these tissues, and that was one thing we would use to sell our products.

Q   Okay.  How has -- how, if at all, has CTM misappropriated any HRT trade secrets relating to the machinery used by HRT?

A   Well, they've taken knowledge that can only

HIGHLY CONFIDENTIAL

Page 41

have been learned -- because it wasn't learned when Banman was a graphic designer.  It was only learned when Banman worked for Skye and HRT and was employed and paid that he learns that there's different parts of a process that are unique, confidential, and we feel are trade secrets that are then taken and plugged into another processor's system, okay, and gives him a competitive advantage that took us years to develop.

Q   Okay.  I understand you think Mr. Banman had access to this information when he was at HRT. My question is a little different.  How did Mr. Banman misappropriate trade secrets relating to machinery used by HRT?

A   He took parts of our process to create

HIGHLY CONFIDENTIAL

Page 42



Page 43

██████████████████████████████████████

Q   Okay.  Let's peel that back.  You mentioned again "dehydration" in your answer.

A   Yes.

Q   It was not a secret that HRT dehydrated products; correct?  We already talked about that?

A   No.

Q   It was not a secret?

A   No.

Q   We got a double negative going.  So I have to fix it.  Am I correct that it was not a secret that HRT dehydrated certain products?

A   We used that for a competitive advantage and shared that in our marketing material.

Q   Okay.  And HRT also informed customers that some of its products were chorion based; correct?

A   For one membrane of five products, yes.

Q   So that was not a secret; correct?

A   Where we -- what the base tissue was, no.  But how it was processed and what was left on it, that was a trade secret.

██ ████████████████████████████████████
██ ██████████████████████████

A   Or the cells, yes.

Q   You mentioned a mill used to particulate

HIGHLY CONFIDENTIAL

Page 44

tissue.  How did Banman misappropriate any trade secrets relating to use of a mill to particulate tissue?

Q    Was it a trade secret of HRT?

A    I believe it's covered in our trade secrets, absolutely.

Q    Did HRT tell potential customers that it particulated fresh tissue?

A    No.

Q    That wasn't in any of the marketing materials?

A    We might have referred to it early on as a particulate, but we did not tell people how we did

HIGHLY CONFIDENTIAL

Page 45

it, no, or what tissues were in it.

A    What we would say this is ready to use preserved connective tissue.

Q    And you would refer to it as "ambient"; right?

A    We had two forms.  We had an ambient temperature version and cryo temp version as well.

Q    So the fact that it was ambient was not secret; correct?

A    No, but the ability to make it to be the first company in the space, yes, that was a secret.

Q    Okay.  How did Mr. Banman and CTM misappropriate from HRT the ability to make or to particulate fresh human tissue?

HIGHLY CONFIDENTIAL

Page 46

Q   Okay.  How do you know --

A   -- and we validated it.

Q   How do you know that the competitors didn't have an ambient temperature product?

A   Because the extensive competitive research that we did showed that nobody had it.

Q   And that was publically available; right?

HIGHLY CONFIDENTIAL

Page 47

MR. SABA:  Objection.  Overbroad.

THE WITNESS:  Publically available on product forms that were not, you know, other people's, and we weren't taking other people's technology.

BY MR. FLUSKEY:

Q   So you were able to know and come to believe that a saline ambient temperature product was new because you knew what the other competitors were selling?

A   We knew what they were not doing.  They didn't know that you can possibly preserve a biologic.  That's what we discovered.

Q   And they didn't know that until HRT and Skye began selling the product with those features; right?

A   They didn't believe it could be done, and even physicians didn't know it can be done until we did it -- until we developed it.

Q   But once you did it, it was no longer a secret?

A   It was a secret because nobody knew how to do it.

Q   But the fact that the product was ambient temperature, that was not a secret?

HIGHLY CONFIDENTIAL

Page 48

A   The delivery and how it shows up in an office, yes, and the temperature it's at, they knew that, but they did not know how you could achieve it.

Q   Okay.  I'm trying to understand why you believe that CTM and Banman misappropriated the how to achieve it part.  So let me go step by step.

Have you seen any documents in which Mr. Banman disclosed to his processor, Alamo, how to particulate human fresh tissue?

A   Yes, we have.

Q   What documents?

A   We saw a presentation that was sent to a few tissue banks.  The one specifically to Alamo showed the types of the areas of the placenta, which tissues, okay, milligram content, all right, and then spells out steps within their SOPs.  It was even at their last deposition that Lee Andrews even said he and Will were dumbfounded.  They didn't know how you could take a tissue and get it into that form.

Okay.  So they didn't have the know-how, and Banman clearly had the know-how because we developed it at HRT, and nobody else in the space was making a fresh product like this.

HIGHLY CONFIDENTIAL

Page 49

Q   Okay.  What evidence do you have that Banman disclosed that know-how, that is, how to particulate fresh human tissue, to Alamo?

A   Well, it's clear when he states milligram content that he knows there's a way to get a solid form into a particulate.

Q   Are you saying that Alamo didn't know how to get a solid form into a particulate before they met Bryan Banman?

A   They knew how to get bone into a particulate, but they had never used a mill, to my knowledge, to make fresh tissue and put it in saline to have a connective tissue product like HRT.

A   Yes.

MR. SABA:  Overbroad.

THE WITNESS:  Can you repeat the question?

BY MR. FLUSKEY:

▮      ▮      ▮

▮      ▮

▮      ▮

A    That is knowledge and know-how that was developed at HRT.

Q    But today, others do that; right?

MR. SABA:  Speculation.

THE WITNESS:  Not to my knowledge.  CTM is the only one.

BY MR. FLUSKEY:

Q    What about Interfyl, that's a particulate product; right?

A    It is different, though.  It's not fresh.

Q    How do you know that?

A    I've seen the product.  I know the product. I've read their marketing materials.  I've met with that company.  I know it.

Q    I see.  So by seeing their product, which is out in the marketplace, you can tell whether or not it's fresh tissue?

A    It's a dried -- it's a dried particulate.

▮      ▮

▮      ▮

▮      ▮

MR. SABA:  Speculation.

HIGHLY CONFIDENTIAL

Page 51

THE WITNESS:  I don't believe so at all. In the -- up until CTM, there was nobody in the marketplace that had reverse engineered our product in the exact same way and fashion that CTM did.

BY MR. FLUSKEY:

A    I don't believe we received all the documents from CTM and Banman.  So to date, I have not seen -- I've seen enough to draw a very solid conclusion to know in my heart, and knowing that nobody else was able to develop a product like ours since we've been on the market for almost 10 years, and they miraculously came up with the exact same

Banman had knowledge to the exact milligram content that worked clinically, and it just happens that one of our formulas is the exact same milligram content as CTM's.

MR. SABA:  Somebody just joined on Zoom. Can you identify yourself, please?  Can someone on Zoom tell us who joined?  Maybe they don't have a microphone.

HIGHLY CONFIDENTIAL

Page 52

MR. BERAL:  That was Hassan.

MR. ELLRAKABAWY:  That's me, Hassan Ellrakabawy.

MR. SABA:  Okay.  All right.  No problem. Let's keep going.  Sorry.

BY MR. FLUSKEY:

███ ██████████████████████████████

█ ████████   █████████████████████████████

█ ██████████████████████████████████████

██ ██████████████

A    I've seen documents that show parts of our process that is enough to be able to make our product.

Q    Have you seen a document in which Mr. Banman explains to Alamo how to particulate fresh human tissue?

A    I have not seen -- no.

Q    Has anyone told you that Mr. Banman explained to Alamo how to particulate fresh human tissue?

A    I'd have to look at the transcript of Lee Andrews.  I believe he did mention that Banman walked them through steps, but I'd have to refresh my memory.

Q    So it's your recollection that the witness

for Alamo, Mr. Lee Andrews, testified that

Mr. Banman told Andrews how to particulate tissue?

        A    As I said, I'd have to review the

transcripts to see exactly the exact details that

Lee Andrews mentioned that were shared from Banman.

        Q    Okay.  It's funny because I was there, and

my recollection is that Mr. Andrews, much to your

chagrin, said they did it themselves.  Am I wrong?

                MR. SABA:  Argumentative.  No.  The

transcript is what it is.  The document will speak

for itself.

BY MR. FLUSKEY:

        Q    You can answer.  Am I wrong?

                MR. SABA:  The question is are you wrong

about your own recollection?

                THE WITNESS:  He said two different things.

So he said that he did not have the knowledge and

know-how to be able to do it in the beginning of

testimony.

BY MR. FLUSKEY:

        Q    Did he --

        A    He didn't know how to do it.

        Q    Did he say Banman told him?  That's what

I'm interested in.

                MR. SABA:  Again, the transcript will speak

HIGHLY CONFIDENTIAL

Page 54

for itself.

BY MR. FLUSKEY:

Q   You can answer.

A   I don't recall.

Q   Okay.  Let's go back to Exhibit 45, page 6 line 15.  In that sentence, HRT stated "Plaintiff alleges that Defendant Banman -- that Defendant Banman and/or the other named Defendants stole, disseminated, and then used these proprietary processing methods to instruct a third-party manufacturer on how to produce Plaintiff's connective tissue matrix products."  Do you see that?

A   Yes.

Q   What evidence do you have to support that contention?

A   In the almost 10 years that HRT has been on the marketplace, nobody has been able to reverse engineer our ambient temperature, ready to use flowable connective tissue product.  Nobody had known the exact milligram content and tissues used in one of our formulations that CTM is marketing.

Q   Do you have any other evidence to support that contention?

A   There are E-mails from various other

HIGHLY CONFIDENTIAL

Page 55

Defendants that are alleging that the product is the same or similar, to my knowledge.

Q    E-mails -- go ahead.

A    Go ahead, Rob.

Q    E-mails from what Defendants?

A    I believe Nate Boulais.

Q    So you believe you've seen an E-mail where Nate Boulais says what?  Tell me what you think it said.

A    They're replacing Skye's connective tissue product with CTM's connective tissue products.

Q    What do you mean by "replacing"?

A    Skye was selling to various accounts, okay, and Boulais stated -- Boulais, who was our rep, but also was repping for CTM, told the facility we'll swap out their connective tissue products for Skye's.

Q    Okay.  Nate Boulais is a sales representative; right?

A    That's correct.

Q    Okay.  So you saw an E-mail where you believe he was marketing CTM's products --

A    Yes.

Q    -- against HRT's?  Do I have that right?

A    Yes.

HIGHLY CONFIDENTIAL

Page 56

Q   Okay.  Do you have any other evidence to support this contention on lines 15 through 17 of page 6 of Exhibit 45?

A   No.  We've seen enough from Alamo to -- we feel that backs up this claim.

Q   Okay.  When you say "seen enough by Alamo," are you referring to documents produced by Alamo in response to the subpoena?

A   Documents produced by Alamo and CTM.

Q   Okay.  Have you seen any documents from Alamo other than what they've produced in response to the subpoena?

A   No.

Q   Okay.  Have you had any conversations with any principals of Alamo about CTM's processes?

A   No.

Q   Looking at page 6 of Exhibit 45, and specifically line 26, at line 26, HRT stated "Plaintiff and Skye developed a best-in-class membrane lineup consisting of three thicknesses, 'Thin,' 'Thick,' and 'X-Thick.'"  Do you see that?

A   Yes.

Q   Okay.  Did HRT ever market its products using the words "Thin," "Thick" --

          (Whereupon, there was an announcement

HIGHLY CONFIDENTIAL

Page 57

over the building's P.A. system.)

THE REPORTER:  Can we go off the record?

THE VIDEOGRAPHER:  We are now off the record.  The time is 10:14 a.m.

(Recess.)

THE VIDEOGRAPHER:  We are now on the record.  The time is 10:26 a.m.

BY MR. FLUSKEY:

Q   Okay.  We're back on the record.

Mr. Sharp, referring again to Exhibit 45, page 6, line 26.  At line 26, HRT stated "Plaintiff and Skye developed a best-in-class membrane lineup consisting of three thicknesses, 'Thin,' 'Thick,' and 'X-Thick.'"  Do you see that?

A   Yes.

Q   Okay.  Did HRT ever market products using the names "Thin," "Thick," and "X-Thick"?

A   Yes.

Q   When did it do that?

A   It was a number of years ago.  We were using that terminology on those three products.

Q   When you say "number of years," can you be more precise?  How many years ago?

A   Rob, I'm guessing it was probably 2015 through '18, but I'd have to refresh my memory.

HIGHLY CONFIDENTIAL

Page 58

Q   Now, were products actually sold using a trade name of "Thin," "Thick," and "X-Thick"?

A   It was on our website.  It was on marketing materials.  I'd have to look specifically again to see if we -- if we sold products with those descriptors.

Q   Okay.  Let me ask you a more precise question.  Was "Thin" ever a name of a product sold by HRT?

A   It was a reference to the product.

Q   But not the name of the product?

A   No, I don't believe it was the actual name, but it was used to describe, and it was aligned with the name of the product.  So one when reading either our marketing materials or our website understood that that product form was thin versus the next one up, which was thick, differentiating it from the thin clearly, and then the "X-Thick" meaning it's even more thick than the thick.  Okay.

Q   Okay.  So HRT used those words descriptively; is that fair?

A   In its marketing and its website to refer to its three membrane forms, yes.

Q   And it used those words to describe the physical characteristics of the products.  Am I

HIGHLY CONFIDENTIAL

Page 59

right?

    A   Yes.

    Q   Okay.  HRT -- was HRT's use of "Thin," "Thick," and "X-Thick" a secret?

    A   No.

    Q   Okay.  Now, do you believe HRT used the word "X-Thick" on any of its marketing materials?

    A   It used it the same as the "Thin" and the "Thick."

    Q   So it did it use the term?

    A   Yes, I believe so, yes.

    Q   And for what HRT product did HRT use the word "X-Thick"?

    A   That was for our cord membrane.

    Q   Umbilical cord?

    A   That is correct.

    Q   Okay.  Let's turn to the next page, page 7. Beginning on line 2, there's a sentence that reads only ███████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ ███████████████████████████████████ Do you see that?

    A   Yes.

HIGHLY CONFIDENTIAL

Page 60

Q    All right.  What do you mean by ████

████████████████████████████

A    We were referring to it earlier as "fresh."
It's the same.

Q    Okay.  I don't think I asked you.  What do
you mean by "fresh"?

A    What we mean by it is in its natural form
when you ███████████████████████████

████████████████████████████

████████████████████████████ ██

████████████████████████ █████

████████████████████████.

Q    Okay.  Now, when HRT receives placental
tissue, is it frozen?

A    Yes.

Q    And then what does it do with it?

A    It's both actually.  Depends where we're
actually receiving it from.

Q    Okay.  And after you receive it, do you put
it in some type of freezer to store it?

A    Yes, we do.

Q    Okay.  So for those tissues that you
particulate, am I right they were all in a frozen
state before the particulating process began?

A    No.

HIGHLY CONFIDENTIAL

Page 61

Q   That's not correct?

A   It's not always, no.

Q   So sometimes you would use receive human placental tissue and not store it in a frozen state?

A   No.  We always store it when we receive it originally because it has to go through proper screening, testing, medical record review, and those are placed into quarantine.  Once the medical director signs off that these tissues are safe to be used, they then are taken from the freezer, okay, and then thawed and run through a certain state.

Q   Okay.  So let me ask my other question again because I think we may have been two ships passing in the night.

All of the tissue that HRT particulates was in a frozen state at some point before it was particulated.  Am I right on that?

A   It goes through various cycles, yes, but one is -- it is frozen.

Q   Okay.  Let's focus on that because -- let

HIGHLY CONFIDENTIAL

Page 62

me ask you a different question which you may have already answered, but I want the record to be clear.

When HRT particulates tissue, the tissue is in a frozen state; is that correct?

A    That's correct.

Q    All right.  So how is it fresh?

A    It's fresh in that it never gets dried.  So it's fresh.  It's frozen to a minus 80 temperature. Okay.  So it's still kept keeping its fresh characteristics.  It's just cryo preserved.

Q    Okay.  So "fresh" means not dried?  Am I following you?

A    Yes.

Q    And does "dried" mean dehydrated?

A    It could be freeze-dried.  It can be dehydrated.  It's the process of removing moisture.

Q    Understood.  So fresh would mean, from your perspective, not freeze-dried and not dehydrated. Do I have that right?

A    Not removing any moisture.

Q    So three things.  Fresh would mean not freeze-dried, not removing any moisture, and not dehydrated; is that right?

A    That seems right.

Q    Okay.  HRT told consumers, potential

HIGHLY CONFIDENTIAL

Page 63

purchasers, that its products were not dehydrated; right?  We already went over that?

A   Yes.

Q   And HRT told potential customers that its products were not dehydrated; right?

A   Repeat the question.

Q   HRT told its customers that its products were not dehydrated; is that correct?

A   One more time, Rob.

Q   Yeah.  HRT told its customers that HRT's products were not dehydrated; is that correct?

A   I'm not understanding your question.

MR. SABA:  Maybe if you ask it in a different form or break it down into two questions.

BY MR. FLUSKEY:

Q   Okay.  Did HRT tell its customers that HRT's products were not dehydrated?

A   ███████████████████████████████████████ ███████████████████████   ███   ███████████████ ███████████████████████   For our membranes, what we told our customers is that they were dehydrated.

Q   Okay.  So HRT told its customers whether or not the products were dehydrated.  Do I have that right?

A   For the membrane -- for two of our

HIGHLY CONFIDENTIAL

Page 64

membranes, yes.

Q   Well, were there certain products that HRT manufactured where it did not tell potential customers about the dehydration status?

A   No.  We would tell them exactly -- if a product went through dehydration, it would be labeled as dehydrated.

Q   Understood.  So whether or not an HRT product is dehydrated was disclosed to customers; is that correct?

A   Yes.

Q   Okay.  And whether or not an HRT product was freeze-dried was disclosed to customers; is that correct?

A   If we did that, yes.

Q   If you did what?  Freeze-dried?

A   We don't freeze-dry.

Q   Right.  So HRT told its customers it did not freeze-dry; correct?

MR. SABA:  Specifically those words?

MR. FLUSKEY:  Yes.

THE WITNESS:  What we told our customers is that our products were dehydrated.  Dehydration can take place through different types of systems.  Okay.  You can -- you can use freeze-drying and

HIGHLY CONFIDENTIAL

Page 65

still achieve dehydration, okay, by a particular setting, as did CTM.  Okay.  Our products did not use a freeze-dryer, okay, but were dehydrated as well.

BY MR. FLUSKEY:

        Q    Understood.  So HRT's dehydrated products were not dehydrated through freeze-drying.  Do I have that right?

        A    Correct.

        Q    And HRT told its customer that; correct?

        A    We just said they were dehydrated.

        Q    Didn't HRT and Skye's sales representatives sell against competitor products that were freeze-dried?

        A    If a customer said the product was freeze-dried, okay, in the industry, that's typically referring to reducing moisture below a dehydrated state.  Okay.  If you use freeze-drying, you can also achieve dehydration and call it dehydrated.

        Q    Okay.  Did HRT ever tell its customers that its products were freeze-dried?

        A    No, we never used a freeze-drying system.

        Q    Correct.  And did your customers know that?

                MR. SABA:  Speculation.

Document 211-4 Filed 12/19/22 Page 332 of 608
Page ID #:6662

Page 66

THE WITNESS:  It was never requested or needed to be disclosed.  The state of the product, Rob, is dehydrated.  So that's a moisture level that is kept within that tissue form.  Okay.  The method used to achieve that is irrelevant.

BY MR. FLUSKEY:

Q   So you think whether or not freeze-drying is used is irrelevant?

A   That's not what I said.

Q   Okay.  Well, then what's irrelevant?

A   I believe what you're trying to ask me is our products being dehydrated, did we disclose what type of machinery or system we used to get to that state.  If that's your question, we never disclosed how we achieved dehydration.

Q   That's not my question exactly.  Let's go step by step.  HRT's products are not freeze-dried.  Am I with you on that?  Is that correct?

A   We do not use freeze-drying, correct.

Q   Correct.  Is HRT's decision not to use freeze-drying a trade secret?

A   No.  The machinery, the mechanism, no.

Q   Okay.  Let's go back to Exhibit 45.  Again, page 7, looking at lines 2 -- beginning at line 2, we were just discussing the meaning of "raw

1-800-727-6396            Veritext Legal Solutions            www.veritext.com

HIGHLY CONFIDENTIAL

Page 67



A    Yes.

Q    What does that mean?

HIGHLY CONFIDENTIAL

Page 68

Q    So when you say here in this interrogatory response "the most tissue biologic content per vial," do you mean the highest ratio of tissue to saline?

A    No.

Q    Okay.  And what in milligrams is that content level per vial?

A    It varies depending on the product form.

Q    Okay.  Can you tell us what the content is in milligrams for each product?

A    I have to look at all our notes.  We

HIGHLY CONFIDENTIAL

Page 69

have -- we now have eight different products that all have different milligram content.

Q   Okay.  When you say "notes," do you mean the SOPs?

A   For each product, yes.

Q   Okay.  So the SOPs would tell us the milligram content for flowable products?

A   Yes.

Q   Okay.  Let's go down to line 14, still on page 7.  Line 14 reads "Through significant research and development, Plaintiff and Skye have developed product lines and unique processing methods which Plaintiff and Skye have had trademarked, including HydraTek and BioAware Membrane Preservation System." Do you see where I'm reading?

A   Yes.

Q   Is it your understanding that HRT has that processes trademarked?

MR. SABA:  I'm sorry.  Can you repeat that question one more time?  I didn't understand it.

BY MR. FLUSKEY:

Q   Is it your understanding that HRT has had processing methods trademarked?

A   We have trademarked the names of our process.

HIGHLY CONFIDENTIAL

Page 70

Q   Understood.  But the process itself is not subject to a trademark; is that right?

A   No.

Q   Now, there's a reference to the HydraTek process.  Do you see that?

A   Yes.

Q   What is that?

A   The HydraTek process is referring to how -- our general approach to how we preserve all forms of our tissue lineup.

Q   And what is that approach?

HIGHLY CONFIDENTIAL

**Page 71**



HIGHLY CONFIDENTIAL

Page 72



A    I don't -- I don't have the details in front of me.  I'd have to look at the SOPs.

Q    That would be in the SOPs as well?

A    It should be, yes.

HIGHLY CONFIDENTIAL

Page 73



Q    What information are you referring to in your last answer?

A    I mean, we can go through the complaint, if you wish.  Be happy to.

Q    Well, we're going through -- let me go back to my initial question.

HIGHLY CONFIDENTIAL

Page 74



HIGHLY CONFIDENTIAL

Page 75



Q   Let me ask the question again because I don't think we got an answer.  Do you allege that CTM or Mr. Banman has misappropriated any aspect of what you call the HydraTek process?

A   Yes.

Q   Okay.  Tell us specifically what aspects of the HydraTek process that they've misappropriated.

HIGHLY CONFIDENTIAL

Page 76



Q    Okay.   And how did CTM or Bryan Banman
misappropriate that part of the HydraTek process?

Q    Okay.   So you believe there's information
that Mr. Banman gave to Alamo regarding this
HydraTek process?

A    Yes.

HIGHLY CONFIDENTIAL

Page 77

Q    Am I following you?

Okay.  And how did he communicate that information to them?

A    It's in Exhibit B of the Alamo agreement.

Q    Exhibit B to the Alamo agreement that was marked during Alamo's deposition?

A    I believe so, yes.

Q    Okay.  So you believe that exhibit contains trade secrets of HRT?  Do I have that right?

A    It contains vital pieces to our process to enable a competitor to make something that they did not have the know-how to make prior to our confidential and trade secret information being disclosed by Banman.

Q    Okay.  What vital pieces -- those are your words, "vital pieces" -- of HRT's process is in Exhibit B?

A    I have --

MR. SABA:  The document speaks for itself without showing to him, but you can answer.

THE WITNESS:  I'd have to refresh my memory to get the exact specifics.  ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ .

HIGHLY CONFIDENTIAL

Page 78

BY MR. FLUSKEY:

Q    Is this know-how you're talking about committed to writing at HRT?

A    Yes.

Q    In the SOPs?

A    Yes.

Q    Okay.  If I wanted to understand where I can find these trade secrets, is there any other document that I can look at other than the SOPs?

A    No.

HIGHLY CONFIDENTIAL

Page 79

Q   Okay.

A   And that's done for good reason, to keep it a trade secret because we were highly advised by attorneys to keep it --

MR. SABA:  Generally, go ahead.  Go ahead. Finish your sentence.

THE WITNESS:  We were highly advised to keep it a trade secret and not to disclose it even internally to employees.  So the only two employees that knew our entire process was Banman and myself. And to this day, I make 100 percent of our commercial connective tissue because the people in the lab do not have access to that component of our SOP.  That's how important our know-how is and the lengths we've gone through and to to protect it.

BY MR. FLUSKEY:

Q   Okay.  So the medical director that works with HRT doesn't have access to the entire process --

A   That is correct.

Q   -- the process he signs off on?  Is that your testimony?

A   Our medical director is an independent medical director that has reviewed our SOPs with our head of quality assurance and signs off on the

HIGHLY CONFIDENTIAL

Page 80

safety of our products.

Q   But there are certain parts of your process that you've kept from that medical director?  Is that your testimony?

A   I have not kept the whole -- ██████████

████████████████████████████████████ but those are irrelevant to whether or not the products are safe to be followed -- safe to be used or they do not follow our proper SOP or procedures.

Q   Okay.  So just so we're clear, there are certain components of the SOP that are not disclosed to your medical director?

A   There's one small component that to my knowledge the medical director has not seen.

Q   And what is that component?

██   ████████████████████████████

██████████████████████████████████

█████████████████████████████████

██████████████████████████

██   ███████████████

██   ████████████████████████

██████████████████████████

██   █████████████████████████████

█████████████████████████████

A   No, but they've gone through validations

that have been signed off, and your validations are what need to be reviewed and signed off in order for you to have confidence that your system provides safe products to the public.

HIGHLY CONFIDENTIAL

Page 82

████████████████████████████████████

████████████

Q    Okay.  And your medical director is not aware of those ratios?  Do I have that right?

A    No.  It's irrelevant.

Q    It's irrelevant -- you think it's irrelevant to the safety process?

A    As I said, it's not -- the tissue type is not what you need to validate.  Okay.  It is the amount -- the total amount of tissue that you could possibly put in the container because that amount is validated to make sure that your level of sterilization, the dose you give it, okay, is able to inactive anything that may be present.  So as long as you stay under that threshold, then your validations hold true.

Q    You mentioned in an earlier answer that there's a quality assurance director at HRT; is that right?

A    Yes.

Q    Who is that?

A    We just hired a new director, and his name is Loc -- Loc Huynh.  I'd have to look up his name right now.

Q    You said Loc Huynh?

HIGHLY CONFIDENTIAL

Page 83

A    Yes.

Q    He was recently hired?

A    Yes.

Q    Who was the quality assurance director before Mr. Huynh?

A    Greg Meyer.

Q    And how long was he the quality assurance director?

A    He was actually a senior VP of quality and regulatory.  Two years.

Q    Were any parts -- well, who was the quality assurance director before Mr. Meyer?

A    Christina Sang-Chin.

Q    And who was the quality assurance director before Christina Sang-Chin?

A    She was the first one.

Q    Okay.  Were any portions of HRT's process withheld from these quality assurance directors?

A    No.

Q    So they had access to the complete process from beginning to end?  Do I have that right?

A    They have seen it, reviewed it, yes.

Q    Okay.  Because earlier you had testified that only you and Mr. Banman had ever seen the complete process.  Do you recall that testimony?

HIGHLY CONFIDENTIAL

Page 84

A   Yes, yes.

Q   So that's not correct; is that right?

A   What I would say to add on to that statement is that Greg Meyer has seen that part of the process as part of our biologic license application that we were going through and understands it.

Q   But only him?

A   Well, Loc is brand new, has not gone through all the training right now.  And Christina, she signed off on as long as we keep the milligram content below that threshold, that we're within our validation parameters.

Q   Okay.  Who -- so back to your point that only you and Mr. Banman knew the whole process.  Who makes -- processes tissue today at HRT?  What human is doing it?

A   You mean the names of the individuals?

Q   Yes.

A   We have Kim Shoen, who is the head of processing.  Okay.  We have -- I'd have to look at our org chart to remember everyone's name.  I'm not the best with names.

Q   Okay.  And there's a lab at HRT; right?

A   Yes.

HIGHLY CONFIDENTIAL

Page 85

Q   And these people work in the lab; is that right?

A   Yes.

Q   Okay.  And are the SOPs up in the lab?

A   The relevant SOPs that the staff follow are handy and accessible to them.

Q   Right.  So the people who are making HRT's products today have access to the SOPs necessary to make the products; correct?

A   Not every single one of them, but the ones that they make, yes.

Q   Right.  So no aspects of those SOPs are withheld from the people making the products?

A   No.

Q   Let's go back to Exhibit 45, page 8.  I'm sorry.  Page 7.  Right at the bottom where we were, line 27.  We've been over this before, but I'll read it again just so the record's clear.  At the beginning of 27, HRT wrote "These products were not being offered by competitors, but Defendant CTM is currently offering membrane and other products referred to as 'Thin,' 'Thick,' and 'Flow' which uses Plaintiff's marketing language."  Do you see that?

