Paul T. Martin (SBN 155367)
  *pmartin@hgla.com*
Thomas H. Case (SBN 116660)
  *tcase@hgla.com*
HENNELLY & GROSSFELD LLP
4640 Admiralty Way, Suite 850
Marina del Rey, CA 90292
Telephone: (310) 305-2100
Facsimile: (210) 305-2116

Robert J. Fluskey, Jr. *(pro hac vice)*
  *rfluskey@hodgsonruss.com*
Ryan K. Cummings *(pro hac vice)*
  *rcumming@hodgsonruss.com*
Matthew K. Parker *(pro hac vice)*
  *mparker@hodgsonruss.com*
HODGSON RUSS LLP
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202-4040
Telephone: (716) 856-4000
Facsimile: (716) 849-0349

Attorneys for Defendants
CTM Biomedical, LLC, Bryan Banman,
CTM Medical, Inc., and Pablo Seoane

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| SKYE ORTHOBIOLOGICS, LLC, a Delaware Limited Liability Company, HUMAN REGENERATIVE TECHNOLOGIES, LLC, a Delaware Limited Liability Company, <br> Plaintiffs, <br><br> vs. <br><br> CTM BIOMEDICAL, LLC, a Delaware Limited Corporation; BRYAN BANMAN, an individual; CTM MEDICAL INC., a Delaware Corporation; VETERANS MEDICAL DISTRIBUTORS, INC.; a Florida Corporation; GARDNER ROGERS, an individual; MIKE STUMPE, an individual; PABLO SEOANE aka PAUL SEOANE, an individual; NATHAN BOULAIS, an individual; and DOES 3 through 10, inclusive, <br> Defendants. | Civil Case No. 2:20-cv-03444-MEMF (PVCx) <br><br><br><br> **REPLY DECLARATION OF ROBERT FLUSKEY IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Date: February 9, 2023 <br><br> Time: 10:00 a.m. <br><br> Courtroom: 8B |

1

Robert Fluskey, under penalty of perjury and pursuant to 28 U.S.C. Section 1746, declares the following to be true and correct:

I am an attorney with Hodgson Russ LLP, counsel to defendants CTM Biomedical, LLC ("CTM"), Bryan Banman ("Banman"), CTM Medical, Inc. ("CTM Med"), and Pablo Seoane ("Seoane") (collectively, the "CTM Defendants"). I submit this reply declaration in further support of the CTM Defendants' motion for summary judgment seeking dismissal of Plaintiffs' First through Sixth, Eighth, and Ninth causes of action.

1. Attached as **Exhibit 1** are additional relevant pages of the deposition transcripts of Christopher Sharp, dated March 29, 2022, March 30, 2022, and September 7, 2022.

2. Attached as **Exhibit 2** are relevant pages of the deposition transcripts of Bryan Banman, dated April 5, 2022 and April 6, 2022.

3. Attached as **Exhibit 3** are additional relevant pages of the deposition transcript of Maria Carey, dated April 7, 2022.

4. Attached as **Exhibit 4** are relevant pages of the deposition transcript of Pablo Seoane, dated October 5, 2022.

5. Attached as **Exhibit 5** are additional relevant pages of the deposition transcript of Christina Chin-Sang, dated September 22, 2022.

6. Attached as **Exhibit 6** are additional relevant pages of the deposition transcript of Kim Shoen, dated September 21, 2022.

7. Attached as **Exhibit 7** are additional relevant pages of the deposition transcript of Arnold Lee Andrews Jr., dated March 17, 2022.

8. Attached as **Exhibit 8** is an Agreement entered into between Skye and BJ Benik, dated September 22, 2022, which Plaintiffs produced in discovery in this action.

9. Attached as **Exhibit 9** are relevant pages of the deposition

transcript of Mike Stumpe, dated May 25, 2022.

10.    Attached as **Exhibit 10** are the response letters sent by Pablo Seoane to Skye, dated June 11, 2020 and June 15, 2022.

11.    Attached as **Exhibit 11** are relevant pages of the deposition transcript of Priscilla Lee, dated September 29, 2022.

12.    Attached as **Exhibit 12** is a copy of Judge Frimpong's Civil Standing Order, which was accessed from the Court's website.


Dated:  December 19, 2022

s/*Robert J. Fluskey, Jr.*
Robert J. Fluskey, Jr.

3

CASE NO: 2:20-cv-03444-MEMF-PVC

16382155v1

# Exhibit 1

HIGHLY CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

SKYE ORTHOBIOLOGICS, LLC, A DELAWARE LIMITED LIABILITY COMPANY, HUMAN REGENERATIVE TECHNOLOGIES, LLC, A DELAWARE LIMITED LIABILITY COMPANY,   No. 2:20-CV-03444-MEMF (PVCX)

            Plaintiffs,

        vs.

CTM BIOMEDICAL, LLC, A DELAWARE LIMITED CORPORATION; BRYAN BANMAN, AN INDIVIDUAL; CTM MEDICAL, INC., A DELAWARE CORPORATION; VETERANS MEDICAL DISTRIBUTORS, INC., A FLORIDA CORPORATION; GARDNER ROGERS, AN INDIVIDUAL; MIKE STUMPE, AN INDIVIDUAL; PABLO SEOANE AKA PAUL SEOANE, AN INDIVIDUAL; NATHAN BOULAIS, AN INDIVIDUAL; AND DOES 3 THROUGH 10, INCLUSIVE,

            Defendants.

_____

** HIGHLY CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF CHRISTOPHER SHARP

El Segundo, California

Tuesday, March 29, 2022

Volume I

Reported by:

MARIA ELLERSICK

CSR No. 10531

Job No. 5154374

PAGES 1 - 267

HIGHLY CONFIDENTIAL

Page 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION


SKYE ORTHOBIOLOGICS, LLC, A
DELAWARE LIMITED LIABILITY
COMPANY, HUMAN REGENERATIVE
TECHNOLOGIES, LLC, A DELAWARE
LIMITED LIABILITY COMPANY,   No. 2:20-CV-03444-MEMF
                                     (PVCX)
          Plaintiffs,
      vs.
CTM BIOMEDICAL, LLC, A
DELAWARE LIMITED CORPORATION;
BRYAN BANMAN, AN INDIVIDUAL;
CTM MEDICAL, INC., A DELAWARE
CORPORATION; VETERANS MEDICAL
DISTRIBUTORS, INC., A FLORIDA
CORPORATION; GARDNER ROGERS,
AN INDIVIDUAL; MIKE STUMPE,
AN INDIVIDUAL; PABLO SEOANE
AKA PAUL SEOANE, AN
INDIVIDUAL; NATHAN BOULAIS,
AN INDIVIDUAL; AND DOES 3
THROUGH 10, INCLUSIVE,
          Defendants.


_____

        Videotaped Deposition of CHRISTOPHER SHARP,
Volume I, taken on behalf of Defendants CTM
Biomedical, LLC, at 2301 Rosecrans Avenue,
Suite 3180, El Segundo, California, beginning at
9:14 a.m. and ending at 5:37 p.m. on Tuesday,
March 29, 2022, before MARIA ELLERSICK, Certified
Shorthand Reporter No. 10531.

HIGHLY CONFIDENTIAL

Page 3

APPEARANCES:


For Plaintiffs:

ROSEN, SABA, LLP

BY:  RYAN D. SABA

BY:  LAURA K. ST. MARTIN (Via videoconference)

Attorneys at Law

2301 Rosecrans Avenue, Suite 3180

El Segundo, California 90245

(310) 285-1727

Email:  rsaba@rosensaba.com


For Defendants CTM Biomedical, LLC, Bryan Banman,

CTM Medical, Inc., and Pablo Seoane:

HODGSON, RUSS, LLP

BY:  ROBERT J. FLUSKEY

BY:  MATTHEW K. PARKER (Via videoconference)

Attorneys at Law

The Guaranty Building

140 Pearl Street, Suite 100

Buffalo, New York 14202

(716) 856-4000

Email:  rfluskey@hodgsonruss.com

HIGHLY CONFIDENTIAL

Page 4

APPEARANCES (Continued):

For Defendants Gardner Rogers and Veterans
Medical Distributors, Inc.:

    YUKEVICH, CAVANAUGH

    BY:  TODD A. CAVANAUGH

    BY:  HASSAN ELLRAKABAWY (Via videoconference)

    Attorneys at Law

    355 South Grand Avenue, 15th Floor

    Los Angeles, California 90071

    (213) 362-7777

    Email:  tcavanaugh@yukelaw.com

For Defendant Mike Stumpe:

    BLANK ROME, LLP

    BY:  ARASH BERAL

    Attorney at Law

    (Via Videoconference)

    2029 Century Park East, 6th Floor

    Los Angeles, California 90067

    (424) 239-3453

    Email:  arash.beral@blankrome.com

HIGHLY CONFIDENTIAL

Page 5

APPEARANCES (Continued):

For Defendant Nathan Boulais:

    BIENERT, KATZMAN, LITTRELL, WILLIAMS, LLP

    BY:  MICHAEL R. WILLIAMS

    Attorney at Law

    (Via Videoconference)

    903 Calle Amanecer, Suite 350

    San Clemente, California 92673

    (949) 369-3700

    Email:  mwilliams@bklwlaw.com

Also Present:

    Bryan Banman

    Gardner Rogers (Via videoconference)

    Mike Stumpe (Via videoconference)

    Pablo Seoane (Via videoconference)

Videographer:

    JOSHUA OSHIMA

HIGHLY CONFIDENTIAL

Page 10

MR. PARKER:  He was.  I think he may have dropped off.

MR. SABA:  Okay.  Thanks folks.


CHRISTOPHER SHARP,

having been administered an oath, was examined and testified as follows:


EXAMINATION

BY MR. FLUSKEY:

Q   Good morning, Mr. Sharp.

A   Good morning, Rob.

Q   You are testifying here today as a representative of Human Regenerative Technologies, LLC?

A   Correct.

Q   You're also testifying here today as a representative of Skye Orthobiologics, LLC.  Do you understand that?

A   Yes, I do.

Q   Okay.  What is your current position with Human Regenerative Technologies, LLC?

A   I'm the CEO.

Q   And I'm going to refer to that company as "HRT."  Okay?

HIGHLY CONFIDENTIAL

Page 90

tissue, okay, and we refer to that as "paste."  And we have E-mail from Banman, you know, we talked about how this would be a great product, you know. I went in the lab, tested it right after that, and looked at it, took pictures, yes.

Q   Did HRT ever manufacture and sell a paste product?

A   No, we didn't.  Not at that time.

Q   Now, the paste product you're referring -- not at that time, you said?

A   No.  We've yet to do it.

Q   Okay.

A   We made prototypes and versions of it.

Q   The paste that you're referring to here?

A   Yes.

Q   The paste product.  So you're referring to something that was internal to HRT, but not sold; is that right?

A   That's correct.

Q   Okay.  What was the paste?  What was it?

A   I just went through that.  You mean the process?

Q   No, no.  The paste, what was it?  What components of the placenta were in this paste product that you say you were working on with Bryan

HIGHLY CONFIDENTIAL

**Page 268**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

SKYE ORTHOBIOLOGICS, LLC, A DELAWARE LIMITED LIABILITY COMPANY, HUMAN REGENERATIVE TECHNOLOGIES, LLC, A DELAWARE LIMITED LIABILITY COMPANY,    No. 2:20-CV-03444-MEMF (PVCX)

Plaintiffs,

vs.

CTM BIOMEDICAL, LLC, A DELAWARE LIMITED CORPORATION; BRYAN BANMAN, AN INDIVIDUAL; CTM MEDICAL, INC., A DELAWARE CORPORATION; VETERANS MEDICAL DISTRIBUTORS, INC., A FLORIDA CORPORATION; GARDNER ROGERS, AN INDIVIDUAL; MIKE STUMPE, AN INDIVIDUAL; PABLO SEOANE AKA PAUL SEOANE, AN INDIVIDUAL; NATHAN BOULAIS, AN INDIVIDUAL; AND DOES 3 THROUGH 10, INCLUSIVE,

Defendants.

_____

** HIGHLY CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF CHRISTOPHER SHARP

El Segundo, California

Wednesday, March 30, 2022

Volume II

Reported by:

MARIA ELLERSICK

CSR No. 10531

Job No. 5156783

PAGES 268 - 545

HIGHLY CONFIDENTIAL

**Page 269**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

SKYE ORTHOBIOLOGICS, LLC, A
DELAWARE LIMITED LIABILITY
COMPANY, HUMAN REGENERATIVE
TECHNOLOGIES, LLC, A DELAWARE
LIMITED LIABILITY COMPANY,    No. 2:20-CV-03444-MEMF
                              (PVCX)

        Plaintiffs,
    vs.
CTM BIOMEDICAL, LLC, A
DELAWARE LIMITED CORPORATION;
BRYAN BANMAN, AN INDIVIDUAL;
CTM MEDICAL, INC., A DELAWARE
CORPORATION; VETERANS MEDICAL
DISTRIBUTORS, INC., A FLORIDA
CORPORATION; GARDNER ROGERS,
AN INDIVIDUAL; MIKE STUMPE,
AN INDIVIDUAL; PABLO SEOANE
AKA PAUL SEOANE, AN
INDIVIDUAL; NATHAN BOULAIS,
AN INDIVIDUAL; AND DOES 3
THROUGH 10, INCLUSIVE,
        Defendants.

_____

        Videotaped Deposition of CHRISTOPHER SHARP,
Volume II, taken on behalf of Defendants CTM
Biomedical, LLC, at 2301 Rosecrans Avenue,
Suite 3180, El Segundo, California, beginning at
9:13 a.m. and ending at 5:51 p.m. on Wednesday,
March 30, 2022, before MARIA ELLERSICK, Certified
Shorthand Reporter No. 10531.

HIGHLY CONFIDENTIAL

Page 270

APPEARANCES:


For Plaintiffs:

     ROSEN, SABA, LLP

     BY:  RYAN D. SABA

     BY:  LAURA K. ST. MARTIN (Via videoconference)

     Attorneys at Law

     2301 Rosecrans Avenue, Suite 3180

     El Segundo, California 90245

     (310) 285-1727

     Email:  rsaba@rosensaba.com


For Defendants CTM Biomedical, LLC, Bryan Banman,

CTM Medical, Inc., and Pablo Seoane:

     HODGSON, RUSS, LLP

     BY:  ROBERT J. FLUSKEY

     BY:  MATTHEW K. PARKER (Via videoconference)

     Attorneys at Law

     The Guaranty Building

     140 Pearl Street, Suite 100

     Buffalo, New York 14202

     (716) 856-4000

     Email:  rfluskey@hodgsonruss.com

HIGHLY CONFIDENTIAL

Page 271

APPEARANCES (Continued):

For Defendants Gardner Rogers and Veterans
Medical Distributors, Inc.:

YUKEVICH, CAVANAUGH

BY:  TODD A. CAVANAUGH

BY:  HASSAN ELLRAKABAWY (Via videoconference)

Attorneys at Law

355 South Grand Avenue, 15th Floor

Los Angeles, California 90071

(213) 362-7777

Email:  tcavanaugh@yukelaw.com

For Defendant Mike Stumpe:

BLANK ROME, LLP

BY:  ARASH BERAL

BY:  SAAM TAKALOO

Attorneys at Law

(Via Videoconference)

2029 Century Park East, 6th Floor

Los Angeles, California 90067

(424) 239-3453

Email:  arash.beral@blankrome.com

HIGHLY CONFIDENTIAL

**Page 272**

APPEARANCES (Continued):


For Defendant Nathan Boulais:

BIENERT, KATZMAN, LITTRELL, WILLIAMS, LLP

BY:  MICHAEL R. WILLIAMS

Attorney at Law

(Via Videoconference)

903 Calle Amanecer, Suite 350

San Clemente, California 92673

(949) 369-3700

Email:  mwilliams@bklwlaw.com




Also Present:

Bryan Banman

Gardner Rogers (Via videoconference)

Mike Stumpe (Via videoconference)

Pablo Seoane (Via videoconference)




Videographer:

JOSHUA OSHIMA

HIGHLY CONFIDENTIAL

Page 281

CHRISTOPHER SHARP,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. FLUSKEY:

Q   Good morning, Mr. Sharp.

A   Good morning.

Q   Yesterday you testified about a patient registry that Skye maintains.  Do you recall that generally?

A   Yes.

Q   Okay.  How does Skye register patients for that registry?

A   We have -- we have an agreement with the physician.  The physician then will at their discretion recruit patients, ask for their permission to have data collected on them.

Q   And does Skye obtain written consents from the participating patients?

A   No.  That's between the doctor and the patient.

Q   Okay.  Do you know if the doctors provide the consents that they obtain to Skye?

A   Can you repeat the question?

HIGHLY CONFIDENTIAL

Page 304

the negotiation in addition to you?

A    Again, it would have been Bryan Banman and myself.

Q    Okay.  Now, Exhibit 56 is a 2017 agreement.  Who would have been -- who negotiated that agreement?  Do you know, Exhibit 56?

A    I mean, with someone like Erin Barnes, some of our bigger independent sales reps, I would get involved.  I would speak with them.  So I would have to go back to my notes on specifically what points were negotiated.  There really aren't a lot of points in our agreements that are negotiated other than commission rates.  There's rarely any other changes that are needed to our template.

Q    When you had the first conversation with Mr. Barnes that you testified about earlier where he told you that Mr. Banman had contacted him, was Mr. Barnes at that time selling products for Skye?

A    Yes.

Q    Did he tell you he was going to cease selling products for Skye?

A    Pardon me?

Q    Did he tell you that he was going to stop selling products for Skye?

A    When?  Back --

HIGHLY CONFIDENTIAL

Page 305

Q   Yeah, back -- when you had that conversation.

A   No.

Q   Did he continue selling for Skye after you had that conversation?

A   Yes.

Q   So there was a period of time when he was selling for both Skye and CTM?

A   I believe so.  I'm not sure when it started, but that is our belief, yes.

Q   When you learned that he was selling for CTM, did you terminate his -- any of his representative agreements that he had with Skye?

A   Yes, we did.

Q   Did you send any documents -- how did you terminate the agreement?

A   I believe we sent an E-mail.

Q   To Mr. Barnes?

A   Yes.

Q   Okay.  Has Skye or HRT since filed any lawsuits against Mr. Barnes?

A   Yes, we have.

Q   And where -- how many lawsuits?

A   Just one.

Q   And where is that lawsuit pending?

HIGHLY CONFIDENTIAL

**Page 320**

Q   Has Skye terminated any agreement that it has with BJ Benik?

A   No.

Q   So Skye knows that BJ Benik is selling for both Skye and CTM today; correct?

A   I believe he is.

Q   So Mr. Benik would have access to both Skye's and CTM's pricing; right?

MR. SABA:  Speculation, but go ahead.

THE WITNESS:  He probably does, yes.

BY MR. FLUSKEY:

Q   He would have access to Skye's marketing plans; right?

A   If we gave them to him, yes.

Q   He would have access to Skye's independent rep training that Skye believes is a trade secret; right?

A   Yes.  Under our confidentiality agreement, yes.

Q   Did Mr. Benik have access to any SOPs for Skye -- for HRT?

A   Sorry.  Can you repeat the question?

Q   Sure.  Did Mr. Benik have any access to HRT's SOPs?

A   No.

HIGHLY CONFIDENTIAL

Page 321

Q   Do you know if Mr. Benik's sales volume for Skye has decreased since he started working for CTM?

A   I'd have to look specifically at the numbers.  I don't have those in front of me.

Q   Okay.  Referring back to Exhibit 54, the next name on our list is Jason Bergey.  Do you see that?

A   Jake Bergey, I believe.

Q   Jake Bergey.

A   Yeah.

Q   Who is Jake Bergey?

A   He was and he still may be, as I've said earlier, independent sales rep for Skye.

Q   Who recruited Mr. Bergey for Skye?

A   I believe Pablo, but to be 100 percent sure, I'd have to look at who managed -- who recruited and managed or currently manages him.

Q   Do you know if Mr. Bergey has any relationship with CTM?

A   I am not sure.  I believe he was contacted, though, and there was an attempt.  I don't know if it was successful off the top of my head by CTM.

Q   Who from CTM do you believe contacted Mr. Bergey?

A   Pablo.

HIGHLY CONFIDENTIAL

Page 408

Q   Right.   And I assume you would not want her to buy a car for Dr. Schlifka in connection with work for Skye; right?

