1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4                  -oOo-

5    HONORABLE MAAME E.M. FRIMPONG, UNITED STATED DISTRICT JUDGE

6

7    SKYE ORTHOBIOLOGICS, LLC, a Delaware
     Limited Liability Company; HUMAN
8    REGENERATIVE TECHNOLOGIES, LLC, a
     Delaware Limited Liability Company,
9
                         Plaintiffs,
10
         v.                              Case 2:20-cv-03444-MEMF
11
     CTM BIOMEDICAL, LLC, a Delaware
12   Limited Corporation; BRYAN BANMAN,
     an individual; CTM MEDICAL INC., a
13   Delaware Corporation; VETERANS
     MEDICAL DISTRIBUTORS, INC., a Florida
14   Corporation; GARDNER ROGERS, an
     individual; MIKE STUMPE, an
15   individual; PABLO SEOANE aka PAUL
     SEOANE, an individual; NATHAN BOULAIS,
16   an individual; and DOES 3 through 10,
     inclusive,
17
                         Defendants.
18

19    REPORTER'S PARTIAL TRANSCRIPT OF JURY TRIAL PROCEEDINGS

20                  TRIAL DAY 6

21              LOS ANGELES, CALIFORNIA

22               AUGUST 28, 2023
     _____
23
                  SUZANNE M. MCKENNON, CRR, RMR
24                United States Court Reporter
                  UNITED STATES COURTHOUSE
25                350 W 1st STREET, ROOM 3411
                  LOS ANGELES, CALIFORNIA 90012

1    APPEARANCES:

2    On Behalf of the Plaintiff:

3        RYAN D. SABA, Attorney at Law
         JAMES R. ROSEN, Attorney at Law
4        TODD M. LANDER, Attorney at Law
         JOHN J. AUMER, Attorney at Law
5        LAURA K. ST. MARTIN, Attorney at Law
         NEDA FARAH, Attorney at Law
6        ALLISON OWENS, Attorney at Law
             Rosen Saba LLP
7            2301 Rosecrans Avenue, Suite 3180
             El Segundo, California 90245
8

9    On Behalf of the Defendants CTM Biomedical, LLC, a Delaware
     Limited Liability Company; Defendant Bryan Banman; Defendant
10   Pablo Seoane:

11       ROBERT J. FLUSKEY, JR., Attorney at Law
         RYAN K. CUMMINGS, Attorney at Law
12           Hodgson Russ LLP
             140 Pearl Street, Suite 100
13           Buffalo, New York 14202

14       MATTHEW K. PARKER, Attorney at Law
             Hodgson Russ LLP
15           605 Third Avenue, Suite 2300
             New York, New York 10158
16

17   On Behalf of the Defendant Mike Stumpe:

18       ARASH BERAL, Attorney at Law
         SAAM TAKALOO, Attorney at Law
19           Blank Rome LLP
             2029 Century Park East, 6th Floor
20           Los Angeles, California 90067

21

22   On Behalf of the Defendant Nathan Boulais:

23       MICHAEL R. WILLIAMS, Attorney at Law
         CARLOS A. NEVAREZ, Attorney at Law
             Bienert Katzman Littrell Williams LLP
24           903 Calle Amanacer, Suite 350
             San Clemente, California 92673

25

1                                **INDEX**

2

3   **PLAINTIFFS REST.** . . . . . . . . . . . . . . . . .   p. 65

4   **DEFENDANTS BANMAN, SEOANE, CTM BIOMEDICAL REST.** . . . .   p. 89

5   **DEFENDANT NATHAN BOULAIS RESTS.** . . . . . . . . . . .   p. 89

6   **DEFENDANT MIKE STUMPE RESTS.** . . . . . . . . . . . .   p. 89

7   **FINAL JURY INSTRUCTIONS.** . . . . . . . . . . . . . .   p. 92

8   **CONFERENCE RE DISPUTED FINAL JURY INSTRUCTIONS.** . . . .   p. 144

9   **CLOSING ARGUMENT BY MR. SABA** . . . . . . . . . . . .   p. 155

10  **CLOSING ARGUMENT BY MR. CUMMINGS** . . . . . . . . . .   p. 179
           **(PARTIALLY SEALED)**

11

12  **CLOSING ARGUMENT BY MR. WILLIAMS** . . . . . . . . . .   p. 186

    **CLOSING ARGUMENT BY MR. BERAL.** . . . . . . . . . . .   p. 196

13
    **REBUTTAL CLOSING ARGUMENT BY MR. SABA.** . . . . . . . .   p. 200

14

15

16

17

18

19

20

21

22

23

24

25

1                              **INDEX**

2

3                            **WITNESSES**

4                    **Direct | Cross | Redirect | Recross**

5
    **FOR THE PLAINTIFF:**
6
    **DAN CISLO (CONTINUED)(PARTIALLY SEALED)**
7        By Mr. Lander              9
         By Mr. Fluskey                    18
8

9   **VIDEOTAPED DEPOSITION**
    **BRIAN FLOROS (SEALED)**
10

11  **HENRY KAHRS**
         By Mr. Saba               23                   64
12       By Mr. Fluskey                   54

13

14  **FOR THE DEFENDANT:**

15  **ROUZBEH TAGHIZADEN, Ph.D. (PARTIALLY SEALED)**
         By Mr. Fluskey           68
16       By Mr. Saba

17
    **JAMES DONOHUE**
18       By Mr. Fluskey           71
         By Mr. Williams          86
19       By Mr. Beral             87
         By Mr. Saba                       88
20

21

22

23

24

25

1                                    **INDEX**

2

3

4                                   **EXHIBITS**

5

6                                                **RECEIVED**                    **MARKED**

7     Exhibit 104                                    67
      Exhibit 106                                    67
8     Exhibit 208                                   141
      Exhibit 458                                   142
9     Exhibit 459                                   142
      Exhibit 460                                   142
10    Exhibit 465                                   142
      Exhibit 466                                   142
11    Exhibit 467                                   142
      Exhibit 493                                   142
12    Exhibit 494                                   142
      Exhibit 496                                   142
13    Exhibit 499                                   142
      Exhibit 502                                   142
14    Exhibit 546                                   142

15

16

17

18

19

20

21

22

23

24
25

```
 1          (Proceedings commenced on August 28, 2023, at 7:52 a.m.)
 2               THE COURT:  Okay.  Good morning.  I hope everyone is
 3     well.  I felt like I spent my whole weekend with you guys.  But
 4     we're here and thank you for the e-mail regarding the time
 5     check.  So if all goes as planned, we will send the case to the
 6     jury today.  I will just advise them this morning that we may
 7     go a little bit later just so that they're prepared for that.
 8          Okay.  In terms of what you were supposed to get us today,
 9     is that the box of jury instructions or --
10               MR. PARKER:  Yes.
11               THE COURT:  Okay.  And the exhibits, has the clerk
12     been able to check all of the exhibits?
13               THE COURTROOM DEPUTY:  Yes.
14               THE COURT:  Okay.  Wonderful.  Is there anything that
15     we need to address before we bring in our jurors?
16               MR. SABA:  Yes, Your Honor.
17               THE COURT:  Yes, go ahead.
18               MR. SABA:  There were a handful of rulings that you
19     made via e-mail that, I believe, should at least at some point
20     get into the record.  I don't know what your preference is of
21     how we do that but whatever the Court pleases is fine with me.
22               THE COURT:  Okay.  You mean from over the weekend?
23               MR. SABA:  Yes.
24               THE COURT:  We can just put that into Minute Order
25     today.
```

```
 1              MR. SABA:  Okay.  Thank you.

 2              THE COURT:  Anything else?

 3         With that, we'll go off the record.  I'll look through the

 4    binders, and when we have our jurors here, we'll bring them in.

 5    Thank you.

 6         (A brief recess was taken.)

 7              THE COURT:  We're back on the record.

 8              MR. SABA:  When we played the video of John Lee, that

 9    was slightly different than the John Lee transcript that was

10    previously lodged on PACER.  Should we just move to strike that

11    one and lodge a new one?  I just -- mechanically, how would you

12    like us -- I'm sorry.  Not John Lee, Lee Andrews.  Thank you.

13    I just want to mechanically -- what your preference was to make

14    sure that we get the correct transcript into the record.

15    That's all.

16              THE COURT:  Yeah.  I guess you could just file

17    something like a joint stipulation indicating that the previous

18    transcript was in error and the parties agree that this is the

19    correct transcript, whatever the new one is.  That does remind

20    me that it was not my understanding that, for the deposition

21    that was played, that that transcript or that video would go to

22    the jury.

23              MR. SABA:  Correct.

24              THE COURT:  Okay.

25              MR. SABA:  Yes.  I think we treat it just like any
```

```
 1   other testimony, if they ask for a read back or whatever.
 2   Thank you.
 3            THE COURT:  Thank you.  Okay.  Our jurors are here,
 4   so the clerk will go get them.
 5            THE COURTROOM DEPUTY:  All rise for the jury.
 6        (Jury entered.)
 7            THE COURT:  Okay.  The parties may be seated.  Good
 8   morning, jurors.
 9            THE JURY:  (Most replied, "Good morning.")
10            THE COURT:  I hope everyone had a good weekend.  Glad
11   to see you back today.
12        So as indicated, we anticipate that the case will go to
13   you today, probably towards the end of the day so you probably
14   will not start substantive deliberations today.  We'll talk
15   towards the end of the day about your schedule when you're
16   deliberating.  We might go a little bit late today just because
17   we have to make up some time here and there.  I don't
18   anticipate it will be any later than 2:30, definitely not
19   3:00 o'clock.  We'll keep you posted as we're going along.
20        With that, remind me, Counsel, where you were on Friday.
21            MR. LANDER:  Your Honor, Mr. Cislo was on the stand.
22            THE COURT:  Okay.  We'll put him back on the stand.
23   Thank you.
24        And, Mr. Cislo, you will just be reminded that you are
25   still under oath.
```

```
1              THE WITNESS:  Yes, Your Honor.
2              THE COURT:  Please proceed Counsel.
3              MR. LANDER:  Thank you, Your Honor.
4                          DAN CISLO,
5        previously called, on behalf of the Plaintiffs, testified:
6                   DIRECT EXAMINATION (CONTINUED)
7   BY MR. LANDER:
8   Q.   Good morning, Mr. Cislo.
9   A.   Good morning.
10  Q.   Before we broke on Friday, Mr. Cislo, you had explained
11  some opinions you had reached as a result of the work you had
12  done in this case.
13       Do you recall that?
14  A.   Yes.
15  Q.   Just so we have it fresh in our mind, can you just
16  articulate quickly again the opinions you'd reached based on
17  the questions I asked you on Friday?
18  A.   Yes.  I reviewed a large number of patents related to
19  placental tissue processing, 40 to 50 patents.  I also reviewed
20  two of the provisional applications that were filed by the
21  plaintiff company, HRT, and they were two patents that listed
22  Mr. Banman and Mr. Sharp as co-inventors, and they were both
23  assigned to the company HRT.  And both of those provisional
24  patent applications talked about the processing techniques, and
25  I confirmed that they were different than what was in the
```

1  patents.

2  Q.   Okay.   Thank you, Mr. Cislo.   Just very briefly, I don't

3  think I asked you on Friday -- prior to your assignment in this

4  case, had you had any experience writing patents or being

5  involved in patents in the biomedical technology area?

6  A.   Yes, I have.   I've prepared many patent applications in

7  this space including hip implants, knee replacements, and

8  various other parts, and I've also worked on various skin care

9  type products for Meaningful Beauty, Cindy Crawford's line.

10      Also, I'm working with J.Lo, J.Lo Beauty and Lifestyle for

11  some of her beauty products.

12      Also, for Guthy Renker with regards to their Proactive

13  Solution.   I had did a lot of work patent -- work for all of

14  those companies.

15      Additionally, I've currently completed some work obtaining

16  patents for Dr. Sabine Hassan for various methodologies and

17  protocols for treating and preventing COVID-19.

18  Q.   Perfect.   Thank you, Mr. Cislo.   If you could look at --

19  and we'll flash on the screen Exhibit 1067, which is in

20  evidence.

21  A.   Yes, I see that.

22  Q.   You mentioned a few minutes that you've reviewed so many

23  patent applications as part of your work; is that correct?

24  A.   Yes, that's correct.

25  Q.   Is this among the applications that you reviewed as part

1    of your assignment?

2    A.    Yes.

3    Q.    If we could just look at page 2, do you see this Figure 1.

4    Do you see that, Mr. Cislo?

5    A.    Yes, I do.

6    Q.    Among the materials you reviewed as part of your

7    assignment?

8    A.    Yes, I did.

9    Q.    If we could look at page 9?

10   A.    Yes, I see that.

11   Q.    You see paragraphs 35 and 36 with -- entitled Initial

12   Tissue Collection?  You see that?

13   A.    Yes.

14   Q.    Among the materials you reviewed as part of your

15   assignment?

16   A.    I see that.

17   Q.    Paragraphs 40 and 41, do you see that?

18   A.    Yes, I do.

19   Q.    Material Check-in and Evaluation, is that among the

20   materials you reviewed, Mr. Cislo?

21   A.    Yes.

22   Q.    And paragraphs 42, 43?

23   A.    Yes.

24   Q.    Gross Tissue Processing and an explanation, as that among

25   the materials you reviewed?

```
 1   A.   Yes, it was.
 2   Q.   If we could look at page 10 of Exhibit 1067.
 3   A.   Yes, I see that.
 4   Q.   Paragraph 50 and 51, do you see that?
 5   A.   Yes, I do.
 6   Q.   Chemical Decontamination, is that among the materials you
 7   reviewed as part of your assignment?
 8   A.   Yes.
 9   Q.   Mr. Cislo, as part of your assignment in reviewing all
10   these applications and this one in particular, is it your
11   opinion that this application Exhibit 1067 does or not disclose
12   the confidential processing and formulas of Skye and HRT?
13   A.   No, it does not.  In fact, if you look at the last page of
14   this patent application, it even speaks of the fact that this
15   patent is about something completely different because in the
16   back there are certain claims that are spoken of.
17        And you can see there is really more patent directed for
18   direct visual determination of the orientation of the tissue
19   graft to a user, and it has nothing to do with the processing
20   of placental tissue.  And I found that the details in the
21   provisional applications that HRT filed are actually quite
22   different than what is disclosed here.  Particularly pages 4,
23   5, and 6 of the second provisional patent application provide
24   many unique and confidential ideas that are not found in this
25   patent document.
```

1  Q.   Okay.  Mr. Cislo, just so the jury has a framework to work

2  with, what exactly is a provisional application?

3  A.   A provisional application is something that the law allows

4  inventors or a company to file with the patent office, and it's

5  kept confidential, and it lasts for a year.  So if anybody

6  comes up with an idea, they can file this provisional

7  application, keep it all secret for a year while they decide

8  whether or not they want to take the next step and file a

9  utility patent application, which would be, of course --

10  ultimately disclose the confidential and unique information in

11  the provisional patent application.

12      So it's a nice way for companies to decide whether or not

13  the tradeoff is worth disclosing the confidential information.

14  So many companies that have process-oriented type applications

15  such as ART will typically file a provisional application like

16  this, they will see over the course of a year, decide whether

17  or not they really want to go public and tell everybody about

18  their confidential information, or they'll keep it secret and

19  not file the next step.

20      In this particular case, I did not find any patent records

21  that indicated the next steps of filing a provisional

22  application.

23      In discussing it with Mr. Sharp, I guess a decision had

24  been made to not go forward and disclose their detailed

25  confidential information but rather keep it a confidential

1    idea, because the belief was by the company that they could

2    not -- somebody could not reverse engineer the process that

3    they had just by getting the product.

4         So I thought that is typically good decision, one that I

5    typically recommend for many of my clients such as Proactive

6    and Meaningful Beauty and so forth where they do have some

7    unique combination of elements.  But it is really the

8    processing of those elements that give rise to the beneficial

9    utility of the composition of matter or the product.

10        Sometimes it makes sense for something like a process;

11   other times it doesn't make sense for a particular type of

12   product such as glasses or something or a toaster that somebody

13   could take apart and figure out how it's made.

14   Q.   Thank you, Mr. Cislo.  Just to break it down very briefly

15   so we all understand, you mentioned some provisional patents

16   that HRT and Skye had filed; is that correct?

17   A.   Yes.

18   Q.   And at the time those were filed based on your testimony,

19   the information within them was confidential; is that correct?

20   A.   Yes, that's correct.

21   Q.   And did you see any evidence that those provisional

22   applications ultimately matriculated into the utility patent

23   applications?

24   A.   No, they did not.

25   Q.   So based on that, is the information within the

```
1   provisional applications, that you reviewed and to which you
2   just referred, confidential and secret as we sit here today?
3   A.    That's correct, as far as I know.
4   Q.    Okay.  And just so high level summary, how is it the
5   provisional applications, if any, informed your opinions that
6   you've offered to the jury?
7   A.    Yes.  Well, particularly, I noted in the provisional
8   applications they referred to a related patent, to the Daniel's
9   patent.  It showed me -- it said specifically over the course
10  of pages 4, 5, 6, and 7 how really what HRT developed is very
11  different.
12          And they talk about the fact that they were able to come
13  up with a shelf-stabilized ambient or room-temperature product
14  that was flowable and it could easily be used by doctors to
15  provide this unique wound healing property.
16  Q.    So, Mr. Cislo, you just referred to the Daniel's patent.
17          If we can, just flash the first page of Exhibit 1067.
18  A.    Yes.
19  Q.    Do you see the name Daniel on the third line from the top?
20  A.    Yes.  John Daniel was the inventor, and I think it was
21  later assigned to a Mimex [sic] or, I think, a company --
22  Q.    MiMedx?
23  A.    MiMedx.  That's it.
24  Q.    And is this the Daniel's patent to which you were
25  referring to?
```

```
 1   A.   Yes, it is.  And I can tell by the fact that there was
 2   initially a provisional application filed.  You see where it
 3   says, "Related U.S. application data."  So it may be that same
 4   acknowledged file provision.  And you can kind of see that they
 5   waited almost a year in which to file their continuation
 6   application, which was -- and these relate to a whole bunch of
 7   other patents.  They have the exact same specification that
 8   were processed through the patent office as well.
 9   Q.   Thank you.  Are you saying, Mr. Cislo, that the
10   information in the provisional patents, at least some of the
11   information in the provisional patents to which you referred to
12   a few minutes ago, that HRT filed, is unique and somehow
13   different from what's in this Exhibit 1067?
14   A.   Absolutely.
15   Q.   How so?  How so, Mr. Cislo?
16   A.   Because of the fact there are details, as I mentioned in
17   pages 4, 5, 6, and 7 of the second provisional patent
18   application, that are not in here.  And also, similar pages
19   from the first provisional application that was filed by HRT --
20   there were two.  One filed in, I believe, it was late June of
21   2013, and then another one in early July of 2013.
22   Q.   Mr. Cislo, did you have the opportunity as part of your
23   assignment to review any of the materials, work, or reports
24   that the defense's experts prepared and submitted?
25   A.   Yes, I did.  And I reviewed them over the weekend to
```

1   double-check, and it appears they did not consider the unique

2   properties, ratios, and processing in the provisional patent

3   applications in their opinions.

4       Although, they said they read my expert report and the

5   associated exhibits which were the provisional applications,

6   they never discussed in their reports these provisional

7   applications that disclosed the unique and confidential

8   information that both Mr. Banman and Mr. Sharp were

9   co-inventors on and signed off on and were indicated as being

10   assigned to HRT.

11   Q.   Just so I can understand, did the work opinions and

12   reports of the defense's experts inform your opinions in any

13   way?

14   A.   Yes, it did.  In the sense that they did not really

15   consider what the unique processing requirements were for the

16   HRT procedures and confidential information.

17   Q.   Thank you, Mr. Cislo.

18       MR. LANDER:  I have no further questions at this

19   time.

20       THE COURT:  Thank you.  Mr. Fluskey?

21       MR. FLUSKEY:  Your Honor, we have a couple notebooks

22   we would like to bring up.

23       THE COURT:  Okay.

24       MR. FLUSKEY:  And Mr. Cislo's deposition transcript

25   as well.  We have one for the witness and one for the Court.

```
 1            THE COURT:  Thank you.  Please proceed, Counsel.
 2                        CROSS-EXAMINATION
 3   BY MR. FLUSKEY:
 4   Q.    Good morning, Mr. Cislo.
 5   A.    Yes.
 6   Q.    You are testifying here today as a lawyer and not as a
 7   scientist?  Do I have that right?
 8   A.    I am testifying in my capacity as designated, correct.
 9   Q.    And that capacity is a lawyer; correct?
10   A.    I wouldn't call myself a scientist.  I would call myself
11   patent attorney.
12   Q.    Understood.  You have no degrees in biology or chemistry;
13   correct?
14   A.    That is correct.
15   Q.    Never worked in a tissue lab; correct?
16   A.    I have not worked in a tissue lab.
17   Q.    Never processed placental tissue; true?
18   A.    I have not processed placental tissue.
19   Q.    You've never been employed by a company that makes or
20   sells placental tissue; is that right?
21   A.    Not that I recall.
22   Q.    You may have, and you don't recall?
23   A.    Well, it's been 37 years and probably about 4,500 patents
24   that I filed and probably looked at tens of thousands of
25   patents, so I might have reviewed some of those materials in
```

1    the past.

2    Q.    My question was a little different.  You have never been

3    employed by a company that makes or sells placental tissue; is

4    that correct?

5    A.    Not that I recall unless one of them was a client that

6    also did that type of work.

7    Q.    You've never drafted standard operating procedures for

8    placental tissue processing?

9    A.    No.  But I reviewed them in this case.

10   Q.    In this case?

11   A.    Yes.

12   Q.    Before working in this case, you had never reviewed

13   standard operating procedures for placental tissue processing;

14   is that correct?

15        (The court reporter interrupted.)

16            THE WITNESS:  For other areas, but not placental

17   tissues.

18   BY MR. FLUSKEY:

19   Q.    On your direct you used the term, "Ordinary skill in the

20   art."

21        Do you recall that?

22   A.    I don't recall that, but if I said that, I know that term

23   well.

24   Q.    And that term is a patent term; correct?

25   A.    It is a term that's used with regards to inventions, yes,

1    and patents.

2    Q.    Now, the art at issue here is life sciences or tissue

3    biologics?  Can we agree on that?

4    A.    I would say so.

5    Q.    And you are not one of ordinary skill in those arts;

6    correct?

7    A.    No.  But I've worked with people who are skilled in the

8    art of all the biological different applications I attested to

9    earlier.

10   Q.    You've worked with those people, but you're not one of

11   them; true?

12   A.    No.  I relied upon person's skilled in the art to help me

13   do my job.

14   Q.    You are not an expert in the placental products industry;

15   correct?

16   A.    No.  I'm an expert with regards to patents.

17   Q.    So when you reviewed the patents in this case that you

18   talked about earlier, you reviewed them as a lawyer not as a

19   scientist and not as an expert in placental tissue processing;

20   true?

21   A.    I am not sure if I could answer that true or false

22   because -- would you like to know why?

23   Q.    I'm sorry.  Let me restate the question.

24        When you reviewed the patents that you testified to on

25   Direct, you reviewed them as a lawyer not as an expert in

```
1   placental tissue processing; true?
2   A.   I relied upon other experts, Mr. Lee and Mr. Sharp.
3   Q.   So it's your belief Mr. Lee is an expert in that area?
4   A.   Yes, as is Mr. Sharp.
5   Q.   Did you speak to Mr. Lee in connection with forming your
6   opinions?
7   A.   Yes, I did.
8   Q.   Have you ever visited HRT's tissue processing lab?
9   A.   No.  That wasn't part of my assignment.
10  Q.   Have you ever observed HRT processing placental tissue?
11  A.   No, I have not.
12  Q.   Have you ever spoken to HRT's laboratory director?
13  A.   No, I have not.
14  Q.   Have you spoken to HRT's quality assurance director?
15  A.   No.  That was outside the scope of my engagement.
16  Q.   Now, you testified on Direct that you have written
17  numerous patent applications in certain subject areas?
18  A.   Yes.
19  Q.   You've never drafted a patent application on the subject
20  of placental membranes, have you?
21  A.   I have to be careful.  I don't recall, as I sit here, but,
22  like I said, there were thousands of patents that I have
23  prepared over the 37 years I've been doing this, so I hate to
24  say I didn't and then find out there is one out there that you
25  would show me.
```

Q.   In preparing to testify as an expert in this case, you
didn't go back and look at your prior work to determine whether
or not you had drafted a patent application on placental
membrane processing?  Is that your testimony?

A.   That was outside the scope of what I had to do in this
case, because I had to look at the patents that were presented
by the parties, the two provisional patent applications that
HRT filed, and look at the standard operating procedures and
see whether or not what was being used by HRT was unique in
terms of the documentation that the parties had.

     (Sealed portion redacted.)

          THE COURT:  Okay.  So the transcript is unsealed at
this time, and the courtroom is reopened.

     Ask the plaintiffs to call their next witness.

          MR. SABA:  Plaintiffs now call Henry Kahrs.

          THE COURT:  Thank you.

          THE COURTROOM DEPUTY:  Please raise your right hand.

     Do you solemnly swear that the testimony you shall give in
the cause now pending before this Court shall be the truth, the
whole truth, and nothing but the truth so help you God?

          THE WITNESS:  I do.

          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

          THE COURT:  Is there a binder of exhibits for the
Court?

          MR. SABA:  The only exhibit he's going to use is 959,

1    Your Honor.

2             THE COURTROOM DEPUTY:  Please state your name for the

3    record, spelling both your first and last name?

4             THE WITNESS:  My name is Henry, H-E-N-R-Y, Kahrs,

5    K-A-H-R-S.

6             THE COURT:  Good morning, Mr. Kahrs.

7             THE WITNESS:  Good morning.

8             THE COURT:  If you would prefer you may take off your

9    mask, we're going to keep ours on, but it's up to you.  And

10   just a reminder that we have the court reporter who is trying

11   to write down what everyone says, so please speak into the

12   microphone and slowly and clearly, and please let the attorneys

13   finish their questions before you answer.  Thank you.  Please

14   proceed, Counsel.

15            THE WITNESS:  Okay.

16            MR. SABA:  Thank you, Your Honor.

17                         **HENRY KAHRS,**

18    **called as a witness, on behalf of the Plaintiffs, testified:**

19                      DIRECT EXAMINATION

20   BY MR. SABA:

21   Q.   Good morning, Mr. Kahrs.

22   A.   Good morning.

23   Q.   You are an expert witness that has been hired by the

24   plaintiffs' side?

25   A.   Yes.

```
1   Q.   What is your general expertise?
2   A.   I am a forensic accountant and damages expert.
3   Q.   Why don't you describe for us your college education?
4   A.   Sure.  I went to the Rochester Institute of Technology in
5   New York.  I graduated there 1985 with a degree in accounting.
6   I started work right after I graduated, moved to California in
7   '87, got my MBA from Cal State Fullerton in 1990.
8   Q.   And where do you work now?
9   A.   I work at a firm called Baker Tilly.  We're an
10  international CPA firm.
11  Q.   How long have you worked for Baker Tilly?
12  A.   Baker Tilly acquired my prior firm, RGL Forensics, in
13  2018.  I had started with the predecessor firm to RGL in 1985,
14  so I've basically been with the same firm doing forensic
15  accounting since I graduated college.
16  Q.   How many years has that been?
17  A.   It was 38 in June.
18  Q.   Do you hold any certifications?
19  A.   I do, yes.
20  Q.   Which ones?
21  A.   I'm a certified public account, CPA.  And affiliated with
22  my CPA license, I'm also accredited in business valuation,
23  which is an AVB, and certified in financial forensics, which is
24  CFF.  I've also got a certified management accountant
25  certificate, CMA, and I am a certified fraud examiner, CFE.
```

```
1   Q.   Are you a member of any boards?
2   A.   Yes.  I am on the board of Cal State Fullerton's
3   fund-raising committee for college students.  I'm also on the
4   board of Coastline Community College Foundation.  I was the
5   volunteer CFO for the Boys and Girls Club of Tustin for about
6   six years, and I was on that board for about 11 years.  I am no
7   longer on that board, though.
8   Q.   Okay.  Let's get down to it.  What was your assignment in
9   this matter?
10  A.   My assignment was to calculate the damages suffered by the
11  plaintiffs in this matter, assuming that liability is proven.
12  Q.   So you're not here to opine upon whether or not anybody is
13  liable or not, just the damages?
14  A.   That is correct, yes.
15  Q.   Have you worked on similar assignments in the past?
16  A.   Yes.
17  Q.   How many occasions?
18  A.   I've been doing damages for 38 years, so probably 3,500
19  cases, over a thousand in litigation.
20  Q.   Okay.  So in order to prepare your analysis, did you
21  review some documents?
22  A.   I did, yes.
23  Q.   What documents did you review?
24  A.   I reviewed the financial statements for Skye and HRT.  I
25  reviewed the financial statements for CTM.  I reviewed some of
```

1    the underlying records behind those financial statements.  I
2    reviewed some deposition transcripts and things like that but
3    mostly financial information.
4    Q.    And did you prepare any calculations?
5    A.    I did, yes.
6    Q.    What types of calculations did you prepare?
7    A.    I prepared a calculation of lost profits for Skye and HRT,
8    and I calculated a second analysis which is the profits earned
9    by CTM and will be earned in the future.
10   Q.    Did you, as part of your assignment during the course of
11   this litigation -- did you issue any reports?
12   A.    I did, yes.
13   Q.    Did you make any changes to the initial reports?
14   A.    I did, yes.
15   Q.    What changes did you make and why?
16   A.    Well, I had received some information, financial
17   information, up through -- I believe it was 2021 for both Skye
18   and CTM.
19        Sometime in 2022, Mr. Seoane had his deposition taken, and
20   he estimated that the revenue for CTM for 2022 was going to be
21   roughly 35 million.  So I reviewed his testimony and relied on
22   it.
23        Later on, I received the actual data for 2022, which was
24   about $7 million less.  The actual revenue was only 28 million,
25   so I had to update my report to fix the correction from his

1    testimony to the actuals.

2    Q.    Did Mr. Seoane's incorrect prediction of the 2022

3    testimony surprise you in any way?

4    A.    A little bit, yes.  My recollection was his deposition was

5    in September or October, so they were mostly through the year.

6    So to be that far off kind of surprised me.  You know, if they

7    were running -- let's say, 36 million is 3 million a month, so

8    they should have been about 26 or 27 million by the time he had

9    his deposition.  So the 28 million seemed low to me.  I was

10   questioning the validity of that amount.

11   Q.    Okay.  Now, I understood you said you did a calculation of

12   lost profits.  Is that past lost profits?

13   A.    I did past lost profits and future lost profits.

14   Q.    What is the difference between past lost profits versus

15   future lost profits, generally?

16   A.    Generally, the difference is exactly what you would think

17   it is.  Anything that happened in the past is past lost

18   profits, so you start at the date that the alleged incident

19   occurred and go up to -- in this case, to late 2023, or even

20   the end of 2023, and then future damages go out into the

21   future.  So you've got to treat them slightly differently.

