1                                                                              **O**

2

3

4

5

6

7

8

9                          UNITED STATES DISTRICT COURT

10                        CENTRAL DISTRICT OF CALIFORNIA

11

12   SKYE ORTHOBIOLOGICS, LLC, et al.,         Case No.:  2:20-cv-03444-MEMF-PVCx

13                        Plaintiffs,           **ORDER GRANTING IN PART
                                               DEFENDANT BANMAN'S RENEWED**
14              v.                              **RULE 50 MOTION AND GRANTING IN
                                               PART RULE 59 MOTION [ECF NOS. 540,**
15                                              **544]**

16   CTM BIOMEDICAL, LLC, et al.,
                                               **REDACTED**
17                        Defendants.

18

19

20

21          Before the Court is a Renewed Rule 50 Motion for Judgment as a Matter of Law [ECF No.

22   540] and Rule 59 Motion for a New Trial, to Strike/Limit Damages, or for Remittitur [ECF No. 544]

23   filed by Defendant Bryan Banman. For the reasons stated herein, the Court hereby GRANTS IN

24   PART both motions.

25

26

27   / / /

28   / / /

                                               1

# BACKGROUND

## I.  Factual Background

Plaintiff Human Regenerative Technologies, LLC ("HRT") processes and manufactures medical products that are derived from human placental tissue. Plaintiff Skye Orthobiologics, LLC ("Skye," or collectively with HRT, the "Skye Plaintiffs" or "Plaintiffs") sells various human tissue products, including products manufactured by HRT. Defendant Bryan Banman ("Banman") is Skye's former Senior Vice President of Business Development. Banman is also the current President and CEO of Defendant CTM Biomedical, LLC ("CTM")—a company that also sells human tissue products—which he started while he was still employed by Skye. This case concerns Plaintiffs Skye and HRT's allegations that Banman—along with his new company CTM, the related entity CTM Medical Inc. ("CTM Med.," or collectively with CTM, the "CTM Defendants"), and Defendants Mike Stumpe ("Stumpe"), Nathan Boulais ("Boulais"), and Pablo Seoane ("Seoane")—misappropriated the Skye Plaintiffs' trade secrets, breached relevant contracts and duties, and interfered with the Skye Plaintiffs' contracts and prospective economic advantage.

## II.  Procedural History

On August 21, 2023, trial for this matter commenced before a jury. After the trial, the jury made the following findings: (1) that Banman breached a Consulting Agreement/Compensation Contract with HRT (Count 4), with lost profits of $7,298,949; (2) that Banman breached his April 18, 2018 Employment Agreement with Skye (Count 5), with lost profits of $7,298,949; (3) that Banman breached his April 18, 2018 Employment Confidentiality Agreement with Skye (the "Skye Confidentiality Agreement") (Count 5), with lost profits of $7,298,949; (4) that Banman breached his fiduciary duty to Skye (Count 10), with lost profits of $7,298,949 and punitive damages of $12,780,000; and (5) that Banman breached his duty of loyalty to Skye (Count 11), with lost profits of $7,298,949 and punitive damages of $12,780,000. ECF No. 511 ("Verdict Form").

Banman previously moved under Fed. Rule Civ. Proc. 50(a) for judgment as a matter of law at the conclusion of Plaintiffs' case on August 28, 2023. ECF No. 493. The Court deferred ruling on the prior motion, and directed Banman to file a renewed Rule 50 Motion as portions of the prior one were mooted by the jury verdict. ECF No. 513. Accordingly, on October 16, 2023, Banman filed the

1    instant Renewed Rule 50 Motion for Judgment as a Matter of Law as well as a Rule 59 Motion for a

2    New Trial. ECF No. 540 (the "Rule 50 Motion" or "JMOL"), 544 (the "Rule 59 Motion" or

3    "MNT"). On November 13, 2023, Plaintiffs filed their oppositions. ECF No. 551 ("JMOL Opp"),

4    554 ("MNT Opp"). On November 29, 2023, Banman filed his replies. ECF No. 560 ("JMOL

5    Reply"), 564 ("MNT Reply"). The Court heard oral argument on the motions on January 10, 2024.

**RULE 50 MOTION (JUDGMENT AS A MATTER OF LAW) [ECF NO. 540]**

### I.  Applicable Law

8    A trial court can "overturn the jury and grant [a Rule 50 motion] only if, under the governing

9    law, there can be but one reasonable conclusion as to the verdict. In other words, the motion should

10   be granted only if "there is no legally sufficient basis for a reasonable jury to find for that party on

11   that issue." *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001).

12   In considering a Rule 50 motion, "the court is not to make credibility determinations or weigh the

13   evidence and should view all inferences in the light most favorable to the nonmoving party,"

14   including accepting the jury's credibility findings as consistent with the verdict and disregard all

15   evidence favorable to the moving party that the jury is not required to believe." *Id.*

### II.  Discussion

17   Banman moves under Rule 50 for judgment as a matter of law on (1) HRT's breach of

18   contract claim (Count 4); (2) Skye's breach of contract claims (Count 5); (3) Skye's breach of duty

19   claims (Counts 10 & 11); and (4) damages. For the reasons discussed below, the Court finds that the

20   jury's findings on Counts 4, 10, and 11 are properly supported by the evidence and not contrary to

21   law. However, the Court concludes that the jury's findings on Count 5 (as to the Skye Employee

22   Confidentiality Agreement only) are improper and grants judgment as a matter of law on this claim.

#### A.    HRT's Breach of Contract Claim is Supported (Count 4)

24   As to HRT's breach of contract claim, the jury found that HRT entered into a Consulting

25   Agreement/Compensation Contract with Banman, that HRT performed its part of the contract, that

Banman breached the contract by using or disclosing HRT's manufacturing process,[1] including but
not limited to HRT's formula for its flowable product, and that this breach was a substantial factor in
causing harm to HRT. Verdict Form at 12.

        i.   <u>The jury properly found HRT's process confidential.</u>

Banman first argues that the evidence undisputedly established that HRT's manufacturing
process, including its formula or ratio for its flowable product, is not confidential. JMOL at 5.
Banman focuses on two specific aspects of the HRT process: (1) the ratio or formula it used in its
flowable product ▮▮▮▮▮▮▮▮▮▮▮▮▮▮; and (2) the ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ membrane product. Banman states that the formula is not confidential because Plaintiffs'
expert, John Lee, testified that he could independently determine the ratio by separating the two
components, and that at least one publicly available patent application published on March 2, 2017,
identifies this ratio as an option for a flowable product. JMOL at 7. Similarly, Banman states that
Lee testified that anyone "skilled in the art" of tissue processing could hold up HRT's chorion
membrane product to a light to see ▮▮▮▮▮▮▮▮▮▮▮▮, and that a patent application
published on November 22, 2012, discussed ▮▮▮▮▮▮▮▮▮. *Id.*

While these facts may, at best, show that some parts of the HRT process could possibly be
identified if a person sought to do so, the Court finds that there were facts sufficient to support a jury
finding that HRT's manufacturing process was not public knowledge and therefore confidential.
Lee's testimony was that he could reverse-engineer the specific ratio, "but the identification of the
parts would not be revealed, so [he] wouldn't know how much chorion, amnion, or cord was present,
but [he] would know how much solid was present, which could also be desiccated saline or salt."
ECF No. 540-25 at 37:18-24. Therefore, while someone an expert may be able to find out that the
product used ▮▮▮▮▮▮▮▮▮▮▮▮▮, they would may not be able to specifically

---

[1] Although the verdict form does not have a specific question relating to whether the process is confidential or
not, the Court interprets that implicit in this finding is that the process is confidential as only confidential
information is protected under the contract. ECF No. 130, Ex. A.