A   Yes.

HIGHLY CONFIDENTIAL

Page 86

Q    Do you see where I'm reading?

A    Yes, I do.

Q    Does HRT allege that its marketing language is a trade secret?

A    What we are alleging is that there are numerous aspects that -- of our process, our marketing, our products that have been copied by the Defendants.

Q    Well, I understand that, but I'm trying to find out what the trade secrets are, separate the wheat from the shaft, so to speak.  So let me go back to my question.

Does HRT allege that its marketing language is a trade secret?

HIGHLY CONFIDENTIAL

Page 87



So when you look at CTM's website and marketing materials, they use very similar language. They use "ECM."  They're using "connective tissue." They're using "Thin" and "Thick."  A pretty close to mirror copy of verbiage marketing language that Skye developed and started to use.

Q   Is HRT's marketing language a trade secret?

MR. SABA:  He just answered the question --

BY MR. FLUSKEY:

Q   I'm going to keep on asking it till you answer it truthfully.

MR. SABA:  Well, hang.  No, no, no, no.

THE WITNESS:  I am being truthful.

HIGHLY CONFIDENTIAL

Page 88

MR. SABA:  Whoa, whoa, whoa.  That doesn't stand on the record.  You do not accuse my client of answering truthfully or not truthfully.  You ask questions.  He answers it.  You're not the judge of who's telling the truth.  So let's start over.

MR. FLUSKEY:  He's not answered the question.  So I'm going to ask it again.

MR. SABA:  Don't use the word "truthfully." Ask the question, and he'll answer it.

BY MR. FLUSKEY:

Q   Does HRT allege in this case that its marketing language is a trade secret?

MR. SABA:  Asked and answered.

THE WITNESS:  We have not trade -- no, we have not claimed that it is a trade secret.

BY MR. FLUSKEY:

Q   And you couldn't do that because your marketing language is publically available; correct?

A   Yes.  We developed it.  We use it to compete, and CTM has copied it to get a competitive advantage.

Q   What marketing language has CTM copied, even though it's not a trade secret?  Let's hear it. What marketing language has CTM copied?

A   They're marketing a connective tissue

HIGHLY CONFIDENTIAL

Page 89

matrix.  Okay.  They're using, as we've outlined here, verbiage that we refer to our membranes as "thin," "thick," "extra thick."  They use -- it's not in here, I don't believe, ECM language.  Okay.  Those are just a few that come to mind.

Q    Okay.  Back to page 8, Exhibit 45, line 7.

A    Yes.

Q    HRT states "Plaintiff and Skye also discovered how to make and apply a paste product."

A    Yes.

Q    "And researched the marketability of such a product while Banman was still at Skye/HRT."  Do you see where I'm reading?

A    Yes.

Q    What paste product did Plaintiff and Skye discover how to make?

A    Paste is a form of our connective tissue matrix.

Q    What does that mean?

HIGHLY CONFIDENTIAL

Page 90

██████████████████████████████████████████  And
we have E-mail from Banman, you know, we talked about how this would be a great product, you know. I went in the lab, tested it right after that, and looked at it, took pictures, yes.

Q   Did HRT ever manufacture and sell a paste product?

A   No, we didn't.  Not at that time.

Q   Now, the paste product you're referring -- not at that time, you said?

A   No.  We've yet to do it.

Q   Okay.

A   We made prototypes and versions of it.

Q   The paste that you're referring to here?

A   Yes.

Q   The paste product.  So you're referring to something that was internal to HRT, but not sold; is that right?

A   That's correct.

Q   Okay.  What was the paste?  What was it?

A   I just went through that.  You mean the process?

Q   No, no.  The paste, what was it?  What components of the placenta were in this paste product that you say you were working on with Bryan

HIGHLY CONFIDENTIAL

Banman?



HIGHLY CONFIDENTIAL

Page 92



A    I have to go back and look at my notes on that.

Q    Okay.  So you have notes on this paste work?

HIGHLY CONFIDENTIAL

Page 93



MR. SABA:  I'm sorry.  Go ahead.

THE WITNESS:  Just the faces and --

MR. SABA:  Okay.  Can we just avoid making

HIGHLY CONFIDENTIAL

Page 94

comments and faces?

MR. FLUSKEY:  There's been no comments at all.

Q    Continue with your answer.

MR. BANMAN:  When he answers questions, I just took my glasses off and put my hand down.

MR. SABA:  Okay.  Let's just -- why don't we take a second.

THE WITNESS:  I need a second.

MR. SABA:  All right.  Let's take a break.

MR. FLUSKEY:  What's going on?

THE REPORTER:  Are we going off the record?

MR. FLUSKEY:  No, we're not going off the record.  Why are we going off the record?

MR. SABA:  Let's just take a break.

MR. FLUSKEY:  You're asking for a break?

MR. SABA:  Yes.

MR. FLUSKEY:  Is there a question pending, though?  I think there is, actually.

(Record read.)

MR. FLUSKEY:  What was the question?

(Record read.)

BY MR. FLUSKEY:

Q    Can we get an answer to that question before we break?

HIGHLY CONFIDENTIAL

Page 95

A   Yes.  As long as there's no more reactions like that, I'm happy to.

MR. FLUSKEY:  Can you read back the question.

(Record read.)

BY MR. FLUSKEY:

Q   One quick follow-up before our break.  I understand that's your position.  All I'm trying to figure out right now is something very simple is what the ratio was of the prototypes.  Let me just ask it perhaps more precisely.

A   Our understanding, Rob --

Q   I haven't asked -- let me ask the question.

MR. SABA:  Let him ask the question.

BY MR. FLUSKEY:

HIGHLY CONFIDENTIAL

Page 96



HIGHLY CONFIDENTIAL

Page 97

Q   Did you have any prototypes -- paste prototypes with any ratios other than HRT's then existing ratios for its flowable products?

A   No.  There was no need because it was understood that you could make it with any of them.

MR. FLUSKEY:  Okay.  Do you still want a break?

MR. SABA:  Yeah.  We've been going about an hour.  Why don't we take a 5 minute break.

MR. FLUSKEY:  Okay.

MR. SABA:  10 minute break, something like that.

THE VIDEOGRAPHER:  We are now off the record.  The time is 11:20 a.m.

(Recess.)

THE VIDEOGRAPHER:  We're now on the record.  The time is 11:41 a.m.

BY MR. FLUSKEY:

Q   Okay.  We're back from a break.  Before the break, Mr. Sharp, we were speaking about the paste prototype that you testified that you and Mr. Banman worked on a few years ago.  When did you work with Mr. Banman on the paste prototype?

A   It was an E-mail exchange, and then I went in the lab and pulled out -- took pictures of

HIGHLY CONFIDENTIAL

Page 98

samples.  That was back -- I'd have to look at our records, but it was August -- I believe the E-mail was end of August, and I was in the lab early September of 2016.

Q   Now, you mentioned an E-mail.  Is this an E-mail between you and Mr. Banman?

A   Correct.

Q   Okay.  Do you know if it's been produced in this case?

A   You'd have to ask my attorney.

Q   Okay.  In an earlier answer when discussing this paste prototype, you mentioned that you may have notes about the prototype; correct?

A   Yes.

Q   Are these handwritten notes?

A   They're photographs from inside the lab of these samples.

Q   Other than the photographs, are there any other documents memorializing any work you did on this paste product?

A   I'd have to look back in my files.

Q   Okay.  You're not sure sitting here today? Is that fair?

A   I didn't review it for today.

Q   So sitting here today, you're not sure one

HIGHLY CONFIDENTIAL

Page 99

way or the other whether there are documents?

A   I believe there are.  You know, I took photos, and we have an E-mail exchange.  So I'm sure I took down some notes.

Q   Okay.  Do you know if the photographs have been produced in this case?

A   That would have to be a question for Ryan.

Q   Did you provide the photographs to your attorney for production?

A   Yes.  I shared them with him, yes.

Q   All right.  Let's go back to Exhibit -- oh, one more question, I'm sorry, before we leave the paste.  Why didn't HRT bring to market a paste product?

A   We were -- we were growing, you know, quite well with our connective tissue, and it was something I thought we would launch at a later date.

Q   Were you concerned that the sterilization process for the paste product would be prohibitively expensive?

A   No.

Q   Did you have any other concerns about the cost of production for the paste product?

HIGHLY CONFIDENTIAL

Page 100

Q   Did you tell Mr. Banman that you had concerns about the cost of production of the paste product?

A   I don't recall saying that.

Q   You don't recall one way or the other?

A   I mean, we would have discussed -- we talked every day for at least two hours throughout our working relationship, and things always came up. Things were shared quite openly in that regard. So when looking at a project like this, I would have shared, you know, this is -- probably would have shared hey, this is, you know, our ratios to make connective tissue. If we were to make a paste, it would reduce it this much, but we had the capacity to do it. So I'm not sure, you know, that would be a decision or negative reason for us not to do it. The reason was we just put it on hold as a development of HRT's to launch at a later date.

Q   Do you recall any discussions with Mr. Banman about the cost of production?

HIGHLY CONFIDENTIAL

Page 101

A    He knows the cost of production.  He was involved in the development of the process.

Q    Do you recall any discussions with him about the cost of production?

A    Of this particular product, the paste?

Q    The paste, yes.

A    I don't recall off -- you know, six years later off the top of my head.

Q    Okay.  Let's look back at Exhibit 45, which I think you still have in front of you, at page 8, line 10.  Beginning at line 10, HRT wrote "Plaintiff's trade secret unique manufacturing and processing protocols are outlined in HRT's standard operating procedures."  Is that a correct statement?

A    The majority, as we talked earlier in the day, not every single aspect is in the SOP, but it's known amongst Banman or my team how to process these tissues the way they're in their final form today and back then.

Q    HRT's standard operating procedures or SOPs, as we typically refer to them as, they summarize the processes used by HRT to manufacture certain products; is that correct?

A    Yes.

Q    And they include information that HRT

considers to be trade secret information; is that correct?

A    That and additional information, yes.

Q    You mean -- what do you mean by "and additional information"?

A    Well, know-how, right.  If it's a guideline and a summary, right, an SOP, a summary doesn't necessarily mean it has every single detail, but those details are known to those that had access to that know-how.

Q    Okay.  Are those additional details that might not be in SOPs memorialized in some other written document?

A    I can't think of off the top of my head.

Q    Okay.  Now, beginning at line 11, HRT identifies certain SOPs by name.  Do I have that right?

A    Yes.

Q    "Separation of placental tissue" is the first one identified?

A    Yes.

Q    "Drying of tissue," is the next one?

A    Yes.

Q    "Cleaning of placental connective tissue"?

A    Yes.

HIGHLY CONFIDENTIAL

Page 103

Q    "Processing of frozen placental tissue, surgical HRT, private label"; right?

A    Yes.

Q    "Processing of frozen placental tissue, non-surgical, umbilical cord only, Skye"?

A    Yes.

Q    And "placental tissue processing"; correct?

A    Yes.

Q    Are there other SOPs that HRT uses in manufacturing its processes that are not listed in this interrogatory response?

A    I don't believe so.  Let me take a look and read this thoroughly.

Q    Sure.

A    I mean, Skye also has a surgical product. It says "surgical HRT," but there would also be surgical -- it could be surgical Skye as well.

Q    Okay.  Any others come to mind?

A    I believe this catches all, but we do have different ratios of tissues.  I have to ask my attorney if this covers those as well.

Q    Would the ratios of tissues not be memorialized in the SOPs?

A    No.  They would be in the SOPs.

Q    Okay.  So what did you mean in your prior

HIGHLY CONFIDENTIAL

Page 104

answer that you'd have to ask your attorney about ratios?

A   I'm just being extra detailed in making sure that all of these cover all of our product forms.  Okay, and I believe they do.  I think your -- we've provided you with the SOPs.

(Exhibit 46 was marked for identification by the court reporter.)

BY MR. FLUSKEY:

Q   Okay.  Let me show you what we just marked as Exhibit 46.  Why don't keep 45 open, too, because we might be going back and forth, but I'm handing you Exhibit 46.  And this document has a title "Separation of Placental Tissue"; correct?

A   Yes.

Q   All right.  My first question is this.  Is this document that I marked as Exhibit 46 the SOP referred to in Exhibit 45 as separation of placental tissue?

A   Yes.

Q   Okay.  So Exhibit 46 is an SOP; correct?

A   Yes, it is.

Q   It's an HRT SOP?

A   Yes, it is.

Q   Who drafted this?

HIGHLY CONFIDENTIAL

Page 105

A    All of our SOPs were roughly drafted by Bryan Banman, myself, Christina Sang-Chin at certain parts, and then I believe that's it.  I have to go back to my notes.  That was a while ago, but the three of us were instrumental in these.

Q    Okay.  Did Mr. Banman have access to this SOP while working with HRT or Skye?

A    He had access to either draft forms, critical parts of the SOPs, and in some cases, I'm sure even full SOPs.

Q    Where was this SOP stored at HRT?

MR. SABA:  Objection.  Vague as to time.

BY MR. FLUSKEY:

Q    Well, let me back up.  So Exhibit 46 shows an effective date of December 17, 2017; correct?

A    Yes.

Q    What does "Effective Date" mean on this document?

A    Well, that's when if there was a slight alteration in an SOP, that's when there would be a date put on here when this SOP would take -- would replace a previous version.

Q    Okay.  So am I right the effective date is when the SOP was being used by HRT?

A    Yeah, yes.  At this date, this SOP would be

HIGHLY CONFIDENTIAL

Page 106

implemented or any change over a previous one that this one specifically draws attention to, yes, this would be how we process.

Q   Okay.  So during the period December 19, 2017, up through July of 2018, okay, where would this document have been stored at HRT?

A   It's on a secured hard drive internally with quality assurance, and then also the appropriate people in the lab where we process would have access to it if deemed necessary.

Q   When you say "secured hard drive," do you mean external media, like a physical drive?

A   It's an internal drive.

Q   So a drive on a computer; is that right?

A   I don't believe it's physically on a computer, but it's a drive system like a server that is accessed.

Q   So Exhibit 46 would have been saved on an HRT server; is that fair?

A   Yes.

Q   Okay.  Would this Exhibit 46 also have been posted in the lab during this time period, December 2017 through July of '18?

A   It would be -- for training purposes, it would be reviewed so that it could be implemented

HIGHLY CONFIDENTIAL

Page 107

and make sure it's being followed.  Those in the lab that were doing specific tasks related to an SOP had access to that specific SOP.

Q   Okay.  And how would Banman have had access?

A   As I mentioned, this is -- this is a final version of a document.  Like any document that one produces, it goes through various drafts.  First of all, before that even draft, there's content, right, that is drafted, okay, and then it's put into a form.  I believe you have documents.  There's many E-mails that have been produced that show that part of Banman's role with HRT and his earning of 10 percent of HRT was that he was tasked with leading the initial SOPs for the products that he and I created.

Q   The final document, the one we're looking at, did Mr. Banman have access to that?

A   At that point, it was no longer necessary because it would -- quality assurance would make sure the "i's" are dotted and the "t's" are crossed and proper references are -- and they flow and have --

Q   Understood.

A   -- proper format that are needed.

HIGHLY CONFIDENTIAL

Page 108

Q   I understand it may not have been necessary for Mr. Banman to have access to it, but did he, in fact, have access to it?

A   He had access to the important aspects of our SOP, but he didn't have access to this final format.

Q   And is that because he didn't have access to the drive on the server where it was stored?

A   That is correct.

Q   Do you have any evidence that Mr. Banman took this document with him, Exhibit 46, when --

MR. SABA:  Vague.  Are you done?

MR. FLUSKEY:  Oh, no.

MR. SABA:  Go ahead.

MR. FLUSKEY:  Okay.  I thought the exhibit the number was wrong you were going to tell me.

MR. SABA:  No.

BY MR. FLUSKEY:

Q   Do you have evidence that Mr. Banman took this document with him, this SOP that I've marked as Exhibit 46, when he ceased working with your companies?

MR. SABA:  I just want to object as vague and ambiguous to the word "took."  You mean a physical document or any electronic version?  I want

HIGHLY CONFIDENTIAL

Page 109

to make sure I understand what the question's asking.

BY MR. FLUSKEY:

Q   By "take," I mean taking a physical copy in hard copy or transferring an electronic copy.  So with that understanding of "take," let me just restate the question.

Do you have any evidence that Mr. Banman took this SOP that I've marked as Exhibit 46 with him when he ceased working for your -- with your companies?

A   Mr. Banman would have had the notes, the knowledge of all the important parts of this SOP that are critical for this SOP to be executed.  If he had this final form, I'm not sure.  He didn't have access to the server, but this final version -- you know, he probably didn't access to the final version.

Q   Have you seen any documents in which Mr. Banman transmitted this document, Exhibit 46, to himself at a personal E-mail address?

A   What I've seen and what I know is that we shared, he and I -- it was his idea that we create a DropBox -- a shared DropBox where we shared all of this information that we both had access to

HIGHLY CONFIDENTIAL

Page 110

throughout the entire research, development, and commercialization of HRT's complete process, and therefore, all of our products.

Q   Okay.   But my question --

A   So he had no need to actually E-mail something that's in final form because he already had all the information.

Q   But he didn't have Exhibit 46, this exact document, though; right?

A   No.  I don't have Exhibit 46.

Q   Okay.  What DropBox are you referring to?

A   I'm referring to -- I would have to look back at E-mails, but it was, I believe, back 2012 because Banman was working remote suggested hey, this is great, you know, this DropBox thing.  We can both share files back and forth.  We can work on documents, develop the whole product portfolio.  In this case, use this SOP, share information between the two of us that's housed in DropBox.

Q   Okay.  And during what period of time was that DropBox used?

A   2012 up until the day he resigned and claimed he deleted it.

Q   Do you have any evidence that he did not delete it, this DropBox?

HIGHLY CONFIDENTIAL

Page 111

A    Yes.

Q    What evidence is that?

A    Some documents that were provided during discovery that he still kept when he claimed he deleted everything.

Q    What documents are you referring to?

A    I would have to ask my attorney to look at those specifically and review those.

Q    You can't identify them sitting here?

A    I can't recall right now off the top of my head.

Q    Were those documents SOPs?

A    They were other documents.  So there's no reason to believe that he would have deleted some and not the others.

Q    But the documents that you're referring to, are those documents SOPs?

A    I didn't see an SOP that he shared that was in his DropBox.

Q    Were the SOPs in the DropBox?

A    Original versions, I believe, were or definitely portions and sections that are critical for our process were in the DropBox.

Q    Okay.  So in addition to the secure drive on HRT's servers, some of the content of your SOPs

HIGHLY CONFIDENTIAL

Page 112

were in this DropBox; is that right?

A    Yes.

Q    And was that DropBox on HRT's server?

A    No.

Q    Did HRT have the ability to wipe that DropBox clean when Mr. Banman ceased working with your companies?

A    He was the author of that DropBox, and he removed himself from that DropBox, but with DropBox, a file remains on your computer unless you physically delete it.

Q    Okay.  So you did receive confirmation that Mr. Banman removed himself from that DropBox?

A    Yes.

Q    Okay.  Have you seen any documents by which Mr. Banman transmitted Exhibit 46 to Alamo?

A    Not in final form, but yes.  Not in this final form.

Q    When you say "DropBox," do you mean an iCloud account?

A    We had -- we had both.  We had DropBox and used iCloud as well.

Q    All right.  Do you know whether this SOP -- these SOP documents were in DropBox or iCloud?

A    I'd have to go back and look specifically

HIGHLY CONFIDENTIAL

Page 113

at our DropBox.  The majority of our documents were in -- were in DropBox, various folders.

Q    Okay.  What, if any, elements of Exhibit 46 does HRT allege that Mr. Banman misappropriated?

A    I'm just going to review it.

MR. SABA:  Take your time.  Go line by line if necessary.

BY MR. FLUSKEY:

Q    Are you finished reading?

A    Yeah.  Can you repeat the question?

Q    Yeah.  Sure.  What, if any, elements of this SOP that I've marked as Exhibit 46 do you allege that Mr. Banman misappropriated?

Q    Okay.  I understand you believe that Mr. Banman would have learned that information from this SOP, but my question is how did he

HIGHLY CONFIDENTIAL

**Page 114**

misappropriate that information?

A   This one does not have the guts of our know-how that they've taken.

(Exhibit 47 was marked for identification by the court reporter.)

BY MR. FLUSKEY:

Q   Okay.  I'm handing you now Exhibit 47. This is an HRT standard operating procedure entitled "Drying of Tissues"; is that right?

A   Yes.

Q   Okay.  And is this the SOP referred to on page 8 of Exhibit 45, which is HRT's interrogatory responses?

MR. SABA:  This specific version or in general?

MR. FLUSKEY:  In general.

Q   So there's an SOP referenced on page 8, "Dying of Tissue."  Is the SOP that I marked as Exhibit 47 the "Dying of Tissue" SOP.

MR. SABA:  I think it's "drying."

MR. FLUSKEY:  Drying.  Sorry.  It says "dying" in the interrogatory response.  Let me back up.  The record should be clear there.

Q   So on page 8 of Exhibit 45, there's a reference to "Dying of Tissue."  That should be

HIGHLY CONFIDENTIAL

Page 115

"Drying of Tissue"; right?

A   Yes.

Q   Okay.  And is what I've marked as Exhibit 47 the "Drying of Tissue" SOP referred to in the interrogatory response?

A   Yes.

Q   Okay.

A   You're also missing steps between this one and this one, just for the record.

Q   Well, I'm just going in order of the interrogatory response.  What SOP would -- should be in between 46 and 47?

A   Well, how you properly separate, clean, disinfect tissues.

Q   Okay.  Do you believe that information will be covered in the other SOPs referred to in -- on page 8 of paragraph 45?

A   When I look at those, I'll let you know.

Q   Okay.  For now then, I'll just go in this order.  All right.  So Exhibit 47, first question, do you know who drafted this?

MR. SABA:  Again, just for clarification of the record, do you mean this version or the "Drying of Tissues" standard operating procedure in general from beginning to end?

HIGHLY CONFIDENTIAL

Page 116

MR. FLUSKEY:  I mean this document, Exhibit 47.

MR. SABA:  So Revision No. 4?

MR. FLUSKEY:  Exhibit 47.

THE WITNESS:  Can I take a few moments to review it?

BY MR. FLUSKEY:

Q   Sure.  You've reviewed Exhibit 47?

A   I have.

Q   Okay.  Who drafted this document?

██████████████████████████████████████

██████████████████████████████████████

████████████████    So this SOP was drafted by Sean Dykeman and Christina Sang-Chin.

Q    Is the consultant you referred to Sean Dykeman?

A    That's what I said, yes.

Q    And he was hired as a third-party consultant by HRT?

A    Yes.

Q    And when did he provide those consulting services?

A    He provided services from 2000- -- or yeah, 2000- -- I'd have to look at my notes.  2013, early '14 to assist with validations and set up of systems like this.

Q    Okay.  Did Mr. Banman play any role in drafting Exhibit 47?

A    He didn't draft this, but it was our desire we wanted to have a dehydrated graft.

Q    Where was this SOP stored at HRT?  Let's first start with its effective date in December of 2015.

A    Can you repeat the question?

Q    Sure.  Where was this SOP stored at HRT in

HIGHLY CONFIDENTIAL

Page 118

December of 2015, which is around its effective date here according to the document?

A    Our same internal system.

Q    Okay.  So on an HRT server?

A    Correct.

Q    Okay.  Was this also up in the lab?

A    Again, if personnel needed access to how to do their job, then they would have access to an SOP. So there's certain SOPs in the lab, yes.

Q    Okay.  Did Mr. Banman need access to SOPs to do his job?

A    Not when he moved from his development role of our entire system in products into more business development on a day-to-day basis.

Q    When did that transition occur?

A    Once our -- well, the two ran in parallel, but more heavily weighted in the business development role would have been once our process was fully up and running, validated, and we had everything in place commercially that we needed to. So that would have been, you know, approximately 2015, he was -- he was more removed from the operation, but all products were established and up and being commercially produced.

Q    Okay.  So from 2015 forward, Mr. Banman did

HIGHLY CONFIDENTIAL

Page 119

not need to have access to SOPs to do his day-to-day job; is that correct?

A    That is correct.  He fulfilled his obligation to assist in the development of all SOPs with HRT, and hence, that triggered his earn-in of 10 percent of HRT.

Q    Okay.  Now, even though he didn't need to have access to the SOPs to do his job from 2015 forward, did he, in fact, have access to this SOP while he was working with HRT and Skye?

A    He could very well have.

Q    Do you know if he did?

A    I don't know, but he was pretty much second in command of the company.  So if he requested it, it would have been given to him.

Q    Did you know if he ever requested it?

A    Not to my knowledge.

Q    Okay.  Have you seen any documents by which Mr. Banman transmitted this SOP, Exhibit 47, to Alamo?

A    Other than his desire to have a dehydrated graft like ours, I did not -- I have not seen this specific SOP.

Q    Okay.  Have you seen any E-mails by which Mr. Banman transmitted this SOP to one of his

HIGHLY CONFIDENTIAL

Page 120

personal E-mail accounts?

A   No.  But again, if he wanted information, he already -- he had information on our DropBox system through the development of the majority of these SOPs.

Q   Was Exhibit 47 in that DropBox system?

A   I'd have to check.

Q   Do you still have access to what was in that DropBox?

A   Yes, I do.

Q   Do you know if it was produced in this case?

A   That's a question for my attorney.

Q   Did you turn it over to counsel as part of --

A   I gave them access to all our files.

Q   Okay.  What, if any, elements of Exhibit 47 does HRT allege that Mr. Banman misappropriated?

A   Well, if you're looking to copy our products and especially our membranes -- two of our membranes, you know, it's dehydrated.  So you're going to take, you know, the desire to achieve a dehydrated state.  That's the most important.

Q   Okay.  So the desire to achieve a dehydrated state is something that you believe

Page 121

Mr. Banman misappropriated from this SOP?

        A    He could taken know-how --

        Q    Please let me finish my question -- from
this SOP; is that correct?

        A    He could have taken know-how without my
knowledge.

        Q    But sitting here today, you don't know
whether he did that; is that correct?

        A    I don't -- I don't know, but he had
knowledge of how to dehydrate membrane grafts.

            MR. FLUSKEY:  Let's mark a new document.

            (Exhibit 48 was marked for

        identification by the court reporter.)

BY MR. FLUSKEY:

        Q    So the court reporter just handed you
Exhibit 48.  Do you have that in front of you?

        A    Yes, I do.

        Q    And this is titled "Cleaning of Placental
Connective Tissue"; right?

        A    Yes.

        Q    Is this an HRT SOP?

        A    It's a checklist.

        Q    Okay.  Would you not refer to it as an SOP?

        A    It would be a checklist that people follow
to be making sure they're following an SOP, yes.

HIGHLY CONFIDENTIAL

Page 122

Q   So it would be used in connection with an SOP; is that fair?

A   Yes, that's accurate.

Q   So referring to Exhibit 45, again, page 8, there's a reference in that interrogatory response to an SOP that's entitled "Cleaning of Placental Connective Tissue."  Do you see that?

A   Yes.

Q   Okay.  Is the document that I've marked as Exhibit 48 the SOP referred to in Exhibit 45?

A   No.

Q   It is not.  Okay.  So there's another SOP that bears the title "Cleaning of Placental Connective Tissue"?

A   I believe so.  That's why I mentioned there was a step missing between these two SOPs.

Q   Okay.  Well, let's look at Exhibit 48.  Do you know who drafted this checklist?

A   It would have been quality assurance.

Q   Okay.  Do you allege that Mr. Banman misappropriated any trade secrets on Exhibit 48?

A   He would know, if he so chose to, how to properly clean placental tissue as a result of the research and development that was done while he was an employee.

HIGHLY CONFIDENTIAL

Page 123

Q   Okay.  Does this document, Exhibit 48, disclose any HRT trade secrets regarding the cleaning of placental connective tissues?

A   If he didn't know how to clean tissues, this would give you the blueprint on how you properly do that.  So if you didn't have knowledge of our space and you got access to this information, then you'd be able to properly clean tissue.

Q   When you mean "our space," what do you mean by that?  When you say "our space," what do you mean by that?

A   Let me clarify.  I mean within the tissue industry.



████████████████████████████████████

Q   Okay.  Have you seen any documents by which Mr. Banman transmitted Exhibit 48 to Alamo?

A   No.  But if he had the -- if he had the will, he had the knowledge, he could quickly jot this down and send it to them.

Q   Have you seen any documents by which Mr. Banman did that, jot down this information and sent it to Alamo?

A   I'd have to go back to the exhibit that he provided to Alamo on how to process our tissues.

Q   So sitting here right now, you're not sure; is that fair?

A   I can't recall.

         (Exhibit 49 was marked for

         identification by the court reporter.)

BY MR. FLUSKEY:

Q   Okay.  The court reporter just handed you what we've marked as Exhibit 49.  Is this an HRT SOP?

A   It's a section of an SOP, yes.

Q   Okay.  And it has the title "Processing of Frozen Placental Tissues-Surgical HRT-Private Label"; correct?

A   Yes.  This is one formulation, yes, of one

HIGHLY CONFIDENTIAL

Page 125

of our products, yes.

Q   So you said it was part of an SOP.  There should be more to this document; is that right?