A   I don't know how those two are related.  It does seem ludicrous to me.

Q   It does.  I would agree with that.  Has she ever told you that she purchased a car for Dr. Schlifka?

A   No.

Q   Okay.  Let's take a big step back.  Start from the beginning.

MR. SABA:  You're sure your co-counsel wants you to do that?

THE WITNESS:  To yesterday?

BY MR. FLUSKEY:

Q   No, no.  Maybe it's a step forward.

Can you summarize your educational background for us?

A   Educational background?

Q   Yeah.

A   I don't recall the preschool I went to.

Q   Let's start with college.  How is that?

A   Okay.  Went to Carlton University.

Q   Where is that?

A   Ottawa.

HIGHLY CONFIDENTIAL

Page 409

Q    And did you graduate?

A    Yes.

Q    What degree did you obtain?

A    Sociology.

Q    Okay.  Do you have any other degrees, college degrees?

A    I have one in marketing as well from Hummer College.

Q    And where is that?

A    That's also in Toronto.

Q    Is that an MBA?

A    I have an MBA on top of that as well.

Q    Okay.  And where did you obtain the MBA?

A    European University in Barcelon.

Q    Do you have any degrees in biology?

A    No, I don't.

Q    Any degrees in any sciences besides sociology?

A    No, I don't.

Q    Can you summarize your professional history for us in between graduating from college and starting Skye and HRT?

A    Sure.  So I graduated with my master's in marketing and finance.  Went to work for a venture capital company called MDS Capital Corp. in Toronto.

HIGHLY CONFIDENTIAL

Page 410

I was tasked with setting up various companies that were an early stage biotech company.  One in particular was Osteopharm working on a cure for osteoporosis, and we merged that company with Biocoll, which was a dental scaffold company that had a collagen scaffold graft -- collagen scaffold graft for dental applications.

So we merged Biocoll with Osprey Biomedical -- no.  Sorry.  Let me back up.  We merged Biocoll Medical with Osteopharm, okay, and created Gen Sci, Regenerative Sciences, and that was working on taking that dental scaffold and applying it to orthopedic applications using poloxamer 407 as a delivery mechanism.

I then was tasked working with Gen Sci OCF, which is an oral maxillofacial company where we were taking grafting materials, dental implants, all working on the oral maxillofacial market.  Did that for a couple years.  And then --

Q   Are you still with MDS at this point?  I'm just trying to follow you.

A   No.  I was hired on to those companies as that was happening.

Q   Understood.  Okay.

A   And then went to work for Clearant.  I was

HIGHLY CONFIDENTIAL

Page 411

recruited to go work for Clearant, which is a new biotech company specializing in sterilization and sterilizing various biologic products, everything from blood derivative products, vaccine products, recombinant products, tissue products.  Worked there for a number of years.

Q   I'm sorry.  What was the name of that company?

A   Clearant.

Q   And what was your job with Clearant?

A   Director of business development.

Q   And what did that job entail?

A   I was working with or selling our sterilization technology to tissue banks throughout the U.S. and the world.

Q   Okay.  And where did you go after Clearant?

A   After that company, that's when I went to work for Osprey Biomedical.

Q   Osprey?

A   Osprey, O-s-p-r-e-y, Biomedical.

Q   And what did Osprey do?

A   That's where we had spinal implants, allograft implants for spine applications, both cervical and lumbar applications.

Q   What was your job with Osprey?

HIGHLY CONFIDENTIAL

Page 412

A   I was CEO.

Q   Did you form Osprey or did you join it afterwards?

A   Yes.  I was part of the team that formed it, yes.

Q   So you were an owner of Osprey?

A   Yes.

Q   Okay.  Did you have to raise capital to found Osprey?

A   Got a loan and self-funded the rest.

Q   No other investors?

A   No.

Q   Okay.  And how long -- when did you cease working with Osprey?

A   We rolled Osprey -- so Osprey Biomedical ran until -- I'd have to look at my notes, but ran until, I think, approximately 2011.  In 2009, started Skye Orthobiologics.

Q   2011?

A   No.  2009, I believe, is when we formed Skye Orthobiologics.

Q   Okay.  And did you say Osprey was rolled into Skye?

A   Eventually.  The focus became more on orthopedic products and general biologic products

HIGHLY CONFIDENTIAL

Page 413

for the entire body, so other specialties outside of Skye Orthobiologics.  And then we rolled in Osprey into that organization, I believe.

Q   Okay.  Which company was formed first? Skye or HRT?

A   Skye.

Q   And that was around 2009?

A   Yes.

Q   When was HRT formed?

A   I believe it was the tail end of 2013.

Q   Okay.  Who were the owners of Skye when it was formed?

A   I was the sole owner.

Q   And who are the owners today?

A   Of which organization?  Because there's --

Q   Skye Orthobiologics.

A   Skye Orthobiologics is owned 100 percent by Skye Biologics Holdings Company.

Q   Okay.  And when HRT was formed, who owned it?

A   It was myself, ECM Trust, which is a family trust, and then there was a 10 percent earn-in for Banman.

Q   Okay.  And who owns HRT today?

A   The 90 percent I was just referring to,

HIGHLY CONFIDENTIAL

Page 437

Q   Paragraph 61.  In paragraph 61, the Plaintiffs allege that "In their marketing and promotional materials, Plaintiffs describe HRT's tissue and graft products with the phrase 'connective tissue matrix,' which is abbreviated as 'CTM' or 'CTMs.'  When selling HRT's products, HRT and Skye salespersons refer to the corporate tissue and graft products as 'CTMs.'  The term 'CTM' is known in the tissue and graft product industry to be associated with Plaintiffs' products."  Did I read that accurately?

A   Yes.

Q   Okay.  The phrase "connective tissue matrix" appears in scientific literature; is that right?

A   It does.

Q   And it's frequently used in scientific literature to refer to something that exists in the human body?

A   Sorry.  Can you repeat that?

Q   Sure.  "Connective tissue matrix" is frequently used in the scientific literature to describe something that exists in the human body.  Would you agree with that?

A   I wouldn't say frequently.  It's referenced

HIGHLY CONFIDENTIAL

Page 438

in certain journals.

Q   Okay.  And does Skye or CTM own a -- excuse me.  Does Skye or HRT own a trademark for "CTM" standing alone?

MR. SABA:  The letters?

MR. FLUSKEY:  Yeah, CTM.

THE WITNESS:  No, we don't, no.

BY MR. FLUSKEY:

Q   Does it own a trademark for the phrase "connective tissue matrix"?

A   We own two trademarks with those three words in it.

Q   What are those trademarks?

A   One is "viable connective tissue" or "complete tissue" -- sorry -- a "viable connective tissue matrix," and I believe it's "original fluid connective tissue matrix."  I'd have to pull them up exactly.  It's been a long day.

Q   Do the companies own a trademark for the phrase "connective tissue matrix" standing alone?

MR. SABA:  Other than what he just described?

MR. FLUSKEY:  That's not what he described.

Q   Standing alone, "connective tissue matrix, do the companies own a trademark on that phrase

HIGHLY CONFIDENTIAL

**Page 545**

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: April 12, 2022

*Maria Ellersick*

MARIA ELLERSICK

CSR No. 10531

HIGHLY CONFIDENTIAL

**Page 546**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

SKYE ORTHOBIOLOGICS, LLC, A
DELAWARE LIMITED LIABILITY
COMPANY, HUMAN REGENERATIVE
TECHNOLOGIES, LLC, A DELAWARE
LIMITED LIABILITY COMPANY,    No. 2:20-CV-03444-MEMF
                                   (PVCX)

     Plaintiffs,

    vs.

CTM BIOMEDICAL, LLC, A
DELAWARE LIMITED CORPORATION;
BRYAN BANMAN, AN INDIVIDUAL;
CTM MEDICAL, INC., A DELAWARE
CORPORATION; VETERANS MEDICAL
DISTRIBUTORS, INC., A FLORIDA
CORPORATION; GARDNER ROGERS,
AN INDIVIDUAL; MIKE STUMPE,
AN INDIVIDUAL; PABLO SEOANE
AKA PAUL SEOANE, AN
INDIVIDUAL; NATHAN BOULAIS,
AN INDIVIDUAL; AND DOES 3
THROUGH 10, INCLUSIVE,

     Defendants.

_____

** HIGHLY CONFIDENTIAL **

VIDEOTAPED DEPOSITION OF CHRISTOPHER SHARP

El Segundo, California

Wednesday, September 7, 2022

Volume III

Reported by:

MARIA ELLERSICK

CSR No. 10531

Job No. 5417023

PAGES 546 - 861

HIGHLY CONFIDENTIAL

Page 547

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA-WESTERN DIVISION

SKYE ORTHOBIOLOGICS, LLC, A
DELAWARE LIMITED LIABILITY
COMPANY, HUMAN REGENERATIVE
TECHNOLOGIES, LLC, A DELAWARE
LIMITED LIABILITY COMPANY,    No. 2:20-CV-03444-MEMF
                                    (PVCX)
        Plaintiffs,
    vs.
CTM BIOMEDICAL, LLC, A
DELAWARE LIMITED CORPORATION;
BRYAN BANMAN, AN INDIVIDUAL;
CTM MEDICAL, INC., A DELAWARE
CORPORATION; VETERANS MEDICAL
DISTRIBUTORS, INC., A FLORIDA
CORPORATION; GARDNER ROGERS,
AN INDIVIDUAL; MIKE STUMPE,
AN INDIVIDUAL; PABLO SEOANE
AKA PAUL SEOANE, AN
INDIVIDUAL; NATHAN BOULAIS,
AN INDIVIDUAL; AND DOES 3
THROUGH 10, INCLUSIVE,
        Defendants.

_____

        Videotaped Deposition of CHRISTOPHER SHARP,
Volume III, taken on behalf of Defendants CTM
Biomedical, LLC, at 2301 Rosecrans Avenue,
Suite 3180, El Segundo, California, beginning at
8:43 a.m. and ending at 5:02 p.m. on Wednesday,
September 7, 2022, before MARIA ELLERSICK, Certified
Shorthand Reporter No. 10531.

HIGHLY CONFIDENTIAL

Page 548

APPEARANCES:


For Plaintiffs:

ROSEN, SABA, LLP

BY:  RYAN D. SABA

BY:  LAURA K. ST. MARTIN (Via videoconference)

Attorneys at Law

2301 Rosecrans Avenue, Suite 3180

El Segundo, California 90245

(310) 285-1727

Email:  rsaba@rosensaba.com


For Defendants CTM Biomedical, LLC, Bryan Banman,

CTM Medical, Inc., and Pablo Seoane:

HODGSON, RUSS, LLP

BY:  ROBERT J. FLUSKEY

BY:  MATTHEW K. PARKER (Via videoconference)

Attorneys at Law

The Guaranty Building

140 Pearl Street, Suite 100

Buffalo, New York 14202

(716) 856-4000

Email:  rfluskey@hodgsonruss.com

HIGHLY CONFIDENTIAL

Page 549

APPEARANCES (Continued):

For Defendants Gardner Rogers and Veterans
Medical Distributors, Inc.:

YUKEVICH, CAVANAUGH

BY:  TODD A. CAVANAUGH

BY:  HASSAN ELRAKABAWY (Via videoconference)

Attorneys at Law

355 South Grand Avenue, 15th Floor

Los Angeles, California 90071

(213) 362-7777

Email:  tcavanaugh@yukelaw.com

For Defendant Mike Stumpe:

BLANK ROME, LLP

BY:  ARASH BERAL

Attorney at Law

2029 Century Park East, 6th Floor

Los Angeles, California 90067

(424) 239-3453

Email:  arash.beral@blankrome.com

HIGHLY CONFIDENTIAL

Page 550

APPEARANCES (Continued):


For Defendant Nathan Boulais:

BIENERT, KATZMAN, LITTRELL, WILLIAMS, LLP

BY:  MICHAEL R. WILLIAMS

Attorney at Law

903 Calle Amanecer, Suite 350

San Clemente, California 92673

(949) 369-3700

Email:  mwilliams@bklwlaw.com




Also Present:

Bryan Banman

Gardner Rogers (Via videoconference)

Mike Stumpe (Via videoconference)






Videographer:

JOSHUA OSHIMA

HIGHLY CONFIDENTIAL

Page 558

opportunity to question Mr. Sharp, given that Plaintiffs just recently almost had two full days with Mr. Boulais, I do reserve my rights if I'm not able to finish my questioning in two hours, but I will make my best effort to do so.

MR. CAVANAUGH:  I join in -- I join in the comments by counsel.

CHRISTOPHER SHARP,

having been administered an oath, was examined and testified further as follows:

EXAMINATION

BY MR. WILLIAMS:

Q   Good morning, Mr. Sharp.

A   Good morning.

Q   As you know, I represent Nate Boulais.

A   Right.

Q   Do you know what a "sales lead" is?

A   Yes.  Sorry.

Q   As a reminder, you heard all the admonitions before, but the court reporter needs words as answers.

And by the way, before I start, any reason you can't give your best testimony today?

HIGHLY CONFIDENTIAL

Page 661

A    Not to my knowledge, no.

Q    Have you asked him whether he's doing that?

A    I have not asked him.

Q    Have you asked Mr. Benik to sign anything attesting to the fact that he's not using Skye trade secrets or confidential information in his efforts to sell for CTM?

A    Yes, I have.

Q    And has he signed something?

A    His lawyers have been reviewing it.

Q    Okay.  How long has that been going on, the reviewing process?

A    I'm not sure.  A couple weeks.

Q    So this was something recent that you asked him?

A    Yeah.  Once we learned that this was happening, yes.

Q    Well, you said you learned several months ago.  So you just recently asked him to sign something?

A    That's an attorney/client, I believe, privilege.

Q    Well, I'm not asking about any discussions. I'm just asking about the timeline.  You learned about it like several months ago, you said.  And I'm

HIGHLY CONFIDENTIAL

Page 662

asking you if you only recently asked him to sign something?

A    It took time to draft up an agreement.

Q    By the way, anybody other than BJ Benik who you understand at any time has signed -- well, strike that.

Putting aside any parties to this case -- so whether it's Mr. Boulais, Mr. Stumpe, or anyone else -- any other sales reps other than Mr. Benik who you understand at any time has simultaneously sold product for both Skye and CTM?

A    It came to light that Jim Carey sold, I think, a wound product or two for Banman.  We had a discussion about that.  He said he wasn't selling for them and their businesses.  We were not -- we're not -- I'm not doing business with him anymore.  We're not.

Q    Anybody else in that category?

A    I'm trying to think.  I think there's one -- Dean Conway, I believe, is the only other one that comes to mind.

Q    Anybody else or is that it?

A    Not -- not that's coming to my mind as I sit here today.

Q    What happened with Mr. Conway, how did you

HIGHLY CONFIDENTIAL

Page 682

A    Yes.   In different markets, yes.

Q    Okay.   Did Dean Conway ever tell you directly that he was selling for both companies?

A    No.

Q    Have you had any conversations with Dean Conway about that topic?

A    I've been trying to reach him, and he's been dodging me on that topic.

Q    When you say trying to reach him, have you been trying to call him?  Have you been texting him? What was the nature of the reach-out?

A    I called him.

Q    You testified earlier that an agreement or a draft agreement had been sent to Mr. Benik's lawyer; is that right?

A    No.  To him directly.

Q    To him directly?

A    Yes.

Q    Was that agreement sent within the past two weeks?

A    I have to look at the calendar, but it was, yeah, recently.

Q    Okay.  Do you know if that draft agreement's been produced in this litigation?

A    I don't provide evidence.  So I'm not sure.

HIGHLY CONFIDENTIAL

Page 683

Q   Well, has anyone asked you to turn that agreement over for production in this case?

MR. SABA:  Well, that's an attorney/client communication.  So don't answer that question.

MR. FLUSKEY:  Okay.  Well, we --

MR. SABA:  If the question is has it been produced, it has not been produced as of yet.  But if you'd like a copy of it once it's signed, we will get you a copy of.

MR. FLUSKEY:  Well, we'd like the communications and the draft even before it's signed.  It's responsive to pending requests.

MR. SABA:  Okay.  We'll talk about it off the record.

BY MR. FLUSKEY:

Q   You testified earlier that at some point, you learned that Jim Carey may have sold products for Skye and CTM.  Do I have that right?

A   I learned that he sold one wound product was my understanding.

Q   Have you ever asked Mr. Carey to sign any agreements regarding his work with CTM?

A   We don't work with him anymore.  So there's no need.

Q   How about Maria Carey, did you ever learn

HIGHLY CONFIDENTIAL

**Page 861**

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: September 20, 2022

*Maria Ellersick*

MARIA ELLERSICK

CSR No. 10531

# Exhibit 2

Bryan Banman                          Highly Confidential                          April 5, 2022

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---------------------------------------------------------

SKYE ORTHOBIOLOGICS, LLC,
a Delaware Limited Liability Company,
HUMAN REGENERATIVE TECHNOLOGIES, LLC,
a Delaware Limited Liability Company,

                    Plaintiffs,

     -vs-                    2:20-cv-03444-MEMF-PVC

CTM BIOMEDICAL, LLC, a Delaware
Limited Liability Corporation;
BRYAN BANMAN, an individual;
CTM MEDICAL, INC., a Delaware
Corporation; VETERANS MEDICAL
DISTRIBUTORS, INC., a Florida
Corporation; GARDNER ROGERS, an
individual; MIKE STUMPE, an individual;
PABLO SEOANE aka PAUL SEOANE, an
individual; NATHAN BOULAIS, an
individual; and DOES 3 through 10,
inclusive,

                    Defendants.

---------------------------------------------------------

          VOLUME I - HIGHLY CONFIDENTIAL

---------------------------------------------------------

     Videotaped Zoom Videoconference Deposition

of BRYAN BANMAN, held before Carrie A. Fisher,

Notary Public, at the law offices of Hodgson Russ

LLP, The Guaranty Building, 140 Pearl Street, Suite

100, Buffalo, New York 14202, on April 5, 2022, at

9:11 a.m., ending at 6:08 p.m., pursuant to the

Federal Rules of Civil Procedure.

Network Deposition Services, Inc. ● networkdepo.com ● 866-NET-DEPO

A P P E A R A N C E S (Via Zoom):


ATTORNEYS FOR THE PLAINTIFFS:

                ROSEN SABA, LLP
                BY: RYAN D. SABA, ESQ.
                2301 Rosecrans Avenue, Suite 3180
                El Segundo, California 90245
                (310) 285-1727

ATTORNEYS FOR THE DEFENDANTS, BRYAN BANMAN, CTM
BIOMEDICAL, LLC, CTM MEDICAL, INC., AND PABLO
SEOANE AKA PAUL SEOANE:

                HODGSON RUSS LLP
                BY: ROBERT J. FLUSKEY, JR., ESQ.
                (present in person)
                and MATTHEW K. PARKER, ESQ.
                (via videoconference)
                The Guaranty Building
                140 Pearl Street, Suite 100
                Buffalo, New York 14202
                (716) 856-4000

ATTORNEYS FOR THE DEFENDANTS, VETERANS MEDICAL
DISTRIBUTORS, INC., AND GARDNER ROGERS:

                YUKEVICH CAVANAUGH
                BY:  TODD A. CAVANAUGH, ESQ.
                and HASSAN ELRAKABAWY, ESQ.
                (via videoconference)
                355 South Grand Avenue, 15th Floor
                Los Angeles, California 90071
                (213) 362-7777

ATTORNEYS FOR THE DEFENDANT, MIKE STUMPE:

                BLANK ROME LLP
                BY:  ARASH BERAL, ESQ.
                (via videoconference)
                2029 Century Park East, 6th Floor
                Los Angeles, California 90067
                (424) 239-3400

2

Bryan Banman   Highly Confidential   April 5, 2022

A P P E A R A N C E S (Cont.):


ATTORNEYS FOR THE DEFENDANT, NATHAN BOULAIS:

          BIENERT KATZMAN LITTRELL WILLIAMS LLP
          BY:  MICHAEL R. WILLIAMS, ESQ.
          (via videoconference)
          903 Calle Amanecer, Suite 350
          San Clemente, California 92673
          (949) 369-3700

ALSO PRESENT:

          CLAYTON WALDEN, Videographer

          CHRIS SHARP,
          Skye Orthobiologics, LLC

          LAURA KELLY ST. MARTIN, ESQ.
          Rosen Saba, LLP

          NEDA FARAH, ESQ.
          Rosen Saba, LLP

          FALLON MARTIN, ESQ.
          Hodgson Russ

          MIKE STUMPE, Defendant

3

the witness.