22   Past damages, you can calculate future damages or projections,

23   and then you have to bring them back to present value.

24   Q.    What type of factors do you consider in order to make

25   future projection?

```
1   A.   I consider things like the market, the product, the growth
2   of the companies historically over time, you know.  In this
3   case, Skye we have about a seven- or eight-year period.  CTM,
4   we have about a four-year period.  So I look at all of those
5   factors.  Sometimes the clients or defendants have their own
6   projections, so I take a look at those and see what they think
7   is realistic and what their expectations are.  If there is any
8   subprojections done by somebody in an e-mail or something like
9   that, I might consider that, too.
10  Q.   Is that something you normally do, review the projections
11  of a defendant?
12  A.   If they have them, yes.  If they don't them, no.
13  Q.   Now, in this particular case, how many years in the future
14  did can you calculate future lost profits?
15  A.   I was asked to do ten years and put a cumulative amount
16  each year in between, so I've got every year from one year into
17  the future up to ten years into the future.
18  Q.   Now, is the idea that you are just doing the math for the
19  jury so they can pick whether it be one year, three years, five
20  years, ten years?
21  A.   Yes.
22  Q.   You are not suggesting the jury automatically award the
23  bottom cumulative number; correct?
24  A.   Only if the facts in the case would warrant that, yes.
25  Q.   So the idea is you were able to prepare a chart so that
```

1   the jury can make some sort of determinations?

2   A.   Correct.

3   Q.   Now, before we get to that chart, why don't you tell us a

4   little bit about the term "barrier to entry."

5        What does that mean?

6   A.   Sure.  Barrier to entry, again, it's exactly what it

7   sounds like.  How easy or hard is it to get into any particular

8   business.  So I'll give an example.  I'm a forensic accountant.

9   All you really need is a computer and a mouse.  Except for you

10  really need four years of college and a CPA license and a lot

11  of years of experience.  Because we don't do tax and audit, we

12  do something very specialized.  You need to know a lot of

13  attorneys because they're the ones that have cases to hire you.

14  So you need to know how to market to them.  You need to know

15  what kinds of things they're looking for in their cases.  You

16  need to know a lot of the buzz words for different types of

17  cases.

18       So while the barriers to entry are very low, they're

19  really kind of high because that kind of expertise doesn't just

20  come to anyone.  So barriers of entry include everything that

21  would take someone, a layperson, me or you, to get a business

22  up and running.

23  Q.   So in this particular case, one of the contentions of Skye

24  and HRT is that their products are unique and that CTM is using

25  that unique product.

1    Did you discover any financial evidence that supports that
2    hypothesis?
3    A.    I did, yes.
4    Q.    Please explain.
5            MR. FLUSKEY:  Your Honor, objection, just restating
6    702 and Daubert and objections previously provided.
7            THE COURT:  Thank you.  The Court will stand on its
8    previous rulings.
9        You may proceed.
10           THE WITNESS:  Okay.  Yes, over the course of this
11    assignment, Mr. Donohue has written some reports and listed out
12    who he thought were major competitors of Skye, HRT, and CTM.
13       So if a product truly has no barriers to entry, Ryan, you
14    and I, we can get in it tomorrow.  Take us a few months.  We'll
15    develop a product, and we'll go out, and we'll start selling
16    it.
17       If that really is the case and there is no barriers to
18    entry, the product is what I would call a "commodity."  You
19    would sell it for a very low margin, low profit, and it would
20    be hard to grow quickly because, well, anyone can do it.  All
21    the competitors are selling allegedly the same products.  Some
22    of these competitors are quite large, so they can force prices
23    down.
24       So I would expect, if there really were no barriers to
25    entry, that this product would not be growing quickly, because

1 the bigger market people would be keeping prices down, keeping

2 things out, and that the margins would be very low.  There

3 would not be a lot of profit in it.

4    What I see is exactly the opposite.  Skye and CTM have

5 been growing by leaps and bounds.

6      THE COURT:  I'm sorry to interrupt.

7    Are you referring to any notes?

8      THE WITNESS:  I'm referring -- yes, I've got some

9 data on schedule.

10     THE COURT:  Okay.  If you could just turn that over

11 for now?

12     THE WITNESS:  Okay.

13     THE COURT:  And, Counsel, to the extent that the

14 witness needs to refresh his recollection in order for

15 something you need to put on the record, we can.  But for now,

16 just testify from your memory.  Thank you.

17     THE WITNESS:  I understand, yes.

18    So Skye and CTM have been averaging a net margin somewhere

19 in the 50 percent range, as high as 56 percent.  Most of the

20 competitors, the average margin is 5 percent.

21    Skye and CTM have been hitting growth in the 40's and

22 50 percent every year.  Most of the competitors, the average,

23 for the companies I've been able to find data on, is about 4 to

24 6 percent per year.

25    So they're outpacing their competition in terms of growth

1    and margin, which indicates to me they're selling something

2    that is different and unique, something that the market is

3    looking for and they want.  If it was the opposite, I would

4    expect low growth, low margins.

5    BY MR. SABA:

6    Q.    So you said a couple of things.  You mentioned a

7    Mr. Donohue.  Is that -- who is that?

8    A.    I don't know who he is, visually, but he is the expert

9    that was hired by the defendants.

10    Q.    And you mentioned the term "gross margin."

11          What is gross margin?

12    A.    Gross margin is the difference between what you can make

13    or buy a product for and sell it for.  So if you buy it for

14    $.50 and sell it for $1.00, your gross margin is 50 percent.

15    Q.    Okay.  Now, in addition to analyzing the revenue, did you

16    also analyze expenses?

17    A.    Yes.

18    Q.    Explain how that works.

19    A.    Sure.  We talked about gross margin already.  That one is

20    easy.  If you can buy it for $.50 and sell it for $1.00, the

21    gross margin is 50 percent.

22          In this particular case, both Skye and CTM, it costs them

23    about $.12 to make the product, and they're selling it for

24    $1.00.  So their gross margin is, roughly 88, 89 percent.  So

25    it's a very profitable product.

1        Then they take that gross profit, and they pay their fixed
2    costs.  They pay the salaries.  They pay commissions.  They pay
3    rent.  They pay if they're trying to develop a new product.
4    They have insurance.  They have office supplies, just all the
5    normal things that a company has.
6        Those fixed expenses, other than commissions, tend not to
7    move up and down with revenue.  So if you are renting a
8    facility and rent is 10,000 a month, whether you sell 100,000
9    units or a million units, your rent is the same.
10       So as your gross margin goes up, once you hit all of your
11   fixed costs, your net profits also go way up.  Hence, these
12   guys have a very high gross margin.  They pay the commissions.
13   Then once they pay their fixed costs, everything else falls
14   straight to the bottom line, which is why their net margins are
15   so high.
16   Q.   Okay.  So in order to calculate lost profits, what are the
17   factors that you consider?
18   A.   Well, the first is the actual revenue that was received by
19   Skye/HRT and then, on the other side, CTM.  So I looked at
20   that.  And I looked at those growth tends over time.  Again,
21   both of these companies are growing significantly, year over
22   year.
23       And then I also look at all of the expenses in the past
24   and what their profits were.  Then I look at -- okay.  Once we
25   get up to today, what do I think things will look like in the

1  future?  How has that growth gone on, and what do I think will
2  happen?
3      I look at the market and what the expected growth in the
4  market is.  This stem cell market, the market is growing at
5  about 7.5 percent per year.  Again, both of these companies
6  have exceeded that growth, which indicates they're not really a
7  commodity.  They're something unique.  So I look at all of
8  those factors.
9      Again, I looked at some PowerPoints that the defendants
10 did.  I know I saw a LinkedIn message from Mr. Seoane
11 projecting revenue for 2023 at 65 million.  My projection is a
12 little more than half of that.  It definitely seems in the
13 ballpark for what defendants think was going to happen, and it
14 follows the pattern that you would expect for a product that is
15 a little bit different, a little bit unique.  It's beating the
16 market and continues to beat the market.
17 Q.   As part of your report, did you prepare schedules?
18 A.   I did, yes.
19 Q.   And what is a schedule?
20 A.   A schedule is a summary of a lot of numbers.  So I lay
21 out -- for example, for each company, first thing I do is I put
22 their financial statements side by side, year or year, so I can
23 look at the revenue growth, the expense patterns, the
24 profitability.
25      Then I make a schedule which has numbers showing my

```
 1   projections of revenue.  Then I make numbers showing my
 2   projections of how I do the cost.  Then I have a schedule
 3   showing the present value.  And if there is any other numbered
 4   data that anyone thinks I should look at or I think I should
 5   look at, I make another schedule that has those numbers on it.
 6   Q.   If you wouldn't mind opening that binder in front of you,
 7   there is an exhibit called "959."  And then I would like you to
 8   turn to page 46, so the bottom right-hand corner will say,
 9   "959-46."
10   A.   Okay.
11   Q.   What do you see at 959-46?
12   A.   I see my calculation of the plaintiffs' lost profits for
13   Skye and HRT.
14           MR. SABA:  Your Honor, at this time, I would like to
15   move in Exhibit 959-46.
16           THE COURT:  Any objection?
17           MR. FLUSKEY:  We do object to its admission, Your
18   Honor.  We don't object to its use as a demonstrative.
19           THE COURT:  Let me see the parties at sidebar,
20   briefly.
21           (Sidebar commenced.)
22           THE COURT:  Go ahead.  It seems to me that it is
23   hearsay.  That is the nature of the objection?
24           MR. FLUSKEY:  It is, Your Honor.  It's calculations
25   done by the expert.  It's not an underlying financial
```

```
 1    statement.
 2              THE COURT:  Mr. Saba?
 3              MR. SABA:  I think his calculations are his work
 4    product, so he can testify that this is his work product.
 5              THE COURT:  How does that make it not hearsay?
 6              MR. SABA:  Well, it's -- I mean, whether he testifies
 7    to the information or whether it's in the schedule, it's not --
 8    it's still being brought in for purposes -- I'm not so sure why
 9    it would be hearsay.  I mean, this is his work product.
10              THE COURT:  It's an out-of-court statement.  We don't
11    need to go back and forth on this.  This is kind of like what I
12    said in one of my rulings, which is that, typically, an expert
13    report would not come in.
14              MR. SABA:  I understand a report wouldn't come in,
15    but this is a work product schedule.
16              THE COURT:  It's not a report.
17              MR. FLUSKEY:  It's appended to the report, Your
18    Honor.
19              THE COURT:  Okay.  You can use it as a demonstrative.
20              MR. SABA:  Okay.
21         (Sidebar concluded.)
22              THE COURT:  Okay.  The objection is sustained.  The
23    schedule can be used as a demonstrative only.  It will not be
24    admitted.
25              MR. SABA:  Great, Your Honor.  May we publish?
```

```
 1              THE COURT:  Yes.
 2              MR. SABA:  Thank you.
 3    Q.   Mr. Kahrs, this is your Schedule 1-A?
 4    A.   Yes.
 5    Q.   And this is the summary of plaintiffs' lost profits?
 6    A.   Correct.
 7    Q.   Why don't you walk us through this and explain to us how
 8    to read this?
 9    A.   Sure.  The plaintiffs' lost profits, the first column,
10    Skye, is the total lost margin, which is the projected revenue
11    minus the projected expenses.  So for each year, I've listed it
12    out.
13         And the total past loss for Skye is $30,816,474.
14         HRT sold products to Skye that they would then resell
15    through the market.  So if Skye lost a sale, then HRT also lost
16    a sale.  So I picked up -- roughly, 10.5 percent of HRT's
17    revenue went to Skye, so I picked that up.  And the total value
18    of the lost margin is $4,102,291.
19    Q.   Why don't you explain -- let's just start with 2018, where
20    I see a number of 622,413.
21    A.   Okay.
22    Q.   So how do you -- how is -- what are the calculations to
23    reach that number?
24    A.   If you were to flip to --
25    Q.   Why don't you just explain it to us.
```

```
 1   A.   Sure.  First thing I did was I projected -- well,
 2   actually, I took the actual revenue for CTM.  And the
 3   assumption is that, had the defendants not left Skye or had
 4   left Skye and done things without doing all the things that
 5   they were alleged with, that Skye would have been able to make
 6   all of the sales of CTM.  So I just projected or calculated the
 7   actual sales of CTM, and then I multiplied them by Skye's net
 8   margin, which is roughly 57 percent.
 9   Q.   So in other words, did you apply the gross revenue of CTM
10   and then multiply what Skye's cost of business would have been?
11   A.   Correct.
12   Q.   So this is -- if, for example, Mr. Banman, Mr. Seoane --
13   I'm sorry -- Mr. Boulais and Mr. Stumpe had stayed and actually
14   sold products for Skye, Skye would have realized an extra
15   $622,413 of profit?
16           MR. BERAL:  Foundation, Your Honor.
17           THE COURT:  The objection is overruled.
18       You may answer.
19           THE WITNESS:  Yes, that is correct.
20   BY MR. SABA:
21   Q.   And so for 2019, did you reach the same -- use the same
22   analysis to reach the 2,295,000 number?
23   A.   I did, yes.
24   Q.   And that goes true for 2020, 2021, and 2022?
25   A.   Correct.
```

1  Q.   So if I understand the way to read this, Skye's lost
2  profits through the year, end of 2022, is $30,816,000?
3  A.   Correct.
4  Q.   So now, explain to us how you reach future lost damages
5  for the year 2023 and beyond?
6  A.   So to reach future damages, I projected CTM's revenue into
7  the future, again, understanding the market is growing at 7. --
8  about 7.5 percent a year, and CTM has been growing historically
9  at, roughly, 50 percent per year, a little bit higher than
10 50 percent per year.  So I projected out the next year at an
11 increase of, roughly, 30 percent, which gets us to 36 million.
12      Then 2024, I increased another 20 percent, then
13 15 percent, then 10 percent, which is typically what you see in
14 a --
15      THE COURT:  I'm sorry.  Just so the record is clear,
16 it looks like the witness is referring to his report in
17 answering the questions.
18      Please proceed.
19      THE WITNESS:  Yes.
20 BY MR. SABA:
21 Q.   Is there a schedule that you're referring to, Mr. Kahrs?
22 A.   Yes.  It's trial Exhibit 959-49.
23 Q.   And that is a document you prepared?
24 A.   Yes.
25      So I followed a projection typically of a newer company

1  that is having such significant growth over its first four

2  years.  Eventually, I roll the increases to inflation only

3  after about eight years.

4      And just for -- to kind of give you an idea of the size of

5  the numbers -- I know Mr. Seoane's LinkedIn said he projected

6  65 million for 2023.  I don't project they will hit 65 million

7  until 2030.

8  Q.   So even though Mr. Seoane, the National Director of Sales,

9  said the 2023 projections were 65 million, you didn't actually

10 use that number; you used a much smaller, more conservative

11 number?

12 A.   Correct.  For 2023, I used, roughly, 36 million.

13 Q.   And did you see any 2023 financials from CTM?

14 A.   No.

15 Q.   Now, I think I understood you said this, that you applied

16 a growth rate for 2023 that was different than 2024, '25, '26.

17      Why is it that you used a gradual decline growth rate?

18 A.   Because companies don't grow at 50 percent forever.  They

19 tend to have their early years, where they're growing at the

20 great rates they are, and then they start to decline.

21 Eventually, they hit market growth only, and at some point,

22 they'll usually hit inflation only, where you are only going to

23 get a little bit of a price rise.

24 Q.   Now, the analysis is little different when you're talking

25 about future lost profits then past lost profits, because you

1  have to apply an additional step?

2  A.    Correct.

3  Q.    And what is that additional step?

4  A.    Anything that happens in the future has to be brought back

5  to present value.  So the question is:  How much do I need

6  today to replace X dollars a year from now, two years from now,

7  five years from now, ten years from now?

8  Q.    So for your example, you said that -- you projected CTM

9  would sell $65 million of product in 2030?

10  A.    Correct.

11  Q.    But according to your chart, that's only seeking

12  $8 million and not $65 million?

13  A.    Correct.

14  Q.    And that is because why?

15  A.    Well, there's two pieces to that.  First, you have to

16  deduct all the expenses, keeping in mind they're selling --

17  they're buying -- they're making it for $.12, selling it for

18  $1.00.  Then they're paying commissions.  Then they've got to

19  pay all the fixed costs.  So the profit on that 65 million, I

20  calculated to be roughly 38 million.

21        And then the present value of that, it will take

22  $8 million, roughly, today to replace 38 million in 2030,

23  because I've used a relatively high present value rate.

24  Q.    All right.  So in addition to lost profits, did you also

25  perform what we call unjust enrichment calculations?

```
 1   A.   I did, yes.
 2   Q.   Is that set forth in Schedule 1-B?
 3   A.   Yes.
 4   Q.   And you prepared Schedule 1-B?
 5   A.   Yes.
 6             MR. SABA:  Your Honor, may I use Schedule 1-B as a
 7   demonstrative?
 8             THE COURT:  Yes.  Thank you.
 9   BY MR. SABA:
10   Q.   So please tell us how to interpret Schedule 1-B?
11   A.   So Schedule 1-B is pretty much the same as Schedule 1-A,
12   except for one difference.  I used the same revenue
13   projections, but CTM has a lower margin than Skye, slightly
14   lower margin than Skye, so I used a lower net margin number.
15   Q.   What does that mean?  Explain to us in English.
16   A.   CTM has, basically, less fixed costs than Skye.  They're
17   both making it for $.12 and selling it for $1.00.  So their
18   gross margins are pretty similar.  They're both paying
19   commissions, pretty similar rate.  But CTM has less kind of
20   fixed costs, so they're -- I'm sorry -- more kind of fixed
21   costs.  They're a little smaller.  The bigger the company, the
22   more fixed costs you're going to have.  So their net margin is
23   a little bit lower.
24   Q.   So is it accurate that CTM, through the year of 2022, has
25   made a profit of $22.5 million?
```

```
 1   A.   Yes.
 2   Q.   And you are projecting that CTM, this year, is going to
 3   make a profit of $17.2 million just in 2023?
 4   A.   Yes.
 5   Q.   And then we could look down that schedule, where it says
 6   Present Value for each of those years, and that is your
 7   projection as to what the profit will be of CTM?
 8   A.   Correct.  So you can see the volume of what I call Present
 9   Value Discount.  The projected profits are 272 million; the
10   projected future on that is 108 million.
11   Q.   Okay.  So let's talk about tissue class.  Okay?
12   A.   Okay.
13   Q.   When you were looking at the CTM financials, were you able
14   to determine what percentage of their revenue was as a result
15   of the flowable product versus the membrane products?
16   A.   Yes.
17   Q.   Okay.  And is that reflected in any of your schedules?
18   A.   It is.  It's on Schedule 4-A.
19           MR. SABA:  Your Honor, may I publish 4-A as a
20   demonstrative?
21           THE COURT:  Yes, you may.
22   BY MR. SABA:
23   Q.   Actually, how about just 4.  4 is the summary of 4-A?
24   A.   Yeah.  4-A has the detail by membrane versus liquid.
25   Q.   Okay.
```

1    A.    Page 76.

2    Q.    Page 76.  Sorry.  Oh, I see.  Excuse me.

3          All right.  Let's go to page 76.

4          All right.  So what were you able to determine as to the

5    percentage of revenue for membrane versus liquid for CTM?

6    A.    Well, in the early years, CTM was selling more membrane,

7    so they were about 24 percent of the revenue.  By 2020, it

8    dropped down to 15 percent; and by 2021, it dropped down to

9    7 percent.  And you can see it's roughly a million a year for

10   '19, '20, and '21.  There is not a lot of growth there.  The

11   growth is all in the liquid product.

12   Q.    So CTM didn't give us the year 2022 breakdown; is that

13   right?

14   A.    Correct.

15   Q.    So when we look under the fiscal year in 2021, the

16   breakdown was liquid accounted for 13.469 million versus

17   membrane for 1 million?

18   A.    Correct.  It's about 7 percent, 7.2 percent.

19   Q.    So roughly 93 percent of all revenue coming into CTM is

20   from the flowable product?

21   A.    Yes.

22   Q.    Did you also perform an analysis of certain customers of

23   CTM and Skye?

24   A.    I did, yes.

25   Q.    Okay.  Is that reflected in Schedule 5-A on page 77?

1  A.   Yes.

2            MR. SABA:  Your Honor, may I publish Schedule 5-A?

3            THE COURT:  As a demonstrative?

4            MR. SABA:  Yes.

5            THE COURT:  Any objection?

6            MR. FLUSKEY:  No objection as a demonstrative.

7            THE COURT:  Okay.  You may.

8  BY MR. SABA:

9  Q.   So explain to us what Schedule 5-A is, Mr. Kahrs?

10  A.   Schedule 5-A summarizes all the different hospitals that

11  were sold to by both Skye and CTM, and it's got the revenue by

12  year.  And then on the far right-hand side, it says, "Were they

13  contacted by Mr. Banman."  And if it was, yes, I put a "Y" in

14  that column.

15  Q.   So let's just look, as an example, at Eskenazi Health in

16  the middle of the page there.  So if I see the blue line, that

17  indicates those were Skye sales.  And the red line is what the

18  CTM sales were?

19  A.   Yes.

20  Q.   So, for example, in 2018, Skye had $411,000 worth of sales

21  to Eskenazi Health, and then CTM had $134,000?

22  A.   Correct.

23  Q.   But then in 2019, '20, and '21, Skye had zero?

24  A.   Correct.

25  Q.   And CTM then had 485,000, and then 1.3 million in 2020.

```
 1        Is that how to read this chart?
 2   A.    Correct.
 3   Q.    Now, did you also perform a comparison of sales by sales
 4   representatives?
 5   A.    I did, yes.
 6   Q.    Okay.  Is that reflected in schedule -- well, what
 7   schedule is that reflected in?  How about that?
 8   A.    I think it's 5-C and D.
 9   Q.    Okay.  Let's look at Schedule 5-C.
10        Is Schedule 5-C the comparison of representatives?
11   A.    Yes.
12   Q.    Okay.  And let's --
13        May I publish this or the jury, Your Honor?
14             THE COURT:  Any objection?
15             MR. FLUSKEY:  No objection as a demonstrative.
16             THE COURT:  You may publish as a demonstrative.
17   BY MR. SABA:
18   Q.    All right.  So let's look at, for example, the first line,
19   just so we make sure we read this correctly.  It says Brian
20   Floros was the representative.
21        Is that what it says?
22   A.    Which line are you looking at?
23   Q.    The very first one.  It says, "Surgical Strategies, Brian
24   Floros," on Schedule 5-C on page 81.
25   A.    There we go.  Yes.
```

1   Q.   So Mr. Floros told $6,000 worth of the product for Skye in

2   2018.

3        Is that what that reflects?

4   A.   Yes.

5   Q.   But then he sold $240,000 worth of product for CTM in

6   2019, and $96,000 worth of product in 2020?

7   A.   Correct.

8   Q.   So we can also look, for example, at Mike Stumpe, for

9   Silenda Medical.

10  A.   Yes.

11  Q.   Mr. Stumpe ended up selling $2.6 million worth of product

12  in 2021 for CTM?

13  A.   Yes.

14  Q.   And 1.6 in 2020?

15  A.   Yes.

16  Q.   And Mr. Boulais, he sold $1.2 million worth of product in

17  2021 for CTM?

18  A.   Yes.

19  Q.   And you didn't receive the 2022 or 2023 numbers from CTM

20  for these individuals; is that right?

21  A.   Correct.

22  Q.   Now, did you also perform some alternative calculations,

23  assuming that sales only grew at industry levels?

24  A.   Yes.

25  Q.   And what does that mean?

1  A.    That means, if you believe that this large growth that CTM
2  has been experiencing year over year will suddenly drop from
3  50 percent a year down to 7 percent a year immediately, 7.5
4  percent a year, then that would lower the projected revenue and
5  it would lower the damages.
6  Q.    And what was the result of that calculation that you
7  performed?
8  A.    It was slightly lower.  The total lost margin to Skye at
9  present value would drop down to 94 million, and HRT would be
10 $12,500,000, roughly.
11 Q.    And what schedule are you looking at, or what page are you
12 looking at, sir?
13 A.    I am looking at trial Exhibit 959-111.
14        MR. SABA:  Your Honor, may I publish that to the
15 jury?
16        THE COURT:  Any objection?
17        MR. FLUSKEY:  Not as a demonstrative.  No objection
18 as a demonstrative.
19        THE COURT:  Thank you.  It may be published as a
20 demonstrative.
21 BY MR. SABA:
22 Q.    So this schedule sets forth what the damages would be if
23 CTM only increased, as the rest of the market did, without the
24 high growth rates?
25 A.    Correct.  If suddenly their growth rate dropped from

1  50 percent -- I actually looked at 6.9 percent that I used.  So

2  if it dropped down from 50 percent to 6.9 percent.

3  Q.   So for the year 2023, Skye and HRT's damages would be,

4  just for that year alone, 19.3 million?

5  A.   Correct.

6  Q.   Not including the damages that they incurred in 2018

7  through 2022?

8  A.   Correct.

9  Q.   Which totaled 34.9 million?

10 A.   Correct.

11 Q.   Now, did you also perform a calculation as to the

12 enterprise value of CTM?

13 A.   I did, yes.

14 Q.   What does that mean?

15 A.   That means the value of the business.

16 Q.   And so were you able to reach a conclusion as to the value

17 of CTM as a business?

18 A.   I did, yes.

19 Q.   How did you reach that conclusion?

20 A.   Well, I looked at their financial statements, and I looked

21 at other companies in the market that are selling similar or

22 the same products.  You know, BioD, I think, and MiMedx are two

23 of them.  So I looked at those companies and what they were

24 valued at.  And then I also looked at the expected cash flows

25 of CTM into the future and I weighed them.

1          You know, I noticed, for example, MiMedx, I think, was

2      trading at 1.6 times revenue.  That is a public company.  So if

3      they're doing 100 million in revenue -- well, let's say 100,000

4      in revenue, then their value is 1.65 times that.  But they were

5      losing money, so --

6      Q.    MiMedx is losing money?

7      A.    MiMedx is losing money.

8          Skye and CTM are making very large profits.  So my

9      conclusion is that CTM should be trading at a higher multiple

10     than 1.65 times earnings.  It should be, probably, closer to

11     2.5 times.

12         Again, I also looked at the income and profitability, and

13     I came up with a value of $75 million for CTM.

14     Q.    That is as of when?

15     A.    What's that?

16     Q.    That is as of what day?

17     A.    As of the last year I had a full financial statement at

18     the time of my report, which was 2021.

19     Q.    So your opinion is, that CTM, as of the end of 2021, was

20     worth $75 million.

21     A.    Correct.

22     Q.    And are you able to make any assumptions or conclusions on

23     what CTM is worth today?

24               MR. FLUSKEY:  Objection.

25               THE WITNESS:  Well, we know their 2022 --

```
1              THE COURT:  I'm sorry.  Just a moment.
2              MR. FLUSKEY:  Objection, Your Honor.  That has not
3    been disclosed in discovery.  It's a new opinion.  We have not
4    seen it.
5              THE COURT:  Understood.  Let me see the parties at
6    sidebar.
7         (Sidebar commenced.)
8              THE COURT:  Suzanne, can you hear me?
9         Go ahead, Mr. Saba.  What is your response?
10             MR. SABA:  He gave this opinion at the time of his
11   deposition.  It's been a long time since then, and we haven't
12   received any new financials.  So based on his assumptions, I
13   just want him to tell us what the value of the company is as of
14   2023.
15             MR. FLUSKEY:  Your Honor, they produced a new report
16   on June 27th.  If they had a new valuation, they could have
17   told us then.  We shouldn't be hearing it for the first time at
18   trial.
19             THE COURT:  I am not sure if you're asking him a
20   hypothetical based upon things that have already been
21   disclosed?
22             MR. SABA:  It's just based on a hypothetical.
23             THE COURT:  Any objection to posing a hypothetical?
24             MR. FLUSKEY:  I do, Your Honor, because there are no
25   2023 numbers yet.  So I don't know what he's basing this on.
```

```
 1              THE COURT:  Okay.  Well, you can try to do it as a
 2    hypothetical.
 3              MR. SABA:  Thank you.
 4         (Sidebar concluded.)
 5              THE COURT:  The objection is sustained.  The jury
 6    should disregard the previous question and not speculate as to
 7    the answer.
 8         Please proceed, Mr. Saba.
 9              MR. SABA:  Thank you.
10    Q.   Mr. Kahrs, hypothetically, assuming the growth rates that
11    you've projected for 2023, assuming the revenue you're
12    projecting for 2023 for CTM, and assuming the gross margin that
13    you project for CTM in the year 2023, are you able to provide
14    us with a hypothetical valuation of CTM as of today?
15              MR. FLUSKEY:  Same objection, Your Honor.
16              THE COURT:  This objection is undisclosed
17    hypothetical -- I mean, undisclosed opinion?
18              MR. FLUSKEY:  Yes, Your Honor.
19              THE COURT:  That objection is overruled.
20              THE WITNESS:  I would estimate it would be roughly 25
21    to 30 percent higher, so more in the 100 million range.
22    BY MR. SABA:
23    Q.   And based on the review of documents, were you able to
24    determine how much of CTM Mr. Banman owns?
25    A.   I believe it was about 71 percent.
```

1    Q.    Now, you've read the reports and deposition testimony of
2    the defense expert, James Donohue?
3    A.    Yes.
4    Q.    And do you have any criticisms of his reports and/or
5    opinions?
6    A.    I do, yes.
7    Q.    What are they?
8    A.    Well, I think the main difference between my analysis and
9    his is he thinks that, had CTM and Banman just -- and the group
10   of defendants had just started the company, they could be up
11   and running and doing what they're doing in 18 months.  They
12   could have developed the product, learned all about the
13   insurance, billings, hired staff, just done everything that
14   quickly.
15        Given the economics, I still think that this is a unique
16   product.  I don't see anyone else that has the kind of growth
17   that's out there.  I don't see anyone else that has
18   reverse-engineered it.  So I don't see that as realistic in any
19   way, shape, or form.  If something is unique and growing at
20   this level, it's hard to replicate.  If it was easy to
21   replicate, these guys wouldn't be having this kind of growth.
22   They would scuttling along because their much larger
23   competitors would have reverse-engineered it and be selling it
24   in the market and be able to wipe them out.
25        So I see this as a very unique set of companies, in a very

1    unique set of circumstances.  I think that all of the things --
2    you know, I talked a little bit more, what would it be to be a
3    forensic accountant.  The only thing you need is a computer and
4    a mouth.  That is easy.  The hard part is learning all of this
5    stuff.  It's how to take 10, 15 years of experience and things
6    that you know and people that you've met and all of the
7    customers and the doctors and the suppliers and all of that and
8    put them together.

9         If not, me and Ryan ought to be starting our own business
10   tomorrow.  We could be hitting 40 million in four years.  Let's
11   do it.