1    identify what the solid or liquid was.[2] Even if such information was available from other sources, a

2    jury could reasonably find that the difficulty for an average person to figure out such information

3    made it more likely than not confidential. The patent Banman points to that includes this ratio also

4    does not specifically identify the ▮▮▮▮▮ as the ideal option, and merely gives a number of

5    possibilities. ECF No. 540-15 at 11 ¶ 0077.

6    　　　Moreover, even if the ratio could be reverse-engineered, Banman points to no authority that

7    would establish that this would preclude it from being confidential information under a contract as a

8    matter of law. Rather, in *Entertainment Research Group, Inc. v. Genesis Creative Group, Inc.*, which

9    Banman cites to in his reply, in evaluating a breach of confidentiality claim, the Ninth Circuit's

10   focus was not on whether a product could be reverse-engineered, but rather whether the plaintiff

11   took actions to keep the information confidential. 122 F.3d 1211, 1227–28 (9th Cir. 1997) (noting

12   that reverse-engineering is legal and therefore "by not requiring the purchasers of its costumes to

13   sign non-disclosure agreements, [the plaintiff] gave up any ability it may have had to claim that the

14   manufacturing and design information disclosed to [the defendant] was 'confidential in nature'").[3]

15   Specifically, the Ninth Circuit held that "[t]he absence of any non-disclosure agreements entered into

16   by [] previous purchasers *is dispositive* of the instant breach of confidence claim." *Id.* (emphasis

17   added). Therefore, the emphasis is on the understanding of the parties of the confidential nature of

18   the information, rather than whether or not it would be possible for someone to independently figure

19   it out. *See Tele-Count Eng'rs, Inc. v. Pac. Tel. & Tel. Co.*, 168 Cal. App. 3d 455, 462 (1985) (noting

20   that "by instructing the jury on appellant's burden to establish that the confidential nature 'of the

21   forms' was '*made known*' to [the defendant] by appellant, the trial court properly focused attention

22   upon the element of an understanding between the parties").

23

24   ---

     [2] Banman argues that this is irrelevant because HRT did not claim CTM used the same proportions of solids
25   in its flowable product, but what was actually used in the CTM product has no bearing on whether or not the
     specific information at issue is confidential. JMOL Reply at 1.

26   [3] This is further supported by the definition of a trade secret, which although is not at issue here, would
     undoubtedly qualify as confidential information. *See* 18 U.S.C. § 1839(3) (defining a trade secret as
27   information the owner has taken reasonable measures to keep such information secret, and derives
     independent economic value from not being generally known). Therefore, in deciding whether information
28   qualifies as a trade secret, a significant consideration is what actions a plaintiff took in keeping it secret.

Here, there was evidence from which a jury could find that the information was more likely than not confidential based on Plaintiffs' actions in keeping its manufacturing process confidential—for example, evidence supported that every employee at Skye and HRT signed confidentiality agreements, and there are security measures to keep the product manufacturing process confidential. ECF No. 551-5 at 51:22-52:9, 72:16-74:9.[4] This is sufficient for a breach of confidentiality. *See Faris v. Enberg*, 97 Cal. App. 3d 309, 323 (1979) ("An actionable breach of confidence will arise when an idea, whether or not protectable, is offered to another in confidence, and is voluntarily received by the offeree in confidence with the understanding that it is not to be disclosed to others, and is not to be used by the offeree for purposes beyond the limited of the confidence without the offerer's permission."). Banman argues that it would be unfair for him to be restrained in using the information beyond what any competitor would be if they were to be able to figure it out on their own.[5] However, as *Faris* makes clear, that is the point of entering into a confidentiality agreement—Banman has voluntarily entered into a confidentiality agreement and therefore has obligations to keep such confidentiality that others would not. *Id.* at 324 (distinguishing between a situation where one voluntarily receives a confidential disclosure as opposed to receiving an unsolicited submission of an idea). This makes sense—Plaintiffs here were likely not concerned with an expert from a niche field reverse engineering its product and then starting a competing business. What Plaintiffs were concerned with, and what they sought to restrain, were people that were intimately aware of their manufacturing and business processes and using their work to compete with them—exactly what the jury found Banman did here.

The same is true as to Banman's arguments as to ▉▉▉▉▉▉▉▉▉▉▉▉ Lee's testimony was that not just anyone would be able to tell that it was ▉▉▉▉ from looking at an

---

[4] Banman also argues that the confidentiality provision must be held overbroad as a matter of law if it precludes him from using information that could possibly be figured out independently. However, at issue is not what could hypothetically be done, but what Banman did in this case. As discussed further in the next section, a jury could have reasonably found that Banman did not independently figure out the information.

[5] At the hearing, counsel for Banman attempted to distinguish between disclosure and use, arguing that restraining use would make the confidentiality provision unenforceable. ECF No. 605 at 28:1-2. The Court does not find the distinction to be significant here, as there is evidence that in the course of using such information, Banman disclosed it to third parties such as Alamo.

HRT product, as only those skilled in the art of tissue processing could make such a determination. ECF No. 542-5 at 40:2-5. While Banman characterizes this as a "basic observation," Lee's testimony could be interpreted to support that this would not be easily known, since it is reasonable to assume not many people are skilled in the art. JMOL Reply at 2. Even if it is possible to discern ████████ ████████ in HRT's product, and that other companies also ████████████ for *other* types of products, it could still be considered confidential as part of the process to create the particular product at issue. There was evidence supporting that HRT's end product was unique, and therefore the *significance* of ████████████ would not be obvious even if the fact of it is. *See* ECF No. 553-5 (testimony that the product had "unique benefits and features," and ████████ ████████ was "one of the key components of the product"). Therefore, it was appropriate for the jury to weigh this evidence along with the evidence of the actions Plaintiffs took to keep their manufacturing process a secret in deciding whether such information was confidential, and whether it was disclosed to Banman in confidence under the contract. The jury could also appropriately consider the evidence showing that Banman himself considered product formulas and specifications confidential by requiring that Precision Allograft Solutions, LLC ("Alamo"), CTM's manufacturer, sign a confidentiality agreement. ECF No. 551-12.

Accordingly, the Court finds that Banman has not met his burden in showing that no reasonable juror could have found that HRT's manufacturing process was confidential by a preponderance of the evidence, or that such a finding is contrary to the law.

                ii.   <u>The jury properly found confidential information used or disclosed.</u>

As an initial matter, part of Banman's argument with regards to use goes towards whether Banman actually knew of the ratio and the ████████████ by HRT. The Court finds that there is evidence supporting this conclusion. ECF No. 553-4 at 17:19-23. Banman argues that the evidence showed that HRT's product at the time Banman worked on those products used a different ratio. JMOL at 9. However, even if this was true, this does not undisputably refute Sharpe's testimony that Banman knew of the ratio. Sharpe testified that in an email in June of 2014, Banman stated that they were "the only guys in the world who've created a room temp product," referring to the prior discovery they made that ████ "worked extremely well." ECF No. 551-4, 553-4 at 17:19-

20. Therefore, it is reasonable to assume that while HRT's product line at the time was not using this specific ratio, this discovery had been made and this was part of the confidential information Banman took with him to start CTM. Banman points to his own testimony as to how he independently came to the ratio, but a jury could have reasonably found Banman not credible and chosen to disbelieve any or all of his testimony. JMOL at 11. It is also reasonable for a jury to infer that Banman knew of the significance of the ████████████████████ as the evidence shows that Banman was the one who wanted Alamo to ████████████████ ECF No. 553-7 at 147:24-148:01.