A   Yes, there should be more to the document, but I'm just trying to see if it dovetails into this one, which -- yes, you're missing one SOP, it looks like.

Q   Do you think I'm missing an SOP that relates to what aspect of the process?  Cleaning?

A   It would be -- it would be an important part of how -- for instance, what tissues, how you prepare the tissues, leading up to actually putting them -- weighing them and putting them in a specific mill --

Q   Okay.  Do you know if that --

A   -- this upfront process to this SOP.

Q   Do you know if that SOP, the one that doesn't appear to be here, has a title?

A   I believe it's processing of placental tissue.

Q   Oh, okay.

A   It would have a number, yeah.

Q   So wait.  Let me -- in Exhibit 45, okay, on page 8, the last SOP referenced has a title of "Placental Tissue Processing.  Do you see that?

HIGHLY CONFIDENTIAL

Page 126

A    Yes.

Q    Okay.  Do you think those are the SOPs that might fill in the gaps you see missing?

A    Yes, they should, yeah.

Q    All right.  Let's -- before we go there, let's finish talking about Exhibit 49.  So Exhibit 45 references an SOP with the title "Processing of Frozen Placental Tissue-Surgical Tissue HRT-Private Label."  Do you see that?

A    Yes.

Q    Am I right that Exhibit 49 is only part of that SOP that is referenced in the interrogatory response?

A    Yes.  This SOP -- this is a sub -- this is a subsection to a greater SOP.  This just shows how you make one of our products, which is a private label product for HRT.

Q    What does "private label product" mean?

A    Pardon me?

Q    What does "private label" mean?

A    It means we make this for Wright Medical, you know.  They're one of our partners.  We also make it under an HRT brand of names, as you can see on the second page.

Q    Okay.  So when you make it for

HIGHLY CONFIDENTIAL

Page 127

Wright Medical, does Wright Medical sell it under their own brand name?

A   A trademark name, yes, that they use.

Q   Do you know what trademark name they use for the product referenced in this SOP?

A   ViaFlow.

Q   Okay.  All right.  Looking at Exhibit 49, have you seen any documents by which Mr. Banman transmitted Exhibit 49 to Alamo?

A   I would go back to the Exhibit B that he shared outlining how to make a connective tissue matrix.

Q   You're referring to Exhibit B to a contract between CTM and Alamo; is that right?

A   That's correct.

Q   Okay.  What on Exhibit B do you believe came from Exhibit 49?

A   Can you share that with me?

Q   I can later.  I don't have it now.  Do you know sitting here?

A   I would like to see that document to properly answer that question.

Q   Well, you testified a moment ago that you thought Exhibit B had certain --

A   Yes.  It has certain aspects of this, yes.

HIGHLY CONFIDENTIAL

Page 128

Q   So what were you thinking about when you testified to that earlier can?

Q   Okay.

Q   Sorry.   What is referenced in Exhibit B to Alamo?

Q   And where do you see that on Exhibit 49?

A   "D" in the middle of the page.

Q   Are you looking at the second page of Exhibit 49?

A   Yes, I am.

Q   And there is a breakout in the middle of the page, A, B, C, D, E?   Is that what you're

HIGHLY CONFIDENTIAL

Page 129

referring to?

A    That is correct.

████  ██████████████████████████████████████

A    That's correct.

Q    Okay.  And you believe you've seen that on Exhibit A to the contract between CTM and Alamo?

A    I think it was Exhibit B, but yes, it's an attachment to that contract.

███  █████  ██████████████████████████████

██  ███████████████████████████████████████

██  ████████████████████

██  ███  ██████

Q    What is BioPower?

A    A tradename for HRT.

Q    When was that tradename first used?

A    I would have to look it up.

Q    Can you provide an estimate, the year?

A    It would be in this timeframe.

Q    By "this timeframe," what do you mean?

A    Whenever this SOP was -- you provided me with other SOPs that had an effective date.  You provided me a partial SOP that doesn't have an effective date.  So it's hard for me to say.

Q    This is how I received it, Exhibit 49. Okay.  Do you think BioPower is something that was

HIGHLY CONFIDENTIAL

Page 130

first used by HRT in the past two years?

A   No, I don't believe so, no.

Q   Earlier than that, you believe?

A   Pardon me?

Q   Earlier than that, you believe?

A   I believe so, yeah.

Q   Do you believe it was used before July 2018?

A   I believe so, yes.

MR. FLUSKEY:  Okay.  One moment.  Okay.

(Exhibit 50 was marked for identification by the court reporter.)

BY MR. FLUSKEY:

Q   Okay.  Mr. Sharp, the court reporter has just handed you Exhibit 50.  It's a document with the title "Processing of Frozen Placental Tissues, Non-Surgical Umbilical Cord Only, Skye."  Is this a portion of an HRT SOP?

A   Yes.

Q   Okay.  But it's just a portion of it. There are additional pages that would otherwise be attached to it?

A   It interchanged with the previous one, Exhibit 49.

Q   I'm sorry?

HIGHLY CONFIDENTIAL

Page 131

A    It's interchangeable with Exhibit 49 into the same SOP.

Q    When you say "interchangeable," what do you mean?

A    Well, this is talking about a specific formulation, right, just like the previous document we went through.  The previous one was "Surgical HRT Private Label," right.  This one is non-surgical. So we use the same system, right, to make the product.  This is just a specific tissue type we use and formulation and ratios.

Q    Okay.  So are the contents of Exhibit 49 and 50 the same?

A    They should be other than, again, those three things.

Q    And I'm sorry.  What were the three things?

HIGHLY CONFIDENTIAL

Page 132

███████████████████████████████████

████████████████████████████

Q    Okay.  Have you seen any documents by which Mr. Banman transmitted Exhibit 50 to Alamo?

A    No, but he was part of a development team for this product.

Q    When you say "this product," what product are you referring to?

██    ███████████████████████████████████████

████████████

██    ████████████████████████

██    ████████████████████████

███████████████████████    ████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████

Q    Okay.  What, if any, elements set forth on Exhibit 50 does HRT allege that Mr. Banman misappropriated?

██    ████████████████████████████████████

████████████████████████    ████████████████████

██████████████████████████████████████████

██████████████████████████    █████████████

██████████████████    █████████████    ████████████

HIGHLY CONFIDENTIAL

**Page 133**



Q  You said in an earlier answer "this

HIGHLY CONFIDENTIAL

Page 134

product."  What product does this product,

Exhibit 50, relate to?

    A    This product was our original ScarX product

we launched early in -- I believe it was fall of

2014.  We also called a product line "Revive" that

used cord only.

    Q    And those were dermatology products or used

in dermatology; is that right?

    A    We designated them for that, but they

could -- they could be used in other procedures.

    Q    Do you know if CTM sells any products for

dermatologic use?

    A    That's irrelevant in that it's -- these are

regenerative products that can be applied, and the

knowledge is known, especially by Banman, that that

same formulation can be used orthopedically.

    Q    You may think it's irrelevant, but let's go

back to my question.  Do you know if CTM sells any

products that are used in the dermatology space?

    A    Not to my knowledge.

        MR. SABA:  Is this a good place to break?

Looks like lunch is here.  I mean, looks you're

about to go another -- I was waiting for you to

finish that SOP.

        MR. FLUSKEY:  Let me -- 5 or 10 minutes.

HIGHLY CONFIDENTIAL

Page 135

We can --

MR. SABA:  That's fine.

MR. FLUSKEY:  Understood.  I think we can finish a topic if we go 10 minutes more.

MR. SABA:  Okay.  Sure.

(Exhibit 51 was marked for identification by the court reporter.)

BY MR. FLUSKEY:

Q   Mr. Sharp, the reporter has just handed you Exhibit 51.  It's a document with the title "Placental Tissue Processing Protocol."

A   Oh, you had this.  Okay.  Good.  Good.

Q   What do you mean by that when you say "you have this, good"?

A   Well, when I mentioned we were missing an SOP, this seems to be the one that this goes to.

Q   Okay.  Exhibit 51 is an HRT SOP; correct?

A   Can I take a minute to review it?

Q   Yeah.

A   I got to take a break for a second.  I'll be right back.

MR. SABA:  Do you have to use the restroom?

THE WITNESS:  Yeah.

THE REPORTER:  Are we off the record, Counsel?

HIGHLY CONFIDENTIAL

Page 136

MR. FLUSKEY:  Yes.

THE VIDEOGRAPHER:  We're now off the record.  The time is 12:45 p.m.

(Lunch recess.)

THE VIDEOGRAPHER:  We're now on the record.  The time is 1:45 p.m.

BY MR. FLUSKEY:

Q   Okay.  Mr. Sharp, we're back from lunch.  Before we broke, we were looking at Exhibit 51.  Do you have that in front of you still?

A   I do.

Q   Okay.  This is an HRT SOP; correct?

A   It's an original draft, I believe, or a very early on SOP, not -- nowhere near the current ones or ones we used subsequently after this.

Q   Okay.  It shows an effective date, October 1, 2013.  Is that the date it was in use?

A   I have to go back and take a look at when we actually started our official process commercializing because I believe it was in '14 we started.  So this looks to be a very early draft because there's a lot of differences.

Q   Okay.  When you say "differences," do you mean that Exhibit 51 includes information that is no longer consistent with how you currently make the

HIGHLY CONFIDENTIAL

Page 137

product?

A    Or how we did when we started the process, yes.

Q    Okay.  Have you seen any documents by which Mr. Banman transmitted Exhibit 51 to Alamo?

A    This is not even our entire process, but again, the guts of our SOPs, he had intimate knowledge and hands-on in crafting them.  So -- but this official document here, if this is an official document or whether it's a draft, I have no knowledge if he -- if he transmitted it to anyone else.

(Exhibit 52 was marked for
    identification by the court reporter.)

BY MR. FLUSKEY:

Q    Okay.  Let me hand you what we just marked as Exhibit 52.  This document has a heading "Placental Tissue Processing."  Is this an HRT SOP?

A    It was at a particular point in time, yes.

Q    The effective date is August 2, 2014.  Is that when this SOP was in use?

A    That's when it started to be used.  I can't comment on how long because I don't see version 5 or I don't have version 6 in front of me.

Q    Okay.  Did Mr. Banman play any role in

HIGHLY CONFIDENTIAL

Page 138

drafting Exhibit 52?

A   I'd have to take a look.

MR. SABA:  And while he's looking at that, just for the record, it looks like what you have here is version 4, and then attached to version 4 is a track changes version, which it doesn't have Bates stamps on it, but I know we produced.  So you just have version 4 as a clean version and a track change version of -- sorry -- Exhibit 52 is version 4 of the "Placental Tissue Processing."

BY MR. FLUSKEY:

Q   Okay.  Have you reviewed Exhibit 52?

A   I didn't go through the track changes version.  Is that --

Q   I don't think that's --

A   -- going to be part of your questioning?

Q   No.  My question is excluding the track changes version, did Mr. Banman play any role in drafting Exhibit 52?

A   Yeah, 100 -- yes, 100 percent.

Q   Okay.  Have you seen any document by which Mr. Banman transmitted Exhibit 52 to Alamo?

A   He had the guts of our entire process because he was part of the team, he and I, where we spent pretty much better part of the summer in 2013

HIGHLY CONFIDENTIAL

Page 139

understanding these tissues and developing this entire process, and he was charged for his ownership earn-in to draft previous versions or provide content to Christina Sang-Chin that was then used to get to this final form.  But to answer your question specifically, did I see anything that this version got transmitted?  Not to my knowledge.  I have not seen that.

Q   Have you seen any documents in which Mr. Banman transmitted any SOPs of HRT to Alamo?

A   Components that you would put in an SOP, yes.

Q   Did you see any actual SOPs transmitted from Banman to Alamo?

A   Well, how an SOP is drafted is you need to have the content.  It's kind of like authoring a novel.  You need to actually first know, you know, what the story's going to be about.  You got to set it up in order to make the novel.  An SOP is the same thing.  The SOP is just the final document.

Q   Let's talk about --

A   So you need the content.  So someone has to provide you with content in order to create an SOP. Okay.  So somebody in quality assurance or a tissue bank that's unfamiliar with how to process these

HIGHLY CONFIDENTIAL

Page 140

types of tissues wouldn't have the knowledge that Mr. Banman did in order to set up an SOP properly so they could follow it.

Q   Okay.  Let's talk about the documents specifically.  Have you seen any documents by which Mr. Banman transmitted an HRT SOP to Alamo?

A   Not a finished SOP.

Q   Okay.  Have you seen any documents by which he transmitted a draft SOP?

A   Contents that you would put in an SOP, but not a draft.

Q   Okay.  And what documents have you seen by which Mr. Banman transmitted contents of an HRT SOP to Alamo?

A   I think this is why you have Exhibit 16 on our table.

Q   We're going to look there in a minute.  So Exhibit 16, you believe, may reflect information flow of HRT's information from Banman to Alamo; is that correct?

A   I believe there's some important information.

Q   We're going to look at that in a minute.

A   Okay.

Q   Other than Exhibit 16, though, can you

identify for me any other documents by which you believe that Mr. Banman transmitted the content of any HRT SOPs to Alamo?

A   Not to my knowledge.

(Exhibit 16 was previously marked for identification by the court reporter.)

BY MR. FLUSKEY:

Q   Okay.  Actually, let's look at Exhibit 16. So in front of you is Exhibit 16, which was previously marked at the deposition of Lee Andrews, a representative of Alamo, and that is an agreement for biomedical materials between a company called Precision Allograft Solutions and CTM Biomedical; correct?

A   Sorry.  I haven't looked at it.  I was just trying to make some space here.  Sorry.  Your question?

Q   So this an agreement for biomedical materials between Precision Allograft Solutions and CTM Biomedical; is that right?

A   That's what it reads, yes.

Q   Now, you were at the deposition of Mr. Lee Andrews when this document was marked; correct?

A   I believe -- yes, I was there, yes.

Q   Okay.  Now, in earlier testimony today, you

HIGHLY CONFIDENTIAL

Page 142

referenced an Exhibit B to this document; correct?

A    I did, yes.

Q    All right.  Let's look at Exhibit B to Exhibit 16, which is the last two pages of the document.  Okay.  You have Exhibit B in front of you?

A    I do.

Q    Does Exhibit B to Exhibit 16 include any of HRT's trade secrets?

A    I believe it does.  It's step by step very similar to the important portions of our SOPs and products.

Q    Okay.  Can you identify for us each HRT trade secret that you see on Exhibit B?

HIGHLY CONFIDENTIAL

Page 143

A    Yes.

Q    Okay.  You believe that first sentence contains an HRT trade secret?

A    I believe if Banman had not worked for our company, he would not have this knowledge in order to create this document and provide this sort of information to a competitor of ours to make competing products against us.

Q    Okay.  My question's a little different, though, which is do you believe the first sentence of Exhibit -- paragraph 1 of Exhibit B includes an HRT trade secret?

A    It's part of a series of steps that you must take that represent a trade secret.

MR. SABA:  It's been asked and answered. It's been asked and answered.

BY MR. FLUSKEY:

Q    You can answer.

A    I mean, you're isolating one step of a process when you know it's a multiple step process in order to achieve exactly the same product.  So if

HIGHLY CONFIDENTIAL

Page 144

you're asking me if umbilical cord or chorion membranes or amnion membranes, someone can have a trade secret on them, the answer is no, you can't have a trade secret on specific tissues.  But how you process tissues in their final forms which you've learned from another company under a confidentiality agreement, those are trade secrets.

Q   And I'm trying to figure out what those -- exactly what those trade secrets are.  So is there anything in paragraph 1 standing alone that is an HRT trade secret?

A   Other than it's very similar to how we would write this or did write this, individually, these components are not trade secrets.

Q   Let's look at paragraph 2.  Well, I don't -- let's back up to my question.  Are there any HRT trade secrets on Exhibit B that you could itemize for us?

A   Well, how he's suggesting to process an umbilical cord, that was learned knowledge at HRT.

Q   Are you looking at paragraph 2?

A   No. 2, yes.

Q   Is that a trade secret of HRT?

A   If he had not worked for HRT, he would not have gained that information or knowledge.

HIGHLY CONFIDENTIAL

Page 145



A    And that sentence and the next one, yes.

Q    Let's go one by one.  Is that sentence that I read, does it include a trade secret of HRT?

A    It's learned information from HRT.

Q    So it's your testimony that Bryan learned that while working with HRT?

A    100 percent.

Q    Okay.  And he learned that by reviewing publically available documents; isn't that right?

A    We looked at literature.

So that was learned on the job at HRT.

HIGHLY CONFIDENTIAL

Page 146



A   Yes.

Q   Does that sentence include a trade secret of HRT?

A   Again, it's learned while at HRT and under HRT time.

A   I'd have -- I'd have to look back at our previous procedures.

HIGHLY CONFIDENTIAL

Page 147



A    I'd have to -- I'd have to speak with our staff to verify that.

Q    Okay.  What staff would you speak to to verify that?

A    I would talk to head of processing.

Q    Who is that?

A    Kim Shoen.

HIGHLY CONFIDENTIAL

Page 148

Q   How long has that employee been with HRT?

A   She's been with the group of companies for over 10 years.

Q   Okay.  Is there anything else in Exhibit B that you believe is a trade secret of HRT?

Q   Do you know if Alamo actually does that when it processes its products for CTM?

A   I mean, this is Exhibit B of a document to Alamo, so I assume, yes, right.

Q   Well, Mr. Andrews testified about this at his deposition, but that transcript speaks for itself.  So we'll let that sit.

Anything else on Exhibit B that you consider a trade secret of HRT?

A   No. 6, again, learned know-how to provide a similar product to HRT -- to HRT and Skye, requesting here dehydration just like Skye and HRT does.

HIGHLY CONFIDENTIAL

Page 149

████  ████████████████████

█  ████████████████████████████████████████

█  ████████████

A    That's what it reads.

Q    Right.  Now, does HRT freeze-dry?

A    No, but we dehydrate.

Q    Okay.  And I think you told me earlier that HRT told its customers that it dehydrated products; correct?

A    Correct, as with this statement.

Q    So how is Exhibit -- paragraph 6, "All tissues will be dehydrated" a trade secret of HRT?

A    Again, it's learned know-how to have best practice -- in learning best practices that you know will give you a competitive advantage in the marketplace because that's what Skye and HRT did, and Banman knew that was a great way to position these membranes.  So therefore, he's requesting that this same dehydration be applied to the membranes he's requesting Alamo to process for him.

Q    He's requesting dehydration, but not through the same method used by HRT; correct?

A    As I mentioned earlier in the day, there's different ways to achieve dehydration.

█  ██████  ████████████

HIGHLY CONFIDENTIAL

Page 150

████████████████████████████████████████████

██    █    ████████

Q    So step 6 on Exhibit B uses a different method to achieve dehydration than HRT's method; correct?

A    It's the same result.

Q    Same result, different method; correct?

A    It's a different method.  It's like using two different dishwashers, two different washing machines.  If you want it to be cleaned a certain way, that's what you're requesting, and that's what you're achieving.

Q    Right.  But the result was not a secret?

A    No.  We market it as dehydrate, and that's why it's being requested that he can also market it as dehydrated.

Q    Right.  So other industry participants knew that HRT dehydrates products; right?

A    Yes.  Yes, they did.

█    ████████████████████████████

████████████████████████████

█    ████████████████████

█    ████████████████████████████

██████████████████████████████

██    ████████

HIGHLY CONFIDENTIAL

Page 151

[REDACTED]

Q   Okay.   Skye sales personnel have criticized other products for using freeze-drying as a method; isn't that right?

MR. SABA:   Speculation.   Vague and ambiguous as to the word "criticize."

BY MR. FLUSKEY:

Q   You can answer.

A   I just have to clarify because you're confusing terms in the industry.   When you use the term "lyophilization" of freeze-drying, there's different settings.   Okay.   You can achieve dehydration, a higher moist moisture level using a freeze-dryer.   Okay.   You can also have a lower moisture level using freeze-drying.   That doesn't classify as dehydration.   Okay.   So you can set it to still achieve dehydration, and that's what it seems they're doing.   So the net effect is a membrane that has a higher moisture content than the

HIGHLY CONFIDENTIAL

Page 152

typical company that's using just freeze-drying

historically that had a lower setting.

Q   You're saying dehydration allows for a

higher moisture content; right?

A   The classification of something being

dehydrated means that it has more moisture, okay,

than something that's typically classified as

freeze-dried.  But we know in this case, they're

saying we want it to be a dehydrated moisture level

so we can claim that the membrane is dehydrated.

They're using lyophilization, which probably -- and

I'm not an expert on lyophilization, but there's

multiple steps.

The first phase, you dry them off X amount

of moisture.  If you stop there, you're probably

just going to have a higher moisture content, and

you can classify it as being dehydrated.  If you

take it to the next level and you're going to dry

more moisture off, and therefore, it no longer falls

under the dehydration category.

Q   Exhibit B calls for dehydration through a

freeze-drying method.  We can agree on that; right?

A   They're using that method, yes.  And

probably, it was already in existence at Alamo, and

they're using, yeah, that machinery that's there,

HIGHLY CONFIDENTIAL

Page 153

but on a -- they should be if they're calling it
dehydrated.  That's another question because maybe
they're not.  Maybe they're calling it "dehydrated,"
but it's actually technically not in the standard of
dehydration.

Q    Okay.  Exhibit B calls for dehydration
through a freeze-drying method.  HRT does not use
freeze-drying to achieve dehydration; correct?

A    We still get to the same endpoint.

Q    Through a different method; correct?

A    Yes.

Q    And the endpoint is not a secret; true?

A    No.

Q    That's not true?

A    It's a marketing -- it's a marketing
advantage.

Q    Dehydration is a marketing advantage?  Do I
have that right?

A    We believe so when we set up HRT.

Q    And because HRT believed dehydration was a
marketing advantage, it told its customers that;
correct?

A    Yes.

Q    Is there anything else on Exhibit B that
reflects an HRT trade secret?

HIGHLY CONFIDENTIAL

Page 154

A    If we go to the lower half of this page, this gets into connective tissue products.  This is extremely similar to Skye's.

Q    How so?

Q    Okay.  Now, the person who purchases and uses the HRT product knows it's at ambient temperature; right?

A    Yes, that's why they like it.

Q    Right.  And that's not secret?

A    No.

HIGHLY CONFIDENTIAL

Page 155

Q    But the product inserts say that; right?

A    I believe they do, yeah.

Q    And the product inserts are not secret?

A    No, but they come in a box that's sealed.
Only a licensed professional -- medical professional
has access to.

Q    A licensed medical professional would open
the box and the insert's in there?  Is that how --

A    That's right.

Q    Okay.  And does HRT have any agreements
with those medical professionals that binds them to
any confidentiality obligations?

A    That's not standard for any product in the
medical space.

Q    So the answer is no, and it's not standard;

HIGHLY CONFIDENTIAL

Page 156

is that right?

A    It's never been standard in the medical space.  The answer is no.

Q    Are product inserts transmitted to the medical facilities who purchase HRT's products?

A    Sometimes.

Q    Are they required to be submitted?

MR. SABA:  Objection.  Vague and ambiguous.  Overbroad.

THE WITNESS:  To my knowledge, no.

BY MR. FLUSKEY:

Q    So why does HRT submit them then sometimes to medical facilities?

A    We rarely do.

Q    Are they transmitted to sales reps?

A    The IFU, rarely.

Q    Is the "IFU," Instruction For Use?

A    Yes, it is.

Q    That's the same thing as a package insert?

A    It is a package insert.

Q    Those terms are interchangeable?

A    Yes.

Q    Okay.

A    But the know-how, as I said earlier, no one's been able to reverse engineer our product.  So

HIGHLY CONFIDENTIAL

**Page 157**

like any finished product, whether it's an iPhone or what have you, people don't know how it's put together.  That's the know-how, and those are the trade secrets.

Q   That's exactly what I'm trying to understand.  So are there any other trade secrets of HRT on Exhibit B?

A   7A.

Q   I'm sorry.  7A?

A   Correct.

HIGHLY CONFIDENTIAL

Page 158



Q   When did Alliqua begin particulating placental birth tissue?

Q   How do you know that Alliqua's product is not fresh?

A   Because you can see when you look at their training materials, their brochures that it's a particulate that's mixed up at the place of surgery.

Q   I understand the reconstitution point.  I'm more focused on the freshness issue.  How do you

HIGHLY CONFIDENTIAL

Page 159

know that Alliqua when it particulates is not using fresh placental tissue?

A    It is my knowledge that it is freeze-dried.

Q    How do you know that?

A    I've heard that.  That's what it looks like.  That's what -- I'm almost positive that's what it is.

Q    What is the basis for that belief?

Q    Is all -- is all learned knowledge a secret?

A    Pardon me?

Q    Is all learned knowledge a secret?

MR. SABA:  That calls for a legal conclusion.

You can answer as a layperson.

THE WITNESS:  If I sign multiple confidentiality agreements and been paid for doing my job, anything I discover while doing that job is the proprietary information of that company.

HIGHLY CONFIDENTIAL

Page 160

BY MR. FLUSKEY:

Q    Even if it's publically available information?

A    Our information that I've shared with you like this is not publicly available.

Q    What do you mean by "like this"?

█ ████████████████████████████████

█ ████████████████████████████  ████

█ ███████████████████████████████████

██  ████████████████████████████████

████████████████████████████████████

██████████████████████████████████

█████████████████████████████████

████████████████████████████████████████

██████████████████████████████

Q    You're familiar with the company Amniox?

A    Yes.

Q    And does Amniox sell a particulate product?

A    Yes.  Just like the others, it is a dried -- they have a dry particulate.  They also have a frozen particulate.  It comes in a vial.  It does not come in a solution where the solution is also a bioactive solution.

Q    And is that -- is the product fresh placental tissue when they particulate it?



HIGHLY CONFIDENTIAL

Page 162

Q    Okay.

A    We tested one when Banman and I were doing the research and development.

Q    And the fact that Retsch sells a machine like this is publically available information; right?

A    Correct.  We don't pretend that that's a trade secret.

Q    Okay.  The particulate flowable product that HRT manufactures, it flows through what gauge needle?

HIGHLY CONFIDENTIAL

Page 163

A   Multiple gauge.  Typically, you know, it -- we're on a 20- -- we're mostly surgical.  25, I believe, down to 27.

Q   Do your SOPs say that?

A   That's -- the SOPs say a 27.  No, but we tested each batch as it's going through the system through, I believe, the 25 or 27 gauge needle.  I would have to double check.

Q   The SOPs refer to a different gauge needle; correct?

A   I'd have to refresh my memory on our SOP. It's small enough to go down a needle that is a small enough gauge to use it both surgically and in non-surgical applications just fine because we're doing that.

Q   The instructions for use, the package inserts that are -- that accompany HRT's flowable products indicate that the product travels through a 23 gauge through 25 gauge needle; is that correct?

A   I believe so.

Q   Those inserts don't mention a 27 gauge needle, do they?

A   You're splitting hairs on gauge sizes. It's a question of does the needle get through the skin through a tendon.  And whether it's a 27 or a

HIGHLY CONFIDENTIAL

**Page 164**

25, it's still delivering a product, the same product.

Q    The package inserts do not reference a 27 gauge needle; correct?

A    I don't believe so.

Q    The HRT package inserts?

A    I don't believe so.

HIGHLY CONFIDENTIAL

**Page 165**



**A    I don't recall that happening.    I'm not**

HIGHLY CONFIDENTIAL

**Page 166**

saying it didn't.  I don't recall that being --



MR. SABA:  I'm sorry.  What do you mean by

HIGHLY CONFIDENTIAL

Page 167

"produce"?  You mean in this litigation or --

MR. FLUSKEY:  Oh, no.  Let me rephrase.

MR. SABA:  Okay.

BY MR. FLUSKEY:

Q   Did HRT create any marketing materials for the PX50 and DX100 products?

A   Yes.  We had -- we had brochures, yes.

Q   Okay.  Are there any other HRT trade secrets reflected on Exhibit B to Exhibit 16?

A   Not a trade secret, but it's interesting that they use the exact same Nalgene vials, the Nuncs that we researched and located to be the best, but that's just a comment.

Q   I'm sorry.  Did you say it's not a trade secret?

A   No, that's not -- using that vial, we don't own the vial, but it was know-how learned that by just calling that out, it's faster to market because we found that one to be the best.  Let me look at the rest here.

Q   I'm sorry.  Can you repeat that?  What is

Page 168

your trade secret that you developed?

██ ███████████████████████████ █

█ ███████████████████████████████

█ ████████████████████████████████

█ ██████████████████  ██████████████

█ ████████████████████████████████████

█ ████████████

Q   Are you looking at 7B?

A   7B.

Q   As in "boy"?

██ ████████  █████████████████████████

██ ████████████████████  ████████████████████

██ █████████████████████████████████ █

██ ████████████████████████████████

██ ████████████████████████████████████

██ ██████████████████████████

Q   Discovered, but didn't bring to market; is that right?

A   Not yet, no.

Q   I want to make sure I'm following one of your more recent answers.  Does HRT contend that sterilization is an HRT trade secret?

██ ████  ████████████████████████████████

██ ██████████████████████████████████████████

██ ████████████████████████████████████████

Page 169

that HRT developed.

Q    What process?