THE REPORTER:  I will just swear you in, if you could raise your right hand for me.

B R Y A N   B A N M A N, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SABA:                                    09:12:48

Q. Good morning, Mr. Banman.

A. Good morning.

Q. You have just been given an oath which requires you to give your testimony under the penalty of perjury.  That's the same oath that   09:12:58 you'd be given in front of a judge and a jury.

Is there any reason you cannot give us your most truthful and accurate testimony today?

A. No.                                          09:13:06

Q. Where do you currently reside?

A. Toronto, Canada.

Q. What is the address?

A. 55 Walmer Road, Toronto, Ontario M5R 2X2.

Q. Who owns that property?                      09:13:28

10

Highly Confidential

what we were going to do at the beginning.  We didn't have a real agreement in place.

Q. Okay.  But you understood that information that was going to be transmitted to you was going to be confidential and proprietary from    11:04:30 Mr. Sharp, correct?

MR. FLUSKEY:  Objection.  Objection. Vague.  You can answer.

A. Potentially some information.

Q. Let's mark as Exhibit 127, it will be tab 2.    11:04:39

(Exhibit 127 marked for identification.)

A. Are you done with this?

Q. What I have handed in front of you, sir, is a seven-page marketing development agreement.

And is that your signature on the sixth    11:05:16 page?

A. Yes, it is.

Q. And what was the purpose of signing a marketing development agreement dated May 21st, 2012?    11:05:33

A. Do you mind if I just read portions of this?

Q. Absolutely.  Take your time.

A. Okay.  So as I recall, this agreement was -- I lived in Toronto at the time -- or I lived in Toronto, and Sharp I believe was not really    11:06:16

90

selling any products other than maybe a little bit of DBM bone products shipping a couple across the border possibly.  I am not sure. And so he had no real tangible Canadian market, and there was no real development of a plastic surgery market.  And if I recall at the time, I believe Skye Orthobiologics was distributing a placental flowable particulate at the time made by BioDlogics that it repacked under a brand LiquidGen, and I think through early 2012, if I recall, that had been on my scope of products to work with him on.

I believe at the time he told me, as I recall, he didn't know what to do with the line and was considering dropping it and did I want to look into that.  And as part of that I think the possibility of a plastic surgery market was considered and so this agreement was put in place, as you can tell on Exhibit A, to cover potential services for the Canadian market where I believe Sharp thought because I lived in Canada I could help generate a Canadian market and to develop a U.S. plastic surgery market with those placental biologics.  Of note  -- yeah.

11:06:35

11:06:56

11:07:19

11:07:37

11:07:54

91

2016?

A. I don't really recall, but that's what this states.

Q. Do you recall getting an increase from $10,000 a month to $12,500 a month at one point?    11:39:10

A. I believe so.

Q. Let's mark as Exhibit...

    THE REPORTER:  134.

Q. 134.  It's tab 35.

    (Exhibit 134 marked for identification.)    11:39:49

A. Thank you.

Q. This is a one-page document dated January 1st, 2017.  Do you see that, sir?

A. I do.

Q. Again, this references in bold the marketing    11:39:56 and development agreement between you and Skye Orthobiologics.  Do you agree with that?

A. It says that.

Q. Okay.  And it -- it references that that agreement was extended again another year to    11:40:10 December 31st, 2017.  Do you see that?

A. It says that.

Q. Do you recall that your monthly marketing fee schedule increased from $12,500 to $18,750 per month?    11:40:24

119

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---------------------------------------------------------

SKYE ORTHOBIOLOGICS, LLC,
a Delaware Limited Liability Company,
HUMAN REGENERATIVE TECHNOLOGIES, LLC,
a Delaware Limited Liability Company,

                    Plaintiffs,

    -vs-                        2:20-cv-03444-MEMF-PVC

CTM BIOMEDICAL, LLC, a Delaware
Limited Liability Corporation;
BRYAN BANMAN, an individual;
CTM MEDICAL, INC., a Delaware
Corporation; VETERANS MEDICAL
DISTRIBUTORS, INC., a Florida
Corporation; GARDNER ROGERS, an
individual; MIKE STUMPE, an individual;
PABLO SEOANE aka PAUL SEOANE, an
individual; NATHAN BOULAIS, an
individual; and DOES 3 through 10,
inclusive,

                    Defendants.

---------------------------------------------------------

          VOLUME II - HIGHLY CONFIDENTIAL

---------------------------------------------------------

        Continued Videotaped Zoom Videoconference

Deposition of BRYAN BANMAN, held before Carrie A.

Fisher, Notary Public, at the law offices of Hodgson

Russ LLP, The Guaranty Building, 140 Pearl Street,

Suite 100, Buffalo, New York 14202, on April 6,

2022, at 9:04 a.m., ending at 5:55 p.m., pursuant to

the Federal Rules of Civil Procedure.

                                                    358

A P P E A R A N C E S (Via Zoom):


ATTORNEYS FOR THE PLAINTIFFS:

           ROSEN SABA, LLP
           BY: RYAN D. SABA, ESQ.
           2301 Rosecrans Avenue, Suite 3180
           El Segundo, California 90245
           (310) 285-1727

ATTORNEYS FOR THE DEFENDANTS, BRYAN BANMAN, CTM
BIOMEDICAL, LLC, CTM MEDICAL, INC., AND PABLO
SEOANE AKA PAUL SEOANE:

           HODGSON RUSS LLP
           BY: ROBERT J. FLUSKEY, JR., ESQ.
           (present in person)
           and MATTHEW K. PARKER, ESQ.
           (via videoconference)
           The Guaranty Building
           140 Pearl Street, Suite 100
           Buffalo, New York 14202
           (716) 856-4000

ATTORNEYS FOR THE DEFENDANTS, VETERANS MEDICAL
DISTRIBUTORS, INC., AND GARDNER ROGERS:

           YUKEVICH CAVANAUGH
           BY:  TODD A. CAVANAUGH, ESQ.
           and HASSAN ELRAKABAWY, ESQ.
           (via videoconference)
           355 South Grand Avenue, 15th Floor
           Los Angeles, California 90071
           (213) 362-7777

ATTORNEYS FOR THE DEFENDANT, MIKE STUMPE:

           BLANK ROME LLP
           BY:  ARASH BERAL, ESQ.
           and SAAM TAKALOO, ESQ.
           (via videoconference)
           2029 Century Park East, 6th Floor
           Los Angeles, California 90067
           (424) 239-3400

359

A P P E A R A N C E S (Cont.):


ATTORNEYS FOR THE DEFENDANT, NATHAN BOULAIS:

            BIENERT KATZMAN LITTRELL WILLIAMS LLP
            BY:  MICHAEL R. WILLIAMS, ESQ.
            (via videoconference)
            903 Calle Amanecer, Suite 350
            San Clemente, California 92673
            (949) 369-3700

ALSO PRESENT:

            CLAYTON WALDEN, Videographer

            CHRIS SHARP,
            Skye Orthobiologics, LLC

            FALLON MARTIN, ESQ.
            Hodgson Russ

360

B R Y A N   B A N M A N,

having been re-duly sworn, was further

examined and testified as follows:


CONTINUED EXAMINATION                        09:06:08

BY MR. SABA:

Q. Good morning, Mr. Banman.  You are still under

the penalty of perjury that requires you to

give us your most truthful and accurate

testimony today.  Can you think of any reason        09:06:16

that you're unable to do so?

A. No.

Q. Any reason we cannot proceed forward today?

A. No.

Q. Okay.  Let's mark as Exhibit 180.  It would be     09:06:31

tab 71.

(Exhibit 180 marked for identification.)

BY MR. SABA:

Q. Which is an email from Michelle Pablos at

Vivex to ctmbiomedical@gmail.com on June 11th,       09:06:49

2018.  Do you recall this email, sir?

A. I don't recall this specific email, but I see

it.

Q. Okay.  Do you remember communicating with

Vivex in June of 2018 by using the name Carl?        09:07:05

367

A. Correct.

MR. WILLIAMS:  No further questions at this time.  Thank you, sir.

MR. FLUSKEY:  Any other lawyers on the Zoom call have any questions for Mr. Banman today?

Hearing silence, I have one minute of questions.

EXAMINATION                    17:52:52

BY MR. FLUSKEY:

Q. Mr. Banman, I am going to hand you what was previously marked as Exhibit 133.

Did you sign that document?

A. No, I didn't.                    17:53:01

Q. Do you know if you ever received that document while you were working with Skye or HRT?

A. I don't recall receiving it.

Q. Did you ever negotiate this document?

A. I don't recall negotiating it.                    17:53:12

Q. Okay.  Now, in the first paragraph of Exhibit 133, it reads, "the agreement made the 25th day of March, 2013, between Common Sense/Bryan Banman and Skye Orthobiologics, LLC, is hereby extended to December 31, 2016."  Do you see                    17:53:33

704

that?

A. I do.

Q. Okay.  And Common Sense Media is a company you were associated with, correct?

A. Correct.                                                17:53:41

Q. Did Common Sense Media or you ever sign an agreement on March 25, 2013, with Skye Orthobiologics, LLC?

A. I don't believe we did.

Q. Okay.  Let me show you what was previously     17:53:52 marked as Exhibit 134.  Did you sign this document?

A. No, I didn't.

Q. Do you know if you ever received a copy of this document while you were working with Skye     17:54:03 or HRT?

A. I don't recall receiving it.

Q. Did you negotiate this document?

A. I don't recall negotiating it.

Q. Okay.  Now this document references a March     17:54:12 25, 2013, agreement between Common Sense/Bryan Banman and Skye Orthobiologics.  Do you see that?

A. I do.

Q. Did Common Sense or you sign an agreement with  17:54:25

705

Confidential

Skye Orthobiologics on March 25, 2013?

A.  I don't believe I did.

MR. FLUSKEY:  I have no further questions.  The witness reserves his right to read and sign.                                  17:54:36

MR. SABA:  Very well.  This will conclude the deposition.  We can go off the record.

THE REPORTER:  Before we go off the record, can I just get transcript orders?     17:54:44

MR. FLUSKEY:  We are ordering one.

THE REPORTER:  Are you getting a rough? Do you want a rough?

MR. FLUSKEY:  For today, yes.  You have already sent yesterday's.                    17:55:04

MR. BERAL:  And, Mr. Fluskey, would you like a copy of the video?

MR. FLUSKEY:  Yes, please.

THE VIDEOGRAPHER:  And do you want it synchronized with the transcript?              17:55:11

MR. FLUSKEY:  No, that is not needed. Thank you.

THE VIDEOGRAPHER:  All right.

MR. ELRAKABAWY:  And this is Hassan Elrakabawy for Yukevich.  We will take a rough   17:55:18

706

STATE OF NEW YORK)

                ) ss.

COUNTY OF ERIE   )



  I, Carrie Fisher, Notary Public, in and for the County of Erie, State of New York, do hereby certify:


  That the witness whose testimony appears hereinbefore was, before the commencement of their testimony, duly sworn to testify the truth, the whole truth and nothing but the truth; that said testimony was taken pursuant to notice at the time and place as herein set forth; that said testimony was taken down by me and thereafter transcribed into typewriting, and I hereby certify the foregoing testimony is a full, true and correct transcription of my shorthand notes so taken.


  I further certify that I am neither counsel for nor related to any party to said action, nor in anyway interested in the outcome thereof.


  IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal this 18th day of April, 2022.


             ---------------------
             Carrie A. Fisher
             Notary Public - State of New York
             No. 01FI6240227
             Qualified in Erie County
             My commission expires 5/02/23

708

# Exhibit 3

Page 1

          IN THE UNITED STATES DISTRICT COURT
           CENTRAL DISTRICT OF CALIFORNIA
                 WESTERN DIVISION
SKYE ORTHOBIOLOGICS, LLC,    :
A DELAWARE LIMITED           :
LIABILITY COMPANY, HUMAN     :
REGENERATIVE TECHNOLOGIES,   : CIVIL CASE NO.
LLC, A DELAWARE LIMITED      : 2:20-CV-03444-
LIABILITY COMPANY,           : MEMF (PVCx)
          PLAINTIFFS         :
                             :
              V              :
                             :
CTM BIOMEDICAL, LLC, A       :
DELAWARE LIMITED LIABILITY   :
CORPORATION; BRYAN BANMAN,   :
AN INDIVIDUAL; CTM MEDICAL,  :
INC., A DELAWARE             :
CORPORATION; VETERANS        :
MEDICAL DISTRIBUTORS, INC.,  :
A FLORIDA CORPORATION;       :
GARDNER ROGERS, AN           :
INDIVIDUAL; MIKE STUMPE, AN  :
INDIVIDUAL; PABLO SEOANE     :
AKA PAUL SEOANE, AN          :
INDIVIDUAL; NATHAN BOULAIS,  :
AN INDIVIDUAL; AND DOES 3    :
THROUGH 10, INCLUSIVE,       :
          DEFENDANTS         :

                   - - -
            Thursday, April 7, 2022
                   - - -
             Videotaped Deposition of
         MARIA CAREY, taken remotely via
         Zoom, beginning at 1:03 p.m., and
         reported stenographically before
         Donna E. Gladwin, Professional
         Reporter, Notary Public.
                   - - -

Page 2

APPEARANCES:   (Remotely Via Zoom)
ROSEN SABA LAW
BY:   NEDA FARAH, ESQUIRE
      LAURA KELLY ST. MARTIN, ESQUIRE
9350 Wilshire Boulevard, Suite 250
Beverly Hills, California 90212
310.285.1727 (phone)
Nfarah@rosensaba.com
Representing the Plaintiffs

HODGSON RUSS, LLP
BY:   ROBERT J. FLUSKEY, JR., ESQUIRE
      MATTHEW K. PARKER, ESQUIRE
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
716.856.4000 (phone)
Rfluskey@hodgsonruss.com
Representing Defendants CTM Biomedical, LLC, a
Delaware Limited Corporation; CTM Medical,
Inc., a Delaware Corporation; Bryan Banman;
and Pablo Seoane

YUKEVICH CAVANAUGH
BY:   HASSAN ELRAKABAWY, ESQUIRE
One Market Street, Spear Tower
36th Floor
San Francisco, California 94105-1420
213.362.7777 (phone)
Helrakabawy@yukelaw.com
Representing Defendant Gardner Rogers, an
individual

BLANK ROME, LLP
BY:   SAAM TAKALOO, ESQUIRE
2029 Century Park East, 6th Floor
Los Angeles, California 90067
424.239.3400 (phone)
Stakaloo@blankrome.com
Representing Defendant Mike Stumpe, an
individual

**Page 3**

APPEARANCES (CONT'D.)

BIENART, KATZMAN, LITTRELL, WILLIAMS, LLP

BY:  CARLOS NEVAREZ, ESQUIRE

601 West 5th Street, Suite 720

Los Angeles, California 90071

949.369.3700 (phone)

Cnevarez@bklwlaw.com

Representing Defendant Nathan Boulais, an

individual


Also Present:

    James Budkins, Videographer

    Mike Stumpe

Page 9

reflect that counsel for Mr. Rogers is on.

MARIA CAREY, was remotely duly sworn by Donna E. Gladwin, Notary Public, pursuant to agreement of counsel, and testified as follows:

DIRECT EXAMINATION

BY MR. FLUSKEY:

Q.   Good afternoon, Ms. Carey.

A.   Good afternoon.

Q.   My name is Rob Fluskey.  I'm one of the lawyers representing Bryan Banman and CTM Biomedical and Pablo Seoane in a litigation that was filed by Skye Orthobiologics and Human Regenerative Technologies in California Federal Court.

You're here today pursuant to subpoena to provide testimony that might be relevant to that lawsuit.

Do you understand that?

A.   Yes, sir.

Q.   Have you ever participated in a deposition before?

Page 52

A.    Yes, sir.

Q.    And Bryan Banman's company is called CTM, right?

A.    Yes, sir.

Q.    Okay.  Now, before IMS and CTM signed a contract did you tell Mr. Banman that you were free to do business with him?

A.    Yes.  Free to do whatever the hell I want, yes, I did.

Q.    Okay.

A.    I did.

        (E-mail Dated September 18, 2018 was marked as Carey Exhibit No. 248.)

BY MR. FLUSKEY:

Q.    Let me show you another document here.  This is a document that I marked for today's deposition as Exhibit 248.

A.    I need glasses.  Hold on.

Q.    And I can blow this up.

A.    No, it's okay, honey.  I got it. I'm looking.  It's fine.

Q.    I'll blow it up a little bit for me. How's that?

A.    No, no, I remember.  This is fine. Yes, I had to -- he was -- yes, he asked me if

Page 53

I would -- he asked me to write this, and I did.

Q.   Okay.  Let's first start by looking at it, and then I want to talk to you about the e-mail, all right.

So this is an e-mail from you to Bryan Banman dated September 18th, 2018, correct?

A.   Yes, sir.

Q.   Okay.  And you wrote this e-mail?

A.   Yes, sir.

Q.   Right.  And in the e-mail you wrote, hi, Bryan.  This e-mail is to confirm that I am free to carry other amniotic lines, and as such, would like to add your products to my portfolio.

Did I read that first sentence accurately?

A.   Yes, sir.  Yes, correct.

Q.   And you believed that was a true statement at the time, correct?

A.   I did.

Q.   Now, did you write this e-mail in response to a request or question from Bryan Banman?

Page 152

C E R T I F I C A T E

I hereby certify that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

Donna E. Gladwin, RPR

Dated:  April 27, 2022

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying shorthand reporter.)

# Exhibit 4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SKYE ORTHOBIOLOGICS, LLC, a           )
Delaware Limited Liability            )
Company, HUMAN REGENERATIVE           )
TECHNOLOGIES, LLC, a Delaware         )
Limited Liability Company,            )
                                      )
                Plaintiffs,           )
                                      )
            v.                        )   Case No.:
                                      )   2:20-cv-03444-MEMF-PVC
CTM BIOMEDICAL, LLC, a                )
Delaware Limited Liability            )
Corporation; BRYAN BANMAN, an         )
individual; CTM MEDICAL, INC.,        )
a Delaware Corporation;               )
VETERANS MEDICAL DISTRIBUTORS,        )
INC., a Florida Corporation;          )   HIGHLY CONFIDENTIAL
GARDNER ROGERS, an individual;        )
MIKE STUMPE, an individual;           )
PABLO SEOANE aka PAUL SEOANE,         )
an individual; NATHAN BOULAIS,        )
an individual; and DOES 3             )
through 10, inclusive,                )
                                      )
                Defendants.           )

VIDEOTAPED DEPOSITION OF PABLO SEOANE

Jacksonville, Florida

Wednesday, October 5, 2022

Reported by:  Bobbie A. Umstead, RPR, FPR

Job No.:  261868

1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

SKYE ORTHOBIOLOGICS, LLC, a     )
Delaware Limited Liability      )
Company, HUMAN REGENERATIVE     )
TECHNOLOGIES, LLC, a Delaware   )
Limited Liability Company,      )
                                )
                  Plaintiffs,   )
                                )
          -vs-                  )   Case No.:
                                )   2:20-cv-03444-MEMF-PVC
CTM BIOMEDICAL, LLC, a          )
Delaware Limited Liability      )
Corporation; BRYAN BANMAN, an   )
individual; CTM MEDICAL, INC.,  )
a Delaware Corporation;         )
VETERANS MEDICAL DISTRIBUTORS,  )
INC., a Florida Corporation;    )   HIGHLY CONFIDENTIAL
GARDNER ROGERS, an individual;  )
MIKE STUMPE, an individual;     )
PABLO SEOANE aka PAUL SEOANE,   )
an individual; NATHAN BOULAIS,  )
an individual; and DOES 3       )
through 10, inclusive,          )
                                )
                  Defendants.   )

VIDEOTAPED DEPOSITION OF PABLO SEOANE, taken

on behalf of the Plaintiffs, at Regus - Bank of America

Tower, 50 North Laura Street, Suite 2500, Jacksonville,

Florida, beginning at 9:09 a.m. and ending at 5:07 p.m.,

on Wednesday, on October 5, 2022, before Bobbie A.

Umstead, Registered Professional Reporter, Florida

Professional Reporter, and Notary Public in and for the

State of Florida.