12        I don't think that is valid point.  I think that the
13   period is probably closer to 10 to 15 years, if everything was
14   done properly and somebody did not have a turnkey operation
15   that made money on day one, such as CTM did.  I just don't
16   think that that is viable rebuttal opinion to these
17   calculations.

18             MR. SABA:  Thank you, Mr. Kahrs.

19        No further questions, Your Honor.

20             THE COURT:  Any Cross?

21             MR. FLUSKEY:  Yes, Your Honor.

22                       CROSS-EXAMINATION

23   BY MR. FLUSKEY:

24   Q.   Good morning, Mr. Kahrs.

25   A.   Good morning.

1  Q.   How did CTM earn money on day one?

2  A.   They were buying and selling products from another

3  company.

4  Q.   Correct.  It wasn't their own product; right?

5  A.   I agree, yes.

6  Q.   They were not using any manufacturing process of their

7  own; correct?

8  A.   Not the manufacturing process, but I believe they were

9  using the insurance information and the customers, the doctors,

10 the supplier information.

11 Q.   They were using the customers, you said?

12 A.   Yes.  They were contacting the doctors and hospitals.

13 Q.   By that you mean selling to customers and doctors?

14 A.   Correct.

15 Q.   I want to make sure I understand your methodology.

16 A.   Sure.

17 Q.   Let's talk about lost profits first.

18 A.   Okay.

19 Q.   Am I right, the idea of lost profits is that you are

20 trying to determine how much money Skye would have made -- the

21 profit Skye would have made -- excuse me -- had CTM not engaged

22 in misconduct; correct?

23 A.   Correct.

24 Q.   Now, what you did with that analysis is you took all of

25 CTM's revenue, you tracked it a little bit, and multiplied

1    Skye's profit margin; right?

2    A.    Yes.

3    Q.    And in doing that, you assumed that, if CTM were not

4    engaged in misconduct, Skye would have captured all of the

5    sales CTM made; right?

6    A.    Agreed, yes.  If this is truly a unique product and no one

7    else is selling it, yes.

8    Q.    Did you assume that -- first of all, what product is

9    unique?  What product are you referring to?

10   A.    The flowable products sold by Skye and CTM.

11   Q.    So in your analysis, you assume that was unique; true?

12   A.    Correct.  I think the economic evidence would show that.

13   I am not scientist.  Science is hard.  Economics is easy.

14   Q.    Now, HRT was selling its flowable product to a company

15   called Stryker; right?

16   A.    Can you say that again?

17   Q.    HRT was selling this unique flowable product to a company

18   called Stryker; correct?

19   A.    I believe so, yes.

20   Q.    In fact, Stryker was a bigger customer of HRT than Skye;

21   isn't that right?

22   A.    I have not seen the data, but I would believe that, yes.

23   Q.    You haven't seen the data?

24   A.    I haven't analyzed the data of HRT's sales to Stryker,

25   specifically.

```
1   Q.   Have you looked at the schedules of HRT's sales to its
2   customers?
3   A.   I'm sure I looked at it at some point, but it is not part
4   of my report.
5   Q.   Stryker was taking this unique flowable product, made by
6   HRT, and selling it in the marketplace; right?
7   A.   Yes.
8   Q.   So we know there is at least one other company in the
9   market selling this unique product in addition to CTM and Skye;
10  correct?
11  A.   Correct.
12  Q.   But you assumed that Stryker would have captured none of
13  the sales if CTM were in the market; right?
14  A.   That is correct.  CTM is selling directly to different
15  places than Stryker is.  Stryker is not able to sell it at the
16  pricing that CTM is, because they've got to pay Skye's profit
17  to Skye, and then sell it at a higher price for themselves to
18  make profit.  So, yes, that is, I think, a valid assumption.
19  Q.   I wasn't following your last answer.
20       So Stryker purchases the flowable from HRT; correct?
21  A.   Correct.
22  Q.   And then it turns around and sells the flowable to medical
23  facilities; correct?
24  A.   Correct.
25  Q.   And when it's out there selling the flowable, it's
```

1  competing with CTM and Skye for that product; true?

2  A.   Yes, I agree.

3  Q.   But in your hypothetical world of lost profits, Stryker

4  would have captured none of the sales that CTM is now

5  capturing.

6       Do I have that right?

7  A.   Correct.  If Stryker was able to make those sales, they

8  would have taken them from CTM.  So my hypothetical, I think,

9  holds true.  You are trying to say that any customer would then

10 crush the market because they're selling the same product.  But

11 that is not happening.

12      The data, the economics, the easy part is showing that

13 Skye -- or CTM is growing at huge growth.  If your hypothetical

14 was true, Stryker, who is much bigger, would just buy it from

15 HRT and crush CTM out of the marketplace.

16 Q.   So, you're assume -- you know Stryker is selling the

17 product in the marketplace; right?

18 A.   I do, yes.

19 Q.   And you don't know whether they could crush CTM; right?

20 A.   If they could price it the same way CTM could, it would

21 have an influence.  But they've got to pay HRT's margin.  So if

22 it costs HRT $.12 to make it and they sell it to Stryker for

23 $1.00, then Stryker has to mark it up and price it higher.  So

24 that is why the smaller companies that are still selling the

25 unique products are able to grow the way they are.  It is just

1    simple economics.

2    Q.    Now, in doing your lost profits analysis, did you consider

3    the market shares of other competitors in the market?

4    A.    Again, I'm working under the assumption that the

5    plaintiffs will prove their liability case, and that this is a

6    unique product.  If it is, then, yes, I've considered the

7    competitors.  Because no one else could price it the way that

8    CTM and Skye are, because they've got to pick up the margins

9    when they buy it and resell it.

10   Q.    Now, your lost profits analysis include sales made by CTM

11   to medical facilities, with which Skye has no prior

12   relationship; is that correct?

13   A.    Yes.

14   Q.    And it includes sales made by CTM through independent

15   sales representatives with whom Skye has no prior relationship;

16   correct?

17   A.    Agreed, yes.

18   Q.    And we looked at some schedules before, where you were

19   looking at different sales reps and different facilities.  But

20   am I right that your damages numbers are not limited to common

21   representatives; right?

22   A.    Yes.

23   Q.    And they are not limited to common customers; correct?

24   A.    Correct.

25   Q.    You are including all of CTM's revenue?

1    A.    Correct.

2    Q.    And, in fact, in your future damages analysis for lost

3    profits, you're assuming that for ten years into the future,

4    Skye would capture every dollar of CTM's sales; correct?

5    A.    That is my projection, yes.  I have not made an assumption

6    on time, but I've calculated it out under the assumption that

7    no one will reverse-engineer this unique product in the next

8    ten years.

9    Q.    Are you familiar with a product company called Interfyl?

10    It's really a product called Interfyl.

11    A.    Not specifically, no.

12    Q.    You didn't consider that product in your lost profits

13    analysis?

14    A.    I am not sure if I did or didn't.

15    Q.    Okay.  Now, during CTM's first year of existence, they had

16    only resold products made by a third party; true?

17    A.    True.

18    Q.    Now, in your lost profits analysis, you've included sales

19    made by CTM on those third-party products; right?

20    A.    Yes.

21    Q.    What confidential information did you assume CTM was using

22    when it simply resold the third-party's product?

23    A.    Well, certainly, they know the pricing.  Certainly, they

24    know who the suppliers were.  They knew what Skye and HRT were

25    making it for and selling it at.  I'm assuming they contacted

1    and knew some of the doctors and medical facilities, so that
2    they knew how to bill it.  They knew how to instruct the
3    doctors how to use the insurance codes to make sure that they
4    would get paid for the product.  So all of that know-how that
5    was curated over years at Skye was something that CTM was using
6    on day one.
7         The other thing is that, had they not been working on
8    using the flowable product, CTM wouldn't be a viable business.
9    If all they were doing is selling membranes, they would be
10   doing a million dollars a year, and they wouldn't be able to
11   make it over time.  So had they not done what they did with
12   their longer vision, they wouldn't have made those sales at
13   all.
14   Q.   So you're saying, if CTM wasn't selling a flowable
15   product, it simply wouldn't exist?
16   A.   Correct.
17        Can you imagine them trying to split that million dollars
18   a year, the profit on that, five ways?
19   Q.   In your supplement report, that you served in June, you
20   assumed CTM would exist, didn't you?
21   A.   I was asked by Mr. Saba to deduct the membrane sales, yes.
22   Q.   Right.  And by deducting the membranes sales, you assumed
23   CTM would exist; correct?
24   A.   Again, I was asked to do that.  I am not saying I agree
25   with it, but I was asked to do the math.

1  Q.   And it is in your report, though; right?

2  A.   Agreed.

3  Q.   Let's talk about your damages on a claim-by-claim basis.

4  So your damages numbers for breach of contract and a breach of

5  fiduciary duty are the same, are they not?

6  A.   Yes.

7  Q.   So you utilized the same methodology in assessing breach

8  of contract damages and breach of fiduciary duty damages?

9  A.   Yes.

10  Q.   Now, in the breach of fiduciary duty damages, during

11  what -- you assume liability; correct?

12  A.   Correct.

13  Q.   During what period of time did you assume the misconduct

14  occurred?

15  A.   At any time they were working for Skye, that they were

16  learning about the stuff and planning to take it with them, all

17  of those plans, without them, nothing happens in the future.

18  So if you are breaching your duty of fiduciary duty in February

19  of 2018 and then you take all of that stuff and move it into

20  the future, it doesn't stop the damages from occurring.

21  Q.   Did you assume that manufacturing process information was

22  taken or used in 2018 in conducting your damages analysis for

23  breach of fiduciary duty?

24  A.   I have made no assumption either way, that I'm aware of.

25  Q.   Okay.  Now, did you separately value -- let me back up.

1      In analyzing Skye's contract claim, you assumed liability;
2  correct?
3  A.    Correct.
4  Q.    And you assumed certain confidential information had been
5  used or disclosed by Mr. Banman?
6  A.    Yes.
7  Q.    Did you separately value the different categories of
8  confidential information?
9  A.    No.  That would be impossible to do.
10  Q.    You think it's impossible to do?  Is that what you said?
11  A.    Yes.
12  Q.    Okay.  So if we were to assume, for example, that the jury
13  concludes that only sales representative training materials had
14  been misused, do you have a damages number?
15  A.    No.
16  Q.    If I were --
17  A.    Other than the damages calculated for each sales rep in my
18  report.  There are schedules for each sales rep in my report.
19  Q.    For the sales representatives?
20  A.    Correct.
21  Q.    My question is a little different.  If we assume that the
22  jury concludes that sales representative training materials
23  were used or disclosed by the defendants, what are the damages
24  for that misconduct?
25  A.    It could be the entire amount.  It depends on what

```
 1   training materials they used.  If it was something that helped
 2   them make a sale and continues to help them make a sale, then
 3   that would be part of damages.
 4   Q.   So it is your opinion that, if sales representative
 5   training materials were misappropriated and nothing else, the
 6   total damages could be over $100 million?
 7   A.   Yes.
 8            MR. FLUSKEY:  I have no further questions.
 9            THE COURT:  Mr. Williams?
10            MR. WILLIAMS:  No questions, Your Honor.  Thank you.
11            THE COURT:  Mr. Beral?
12            MR. BERAL:  No questions, Your Honor.
13            THE COURT:  Okay.  Any Redirect?
14            MR. SABA:  Just one question, Your Honor.
15            THE COURT:  Thank you.
16                      REDIRECT EXAMINATION
17   BY MR. SABA:
18   Q.   Mr. Kahrs, why is it important that use CTM's total
19   revenue when conducting your lost profit analysis?
20   A.   Because I don't think they could be a viable business had
21   they not been selling the flowable product.
22            MR. SABA:  Thank you very much.
23            THE COURT:  Any additional Cross?
24            MR. FLUSKEY:  No, Your Honor.
25            THE COURT:  Thank you.
```

```
 1          May the witness be excused?
 2              MR. SABA:  Yes, Your Honor.
 3              THE COURT:  Okay.  You're excused.  Thank you.
 4              THE WITNESS:  Thank you, Your Honor.
 5              THE COURT:  Let me ask the plaintiffs to call their
 6   next witness.
 7              MR. SABA:  At this time, the plaintiffs rest.
 8              THE COURT:  Thank you.  Let me turn to the CTM
 9   defendants and ask them to call their first witness.
10          To the extent there is a motion, we can handle it off the
11   record.  I'll take it under submission.
12              MR. FLUSKEY:  Thank you, Your Honor.
13          The defendants call Dr. Rouzbeh Taghizadeh.
14              THE COURT:  Thank you.
15              MR. FLUSKEY:  And, Your Honor, we have a couple of
16   notebooks to bring up to you.
17              THE COURT:  Thank you.
18              THE COURTROOM DEPUTY:  Please raise your right hand.
19          Do you solemnly swear that the testimony you shall give in
20   the cause now pending before this Court shall be the truth, the
21   whole truth, and nothing but the truth, so help you God?
22              THE WITNESS:  I do.
23              THE COURTROOM DEPUTY:  Thank you.  Please be seated.
24          Please state your name for the record, spelling both your
25   first and last name.
```

```
 1              THE WITNESS:  Dr. Rouzbeh, R-O-U-Z-B-E-H, Taghizadeh,
 2    T-A-G-H-I-Z-A-D-E-H.
 3              THE COURT:  I apologize, Counsel.  I think that now
 4    might be a good time to take our break rather than just getting
 5    a few minutes in.
 6         So we'll take a 20-minute recess at this time.
 7         Jurors, do not talk about the case.  Do not make up your
 8    minds about the case.  We'll see you in 20 minutes.  Thank you.
 9              THE COURTROOM DEPUTY:  All rise for the jury.
10         (Jury exited.)
11              THE COURT:  The Court's in recess.
12         (A brief recess was taken.)
13              THE COURT:  Okay.  The witness can return to the
14    witness stand, and assuming our jurors are here, we will get
15    them back to the courtroom.
16              MR. SABA:  Your Honor?
17              THE COURT:  Yes.
18              MR. SABA:  Just for your purposes, that video that
19    was played --
20              THE COURT:  Yes.
21              MR. SABA:  Evenly split five and five.
22              THE COURT:  Thank you.  I appreciate it.
23              MR. SABA:  Your Honor?
24              THE COURT:  Yes.
25              MR. SABA:  We would need to admit Exhibits 104 and
```

1  106.

2          THE COURT:  Okay.  Thank you.

3          THE COURTROOM DEPUTY:  All rise for the jury.

4      (Jury entered.)

5          THE COURT:  Okay.  You may be seated.  Welcome back,

6  jurors.  One quick matter that we need to handle is the video

7  that we played of the deposition of Mr. Floros, there were some

8  exhibits that were admitted or were discussed, and they need to

9  be admitted at this time, so I will now turn to plaintiffs'

10 Counsel or defense Counsel to seek to have those admitted at

11 this time.

12          MR. SABA:  Thank you, Your Honor.  At this time we

13 would like to move in Exhibits 104 and 106.

14          THE COURT:  Thank you.  I trust there is no

15 objection?

16          MR. CUMMINGS:  No objection, Your Honor.

17          THE COURT:  104 and 106 are admitted.

18      (Exhibits 104 and 106 were received into evidence.)

19          THE COURT:  With that, Mr. Fluskey, you may proceed.

20     Let me just advise you, we have a court reporter.  She's

21 trying to write down what everybody is saying, so please make

22 sure that you speak into the microphone and don't speak over

23 the attorneys.  If you hear "Objection," then just stop

24 speaking until I tell how to proceed.  Thank you.

25                    **ROUZBEH TAGHIZADEN, Ph.D.,**

```
1    called as a witness, on behalf of the Defendants, testified:
2                    DIRECT EXAMINATION
3    BY MR. FLUSKEY:
4    Q.    Good morning, Doctor.
5    A.    Good morning.
6    Q.    Can you, please introduce yourself to the Court, please?
7    A.    My name is Rouzbeh Taghizadeh.
8    Q.    Can you summarize your educational history for us?
9    A.    Yes, absolutely.  I received my Bachelor of Science in
10   Chemical Engineering from the University of Massachusetts
11   Amherst in the year 2000.  I then went on to pursue my graduate
12   career where I attended MIT and received a Ph.D. in biological
13   engineering in 2006.  I then went on to pursue and complete for
14   an additional two years, a postdoctoral research fellowship.
15        And during my time as a Ph.D. student and postdoctoral
16   fellow, my research was focused on using cells and tissues from
17   placental and nonplacental sources in order to develop
18   therapeutics for patients afflicted with uncurable diseases and
19   disorders.
20   Q.    Can you summarize your professional work history for us,
21   please?
22   A.    Sure.  So shortly after completing my postdoctoral
23   fellowship in 2008, I co-founded a biotechnology company where
24   I served as Chief Scientific Officer for 15 years.  In that
25   role, my responsibilities were to develop the steps to process,
```

1    bank, and eventually therapeutically clinically use cells and
2    tissue products from both, again, placental and nonplacental
3    sources for patients.
4        I then -- just recently in the past year and a half or so,
5    I started to do more consulting.  Again, in the same area of
6    cell and tissue, therapeutics, processing, banking,
7    manufacturing, regulatory.
8        And, you know, over the 22-, 23-year span of my career as
9    a scientist, I have processed placental tissue and nonplacental
10   tissue hundreds and upon hundreds of times with these hands.  I
11   actually done them.  And I've written and authored many
12   publications, peer-reviewed scientific publications.  I have
13   written book chapters.  I have been editor on several textbooks
14   in the placental tissue space, in that space.  I even invented
15   tissue processing device, technology, that I've been awarded
16   over a dozen patents for here in the U.S., both utility and
17   design patents.
18       As a scientist, I've also given countless presentations at
19   seminars and meetings and conferences.
20   Q.   Were you engaged to perform services in connection with
21   this case?
22   A.   Yes, I was.
23   Q.   By whom?
24   A.   By your firm on behalf of CTM defendants, I was -- I've
25   been engaged as a subject matter expert for this matter.

1  Q.   What was the nature of your engagement or assignment?

2  A.   So I examined and reviewed the procedures for both HRT and

3  Alamo, the manufacturer of CTM's products.  With respect to

4  their respective processing steps for manufacturing both

5  placental membrane and particulated flowable products.  And I

6  also formulated opinions based on those procedures.

7  Q.   In connection with performing your work, what did you

8  do -- what information did you review?  What activities did you

9  undertake?

10 A.   Yeah.  So I reviewed standard operating procedures for

11 both HRT and Alamo with respect to their procedures and

12 preparation of both placental membrane and particulated

13 flowable products.  I also reviewed the scientific literature,

14 the publicly available scientific literature, in order to

15 determine whether the steps that HRT uses in their preparation

16 of placental membrane and particulated flowable products are in

17 the public domain, are in scientific literature for anyone to

18 see.

19      I also reviewed deposition material.  I also toured Alamo

20 in San Antonio and actually observed Alamo's processing of both

21 CTM's placental membrane and particulated flowable products.

22           THE COURT:  I'm sorry, Counsel.  Should we close the

23 courtroom at this time?

24           MR. FLUSKEY:  Up to the plaintiffs.

25           THE COURT:  Okay.

```
 1              MR. SABA:  We can do it now.  That's fine.
 2              THE COURT:  Okay.  The transcript will be sealed and
 3    the courtroom closed.
 4         Thank you, Mr. Fluskey, please proceed.
 5         (Sealed portion redacted.)
 6              THE COURT:  Okay.  The transcript is now unsealed,
 7    and the courtroom is reopened.  Thank you.
 8                            JAMES DONOHUE,
 9     called under "Seal," on behalf of the Defendants, testified:
10                        DIRECT EXAMINATION
11    BY MR. FLUSKEY:
12    Q.   Good morning, Mr. Donohue.
13    A.   Good morning.
14    Q.   Can you introduce yourself to us, please?
15    A.   Sure.  I'm James Donohue.
16    Q.   And why are you here today, Mr. Donohue?
17    A.   I am here as a damage expert to respond to the plaintiffs'
18    damage claims.
19    Q.   And who retained you in this case?
20    A.   The CTM defendants' Counsel retained me.
21    Q.   Mr. Donohue, did you prepare some PowerPoint slides for
22    your testimony today?
23    A.   I did.
24              MR. FLUSKEY:  Your Honor, I'd ask to permission to
25    publish those slides.  Counsel and I have reviewed them.
```

```
1              THE COURT:  And this is demonstrative only?
2              MR. FLUSKEY:  Demonstrative only, yes.
3              THE COURT:  Okay.  You may do so.
4              MR. FLUSKEY:  If we can pull the first slide.
5   Q.   Mr. Donohue, where do you work, and what is your title?
6   A.   I works a Charles River Associates, and I am a vice
7   president there in our New York City office.
8   Q.   What is your educational background?
9   A.   I have a degree in accounting form Villanova University.
10  Q.   Do you hold any professional certifications?
11  A.   Yes.  I'm a certified public account, CPA; I'm also a
12  certified valuation analyst; and I'm accredited in business
13  valuation.
14  Q.   What are your areas of expertise at CRA?
15  A.   Valuation, damages, forensic accounting, and I also have a
16  focus in intellectual property.
17  Q.   How long have you been providing these types of services?
18  A.   For more than 30 years.
19  Q.   And have you valued intellectual property in the past?
20  A.   I have.  I have valued IP, intellectual property, for many
21  contexts, for transactions, fairness opinions, financial
22  reporting, things of that nature.
23  Q.   Do you have experience calculating damages in litigation?
24  A.   Yes.  I've calculated damages, lost profits, unjust
25  enrichment, royalties, in various settings for various claims.
```

1  Q.   Have you testified before in providing damages
2  calculations?
3  A.   I have.
4  Q.   Have you been qualified as an expert before?
5  A.   I have.
6  Q.   On what topic?
7  A.   On damages valuation, forensic accounting.
8  Q.   Are you being compensated -- is CRA being compensated for
9  your work on this matter?
10  A.   Yes.  My firm bills for our time.
11  Q.   Is your compensation dependent in any way on your opinions
12  or the outcome of this case?
13  A.   No.  We have no contingent compensation.  It is strictly
14  hourly.
15  Q.   In performing your assignment, what did you review?
16  A.   I reviewed financial information and other information
17  produced in this case -- financials, sales documents,
18  communications, certain agreements.  I also considered
19  depositions in this case, certain legal filings, research,
20  input from the technical experts in this case, reports,
21  deposition transcripts, and testimony.  And I've also been
22  watching the trial and/or reading transcripts.
23  Q.   As part of --
24          THE COURT:  I'm sorry, Counsel, to interrupt.  Just
25  for the sake of the record, can we mark that demonstrative as

1    1319?  It is not been admitted, but I just want to make sure it

2    is clear for the record.

3         (Demonstrative 1319 was marked for identification.)

4              THE COURT:  You may proceed.

5    BY MR. FLUSKEY:

6    Q.   As part of your damages work in this case, Mr. Donohue,

7    did you assume liability?

8    A.   Yes.  I was asked to assume liability.

9    Q.   What does it mean to assume liability?

10   A.   As a damage expert, we're assuming liability in

11   calculating damages, assuming that liability is found.

12   Q.   Now, what if the jury finds no liability here?

13   A.   If there is no liability, there is no damages and no need

14   for a damage calculation.

15   Q.   For what claims were you asked to assume liability?

16        And if we could have Slide Number 2 brought up, that would

17   be helpful.

18   A.   As shown here by the slide, I was asked to assume

19   liability for various claims.  I have them listed here.  Some

20   of them are with respect to Skye, and some of them -- one of

21   them is for HRT alone.

22   Q.   Now, earlier today, we heard some testimony from Mr. Kahrs

23   about the difference between a lost profits damages analysis

24   and an unjust enrichment damages analysis.

25        Can you provide us just a thumb-nail summary of the

```
 1   difference between those two damages methodologies?
 2   A.   Sure.  Lost -- unjust enrichment is essentially the
 3   alleged gain that the defendant has achieved by making a sale
 4   of a product, in this case.  And the flip side of that would be
 5   not only is that sale relevant to the allegations but that
 6   but-for that sale by the defendant, the plaintiff would have
 7   captured it, and therefore, it lost profits there.
 8        They're alternatives in this case.  You don't add them up.
 9   You either -- it is unjust enrichment or a gain or the other
10   side's loss.
11   Q.   Let's talk about breach of contract claims and your
12   analysis of those.
13        What confidential information did you assume was misused
14   or disclosed in assuming liability for the purposes of your
15   damages analysis?
16   A.   As I listed -- I believe it's the next slide, Slide 3.  I
17   understand that the breach of contract claims concern --
18             MR. SABA:  Objection, Your Honor.
19             THE COURT:  What's the objection?
20             MR. SABA:  Beyond the scope and 702.
21             THE COURT:  Let me see the parties at sidebar.
22        (Sidebar commenced.)
23             THE COURT:  Can you hear me, Suzanne.
24        What is the objection?
25             MR. SABA:  So, Your Honor, I think he's going to try
```

```
 1   and describe the summary judgment ruling here and what the
 2   claims are that were and were not in before.
 3             THE COURT:  Okay.
 4             MR. SABA:  And I just think that that is not
 5   appropriate, because he is rebuttal expert only, and Mr. Kahrs,
 6   obviously, didn't talk about that.
 7             THE COURT:  Okay.  I just heard him talk about the
 8   claims that are in.
 9             MR. FLUSKEY:  That's correct.  He's not going to talk
10   about the other.
11             THE COURT:  Okay.  You don't have a concern about
12   what he said it.  It's what you thought he might say.
13             MR. SABA:  Or about to say.
14             THE COURT:  Okay.  So we're cool?
15             MR. SABA:  Yes.
16        (Sidebar concluded.)
17             THE COURT:  The objection is overruled.
18        I don't know if we got an answer to the last question, so
19   Mr. Fluskey, I will allow to start again.
20   BY MR. FLUSKEY:
21   Q.   Mr. Donohue, what confidential information did you assume
22   was used or disclosed by Mr. Banman in calculating damages?
23   A.   For the breach of contract claims, as listed here, I've
24   assumed that it's the HRT manufacturing process, what is being
25   called the order history, Skye's order history, specifically
```

 1   for Dr. Ertl at Eskenazi and Ethan Chappell at Community, and,
 2   lastly, Skye's sales representative training methods.
 3   Q.    Now, you were here for Mr. Kahrs's testimony; correct?
 4   A.    I was.
 5   Q.    And you've reviewed the expert reports that he's produced
 6   in this case?
 7   A.    I have.
 8   Q.    How did Mr. Kahrs value this information for the purpose
 9   of calculating damages?
10   A.    Mr. Kahrs assumed that this information essentially
11   prevents CTM from making any sales, and so he simply captured
12   all of CTM's sales and also looked at what Skye's lost profits
13   would be on those sales.
14   Q.    Do you believe Mr. Kahrs used a proper damages
15   methodology?
16   A.    No.
17   Q.    Why not?
18   A.    You have to consider -- when doing a damage calculation,
19   you have to consider the information at issue, this
20   confidential information, for example.  And Mr. Kahrs's method
21   is blunt instrument that essentially values the business or
22   tries to.  You have to look at this information and understand
23   how this information ties to those claims.
24   Q.    Now, in his lost profits analysis, Mr. Kahrs testified
25   that he assumed that Skye would have captured, essentially, all

1  of CTM's sales?

2      Do you recall that?

3  A.   I do.

4  Q.   And do you agree with that?

5  A.   No.  First, I don't -- as I mentioned, I don't agree that

6  all the sales should be at issue.  There's other ways to be in

7  this market.  It is competitive market.  You can enter this

8  market.  But if you assume that these sales were not made by

9  CTM, in Mr. Kahrs's opinion, he assumes that Skye would have

10 captured all of them, which is wrong.  There are other

11 competitors in this space, including a competitor, Stryker,

12 which was Wright Medical as well, that is selling the identical

13 product in the marketplace. So to suggest that no one else

14 would capture these sales is wrong.

15 Q.   Did you hear Mr. Kahrs testify this morning and explain

16 that he included in his damages numbers products that CTM had

17 resold, products manufactured by a third party?

18 A.   Yes, the private label products.

19 Q.   Do you agree with his inclusion of those sales?

20 A.   No.  Those products, as acknowledged by Mr. Kahrs and, I

21 believe, during the last week -- those third-party products are

22 not using the HRT manufacturing process in any way.  So Skye --

23 CTM can sell them in the marketplace.

24 Q.   Let's talk about Mr. Kahrs's projections.  Is Mr. Kahrs's

25 damages purely limited to CTM's sales, that CTM has actually

1  made?

2           THE COURT:  I'm sorry.  His damages period or

3  calculation?

4  BY MR. FLUSKEY:

5  Q.   Is his damages calculation limited to CTM sales that CTM

6  has actually made?

7  A.   No.  The calculations that he showed this morning include

8  both past sales and upwards of another ten years into the

9  future.

10  Q.   And do you agree with his projections?

11  A.   No.  His projection is speculative.  As he acknowledged,

12  he updated the projection already from the time he did it in

13  '22 to now, which is just less than a year, and it changed

14  dramatically.  I think his future sales went down by a third,

15  suggesting that his projection is not reliable.

16  Q.   Now, let's talk about methods you employed, Mr. Donohue.

17  What methods did you use to value Skye's breach of contract

18  claim?

19  A.   For my calculation, I considered the information at issue

20  and the value of that information.  And a more -- a better way

21  to do that rather than just simply assuming no sales can occur

22  is to consider the value of that information.  And I

23  understand, based on technical expert testimony in the market,

24  that you can be in the market within 12 months with a product;

25  within six months with a membrane, as testified by Mr. Lee and

1    also explained to me by the defendants' technical experts.

2    Q.   Have you prepared a damages calculation based on this

3    methodology?

4    A.   Yes.  This is what the damage experts call a "headstart

5    methodology."  It considers that, if that information has a

6    value, it's limited to, potentially, a headstart, that it might

7    provide someone entry into market in a period of time.  So for

8    example, the 12-month entry period.

9         So I've limited those sales to the products at issue, the

10   flowable and the chorion membrane, for a limited period of

11   about less than two years.

12   Q.   And what are Skye's damages, based on this headstart

13   concept?

14   A.   If you looked at CTM's profits for this headstart

15   period, -- and, again, assume they couldn't be in the market

16   during that time -- those profits are about $1.6 million for

17   CTM.

18   Q.   Let's discuss your breach of fiduciary duty damages

19   calculations.  First, did Mr. Kahrs limit his breach of

20   fiduciary duty calculations by time frame?

21   A.   No.  As I just explained, he includes CTM sales for four

22   years in the past and another ten going forward; so a 14-year

23   period.  It does not limit it to his employment time period.

24   Q.   And how did you go about calculating damages, again,

25   assuming liability, with respect to the breach of fiduciary

1   duty claims?

2   A.   I considered the information at issue during the

3   employment period.  And I understand that certain sales of CTM

4   were initiated while Mr. Banman was employed by Skye.  So I

5   looked at those sales, that occur in 2018, for two particular

6   customers.