Banman also argues that there is no evidence showing that he used or disclosed any confidential information with regards to HRT's manufacturing process. Again, Banman's argument in this respect relies heavily on testimony from himself (and Lee Andrews, the CEO of Alamo), whom a jury could have not found credible. For example, Banman solely relies on his and Andrews's testimony to support that he only provided "minor non-substantive contributions" to Alamo's Standard Operating Procedures ("SOP") in manufacturing CTM's flowable products, and did not draft or edit the SOP for the flowable products specifically. JMOL at 9. But, importantly, their testimony confirms that it was *Banman* who gave the instruction to Alamo to ████████████ ████████████████. ECF No. 553-3 at 31:22-32:2, 32:17-21. This evidence is sufficient for a jury to find use and/or disclosure of some (arguably crucial) part of HRT's confidential process, regardless of the other differences as to HRT and Alamo's processes.

Accordingly, the Court finds that Banman has not met his burden in showing that no reasonable juror could have found by a preponderance of the evidence that Banman used or disclosed HRT's confidential information, or that such a finding is contrary to the law.

iii.   The HRT contract's confidentiality provision is not void.

Banman argues that the confidentiality provision in his contract with HRT is facially void and unenforceable as a matter of law because it precludes him from competing in an industry, and using general knowledge and skill even if it was gained through his work with HRT.

He relies on *Brown v. TGS Management Co., LLC*, 57 Cal. App. 5th 303 (2020) and *Dowell v. Biosense Webster, Inc.*, 179 Cal. App. 4th 564 (2009) in support of his position and argues that the

HRT agreement was "substantively indistinguishable from" (JMOL Reply at 4) and "substantively identical to the confidentiality provisions found invalid in *Brown* and *Dowell*." JMOL at 13. To the contrary, the provisions of the HRT agreement are significantly different from those at issue in *Brown* and *Dowell*. For example, in *Brown*, "confidential information" was *defined* as "information in whatever form, used or *usable* in, or originated, developed or acquired for use in, or about or relating to the Business." *Brown*, 57 Cal. App. 5th at 316 (emphasis added). "The Business" was then *defined* to include "without limitation analyzing, executing, trading and/or heding in securities and financial instruments and derivatives thereon, securities-related research, and trade processing and related administration . . ." *Id.* This meant that confidential information was essentially *defined* to mean all information *usable* in the securities industry. *Id.* at 317 (noting that this definition was "not just statistical arbitrage—the actual business of [the company]—but, instead, refer[red] to all aspects of working in the securities industries at large"). Plainly, such a definition is improper and such a provision is unlawful because it seeks to prevent the signatory from using information that was *usable* in the industry regardless of whether it was ever *used* by the company and regardless of whether it was ever *owned* by the company. The provision in *Dowell* is even more distinguishable, as there, the provision was an actual anti-compete provision. *Dowell*, 179 Cal. App. at 568, 575 ("The broadly worded noncompete clause prevents [the plaintiff], for a period of 18 months after termination of employment with [the company], from rendering services, directly or indirectly, to any competitor . . .").

Here, the HRT agreement only prevents Banman from using HRT's confidential information, not confidential information designed as all usable information in the placental products industry. A close review of the provision at issue demonstrates that. ECF No. 540-7, Section 3 ("[I]t is anticipated that Consultant will have access to *the Company's* proprietary or confidential information . . . .") (emphasis added). Accordingly, the confidentiality agreement plainly does not prevent Banman from competing—it merely states that Banman will have access to HRT's confidential information that shall not be disclosed to any third party. The proprietary and confidential information at issue is specifically limited to things "concerning the finances, business and affairs of [HRT]." *Id.* Therefore, read literally, HRT's provision does not, as Banman argues,

encompass information that is generally known in the industry or would be necessary for anyone to compete in that particular field. JMOL at 13. Banman is free to start his own competing placental products in the industry, and the provision only precludes him from using HRT's confidential information to do so—which is not contrary to California law. *See Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1520 (1997) (noting that "the right of free competition does not include the right to use confidential work product of others").

Accordingly, the Court finds that the confidentiality provision is not void as a matter of law.

\*\*\*

As the jury's findings on HRT's breach of contract claim are supported by the evidence and not contrary to the law, the Court DENIES Banman's Rule 50 Motion on this claim.

**B.  Skye's Breach of Contract Claim is Not Supported (Count 5)**

As to Skye's breach of contract claim, the jury found that Skye entered into an Employment Agreement as well as an Employee Confidentiality Agreement dated April 18, 2018 with Banman, that Skye performed its part of the contract, that Banman breached the contract, and that this breach was a substantial factor in causing harm to Skye. Verdict Form at 13, 14.[6] Similar to the HRT contract, the breach at issue was Banman's disclosure of confidential information, including HRT's manufacturing process. This claim also included Banman's use of Skye's sales representative training methods and order history information (excluding pricing information) with respect to Ethan Chappell and Community Hospital, and Dr. Janos Ertl and Eskenazi Health. ECF No. 508 at 45.

As to these latter two categories, Banman argues that the jury found that Skye was not the owner of its sales representative training methods or the order history information under its trade secret misappropriation claim (Count 1). Verdict Form at 3, 5. The Court notes that information can be confidential even if it is not a trade secret. *See Tele-Count Eng'rs, Inc.*, 168 Cal. App. at 463. Nevertheless, given that the wording of the verdict form is about the ownership of the information specifically, the Court finds that the jury's findings on Skye's lack of ownership of this information

---

[6] Banman's arguments here appear directed at the Skye Employee Confidentiality Agreement only, therefore the Court's analysis here applies only to the claim involving this agreement. Verdict Form at 14.

1  sufficient to disregard it as the basis of liability for the breach. Therefore, the sole basis of liability

2  for Banman's breach of contract against Skye is the same as it was for HRT—from the disclosure of

3  HRT's confidential manufacturing process.[7] And, for the same reasons as discussed above, the Court

4  finds that there is sufficient evidence to support disclosure of this information. The Court therefore

5  turns to the additional argument Banman raises with regards to the Skye Confidentiality

6  Agreement—its prospective nature. JMOL at 14.

7          The Skye Confidentiality Agreement has an exception to the "proprietary information"

8  covered under its confidentiality provision—specifically, it excludes information that Banman

9  "knew or disclosed to SKYE, its predecessors or affiliates prior to the commencement of [his]

10  employment or pursuant to the terms of the Mutual Non-Disclosure, Confidentiality & Non-

11  Circumvent Agreement dated April 23, 2012" between him and Skye. ECF No. 540-8 at 1. Banman

12  argues that everything he learned about HRT's manufacturing process was learned prior to his

13  "employment" with Skye in April 2018, and Plaintiffs do not appear to dispute this temporal point.[8]

14  JMOL Opp. at 11. Rather, Plaintiffs appear to be arguing that the information was confidential

15  because it was confidential under other agreements, like HRT's. *Id.* But, this is irrelevant to breach

16  of **this** particular contract with Skye, which is what Plaintiffs have brought their claim on. Plaintiffs

17  cannot simply piggyback off confidential information covered under one contract and extend that

18  definition to confidential information under other contracts, especially when such information is

19  expressly excluded.[9]

20

21  ───────────────────

22  [7] Skye makes no arguments as to the sales representative training and order history, therefore appearing to concede this point. JMOL Opp. at 10.