███ █████ ████████████ █████████ █
███████████████████████ █████████████████████
████████████████████████████████████████
████████████████████████████████████
██████████████████ █████████████████████
██████████████████████████████████████████
█████████████████████████████████████████
██████████████████████████
█████████████████████████████████████████
██████████████████████████████ █████████
███████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████

███████    Nobody was doing that in our industry until we discovered that in 2013 and '14.  That's what I'm claiming.

Q    But they are now; right?  There are other competitors sterilizing products and selling them at ambient temperature?

A    Let's walk through that.  Give me some examples.

Q    Well, are you aware of any?

A    It depends what you mean.  If you say a

HIGHLY CONFIDENTIAL

Page 170

medical product is sterile, of course, medical products are sterile.

Q    Right.

A    But in this format, the answer is no.

Q    This exact format?

A    As I just walked through, yes.

Q    Okay.  But sterilization itself with respect to these products, you're not claiming trade secret protection over that concept, are you?

A    No.  Again, you're splitting one hair. It's a way to achieve it to be shelf stable, and you need to sterilize it in order to do that.  It's one step that was learned, okay, at HRT.

Q    But the need to sterilize isn't a trade secret.  That concept is not a trade secret.  Can we agree on that?

A    You can't have shelf stable unless you sterilize it.

Q    Right.

A    Otherwise, you'd have to freeze it.  Okay.

Q    And that fact is not an HRT trade secret, is it?

A    People didn't believe we could do this. They did not believe we could have an ambient temperature product.  We even created a

HIGHLY CONFIDENTIAL

Page 171

cryo-preserve product because the industry doubted the ability to have an ambient temperature flowable product like it's described here.  It had never been done before, and the reason they thought that is because either the concern of bacteria and stability, nobody had developed that.  Okay.  So that is why it is a trade secret to HRT.  It's the process of these components to be able to achieve a shelf stable, ambient temperature product that is safe to use.

Q   What I'm trying to understand is the details of that process.  Let me back up.

Does HRT contend that Mr. Banman's company could never make a flowable particulate product without violating trade secrets?

A   Depends on how you do it.  If it was just a -- if it was a dried tissue particulate and put in a vial, that's not what we're contending here.

Q   So it's the specific method that you believe is protected and that you take issue with?

A   As you had me walk you through, it's not just one where you can isolate one.  Absolutely, we have an issue with that, but there's a series of violations, we feel, that are done here.

Q   Have you seen any documents by which

HIGHLY CONFIDENTIAL

Page 172

Mr. Banman communicated to Alamo any of the information on Exhibit B?

A    I haven't, but isn't this enough?

Q    Do you know how it was drafted?

A    Pardon?

Q    Do you know how this was drafted?

A    It was requested by Alamo for Banman to fill out.

Q    Do you know how this was developed?

A    Yeah, at HRT.

Q    Do you know how Exhibit B was developed?

A    Taking information that was learned from HRT.

Q    All of this?  Using a Retsch cryo-shaker at that cycle, was that from HRT?

A    Did you see the E-mail where I ask Banman --

Q    Are you asking a question --

MR. SABA:  Wait, wait, wait.  Stop.

Ask a question, please.

MR. FLUSKEY:  I think I did.

MR. SABA:  Just ask it again so we have a clear record.

BY MR. FLUSKEY:

Q    There was information on Exhibit B that

HIGHLY CONFIDENTIAL

Page 173

does not belong to HRT; correct?

A   You tell me.  What are you referring to?

Q   I'm asking you that.

A   I don't own -- I don't own the Retsch company, but the know-how to take something and apply it for a different use is something that we discovered.  So whether we use a Retsch or a Spex, we tested both.

Q   Okay.  So you're saying if CTM particulates fresh placental tissue, if it does that, it's violating an HRT trade secret?  Do I have that right?

A   Yeah.  Yes.

Q   Okay.  So it can't make, according to you, a particulate flowable product?

A   You said "fresh."  Now you're changing it. You can make a particulate that potentially is dried because we didn't come up with that.

Q   What do you mean by "dried"?

A   Let's go back to your freeze-dry questions. You know how you take a tissue and you dry it and you drive off moisture, right.  Okay.  You were asking about Amniox is one particular product, right.  They take membranes, cords, they actually freeze-dry, they dry it, and then they grind it up

Page 174

somehow, and then it's in a vial, and that vial is sterilized and sent to that doctor.  Okay.  A number of companies do that.  Okay.  That's not what we do. So if he is not in violation of any other confidential information or their patents, then I'm sure he's at free will to do those.

Q   So it's the fact of using fresh -- what you call fresh, fresh frozen?

A   It's not just that.  It's a series -- it's a series of steps that he's outlined here that --

The hand movements, can we stop those?

Q   What are you talking -- there's no hand movements.  I want the record to be clear.  There's no hand movements.

MR. SABA:  Obviously, he feels there are, so.

MR. FLUSKEY:  Okay.  So fine.

MR. SABA:  Let's -- are we at a good spot to take a break?

MR. FLUSKEY:  No, not yet.

Q   Look, let's -- my client doesn't want to use your trade secrets.

A   He is.

Q   We're trying to understand what they are. That's why we're here.

HIGHLY CONFIDENTIAL

Page 175

MR. SABA:  He's answered the question a thousand a times already.

MR. FLUSKEY:  We still don't know.

MR. SABA:  Oh, it's pretty clear to everybody in the room.

MR. FLUSKEY:  No.  It's clear that you guys are claiming protection over a product idea.

MR. SABA:  Okay.  That's your argument. Yet the courts have disagreed.  So let's just -- let's get down -- and some day a jury is going to decide.  So let's --

MR. FLUSKEY:  Or the judge before we get to a jury.  This isn't a product idea case.  It's not pled in the complaint.

MR. SABA:  Okay.  Ask your questions. He'll give you answers.

BY MR. FLUSKEY:

Q    Is there anything else -- have you identified for us all the HRT trade secrets on Exhibit B to Exhibit 16?

A    Yes.

MR. SABA:  Can we now take a break?  It's been an hour.

MR. FLUSKEY:  Yeah.

THE VIDEOGRAPHER:  We're now off the

HIGHLY CONFIDENTIAL

Page 176

record.   The time is 2:43 p.m.

(Recess.)

THE VIDEOGRAPHER:   We are now on the record.   The time is 3:04 p.m.

BY MR. FLUSKEY:

Q   So this phase-out period started about two years ago?

A   Yes.

Q   Is that right?

Okay.   It started after Mr. Banman was

HIGHLY CONFIDENTIAL

Page 177

no longer working with HRT and Skye; is that correct?

A   We knew we were going to be doing it prior to his departure, but yes, it happened -- yeah, it took place -- there was no rush to remove them.  We just wanted to remove them.

A   Yes, of course.

Q   Do you know when that update would have occurred, the year?

A   I'd have to go and speak with quality assurance, but it would be once they stopped using them.

Q   So some time in the last two years?

A   Yes.

Q   Fair?

A   Yes.

HIGHLY CONFIDENTIAL



**Page 179**

(Exhibit 20 was previously marked for identification by the court reporter.)

BY MR. FLUSKEY:

Q   Let me show you what was previously marked as Exhibit 20 at the deposition of Lee Andrews.  It was an E-mai from Bryan Banman to Lee Andrews dated September 20, 2019.  Do you have that in front of you?

A   Sorry.  What was the question?

Q   Do you have that in front of you?

A   Yes.

Q   Okay.  There is a document attached to the E-mail, three-page document.  Do you see that?  It says "SOP Template," the title.

A   Yes.

Q   Does HRT contend that any of its trade secrets are reflected in this document, the attachment to the E-mail marked as Exhibit 20?

A   Can I have a moment to review it?

Q   Sure.  Have you reviewed Exhibit 20?

A   I have.

Q   Okay.  Does HRT allege that Exhibit 20, specifically the attachment to the E-mail, the "SOP Template," includes any trade secrets of HRT?

A   Yes.  This is similar to what we just went

HIGHLY CONFIDENTIAL

Page 180

through prior to the break.

Q   Can you identify for us where I can find HRT's trade secrets in this document?

██   ████████████████████████████████
█ █████████████████████████████████████
█ █████

Q   And where do you see that in here?

A   Under "Purpose."

Q   So the purpose, the notion of making that type of product?

A   Yeah.

Q   Okay.

█   ████████████████████████████████
█ ████████████████████████████
█ ███████████████████████████████████
█ ██████████████████████████████
█ ███████████████████████████████
█ ███████████████████████████████
█ ██████████████████████████     ██████
█ █████████████   ████████████████████

Q   So you believe under the "Scope" heading, subparagraphs B through D, include HRT trade secrets?  Do I have that right?

A   Yes.

Q   I assume you don't contend that the

HIGHLY CONFIDENTIAL

Page 181

definitions are HRT trade secrets, but tell me if I'm wrong.

A    No, I don't see it -- no.

Q    Okay.  Let's return to Exhibit 45, if we could, and you still have it in front of you, and specifically page 8.  You see there's a heading "Customer Lists and Potential Customers"?

A    Yes.

Q    Okay.  HRT alleges that Mr. Banman and CTM alleged -- excuse me -- misappropriated certain information regarding customer lists and potential customers.  Do I have that right?

A    Yes.

Q    Okay.  And the information allegedly misappropriated is identified here on pages 8 up to the top of page 10?

MR. SABA:  I'm sorry.  I didn't understand the question.

MR. FLUSKEY:  Can you read --

MR. SABA:  Are you just asking if that's the pages?

MR. FLUSKEY:  Let's have it read back.

MR. SABA:  Okay.

(Record read.)

MR. SABA:  You can answer if you know.

HIGHLY CONFIDENTIAL

Page 182

THE WITNESS:  I mean, this was the start of the information we began to learn at the time that this was shared, but since then, learned significantly more as a result of the actions of the Defendants.

BY MR. FLUSKEY:

Q   So you're saying this answer is not complete?

A   I just think there's more detail that could be added to it.

Q   What detail could be added to it?

A   Well, let me -- can I take a moment to review it?

Q   Yes.

A   Okay.  I've reviewed it now.

Q   Okay.  I think my question was is there additional information or detail that you'd want to add to this as a representative of HRT?

MR. SABA:  And just for the record, "this" means Section B of Interrogatory No. 1?

MR. FLUSKEY:  Correct.

THE WITNESS:  No.  I think this is -- this is good.

BY MR. FLUSKEY:

Q   Okay.  Now, the heading in Section B refers

HIGHLY CONFIDENTIAL

**Page 183**

to customer lists.  Does HRT have a customer list?

A    I mean, it has a private label relationship.  It also has a few stocking distributors that buy products.

Q    How many customers does HRT have?

A    I'd have to specifically look it up, but you know, if I were to guess, it's probably 15.

Q    HRT, not Skye, has 15 customers?

A    Yes, that's what you asked.

Q    Okay.  And can you identify them?

A    It's not a big part of HRT's business.  So

the remaining ones, no, I can't think of off the top of my head.

Q   Okay.  And are these customers on a written list at HRT?

A   If they're purchasing product from HRT, we would have a customer list.

Q   Okay.  So there is a written customer list that HRT maintains?

A   Yes, yes.

Q   Okay.  And do you have any evidence that Mr. Banman took with him an HRT customer list when he ceased working with the companies?

A   He would know who was using our products, who was purchasing our products from HRT.

Q   He would just know in his head?  Is that what you mean?

A   Well, he was very involved.  I mean, he was pretty much second in command at the organization and helped built it up from the ground.  So he was involved in the majority of the meetings and interactions with clients.

Q   He was second in command at HRT?

A   I said -- he was not officially, but he was a senior executive within the organization.

Q   He was never employed by HRT; correct?

HIGHLY CONFIDENTIAL

Page 185

A    He wasn't officially employed by HRT, but had a consulting agreement with HRT originally.

Q    Mr. Banman had a consulting agreement with HRT, but was never an employee?

A    No, wasn't an employee at HRT, no.

Q    Okay.  So back to my original question.  Do you have any evidence that Mr. Banman took with him a written HRT customer list?

A    He always had access of every customer that we sold.  So you know, whether he took it the day he left or he just kept it on his computer -- you know, I don't know if he officially took it or E-mailed it to himself, but he had access to this information.

Q    I know you believe he had access.  My question is did he take it?

A    Well, he never -- to my knowledge, he was always adamant about backing everything up and not deleting things.  So if he kept that rolling forward, he would have copies of everything on his personal hard drives.

Q    Do you know that?

A    That he meticulously backed things up?

Q    No.  That he took with him or maintained an HRT customer list after he ceased working with the companies?

HIGHLY CONFIDENTIAL

Page 186

A   I can't -- I can't testify that I know unequivocally that he took, you know, something, but he had access to confidential information without any issue of getting it if he chose to.

Q   Do you know if Mr. Banman has used any HRT customer lists in connection with CTM's business?

A   Off the top of my head, no.

Q   Do you know if Mr. Banman sells product to any of HRT's customers?

A   Not off the top of my head, no.

Q   HRT is a tissue processer or manufacturer; right?

A   Yes, that's correct.

Q   CTM is not, to your knowledge?

A   No.

Q   So how did Mr. Banman use information on an HRT customer list?

A   Again, I don't think we've looked at all -- all documents have come in to unequivocally state whether or not he has or he has not, but he had knowledge of all those customers, and we know that the sister company, Skye, that he definitely did that.  So there's reason to believe he would have done the same thing with HRT.

Q   Definitely did what with respect to Skye?

HIGHLY CONFIDENTIAL

Page 187

A    Interfered with customers of ours.

Q    By "interfered with," what do you mean?

A    Contacting customers that were confidential in nature to Skye and convinced them to sell -- or convinced them to purchase and use a competing product to Skye and HRT.

Q    We're going to get to the interference thing probably tomorrow.  We'll come back to that later.

Sticking with this topic, HRT's trade secrets under heading B, on page 9, beginning on line 7, HRT wrote "Plaintiff has invested substantial time, research, money, and resources identifying and maintaining key customer relationships, designing customer initiatives, and compiling information about the unique needs and preferences of its customers, including historical purchasing information in order to develop a list of customers throughout the country who are willing to purchase and/or who did, in fact, purchase Plaintiff's tissue products."  Do you see where I'm reading?

A    Yes.

Q    Is this information committed to writing? It's a physical list?

HIGHLY CONFIDENTIAL

Page 188

MR. SABA:  It's been asked and answered.

THE WITNESS:  Yes.

BY MR. FLUSKEY:

Q   The answer's "yes"?

A   Yes.

Q   Okay.  Do you know if Mr. Banman took with him any of the information that I just read through here when he ceased working for HRT and Skye?

A   Our investigation is ongoing, and we still have many documents to review.

Q   So at this point, you don't know whether he did; is that fair?

A   We have not come to a final conclusion.

Q   Page -- excuse me.  Page 9, line 19, HRT wrote "Plaintiff's collection of customer information contains information that Plaintiff has gathered over the entire history of its operation, which span not only many years, but thousands of hours of research, travel, and individual customer interaction."  Do you see that?

A   Yes.

Q   How many customers has HRT had over the life of the business, approximately?

A   I mean, that's over almost 10 years.  I'd have to -- I'd have to look at our records.

HIGHLY CONFIDENTIAL

Page 189

Q   You think it's more than 30?

A   Yes, it very well could be.

Q   And it's your testimony that HRT spent thousands of hours of research to compile its customer list; is that right?

A   We have spent thousands of hours looking at different business opportunities and different potential customers in order to get to the customers that we currently have.

Q   Okay.  Can you tell us how, if at all, Mr. Banman or CTM misappropriated any of the information summarized here under heading B of this interrogatory response?

MR. SABA:  For HRT.

THE WITNESS:  Right.  Yeah.  Again, we have not completed our investigation on the HRT side. Clearly, the majority of the violations when it comes to customers were on the more commercial side of the business, which is Skye.

BY MR. FLUSKEY:

Q   Okay.  Let's turn to page 10.  There's a heading there, "Research Physicians and Patient Registry."  Do you see that?

A   Yes.

Q   Okay.  Does HRT have a patient registry?

HIGHLY CONFIDENTIAL

Page 190

A    Skye does.

Q    Okay.  When was it developed?

A    Many years ago.  I'd have to -- I'd have to look at our records.  It's been a long time.

Q    Was it developed with Mr. Banman was working with the company?

A    Yes.  We've been collecting data even before that time.

Q    Okay.  Where is that stored?  On what data platform?

A    Within the organization systems.

Q    Where in the systems?

A    I'd have to ask our people where -- which exactly drive and location.

Q    What's in the patient registry?

A    It's a collection of data on application of our various products, where they're used, how they're used.

Q    Is this all this information in one document?

A    It's in many.  It comes in both digitally and it comes in hard copy.

Q    When you say "comes in," what do you mean by that?

A    Well, some are E-mailed in on PDFs.  Then

HIGHLY CONFIDENTIAL

Page 191

have to be entered into spreadsheets and into our data collection system.

Q   So is this patient registry a collection of documents?

A   It's a collection of information we receive from the doctors that are evaluating or collecting data on our products.

Q   And is it all stored together in one place?

A   I'd have to check with our people, again, it's -- again, whether or not it's already been digitized, and it's going to be saved in a file, if it's been, you know, turned into, you know, a graph or a spreadsheet that may be in a different file or if it is in a PDF form that may be stored in an even different file.

Q   Okay.  Has the patient registry been produced in this litigation?

A   I would have to ask our -- my attorneys.

Q   Did you turn it over to your attorneys for production?

A   I believe so.

Q   Okay.  Do you allege in this case that CTM or Mr. Banman misappropriated this patient registry?

A   What we feel was done is that specific surgeons or physicians, as termed here, were

HIGHLY CONFIDENTIAL

Page 192

collecting data for Skye, and those physicians were interfered with.

Q   Okay.  I understand the interference issue, which we're going to get to, believe me.  But what I want to understand is whether or not HRT contends that Mr. Banman or CTM used this patient registry that's referred to in this interrogatory response?

A   Yes.  I feel that the data that was collected would have given a competitive advantage to a competing company in knowing which products to apply, where to apply them, and have different doctors set up clinical studies like Dr. Badman, for instance, or Dr. Hiatt.

Q   This information -- this information is contained in a registry?

A   Information that we receive is collected as I mentioned.

Q   And part of a registry?

A   Define what a "registry" is to you.

Q   You tell me.  It's your interrogatory response under oath.  What is this registry?

A   A registry is a collection of data that we receive, okay, from various physicians.  It can be a single physician.  It can be multiple.  It can show trends.  It takes many different forms, but the root

HIGHLY CONFIDENTIAL

Page 193

of it is, is that we're collecting data on specific indications that this class of tissue products can be applied.  And from that, you can glean oh, I could do a shoulder setting, oh, this could be used for tonsillectomies, oh, this could be used in other areas that you wouldn't have knowledge of unless you were collecting that data specifically from doctors that were doing that procedure or this would give you a head start because you had this information.

Q   I'm trying to understand.  If I want to look at this registry, is it in one location?  How do I look at it?

A   I don't understand the relevance of one location.  It's data.  Data takes many forms.

Q   The relevance -- you're accusing my client of using it.  Can you tell us, sir, what it is?  In what form does this registry exist?

A   What the Defendant you're referring to, what he had access to was specific doctors that were collecting data on a specific specialty, specific procedure within a specialty.  Okay.  And that information would show, okay, does a connective tissue matrix, does a membrane have a certain benefit, and what is that benefit to that patient.  Okay.

HIGHLY CONFIDENTIAL

Page 194

Q   Okay.  So you're saying Mr. Banman knew that certain doctors were doing certain work for --

A   He was --

Q   Let me finish my question.

-- for HRT; is that correct?

A   For Skye.

Q   Okay.  This is in HRT's response, but you're saying this registry is more of a Skye item; is that correct?

A   Well, I'm reading on line 7.  It says "Skye has spent significant time."  Is this not what -- are we on page 10?

Q   Right, but we're reading HRT's interrogatory response and what its trade secrets are.

A   Okay.  I'm just following the document you asked me to take a look at.

Q   Okay.  Does the term "data registry" have a meaning in the industry?

A   Yes, I believe so, yes.

Q   And are you using the term "patient registry" consistent with what you understand to be the industry definition to be?

A   We're using the relevant terms that make sense to our organization for us to collect data,

HIGHLY CONFIDENTIAL

Page 195

analyze data, and use that for us in our product development and clinical studies and various other work we're doing internally.

Q    Okay.  And is this information kept secret?

A    Other than the doctor and the rep that have access to this information, it is -- it is not being openly shared with anybody at this point in time.

Q    To the extent that Skye or HRT publishes studies, those aren't secret; right?

A    No.

Q    Does the registry include publications?

A    It does not include publications.  It may include data that was used in a publication.

Q    Okay.  And how has Mr. Banman used this registry in his business, the Skye registry?

Q    Okay.  How did Mr. Banman and/or CTM use

HIGHLY CONFIDENTIAL

Page 196

any of this information?

A   Well, he had firsthand knowledge of what these products do.  It dovetails into why would he end up having the exact same line of products as us is because he knows how well they work.  So that data demonstrated that our products were efficacious.  They also had access due to relationships that they developed while working at Skye to some of these physicians that were working with us.

Q   How did CTM or Mr. Banman use the patient registry of Skye?

A   Again, they used the knowledge and understanding of how the products work on a particular procedure to then go after other doctors or stay in a certain market that we were in and go after specific doctors that were already aligned with us, convincing them to come over to work for CTM and do similar.

Q   So if I'm following you, you're saying that CTM and Banman used their knowledge of doctors -- the doctors working with Skye to try to recruit them?

A   That's one piece of it that you've picked.

Q   What's the other piece of it?

HIGHLY CONFIDENTIAL

Page 197

A    Is that they got firsthand knowledge of how well our products work, okay, in those procedures specifically.  Therefore, giving them a competitive advantage than somebody trying to start from scratch of knowing oh, so this can be applied on a rotator cuff.  Okay.  So we'll cut and go straight to rotator cuff or we'll apply on an ENT procedure.

That information coupled with our product forms, if you create a similar product form and you know the doctor's doing this, you can quickly have access and instant -- pretty much instant revenue right from the get-go because of that information that was Skye's.

Q    What products are you talking about in your last answer?  Skye products?  HRT products?

A    Aren't they the same?  Skye --

Q    Are you talking about Skye and HRT products?

A    They're Skye label products, but as you know, HRT is a processer, right.

Q    But are you talking about your company's products?  That's what I'm trying to get at.  Is that what you were referring to in your last answer?

A    Are you asking are these products produced?

Q    In your last answer, you referred to how

HIGHLY CONFIDENTIAL

Page 198

these products performed.  Were you referring to products of your company, Skye and HRT?

A    Yes.

Q    Have you seen any documents by which Mr. Banman transmitted any information in this patient registry to any third parties?

A    How this information would come into our company is that Bryan was a point person -- a trusted point person with these doctors, and they would send the information in to him and also the company.  So he always -- he had a copy of that at all times.  And so did he receive it, send it into the company, and then take it again?  I don't have knowledge of him sending it from Skye to a personal E-mail, but he already received it.

Q    You don't have knowledge of him disclosing the information to a third party, is that correct, after he left your companies?

A    I believe we've seen some documents where some of Skye's information was leveraged in marketing materials used by CTM.

Q    Skye's information from the patient registry?

A    I'd have to go back and look at it.

Q    So you're not sure sitting here today?

A    I can't recall at this particular moment.

Q    On page 10 of Exhibit 45, specifically line 17, HRT wrote "The doctors conducting the studies, the products used in the studies, the methods of the studies, and the types of data sought from these studies is all trade secret, confidential information until the results of the studies are final and published."  Do you see that?

A    Yes.

Q    Does HRT that the identity of the doctors performing studies is a trade secret?

A    It's confidential information that until these studies are published, it's not common knowledge in this space.  So if somebody knows hey, here's a doctor that's a high volume user of a placental competitor product, they're a great target.

Q    Does HRT or Skye have agreements with the doctors performing these studies that prohibit the doctors from disclosing the fact that they are working with HRT or Skye?

A    It depends on the level of study that's being done.  When we're just doing evaluations and data registry collection, we don't require them to keep it confidential.  But as we go deeper into

HIGHLY CONFIDENTIAL

Page 200

clinical trials, we do ask them to not disclose it.

Q   Not disclose the fact that they're working with HRT or Skye?

A   More the data that's being collected and the results until it's finalized.

Q   Okay.  Let me be more precise because I want to separate the identity from the data.  Does HRT or Skye require the doctors performing this work to agree not to disclose the fact that they're working with HRT or Skye?

A   Not the fact, no.

Q   Let's turn to the next page, page 11.  You see there's a heading "Plaintiff's Employees, Independent Contractors, Sales Representatives, and Distributors"?  Do you see that?

A   Yes.

Q   Okay.  The first sentence beneath that heading reads "Plaintiff's compilation of information regarding its employees, independent contractors, sales representatives," et cetera.  Do you see that?

A   Yes.

Q   Okay.  What is this compilation of information that you're referring to here?

A   Is this HRT or Skye?

HIGHLY CONFIDENTIAL

Page 201

Q   HRT.

A   I mean, this is stating anyone that -- if you're an independent contractor working as a consultant for HRT, if you're an employee, if you're a distributor -- I think it's pretty self-explanatory, unless you want me to get more specific.

Q   Does HRT contend in this case that the identity of its employees is confidential?

A   We don't -- we don't promote who works for us.  We try to keep that information to ourselves, but we don't make that confidential.

Q   Does HRT have any independent sales representatives that work for HRT?

A   We have some stocking distributors that are, in effect, independent.

Q   Okay.  Does HRT contend in this case that the identities of those distributors is confidential?

A   Well, they should be confidential, yes, to anyone working for or previously who has worked for HRT or Skye, and they're not allowed to pursue them or work with them.

Q   In your last answer, you referred to stocking distributors.  Is that another phrase for a

HIGHLY CONFIDENTIAL

Page 202

customer?

A    It can be, yes, yes.

Q    So these are entities that buy product from HRT?

A    Instead of getting a commission, it can be they get -- they buy the product at a transfer fee.

Q    And do those stocking distributors -- is it "stacking" or "stocking"?

A    Stocking.

Q    Stocking distributors sign any agreements with HRT that prohibits them from disclosing the fact that they purchase products from HRT?

A    Not that they purchase products from HRT, no.

Q    How, if at all, has CTM or Banman misappropriated the information referred to here under heading D on page 11 of the interrogatory response?

MR. SABA:  By HRT.

THE WITNESS:  Again, our investigation is ongoing.  It's more the Skye's side of the business that we have issue with.

BY MR. FLUSKEY:

Q    Okay.  Let's turn to page 12.  You see the heading "Business Operations"?

HIGHLY CONFIDENTIAL

Page 203

A   Yes.

Q   How, if at all, has CTM or Banman misappropriated the information summarized here under the "Business Operations" heading?

A   I mean, it's -- when you look at this -- let's dive into it.  So in terms of our business operations, those would include, you know, all of our SOPs, how you process products that we've discussed today; ██████████████████

██████████████████████

██████████████████

████████████   ████████

██████████████████

████████████████████████

████████████████

████████████████████████

███████████   So therefore, he can set favorable pricing for himself, and I believe there were some E-mails that were shared with us to that effect.  So that's information that's he would not have unless he worked closely with another tissue manufacturer and had this confidential information, and that's one thing we're touching on here.

Q   And let me make sure I'm following you because this is new to me.  Does HRT allege that

HIGHLY CONFIDENTIAL

Page 204

Mr. Banman or CTM has misappropriated its pricing information?  Is that an allegation in this case?

A   I think -- I think that when you work for an organization and you have firsthand knowledge on what you can purchase products for, what a yield is in making products, okay, you can use that to your advantage in business, and you would not have gained that information unless you had that inside information and intimate information and know-how of how someone processes the exact same products that we made at HRT and Skye, and then went and asked Alamo to make, and therefore, you can set your transfer pricing.

Q   Is HRT alleging that Banman or CTM misappropriated or used HRT's pricing information?

A   Yes.

Q   Okay.  None of that's part --

A   Or knowledge to come -- knowledge to calculate favorable pricing for themselves.

MR. FLUSKEY:  So none of that's been produced.  Counsel, we've discussed this, the pricing information.  ████████████████ agreements were redacted on the representation that that information was not at issue.  So it's news to me that HRT is alleging misappropriation of its

HIGHLY CONFIDENTIAL

Page 205

pricing.  So we don't have any information that I can ask the witness about.  I don't have HRT's pricing.

MR. SABA:  Okay.  Just ask questions, and we can deal with stuff later.

MR. FLUSKEY:  Well, the deposition is now definitely going to be left open because if I --

MR. SABA:  If that remains a claim.  Keep going.

MR. FLUSKEY:  Well, the witness just said it is.

MR. SABA:  That's not how it works. Pleadings govern the claims.  Just ask questions.

MR. FLUSKEY:  I don't think you're going to be narrowed by your pleadings.  I don't think that's the position.  But in all seriousness, just reasonably, if that's at issue, we're obviously entitled to see the information.

MR. SABA:  If that becomes an issue, we'll talk about it at that time.

MR. FLUSKEY:  Well, it's an issue now.

MR. SABA:  Move on to your next question. You're wasting time.  Unless you want to -- I'm happy to waste your time and debate this for an hour.