2

A P P E A R A N C E S

RYAN D. SABA, Esquire (in person)
LAURA ST. MARTIN, Esquire (via Zoom Teleconference)

    ROSEN SABA
    2301 Rosecrans Avenue, Suite 3180
    El Segundo, California  90245
    310-285-1727
    rsaba@rosensaba.com
    lstmartin@rosensaba.com

       Appearing on behalf of Plaintiffs.

SAAM TAKALOO, Esquire (via Zoom Teleconference)

    BLANK ROME
    2029 Century Park East, 6th Floor
    Los Angeles, California  90067
    424-239-3400
    saam.takaloo@blankrome.com

       Appearing on behalf of Defendant
       Mike Stumpe.

RYAN K. CUMMINGS, Esquire (in person)

    HODGSON RUSS LLP
    140 Pearl Street, Suite 100
    Buffalo, New York  14202
    716-848-1665
    rcumming@hodgsonruss.com

       Appearing on behalf of Defendants
       Bryan Banman, CTM BioMedical, LLC,
       and Pablo Seoane aka Paul Seoane

3

Pablo Seoane                     Highly Confidential                    October 5, 2022

                          A P P E A R A N C E S


          CARLOS A. NEVAREZ, Esquire (via Zoom Teleconference)

                 BIENERT KATZMAN LITTRELL WILLIAMS
                 903 Calle Amanecer, Suite 350
                 San Clemente, California  92673
                 949-369-3700
                 cnevarez@bklwlaw.com

                     Appearing on behalf of Defendant
                     Nathan Boulais.


          HASSAN ELRAKABAWY, Esquire (via Zoom Teleconference)
          TODD A. CAVANAUGH, Esquire (via Zoom Teleconference)

                 YUKEVICH CAVANAUGH
                 355 South Grand Avenue, 15th Floor
                 Los Angeles, California  90071
                 (213) 362-7777
                 helrakabawy@yukelaw.com
                 tcavanaugh@yukelaw.com

                     Appearing on behalf of Defendant
                     Gardner Rogers/VMD, INC.


     ALSO PRESENT:

          CHRIS SHARP, Corporate Representative,
          Skye Orthobiologics, LLC

          CAMERON HODGES, Videographer

          MIKE STUMPE (via Zoom Teleconference)

          JARED KEELING, Technician for NDS
          (via Zoom Teleconference)

4

Highly Confidential

Mike Stumpe.     09:10

        MR. ELRAKABAWY:  And Hassan Elrakabawy for     09:10

defendants VMD and Gardner Rogers.     09:10

        MS. ST. MARTIN:  Hi.  This is Laura St. Martin     09:10

for the plaintiffs.     09:10

        MR. SABA:  For those that are online, if     09:10

you're going to object, please say your name so the     09:10

court reporter can understand who's talking,     09:10

please, when you do so.     09:10

        Okay.

                    PABLO SEOANE,

having been produced and first duly sworn, and after

responding "I do" to the oath, was examined and

testified as follows:

                    DIRECT EXAMINATION

BY MR. SABA:

        Q    Have you ever lied to Chris Sharp?     09:11

        A    Yes.     09:11

        Q    On how many occasions?     09:11

        A    Once.     09:11

        Q    What was the lie?     09:11

        A    Where I was going to go to work after I left     09:11

Skye.     09:11

        Q    What did you tell Chris Sharp about that     09:11

issue?     09:11

11

A    Lawsuits are scary.                                09:21

Q    Do you recall the day that you gave notice to    09:21
Chris Sharp that you were going to leave Skye?         09:21

A    No.                                               09:21

Q    Do you recall any communications, oral or        09:21
written, that you had with Chris Sharp on the day that 09:21
you gave notice?                                       09:22

A    No.                                               09:22

Q    Do you recall your last day of employment and    09:22
your last communication with Chris Sharp while you were 09:22
still employed with Skye?                              09:22

A    No.                                               09:22

Q    Do you recall a conversation with Chris Sharp    09:22
where you and he discussed the notes that were contained 09:22
on your Apple iOS device?                              09:22

A    Yes.                                              09:22

Q    When was that conversation?                      09:22

A    On my last day.                                   09:22

Q    On your last day, you and Chris Sharp            09:22
discussed the Notes application on your iOS device;    09:22
correct?                                               09:22

A    Yes.                                              09:22

Q    And these were Skye notes that contained         09:22
business development information?  Agree?              09:22

MR. CUMMINGS:  Object to the characterization.    09:22

21

You can answer.    09:22

THE WITNESS:  Yeah.    09:22

BY MR. SABA:    09:22

Q    These are notes that you prepared while you were working at Skye; correct?    09:22

A    Some of them.  Most of them, yes.    09:22

Q    Okay.  And as part of your job, you were in charge of business development for Skye when you were working at Skye; correct?    09:22

A    I wouldn't say I was in charge.    09:23

Q    That was -- your role within the company was to promote business development at Skye; correct?    09:23

A    Correct.    09:23

Q    Okay.  And as part of your role, you participated and created various notes on how representatives could better be assisted to sell the products for Skye; correct?    09:23

A    Yes.    09:23

Q    Okay.  And as part of those notes, you created access for other people to review those notes; yes?    09:23

A    Yes.    09:23

Q    Okay.  So you were the creator of those notes; correct?    09:23

A    Yes.    09:23

Q    Okay.  Now, upon your leaving Skye, this last    09:23

22

Pablo Seoane    Highly Confidential    October 5, 2022

day with this conversation with Chris Sharp, he asked    09:23
you to delete those notes from your iOS device; correct?    09:23

A    He did while I was in the room with him.  I    09:23
showed him all the notes.  And I was literally just    09:23
deleting some of them on my phone as he was looking at    09:23
them, and he said, "That's -- that's fine."    09:23

Q    Okay.  You told him you deleted all the iOS    09:23
notes, didn't you?    09:24

A    No, I did not.    09:24

Q    You didn't delete all the iOS notes, though,    09:24
did you?    09:24

A    I did not tell him that I deleted all the    09:24
notes.  I was right in front of him.  He was looking at    09:24
hundreds of notes.    09:24

Q    You intentionally did not delete 17 notes;    09:24
correct?    09:24

MR. CUMMINGS:  Objection.  Mischaracterizes    09:24
the testimony.    09:24

You can answer.    09:24

THE WITNESS:  Yes.    09:24

BY MR. SABA:    09:24

Q    Now, those 17 notes remain on your device for    09:24
a period of about six months until you got a letter from    09:24
our law firm; is that right?    09:24

A    Yes.    09:24

23

Pablo Seoane                      Highly Confidential                      October 5, 2022

Q    Why is it that you didn't delete the last 17 notes?

A    Because I could not transfer ownership to my colleagues, and they had asked me to not delete them so they could continue to have access to them and at some point copy them into new notes so they wouldn't lose access to the information.

Q    Did you ever follow up with anybody in the days later to make sure that the notes had been transferred so that you could delete them off of your phone?

A    No.

Q    Why not?

A    Because it wasn't my problem.

Q    Did you ever transfer one or more of those notes to Bryan Banman?

A    No.

Q    Sure?

A    I'm pretty sure.

MR. CUMMINGS:  Asked and answered.

BY MR. SABA:

Q    Okay.

A    Yeah.

Q    Did you ever tell Chris Sharp the reason why you were moving to Jacksonville is because your wife was

24

BY MR. SABA:

Q    It says here "having potential access."  You didn't say, "I do have access and I have been looking at the documents."  You didn't say that, did you?

MR. CUMMINGS:  Objection.  The document speaks for itself.

But go ahead.

THE WITNESS:  I said, "Have their IT team contact me so I can transfer ownership of documents."  I'm implying that I had access to the documents.

BY MR. SABA:

Q    Once you got my letter, you went and looked on your phone and opened those notes, didn't you?

A    Probably.

Q    I sent you a letter on June 12th in response, which is Tab 116.

MR. SABA:  We'll mark that as Exhibit 521.

(Thereupon, Exhibit 521 was marked for identification.)

UNIDENTIFIED SPEAKER:  Did you say 116?

MR. SABA:  Yes, 116.

UNIDENTIFIED SPEAKER:  I don't seem to have that one.  Hang on.

BY MR. SABA:

270

Pablo Seoane                    Highly Confidential                    October 5, 2022

Q    June 12th, 2020, you got a letter from me, which gave -- which gave you instructions starting on the second page of how to delete the notes from your phone.  Since you were the author of the notes, you had to be the one that deleted them.

Did you delete the notes from your iCloud account and your MacBook and your mobile device upon receipt of my June 12th, 2020, letter?

A    I -- well, I have a technical question.

THE WITNESS:  Can I ask you about this?

MR. CUMMINGS:  Yes.  I -- it's going to invoke the attorney/client privilege on this.

BY MR. SABA:

Q    If you want to step outside and talk to him for a second, I -- my question is -- or how about this.

Were the notes ever deleted from your iCloud, mobile device, and laptop?

MR. CUMMINGS:  That, you can answer.

THE WITNESS:  They were.

BY MR. SABA:

Q    Immediately upon my letter?

A    Well, that's part of the technical question on the time frame.

Q    You don't recall when?

A    I don't recall the exact date.

271

But I just wanted to ask him a quick question   03:38

because I may have gotten advice to or not to.   03:38

MR. CUMMINGS:  The documents were preserved   03:38

and then deleted.   03:38

MR. SABA:  Fine.   03:38

MR. CUMMINGS:  And then produced in this   03:38

litigation.   03:38

MR. SABA:  Let me just ask one question.   03:38

Preserved by your -- you or your firm?   03:38

MR. CUMMINGS:  Yes.   03:38

MR. SABA:  Got it.  Okay.   03:38

BY MR. SABA:   03:39

Q    That letter was on June 17th; yes?   03:39

MR. CUMMINGS:  June 12th.   03:39

THE WITNESS:  Yeah, June 12th.   03:39

BY MR. SABA:   03:39

Q    June 12th.  Thank you.   03:39

UNIDENTIFIED SPEAKER:  Mr. Saba, I didn't   03:39

receive Tab 116 for some reason in the Dropbox   03:39

folder.   03:39

MR. SABA:  That's fine.   03:39

UNIDENTIFIED SPEAKER:  So no one online has   03:39

seen the document, just so you know.   03:39

MR. SABA:  That's okay.  They'll survive.   03:39

We'll e-mail it to them.  No worry.   03:39

272

We're going to mark as Exhibit 522, Tab 119.    03:39

(Thereupon, Exhibit 522 was marked for    03:39

identification.)    03:39

THE WITNESS:  (Examining document.)    03:39

BY MR. SABA:    03:39

Q    So even though on June 12th you were asked to    03:39
delete notes, is it accurate on June 23rd, 2020, you    03:39
forwarded a note named, "Plastic Indications for Skye    03:40
BioECM" to Bryan Banman and Matt Chormann?    03:40

A    This feels like a mistake.  That is --    03:40

Q    Oh, it's a mistake.    03:40

A    I mean, as in I probably didn't mean to do    03:40
this.  Maybe I was trying to delete it and I sent it on    03:40
accident.    03:40

Q    Well, did you ever send a follow-up e-mail    03:40
saying, "This was done by accident"?    03:40

A    I probably didn't know that I did it.    03:40

Q    Well, I have an e-mail from you to Bryan    03:40
Banman forwarding a note after you received two cease    03:40
and desist letters.  Do you have any explanation as to    03:40
why you sent this note to Bryan Banman on June 23rd,    03:40
2020?    03:40

A    I believe it's because it was an accident.  Do    03:40
we know which Bryan Banman e-mail?  Was it his Skye    03:40
e-mail or his CTM e-mail?  I bet it was his Skye e-mail.    03:40

273

Highly Confidential

Because I'm sure that Matt Chormann and Bryan Banman were copied on this note, and I was probably playing around with it trying to delete it and it got sent instead.

Q    Well, were you --

A    It was probably me trying --

Q    -- the person that was deleting the notes?  My understanding was, is that counsel was the one that was deleting notes.  Are you the person that physically --

MR. CUMMINGS:  Object -- hang on.  That is a mischaracterization of what I said.

MR. SABA:  That's fine.

BY MR. SABA:

Q    Were you the person that deleted the notes physically?

A    Yes.

Q    You did?

A    Yes.  When -- yes.

Q    On what date?

A    When I was told to delete them, I deleted them.

Q    What day?

A    I don't remember what day, but I -- I don't think it was close.  I think it was a while later from the day you sent me this letter, because I was told not

274

to.

Q   Did you ever contact Bryan Banman and tell him, "Don't open that note I sent you?  It was a mistake"?

A   I don't --

MR. CUMMINGS:  Objection.  Mischaracterizes the testimony.  He said he believes it was the Skye e-mail.

THE WITNESS:  I also don't think I know I sent it, so I wouldn't have known to call anybody.  Why would I have sent it to Matt?

MR. SABA:  I'm going to mark for you Exhibit 523, which is your -- which is Tab 113.

(Thereupon, Exhibit 523 was marked for identification.)

THE WITNESS:  (Examining document.)

BY MR. SABA:

Q   This is your LinkedIn page.  And if you look at the upper left-hand corner, it was printed on June 3rd, 2020.  Do you see that?

A   Yes.

Q   Okay.  And it says that you are the director of business development at Skye Biologics, Inc.

A   (Nodding head.)  Yes.

Q   Okay.  Now, you had not been the director of

275

C E R T I F I C A T E

STATE OF FLORIDA )
COUNTY OF DUVAL  )

        I, Bobbie A. Umstead, Registered Professional Reporter, certify that I was authorized to and did stenographically report the deposition of PABLO SEOANE; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

        I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

        DATED this 16th day of October, 2022.


                      /s/ Bobbie A. Umstead

                      Bobbie A. Umstead, RPR

322

C E R T I F I C A T E   O F   O A T H

STATE OF FLORIDA  )
COUNTY OF DUVAL    )

        I, the undersigned authority, certify that
PABLO SEOANE personally appeared before me and was duly
sworn.

        WITNESS my hand and official seal this 16th
day of October, 2022.

Identification:
     Personally Known
     Produced Identification    XXX
     Type of ID Produced        Florida driver's license

                    /s/ Bobbie A. Umstead

                    Bobbie A. Umstead
                    Notary Public - State of Florida
                    My Commission No. HH 216534
                    Expires:  May 11, 2026

323

# Exhibit 5

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

-------------------------------------------X

SKYE ORTHOBIOLOGICS, LLC, a Delaware

Limited Liability Company, HUMAN

REGENERATIVE TECHNOLOGIES, LLC, a Delaware

Limited Liability Company,

                            PLAINTIFFS,


        -against-    Case No.: 2:20-cv-03444-MEMF-(PVC)


CTM BIOMEDICAL, LLC, a Delaware Limited

Liability Corporation; BRYAN BANMAN, an

individual; VETERANS MEDICAL DISTRIBUTORS,

INC., a Florida Corporation; GARDNER

RODGERS, an individual; MIKE STUMPE, an

individual; PABLO SEOANE aka PAUL SEOANE,

an individual and DOES 1 THROUGH 10

INCLUSIVE,


                            DEFENDANTS.

-------------------------------------------X


            DATE: September 22, 2022

            TIME: 10:05 a.m.


        DEPOSITION of CRISTINA

CHIN-SANG, taken by the Defendant, pursuant

to the Federal Rules of Civil Procedure,

held via video conference, before Patricia

A. Venditti, a Notary Public of the State

of New York.

Page 2

A P P E A R A N C E S:

ROSEN SABA LAW
   Attorneys for the Plaintiffs
   SKYE ORTHOBIOLOGICS, LLC, a Delaware
   Limited Liability Company, HUMAN
   REGENERATIVE TECHNOLOGIES, LLC, a
   Delaware Limited Liability Company
   9350 Wilshire Boulevard
   Beverly Hills, California 90210
   BY: NEDA FARAH, ESQ.
       RYAN SABA, ESQ.
       LAURA ST. MARTIN, ESQ.

HODGSON RUSS, LLP
   Attorneys for the Defendants
   CTM BIOMEDICAL, LLC, a Delaware Limited
   Liability Corporation; BRYAN BANMAN, an
   individual & PABLO SEOANE aka PAUL
   SEOANE, an individual
   1540 Broadway
   New York, New York 10036
   BY: ROBERT FLUSKEY, ESQ.

YUKERICH CAVANAUGH
   Attorneys for the Defendants
   VETERANS MEDICAL DISTRIBUTORS, INC., a
   Florida Corporation & GARDNER RODGERS, an
   Individual
   355 South Grand Avenue
   Los Angeles, California 90071
   BY: TODD CAVANAUGH, ESQ.


BLANK ROME, LLP
   Attorneys for the Defendant
   MIKE STUMPE, an individual
   2029 Century Park East
   Los Angeles, California 90067
   BY: ARASH BERAL, ESQ.

**Page 3**

BIENERT, KATZMAN, LITRELL WILLIAMS LLP
   Attorneys for the Defendant
   NATHAN BOULAIS
   903 Calle Amanecer, Ste 350
   San Clemente, California 92673
   BY: MICHAEL WILLIAMS, ESQ.


ALSO PRESENT: James Montemurno-videographer
              Chris Sharp
              Mike Stumpe

                *        *        *

Page 7

C. CHIN-SANG

MR. CAVANAUGH:  I'll go next.

This is Todd Cavanaugh for defendants Gardner Rogers and Veterans Medical Distributors.

MR. WILLIAMS:  Michael Williams on behalf of the defendant Nathan Boulais.

MR. BERAL:  Arash Beral on behalf of defendant Mike Stumpe.

MR. FLUSKEY:  I think that's everyone, right?  Okay.  Swear in the witness.

CRISTINA  CHIN-SANG, called as a witness, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. FLUSKEY:

Q.   Good morning, Ms. Chin-Sang. My name is Rob Fluskey.  I represent Bryan Banman, CTM Biomedical, CTM Medical and Pablo Seoane in a lawsuit that was filed by Human Regenerative Technologies and Skye

Page 30

C. CHIN-SANG

HRT to Skye, did your responsibilities change or did they remain the same?

A.     Remained the same.

Q.     What were your job responsibilities as director of quality assurance?

A.     I set up the quality systems in 2013 and I had to maintain it in order to maintain compliance with agencies.

Q.     What do you mean by quality systems?

A.     Facilities, security, procedures, health and safety procedure, product labeling.

Q.     Did your job responsibilities include oversight of manufacturing processes for the tissue manufactured by HRT?

A.     Oversight for quality.

Q.     Were you responsible for ensuring that the tissue process by HRT was made in accordance with HRT's written procedures?

A.     Yes.

Page 53

C. CHIN-SANG

In your prior answer you said two at that time. What time are you referring to?

A. When I was employed.

Q. After the product was inspected -- strike that.

As part of this inspection process, did anyone ensure that the finished product was made according to the manufacturing steps that the company maintained in certain documents?

MS. FARAH: Objection; calls for speculation.

Q. You can answer.

A. Well, processing manager also reviewed the record.

Q. The company maintained SOPs that set forth certain steps of the manufacturing process; right?

MS. FARAH: Same objection.

Q. Is that correct?

A. Could you repeat your question?

Q. Sure.

HRT maintained SOPs that set

Page 54

C. CHIN-SANG

forth steps of the manufacturing process

for its membrane products; correct?

MS. FARAH:  Same objection.

A.    Yes.

Q.    Who at the company, if anyone,

was responsible for ensuring that the

finished product was made according to

those SOPs?

A.    Excuse me?

Q.    Who at the company -- sure.

Who at the company was

responsible for ensuring that the finished

product was made according to the SOPs?

MS. FARAH: Objection; calls for

speculation.

Q.    You can answer.

A.    Well, processing staff with the

processing manager made sure that the

grafts were made or the products were made

to specification.

Q.    Was it part of your job at all

to ensure that the finished products were

made according to the SOPs?

A.    Yes.

Page 61

C. CHIN-SANG

So the quality assurance group reviewed inspection records for both the membrane products and the injectable flowable products; right?

A.    Yes.

Q.    You were in charge of that quality assurance group in 2013 when you left the company in 2020; true?

A.    Yes.

Q.    In order for the quality assurance group to do it's job, it needed to understand the process used by HRT to make the injectable flowable product; correct?

A.    Right.

Q.    You had an understanding of that process; correct?

A.    Correct.

Q.    So with that understanding, let's return back to what you were helping me with which were the steps of the process, okay?

A.    Okay.

Q.    You said initially -- and

Page 62

C. CHIN-SANG

again, we are talking about the injectable flowable product now.

Frozen tissue is removed from the freezer?