7   Q.   And did you calculate damages based on that assumption?

8   A.   I did.  I calculated -- this was for Surgery Center of

9   Carmel and Riverview Health.  And for 2018, CTM's profits on

10  those sales were about $150,000.

11  Q.   And that is for all of 2018?

12  A.   That is for all of '18.  And I understand that not all of

13  sales were necessarily initiated in June or July of 2018 when

14  Mr. Banman was working at Skye.

15  Q.   Let's discuss the trade secrets claim, if we could.  Did

16  you conduct an alternative damages calculation for that claim?

17  A.   Yes, I did.

18         MR. FLUSKEY:  If we can call up Slide 4.

19  Q.   Can you explain what you did.  Excuse me.

20  A.   Here, again, focusing on the information that is at issue,

21  I understand the trade secret information -- I think the slide

22  just went down -- but the trade secret information was the

23  order history that we discussed for Dr. Ertl and Ethan

24  Chappell, and the training methods.

25         MR. FLUSKEY:  If we could pull up Slide 5, please.

1   Q.   What does this slide show us?

2   A.   Slide 5 compares Mr. Kahrs's opinions for the trade secret

3   claim with my rebuttal opinions to Mr. Kahrs's opinions.  So

4   Mr. Kahrs had produced a Skye profit calculation that, at

5   least, narrowed it to Dr. Ertl or Eskenazi, or what he thought

6   was, and Community Hospital.  So he narrowed it, in this case,

7   to those doctors.

8        But I've made some adjustments.  First of all, not all of

9   the sales at Eskenazi were Dr. Ertl's sales.  There were other

10  doctors involved.  So I've narrowed that number to only include

11  Dr. Ertl's sales at Eskenazi.  And, also, I've included a lost

12  profit -- CTM profits or the unjust enrichment or gains, CTM's

13  gain, and that is $483,000 there.

14       Given my concerns with his Skye lost profits calculation,

15  I also do that calculation here, but as I mentioned, it's wrong

16  to assume Skye would capture every sale.

17  Q.   In connection with your work, did you calculate CTM's

18  profit margin?

19  A.   I did.

20  Q.   Did you calculate it differently than Mr. Kahrs?

21  A.   Yes.  I have a lower margin, because Mr. Kahrs removed

22  certain expenses from CTM Canada.  Canada was where a lot of

23  employees were.  There was expenses within that number.  He

24  removed them, and I've used a lower margin, given those

25  additional expenses.

1    Q.    Mr. Donohue, let's discuss your conclusions.

2          If we can pull up Slide 7, please.

3          What does that slide show us?

4    A.    These are my overall conclusions, given my response to the

5    various Kahrs calculations.  So I will just take them one by

6    one.

7          For breach of contract, there, I have limited it to the

8    information at issue concerning the order history.  There, it

9    would just be the $482,000, which is for the Ertl sales and the

10   Community sales.

11         The next one is a breach of duty.  That would be limited

12   to Carmel Surgery Center and Riverview Health, which would be

13   $158,000.

14         The trade secret, that's the same set of information.  The

15   trade secret and the breach of contract, again, is the order

16   history, so it's the same number, the 482,787.

17         And, lastly, there was a tortious interference contract

18   claim as well, that Mr. Kahrs had provided.  So I provided an

19   alternative here, which limits it to CTM's profits and also

20   limits it to CTM's profits during the reps' exclusivity period.

21   So that adjusts $728,000.

22         And the total there, when you remove the overlap, because,

23   as I mentioned, the breach of contract and the trade secrets

24   are the same information, is $1.369 million.

25   Q.    Now, I see here an unjust enrichment column and a lost

1  profits column.  Are they to be added together, or are those
2  alternatives?
3  A.   NO.  Those are alternatives.  And the CTM is just CTM's
4  gains on those sales.  And as I mentioned, the Skye lost profit
5  column is assuming, as Mr. Kahrs did, 100 percent Skye captured
6  the sales, which is incorrect.
7  Q.   Looking at this slide with your conclusions, can you just
8  summarize for us how your approach differs from Mr. Kahrs's?
9  A.   It differs because Mr. Kahrs assumed, essentially, all of
10 CTM's activity was due to that information.  My approach
11 narrowed it to actually considering the information at issue
12 and what's the value of that information and given the ability
13 to design around and enter the market and use private label
14 products and membrane products.  It's not appropriate to just
15 include all of the sales for a 4- and 14-year period.
16         MR. FLUSKEY:  Let's flip to the next slide, please,
17 Slide 8.
18 Q.   You see the numbers on this slide are slightly higher.
19 Can you explain to us how Slide 8 differs from Slide 7?
20 A.   Yes.  So here with the title, you can see it says, With
21 Skye's Acceleration Period, or headstart.  So what I have done
22 there is now include the period of profits for CTM during that
23 two-year headstart period to value that information.  If that
24 information provided value, it accelerated their entry and
25 provided another $1.6 million.  So that's the increment to that

1    number.

2    Q.    Mr. Donohue, earlier today, did you hear Mr. Kahrs testify

3    that CTM's flowable sales account for more than 90 percent of

4    the company's revenue through 2021?

5    A.    I did.

6    Q.    Is he right?

7    A.    No.

8    Q.    What is the right number?

9    A.    It's more like 50 to 60 percent, depending on the year.

10   Q.    And can we call up Exhibit 581, for use as a demonstrative

11   only, before you publish it.

12            THE COURT:  Any objection?

13            MR. SABA:  I'm sorry.  Give me one second.

14            MR. FLUSKEY:  This is a schedule from Mr. Donohue's

15   supplemental report.

16            MR. SABA:  No objection as a demonstrative.

17            THE COURT:  Okay.  You may publish.

18   BY MR. FLUSKEY:

19   Q.    What does this table show us, Mr. Donohue?

20   A.    Exhibit 6 -- this is from one of my reports that I issued

21   in response to Mr. Kahrs -- is a summary of CTM's sales by

22   product.  So you can see on the left, going down, those are the

23   different CTM products.  And then they're classified as

24   flowable, paste.  And there are certain membrane products,

25   cord, chorion, and amnion.

1    And at the bottom are private label products, you can see
2  there.  Those are products that CTM purchased from someone
3  else.  They purchased their products from someone else as well.
4  But these are products they purchased from other people like
5  Vivex and things like that.  And you can see it breaks it down
6  by dollars, by years, for each product category.
7  Q.   What does this document tell us with respect to CTM's
8  flowable sales as compared to non-flowable sales?
9  A.   Well, you can see that CTM-branded flowable sales is the
10  top three lines, and that is about less than 60 percent of
11  their overall sales.
12       MR. FLUSKEY:  Thank you, Mr. Donohue.  No further
13  questions.
14       THE COURT:  Thank you.
15  And anything from the other Defendants' Counsels?
16       MR. WILLIAMS:  I have just, I think, one or two
17  questions, Your Honor.
18       THE COURT:  Okay.  Please proceed.
19                      DIRECT EXAMINATION
20  BY MR. WILLIAMS:
21  Q.   Mr. Donohue, a few moments ago, there was a number up on
22  the screen that was a potential damage number associated with
23  misappropriation of trade secrets for the order histories.
24  A.   Yes.
25  Q.   And I just want to be clear, that assumes a finding that

```
1   the order histories were, in fact, trade secrets; correct?
2   A.   Yes.  That assumes liability, and it also assumes that the
3   appropriate remedy would be 100 percent of the profits for the
4   order history, which I don't think is appropriate.  But if all
5   of those sales are at issue, that is all of the profits.
6   Q.   And would agree with me that, if the jury concludes the
7   order history is not a trade secret, the damage number is zero?
8   A.   Correct.  If no liability, it would be zero.
9           MR. WILLIAMS:  Thank you.
10          THE COURT:  Thank you.
11      Mr. Beral?
12          MR. BERAL:  Really quickly, Your Honor.
13                       DIRECT EXAMINATION
14  BY MR. BERAL:
15  Q.   Hello, Mr. Donohue.
16  A.   Hello.
17  Q.   You said 100 percent of the profits.  You are talking
18  about CTM's profits; right?
19  A.   Yes.
20  Q.   Not Mr. Stumpe or Mr. Boulais; right?
21  A.   That's correct.  That's CTM's profits.
22          MR. BERAL:  Thank you, sir.
23          THE COURT:  Okay.  Any Cross?
24          MR. SABA:  Yes, Your Honor.
25                       CROSS-EXAMINATION
```

```
 1   BY MR. SABA:
 2   Q.   Mr. Donohue, I would like you to take a look at 581,
 3   again.  That was your demonstrative that you prepared; correct?
 4   A.   Yes.
 5   Q.   Okay.  And if I am looking at this correctly, you said the
 6   top three lines -- let's just look at 2021.  The top three
 7   lines are flowable products; right?
 8   A.   Correct.
 9   Q.   And then the next line under that is the paste, which is
10   essentially the same as the flowable without saline; right?
11   A.   That's correct.
12   Q.   And then you've got the thick, which is the chorion;
13   right?
14   A.   Yes.
15   Q.   So between the flowables, the paste, and the thick, that
16   is everything except for $500,000 worth of revenue for CTM;
17   correct?
18   A.   Yes.  That would increase the number.
19   Q.   And did CTM give you their 2023 profit and loss or any
20   financials?
21   A.   No, I don't think -- I don't believe the parties have
22   produced '23 information.
23   Q.   So your client didn't give you their current financials;
24   correct?
25   A.   I don't have it from either the plaintiff or defendant.
```

1  Q.   And they didn't give you their CTM Canada profit and loss
2  financials either, did they?
3  A.   Well, they gave me tax records for the employees that I'm
4  deducting, but nothing else.
5  Q.   They didn't give you their income statements or profit and
6  loss statements; right?
7  A.   They did not.  Just the expense records for those costs.
8           MR. SABA:  No further questions.  Thank you, Your
9  Honor.
10          THE COURT:  Thank you.
11      Any Redirect?
12          MR. FLUSKEY:  No, Your Honor.
13          THE COURT:  Okay.  The witness is excused.  Thank
14  you.
15      Let me ask the defense to call their next witness, CTM
16  defendants.
17          MR. FLUSKEY:  CTM defendants rest, Your Honor.
18          THE COURT:  Thank you.
19      And Counsel for Mr. Boulais, any witnesses?
20          MR. WILLIAMS:  No, Your Honor.  Thank you.
21          THE COURT:  And Counsel for Mr. Stumpe, any
22  witnesses?
23          MR. BERAL:  We rest as well, Your Honor.
24          THE COURT:  Okay.  Thank you.
25      If I could see the parties, briefly, at sidebar.  Thank

1    you.

2          (Sidebar commenced.)

3          THE COURT:  Okay.  So in terms of the next steps,

4    first of all, the juror -- a member of the jury advised --

5          Suzanne, can you hear me.

6          Okay.  A member of the jury advised the clerk that

7    they want to just stay late today.  So my plan is to do

8    everything we were planning to do.  And then at 2:00, when we

9    break, they'll go back into the jury deliberation room, they'll

10   get their lunch, and they can start deliberating.

11         We do need to talk about the exhibits, because there were

12   some exhibits that were introduced today that are not in the

13   binders, et cetera.  But I think other than that, that's all we

14   need to talk about.  So I would be inclined, at this point,

15   since it's not yet 12:00, to go ahead and instruct the jury at

16   this time.  Then we can take our long break, talk about the

17   exhibits, and then the parties can close.

18         MR. BERAL:  Sounds good, Your Honor.

19         MR. SABA:  Yes.

20         THE COURT:  Okay.  Thank you.

21         (Sidebar concluded.)

22         THE COURT:  Okay.  Now, that all parties have rested,

23   it is time for me to give you your instructions, and then the

24   parties will close.

25         I will ask the clerk if she can provide you with your jury

instructions.  We have given each of you -- we're giving each of you your own copy of the jury instructions.  So just to be clear, there will be an official copy of the jury instructions, that is original; that is going to be on white paper.  That will go into the jury room with you.  But you all, each, have your own copy of the jury instructions that is on blue paper in case you want to make your own notes or refer to it during your deliberations.  You can take that into the jury room as well.

And then there is verdict form, which is at the back. There is going to be the original copy of the verdict form; that will be on white paper.  That is what you would complete when you are making your verdict.  But you each have a copy of it in your binder in case you want to make your own notes.

Going into the jury room with you will also be three binders of exhibits, all of the exhibits that were admitted, as well as there were a couple of physical exhibits.  Those will go back with you as well.

Something I'll just mention, that you'll notice when you see the exhibits, we have a particular label that we put on every exhibit, which covers part of the exhibit.  So for that reason, with each exhibit, the first page is basically copied because the first page it will be with our label on it, and then they have given you another copy of that same first page without the label so you see the whole document.  It will become clearer when you see it.

1        So with that, I will give my instructions, and then the

2    parties will give their closing arguments.

3        Members of the Jury:  Now, that you have heard all of the

4    evidence in this case, you will soon hear the closing arguments

5    by the attorneys, it is my duty to instruct you on the law that

6    applies in this case.

7        And a copy of all instructions are going to be sent to the

8    jury room for you to consult.  So this includes some of the

9    jury instructions I gave you at the beginning of the trial as

10   well as some that you are hearing right now.

11       It is your duty to find the facts from all the evidence in

12   the case.  To those facts, you will apply the law as I give it

13   to you.  You must follow the law, as I give it to you, whether

14   you agree with it or not.  And you must not be influenced by

15   personal dislikes or likes, opinions, prejudices, or sympathy.

16   That means that you must decide the case solely on the evidence

17   before you. You will recall that you took an oath to do so.

18       Please do not read into these instructions or anything

19   that I may say or do or have said or done that I have an

20   opinion regarding the evidence or what your verdict should be.

21       Before you begin your deliberations, you will elect one

22   member of the jury as your presiding juror.  The presiding

23   juror will preside over the deliberations and serve as the

24   spokesperson for the jury in court.

25       You shall diligently strive to reach agreement with all of

1  the other jurors if you can do so.  Your verdict must be
2  unanimous.
3      Each of you must decide the case for yourself, but you
4  should do so only after you have considered all of the
5  evidence, discussed it fully with the other jurors, and
6  listened to their views.
7      It is important that you attempt to reach a unanimous
8  verdict but, of course, only if each of you can do so after
9  having made your own conscientious decision.  Do not be
10  unwilling to change your opinion if the discussion persuades
11  you that you should.  But do not come to a decision simply
12  because other jurors think it is right or change an honest
13  belief about the weight and effect of the evidence simply to
14  reach a verdict.
15      Because you must base your verdict only on the evidence
16  received in the case and on these instructions, I remind you
17  that you must not be exposed to any other information about the
18  case or to the issues it involves, except for discussing the
19  case with your fellow jurors during your deliberations.
20      Do not communicate with anyone in any way and do not let
21  anyone else communicate with you in any way about the merits of
22  the case or anything to do with it.  This includes discussing
23  the case in person, in writing, by phone, tablet, computer, or
24  any other means, via e-mail, via text messaging, or any
25  Internet chat room, blog, website or application, including but

1    not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn,

2    Snapchat, TikTok, or any other forms of social media.  This

3    applies to communicating with your family members, your

4    employer, the media or press, and the people involved in the

5    trial.  If you are asked or approached in any way about your

6    jury service or anything about this case, you must respond that

7    you have been ordered not to discuss the matter and to report

8    the contact to the Court.

9         Do not read, watch, or listen to any news or media

10   accounts or commentary about this case or anything to do with

11   it.  Do not do any research, such as consulting dictionaries,

12   searching the Internet, or using other reference materials.

13   And do not make any investigation or in any other way try to

14   learn about the case on your own.  Do not visit or view any

15   place discussed in this case and do not use Internet programs

16   or other devices to search for or view any place discussed

17   during the trial.

18        Also, do not do any research about this case, the law, or

19   the people involved, including the parties, the witnesses or

20   the lawyers, until you have been excused as jurors.  If you

21   happen to read or hear anything touching on this case in the

22   media, turn away and report it to me as soon as possible.

23        These rules protect each party's right to have this case

24   decided only on the evidence that has been presented here in

25   court.  Witnesses here in court take an oath to tell the truth,

1    and the accuracy of their testimony is tested through the trial
2    process.  If you do any research or investigation outside the
3    courtroom or gain any information through improper
4    communications, then your verdict may be influenced by
5    inaccurate, incomplete, or misleading information that has not
6    been tested by the trial process.
7        Each of the parties is entitled to a fair trial by an
8    impartial jury, and if you decide the case based on information
9    not presented in court, you will have denied the parties a fair
10   trial.  Remember, you have taken an oath to follow the rules,
11   and it is very important that you follow these rules.
12       A juror who violates these restrictions jeopardizes the
13   fairness of these proceedings, and a mistrial could result that
14   would require the entire trial process to start over.  If any
15   juror is exposed to any outside information, please notify the
16   court immediately.
17       If it becomes necessary during your deliberations to
18   communicate with me, you may send a note, through the marshal,
19   signed by your presiding juror or by one or more members of the
20   jury.  No member of the jury should ever attempt to communicate
21   with me except by a signed writing.  I will communicate with
22   any member of the jury on anything concerning the case only in
23   writing or here in open court.
24       If you send out a question, I will consult with the
25   parties before answering it, which may take some time.  You may

 1   continue your deliberations while waiting for the answer to any
 2   question.  Remember that you are not to tell anyone, including
 3   me, how the jury stands, numerically or otherwise, until after
 4   you have reached a unanimous verdict or have been discharged.
 5   Do not disclose any vote count in any note to the Court.
 6         A verdict form has been prepared for you.  And as
 7   indicated, each of you has a copy for yourselves in your
 8   binder.  There is just one official one that is the one that
 9   will come back to us.
10         After you have reached unanimous agreement on a verdict,
11   your presiding juror should complete the verdict form according
12   to your deliberations, sign and date it, and advise the clerk
13   that you are ready to return to the courtroom.
14         When a party has the burden of proving any claim by the
15   preponderance of the evidence, it means you must be persuaded
16   by the evidence that the claim is more probably true than not
17   true.
18         You should base your decision on all of the evidence,
19   regardless of which party presented it.
20         When a party has the burden of proving any claim or
21   defense by clear and convincing evidence, it means that the
22   party must present evidence that leaves you with a firm belief
23   or conviction that it is highly probable that the factual
24   contentions of the claim or defense are true.  This is a higher
25   standard of proof than proof by a preponderance of the

1    evidence, but it does not require proof beyond a reasonable
2    doubt.
3        There are two plaintiffs in this trial, Skye and HRT.  You
4    should decide the case of each plaintiff separately as if it
5    were a separate lawsuit.  Each plaintiff is entitled to
6    separate consideration of that plaintiff's own claims.
7        There are six defendants in this trial.  You should decide
8    the case against each defendant separately as if it were a
9    separate lawsuit.  Each defendant is entitled to separate
10   consideration of that defendant's own defenses.  And you will
11   be reminded that the defendants are the two CTM defendants,
12   Mr. Banman, Mr. Seoane, Mr. Boulais, and Mr. Stumpe.  Those are
13   the six defendants.
14       Different aspects of this case involve different parties,
15   plaintiffs and defendants.  Each instruction will identify the
16   parties to whom it applies.  Pay particular attention to the
17   parties named in each instruction.
18       You should decide the case as to each plaintiff and each
19   defendant separately.  Unless otherwise stated, the
20   instructions apply to all parties.
21       All parties are equal before the law.  And a company is
22   entitled to the same fair and conscientious consideration by
23   you as any party.
24       Under the law, a company is considered to be a person.  It
25   can only act through its employees, agents, directors, or

1    officers.  Therefore, a company is responsible for the acts of
2    its employees, agents, directors, and officers performed within
3    the scope of authority.
4        Each one of us has biases about or certain perceptions or
5    stereotypes of other people.  We may be aware of some of our
6    biases, although we may not share them with others.  We may not
7    be fully aware of some of our other biases.
8        Our biases often affect how we act, favorably or
9    unfavorably, toward someone.  Bias can affect our thoughts, how
10   we remember, what we see and hear, whom we believe or
11   disbelieve, and how we make important decisions.
12       As jurors you are being asked to make very important
13   decisions in this case.  You must not let bias, prejudice, or
14   public opinion influence your decision.  You must not be biased
15   in favor of or against parties or witnesses because of their
16   disability, gender, gender identity, gender expression, race,
17   religion, ethnicity, sexual orientation, age, national origin,
18   or socioeconomic status.  Your verdict must be based solely on
19   the evidence presented.  You must carefully evaluate the
20   evidence and resist any urge to reach a verdict that is
21   influenced by bias for or against any party or witness.
22       For purposes of deciding liability and compensatory
23   damages, you may not consider the wealth or poverty of any
24   party.
25       In reaching your verdict, you may not consider the wealth

1    or poverty of any party for purposes of deciding liability and

2    compensatory damages.  You may, however, consider the evidence

3    that the parties present on either parties' revenue and profits

4    or lack thereof.  You may consider the wealth or poverty of the

5    defendants for purposes of determining punitive damages.

6        Now, whether or not you take notes, you should rely on

7    your own memory of the evidence.  Notes are only to assist your

8    memory.  You should not be overly influenced by your notes or

9    those of other jurors.

10       The evidence you are to consider in deciding what the

11   facts are consists of:

12       One, the sworn testimony of any witness;

13       Two, the exhibits that are admitted into evidence;

14       Three, any facts to which the lawyers have agreed; and

15       Four, any facts that I may instruct you to accept as

16   proved.

17       And, Jurors, you will recall that at the beginning I read

18   you a set of facts that you are to accept as proved that is

19   going to be one of your exhibits that you will have, Court

20   Exhibit Number 1,

21       In reaching your verdict, you may consider only the

22   testimony and exhibits received into evidence.  Certain things

23   are not evidence, and you may not consider them in deciding

24   what the facts are.  I will list them for you:

25       One, arguments and statements by lawyers are not evidence.

1    The lawyers are not witnesses.  What they may say in their
2    opening statements, closing arguments, and at other times is
3    intended to help you interpret the evidence, but it is not
4    evidence.  If the facts, as you remember them, differ from the
5    way the lawyers have stated them, then your memory of them
6    controls.

7         Questions -- number two, questions and objections by
8    lawyers are not evidence.  Attorneys have a duty to their
9    clients to object when they believe a question is improper
10    under the rules of evidence.  You should not be influenced by
11    the objection or by the Court's ruling on it.

12         Three, testimony that is excluded or stricken or that you
13    are instructed to disregard is not evidence and must not be
14    considered.  In addition, some evidence may be received only
15    for a limited purpose.  When I instructed you to consider
16    certain evidence only for a limited purpose, you must do so,
17    and you may not consider that evidence for any other purpose.

18         Four, anything you may have seen or heard when the court
19    was not in session is not evidence.  You are to decide the case
20    solely on the evidence received at the trial.

21         Evidence may be direct or circumstantial.  Direct evidence
22    is direct proof of a fact, such as testimony by a witness about
23    what that witness personally saw or heard or did.

24         Circumstantial evidence is proof of one or more facts from
25    which you could find another fact.  You should consider both

kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give any evidence.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned on garden hose, may provide a different explanation for the presence of water on the sidewalk.  Therefore, before you decide that a fact has been proved by circumstantial evidence, you must consider all the evidence in the light of reason, experience, and common sense.

Some evidence may be admitted only for a limited purpose. When I instruct you that an item of evidence has been admitted only for a limited purpose, you must consider it only for that limited purpose and not for any other purpose.

There are rules of evidence that control what can be received into evidence.  When a lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought it was not permitted by the rules of evidence, that lawyer may have objected.  If I overruled the objection, the question was answered or the exhibit received.  If I sustained the objection, the question was not answered, and the exhibit was not received.  Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

1    Sometimes I ordered that evidence be stricken from the
2    record and that you disregard or ignore that evidence.  That
3    means, when you are deciding the case, you must not consider
4    the stricken evidence for any purpose.

5    A deposition is the sworn testimony of a witness taken
6    before trial.  The witness is placed under oath to tell the
7    truth, and the lawyers for each party may ask questions.  The
8    questions and answers are recorded.  When a person is
9    unavailable to testify at trial, the deposition of that person
10   may be used at the trial.

11   And we heard two depositions in lieu of live testimony,
12   the deposition of Arnold Lee Andrews and then today the
13   deposition of Brian Floros.  Because the Brian Floros'
14   testimony happened today, it is not written down in the
15   instructions, but you'll remember there were two.

16   Insofar as possible, you should consider deposition
17   testimony, presented to you in court in lieu of live testimony,
18   in the same way as if the witness had been present to testify.

19   Do not place any significance on the behavior or tone of
20   voice of any person reading the questions or answers for the
21   portions that were read by Counsel.

22   In deciding the facts in this case, you may have to decide
23   which testimony to believe and which testimony not to believe.
24   You may believe everything a witness says or part of it or none
25   of it.

In considering the testimony of any witness, you may take into account:

One, the opportunity and ability of the witness to see or hear or know the things testified to;

Two, the witness's memory;

Three, the witness's manner while testifying;

Four, the witness's interest in the outcome of the case, if any;

Five, the witness's bias or prejudice, if any;

Six, whether other evidence contradicted the witness's testimony;

Seven, the reasonableness of the witness's testimony in light of all the evidence; and

Eight, any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other

1    hand, if you think the witness testified untruthfully about

2    some things but told the truth about others, you may accept the

3    part you think is true and ignore the rest.

4         The weight of the evidence as to a fact does not

5    necessarily depend on the number of witnesses who

6    testify.  What is important is how believable the witnesses

7    were, and how much weight you think their testimony deserves.

8         You may consider whether one party intentionally concealed

9    or destroyed evidence.  If you decide that a party did so, you

10   may decide that the evidence would have been unfavorable to

11   that party.

12        You have heard testimony from John Lee, Daniel Cislo, Hank

13   Kahrs, Rouzbeh Taghizadeh, and James Donohue, who testified

14   about certain opinions and the reasons for those opinions.

15   This opinion testimony is allowed because of the specialized

16   knowledge, skill, experience, training, or education of this

17   witness.

18        Such opinion testimony should be judged like any other

19   testimony.  You may accept it or reject it and give it as much

20   weight as you think it deserves, considering the witness's

21   specialized knowledge, skill, experience, training, or

22   education, the reasons given for the opinion, and all the other

23   evidence in the case.

24        I just wanted to confirm with the parties that the

25   courtroom does not need to be sealed for any of the substantive

1    instructions.

2                    MR. SABA:  No.

3                    THE COURT:  Okay.  Skye claims that it is the owner

4    of two components of alleged trade secrets:  one, sales

5    representative training methods; and, two, order history

6    information, excluding pricing information, with respect to

7    Ethan Chappell and Community Hospital, as well as with respect

8    to Dr. Janos Ertl and Eskenazi Health.

9         Skye claims that these two components constitute their

10   trade secrets and that, first, with respect to:

11        One, the sales representative training methods, that CTM

12   Biomedical, LLC; CTM Medical, Inc.; Bryan Banman; and Pablo

13   Seoane misappropriated them; and

14        Second, as to category number two, order history

15   information, excluding pricing information, with respect to

16   Ethan Chappell and Community Hospital, as well as with respect

17   to Dr. Janos Ertl and Eskenazi Health, that CTM Biomedical,

18   LLC; CTM Medical, Inc.; Bryan Banman; Pablo Seoane; and Mike

19   Stumpe misappropriated them.  "Misappropriation" means that the

20   alleged trade secrets were improperly used or improperly

21   disclosed by a defendant without consent.

22        Skye also claims that the defendants' misappropriation

23   caused it harm or defendants to be unjustly enriched.

24        CTM Biomedical, LLC; CTM Medical, Inc.; Bryan Banman;

25   Pablo Seoane; and Mike Stumpe deny all of these claims and,

1    among other things, contend that, one, sales representative

2    training methods; and, two, order history information,

3    excluding pricing information with respect to Ethan Chappell

4    and Community Hospital, as well as with respect to Dr. Janos

5    Ertl and Eskenazi Health, are not secret, do not derive

6    independent economic value, nor were reasonable efforts made to

7    keep them secret, and nor are they owned by HRT and/or Skye but

8    by third parties whose information was freely accessible and/or

9    readily ascertainable.

10        CTM Biomedical, LLC; CTM Medical, Inc.; Bryan Banman;

11    Pablo Seoane; and Mike Stumpe also contend that none of these

12    alleged trade secrets was ever "misappropriated," that is,

13    improperly used or disclosed.

14        CTM Biomedical, LLC; CTM Medical, Inc.; Bryan Banman;

15    Pablo Seoane; and Mike Stumpe also deny that Skye ever

16    sustained damages or that the defendants were unjustly enriched

17    as a result of any misappropriation of any alleged trade

18    secret.

19        We'll move onto the elements of trade secret

20    misappropriation.  Skye claims that CTM Biomedical, LLC; CTM

21    Medical, Inc.; Bryan Banman; Pablo Seoane; and/or Mike Stumpe,

22    as applicable, has misappropriated a trade secret.  To succeed

23    on this claim, Skye must prove all of the following:

24        One, that Skye owned the following alleged trade secrets:

25    One, the sales representative training methods; and, two, the

1    order history information, excluding pricing information, with
2    respect to Ethan Chappell and Community Hospital, as well as
3    with respect to Dr. Janos Ertl and Eskenazi Health.  That's the
4    first element.
5         The second element is that these alleged trade secrets
6    were trade secrets at the time of the alleged misappropriation.
7    And you got an instruction on that.
8         Three, that CTM Biomedical, LLC; CTM Medical, Inc.; Bryan
9    Banman; Pablo Seoane; and/or Mike Stumpe, as applicable,
10   improperly used, or improperly disclosed the trade secret(s).
11        Four, that Skye was harmed or that CTM Biomedical, LLC;
12   CTM Medical, Inc.; Bryan Banman; Pablo Seoane; and/or Mike
13   Stumpe, as applicable, was unjustly enriched;
14        Five, that CTM Biomedical, LLC's; CTM Medical, Inc.'s;
15   Bryan Banman's; Pablo Seoane's; and/or Mike Stumpe's, as
16   applicable, improper use or improper disclosure was a
17   substantial factor in causing Skye's harm or CTM Biomedical,
18   LLC; CTM Medical, Inc.; Bryan Banman; Pablo Seoane; and/or Mike
19   Stumpe, as applicable, to be unjustly enriched.
20        Additionally, to prove its Defend Trade Secrets Act claim,
21   Skye must prove that the alleged trade secrets relate to
22   products or services used in, or intended for use in, in
23   interstate or foreign commerce.
24        You must consider these five elements for each defendant
25   separately.

1    Turning to element two, the definition of a trade secret.

2   The term "trade secret" means all forms and types of financial,

3   business, scientific, technical, economic, or engineering

4   information, including patterns, plans, compilations, programs,

5   devices, formulas, designs, prototypes, methods, techniques,

6   processes, procedures, programs, or codes, whether tangible or

7   intangible and whether or how stored, compiled, or memorialized

8   physically, electronically, graphically, photographically, or

9   in writing, if:

10    One, the information is actually secret because it is not

11   generally known to or readily ascertainable through proper

12   means by another person who can obtain economic value from the

13   disclosure or use of the information;

14    Two, the owner thereof has taken reasonable measures to

15   keep such information secret; and

16    Three, the information derives independent economic value,

17   actual or potential, from being secret.