23  [8] Plaintiffs also cite to Sharpe's testimony that the contract was meant to cover "everything" he and Banman
24  ever worked on together, but the plain language of the contract excludes information knew prior to when he began his employment. JMOL Opp. at 11; *see Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th
25  1107, 1125 (2008) (a court "generally may not consider extrinsic evidence . . . to vary or contradict the clear and unambiguous terms of a written, integrated contract"). Plaintiffs point to no evidence that can support an
26  inference that Banman learned of the confidential information at issue in this case after April 2018.

27  [9] Plaintiffs also inaccurately assert that the Court has affirmatively ruled on this issue before. JMOL Opp. at 10. The Court's ruling on Banman's motion in limine denied the request solely for lack of specificity as to
28  any actual evidence sought to be excluded. ECF No. 428 at 22. Plaintiffs also point to a form minute order denying Defendants' Notice of Substantive Case Issues, which made no specific findings. ECF No. 485.

1    Accordingly, the Court finds the breach of the Skye Confidentiality Agreement unsupported

2    by the evidence and not consistent with the plain language of the contract. The Court therefore

3    GRANTS Banman's Rule 50 Motion on this claim (as to the Skye Confidentiality Agreement only)

4    and dismisses it as a matter of law.[10]

5    **C.    Skye's Breach of Duty Claims are Supported (Counts 10 & 11)**

6    As to Skye's breach of fiduciary duty and breach of loyalty claims, Banman contests the

7    jury's finding that he was "an officer of Skye," and additionally as to the breach of loyalty claim,

8    that he was an officer "who participated in the management of Skye and exercised discretionary

9    authority." Verdict Form at 17, 19.

10                            i.    The jury properly found that Banman owed fiduciary duties.

11    Banman first argues that a jury could not have reasonably found that that Banman was an

12    officer of Skye because Skye's Limited Liability Company Operating Agreement did not appoint

13    him as such or assign any fiduciary duties. JMOL at 17. As an initial matter, as reflected in Jury

14    Instruction No. 48, fiduciary duties are not limited to employees who have a formal officer title

15    under Delaware law.[11] ECF No. 508 at 56 (instructing that "[a]ny person who performs functions

16    usually performed by an officer of a limited liability company is considered an officer of the limited

17    liability company"); *see Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (1980)

18    (explaining that the "principles and limitations of agency law carry over into the field of corporate

19    employment so as to apply not only to officers and directors but also to key managerial personnel").

20    Therefore, it is irrelevant whether or or not Skye's LLC operating agreement or any other formal

21    document established Banman as an officer. What is relevant, however, is whether Banman

22

23    _____

24    [10] However, the Court makes no findings on the broader Employment Agreement that the jury also found liability for. Verdict Form at 13. Accordingly, that finding still stands.

25    [11] Banman provides authority citing both California and Delaware law on this issue. Under California law,

26    "[t]he law of the state or other jurisdiction under which a foreign limited liability company is formed governs" its internal affairs. Cal. Corp. Code § 17708.01; *see also Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1527

27    (9th Cir. 1985) ("Claims involving 'internal affairs' of corporations, such as the breach of fiduciary duties, are subject to the laws of the state of incorporation.'). Accordingly, as it is undisputed that Skye is a Delaware

28    LLC, the Court finds Delaware law controlling on this issue. JMOL at 17. Nevertheless, as the parties both primarily cite to California law, the Court considers the law and does not find that it leads to a different result.

participated in management such that he owed fiduciary duties nonetheless. *See In re NSC Wholesale Holdings LLC*, 637 B.R. 71, 87 (D. Del. 2022) (permitting breach of fiduciary duty claim to proceed against a defendant where the complaint sufficiently showed "that [the defendant] did, in fact, exert some level of control over [the LLC's] day to day operations which may warrant imposing fiduciary duties upon him").

Banman further argues that there is insufficient evidence supporting a finding that Banman participated in Skye's management and exercised discretionary authority. JMOL at 19. Banman points to the fact that Skye's LLC operating agreement expressly limits management authority to its sole member, Skye Biologics Holdings. *Id.* Again, the Court does not find the express terms of the operating agreement dispositive, as Plaintiffs provided evidence from which a reasonable jury could find that Banman did in fact exercise control over the company. Specifically, Plaintiffs provided evidence that Banman was a Senior Vice President of Business Development, that he was the "number two person in the company" who managed over 150 sales distributors, and that he had "discretionary management authority" in a number of areas of the business. ECF No. 551-5 at 50:6-16, 52:20-22, 67:13-16; *see Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 602 (Del. Ch. 2010) (finding that a defendant who "held the position of Executive Vice President and was second in command . . . both an officer and one of the key managerial personnel of [the company] and, therefore owed that company fiduciary duties").

Banman also emphasizes that his employment agreement with Skye states that he agreed to "commit to offering the level [of] service and dedication" as he had when he was a consultant. ECF No. 540-9. Banman argues that when he was an independent business development consultant, he was not exercising management authority. However, the language in the employment agreement, which counsel for Banman described as "very bare bones," can be interpreted otherwise—the "level [of] service and dedication" could be interpreted as the amount of effort and quality of the work expected, as opposed to meaning that Banman was to perform the same tasks as he did before. ECF No. 605 at 7:5-6. And, rather than relying on the terms of this "bare bones" employment agreement, the jury was justified in relying on the evidence it heard with regards to the work Banman actually did as Skye's employee and the role he played in the business overall—including managing and

1    supervising others, leading sales and business development for the company as a whole, and

2    overseeing projects.[12]

3         Banman cites *GAB* to argue that a nominal officer with no management authority is not a

4    fiduciary, which lends support to the inverse here—even if Banman did not have a formal officer

5    title, he could owe fiduciary duties because he did participate in the management of the company.

6    JMOL at 19; *see GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App. 4th

7    409, 420–21 (2000) (concluding that "an officer who participates in management of the corporation,

8    exercising some discretionary authority, is a fiduciary of the corporation as a matter of law").[13] As

9    the California Court of Appeal explained in *Huong Que*, "[t]he duty of loyalty arises not from a

10    contract but from a relationship—here, the relationship of principal and agent." *Huong Que, Inc. v.*

11    *Luu*, 150 Cal. App. 4th 400, 410–11 (2007). "Where such a relationship arises, the agent 'assumes a

12    fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency

13    relationship.'" *Id.* at 411. Banman cites no authority providing a requirement that a defendant have

14    any specific title with a company as a prerequisite to owing fiduciary duties. Rather, whatever the

15    formal title of an individual, he owes fiduciary duties if the scope of his duties makes it so. *See, e.g.,*

16    *Cal. Physicians' Service v. Johnson*, 2019 WL 1578359, *9 (Cal. App. Apr. 12, 2019) (noting that

17    while "a bare employee-employer relationship does not ordinarily create a fiduciary duty, employees

18    do owe a fiduciary duty when they accept a position of trust and confidence with their employer")

19    (internal citations omitted).

20

21

---

22    [12] Banman also refers to a list of specific things that he did not do or have authority to do—check-writing authority, access to bank accounts and tax returns, access to operating documents, serving on the board, or

23    signing contracts. JMOL at 19–20. However, he cites no law stating that a lack of these things precludes a

24    finding that an individual has managerial authority or can owe a fiduciary duty.