MR. FLUSKEY:  No.  I'd like to have an answer.  I mean, is that at issue in this case?

MR. SABA:  We're not -- he's not going to make decisions on that on the fly in a deposition. I would ask questions as you see fit.  I will meet and confer with you about it later.

MR. FLUSKEY:  But you previously represented in writing and to me over the phone that that pricing is not at issue; right?

MR. SABA:  It's not in this discovery response.

MR. FLUSKEY:  That's unclear.

MR. SABA:  Okay.  Let's just ask other questions.  We'll talk to you about it later.

BY MR. FLUSKEY:

Q   What does "internal financials" mean here in this interrogatory response?  You see it there on line 5 to 6?

A   Yes.  Well, Banman has access as a shareholder in HRT to internal financials.

Q   Is that right?  He has access to the internal financials?

A   Does he not get a statement?

Q   What do you mean by "statement"?

A   An income statement.

HIGHLY CONFIDENTIAL

Page 207

Q   After we sued for it, he did.

A   That wasn't my question.  Has he not got a statement?

Q   He has not.

A   For which years?

MR. SABA:  Hang on.  Hang on.  He ask the questions.  Go ahead.  Ask the next question.

BY MR. FLUSKEY:

Q   Yeah.  Are you alleging in this case -- is HRT alleging that Mr. Banman has somehow used the financial data of HRT in connection with CTM?

A   What I'm alleging is that he's had inside knowledge on the -- on all aspects of financials; the profitability of a company, the potential profitability of the company, which products have a higher yield than other products.  So that is confidential information and information that would allow somebody to potentially do harm to our organization by knowing that information and becoming a competitor.

Q   Do you know if he's used the information?  That's my question.

A   I'm not -- I'm not sure at this time.

MR. FLUSKEY:  Let's mark a new exhibit.

MR. SABA:  What number is this now?  53.

HIGHLY CONFIDENTIAL

Page 208

(Exhibit 53 was marked for

identification by the court reporter.)

BY MR. FLUSKEY:

Q    All right.  Mr. Sharp, the reporter's just

handed you Exhibit 53, which is Skye Orthobiologics,

LLC's, Amended Responses to Bryan Banman's First Set

of Interrogatories.  So this is a Skye interrogatory

response.

A    Okay.  May I ask, are we done with

Exhibit 45?

Q    You can set it aside for now, yes.

A    All right.

Q    And if you would turn to three pages before

the end of this document, you'll see there's a

Verification page.

A    Yes.

Q    And that's your signature; correct?

A    Yes.

Q    You verified these responses under oath?

A    Yes.

Q    Okay.  Let's turn to page 16 -- excuse

me -- page 4.  So on Interrogatory 1 on page 4,

Mr. Banman asked Skye Orthobiologics to identify and

describe in detail each trade secret of Skye that

Banman allegedly misappropriated; correct?

HIGHLY CONFIDENTIAL

Page 209

A    Can I review it?

Q    Yeah.  It's just a question. Interrogatory 1 is what I'm referring to, top of page 4.

A    Okay.

Q    Okay.  And then Skye provided an answer over the next several pages; correct?

A    Yes.

Q    Okay.  So let's look at portions of this answer.  Let's start on page 5.  There's a heading "Cost and Pricing."  Do you see that?

A    Yeah.  Yes.

Q    Skye alleges that certain cost and pricing information is a trade secret; correct?

A    Yes.

Q    Okay.  What cost and pricing information does Skye contend is a trade secret?

████  █████████████████████████████████████

██  ██████████████████████████████████████████

██  ███████████████████████████████████████████████████

██  ██████████████████████████████████████████

Q    So it's pricing?

A    In that particular point, yes.

Q    Okay.  Now, is this pricing disclosed to customers?

HIGHLY CONFIDENTIAL

Page 210

A    No.  If it's a negotiated price with a specific customer, that is only with that customer and not known by anybody else.

Q    So the customer that pays the price knows the price; correct?

A    Yes.

Q    And are Skye's customers bound by any confidentiality agreement with Skye to protect the confidentiality of Skye's pricing?

A    I don't believe so.

Q    How has -- how, if at all, has CTM or Mr. Banman misappropriated Skye's pricing information?

A    Well, when they know pricing of specific accounts, especially the ones that we've shared that they've interfered with, they knew exactly our pricing.  And we have E-mails from one of the Defendant actually going into the facility, Nate Boulais, and stating, you know, whether he can undercut the price or they know the price.  That is privied information that if you weren't working in the space specifically for a competitor, you wouldn't have that knowledge and that competitive edge to be able to bring in a product at that price or know they use a product at that price or even use

HIGHLY CONFIDENTIAL

Page 211

a product in that facility that's approved and the ability to switch it up.

Q   So you're saying that at least Nate Boulais has --

A   And there's many others.

Q   We're going to go through those.

    -- has used Skye's pricing information to compete against Skye?  Am I right?

A   That's what we're saying, yes.

Q   And you've seen this in an E-mail; is that correct?

A   In documents disclosed, yes.

Q   Well, what documents?

A   Could -- may I ask you what's the definition of a "document" to you?

Q   A "document" is a transmittal of information by any means; E-mail, hard copy --

A   Okay.

Q   -- text.

A   Okay.

Q   Using that definition, what documents have you seen where Nate Boulais disclosed Skye's pricing to a third party?

A   Definitely in E-mails.  I'm sure texts as well, but we've seen E-mails for sure.

HIGHLY CONFIDENTIAL

Page 212

Q   Just so I'm clear, because I don't want to mark exhibits I don't need to mark, you've seen E-mails where Nate Boulais disclosed Skye's pricing to a third party?  Do I have that right?

A   Nate Boulais and many others already knew our pricing.  So it wasn't a matter of them going to another competitor.

Q   Whether they knew it --

A   I'm answering the question.

Q   Well, did they disclose it?  That's the question.

MR. SABA:  Wait, wait, wait.  You have to --

BY MR. FLUSKEY:

Q   I know they knew it.  Did they disclose it?

MR. SABA:  Mr. Fluskey hang on.  He was in the middle of an answer.

MR. FLUSKEY:  But he's not answering the question.  I've been very patient.  We've been here a long time.  It's a very concrete question.

MR. SABA:  Hang on.  Hang on.  He gets to answer the question the way he wants to answer it. You have to at least let him finish before you say he's not answering the question.  He was on the way to finishing that answer.  So let's start over.  Ask

HIGHLY CONFIDENTIAL

Page 213

a fresh question, get a fresh answer, but that last answer was incomplete.  Go ahead.

MR. FLUSKEY:  Well, there was no answer.

Q    Have you seen documents where Nate Boulais disclosed Skye's pricing to a third party?

A    I'd have to check all the documents.  I mean, there's over a million documents that we've been going through, and there is -- there is definitely, you know, the knowledge of Skye's pricing in specific facilities that -- let's just use Nate for now -- that Nate was selling Skye products.  Okay.  So he knew the price he needed to come in at and potentially undercut.

Now, I have to go back and look at the E-mails to be able to specifically say did he undercut, did he match our pricing, but he had insider knowledge, okay, because he represented Skye and signed in his rep agreement a confidentiality agreement, but he used that information to benefit CTM.

Q    How do you know he used that information to benefit CTM?

A    Because he stated we can switch this account to CTM.

Q    How do you know he used the pricing

HIGHLY CONFIDENTIAL

Page 214

information of Skye?

A    How do you sell a product into a facility without knowing the pricing information?

Q    Of Skye?

A    Of any product.  He was switching one product for the other.  The facility is not going to pay more on average for a product.  They're going to either pay the similar price or a discounted price.  That's typically how it works.

Q    So I understand Mr. Boulais may have had knowledge of Skye's pricing.  What I'm trying to understand is if he disclosed it.  Do you know if disclosed it?

A    I am almost certain that he disclosed our pricing.  He knew our pricing.  He worked for Skye for years.  He set up these accounts and switched them to CTM.  So the answer to that question is he could disclose it back to them, but they already knew it and he knew it.  He just had to set his price.

Q    They did already know it, didn't they?

A    Pardon?

Q    They already knew it, these customers; right?  They new Skye's price?

A    Because Skye set them up as a customer.

HIGHLY CONFIDENTIAL

Page 215

Q   Right.  But Mr. Boulais didn't need to disclose that to them.  They knew it already?

A   He used it to his advantage to actually take that account from Skye.

Q   Have you seen documents to that effect?

A   To which effect?

Q   That support what you just said, that he used the information to take customers from Skye.

A   We've seen E-mails where he says we can switch this account.  This account's ready.  I'm going to go after this doctor, and I'll ship back Skye's inventory.  We're now going to -- we're now going to switch it with CTM's.  So yes, he used our information in order to benefit CTM and himself personally.

Q   What evidence do you have to support your contention that he used the information?

A   We have E-mails.

Q   And do the E-mails show use of the pricing information, not knowledge, use of it?

A   I'd have to go back and look, Rob, but they're one in the same.

Q   They're one in the same from your perspective; is that correct?

A   In order to be able to get access and to

HIGHLY CONFIDENTIAL

Page 216

sell a product, you have to agree with the facility on a price.  He knew the pricing that they would accept because they were already using Skye.  If he did not work for Skye, he would not know what that price is.  If he went in too high, they wouldn't use him.  They wouldn't even look at him.  But because he was selling Skye, he knew the price, he was able to say hey, this may be a better product or wink, wink, work with me.  I'll give you the same price.  Only way you know that is if you got insider information, and that's what he had, and that's what he used.

Q   Well, you keep on saying that's what he used.  I've asked you for evidence of it, and the record will reflect what it is.

So from your perspective, any former sales rep of Skye couldn't sell for someone else to a Skye customer because they would necessarily be using trade secrets; is that right?

A   We have in our agreements, yes, non-competes to not be able to sell using our information.

Q   You have non-competes in your agreements?

A   We have certain -- depending on the agreement you're referring to -- there's multiple,

HIGHLY CONFIDENTIAL

Page 217

whether it be an employee, whether it be an independent rep selling for us.  Which one would you like me to review?

Q   But separate from the non-compete, okay, are you saying that any former Skye rep would necessarily be using Skye trade secrets if they sold against Skye for someone else?

A   If the time has expired where they're no longer under an agreement with Skye, then, obviously, we don't have the ability to stop them from selling.

Q   Okay.  Have you seen any documents in which Mr. Banman disclosed Skye's pricing, disclosed it?

A   I'd have to ask my counsel if I've seen documents there.  I can't -- I can't recall everything.  As I said, we've seen over a million documents.  There are some things of Skye's that have been shared by CTM with others.  I'd have to take a break and ask him if you want me to answer that question.

Q   Okay.  Have you seen any documents in which a CTM representative disclosed Skye's pricing to a third party?

A   The question is it's not a third party.  If you're already in one of our accounts and that's our

issue and you're selling to -- you're converting a Skye account over to CTM when you already know the pricing, it's a non-issue because you've already got the competitive advantage because you know what the pricing said.

Q   Do you recall my question, Mr. Sharp?

A   You're asking if someone --

Q   Do you recall it?

MR. SABA:  Hang on.  Slow down.  Just ask him.

BY MR. FLUSKEY:

Q   Do you recall the question?

A   Why don't you repeat it.

Q   Okay.  I'll ask it again.

MR. SABA:  And after this question, we should take a break.  It's been over an hour.

BY MR. FLUSKEY:

Q   Have you seen any documents in which a Skye representative -- excuse me.

Have you seen any documents in which a CTM representative disclosed Skye's pricing to a third party?

A   As I said, I'd have to go back through all the documents that have been shared with us.  I don't recall at this particular moment.

HIGHLY CONFIDENTIAL

**Page 219**

MR. FLUSKEY:  Okay.

MR. SABA:  Let's take a break.

MR. FLUSKEY:  Are you asking for a break?

MR. SABA:  Yeah.  It's been over an hour.

MR. FLUSKEY:  Okay.

THE VIDEOGRAPHER:  We're now off the record.  The time is 4:05 p.m.

(Recess.)

THE VIDEOGRAPHER:  We are now on the record.  The time is 4:28 p.m.

BY MR. FLUSKEY:

Q   Okay.  Mr. Sharp, let's continue looking at Exhibit 53, and let's turn to page 6.  There's a heading, heading B, "Customer Lists and Potential Customers."  Do you see that?

A   Yes.

Q   Okay.  We talked about this previously with HRT.  These are now Skye's responses.  Okay.  Does Skye maintain a customer list?

A   Yes.

Q   Okay.  What is on that list?

A   There are a couple -- there are two different types of lists, but there's a customer list, which as the name implies, are actual customers purchasing products and are using products

HIGHLY CONFIDENTIAL

Page 220

from Skye.

Q   I'm sorry.  What was the second list?

A   I haven't said that yet.

Q   Oh.

A   The second list are potential customers that we are in the process of converting, educating to purchase our products, kind of win the business.

Q   So there's a customer list and a prospective customer list?

A   Yes, potential customers, yes.

Q   And how is this list maintained?  Is it a spreadsheet?  A Word document?  What's it look like?

A   Our customer list is in our -- we have an Oracle data management system that when a customer becomes just that, their name and information is loaded into that system.

Q   It's a database?

A   Yes.

Q   It's like a CRM database?

A   Yes.

Q   Okay.  When did Skye begin using this Oracle data management system?

A   This is our second system.  We moved over to this system, I think, five or six years ago.

Q   Okay.  And did you have a -- what system

HIGHLY CONFIDENTIAL

Page 221

did you use before that?

A   I had a system called Surgisoft.  So it was a similar system.  It just didn't have the depth that a manufacturer and a company our size could handle.  We wanted something a little more user friendly.  So we moved over to a new system.

Q   What information on each customer is contained in this database?

A   It would be the name -- you know, the name of the facility, right, the address, pricing information, doctors -- doctors, and procedures that those doctors are using the product on are loaded into that system.

Q   And that's the -- your prior answer, were you talking about the customer list as opposed to the prospective list?

A   Yeah, that's the customer list.

Q   How does Skye determine what entities or individuals end up on the prospective list?

A   That's the business development team's role is to manage that.  So they're always recruiting new distributors and looking to open up new customers.

Q   Do you know how they determine what entity or individual ends up on that prospective list?

A   Anyone that has interest in using these ECM

HIGHLY CONFIDENTIAL

Page 222

products.

Q   Well, could that prospective list then be as broad as -- is it any potential customer in the industry or is it limited to potential customers with which Skye has had some contact?

A   No.  It's contact, yeah.

Q   Have you seen any documents by which Mr. Banman has transmitted the customer list of HRT to any third party?

A   Of the documents, much like your pricing question earlier before the break, I'm only privy to certain documents.  Others are marked "highly confidential" between attorneys.

Q   Okay.  But the documents you've seen -- let's limit your -- my question and your answer just to that.  Of the documents that you've seen, have you seen any instances in which Mr. Banman transmitted a Skye customer list to a third party?

A   Banman always -- like all questions and trade secrets and confidential information that we've covered today, he always had access to that at his remote location in Toronto or on his machines or what have you.  So it was never a question or a need to be able to transmit something from our system back to him.  It already lived on his machine.

HIGHLY CONFIDENTIAL

Page 223

Q   It lived in his machine while he was working with you?

A   Yes.

Q   He was able to download this list on to his own machine?

A   If he wished to, he had access to that, yes.

Q   Okay.  Skye's systems didn't prevent that type of a download; is that right?

A   No.  If he had -- I mean, he had -- you know, he was a trusted employee under confidentiality and non-compete agreements, and we trusted him through his login privileges that he would take care of that information.

Q   Understood.  And some companies have policies where you can't -- you can't download information locally.  So I'm trying to get a sense if that's something that existed at Skye.

So when Mr. Banman was at Skye, could he take a document that was on a Skye server and save it locally to his personal computer?

A   I believe so, yes.

Q   Can all of your sales reps do that?

A   No.

Q   Skye's.

HIGHLY CONFIDENTIAL

**Page 224**

A    There are certain restrictions depending on your position in the organization.

Q    So I understand that you believe Mr. Banman had access to the list, but again, my question is a little different and more focused --

A    I know he did.

Q    -- which is this.  Have you seen any documents by which Mr. Banman transmitted a Skye customer list to a third party?

A    No.

Q    Have you seen any documents by which Mr. Banman transmitted a potential customer list of Skye to a third party?

A    No.

Q    Has anyone told you that Mr. Banman transmitted to them a Skye customer list?

A    No.

Q    Okay.  Has anyone told that you Mr. Banman transmitted to them a potential customer list of Skye?

A    No.

Q    Okay.  Let's flip to page 12 of Exhibit 53. There's a heading there that reads "Marketing and Sales."  Do you see that?

A    Hang on one second.

HIGHLY CONFIDENTIAL

Page 225

Q    Sure.

A    Okay.

Q    The first sentence beneath the heading "Marketing and Sales" refers to "Plaintiff's marketing strategies, methods, and processes."  Do you see that?

A    Yes.

Q    Okay.  Does HRT allege in this case that its marketing strategies are a trade secret -- excuse me.  Does Skye allege in this case that its marketing strategies are a trade secret?

A    I believe so, yes.

Q    Okay.  And do these marketing strategies exist in written form?

A    It depends on which part of the strategy. A lot of it is -- through training is taught on how Skye -- it's got a very unique way and still does of recruiting 1099s and managing them that is not the traditional way that medical companies typically have a structure or operate.

Q    What is that unique way?  What do you mean?

A    Well, we -- in terms of our sales outreach program, a program that I started prior to Banman was that we use only 1099s.  We recruit 1099s through various methods.  We train them.  We don't

HIGHLY CONFIDENTIAL

**Page 226**

have regional people on the ground.  We highly educated these individuals to become the most knowledgeable in the space.

We had a unique way of simplifying and certain key verbiage and terminology that would resonate easily with representatives and in turn, doctors.  Hence, the use of, you know, an "extra cellular matrix" versus you know, trying to position this class of products in a more challenging way that the competition was doing prior to us, really making inroads into this space.

We created very unique forms that would meet every challenge that a doctor may have while surgically handling.  We had different products that we created for different markets that was a unique strategy to the competition at the time of when we launched that strategy, to name a few.

Q   Okay.  You mentioned you use 1099s.  You're referring to independent contractor sales representatives?

A   Yes.

Q   Okay.  You said that was unique.  Do you believe that the use of independent contractor sales representative is a trade secret of Skye?

A   To use a 1099 is not a trade secret.

HIGHLY CONFIDENTIAL

Page 227

Q   So how, if at all, has CTM or Banman utilized any of the trade secrets summarized under the "Marketing and Sales" heading here in this interrogatory response?

A   Our -- we had a very unique sales strategy in that how we worked with the individuals.  Yes, they were a 1099, but how we trained them, how we did it remotely, how we shared information with them, how -- we wouldn't necessarily need to meet with the doctor face to face.  We could share information with that doctor or that independent sales rep in order to better arm them with a higher percentage chance of succeeding and getting those doctors to use our product, which was a unique way for our space.

Q   Okay.  And how, if at all, has CTM or Banman used any of this unique information?

A   They've set their organization up, to my knowledge, the exact same way as I just described.

Q   How are they using the specific information that you believe is a trade secret of Skye?

A   It's the system we've developed that they are using that he learned while at Skye in how you recruit independent sales reps.  Okay.  I was making sure you were writing.

HIGHLY CONFIDENTIAL

Page 228

Q   I'm listening.

A   He recruited independent sales reps to how they were trained, what information was effective on how to sell these products, okay, that we had spent countless hours and days and weeks perfecting the messaging on how to position these products.  Okay. That went so far as, you know, in a wound care setting having a specific brand of products with a Q code for that space to creating surgical products and how those would be reimbursed and how you categorize them and so on.

Q   So CTM doesn't sell any wound care products; right?

A   I don't believe so.

Q   Okay.  So have you seen any documents -- CTM documents that include any of these marketing and sales techniques that you're referring to?

A   Yeah.  They're using very similar verbiage to ECM verbiage on how we position, the fact that they created connective tissue product knowing that there's specific reimbursement codes that you can use when you have a connective tissue product. Okay.  Same with membranes.

Q   You mentioned verbiage and reimbursement codes.  Let's take them one at a time.  What

HIGHLY CONFIDENTIAL

Page 229

verbiage is CTM using that you believe reflects a Skye trade secret?

A    Well, you know, if I go just off the top of my memory, things such as, you know, referring to these -- when we started, not everyone was referring to these products the same way.  Okay.  So we created an amazing talk track of factual information that allowed Skye to be able to not only differentiate from our product portfolio, but how we positioned, how we spoke to the surgeons to how reimbursement of those and so on.

So language like "ECM" and "connective tissue," and -- I'm trying to recall exactly, you know, whether the terminology of rich content in a connective tissue, being able to offer different options in the products of membranes.  You know, a thin one is great for a topical application.  ■

HIGHLY CONFIDENTIAL

Page 230

████████████████████████████████████

████████████████████████████

Q   The acronym "ECM," do you believe use of that acronym is a trade secret of Skye?

A   We trademarked "BioECM" because we feel there is value in referring to these, and we had tremendous success by being, you know, one of the first and the select few that use that term.  Do we own the term "ECM"?  No, but it helps you sell the products.

Q   Is Skye's use of "ECM" a secret?

A   No.  But by working for an organization where you can learn a quick talk track on what leads to quicker success and you use that, obviously, that gives you a competitive advantage.

Q   Is Skye's use of the phrase "connective tissue" a Skye trade secret?

A   No, but we are one of the only ones that created a specific connective tissue for all types -- to be used in all types of connective tissue repair in the body.

Q   Connective tissue is something that exists in the human body; right?

A   Yeah.  Our entire musculoskeletal systems are made up with it.  That's what was so genius

HIGHLY CONFIDENTIAL

Page 231

about creating a connective tissue product.

Q   But the phrase "connective tissue," it describes something that's in our bodies; right?

A   It is -- it is replacing damaged or inadequate connective tissue within the body.

Q   But Skye's use of the phrase is not a secret.  Can we agree on that?

A   No, but it gives you a competitive advantage knowing that it makes a lot of sense to use that terminology, that doctors can relate to that and what it means, and also, that there's specific reimbursement tied to using a connective tissue product.

Q   A lot of your competitors use the phrase "connective tissue" to describe their products; right?

MR. SABA:  Speculation.

THE WITNESS:  Not to my knowledge, no.

BY MR. FLUSKEY:

Q   You haven't seen printed publications where your competitors use the phrase "connective tissue"?

A   I've seen one or two that reference "connective tissue."

Q   Have you seen scientific articles that reference "connective tissue"?

HIGHLY CONFIDENTIAL

Page 232

A   Yes.  Connective tissue, does not -- it doesn't only apply to placental tissues.  It can be other forms of human tissue as well.

Q   You mentioned a Q code, right.  What is a Q code?

A   A Q code is a code that is granted by CMS, the government for a wound application.

Q   And is a Q code used to obtain government reimbursement for a wound product?

A   For MediCare.

Q   MediCare reimbursement?

A   Yes.

Q   Do you know if CTM uses a Q code for any wound care products?

A   Well, you just mentioned -- you asked me if they have a wound care line.  They don't have a wound care line.  So they have no reason at this point in time to have a code that would -- or a code through MediCare for wound care.

Q   Okay.  So Skye isn't alleging that CTM and Banman misappropriated a Q code from Skye?

A   No.  It's referring to the more surgical arm of the business.

Q   Okay.  Is there a Q code for the surgical arm of the business?

Page 233

MR. SABA: Slow down. You guys are talking over each other. Just both of you take a breath in between each question and answer. That's all.

MR. FLUSKEY: I think he's all right, but okay.

Q Did you hear my last question or shall I repeat it?

A Would you mind?

Q Yeah. Is there a Q code for the surgical side of the business?

A No.

Q Okay. So does Skye allege that CTM or Banman misappropriated any reimbursement code information from Skye?

A Yes.

Q Okay. What is that information?

A The knowledge that there are certain codes that we discovered at Skye that gave us an advantage over the competition.

Q Are these private insurance reimbursement codes you're referring to?

A Yes.

Q Okay. And what are they?

A There's a connective tissue code. Okay. There's actually a couple codes you can use, and

HIGHLY CONFIDENTIAL

Page 234

what we discovered back -- I believe it was in '14.
This industry, there weren't -- there weren't codes
that were reimbursing competitive products that were
being used in a flowable form.  So whether they be
just a dry particulate or whether they be amniotic
fluid or a stem cell, these companies would sell
these products, and they'd be -- the cost of the
product would be absorbed in the case.  Okay.  And
there's pushback because nobody wants to lose money
on a case.

So if you have a product that actually is
reimbursed, okay, and is not taken out of the bundle
for a case, then that's of extreme benefit to you
and also the facility because they're making money
or being reimbursed a portion or greater, okay, for
the use of that product.

So what we discovered was there's a class
of products called "connective tissue" that to our
knowledge back then, there wasn't a single company
that was using that -- there wasn't a single company
that was using a connective tissue product that they
could tie to a connective tissue implant that would
then get reimbursement in a surgery center for a
large portion, okay, of insurances.

In all those cases that I'm referring to

HIGHLY CONFIDENTIAL

Page 235

where an insurance company did acknowledge and reimburse on a connective tissue code, it would be cost plus.  So a surgery center would use our product, and we would charge, say, $3,000, and they would make, say, 110 percent.  So they would not only get reimbursed the $3,000, but they would also make $300 in addition to their built-in profit of doing the case.  Okay.

So you can imagine if you can offer that to a surgery center versus the competition that's not getting reimbursed, the doctor's going to use your product happily.  So that's something we discovered and use, and use quite successfully and something that CTM is also using.

Q   How do you know that?

A   Because in the information that has been shared with us or the information I've seen, we've seen them referencing the exact same codes and even E-mails from some of the Defendants stating just use the same codes or same information.

Q   Was the company Striker using a reimbursement code back when you were working on reimbursement codes for HRT and Skye?

A   For which product?

Q   I don't know.  Any product.

HIGHLY CONFIDENTIAL

Page 236

MR. SABA:  Speculation.

BY MR. FLUSKEY:

Q   Do you know?

A   Well, they were for membranes.  If you use a membrane -- let's pivot over to membranes.  Okay. If you were using a membrane that has an adhesion barrier, there was a code to use it as an adhesion barrier, if that's your question, or maybe you want to ask your --

Q   What about a code for flowable bone connective tissue, was Striker using such a code?

MR. SABA:  Speculation.

BY MR. FLUSKEY:

Q   Do you know?

A   I'm not sure.

Q   Did you discuss that with Bryan Banman?

A   I'm not sure.  I'm not aware of one, and all I know is that I have an E-mail from Banman to -- just before he left to Pablo and my business development team reiterating what I just said on the connective tissue, that our competitors in the placental space do not have this same ability that Skye does.  This is a game changer -- I'm paraphrasing -- that Skye has over our competition, clearly demonstrating that it has immense value to

HIGHLY CONFIDENTIAL

**Page 237**

us, and that's an internal trade secret, the know-how to be able to apply that, when it's not generally known in the public domain.

Q   So it's your belief that this coding information is not available in the public domain? Do I have that right?

A   No.  You're cherry-picking what I just said.

Q   So I'm not right.  Is this information in the public domain?

A   The code is in the public domain.

Q   Okay.

A   The know-how and the ability to tie it all together with a product that actually can be classified to use that code is something that is what we discovered and planned and executed.  And nobody, to my knowledge, has been using the same strategy that we have across all products.

Q   Are you familiar with a company called Arthrex?

A   Yes.

Q   Have you ever seen their published coding guideline before?

A   No.

Q   Okay.

HIGHLY CONFIDENTIAL

Page 238

A    Not to my knowledge.

Q    Turning to page 13 of Exhibit -- of the exhibit we're on here, there's a reference on page 13 to 14, to 17, "'Notes' files."  Notes, N-o-t-e-s.  Do you see that?

A    Yes, yes.

Q    Okay.  Have you seen any evidence that anyone associated with CTM has used those Notes files in connection with CTM's business?

MR. SABA:  I'm sorry.  Can you repeat that exactly as you said it?  I think I misheard a word.

MR. FLUSKEY:  Can you read it back.

(Record read.)

THE WITNESS:  I haven't been privy to all the discovery documents to be able to accurately answer that; but of the ones I have seen, I don't believe so.

BY MR. FLUSKEY:

Q    Okay.  The "Notes" referenced in this interrogatory response, do you know who drafted them, who prepared them?

A    Mostly Bryan Banman.

Q    Were there any other authors?

A    There were -- there's various people on the business development team that tweaked or might have

Page 239

drafted them.  I'd have to look specifically, go back through each one internally to determine if -- you know, who made edits and when.

Q    Okay.  Did Skye's independent sales representatives have access to these "Notes" files?

A    Once they signed a contract with Skye, which had provisions of confidential information, they were then granted access to information like this.

Q    Where were these "Notes" stored at Skye?

A    We use Mac computers, and they were kept in a "Notes" section.

Q    Okay.  You said the "'Notes' section."  Are you referring to the "Notes" app that exists on Mac devices?

A    Yeah, yeah.  The app or program, yes.

Q    And the "Notes" app can be on a laptop or a phone; right?

A    That is password protected, yes.

Q    Now, Skye's independent -- when you say "password protected," you mean password protected using the independent contractor's password; right?