A.    Right.

Q.    That's the first step that you identified; correct?

A.    Right.

Q.    All right.

Would this tissue be sealed in any type of pouch or encasement?

A.    Yes.

Q.    What happened next?

A.    It could be removed under its pouch, it will be unsealed, under a laminar flow hood.

Q.    What part of the lab would that happen?

A.    There is one or two laminar flow hoods within the processing area.

Q.    What would happen next?

A.    Chris did his portion of the procedure.

Q.    What is that portion of the

Page 63

C. CHIN-SANG

procedure entail?

A.      Weighing.  I don't know exactly.

Q.      You said weighing.  Did you mean weighing tissue?

A.      Weighing, inspecting.

Q.      How do you know that he did that?

A.      Because we have a measuring scale.

Q.      Did you ever observe him measuring the tissue?

A.      No.

Q.      Would he do this by himself?

A.      Yes.

Q.      How do you know that he did it by himself?

A.      That's what he wanted.

Q.      He told you that?

A.      Yes.

Q.      Okay.

Did he ever allow you as the director of quality assurance to watch him handle this tissue?

Page 64

C. CHIN-SANG

A.     No.

Q.     As director of quality assurance, did it make you uncomfortable that you were not allowed to see part of the procedure for a product that is used in medical procedures on humans?

A.     No.

Q.     Why not?

A.     Because we provided training as to how to work under a hood using a septic technique.

Q.     You provided training to Chris Sharp?

A.     Not me personally.

Q.     Who did?  Do you know who did?

A.     I don't recall.

Q.     Do you know if anybody did?

A.     Maybe the processing manager.

Q.     But you don't know for sure?

A.     Well, no.  It would be on record, but no, I don't have any records.

Q.     You said it would be on record. What type of record would indicate that Mr. Sharp was trained on that procedure?

Page 107

C. CHIN-SANG

and answered.

Q.    You can answer.

A.    The steps were recorded in the processing record which is what I saw.

A.    No.

Q.    That wasn't written in that record?

A.    No.

Q.    So in your role as quality assurance director, how did you determine that that ratio was consistently applied with each production batch?

A.    That was Chris' record.

Q.    So in your role as QA director, you did not do that; am I right?

A.    No, I did not see that.

C. CHIN-SANG

A.    I don't know.

[REDACTED]

A.    No.

Q.    You trusted Mr. Sharp to do that?

A.    Yes.

Q.    Did you ever ask him if he actually did it?

A.    No.

Q.    Let's scroll down to page 19.

A.    On the screen?

Q.    I'm sorry, on the screen, yeah, which is bates number 312350.

A.    Um-hum.

Q.    I'm going to direct your attention to Section 8.50, "Quality control review of technical records."

        Do you see that heading?

A.    Correct.

Q.    Now this section sets forth the

**Page 109**

C. CHIN-SANG

obligations of the QA director; is that
right?

A.    Correct.

Q.    The QA director was -- you were
the QA director at this time; true?

A.    Correct.

Q.    And one of the responsibilities
set forth in this document reads as
follows; "Tissue processed for consistency
as per tissue requirements and product
specifications."

Did I read that accurately?

A.    Yes.

A.    No.    I inspected the processing
record.

A.    Correct.

Q.    Did you ever take a finished
product, flowable product and try to

Page 121

C. CHIN-SANG

A.    In the records room.

Q.    That room was separate from the lab?

A.    Yes.

███ ███ ███ █████ ██ ████ ██ ██

█ ███ █████ ██ █████ ███████ █████

█ ███ ███ █ ███ █ ███ █ ███

█ █████ ████ █████?

A.    No.

Q.    Do you know if that information was written down anywhere?

MS. FARAH: Objection; asked and answered.

Q.    You can answer.

A.    I don't know.

Q.    Do you know if Mr. Sharp kept any SOPs in a locked area in his office?

A.    Yes.

Q.    He did; is that correct?

A.    He kept documents.

Q.    I'm being a little more precise.  Do you know if he kept SOPs in a locked area in his office?

A.    Yes.

**Page 122**

C. CHIN-SANG

Q.    He did?

A.    Yes.

Q.    How do you know that?  Did he tell you that he had SOPs in his office?

A.    This SOP that we are talking about.

Q.    I thought you indicated that this SOP, the placental tissue processing SOP, was kept in a records room near the lab?

A.    Yes.

Q.    Was that in the records room and in Mr. Sharp's office?

A.    Yes.

Q.    Okay.

Did Mr. Sharp, to your knowledge, have any SOPs in his office that were not in the records room or the lab?

A.    Did he have any SOPs?  I don't know.

Q.    Okay.

Ms. Chin-Sang, do you know someone named Loch Khun (phonetic)?

A.    No.

Page 145

C. CHIN-SANG

C E R T I F I C A T E


STATE OF NEW YORK          )

                          :   SS.:

COUNTY OF RICHMOND         )


        I, PATRICIA A. VENDITTI, a Notary Public for and within the State of New York, do hereby certify:

        That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

        I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 5th day of October, 2022.

                    *Patricia Venditti*

                    PATRICIA A. VENDITTI

# Exhibit 6

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

- - -

Skye Orthobiologics, LLC, a )
Delaware Limited Liability  )
Company; HUMAN REGENERATIVE )
TECHNOLOGIES, LLC, a        )
Delaware Limited Liability  )
Company,                    )
                            )
          Plaintiffs,       )
                            )
          vs.               ) No. 2:20-cv-03444
                            )     MEMF (PVCx)
CTM BIOMEDICAL, LLC, a      )
Delaware Limited            )
Corporation; BRYAN BANMAN,  )
an individual; CTM MEDICAL, )
INC.,  a Delaware           )
corporation; VETERANS       )
MEDICAL DISTRIBUTORS, INC., )
a Florida corporation;      )
GARDNER ROGERS, an          )
individual; MIKE STUMPE, an )
individual; PABLO SEOANE    )
aka PAUL SEOANE, an         )
individual; NATHAN BOULAIS, )
an individual; and DOES 3   )
through 10, inclusive,      )
                            )
          Defendants.       )
                            )


DEPOSITION OF

KIM SHOEN

Wednesday, September 21, 2022

Reported By:

MICHELLE K. BAILEY

RPR, CSR No. 10713

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 2

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

- - -

Skye Orthobiologics, LLC, a )
Delaware Limited Liability  )
Company; HUMAN REGENERATIVE )
TECHNOLOGIES, LLC, a        )
Delaware Limited Liability  )
Company,                    )
                            )
        Plaintiffs,         )
                            )
        vs.                 ) No.  2:20-cv-03444
                            )      MEMF  (PVCx)
CTM BIOMEDICAL, LLC, a      )
Delaware Limited            )
Corporation; BRYAN BANMAN,  )
an individual; CTM MEDICAL, )
INC.,  a Delaware           )
corporation; VETERANS       )
MEDICAL DISTRIBUTORS, INC., )
a Florida corporation;      )
GARDNER ROGERS, an          )
individual; MIKE STUMPE, an )
individual; PABLO SEOANE    )
aka PAUL SEOANE, an         )
individual; NATHAN BOULAIS, )
an individual; and DOES 3   )
through 10, inclusive,      )
                            )
        Defendants.         )
                            )

        Deposition of KIM SHOEN, taken on behalf of the
Defendants, beginning at 9:04 a.m., and ending at 11:57
a.m., on Wednesday, September 21, 2022, before MICHELLE
K. BAILEY, RPR, CSR No. 10713.

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 3

APPEARANCES:
For the Plaintiffs:
    ROSEN SABA LAW
    BY:  RYAN SABA, ESQ.
         NEDA FARAH, ESQ.
    2301 Rosecrans Avenue
    Suite 3180
    El Segundo, California  90245
    310.285.1727
    rsaba@rosensaba.com

For the Defendants CTM Biomedical, LLC; Bryan Banman;
CTM Medical, Inc.; and Pablo Seoane:

    HODGSON RUSS, LLP
    BY:  ROBERT J. FLUSKEY, JR., ESQ.
         RYAN CUMMINGS, ESQ.
    140 Pearl Street
    Suite 100
    Buffalo, New York  14202
    716.856.4000
    rfluskey@hodgsonruss.com

For the Defendants Gardner Rogers and Veterans
Medical Distributors:
    YUKEVICH CAVANAUGH
    BY:  TODD CAVANAUGH, ESQ.
    355 South Grand Avenue
    15th Floor
    Los Angeles, California  90071
    213.362.7777
    tcavanaugh@yukelaw.com

For the Defendant Nathan Boulais:

    BIENERT KATZMAN, PC
    BY:  CARLOS A. NEVAREZ, ESQ.
    903 Calle Amanecer
    Suite 350
    San Clemente, California  92673
    949.369.3700
    cnevarez@bklwlaw.com

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

**Page 4**

APPEARANCES (continued):

For the Defendant Mike Stumpe:

    BLANK ROME, LLP

    BY:  ARASH BERAL, ESQ.

    2029 Century Park East

    6th Floor

    Los Angeles, California  90067

    424.239.3400

    aberal@blankrome.com

ALSO PRESENT:

    Terry West, videographer

    Bryan Banman

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 8

KIM SHOEN,

having first been duly sworn

by the reporter, was examined

and testified as follows:


EXAMINATION

BY MR. FLUSKEY:

Q. Good morning, Ms. Shoen.

A. Good morning.

Q. My name is Rob Fluskey. I represent Bryan Banman, CTM Biomedical, CTM Medical, and Pablo Seoane in a lawsuit that Skye Orthobiologics and Human Regenerative Technologies filed in federal court in California.

Have you ever participated in a deposition before?

A. No.

Q. Have you ever testified at trial?

A. No.

Q. A few ground rules, format issues. If I ask a question that you do not understand, would you please ask me to clarify?

A. Yes, I will.

Q. Because we have a court reporter here taking down every word we say, you will need to let me finish

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 13

certifications?

A.   For AATB, a CTBS, certified tissue bank specialist.

Q.   What is AATB?

A.   American Association of Tissue Banks.

Q.   And when did you obtain that certification that you referenced in your prior answer?

A.   That was in -- I'm not exactly sure.  It was early -- it might have been 2014, 2015, but I'm not exactly sure what year that was.

Q.   When you were in college, did you have any -- did you gain any experience in manufacturing products derived from human placental tissue?

A.   No.

Q.   So when you began working with Osprey and then later HRT, that was the first time you ever had the opportunity to work with products derived from human placental tissue; is that correct?

A.   Yes.

Q.   Okay.

Let's go back to the 2014 time frame, Ms. Shoen.  You mentioned that at that point, you became a processing technician with HRT; is that right?

A.   Yes.

Q.   Can you describe for me your duties in that

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 14

role.

A.   Processing placental tissue into membrane products.  Part of maintaining a clean room environment and materials as well to go along with the processing of the tissues.  And also keeping track of tissue inventory as well as we processed the tissue.

Q.   You mentioned in your prior answer processing tissue into membrane products.  Can you explain what you mean by that?

A.   From taking a raw material placental membrane, and we would process it into a usable tissue for distribution, for use.

Q.   And what role did you specifically play in that processing environment?

A.   I hands on processed the tissue from start to finish.

Q.   Where did you physically work?

MR. SABA:  After 2014?

MR. FLUSKEY:  Yeah.  We're in 2014.

MR. SABA:  Okay.  Go ahead.

THE WITNESS:  Which -- when processing the tissue?

BY MR. FLUSKEY:

Q.   Correct.

A.   In a clean room.

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 17

MR. FLUSKEY:  Yeah.

MR. SABA:  Okay.  Go ahead.

BY MR. FLUSKEY:

Q.  Let me back up and be more specific so we're on the same page.  I'm talking about any SOPs that you would have reviewed in 2014 as part of your training.

So what did those SOPs include?

A.  Instruction about how to handle tissue and what types of materials to use when and instruction on how long to do certain parts of the process or which steps to carry through.

Q.  Okay.

Did you play any role in drafting the SOPs that you reviewed until 2014?

A.  No.

Q.  Who provided the SOPs to you?

A.  Our quality department.

Q.  Who in the quality department?

A.  At the time, it would have been Cristina.

Q.  Cristina Chin-Sang?

A.  Yes.

Q.  Other than the SOPs, did you review any other documents as part of your training when you began working as a lab technician in 2014?

A.  No, not that I recall.

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 27

time?

A.   General revisions, yes.

Q.   What role, if any, did you play in the revision process?

A.   I would review them, but not create them.

Q.   Who created them, the revisions?

MR. SABA:   Overbroad.

BY MR. FLUSKEY:

Q.   You can answer.

A.   Between a QA making revisions.  Yeah.

Q.   So individuals who worked in the quality assurance area would make revisions; is that right?

A.   Yes.

Q.   And you identified for me previously the directors of quality assurance that you're aware of; right?

A.   Yes.

Q.   Any employees other than those in quality assurance responsible for making revisions to SOPs?

A.   No, other than -- well, Chris Sharp would be, depending on the revision needed.

Q.   How did HRT track those revisions?

MR. SABA:   Speculation.

BY MR. FLUSKEY:

Q.   You can answer.

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 32

A.   When the -- when the tissue is distributed into the vials, final package, I close the vials and I keep track of the number of vials that were made.  And then, also, I pouch and seal for final packaging of those tissues.

Q.   That's all you do?

A.   Yeah.

Q.   Who performs all the other steps necessary for processing that product?

A.   Chris Sharp.

Q.   Only Chris Sharp?

A.   Yes.

Q.   So to your knowledge, every single injectable flowable is processed by Chris Sharp?

A.   Yes.

Q.   Okay.

Since 2014, since you've been involved in the processing side of the business, do you know if anyone other than Chris Sharp has observed the entire process used to manufacture HRT's injectable flowable product?

A.   No.  Nobody.

Q.   You know that for a fact?

A.   Yes.

Q.   So your quality assurance directors know the entire process?

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 33

A.   They would not know the entire process, no.

Q.   Who at HRT is responsible then for confirming that the finished product, the injectable flowable product, is consistent with the SOPs for that product?

A.   It's through a review of our -- of myself, and final -- final review of quality does of the packaging content and review of the processing record as well, that it meets the SOP standard.

Q.   So you are familiar with the SOPs used for --

A.   Not the SOP specifically.

Q.   Let me just -- let me get the question out so we have a clean record.

Have you seen HRT's SOPs for the injectable flowable product?

A.   No.

Q.   You've never seen them?

A.   No.

Q.   So you're unable to confirm that the finished project comports with those SOPs; right?

A.   I guess based on the end result that is meant for the product, that it is.

Q.   But you're unable to compare the SOP to the finished product; correct?

A.   Correct.

Q.   Who does that, if anyone?

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 34

A.   Either Chris Sharp himself can review it or our quality for reviewing the rest of the records.

Q.   Do you know if individuals working in quality assurance have access to the SOPs used for the flowable injectable product?

A.   No, they do not.

Q.   So then they're unable to compare the finished product to the SOP to ensure that the finished product comports with the SOP; right?

MR. SABA:   Speculation.

THE WITNESS:   Yeah.

BY MR. FLUSKEY:

Q.   You agree with me?

A.   Yes.

Q.   Okay.

So the only person in HRT who has the ability to ensure that the finishes product of an injectable flowable product comports with the SOP is Chris Sharp.

Is that your testimony?

A.   Yes.

Q.   Do you know if he does that?

A.   Yes, I believe he does.

Q.   Do you know if he documents that?

A.   I'm not sure.  Yes.  I imagine.

Q.   Well, I don't want you to guess.  Do you know

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 35

one way or the other whether he documents that work?

A.   I do not know for a fact.

Q.   So you've never seen documentation of that work; is that right?

A.   Only our processing records for the batch.

Q.   So HRT creates processing records for the injectable flowable product; correct?

A.   Correct.

Q.   And those are hard copy?

A.   Yes.

Q.   Do you have access to those?

A.   Yes.

Q.   You've reviewed those?

MR. SABA:  Well, vague as to when.

BY MR. FLUSKEY:

Q.   Have you ever reviewed one of those records, Ms. Shoen?

A.   Yes.

Q.   Okay.

And is there anything in the record that indicates that someone compared the finished product to the SOP?

A.   No.

Q.   So you don't know whether HRT's injectable flowable product is even made according to the SOP for

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 36

that product; right?

A.  I guess not.

Q.  Have you played any role in drafting any section of the SOPs used for the injectable flowable product?

A.  No.

Q.  Have you played any role in revising any section of the SOPs used for the injectable flowable product?

A.  No.

Q.  Do you even know if the SOPs for the injectable flowable product have been revised since you've been with HRT?

A.  Nope.

Q.  Why is it that you are aware of the revisions made to the SOPs to the membrane products but not the injectable flowable products?

A.  Because I'm responsible for processing the membrane products.

Q.  Even today?

A.  Yes.

Q.  Okay.

So today in your role as director of processing, your job is limited to the processing of the membrane products.  Do I have that right?

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 37

A.   Yes.

Q.   If you know, was Cristina Chin-Sang's role limited to the membrane products?

A.   I am not sure.

Q.   Did the Cristina Chin-Sang ever tell you that she had reviewed the SOPs for the injectable flowable products?

A.   I can't be sure.  I'm not sure.

Q.   You mentioned earlier that the SOPs for the membrane products were available in hard copy binders in a certain room at HRT; right?

A.   Right.

Q.   Are the SOPs for the injectable flowable products also available in binders in that room?

A.   No.

Q.   Do you know where those SOPs are located?

A.   In Chris Sharp's office, in a locked cabinet in his office.

Q.   How do you know they're there?

A.   He's told me that that's where they are.

Q.   Okay.

But you've never seen them?

A.   No.

Q.   Did you ever work with Bryan Banman while you were at HRT?

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***

Page 110

REPORTER'S CERTIFICATION

I, Michelle K. Bailey, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 6th day of October, 2022.

Michelle K. Bailey
RPR, CSR No. 10713

# Exhibit 7

Arnold Lee Andrews, Jr.                Confidential                March 17, 2022

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SKYE ORTHOBIOLOGICS, LLC, ) Case No.:
a Delaware Limited        ) 2:20-cv-03444-MEMF-PVC
Liability Company, HUMAN  )
REGENERATIVE TECHNOLOGIES, ) Honorable Maame
LLC, a Delaware Limited   ) Ewuisi-Mensah Frimpong
Liability Company,        )
                          ) Magistrate
        Plaintiffs        ) Pedro V. Castillo
                          )
VS.                       )
                          )
CTM BIOMEDICAL, LLC, a    )
Delaware Limited Liability )
Corporation; BRYAN BANMAN, )
an individual; CTM MEDICAL,)
INC., a Delaware          )
Corporation; VETERANS     )
MEDICAL DISTRIBUTORS, INC.;)
a Florida Corporation;    )
GARDNER ROGERS, an        )
individual; MIKE STUMPE, an)
individual; PABLO SEOANE  )
aka PAUL SEOANE, an       )
individual; NATHAN BOULAIS,)
an individual, and DOES 3 )
through 10, inclusive,    )
                          )
        Defendants        )

**********************************************************

VIDEO/ORAL DEPOSITION OF

ARNOLD LEE ANDREWS, JR. (ALAMO BIOLOGICS)

MARCH 17, 2022

HIGHLY CONFIDENTIAL

**********************************************************

1

VIDEO/ORAL DEPOSITION of ARNOLD LEE ANDREWS, JR. (ALAMO BIOLOGICS), produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 17th day of March, 2022, from 9:08 a.m. to 6:37 p.m., before Monique M. Hinchcliff, CSR in and for the State of Texas, reported by machine shorthand, at the offices of CLARK HILL, 2301 Broadway Street, San Antonio, TX 78215, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

2

Arnold Lee Andrews, Jr.                    Confidential                    March 17, 2022

A P P E A R A N C E S


FOR THE PLAINTIFFS:
     BY:  Mr. Ryan D. Saba
     BY:  Ms. Laura Kelly St. Martin
          (Remote appearance)
     ROSEN SABA, LLP
     2301 Rosecrans Avenue, Suite 3180
     El Segundo, CA  90245
     Telephone:  (310)285-1727
     E-mail:  rsaba@rosensaba.com
     E-mail:  lstmartin@rosensaba.com


FOR THE DEFENDANT, ALAMO BIOLOGICS:
     BY:  Mr. Stephen Dennis
     CLARK HILL
     2301 Broadway Street
     San Antonio, TX  78215
     Telephone:  (210)250-6011
     E-mail:  sdennis@clarkhill.com


FOR THE DEFENDANTS, BRYAN BANMAN, CTM BIOMEDICAL, LLC,
and PABLO SEOANE aka PAUL SEOANE:
     BY:  Mr. Robert J. Fluskey, Jr.
     BY:  Mr. Matthew K. Parker
          (Remote appearance)
     HODGSON RUSS LLP
     The Guaranty Building
     140 Pearl Street, Suite 100
     Buffalo, NY  14202
     Telephone:  (716)856-4000
     E-mail:  rfluskey@hodgsonruss.com
     E-mail:  mparker@hodgsonruss.com


FOR THE DEFENDANT, NATHAN BOULAIS:
     BY:  Mr. Michael R. Williams
     BIENERT KATZMAN LITTRELL WILLIAMS LLP
     903 Calle Amanecer, Suite 350
     San Clemente, CA  92673
     Telephone:  (949)369-3700
     E-mail:  mwilliams@bklwlaw.com

3

Arnold Lee Andrews, Jr.                    Confidential                    March 17, 2022

FOR THE DEFENDANT, MIKE STUMPE:
          BY:  Mr. Arash Beral
                (Remote appearance)
          BLANK ROME LLP
          2029 Century Park East, 6th Floor
          Los Angeles, CA  90067
          Telephone:  (424)239-3400
          E-mail:  aberal@blankrome.com


FOR THE DEFENDANTS, GARDNER ROGERS and VETERANS
MEDICAL DISTRIBUTORS, INC.:
          BY:  Mr. Hassan Elrakabawy
                (Remote appearance)
          YUKEVICH CAVANAUGH
          355 South Grand Avenue, 15th Floor
          Los Angeles, CA  90071
          Telephone:  (213)362-7777
          E-mail:  helrakabawy@yukelaw.com


The Videographer:   Mr. David Flores

Video technician:   Mr. Oliver Garcia
                    (Remote appearance)

Also Present:  Mr. Bryan Banman (Remote appearance)
                Mr. Chris Sharp


                    *  *  *  *  *

4

Arnold Lee Andrews, Jr.                    Confidential                    March 17, 2022

MR. ELRAKABAWY:  Good morning.  Hassan Elrakabawy for Defendants, Gardner Rogers and VMD.