18    To prove that, category one, sales representative training

19   methods and, category two, order information -- excuse me,

20   order history information, excluding pricing information, with

21   respect to Ethan Chappell and Community Hospital, as well as

22   with respect to Dr. Janos Ertl and Eskenazi Health, was or were

23   trade secret(s), Skye must prove all of the following:

24    One, the alleged trade secret was actually secret because

25   it was not generally known to or readily ascertainable through

proper means by another person who can obtain economic value
from the disclosure or use of the information;

Two, the owner of the alleged trade secret thereof has
taken reasonable measures to keep it secret; and

Three, the alleged trade secret derives independent
economic value, actual or potential, from being secret.

In addition, facts and information acquired by an
employee, whether by memorization or some other means, in the
course of his or her employment, may potentially be trade
secrets but only if they meet the definition of a trade secret
set forth above.  However, the personal skills, talents, or
abilities that an employee develops at his place of employment
are not trade secrets.

The term "trade secret" can include compilations of public
information when combined or compiled in a novel way, even if a
portion or every individual portion of that compilation is
generally known.  Combinations or compilations of public
information from a variety of different sources, when combined
or compiled in a novel way, can be a trade secret.  In such a
case, if a portion of the trade secret is generally known or
even if every individual portion of the trade secret is
generally known, the compilation or combination of information
may still qualify as a trade secret if it meets the definition
of a trade secret set forth in the preceding paragraphs.

Okay.  Continuing with element two of trade secret

misappropriation, which relates to reasonable efforts to
protect secrecy.  To establish that, one, the sales
representative training methods and, two, order history
information, excluding pricing information, with respect to
Ethan Chappell and Community Hospital, as well as with respect
to Dr. Janos Ertl and Eskenazi Health, was or were trade
secret(s), Skye must prove that it made reasonable efforts
under the circumstances to keep it secret.  "Reasonable
efforts" are the efforts that would be made by a reasonable
business in the same situation and having the same knowledge
and resources as Skye, exercising due care to protect important
information of the same kind.  This requirement applies
separately to each item that Skye claims to be a trade secret.

    In determining whether or not Skye made reasonable efforts
to keep the two components of the alleged trade secrets secret,
you should consider all of the facts and circumstances.  Among
the factors you may consider are the following:

    (a)  whether documents or computer files containing the
two components of the alleged trade secrets were marked with
confidentiality warnings;

    (b)  whether Skye instructed its employees to treat the
two components of the alleged trade secrets as confidential;

    (c)  whether Skye restricted access to the two components
of the alleged trade secrets to persons who had a business
reason to know the information;

1      (d)  whether Skye required employees or others with access

2  to the two components of the alleged trade secrets to sign

3  confidentiality or nondisclosure agreements;

4      (e)  whether Skye employees or others with access to the

5  two components of the alleged trade secrets -- I apologize.  I

6  think that there is a duplication here.

7      Turning to (f), whether Skye took any action to protect

8  the specific two components of the alleged trade secrets and

9  whether it relied on general measures taken to protect its

10  business information or assets;

11      (g)  the extent to which any general measures taken by

12  Skye would prevent the unauthorized disclosure of the two

13  components of the alleged trade secrets; and

14      (h)  whether there were other reasonable measures

15  available to Skye that it did not take;

16      Okay.  Another part of the second element of trade secret

17  misappropriation is the concept of independent economic value.

18  The two categories of alleged trade secrets which are the sales

19  representative training methods and order history information,

20  excluding pricing information, with respect to Ethan Chappell

21  and Community Hospital, as well as with respect to Dr. Janos

22  Ertl and Eskenazi Health, as applicable, has independent --

23  these secrets have independent value if they give the owner an

24  actual or potential business advantage over others who did not

25  know the information and who could obtain economic value from

its disclosure or use.

In determining whether the alleged trade secrets, that I've mentioned, these two categories, had actual or potential independent economic value because they were secret, you may consider the following:

(a)  the extent to which Skye obtained or could obtain economic value from the information in keeping it or them secret;

(b)  the extent to which others could obtain economic value from the information if it or they were not secret;

(c)  the amount of time, money, or labor that Skye expended in developing the information; and

(d)  the amount of time, money, or labor that would be saved by a competitor who used the information.

The presence or absence of any one or more of these factors is not necessarily determinative.

Okay.  Turning to the third element of trade secret misappropriation, which relates to misappropriation by use or disclosure, focusing on misappropriation by disclosure:  CTM Biomedical, LLC; CTM Medical, Inc.; Bryan Banman; Pablo Seoane; and/or Mike Stumpe, as applicable, misappropriated Skye's trade secret(s) by disclosure if CTM Biomedical, LLC; CTM Medical, Inc.; Bryan Banman; Pablo Seoane; and/or Mike Stumpe, as applicable:

One, disclosed it or them without Skye's consent; and

1      Two, did any of the following:

2          (a)  at the time of disclosure, knew or had reason to

3  know that it, his, or their knowledge of Skye's trade secret(s)

4  was acquired after Skye specifically informed it's alleged --

5  excuse me.  After Skye specifically informed and defined its

6  alleged secrets to it, he, or them, which defendant(s) was

7  expected to keep the alleged trade secret(s) secret; or

8          (b)  at the time of disclosure, knew or had reason to

9  know that it, his, or their knowledge of Skye's trade secret(s)

10  came through or from current or former Skye employees, and that

11  those employees had a duty to Skye to keep the information

12  secret.

13      The other part of element three, misappropriation by use,

14  CTM Biomedical, LLC; CTM Medical, Inc.; Bryan Banman; Pablo

15  Seoane; and/or Mike Stumpe, as applicable, misappropriated

16  HRT's and/or Skye's trade secret(s) by use if CTM Biomedical,

17  LLC; CTM Medical, Inc.; Bryan Banman; Pablo Seoane; and/or Mike

18  Stumpe, as applicable, used it or them without Skye's consent;

19  and, two, did any of the following:

20          (a)  at the time of use, knew or had reason to know that

21  it, his, or their knowledge of Skye's trade secret(s) was

22  acquired after Skye specifically informed and defined its

23  alleged secrets to it, he, or them, which defendant(s) was

24  expected to keep the alleged trade secret(s) secret; or

25          (b)  at the time of use, knew or had reason to know that

1    it, his, or their knowledge of Skye's trade secret(s) came from

2    or through current or former Skye employees, and that those

3    employees had a duty to Skye to keep the information secret.

4         A plaintiff may express consent by words or acts that are

5    reasonably understood by another person as consent.

6         A plaintiff may also express consent by silence or

7    inaction if a reasonable person would understand that the

8    silence or inaction intended to indicate consent.

9         Turning to the remedies, if Skye proves that CTM

10   Biomedical, LLC; CTM Medical, Inc.; Bryan Banman; Pablo Seoane;

11   and/or Mike Stumpe, as applicable, misappropriated its trade

12   secret(s), then Skye is entitled to recover damages if the

13   misappropriation caused Skye to suffer an actual loss or CTM

14   Biomedical, LLC; CTM Medical, Inc.; Bryan Banman; Pablo Seoane;

15   and/or Mike Stumpe, as applicable, to be unjustly enriched.

16        Unjust enrichment, CTM Biomedical, LLC; CTM Medical, Inc.;

17   Bryan Banman; Pablo Seoane; and/or Mike Stumpe, as applicable,

18   was or were unjustly enriched if its, his, or their

19   misappropriation of Skye's trade secret(s) caused CTM

20   Biomedical, LLC; CTM Medical, Inc.; Bryan Banman; Pablo Seoane;

21   and/or Mike Stumpe, as applicable, to receive a benefit that

22   it, he, or they otherwise would not have achieved.

23        To decide the amount of any unjust enrichment, first

24   determine the value of CTM Biomedical, LLC's; CTM Medical,

25   Inc.'s; Bryan Banman's; Pablo Seoane's; and/or Mike Stumpe's,

as applicable, benefit that would not have been achieved except
for its, his, or their misappropriation, then subtract from
that amount CTM Biomedical, LLC's; CTM Medical, Inc.'s; Bryan
Banman's; Pablo Seoane's; and/or Mike Stumpe's, as applicable,
reasonable expenses, including the value of the labor,
materials, rents, or interest on invested capital.  In
calculating the amount of any unjust enrichment, do not take
into account any amount that you included in determining any
amount of damages for Skye's actual loss.

Another category of damages is exemplary damages.  If you
decide that CTM Biomedical, LLC's; CTM Medical, Inc.'s; Bryan
Banman's; Pablo Seoane's; and/or Mike Stumpe's, as applicable,
misappropriation of trade secrets caused Skye harm, you must
decide whether that conduct justifies an award of punitive
damages.  The purposes of punitive damages are to punish a
wrongdoer for the conduct that harmed Skye and to discourage
similar conduct in the future.

In order to recover punitive damages, Skye must prove by
clear and convincing evidence that CTM Biomedical, LLC; CTM
Medical, Inc.; Bryan Banman; Pablo Seoane; and/or Mike Stumpe,
as applicable, acted willfully and maliciously.  You may not
award an amount of punitive damages that is not more than two
times the amount of damages awarded for actual loss or unjust
enrichment.

"Willful" means that CTM Biomedical, LLC; CTM Medical,

1  Inc.; Bryan Banman; Pablo Seoane; and/or Mike Stumpe, as

2  applicable, acted with a purpose or willingness to commit the

3  act or engage in the conduct in question, and the conduct was

4  not reasonable under the circumstances and was not undertaken

5  in good faith.

6       Conduct is "malicious" if it is accompanied by ill will or

7  spite or if it is for the purpose of injuring Skye.

8       Another one of the claims in this case is the RICO claim,

9  the Racketeer, Influenced, and Corrupt Organization Act.  Skye

10  asserts a claim against Bryan Banman, Nathan Boulais, Pablo

11  Seoane, and Mike Stumpe for allegedly violating the Racketeer

12  Influenced, and Corrupt Organization Act, commonly known as

13  RICO.  Skye specifically claims that these parties violated

14  Section 1962(c) of RICO.

15      To succeed on this claim, Skye must prove each of the

16  following five facts by a preponderance of the evidence:

17      First, you must find the existence of an enterprise;

18      Second, you must find that the enterprise engaged in, or

19  had some effect on, interstate or foreign commerce;

20      Third, you must find that Bryan Banman, Nathan Boulais,

21  Pablo Seoane, and/or Mike Stumpe, as applicable, was employed

22  by or associated with the alleged enterprise;

23      Fourth, you must find that Bryan Banman, Nathan Boulais,

24  Pablo Seoane, and/or Mike Stumpe, as applicable, participated,

25  either directly or indirectly, in the conduct of the affairs of

1    the enterprise; and

2         Fifth, you must find that Bryan Banman, Nathan Boulais,

3    Pablo Seoane, and/or Mike Stumpe, as applicable, participated

4    through a pattern of racketeering activity.

5         Now, I'll provide you with some additional instructions to

6    apply as you consider the facts that each of the plaintiffs, as

7    applicable, must prove.

8         For the first element, Skye must prove the existence of an

9    enterprise.  An "enterprise" may consist of an individual,

10   partnership, corporation, association, or other legal entity.

11   In this case, the enterprise is alleged to consist of Bryan

12   Banman, Nathan Boulais, Pablo Seoane, and/or Mike Stumpe.

13        For the second element, Skye must prove that the

14   enterprise engaged in or had an effect on interstate or foreign

15   commerce.  "Engage in or have an effect on interstate or

16   foreign commerce" means that the enterprise either engaged in

17   or had an effect on commerce between two or more states or on

18   commerce between a state and a foreign country.

19        For the third element, Skye must prove that Bryan Banman,

20   Nathan Boulais, Pablo Seoane, and/or Mike Stumpe, as

21   applicable, was employed by or associated with the alleged

22   enterprise.  The requirement that Bryan Banman, Nathan Boulais,

23   Pablo Seoane, and/or Mike Stumpe, as applicable, be "employed

24   by or associated with" the alleged enterprise means that he or

25   they must have some minimal association with the alleged

1  enterprise.  Bryan Banman, Nathan Boulais, Pablo Seoane, and/or

2  Mike Stumpe, as applicable, must know something about the

3  alleged enterprise's activities as they relate to the

4  racketeering activities.

5      For the fourth element, Skye must also prove by a

6  preponderance of the evidence that Bryan Banman, Nathan

7  Boulais, Pablo Seoane, and/or Mike Stumpe, as applicable,

8  "participated, directly or indirectly, in the conduct of the

9  affairs of the enterprise."  To prove this, Skye must show that

10  Bryan Banman, Nathan Boulais, Pablo Seoane, and/or Mike Stumpe,

11  as applicable, actively conducted or participated in conducting

12  the affairs of the alleged enterprise through a pattern of

13  racketeering activity.

14      Bryan Banman, Nathan Boulais, Pablo Seoane, and Mike

15  Stumpe do not need to participate in, or be aware of all of the

16  enterprise's activities.  It's sufficient if Bryan Banman,

17  Nathan Boulais, Pablo Seoane, and/or Mike Stumpe, as

18  applicable, conducted or participated in the conduct of some of

19  the enterprise's activities through a pattern of racketeering

20  activity.

21      For the fifth element, Skye must prove that Bryan Banman,

22  Nathan Boulais, Pablo Seoane, and/or Mike Stumpe, as

23  applicable, participated in the conduct of the enterprise's

24  affairs through a pattern of racketeering activity.

25      "Racketeering activity" is an act that violates Title 18

of the United States Code Section 1832, the statute at issue in this case.  I'll explain the law about this statute to help you determine whether HRT and/or Skye, as applicable, proved by a preponderance of the evidence that Bryan Banman, Nathan Boulais, Pablo Seoane, and/or Mike Stumpe, as applicable, violated this statute.

An act violates this statute, Section 1832, if a person with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof and intending or knowing that the offense will injure any owner of that trade secret, knowingly:

(1)  steals, or without authorization appropriates, takes, carries away, conceals, or by fraud, artifice, or deception obtains a trade secret;

(2)  without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys a trade secret;

(3)  receives, buys, or possesses a trade secret, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;

(3) [sic]  attempts to commit any offense described in any of paragraphs (1) through (3); or

(5)  conspires with one or more other persons to commit

any offense described in any of paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy.

An act of "racketeering activity" is also called a "predicate act."

A "pattern of racketeering activity" means that Bryan Banman, Nathan Boulais, Pablo Seoane, and/or Mike Stumpe, as applicable, committed at least two distinct predicate acts. "Distinct" does not have to mean different types.  But by itself, proof of two or more predicate acts doesn't establish a pattern under RICO.

To prove a pattern of predicate acts, Skye must show that the acts were related to one another and to the enterprise. Two or more acts of racketeering activity that aren't related don't establish a pattern of racketeering activity under RICO. Predicate acts are "related" to one another if they have the same or similar purposes, results, participants, victims, or methods.  Predicate acts are also related if they have common distinguishing characteristics and are not isolated events.

To be related, the predicate acts don't have to be the same kind of acts.  For example, the acts may comprise one act of trade secrets and one act of receipt of trade secrets -- excuse me.  Let me repeat.

To be related, the predicate acts don't have to be the same kind of acts.  For example, the acts may comprise one act

of trade secrets and one act of receipt of trade secrets known
to be stolen.

To make up a pattern of racketeering activity, predicate
acts must demonstrate continuity.  Continuity can be
demonstrated in two basic ways.  The first is to determine
related predicate acts extending over a substantial period of
time.  The second is to show conduct that doesn't occur over a
substantial period of time but, by its nature, is likely to be
repeated into the future.

Again, "racketeering activity" means an act that violates
Section 1832, the statute at issue in this case.  But you can't
consider just any racketeering act Bryan Banman, Nathan
Boulais, Pablo Seoane, and/or Mike Stumpe, as applicable,
allegedly committed in violation of this statute as bearing on
whether Bryan Banman, Nathan Boulais, Pablo Seoane, and/or Mike
Stumpe, as applicable, has committed two or more predicate acts
as a pattern of racketeering activity.

To determine if there is a pattern, you must only consider
those specific racketeering acts that HRT and/or Skye, as
applicable, alleges against each defendant.  And you can't find
that Bryan Banman, Nathan Boulais, Pablo Seoane, and/or Mike
Stumpe, as applicable, engaged in a "pattern of racketeering
activity" unless you unanimously agree on which of the alleged
predicate acts, if any, make up the pattern.

So it's insufficient if you don't all agree to the finding

1    of what two or more predicate acts Bryan Banman, Nathan

2    Boulais, Pablo Seoane, and/or Mike Stumpe, as applicable,

3    committed.  Some of you can't find that the predicate acts are

4    A, B, and C, and the rest of you find that the predicate acts

5    are X, Y, and B.  Put another way, you can't find that Bryan

6    Banman, for example, has engaged in a pattern of racketeering

7    activity unless you find, one, a "pattern" of predicate acts

8    and, two, that Skye has proved by a preponderance of the

9    evidence that Bryan Banman committed each of the two or more

10   predicate acts that you find make up that pattern.

11        As a reminder, as against Bryan Banman and Pablo Seoane,

12   the only alleged trade secrets at issue are the sales

13   representative training methods and order history information,

14   excluding pricing information, with respect to Ethan Chappell

15   and Community Hospital, as well as with respect to Dr. Janos

16   Ertl and Eskenazi Health.  As against Nathan Boulais and Mike

17   Stumpe, the only alleged trade secret at issue is order history

18   information, excluding pricing information, with respect to

19   Ethan Chappell and Community Hospital, as well as with respect

20   to Dr. Janos Ertl and Eskenazi Health.  These are the only

21   alleged trade secrets that you may consider in determining

22   whether Skye proved a violation of 18 U.S.C. Section 1832 and a

23   pattern of predicate acts.

24        A person doesn't violate RICO just by associating with or

25   being employed by an otherwise lawful enterprise if others

conduct the enterprise's affairs through a pattern of
racketeering activity in which the person isn't personally
engaged.

    If you find that Bryan Banman, Nathan Boulais, Pablo
Seoane, and/or Mike Stumpe, as applicable, violated Section
1962(c), you must decide whether that violation caused an
injury to Skye.  The damages that Skye may recover are those
caused by the predicate acts constituting the pattern of
racketeering activity if they injure Skye or its business or
its property.  It isn't necessary that every predicate act
caused damage to Skye, but it can only recover damages caused
by predicate acts that are part of the pattern of racketeering
activity.

    Next, we have the conspiracy to violate civil RICO.  Mere
presence at the scene of some transaction or event or mere
similarity of conduct among various persons and the fact that
they may have associated with one another and may have
assembled together and discussed common aims and interests,
that doesn't necessarily prove the existence of a conspiracy.
A person who doesn't have knowledge of a conspiracy but who
happens to act in a way that advances some object or purpose of
conspiracy doesn't become a conspirator.

    Skye does not have to prove that a defendant actually
committed any of the acts that Bryan Banman, Nathan Boulais,
Pablo Seoane, and/or Mike Stumpe, as applicable, may have

1    agreed to commit to establish his membership in the conspiracy.

2         To determine whether there was a conspiracy, you must

3    consider all the evidence in the case.  If you find that there

4    was a conspiracy, then you can attribute the statements or acts

5    of Bryan Banman, Nathan Boulais, Pablo Seoane, and/or Mike

6    Stumpe, as applicable, to each other.  If you find that there

7    was not a conspiracy, then you can't attribute the statements

8    or acts of Bryan Banman, Nathan Boulais, Pablo Seoane, and/or

9    Mike Stumpe, as applicable to each other.

10        If you find the conspiracy didn't exist, then you must

11   find for Bryan Banman, Nathan Boulais, Pablo Seoane, and Mike

12   Stumpe.  But if you're satisfied that the conspiracy existed,

13   you must determine who the members of the conspiracy were.

14        If you find that a particular defendant is a member of

15   another conspiracy, but not the one Skye charged, then you

16   can't find that defendant liable in this case.  Put another

17   way, you can't find that a defendant violated Section 1962(d)

18   unless you find that Bryan Banman, Nathan Boulais, Pablo

19   Seoane, and/or Mike Stumpe, as applicable, was a member of the

20   conspiracy charged, not some other separate conspiracy.

21        If you decide that a defendant conspired to violate RICO,

22   you must decide whether that conspiracy caused Skye, as

23   applicable, injury.  The damages Skye, as applicable, may

24   recover are those caused by the predicate acts committed by

25   members of the conspiracy that injured Skye, as applicable in

1    its business or property.

2         If you conclude that a defendant joined in a conspiracy to

3    violate RICO, Bryan Banman, Nathan Boulais, Pablo Seoane,

4    and/or Mike Stumpe, as applicable, is responsible for all

5    damages caused by predicate acts committed by members of the

6    conspiracy that caused injury to Skye.  It isn't necessary that

7    every predicate act caused injury to Skye, but Skye can only

8    recover for damages caused by a predicate act committed by a

9    conspiracy member.

10        In your consideration of this conspiracy claim, you should

11   first determine whether the alleged conspiracy existed.  If you

12   conclude that a conspiracy existed as alleged, you should next

13   determine whether each defendant under consideration willfully

14   became a member of that conspiracy.

15        Turning to the breach of contract claim by HRT against

16   Bryan Banman, HRT claims that it and Banman entered into a

17   contract to maintain the confidentiality of certain information

18   and not to misappropriate the information.  HRT claims that

19   Banman breached this contract by using and disclosing

20   confidential information.  Specifically, HRT claimed that

21   Banman used or disclosed HRT's manufacturing process, including

22   but not limited to HRT's formula for its flowable product, in

23   breach of his contract with HRT.

24        HRT also claims that Banman's breach of this contract

25   caused harm to HRT for which Banman should pay.

1          Banman denies that he breached this contract.  He denies

2     that he used or disclosed any confidential information that is

3     protected by the contract.

4          Turning to the break of contract claim by Skye against

5     Banman, Skye claims that it and Banman entered into a contract

6     to not use or disclose confidential information, one, to third

7     parties; two, for purposes other than his employment with Skye;

8     three, to breach and end the business relationship that Skye

9     and HRT had with their customers; and, four, to form, create,

10    and then work for CTM during his employment with Skye.

11         Skye claims that Banman breached this contract.  With

12    respect to its claim for breach of the confidentiality

13    provision of the Skye contract, Skye claims that Banman used or

14    disclosed the following information:  one, Skye's sales

15    representative training methods and, two, order history

16    information, excluding pricing information, with respect to

17    Ethan Chappell and Community Hospital, as well as with respect

18    to Dr. Janos Ertl and Eskenazi Health.  Skye also claims that

19    Banman's breach of this contract caused harm to Skye for which

20    Banman should pay.

21         Banman denies that he breached this contract.  He denies

22    that he used or disclosed any confidential information that is

23    protected by the contract.

24         Turning to the factual elements of contract formation, HRT

25    claims that it entered into a contract with Banman.  To prove

that a contract was created, HRT must prove all of the
following:

One, that the contract terms were clear enough that the
parties could understand what each was required to do;

Two, that the parties agreed to give each other something
of value; and

Three, that the parties agreed to the terms of the
contract.

The essential factual elements for formation of the Sky
contract:  Skye claims that it entered into a contract with
Banman.  To prove that a contract was created, Skye must prove
all of the following:

One, that the contract terms were clear enough that the
parties could understand what each was required to do;

Two, that the parties agreed to give each other something
of value; and

Three, that the parties agreed to the terms of the
contract.

Here are the elements of the breach claim by HRT.  To
recover damages from Banman for breach of contract, HRT must
prove all of the following:

One, that HRT and Banman entered into a contract;

Two, that HRT did all, or substantially all, of the
significant things that the contract required it to do;

Three, that Banman did something that the contract

1    prohibited him from doing;

2          Four, that HRT was harmed; and

3          Five, that Banman's breach of contract was a substantial

4    factor in causing HRT's harm.

5          In deliberating on this claim, you must consider only the

6    following item of alleged confidential information:  HRT's

7    manufacturing process, including but not limited to the HRT

8    formula for the flowable product.

9          Turning to the factual elements for the breach of contract

10   claim by Skye, to recover damages from Banman for breach of

11   contract, Skye must prove all of the following:

12         One, that Skye and Banman entered into a contract;

13         Two, that Skye did all, or substantially all, of the

14   significant things that the contract required it to do;

15         Three, that Banman did something that the contract

16   prohibited him from doing;

17         Four, that Skye was harmed; and

18         Five, that Banman's breach of contract was a substantial

19   factor in causing Skye's harm.

20         If you decide that HRT or Skye has proved its claim

21   against Banman for breach of contract, you also must decide how

22   much money will reasonably compensate HRT or Skye for the harm

23   caused by the breach.  This compensation is called "damages."

24   The purpose of such damages is to put Skye and HRT in as good a

25   position as Skye and HRT would have been if Banman had

1    performed as promised.

2        To recover damages for any harm, Skye and HRT must prove

3    that, when the contract was made, both parties knew or could

4    reasonably have foreseen that the harm was likely to occur in

5    the ordinary course of events as a result of the breach of the

6    contract.

7        Skye and HRT also must prove the amount of their damages

8    according to the following instructions.  Skye and HRT does not

9    have to prove the exact amount of damages, but you must not

10   speculate or guess in awarding damages. You must examine

11   damages separately for Skye and HRT.

12       Lost profits, to recover damages for lost profits on their

13   contract claims, HRT and/or Skye must prove that it is

14   reasonably certain that HRT and/or Skye would have earned

15   profits but for Banman's breach of the contract.

16       To decide the amount of damages for lost profits, you must

17   determine the gross, or total, amount HRT and/or Skye would

18   have received if the contract had been performed and then

19   subtract from that amount the costs HRT and/or Skye would have

20   had if the contract had been performed.

21       You do not have to calculate the amount of lost profits

22   with a mechanical precision, but there must be a reasonable

23   basis for computing the loss.

24       And you must separately examine damages for Skye's and

25   HRT's contract claims.

1    You should assume that the parties intended the words in
2  their contract to have their usual and ordinary meaning, unless
3  you decide that the parties intended the words to have a
4  special meaning.
5      In deciding what the words of a contract meant to the
6  parties, you should consider the whole contract and not just
7  isolated parts.  You should use each part to help you interpret
8  the others, so that all the parts make sense when taken
9  together.
10     In deciding that the contracts -- excuse me.  In deciding
11  what the words in the contract meant to the parties, you may
12  consider how the parties acted after the contract was created
13  but before any disagreement between the parties arose.
14     Turning to a new claim.  Skye also claims that CTM -- this
15  says, "CTM," but I think it means to say, CTM Biomedical, LLC.
16  The parties can advise -- CTM Medical, Inc. and/or Banman
17  intentionally caused Maria Carey, Integrative Medical
18  Solutions, Mike Stumpe, Pablo Seoane, Brian Floros, Gregg
19  Dimery, Erin Barnes, Brian Houghton, and/or James Demo to
20  breach their contracts with Skye.
21     To establish this claim, Skye must prove all of the
22  following:
23     One, that there was a contract between Skye and Maria
24  Carey, Integrative Medical Solutions, Mike Stumpe, Pablo
25  Seoane, Brian Floros, Gregg Dimery, Erin Barnes, Brian

1    Houghton, and/or James Demo;

2        Two, that Banman knew of the contracts;

3        Three, that Banman intended to cause Maria Carey,

4    Integrative Medical Solutions, Mike Stumpe, Pablo Seoane, Brian

5    Floros, Gregg Dimery, Erin Barnes, Brian Houghton, and/or James

6    Demo to breach their contracts;

7        Four, that Banman's conduct caused Maria Carey,

8    Integrative Medical Solutions, Mike Stumpe, Pablo Seoane, Brian

9    Floros, Gregg Dimery, Erin Barnes, Brian Houghton, and/or James

10   Demo to breach their contracts;

11       Five, that Skye was harmed; and

12       Six, that Banman's conduct was a substantial factor in

13   causing Skye's harm.

14       Turning to a new set of claims, there is a claim for

15   breach of fiduciary duty.  Skye claims that Banman breached his

16   fiduciary duty to Skye.

17       An officer of a limited liability company owes what is

18   known as a fiduciary duty to the company if he participates in

19   the management of a company and exercises discretionary

20   authority.

21       A fiduciary duty imposes on such an officer a duty to act

22   with the utmost good faith in the best interests of his

23   company.

24       Any person who performs functions usually performed by an

25   officer of a Limited Liability Company is considered an officer

of the Limited Liability Company.

Here are the elements of the fiduciary duty claim:  Skye claims that Banman breached his fiduciary duties while he was employed by Skye and that Skye was harmed by the breach.  An officer of a Limited Liability Company owes the company fiduciary duties.  To establish this claim, Skye must prove all of the following:

One, that Banman was an officer of Skye who participated in the management of Skye and exercised discretionary authority;

Two, that Banman knowingly acted against Skye's interests in connection with his role as Senior Vice President of Business Development while he was employed by Skye during the period of April 18, 2018, up through July 2, 2018;

Three, that Skye did not give informed consent to Banman's conduct;

Four, that Skye was harmed; and

Five, that Banman's conduct was a substantial factor in causing Skye's harm.

Turning to the factual elements of the next claim, which is the breach of duty of loyalty, Skye claims that Banman breached his duty of loyalty while he was employed by Skye and that Skye was harmed by that breach.  An officer of a Limited Liability Company owes the company undivided loyalty.  To establish this claim, Skye must prove all of the following:

1       One, that Banman was Skye's officer;

2       Two, that Banman knowingly acted against Skye's interests

3   in connection with his role as a Senior Vice President of

4   Business Development while he was employed by Skye during the

5   period of April 18, 2018, up through July 2, 2018;

6       Three, that Skye did not give informed consent to Banman's

7   conduct;

8       Four, that Skye was harmed; and

9       Five, that Banman's conduct was a substantial factor in

10  causing Skye's harm.

11      It is the duty of the Court to instruct you about the

12  measure of damages.  I'm going to speak about the damages

13  before these last two claims.

14      By instructing you on damages, the Court does not mean to

15  suggest for which party your verdict should be rendered.

16      If you decide that HRT or Skye has proven its claim

17  against Banman for breach of contract, -- this also relates to

18  the breach of contract claim -- you also must decide how much

19  money will reasonably compensate HRT and/or Skye for the harm

20  caused by the breach.  This compensation is called "damages."

21  The purpose of such damages is to put HRT and/or Skye in as

22  good a position as it would have been if Banman had performed

23  as promised.

24      To recover damages for any harm, HRT and/or Skye must

25  prove that, when the contract was made, both parties knew or

could reasonably have foreseen that the harm was likely to occur in the ordinary course of events as a result of the breach of contract.