     [13] The Court finds the cases relied on by Banman distinguishable from the facts at hand. *See Officia Imaging,*

25    *Inc. v. Langridge*, 2018 WL 6137183, at *11 (C.D. Cal. Aug. 7, 2018) (merely alleging that the defendant was a "'Sales Account Manager' 'whose primary duty was to generate business'" is not sufficient to plead that he

26    owed a fiduciary duty); *Agfa Corp. v. Richard*, 2018 WL 3078585, at *3 (C.D. Cal. June 1, 2018) (finding that a defendant's position as a "regional account manager" did not "suggest the type of discretionary

27    management authority typically necessary to establish a fiduciary relationship"). Here, there is evidence from which a jury could draw facts that Banman, as someone in a fairly senior Vice President role, had discretion

28    in managing the company as a whole.

1    The Court finds that there was sufficient evidence from which the jury could draw a

2    reasonable finding that Banman had management or discretionary authority over the company such

3    that he owed fiduciary duties, including duties to act in Skye's best interest and not to compete with

4    it. *GAB*, 83 Cal. App. 4th at 421 (noting that "[w]hether a particular officer participates in

5    management is a question of fact" and expecting "that in most cases, this test will be easily met").

6    Accordingly, Banman is not entitled to judgment as a matter of law on this issue.

7                ii.   The breach of duty claims are not preempted by trade secret law.

8    Banman also argues that non-contractual civil claims are preempted by trade secret law,

9    citing *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.* 171 Cal. App. 4th 939 (2009).

10   The California Uniform Trade Secrets Act ("CUTSA") includes a preemption provision, which

11   "implicitly prevents alternative civil remedies based on trade secret misappropriation." *Id.* at 954.

12   "As reflected in case law decided under the California statute, the determination of whether a claim

13   is based on trade secret misappropriation is largely factual." *Id.* This preemption does not apply to

14   contract claims or "noncontract claims that, although related to a trade secret misappropriation, are

15   independent and based on facts distinct from the facts that support the misappropriation claim."

16   *Angelica Textile Servs., Inc. v. Park*, 220 Cal. App. 4th 495, 506 (2013).

17   In *Angelica*, the California Court of Appeals held that a breach of fiduciary duty claim was

18   not preempted by a trade secret claim, because they were "based on [the defendant's] conduct in

19   violating the noncompetition agreement and violating his duty of loyalty." *Id.* at 508 (finding that

20   this theory of liability "was independent of any trade secret claim" and therefore not preempted).

21   Citing *Angelica*, the Ninth Circuit reversed a lower court's decision finding that a breach of fiduciary

22   claim was preempted by CUTSA. *Integral Dev. Corp. v. Tolat*, 675 Fed. Appx. 700, 704 (9th Cir.

23   2017) ("If a breach of fiduciary duty is not 'based on the same nucleus of facts as [the] trade secret

24   misappropriation,' CUTSA will not preempt the claim."). The Ninth Circuit specifically noted that a

25   breach of fiduciary claim based on a breach of confidence "does not require that the confidential

26   information qualify as a 'trade secret' and, therefore, has an independent basis and was not

27   preempted. *Id.* Although Banman cites to non-binding authority prior to the Ninth Circuit's decision

28

1    in *Tolat*, the Court finds this case, which Banman fails to address, persuasive. JMOL Reply at 12.[14]

2    While facts related to the disclosure of confidential information are part of the breach of duty claims,

3    there are also distinct allegations to those claims. *See* Fourth Amended Complaint ¶¶ 250–267

4    (alleging that Banman had a duty to "act with the utmost good faith in the best interests of SKYE,

5    not to compete with SKYE, to protect its interests, and refrain from doing anything that would injure

6    SKYE or deprive it of profit or advantage"). For example, a jury could simply have found that

7    Banman acted against Skye's best interests because he started a competing company while he owed

8    duties to Skye. Here, the thrust of Skye's claims is Banman's breach of certain duties owed to it—

9    and these claims survive regardless (and despite the failure) of its trade secret misappropriation

10    claims—so there is an independent basis for these claims.

11           Accordingly, the Court does not find preemption a basis to grant judgment as a matter of law.

12        **D.**    **The Damages are Supported by the Evidence**

13           Banman argues that Plaintiffs did not present sufficient evidence of damages, taking issue

14    specifically with the opinion of Plaintiffs' expert, Henry Kahrs. JMOL at 22.[15] Banman states that

15    Khars did not apply "expert methodology" and complains that his opinions consisted of "basic

16    arithmetic." JMOL at 23. However, the Court finds that "basic arithmetic" can be a proper way to

17    calculate damages. *Id*. Banman also argues that Khars's opinions were based on the assumption "that

18    CTM could not exist at all without misappropriating confidential information." *Id.* But, such an

19    assumption could reasonably have been drawn from the evidence presented at trial—namely, that

20    Banman would not have been successful at starting his own company without breaching his legal

21

22    _____

23    [14] The Court finds the cases cited by Banman that did not specifically deal with breach of duty claims
      inapposite. *See Artec Grp., Inc. v. Klimov*, 2016 WL 8223346, at *6 (N.D. Cal. Dec. 22, 2016) (finding
24    preemption on claims for unjust enrichment, civil conspiracy, constructive trust, and unfair competition);
      *Total Recall Tech. v. Luckey*, 2016 WL 199796, at *6 (N.D. Cal. Jan. 16, 2016) (discussing preemption in the
25    context of claims for conversion, constructive fraud, unfair competition law). Moreover, to the extent that
      cases did deal with breach of duty claims, the Court finds that *Tolat* more persuasive with respect to these
26    claims. *See Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911, 988 (C.D. Cal. Jan. 5, 2011).

27    [15] Banman previously brought a motion in limine to exclude Khars's testimony, which the Court denied. ECF
      No. 428 at 17 (holding that Khars has appropriate credentials and that Defendants' arguments "go towards
28    factual disagreement, bias, and weight, but not his actual qualifications or an absence of the basis for his
      opinions").

obligations to Plaintiffs. ECF No. 540-26, 61:7-16 (opining that CTM would not be a "viable business" if they had not been working on a flowable product, because "[i]f all they were doing is selling membranes, they would be doing a million dollars a year, and they wouldn't be able to make it over time"). This is further supported by his opinion that not just anyone could just get a business up and running—while CTM may have existed prior to selling its own products, it would be permissible for Kahrs to opine that it may not have been successful on the scale that it was after it sold the products at issue. ECF No. 535 at 29:3-31:5. Therefore, damages could reasonably be calculated by simply encompassing CTM's total income and applying Skye's profit margin. Moreover, the Court does not find that it was improper to assume a "two-player market" of only CTM and Skye,[16] as there was evidence from which a jury could find that that they were the only competitors in the product for a unique flowable product. ECF No. 551-10 at 31:18-32:4 (opining that Skye and CTM are "outpacing their competition in terms of growth and margin, which indicates [] they're selling something that is different and unique").[17]

Banman also notes that Kahrs did not limit his damages to Skye's breach of duty claims, which he argues should have only been tied to conduct during the period of Banman's employment of April 18, 2018 to July 2, 2018. JMOL at 23. While the Court has previously decided that the claim can only be tied to *conduct* from this time period (ECF No. 455 at 3), Banman provides no reasoning as to why *damages* stemming from the conduct should be so limited temporally. The jury

---

[16] At the hearing, counsel for Banman argued against this assumption by stating that HRT's product "is sold to Stryker, and Stryker sells it," arguing that this is evidence there are at least three companies in the market selling HRT's unique product. ECF No. 605 at 21:15-20. But, a company that HRT sells to would logically seem to be part of HRT's market for purposes of Kahr's analysis here, and regardless was accounted for by him. ECF No. 535 at 58:3-59:1.