A    Well, every iPhone, computer has a password in order to access it.

Q    Right.  Skye's independent sales

HIGHLY CONFIDENTIAL

**Page 240**

representatives used their own phones to conduct Skye business; right?

A    Yes.

Q    They owned the phones, not Skye; correct?

A    Independent reps, you're asking?

Q    Yes.

A    Yes.

Q    And they stored these "Notes" in their personal iCloud accounts; correct?

A    If it's personal or corporate, it was on their device, however they had it set up.

Q    But many of them did store it in their personal iCloud accounts; right?

A    I don't have knowledge if it's personal or not.

Q    Okay.  The company didn't prohibit the independent contractor sales individuals from storing these "Notes" --

A    We trusted them because --

Q    Let me finish the question.

A    Sure.

Q    -- on their personal iCloud accounts; is that correct?

A    We trusted them given they had agreed to the parameters of a confidentiality within their

HIGHLY CONFIDENTIAL

**Page 241**

independent sales distribution representation agreement.

Q   Okay.  And the personal iCloud accounts in which these representatives stored these "Notes" were subject to the Apple I.D. and password owned by that individual rep; right?

A   I believe so.

Q   So you didn't know the I.D. and passwords that those reps were using to access their iCloud accounts; correct?

A   No.

Q   And sales reps could access these "Notes" through their personal phones; right?

A   I believe so, yes.

Q   And did Skye install a software on the sales reps' phones that would enable Skye to wipe information on the phones?

A   No, we didn't.

Q   Have you ever heard of a program called Mobile Iron?

A   No, I haven't heard of that program.

Q   Okay.  So if a sales rep had these "Notes" on his or her phone and left it in a cab, for example, Skye wouldn't have the ability to wipe those "Notes" from the phone remotely; correct?

HIGHLY CONFIDENTIAL

Page 242

A    Well, I believe -- I mean, I've heard cases where -- I believe there's not far from here a potential terrorist who had a phone -- an iPhone, and the FBI couldn't even hack the phone.  So that was not a concern of mine.  If you can't break -- if the average person and even the FBI has trouble accessing an iPhone due to the code that's on it, we weren't concerned at that point in time if someone lost their phone or not.

Q    You say at that point in time.  Does Skye have anything in place now that enables it to wipe the phone of a sales reps so that it could take Skye's trade secrets off that phone?

A    No.

Q    Does it have any ability, Skye, to access the phones of its independent salespersons?

A    No.

Q    Now, the "Notes" feature, the Apple "Notes" app, enables the user to share notes with another user; right?

A    Yes.

Q    Okay.  And your independent sales reps will share notes regarding Skye's business with each other; right?

MR. SABA:  Speculation.

HIGHLY CONFIDENTIAL

Page 243

THE WITNESS:  No.  Our independent sales reps are not, to my knowledge, sharing information with other sales reps that are not on a contract with us.

BY MR. FLUSKEY:

Q   Oh, no.  Let me be clear.  I'm talking about Skye sales reps who are under contract with you.  So let me restate that question.

A   The 1099s?

Q   1099s.

A   Okay.

Q   So am I right that Skye's sales representatives, 1099s, will often share notes in their "Notes" app with another Skye 1099 contractor; correct?

A   They're not -- they're not interacting with each other.  So I'm not following you.

Q   Well --

A   If there's one guy in L.A. and you're in Buffalo, those two reps are not talking to each other.  They're independent 1099s.

Q   Well, I'm not talking about them actually speaking to each other.  I'm talking about this "Notes" feature.  Okay.  Are you aware that some of your independent sales representatives use the

HIGHLY CONFIDENTIAL

Page 244

"Notes" feature on their phone to share Skye notes

and material with each other electronically?

A    I'm not following your question because we

have a business development team that share the

"Notes," okay, with the 1099.  Okay.

Q    Okay.

A    It goes one way.  All right.  The 1099 is

not talking with another 1099 elsewhere in the

country and sharing our "Notes," to my knowledge.

Q    Okay.

A    So I'm just trying to follow you.

Q    So it's your understanding that some of

your actual employees -- W-2 employees will share

notes on their "Notes" app with independent

contractors that are working for Skye; is that

right?

A    Yes.  On our contract, yes.

Q    But you don't believe that the contractors

are sharing their "Notes" with each other?

A    They shouldn't be, no.

Q    Is there something in Skye's contracts or

documents that prohibit the independent sales

representatives from sharing their "Notes" with each

other?

A    Skye -- they all sign an independent

HIGHLY CONFIDENTIAL

Page 245

representative agreement, and in there, there's

stipulations, okay, of confidential information and

not sharing it.  I don't have any knowledge myself

of a 1099 speaking with another Skye 1099 and

sharing any information.  So I can't comment on your

question.

Q   Okay.  Is the information stored in the

"Notes" app of the independent contractors' phones

and computers stored on any server owned or

controlled by Skye?

A   I believe it's backed up on -- certain

versions of it are backed up.

Q   Certain versions of the "Notes" app are

backed up?

A   Yes.

Q   Okay.  But not backed up from the

independent contractors' phones; right?

A   Well, if we sent it to them, we don't -- I

just said we don't have access to their phone.  How

would I be able to back up an independent

contractor's phone?

Q   So from where is Skye backing it up?  From

what device?

A   From the -- from the author of the "Notes"

section.

HIGHLY CONFIDENTIAL

**Page 246**

Q   And the author, to your knowledge, would be a Skye employee?

A   Yes.

Q   Okay.  Do any of the independent contractors, to your knowledge, create their own notes involving Skye's business?

A   I'm sure if they've got leads and successes and testimonials, they probably jot them down. That's what good reps would do.

Q   Okay.  Do you know if they share those notes back with Skye employees?

A   I'd have to ask the team.

Q   Okay.  Just bear with me one moment.  Let's turn to page 15 of these interrogatory responses, Exhibit 53.  There's a heading there, "Plaintiff's Employees, Independent Contractors, Sales Representatives, and Distributors."  Do you see that?

A   Yes.

Q   Okay.  How, if at all, has CTM or Mr. Banman used any of the information summarized beneath that heading in connection with CTM's business?

A   Do you mind if I read it?

Q   Oh, sure.

HIGHLY CONFIDENTIAL

Page 247

A    Thanks.  What's your question?

Q    How, if at all, did CTM or Banman use any of the information summarized beneath that heading, the heading "Plaintiff's Employees, Independent Contractors, Sales Representatives, and Distributors" on page 15?

A    I mean -- I mean, how did we come to all these Defendants, right.  The knowledge -- inside knowledge on who was our independent contractors, who were successful contractors, what were they being paid.  So I'm sure they're being paid the same amount of commission or greater, right.  I mean, we gave the playbook or the playbook was taken.  So I think that's --

Q    Okay.  Let me --

A    -- pretty much known.

Q    Let me -- well, let me make sure I'm following you.  Does Skye contend that the identity of its independent contractor sales representatives is a trade secret?

A    The information on our reps, the type of sales they have, their relationships, how they've been trained, their successes, yes, that is, we feel -- I feel it's not only confidential, it's a trade secret.

HIGHLY CONFIDENTIAL

Page 248

Q    All right.  You said several things there, though, and I need to go step by step.  That's just how this is.

So step one, does Skye allege that the identity of its independent sales representatives is a trade secret, just the identity?

A    Yes.

Q    Okay.  Does Skye have any contracts with independent sales reps that prohibits them from even saying that they work with Skye?

A    No.

Q    Okay.  And the independent sales reps call on doctors on behalf of Skye; right?

A    Yes.

Q    And they tell the doctors who they're working for; correct?

A    Yes.

Q    All right.  You mentioned, I believe, that the other information that Skye has on these reps is a trade secret.  Can you itemize for us what information you're talking about?

A    Yes.  So do you know how difficult it is to possibly sell a product if you're brand new to a marketplace, you don't know who to call who can represent you, you don't know who the users are in a

space?  Well, when you have this information, when you know the names of independent contractors, you know what specialty they sell to, you know how successful they are, that they've got immediate and current sales, you know the level of those sales that can finance your business right out of the gate to what commissions they're being paid so you can offer them something more attractive, potentially, that gives you a leg up and that is one component of what we're saying here is our proprietary information.  That individuals signed confidentiality -- multiple confidentiality agreements, non-compete agreements, and used this trade secret information that caused damage to Skye to benefit them.

Q   Could a former Skye employee hire a Skye independent contractor without misappropriating trade secrets?

MR. SABA:  Improper hypothetical. Speculation.  Lack of foundation.

THE WITNESS:  Depends what the trade secret is.

BY MR. FLUSKEY:

Q   Well, you just told me the trade secret included knowledge of what they're paid and

HIGHLY CONFIDENTIAL

Page 250

knowledge of their performance, among other things. You allege Mr. Banman had knowledge of both of those things?

A   Yes.  Many things, yes.

Q   So is it your testimony that Mr. Banman could never hire an independent sales rep that he was aware of at Skye without utilizing trade secrets?

A   He could hire -- he could hire them and have them sell a dermis product or something outside of our scope of our business, yes.

Q   Okay.  But he couldn't hire them to sell products that Skye sells?

A   Not for a specific period of time as our agreements outline.

Q   The agreements outline a non-compete period; right?  Is that what you mean?

A   Depends which agreements you look at, but yes, there's one that is a non-compete.

Q   Okay.  But if I'm following you, you're saying that even in the absence of a non-compete, Mr. Banman couldn't hire one of these individuals without violating Skye's trade secrets?  Am I following you correctly?

A   Can you repeat the question?

HIGHLY CONFIDENTIAL

Page 251

Q   Sure.  In the absence of a non-compete, is it your position that Mr. Banman could never hire a Skye independent contractor sales rep that he knew of while working with you without violating trade secrets?

A   I believe that if he's using information that I outlined earlier, that that is a violation.

Q   But how could he not know that information? Are you saying you he could never hire them because he knows the information that you claim is a trade secret?

A   Not if he's using our information.

Q   And how is he using it with respect to any of Skye's independent sales reps?

A   Again, he's using -- he's using our information.  It's insider information that we've developed that gives somebody an instant leg up or success by doing all the things I previously mentioned.

Q   But how is he using it?  What evidence do you have that he's using the information, not that he knew it, but that he's used it?

A   Because we've named multiple Defendants and there's others that we received information on that were independent sales reps that were selling our

HIGHLY CONFIDENTIAL

Page 252

products, okay, using our information.

Q   Okay.   But again, my question is a little more precise.   I understand that you're aware of independent sales reps who have worked for Mr. Banman.   I understand that.   My question is what evidence do you have to support the contention that Mr. Banman has used trade secrets of Skye in working with or recruiting those people?

A   Not all the information that has been shared has been for my eyes, and my attorneys tell me that there's information --

MR. SABA:   Whoa, whoa, whoa.

BY MR. FLUSKEY:

Q   Don't tell me what your attorney said, but you can keep on answering.

MR. SABA:   Generally, you can say your attorneys have discussed this with you.

THE WITNESS:   Yes.   Okay.

MR. FLUSKEY:   So could you read back my question, please.

(Record read.)

BY MR. FLUSKEY:

Q   Can you answer that question without disclosing privileged information?

A   My attorneys have told me that we've

HIGHLY CONFIDENTIAL

Page 253

received information that clearly demonstrates --

MR. SABA:  Hang on.  Hang on.  Hang on.
Well, let me rephrase it.  Can you answer the
question without disclosing attorney/client
privileged communications or is the only way you
know this information is because of communications
through your attorneys?

THE WITNESS:  It's predominantly through
our attorneys, yes.

BY MR. FLUSKEY:

Q    Okay.  Well, let me ask a different
question because you are here as representative of
Skye.  This is a topic.  So I want to make sure we
know what the answer is.

Based on information you've seen and
reviewed, can you identify for me any evidence which
shows that Mr. Banman or CTM used Skye trade secrets
in working with recruiting independent sales reps?

A    Yes.  They had insider information on who
were our top reps or which ones were successful,
where were they successful, what pricing information
they were using, what commission rates they were
being paid, how they were selling our products.  And
if they could give them, you know, similar products
and use the same information, that's what they did

in order to convince them to sell for CTM.  And unless they worked for Skye or HRT they would not have had access to that trade secret information.

Q   Again, I'm trying to draw a distinction between "access" and "use."  I understand your position that they had access to certain information.  My question is a little different and very narrow.

Based on what you've seen, can you identify any evidence which shows that Banman or CTM used that information that you believe they had access to to work with or recruit independent sales reps?

A   Yes.  I mean, they recruited Mike Stumpe, Nate Boulais, and numerous other individuals, okay, using that insider trade secret information in order to convince them to come on board with our company -- or his company.

Q   What evidence do you have that they used that insider trade secret information?

A   How else would he know to be able to do that if he didn't have this information because if you're a layperson outside of the industry, you wouldn't have the ability to do that and have the success that you achieved unless you knew that information.

HIGHLY CONFIDENTIAL

Page 255

Q   Okay.  So if I'm following you, you're saying that you believe the use of that information is necessary and inevitable?  Is that what you're saying?

MR. SABA:  I'm sorry.  Can you repeat that?

THE WITNESS:  Yeah, can you repeat that?

BY MR. FLUSKEY:

Q   Are you saying that because they had access to this information, its use is inevitable?

A   I don't understand.

Q   I'm still trying to understand -- can you identify for me any document which shows that CTM or Banman used Skye trade secrets to recruit any Skye sales rep?

A   And clearly, his success, the initial -- the information we've seen, it shows the initial sales were to Skye accounts using Skye reps.  And unless you had insider information, which is our trade secrets, you would not be able to have such a high concentration of independent reps selling a product competing against Skye to doctors that were using Skye.

Q   My question, again, is can you identify any documents which shows that CTM or Banman used Skye's trade secrets to recruit independent sales

HIGHLY CONFIDENTIAL

Page 256

representatives?

A    We have texts, E-mails we've seen where there's communication between Nate Boulais, Mike Stumpe, Dr. Hiatt, and others that is evidence that they used access -- privileged access, which is our trade secrets, in order to bring that band of brothers together.

Q    Do these E-mails or texts you refer to disclose or include Skye trade secrets?

A    You're asking the same question.  If they're contacting customers of ours and it's the same -- and it's independent reps of ours that you know are successful in this space, and you're in the beginning stage of CTM, was private label, and are reselling products and claiming them to be connective tissue to use the codes of ours, okay, that's insider trade secret information, and we saw that information.

Q    You saw what information?

A    E-mails, again, between Nate Boulais and others where they were using Vivex products or Amnio Technology products that in the past never referred to their own products as a connective tissue, but they were using it and positioning as a connective tissue and using a

HIGHLY CONFIDENTIAL

Page 257

connective tissue code, which should be questioned if that's legal.

Q   Okay.  I still don't have an answer to the question.  So I'm going to try to rephrase it.

No, I'm not going to let this go.  This is relevant.

MR. SABA:  Well, no.  Hang on.  You asked has he seen documents.  He's told you he's seen E-mails.  I don't know what more you want to know.

BY MR. FLUSKEY:

Q   What trade secrets of Skye are in these E-mails and texts that were used to recruit doctors?  What are they?  What are the trade secrets you saw?

MR. SABA:  Answer it again for the last time.

THE WITNESS:  Okay.  All right.

BY MR. FLUSKEY:

Q   The question is what trade secrets did you see in these documents?  That's the question.  Very narrow.

MR. SABA:  You're talking about for recruiting of doctors here?

MR. FLUSKEY:  No.  Of sales reps.

MR. SABA:  Okay.  You said doctors.

MR. FLUSKEY:  Did I?  Let me restate the

HIGHLY CONFIDENTIAL

Page 258

question.

MR. SABA:  Okay.  Let's make sure we're clear.

BY MR. FLUSKEY:

Q  Yeah.  Skye alleges in this case that CTM and Banman used Skye trade secrets to recruit sales reps; correct?

A  Yes.

Q  Okay.  Have you seen any documents in which Skye's trade secrets are included where CTM was recruiting sales reps?

A  Earlier I asked you the question the definition of a "document," and you said E-mails, texts, and other forms of information.  And I've told you that we have seen E-mails, okay, and we've seen texts, all right, that show that CTM used insider trade secret information of specific sales reps to target.

The know-how of the value of using specific reimbursement codes, okay, that Skye was using that we developed this system, and then they went and got a competitor's product that wasn't using those codes because they don't apply, but told the facility use those codes because they knew those codes had value because those were developed -- the understanding

HIGHLY CONFIDENTIAL

Page 259

was developed at Skye.

They also had access because they knew certain key doctors, high volume doctors, okay, that were using the product and how they were using the product and pricing information that would give them a benefit to getting access into those facilities.

Q   But we're talking here, though, about the recruitment of sales reps.  You said you saw texts and E-mails that included Skye's insider trade secret information that was used to recruit sales reps.  So how -- what documents did you see that included insider trade secrets of Skye in connection with the recruitment of sales reps?

A   E-mails between -- again, I'll try this again -- I'm happy to do this all day or all night. E-mails --

Q   We may have to.  Go ahead.

MR. SABA:  Answer the question.  Then I'll jump in.

THE WITNESS:  There are E-mails that we have seen where CTM is contacting reps where all of a sudden has sales with a distributor or a rep that was selling Skye and our sales decrease.  Okay.  So we've seen E-mails where there's contact, reached out to those individuals by CTM.  Okay.  They would

HIGHLY CONFIDENTIAL

Page 260

not have known or had access to those distributors to know that hey, these are high value targets that have true potential because you can't just pull that out of the air, all right, and that was our information or one part of it.

BY MR. FLUSKEY:

Q   So you're saying -- you're saying that CTM -- the trade secret CTM used to recruit sales rep was the knowledge of the sales rep?  Am I following you?

MR. SABA:  Misstates his testimony.

THE WITNESS:  That's not what I said.

BY MR. FLUSKEY:

Q   Okay.  Then what trade secrets were in these documents that you saw?  What trade secrets were in the documents?

MR. SABA:  I need to set forth my objection here.

MR. FLUSKEY:  You can object.  Go ahead.

MR. SABA:  I appreciate that you are unhappy with his response.  Okay.  But you've now asked the question at least a half a dozen times, and I know you believe you have not gotten a sufficient answer, but Mr. Sharp believes he's given you the best answer he can give.  So we're sort of

Page 261

at one of those places where it's not going to get any -- it's not going to change because he's going to keep answering the question the same way, and you seem to believe that the question is not being answered.

So I suggest we move on to a different topic or call it for the night because it seems like you guys are both kind of going in circles on this because you're getting the same answer to the same question over and over.  So I'm respectfully asking you to move on to maybe another question or call it for the night since we were planning on doing so anyway, and maybe tomorrow you can ask a fresh question or something.

MR. FLUSKEY:  Are you done?

MR. SABA:  I am.

MR. FLUSKEY:  I haven't gotten an answer to this question.

MR. SABA:  I know you believe that.

MR. FLUSKEY:  And it's critical.  It's not just that I believe it.  Can you tell me what trade secrets from the documents?  You've been here.

MR. SABA:  It's not my deposition.

MR. FLUSKEY:  We're entitled to an answer to that question.  It's a simple question.  It's not

HIGHLY CONFIDENTIAL

Page 262

even a contentious question.  I just want to know what they are so we know what we're talking about.

THE WITNESS:  Can I take a break?

MR. FLUSKEY:  We can take a break.  Sure. Take a 5 minute break.

THE VIDEOGRAPHER:  We're now off the record.  The time is 5:26 p.m.

(Recess.)

THE VIDEOGRAPHER:  We're now on the record. The time is 5:32 p.m.

BY MR. FLUSKEY:

Q   Okay.  Mr. Sharp, I have a different question for you.

A   Oh, good.

Q   You mentioned in your earlier testimony that certain reimbursement codes or the use of them is a Skye trade secret; correct?

A   Yes.

Q   Okay.  My question is simply this.  What codes are you referring to?

A   I have to pull out my notes.  Am I allowed to pull out my notes?

Q   I'm okay with it if you are.

MR. SABA:  As long as you don't ask him to see it, whatever he's looking at.  I don't know what

Page 263

he's looking at.

BY MR. FLUSKEY:

    Q   As long as you can tell me what codes you're referring to, you can -- yeah.

    A   There's a series of codes, and I'm not the coding expert in my company.  I have people that do that and handle that, but I will give an attempt to answer your question to the best of my ability.

    Q   Okay.

    A   All right.  So there's a few.

    Q   Okay.

HIGHLY CONFIDENTIAL

Page 264



Q   Okay.  I wasn't sure if you were referring to an internal revenue code like on Skye's financials.  That's not --

A   No.

Q   You are not referring to that; right?

A   No.

Q   Okay.

HIGHLY CONFIDENTIAL

Page 265

[REDACTED]

A    Yeah.  And we have a whole coding guide that I'm sure has been provided.  So if I've missed anything, it would be in that as well.  Let me just --

Q    Skye has a document that's called a "coding guide"?

A    Yes.

Q    Okay.  And it includes the codes that Skye --

A    Yes.

Q    -- uses for reimbursement of its products?

A    Yes.

MR. FLUSKEY:  Okay.  I think we're done for the day.

THE VIDEOGRAPHER:  This ends today's volume of the deposition of Christopher Sharp.  We're now off the record.  The time is 5:37 p.m.

(TIME NOTED: 5:37 p.m.)

HIGHLY CONFIDENTIAL

**Page 266**

I, CHRISTOPHER SHARP, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of _____, 2022, at _____, _____.

(City)                                    (State)

_____

CHRISTOPHER SHARP

HIGHLY CONFIDENTIAL

Page 267

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: April 11, 2022

MARIA ELLERSICK

CSR No. 10531

HIGHLY CONFIDENTIAL

**Page 268**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

SKYE ORTHOBIOLOGICS, LLC, A
DELAWARE LIMITED LIABILITY
COMPANY, HUMAN REGENERATIVE
TECHNOLOGIES, LLC, A DELAWARE
LIMITED LIABILITY COMPANY,      No. 2:20-CV-03444-MEMF
                                     (PVCX)
          Plaintiffs,
        vs.
CTM BIOMEDICAL, LLC, A
DELAWARE LIMITED CORPORATION;
BRYAN BANMAN, AN INDIVIDUAL;
CTM MEDICAL, INC., A DELAWARE
CORPORATION; VETERANS MEDICAL
DISTRIBUTORS, INC., A FLORIDA
CORPORATION; GARDNER ROGERS,
AN INDIVIDUAL; MIKE STUMPE,
AN INDIVIDUAL; PABLO SEOANE
AKA PAUL SEOANE, AN
INDIVIDUAL; NATHAN BOULAIS,
AN INDIVIDUAL; AND DOES 3
THROUGH 10, INCLUSIVE,
          Defendants.
_____

** HIGHLY CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF CHRISTOPHER SHARP

El Segundo, California

Wednesday, March 30, 2022

Volume II

Reported by:
MARIA ELLERSICK
CSR No. 10531
Job No. 5156783
PAGES 268 - 545

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

SKYE ORTHOBIOLOGICS, LLC, A
DELAWARE LIMITED LIABILITY
COMPANY, HUMAN REGENERATIVE
TECHNOLOGIES, LLC, A DELAWARE
LIMITED LIABILITY COMPANY,     No. 2:20-CV-03444-MEMF
                                     (PVCX)
          Plaintiffs,
     vs.
CTM BIOMEDICAL, LLC, A
DELAWARE LIMITED CORPORATION;
BRYAN BANMAN, AN INDIVIDUAL;
CTM MEDICAL, INC., A DELAWARE
CORPORATION; VETERANS MEDICAL
DISTRIBUTORS, INC., A FLORIDA
CORPORATION; GARDNER ROGERS,
AN INDIVIDUAL; MIKE STUMPE,
AN INDIVIDUAL; PABLO SEOANE
AKA PAUL SEOANE, AN
INDIVIDUAL; NATHAN BOULAIS,
AN INDIVIDUAL; AND DOES 3
THROUGH 10, INCLUSIVE,
          Defendants.

_____

          Videotaped Deposition of CHRISTOPHER SHARP,
Volume II, taken on behalf of Defendants CTM
Biomedical, LLC, at 2301 Rosecrans Avenue,
Suite 3180, El Segundo, California, beginning at
9:13 a.m. and ending at 5:51 p.m. on Wednesday,
March 30, 2022, before MARIA ELLERSICK, Certified
Shorthand Reporter No. 10531.

HIGHLY CONFIDENTIAL

Page 270

APPEARANCES:

For Plaintiffs:

    ROSEN, SABA, LLP

    BY:  RYAN D. SABA

    BY:  LAURA K. ST. MARTIN (Via videoconference)

    Attorneys at Law

    2301 Rosecrans Avenue, Suite 3180

    El Segundo, California 90245

    (310) 285-1727

    Email:  rsaba@rosensaba.com

For Defendants CTM Biomedical, LLC, Bryan Banman, CTM Medical, Inc., and Pablo Seoane:

    HODGSON, RUSS, LLP

    BY:  ROBERT J. FLUSKEY

    BY:  MATTHEW K. PARKER (Via videoconference)

    Attorneys at Law

    The Guaranty Building

    140 Pearl Street, Suite 100

    Buffalo, New York 14202

    (716) 856-4000

    Email:  rfluskey@hodgsonruss.com

HIGHLY CONFIDENTIAL

Page 271

APPEARANCES (Continued):

For Defendants Gardner Rogers and Veterans

Medical Distributors, Inc.:

        YUKEVICH, CAVANAUGH

        BY:  TODD A. CAVANAUGH

        BY:  HASSAN ELLRAKABAWY (Via videoconference)

        Attorneys at Law

        355 South Grand Avenue, 15th Floor

        Los Angeles, California 90071

        (213) 362-7777

        Email:  tcavanaugh@yukelaw.com


For Defendant Mike Stumpe:

        BLANK ROME, LLP

        BY:  ARASH BERAL

        BY:  SAAM TAKALOO

        Attorneys at Law

        (Via Videoconference)

        2029 Century Park East, 6th Floor

        Los Angeles, California 90067

        (424) 239-3453

        Email:  arash.beral@blankrome.com

HIGHLY CONFIDENTIAL

**Page 272**

APPEARANCES (Continued):


For Defendant Nathan Boulais:

BIENERT, KATZMAN, LITTRELL, WILLIAMS, LLP

BY:  MICHAEL R. WILLIAMS

Attorney at Law

(Via Videoconference)

903 Calle Amanecer, Suite 350

San Clemente, California 92673

(949) 369-3700

Email:  mwilliams@bklwlaw.com




Also  Present:

Bryan Banman

Gardner Rogers (Via videoconference)

Mike Stumpe (Via videoconference)

Pablo Seoane (Via videoconference)






Videographer:

JOSHUA OSHIMA

HIGHLY CONFIDENTIAL

**Page 279**

El Segundo, California; Wednesday, March 30, 2022

9:13 a.m.

THE VIDEOGRAPHER:  All right.  Good morning.  We are now going on the record.  The time is 9:13 a.m. on Wednesday, March 30th, 2022.

Please note that microphones are sensitive and may pick up whispering, private conversations, and cellular interference.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This begins Volume II of the video recorded deposition of Christopher Sharp taken in the matter of Skye Orthobiologics, LLC, et al., versus CTM Biomedical, LLC, et al., filed in the U.S. District Court, Central District of California, case number of which is 2:20-CV-03444 DMG.

This deposition is being held at 2301 Rosecrans Avenue, El Segundo, California 90245, and also on Zoom videoconference.

My name is Joshua Oshima from the firm Veritext.  I'm the videographer.  The court reporter is Maria Ellersick.  I am not related to any party in this action, nor am I financially interested in

Page 280

the outcome.

Counsel and all parties present will now state their appearances and affiliations for the record.  If there are any objections to proceeding, please state them at the time of your appearance, beginning with the noticing attorney.

MR. FLUSKEY:  Rob Fluskey of Hodgson, Russ for CTM Biomedical, CTM Medical, and Bryan Banman, and Pablo Seoane.

MR. SABA:  My name is Ryan Saba of Rosen, Saba on behalf of Plaintiffs.

MR. CAVANAUGH:  Todd Cavanaugh for Defendants Gardner Rogers and Veterans Medical Distributors.

THE REPORTER:  On the Zoom.

MR. BERAL:  Arash Beral on behalf of Defendant Mike Stumpe.

MR. WILLIAMS:  Michael Williams on behalf of Defendant Nathan Boulais.

MR. PARKER:  Matt Parker on behalf of Defendants Bryan Banman, CTM Biomedical, CTM Medical, and Pablo Seoane.

//

//

HIGHLY CONFIDENTIAL

Page 281

CHRISTOPHER SHARP,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. FLUSKEY:

Q   Good morning, Mr. Sharp.

A   Good morning.

Q   Yesterday you testified about a patient registry that Skye maintains.  Do you recall that generally?

A   Yes.

Q   Okay.  How does Skye register patients for that registry?

A   We have -- we have an agreement with the physician.  The physician then will at their discretion recruit patients, ask for their permission to have data collected on them.

Q   And does Skye obtain written consents from the participating patients?

A   No.  That's between the doctor and the patient.

Q   Okay.  Do you know if the doctors provide the consents that they obtain to Skye?

A   Can you repeat the question?

HIGHLY CONFIDENTIAL

Page 283

A    Yes.

Q    Okay.  Do Skye's independent sales reps have access to this price list?