MR. PARKER:  Good morning.  This is Matt Parker for Defendants, Banman, Seoane, CTM Medical and CTM Biomedical.

THE VIDEOGRAPHER:  The witness may now be sworn in.

(ALAMO BIOLOGICS), ARNOLD LEE ANDREWS, JR., having been first duly sworn, testified as follows:

MR. SABA:  I think there's one more counsel.  I see a window for Michael Williams.  I didn't hear him announce himself.  I don't know if he's having technical difficulties or not, but he seems to be signed into Zoom as well.

EXAMINATION

BY MR. SABA:

Q.   Good morning, Mr. Andrews.

A.   Good morning.

MR. WILLIAMS:  One more try, guys.  This is Mike Williams.  Can you hear me this time?

MR. SABA:  We can.  Thank you.

MR. WILLIAMS:  Okay, perfect.  Michael Williams on behalf of Defendant, Nathan Boulais.

Q.   (BY MR. SABA)  You're here today, sir, for a deposition.  Have you ever participated in a

9

Arnold Lee Andrews, Jr.                    Confidential                    March 17, 2022

What CTM has -- has agreed with Alamo, right, in this agreement --

A.   Yes, sir.

Q.   -- is that Alamo is going to manufacture these products?

A.   Yes, sir.

Q.   And CTM prepared Exhibit B to identify how the products should be made.

MR. FLUSKEY:  Form.

THE WITNESS:  No.

MR. FLUSKEY:  Mischaracterizes the document.

THE WITNESS:  That's not correct.

Q.   (BY MR. SABA)  What do you mean by not correct?

A.   I don't -- this is how we process that tissue.

Q.   Correct.

A.   Not how he necessarily tells us to process it.  He -- I don't know why this is in here, but the way we process the tissue was all predetermined -- predetermined before this agreement was written.

Q.   Well, let me ask --

A.   And we determined how that happened.

Q.   Okay.  Hold on.  Let me ask you this:  Does

159

Alamo create the products for CTM according to Exhibit B?

    A.    Generally speaking, yes.

    Q.    Well, what -- what are the differences?

    A.    I can't tell you exactly, but there could be. There could be a difference in this 60 seconds, there could be a difference in this 30 seconds.  There could be a difference in the ten milliliter pipette.

    Q.    Well, hang on.  I know there could be hypothetical differences, but one of the topics, is whey you're here, is to tell me exactly what the differences are.

              How does CTM manufacture -- sorry, Alamo manufacture the CTM products that are different than Exhibit B?

    A.    I'm not qualified to tell you exactly how we are processing compared to this statement, but I can --

    Q.    Who would be the person from the company that would have that information?

    A.    Regina Resendez, R-E-S-E-N-D-E-Z.

    Q.    Okay.  So you don't know one way or another whether Alamo manufactures CTM's product according to Exhibit B; is that correct?

    A.    I'm going to tell you, sir, that Alamo Tissue

160

produces these products generally as this says,

generally speaking.  There are changes in flowable,

there are changes in gauges of needles, there are

always changes.  SOPs and procedures are living

documents and things change.  As -- as does machinery.

Q.  Okay.  Okay.  So then let's talk general --

let's talk generally since that's what you know,

right?  Generally, right --

A.  Well, you -- you're asking me to be very

specific and --

Q.  I was.

A.  -- I don't watch them do this process.

Q.  Okay.  That's fine.

A.  That's not my job.

Q.  No, I understand that.  But one of the

reasons why you're here, one of the reasons why we're

taking this deposition was to ask you that question.

But if you don't have the answer, that's okay.  Let me

talk about what you do know.

A.  Okay.

Q.  Okay.  Generally, what you know, when you're

making a -- liquid products and paste products, is

that you're taking placenta particulate, you're

putting it into a cryo shaker, right?

MR. FLUSKEY:  Form.

161

Arnold Lee Andrews, Jr.                    Confidential                    March 17, 2022

own?

A. Yes, sir.

Q. All right. We've talked a lot today about SOPs.

A. Yes, sir.

Q. Now, a jury and a judge might be watching this video one day and I want to make sure they understand what we're talking about.

A. Okay.

Q. All right. So what does SOP stand for?

A. Standard operating procedure.

Q. Okay. And in your business, what is it an SOP and how is it used?

A. It's used in the everyday production of -- of product.

Q. Okay. Fair to say the SOP sets forth the steps used by your company in manufacturing a certain product?

A. Yes, sir.

Q. Okay. If I wanted to understand how your company manufactured a product, is the SOP the best written source to review?

A. Yes, sir.

MR. SABA: Objection -- objection to form.

323

Q.   (BY MR. FLUSKEY)  Now, do you have -- I want to look at some of the SOPs again that we looked at today.  Can you grab Exhibit 33 for me?

A.   Yes, sir.

MR. PARKER:  Hey, Rob, while he's doing that, do you have a microphone or something you can use?  I can kind of hear you, but it's difficult to hear your questions.

MR. FLUSKEY:  The microphone's on.  Sorry, Matt.

THE WITNESS:  Did you say 33?

Q.   (BY MR. FLUSKEY)  Yes, please, 33.  Sorry about that.  Lots of exhibits.

A.   Got it.

Q.   All right.  Now, Exhibit 33 includes two e-mails.  The first e-mail in time is an e-mail from Dina Van Hoose to you --

A.   Yes, sir.

Q.   -- dated September 8, 2020.  You see that?

A.   Oh, yes.  September 8, 2020, yes, sir.

Q.   Now, the e-mail indicates that her title, as of September 8, 2020, was director of quality; is that right?

A.   Yes, sir.

Q.   And what were her responsibilities as

324

Arnold Lee Andrews, Jr.                    Confidential                    March 17, 2022

director of quality in September of 2020?

A.    Maintain all SOPs, make sure the lab is following the SOPs, make sure -- sure that her staff are qualifying and quantifying tissues that have been going into process and coming out of process.

Q.    Okay.  Now, Ms. -- is it Van Hoose?  Am I pronouncing that right?

A.    Van Hoose, yes, sir.

Q.    Van Hoose.  Ms. Van Hoose forwarded documents to you.

A.    Yes, sir.

Q.    And the subject line is "BT SOPs."

A.    Yes, sir.

Q.    You forwarded those documents to Mr. Banman.

A.    Yes, sir.

Q.    See that, correct?

A.    Yes, sir.

Q.    And you wrote, "Current SOPs."

When you sent this e-mail in September 2020, was it your understanding that the SOPs you attached to the e-mail were the SOPs used by Alamo in manufacturing products for CTM?

A.    That's correct.

Q.    All right.  Now, I see three SOPs attached to this e-mail.  The first is BT-8005, birth tissue

325

Arnold Lee Andrews, Jr.                    Confidential                    March 17, 2022

A.   Yes, sir.

Q.   Mr. Banman didn't need to teach you how to particulate using your shaker mill, right?

MR. SABA:  Objection --

THE WITNESS:  That's correct.

MR. SABA:  Objection; lack of foundation.

Q.   (BY MR. FLUSKEY)  I think you testified earlier that you don't know for certain who manufactured your shaker mill, right?

A.   That's correct.

Q.   All right.  If we could take a look at Exhibit 16, please.

A.   Yes, sir.

Q.   All right.  So this is the agreement for biomedical materials between CTM and Precision Allograft Solutions, right?

A.   Yes, sir.

Q.   I want to refer your attention to Page 8 of this contract, which is Section 11.6.

A.   Yes, sir.

Q.   And before we get there, just to confirm, you signed this document, right?

A.   Yes, sir.

Q.   And when you signed it, you believed the

335

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SKYE ORTHOBIOLOGICS, LLC,    ) Case No.:
a Delaware Limited           ) 2:20-cv-03444-MEMF-PVC
Liability Company, HUMAN     )
REGENERATIVE TECHNOLOGIES,   ) Honorable Maame
LLC, a Delaware Limited      ) Ewuisi-Mensah Frimpong
Liability Company,           )
                             ) Magistrate
        Plaintiffs           ) Pedro V. Castillo
                             )
VS.                          )
                             )
CTM BIOMEDICAL, LLC, a       )
Delaware Limited Liability   )
Corporation; BRYAN BANMAN,   )
an individual; CTM MEDICAL,  )
INC., a Delaware             )
Corporation; VETERANS        )
MEDICAL DISTRIBUTORS, INC.;  )
a Florida Corporation;       )
GARDNER ROGERS, an           )
individual; MIKE STUMPE, an  )
individual; PABLO SEOANE     )
aka PAUL SEOANE, an          )
individual; NATHAN BOULAIS,  )
an individual, and DOES 3    )
through 10, inclusive,       )
                             )
        Defendants           )

REPORTER'S CERTIFICATION

VIDEO/ORAL DEPOSITION OF

ARNOLD LEE ANDREWS, JR. (ALAMO BIOLOGICS)

MARCH 17, 2022


HIGHLY CONFIDENTIAL

I, MONIQUE M. HINCHCLIFF, Certified Shorthand

Reporter in and for the State of Texas, hereby certify

to the following:

365

Arnold Lee Andrews, Jr.                    Confidential                    March 17, 2022

That the witness, ARNOLD LEE ANDREWS, JR. (ALAMO

BIOLOGICS), was duly sworn by the officer and that the

transcript of the VIDEO/ORAL DEPOSITION is a true

record of the testimony given by the witness;

That the deposition transcript was submitted on

_____ to the witness or to the

attorney for ALAMO BIOLOGICS, for examination,

signature, and return to me by _____;

That the amount of time used by each party at the

deposition is as follows:

Mr. Ryan D. Saba - 06:20

Mr. Robert J. Fluskey, Jr. - 00:36

Mr. Michael R. Williams - 00:01

Mr. Hassan Elrakabawy - 00:01

Mr. Arash Beral - 00:01

That pursuant to information given to the

deposition officer at the time said testimony was

taken, the following includes counsel for all parties

of record:

Mr. Ryan D. Saba, Ms. Laura Kelly St. Martin,
for the Plaintiffs;

Mr. Stephen Dennis, for the Defendant, Alamo
Biologics;

Mr. Robert J. Fluskey, Jr., Mr. Matthew K.
Parker, for the Defendants, Bryan Banman, CTM
Biomedical, LLC, and Pablo Seoane aka Paul Seoane;

366

Arnold Lee Andrews, Jr.                    Confidential                    March 17, 2022

        Mr. Michael R. Williams, for the Defendant, Nathan Boulais;

        Mr. Arash Beral, for the Defendant, Mike Stumpe;

        Mr. Hassan Elrakabawy, for the Defendants, Gardner Rogers and Veterans Medical Distributors, Inc.;

    I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

    Certified to by me this _____ day of _____, 2022.

                        _____
                        MONIQUE M. HINCHCLIFF
                        Texas CSR 6199
                        Expiration Date: 1/31/24
                        MAGNA LEGAL SERVICES
                        Firm Registration No. 631
                        16414 San Pedro, Suite 900
                        San Antonio, TX  78232
                        Phone:  866-672-7880

367

# Exhibit 8
Subject to a Sealing Motion

# Exhibit 9

Mike Stumpe                                                    May 25, 2022

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


SKYE ORTHOBIOLOGICS, LLC, a      )
Delaware Limited Liability       )
Company, HUMAN REGENERATIVE      )
TECHNOLOGIES, LLC a Delaware     )
Limited Liability Company,       )
                    Plaintiff,   ) Case No:
          -vs-                   ) 2:20-cv-03444-MEMF-PVC
CTM BIOMEDICAL, LLC, a           )
Delaware Limited Liability       )
Corporation; BRYAN BANMAN, an    )
individual; CTM MEDICAL, INC.,   )
a Delaware Corporation;          )
VETERANS MEDICAL DISTRIBUTORS,   )
INC.,;a Florida Corporation;     )
GARDNER ROGERS, an individual;   )
PABLO SEOANE aka PAUL SEOANE,    )
an individual; NATHAN BOULAIS,   )
an individual, and DOES 3        )
through 10, inclusive,           )
                    Defendants.  )


VIDEO DEPOSITION OF MIKE STUMPE


     The video deposition upon oral examination of
MIKE STUMPE, a witness produced and sworn before
Wendi Kramer Sulkoske, Notary Public in and for
the County of Boone, State of Indiana, taken on
behalf of the Plaintiff at Barnes & Thornburg,
11 South Meridian Street, Indianapolis Marion County,
Indiana on May 25, 2022, at 9:18 a.m., pursuant to
the Federal Rules of Civil Procedure.

1

Mike Stumpe                                                                May 25, 2022

APPEARANCES



FOR THE PLAINTIFF:

ROSEN SABA
Ryan D. Saba, Esq.
Laura St. Martin (Via Zoom Teleconference)
2301 Rosecrans Avenue, Suite 3180
El Segundo, California 90245
rsaba@rosensaba.com


FOR THE DEFENDANT MIKE STUMPE:

BLANK ROME
Arash Beral, Esq.
2029 Century Park East, 6th Floor
Los Angeles, California  90067
aberal@blankrome.com


FOR THE DEFENDANT BRYAN BANMAN, CTM BIOMEDICAL, LLC
and PABLO SEOANE aka PAUL SEOANE:

HODGSON RUSS
Robert J. Fluskey, Esq. (Via Zoom Teleconference)
Ryan K. Cummings, Esq.
140 Pearl Street, Suite 100
Buffalo, New York  14202
rfluskey@hodgsonruss.com


FOR THE DEFENDANT NATHAN BOULAIS:
   (Via Zoom Teleconference)

BIENERT KATZMAN LITTRELL WILLIAMS
Michael R. Williams, Esq.
903 Calle Amanecer, Suite 350
San Clemente, California 92673
mwilliams@bklwlaw.com

2

Mike Stumpe                                                                    May 25, 2022

                                    APPEARANCES



FOR THE DEFENDANT GARDNER ROGERS/VMD, INC:
  (Via Zoom Teleconference)

YUKEVICH CAVANAUGH
Hassan Elrakabawy, Esq.
355 S. Grand Avenue, 15th Floor
Los Angeles, California 90071
helrakabawy@yukelaw.co,




ALSO PRESENT: Chris Sharp, Jared Keeling,
              Caitlin Clark, Zoom Moderator
              Michael Pratt, Videographer




                        EXAMINATION INDEX
                                                      Page

  EXAMINATION
    QUESTIONS BY MR. SABA                              7
  EXAMINATION
    QUESTIONS BY MR. CUMMINGS                          305
  EXAMINATION
    QUESTIONS BY MR. ELRAKABAWY                        323
  EXAMINATION
    QUESTIONS BY MR. SABA                              324
  EXAMINATION
    QUESTIONS BY MR. CUMMINGS                          330

                                                              3

Gardner Rogers and VMD.

VIDEOGRAPHER:  Would the court reporter please swear in or affirm the witness.

MR. WILLIAMS:  Hold on.  There's one more Zoom appearance.  Michael Williams on behalf of Nathan Boulais.

MR. SABA:  Also, Laura St. Martin, who is an attorney in my office, has joined us by Zoom as well.

For those who are remote, we are having slight audio issues in here.  So if you do want to speak up, sort of yell and say your name and we will stop and make sure we get whatever you say on the record.

MIKE STUMPE

the witness herein, having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION,

QUESTIONS BY MR. SABA:

Q   Thank you for coming today, Mr. Stumpe.  Can you spell your full name for the record?

A   Michael, M-I-C-H-A-E-L.  Stumpe, S-T-U-M-P-E.

MR. BERAL:  Take your time.  She has to write all that down.  Take your time.

7

Mike Stumpe                                                    May 25, 2022

MR. BERAL:  Don't reveal attorney/client

communications.  If you can answer it without

revealing attorney/client communications go for

it.

If you can't, just say I can't divulge the

information I learned from my attorneys.

A   I can't divulge the information I learned from my

attorneys.

Q   Other than the four items that were handed to me

today, you don't have any other Skye product in

your possession, is that correct?

A   That is correct.

Q   Have you ever used an application called Signal?

A   Signal?

Q   Signal.

A   No.

Q   How did you first get introduced to Skye?

A   Through a rep I used to work with named

Jason Ewers, E-W-E-R-S.

Q   What did Jason, how did he introduce you to Skye?

A   I was working with another company and they were

not very good people.

Q   Is that Biomet?

A   No.

Q   Who was that?

44

Mike Stumpe                                                              May 25, 2022

A    That was some distributors for another placental
     company called NuCell, Nutech, N-U-T-E-C-H.  And I
     had a need for some products.  So I called Jason
     and I said, hey, I need some stuff.

Q    And Jason said what?

A    Okay.  Where do you need the stuff sent?

Q    Had you ever heard of Skye at that time?

A    Not really.

Q    Did you do any due diligence on Skye before you
     began to sell their products?

A    Not a thing.

Q    Why not?

A    Because it does not matter.  I called Jason.
     Jason gives me the product.  I put the product in.
     Jason gives me my money.

Q    When you are selling the products to facilities
     and doctors don't you need to know what the
     products are?

A    A lot of the times these facilities and doctors,
     you have a nice reputation, so they understand
     that what you will be bringing is up to code AOK.

Q    So the doctors at the facilities rely on you to
     make sure you are bringing solid products to them,
     correct?

A    Correct.

45

Mike Stumpe                                                                May 25, 2022

were selling Organogenesis products?

A    I don't know.

Q    When you were working with Skye did you ever sell
any other human placental products?

A    Yeah.

Q    Which products?

A    Zimmer Biomet.  Biomet.  Organogenesis.  CTM.  I
think that's it.

Q    Did you ever disclose to Skye that you were
selling other products while you were under a
representation agreement with them?

A    Absolutely.

Q    Who was your contact at Skye when you were working
with them?

A    Bryan.

Q    How did you first meet Bryan?

A    Through Jason Ewers.

Q    Do you recall the first time that you met with
Bryan Banman in person?

A    I do not.

Q    Do you recall how much you were making with Skye
in the last year of selling Skye products?

A    A couple hundred thousand.

Q    Other than Bryan Banman, did you have any other
contact at Skye that you would regularly

52

Q   And is it your view that those relationships are personal to you and not to the companies on whose behalf you were selling product?

A   Absolutely.

Q   I want to focus on training for a moment.  Well, before I get there, did you ever see how Skye's products were processed?

A   No.

Q   Were you ever given any recipes regarding Skye's products?

A   No.