If you find that Skye has proved damages for CTM, CTM Medical, and/or Banman's interference with contract and/or if you decide that Skye has proved damages for Banman's breaching of fiduciary duty -- this says, "fiduciary duty of loyalty or confidentiality."  It should say, "breaching a fiduciary duty or a duty of loyalty" -- then you must also determine the plaintiffs' damages.  The plaintiff has the burden of proving damages by a preponderance of the evidence.  "Damages" means the amount of money that will reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant.

It is for you to determine what damages, if any, have been proved.  Skye is seeking recovery of lost profits and punitive damages.

Skye does not have to prove the exact amount of damages that will provide reasonable compensation for the harm.  Your award must be based on evidence and not upon speculation, guesswork, or conjecture.

To recover damages for lost profits, Skye and/or HRT must prove it is reasonably certain it would have earned profits but for defendants' conduct.

To decide the amount of damages for lost profits, you must

1    determine the gross amount Skye would have received but for

2    each defendants' conduct and then subtract from that amount the

3    expenses Skye would have had if each defendants' conduct had

4    not occurred.

5         The amount of the lost profits need not be calculated with

6    mathematical precision, but there must be a reasonable basis

7    for computing the loss.

8         If Banman breached the contract and the breach caused

9    harm, HRT and/or Skye are not entitled to recover damages for

10   harm that Banman proves HRT and/or Skye could have avoided with

11   reasonable efforts or expenditures.  You should consider the

12   reasonableness of HRT and/or Skye's efforts in light of the

13   circumstances facing it at the time, including their ability to

14   make the efforts or expenditures without undue risk or

15   hardship.

16        If HRT and/or Skye made reasonable efforts to avoid harm,

17   then your award should include reasonable amounts that it spent

18   for this purpose.

19        Any award for future economic damages must be for the

20   present cash value of those damages.

21        "Present cash value" means the sum of money needed now,

22   which, when invested at a reasonable rate of return, will pay

23   future damages at the times and in the amounts that you find

24   the damages will be incurred.

25        The rate of return to be applied in determining present

1    cash value should be the interest that can reasonably be

2    expected from safe investments that can be made by a person of

3    ordinary prudence, who has ordinary financial experience and

4    skill.

5        You may consider expert testimony in determining the

6    present cash value of future damages.

7        Punitive damages for the breach of fiduciary duty and the

8    breach of the duty of loyalty claims:  If you decide that

9    Banman's conduct for breach of fiduciary duty or breach of the

10   duty of loyalty caused Skye harm, you must decide whether that

11   conduct justifies an award of punitive damages.  The purposes

12   of punitive damages are to punish a wrongdoer for the conduct

13   that harmed the plaintiff and to discourage similar conduct in

14   the future.

15       You may award punitive damages only if Skye proves by

16   clear and convincing evidence that Banman engaged in that

17   conduct with malice, oppression, or fraud.

18       "Malice" means that Banman acted with an intent to cause

19   injury or that Banman's conduct was despicable and was done

20   with a willful and knowing disregard of the rights or safety of

21   another.  A person acts with knowing disregard when the person

22   is aware of the probable dangerous consequences of the person's

23   conduct and deliberately fails to avoid those consequences.

24       "Oppression" means that Banman's conduct was despicable

25   and subjected Skye to cruel and unjust hardship in knowing

1    disregard of its rights.

2        "Despicable conduct" is conduct that is so vile, base, or

3    contemptible that it would be looked down on and despised by

4    reasonable people.

5        "Fraud" means that Banman intentionally misrepresented or

6    concealed a material fact and did so intending to harm Skye.

7        There is no fixed formula for determining the amount of

8    punitive damages, and you are not required to award any

9    punitive damages.  f you decide to award punitive damages, you

10   should consider all of the following factors in determining the

11   amount:

12       (A)  How reprehensible was Banman's conduct?  In deciding

13   how reprehensible Banman's conduct was, you may consider, among

14   other factors:

15           1.  whether the conduct caused physical harm;

16           2.  whether Banman disregarded the health or safety

17   of others;

18           3.  whether Banman [sic] was financially weak or

19   vulnerable and Banman knew Skye was financially weak or

20   vulnerable and took advantage of it.

21       I wonder if that is supposed to read whether Skye was

22   financially weak or vulnerable.

23       Would the parties agree?

24           MR. SABA:  Yes.

25           THE COURT:  Okay.  So number three should read

1    "whether Skye was financially weak or vulnerable and Banman

2    knew Skye was financially weak or vulnerable and took advantage

3    of it."   I think you understand.

4            4.   whether Banman's conduct involved a pattern or

5    practice; and

6            5.   whether Banman acted with trickery or deceit.

7      (B)   Is there a reasonable relationship between the amount

8    of punitive damages and Skye's harm?

9      (C)   In view of Banman's financial condition, what amount

10    is necessary to punish him and discourage wrongful conduct?

11    You may not increase the punitive award above an amount that is

12    otherwise appropriate merely because Banman has substantial

13    financial resources.

14      Turning to punitive damages for inducing breach of

15    contract, which is one of the claims, if you decide that CTM,

16    CTM Medical, and/or Banman's conduct for inducing breach of

17    contract caused Skye and/or HRT harm, you must decide whether

18    that conduct justifies an award of punitive damages.  The

19    purposes of punitive damages are to punish a wrongdoer for the

20    conduct that harmed the plaintiff and to discourage similar

21    conduct in the future.

22      You may award punitive damages only if Skye and/or HRT

23    proves by clear and convincing evidence that Banman engaged in

24    that conduct with malice, oppression, or fraud.

25      You should use the same definitions of malice, oppression,

1  or fraud as previously provided to you.

2      Now, the law that applies to this case authorizes an award

3  of nominal damages.  So if you find for the plaintiff but you

4  find that the plaintiff has failed to prove damages as defined

5  in these instructions, you must award nominal damages.  Nominal

6  damages may not exceed one dollar.

7      The arguments of the attorneys are not evidence of

8  damages.  Your award must be based on your reasoned judgment

9  applied to the testimony of the witnesses and the other

10  evidence that has been admitted during the trial.

11      Finally, for purposes of deciding liability and

12  compensatory damages, you must not consider or include as part

13  any part of an award attorney fees or expenses that the parties

14  incurred in bringing or defending this lawsuit.

15      Okay.  Jurors, congratulations for getting through all of

16  the instructions.  I thank you for your patience.  And I didn't

17  want to break them up with our break, so that is why I went

18  quite late.  So those are the instructions.  Here is what we're

19  going to do at this time.

20      I understand that you would like to stay late today to see

21  how much you can accomplish in terms of your deliberations.  Am

22  I correct about that?

23          JUROR IN SEAT NUMBER ONE:  Yes.

24          THE COURT:  Okay.  That's what the clerk advised me.

25      So here's what we're going to do.  We're going to take a

1    break because everybody needs a break at this time.  And when

2    we come back from the break, the parties will give their

3    closing argument.  Then I will send you back to the jury room

4    to begin your deliberations.

5         As I think the clerk has advised you, the Court provides

6    lunch when you are deliberating.  So you are going to -- you

7    will have lunch delivered to you at that time, and you can

8    start your deliberations.

9         You can go until about 5:00 p.m. today.  That's when we

10   have staffing for.  If you don't finish today, you will return

11   tomorrow at 8:00, and we'll have you go from 8:00 to 5:00

12   tomorrow.  In the subsequent days, you will have lunch every

13   day.  And you'll decide amongst yourselves when you take breaks

14   and how long your breaks are.

15        So I hope that's all clear.  Let's ago ahead and take --

16   because I need to finalize a couple things with the Counsel.

17   Let's take a 30-minute break at this time and -- let's take a

18   30-minute break at this time.  If something changes with the

19   timing, I will let you know when we come back.

20        Okay.  The Court is in recess.

21             THE COURTROOM DEPUTY:  All rise for the jury.

22        (Jury exited.)

23             THE COURT:  Okay.  We're back on the record.  Before

24   we take our break.  Let's just talk about a couple of things.

25   The exhibits -- so there were a number of exhibits that were in

1    the binders that I don't have a record that they were admitted.

2    I think they may be the exhibits that the parties stipulated

3    could be admitted, the financial exhibits.  So I am going to

4    read them for the record and just have the parties stipulate on

5    the record that they believe these are admitted and are proper

6    to go to the jury.

7        I have -- one of these, it may be just my notes don't

8    reflect -- this first one, I don't think is part of the

9    stipulation.  It may just be that my notes don't reflect that

10   it is admitted, but I just want to confirm on the record that

11   the parties believe it is admitted.  That is 208.  I think that

12   is the declaration, the Banman declaration.

13               MR. SABA:  Yes.

14               THE COURT:  Okay.  So do the parties all stipulate

15   that 208 was admitted and can go to the jury?

16               MR. CUMMINGS:  Yes, Your Honor.

17               MR. FLUSKEY:  Yes.

18               THE COURT:  Mr. Beral?

19               MR. BERAL:  Yes, Your Honor.

20               MR. WILLIAMS:  Yes, Your Honor.

21         (Exhibit 208 was received into evidence.)

22               THE COURT:  And here are the exhibits that I think

23   maybe the parties' understanding is per the stipulation they

24   were admitted even though they, to my knowledge, were not

25   discussed -- 458, 459, 460, 465, 466, 467, 493, 494, 496, 499

```
1   502, and 546.  I think the simplest way to do this is let me
2   just go party by party and confirm that you stipulate these
3   were admitted and can go to the jury.
4         Mr. Saba?
5             MR. SABA:  Yes, for the plaintiffs, Your Honor.
6             THE COURT:  Okay.  Mr. Fluskey?
7             MR. FLUSKEY:  Yes, for CTM defendants.
8             THE COURT:  Mr. Williams?
9             MR. WILLIAMS:  Yes, Your Honor.
10            THE COURT:  Mr. Beral?
11            MR. BERAL:  Yes, Your Honor.
12        (Exhibits 458, 459, 460, 465, 466, 467, 493, 494, 496, 499
13        502, and 546 were received into evidence.)
14            THE COURT:  And then we have some exhibits that were
15  introduced today and admitted today that were not in the binder
16  I received, so I trust that the parties have those and can put
17  them in the jury's binders when we take our recess.
18        And that is 104, 108 -- excuse me.  104, 106 -- sorry not
19  108.  104, 106, 864, 865, and 1069.
20        So let me just confirm with the parties that it is your
21  understanding these are admitted and should be added to the
22  exhibit binders.
23        Mr. Saba?
24            MR. SABA:  Yes, from the plaintiffs, Your Honor.
25            THE COURT:  Mr. Fluskey?
```

```
1           MR. FLUSKEY:  Yes, for the CTM defendants.

2           THE COURT:  Mr. Williams?

3           MR. WILLIAMS:  Yes, Your Honor.

4           THE COURT:  And, Mr. Beral?

5           MR. BERAL:  Yes, Your Honor.

6           THE COURT:  And then this is a small thing, but just
7   so the record is clear, In the binders there is a -- under the
8   tab for the boxes of CTM products, there is a sheet that says
9   something like "Physical Exhibit."  But under the tab for 692,
10  the plaque, there is photo of plaque.  But my understanding is
11  the actual exhibit is not the photo of the plaque but the
12  plaque itself.

13      And so I think we will need to -- and we may need to help
14  with this.  I think what would be appropriate is under 692 to
15  have that same sheet, which says, "Physical Exhibit," as for
16  the others, so there is not confusion about whether the exhibit
17  is the photo or the plaque itself.

18      Let me confirm with Mr. Saba?

19          MR. SABA:  That's correct, Your Honor.

20          THE COURT:  Mr. Fluskey?

21          MR. FLUSKEY:  Agreed.

22          THE COURT:  Mr. Williams?

23          MR. WILLIAMS:  Agreed, Your Honor.

24          THE COURT:  And, Mr. Beral?

25          MR. BERAL:  Agreed.
```

1          THE COURT:  Okay.  And then the binders did not

2     contain the Court exhibit, so I just want to confer with the

3     parties the Court exhibit will also be going back to the jury.

4     Either we'll slip it into the front of the binders or somehow

5     it will be designated.

6          Okay.  Anything else before we take our break, Mr. Saba?

7          MR. SABA:  Yes, Your Honor.  I noticed that there was

8     an error with one of the jury instructions that, I think, we

9     have an opportunity to fix now that is substantial, Jury

10     Instruction 37.

11          This Court's Motion for Summary Judgment and Motion for

12     Clarification made it clear that for the breach of contract

13     claims, it was sales representative training methods, order

14     history, and manufacturing process.  That was left out of

15     Instruction Number 37.  The word "manufacturing process" was

16     not in there.  It only references the sales representative

17     training and order history.  Skye's contract includes product

18     formulations and formulas.

19          THE COURT:  Mr. Fluskey, would you agree?

20          MR. FLUSKEY:  Is this for the Skye breach of contract

21     claim?

22          THE COURT:  Yes.

23          MR. FLUSKEY:  Your Honor, I am not sure I do agree.

24     For the HRT contract claim, yes, I believe the instruction is

25     correct on that.  But on the Skye contract claim, I am not sure

1  that is right.

2           THE COURT:  Okay.  Mr. Williams?

3           MR. WILLIAMS:  I take no position on this, Your

4  Honor.

5           THE COURT:  Mr. Beral?

6           MR. BERAL:  No position, Your Honor.

7           THE COURT:  Okay.  My understanding -- and the Court

8  issued a Minute Order regarding the back and forth with the

9  parties this weekend -- is that the parties reviewed and

10  stipulated to these jury instructions.  So given there is not

11  agreement at this time but given what I understood the parties

12  stipulated to, I am not inclined to make a change at this time.

13      I understand, because I believe that the position of the

14  CTM defendants, that Skye cannot claim credit for keeping the

15  HRT manufacturing process confidential.  If you want to, over

16  the break, point to something specific from the Court that

17  addressed that, you can.  For now, that will remain as is.

18      I did notice -- I corrected for the jury the one

19  instruction, which I don't think was a huge deal, on the

20  punitive damages.  There were a couple of tense issues that I

21  tried to change on the fly.

22      And I just wanted to check with the parties:  Instruction

23  Number 26, which has the list of things that can be considered,

24  (d) and (e) look like their duplicates.  And so it causes me

25  concern that some other factor that is not written here was

 1    accidentally deleted.  I don't know if the parties are aware of

 2    that.

 3                MR. SABA:  I'm sorry.  What instruction was that,

 4    Your Honor?

 5                THE COURT:  Twenty-six.  To the extent that it helps,

 6    I am looking back at the last version that the parties filed on

 7    August 15, and it has that same duplication.  So it may have

 8    just been introduced very early on, and it's just been there,

 9    and nobody noticed it.

10                MR. CUMMINGS:  Your Honor, excuse me.  I believe,

11    Your Honor, that the Court had issued a ruling at one point

12    during the last month where we were directed to remove two

13    sub-paragraphs.

14                THE COURT:  Those weren't the ones.  You were

15    supposed to remove (i) and (j), which is what you did.

16         This is something that we never talked about, and the

17    issue was never raised.  The concern that the plaintiffs had

18    was with (i) and (j), and I ordered that it would be deleted.

19    It sounds like no one noticed that (d) and (e) are basically

20    the same.

21                MR. BERAL:  Your Honor?

22                THE COURT:  Yes.

23                MR. BERAL:  I am just looking at CACI instruction.  I

24    believe (d) should have said something like "whether Skye kept

25    the information in a restricted or secured area."

```
 1              THE COURT:  Okay.
 2              MR. BERAL:  I'm assuming somewhere in the drafting
 3    process that was deleted, and the language and verbiage from
 4    (e) wasn't put into (d).
 5              THE COURT:  Okay.
 6              MR. BERAL:  So that might be the error.
 7              THE COURT:  Okay.  Any other issues with the jury
 8    instructions?  I'm going to have the parties meet and confer.
 9    And then when we come back from the break, just tell me what
10    you believe the language should be.
11         Mr. Saba, anything else besides the concern you raised
12    with 37?
13              MR. SABA:  Nothing else in regard to the jury
14    instructions.
15              THE COURT:  Okay.  And, Mr. Fluskey?
16              MR. FLUSKEY:  Nothing else, Your Honor.
17              THE COURT:  Mr. Williams?
18              MR. WILLIAMS:  Nothing, Your Honor.
19              THE COURT:  And, Mr. Beral?
20              MR. BERAL:  Nothing, Your Honor.
21              THE COURT:  Okay.  Anything that we need to discuss
22    before we take our recess.
23         I am a little bit concerned about the time issue and
24    just -- and maybe I can just ask the clerk to check with the
25    jurors.  Because right now we're going to take a 20-minute
```

1    recess for our reporter.  That is going to take us to about ten

2    after.

3        And then although I have a little over 50 minutes for each

4    side, I'm going to give you an hour each.  So I hope you're

5    grateful for that extra time.

6        What that means is that we're going to be going until

7    after 3:00 before they can eat their lunch.  Technically, they

8    are only supposed to get their lunch once they start

9    deliberating.  So I think they have snacks, and they are

10   probably okay.

11       But maybe I'll just have the clerk confirm with them that

12   they are okay to going until about 3:15.  And if somebody for

13   some reason feels like they are going to need to have a break

14   or eat in there, then we can incorporate that.

15       Okay.  So with that, we'll take our 20-minute recess, so

16   that the parties can meet and confer.  I'm going to have you

17   meet and confer both on 26 and on the issue Mr. Saba raised

18   with 37.  We'll come back and address those and bring the jury.

19   Thank you.  Twenty minutes.

20       (A brief recess was taken.)

21           THE COURT:  We're back on the record.  As indicated

22   the clerk advised that the jurors are fine to go straight

23   through and have their lunch after we break.  They seemed to

24   have some questions regarding the verdict form.  And I will

25   advise them that they are not to start talking about the case

1  until it is given to them for their deliberations or making up

2  their minds, and any questions that they have, if they still

3  have them after the closing can be addressed via a note.

4      Okay.  I asked the parties to meet and confer regarding 26

5  and 37.  So regarding 26, did the parties agree to something?

6          MR. SABA:  We did, Your Honor.

7          MR. FLUSKEY:  We did.

8          MR. SABA:  (e) should be stricken and replaced with

9  the following words:

10         THE COURT:  Okay.

11         MR. SABA:  "whether Skye kept the information in a

12  restricted or secure area."

13         THE COURT:  Okay.  So I will just make that change by

14  hand on the original, and I'll ask the jurors to do the same.

15     With respect to 37?

16         MR. SABA:  We were not able to reach an agreement in

17  that regard.

18         THE COURT: Okay.

19         MR. SABA:  But I would like to make my record.

20         THE COURT:  Please do.

21         MR. SABA:  Your Honor, in regard to Instruction 37,

22  it was part of a pack of original instructions that were

23  presented to this Court.  It was a disputed instruction,

24  originally Number 62.  When this Court went through and picked

25  different versions of various instructions, this Court picked

1    defendants' version.  Plaintiffs' version did not have any

2    limitation that excluded manufacturing process from it.

3         I think the record is clear, manufacturing process is

4    absolutely part of the breach of contract claims.  It was clear

5    in the Motion for Reconsideration that was filed by the CTM

6    parties.  This is -- it's just not right that it be waived

7    simply because the instruction was selected by this Court.  And

8    I'm objecting to it now.  We have an opportunity to fix it.

9    It's the right thing to do, Your Honor.

10             THE COURT:  Let me hear from Mr. Fluskey.

11             MR. FLUSKEY:  Your Honor, I don't think it's just an

12   issue of waiver.  The HRT process is an HRT process, and it's

13   clearly part of the HRT contract claim Count 4.  We drafted our

14   instruction for Count 5 for Skye breach of contract not

15   including the process initially, through all meet and confers,

16   every time because we don't think it's part of the claim.

17             THE COURT:  Okay.  Thank you.

18        I trust, Mr. Williams or Mr. Beral, you don't need to be

19   heard further?

20             MR. WILLIAMS:  Correct, Your Honor.

21             THE COURT:  I am looking through my notes.  It's my

22   recollection that I don't think this issue was discussed, so I

23   think it was an error on the part of plaintiffs' Counsel not to

24   raise it.  It is my understanding that we had some litigation

25   regarding the extent to which Skye could make claims regarding

1    HRT's manufacturing process.  And if memory serves me, because

2    Skye pointed to language regarding confidential information of

3    Skye affiliates, that the Court had at some point determined

4    that HRT's manufacturing process could be something that was

5    actionable by Skye.  That's my recollection.  I am very

6    hesitant to make a change so late in the day.

7        I guess my question for you, Mr. Fluskey, is I appreciate

8    that you maintain that this should not be included, but I think

9    you know the difference between you don't think it should be

10   included and I thought it should be included and this is

11   another opportunity to have it excluded versus your

12   understanding all along was I made a ruling to not include it

13   here.

14       So if you just need to make a record that it shouldn't be

15   included, if that's your position, that is fine.  I am not sure

16   if you are indicating that this was discussed explicitly and

17   excluded?

18           MR. FLUSKEY:  It was not discussed explicitly with

19   the Court and excluded.

20           THE COURT:  Okay.  So with that, and understanding

21   that you maintain the objection that you've had all along to

22   including that, I think it makes sense for this to track --

23   okay.

24       So we will add then -- I'll write this in in the original

25   and have the jury write it in.  The following information:  The

1   Skye says representative training methods, the order history
2   information, et cetera, et cetera, and HRT's manufacturing
3   process, including but not limited to HRT's formula for its
4   flowable product in breach -- yeah.  We'll just leave it at
5   that.
6        Okay.  Do the parties need to be heard further on that
7   issue?
8             MR. SABA:  Nothing.
9             THE COURT:  Okay.  Anything else before we bring out
10  our jurors?
11       Okay.  I'll ask the clerk to give me the jury instructions
12  so I can make those edits.  Thank you.
13       (A discussion was held off the record.)
14            THE COURT:  Back on the record with respect to
15  Exhibit 26, the subcomponents all talk -- subparagraphs all
16  talk about the two components of the alleged trade secrets.
17  But what Mr. Saba read for the new paragraph (e) just says, the
18  information.  And I'm gathering what the parties want it to
19  read is "Skye kept the two components of the alleged trade
20  secret(s) in a restricted or secured area"; correct?
21            MR. FLUSKEY:  That is the position of the defendants.
22  Yes, Your Honor.
23            THE COURT:  Mr. Saba?
24            MR. SABA:  If that is consistent with the rest of the
25  paragraphs, then that is acceptable.

```
 1              THE COURT:  Okay.  Thank you.
 2        If I can do it, I might these new pages printed and the
 3    whole thing restapled.
 4              MR. SABA:  If we can assist in any way, we'll help
 5    with that, Your Honor.
 6              THE COURT:  Okay.  Thanks.
 7              THE COURTROOM DEPUTY:  All rise for the jury.
 8        (Jury entered.)
 9              THE COURT:  Okay.  We're back on the record.  Thank
10    you, Jurors.
11        So a couple of things as indicated, we are going to now
12    have the parties closing arguments.  I anticipate that each
13    side will have about an hour's worth of closing arguments.
14    Plaintiffs may decide to split theirs between an opening and a
15    rebuttal.
16        When I was reading the jury instructions, we did notice
17    two errors, which I am going to advise you of.  The clerk also
18    advised me that you're fine with completing the two closing
19    arguments and that's when you'll have your lunch and be in your
20    deliberations.
21        I understand that you already have some questions about
22    the verdict form.  You are not to begin your deliberations or
23    talk about the case or make up any of your minds about the case
24    until the matter has been sent to you for your deliberations,
25    so we are not at that point.  If when you begin your
```

1    deliberations, you have any questions, as you heard from my

2    instructions, you are to send any questions via a written note.

3    So don't address questions to the clerk.  Send a written,

4    signed note to --

5            I'm sorry.  Madam Clerk, is there something?

6                    THE COURTROOM DEPUTY:  No, I was just --

7                    THE COURT:  Okay.  If there are any questions, you'll

8    send them via a signed written note to the Court.  As

9    indicated, I'll either send you a note in response or answer

10   the question here in open court, so I hope that helps.

11           With respect to the two instructions that we noticed

12   errors with, I'm going to -- we're going to try to correct them

13   in the original, the white copy, but I also want you to change

14   them in your copy.  So if you turn to Instruction Number 26,

15   which is on page 29, paragraph (e), which currently reads:

16   "Whether Skye employees or others with access to the two

17   components of the alleged trade secrets to sign a

18   confidentiality or nondisclosure agreements," that should be

19   changed.

20           Paragraph (e) should read:  "Whether Skye kept the two

21   components of the alleged trade secrets in a restricted or

22   secure area."  So that was just a clerical error on our part.

23   And the original will have the corrected version.

24           The other instruction that we noticed an error with was

25   Instruction Number 37, which is found on page 45.  It's the end

of the last paragraph, and it describes the information that Skye claims that Banman used or disclosed.  It has two categories.

There should be a third category which is:  "HRT's manufacturing process, including but not limited to HRT's formula for its flowable product."  We'll have that correction in the original.

So with that, I'll let the clerk distribute some water to you, and we'll have our closings.

Do the plaintiffs wish to reserve some time for rebuttal?

MR. SABA:  Yes, Your Honor, we will.

THE COURT:  Okay.  Wonderful.  So with that, let's proceed.  Thank you.

### CLOSING ARGUMENTS BY PLAINTIFFS

MR. SABA:  Thank you, Your Honor.

Thank you, ladies and gentlemen.  Thank you so very much. We know this has been an imposition on your lives.  But I'm a big believer in our American jury system.  This is a unique system.  A system which allows seven people from different walks of life to come into a courtroom, listen to evidence, evaluate credibility, and render a verdict.  It's a great power that you have, a power that some people never get to exercise in their entire lives.  Sometimes they only get to do it once. But it's a power to judge.  It's a power to tell somebody whether they're right or wrong.  It's a power to hold somebody

1    accountable.

2         And that's why we're here.  We came into this courtroom

3    from day one to tell you that we are here to hold the

4    defendants accountable, accountable for their actions, for

5    their conduct, for their misgivings, misdeeds, deception, and

6    lies.  And we're going to get to that.

7         But first, let's talk about your deliberations.  At some

8    point about 40 minutes from now, I'm going to sit down, and the

9    defense is going to come up, and they're going to do their

10   three closings, and then I'm going to finish with a few minutes

11   at the end.

12        Then you're going to go into the jury room.  While you're

13   in the jury room, I want everybody's voice to be heard, seven

14   equal parts.  Each one of you gets an equal vote.  Take your

15   time.  Look through the evidence.  Go page by page.  Remind

16   yourselves of the testimony.  Talk about things.  Make sure

17   that you understand the facts and the law that have been read

18   to you before you begin to answer questions.

19        If you don't understand, if something is not right or

20   there is a confusion, because mistakes happen on our end, too,

21   send us a note.  Ask us for help.  That is why we are here.  We

22   would rather have you ask us for help then have you guess and

23   make a decision that was based on the wrong assumption.

24        But at the end of the day, it's going to take seven

25   unanimous votes for each and every single question.  So what I

intend to do over the next few minutes is sort of help guide
you through the jury instruction, remind you of some of the
evidence, and help you fill out that verdict form based upon
what we believe is the correct state of what you saw.

So let's go back to the beginning.  When you first walked
into this courtroom, the very first thing that you learned was
the findings of fact by Judge Frimpong.  She read to you the
facts that have already been determined.  That's important.
And some of them include these key ones, which we'll reference
in a little bit:  that Mr. Banman executed a number of
agreements; and via those agreements, he promised to hold in
confidence product formulas, product ingredients, product
design, future products.

You also learned that, in the course of developing these
products, there was an HRT design file and that HRT design file
tracked the progress of the development of the HRT products,
the trial and errors, and that Mr. Sharp and Mr. Banman spent
significant time creating the connective tissue matrix saline
product.

The Court also told you that Mr. Banman became the Senior
Vice President of Business Development and managed the
marketing and sales of Skye and that Skye kept detailed records
of which sales representatives made the most sales and which
medical facilities were buying products.

The Court also advised you that CTM sent a term sheet to

1    Alamo, that is, before we saw Exhibit B.  But a term sheet in
2    which CTM told Alamo, CTM will provide all product designs for
3    the CTM liquid matrix product and the CTM particulate paste
4    product and processing specs for CTM amnion, chorion, and
5    umbilical cord membranes.
6        And the Court also told you that, prior to meeting
7    Mr. Banman, Alamo, Lee Andrews, had never manufactured a
8    flowable particulate or chorion-only membrane product.  And
9    finally, during the manufacturing process, Mr. Banman sent a
10   photograph of the HRT sample chorion membrane as an example of
11   the thickness that he was seeking and instructed Alamo to keep
12   the stromal layer of the chorion-only membrane intact.
13       Those were the initial findings of facts.  There are no
14   disputes over those facts.
15       From that moment on, we attempted on our side to present
16   you additional facts.  Some of those facts included a full list
17   of deception by the defendants.  Mr. Banman lied to Chris Sharp
18   on numerous occasions.  He lied to him while he was leaving
19   Skye.  He concealed the fact that he had started a competing
20   company while he was still employed by Skye.  He lied to Amnio
21   and Grant Senner by using fake names of Carl and Nathan
22   Tierney.  He applied fraudulent signatures to documents to
23   conceal his true identity.  He lied to Bone Bank Allograft by
24   using the fake names of Nathan Tierney.  He lied to Vivex by
25   signing false documents.  He even lied to this Court by not

1  disclosing the fact that CTM Medical owned 100 percent of CTM

2  Biomedical.

3      Nathan Boulais lied to customers by telling them that the

4  products were two to 300 percent more potent than anything on

5  the marketplace.  Take a close look at these exhibits, ladies

6  and gentlemen.  That is why they are in the jury room for you

7  to look at.  They are packed with information.

8      Mr. Banman even lied to you as he sat on that stand, and

9  we had to impeach him by reading his deposition testimony.

10     That is critical because you are the judge of character.

11 And these gentlemen have come into this courtroom, all of them

12 admitted liars -- Mr. Seoane, Mr. Stumpe, Mr. Boulais, and

13 Mr. Banman.  Every single one of them admitted to you that they

14 lied to Chris Sharp at one point.  Now, they come in here and

15 want you to believe them.

16     Let's start where Mr. Banman came from.  When Mr. Banman

17 met Mr. Sharp, he was virtually unemployed, was a graphic

18 designer.  As a favor to Mr. Sharp's wife, he hired the husband

19 of Mrs. Sharp's friend.  He gave him a job.  He treated him

20 well.  And Mr. Banman began to make more money than he had ever

21 made in his lifetime.

22     Mr. Sharp even gave him an opportunity to get 10 percent

23 of the company as a reward for his hard work.  This was a small

24 company.  They were in an incubator.  They beginning to build

25 something.  And even though the company began to make more

1    money and began to grow, so did Mr. Banman's salary and so did

2    Mr. Banman's bonus.  But that wasn't enough.

3         And even though Mr. Sharp had no idea Mr. Banman was

4    starting CTM behind his back, when he found out that he had

5    quit, the first thing Mr. Sharp did was get him in a room to

6    have a meeting.  And what did he do?  He said, "Look, if I win,

7    you win.  If we're able to sell this company, I'll guarantee

8    you $50,000,000."  But that wasn't enough for Mr. Banman.  He

9    wanted more.  He wanted it all.