[17] Although not explicitly argued in his moving papers, Banman appears to take issue with Khars's lack of apportionment of the damages as to different confidential information and different claims, citing *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1076 (N.D. Cal. 2005). JMOL at 22; JMOL Reply at 10. But, as the Court previously ruled, apportionment is not required. *See SPS Techs., LLC v. Briles Aerospace, Inc.*, 2021 WL 4913509, at *3 (C.D. Cal. Sept. 8, 2021) (noting that "California authority does not require an apportionment of damages"). And, in this case specifically, given that a jury could find that CTM would not successfully exist without Banman's misconduct, such apportionment is unnecessary. *Id.* (noting that *O2 Micro* does not apply where "there is no damages claim for the value of the trade secrets themselves"). Accordingly, the discussion in the concurrence in *BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 20 F.4th 1231 (9th Cir. 2021) is also inapposite, as it dealt with the value of a specific trade secret.

found that Banman breached his fiduciary duties and the duty of loyalty. Banman cites no authority for the propostion that the damages sustained—which may not necessarily be the same as when the conduct occurred—should be temporally limited. It is a reasonable inference that the conduct of creating a competing company causes damages that can be ongoing, throughout the competing company's existence. Accordingly, the Court finds the damages properly supported.

### RULE 59 MOTION (MOTION FOR NEW TRIAL) [ECF NO. 544]

## I.  Applicable Law

"The court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). Rule 59 does not specify the grounds upon which a new trial may be granted, but the Ninth Circuit recognizes that courts are bound by historically recognized grounds. For example, a new trial may be granted "if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)). Courts "enjoy[] considerable discretion" in deciding a new trial motion. *Jorgensen v. Cassiday*, 320 F.3d 906, 918 (9th Cir. 2003) (internal quotation marks omitted).

"[A] jury's award of damages is entitled to great deference, and should be upheld unless the amount is clearly not supported by the evidence or only based on speculation or guesswork." *In re First All. Mortg. Co.*, 471 F.3d 977, 1001 (9th Cir. 2006) (internal quotation marks omitted); accord *Chalmers v. City of Los Angeles*, 762 F.2d 753, 760 (9th Cir. 1985) (requiring jury's award to be upheld unless "grossly excessive or monstrous or shocking to the conscience" (internal quotation marks omitted)). Awards must be upheld "whenever possible, and all presumptions are in favor of the judgment." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1224 (9th Cir. 2010) (internal quotation marks omitted).

For punitive damages specifically, a plaintiff seeking a punitive damages award bears the burden of proving a defendant's financial condition. *Adams v. Murakami*, 813 P.2d 1348, 1358 (1991). This is because evidence of the defendant's financial condition is crucial to the jury—and a reviewing court—in determining "whether the amount of the award is appropriate and, in particular,

1    whether it is excessive in light of the central goal of deterrence." *Id*. As the California Supreme

2    Court has held, "[f]undamental fairness must be the lodestar for our analysis. . . These bedrock

3    concerns—policy and fairness—support placing the burden on a plaintiff to prove a defendant's

4    financial condition." *Id.* at 1357; *see also* Kaffaga 938 F.3d 1006, 1018 (9th Cir. 2019) ("It is the

5    plaintiff's burden to place into the record 'meaningful evidence of the defendant's financial

6    condition to support a defendant's ability to pay.'" (citing *Adams*)). And, the defendant's financial

7    condition means net figures, not gross, so the plaintiff must present evidence of assets, income,

8    liabilities, and expenses for a punitive damages award to survive. *Id.* at 1018.

9        Once that evidence has been presented, "there are no rigid benchmarks that a punitive

10    damages award may not surpass," but the award "must be based upon the facts and circumstances of

11    the defendant's conduct at the harm to the plaintiff." *State Farm Mut. Auto. Ins. Co. v. Campbell*,

12    538 U.S. 408, 425 (2003). To determine whether punitive damages are excessive, courts consider

13    three guideposts: "(1) the degree of reprehensibility, (2) the disparity between the harm suffered and

14    the punitive damages award, and (3) the difference between this remedy and the civil penalties

15    authorized or imposed in comparable cases." *Bains LLC v. ARCO Prods. Co.*, 405 F.3d 764, 775

16    (9th Cir. 2005) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996)). The first

17    guidepost is "[p]erhaps the most important." *Gore*, 517 U.S. at 575.

18    **II.  Discussion**

19        Banman also moves under Rule 59 for a new trial, to strike or limit damages, or for

20    remittitur, arguing that (1) there were prejudicial legal errors; (2) the verdict is unsupported by the

21    evidence; (3) the actual damages are unsupported, excessive, and contrary to the evidence; (4) and

22    the punitive damages are excessive and in violation of state law. For the reasons discussed below,

23    the Court finds that there were no prejudicial legal errors, the verdict is supported by the evidence,

24    and the actual damages are supported. However, the Court finds that the punitive damages are not

25    supported. Accordingly, the Court vacates the award for punitive damages as to Counts 10 and 11.

26    **A.    No Legal Errors Justify the Granting of a New Trial**

27        i.    Plaintiffs' expert testimony was properly admitted.

28

1    Banman first challenges the admissibility of testimony from Plaintiffs' experts, Daniel Cisco

2  and Henry Khars. As to Cislo, Banman challenges his qualifications through similar arguments

3  raised in a prior motion in limine. ECF No. 338. The Court previously limited Cislo's testimony "as

4  to noninfringement or invalidity, as he is not qualified to so testify," but specifically permitted

5  testimony to distinguish the patents at issue in this case. ECF No. 428 at 22. This is what Cislo did at

6  trial. Banman takes issue with Cislo's testimony that he did not "find in any one patent the critical

7  features that are found in some of the Plaintiffs' provisional patents and [he] did not find critical

8  methodology that is described in some of their standard operating procedures." ECF No. 544-24 at

9  156:14-20. While Cislo may not have the qualification to independently determine what the "critical

10  features" or "methodology" were, a reasonable interpretation is that Cislo was using the word

11  "critical" to mean the features and methodology that he has been instructed are at issue in this case.

12  ECF No. 554-2 at 155:1-8 (testifying that his work is to "understand from [] the perspective [of a

13  person skilled in the art] what is important and what processes are important" and that he works with

14  clients who are "skilled in the art to figure out what is—what are the critical features").[18] Having

15  been told what the critical features are of HRT's manufacturing process, Cislo was properly

16  qualified to testify as to whether those features were apparent in other patents.

17    Banman presents a hypothetical situation where HRT's process was disclosed on a webpage.

18  MNT Reply at 2. Banman asserts that in such a scenario, Plaintiffs could not rely on a webpage

19  designer to testify as to whether the webpage disclosed the process, and "would need to" rely on an

20  expert in the relevant art. *Id.* However, the Court does not find that to be the case. If such disclosure

21  was obvious, no expert would be needed at all. A more apt hypothetical would be if HRT's process

22  was disclosed in code on the website—then, it would be undoubtedly appropriate for Plaintiffs to

23  have a webpage designer interpret and translate the code to testify as to whether the processes they

24  have been told to look for exist within that code. The Court finds this to be in the ambit of what

25

26

27  ─────────────────

28  [18] *See* ECF No. 309-1 at 6–7 (stating in his expert report that Cislo talked to Plaintiffs' biologics expert, John Lee, to understand which processes and procedures were at issue in the case).

1    Cislo did, albeit in the context of patents.[19] Therefore, the Court finds Cislo's testimony

2    permissible.[20]

3           Banman makes the same arguments as to the testimony of Khars as in his Rule 50 Motion.

4    For the reasons discussed in its prior analysis, the Court does not find that Khars's testimony was

5    unreliable. *See* JMOL Order Section II.D, *supra*.