A    Yes.  It's the price list they start off with when entering into an account, and then negotiations typically happen after that to determine the final price.

Q    Okay.  Ask you a few questions about Pablo Seoane.  HRT and Skye have named Mr. Seoane as a Defendant.  You understand that?

A    That's correct.

Q    Okay.  Did Mr. Seoane play any role in the development of the manufacturing process used by HRT?

A    No, he did not.

Q    Did he have access to the standard operating procedures, the SOPs, of HRT?

A    No, he did not.

Q    Okay.  Has Mr. Seoane ever been in HRT's lab?

A    Yes, he has.

Q    How many times?

A    I'm not sure.  I wasn't counting.

Q    Okay.  Do you know why he was in the lab?

A    He would be giving tours, maybe looking at

HIGHLY CONFIDENTIAL

Page 317

Q   Let me hand you what has been marked as Exhibit 58.  Before we look at 58 in detail, let's first look at Exhibit 54, that interrogatory response we've been using as our guide.  So on page 14 of Exhibit 54, the next individual that appears is BJ Benik.  Do you see that?

A   Right.

Q   And who is BJ Benik?

A   He's an independent sales rep for us.

Q   Is he still an independent sales rep for Skye?

A   Yes, he is.

Q   Okay.  And to your knowledge, is he also serving as an independent sales rep for CTM?

A   I have not asked him if he is directly or not.

Q   You have Exhibit 58 handy?

A   I have it in front of me, yeah.

Q   Right.  So this is an agreement between a company called JJBM Medical and Skye Biologics, Inc., dated June 29, 2017; correct?

A   Yes.

Q   And BJ Benik is associated with JJBM Medical?

A   He signed as if he has signing authority,

HIGHLY CONFIDENTIAL

Page 318

yes.

Q   Now, if you would turn to the second page of Exhibit 58 for me.

A   Right.

Q   You see there's a paragraph numbered 1.9 --

A   Right.

Q   -- with the heading "Exclusive Supplier"?

A   Right.

Q   I see that's crossed out.  Do you see that?

A   I see that as well, yes.

Q   So did Skye and BJ Benik agree to delete this section from their contract, Exhibit 58?

A   It looks that way.

Q   So am I right that BJ Benik, his company, JJBM, is not bound by any exclusivity obligation in this contract that's in front of you, Exhibit 58?

MR. SABA:  Calls for a legal conclusion.

You can answer to your lay opinion.

THE WITNESS:  Under this specific contract and not having any others in front of me, it looks to be that way.

BY MR. FLUSKEY:

Q   Okay.  Sitting here today, do you know if Skye has any other contracts with BJ Benik?

A   Yes, we do.

HIGHLY CONFIDENTIAL

Page 319

Q   Do you know if those contracts include an exclusivity provision?

A   I'd have to look at them.

Q   Does Skye allege in this case that CTM or Bryan Banman interfered with Skye's relationship with BJ Benik?

A   Yes, we do.

Q   And what is the basis for that allegation?

A   Well, Bryan Banman knew and knows BJ quite well.  They've interacted while Banman was at Skye. He knows that he's a very successful sales representative for amniotic and placental products. He would not have known that if it weren't for working for Skye.

Q   Okay.

A   In terms of interference, I do believe there is evidence, while not in front of me, that CTM has been replaced in certain accounts.

Q   Meaning -- do you mean that certain customers that you used to be customers of Skye are now customers of CTM who are serviced by BJ Benik?

A   I believe so.

Q   Okay.  Does Skye allege that BJ Benik breached any agreements that it has with BJ Benik?

A   I have not alleged that, no.

HIGHLY CONFIDENTIAL

Page 376

Q   Can you identify any of it?

A   Pardon me?

Q   Can you identify any evidence that supports the contention that Mr. Stumpe used that confidential information on behalf of CTM?

A   Things that do come to mind glowingly, there were doctors that he was switching products, getting them to use, talking with other -- interfering with other reps of ours to sell Skye. Getting doctors to stop using, stop gathering data on us.  There's a lot of information, Rob.

Q   Which doctor -- I understand, but the lawyers on the other side are trying to understand what the evidence is so they know what's going on, what the case is about.

You mentioned in your prior answer that he encouraged doctors to stop working with Skye.  Which doctors do you believe --

A   I believe one is Dr. Badman.  He was to be collecting data for us under an evaluation agreement.

Q   Mr. Badman was?

A   Yes.

Q   And what do you believe Mr. Stumpe did with respect to that agreement with Mr. Badman?

HIGHLY CONFIDENTIAL

Page 377

A   Convinced him not to use Skye anymore and to work with CTM, collect CTM, and do a shoulder study for CTM.

Q   Does Skye allege that Mr. Badman breached his agreement with Skye by working with CTM?

A   I don't have an issue with Dr. Badman.

Q   So Skye does not allege that?

MR. SABA:  Well, what do you mean by "allege"?  In this case, there's no allegations against Dr. Badman.

BY MR. FLUSKEY:

Q   Yes.  Does Skye allege that Mr. Badman breached its contract with Skye?

A   I'm not pursuing anything with Dr. Badman at this time unless evidence shows that we should be.

Q   I understand you're not pursuing it, but does Skye believe that Mr. Badman breached his agreement with Skye?

A   I'd have to review his agreement.

Q   Okay.  So Skye doesn't contend then that Mr. Stumpe induced a breach of Mr. Badman's agreement, does it?

A   Again, I'd have to review his agreement to answer your question.

HIGHLY CONFIDENTIAL

Page 384

Q   Does Skye allege in this case that CTM or Banman interfered with any of Skye's relationships with doctors who performed consulting services or research services?

A   Yes, we do.

Q   Can you identify those doctors for us?

A   Can you repeat the question?

Q   Sure.  Can you identify the doctors with which Skye alleges that CTM or Banman interfered?

A   Okay.  Dr. Hiatt, Dr. Badman, Dr. Anderson.

Q   Any others?

A   I don't have all the evidence in front of me to recall every single one.

Q   Okay.  Let's take one at a time.  Let's talk about Dr. Hiatt.  How did CTM and Banman -- well, let me first back up.

What relationship did Skye have with Dr. Hiatt?

A   She's an ENT doctor who's extremely interested in how well our products helped her ENT patients.  She was providing us with case information, case images.  She was -- she agreed to do some studies for Skye in the ENT space.  She's a very large user of Skye.

Q   Okay.  Did Skye have a written contract

HIGHLY CONFIDENTIAL

Page 385

with Dr. Hiatt?

A    I believe we did.

Q    Okay.  Do you know if Skye had any agreement with Dr. Hiatt that she would work exclusively with Skye?

A    I'd have to look at the agreement.

(Exhibit 74 was marked for identification by the court reporter.)

BY MR. FLUSKEY:

Q    Okay.  Let me show you what's been marked as Exhibit 74.  Okay.  Exhibit 74 is a Skye Biologics Clinical Research Agreement between Skye Biologics and Dr. Hiatt; correct?

A    Yes.

Q    And under this agreement, is Dr. Hiatt precluded from working with other companies?

MR. SABA:  Calls for a legal conclusion.

You can answer in your lay opinion.

THE WITNESS:  Let me read it then.

BY MR. FLUSKEY:

Q    You've read -- you've read the exhibit?

A    I have, yeah.  Yes.

Q    Does this document preclude Dr. Hiatt from working with other companies?

MR. SABA:  Calls for legal conclusion.

HIGHLY CONFIDENTIAL

**Page 386**

THE WITNESS:  This specific agreement in front of me --

BY MR. FLUSKEY:

Q   Yeah.

A   -- seems that it does not, but I'm not -- I'm not a lawyer.

Q   Are you aware of any agreement with Dr. Hiatt -- between Dr. Hiatt and Skye that precluded Dr. Hiatt from working with other companies?

MR. SABA:  Same objection.

THE WITNESS:  Not to my knowledge.  I would have to look through our files.

BY MR. FLUSKEY:

Q   Does Skye allege in this case that Dr. Hiatt breached the agreement that I've marked as Exhibit 74?

A   Can you repeat the question?

Q   Does Skye allege in this case that Dr. Hiatt breached the agreement that I've marked as Exhibit 74?

A   We haven't officially decided if she has or has not and whether or not we're going to take legal action.

Q   Okay.  How, if at all, did CTM or Bryan

HIGHLY CONFIDENTIAL

Page 392

arrangement -- any agreement?

A    I'd have to look at our records.

Q    Sitting here today, you don't know?

A    Not off the top of my head.

Q    Okay.  You mentioned a Dr. Anderson in your prior answer as being one of the doctors with which Skye alleges CTM and Banman interfered; correct?

A    Yes.

Q    How did CTM or Banman interfere with Skye's relationship with Dr. Anderson?

A    Dr. Anderson was a user of Skye.  Bryan Banman and myself met with Dr. Anderson.  He became a user of our products.  He through his research foundation was collecting data on our products and other amniotic products.

I received E-mails very early on, August of 2018, where it was intended to -- the recipient to be Bryan Banman, but they sent it to Skye E-mail, and there were specific pricing comparisons and information asking him about coding and comparing the new CTM offering and how it differs from Skye products is what I recall.

(Exhibit 75 was marked for

identification by the court reporter.)

BY MR. FLUSKEY:

HIGHLY CONFIDENTIAL

Page 395

him since the filing of this lawsuit?

A    No.

Q    How did Banman and CTM interfere with Skye's relationship with Dr. Badman?

A    Well, he was using product through our sales reps, whether it be -- I'm trying to recall 100 percent whether it be Alex Wrinkles, Mike Stumpe.  He was using Skye products.  And then after Banman left, quickly thereafter, Dr. Badman ceased to use our products, and then we learned he's doing a similar shoulder study for CTM.

Q    When you say Dr. Badman was using Skye products, do you mean he was purchasing them?  He was a customer?

A    He was a customer.  He personally was not purchasing them, but his facility was using them.

Q    So his facility was a customer of Skye, and Skye had an agreement with him regarding research?

A    Yes.

Q    Okay.  Did Skye have any agreement with Dr. Badman that precluded him from working with other companies?

A    I'd have to look at that agreement that you have in front of you.

HIGHLY CONFIDENTIAL

Page 396

Q    Without seeing the agreement, do you know the answer?

A    I don't know it off the top of my head.

(Exhibit 76 was marked for identification by the court reporter.)

BY MR. FLUSKEY:

Q    Let me show you what's been mark as Exhibit 76.  Have you read Exhibit 76?

A    Not all of it, but since you're asking me, I will.  Okay.

Q    Okay.  Is there anything in the document that I marked as Exhibit 76 that prohibits Dr. Badman from working with another company?

A    No, not him, no.

Q    Is there someone else in this document that -- you said "not him."  Is there someone else in this document that's prevented from working with another company?

A    It's only addressed to him.

Q    Does Skye allege in this case that CTM or Banman interfered with Skye's relationship with Dr. Schlifka?

A    Are we done with this exhibit?

Q    We are.

A    Okay.  I don't believe so.

HIGHLY CONFIDENTIAL

Page 414

myself and the trust has been -- those shares are in Skye Biologics Holdings, and then 10 percent resides outside of that.

Q   Okay.  Does HRT have any employees today?

A   Yes.

Q   About how many?

A   I'd have to look at our records.

Q   More than ten?

A   I believe so, yes.

Q   More than 20?

A   I don't think so.

Q   So between 10 and 20 is a fair estimate?

A   I believe so, yes.

Q   All right.  And does HRT manufacture products today?

A   HRT, yes.

Q   Yes.  And does it generate revenue through manufacturing products?

A   Yes.

Q   Okay.  And how many employees does Skye have today?

A   I'd have to look at the numbers, but 10 to 15.

Q   So it has about 10 to 15 employees, but probably around 100 or more independent sales reps;

HIGHLY CONFIDENTIAL

Page 415

is that fair?

A    Yes, yes.

Q    And am I right that Skye sells its products principally through those independent sales reps?

A    Yes.

Q    Let's talk briefly about the early product development.  Okay.

MR. SABA:  Do you want to take a lunch break at this point or do you -- it make sense if you're going into a whole new section.

MR. FLUSKEY:  I am.  Is the food here?

MR. SABA:  I believe that's what I'm seeing back over there, yes.

MR. FLUSKEY:  Okay.  If the food's here, then now is a logical time to break for lunch.

MR. SABA:  Okay.

MR. FLUSKEY:  I think we should try to keep it as brief as possible.

MR. SABA:  That's fine.

MR. FLUSKEY:  Maybe a half an hour.

THE VIDEOGRAPHER:  We're now off the record.  The time is 1:06 p.m.

(Lunch recess.)

THE VIDEOGRAPHER:  We are now on the record.  The time is 1:55 p.m.

HIGHLY CONFIDENTIAL

Page 419

you earlier, I already started and was running two Biologics companies that were working with human tissue, but those were cadaveric tissues, and the industry is pretty small.

I observed two companies working with amniotic tissues in ocular and wounds, and then I was approached about an opportunity for Skye Orthobiologics to be a stocking distributor or the ability to private label some placental tissues, and that was -- was your question when?

Q   Well, let me go step by step with what you've just told me here.  What was the name of that company that you did distribution for?

A   BioDlogics.

Q   BioDlogics?

A   Yes.

Q   Okay.  And Skye distributed BioDlogics products?

A   We private labeled their products and distributed them.

Q   Okay.  And by "private label," you mean they made the products, but you sold them under a Skye brand?

A   A Skye trademark, brand, yes.

Q   Okay.  When did Skye begin selling products

HIGHLY CONFIDENTIAL

Page 420

manufactured by BioD?

A   I have to look at my notes to give you the exact date, but the timeframe, I believe, was first quarter of 2011.

Q   Okay.  How many products did you distribute for BioD?

A   I don't have -- I'd have to look at the financials, you know, to look at the number of units of each skew.

Q   I don't mean units or skew, just product categories or product names.  What types of products did you distribute from BioD?

A   Distributed a crosslinked membrane by the name of Reset, and then also distributed a cryopreserved product by the name of Liquid Gen.

HIGHLY CONFIDENTIAL

Page 421

A   It was a crosslink membrane, yes, for adhesion barriers or as an adhesion barrier.

Q   Amniotic membrane?

A   It was, yes.

Q   Any other BioD products?

A   Not that I can recall.

Q   Okay.

A   Not at that time.

Q   During the time that Skye was distributing BioD products, did you ever tour BioD's lab?

A   Yes.

Q   When did that occur?

A   That would have been -- I'd have to look at my notes, but approximate -- in 2011, at some point in time.

Q   Okay.  Did anyone else attend that tour with you?

A   Yes.  Bryan Banman.

Q   What was the purpose of the tour?

A   I can't recall.  We were visiting -- spent time with the CEO to get a tour.  I have to go back to my E-mails and notes to know exactly.  Nothing glaring comes up to me in terms of what the agenda for the meeting was other than a meet and greet and seeing the facility.

HIGHLY CONFIDENTIAL

**Page 424**

Q   Okay.  And when did Skye and HRT bring their first product to market?

A   After validations and everything, it was early in 2014.

Q   So is it fair to say that the early development phase of HRT and Skye's products occurred in 2013 and early 2014?

A   The official, yes, yes.

Q   When you say "official," what do you mean by that?

A   Well, we made a decision to become a fully -- a fully vertically integrated organization. And when we decided to do that, that's when the serious development of, you know, what forms, how do we differentiate from every competitor, what provides the best solutions to doctors.

Q   Okay.  That's what I'm trying to figure out.  Can you give me just bookends of the timeframe when that work took place?

A   It would have been -- it was 2000- -- you know, pretty much the entirety of 2013 through '14, we developed all those products and launched those products, commercialized those products.

Q   Okay.  Today, can you just identify for us the products by name that Skye distributes today,

HIGHLY CONFIDENTIAL

Page 434

graphics design company.  And we talked about him
assisting Osprey Biomedical and Skye with updating
our websites and marketing materials is what I
recall.  So to answer your question, it would be
2009, I believe.

Q   So paragraph 40 of the complaint talks
about beginning in 2012.  What began in 2012?

A   I think that's when a formal relationship
was formed.

Q   Okay.

A   And it wasn't -- yeah.

Q   Okay.  Now, Exhibit 81, if you flip to the
last page, you signed Exhibit 81 on behalf of
Skye Orthobiologics; correct?

A   Yes, I did.

Q   And this is a mutual non-disclosure
agreement, meaning that each party anticipated
disclosing confidential information to the other;
correct?

A   Well, let me review it.  This is an old
version.

Q   And I can refer you to a specific paragraph
if that helps, paragraph 1.

A   Okay.

Q   You see in paragraph 1 where it states "The

HIGHLY CONFIDENTIAL

Page 456

Q    Okay.  And is this a Skye vendor packet?

A    It appears to be.

Q    Okay.  And who does Skye send this type of vendor packet to?

A    To customers that are looking to start using our products.

Q    Okay.  And by "customers," do you mean medical facilities?

A    Yes.

Q    Okay.  Does Skye have non-disclosure agreements with the medical facilities to which it would send this type of packet?

A    That's not a standard industry practice.

Q    So the answer is no, and you don't think it's standard?

A    As with any medical company in the United States that sells to hospitals and surgery centers, they do not get a confidentiality agreement signed before they share a vendor packet.

MR. FLUSKEY:  Okay.  All right.  I am going to yield time to other -- the other co-defendants.  I am not done and leaving the deposition open for reasons previously explained to Counsel before the deposition and on the record, and I suspect we'll meet and confer off the record about those issues,

HIGHLY CONFIDENTIAL

Page 463

doctors.  It's usually they are the ones who do that?

A    For the most part, yes.  Majority of the time, yes.

Q    They control their own operations; right?

A    They're independent, so yes.

Q    And you don't direct them or control them; right?

A    No.

Q    Okay.  Is it also normal to have subrepresentatives?

A    Yes.  Some do, yes.

Q    What are "subrepresentatives"?

A    Well, if you have a large territory or a successful independent sales rep, you run it like a small company that you're going to need more hands to assist you with recruiting new doctors, servicing those doctors, admin for the sales that you're generating.

Q    And with respect to the relationships that these representatives have, you're not contending that the relationships of these representatives with their clients are Skye's trade secrets, are you?

A    Can you repeat the question?

Q    Can I have it read back by the

HIGHLY CONFIDENTIAL

Page 464

court reporter, please.

(Record read.)

MR. SABA:  It's vague and ambiguous.

THE WITNESS:  The actual relationship itself is not.  I don't -- I'm not questioning or believe the relationship is a trade secret.  It's the fact -- it's the connection between that doctor, that relationship of learning to use these types of products, okay, is a trade secret.

BY MR. BERAL:

Q   So if a doctor decides to do business with a sales representative in light of their relationship with that sales representative, you would not contend that that would be a misappropriation of a trade secret; right?

A   Can you repeat the question?

MR. BERAL:  Could I have it read back.

(Record read.)

MR. SABA:  It's vague and ambiguous as well.

THE WITNESS:  Can you ask the question a different way?  I'm not following the question.

BY MR. BERAL:

Q   What's ambiguous about it?

A   I'm just not following what you're asking.

HIGHLY CONFIDENTIAL

**Page 546**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

SKYE ORTHOBIOLOGICS, LLC, A DELAWARE LIMITED LIABILITY COMPANY, HUMAN REGENERATIVE TECHNOLOGIES, LLC, A DELAWARE LIMITED LIABILITY COMPANY,   No. 2:20-CV-03444-MEMF (PVCX)

   Plaintiffs,

  vs.

CTM BIOMEDICAL, LLC, A DELAWARE LIMITED CORPORATION; BRYAN BANMAN, AN INDIVIDUAL; CTM MEDICAL, INC., A DELAWARE CORPORATION; VETERANS MEDICAL DISTRIBUTORS, INC., A FLORIDA CORPORATION; GARDNER ROGERS, AN INDIVIDUAL; MIKE STUMPE, AN INDIVIDUAL; PABLO SEOANE AKA PAUL SEOANE, AN INDIVIDUAL; NATHAN BOULAIS, AN INDIVIDUAL; AND DOES 3 THROUGH 10, INCLUSIVE,

   Defendants.

_____

** HIGHLY CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF CHRISTOPHER SHARP

El Segundo, California

Wednesday, September 7, 2022

Volume III

Reported by:

MARIA ELLERSICK

CSR No. 10531

Job No. 5417023

PAGES 546 - 861

HIGHLY CONFIDENTIAL

Page 547

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

SKYE ORTHOBIOLOGICS, LLC, A
DELAWARE LIMITED LIABILITY
COMPANY, HUMAN REGENERATIVE
TECHNOLOGIES, LLC, A DELAWARE
LIMITED LIABILITY COMPANY,    No. 2:20-CV-03444-MEMF
                                   (PVCX)
          Plaintiffs,

     vs.

CTM BIOMEDICAL, LLC, A
DELAWARE LIMITED CORPORATION;
BRYAN BANMAN, AN INDIVIDUAL;
CTM MEDICAL, INC., A DELAWARE
CORPORATION; VETERANS MEDICAL
DISTRIBUTORS, INC., A FLORIDA
CORPORATION; GARDNER ROGERS,
AN INDIVIDUAL; MIKE STUMPE,
AN INDIVIDUAL; PABLO SEOANE
AKA PAUL SEOANE, AN
INDIVIDUAL; NATHAN BOULAIS,
AN INDIVIDUAL; AND DOES 3
THROUGH 10, INCLUSIVE,

          Defendants.

_____

          Videotaped Deposition of CHRISTOPHER SHARP,
Volume III, taken on behalf of Defendants CTM
Biomedical, LLC, at 2301 Rosecrans Avenue,
Suite 3180, El Segundo, California, beginning at
8:43 a.m. and ending at 5:02 p.m. on Wednesday,
September 7, 2022, before MARIA ELLERSICK, Certified
Shorthand Reporter No. 10531.

HIGHLY CONFIDENTIAL

Page 548

APPEARANCES:


For Plaintiffs:

ROSEN, SABA, LLP

BY:  RYAN D. SABA

BY:  LAURA K. ST. MARTIN (Via videoconference)

Attorneys at Law

2301 Rosecrans Avenue, Suite 3180

El Segundo, California 90245

(310) 285-1727

Email:  rsaba@rosensaba.com


For Defendants CTM Biomedical, LLC, Bryan Banman,

CTM Medical, Inc., and Pablo Seoane:

HODGSON, RUSS, LLP

BY:  ROBERT J. FLUSKEY

BY:  MATTHEW K. PARKER (Via videoconference)

Attorneys at Law

The Guaranty Building

140 Pearl Street, Suite 100

Buffalo, New York 14202

(716) 856-4000

Email:  rfluskey@hodgsonruss.com

**Page 549**

APPEARANCES (Continued):


For Defendants Gardner Rogers and Veterans

Medical Distributors, Inc.:

    YUKEVICH, CAVANAUGH

    BY:  TODD A. CAVANAUGH

    BY:  HASSAN ELRAKABAWY (Via videoconference)

    Attorneys at Law

    355 South Grand Avenue, 15th Floor

    Los Angeles, California 90071

    (213) 362-7777

    Email:  tcavanaugh@yukelaw.com


For Defendant Mike Stumpe:

    BLANK ROME, LLP

    BY:  ARASH BERAL

    Attorney at Law

    2029 Century Park East, 6th Floor

    Los Angeles, California 90067

    (424) 239-3453

    Email:  arash.beral@blankrome.com

HIGHLY CONFIDENTIAL

Page 550

APPEARANCES (Continued):

For Defendant Nathan Boulais:

    BIENERT, KATZMAN, LITTRELL, WILLIAMS, LLP

    BY:  MICHAEL R. WILLIAMS

    Attorney at Law

    903 Calle Amanecer, Suite 350

    San Clemente, California 92673

    (949) 369-3700

    Email:  mwilliams@bklwlaw.com

Also Present:

    Bryan Banman

    Gardner Rogers (Via videoconference)

    Mike Stumpe (Via videoconference)

Videographer:

    JOSHUA OSHIMA

HIGHLY CONFIDENTIAL

Page 555

El Segundo, California; Wednesday, September 7, 2022

8:43 a.m.


THE VIDEOGRAPHER:  All right.  Good morning.  We are going on the record.  The time is 8:43 a.m. on Wednesday, September 7th, 2022.

This begins the video recorded deposition of Christopher Sharp taken in the matter of Skye Orthobiologics, LLC, et al., versus CTM Biomedical, et al., filed in the U.S. District Court for the Central District of California.  Case number of which is 2:20-CV-03444-MEMF.

The location of this deposition is 2301 Rosecrans Avenue, El Segundo, California 90245.  Also being conducted with Zoom virtual technology.

My name is Joshua Oshima representing Veritext, and I am the videographer.  The court reporter is Maria Ellersick.  I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all parties present will now state their appearances and affiliations for the record, beginning with the noticing attorney.

HIGHLY CONFIDENTIAL

Page 556

MR. FLUSKEY:  Rob Fluskey of Hodgson, Russ, LLP, for Bryan Banman, CTM Biomedical, and Pablo Seoane, and CTM Medical.

MR. WILLIAMS:  Michael Williams on behalf of Defendant Nathan Boulais.

MR. CAVANAUGH:  Todd Cavanaugh for Defendants Veterans Medical Distributors, Inc., and Gardner Rogers.

MR. BERAL:  Arash Beral for Defendant Mike Stumpe.

MR. SABA:  My name is Ryan Saba.  I represent the Plaintiffs in this action and Mr. Sharp in his individual capacity.

But I'm hearing a reverberation coming from one of these laptops.  So maybe we can -- or somewhere.

While you're adjusting that, I just wanted to state on the record something that I had already put in an E-mail to all counsel, but just so there's clarity for everybody.

This is the third day Mr. Sharp will have been deposed in some format.  He is here to be deposed for a full seven hours of testimony time. He will answer any and all questions that have not already been asked to him.

HIGHLY CONFIDENTIAL

Page 557

I understand that there's multiple counsel, and you guys have attempted work out an order. But if someone does not get to ask questions today for any reason, that's not going to be an excuse to get a fourth day of deposition with Mr. Sharp. So you need to work it out amongst yourselves to make sure that you've allotted the appropriate time to what you believe is necessary for the questioning in this particular matter.

MR. FLUSKEY: As you know from our prior E-mail correspondence, we have some concerns that getting this done in seven hours might not be possible. And if we reach a point where we think that is not possible, Defendants reserve all their rights, but I guess, we'll cross that bridge if and when we come to it.

MR. WILLIAMS: And just from clarity from my perspective, I think everyone on the defense side has agreed to endeavor to complete what we need to do within seven hours. To that end, we have agreed to divide up the seven hours today. I'm going to be questioning Mr. Sharp for approximately two hours. I'm going to make my best effort to finish my questioning in that time.

But given that I have not previously had an

HIGHLY CONFIDENTIAL

Page 558

opportunity to question Mr. Sharp, given that Plaintiffs just recently almost had two full days with Mr. Boulais, I do reserve my rights if I'm not able to finish my questioning in two hours, but I will make my best effort to do so.

MR. CAVANAUGH:  I join in -- I join in the comments by counsel.

CHRISTOPHER SHARP,

having been administered an oath, was examined and testified further as follows:

EXAMINATION

BY MR. WILLIAMS:

Q   Good morning, Mr. Sharp.

A   Good morning.

Q   As you know, I represent Nate Boulais.

A   Right.

Q   Do you know what a "sales lead" is?

A   Yes.  Sorry.

Q   As a reminder, you heard all the admonitions before, but the court reporter needs words as answers.

And by the way, before I start, any reason you can't give your best testimony today?

HIGHLY CONFIDENTIAL

Page 586

So it may trigger an objection.  We'll see.

Is that going to be the same basic answer if I ask you about any of these, that you aren't sure sitting here now if there was a specific written contract?  You'd have to look.

A   Well, I mean, if you -- you know, to make this easier, if you presented the ones that we provided you and the information, I'd be able to look at it and answer the question, right, but there's over 65 different ones that were interfered with, so yes.

Q   Let me ask this question, and let's go back to Beltway Surgery Center.  Did Skye have a contract with Beltway Surgery Center in which Beltway Surgery Center promised to buy Skye product?

A   I mean, there's never a promise that someone's going to purchase product.  But in order for you to have access to doing business there, you have to come to agreed terms.

Q   So that -- and if I understand what you're describing -- and this is, I guess, generally in the business -- you have a contract with, let's say, Beltway Surgery Center or some other surgery center where you agree okay, if you buy our product, here's going to be the pricing, here's going to be the

HIGHLY CONFIDENTIAL

Page 587

return terms, whatever the terms there may be.  Here are the terms if you choose to buy our product, but the customer's making no commitment to buy any product?

A   Well, it's slightly different than that. It's not our terms, per se.  It's usually their terms, per se.

Q   Got it.

A   Right.  So that's -- in order for us to do business -- in order for us to have the knowledge and the ability that's, you know, confidential and you know, really a trade secret in that case is that knowing what they say their price will be, right. They don't just advertise it.  They don't say okay, these are the terms.  So they set that.  And then we agree to it, and we either agree to it in writing, orally, or implied by, you know, initiating to do business with them.

Q   Got it.  So with the institutions, typically, they set the terms.  We will buy it from you under the following terms and conditions, price, whatever the terms may be important to them.  And if you agree to that, now you have the opportunity for them to buy product, but they don't actually commit to buy any product?