Q   Do you know where Skye's products were sourced from?

A   No.

Q   Were you involved at all in the development of CTM's products?

A   No.

Q   With regard to training, were you ever provided any sales training by Skye?

A   No.

Q   How did you learn to sell Skye products?

A   I used the training that I had gotten myself through previous companies and my, my relationships to sell Skye products.

Q   Did you ever have any doctors that you worked with

307

Mike Stumpe                                                        May 25, 2022

STATE OF INDIANA     )
                     ) SS:
COUNTY OF BOONE      )


     I, Wendi Kramer Sulkoske, Notary Public in and

for said county and state, do hereby certify that

MICHAEL STUMPE, the deponent herein was by me

first duly sworn to tell the truth in the

aforementioned matter;

     That the foregoing deposition was taken on

behalf of the Plaintiff at the time and place

heretofore mentioned with counsel present as

noted.

     That the deposition was taken down in

Stenograph notes, reduced to typewriting under

my direction, is a true record of the testimony

given by said deponent, and was thereafter

presented to the deponent for signature.

     That this certificate does not purport to

acknowledge or verify the signature hereto of

the deponent.

     I do further certify that I am a

disinterested person in this cause of action;

that I am not a relative or attorney of any of

the parties or otherwise interested in the event

of this action, and am not in the employ of the

332

Mike Stumpe                                                                                May 25, 2022

attorneys for the respective parties.

IN WITNESS WHEREOF, I have hereunto set my

hand and affixed my notarial seal this 2nd day

of June, 2022.

_____
Wendi Kramer Sulkoske, Notary Public

Commission Number  NP0661030

My commission expires December 1, 2022.
My County of residence is Boone.

333

# Exhibit 10

| From: | Pablo Seoane <pseoane23@gmail.com> |
|---|---|
| Sent: | Thursday, June 11, 2020 9:16 AM |
| To: | Ryan Saba |
| Cc: | pseoane@ctmbiomedical.com; Paul Martin; Fluskey, Jr., Robert; Laura St. Martin |
| Subject: | Re: Cease and Desist from Illegal Action |

| Follow Up Flag: | Follow up |
|---|---|
| Flag Status: | Flagged |

Dear Mr. Saba,

I am shocked and deeply offended by the mentioned allegations. I have never engaged in any behavior with intention to negatively impact Skye Biologics, it's employees or customers. I was a dedicated, productive and loyal team member for the entirety of my employment. I don't believe there is a single employee, distributor or customer during my tenure at the company, that would argue otherwise.

While working at Skye, I created and stored documents in my personal iCloud account according to Skye's policy and at the direction of Mr. Sharp (all business development employees were required to store company information on personal accounts and devices). Leading up to my departure, I complied with all instructions to transition management of selling distributors I was responsible for to my colleagues, and make information in my personal iCloud available to other Skye business development team members. Furthermore, it was requested by my colleagues that I don't delete any information pertaining to Skye from my personal iCloud account, to prevent them from potentially losing access to it.

If you are concerned about me having potential access to information relating to Skye, please have their IT team remove me from any shared iCloud documents. If Skye wants me to transfer electronic ownership of any documents that I authored in my personal iCloud account, please advise how such ownership should be transferred.

Best,
Pablo Seoane

On Wed, Jun 3, 2020 at 7:06 PM Ryan Saba <rsaba@rosensaba.com> wrote:

Dear Mr. Seoane:

Please review the attached letter and respond by June 10, 2020.

Thank you,

Ryan Saba



1

RYAN D. SABA

ROSEN ◇ SABA, LLP
TRIAL LAWYERS

9350 Wilshire Blvd., Suite 250

Beverly Hills, CA 90212

t 310.285.1727

**Website** | **LinkedIn** | **vCard** | **Email**

CONFIDENTIALITY NOTICE: This e-mail, and any attached documents, files or previous e-mail messages, is intended for the addressee only.  E-mail may contain confidential information that is legally privileged.  Do not read this e-mail if you are not the intended recipient.

If you are not the intended recipient of this e-mail, you are hereby notified that any disclosure, copying, distribution or use of any information contained in or attached to this transmission is STRICTLY PROHIBITED.  If you have received this transmission in error, please immediately notify us by reply e-mail or by telephone at (310) 285-1727, and destroy the original transmission and its attachments without reading, saving or copying any of it. Thank you.

---

**Total Control Panel**                                                    Login

To: lstmartin@rosensaba.com         Message Score: 50              High (60): Pass
From: pseoane23@gmail.com           My Spam Blocking Level: Medium  Medium (75): Pass
                                                                   Low (90): Pass

                                    Block this sender
                                    Block gmail.com

*This message was delivered because the content filter score did not exceed your filter level.*

2



**Robert J. Fluskey, Jr.**
Partner
Direct Dial: 716.848.1688
*rfluskey@hodgsonruss.com*

June 11, 2020

**By Email (rsaba@rosensaba.com)**

Ryan D. Saba
Rosen Saba
9350 Wilshire Blvd. Suite 250
Beverly Hills, CA 90212

Dear Mr. Saba:

Re:     Your June 3, 2020 Letter to Pablo Seoane

As you know, Hodgson Russ LLP represents CTM Biomedical, LLC ("CTM") and Bryan Banman. I write in response to your June 3, 2020 letter to Pablo Seoane, on which I was copied. I also write to place Skye Orthobiologics, LLC ("Skye") and Chris Sharp on notice that their accusations of trade secret theft and confidentiality breaches against CTM and its representatives are baseless, and CTM will pursue all appropriate legal remedies for Mr. Sharp's misconduct.

Mr. Seoane began working for CTM on February 17, 2020. As you know, as a matter of law, Skye cannot prohibit CTM from employing Mr. Seoane. CTM is free to compete with Skye. Your implications to the contrary are part of Skye's improper attempt to interfere with CTM's legitimate business and Mr. Seoane's right to earn a living in the field of his choosing.

You vaguely allege—with no evidence—that Skye has "reason to believe" that Mr. Seoane has used or disclosed Skye's "confidential information" in connection with his work for CTM. You provide no basis for Skye's belief. Skye's unsubstantiated allegation is false. CTM has not received, used, or disclosed any of Skye's confidential information.

Our investigation of the allegations in your letter has uncovered additional evidence that further undermines Skye's trade secret claims. In its lawsuit against CTM, Skye alleges that it employs reasonable measures to protect its alleged trade secrets, including "firewalls, password protection, and security credentials to prevent unauthorized access to Plaintiffs' servers and revoke authorization at the end of any relationship . . . ." Complaint ¶ 23. This is not true. Mr. Sharp has directed Skye representatives to use their ***personal*** iCloud accounts to store documents relating to Skye's business. He also has directed Skye representatives to use their personal iCloud accounts to share Skye-related documents with each other. This sharing of personal iCloud accounts includes no company-maintained firewalls, no password protection, no information technology controls, no process for revoking access, and no Skye servers.

June 11, 2020
Page 2



When Mr. Seoane resigned his employment with Skye, Mr. Seoane was asked to make any Skye-related documents in his personal iCloud account available for others at Skye to allow Skye's continued access after his departure. Mr. Seoane performed that task. We recently discovered that Skye took no steps to disconnect Mr. Seoane's shared access to documents shared from the personal iCloud drives of other Skye representatives.

Skye has represented to a federal court that its business is built upon highly-valuable trade secrets that it rigorously protects. Yet, in truth, Mr. Sharp directs Skye representatives to create, save, and share Skye documents on personal iCloud accounts. And when a representative leaves the company, Mr. Sharp has no process for disconnecting shared iCloud services.

CTM and Bryan Banman want nothing to do with Skye or Skye's documents. Please inform Mr. Sharp that he needs to take action to disconnect Mr. Seoane's access to any shared iCloud files and folders of Skye representatives.

As Skye considers its options for filing an amended complaint, the company should closely examine the factual basis for its claims.

Very truly yours,

Rob Fluskey

15516148v1



**Robert J. Fluskey, Jr.**
Partner
Direct Dial: 716.848.1688
*rfluskey@hodgsonruss.com*

June 15, 2020

**By Email (rsaba@rosensaba.com)**

Ryan D. Saba
Rosen Saba
9350 Wilshire Blvd. Suite 250
Beverly Hills, CA 90212

Dear Mr. Saba:

    Re:  <u>Your June 12, 2020 Letter to Pablo Seoane</u>

    Hodgson Russ LLP represents Pablo Seoane, CTM Biomedical, LLC ("CTM"), and Bryan Banman. I write in response to the letter that you sent directly to Mr. Seoane on June 12, 2020 in which you asked Mr. Seoane to destroy certain information that may be stored on his iOS devices.

    In the second paragraph of your letter, you incorrectly state that Mr. Seoane's email to you "confirms your intentional refusal to follow instructions by Chris Sharp." Mr. Sharp did not ask Mr. Seoane to "delete any and all Skye information" on the last day of Mr. Seoane's employment with Skye. And as Mr. Sharp knows, other Skye representatives specifically asked Mr. Seoane not to delete certain information out of fear that such information would no longer be available to them.

    At your request, to the extent that any of the "notes" set forth in numbers 1 through 17 of your letter are available on any of Mr. Seoane's iOS devices, the notes will be promptly deleted from those devices. If Mr. Seoane possesses any other Skye-related information—regardless of whether such information is allegedly "confidential"—it will be returned. Mr. Seoane has not shared any of Skye's or HRT's confidential information with CTM or with any other individual/entity. Nor has Mr. Seoane shared any of Skye's or HRT's "sales tactics, strategic information, clinical trial plans, or research."

    In my June 11, 2020 letter, and in Mr. Seoane's email of the same date, we asked you to direct Mr. Sharp to disconnect Mr. Seoane's access to any shared iCloud files or folders of Skye representatives. I am making that request again. As I previously indicated, Mr. Seoane does not want any shared access to these documents/data.

        Very truly yours,

        Rob Fluskey

# Exhibit 11

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA -- WESTERN DIVISION

SKYE ORTHOBIOLOGICS, LLC, a ) Case No.
Delaware Limited Liability ) 2:20-cv-03444-MEMF
Company, HUMAN REGENERATIVE ) (PVCx)
TECHNOLOGIES, LLC, a Delaware )
Limited Liability Company, )
                            )
            Plaintiffs, )
                            )
v.                          )
                            )
CTM BIOMEDICAL, LLC, a      )
Delaware Limited Corporation; )
BRYAN BANMAN, an individual; )
VETERANS MEDICAL            )
DISTRIBUTORS, INC.; a Florida )
Corporation; GARDNER ROGERS, )
an individual; MIKE STUMPE, )
an individual; PABLO SEOANE )
aka PAUL SEOANE, an         )
individual; and DOES 1      )
through 10,                 )
                            )
            Defendants. )
_____ )

REMOTE VIDEOTAPED DEPOSITION OF PRISCILLA LEE

(PAGES 16 - 136 HIGHLY CONFIDENTIAL)

SEPTEMBER 29, 2022

Reported By: Amy E. Simmons, CA CSR 14553, RPR, CRR, CRC

Page 2

**REMOTE VIDEOTAPED DEPOSITION OF PRISCILLA LEE**

BE IT REMEMBERED that the remote videotaped deposition of PRISCILLA LEE was taken via videoconference by the attorney for the Defendants before Veritext Legal Solutions, Amy E. Simmons, a California and Idaho Certified Court Reporter, and Notary Public in and for the County of Ada, State of Idaho, on Thursday, the 29th day of September, 2022, commencing at the hour of 9:03 a.m. in the above-entitled matter.

APPEARANCES (remotely):

For the Plaintiffs:   ROSEN SABA
                      By:  Ryan D. Saba, Esq.
                           Laura Kelly St. Martin, Esq.
                      2301 Rosecrans Avenue, Suite 3180
                      El Segundo, CA  90245
                      Telephone:  (310) 285-1727
                      rsaba@rosensaba.com
                      lkstmartin@rosensaba.com

For the Defendants, CTM Biomedical, LLC; Bryan Banman; CTM Medical, Inc.; and Pablo Seoane:

                      HODGSON RUSS LLP
                      By:  Robert J. Fluskey, Jr., Esq.
                      140 Pearl Street, Suite 100
                      Buffalo, NY 14202-4040
                      Telephone:  (716) 856-4000
                      Facsimile:  (716) 849-0349
                      rfluskey@hodgsonruss.com

Page 3

APPEARANCES (remotely, continued):


For the Defendant, Mike Stumpe:
                         BLANK ROME
                         By:  Arash Beral, Esq.
                         2029 Century Park East, 6th Floor
                         Los Angeles, CA  90067
                         Telephone:  (424) 239-3400
                         Facsimile:  (424) 239-3434
                         arash.beral@blankrome.com


For the Defendants, Gardner Rogers and Veterans Medical
Distributors, Inc.:
                         YUKEVICH CAVANAUGH
                         By:  Todd Cavanaugh, Esq.
                         355 South Grand Avenue, 15th Floor
                         Los Angeles, CA  90071
                         Telephone:  (213) 362-7777
                         Facsimile:  (213) 362-7788
                         tcavanaugh@yukelaw.com


For the Defendant, Nate Boulais:
                         BIENERT KATZMAN
                         LITTRELL WILLIAMS, LLP
                         By:  Michael R. Williams, Esq.
                         903 Calle Amanecer, Suite 350
                         San Clemente, CA  92673
                         Telephone:  (949) 369-3700
                         Facsimile:  (949) 369-3701
                         mwilliams@bklwlaw.com

Also Present:       Peter Steinbroner, Videographer

Page 7

THE VIDEOGRAPHER:  Very well.  Will the court reporter please swear in the witness, and then counsel may proceed.

PRISCILLA LEE,

a witness having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

EXAMINATION

BY MR. FLUSKEY:

Q.    Good morning, Ms. Lee.  Can you hear me okay?

A.    Yep.

Q.    Who is your current employer?

A.    My employment is controlled by Skye Orthobiologics and HRT.

Q.    And which of those entities is your employer?

A.    They both control my employment.  For tax purposes, it's Skye.

Q.    So Skye Orthobiologics issues your W-2?

A.    Correct.

Q.    Okay.  But you provide services for both companies; is that correct?

HIGHLY CONFIDENTIAL

Page 116

Excel by you?

A.   Yes.

Q.   All right.  Ms. Lee, would you go grab Exhibit 463 for me, please.  We looked at this previously.  I have a few more questions.

MR. SABA:  463?

MR. FLUSKEY:  463, yeah.

THE WITNESS:  Okay.  I've got it.

Q.   (BY MR. FLUSKEY)  You explained earlier that this document showed Skye's revenue by customer, right?

A.   Yes.

Q.   Now, do Skye's systems track which doctor at the customer facility used the product that Skye sold?

A.   Not really, because we don't know who the doctor is.  Sometimes we'll have it; sometimes we don't.

Q.   When you do have it, how do you obtain it?  How do you know which doctor used the product?

A.   If it's a consignment unit, then the rep will submit a usage sheet.  And if he happens to write the doctor's name on it, then we'll know.  Or if there is an agent sticker that has the

HIGHLY CONFIDENTIAL

**Page 117**

doctor's name, then we'll know.  But if that information is not there, then we don't have the information.

MR. FLUSKEY:  All right.  Let's take a quick, five-minute break.

THE VIDEOGRAPHER:  We're going off the record.  The time is 12:03 p.m.

(Break taken from 12:03 p.m. to 12:14 p.m.)

THE VIDEOGRAPHER:  We're back on the record.  The time is 12:14 p.m.

Q.   (BY MR. FLUSKEY)  Okay.  Ms. Lee, I'm going to mark a new document as Exhibit 502.  That document bears Bates No. SKYE/HRT 652829 to 652830.

(Deposition Exhibit No. 502 was marked.)

Q.   (BY MR. FLUSKEY)  Do you have that in front of you?

A.   Yes.

Q.   Okay.  Do you also have handy Exhibit 467, which we looked at previously?

A.   Yes.  I have it, yes.

Q.   Am I correct, Ms. Lee, that Exhibit 502 is the same as 467 except that in 502, Skye and Osprey have been unredacted?

A.   Yes.

Page 137

REPORTER'S CERTIFICATE

STATE OF IDAHO          )

                       )

COUNTY OF ADA          )

I, Amy E. Simmons, Certified Shorthand Reporter and Notary Public in and for the States of California and Idaho, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth and nothing but the truth;

That said deposition was taken down by me in shorthand at the time and place therein named and thereafter reduced to typewriting under my direction, and that the foregoing transcript contains a full, true and verbatim record of said deposition.

I further certify that I have no interest in the event of the action.

WITNESS my hand and seal this 5th day of October, 2022.

AMY E. SIMMONS

CSR, RPR, CRR, CRC, and Notary

Public in and for the

State of Idaho.

My commission expires:  6/13/28.

# Exhibit 12

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

[PLAINTIFF'S NAME],

               Plaintiff,

    v.

[DEFENDANT'S NAME],

               Defendant.

Case No.:  2:22-cv-01234-MEMF(x)

**CIVIL STANDING ORDER**

**PLEASE READ THIS ORDER CAREFULLY. IT GOVERNS THE CASE AND DIFFERS IN SOME RESPECTS FROM THE LOCAL RULES.**

Both the Court and all counsel bear responsibility for the progress of litigation in this Court. **"Counsel," as used in this Order, includes parties appearing pro se.[1]** To secure the just, speedy, and inexpensive determination of every action, all counsel are ordered to familiarize themselves with

---

[1]  This Court does not exempt parties appearing pro se—that is, parties who are not represented by an attorney—from compliance with the Federal Rules of Civil Procedure or the Local Rules. *See* Local Rules 1-3 and 83-2.2.3.

1

the Federal Rules of Civil Procedure and the Local Rules of the Central District of California. FED. R. CIV. P. 1.

**UNLESS THE COURT ORDERS OTHERWISE, THE FOLLOWING RULES APPLY.**

### I.    Service of the Complaint

The Plaintiff shall promptly serve the complaint in accordance with Federal Rule of Civil Procedure 4 and shall comply with Local Rule 5-3 with respect to all proofs of service.

### II.    Presence of Lead Counsel

Lead trial counsel shall attend any proceeding before this Court, including all Scheduling, Pretrial, and Settlement Conferences.

The Court has a strong commitment to fostering the development of new and diverse lawyers in the legal community. Consequently, the Court strongly encourages litigants to provide opportunities for less experienced lawyers or lawyers whose identities and/or backgrounds further the diversity of the legal profession to conduct hearings before the Court, particularly where they contributed significantly to the underlying motion or prepared the witness. Of course, the ultimate decision of who speaks on behalf of the client is for the client and not the Court.

### III.    Invitation to Self-Identify Pronouns and Honorifics

Litigants and counsel may indicate their pronouns and honorifics by filing a letter, adding the information in the name block or signature line of the pleadings, or verbally informing the Court when making an appearance.

### IV.    Scheduling Conference and Rule 26(f) Meeting of Counsel

This court hears status conferences and scheduling conferences on **Thursdays, beginning at 10:00 a.m.** Pursuant to Federal Rules of Civil Procedure 16(b) and 26(f), the Court will issue an Order Setting a Scheduling Conference. Counsel shall meet no later than twenty-one (21) days prior to the court-ordered Scheduling Conference pursuant to Federal Rule of Civil Procedure 26(f) and applicable Local Rules. This meeting may occur telephonically and need not occur in person. A written exchange of correspondence will not satisfy this requirement.

/ / /

/ / /

### V.    Joint Rule 26(f) Report

Unless otherwise ordered, no later than fourteen (14) days before the Scheduling Conference, counsel shall file a Joint Rule 26(f) Report. A Joint Rule 26(f) Report which is not timely filed or does not conform with this Order, Federal Rule of Civil Procedure 26(f), and applicable Local Rules will interfere with preparation by the Court and its staff and may result in the assessment of sanctions. The Joint Rule 26(f) Report shall address the matters set forth in Federal Rule of Civil Procedure 26(f), as well as those enumerated in the Court's Order Setting Scheduling Conference.

### VI.    Discovery

All discovery matters have been referred to a magistrate judge, who will hear all discovery disputes. The magistrate judge's initials follow the district judge's initials next to the case number. All discovery documents must include the words "DISCOVERY MATTER" in the caption to ensure proper routing. Please do not deliver courtesy copies of discovery documents to Judge Frimpong's chambers.