10        So instead of creating his own ideas and instead of

11    creating his own products, he went on a campaign to steal

12    Mr. Sharp's company.  Let's look what he did at every step.

13    Starting with the name, he selected the name CTM, Connective

14    Tissue Matrix, the exact name that Skye refers to its saline

15    particulate flowable product as.  Why?  So he could begin to

16    confuse the marketplace.  So the purchasers wouldn't know

17    there's a difference.

18        Second, he called his products "thin," "thick," and "extra

19    thick," just like on the Skye demonstrative trade show plaque

20    that we showed you.

21        Third, he specifically looked at Skye's sales, information

22    that he had access to.  He had access.  He knew where the

23    hottest markets were, who the doctors were that were buying the

24    most product.  He was able to distill that that was in the

25    State of Indiana, in Indianapolis.  That was Skye's number one

1    market.

2        It was no coincidence that he selected Mr. Boulais and

3    Mr. Stumpe.  They weren't friends.  They weren't pals.

4    Mr. Banman knew that they were the top sales reps in the number

5    one market and he knew who the doctors were that were ordering

6    the product.  So he went out, and he targeted those two

7    individuals with insider information.

8        Fourth, he then targeted the specific customers because,

9    once he had the sales reps, he was then able to get the

10    customers, and the high volume customers like Community Health

11    and Eskenazi, so that they could begin to switch products

12    quickly and quietly.

13        Mr. Stumpe even testified that they were able to cut the

14    red tape so they could fly under the radar and they could get

15    the products into the facilities without going through the

16    laborious channels.

17        So why did Mr. Banman need immediate sales?  In other

18    words, why not take a step back if you are going to compete

19    fairly and create your own product?  Why do he need immediate

20    sales?  Because he needed money.  That's what this is all

21    about.  He needed money to fund the manufacturing of his own

22    product.

23        We know that that's what his plan was from the very

24    beginning because he went around and told people.  I have the

25    formula.  He was looking for manufactures.  Nobody bit but

1    Alamo.  Why did they not bite?  We don't know.  We can guess,
2    probably because he couldn't explain where he got the formula
3    from.  But you know who did bite?  Lee Andrews, who doesn't ask
4    questions and doesn't care as long as his company is making
5    money.
6        And Mr. Andrews even told you that the rise of CTM was
7    fast and furious and like nothing he had ever seen before.
8    Well, that makes sense because Mr. Banman literally handed
9    Alamo the recipe, and that was Exhibit B to Exhibit 16.  He
10   took the recipe, handed it to Lee Andrews, and said, "Make
11   this."
12       And Mr. Andrews had been manufacturing human tissue for a
13   very long time.  And you remember what he said when he first
14   heard the idea about grinding up fresh tissue?  He thought it
15   couldn't be done.  But once he had the recipe, they were able
16   to do it.  And amazing, lo and behold, a successful product was
17   immediately generated.
18       And the formula?  That formula is very specific,
19   75 milligrams to 1 cc.  That's not a coincidence that the two
20   companies had the identical formula.  I don't care if
21   Mr. Banman comes in and say, "Oh, I looked at brochures, and I
22   was able to make that determination."  Come on.  If he really
23   did that, don't you think there would have been an e-mail or a
24   text message or something along the way that says, "Hey, I have
25   a great idea.  Let's follow this brochure because it's

something between 150 milligrams."  There is not a shred of
evidence of that.  That is somebody making something up on the
stand in front of you.

We know that's also true because there is no CTM design
file.  HRT had a design file that showed over the years of hard
work and numerous hours that they put in in developing the
product.  Where is the CTM design file?  It doesn't exist.  Why
doesn't it exist?  Because he had the recipe, a recipe that he
had promised to keep confidential, a recipe he promised
numerous times that he would not disclose to anybody.

Think about it, if Mr. Banman was willing to lie to Amnio,
Bone Bank, Vivex, basically everybody, before he was getting
sued, don't you think he's got motivation to lie to you now
when he's being sued for tens of millions of dollars?

The truth is he stole the formula, he stole the recipe,
and he skipped all the normal steps that one would do when
you're starting a new business.  He skipped them all to jump to
the front of the line.  That is just not right.  There is
right, and there is wrong.  And that is what you, the jury,
need to decide.

Now, we learned that the sales of Mr. Banman's products
currently, as of the last time he gave us financials, every
single sale except for $500,000, 500 out of 14 million, was
either a flowable or a chorion.  Think about that.  The two
unique products that belong to Skye are all of the sales of

Banman but $500,000.

Do you think that's a coincidence?  Of course not.
Because those are the two unique products that Skye and HRT had
in the marketplace.  It is undisputed that there's lots of
companies that sell amnion cords.  There's lots of them.
Mr. Banman is not out there really selling the amnion cord.
They had $200,000 worth of sales.

He is selling the products that nobody else has:  a
shelf-stable, ready-to-use, room-temperature flowable.  A
product that the doctors like because it's easy to use.  It's
ready to go.  It's not frozen.  You don't have to mix it.

So let's talk a little bit about the brazen acts of the
defendants.  I mean, they're not even trying to hide that
they're a copy of Skye, because you've seen Pablo Seoane's
LinkedIn message from 2023.  I mean, we're in the midst of this
lawsuit, and he's still out there telling people, "We're a 2.0
version of Skye.  We're a copy of Skye."

They're not going to stop.  There is only one way to make
people stop who are doing wrong, and that is a large verdict
because that's all we can sue for is money.  I can't put
anybody in jail.  I can't take away anything from them that
they own.  But a large verdict tells them, "You're wrong, and
it's time to stop."  Because if you don't, 2.0 version of Skye
will continue to operate.

Now, you have to ask yourself:  Is it credible, when they

come in here and they tell you that "Oh, this information is in
the public domain," or "My contract didn't say I had to keep it
secret," or "Paragraph sub (d) allows me to tell anybody I want
about the formula."  If that was true, if they really believed
those lies that they are now telling you, then why did they
sneak around?  Why did they create the WhatsApp message chain?

Think about that for a second.  They never communicated on
WhatsApp.  They only created that specifically to hide their
conversations in an encrypted app for the sole purpose of
concealing their communications from Mr. Sharp.

Does that appear to you as somebody who believes they have
the right to expose information?  Does that appear to you as
somebody who thinks that it's not confidential?  No, it's not
consistent with that at all.

When Mr. Banman told Amnio he has a team of execs and reps
with significant experience and he used fake names like Carl
and Nathan Tierney, that is not consistent with a man who is
acting as if he had the right to use a formula.

Because if he didn't think it was confidential, he thought
he had the right to use the formula, then he could have easily
just gone to Mr. Sharp and said, "Hey, pal, thanks for the job,
but I am going to go ahead and start a competing business."  He
didn't do that.  He snuck in the shadows.  He lurked behind
rocks so that he could build a company deceptively.

And he even wanted to cover up his deception, that is why

1    he told Mr. Stumpe to delete his WhatsApp messages.

2        And Mr. Stumpe and Mr. Boulais, they signed equity

3    agreements.  Why?  To throw Chris Sharp off, make sure there

4    were no alarm bells.

5            MR. BERAL:  Your Honor, objection.  Objection.  Lacks

6    foundation.

7            THE COURT:  Jurors, let me remind you that your

8    recollection of the evidence controls.  The argument of Counsel

9    is not evidence.  If, when you begin your deliberations, you

10   have a question about the evidence, you can ask that the court

11   reporter's record be read to you, and you must accept the court

12   reporter's record as accurate.  Thank you.

13           MR. SABA:  So let's look at this verdict form.  Now,

14   it's long, and I am not going to show you every page, but I am

15   going to hit the highlights because there are some portions of

16   this verdict form that are real easy.  Let's start with breach

17   of contract.  It's going to be on page 12 of your verdict form.

18       We know that Mr. Banman entered into a contract with

19   HRT -- that's Exhibit 129 -- where he promised to keep the

20   processes and protocols and the product formulations

21   confidential.

22       And when you are in the jury room look at Exhibit 129 and

23   look to Exhibit A where he talks about SOPs and the formula and

24   his responsibilities regarding those.

25       And when then you are in the jury room, also look at 131,

which is confidentiality agreement that he had signed
simultaneously.

What do we know?  We know that, when Mr. Banman left Skye,
what did he keep on his computer.  He kept the HRT design file.
He admits it to you.  He said it right there on the stand.  Of
all the things to keep, why do you keep the HRT design file
unless you intend to use it.

This recipe is not in the public domain.  Not one person
told you that they saw a patent or an article that you could
start at the beginning to the end and make these products.

The defense experts tried to patch together, well, if you
used part of this patent and then you use this patent but sort
of and you don't freeze and you don't add amniotic fluid, maybe
you could come up with a product.  That is not the reality.

What is reality is, when Kim Schoen came in here and told
you from the stand, the person that had been manufacturing
these products for a very long time for HRT, just by looking at
Exhibit B, that was the recipe.

And Banman, he knew it was secret.  That's why he had
Alamo sign a confidentiality agreement.  But it's worse than
that.  Look at that agreement that Banman signed with Alamo.
He actually requires Alamo, as a penalty.  If Alamo were to
ever steal the formula from Banman, they have to pay him a
5 percent royalty.  So he knew the recipe had economic value.

Lee Andrews had been in this business for a long time.  He

didn't think he could make the product.  And even when he tried to make the product, he didn't get it right.  Banman had to send him a sample, a picture, and say, "Make it like this."

This is the complete copy of Skye's products.  He did this because he knew Skye's products worked.  There is no question about it.  That is why Skye has been successful.  A company that Mr. Sharp, with his wife, built from scratch, their life's work.

So when you are looking at the verdict form for breach of contract, it's easy.  It's yeses right down the line.  Did HRT prove it entered into a contract?  Did HRT prove that it performed everything it was supposed to do?  Did HRT prove that Banman used or disclosed the manufacturing process?  And did HRT prove that it was harmed by Banman's breach of contract?  That's about as easy as it gets, ladies and gentlemen.

Well, let's look at the next cause of action which is breach of contract for Skye.  Breach of contract for Skye is essentially the same but we have to look at Skye's contract.  Now, Skye has two contracts.  There is his employment contract and his confidentiality contract.

For Skye's employment contract, if you'll recall Exhibit 136, it required Mr. Banman to have his sole job and focus, and he also promised that he would be focused on maintaining existing sales and growth of Skye.  And as a Senior Vice President, he would report directly to the CEO, report

1  directly to Mr. Sharp.

2      And as part of his employment contract, he was also

3  required to sign the employee confidentiality agreement and the

4  company handbook.  And when you look at Exhibit 132, which is

5  the company handbook, Mr. Banman promised that not only the

6  company's confidential information was secret but, if such

7  disclosures were used, it would cause immediate and irreparable

8  harm to the company and would give a competing business an

9  unfair business advantage.  Mr. Banman knew that.  He knew it

10  at the time he signed this contract and he knew it when he was

11  taking the formula.

12      And when you go to the next cause of action, which is

13  another breach of contract by Skye, you will see Exhibit 135,

14  which is the confidentiality agreement.  This time, Mr. Banman

15  promised to keep the manufacturing process in the strictest

16  confidence of product formulas and product ingredients.

17      When you are looking at these verdict forms for these two

18  breach of contract claims, again, you check, "Yes" down to the

19  board.  Was there a contract?  Did Skye do everything it was

20  supposed to do?  Did Mr. Banman breach it?  And did it cause

21  harm?

22      Let's look at breach of fiduciary duty.  Well, to owe a

23  fiduciary duty, you must be officer of a company that has some

24  or management control.  Mr. Banman was the vice president and

25  the number two person in the company.  That's undisputed.  Yet,

1    I have a feeling his lawyers are going to try and come up here

2    and convince you, or try to, that as vice president he wasn't

3    an officer.  That's the way they're going to try to get around

4    breach of fiduciary duty.

5        But you heard Mr. Sharp tell you that Mr. Banman

6    participated in major decisions in the company.  He exercised

7    discretion.  He handled the management of hiring salespeople.

8    He oversaw 150 sales reps.  If you believe Mr. Banman in any

9    way used confidential information, whether it was order history

10   or the formula, then he has breached his fiduciary duty.

11       And let's talk about confidential information and what was

12   happening in the shadows during the time period that just that

13   Mr. Banman was employed at Skye.

14       Do you recall that, on March 30, 2018, Mr. Banman started

15   a WhatsApp communication with Mr. Boulais?  He also started a

16   separate WhatsApp communication with Mr. Stumpe.

17       On April 18, just 19 days date later, he signed his

18   employment contract with Skye.

19       But by April 20, they were ready to rip.  And Mr. Banman's

20   sole job and focus to Skye should have been to Skye.  And so

21   when he was told, "Hey, I've got four reps that can sell for

22   our new business," what Mr. Banman should have said, "Hey, wait

23   a second.  I work for Skye.  Those four reps should come sell

24   for Skye.  They shouldn't be selling for my new venture."

25   That's what "sole job and focus" means.

Mr. Banman knew he was doing something wrong because, on May 2, he reminds somebody, "Text is dangerous."  Why? Somebody might see it.

On May 4, Mr. Boulais and Mr. Banman develop a solid plan as they begin to switch out Skye products for CTM products so they can flip it all.

By May 22, 23, and 24 of 2018, Banman's out there using the fake names and signing contracts.  At the same time, Mr. Banman tells Mr. Boulais that the interim products are almost ready.

By May 24, 2018, Mr. Banman is told by Mr. Boulais, "I know how to get 3 to 5 million out of the gate and another 3 to 5 million after that."  Those are sales that should have been going to Skye, not CTM.

On May 25, Mr. Banman uses another fake name and signs his contract with Vivex.

On May 30, he signs another fake contract with Amnio.

By June 1, he is registering CTM Biomedical and CTM Medical.

By June 6, he is already talking about switching consignment inventory.

The same day that he signs the Vivex contract on June 13, they receive their first purchase order.

Mr. Banman was employed by Skye on June 13, and he's making purchase orders to Vivex for CTM.

 1          On June 14, Mr. Banman creates and sends Mr. Boulais CTM
 2     vendor registration forms, vendor registration forms.  He's now
 3     actually created forms, sending them to Mr. Boulais so they can
 4     register vendors.  On the same day Mr. Boulais sends a text
 5     message to Mr. Banman telling him, "Here's a pathway to
 6     St. Vincent's."
 7          Four days later, Mr. Boulais is telling Riverview that
 8     he's in the process of converting them to a new injectable
 9     product.
10          By June 27, Mr. Banman was getting ready to quit Skye
11     because he knew in a few days he was about to tell Chris Sharp
12     that he could no longer work for him, and that's when he told
13     Mr. Stumpe, "Delete your WhatsApps."
14          All of this happened while he was employed at Skye.  So
15     when you are looking at the breach of fiduciary duty cause of
16     action, you are going to want to check "Yes" down the board
17     similar to breach of contract.
18          And then there is a second breach right after that called
19     breach of duty of loyalty.  Mr. Banman promised his loyalty to
20     Skye.  And he did exactly the opposite.  He was disloyal.  He
21     acted directly in the contravention of Skye's best interest.
22          Now, we all just heard very long instructions for DTSA and
23     RICO.  And I am going to summarize those very quickly.  Those
24     relate to order history.  They do not relate to manufacturing
25     process.  Okay?

1    Now, throughout this trial, Mr. Boulais and Mr. Stumpe

2  kept trying to tell you that their relationships are their

3  relationships.  We are not talking about order history from the

4  physician side.  That's not our claim.  That's never been our

5  claim.  The claim is Mr. Banman knew who was buying the

6  products, who was buying the most products, and he knew it from

7  Skye's system, a system that only he had access to, a system

8  that contained information that was not made public, and he

9  specifically targeted those reps and those physicians.  That's

10  the stolen order history.

11    But I am going to come back to DTSA and RICO in my

12  rebuttal for you, because now I do want to speak to you for a

13  few minutes about damages.

14    Now, you heard the proper way to calculate damages, for

15  lost profit damages, is what you do is you take CTM's revenue,

16  and you multiply it by Skye's expense ratio; right?  Because

17  had Skye received those sales, Skye would have converted those

18  sales to potentially profit.  We are not asking you to just

19  give us all of their revenue.  That is not appropriate.  That's

20  not what we're asking for.

21    But we're talking about a lot of money.  These are big

22  dollars, because this is big theft.  This is a very serious

23  trial and a very serious courtroom.  It doesn't get any more

24  serious than a federal trade secret case in the Central

25  District of California.

1    We didn't come in here screwing around.  We presented

2    evidence to you in a streamlined fashion, direct to the point,

3    and told you the truth about what happened.  And that caused

4    real damage.

5        And look at CTM's business.  Does that look like a normal

6    startup to you?  Their growth is astronomical.  And as you saw

7    today, that's based all on flowable and chorion.  They went

8    from 1 million in 2018 to 4 million in 2019 to 6 million in

9    2020 to 14 million in 2021 to 28 million in 2022, and now

10   they're on pace, at least according to Hank Kahrs, for

11   36.4 million.

12       They refused to give you their financials.  They didn't

13   bring us their 2023 financials.  I'll bet you a dollar --

14            MR. FLUSKEY:  Objection.  Foundation.  Speculation.

15            THE COURT:  Thank you.

16       Jurors, I'll just remind you that your recollection of the

17   evidence controls.  That's it.  Thank you.

18            MR. SABA:  I guarantee you, if their revenue was less

19   than Hank Kahrs's projection of 36.4, they would have showed up

20   in this courthouse with their financials.  It's probably closer

21   to what Pablo Seoane said in his text message -- excuse me, his

22   LinkedIn message, that it's closer to 65.

23       But since we're acting in responsible manner, we've hired

24   an economist to give us a reasonable projection.  And we

25   projected it at 36.4 million.

1          Let's look at Exhibit 94946, which was the demonstrative
2     that was shown to you.  You're not going to have this in the
3     jury room, so it's important to write some of these numbers
4     down if they interest you.  But if you're looking a past loss
5     totals for just the lost, -- this is what has already been
6     taken; this is not speculation in the future -- Skye and HRT
7     have already lost $34.9 million.  HRT is 4.1, and Skye is 3.8
8     [sic].
9          So when you are filling out those breach of contract jury
10    instructions -- excuse me, breach of contract causes of action,
11    the past is 4.1 for HRT, and the past is 30.8 million for Skye.
12         But like we talked about at the beginning, misconduct is
13    ongoing.  I mean, it's almost September of 2023, and they're
14    still doing this.  These numbers only reflect to the end of
15    2022.
16         So you need to look at the damages that Skye and HRT have
17    suffered in the year of 2023 and then ask yourself what is a
18    reasonable amount in the future that we should hold them
19    accountable for.  Is it two years, four years, six years?  I
20    don't know.  That is your decision.  We only provided the math
21    for you so you could make the selection.
22         But what I know that I didn't hear in this case -- and I
23    am certain I didn't hear it -- is I didn't hear Mr. Banman get
24    on the stand and say, "I'm sorry.  I'll stop."  At no time did
25    he say, "Please, I'll fix this.  I'll get a new product.  I

1    won't compete unfairly."

2         He sat there and said, "I didn't do anything wrong."

3         Only a jury can stop this.

4         Now, the issue of punitive damages has to be discussed

5    because punitive damages are damages to punish people for their

6    malice and oppression, their fraud.  That is what punitive

7    damages are for.

8         What we know about Mr. Banman is that he thinks it's funny

9    to laugh at Chris Sharp behind his back.  We receive

10   Exhibit 1316 where Mr. Banman, when he found out that another

11   sales rep had flipped, "Ha-ha.  Good.  Skye can suck my" -- and

12   then in 1314, he was laughing at Mr. Sharp again, "Cat's out of

13   the bag."

14        And Mr. Stumpe says, "Well, F 'em."

15        We know that Mr. Banman predicted, in Exhibit 1310, in

16   18 months, we'll withhold $26 million from them.  That was his

17   plan from the beginning.  His plan was never to go out and

18   fairly compete.  His plan was to flip them all and capture as

19   much of Skye's revenue as they possibly can do.  And they've

20   been successful at that.  They've been successful at this plan.

21        Mr. Banman owns 71 percent of CTM.  We know, at least as

22   of 2021, that amount is worth $53 million.  We don't know what

23   it is worth today because that evidence was never provided to

24   us.

25        But here's the reality, ladies and gentlemen, and it's a

1    sad, harsh reality Mr. Sharp's actually had to deal with, which
2    I'm not so sure he's even appreciated.  When you issue an award
3    in favor of HRT, Mr. Banman actually gets 10 percent of that
4    back, because he still owns 10 percent of HRT.  And even though
5    Mr. Sharp knows Mr. Banman has been doing something wrong, he
6    continues to pay him his 10 percent dividend every single year.
7         This is not a case about revenge, ladies and gentlemen.
8    You saw Mr. Sharp attempt to reach an amicable solution with
9    Mr. Banman.  Long before this lawsuit was ever filed, on
10   December 26, 2018, Mr. Sharp sent an e-mail that says, "We've
11   known each other a long time.  I want you to know this issue
12   can be resolved as long as we communicate with each other
13   honestly and transparently."
14        Mr. Sharp reached out.  He tried to avoid all of us being
15   here.  He tried to avoid lawyers, juries, judicial resources.
16   Somebody who thought he wasn't doing anything wrong, you think
17   he would have responded.  Mr. Banman could have said, "I'm not
18   doing anything wrong.  Let's sit down and talk about it."
19        That's not what happen happened.  Mr. Banman ignored the
20   e-mail and continued to poach sales reps and then hired
21   Mr. Seoane, and that was the straw that ultimately broke the
22   camel's back.  When Mr. Sharp learned that Mr. Seoane had
23   downloaded the sales rep order history, e-mailed it to himself,
24   and sent it off to CTM.  And then we learned that Mr. Seoane
25   bragged about it by taking a picture of him uploading the

information into the CTM system so Mr. Banman and him could laugh at Chris Sharp again.

At the end of the day, ladies and gentlemen, Mr. Sharp is here because he's trying to protect his company. You saw how excited he was when he was on the stand and when he lights up when he talks about his business and starting it as a small company, a business that he built from scratch. He worked hard, but it was stolen.

Mr. Sharp is here because he's protecting his employees, individuals that work hard for him so that they can pay their bills and support their families. He's here to protect his product, a product that he spent countless hours on, working in a lab, developing, as he described it, his life's work.

A product that was so novel and so unique that even Mr. Banman wrote in an e-mail, "Isn't it incredible when you sit back and look at what we've done. We're the only guys in the world who created a room-temperature product from placenta and figured out it would work."

Mr. Sharp is here for his family. His family has been betrayed by the husband of his wife's ex-best friend. But mostly Mr. Sharp is here for justice, a justice that only the seven of you can render, only the seven of you have the power to levy. That is your power. And we ask that you hold the defendants accountable and use that power to its fullest extent. Thank you.

1          THE COURT:  Thank you.

2      Okay.  And on behalf of the defense.  I assume you're

3  going to be dividing your time?

4          MR. CUMMINGS:  Yes, Your Honor.

5          THE COURT:  Okay.  Let me know when you're ready to

6  proceed.

7      Go ahead, Counsel.

8          MR. CUMMINGS:  Thank you, Your Honor.

9   **CLOSING ARGUMENT BY DEFENDANTS BANMAN, SEOANE, CTM BIOMEDICAL**

10         MR. CUMMINGS:  Ladies and gentlemen, on behalf of

11  Mr. Banman, Mr. Seoane, and my colleagues, I want to thank you

12  for your service here over the past week.  We greatly

13  appreciate your time and your attention, and I trust that your

14  memories about what was said on that stand and the evidence

15  that you got in those binders that is going back to the jury

16  room will control.

17      As Her Honor instructed, it's not what the Counsel say no

18  matter how loud, how fast, how boring, or how exciting.  It's

19  not what we say; it's what came out of that box or off of those

20  TV screens.  We trust that you paid attention and the story

21  that you just heard wasn't supported by the testimony or the

22  documents.

23      And that's been a theme throughout the last week.  The

24  case plaintiffs outlined for you last Monday and have put

25  before you over the last week is not the case you are being

1    asked to decide here today.  They devoted their time to

2    highlighting every sensationalized or colorful message they

3    could find, and some of them were colorful.

4        They hope you will dislike these defendants so much that

5    you will ignore the instructions Her Honor gave you and the

6    questions you are asked on that verdict form.  We trust you

7    will see through that strategy, uphold the oath you took last

8    Monday, and apply the law you were given.

9        What plaintiffs never outlined for you, what were the

10   trade secrets Skye was suing on?  Even in the closing just a

11   few moments ago, they start with breach of contract claims.

12   They skip over the first 12 pages of the verdict form.

13       Have they ever identified the Skye order history

14   information of Dr. Ertl, Mr. Chappell that they claim was

15   misused?  Do you have a document?  Have they ever identified

16   the Skye independent sales representative training materials or

17   methods that were allegedly used by CTM?

18       Did they identify the confidential aspects of the HRT

19   manufacturing process that Mr. Banman allegedly disclosed to

20   Alamo?  Is it the entire process or specific parts of it?  Did

21   they even try to establish that Mr. Banman interfered with the

22   contracts of Maria Carey, Brian Floros, Brian Houghton, Erin

23   Barnes, Gregg Dimery, James Demo?

24       You heard today from Brian Floros.  He signed with CTM in

25   September of 2018.  He signed with Skye in October of 2018.

Yet they accuse Bryan Banman of somehow interfering with Skye's contract.  It was signed a month later.

Did they ever address the fact that Mike Stumpe's sale representative agreement with Skye had expired over a year before he joined CTM?  Did they establish that Bryan Banman was an officer of Skye.  The answer is "No" to all of these questions.  And in most instances, they did not even try to answer those questions.  As the Judge instructed you, it was their burden to answer those questions, by a preponderance of the evidence.  They have failed, and in most instances, they didn't even try.

Rather, the evidence has shown that what plaintiffs are really trying to do here -- and I said this last Monday -- put a competitor out of business and prevent two former employees and two independent sales representatives from making a living in their chosen field.  That is not what the law is for.

Before I get into what the case is about, let's talk about what the case is not about.  You will remember, from my opening, I outlined what the case is not about, and the list has actually just grown during the last week based on what has been presented to you.  It's not about whether CTM or Skye's business and products are similar.  It is not about what can be seen from looking at a brochure or a box.

It is not about product pricing.  You've heard the instructions.  It always excludes pricing.  Yet in the closing,

1    what do they do?  They highlight pricing.  That is not part of

2    the case.

3        It is not about insurance billing.  It is not about

4    flipping customers or about any customers other than four:

5    Dr. Ertl, Eskenazi Hospital, Community Health, Ethan Chappell.

6        It's not about a suite of products that are publicly

7    available.  Everybody knows what type of soda Coca Cola is

8    selling; right?  It's out on the market.  If somebody wants to

9    go make a Coke-type product, they can.

10       It's not about any contracts other than three:  2014, HRT

11   agreement; 2018, Skye employment agreement; 2018, Skye

12   confidentiality agreement.  They've paraded out a number of

13   other documents.  That is not what this case is about.

14       It's not about whether the individual defendants said mean

15   things about Chris Sharp.  They did.  Many people do about

16   their boss.  And it's not whether you like them.  You don't

17   have to like them to find in their favor.  That was true last

18   Monday; it's true today.  Don't be distracted by what this case

19   is not about.

20       We're going to talk about the eight claims and the six

21   categories that they fall within.  I will address each of them

22   individually.

23       First one, DTSA RICO claim, this is Skye's trade secret

24   claims.  There are two categories:  First category, Skye's

25   independent sales representatives training methods; second

1    category, the order histories of Dr. Ertl, Eskenazi, Ethan

2    Chappell, Community Health.  Mr. Williams and Mr. Beral will be

3    addressing that second category, the order histories.  I will

4    focus my time on the first category and the rest of the claims.

5          So let's talk about those training methods.  What are

6    they?  Have they identified them?  They made no effort to

7    educate you on what the training methods were, what was taken,

8    how they were taken, who took them, how they are being used.

9          Why is that?  It's a smoke-and-mirror claim.  They talk

10   about training methods generally and avoid the details.  That

11   is not how trials work.  That is why there is a burden of

12   proof.  They have to show up and put their evidence in and give

13   it to you.  Help you answer these questions.  They didn't do

14   it.

15         Bryan Banman got up and testified that he developed the

16   CTM independent contractor training materials and method with

17   an outside consultant, a gentleman named Stephan Berry.  They

18   were developed in 2019 before Pablo Seoane ever worked at CTM.

19         Pablo Seoane testified that CTM's training materials were

20   in place when he started working there, and he did not use any

21   Skye materials while employed by CTM.  Mr. Seoane also told us

22   CTM uses a newer, more sophisticated training program called

23   Showpad.

24         Did anyone come in and tell you what Skye does?  That

25   evidence is unrebutted.  This category of trade secret claim

1    fails.  Period.

2         At the end of the day, this is not a trade secret case.

3    The items at issue, some unidentified order histories and sales

4    training materials, don't belong to Skye and are not secret.

5    There is no relationship between those two alleged categories

6    of trade secrets.  There is no pattern.  There is no

7    racketeering.  This is not a criminal enterprise.

8         Skye's first three claims for violation of the DTSA and

9    the civil RICO claims fail for that simple reason.  If there

10   isn't a trade secret, there is no RICO.  Period.

11        Let's focus on the second category of claims, Skye's

12   breach of contract claims.  Skye has asserted that Bryan Banman

13   breached an April 18, 2018, Skye Orthobiologics employee

14   confidentiality agreement and his April 18, 2018, employment

15   agreement.  Now, the allegation is that he breached those two

16   agreements by using the same alleged trade secret categories of

17   information -- order histories and independent sales

18   representative training materials and methods.  As I've just

19   discussed, those order histories and training materials are not

20   secret, they cannot the basis of a breach of contract claim

21   against Bryan Banman.

22        To the extent Skye argues that HRT's manufacturing process

23   is part of Skye's breach of contract claim, that fails, too.

24   Now, Counsel tried to encourage you to overlook the actual

25   words in the contract, not subpart D.  You don't want to look

1   at that.  Ladies and gentlemen, the words on the page matter.

2         So let's look at what is not proprietary information under

3   the confidentiality agreement that they're suing on.  The

4   information is on your screen.  Proprietary information shall

5   not include:  A, information that is available in the public

6   domain; and, D, information that Bryan Banman knew prior to the

7   commencement of his employment.  Those are the words on the

8   page.

9         So let's look when his employment started.  Exhibit 136,

10  Bryan Banman commenced his employment on April 1, 2018.  It's

11  the start date.  So any information that Bryan Banman knew

12  before April 1, 2018, is not covered by the confidentiality

13  agreement.

14        It is undisputed that Bryan Banman completed all product

15  development work with HRT by 2015.  Bryan Banman testified to

16  it.  Chris Sharp testified to it.  To the extent Bryan Banman

17  knew anything about HRT's manufacturing process, it was well

18  before April 1, 2018.  That cannot be the basis of a breach of

19  contract claim against Bryan Banman.