6                  ii.    Jury Instruction 48 was not wrong as a matter of law.

7           As discussed with Banman's Rule 50 motion, the Court finds that Jury Instruction 48,

8    instructing that "[a]ny person who performs functions usually performed by an officer of a limited

9    liability company is considered an officer of the limited liability company," was not a misstatement

10   of the law. *See* JMOL Order Section II.C.i, *supra*. While it may have been clearer to define fiduciary

11   duties as owed by one who exercises discretionary authority over the management of the company,

12   regardless of the formal title of officer, the Court finds that this instruction would not lead the jury to

13   a finding contrary to the law. *See Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (explaining

14   that reversal is not warranted where the error in the jury instruction is harmless).[21] Here, taken

15   together with the remainder of Instruction 48, the contested part of the instruction is not wrong. The

16   instruction defines an officer as one who "participates in the management of a company and

17

18   [19] At the hearing, counsel for Banman argued that the patents were in "English prose," which do not require
19   translation. ECF No. 605 at 17:8-9. On direct, Cislo testified specifically as to one patent (ECF No. 544-16)
     which Banman puts at issue (MNT at 6) and explained why he did not believe it to disclose Plaintiffs'
20   confidential processing and formulas. *See* ECF No. 535 at 12:9-16. Banman could have cross-examined Cislo
     on his reasoning using the plain language of the patent, and attempted to use such testimony to demonstrate
21   why Cislo's testimony was beyond the scope of his expertise (rather, Cislo was cross-examined on another
     patent and supported his interpretation with the plain language reading of that patent). *See* ECF No. 536 at
22   11:5-12:4. However, as there was no such cross-examination, Banman has failed to identify any specific
     testimony about the patents beyond Cislo's general opinion that is impermissible.

23   [20] Even if Cisco's testimony was improperly admitted, the Court finds that it would not have been prejudicial.
24   *See Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) ("A new trial is only warranted
     when an erroneous evidentiary ruling 'substantially prejudiced' a party."). As explained in the Court's
25   discussion on the Rule 50 Motion, the existence of some parts of the process in a public patent would not
     necessarily preclude it from being confidential information. *See* JMOL Order Section II.A.i, *supra*.

26   [21] Although not contested by Banman, the Court finds that Instructions No. 49 and 50, which include a
27   requirement that Plaintiffs prove that Banman is an officer as an element of the breach of fiduciary duty and
     breach of loyalty claims, may therefore be in error. ECF No. 508 at 57–58. However, any errors are not
28   prejudicial—as the jury found all the other required elements of these claims, the negation of an additional
     element would not change the outcome.

exercises discretionary authority," and that an officer owes fiduciary duties. ECF No. 508 at 56. Therefore, the contested line implies that any person who participates in management and exercises discretionary authority owes fiduciary duties, which the Court finds to be the correct interpretation of the law. While Banman focuses on whether he could be found an officer without some sort of formal appointment, regardless of this title, he could be found to owe fiduciary duties if he participated in management and exercised discretionary authority under applicable law. *See Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (1980) (explaining that an agent "can make arrangements or plans to go into competition with his principal . . . provided no unfair acts are committed or injury done his principal" and that these principles "apply not only to officers and directors but also to key managerial personnel"); *GAB Business Services v. Lindsey & Newsom Claim Services*, 83 Cal. App. 4th 409, 420 (2004) (explaining that "something more than bare title" is required to determine fiduciary status). As any error in the instruction is harmless, the Court does not find this warrants a new trial.

### B.    The Verdict is Supported by the Evidence

Banman argues that the liability verdict was against the clear weight of the evidence, relying on the arguments made in his Rule 50 motion. The Court addresses only the new arguments made as to the Rule 59 motion, which solely concern the breach of the HRT contract (Count 4).

As to breach of the HRT contract, Banman relies on the testimony of his expert, Dr. Rouzbeh Taghizadeh, to bolster his argument that HRT's manufacturing process was commonly known and was not used by Banman because Alamo's manufacturing process was different than HRT's. MNT at 12. However, the Court does not find Dr. Taghizdeh's testimony to move the needle on these arguments. At most, Dr. Taghizdeh confirmed that the basic manufacturing steps may be available publically, but not the specific steps alleged to be confidential in this case to make the specific product at issue. ECF No. 536 at 30:4-6, 33:5-7, 39:24-40:4. Further, despite any differences in Alamo and HRT's processes, the evidence plainly shows that Banman specifically instructed Alamo to replicate key parts of HRT's processes, including the ███████████████████████████ ████████████. ECF No. 553-3 at 31:22-32:2, 32:17-21.

Accordingly, the Court finds that the verdict as to Count 4 is not against the weight of the evidence. As Banman makes no new arguments as to the remaining counts, the Court cites its analysis as to the Rule 50 motion and makes no new findings here.

### C.     The Actual Damages Award is Not Inconsistent

In arguing that the damages are unsupported, Banman again takes issue with a lack of apportionment by Khars. MNT at 15. As previously explained, the Court does not find this to lead to an unsupported damages award. Banman also argues that it cannot be determined where the jury got the figure of $7,298,949 from, which is the same damages the jury gave to every claim. However, "the fact that the damages award does not precisely correspond to any method of calculation proposed by either party is not a significant cause for concern." *Cardinal v. Lupo*, 2020 WL 1694355, at *3 (N.D. Cal. Apr. 7, 2020). Rather, "while the *fact* of damages must be clearly shown, the *amount* need not be proved with the same degree of certainty," so long as a "reasonable approximation" is made. *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1443 (9th Cir. 1990). Therefore, the Court analyzes whether the damages awarded by the jury finds any support in the evidence presented by the parties.

Plaintiffs primarily rely on the projections prepared by Khars that was not admitted into evidence, but was shown to the jury as a demonstrative, to support the amount of the award. ECF No. 535 at 36:22-37:6; ECF No. 554-9 ("Lost Profit Chart"). Khars testified that the "total past loss for Skye is $30,816,474," and $4,102,291 for HRT. ECF No. 535 at 37:13-18. In getting to this number, he explained that he took the actual revenue for CTM, multiplied by Skye's net margin, which is "roughly 57 percent." *Id.* 38:1-8. For future profits, Khars "projected CTM's revenue into the future," settling on an increase of 30%, then 20%, 15%, and 10%, then after eight years, only having increases calculated by inflation. *Id.* at 39:6-40:3. While Banman argues that the Lost Proft Chart is not admitted evidence, Banman does not object to the underlying financial information from CTM, Skye, or HRT that Khars relies on in calculating these numbers. Therefore, a jury could rely on the projections set forth in the Lost Profits Chart, if the rationale for his calculations is supported.

Here, the Court finds that the compensatory damages awarded find some grounding in Khars's calculations. As to HRT, the jury awarded $7,298,949 only for its sole breach of contract

claim. Khars calculated HRT's past lost profits to be $4,102,291—Banman argues that this clearly signifies an excessive award because the award is almost twice this calculation. MNT at 15. However, Banman fails to explain why lost profits should be limited, as a matter of law, to past lost profits. Rather, considering the total past and future lost profits calculated by Khars to be $16,617,202 to HRT, the jury's award of $7,298,949 is not excessive. Lost Profit Chart. Khars calculated Skye's past losses to be $30,816,474 alone, and the cumulative amount awarded to Skye for compensatory damages—$29,195,796—is less than this, also not signifying an excessive award. *Id.* Again, Banman has not justified a strict temporal limitation on the damages stemming from conduct that occurred within his employment period.