HIGHLY CONFIDENTIAL

Page 588

A    No, they don't give minimums or they're going to purchase this amount, but it's slightly -- again, it's slightly different.  It's a negotiation between the two companies on -- or our company and the facility on what the pricing and terms will be.

Q    Now, question -- I think we've talked so far about entities.  Let's look at No. 22, and there are a number on here of doctors as opposed to entities.

A    Right.

Q    No. 22 is Layton Elliot.  We talked about Dr. Elliot earlier.  What was the nature of Skye's contract with Layton Elliot?

A    I'd have to look and see, you know, what relationship we had and you know, the terms, if there's a research agreement with Dr. Elliot to refresh my memory.

Q    Okay.  Well, let me ask this question.  I know there are some doctors -- and we talked about Dr. Hiatt, for example -- where there was a research agreement between Skye and the doctor.  Are there ever contracts between Skye and the doctors regarding terms and conditions or pricing or anything like that?

A    No.

HIGHLY CONFIDENTIAL

Page 590

A    No.  I mean, she would have been a user of ours that we educated and was using our product.

Q    And in your mind, does that create a contract?

A    I mean, it's a customer that you would only know of that would use these novel products if you're in the industry or working with them previously.

Q    Well, I guess, that's a different question. You've answered a different question than the one I asked.  My question is do you view -- if the only relationship with a doctor is that that doctor is a user of the product --

A    Right.

Q    -- not doing research or anything like that --

A    Right.

Q    -- just a user of the product, do you view that as a contract between Skye and the doctor?

A    No.  We don't have a contract specifically with the doctor to use product.

Q    Okay.

A    But we do have contracts with doctors to do -- collect data and do research for us.

Q    Understood.  Riverview Hospital, No. 46, do

HIGHLY CONFIDENTIAL

Page 591

you have any knowledge as you sit here about the
contract that's being referenced in this response
with respect to Riverview?

A   No.  Again, I'd have to look up exactly the
terms and conditions of that contract.

Q   No. 30 -- or 51, sorry, Senate Street
Surgery Center, same question.  Any knowledge as you
sit here about the specific contract that's
referenced here?

A   No.  I would have to see what the -- what
was -- you know, what information was exchanged and
agreed to for pricing and terms.

Q   No. 61, University of Indiana, same
question.  Any knowledge as you sit here of that
contract?

A   I'd have the same answer.

Q   And then 64, Witham Hospital, same question
and same answer?

A   Yes.

Q   Has Skye ever entered into a contract with
any customer in which the customer agreed to buy a
certain quantity of Skye product?

A   Let me think.  I've been in this business
for 20 years.  Skye's been around since '09.  It's
not customary for them to agree to minimums, if

HIGHLY CONFIDENTIAL

Page 592

that's what you're asking.

Q   Well, to agree to any quantity, whether it's a minimum or you know, over the next year, we're going to buy just X number of products.

A   No.  I mean, you know, a lot of time you'll have a volume contract.  The more they use, you know, maybe a discount on the product.

Q   But they're not obligated to buy anything under that deal?

A   No.

Q   Just if they buy that much, they'll get the discount?

A   Correct.

MR. WILLIAMS:  This document I am handing you, Mr. Sharp, previously was marked Exhibit 59 in a prior deposition.

(Exhibit 59 was previously marked for identification by the court reporter.)

BY MR. WILLIAMS:

Q   Have you ever seen Exhibit 59 before?

A   Let me take a look.

Yes.  Yes, I have.

Q   What do you recognize Exhibit 59 to be?

A   This looks to be the initial agreement with Medical Assist.

HIGHLY CONFIDENTIAL

Page 673

time.

THE WITNESS:  My pleasure.


EXAMINATION

BY MR. FLUSKEY:

Q   Okay.  Mr. Sharp, I think, as you know, I represent Mr. Banman and CTM in this case.

A   Yes.

Q   Can you find Exhibit 454 for me, which was marked earlier today, and 455 while you're looking. Look at both of those.  I'm going to ask you to turn to page 8 of Exhibit 455 -- excuse me -- 454. Page 8 of Exhibit 454.

A   Okay.

Q   Mr. Williams asked you some questions about this list here, and I have some follow-up.  So do you see the list beginning on page 8 and continuing on to page 9 of 40 entities and individuals?

A   Yes.

Q   Okay.  Now, that list includes medical facilities that were customers of Skye, doctors who use Skye products, and some doctors who had consulting relationships with Skye; is that fair?

A   Research agreement in the last one, but yes.

HIGHLY CONFIDENTIAL

Page 674

Q    Okay.  Let's talk about the facilities first for a minute.  Did Skye have any contracts with the facilities listed here that prohibited the facility from purchasing product from another supplier?

A    No.

Q    Now let's talk about the doctors who used products at those facilities.  Did Skye have any contracts with those doctors that prohibited the doctors from using products provided by other suppliers?

A    No.

Q    The third category, I think you said, was doctors with whom Skye had research agreements; is that right?

A    Yes.

Q    Did Skye have any contracts with those doctors that prohibited those doctors from using products supplied by another supplier?

A    For them personally using on their patients?

Q    Yes.

A    No.

Q    Look at 450- -- actually, before we go there.  Sorry.  Has Skye or HRT filed any lawsuits

HIGHLY CONFIDENTIAL

Page 675

against any of the individuals or entities listed on pages 8 through 9 for breaching any contracts?

A    No.  I don't believe so, no.

Q    Does Skye allege that any entity or individual on that list has breached a contract with Skye?

A    No.

Q    Okay.  Let's look at 455 now and specifically page -- well, beginning on page 9.  And again, Mr. Williams asked you some questions about the entities and individuals listed on pages 9 through 11.  Do you see that list there of 65 entities and individuals?

A    Yes.

Q    Okay.  Now, am I correct that this list includes medical facilities that were customers of Skye, doctors who used Skye products at medical facilities, and doctors with whom Skye had a research relationship?

A    I'm just taking a quick look.

Q    Sure.

A    Yes.

Q    Okay.  Did Skye have any contracts with the medical facilities on this list that prohibited the facility from purchasing products from another

HIGHLY CONFIDENTIAL

**Page 676**

supplier?

A   No.

Q   Did Skye have any contracts with the doctors on this list who used Skye products that prohibited the doctors from using products supplied by another company?

A   No.

Q   Focusing on the doctors who had consulting relationships with Skye, did Skye have any contracts with those doctors that prohibited the doctors from using products offered by another supplier?

A   No.

Q   Has Skye sued any of the entities or individuals on this list for breach of contract?

A   No, we haven't.

Q   Does Skye allege that any of the individuals or entities on that list have breached a contract with Skye?

A   Not at this time.

Q   You said "not at this time."  Do you believe that any entity or individual on that list has breached a contract with Skye?

MR. SABA:  Calls for a legal conclusion. May invade the attorney work product, but you can answer.

HIGHLY CONFIDENTIAL

Page 677

THE WITNESS:  I haven't looked at this in fine detail.  So at this time, you know, we're not choosing to do anything or alleging that.

BY MR. FLUSKEY:

Q   Okay.  My last series of questions focused on medical facilities on this list.  Let me be more broad now.  Does Skye have contracts with any of its medical facility customers that prohibits the facility from purchasing product from another supplier?

A   No, that's not customary in our industry.

THE REPORTER:  Can we go off the record for a minute?

MR. FLUSKEY:  Sure.

THE VIDEOGRAPHER:  We're now off the record.  The time is 11:45 a.m.

(Recess.)

THE VIDEOGRAPHER:  We're now on the record. The time is 11:47 a.m.

BY MR. FLUSKEY:

Q   Okay.  Mr. Sharp, do you have Exhibit 454 in front of you?

A   Yes.

Q   I want to ask one more question about that. If you look at pages 8 to -- excuse me.  Yes, 8 to

HIGHLY CONFIDENTIAL

Page 697

A    It's the cost to -- that we would pay to make our products.

Q    Is that the cost you would pay to HRT?

A    Well, HRT didn't make those products I was just mentioning, part of those.  HRT only makes placental tissue products.

Q    During this timeframe -- let's do '14 to '15 -- was Skye paying HRT to make -- strike that.

In 2014, 2015, was Skye paying HRT for placental products?

A    Yeah.  Skye created HRT and funded it, and then had to transfer pricing to pay for units that HRT would make for Skye.

Q    Let me peel back the layers on that.  In the "Cost of Goods Sold" row -- let's look at '15, for example.  In 2015, Skye was selling placental products; correct?

A    Yes.

Q    There's a figure there under 2015 for "Cost of Goods Sold."  Does that figure include any amounts that Skye paid to HRT for product manufacturing?

A    Yes.  It would be -- as I mentioned, it would be for -- that would -- that's catching all the products that we had made for us, right.

HIGHLY CONFIDENTIAL

Page 757

A    Yes.

MR. SABA:  Now, the question -- the problem is the question is just -- does it reveal what we've already agreed would be confidential information.  I would need to ask him privately if he wants to divulge that.  I know what the answer is.  I'm sure he does, too, but would require us to go off the record.  Do you really need that information?

MR. FLUSKEY:  Well, I think I do.  But if you guys want to talk during the next break after someone else questions --

MR. SABA:  Okay.  Why don't we come back to it, and then we can deal with it later.  It's better than taking a special break just for that question or I can -- if we agree to tell you, tell you offline as well.

MR. FLUSKEY:  Well, if you agree to tell me, we'll get it on the record, but we'll table that until later.

MR. SABA:  That's fine.

BY MR. FLUSKEY:

Q    All right.  Mr. Sharp, who do you consider to be Skye's customers in the market for selling placental tissue -- excuse me -- Skye's competitors in the market for selling placental tissue?

HIGHLY CONFIDENTIAL

Page 758

A    Can you repeat the question?  Sorry.

Q    Sure.  Who do you consider to be Skye's competitors in the market for placental tissue?

MR. SABA:  You're talking about today?

MR. FLUSKEY:  Today.

THE WITNESS:  It depends which market we're selling in.

BY MR. FLUSKEY:

Q    Let's talk about surgical specifically.

A    Okay.

Q    Who do you consider to be Skye's competitors in the market for selling placental tissue for surgical applications?

A    Yes.  So say MiMedx, Organogenesis, I guess, CTM.  I said Organo.  Amnio Technologies, Tides Medical.  Actually, Tides, no, they're not selling surgical anymore.  That's what I've got right now.

Q    Let me ask you about some other companies.

A    Sure.

Q    BioD --

A    Yes.

Q    -- do you consider them a competitor?

A    That's Integra.

Q    Yeah.

HIGHLY CONFIDENTIAL

Page 767

on the list.  Are those all the same products --

A    Yes.

Q    -- or different products?

A    Correct.  Those are our Active Barrier 2000's.  So that's our cord -- sorry.  Let me back up.  ████████████████████████████████

█████████████████████████  ████████████████████████████

████████████████████████████████████████████

████████████████████

Q    And that's -- what is that one again?

A    That's the Active Barrier 200.

Q    And what are the last two?

█  ██████████████████████████████  ███████

██████████████████████████████████

██████████████████████████████

Q    Are all the products listed on this Exhibit 468, are they still offered by Skye?

A    Yes.

Q    Are any of these products currently on an FSS?

A    Yes.

Q    Are all of them currently on an FSS?

A    I believe so, but I'd have to compare to be exact, but they should be.

Q    Okay.  And is Academy Medical the FSS

HIGHLY CONFIDENTIAL

Page 768

licensee or the FSS vendor, I should say?

A    Yes.  Yes.

Q    I'm sorry.  I didn't mean to talk over you there.

Speaking of Academy Medical, when did Skye begin selling into VA healthcare facilities?

A    Like period, first time ever --

Q    Yeah.

A    -- or Academy?

Q    First time ever.

A    I mean, it was --

Q    Like I would say "now speaking of Academy," and then I ask you a question that doesn't have anything to do with Academy?

MR. SABA:  It's an old lawyer trick.  Don't get fooled.

THE WITNESS:  Oh, sorry.  You're testing my memory.  I mean, I believe through Gardner, it was back -- so Veterans Medical was back in, I believe, 2017.  Might have been as early as -- I think it was 2016, actually.  Prior to that, I can't recall if we had a couple sales before we met Gardner.

BY MR. CAVANAUGH:

Q    We'll get to that in a minute.  There's some revenue documentation that's been provided that

HIGHLY CONFIDENTIAL

Page 776

agreement with VMD --

A    Yes.

Q    -- that terminated at the end of 2018?

A    Yes.

Q    Was the Academy Medical submission made in the year 2018?

A    I have to look at my records.  It was after the termination with Gardner.

Q    Was it after Gardner gave you written notice of intent --

A    Yes, of course.  That's why we had to do it.

Q    I know you're telling me to pick up the pace here.  Let me finish the question.

When you say after it terminated, do you mean after Gardner gave you written notice of intent not to renew or was it after 2018 is over?

A    I'd have to look at my records.

Q    Okay.  When were -- when did you obtain approval to have Skye products listed on Academy Medical's FSS?

A    It was in '19.

Q    First half of 2019?  Second half of 2019?

A    It was early '19, yeah.

Q    Is it your recollection that from the time

HIGHLY CONFIDENTIAL

Page 796

with them.

Q   Has anyone at the Long Beach VA communicated to you or anyone at Skye that it won't buy your products anymore because VMD is not distributing your products?

A   Not to my knowledge, no.

Q   Are you aware of any facts that support your opinion that you don't have sales into Long Beach VA since 2018 because VMD is no longer distributing your products?

A   What I know is that we were doing substantial business in these six or seven VAs through VMD, and all of a sudden, our agreement is terminated, and then subsequently, all that business evaporated.  So I think it's quite a coincidence.

Q   Isn't it true, though, that Skye does the selling, and VMD did the paperwork?

A   But if there's a disruption in the processing of paperwork, people don't want to do business with you.

Q   The disruption in what?

A   In the paperwork, in the processing of PO's and invoices, and -- see, they would quarterback product being shipped, product being -- you know, invoicing for that product, replenishment for the

HIGHLY CONFIDENTIAL

Page 801

were still doing part of that in order for us to maintain that Long Beach relationship, and we were paying VMD for those services or just paying to remain under VMD.

Q   Do you remember who the doctor was that Billy Trengove had the relationship with at Long Beach?

A   I can't remember the doctor.  Sorry.

Q   Is that doctor still there?

A   I'm not sure.  I don't keep track of all the doctors.  Sorry.

Q   Did Skye or HRT ever have a contract with Long Beach VA?

A   A direct contract with Long Beach?

Q   Yes.

A   I don't recall.

Q   Did Skye or -- did Long Beach VA ever make any promises to Skye or HRT with regard to purchases of Skye products?

A   I don't believe so.

Q   Did Long Beach VA ever give Skye an understanding that it would purchase Skye products?

A   I don't believe so.

Q   Now, you said with Gardner, you've never met him in person.  I know you said that.  Have you

HIGHLY CONFIDENTIAL

Page 804

Q   2014 -- let me just correct this.  2014 is Exhibit 277.  The 2018 agreement is 278.

A   Right.

Q   Given that you -- given that Skye entered into a new agreement with VMD in 2018, would it be fair to say that Skye was satisfied with VMD services from 2014 through 2017?

A   Yes.

Q   Did you ever tell anyone on your team not to continue Skye's relationship with VMD?

A   No.

Q   Anybody on your team ever tell you that you shouldn't continue that relationship?

A   No.  I think we questioned it, but we never -- no.

Q   The 2018 agreement, it's 278, this one.

A   Okay.

Q   It's on Skye letterhead.  Was it prepared by Skye?

A   Yes.

Q   There's a clause entitled "Previous Agreements" --

A   At the bottom?

Q   -- at the bottom.

A   Yes.

HIGHLY CONFIDENTIAL

Page 805

Q    And does that clause mean that it supersedes the 2014 agreement or any other prior agreement?

MR. SABA:  Calls for a legal conclusion.

THE WITNESS:  Yes, that's what it says.

BY MR. CAVANAUGH:

Q    And this 2018 agreement included a "Non-Circumvention" clause.  Do you see that?

A    Yes.

Q    And did that clause forbid VMD from distributing products for other amniotic or placental manufacturers during the period of this agreement?

A    Yes.

Q    Are you aware of any evidence that VMD ever violated that provision?

MR. SABA:  Still calls for a legal conclusion as well, but you can answer to the best of your knowledge.

THE WITNESS:  Yeah, not that I'm aware of.

BY MR. CAVANAUGH:

Q    Are you aware of any evidence that VMD sold human tissue, amniotic, or placental products for any other companies in 2018?

A    I'm not sure.  I can't -- I can't answer

HIGHLY CONFIDENTIAL

Page 806

that.  He terminated this in September of 2018.  So I'm not sure what happened after that or before.

Q   Okay.  And so hoping to get an answer.  Are you aware -- either individually or in your capacity as a 30(b)(6) representative for the Plaintiffs, are you aware of any evidence that VMD sold any human tissue, placental, or amniotic products for any other manufacturers in 2018?

A   Other than Gardner demanding that I needed to alter the agreement so that he can sell for another company, which implies he's going to, I have no other evidence.

Q   Okay.  And forgetting the implication here, do you have any evidence -- do you know of any evidence that VMD sold other amniotic or placental products in 2018?

A   I don't have any other evidence other than him suggesting that that's what he was going to do.

Q   Well, did he tell you he wanted to sell for other companies in 2018?

A   Well, I don't know why the rush to -- before the term of our '18 agreement was up to call and to demand that if I don't give him the ability to sell for another company, he'll terminate my agreement.  So to me, that speaks for itself.

HIGHLY CONFIDENTIAL

Page 826

misappropriated any trade secrets -- any of its trade secrets?

MR. SABA:  I'm sorry.  Can you repeat that question for me.

MR. CAVANAUGH:  I'll try it again.

MR. SABA:  Okay.

BY MR. CAVANAUGH:

Q    Do Plaintiffs contend that VMD or Rogers misappropriated any Skye or HRT trade secrets?

MR. SABA:  Okay.  That calls for a legal conclusion.  Also, the complaint is a document which speaks for itself which sets forth the allegations.

You can answer under your own lay opinion.

THE WITNESS:  Yeah, I think the complaint speaks for itself.  As we have it in there, that's our belief.

BY MR. CAVANAUGH:

Q    What exact trade secrets do Plaintiffs contend were misappropriated by Rogers or VMD?

A    Again, he had knowledge of, you know, our products, what we're selling at, what price, what VAs, what doctors we're using that he was never introduced to this space before.  Okay.  I mean, we're the first amniotic placental company to ever work with his VA distributorship, right.  So he

HIGHLY CONFIDENTIAL

Page 827

gained all that knowledge and information.

So if he then picks up a competitor like he's asking, right -- that he asked me, then he has a leg up. He can instantly go in. He knows our pricing. He can choose which company to put in because he controls the invoicing and shipment of product and what have you. So yes, those are things that we feel that he had knowledge of and potentially was using.

Q   Okay. Knowledge of is one thing. Potentially using is another. I'm asking what exact trade secrets did Rogers or VMD misappropriate?

A   As I said, I don't -- I don't -- you know, I know what companies he sold for. He was asking to sell for another company, have access, and had specific trade secrets that were ours.

Q   What were the trade secrets that he had that were yours?

MR. SABA:  Asked and answered.

THE WITNESS:  Thank you.

BY MR. CAVANAUGH:

Q   He knew what products you sell?

A   I just went through it. I said that he knew what the price --

Q   The whole world -- the whole world knows

HIGHLY CONFIDENTIAL

Page 828

what products you sell into VA hospitals -- into VA facilities.

MR. SABA:  Misstates his testimony.

BY MR. CAVANAUGH:

Q    The whole world can know -- can find that out.

MR. SABA:  Misstates his testimony.

THE WITNESS:  How does the whole world know?  It's not on the internet.

BY MR. CAVANAUGH:

Q    Okay.

A    It does not --

Q    Do you contend -- so what -- so what's the trade -- if he has -- if he knows -- what's trade secret about a product name?

A    I never said the product name.

Q    Did he have any of the product formulations?

A    He didn't have the product formulations.

Q    Did he have any of the development files?

A    He didn't have those.

Q    Did he have any of the manufacturing protocols?

A    No, not those.

Q    Design protocols?

HIGHLY CONFIDENTIAL

Page 829

A   No.

Q   Did he have your customer lists?

A   Yeah, he had a customer list of seven VAs that we were actively selling into, and as you saw, those dried up.

Q   Did he have -- did he have any other customer lists of Skye?

A   No.  Just -- just the VA.

Q   Did he have Skye's employee information?

A   Those employees that he interacted with, yes.

Q   What employee information does Skye contend is a trade secret?

A   I never said employee information is a trade secret.

Q   I know you didn't, but you said the complaint speaks for itself, and it's in the complaint.  So I'm asking you what employee information is a trade secret that Rogers also possessed and misused and misappropriated?

A   At the top of my head, I can't -- I can't recall.

Q   Are you aware of any factual evidence that Rogers or VMD has misappropriated any Skye or HRT trade secrets?

HIGHLY CONFIDENTIAL

Page 830

MR. SABA:  Other than what your attorneys have told you, which would be attorney/client privilege.

THE WITNESS:  Right.

BY MR. CAVANAUGH:

Q    I'm asking for facts.

A    I mean, we have facts where we know, you know, he was collecting everything from -- he was collecting checks for Banman.  Okay.

Q    Okay.  I'm going to -- I need to write these down.

A    Okay.  While he was under contract with us, he's collecting checks with Banman.  They're best friends.  Families know each other well.  And then suddenly, we're told hey, you know, you got to change your agreement, okay, to allow me to sell somebody else.  Well, who else has a competing company?  Banman.  And then something happens to our FSS that's not true, right, to interfere with, and then it just kind of evaporates.  So those are just some of the issues.

Q    But I'm really trying to be very targeted here.  I'm asking about the facts that support the allegation that Rogers or VMD misappropriated any Skye or HRT trade secrets.

HIGHLY CONFIDENTIAL

Page 831

A    I think I've answered that in that there's seven VAs that we developed with and taught him how to -- you know, worked with him to get into those seven VAs.  There were doctors using those that weren't using, you know, our products before or to my knowledge, a competitor's product.  He knew exactly, you know, what the pricing needed to be. He had control over what product he could put in that facility.

Okay.  And we feel those are our trade secrets.  That that information gives a competitor a leg up that was our information that the common person would not know.  It's not known around the world.

Q    How do you know -- how do you know he's using any of it?

A    I don't know.  Seems -- seems like a lot happened here to us, you know.

Q    How do you know he's using any of it?

A    He asked us if he could sell a competitor or demanded it.  So it would lead me to believe that you would only ask that if that was your intent.

Q    Is it your belief that it's a misappropriation of a Skye trade secret if VMD ever distributes a competitive product to anyone?

HIGHLY CONFIDENTIAL

Page 832

A    If they use the information that they learned while working with us, yes.

Q    And what information did he learn through Skye that he's using today or has ever used even one time since January 1st of 2019?

A    I don't know if he's used it, how many times.  Okay.  I've laid out the facts that we know, and we'll let a jury decide.  I've answered the question.

Q    Well, I've got collecting checks for Banman, best friends, and suddenly wanted to change the agreement.

A    And contract interference with our FSS.

Q    Hold on.  Hold on.  Is interference with the FSS a misappropriation of a trade secret?

A    I didn't say that.

Q    See, that's what I'm asking you.  I just want to know the facts that support the trade secret misappropriation claim.

A    I feel I've answered your question.  Sorry.

Q    Okay.  Do you know if VMD has distributed products into any of the seven VAs that he distributed Skye into since 2019?

A    I'm not sure.

Q    Do you know if VMD distributed any tissue,

HIGHLY CONFIDENTIAL

Page 833

placental, or amniotic products for any competitors in 2019?

A    I'm not sure.

Q    How about in 2020?

A    I haven't been following him.

Q    How about in 2022?

A    I'm not sure.

Q    So how is he using all this stuff?

A    I'm not a private investigator.  I haven't gone looking specifically.  It's just everything that happened would lead us to believe that he's a bad actor, and he's done -- he's done things that look like he was doing it -- he, A, interfered with our business; and B, he was going to be working with a competitor, and he's good friends with Banman, and he's got a competing company.  Somehow, they all work together to create what they have.

Q    Are you aware of any evidence that VMD has ever distributed a product for CTM?

A    I'm not personally aware.

Q    Are you aware of any evidence that VMD has ever distributed a product for Vyvex?

A    I'm not sure.

Q    Okay.  Do you have any evidence that Rogers or VMD have ever disclosed Skye prices to anyone?

HIGHLY CONFIDENTIAL

Page 834

A    I don't have evidence of it.

Q    Are you aware of any evidence that Rogers or VMD has disclosed to anyone the identity of the VA facilities that he used to distribute your products into?

A    No, I don't.

Q    Do you have any evidence that Rogers or VMD has ever distributed products to a physician that he distributed Skye products to?

A    No.

Q    Are you aware of any evidence that Rogers or VMD have used any alleged Skye or HRT trade secrets since 2019?

A    No.

Q    Do the Plaintiffs contend that Rogers conspired with anyone to harm Skye or HRT?

A    Yes.

MR. SABA:  The complaint speaks for itself. Also calls for a legal conclusion.

MR. CAVANAUGH:  Who --

MR. SABA:  Go ahead.

BY MR. CAVANAUGH:

Q    With whom?

A    CTM and Bryan Banman.

Q    And when did they do that?

HIGHLY CONFIDENTIAL

Page 850

MR. CAVANAUGH:  You want to use that one or this one?

MR. SABA:  You can hand him that one, but it's already been --

MR. FLUSKEY:  Exhibit 80.

BY MR. CAVANAUGH:

Q   It's Exhibit 80.  I'm going to direct your attention to 107.  Okay.  The allegation concludes with the following, "Under Banman's direction, Rogers knowingly misrepresented to the NAC that Skye was not a viable candidate."  Do you see that?

A   I do.

Q   What is the factual basis for the contention that Rogers told anyone at NAC that Skye was not a viable candidate?

A   All of a sudden, it disappeared.  We were in.  It was in a pile to be reviewed.  We were lied to, told that it actually was denied, and then we were told that it was withdrawn.  So somebody or a group of individuals interfered with it.

Q   Are you aware of any evidence that Rogers ever communicated to anyone at the NAC that Skye was not a viable candidate?

A   No, but it's highly suspicious when he says it was denied, and then subsequently terminates, and

HIGHLY CONFIDENTIAL

Page 851

then it's withdrawn.

Q    Move to strike everything after "no" as not responsive.

Do you have any evidence that Rogers told anyone at NAC that Skye was not a viable candidate? Yes or no?

MR. SABA:  He just answered that question. His answer will stand.

MR. CAVANAUGH:  I don't want to have to move to strike non-responsive stuff.

MR. SABA:  Just because you don't like an answer does not make it a motion to strike.  It's asked and answered.  Let's move on.

BY MR. CAVANAUGH:

Q    Paragraph 110 -- you know, stay back there on 108.

A    Okay.

Q    The end of the allegation there, "Rogers lied to get out of the contract with Skye based on Banman's representation such that he could enter into a more financially lucrative agreement with Banman," are you aware of any evidence that Rogers and VMD and Banman or CTM ever entered into a more financially lucrative agreement?

A    No, I don't have -- I don't have evidence

HIGHLY CONFIDENTIAL

Page 852

of an agreement.

Q    Are you able to identify any valid and then existing contract with which Rogers or VMD interfered?

A    Can you repeat the question?

Q    Yes.  Can you identify any valid then existing contract with which Rogers or VMD interfered?

A    No.

Q    In 109 -- I think it's 109.  "Plaintiffs are informed and believe and based thereon allege Banman, CTM Med, and CTM manipulated, failed to act with due care, and/or otherwise wrongfully interfered with the application process to the NAC." How did that happen?  What was that manipulation? How did Banman or CTM manipulate the application process?

A    Those two were extremely involved.  In fact, they were driving that application, okay, in contact on the other side, and miraculously, you know, six months later, it's withdrawn.

Q    Well, does paragraph 109 allege that Rogers or VMD manipulated the application process?

A    No.  I apologize.  No.

Q    Does it say that Rogers --

HIGHLY CONFIDENTIAL

Page 853

A    Not Rogers.

Q    Does it say Rogers or VMD failed to act with due care with regard to the application process?

A    No, no.

Q    Does it allege that Rogers or VMD wrongfully interfered with the application process?

A    No, it doesn't.

Q    So there's no claim in this case that Rogers or VMD manipulated the FSS application; is that correct?

A    I'd have to ask my attorney.

Q    It's not any- -- it's not anywhere else in the complaint.

A    If it's not, I guess not.

Q    Okay.  Then with regard to failure to act with due care or wrongful interference with the application process, it's not alleged in the complaint.  It's not alleged in the case.  Fair?

MR. SABA:  The complaint speaks for itself, but it depends on what you're asking.

MR. CAVANAUGH:  That's why I asked.

THE WITNESS:  I guess, if it's not in here, maybe we should take a look at that.

MR. CAVANAUGH:  I'm going to look through

HIGHLY CONFIDENTIAL

Page 861

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: September 20, 2022

*Maria Ellersick*

MARIA ELLERSICK

CSR No. 10531