In accordance with 28 U.S.C. § 636(b)(1)(A), the magistrate judge's decision shall be final, and this Court will not reverse any order of the magistrate judge unless it has been shown that the magistrate judge's order is clearly erroneous and contrary to law. Any party may file and serve a motion for review and reconsideration before this Court. *See* Local Rule 72-2. The moving party must file and serve the motion within fourteen (14) days of service of a written ruling or an oral ruling that the magistrate judge states will not be followed by a written ruling. The motion must specify which portions of the ruling are clearly erroneous and contrary to law, and the claim must be supported by points and authorities. Counsel shall provide the magistrate judge chambers copies of the moving papers and responses.

### VII.    Motions – General Requirements

A.    **Pre-Filing Requirement:** Counsel should take note of Local Rule 7-3, which requires "counsel contemplating filing of any motion" to "first contact opposing counsel to discuss thoroughly, preferably in person, the substance of the contemplated motion and any potential resolution." Counsel should discuss the issues sufficiently such that if a motion is still necessary, the briefing may be directed to those substantive issues requiring resolution by the Court. Counsel

should resolve minor procedural or other non-substantive matters during the conference. The notice of motion or other request must include a statement of compliance with Local Rule 7-3. The Court may strike or outright deny a motion or other relief if counsel fails to meet and confer in good faith.

**B.** **Time for Filing and Hearing Motions:** Motions shall be filed in accordance with Local Rule 7. This Court hears civil motions on **Thursdays, beginning at 10:00 a.m.** If Thursday is a national holiday, motions will be heard on the next Thursday. It is not necessary to clear a hearing date with Judge Frimpong's Courtroom Deputy Clerk before filing a motion, **except for motions for summary judgment and preliminary injunction**. For these two motions, contact the Courtroom Deputy Clerk via the Court's chambers email address at MEMF_Chambers@cacd.uscourts.gov to reserve a hearing date. For all motions, if the motion date selected is not available, the Court will issue a minute order continuing the date. **Closed motion dates** can be found on Judge Frimpong's Procedures and Schedules page.

**C.** **Length and Format of Motion Papers:** Pursuant to Local Rule 11-6, Memoranda of Points and Authorities in support of or in opposition to motions shall not exceed twenty-five (25) pages absent leave of Court. Replies shall not exceed ten (10) pages. Only in rare instances and for good cause shown will the Court grant an application to extend these page limitations. Pursuant to Local Rule 11-8, all Memoranda of Points and Authorities exceeding ten (10) pages must be accompanied by a Table of Authorities and a Table of Contents. All briefing must use Times New Roman or Courier font. Text must be no less than twelve (12) point font; footnotes shall be no less than ten (10) point font.

Counsel shall adhere to Local Rule 5-4.3 with respect to the conversion of all documents to .pdf format so that when a document is electronically filed, it is in proper size and is .pdf searchable. Further, all documents shall be filed in a format so that text can be selected, copied, and pasted directly from the document. *See* Local Rule 5-4.3.1.

**D.** **Citations to Case Law:** Citations to case law must identify the case cited and the specific page referenced. For example, if a quotation is presented, the associated page citation shall be provided. Similarly, if a case is cited in support of a proposition based on language in the opinion, the page on which such language appears shall be provided. Bluebook style is required.

**E.**    **Citations to Other Sources:** Statutory references must identify with specificity the sections and subsections referenced. Citations to treatises, manuals, and other materials should include the volume, section, and pages being referenced. Citations to prior filings in the same action shall include the docket entry number, section, and pages referenced. Bluebook style is required.

**F.**    **Oral Argument:** If the Court deems a matter appropriate for decision without oral argument, the Court will take the matter under submission and notify the parties before the hearing.

**VIII.    Motions – Specific Requirements**

**A.**    **Motions Pursuant to Federal Rule of Civil Procedure 12:** Many motions to dismiss or strike can be avoided if the parties confer in good faith as required by Local Rule 7-3, especially for perceived defects in a complaint, answer, or counterclaim that can be corrected by amendment. *See Polich v. Burlington Northern, Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991) (noting that where a motion to dismiss is granted, a district court should grant leave to amend unless it is clear the complaint cannot be saved by amendment). Moreover, a party has the right to amend the complaint "once as a matter of course at any time before a responsive pleading is served." FED. R. CIV. P. 15(a). Even after a complaint has been amended or a responsive pleading has been served, the Federal Rules of Civil Procedure provide that leave to amend should be "freely given when justice so requires." FED. R. CIV. P. 15(a). Indeed, the Ninth Circuit requires that this policy favoring amendment be applied with "extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

Consequently, parties should carefully consider and weigh an opponent's contentions as to the deficiencies in a pleading. The Court expects that, in most instances, the parties will agree to any amendment that would cure the defect.

**B.**    **Motions to Amend:** In addition to the requirements of Local Rule 15-1, all motions to amend pleadings shall: (1) state the effect of the amendment; (2) be serially numbered to differentiate the amendment from previous amendments; and (3) identify the pages, line numbers, and wording of any proposed change or addition of material.

5

Counsel shall electronically file a "Notice of Lodging" attaching the proposed amended pleading as a document separate from the motion, as well as a "redlined" version of the proposed amended pleading identifying all additions and deletions of material as an appendix to the moving papers.

**C.    Motions In Limine:** Motions in limine shall be noticed for hearing no later than four (4) weeks before the Final Pretrial Conference date.

**D.    Motions for Class Certification:** If this action is a putative class action, the parties are to act diligently and begin discovery immediately, so that the motion for class certification can be filed expeditiously. This Court requires an extended briefing schedule for motions for class certification. Parties are advised to refer to the Court's Order Setting Scheduling Conference for additional guidance as to filing and timing of motions for class certification.

**E.    Rule 56 Motions: No party may file more than one motion pursuant to Federal Rule of Civil Procedure 56**, regardless of whether such motion is denominated a motion for summary judgment or summary adjudication, without leave of the Court. The parties shall not attempt to evade the page limitations for briefs by filing multiple motions. If a party believes this is one of the rare instances in which good cause exists for more than one motion for summary judgment or to increase page limits, the party shall seek leave by noticed motion setting forth a detailed showing of good cause. Pursuant to Federal Rule of Civil Procedure 56(f), when appropriate, based on undisputed facts and controlling principles of law, the Court may sua sponte enter summary judgment in favor of the non-moving party.

The Court will not entertain cross-motions that seek to adjudicate the same legal issues. If parties wish to cross-move for summary judgment, their counsel shall meet and confer to determine which party will move and which will oppose the one motion for summary judgment.

Parties need not wait until the motion cutoff date to bring motions for summary judgment or partial summary judgment. The hearing on any such motion shall be set for a date in advance of the Final Pretrial Conference. This Court requires an extended briefing schedule for motions for summary judgment, as set forth below:

- *Motions for Summary Judgment*: Must be filed at least forty-two (42) days before the noticed hearing date.

6

- *Opposition*: Must be filed twenty-eight (28) days before the noticed hearing date and fourteen (14) days after the motion is filed.
- *Reply*: Must be filed twenty-one (21) days before the noticed hearing date and seven (7) days after the opposition is filed.

**The above briefing schedule is the default.** The parties may stipulate to a modified schedule that is reasonable for all parties. Any briefing schedule must provide the Court at least twenty-one (21) days between the reply deadline and the hearing date.

The parties should prepare papers in a fashion that will assist the Court in processing and analyzing the volume of material (*e.g.*, tables of contents, headings, indices, bookmarks in electronic documents, pinpoint citations, etc.). Additionally, *for motions for summary judgment only*, parties should submit two paper copies of all Motion for Summary Judgment filings to Judge Frimpong's mailbox on the Fourth Floor of the First Street Courthouse. Pro se parties are exempt from this requirement. The parties shall comply with Local Rules 56-1 and 56-2, in addition to the Court's additional requirements described below.

### 1.   Statements of Uncontroverted Facts and Genuine Disputes

The separate statement of uncontroverted facts required under Local Rule 56-1 shall be prepared in a two-column table, as shown below. The left column sets forth the allegedly undisputed fact. The right column sets forth the evidence that supports the factual statement. The factual statements should be set forth in sequentially numbered paragraphs. Each paragraph should contain a narrowly focused statement of fact. Each numbered paragraph should address a single subject as concisely as possible. The "Conclusions of Law" portion of the statement should be inserted after the statement of uncontroverted facts.

**Plaintiff's Claim for _____ Is Barred by the Applicable Statute of Limitations.**

| Undisputed Fact | Evidence |
|---|---|
| 1.  Mike and Jane signed a contract for the sale and purchase of property. | Smith Decl. (Dkt. No. 61-2) ¶ 5, Ex. 6. |
| 2.  Jane mailed the contract in May 2017. | Smith Decl. ¶ 8, Ex. 21. |

7

The opposing party's statement of genuine disputes of material fact must be in two columns and track the moving party's separate statement exactly as prepared. The left column must restate the allegedly undisputed fact and the right column must state either that it is undisputed or disputed. The opposing party may dispute all or only a portion of the statement, but if disputing only a portion, it must clearly indicate what portion is being disputed, followed by a brief citation to the opposing party's evidence controverting the fact. To demonstrate that a fact is disputed, the opposing party must briefly state why it disputes the moving party's asserted fact, cite to the relevant exhibit or other evidence, and describe the reason(s) the exhibit or evidence refutes the asserted fact. No legal argument should be set forth in this document.

| Undisputed Fact and Evidence | Disputed/Undisputed Fact and Evidence |
| --- | --- |
| 1.  Mike and Jane signed a contract for the sale and purchase of property. Smith Decl. (Dkt. No. 61-2) ¶ 5, Ex. 6. | Disputed. Jane testified that the contract was for a lease, not a purchase. Jane Depo. (Smith Decl. Ex. 4) at 29:4-16. |
| 2.  Jane mailed the contract in May 2017. Smith Decl. ¶ 8, Ex. 21. | Disputed as to date. Jane testified she mailed the contract in June 2017. Jane Depo. at 3:4-10. |

The opposing party may submit additional material facts that bear on or relate to the issues raised by the moving party, which shall follow the format described above for the moving party's separate statement. These additional facts shall continue in sequentially numbered paragraphs with the evidence that supports each statement set forth in the right column.

With its reply, the moving party shall file a response to the statement of genuine disputes of material fact and additional material facts. For each fact, the response shall restate the allegedly undisputed fact and state whether the fact is disputed or undisputed by the opposing party. If the fact is undisputed, no further response is required.

If the fact is disputed, the response shall restate the opposing party's evidence and reason for disputing the asserted fact. The moving party may provide a response to the opposing party's reason for dispute, including any reason why the evidence cited by the opposing party does not create a genuine dispute and/or any additional evidence relevant to the asserted fact. This response may

8

either be presented in three columns, with the response appearing in the right column, or in two columns, with a response provided below each fact.

The response may also include any response to additional material facts asserted by the non-moving party, and this response shall follow the format described above for the statement of genuine disputes of material fact. The response to these additional facts shall continue in sequentially numbered paragraphs and shall not restart the numbering.

All facts asserted by either party, whether disputed or undisputed, and all supporting evidence cited, shall be included in the response. Do not repeat descriptions of and citations to the evidence. If you have already described and cited the evidence once, simply refer to the earlier citation succinctly (*e.g.*, "*See supra*, Fact # 1").

### 2. Supporting Evidence

No party shall submit evidence other than the specific items of evidence or testimony necessary to support or controvert a proposed statement of undisputed fact. For example, entire deposition transcripts, entire sets of interrogatory responses, and documents that do not specifically support or controvert material in the separate statement shall not be submitted in support of or in opposition to a motion for summary judgment.

Evidence submitted in support of or in opposition to a motion for summary judgment should be submitted either by way of stipulation or as exhibits to declarations sufficient to authenticate the proffered evidence and should not be attached to the memorandum of points and authorities. Documentary evidence for which there is no stipulation regarding foundation must be accompanied by the testimony, either by declaration or properly authenticated deposition transcript, of a witness who can establish authenticity.

### 3. Objections to Evidence

If a party disputes a fact based in whole or in part on an evidentiary objection, the ground for the objection should be stated succinctly in a separate statement of evidentiary objections in a two-column format. The left column should identify the items objected to (including page and line number if applicable) and the right column should set forth a concise objection (*e.g.*, hearsay, lack of foundation, etc.) with a citation to the Federal Rules of Evidence or, where applicable, a case

9

citation. A proposed order shall be filed and attached to the evidentiary objections as a separate Word document consistent with Local Rule 52-4.1 and emailed directly to the Court's chambers email address at MEMF_Chambers@cacd.uscourts.gov.

**F.    Motions for Attorneys' Fees:** Motions for attorneys' fees shall be electronically filed and set for hearing according to Local Rule 6-1 and this Order. Any motion or request for attorneys' fees shall attach two summaries, in table form, of the hours worked by and billing rate of each attorney with title (*e.g.*, partner, counsel, associate, etc.).

The first table shall include a summary of the hours worked by each attorney, organized by task (*e.g.*, discovery, motion to dismiss, motion for summary judgment). The second table shall include a summary of the hours worked by each attorney, organized by attorney. Both tables shall list all the tasks on which the attorney worked, the hours worked on each task, and the hourly rate of each attorney. If the hourly rate charged by any individual attorney changed while the action was ongoing, the party shall provide separate calculations for the total number of hours the attorney spent in connection with each task at each hourly rate.

All tables shall be attached to the motion and electronically filed. The courtesy copies of the tables shall be prepared in Excel, have all restrictions removed so the spreadsheets can be edited, and be emailed to the Court's chambers email address at MEMF_Chambers@cacd.uscourts.gov.

**G.    Under Seal Filings:** Local Rule 79-5 governs applications to file documents under seal. Local Rule 79-5.2.2 explains how to apply to file under seal and how to proceed if leave is granted. Parties must comply with all provisions of Local Rule 79-5.

There is a strong presumption of access in civil actions. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). For each document or other type of information a party seeks to file under seal, the party must identify and discuss the factual and/or legal justification that establishes "good cause" or "compelling reasons" for the information to be protected. *Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1178–80 (9th Cir. 2006).

Documents that are not confidential or privileged in their entirety should not be filed under seal if the confidential portions can be redacted and filed separately with a reasonable amount of effort.

10

The parties should file a complete version of the documents under seal and a redacted version for public viewing, omitting only the portions that the Court has authorized to be filed under seal.

Sealing must be justified for each individual item—blanket claims of confidentiality will result in the application to seal being denied. Counsel are strongly encouraged to consider carefully whether sealing or redaction is absolutely required for a given piece of evidence or argument. An application to seal that includes meritless requests to seal or redact documents will be denied. The parties also must meet and confer before filing an application to seal.

## IX.    Proposed Orders

Each party filing or opposing a motion or seeking the determination of any matter shall serve and electronically lodge a proposed order setting forth the relief or action sought and a brief statement of the rationale for the decision with appropriate citations. In addition, a copy of the proposed order in Word format shall be emailed directly to the Court's chambers email address at MEMF_Chambers@cacd.uscourts.gov on the day the document is electronically filed.

A template for proposed orders is available on Judge Frimpong's webpage.[2] The parties must use this template. Failure to submit a proposed order in Word format may result in the Court striking the motion, application, or stipulation without consideration of the request on its merits.

## X.    Chambers Courtesy Copies

The Court does not require chambers copies of any motion papers or exhibits and discourages the parties from sending chambers courtesy copies, with the exception of documents related to motions for summary judgment (*see supra* Section VIII.E). Excel files prepared in support of motions for attorneys' fees (*see supra* Section VIII.F) and proposed orders in Word format (*see supra* Section IX) should be submitted to the Court's chambers email address at MEMF_Chambers@cacd.uscourts.gov.

## XI.    Ex Parte Applications

Counsel are reminded that ex parte applications are solely for extraordinary relief. Applications that do not meet the requirements set forth in Local Rule 7-19 will not be considered. Sanctions may

---

[2] Judge Frimpong's webpage can be found at https://www.cacd.uscourts.gov/honorable-maame-ewusi-mensah-frimpong.

11

be imposed for misuse of ex parte applications. The Court considers ex parte applications on the papers and usually does not set these matters for hearing.

**XII.   Continuances**

Counsel requesting a continuance must lodge, prior to the date to be continued, a proposed stipulation and order including a detailed declaration of the grounds for the requested continuance or extension of time. The Court grants continuances only upon a showing of good cause, focusing on the diligence of the party seeking the continuance and any prejudice that may result if the continuance is denied. Counsel are required to first meet and confer with opposing counsel regarding the substance of the continuance and include a statement of compliance with Local Rule 7-3 (*see supra* Section VII.A). Failure to meet and confer in good faith in compliance with the Local Rules and this Order may result in denial of the request for continuance.

**XIII.   Electronic Filings**

Counsel shall e-file all civil and criminal filings pursuant to Federal Rules of Civil Procedure 5(d)(3) and Local Rule 5-4 as follows:

- All non-signature items shall be **e-filed** in **PDF** format. All proposed signature items shall be **e-filed** as an attachment to the main document in **PDF format**.
- All proposed signature items shall be **emailed** to the courtroom deputy email address at MEMF_Chambers@cacd.uscourts.gov in **Word** format. **Only proposed order signature items should be emailed to the chambers' email address.** Do not email other associated documents and do not use this email address for communication with the Court or the Clerk.

**Note for Parties Who Do Not Have an Attorney**: Pro se litigants—that is, parties who are not represented by an attorney—may submit documents for filing through the Court's Electronic Document Submission System (EDSS) instead of mailing or bringing documents to the Clerk's Office. Only internet access and an email address are required. Documents are submitted in PDF format through an online portal on the Court's website. To access EDSS and for additional information, visit the Court's website at https://apps.cacd.uscourts.gov/edss.

## XIV.   Communications with Chambers

Counsel must not attempt to contact the Court or chambers staff by email, telephone, or by any other ex parte means. Counsel may, for appropriate matters only, contact the Courtroom Deputy via the Court's chambers email at MEMF_Chambers@cacd.uscourts.gov. Counsel must not contact the Courtroom Deputy regarding the status of any matter before the Court. Calls or emails regarding the status of submitted motions, stipulations, or proposed orders will not be returned. Counsel may determine the status of any submitted motion, stipulation, or proposed order by accessing the docket sheet through PACER, which can be accessed via the Central District of California website. Counsel must include on all papers their email address, telephone number, and fax number to facilitate communication with the Courtroom Deputy.

## XV.   Courtroom Decorum

The Court expects everyone in her courtroom to treat each other with dignity and respect. Therefore, at a minimum, she expects the following from all[3]:

- Being punctual and prepared for all court appearances.
- Speaking and writing civilly and respectfully in all communications involving the Court. This includes:
  - o Referring to and addressing witnesses, counsel, parties, and court personnel by their surnames, pronouns, and honorifics, unless leave to do otherwise is granted.
  - o Refraining from interrupting any other person in the courtroom when someone else is speaking. The same courtesy will be returned for every person.
  - o Refraining from making gestures, facial expressions, or audible comments as manifestations of approval or disapproval of testimony or argument.
- Being considerate of the time constraints and pressures on the Court and court staff inherent in their efforts to administer justice.

[3] For more detailed guidance, counsel are advised to refer to the Central District of California's Civility and Professionalism Guidelines, which can be found at http://www.cacd.uscourts.gov/attorneys/admissions/civility-and-professionalism-guidelines.

13

- Acting and speaking civilly to court marshals, court clerks, court reporters, secretaries, and law clerks with an awareness that they, too, are an integral part of the judicial system.

## XVI.   Guidance for Pro Se Litigants

Parties who represent themselves in civil litigation (*i.e.*, appear pro se), should be aware that the Court holds these parties to the same standards of conduct to which it holds attorneys.

The following links may be helpful to those representing themselves in civil matters:

- General information on how parties may represent themselves in civil cases in the Central District of California can be found at https://prose.cacd.uscourts.gov/.
- Local Civil Rules for the Central District of California can be found at http://www.cacd.uscourts.gov/court-procedures/local-rules.
- Federal Rules of Civil Procedure can be found at https://www.law.cornell.edu/rules/frcp.

## XVII.   Additional Information

### A.  Interpreter Services

Counsel in civil actions are responsible for arranging for the services of an interpreter. The Interpreter's Office may be reached at (213) 894-4599.

## XVIII.   Notice of This Order

**Counsel for Plaintiff shall immediately serve this Order on all parties, including any new parties to the action. If this case came to the Court by noticed removal, the Defendant shall serve this Order on all other parties.**

IT IS SO ORDERED.

Dated: May 10, 2022

_____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge

14