20        So where does the process claim actually reside?  It's in

21  the HRT breach of contract claim.  That is the 2014 consulting

22  agreement.  Again, HRT has not bothered to identify what

23  aspects of its manufacturing process it claims was confidential

24  and taken by Mr. Banman.

25        (Sealed portion redacted.)

```
1              CLOSING ARGUMENT BY DEFENDANT NATHAN BOULAIS
2           MR. WILLIAMS:  First, I want to join -- on behalf of
3    myself and my client, Nate Boulais, I want to join my
4    colleagues, Mr. Saba and Mr. Cummings, in thanking you all.
5           A week ago, almost exactly a week ago, I stood here, and I
6    told you that there are three things the evidence was going to
7    show with respect to Mr. Boulais.  First, that most of this
8    case has nothing to do with Mr. Boulais.  The vast majority of
9    this case has nothing to do with Mr. Boulais.  Second, that Mr.
10   Boulais did not steal any trade secrets.  All he did was sell
11   product to his own long-time customers.  And, finally, what
12   this case is really about is Skye's effort to prevent
13   competition.  The evidence has shown all of those three things
14   to be true.
15          So you will recall that, in my opening statement, I used a
16   super low-tech way of demonstrating how little of this case has
17   to do with Mr. Boulais.  I used my hands.
18          Now, I have a slightly less low-tech way of demonstrating
19   that.  And because it's way over there, my colleague, Leah
20   Thompson is going to assist.
21          So do we have our -- yeah, so that big circle that you see
22   on that chart represents the entire case, all of the claims.
23   But you will remember, only one of the two plaintiffs is suing
24   Mr. Boulais.  That's Skye.  So we go down a level, and now it's
25   just half of that circle, because HRT, the company that
```

1    actually manufactures the product, has no claim against

2    Mr. Boulais.

3        So we're only talking about Skye's claims.  But Skye

4    alleges a whole bunch of claims, as you've heard from Mr. Saba

5    and Mr. Cummings, almost -- well, the vast majority of those

6    claims aren't alleged against Mr. Boulais, including all these

7    claims about the manufacturing process and the formulas and all

8    of that.  Nobody claims anything with respect to Mr. Boulais on

9    those issues.  We are only talking, when it comes to

10   Mr. Boulais, about Skye's claims for RICO.

11       So we go to the next level.  We have a little wedge there

12   that represents Skye's RICO claims, the only ones asserted

13   against Mr. Boulais.

14       So now let's talk about those RICO claims.  And what we're

15   going to do is put on the screen Jury Instruction Number 34.

16   If we can have that up, please.

17       Now, you'll see, it's a really long jury instruction.  I

18   am not going to try and make you read that on your screens.

19   But this is really the heart of the RICO claim, this jury

20   instruction.  And I am going to walk you through the most

21   pertinent parts.

22       So first, as with all of the claims that both plaintiffs

23   assert in this case, there are elements of the claim.  What

24   that means is, those are the things that a plaintiff asserting

25   that claim has to prove.  There is always a list of things that

the plaintiff has to prove to make out their case.  And so the element that I want to highlight here, in this Instruction 34, is the fifth the element, which is that Mr. Boulais, with the other defendants on this claim, participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

    And the next sentence tells us what racketeering activity is at issue in the case, specifically, violation of 18 U.S.C. 1832.  That is the trade secret law; right?

    So we're not talking here about any old racketeering activity, any old predicate act, which is the other term that's used for that.  We're just talking about theft of trade secrets.  So we can go another level down on our board, and we see our wedge is getting smaller.

    But then as we go deeper into this jury instruction, we see an explanation of what "trade secret" means and what you have to prove -- or one of the things you have to prove to make out a claim that somebody stole trade secrets.  So I am just highlighting portions of it because it's lengthy.

    An act violates 18 U.S.C. Section 1832 if a person steals, without authorization, appropriates, carries, takes away, et cetera, a trade secret.  As I mentioned, "racketeering activity" and "predicate" act, those are interchangeable terms, and you will hear both.

    But of all the things that could be a trade secret --

right? -- lots of things could, in theory, be a trade secret, but as Her Honor has instructed you the only trade secrets at issue in this case, with respect to Mr. Boulais, is order history information. That's it. Nothing else.

So let's go one more level down. So now our wedge is getting smaller because we're just talking about a small category of trade secrets that is order history information. But it is not just any order history information. It is not order history information as to any old customer. It's only with respect to Ethan Chappell and Community Hospital or Dr. Ertl, who you saw on your screens a couple of days ago, and Eskenazi.

So let's finally go to the bottommost level of our chart. That tiny, little wedge, that is the part of this case that relates to Nate Boulais. That's it. So let's talk about that wedge. Let's talk about whether the plaintiffs proved their case, because -- I highlight this one in red because this is really important. These are the only alleged trade secrets that you may consider in determining whether Skye proved a violation of U.S.C. Section 1832 in a pattern of predicate acts. In other words, you cannot find Mr. Boulais liable for RICO unless you find that there was a theft of one of those order histories for those particular doctors and those particular facilities.

So let's talk about what the evidence showed. First and

foremost, there was no order history.  And I want to pause here
because this is really remarkable.  We've been here a week.
The plaintiffs have shown you dozens, maybe hundreds of
documents.  I lost count.  Did they show you an order history?
Did they show you a list of orders?  Did they show you a single
piece of evidence that could reasonably be construed as an
order history for any customer, let alone these two particular
customers.  I mean, you can stop there.  They had the burden to
prove to you that my client stole order history, but they
didn't show you an order history.  You can't steal something
that doesn't exist.  So on that basis alone, you should find
for Mr. Boulais and against Skye on the RICO claims.

But let's move to a second reason why you should find for
Mr. Boulais.  The order histories aren't secret.  Something
can't be a trade secret if it's not secret.  And it kind of
goes without saying.

Mr. Sharp sat on that stand, and he admitted to you that
order history information is not secret.  And specifically,
there's some questioning, when Mr. Sharp was on the stand on
Cross-examination -- and I won't read it all for you.  You can
see it on your screen.

Mr. Cummings asked him, "Did Skye have written
confidentiality agreements with Dr. Ertl?"

"No."

"With Ethan Chappell?"

1    "No."

2    "With Eskenazi?"

3    "No."

4    And then he asked again, "Would that be the same for

5    Community, that there was no written confidentiality

6    agreement?"

7    "That's correct."

8    "So Dr. Ertl was free to discuss his orders histories of

9    Skye products with anyone he wanted; correct?"

10    Mr. Sharp admitted, "Yes."

11    "Ethan Chappell, free to discuss with anyone he wanted

12    order histories for Community?"

13    "Yes."

14    I even asked Mr. Sharp a question about this topic, a few

15    questions.  I am just going to highlight kind of the last one I

16    asked him.  "If a doctor wants to be an open book with a sales

17    rep about what he or she buys, how much, that kind of

18    information, can the doctor be an open book?"

19    "Yes, that is correct."  That is what Mr. Sharp admitted

20    to you on the stand.

21    If the customers have the information, if the customers

22    can freely share that information with anyone they want,

23    including competing sales reps, how in the world is that

24    secret?  And how in the world is it a trade secret?  It is not.

25    Now, the plaintiffs spent a fair amount of time talking

about the confidentiality clause in Mr. Boulais's agreement and similar ones in other sales rep agreements.

What happens a lot in the law is one side of a case really likes the first sentence of a provision, and they don't talk about the next sentence of a provision. And that's what we have going on here. So what is highlighted on the screen now is the first sentence of a confidentiality clause for Mr. Boulais's sale rep agreement. And it gives you a list of things that constitute confidential information. And that was the sentence that Skye spent a lot of time talking about.

But they didn't talk about the next sentence, which reads: "The representative agrees it will not use" -- and it goes on from there -- "any such confidential information revealed to representatives by Skye, unless" -- et cetera, et cetera.

In other words, what this provision prevented Mr. Boulais from doing was revealing information Skye gave him.

Did Skye give him order histories? Well, first of all, we haven't seen any. But, no. He's the one who got the orders. He's the one who went out and got these customers to buy products. He is sending the orders in to Skye. This has no application to order histories at all. Even, again, assuming such a thing it exists, we haven't seen it, so we don't know.

Finally, the third reason that you should conclude that there was no RICO here as to Mr. Boulais is because you heard

1    undisputed testimony from multiple witnesses that what drives
2    sales of these kinds of products is not some of theoretical
3    order history.  It is relationships.  You heard that from
4    Mr. Boulais.  You heard it from Mr. Stumpe.  You heard it from
5    others.  It's relationships.  You heard it from Dr. Ertl; he
6    said the same thing.  That is what caused these customers to
7    decide they were going to buy from CTM instead of Skye, because
8    they have longstanding relationships.
9        You heard from Mr. Boulais on the stand, that
10   Dr. Kelly Hiatt, his main doctor who buys at Community, he's
11   known her -- he's know her for years before he ever sold a
12   single Skye product.  She's a close friend.  She's like family.
13       You heard it directly from Dr. Ertl.  He told you about
14   his close relationship with Mr. Stumpe.  That's what drove
15   these sales, not some sort of alleged trade secret, order
16   history information.
17       Now, Mr. Cummings took you through the whole verdict form.
18   I am going to highlight just the parts that are relevant to
19   Mr. Boulais, and specifically Question 10:  "Has Skye proved
20   that it is the owner of order history information with respect
21   to Ethan Chappell, Community Health, or Dr. James Ertl,
22   Eskenazi Health?  Trade Secret Category 2."
23       So the question really is:  Have they proved to you that
24   there is such a thing and that they own it?  The answer is
25   "No."

1      But even if they did, even if somehow you were to come to

2   the conclusion that, okay, there is such a thing as order

3   history, was Trade Secret Category 2 order history a trade

4   secret at the time of the alleged misappropriation?  It wasn't

5   secret.  So the answer to that one is "No."

6      And just as Mr. Cummings explained, once you answer "No,"

7   you skip ahead to the next section.

8      Now, let me talk briefly about conspiracy, because there

9   is also a RICO conspiracy claim.  And we've heard the word

10  conspiracy a lot in this trial from the plaintiffs.  They've

11  talked about the defendants being in a conspiracy and

12  conspiring and, you know -- we've heard that over and over

13  again.  But remember, for them to prove liability, it isn't

14  just any conspiracy; it's conspiracy to commit RICO.  And

15  because, as we've just discussed, there was no RICO, there can

16  be no conspiracy.

17     It's not a conspiracy to compete.  That is not enough for

18  them to prove.  It's not a conspiracy to, frankly, engage in

19  capitalism and think, I can do this better so I'm going to do

20  it.  It's not a conspiracy to flip customers, to try to

21  convince customers to stop buying from one company and start

22  buying from another.  That's not a RICO conspiracy.  It's not a

23  conspiracy to not tell Chris Sharp that you're planning to

24  compete with him.  That's not the kind of conspiracy, either,

25  that can lead to liability here.  It has to be a RICO

conspiracy.  And they can't prove that because they haven't proved RICO.

You know, there is saying in the law:  When the facts are on your side, argue the facts.  When the law is on your side, argue the law.  When neither the facts nor the law are on your side, pound the table.  The plaintiffs have been doing a lot of pounding the table in this case, but they haven't actually given you the facts to go with the law to find any liability with respect to Mr. Boulais.

Now, we're almost at the finish line of this trial, I'm happy to say.  But for Mr. Boulais, we're coming to the finish line of what has been a multi-year ordeal, dragged through this litigation, the culmination of which was sitting there for a week being accused of a lot of things except the things he's actually accused of legally in this case -- stealing order history information.

And he is grateful to you for taking the time to carefully consider this case, to carefully look at the evidence, and to carefully consider the law that the Judge has provided to you.

And we are confident that, at the end of that process, you will return the only appropriate verdict, which is one in favor of Mr. Boulais.  Thank you.

        THE COURT:  Can I see the parties at sidebar?

    (Sidebar commenced.)

        THE COURT:  Hi.  I just wanted to note that the

```
 1   defendants only have five minutes, and I don't know if that was
 2   your plan.
 3            MR. WILLIAMS:  It was.
 4            THE COURT:  Okay.  Then we're fine.
 5            MR. BERAL:  I can make my reference in all five
 6   minutes.
 7            THE COURT:  Okay.  Thank you.
 8         (Sidebar concluded.)
 9            THE COURT:  Okay.  Thank you, Counsel.  I'll turn to
10   Mr. Beral.
11            MR. BERAL:  Thank you, Your Honor.
12            CLOSING ARGUMENT BY DEFENDANT MIKE STUMPE
13            MR. BERAL:  Thank you, members of the jury.  Thank
14   you for your service.  I want to echo what Mr. Saba and
15   Mr. Cummings and Mr. Williams said.  We really appreciate your
16   time.  And I know this has been a tough week for everybody.
17         So I don't have any fancy pie charts or anything else that
18   Mr. Williams showed you, but everything that he told equally
19   applies to my client, obviously, because my client has been
20   sued for, basically, the same kind of stuff that Mr. Boulais is
21   being sued for in this case.
22         But I will add a few things.  Now, I started last week by
23   telling you what this case is about and what it's not about,
24   and I hope it's obvious.  Isn't it obvious?  One man is upset
25   at another man for starting a company and competing.  That's
```

1   all this is about.  He's been dragged through the litigation,

2   along with all with the other folks out here, just for one man

3   to exact his revenge for this man starting his own company.

4   That is all this is about.  That's all that it's been about.

5         I told you at the outset, if this were a real trade secret

6   case, they would get up there on the stand and show you

7   evidence, testimony, exhibit after exhibit about how this is a

8   real trade secret case.  Did they do that?

9         As Mr. Williams told you, we don't even know what the

10  order history is.  Not a single exhibit shown to you what the

11  order history is that they allege some of these folks over here

12  allegedly stole.  I don't think I've ever seen a case like

13  that.  I've never been involved in a case where a plaintiff

14  doesn't show you what it is -- what the thing is that they

15  claim defendants stole.  No evidence.

16        Told you it's not a real case.  Told you, if they had a

17  real case, they would show you the evidence.  They purposely

18  filed this case in federal court with all of the -- Mr. Saba

19  actually mentioned it in his closing -- with all of the majesty

20  and the formality and the seriousness that comes with being in

21  federal court, just to make you believe that it's a serious

22  case.  It's not a serious case.

23        They peppered you with scary sounding language -- RICO,

24  corrupt organizations, racketeering, misappropriation, just to

25  make you believe that this is a real case.  It's not a real

1  case.  It's all make-believe.

2       And standing up here, I still don't know what the order

3  history information is.  Mr. Saba, in his closing, said it had

4  to do with what Mr. Banman knew about something.  And if it has

5  to do with what Mr. Banman knew, what are Mr. Boulais and

6  Mr. Stumpe doing here?  I don't get it.

7       Mr. Sharp, in his testimony, when I was cross-examining

8  him, tried to kind of identify what the order history is.  I

9  think he was trying to tell us that, as soon as the information

10 comes to him from third-party sources and it gets on to his

11 computers and there is some sort of commission report that's

12 given to these sales representatives, then that information is

13 his, and nobody gets to use it.

14      Then it got me thinking.  We do that every day.  When we

15 go to the supermarket, we go there.  We buy our bread, milk,

16 eggs, whatever it may be.  We go to the register.  They ring us

17 up.  They give us a receipt.  They have our order histories.

18      Does that mean they get to sue us if we go to another

19 supermarket and buy the same bread, milk, or eggs?  I told you

20 at the outset their case makes no sense.  That makes no sense

21 whatsoever.

22      They dragged my client through three and a half years of

23 litigation.  Three and a half years.  They practically

24 bankrupted this guy.  For what?  Just to exact revenge against

25 Mr. Banman.

In the end, if you agree with me on any one of these following five statements, any one, you must find for Mr. Stumpe.

Number one, Skye doesn't own the order history; others do.

Number two, the order history was not secret. It was readily available, including from the doctors and the hospitals who you heard from.

Number three, order history has no independent value. Anybody could go get that information. It's not worth anything.

Number four, the order history only relates to services within the State of Indiana, so the interstate commerce requirements that Her Honor read to you cannot be met. Dr. Ertl, Eskenazi, Community Hospital, Ethan Chappell, all in the State of Indiana. Interstate commerce is not met.

Number five, there is no causation. It wasn't that Mr. Stumpe possessed the order history information that caused others to purchase CTM products. The substantial factor that influenced others to buy CTM products was Mr. Stumpe's relationships with them or that CTM made a better product or both, not that he used or disclosed the order history information, as Skye alleges.

It wasn't what Mr. Stumpe knew about his customers but what his customers knew about him that gave him the competitive advantage.

1    If you agree with me on any one of those five, you must

2  find for Mr. Stumpe.  Thank you, again.

3         THE COURT:  Thank you, Counsel.

4    Any rebuttal?

5         MR. SABA:  Yes, just briefly, Your Honor.

6         **REBUTTAL CLOSING ARGUMENT BY THE PLAINTIFFS**

7         MR. SABA:  We've all been here a long time.  You've

8  heard a lot of things, so I am going to be brief.  I am not

9  going to rehash old news, but I am going to state general

10 principles.

11    Competition is allowed in America but only when it's fair.

12 You know what is not fair competition?  When you use somebody

13 else's formula; when you use somebody else's corporate

14 information; when you use somebody else's documents,

15 information, and formula that you promised not to use.  You

16 signed confidentiality agreements.  You promised time and time

17 and time again, "I will not use these.  These will be

18 confidential."  And then you go use them.

19    And then you hire a bunch lawyers to come in here and try

20 and tell you that it wasn't confidential in the first place.

21    Look at the way Mr. Banman acted.  If he truly believed it

22 wasn't confidential, he wouldn't have needed the WhatsApps and

23 the fake names and the text messages.  It is not the conduct of

24 somebody who believed what he was doing was legal.  That's the

25 conduct of somebody who knows he's doing something wrong and is

1    furthering that wrong.

2        Well, let's look at Exhibit 135, because Mr. Cummings made

3    a big point about looking at subparagraph D.  So I want to make

4    sure that we do as well, because you're going to get jury

5    instruction -- and I don't have the number in front of me, but

6    it talks about how to interpret contracts.  And it effectively

7    says -- and you'll read it very specific -- that you should

8    look at all the words together, read them as it is together.

9        Do you really think Mr. Sharp created a contract that

10   allowed Mr. Banman to use the formula?  Of course, not.

11       When you read this sentence, D, in its whole, it's stuff

12   that he knew or disclosed to Skye, knew or disclosed.  There is

13   a whole sentence there.  And it also references the April 23,

14   2012, agreement.

15       Mr. Sharp is taking this all the way back to the first

16   agreement that they signed.  If Mr. Banman truly believed that,

17   by signing this contract, he didn't have to keep the formula

18   confidential -- mind you, he had a set of lawyers -- why didn't

19   he just put it in there?  Instead of doing a tricky sentence,

20   things that I knew, what did he say?  "Hey, I can use the

21   formula."

22       Because that is not what it was meant -- that is not what

23   the parties intended it to mean when they wrote.  They intended

24   this to mean the only thing that is not confidential is stuff

25   that Mr. Banman knew or disclosed to Skye before the year 2012.

```
 1        Now, Mr. Cummings made a big deal about talking about John
 2   Lee and talking about how he was in China discussing products.
 3   Again, it's interesting because the defense wants you to
 4   believe that every flowable product is the same.  That's not
 5   the case.
 6        What did Mr. Lee tell you?  There are no products on the
 7   marketplace like Skye's.  Okay?  Skye is the only
 8   room-temperature, ready-to-use, flowable product that exists.
 9   Any other product is either frozen or needs to be mixed at the
10   site.
11        So when they start talking about BioD, which uses, by the
12   way, amniotic fluid, not even saline, and is frozen, or
13   Interfyl, or all these other companies, they're not the same
14   products.  The only other product on the marketplace that's the
15   same as HRT's and Skye's products is Skye's.  And that is why
16   its sales are through the roof.
17        Just looking at the economics of it, as Mr. Kahrs
18   explained to you, a product that is readily used and known in
19   the industry doesn't have a mediocre rise like these products
20   have had.  The reason why they have a high-growth rate is
21   because they're novel and unique.  They're the only ones on he
22   market, so people are buying them.
23        So Mr. Cummings keeps asking, what is confidential?  What
24   is confidential?  We've been very clear.  We've been very clear
25   from the very beginning.  Skye takes fresh tissue, puts it in
```

1    the CryoMill, blends it, and mixes it to a very specific ratio,
2    and allows that product, then, after it goes through the rest
3    of the process, to be shelf-stable, ambient temperature, and
4    ready to use for a doctor.  That's it.
5         I didn't say it has to be super-complicated for it to be
6    confidential.  It is just unique.  The fact that Mr. Sharp
7    created a product that is, say, novel product doesn't mean it
8    has to be have super-complicated steps to get there.
9         The reality is is Mr. Banman knew it was novel.  That is
10   why he sent the e-mail: "Isn't it incredible that we sit back,
11   and we're the only guys in the world that figured this out."
12        And you know what else was novel?  Was the fact that they
13   used a chorion membrane.  If you noticed, Mr. Lee told you, no
14   one else has a chorion membrane, not another single company.
15        Why?  Because people thought the chorion was a -- sort of
16   a discarded piece of the placenta.  It was not something that
17   was used in the industry.  And even though Mr. Sharp markets it
18   as a chorion base, the reality is, no other company makes one,
19   even to this day.  But Mr. Banman did.
20        And the reality is is that they discussed developing these
21   products.  They were in the lab together.  They talked about
22   it.  They knew what ratios worked.
23        And Mr. Cummings is right about something.  The ratio was
24   agreed upon that 50 milligrams to 300 milligrams works.  But
25   you know what dialed it in?  Is yield, which means how can we

1    get the most product out of each placenta?  That's part of the

2    secrets.  How do we maximize the profits by getting the most

3    out of these products?

4        Mr. Banman did not randomly look at a brochure and happen

5    to pick the exact formula.  There is no chance.

6        Mr. Cummings wants you to believe that Mr. Lee said, well,

7    just because we discussed these products in China, that means

8    they're not secret.  Mr. Lee, at no time, said he discussed

9    these identical products.  He just said we discussed flowable

10   products.  That's all he said.  He didn't say whether they were

11   frozen or not frozen.

12       He also said, "I cannot reverse-engineer this product.  I

13   can take the formula and distill it down, but that doesn't mean

14   I know what was in there.  I don't know the makeup is.  I don't

15   know what is mixed in with the particular placenta that is

16   there."  That's what he said.

17       At no time did he said say, "I can reverse-engineer the

18   entire product."  In fact, he said the exact opposite.

19       Now, finally, the defense keeps throwing up patents.  Look

20   at this patent; look at that patent.  What you haven't seen is

21   a single patent that shows you how to make HRT products from

22   beginning to end.  You see parts of patents.  You hear them

23   talk about patents.  You heard their experts say, "Well, there

24   is tons of articles out there."  But we didn't see them.  There

25   is none.

And if there was one out there, don't you think they would be suing Mr. Sharp for patent infringement?  Give me a break.

Now, let's talk about DTSA so we can talk about the individuals.  As I mentioned before, here's how it works: Mr. Banman knew specifically that doctors in Indiana were using this product.  The only way he knew that was because he was the head of sales for Skye.  That information was not public.

Mr. Banman knew the Indiana doctors were using it.  So what did he do?  He went out and sought Mr. Stumpe and Mr. Boulais for the sole purpose of recruiting them into his competing business, his illegal competing business.  At that moment, the conspiracy was born.  They then further that conspiracy by taking actions to harm Skye.

I want you to read that RICO instruction.  Take your time. It's very long.  But if you read it and you read the DTSA instruction, it talks about not just that they stole a product but that they attempted to use a product -- I'm sorry -- they attempted to use the information.

The DTSA and RICO claims are a small part of the overall damages because it just deals with the two hospitals.  At the end of the day, our main damages result from the stolen product.  We're not trying to sugar-coat that in any way, shape, or form.  That's why I'm spending more time on the breach of contract and the breach of fiduciary duty claims, because those are the claims in which Mr. Banman has materially

harmed Skye and harmed HRT.  Those are the claims that are
necessary against Mr. Banman so he'll stop doing what he's
doing.

The orders from Eskenazi and from Community Hospital
exist, and they're smaller claims, but I -- just because I'm
not spending a lot of time talking about those, I don't want
you to feel like they're not important, because they are.  The
reason I spent the bulk of my time up here talking about breach
of contract and breach of fiduciary duty is because this case
has not been about revenge.  This case isn't about, you know,
Mr. Sharp being rich and powerful and levying his power over
these people.  It's because Mr. Banman did wrong.

And when my kids do something wrong, they have to be held
accountable.  And when Mr. Banman did something wrong, he needs
to be held accountable.  And that is why we're here.  That is
why this whole trial happened -- is to stop the misconduct of
Mr. Banman and his conspirators.

I've been doing this a long time.  I've seen a lot good
people, and I've seen a lot of bad people.  Mr. Sharp is a good
man.  If they truly believed that Mr. Sharp was mean and
didn't -- would withhold commissions and did all of these bad
things, they would have showed you e-mails.  They would have
showed you text messages.  But absent one text message about a
$2,200 commission, you didn't see anything.

Instead, what you saw were a couple salesmen, who sell for

a living -- and I think Mr. Stumpe even said, "I'm always
selling all the time -- get on the stand and try and sell you."
And that is what you saw.  You saw admitted liars get into this
courtroom and tell you anything they can to avoid
accountability.

I trust in this jury system.  Every single time I've done
a jury trial, the jury has gotten the correct result.  I
believe you will do so here as well.  Wade through the bull.

Read each exhibit, please.  Go through them just one time.
Read the jury instructions.  Ask us questions if you need help.
But at the end of the day, I believe in the American jury
system, and I believe you will get this right.

Thank you very much, and God speed with your
deliberations.

THE COURT:  Thank you.

I will now ask the clerk to swear in the bailiff.

THE COURTROOM DEPUTY:  Please state your name for
record.

THE BAILIFF:  David Madrid.

THE COURTROOM DEPUTY:  Do you solemnly swear to keep
this jury together in some private and convenient place, that
you will not be permit any person to speak or communicate with
them, nor do so yourself unless by order of the Court or to ask
them if they have agreed upon a verdict, and that you will
return them to court when they have so agreed or when ordered

1    by the Court, so help you God?

2          THE BAILIFF:  I do.

3          THE COURT:  Thank you.

4      Jurors, I now turn you over to the care of the bailiff.

5    You can take all of your belongings and your notes and the

6    binders with you.

7          THE COURTROOM DEPUTY:  All rise for the jury.

8      (Jury exited.)

9          THE COURT:  Okay.  We're back on the record.  During

10   our last break, did the parties add the additional exhibits to

11   the exhibit binders?

12         MR. SABA:  I'm getting a "Yes" from our side, Your

13   Honor.

14         THE COURT:  Okay.  And then the only other thing -- I

15   don't know if the parties did it.  So if not, I'm going to ask

16   the clerk to do it.  Exhibit 692 that I wanted the photo of the

17   plague replaced with the document that says, "Physical

18   exhibit," did the parties already do that, or should we do it?

19         MR. SABA:  We did it.  Apparently, it's been done,

20   Your Honor.

21         THE COURT:  Okay.  Wonderful.

22      Can I collect that from you, Ms. Davis?

23         THE COURTROOM DEPUTY:  Yes.

24         THE COURT:  We reprinted the jury instructions with

25   the edits that were made to 26 and 37.  I also took the liberty

1    of making the edit to the exhibit -- excuse me, the instruction

2    regarding -- I believe it was regarding punitive damages where

3    it referenced Banman being financially vulnerable.  It should

4    have been Skye.  So I made that change on the fly, while I was

5    reading the instruction to the jurors, and I made the written

6    change as well.

7         Okay.  And anything else before the clerk sends the

8    instructions, verdict form, and exhibits to the jurors?

9         Mr. Saba?

10         MR. SABA:  No, Your Honor.  Do you want us on a phone

11    call leash?  Or how -- what do you want us to do?

12         THE COURT:  Yeah.  I will address that in just a

13    minute.  Anything else?

14         MR. SABA:  Nothing from me.

15         THE COURT:  Mr. Fluskey?

16         MR. FLUSKEY:  Nothing from the CTM defendants.

17         THE COURT:  Okay.  Mr. Williams?

18         MR. WILLIAMS:  Nothing here, Your Honor.

19         THE COURT:  Mr. Beral?

20         MR. BERAL:  Nothing, Your Honor.  Thank you.

21         THE COURT:  Okay.  Thank you.

22         In terms of going forward, so I need the parties to be

23    within 15 minutes of this courtroom.  Not 15 minutes of the

24    courthouse, 15 minutes of the courtroom.  So the jury is going

25    to be deliberating until 5:00.  My recommendation is that you

1    don't leave the building, because we may have questions right

2    away and we can save time if everyone is close by.

3        As I indicated to them, they will start tomorrow at 8:00

4    and go until 5:00.  They will take their breaks whenever they

5    want to.  So for all of tomorrow, I will need the parties

6    within 15 minutes of the courtroom.

7        Make sure that the clerk has your contact information.

8    She is not going to be texting 15 million people.  So you are

9    going to give her one contact information for each of the four

10   Counsel that we'll have here, and then she will let you know

11   when you need to return.

12       Okay.  With that, the Court stands in recess until we have

13   a question or verdict.

14       Thank you very much.

15           MR. SABA:  Thank you, Your Honor.

16           MR. FLUSKEY:  Thank you, Your Honor.

17           MR. CUMMINGS:  Thank you, Your Honor.

18           MR. WILLIAMS:  Thank you, Your Honor.

19           MR. BERAL:  Thank you, Your Honor.

20           THE COURT:  Oh, one thing I should just say on the

21   record, I think I sort of said it in the by-and-by, with

22   respect to -- I understand that Mr. Stumpe has filed a motion

23   for a JMOL.  As I indicated before you filed it, I will take

24   that under submission.

25       And I understand that the other defendants wanted to file

1    or make a similar motion.  That is also taken under -- you can

2    make it now, if you want, or you can have it filed in writing

3    later.  If you want to make it orally now, I would be taking it

4    under submission.

5          MR. CUMMINGS:  Your Honor, I believe -- well, I know

6    the CTM defendants have already filed as well.

7          THE COURT:  Wonderful.  Okay.  So all of that is

8    taken under submission.  Thank you.

9          MR. SABA:  At some point, there will be a briefing

10    schedule, if necessary?

11          THE COURT:  Yes.

12          MR. BERAL:  Thank you, Your Honor.

13       (Jury deliberations began at 3:29 p.m.)

14                          -oOo-

15

16

17                    REPORTER'S CERTIFICATE

18

19

20     I certify that the foregoing is a correct transcript of

21    proceedings in the above-entitled matter.

22

23    /s/ Suzanne M. McKennon, CSR, CRR, RMR
                                        Date:  09/21/2023
24    United States Court Reporter

25