The Court next turns to the question of whether the jury failed to separately determine damages for each claim as required. Banman confidently asserts that it did, but without any support. As a preliminary matter, Banman cannot rely on the structure of the verdict form itself in support of this contention since Banman requested this verdict form and so any alleged failure to require a separate damages determination would be invited error. Next, the simple fact that neither the parties nor the Court can reverse-engineer the number also does not demonstrate that the jury failed to separately determine damages or that there was no support for its verdict—particularly since, as noted above, the number is less than the past lost profits alone calculated by Khars for Plaintiffs ($34 million). Lost Profit Chart. But most importantly, the fact that the jury assigned identical numbers to different claims does not demonstrate that the jury failed to separately determine damages. First, we presume that the jury follows the Court's instructions, *CSX Transp., Inc. v. Hensley,* 556 U.S. 838, 841 (2009), and the Court's instructions were very clear on this—"To decide the amount of damages for lost profits, you must determine the gross, or total, amount HRT and/or Skye would have received if the contract had been performed . . ." ECF No. 508 at 51. And second, to aggregate and divide would not be contrary to the jury instructions or to governing law. For example, in torts cases, where there are multiple defendants at fault, "the sums representing the damages are added together, and the amount is equally divided between the parties." *The Atlas*, 93 U.S. 302, 313 (1876).

As the Court has already dismissed Count 5 as to the Skye Employee Confidentiality Agreement contract, one duplication that Banman contests is a non-issue at this stage. Banman also

1  argues that the two breach of duty awards are duplicative of the damages stemming from the

2  remaining breach of the Skye Employment Agreement contract under Count 5. MNT at 18.

3  However, presuming that the jury properly followed the Court's instructions and that aggregating

4  damages is not improper, there is no evidence that the jury duplicated any award. For example, it

5  seems reasonable for the jury to come to a total award and divide it evenly among the claims. This

6  may even have been the most logical way to calculate the damages—assuming that Skye suffered

7  the same harm across all of Skye's claims, the jury may not have been able to determine how much

8  of the harm was attributable to each claim and therefore divided it evenly. This would not be the

9  same as finding a total $7,298,949 of damages and then duplicating it across each claim, and given

10  the lack of evidence that the jury did this, the Court must give deference to the jury's award.[22]

11  Accordingly, the Court finds that the jury's actual damages award supported by the evidence.

12      **D.    The Punitive Damages are Insufficiently Supported by Evidence of Banman's**

13  **Financial Condition**

14          The Court finds that there was insufficient evidence of Banman's financial condition—either

15  his net worth or his ability to pay—to support a punitive damages award. *See Kaffaga v. Estate of*

16  *Steinbeck*, 938 F.3d 1006, 1018 (9th Cir. 2019) ("The record [] must contain sufficient evidence of [a

17  defendant's] assets, income, and liabilities and expenses for the punitive damages award to stand.");

18  *Adams v. Murakami*, 813 P.2d 1348, 1350 (1991) (noting that "absent financial evidence, a jury will

19  be encouraged (indeed, required) to speculate as to a defendant's net worth in seeking to return a

20  verdict that will appropriately punish the defendant"). In *Kaffaga*, the Ninth Circuit vacated a

21  punitive award noting that while there was "some evidence" of the defendant's financial condition,

22  it was "unable to come to even a reasonable approximation" of the defendant's net worth. *Kaffaga*,

23  938 F.3d at 1019. Even assuming Skye is correct that a *net worth* calculation is not required, even an

24  *ability to pay* determination would necessarily require some consideration of Banman's liabilities.

25

26  _____

27  [22] Although the granting of $7,298,949 on all the claims, both as to Skye or HRT, may at first seem like evidence of improper duplication, it finds support in the evidence when aggregated. The jury awarded HRT

28  $7,298,949 only, while it awarded Skye $7,298,949 across multiple claims, totaling over $29 million, which is consistent with the disparity in the lost profits to each entity as calculated by Khars.

But Plaintiffs appear to concede that there was no evidence, or attempt to introduce evidence of, Banman's liabilities, instead arguing that such evidence is not required. MNT Opp. at 24.[23]

Although Skye points to Banman's admittedly evasive (or at least puzzling) answers with respect to his personal income, the fact remains that he was not asked about his liabilities even though it appears that it was a topic of discovery. ECF No. 567-1 (deposition testimony discussing Banman's financial condition, including a $1.3 million mortgage). Skye cites *Green v. Laibco, LLC*, where the court found that evidence of the defendant's net worth was lacking but still sufficient for an assessment of defendant's financial condition, because the evidence shown was of profit (not just income), and there was testimony that the defendant was "in the black" (that its assets were greater than its liabilities). 192 Cal. App. 4th 441, 453 (2011). Moreover, to the extent there was any lack of evidence of net worth, the court in *Green* found that it was because the defendant stonewalled in discovery. *Id.* at 452. Here, because there was apparently compliance with discovery on liabilities, Banman's evasive answers do not constitute the type of "stonewalling" that would permit the Court to uphold a punitive damages award regardless of its relationship to net worth or ability to pay.

Having presented no such evidence, the Court has no basis upon which to determine that the jury's punitive damages award is justified by its relationship to Banman's financial condition. Accordingly, the Court finds that there was insufficient evidence of Banman's financial condition presented to sustain the punitive damages award.[24] Nevertheless, for the first time at the hearing, counsel for Skye raised the argument of what remedy is proper under a Rule 59 motion. In particular, Skye argued that this Court does not have the power to vacate punitive damages, but may only grant a new trial or remittitur. Accordingly, the Court will allow the parties to further brief the

---

[23] Plaintiffs cite to *Rufo v. Simpson* for the proposition that all that is required is evidence of a defendant's ability to pay. 86 Cal. App. 4th 573, 621 (2001). But, a defendant's ability to pay necessarily requires a showing of his liabilities, which *Rufo* supports. *Id.* (citing *Kenly v. Ukegawa*, 16 Cal. App. 4th 49, 57 (1993) ("some evidence regarding liabilities must be offered") and *Robert L. Cloud & Assocs., Inc. v. Mikesell*, 69 Cal. App. 4th 1141, 1152 (1999) ("income standing alone or wrongful profit standing alone is not meaningful evidence")); *see also Kafaga*, 938 F.3d at 1018 ("The rule established by lower California courts is that only net, not gross, figures are relevant.").

[24] The Court therefore does not reach the analysis of whether the amount of punitive damages meets the guideposts set forth in *Bains LLC v. ARCO Prods. Co.*, 405 F.3d 764, 775 (9th Cir. 2005) or is constitutionally excessive under the Due Process Clause of the Fourteenth Amendment.

issue of what remedy is proper given the Court's finding on the insufficiency of evidence on the punitive damages award.

### CONCLUSION

For the foregoing reasons, the Court hereby ORDERS as follows:

1. Defendant's Rule 50 Motion for Judgment as a Matter of Law (ECF No. 540) is GRANTED IN PART;

   a. Skye's breach of contract claim (Count 5) as to the Skye Orthobiologics LLC Employee Confidentiality Agreement only is DISMISSED;

2. Defendant's Rule 59 Motion for a New Trial (ECF No. 544) is GRANTED IN PART:

   a. The parties are ORDERED to further brief the issue of what remedy is appropriate with regards to the punitive damages award;

   b. A response from Skye will be due no later than May 3, 2024;

   c. A response from Banman will be due no later than May 10, 2024;

   d. Any reply from Skye will be due no later than May 17, 2024.

IT IS SO ORDERED.

Dated: April 17, 2024          _____

MAAME EWUSI-MENSAH FRIMPONG

United States District Judge